**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HONORABLE DONALD C. POGUE, SENIOR JUDGE**

| | |
|---|---|
| SUNPOWER CORP., | ) |
| Plaintiff, | ) |
| and | ) |
| CANADIAN SOLAR INC., *et. al.,* | ) |
| Plaintiff-Intervenors, | ) Consol. Court No. 15-00067 |
| v. | ) |
| THE UNITED STATES, | ) |
| Defendant, | ) |
| and | ) |
| SOLARWORLD AMERICAS, INC., | ) |
| Defendant-Intervenor. | ) |

**ORDER**

Upon consideration of the Motion for Judgment on the Agency Record on behalf of

Consolidated Plaintiffs Canadian Solar Inc., Changzhou Trina Solar Energy Co., Ltd., China

Sunergy (Nanjing) Co., Ltd., Chint Solar (Zhejiang) Co., Ltd., ET Solar Industry Ltd., Hefei JA

Solar Technology Co., Ltd., Jinko Solar Co., Ltd., LDK Solar Hi-Tech (Nanchang) Co., Ltd.,

Perlight Solar Co., Ltd., ReneSola Jiangsu Ltd., Shanghai JA Solar Technology Co., Ltd.,

Shenzhen Sacred Industry Co., Ltd., Shenzhen Sungold Solar Co., Ltd., Sumec Hardware &

Tools Co., Ltd., Sunny Apex Development Ltd., Wuhan FYY Technology Co., Ltd., Wuxi

Suntech Power Co., Ltd., Zhongli Talesun Solar Co., Ltd., Znshine PV-Tech Co., Ltd., as well as

Consolidated Plaintiffs Shanghai BYD Co., Ltd. and BYD (Shangluo) Industrial Co., Ltd.,

collectively "Consolidated Plaintiffs," the brief in support thereof, and all papers and

proceedings herein, it is hereby:

**ORDERED** that Consolidated Plaintiffs' Motion for Judgment on the Agency Record is GRANTED; and it is further

**ORDERED** that the scope of the final antidumping and countervailing duty determinations on <u>Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China</u> and the resulting antidumping and countervailing duty orders based on these determinations, published as <u>Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China</u>, 80 Fed. Reg. 8592 (Dep't Commerce Feb. 18, 2015) (amended final CVD determ. and AD/CVD orders) is unlawful; and it is further

**ORDERED**, that this matter is remanded to the U.S. Department of Commerce, with instructions for the agency to revoke the antidumping and countervailing duty orders in <u>Crystalline Silicon Photovoltaic Products From the People's Republic of China.</u>

**SO ORDERED**.

_____
The Hon. Donald C. Pogue, Senior Judge

Dated: _____, 2015
       New York, NY

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HONORABLE DONALD C. POGUE, SENIOR JUDGE**

| | |
|---|---|
| SUNPOWER CORP., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| and | ) |
| | ) |
| CANADIAN SOLAR INC., *et. al.,* | ) |
| | ) Consol. Court No. 15-00067 |
| Plaintiff-Intervenors, | ) |
| v. | ) |
| | ) |
| THE UNITED STATES, | ) |
| | ) |
| Defendant, | ) |
| and | ) |
| | ) |
| SOLARWORLD AMERICAS, INC., | ) |
| | ) |
| Defendant-Intervenor. | ) |
| | ) |

**CONSOLIDATED PLAINTIFFS' JOINT RULE 56.2**
**MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Pursuant to USCIT Rule 56.2 we submit this Motion for Judgment on the Agency Record

on behalf of Plaintiffs Canadian Solar Inc., Changzhou Trina Solar Energy Co., Ltd., China

Sunergy (Nanjing) Co., Ltd., Chint Solar (Zhejiang) Co., Ltd., ET Solar Industry Ltd., Hefei JA

Solar Technology Co., Ltd., Jinko Solar Co., Ltd., LDK Solar Hi-Tech (Nanchang) Co., Ltd.,

Perlight Solar Co., Ltd., ReneSola Jiangsu Ltd., Shanghai JA Solar Technology Co., Ltd.,

Shenzhen Sacred Industry Co., Ltd., Shenzhen Sungold Solar Co., Ltd., Sumec Hardware &

Tools Co., Ltd., Sunny Apex Development Ltd., Wuhan FYY Technology Co., Ltd., Wuxi

Suntech Power Co., Ltd., Zhongli Talesun Solar Co., Ltd., Znshine PV-Tech Co., Ltd., as well as

Consolidated-Plaintiffs Shanghai BYD Co., Ltd. and BYD (Shangluo) Industrial Co., Ltd.,

collectively "Consolidated Plaintiffs."  Consolidated Plaintiffs respectfully move this Court for an Order grating their Motion for Judgment on the Agency Record.

This motion challenges the final determinations of the U.S. Department of Commerce ("Commerce") in the antidumping and countervailing investigations in <u>Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China</u> and the resulting antidumping and countervailing duty orders based on these determinations.  See <u>Crystalline Silicon Photovoltaic Products From the People's Republic of China</u>, 79 Fed. Reg. 76970 (Dep't Commerce Dec. 23, 2014) (final LTFV determ.); <u>Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China</u>, 79 Fed. Reg. 76962 (Dep't Commerce Dec. 23, 2014) (final CVD determ.); <u>Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China</u>, 80 Fed. Reg. 8592 (Dep't Commerce Feb. 18, 2015) (amended final CVD determ. and AD/CVD orders) ("<u>Solar II orders</u>").

Commerce's final determinations are reviewable under  Sections 516A(a)(2)(A)(i)(II) and 516A(a)(2)(B)(i) of the Tariff Act of 1930, 19 U.S.C. §§ 1516a(a)(2)(A)(i)(II) and 1516a(a)(2)(B)(i).  This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1581(c).

For the reasons more fully set forth in the accompanying brief, which is incorporated into this motion by reference, Commerce's final antidumping and countervailing determinations and its resulting orders in <u>Solar II</u> are unsupported by substantial evidence on the record, are arbitrary and capricious, and are otherwise not in accordance with law.  Specifically, Commerce's determination to significantly expand the scope of the <u>Solar II</u> investigations and resulting orders to include solar modules assembled in China containing third country cells is unlawful and unsupported by substantial evidence.  In its 2012 antidumping and countervailing orders on <u>Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the</u>

People's Republic of China[1] ("Solar I"), Commerce closely examined the country of origin of solar modules through its long-standing and judicially-endorsed substantial transformation test finding that module assembly does not substantially alter the essential nature of the solar cells nor does it constitute significant processing such that it changes the country of origin of the cell. Commerce, therefore, concluded in Solar I that where solar cell production occurs in a different country from solar module assembly, the country of origin of the solar modules is the country in which the solar cell was produced.

In Solar II, contrary to law and agency practice, and without analysis, Commerce announced that solar modules assembled in China with non-Chinese origin cells are within the scope of the Solar II orders. This determination resulted in inconsistent country of origin determinations between Solar II and Solar I, and its sister case, Solar Products from Taiwan, on the same class or kind of merchandise. Commerce deviated from its judicially-endorsed substantial transformation test and adopted a new and contradictory scope definition that is unprecedented in breadth and is not based on any legally recognized or rational method for determining country of origin under AD/CVD laws. Further, Commerce failed to reconcile the rationale used to determine origin in Solar II with the long-standing substantial transformation rule that was used in Solar Products from Taiwan, Solar I and scores of prior agency determinations.

As Commerce's decision departed from the substantial transformation test without explanation, created conflicting country of origin determinations on the same product, and

---

[1] Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China, 77 Fed. Reg. 73018 (Dep't Commerce December 7, 2012) (amended LTFV determ. and AD order) and Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China, 77 Fed. Reg. 73017 (Dep't Commerce December 7, 2012) (CVD order)(collectively "Solar I").

changed the scope language at a late hour preventing parties and the U.S. International Trade

Commission ("ITC") from proper consideration for the final results, this decision is unreasonable

and unsupported by substantial evidence.  Further, the Solar II scope violates Commerce's

statutory authority and is manifestly arbitrary and capricious.  Because the scope of Solar II

cannot be rationally reconciled with the existence of the Solar I orders, revocation of Solar II is

the appropriate remedy.

WHEREFORE, Consolidated Plaintiffs respectfully request that this Court find the scope

of Solar II unlawful and therefore order Commerce to revoke the orders.  Alternatively, the Court

should remand the final determinations for Commerce to apply the substantial transformation test

to determine country of origin and find that the class or kind of merchandise is already covered

by the orders in Solar I, an analysis that must lead to the same result -  revocation of Solar II.


Respectfully submitted,


 /s/ John M. Gurley_____          /s/ Craig A. Lewis_____

John M. Gurley                          Craig A. Lewis
Diana Dimitriuc Quaia                   Samantha  Clark Sewall
Tina Termei                             Wesley Verne Carrington
ARENT FOX LLP                           HOGAN LOVELLS US LLP
1717 K Street, NW                       Columbia Square Building
Washington, DC 20036                    555 Thirteenth Street, NW.
(202) 857-6301                          Washington, DC 20004
                                        (202) 637-8613
*Counsel for Canadian Solar Inc.,*
*Changzhou Trina Solar Energy Co., Ltd.,*   *Counsel for Shanghai BYD Co., Ltd. and BYD*
*China Sunergy (Nanjing) Co., Ltd., Chint*  *(Shangluo) Industrial Co., Ltd*
*Solar (Zhejiang) Co., Ltd., ET Solar*
*Industry Ltd., Hefei JA Solar Technology*
*Co., Ltd., Jinko Solar Co., Ltd., LDK Solar*
*Hi-Tech (Nanchang) Co., Ltd., Perlight*
*Solar Co., Ltd., ReneSola Jiangsu Ltd.,*
*Shanghai JA Solar Technology Co., Ltd.,*

4

*Shenzhen Sacred Industry Co., Ltd.,*
*Shenzhen Sungold Solar Co., Ltd., Sumec*
*Hardware & Tools Co., Ltd., Sunny Apex*
*Development Ltd., Wuhan FYY Technology*
*Co., Ltd., Wuxi Suntech Power Co., Ltd.,*
*Zhongli Talesun Solar Co., Ltd., Znshine*
*PV-Tech Co., Ltd.*

.

October 5, 2015

**UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HONORABLE DONALD C. POGUE, SENIOR JUDGE**

| | |
|---|---|
| SUNPOWER CORP., | ) |
| Plaintiff, | ) |
| and | ) |
| CANADIAN SOLAR INC., *et. al.,* | ) |
| Plaintiff-Intervenors, | ) Consol. Court No. 15-00067 |
| v. | ) |
| THE UNITED STATES, | ) |
| Defendant, | ) |
| and | ) |
| SOLARWORLD AMERICAS, INC., | ) |
| Defendant-Intervenor. | ) |

**CONSOLIDATED PLAINTIFFS' JOINT BRIEF IN SUPPORT OF THEIR
RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

John M. Gurley
Diana Dimitriuc Quaia
Tina Termei

Arent Fox LLP
1717 K Street NW
Washington, DC  20006
(202) 857-6301

*Counsel for Canadian Solar Inc., Changzhou Trina Solar Energy Co., Ltd., China
Sunergy (Nanjing) Co., Ltd., Chint Solar (Zhejiang) Co., Ltd., ET Solar Industry Ltd.,
Hefei JA Solar Technology Co., Ltd., Jinko Solar Co., Ltd., LDK Solar Hi-Tech
(Nanchang) Co., Ltd., Perlight Solar Co., Ltd., ReneSola Jiangsu Ltd., Shanghai JA Solar
Technology Co., Ltd., Shenzhen Sacred Industry Co., Ltd., Shenzhen Sungold Solar Co.,
Ltd., Sumec Hardware & Tools Co., Ltd., Sunny Apex Development Ltd., Wuhan FYY*

*Technology Co., Ltd., Wuxi Suntech Power Co., Ltd., Zhongli Talesun Solar Co., Ltd., Znshine PV-Tech Co., Ltd.*

Craig A. Lewis
Samantha  Clark Sewall
Wesley Verne Carrington

Hogan Lovells US LLP
Columbia Square Building
555 Thirteenth Street, NW.
Washington, DC 20004
(202) 637-8613

*Counsel for Shanghai BYD Co., Ltd. and BYD (Shangluo) Industrial Co., Ltd.*

October 5, 2015

# TABLE OF CONTENTS

**Page**

ADMINISTRATIVE DECISIONS UNDER REVIEW..................................................................2

ISSUE PRESENTED AND SUMMARY OF ARGUMENT .........................................................2

I.     WHETHER COMMERCE'S DECISION TO ABANDON THE SUBSTANTIAL TRANSFORMATION TEST TO DETERMINE COUNTRY OF ORIGIN AND INSTEAD TO EXPAND THE SCOPE LANGUAGE TO COVER MODULES ASSEMBLED IN CHINA WITH NON-CHINESE SOLAR CELLS, RESULTING IN CONTRADICTORY SCOPE RULES FOR THE SAME MERCHANDISE, IS SUPPORTED BY SUBSTANTIAL EVIDENCE AND IN ACCORDANCE WITH LAW? ...............................................................................................................................2

STATEMENT OF FACTS.............................................................................................................3

I.     THE SOLAR I PROCEEDINGS .....................................................................................3

II.    THE SOLAR II PROCEEDINGS ....................................................................................5

STANDARD OF REVIEW...........................................................................................................11

ARGUMENT ...............................................................................................................................12

I.     THE SCOPE DEFINITION OF SOLAR II IS INCOMPATIBLE WITH SOLAR I AND RESULTS IN CONFLICTING SCOPE RULES ON THE SAME MERCHANDISE ....15

     A.     THE SUBSTANTIAL TRANSFORMATION TEST PROVIDES THE JUDICALLY-APPROVED FRAMEWORK FOR DETERMINING ORIGIN ...15

     B.     SOLAR I APPLIES THE SUBSTANTIAL TRANSFORMATION TEST AND PROVIDES A LAWFUL AND TRANSPARENT ORIGIN RULE ...................16

     C.     SOLAR II INEXPLICABLY DEVIATES FROM THE SUBSTANTIAL TRANSFORMATION FRAMEWORK .............................................................17

II.    COMMERCE'S SCOPE AND COUNTRY OF ORIGIN DETERMINATION ARE NOT SUPPORTED BY SUBSTANTIAL EVIDENCE ............................................................21

     A.     COMMERCE'S DEPARTURE FROM THE SUBSTANTIAL TRANSFORMATION RATIONALE IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE ON THE RECORD .............................................22

     B.     COMMERCE'S LATE HOUR EXPANSION OF THE SCOPE DEFINITION RENDERS BOTH COMMERCE'S AND THE ITC'S FINAL DETERMINATIONS UNSUPPORTED BY SUBSTANTIAL EVIDENCE ......30

III.   COMMERCE'S SCOPE IS UNLAWFUL .......................................................................33

     A.     THE SCOPE VIOLATES COMMERCE'S ANTIDUMPING AND COUNTERVAILING DUTY STATUTES .........................................................33

     B.     COMMERCE'S SCOPE AND ITS COUNTRY OF ORIGIN DETERMINATION ARE ARBITRARY AND CAPRICIOUS .........................37

IV.   CONCLUSION ...............................................................................................................42

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

A.L. Patterson, Inc. v. United States,
No. 11-00192, 2012 WL 3538722 (Ct. Int'l Trade Aug. 6, 2012) .......................................... 31

Advanced Tech. & Materials Co. v. United States,
No. 09-00511, 2011 WL 5191016 (Ct. Int'l Trade Oct. 12, 2011) ........................................ 17

Allegheny Bradford Corp. v. United States,
28 CIT 830, 342 F. Supp. 2d 1172 (2004)..........................................................................31, 32

Anderson v. U.S. Sec'y of Agric.,
30 CIT 1742, 462 F. Supp. 2d 1333 (2006)................................................................................21

Appleton Papers Inc. v. United States,
37 CIT ___, 929 F. Supp. 2d 1329 (2013)...........................................................................13, 16

Bell Supply Co. v. United States,
39 CIT ___, 83 F. Supp. 3d 1311 (2015).....................................................................................22

British Steel PLC v. United States,
127 F.3d 1471 (Fed. Cir. 1997) ....................................................................................................38

Burinskas v. NLRB,
357 F.2d 822 (D.C. Cir. 1966).......................................................................................................21

Ceramica Regiomontana, S.A. v. United States,
810 F.2d 1137 (Fed. Cir. 1987).............................................................................................30, 41

Changzhou Wujin Fine Chem. Factory Co. v. United States,
701 F.3d 1367 (Fed. Cir. 2012) ....................................................................................................40

Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.,
467 U.S. 837 (1984) ........................................................................................................................11

Co-Steel Raritan, Inc. v. Int'l Trade Comm'n,
357 F.3d 1294 (Fed. Cir. 2004) ............................................................................................31, 32

Consol. Bearings Co. v. United States,
348 F.3d 997 (Fed. Cir. 2003) ......................................................................................................38

Diamond Sawblades Mfrs. Coal. v. United States,
No. 06-00248, 2013 WL 5878684 (Ct. Int'l Trade Oct. 11, 2013) ........................................16

E.I. Du Pont de Nemours & Co. v. United States,
    22 CIT 370, 8 F. Supp. 2d 854 (1998).............................................................*passim*

E.I. DuPont de Nemours & Co. v. United States,
    No. 97-08-01335, 1999 WL 378258 (Ct. Int'l Trade June 2, 1999) ................................29, 41

Mid Continent Nail Corp. v. United States,
    725 F.3d 1295 (Fed. Cir. 2013) ...............................................................................31

Mitsubishi Heavy Indus. v. United States,
    21 CIT 1227, 986 F. Supp. 1428 (1997).................................................................12

Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,
    463 U.S. 29, 57 (1983) ...................................................................................11, 37

Nakornthai Strip Mill Pub. Co. v. United States,
    32 CIT 1272, 587 F. Supp. 2d 1303 (2008)..........................................................21

Nat'l Fisheries Inst., Inc. v. United States,
    33 CIT 1137, 637 F. Supp. 2d 1270 (2009)..........................................................11

Nat'l Muffler Dealers Ass'n v. United States,
    440 U.S. 472 (1979) ..........................................................................................21

PT Pindo Deli Pulp v. United States,
    36 CIT ___, 825 F. Supp. 2d 1310 (2012)...........................................................22

SEC v. Chenery Corp.,
    318 U.S. 80 (1943) ............................................................................................12

SKF USA Inc. v. United States,
    263 F.3d 1369 (Fed. Cir. 2001), aff'd Fag Kugelfischer Georg Schafer AG v.
    United States, 332 F.3d 1370 (Fed. Cir. 2003) .......................................................11

Smith Corona Corp. v. United States,
    16 CIT 562, 796 F. Supp. 1532 (1992)..................................................................32

Smith Corona Corp. v. United States,
    17 CIT 47, 811 F. Supp. 692 (1993)......................................................................15

Timken Co. v. United States,
    354 F.3d 1334 (Fed. Cir. 2004) ...........................................................................11

Transactive Corp. v. United States,
    91 F.3d 232 (D.C. Cir. 1996).........................................................................11, 37

Trs. in Bankr. of N. Am. Rubber Thread Co. v. United States,
    31 CIT 2040, 533 F. Supp. 2d 1290 (2007)..........................................................37

iii

Trs. in Bankr. of N. Am. Rubber Thread Co. v. United States,
    32 CIT 663, 558 F. Supp. 2d 1367 (2008) .............................................................. 37

Ugine & ALZ Belg., N.V. v. United States,
    31 CIT 1536, 517 F. Supp. 2d 1333 (2007), aff'd 551 F.3d 1339 (Fed. Cir.
    2009) ................................................................................................ 13, 15, 33, 35

Ugine & ALZ Belg. v. United States,
    551 F.3d at 1349 .............................................................................................. 13, 35

United States v. Gibson-Thomsen Co., Inc.,
    27 C.C.P.A. 267 (Cust. & Pat. App. 1940) ........................................................... 15

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i) ..................................................................................... 11

19 U.S.C. § 1671 .................................................................................................. *passim*

19 U.S.C. § 1671a ......................................................................................................... 5

19 U.S.C. § 1673 .................................................................................................. *passim*

19 U.S.C. § 1673(1) ..................................................................................................... 12

19 U.S.C. § 1673a ......................................................................................................... 5

19 U.S.C. § 1677j(b) ................................................................................................... 36

**Regulations**

19 C.F.R. § 351.225(h) ............................................................................................... 36

**Administrative Determinations**

3.5″ Microdisks & Coated Media Thereof From Japan,
    54 Fed. Reg. 6433 (Dep't Commerce Feb. 10, 1989) (final LTFV determ.) ........... 38, 39

Certain Crystalline Silicon Photovoltaic Products From China And Taiwan, 79
    Fed. Reg. 12221 (Int'l Trade Comm'n Mar. 4, 2014) ............................................... 7

Certain Crystalline Silicon Photovoltaic Products From the People's Republic of
    China, 79 Fed. Reg. 76962 (Dep't Commerce Dec. 23, 2014) (final CVD
    determ.), and accompanying Issues & Decision Memorandum ..................... *passim*

Certain Crystalline Silicon Photovoltaic Products From the People's Republic of
    China, 79 Fed. Reg. 76970 (Dep't Commerce Dec. 23, 2014) (final LTFV
    determ.), and accompanying Issues and Decision Memorandum ................. *passim*

Certain Crystalline Silicon Photovoltaic Products From the People's Republic of
China, 80 Fed. Reg. 8592 (Dep't Commerce Feb. 18, 2015) (amended final
CVD determ. and AD/CVD orders) ...........................................................2, 10, 18

Certain Crystalline Silicon Photovoltaic Products From the People's Republic of
China, 79 Fed. Reg. 33174 (Dep't Commerce June 10, 2014) (prelim. CVD
determ.)..................................................................................................................7, 8

Certain Crystalline Silicon Photovoltaic Products From the People's Republic of
China, 79 Fed. Reg. 44399 (Dep't Commerce July 31, 2014) (prelim. LTFV
determ.).......................................................................................................................8

Certain Crystalline Silicon Photovoltaic Products From the People's Republic of
China and Taiwan, 79 Fed. Reg. 4661 (Dep't Commerce Jan. 29, 2014)
(initiation AD inv.) .................................................................................................5, 6

Certain Crystalline Silicon Photovoltaic Products From the People's Republic of
China and Taiwan, 79 Fed. Reg. 4667 (Dep't Commerce Jan. 29, 2014)
(initiation CVD inv.) ..............................................................................................5, 6

Certain Crystalline Silicon Photovoltaic Products From Taiwan, 79 Fed. Reg.
76966 (Dep't Commerce Dec. 23, 2014) (final LTFV determ.) .............................10

Certain Crystalline Silicon Photovoltaic Products From Taiwan, 80 Fed. Reg.
8596 (Dep't Commerce Feb. 18, 2015) (AD order).................................................19

Certain Steel Nails From the People's Republic of China, 73 Fed. Reg. 33977,
33979 (Dep't Commerce June 16, 2008) (final LTFV determ.) .............................30

Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules,
From the People's Republic of China, 77 Fed. Reg. 73018 (Dep't Commerce
Dec. 7, 2012) (amended LTFV determ. & AD order)....................................3, 4, 10

Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules,
From the People's Republic of China, 77 Fed. Reg. 73017 (Dep't Commerce
Dec. 7, 2012) (CVD order)..........................................................................3, 4, 10

Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules,
from the People's Republic of China, 77 Fed. Reg. 63791 (Dep't Commerce
Oct. 17, 2012) (final LTFV determ.), and accompanying Issues & Decision
Memo........................................................................................................................16

Certain Crystalline Silicon Photovoltaic Products from China and Taiwan,
USITC Inv. Nos. 701-TA-511 and 731-TA-1246-1247, USITC Pub. 4519
(Feb. 2015) (final) ..............................................................................................32-33

Cold–Rolled Carbon Steel Flat Products from Argentina,
58 Fed. Reg. 37062 (Dep't Commerce Jul. 9, 1993) (final LTFV determ.)......................13, 33

<u>Dynamic Random Access Memory Semiconductors from the Republic of Korea</u>,
    67 Fed. Reg. 70927 (Dep't Commerce Nov. 27, 2002) (initiation CVD inv.) ............ 25, 38, 39

<u>Erasable Programmable Read Only Memories (EPROMs) From Japan</u>,
    51 Fed. Reg. 39680 (Dep't Commerce Oct. 30, 1986) (final LTFV determ.) ............. 24, 38, 39

<u>Stainless Steel Plate in Coils from Belgium</u>, 69 Fed. Reg. 74495 (Dep't of
    Commerce Dec. 14, 2004) (final results), and accompanying Issues and
    Decision Memorandum ............................................................................................ 15, 34, 41

<u>Static Random Access Memory Semiconductors From Taiwan</u>, 62 Fed. Reg.
    51442 (Dep't Commerce Oct. 1, 1997) (Prelim. LTFV determ.) ........................................... 39

**Other Authorities**

<u>Antidumping Duties; Countervailing Duties</u>, 62 Fed. Reg. 27295 (Dep't
    Commerce May 19, 1997) ......................................................................................................... 30

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HONORABLE DONALD C. POGUE, SENIOR JUDGE

| | |
|---|---|
| SUNPOWER CORP., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| and ) | |
| ) | |
| CANADIAN SOLAR INC., *et. al.,* ) | |
| ) | |
| Plaintiff-Intervenors, ) | |
| ) | Consol. Court No. 15-00067 |
| v. ) | |
| THE UNITED STATES, ) | |
| ) | |
| Defendant, ) | |
| and ) | |
| ) | |
| SOLARWORLD AMERICAS, INC., ) | |
| ) | |
| Defendant-Intervenor. ) | |
| ) | |

**CONSOLIDATED PLAINTIFFS' JOINT BRIEF IN SUPPORT OF THEIR
RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

In accordance with Rule 56.2 of the Rules of this Court and the July 1, 2015

Scheduling Order in this action, we submit this Joint Brief in support of the Rule 56.2 Motion for

Judgment on the Agency Record on behalf of Consolidated Plaintiffs Canadian Solar Inc.,

Changzhou Trina Solar Energy Co., Ltd., China Sunergy (Nanjing) Co., Ltd., Chint Solar

(Zhejiang) Co., Ltd., ET Solar Industry Ltd., Hefei JA Solar Technology Co., Ltd., Jinko Solar

Co., Ltd., LDK Solar Hi-Tech (Nanchang) Co., Ltd., Perlight Solar Co., Ltd., ReneSola Jiangsu

Ltd., Shanghai JA Solar Technology Co., Ltd., Shenzhen Sacred Industry Co., Ltd., Shenzhen

Sungold Solar Co., Ltd., Sumec Hardware & Tools Co., Ltd., Sunny Apex Development Ltd.,

Wuhan FYY Technology Co., Ltd., Wuxi Suntech Power Co., Ltd., Zhongli Talesun Solar Co.,

Ltd., Znshine PV-Tech Co., Ltd., as well as Consolidated Plaintiffs Shanghai BYD Co., Ltd. and

BYD (Shangluo) Industrial Co., Ltd., collectively "Consolidated Plaintiffs."

<u>ADMINISTRATIVE DECISIONS UNDER REVIEW</u>

The administrative determinations under review are the U.S. Department of Commerce's

("Commerce") final determinations and resulting orders in the antidumping and countervailing

investigations in <u>Certain Crystalline Silicon Photovoltaic Products From the People's Republic</u>

<u>of China</u> ("Solar Products from China"). <u>See</u> <u>Certain Crystalline Silicon Photovoltaic Products</u>

<u>From the People's Republic of China</u>, 79 Fed. Reg. 76970 (Dep't Commerce Dec. 23, 2014)

(final LTFV determ.), AD P.R. 834 ("<u>Solar II Final AD Determination</u>"), and accompanying

Issues and Decision Memorandum, AD P.R. 817 ("<u>Solar II AD ID Memo</u>"); <u>Certain Crystalline</u>

<u>Silicon Photovoltaic Products From the People's Republic of China</u>, 79 Fed. Reg. 76962 (Dep't

Commerce Dec. 23, 2014) (final CVD determ.), CVD P.R. 408 ("<u>Solar II Final CVD</u>

<u>Determination</u>"), and accompanying Issues and Decision Memorandum, CVD P.R. 388 ("<u>Solar</u>

<u>II CVD ID Memo</u>"); <u>Certain Crystalline Silicon Photovoltaic Products From the People's</u>

<u>Republic of China</u>, 80 Fed. Reg. 8592 (Dep't Commerce Feb. 18, 2015) (amended final CVD

determ. and AD/CVD orders), AD P.R. 853, CVD P.R. 417 ("<u>Solar II Orders</u>").

<u>ISSUE PRESENTED AND SUMMARY OF ARGUMENT</u>

**I.   WHETHER COMMERCE'S DECISION TO ABANDON THE SUBSTANTIAL TRANSFORMATION TEST TO DETERMINE COUNTRY OF ORIGIN AND INSTEAD TO EXPAND THE SCOPE LANGUAGE TO COVER MODULES ASSEMBLED IN CHINA WITH NON-CHINESE SOLAR CELLS, RESULTING IN CONTRADICTORY SCOPE RULES FOR THE SAME MERCHANDISE, IS SUPPORTED BY SUBSTANTIAL EVIDENCE AND IN ACCORDANCE WITH LAW?**

Commerce's expansion of the scope of the investigations on <u>Solar Products from China</u>

to include modules assembled in China with non-Chinese cells represents an unlawful expansion

of the scope of these investigations, at an extremely late stage of these proceedings, and well

2

beyond Petitioner's intent.  Commerce's determination as to the scope of the investigations was a

departure from agency precedent and its statutory authority.  In contrast to its 2012 orders on

solar cells from China[1] and its contemporaneous antidumping duty order on Solar Products from

Taiwan, in Solar II, Commerce departed from its long-standing substantial transformation

reasoning to determine country of origin and made a cursory determination that modules

assembled in China, with non-Chinese cells, are within the scope of the Solar II investigations.

As this decision rejected the substantial transformation test without explanation, created

conflicting country of origin determinations on the same product, and changed the scope

language at a late hour preventing parties and the U.S. International Trade Commission ("ITC")

from proper consideration for the final results, this decision is unreasonable and unsupported by

substantial evidence.  Further, the Solar II scope violates Commerce's statutory authority,

deviates from agency practice and is manifestly arbitrary and capricious.

This Court should accordingly find that such an overly broad scope is without support in

U.S. law or substantial evidence, and is therefore invalid.  Because the identical merchandise is

already covered by the scope of the Solar I antidumping and countervailing duty orders, this

Court find the scope of Solar II unlawful and order Commerce to revoke the Solar II orders.

## STATEMENT OF FACTS

I.    THE SOLAR I PROCEEDINGS

On October 19, 2011, SolarWorld filed a petition with Commerce and the U.S.

International Trade Commission ("ITC") alleging that imports of solar cells from China were

---

[1] Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China, 77 Fed. Reg. 73018 (Dep't Commerce Dec. 7, 2012) (amended LTFV determ. and AD order) and Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China, 77 Fed. Reg. 73017 (Dep't Commerce Dec. 7, 2012) (CVD order)(collectively "Solar I").

being, or were likely to be, sold in the United States at less than fair value, that producers and exporters of those solar cells and modules had benefitted from countervailable subsidies, and that the imports were materially injuring, or threatening material injury to, a domestic industry. Petition for the Imposition of Antidumping and Countervailing Duties Pursuant to Sections 701 and 731 of the Tariff Act of 1930, as Amended, Vol. I, Common Issues & Injury at 1, Inv. Nos. A-570-979 and C-570-980 (Oct. 19, 2011), extracts attached at Exhibit 1. After both Commerce and the ITC made affirmative determinations, the antidumping and countervailing duty orders were published on December 7, 2012. Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China, 77 Fed. Reg. 73018 (Dep't of Commerce Dec. 7, 2012) (amended LTFV determ. & AD order); Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, From the People's Republic of China, 77 Fed Reg. 73017 (Dep't of Commerce Dec. 7, 2012) (CVD order), collectively attached at Exhibit 2.

Solar cells "are made from crystalline silicon wafers." Memo from J. Pedersen to G. Taverman, re: Scope Clarification at 6, Inv. Nos. A-570-979 and C-570-980 (Mar. 19, 2012), (the "Solar I Scope Clarification Memo").[2] A dopant creates the positive/negative (p/n) junction "that is needed for the conversion of sunlight into electricity." Id. Solar modules are assembled by "stringing together 60 or 72 solar cells, laminating them, and fitting them in a glass-covered aluminum frame." Id. at 7.

---

[2] Attached as Exh. 2 to Letter from Sidley Austin LLP to Commerce, Inv. Nos. A-570-010, A-583-853, and C-570-011, re: Comments on Scope on behalf of Yingli Green Energy Holding Co. Ltd., Yingli Green Energy, Americas, Inc., Canadian Solar Inc., Changzhou Trina Solar Energy Co., Ltd., Wuxi Suntech Power Co., Ltd., Shanghai JA Solar Technology Co., Ltd., Hefei JA Solar Technology, Co., Ltd., and Jinko Solar Co., Ltd. and with the support of the China Chamber of Commerce for Import and Export of Machinery and Electronic Products ("CCCME") and its members (Feb. 18, 2014), AD P.R. 125, CVD P.R. 88 ("Respondents' Scope Comments").

AFDOCS/12508777.15

In <u>Solar I</u>, Commerce carefully examined how to determine the country of origin of solar panels. <u>Id</u>.  Commerce determined that because the cells were the "essential active component," which conferred the origin of the product, if a module consisted of non-Chinese cells, it could only become a Chinese product if it underwent a substantial transformation. <u>See</u> <u>Solar II CVD ID Memo</u> at 40, CVD P.R. 388.  Commerce closely examined the country of origin of solar modules through its long-standing and judicially-endorsed substantial transformation test finding that "module assembly does not substantially alter the essential nature of the solar cells nor does it constitute significant processing, such that it changes the country of origin of the cell." <u>Solar I Scope Clarification Memo</u> at 8.  Commerce, therefore, concluded in <u>Solar I</u> that "where solar cell production occurs in a different country from solar module assembly, the country of origin of the solar modules is the country in which the solar cell was produced." <u>Id</u>. at 8.  Therefore, Commerce found that it could not lawfully cover within the scope of the <u>Solar I</u> orders modules that are merely assembled in China if the cells were not Chinese.

## II.     THE <u>SOLAR II</u> PROCEEDINGS

Dissatisfied with <u>Solar I</u>, Petitioner filed new petitions on the same class or kind of merchandise and requested that Commerce initiate new antidumping ("AD") and countervailing duty ("CVD") investigations of Solar Products from China and Taiwan, which Commerce initiated on January 22, 2014.  <u>See</u> <u>Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China and Taiwan</u>, 79 Fed. Reg. 4661 (Dep't Commerce Jan. 29, 2014) (initiation AD inv.), AD P.R. 852 ("<u>Solar II AD Initiation Notice</u>"); <u>Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China and Taiwan</u>, 79 Fed. Reg. 4667 (Dep't Commerce Jan. 29, 2014) (initiation CVD inv.), CVD P.R. 70 ("<u>Solar II CVD Initiation Notice</u>"). Commerce initiated the investigation pursuant to Section 732 of the Tariff Act of 1930, as amended (the "Act"), 19 U.S.C. §§ 1671a and 1673a. In the Initiation Notices, Commerce

incorporated Petitioner's "two-out-of-three" rule to define the scope of the investigation.  In relevant part, the scope stated as follows:

> crystalline silicon photovoltaic cells, and modules, laminates and/or panels consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including building integrated materials. For purposes of these investigations, subject merchandise also includes modules, laminates and/or panels assembled in the subject country consisting of crystalline silicon photovoltaic cells that are completed or partially manufactured within a customs territory other than that subject country, using ingots that are manufactured in the subject country, wafers that are manufactured in the subject country, or cells where the manufacturing process begins in the subject country and is completed in a non-subject country.

Solar II AD Initiation Notice at 4667, AD P.R. 852; see also Solar II CVD Initiation Notice at 4671, CVD P.R. 70.

In short, under the two-out-of-three rule, if module assembly takes place in China or Taiwan and an input for the production of solar cells, i.e. polysilicon ingots or wafers, originates in the subject country, then the module is subject merchandise covered by the investigation. See Petition for the Imposition of Antidumping and Countervailing Duties Pursuant to Sections 701 and 731 of the Tariff Act of 1930, as Amended, Vol. I, Common Issues and Injury, at 5-6 (Dec. 31, 2013), AD P.R. 1-10, AD C.R. 1-11  ("Solar II Petition").  In a supplement to the Petition, SolarWorld further explained the two-out-of-three scenario as follows:

> Petitioner intends that the present proceeding cover panels and modules assembled in a subject country (e.g., China), even if the cells in those modules are produced in a different country (e.g., Taiwan or a non-subject country), if those cells are made from ingots, wafers or partially manufactured cells that were manufactured in the subject country (e.g., China). This would cover situations where the panels or modules are assembled in a subject country from cells made in a different country but: 1) the ingots used for the wafers  made into the cells were manufactured in the subject country; 2) the wafers made into the cells were manufactured in the subject country; or 3) the cell manufacturing process began in the subject country and then was completed in a non-subject country.   With reference to the steps described in the petition, this means that the scope covers module assembly (step 4) in a subject country, even if cell conversion (step 3) does not occur in the subject country , if either ingot crystallization (step 1), wafer

production (step 2) or the beginning of cell conversion (step 3) also occurs in the same subject country.

See Letter from Wiley Rein to Commerce and the ITC, re: Supplement II to Petition at 2 (Jan. 13, 2014), AD P.R. 25, AD C.R. 17, CVD P.R. 45, CVD C.R. 36 ("Solar II Supplement II to Petition").

On March 4, 2014, the ITC preliminarily determined that there is a reasonable indication that imports of Solar Products from China and Taiwan are materially injuring the U.S. industry. See Certain Crystalline Silicon Photovoltaic Products From China And Taiwan, 79 Fed. Reg. 12221 (Int'l Trade Comm'n Mar. 4, 2014). Between February 18, 2014, and April 21, 2014, several parties, including certain Consolidated Plaintiffs to this proceeding, submitted comments and rebuttal comments regarding the scope of the investigation. In their comments, Consolidated Plaintiffs argued that the two-out-of-three rule is contrary to the origin rule in Solar I which established that the origin of the cell determines the origin of the solar module.[3]  Further, Consolidated Plaintiffs also argued that Petitioner's two-out-of-three rule is burdensome and unworkable in addition to being inconsistent with Commerce's long-standing substantial transformation test to determine origin. Id.

On June 10, 2014, Commerce published its preliminary CVD determination on Solar Products from China. See Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China, 79 Fed. Reg. 33174 (Dep't Commerce June 10, 2014) (prelim. CVD determ.), CVD P.R. 278 ("CVD Preliminary Determination").  On July 31, 2014, Commerce published its preliminary determination that Solar Products from China are being, or are likely to

---

[3] See Respondents' Scope Comments, AD P.R. 125, CVD P.R. 88; see also Letter from Sidley Austin LLP to Commerce, re: Response to Petitioner's Rebuttal on Scope  on behalf of Yingli Green Energy Holding Co. Ltd., Yingli Green Energy Americas, Inc., Canadian Solar Inc., Changzhou Trina Solar Energy Co., Ltd., Wuxi Sutech Power Co., Ltd., Shanghai JA Solar Technology Co., Ltd., Hefei JA Solar Technology, Co., Ltd., and Jinko Solar Co., Ltd. and with the support of CCCME and its members (April 21, 2014), AD P.R. 358-362, CVD P.R. 176-180.

7

be, sold in the United States at less than fair value.  See Certain Crystalline Silicon Photovoltaic

Products From the People's Republic of China, 79 Fed. Reg.  44399 (Dep't Commerce July 31,

2014) (prelim. LTFV determ.), AD P.R. 835 ("AD Preliminary Determination").  In both the AD

and CVD Preliminary Determinations, Commerce continued to define the scope of the

investigation consistent with the scope description of the Notice of Initiation. See CVD

Preliminary Determination at 33175, CVD P.R. 278; AD Preliminary Determination at 44399,

AD P.R. 835. That scope definition continued to be based on Petitioner's two-out-of-three rule

for defining subject merchandise.

Two weeks before briefing, on October 3, 2014, Commerce issued a letter stating that it

was considering the possibility of a scope "clarification," the effect of which was to broaden the

definition of subject merchandise to include all modules, laminates, and/or panels assembled in

China that contain crystalline silicon photovoltaic cells produced in a customs territory other

than China. See Commerce Letter to All Interested Parties, re: Opportunity to Submit Scope

Comments (Oct. 3, 2014), AD P.R. 765, CVD P.R. 349 (the "Solar II Scope Clarification").

Plaintiffs filed briefs on October 16, 2014 and rebuttal briefs on October 22 and October 27,

2014, opposing the expansion of the scope language in the manner proposed by Commerce. See

Respondents' Case Brief (Oct. 16, 2015), AD P.R. 780; Case Brief of Changzhou Trina Solar

Energy Co., Ltd. (Oct. 16, 2014), AD P.R. 784; see also Respondents' Rebuttal Brief (Oct. 27,

2014), AD P.R. 808; Rebuttal Brief of Changzhou Trina Solar Energy Co., Ltd. (Oct. 23, 2014),

AD P.R. 804, AD C.R. 978.

On December 23, 2014, Commerce published its final determination that Solar Products

from China are being, or are likely to be, sold in the United States at less than fair value, as well

as its final CVD determination on Solar Products from China.  See Solar II Final AD

Determination, AD P.R. 834; Solar II Final CVD Determination, CVD P.R. 408.  In the Final

Determinations, Commerce amended the scope language and adopted the language of the Solar

II Scope Clarification, significantly broadening the scope of the investigations.  The final scope

is as follows:

> The merchandise covered by this investigation is modules, laminates and/or panels consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including building integrated materials. For purposes of this investigation, subject merchandise includes modules, laminates and/or panels assembled in the PRC consisting of crystalline silicon photovoltaic cells produced in a customs territory other than the PRC.

> Subject merchandise includes modules, laminates and/or panels assembled in the PRC consisting of crystalline silicon photovoltaic cells of thickness equal to or greater than 20 micrometers, having a p/n junction formed by any means, whether or not the cell has undergone other processing, including, but not limited to, cleaning, etching, coating, and/or addition of materials (including, but not limited to, metallization and conductor patterns) to collect and forward the electricity that is generated by the cell.

> Excluded from the scope of this investigation are thin film photovoltaic products produced from amorphous silicon (a-Si), cadmium telluride (CdTe), or copper indium gallium selenide (CIGS). Also excluded from the scope of this investigation are modules, laminates and/or panels assembled in the PRC, consisting of crystalline silicon photovoltaic cells, not exceeding 10,000mm in surface area, that are permanently integrated into a consumer good whose function is other than power generation and that consumes the electricity generated by the integrated crystalline silicon photovoltaic cells. Where more than one module, laminate and/or panel is permanently integrated into a consumer good, the surface area for purposes of this exclusion shall be the total combined surface area of all modules, laminates and/or panels that are integrated into the consumer good. Further, also excluded from the scope of this investigation are any products covered by the existing antidumping and countervailing duty orders

on crystalline silicon photovoltaic cells, whether or not assembled into modules, laminates and/or panels, from the PRC.

> Merchandise covered by this investigation is currently classified in the Harmonized Tariff Schedule of the United States (HTSUS) under subheadings 8501.61.0000, 8507.20.8030, 8507.20.8040, 8507.20.8060, 8507.20.8090, 8541.40.6020, 8541.40.6030 and 8501.31.8000. These HTSUS subheadings are provided for convenience and customs purposes; the written description of the scope of this investigation is dispositive.

Solar II Final AD Determination at 76970, AD P.R. 834; Solar II Final CVD Determination at 76963, CVD P.R. 408 (footnotes omitted). Commerce's factual and legal conclusions underlying its Final Determinations are set forth in the Solar II AD ID Memo, AD P.R. 817 and the Solar II CVD ID Memo, CVD P.R. 388.

On the same date, in the parallel Taiwan Solar Products investigation, Commerce made a final determination of sales at less than fair value. Certain Crystalline Silicon Photovoltaic Products From Taiwan, 79 Fed. Reg. 76966 (Dep't Commerce Dec. 23, 2014) (final LTFV determ.) ("Solar Products from Taiwan"). In relevant part, the scope of the Taiwan investigation specifies that

> Modules, laminates, and panels produced in a third-country from cells produced in Taiwan are covered by this investigation. However, modules, laminates, and panels produced in Taiwan from cells produced in a third-country are not covered by this investigation.

Id. at 76968 (emphasis added). In this regard, although Solar Products from Taiwan is contemporaneous with Solar II (this case), the scope language, and country of origin determination (i.e., using the cell origin to confer origin to the and excluding mere assembly in China as conferring origin) is inconsistent with Solar II and follows the reasoning in Solar I.

On February 18, 2015, Commerce published the antidumping duty and countervailing duty Orders on Solar Products from China. See Solar II orders, AD P.R. 853, CVD P.R. 417.

In April 2015, Consolidated Plaintiffs filed Complaints with this Court challenging Commerce's final antidumping and countervailing duty determinations. See Compl., Apr. 20, 2015, Canadian Solar Inc. v. United States (CIT No. 15-00088), ECF No. 10, amended Apr. 24, 2014, ECF No. 11; Compl., Apr. 20, 2015, Canadian Solar Inc. v. United States (CIT No. 15-00089), ECF No. 10, amended Apr. 24, 2015, ECF No. 11; Compl., Apr. 20, 2015, Shanghai BYD Co. v. United States (CIT No. 15-00083), ECF No. 11, amended May 5, 2015, ECF 12; Compl., Apr. 20, 2015, Shanghai BYD Co. v. United States (CIT No. 15-00087), ECF No. 11, amended May 5, 2015, ECF No. 12.  In July 2015, the Court consolidated these claims into this action, SunPower Corp. v. United States (CIT No. 15-00067), ECF No. 31.

## STANDARD OF REVIEW

This Court must hold unlawful any determination, finding, or conclusion found to be "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Where the antidumping or countervailing statute does not directly address the question before the agency, the Court will defer to Commerce's construction of its authority if it is reasonable. Timken Co. v. United States, 354 F.3d 1334, 1341 (Fed. Cir. 2004) (relying on Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 842-43 (1984)).

An "agency action is arbitrary when the agency offer{s} insufficient reasons for treating similar situations differently." Transactive Corp. v. United States, 91 F.3d 232, 237 (D.C. Cir. 1996) (citing Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 57 (1983)); SKF USA Inc. v. United States, 263 F.3d 1369, 1378 (Fed. Cir. 2001), aff'd Fag Kugelfischer Georg Schafer AG v. United States, 332 F.3d 1370 (Fed. Cir. 2003) (holding Commerce's determination to be not in accordance with law under 19 U.S.C. § 1516a(b)(1)(B)(i)); see also Nat'l Fisheries Inst., Inc. v. United States, 33 CIT 1137, 637 F. Supp. 2d 1270, 1282 (2009) (noting the Court's holding that Commerce's decision was

"arbitrary . . . and therefore contrary to law").  In determining whether an agency has provided a reasoned explanation for departing from precedent or treating similar situations differently, the court looks only to the reasons given by the agency. SEC v. Chenery Corp., 318 U.S. 80, 88 (1943).

## ARGUMENT

The Solar II investigations as to China should have been terminated long ago, certainly before the imposition of the Solar II orders.  The class or kind of merchandise that the final determinations in these investigations, and the resulting AD/CVD orders, seek to cover are modules assembled in China consisting of third country solar cells.  In 2012, in Solar I, Commerce issued orders on the same class or kind of merchandise and found, by employing Commerce's traditional and judicially-endorsed substantial transformation test, that the solar cells are the essential component of the module, thus conferring origin.  Commerce also determined that assembly of the cells into modules did not substantially transform the cells so as to confer the origin of the solar panels (i.e., a module assembled in China, without Chinese cells, was not of Chinese origin).  Had Commerce properly applied its traditional substantial transformation test in Solar II to determine the country of origin of modules assembled in China, it would have found that all such modules that are of Chinese origin (i.e., incorporating Chinese cells) are already covered by the 2012 orders in Solar I.  As the class or kind of merchandise at issue in this investigation is already fully covered by the orders of Solar I, the only rational and lawful outcome is for the Solar II orders to be revoked.

Commerce is tasked with administering antidumping and countervailing duty orders, but it may not do so in an unlawful manner. See 19 U.S.C. §§ 1671, 1673. See Mitsubishi Heavy Indus. v. United States, 21 CIT 1227, 1232, 986 F. Supp. 1428, 1433 (1997). The statute, 19 U.S.C. § 1673(1), provides for the imposition of antidumping duties on "subject merchandise,"

defined as "the class or kind of merchandise that is within the scope of an investigation, a review, a suspension agreement, {or} an order . . . ." Id. § 1677(25). This provision requires Commerce to make a finding of dumping for a class or kind of merchandise from a particular country. E.I. Du Pont de Nemours & Co. v. United States, 22 CIT 370, 375, 8 F. Supp. 2d 854, 859 (1998) ("{A}ntidumping orders apply to merchandise from particular countries . . . ."). Antidumping orders must specify both the class or kind of merchandise and the particular country from which the merchandise originates. "For merchandise to be subject to an order, it must meet both parameters, i.e., product type and country of origin." Ugine & ALZ Belg., N.V. v. United States, 31 CIT 1536, 1551, 517 F. Supp. 2d 1333, 1345 (2007), aff'd  551 F.3d 1339 (Fed. Cir. 2009);[4] Appleton Papers Inc. v. United States, 37 CIT ___, 929 F. Supp. 2d 1329, 1335 (2013) ("AD and CVD orders cover a particular class or kind of merchandise from a particular country.")  However, Commerce's scope definition in Solar II results in two countries of origin for the same product, in violation of the agency's statutory authority.  Moreover, the scope of Solar II represents a radical departure, without any explanation, from decades of Commerce practice applying the substantial transformation test to determine the country of origin of a product. Commerce is required to explain this fundamental change in practice. See Ugine & ALZ Belg. v. United States, 551 F.3d at 1349  ("Nonetheless, Commerce is obligated to follow prior precedent absent some legitimate reason for departing from it."). It has failed to do so here.

---

[4] Quoting Cold–Rolled Carbon Steel Flat Products from Argentina, 58 Fed. Reg. 37062, 37065 (Dep't Commerce Jul. 9, 1993) (final LTFV determ.) ("Cold-Rolled from Argentina") ("The scope of an antidumping or countervailing duty order is defined by the type of merchandise and by the country of origin (e.g., widgets from Ruritania)."  31 CIT at 1551-52, 517 F. Supp. 2d at 1345.

AFDOCS/12508777.15

Without regard to the law or agency practice, Commerce has drafted a scope that is worldwide in coverage and is inconsistent with the existing orders on the same class or kind of merchandise. After closely examining the proper country of origin of solar modules in Solar I, in this case (Solar II), Commerce deviated from its established judicially-endorsed practice and adopted a new and contradictory scope definition that is unprecedented in breadth and is not based on any legally recognized or rational method for determining country of origin under AD/CVD laws. In a cursory fashion, and without analysis, Commerce announced that solar modules assembled in China with non-Chinese origin cells are within the scope of the orders on Solar Products from China. This determination resulted in inconsistent country of origin determinations between Solar II and Solar I, and its sister case, Solar Products from Taiwan. Commerce failed to reconcile the rationale used to determine origin in Solar II with the long-standing substantial transformation rule that was used in Solar Products from Taiwan, Solar I and scores of prior agency determinations.

Therefore, the scope of this case is both unlawful and unsupported by substantial evidence. For these reasons that are further discussed below, Consolidated Plaintiffs respectfully request that this Court find the scope of Solar II unlawful and therefore order Commerce to revoke the orders. Revocation of Solar II is the appropriate remedy because its scope cannot be rationally reconciled with the existence of the Solar I orders. A proper application of the substantial transformation test in this case leads to the conclusion that the class or kind of merchandise purportedly covered by the scope of Solar II is already covered by the existing AD/CVD orders in Solar I. Two contradictory determinations from the same agency, applying the same law, to the same facts, cannot be permitted. Thus, revocation of Solar II provides the only appropriate remedy. Alternatively, the Court should remand the final determinations for

14

Commerce to apply the substantial transformation test to determine country of origin and find

that the class or kind of merchandise is already covered by the orders in <u>Solar I</u>, an analysis that

must lead to the same result - revocation of <u>Solar II</u>.

I.      **THE SCOPE DEFINITION OF <u>SOLAR II</u> IS INCOMPATIBLE WITH <u>SOLAR I</u>
        AND RESULTS IN CONFLICTING SCOPE RULES ON THE SAME
        MERCHANDISE**

The scope of <u>Solar II</u> ignores Commerce's long-standing substantial transformation test

for determining country of origin in favor of an unprecedented, results-oriented scope definition.

Ironically, the scope of <u>Solar II</u> ignores the most critical aspect of a solar panel - the solar cell.

Instead, the scope definition is an unjustified departure from Commerce's past practice and

creates multiple – and inconsistent - rules of origin for identical products.

A.      **THE SUBSTANTIAL TRANSFORMATION TEST PROVIDES THE
        JUDICALLY-APPROVED FRAMEWORK FOR DETERMINING
        ORIGIN**

The scope of an order is limited to merchandise that is produced in the country covered

by the order. <u>See</u> <u>Stainless Steel Plate in Coils from Belgium</u>, 69 Fed. Reg. 74495 (Dep't of

Commerce Dec. 14, 2004) (final results), and accompanying Issues and Decision Memorandum

at 15 (cmt. 4) ("<u>Steel Plate from Belg.</u>").  As Commerce and the Court agree, a product can only

have one country of origin for antidumping purposes and Commerce has traditionally answered

that question through the application of its substantial transformation test. <u>See</u> <u>Ugine & ALZ</u>

<u>Belg.</u>, 31 CIT at 1550, 517 F. Supp. 2d at 1345.  For over seven decades, the substantial

transformation test has provided the framework for country of origin determinations. <u>See</u> <u>United</u>

<u>States v. Gibson-Thomsen Co., Inc.</u>, 27 C.C.P.A. 267 (Cust. & Pat. App. 1940); <u>E.I. Du Pont</u>, 22

CIT at 373, 8 F. Supp. 2d at 858 (applying <u>Chevron</u> deference to the substantial transformation

test); <u>Smith Corona Corp. v. United States</u>, 17 CIT 47, 50, 811 F. Supp. 692, 695 (1993) (noting

that in determining if merchandise exported from an intermediate country is covered by an

15

antidumping order, Commerce identified the country of origin by considering whether the essential component is substantially transformed in the country of exportation). "This Court has upheld Commerce's use of the substantial transformation analysis as a means of determining the country of origin of merchandise produced in multiple countries." Appleton Papers, 929 F. Supp. 2d at 1336 (citing E. I. Du Pont, 22 CIT at 373-76, 8 F. Supp. 2d at 858-59); see also Diamond Sawblades Mfrs. Coal. v. United States, No. 06-00248, 2013 WL 5878684, at *10 (Ct. Int'l Trade Oct. 11, 2013).

Applying its substantial transformation analysis, Commerce determines whether the processes performed in a country constitute a transformation so substantial that the resulting product must be considered as originating in the country where that transformation occurred. E.I. Du Pont, 22 CIT at 372, 8 F. Supp. 2d at 857 ("Substantial transformation generally refers to a degree of processing or manufacturing resulting in a new and different article"); Appleton Papers, 929 F. Supp. 2d at 1336 (explaining that the substantial transformation test "determin{es} whether the processes performed on merchandise in a country are of such significance as to require that the resulting merchandise be considered the product of the country in which the transformation occurred") (citation omitted).  Consistent with this practice, the scope of Solar II should be informed by the substantial transformation test.

## B. SOLAR I APPLIES THE SUBSTANTIAL TRANSFORMATION TEST AND PROVIDES A LAWFUL AND TRANSPARENT ORIGIN RULE

In Solar I, Commerce considered Petitioner's request that all modules assembled in China must be covered by the scope, regardless of cell origin, but Commerce decided that it could not lawfully adopt that scope language. See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China, 77 Fed. Reg. 63791 (Dep't Commerce Oct. 17, 2012) (final LTFV determ.), and accompanying Issues & Decision Memo at

16

at 8 (Cmt. 1) ("Solar I AD ID Memo"), attached to Respondents' Scope Comments at Exh. 1,

AD P.R. 125, CVD P.R. 88.  Commerce correctly explained that "a product can only have one

country of origin" for AD/CVD purposes." Solar II AD ID Memo at 8, AD P.R. 817.  It then

employed its "usual practice" of conducting a substantial transformation analysis, and

determined the solar cells to be the "essential active component," and therefore, the country of

origin determining component of the solar module. Id. at 15. Commerce also examined whether

assembly of cells into modules would result in substantial transformation so as to confer Chinese

origin to the modules.  After analyzing the complexity of producing cells to the rather simple

process of assembly, it determined that solar cells produced in one country are not substantially

transformed simply by assembly into solar modules in another country and thus assembly did not

confer country of origin. Solar I AD ID Memo, attached to Respondents' Scope Comments, at

Exh. 1, AD P.R. 125, CVD P.R. 88. In the companion case, Solar Products from Taiwan,

Commerce followed this same country of origin analysis and determination (i.e., cells confer

origin of solar panels and assembly does not substantially transform the product to confer

origin).  Therefore, under Solar I and Solar Products from Taiwan the origin rule is that the

origin of the cells determines the origin of the module.  This is consistent with Commerce's

decades-long practice of determining country of origin based on its well-established and

judicially-endorsed substantial transformation test.

### C.  SOLAR II INEXPLICABLY DEVIATES FROM THE SUBSTANTIAL TRANSFORMATION FRAMEWORK

The Court has recognized that a determination of where the merchandise is produced is a

"fundamental step in the administration of the antidumping laws." Advanced Tech. & Materials

Co. v. United States, No. 09-00511, 2011 WL 5191016, at *4  (Ct. Int'l Trade Oct. 12, 2011).

However, in Solar II, Commerce deviated from its established country of origin analysis and

drafted an unlawful and unreasonable scope definition with the sole purpose of covering as much product as possible under the umbrella of AD/CVD orders on China. The result is worldwide orders on solar modules assembled in China regardless of the origin of the solar cells:

> For purposes of these orders, subject merchandise includes modules, laminates and/or panels assembled in the PRC consisting of crystalline silicon photovoltaic cells produced in a customs territory other than the PRC . . . . {A}lso excluded from the scope of these orders are any products covered by the existing antidumping and countervailing duty orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, laminates and/or panels, from the PRC.

Solar II Orders at 8593, AD P.R. 853, CVD P.R. 417. In drafting this scope definition, Commerce contradicted its determination in Solar I that assembly alone cannot confer the product's country of origin. Instead, Commerce flipped positions to suddenly confer origin status to mere assembly of cells into modules.

Furthermore, Solar II represents an internally inconsistent scope definition containing two contradictory scope rules disconnected from each other. On the one hand, the Solar II scope definition makes clear that solar cells manufactured in China continue to be subject to the orders in Solar I, regardless of where assembly takes place. Therefore, if a module is assembled in Thailand from Chinese cells, Commerce will apply the origin rule of Solar I and find those modules to be subject to the orders in Solar I. At the same time, for the same merchandise, Commerce will apply the exact opposite scope rule and find that modules assembled in China from Thai cells are also of Chinese origin and are subject to the present orders. However, both scope rules cannot apply at the same time on the same merchandise. If the Thai assembled module with Chinese cells is a Chinese product, then the exact opposite transaction – Chinese assembled module with Thai cells – cannot *also* be of Chinese origin. Therefore, the scope definition of Solar II requires Commerce to apply two contradictory scope rules at the same time and on the same product, one to China and Taiwan, and another rule to all other countries.

18

The <u>Solar II</u> scope definition is even more inexplicable when considered in light of Commerce's scope definition in the contemporaneous decision in <u>Solar Products from Taiwan</u>. In the Taiwan case, Commerce followed the country of origin analysis from <u>Solar I</u> in determining that the origin of the cells conferred the origin of the module and that assembly does not substantially transform the module to confer origin. <u>Certain Crystalline Silicon Photovoltaic Products From Taiwan</u>, 80 Fed. Reg. 8596, 8596 (Dep't Commerce Feb. 18, 2015) (AD order) ("<u>Taiwan Solar AD order</u>").[5]

In defense of its contradictory scope rules, Commerce makes the specious claim that the country of origin analysis in <u>Solar II</u> is not inconsistent with the origin analysis in <u>Solar I</u>, but that it is "built upon" <u>Solar I</u> and the two approaches are "complementary." <u>See</u> <u>Solar II AD ID Memo</u> at 15-16 and 28-29, AD P.R. 817. That argument is baseless.

First, <u>Solar I</u> established the general rule that the origin of the cell, and not the country of module assembly, confers origin on the solar module. In <u>Solar I</u> Commerce explicitly rejected arguments that solar cells produced in one country are converted into a product of a second country simply by being assembled into modules or panels in that second country, because the "essential component" of a module or panel is the solar cell, which is not substantially transformed by panel or module assembly. <u>Solar II</u>, in complete contradiction of <u>Solar I</u>, announced the "new" contrary rule that module assembly determines origin regardless of the origin of the cells (unless the cells are Chinese). This is the exact opposite result from the <u>Solar I</u> origin rule. Thus, it can be seen clearly that the origin rules applied in <u>Solar II</u> turn the <u>Solar I</u> rule completely on its head.

---

[5] However, Commerce made one exception from that origin rule for cases where the assembly occurs in China, in which case the module is Chinese, subject to the orders in <u>Solar II</u>. <u>Taiwan Solar AD order</u>, 80 Fed. Reg. at 8596. This exception would not be necessary but for the scope definition in the <u>Solar II</u> China case.

A new origin rule that is the exact opposite of the existing origin rule for the same merchandise cannot be said to be "built upon" the existing rule any more than the ground floor of a building can be said to be built upon the tenth floor. Second, to the extent Commerce is arguing that the two origin determination rationales could co-exist under the same order, that argument is equally flawed.  Just because Commerce has made the two origin determinations in two proceedings that are initially separated in time, does not make them any less contradictory. The fact remains that application of the two origin determinations unavoidably results contradictory outcomes.  In other words, once the Solar II orders were issued, the contradictory scope language of Solar I versus Solar II became **simultaneously** applicable to **identical** products.  Therefore, Solar II results in the same agency determining that the same product, simultaneously, has two countries of origin under the same governing statute and regulations.

In short, Commerce's origin determinations on solar modules can be summarized by the following:

1)   Commerce used two different and contradictory country of origin rationales for the identical product in Solar I (and Solar Products from Taiwan) versus Solar II;

2)   Commerce used two different country of origin rationales for the identical product, during contemporaneous investigations, in the Solar Products from Taiwan versus the Solar II investigations; and

3)   In Solar II, Commerce created a scope definition where the same product can have two countries of origin.

These actions are neither lawful, nor reasonable.

In Solar I, Commerce correctly recognized that such a result would be unlawful.  Commerce fully explained that including modules assembled in China from non-Chinese cells in the orders on solar cells from China is not possible:

20

**The main issue is that an investigation covering modules from the PRC cannot at the same time cover modules whose country of origin is not the PRC**. Determining that all modules assembled in the PRC are covered by the scope of the investigation, no matter where the solar cells in the module were produced, **would either necessitate making inconsistent country-of-origin determinations for a single product, or require ignoring the country-of-origin** when considering whether merchandise entering the United States is covered by the scope of the investigation.

Solar I AD ID Memo at 8 (footnote omitted) (emphasis added), attached to Respondents' Scope Comments at Exh. 1, AD P.R. 125, CVD P.R. 88.  For the same reasons Commerce explained in Solar I, Commerce cannot lawfully adopt such a scope definition in this case.  Simply put, the same product - third country cells assembled into modules in China - cannot be *both* of third country origin *and* Chinese origin.  "Agencies have a responsibility to administer their statutorily accorded powers fairly and rationally, which includes not 'treat{ing} similar situations in dissimilar ways.'" Nakornthai Strip Mill Pub. Co. v. United States, 32 CIT 1272, 1276, 587 F. Supp. 2d 1303, 1307 (2008), quoting Anderson v. U.S. Sec'y of Agric., 30 CIT 1742, 1749, 462 F. Supp. 2d 1333, 1339 (2006) (quoting Burinskas v. NLRB, 357 F.2d 822, 827 (D.C. Cir. 1966)). "Indeed, a principal justification for the administrative state is that in 'area{s} of limitless factual variations, like cases will be treated alike.'" Anderson, 30 CIT at 1749, 462 F. Supp. 2d at 1749 (quoting Nat'l Muffler Dealers Ass'n v. United States, 440 U.S. 472 (1979)).  Therefore, Commerce's Solar II scope is both incompatible with agency precedent, but also unlawful and unsupported by substantial evidence.

## II.   COMMERCE'S SCOPE AND COUNTRY OF ORIGIN DETERMINATION ARE NOT SUPPORTED BY SUBSTANTIAL EVIDENCE

Commerce's sharp departure in finding non-Chinese cells assembled in China into modules to be Chinese-origin modules, and therefore within the scope of Solar II, was without meaningful analysis – or even explanation.  First, it is unclear from the administrative record what actual country of origin analysis Commerce used in reaching its decision of Chinese origin.  Next,

21

the reasons Commerce provides for determining that non-Chinese cells assembled in China

become Chinese-origin modules are simply unreasonable. This Court has explained that

"Commerce's authority to administer the antidumping and countervailing duty laws is broad, <u>but</u>

<u>it is not unlimited.</u>" <u>Bell Supply Co. v. United States</u>, 39 CIT ___, 83 F. Supp. 3d 1311, 1324

(2015) (emphasis added).  Commerce's discretion in drafting an antidumping or countervailing

duty order, and hence its scope, must be reasonable and supported by substantial evidence.  <u>PT</u>

<u>Pindo Deli Pulp v. United States</u>, 36 CIT ___, 825 F. Supp. 2d 1310, 1318 (2012).  Commerce's

country of origin determination in <u>Solar II</u> is unreasonable and unsupported by substantial

evidence. Accordingly, the scope and the <u>Solar II</u> orders should be invalidated.

### A.   COMMERCE'S DEPARTURE FROM THE SUBSTANTIAL TRANSFORMATION RATIONALE IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE ON THE RECORD

In deciding that modules assembled in China with third country cells, are of Chinese

origin, Commerce cited two primary reasons for its decision: 1) this decision follows Petitioner's

intent; and 2) this decision helps combat against circumvention of <u>Solar I</u>. <u>See</u> <u>Solar II CVD ID</u>

<u>Memo</u> at 38-41, CVD P.R. 388; <u>Solar II AD ID Memo</u> at 12-14, AD P.R. 817.  First, Commerce

attempted to ground its decision in the following characterization of Petitioner's "intent:"

> The Petition and Petitioner's comments in this investigation demonstrate that the Petitioner's intent is a scope that covers all solar modules assembled in the PRC using third-country solar cells. In its Petition to this investigation, **the Petitioner stated its intent to include all of these modules in the scope, citing the "loophole" that resulted when, following the application of Department's substantial transformation analysis in the *Solar I* investigations, producers subject to the *Solar I* investigations increased exports to the United States of modules assembled in the PRC with non-PRC cells with the result of avoiding the reach of the *Solar I* AD and CVD orders.** Indeed, in the Petition for this investigation, Petitioner noted that it had argued for a scope almost identical to the scope in the October 3rd Letter {where mere assembly in China conferred origin on non-Chinese cells} . . . .

22

Solar II AD ID Memo at 12, AD P.R. 817 (emphasis added) (footnotes omitted). However, the record of these investigations reveals that Commerce's characterization of its scope language being "almost identical" to that requested by Petitioner is a red herring.

The two-out-of-three scope definition proposed by Petitioner sought to determine a solar module's origin by reference to assembly in the subject country *and* polysilicon ingots or wafers originating in the subject country. See Solar II Supplement II to Petition at 4, AD P.R. 25, AD C.R. 17 (explaining that the scope would cover a solar module assembled in China or Taiwan if the cells in the module used "ingots that are manufactured in the subject country, wafers that are manufactured in the subject country, or cells where the manufacturing process begins in the subject country and is completed in a non-subject country."). Thus, Petitioner's proposed language plainly sought to cover solar modules that were in some way connected to a Chinese or Taiwanese-origin input for the production of the solar cells, i.e., wafers or ingots. In its Post Conference Brief to the ITC, Petitioner illustrated with examples the extent of its proposed scope definition:

> Therefore, using China as the subject country for an example, modules exported to the United States from China, which undergo the following types of production processes, are included in the scope of this investigation and considered subject merchandise from China:
>
> (1) ingots from China + module assembly in China;
>
> (2) wafers from China + module assembly in China; and/or
>
> (3) cells in which the manufacturing process began in China and was completed in another country + module assembly in China.
>
> Each of these types of modules would be considered subject merchandise from China, within the scope of this investigation.

Post-Conference Brief of SolarWorld Indus. Am., Inc. & Answers to Staff Questions, Exh. 1, at

2-3 (Jan. 29, 2014), Certain Crystalline Silicon Photovoltaic Products from China and Taiwan,

USITC Inv. Nos. 701-TA-511 and 731-TA-1246-1247 (Preliminary), attached to Respondents'

Scope Comments at Exh. 3, AD P.R. 125, CVD P.R. 88.  In contrast, Commerce's scope

language unequivocally underlines expands the universe of subject merchandise (and Petitioner's intent

along with it) to include cell production in any third country:

> For purposes of this investigation, subject merchandise includes modules,
> laminates and/or panels assembled in the PRC consisting of crystalline silicon
> photovoltaic cells produced in a customs territory other than the PRC.

Solar II Final CVD Determination at 76963, CVD P.R. 408; Solar II Final AD Determination at

76972, AD P.R. 834. This expansion of the scope language is so broad that it cannot be justified

in relation to Petitioner's intent.  Although Commerce dedicates ink to stressing Petitioner's

intent, there can be no dispute that Commerce went well past the scope descriptions in the

petition and crafted a scope much broader than that requested by Petitioner.[6]  However, even

assuming arguendo that Commerce was following Petitioner's intent, that is not a carte blanche

for the agency to adopt an unreasonable and unlawful, scope.  While petitioners are free to

decide what scope description to include in a petition, they cannot impose on Commerce what

rules determine the origin of merchandise within that scope.[7]

Next, the record demonstrates that Petitioner's intent to include Chinese-assembled

modules in the scope was really targeted to obtain a remedy against certain producers:

> {T}he Petitioner stated its intent to include all of these modules in the scope, citing
> the "loophole" that resulted when, following the application of Department's
> substantial transformation analysis in the Solar I investigations, **producers** subject
> to the Solar I investigations increased exports to the United States of modules
> assembled in the PRC with non-PRC cells with the result of avoiding the reach of
> the Solar I AD and CVD orders.

---

[6] Compare Solar II CVD ID Memo at 4, CVD P.R. 388, on the one hand with Solar II Petition at
5-6, AD P.R. 1-10, AD C.R. 1-11, and Solar II Supplement II to Petition at 2, AD P.R. 25, AD
C.R. 17, CVD P.R. 45, CVD C.R. 36 on the other hand.
 See e.g. Erasable Programmable Read Only Memories (EPROMs) From Japan, 51 Fed. Reg.
39680, 39691 (Dep't Commerce Oct. 30, 1986) (final LTFV determ.) ("EPROMs from Japan").

. . .

> **Petitioner has cited statements by five large Chinese solar module producers** and one U.S. importer of solar modules noting the ease with which they were able to modify their production chain to avoid paying the AD and CVDs imposed by *Solar I.*

Solar II AD ID Memo at 12-13, AD P.R. 817; Solar II CVD ID Memo at 38-39, CVD P.R. 388 (emphasis added) (footnotes omitted). However, trade remedies are not available against certain producers, but with respect to merchandise from countries specifically named in the petitions. "Because antidumping orders apply to merchandise from particular countries, not individual producers, determining the country where the unfairly traded merchandise is produced or manufactured is fundamental to the proper administration and enforcement of the antidumping statute. E.I. Du Pont, 22 CIT at 375, 8 F. Supp. 2d at 859 (citing 19 U.S.C. § 1673, §§ 1677j, 1677b(a)(3)). This leads to the critical point regarding Commerce's use of Petitioner's intent for supporting its country of origin determination:   Petitioner's intent does not explain or support how the modules at issue here were determined to be of Chinese origin for AD/CVD purposes. Petitioner's intent explains exactly that, Petitioner's intent.  It explains nothing about country of origin.  It therefore cannot be cited as support for Commerce's country of origin determination and its departure from well-established agency practice that module assembly in China does not confer origin. See Solar I, Solar Products from Taiwan, Dynamic Random Access Memory Semiconductors from the Republic of Korea, 67 Fed. Reg. 70927, 70928 (Dep't Commerce Nov. 27, 2002) (initiation CVD inv.) ("DRAMs from Korea Initiation") (Finding that wafers from third countries assembled into finished semiconductors in Korea are not covered by the scope of the investigation on Korea).

Second, Commerce attempted to support its country of origin determination by pointing to circumvention and enforcement concerns:

the scope clarification adopted in this final determination will make the resulting order(s) substantially easier to administer and enforce (for both the Department and CBP), **by helping to prevent significant and widespread evasion** similar to the evasion that that {sic} has resulted due to parties that have exploited the substantial transformation analysis conducted in *Solar I*. As indicated in the Petition, although "imports of modules from China consisted largely of modules assembled with Chinese cells" from 2010 through early 2012, "{s}ince that time, imports of modules from China have consisted almost entirely of modules assembled in China from solar cells completed or partially manufactured in Taiwan or other countries (i.e., cells manufactured in Taiwan from Taiwanese inputs, or cells manufactured in Taiwan or other countries from Chinese inputs, including wafers)" . . . . With this scope clarification, it is the Department's intent to **reduce as much as possible additional opportunities for evasion** like those that resulted after the imposition of AD and CVD cash deposits in *Solar I*.

Solar II AD ID Memo at 13-14, AD P.R. 817; see also Solar II CVD ID Memo at 39, CVD P.R.

388.  Although Commerce explains that it departed from its practice to address enforcement and

circumvention, again, these items have no bearing on a country of origin analysis. As an initial

matter, a product that is excluded from the scope of an order, for lacking the requisite country of

origin to which the order applies, does not constitute circumvention – it is the lawful application

of the antidumping and countervailing statutes that apply orders to specific merchandise from a

specific country.[8]  See 19 U.S.C. §§ 1671, 1673; E.I. Du Pont, 22 CIT at 375, 8 F. Supp. 2d at 859

("{A}ntidumping orders apply to merchandise from particular countries . . . .").  To determine

otherwise is a novel and legally invalid position.

Commerce is also conflating the issues of enforcement with country of origin. Solar II AD

ID Memo at 15, AD P.R. 817; Solar II CVD ID Memo at 41, CVD P.R. 388. As discussed,

Commerce is tasked with administering antidumping and countervailing duties from a specific

country. See 19 U.S.C. §§ 1671, 1673. It is only once a product has been determined to be within

---

[8] Consolidated Plaintiffs also note that Commerce's substantial transformation test already guards against possible circumvention. As the Court explained, the substantial transformation test "provides a means for Commerce to carry out its country of origin examination and properly guards against circumvention of existing antidumping orders." E.I Du Pont, 22 CIT at 375, 8 F. Supp. 2d at 859 (emphasis added).

AFDOCS/12508777.15

the scope of an order, and therefore its country of origin analysis *completed*, that Commerce may then turn to examining enforcement and circumvention. Commerce is putting the cart before the horse. It is addressing enforcement before it has even determined whether the product falls within the scope of the order. It is conflating the issues and using enforcement as a proxy for a country of origin determination. This circular reasoning leads to products being within the scope of the order regardless of their origin, as is the case here. Commerce targeted and arrived at a result – covering as many products as possible – rather than using a proper process (use of consistent country of origin principles) to achieve that result. It did so, moreover, for the legally impermissible purpose of targeting specific producers, rather than products of specific origin. Petitioner's intent and enforcement concerns do not explain Commerce's country of origin determination and its deviation from established agency precedent.

Finally, in the 24 pages Commerce dedicates to respond to comments on its unprecedented country of origin determination and illegal new scope, Commerce never explains its country of origin analysis or decision-making process. See Solar II AD ID Memo at 6-29 (cmt. 1), AD P.R. 817; CVD ID Memo at 32-55 (cmt 1), CVD P.R. 388. Even after 24 pages, one cannot discern how Commerce reached its determination.  In relevant part, Commerce explained its departure from Solar I and its new country of origin determination by the following:

> **Although the Department routinely has found a substantial transformation analysis to be an appropriate means to determine the country of origin** of merchandise under investigation, in the circumstances presented by these investigations and discussed above, the Department has determined that it **needs to conduct additional analysis**. . . . **Relying on the substantial transformation analysis alone** could result in failure to provide relief to the domestic industry for alleged injury caused by a finished product produced in the subject country but which would be deemed to originate from a third-country for AD/CVD purposes if the traditional substantial transformation analysis were applied. In these particular proceedings, a rote application of a substantial transformation analysis would not allow the Department to address unfair pricing decisions and/or unfair subsidization concerning the modules that is taking place in the **country of**

**export.** Consistent with sections 701 and 731 of the Act, the Department must be able to address such circumstances, and where appropriate, address unfair pricing decisions or unfair subsidization that is taking place in the exporting country where further manufacturing, such as assembly, occurs, notwithstanding that such activities may not necessarily result in a substantial transformation of merchandise. **While the Department intends that a substantial transformation analysis will continue to be the primary manner in which it will evaluate country of origin in AD/CVD proceedings, given the facts presented by these investigations** (and in light of the *Solar I* orders already in place, under which country of origin was already based on a substantial transformation analysis), **the Department finds that its additional analysis is appropriate**. We do not agree that our analysis is inconsistent with *Solar I*. Rather, in these investigations we are building upon our decisions in *Solar I* and finding, given the circumstances before us, that **it is appropriate to go beyond our decision concerning country of origin from *Solar I*** to address merchandise exported from China that is not subject to the *Solar I* orders and that is alleged to injure the domestic industry through unfair pricing and/or subsidization.

Solar II AD ID Memo at 15-16, AD P.R. 817; Solar II CVD ID Memo at 41, CVD P.R. 388 (emphasis added).  The above response results in confusion – and many questions.

First, Commerce stresses that it desires to conduct "additional analysis" to substantial transformation and that substantial transformation "alone" does not provide relief to the domestic injury. What is the "additional analysis"? Although Commerce states it used additional analysis to substantial transformation, there is no indication that Commerce did a substantial transformation analysis at all, let alone any additional analysis.  In short, in reviewing Commerce's rationale, it is unclear what analysis it used to establish country of origin. More problematically, it is unclear whether Commerce performed *any* country of origin analysis. In fact, it appears that Commerce is unlawfully examining the country of export, instead of the product's country of origin, in direction violation of the AD/CVD statutes. The only conclusion that can be discerned is that Commerce changed its practice to cast the widest antidumping and countervailing duty order net – catching all solar products, regardless of origin.

28

When products are made in more than one country, such as solar modules, it is important to determine *the* country of origin of the product. It is well established by this Court, as well as the Federal Circuit, that Commerce country of origin determinations are conducted by the use of the "substantial transformation" test. See E.I. Du Pont, 22 CIT at 373-374, 8 F. Supp. 2d. at 858. ("The 'substantial transformation' rule provides a yardstick for determining whether the processes performed on merchandise in a country are of such significance as to require that the resulting merchandise be considered the product of the country in which the transformation occurred."). In Solar I, Commerce employed its "usual practice" of using the substantial transformation analysis. Solar II CVD ID Memo at 40-41, CVD P.R. 388; Solar II AD ID Memo at 15, AD P.R. 817; see also, Solar I ID Memo at 8 (cmt. 1).  Based on the substantial transformation analysis, Commerce determined in Solar I that:

> the solar cell was the essential active component of the module, that assembly of cells into modules did not constitute substantial transformation such that the assembled module could be considered a product of the country of assembly, and consequently, that the modules assembled in {China} from solar cells produced in third countries are not covered by the scope of that investigation.

Solar II CVD ID Memo at 40-41 (citing Solar I AD ID Memo at 5-7 (cmt. 1). Therefore, Commerce's established practice of substantial transformation concluded that assembly does not change the origin of the product, so as to confer a new origin from that of its cells. This is the same analysis that should have been used in this case and Commerce has provided no reasonable explanation for why it has deviated from this well-established practice, or even what practice it has used.

Moreover, the method Commerce did employ is unknown and results in an unreasonable scope that allows for two country of origin determinations on the same product. See E.I. DuPont de Nemours & Co. v. United States, No. 97-08-01335, 1999 WL 378258, at *3 (Ct. Int'l Trade

June 2, 1999) ("{A}gency's path {must be} reasonably discernible.") (citing Ceramica

Regiomontana, S.A. v. United States, 810 F.2d 1137, 1139 (Fed. Cir. 1987).  In rejecting module

assembly from the scope of Solar I, Commerce explained that if the scope were to cover assembly

of modules from non-Chinese cells, it "would either necessitate making inconsistent country-of-

origin determinations for a single product, or requiring ignoring the country-of-origin when

considering whether merchandise entering the United States is covered by the scope of the

investigation." Solar I AD ID Memo at 8 (cmt 1) (footnote omitted), attached to Respondents'

Scope Comments at Exh. 1, AD P.R. 125, CVD P.R. 88. By its own admission, by including mere

assembly in its "analysis" Commerce has made inconsistent country of origin determinations. See

id. For the same reasons Commerce previously provided, Solar II's inclusion of assembled solar

panels from non-Chinese cells is unreasonable and unsupported by substantial evidence.

> **B.     COMMERCE'S LATE HOUR EXPANSION OF THE SCOPE
>         DEFINITION RENDERS BOTH COMMERCE'S AND THE ITC'S
>         FINAL DETERMINATIONS UNSUPPORTED BY SUBSTANTIAL
>         EVIDENCE**

It is Commerce's practice to address scope issues early on in the investigations. See

Antidumping Duties; Countervailing Duties, 62 Fed. Reg. 27295, 27323 (Dep't Commerce May

19, 1997) (final rule).  In its rulemaking notice, Commerce provided a well-reasoned explanation

of its scope evaluation process and the important policy goals that it was seeking to achieve in

light of the statutory scheme.  In particular, Commerce explained that "early amendment will

partially alleviate the reporting burden on respondents and avoid suspension of liquidation and

posting of bonds or cash deposits on products of no interest to petitioners." Id.  This is consistent

with Commerce's approach in other investigations where Commerce made adjustments to the

scope language after initiation and comments by interested parties.  See Certain Steel Nails From

the People's Republic of China, 73 Fed. Reg. 33977, 33979 (Dep't Commerce June 16, 2008)

30

(final LTFV determ.); <u>Co-Steel Raritan, Inc. v. Int'l Trade Comm'n</u>, 357 F.3d 1294, 1316-17 (Fed. Cir. 2004). However, that is not the path Commerce followed in this case. Although Commerce requested comments on the scope issues and parties filed such comments and rebuttal scope comments on February 18, 2014 and April 21, 2014, Commerce gave parties no indication that it was contemplating expanding the scope until October 3, 2014, at a very late stage of the investigations. The scope of the investigations, defined by the two-out-of-three rule, remained unchanged until the final determinations, when Commerce announced that it was adopting the language of the October 3, 2014 Solar II Scope Clarification. <u>Solar II AD ID Memo</u> at 7, AD P.R. 817.

As the Federal Circuit has explained, Commerce has the responsibility to ensure that the scope of an investigation is administrable and sufficiently clear to provide "adequate notice of what conduct is regulated by the order." <u>Mid Continent Nail Corp. v. United States</u>, 725 F.3d 1295, 1300 (Fed. Cir. 2013) (citation omitted). Here, Commerce first proposed its vastly expanded scope definition just <u>two</u> <u>months</u> before the final determinations. <u>See</u> Solar II Scope Clarification Memo. Such a massive proposed change in scope at that late stage of the investigation is unprecedented. This was after the record for factual information had closed, thus precluding respondents from submitting factual evidence addressing the unprecedented scope definition, and almost nine months after the initiation of the AD/CVD investigations. This late amendment to the scope definition thus raises serious due process concerns. As this Court explained, "Commerce cannot include in the final order merchandise for which there was no investigation and for which there was no determination of sales at LTFV or determination of injury." <u>A.L. Patterson, Inc. v. United States</u>, No. 11-00192, 2012 WL 3538722, at *15 (Ct. Int'l Trade Aug. 6, 2012), citing <u>Allegheny Bradford Corp. v. United States</u>, 28 CIT 830, 848, 342 F.

31

Supp. 2d 1172, 1187-88 (2004).  Like the present situation, in <u>Allegheny Bradford</u>, Commerce

amended the scope language at a last hour, concurrent with the issuance of the final

determination. The Court expressed concerns for the finality of the administrative action and

found that such late amendment compromised the integrity of the investigation's prior stages.

<u>Allegheny Bradford</u>, 28 CIT at 848, 342 F. Supp. 2d at 1188;  <u>see also</u> <u>Smith Corona Corp. v.

United States</u>, 16 CIT 562, 565-66, 796 F. Supp. 1532, 1535 (1992) (the Court upheld

Commerce's decision to deny an expansion of the scope language proposed by Petitioner one

month after the preliminary results were issued).  In <u>Smith Corona</u>, the Court explained that

Commerce  "must exercise caution in redefining scope in midstream to include items which were

clearly known about and excluded at the time of initiation of the investigation, and, indeed in this

case, at the time of the preliminary determination.  <u>Smith Corona</u>, 16 CIT at 565, 796 F. Supp. at

1535.

     In similar circumstances, the Federal Circuit upheld an ITC preliminary determination

that did not take into account petitioners' scope modification, where such modification was

submitted three days before the ITC's preliminary determination was due.  <u>Co-Steel Raritan</u>,

357 F.3d at 1317.  Moreover, the court reasoned that such late in-the day scope modifications

"would undermine the ability of the Commission to arrive at <u>final</u> preliminary determinations

in antidumping cases," <u>id.</u>, and encourage future litigation.  The court's rationale is directly

applicable here. Commerce altered the scope language of <u>Solar II</u> at the time of the final

determinations; moreover, it first provided an indication of this proposed scope modification

only on October 3, 2014, when the final phase of the ITC investigation had already

commenced and the questionnaires were already issued under the initial scope definition.  <u>See

Certain Crystalline Silicon Photovoltaic Products from China and Taiwan</u>, Invs. 701-TA-511

and 731-TA-1246-1247, USITC Pub. 4519, at 5 (Feb. 2015) (Final) ("Commerce did not

finalize the scope of these investigations until December 16, 2014").

Thus, the investigations before Commerce and the ITC were conducted under a vastly

different scope definition than the final scope language, which calls into question the validity of

Commerce's and the ITC's final determinations.  In particular, the ITC had to address a very

different understanding of what is subject merchandise and what is not subject merchandise.

Therefore, the ITC determination of like product and its injury findings are premised on a record

that does not support the final scope definition of Solar II.  For these reasons alone, Commerce's

scope definition is not supported by substantial evidence on the record.

## III.   COMMERCE'S SCOPE IS UNLAWFUL

### A.   THE SCOPE VIOLATES COMMERCE'S ANTIDUMPING AND COUNTERVAILING DUTY STATUTES

Commerce derives its authority to impose antidumping and countervailing duties from the

unfair trade statutes, 19 U.S.C. §§ 1671 and 1673.  The statutes provide for the imposition of

antidumping and countervailing duties on "subject merchandise," defined as "the class or kind of

merchandise that is within the scope of an investigation, a review, a suspension agreement, {or} an

order . . . ." Id. § 1677(25). This provision requires Commerce to make a finding of dumping for a

class or kind of merchandise from a particular country. See E.I. Du Pont, 22 CIT at 375, 8 F. Supp.

2d at 859 ("{A}ntidumping orders apply to merchandise from particular countries . . . .").

Antidumping and countervailing orders must specify both the class or kind of merchandise and the

particular country from which the merchandise originates. "For merchandise to be subject to an

order, it must meet both parameters, i.e., product type and country of origin." Ugine & ALZ Belg.,

31 CIT at 1551, 517 F. Supp. 2d at 1345 (citing Cold–Rolled from Argentina, 58 Fed. Reg. at

37065 ("The scope of an antidumping or countervailing duty order is defined by the type of

merchandise and by the country of origin (e.g., widgets from Ruritania).")). However, Solar II results in the application of antidumping and countervailing duties on products that are not of Chinese origin – a direct violation of the statutes. See 19 U.S.C. §§ 1671, 1673.  In fact, the Solar II scope results in the application of antidumping and countervailing duties on solar panels originating everywhere in the world, except for China or Taiwan because of specific language excluding products from Solar I and Solar Products from Taiwan.

Therefore, Commerce has issued antidumping and countervailing orders on solar panels from the entire world—regardless of origin, in violation of the requirement that the scope of an order is limited to merchandise that is produced in the country covered by the order. See Steel Plate from Belg., Issues & Decision Memo. at 15 (cmt. 4). When products are made in more than one country, it is important to determine the country of origin of the product, as the Court has clearly explained:

> The antidumping statute reflects Congress' recognition that country of origin determinations are vital to preserve the integrity of existing antidumping orders from potential circumvention through third country assembly, U.S. assembly, and transshipment of subject merchandise through intermediate countries. See 19 U.S.C. §§ 1677j, 1677b(a)(3). **Because antidumping orders apply to merchandise from particular countries, not individual producers, determining the country where the unfairly traded merchandise is produced or manufactured is fundamental to the proper administration and enforcement of the antidumping statute.** See 19 U.S.C. § 1673; see also §§ 1677j, 1677b(a)(3). The "substantial transformation" rule provides a means for Commerce to carry out its country of origin examination and properly guards against circumvention of existing antidumping orders.[18]

E.I. Du Pont, 22 CIT at 375, 8 F. Supp. 2d at 859 (emphasis added).

Consistent with law, in Solar I, Commerce determined the country of origin of modules containing non-Chinese cells by employing the substantial transformation test. Solar I AD ID Memo. at 8 (cmt. 1), attached to Respondents' Scope Comments at Exh. 1, AD P.R. 125, CVD P.R. 88.  As previously described, in applying this test, Commerce found solar cells to be the

34

essential component of modules – the country of origin determining component. Therefore, the existing orders in Solar I already covered imports of solar panels from China and determined the solar panels that are not Chinese-origin for AD/CVD purposes. Commerce cannot ignore its own precedent. Ugine & ALZ Belg., 551 F.3d at 1349 ("Nonetheless, Commerce is obligated to follow prior precedent absent some legitimate reason for departing from it."). Solar II is therefore unlawful.

Next, Commerce also violates the antidumping and countervailing statutes by creating a scope whose country of origin determination allows two orders applying to the same product. The antidumping and countervailing statute state that if Commerce determines that "a class or kind of foreign merchandise" is either sold at less than fair value or received subsidies, then if other requirements are met, it "shall . . . impose{} upon such merchandise an antidumping {or countervailing} duty." Ugine & ALZ Belg., 31 CIT at 1550, 517 F. Supp. 2d at 1344 (quoting 19 U.S.C. § 1673).  As mentioned, a product must have a single country of origin for AD/CVD purposes. Commerce's revised scope has allowed the same product to have two different country of origins, one for Solar I and one for Solar II. In having two country of origins for the same product, the country of origin determinations alone would render two orders applying to the same merchandise. Commerce is well aware of this statutory requirement; it is the reason why it attempted to sidestep the statutory restrictions by merely adding language to the scope that merchandise covered therein does not include products covered by Solar I.  However, that language does not expunge statutory violations.  It is attempting to circumvent the plain reading of the statute that allows for only one country of origin determination and the application of one order to one product.  Commerce's actions are in violation of its statutory authority under 19 U.S.C.§§ 1671 and 1673.

In response to its failure in creating a scope that results in two country of origins for a single product, Commerce provided the following defense: "{w}ith regard to respondents' assertion that the scope clarification results in a single product having two countries of origin, we disagree. No product would at any time have two countries of origin for AD/CVD purposes." Solar II AD ID Memo at 16, AD P.R. 817. Although Consolidated Plaintiffs agree that should not be the case, that is the exact consequence of Solar II. As the example chart below demonstrates, Solar I versus Solar II have completely opposite country of origin determinations for the same product, XYZ.  This is impermissible under the statutes.

| Product | Country of Cells | Country of Assembly | COO[9] under Solar I (2013) | COO under Solar II (2014) | COO under Solar Products from Taiwan |
|---------|------------------|---------------------|-----------------------------|---------------------------|--------------------------------------|
| YXZ | Singapore | China | Singapore | China | Singapore |

Accordingly, Commerce's scope is unlawful as it violates its statutes under 19 U.S.C. §§ 1671 and 1673.

Finally, Consolidated Plaintiffs note that Commerce's regulations and statutes address certain situations where subject merchandise may be completed or assembled in third countries. However, those limited situations are not presented in this case. First, as Commerce is aware, it may not expand antidumping or countervailing proceedings involving merchandise from named foreign countries to include merchandise produced in unnamed foreign countries, except under the conditions of the anti-circumvention provisions of the statute, which require the existence of antidumping or countervailing order in force. See 19 U.S.C. § 1677j(b); 19 C.F.R. § 351.225(h). Second, such procedures deal with the scenario of "Merchandise completed or assembled in other

---

[9] The designation, "COO," refers to "country of origin."

foreign countries," but this case presents the reverse scenario. <u>Solar II</u> seeks to include solar panels where the completion or assembly is in China, while the "essential components" (according to Commerce's own words in <u>Solar I</u>) of the solar panels, the solar cells, are from such unnamed foreign countries. Additionally, this case does not involve AD/CVD orders already in force, but instead, is drafting a scope for a new investigation. The statutes do not authorize a world-wide scope expansion under this scenario. Therefore, there is no legal basis for Commerce's limitless scope expansion of <u>Solar II</u>, covering solar panels with cells produced in third countries.

### B.   COMMERCE'S SCOPE AND ITS COUNTRY OF ORIGIN DETERMINATION ARE ARBITRARY AND CAPRICIOUS

Commerce has "the discretion to change its policies and practices as long as they are reasonable and consistent with their statutory mandate {and} 'may adapt its views and practices to the particular circumstances of the case at hand, so long as the agency's decisions are explained and supported by substantial evidence on the record.'" <u>Trs. in Bankr. of N. Am. Rubber Thread Co. v. United States</u>, 31 CIT 2040, 2047, 533 F. Supp. 2d 1290, 1297 (2007) (citation omitted). As explained in the previous sections, Commerce's scope is unsupported by substantial evidence and violates its statutory authority, but additionally, this scope deviates from agency practice and is unlawfully arbitrary and capricious.  This Court has emphasized that when departing from its own precedent, Commerce must explain its departure. <u>Transactive Corp.</u>, 91 F.3d at 237 ("{A}gency action is arbitrary when the agency offer{s} insufficient reasons for treating situations differently.") (citing <u>Motor Vehicle Mfrs. Ass'n</u>, 463 U.S. at 57). <u>See</u> <u>Trs. in Bankruptcy</u>, 31 CIT at 2047, 533 F. Supp. 2d at 1297 (Commerce must "attempt to distinguish the reasoning set forth in {prior cases} from the present case"); <u>Trs. in Bankr. of N. Am. Rubber Thread Co. v. United States</u>, 32 CIT 663, 664, 558 F. Supp. 2d 1367, 1370 (2008) ("Generally, 'an agency action is arbitrary when the agency offer{s} insufficient reasons for treating similar

37

situations differently.'" (citation omitted)); <u>Consol. Bearings Co. v. United States</u>, 348 F.3d 997, 1007 (Fed. Cir. 2003) (Commerce acts arbitrarily and capriciously when it "consistently follow{s} a contrary practice in similar circumstances and provide{s} no reasonable explanation for the change in practice."); <u>British Steel PLC v. United States</u>, 127 F.3d 1471, 1475 (Fed. Cir. 1997) ("An agency is obligated to follow precedent, and if it chooses to change, it must explain why." (citation omitted)).

Consolidated Plaintiffs' arguments in this brief commenced by an explanation of Commerce's decision in <u>Solar I</u> versus <u>Solar II</u>.  Simply stated, in <u>Solar I</u>, Commerce determined that solar cells are the "essential critical component" of solar panels, and therefore, the origin-determining component of solar cells. Additionally, after careful examination and application of the substantial transformation test, Commerce determined that solar panels with non-Chinese cells, assembled in China, are not Chinese products so to fall within the scope of an order from China. Commerce explained its decision by stating that including mere assembly would result in either inconsistent country of origin determinations or ignoring country altogether – both of which are unlawful. In sharp contrast, and without proper explanation, Commerce in <u>Solar II</u> included non-Chinese cells assembled in China in the scope of the order on the exact products. Additionally, in the sister case, <u>Solar Products from Taiwan</u>, decided on the same day as <u>Solar II</u>, Commerce returned to the reasoning of <u>Solar I</u> and determined solar cells as conferring product origin and excluded mere assembly in Taiwan from the scope of the order. Commerce's origin determination in Solar I is consistent with its prior determinations in <u>EPROMs from Japan</u>,[10] 3.5″ <u>Microdisks & Coated Media Thereof From Japan</u>,[11] <u>DRAMs from Korea Intiation</u>[12] and

---

[10] 51 Fed. Reg. at 39681.

[11] 54 Fed. Reg. 6433, 6434-35 (Dep't Commerce Feb. 10, 1989) (final LTFV determ.) ("<u>Microdisks from Japan</u>").

AFDOCS/12508777.15

subsequent cases. Since 1986, Commerce has consistently determined that the country of origin of a memory microcircuit is the country in which the microcircuit is produced.[13]

- In <u>EPROMs from Japan</u>, which are memory integrated circuits, Commerce found that assembly of its main components, "processed wafers" and dice did not constitute a substantial transformation.  <u>EPROMs from Japan</u> at 39692. Commerce based its conclusion on the fact that (1) the processed wafer is not only a major component of the finished device, it is the essential active component that defines the merchandise, (2) assembly does not add to its essential characteristics, and (3) assembly is fairly unsophisticated process that could be accomplished with relative ease in a third country. <u>Id.</u>

- In <u>DRAMs from Korea</u>, Commerce concluded that finished semiconductors assembled in Korea from wafers "fabricated" outside Korea were of Korean origin because "in numerous past proceedings on DRAMs and similar products such as EPROMs, the Department has consistently maintained that the country of origin is the country where wafer fabrication occurs."  <u>DRAMs from Korea Initiation</u> at 70928.

- <u>EPROMs from Japan</u>, <u>DRAMs from Korea</u> and subsequent cases in the semiconductor industry analyzed whether conversion of raw silicon wafers to memory microcircuits, in a process called "wafer fabrication," is a "substantial transformation." "Wafer fabrication" as used in the <u>EPROMs</u> and the <u>DRAMs</u> cases is similar to the conversion of a raw silicon wafer to a solar cell.

---

[12] 67 Fed. Reg. at 70928.

[13] <u>Id.</u>; <u>see</u> <u>also</u> <u>EPROMs From Japan</u> at 39692; <u>Static Random Access Memory Semiconductors From Taiwan</u>, 62 Fed. Reg. 51442, 51444 (Dep't Commerce Oct. 1, 1997) (Prelim. LTFV determ.).

AFDOCS/12508777.15

 Therefore, Commerce's consistent determination that converting raw silicon wafers to microcircuits constitutes a substantial transformation supports Commerce's finding in <u>Solar I</u> that the country of origin of a module for AD/CVD purposes is the country in which solar cell production takes place.  Similar to <u>EPROMs</u> and <u>DRAMs</u>, the process which imparts the essential function of a solar cell, <u>i.e.</u> of converting sunlight to electricity, is where substantial transformation occurs.  <u>See</u> <u>Solar I</u> Scope Clarification Memo at 6-7, attached to Respondents' Scope Comments, at Exh. 2 AD P.R. 125, CVD P.R. 88.

In <u>Solar II</u>, although it provided an explanation of why it was casting the widest "net" to capture all country of origins, it provided no explanation on why the country of origin determination in this case was different than <u>Solar I</u> or <u>Solar Panels from Taiwan</u>.  Again, country of origin determinations, which examine the production process of the subject merchandise, *cannot* in any way be influenced by enforcement and anticircumvention concerns. This is not a reasoned explanation for its country of origin analysis deviation. Yet, Commerce appears to have conflated these two issues by providing only enforcement related reasons for its country of origin determination.  The simple fact remains that Commerce has provided <u>no</u> <u>explanation</u> at all for why it deviated from established practice. This is unlawful and remand is therefore appropriate.

Next, Commerce's decision should be remanded as arbitrary and capricious.  First, Commerce's application of different origin rules to the same merchandise and the same fact pattern, varying only because of the country involved is arbitrary and capricious.  <u>See</u> <u>Changzhou Wujin Fine Chem. Factory Co. v. United States</u>, 701 F.3d 1367, 1377 (Fed. Cir. 2012) (explaining that antidumping determination will be set aside if they are arbitrary and capricious).  Second, Commerce's determination should be remanded because the "agency's path

is {not} reasonably discernable." <u>E.I. DuPont</u>, 1999 WL 378258, at *3 (citing <u>Ceramica Regiomontana, S.A. v. United States</u>, 810 F .2d 1137, 1139 (Fed. Cir. 1987). As the previous sections demonstrates, it is unclear what country of origin analysis, if any, Commerce employed in this case.  As explained, antidumping and countervailing duty orders attach to products from a specific country and country of origin cannot be ignored. <u>See</u> 19 U.S.C. §§ 1671, 1673; <u>Steel Plate from Belg.</u>, I&D Memo at 15 (cmt. 4) (The scope of an order is limited to merchandise that is produced in the country covered by the order.).  Therefore, although this case is fraught with grounds for remand, Commerce's failure to explain its decision, its country of origin analysis (if any), again warrants remand.

The scope definition of <u>Solar II</u> results in the application of contradictory origin rules to the identical products, at the same time, a result that is absurd and impossible to reconcile with Commerce's practice and its long-standing substantial transformation framework. As noted above, application of Commerce's substantial transformation test would result in Commerce finding that the product subject to the <u>Solar II</u> investigations is already covered by the existing antidumping and countervailing duty orders in <u>Solar I</u>. In light of <u>Solar I</u> there is no construction of the <u>Solar II</u> scope definition that would allow the two scopes to co-exists. Accordingly, the only appropriate remedy is for the Court to declare the scope of <u>Solar II</u> void and remand with instructions for Commerce to revoke the <u>Solar II</u> orders.

41

## IV.      CONCLUSION

For the reasons set forth above, the Court should GRANT Consolidated

Plaintiffs' motion for judgment on the administrative record and order Commerce to

revoke the <u>Solar II</u> orders.


Respectfully submitted,


**/s/ John M. Gurley_____**              **\_/s/ Craig A. Lewis_____**

John M. Gurley                                   Craig A. Lewis
Diana Dimitriuc Quaia                            Samantha  Clark Sewall
Tina Termei                                      Wesley Verne Carrington
ARENT FOX LLP                                    Hogan Lovells US LLP
1717 K Street, NW                                Columbia Square Building
Washington, DC 20036                             555 Thirteenth Street, NW.
(202) 857-6301                                   Washington, DC 20004
                                                 (202) 637-8613




October 5, 2015

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Chamber Procedure 2(b)(1) and Senior Judge Pogue's consolidation Order dated July 1, 2015, the undersigned certifies that **Consolidated Plaintiffs' Brief in Support of its Rule 56.2 Motion For Judgment On The Agency Record** complies with the word limitation requirement of 16,000 words (8,000 for each Plaintiff). The word count for **Consolidated Plaintiffs' Brief in Support of its Rule 56.2 Motion For Judgment On The Agency Record**, as computed by Arent Fox LLP's word processing system is 13476.


       **/s/ Diana Dimitriuc Quaia**
       Diana Dimitriuc Quaia

# EXHIBIT 1
# Extracts from <u>Solar I</u> Petition

ORIGINAL

DOC Investigation Nos. A-570-979 and
C-570-980
USITC Inv. Nos. 701-TA-___, 731-TA-
___

Total Pages: 409
Investigation
Petitioner's Business Proprietary
Information Deleted from the Table of
Contents, pages 2-3, 5-6, 16, 27, 29-32,
34-38, 44, and 51-52, Exhibit List,
Exhibits I-3(B)-(G), I-8-I-9, I-13, and I-24
**PUBLIC VERSION**

# BEFORE THE
# INTERNATIONAL TRADE ADMINISTRATION
# UNITED STATES DEPARTMENT OF COMMERCE
# AND THE
# UNITED STATES INTERNATIONAL TRADE COMMISSION

## CRYSTALLINE SILICON PHOTOVOLTAIC CELLS, WHETHER OR NOT ASSEMBLED INTO MODULES, FROM THE PEOPLE'S REPUBLIC OF CHINA

### PETITION FOR THE IMPOSITION
### OF ANTIDUMPING AND COUNTERVAILING DUTIES PURSUANT TO
### SECTIONS 701 AND 731 OF THE TARIFF ACT OF 1930, AS AMENDED

### VOLUME I

### COMMON ISSUES AND INJURY

Timothy C. Brightbill, Esq.
Adam H. Gordon, Esq.
Robert E. DeFrancescso, Esq.
WILEY REIN LLP
1776 K Street, N.W.
Washington, D.C. 20006
(202) 719-7000
*Counsel to SolarWorld Industries
America Inc.*

October 19, 2011

25323.12

**PUBLIC VERSION**

# BEFORE THE
## UNITED STATES DEPARTMENT OF COMMERCE
### AND THE
## UNITED STATES INTERNATIONAL TRADE COMMISSION
### WASHINGTON, D.C.

### PETITION FOR THE IMPOSITION
### OF ANTIDUMPING AND COUNTERVAILING DUTIES AGAINST
### CRYSTALLINE SILICON PHOTOVOLTAIC CELLS FROM
### THE PEOPLE'S REPUBLIC OF CHINA

These Petitions are presented on behalf of SolarWorld Industries America Inc.

("SolarWorld" or "Petitioner") and are supported by the Coalition for American Solar

Manufacturing.[1]  Petitioner alleges that crystalline silicon photovoltaic cells (hereinafter "CSPV

cells") imported from the People's Republic of China,[2] whether individually or partially or fully

assembled into modules or panels,[3] are being or are likely to be sold at less than normal value

within the meaning of section 731 of the Tariff Act of 1930, *as amended*, 19 U.S.C. § 1673

(hereinafter "the Act" or "the Tariff Act").  Petitioner further alleges that Chinese producers and

exporters of CSPV cells and modules imported into the United States have benefited from

subsidies that are countervailable within the meaning of section 701 of the Act, *as amended*, 19

U.S.C. § 1671.  Finally, Petitioner alleges that these unfairly traded imports are a cause of

material injury to the United States domestic industry producing CSPV cells and modules and

threaten to cause further material injury if remedial action is not taken.  These Petitions contain

---

[1]      The Coalition for American Solar Manufacturing consists of the following companies: SolarWorld, [ Company Name      Company Name      Company Name ].
*See* **Exhibit I-3(B-G)**.

[2]      U.S. producers of thin-film products, such as Solyndra, are not part of the domestic CSPV industry on whose behalf these Petitions are being filed.

[3]      The terms "module" and "panel" are used interchangeably herein.  For purposes of this Petition, both terms refer to multiple CSPV cells strung together.

Business Proprietary Information Deleted

25323.12

PUBLIC VERSION

shuttered U.S. facilities, and with prospects for a "double-dip" global recession mounting, the domestic industry is extremely vulnerable to further material injury. In the absence of relief, the future of the domestic CSPV industry will be in peril. Chinese producers have enormous and growing CSPV capacity, are export-oriented, and have demonstrated that they can and will rapidly ship huge volumes of dumped and subsidized product into the U.S. market, irrespective of actual demand. Indeed, the sheer size of China's substantial capacity compels Chinese producers and exporters to export virtually all of their production at dumped and subsidized prices. With demand in China's alternative export markets stagnating, Chinese producers and exporters are poised to continue to increase shipments of dumped and subsidized product to the United States. Given the growing vulnerability of the U.S. industry, any hope of recovery will be dashed if AD and CVD orders are not imposed.

Separate volumes regarding the allegations of dumping by Chinese producers and exporters, countervailable subsidies provided to Chinese producers and exporters, and critical circumstances are being filed simultaneously at both the U.S. Department of Commerce (the "Department") and the U.S. International Trade Commission (the "Commission" or the "ITC"). Petitioner requests that antidumping and countervailing duties be imposed to offset the dumping and subsidy margins detailed in the specific antidumping and countervailing duty volumes.

## I.    COMMON ISSUES

This section contains information required in antidumping, countervailing duty, and critical circumstances petitions by 19 C.F.R. §§ 351.202(b)(1)-(9) and 19 C.F.R. § 207.11.

### A.    The Name and Address of the Petitioner (19 C.F.R. § 351.202(b)(1))

Petitioner is a company that produces the domestic like product in the United States. Accordingly, Petitioner is a domestic interested party within the meaning of 19 U.S.C. § 1677(9)

4

25323.12

**PUBLIC VERSION**

and 19 C.F.R. § 351.102(b).  Petitioner's address and telephone number are provided in **Exhibit I-1**.

    **B.**    **Identity of the Industry on Whose Behalf the Petition Is Filed (19 C.F.R. § 207.11(b)(2)(ii); 19 C.F.R. § 351.202(b)(2))**

These Petitions are filed on behalf of the United States industry that produces certain CSPV cells, whether or not fully or partially assembled into modules or panels.  In addition to information relating to the Petitioner, the names, addresses, and telephone numbers of all other domestic producers in the United States are provided in **Exhibit I-2A**.  According to the best information available to Petitioner, **Exhibits I-1** and **I-2A** identify all known producers of the subject merchandise in the United States.[11]

    **C.**    **Information Relating to the Degree of Industry Support for the Petitions (19 C.F.R. § 351.202(b)(3))**

According to 19 U.S.C. §§1671a(c)(4)(A) and 1673a(c)(4)(A), a petition is filed by or on behalf of the domestic industry if: (1) petitioning domestic producers account for at least 25 percent of the total production of the domestic like product, and (2) domestic producers who support the petition account for more than 50 percent of the production of the domestic like product produced by that portion of the industry expressing support for or opposition to the petition.

    As shown in **Exhibit I-3**, the Petitions meet both of these requirements.  Based on production data published by Photon International, a leading source for the solar PV industry, affidavits of support provided by domestic producers, and Petitioner's detailed knowledge of U.S. CSPV cell capacity and production, SolarWorld alone represents approximately [      ] percent of 2010 U.S. production.  [      *Narrative*

---

[11]    *See* **Exhibit I-3A**.  For purposes of the Commission's injury analysis, **Exhibit I-2B** provides a list of U.S. CSPV module and panel producers.

**Business Proprietary Information Deleted**

25323.12

**PUBLIC VERSION**

Company    Company

Company                    ].[12]  In total, domestic producers who

support the Petitions account for [ **70** ] percent of 2010 CSPV cell production.[13]

Therefore, domestic producers who support the Petitions account for at least 25 percent

of the total production of the domestic like product and more than 50 percent of the production

of the domestic like product produced by that portion of the industry expressing support for or

opposition to the Petitions.

**D.    Previous Requests for Import Relief for the Merchandise (19 C.F.R. § 351.202(b)(4))**

Petitioner has not previously filed for relief from imports of the subject merchandise

under Section 337 of the Act, Section 701 of the Act, or Section 731 of the Act.   Nor has

Petitioner sought relief from imports under either Section 201 or Section 301 of the Trade Act of

1974, or under Section 232 of the Trade Expansion Act of 1962.

**E.    Scope of the Investigation and a Detailed Description of the Subject Merchandise (19 C.F.R. § 351.202(b)(5))**

**1.    Scope of Investigation**

The scope of this proceeding is defined as follows:

> The merchandise subject to these proceedings consists of
> crystalline silicon photovoltaic ("PV") cells, whether or not

---

[12]    *See* **Exhibit I-3**.

[13]    These calculations do not include Evergreen Solar Inc.'s production, because Evergreen should be excluded from the industry support analysis.  In 2010, Evergreen entered into a joint venture in China to produce CSPV cells and began shifting its U.S. production to its Chinese affiliate, and therefore its position must be disregarded as a producer related to a foreign producer.  In addition to its relationship to a Chinese producer, Evergreen shut down all of its U.S. operations in March of this year.  As a result, because Evergreen no longer produces in the United States, now produces in China, and would be shipping subject merchandise from China to the United States, Evergreen's 2010 reported production of 157 MW should not be included in the standing and support calculation.  19 U.S.C. § 1671a(c)(4)(B); Greg Turner and Jerry Kronenberg, *Evergreen Solar Files for Bankruptcy, Plans Asset Sale*, The Boston Herald, Aug. 15, 2011, included at **Exhibit I-24**; Keith Bradsher, *Solar Panel Maker Moves Work to China*, The N.Y. Times, Jan. 14, 2011, included at **Exhibit I-24**; Photon International Survey, *Year of the Tiger*, Science & Technology at 194 (Mar. 2011) ("March 2011 Photon Int'l Survey"), included at **Exhibit I-10**.

**Business Proprietary Information Deleted**

25323.12

PUBLIC VERSION

individually or partially or fully assembled into other products, including, but not limited to, modules, laminates, panels and building integrated materials.

These proceedings cover crystalline silicon PV cells of thickness equal to or greater than 20 micrometers, having a heterogeneous, homogeneous or patterned p/n junction, heterojunction, metal-insulator-semiconductor junction or charge-induced junction. The junction may be formed by any means, including but not limited to dopant diffusion, ion implantation, epitaxial growth, any other deposition or growth of semiconductors, insulators or metals, or bonding of dissimilar materials. The merchandise subject to these petitions may be either partially or fully processed.

Subject merchandise may be described at the time of importation as parts for final finished products that are assembled after importation, including, but not limited to, modules, laminates, panels, building-integrated modules, building-integrated panels, or other finished goods kits. Such parts that otherwise meet the definition of subject merchandise are included in the scope of this proceeding.

Excluded from the scope of these proceedings are thin film PV products produced from amorphous silicon (a-Si), cadmium telluride (CdTe), or copper indium gallium selenide (CIGS).

Unless explicitly excluded from the scope of these proceedings, crystalline silicon PV cells possessing the physical characteristics of subject merchandise are covered by these proceedings.

Merchandise covered by these proceedings is currently classified in the Harmonized Tariff System of the United States ("HTSUS") under subheadings 8501.61.00.00, 8507.20.80, 8541.40.60.20 and 8451.40.60.30. These HTSUS subheadings are provided for convenience and customs purposes; the written description of the scope of these proceedings is dispositive.

## 2. Technical Characteristics and Uses

CSPV cells, which are made from crystalline silicon, are the building blocks of solar photovoltaic power-generation systems. CSPV cells are produced from ultra-refined polysilicon. CSPV cells convert the energy of sunlight directly into electricity, by the photovoltaic effect. Specifically, CSPV cells have a positive-negative junction ("p/n junction"), which is an interface

Filed By: tbrightbill@wileyrein.com, Filed Date: 10/19/11 3:10 PM, Submission Status: Approved

of a p-type semiconductor and an n-type semiconductor that is usually formed by dopant additions to create an intrinsic or extrinsic charge state.[14] The p/n junction can be heterogeneous (*i.e.*, non-uniform dopant distribution, resulting in sections of the substrates responding differently to sunlight); homogeneous (*i.e.*, uniform dopant species or concentrations, resulting in a uniform response to sunlight); or patterned (*i.e.*, alternative dopant species or concentrations to purposefully create either a different response to sunlight or improve the ability to extract current from the cell). Positive and negative charge carriers are released in the cells through light radiation, causing electrical current (direct current) to flow.

Depending on the characteristics of the crystal growth process, CSPV cells can be mono-crystalline (also referred to as c-Si), having a single crystal lattice, or multi-crystalline (also referred to as polycrystalline or mc-Si), having variable crystal lattice patterns. In general, CSPV cells may vary with respect to efficiency, wattage output, length and width, the types of dopants employed (*e.g.*, n-type and p-type dopants), surface diffusion, surface texture, the types of conductive metallic pastes or inks applied to either side of the cell surface to produce conductive fingers, grid lines, and bus bars, and surface coating.

CSPV cells typically form the basic element of solar panels or modules but can be utilized in other products as well, including building integrated photovoltaic ("BIPV") materials.[15] CSPV cells used in solar panels or modules are conductively connected to one

---

[14] The p/n junction can be formed by several means, including, but not limited to, dopant diffusion (*i.e.*, the process of using a concentration gradient of one species along with temperature and/or energy to insert those species into another); ion implantation (*i.e.*, the process of using a potential field to accelerate charged species, colliding those species with another to insert at a prescribed depth proportional to the applied potential field); epitaxial growth (*i.e.*, the process of using a gas or liquid that contains a concentration of species to grow atop a layer of another); or bonding of dissimilar materials (*i.e.*, the process of combining two materials that have differing species concentrations).

[15] BIPV products are PV products that replace traditional building materials and can be used in several applications, including windows, paint, roofing tiles, facades, and siding. These products are relatively new market entrants and do not comprise a significant portion of the CSPV market.

8

# EXHIBIT 2
# <u>Solar I</u> AD & CVD Orders

to the Department's discontinuation, effective July 24, 2012, of the suspension of liquidation.

The ITC determined that critical circumstances do not exist with respect to subject imports from the PRC. Because of the ITC's negative determination of critical circumstances, the Department will direct CBP to refund all cash deposits collected on entries of solar cells from the PRC which were entered, or withdrawn from warehouse, for consumption on or after December 27, 2011, and before March 26, 2012. The interest provisions of section 778 of the Act do not apply.

In accordance with section 706 of the Act, the Department will direct CBP to reinstitute the suspension of liquidation of solar cells from the PRC, effective the date of publication of the ITC's notice of final determination in the **Federal Register**, and to assess, upon further advice from the Department pursuant to section 706(a)(1) of the Act, countervailing duties for each entry of the subject merchandise in an amount based on the net countervailable subsidy rates for the subject merchandise. On or after the date of publication of the ITC's final injury determination in the **Federal Register**, CBP must require, at the same time as importers would normally deposit estimated duties on this merchandise, a cash deposit equal to the rates noted below:

| Company | Subsidy rate |
|---|---|
| Changzhou Trina Solar Energy Co., Ltd.; Trina Solar (Changzhou) Science and Technology Co., Ltd. (collectively, Trina Solar) | 15.97 percent *ad valorem*. |
| Wuxi Suntech Power Co., Ltd.; Luoyang Suntech Power Co., Ltd.; Suntech Power Co., Ltd.; Yangzhou Rietech Renewal Energy Co., Ltd.; Zhenjiang Huantai Silicon Science & Technology Co., Ltd.; Kuttler Automation Systems (Suzhou) Co., Ltd.; Shenzhen Suntech Power Co., Ltd.; Wuxi Sunshine Power Co., Ltd.; Wuxi University Science Park International Incubator Co., Ltd.; Yangzhou Suntech Power Co., Ltd.; and Zhenjiang Rietech New Energy Science & Technology Co., Ltd; (collectively, Wuxi Suntech) | 14.78 percent *ad valorem*. |
| All Others Rate .................................................................................................................... | 15.24 percent *ad valorem*. |

This notice constitutes the countervailing duty order with respect to solar cells from the PRC pursuant to section 706(a) of the Act. Interested parties may contact the Department's Central Records Unit, Room 7046 of the main Commerce building, for copies of an updated list of countervailing duty orders currently in effect.

This countervailing duty order is issued and published in accordance with sections 705(c)(2) and 706 of the Act, and 19 CFR 351.211.

Dated: December 3, 2012.

**Ronald K. Lorentzen,**

*Acting Assistant Secretary for Import Administration.*

[FR Doc. 2012–29669 Filed 12–6–12; 8:45 am]

**BILLING CODE 3510-DS-P**

---

## DEPARTMENT OF COMMERCE

### International Trade Administration

**[A–570–979]**

**Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order**

**AGENCY:** Import Administration, International Trade Administration, Department of Commerce.

**DATES:** *Effective Date:* December 7, 2012.

**SUMMARY:** Based on affirmative final determinations by the Department of Commerce (the ''Department'') and the International Trade Commission (''ITC''), the Department is issuing an antidumping duty order on crystalline silicon photovoltaic cells, whether or not assembled into modules (''solar cells''), from the People's Republic of China (''PRC''). In addition, the Department is amending its final determination to correct certain ministerial errors.

**FOR FURTHER INFORMATION CONTACT:** Jeffrey Pedersen, Krisha Hill, or Drew Jackson, AD/CVD Operations, Office 4, Import Administration, International Trade Administration, U.S. Department of Commerce, 14th Street and Constitution Avenue NW., Washington, DC 20230; telephone: (202) 482–2769, (202) 482–4037, or (202) 482–4406, respectively.

**SUPPLEMENTARY INFORMATION:**

### Background

In accordance with sections 735(d) and 777(i)(1) of the Tariff Act of 1930, as amended (''Act''), on October 17, 2012, the Department published the final determination of sales at less than fair value, and affirmative final determination of critical circumstances, in part, in the antidumping duty investigation of solar cells from the PRC.[1] On November 30, 2012, the ITC notified the Department of its affirmative determination of material injury to a U.S. industry.[2] In addition, the ITC notified the Department of its final determination that critical circumstances do not exist with respect to imports of solar cells from the PRC that are subject to the Department's affirmative critical circumstances finding.[3]

### Scope of the Order

The merchandise covered by this order is crystalline silicon photovoltaic cells, and modules, laminates, and panels, consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including, but not limited to, modules, laminates, panels and building integrated materials.

This order covers crystalline silicon photovoltaic cells of thickness equal to or greater than 20 micrometers, having a p/n junction formed by any means, whether or not the cell has undergone other processing, including, but not limited to, cleaning, etching, coating, and/or addition of materials (including, but not limited to, metallization and conductor patterns) to collect and forward the electricity that is generated by the cell.

Merchandise under consideration may be described at the time of importation as parts for final finished products that are assembled after importation, including, but not limited to, modules, laminates, panels, building-integrated modules, building-integrated panels, or other finished goods kits. Such parts that otherwise meet the definition of merchandise

---

[1] *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Final Determination of Sales at Less Than Fair Value, and Affirmative Final Determination of Critical Circumstances, in Part,* 77 FR 63791 (October 17, 2012) (''Final Determination'').

[2] *See Crystalline Silicon Photovoltaic Cells and Modules from China (Investigation Nos. 701–TA–*

481 and 731–TA–1190 (Final), USITC Publication 4360, November 2012).

[3] *See id.*

Federal Register / Vol. 77, No. 236 / Friday, December 7, 2012 / Notices

**73019**

under consideration are included in the scope of this order.

Excluded from the scope of this order are thin film photovoltaic products produced from amorphous silicon (a-Si), cadmium telluride (CdTe), or copper indium gallium selenide (CIGS).

Also excluded from the scope of this order are crystalline silicon photovoltaic cells, not exceeding 10,000mm² in surface area, that are permanently integrated into a consumer good whose function is other than power generation and that consumes the electricity generated by the integrated crystalline silicon photovoltaic cell. Where more than one cell is permanently integrated into a consumer good, the surface area for purposes of this exclusion shall be the total combined surface area of all cells that are integrated into the consumer good.

Modules, laminates, and panels produced in a third-country from cells produced in the PRC are covered by this order; however, modules, laminates, and panels produced in the PRC from cells produced in a third-country are not covered by this order.

Merchandise covered by this order is currently classified in the Harmonized Tariff System of the United States ("HTSUS") under subheadings 8501.61.0000, 8507.20.80, 8541.40.6020, 8541.40.6030, and 8501.31.8000.[4] These HTSUS subheadings are provided for convenience and customs purposes; the written description of the scope of this order is dispositive.

### Amendment to the Final Determination

On October 17, 2012, the Department published its affirmative final determination in this proceeding.[5] On October 19, 2012, Wuxi Suntech Power Co., Ltd. ("Wuxi Suntech") respondent in the investigation, submitted timely ministerial error allegations and requested that the Department correct the alleged ministerial errors in the dumping margin calculations. On October 24, 2012, Solar World Industries America, Inc., ("Petitioner") submitted timely rebuttal comments. No other interested party submitted ministerial error allegations or replied to Wuxi Suntech's submission.

After analyzing all interested party comments and rebuttals, we have determined, in accordance with section

735(e) of the Act and 19 CFR 351.224(e), that we made the following ministerial errors in our calculations for the *Final Determination* with respect to Wuxi Suntech:

• In calculating net U.S. price, we incorrectly overstated the amount of certain advertising expenses that we deducted from gross price.

• In calculating the weighted average unit value of reported silicon wafers, we incorrectly overstated the quantity of silicon wafers purchased from non-market economy suppliers.

In addition to correcting the ministerial errors described above, we corrected an error regarding the valuation of Wuxi Suntech's installation manuals.[6]

In the *Final Determination*, we determined that a number of companies, in addition to the mandatory respondents, qualified for a separate rate.[7] Since the cash deposit rate for the separate rate respondents is based on the average of the margins for the mandatory respondents, and the margin for Wuxi Suntech changed as a result of the aforementioned ministerial errors, we have revised the calculation of the dumping margin for the separate rate respondents in the amended final determination.[8] The amended weighted average dumping margins are provided, below.

### Antidumping Duty Order

As noted above, on November 30, 2012, in accordance with section 735(d) of the Act, the ITC notified the Department of its final determination in this investigation, in which it found material injury with respect to solar cells from the PRC. Because the ITC determined that imports of solar cells from the PRC are materially injuring a U.S. industry, unliquidated entries of such merchandise from the PRC, entered or withdrawn from warehouse, are subject to the assessment of antidumping duties.

Therefore, in accordance with section 736(a)(1) of the Act, the Department will direct CBP to assess, upon further instruction by the Department, antidumping duties equal to the amount by which the normal value of the merchandise exceeds the export price (or constructed export price) of the

merchandise, for all relevant entries of solar cells from the PRC. These antidumping duties will be assessed on unliquidated entries from the PRC entered, or withdrawn from warehouse, for consumption on or after May 25, 2012, the date on which the Department published its *Preliminary Determination,*[9] but will not include entries occurring after the expiration of the provisional measures period and before publication of the ITC's final injury determination as further described below.

### Continuation of Suspension of Liquidation

In accordance with section 735(c)(1)(B) of the Act, we will instruct CBP to continue to suspend liquidation on entries of subject merchandise from the PRC. We will also instruct CBP to require cash deposits equal to the estimated amount by which the normal value exceeds the U.S. price as indicated in the chart below. These cash deposit rates will be adjusted, where appropriate, for export subsidies. These instructions suspending liquidation will remain in effect until further notice.

Accordingly, effective on the date of publication of the ITC's final affirmative injury determination, CBP will require, at the same time as importers would normally deposit estimated duties on this subject merchandise, a cash deposit equal to the estimated weighted-average antidumping duty margins as discussed above, adjusted, where appropriate, for export subsidies.[10] The "PRC-wide" rate applies to all exporters of subject merchandise not specifically listed.

### Provisional Measures

Section 733(d) of the Act states that instructions issued pursuant to an affirmative preliminary determination may not remain in effect for more than four months except where exporters representing a significant proportion of exports of the subject merchandise request the Department to extend that four-month period to no more than six months. At the request of exporters that account for a significant proportion of exports of solar cells from the PRC, we extended the four-month period to no more than six months.[11] In the underlying investigation, the Department published the *Preliminary*

---

[4] U.S. Customs and Border Protection ("CBP") provided notification that HTSUS number 8501.31.8000 should be added to the scope of the investigation, as certain articles under this number may fall within the scope. *See* Memorandum from Gene H. Calvert through Mark Hoadley to the File, "ACE Case Reference File Update," dated May 16, 2012.

[5] *See Final Determination.*

[6] For a detailed discussion of all alleged ministerial errors, as well as the Department's analysis, *see* memorandum regarding, "Ministerial Error Memorandum, Amended Final Determination of Sales at Less Than Fair Value: Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China," dated concurrently with this notice ("Ministerial Error Memorandum").

[7] *See Final Determination.*

[8] *See* Ministerial Error Memorandum.

[9] *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Preliminary Determination of Sales at Less Than Fair Value, Postponement of Final Determination and Affirmative Preliminary Determination of Critical Circumstances,*77 FR 31309 (May 25, 2012) ("*Preliminary Determination*").

[10] *See* section 736(a)(3) of the Act.

[11] *See Preliminary Determination.*

*Determination* on May 25, 2012.[12] Therefore, the six-month period beginning on the date of the publication of the *Preliminary Determination* ended on November 21, 2012. Furthermore, section 737(b) of the Act states that definitive duties are to begin on the date of publication of the ITC's final injury determination.

Therefore, in accordance with section 733(d) of the Act and our practice, we will instruct CBP to terminate the suspension of liquidation and to liquidate, without regard to antidumping duties, unliquidated entries of solar cells from the PRC entered, or withdrawn from warehouse, for consumption after November 21, 2012, the date provisional measures

expired, and through the day preceding the date of publication of the ITC's final injury determination in the **Federal Register**. Suspension of liquidation will resume on and after the date of publication of the ITC's final injury determination in the **Federal Register**.

The weighted-average dumping margins are as follows:

| Exporter | Producer | Weighted-average percent margin |
|---|---|---|
| Changzhou Trina Solar Energy Co., Ltd. and Trina Solar (Changzhou) Science & Technology Co., Ltd. | Changzhou Trina Solar Energy Co., Ltd | 18.32 |
| | Trina Solar (Changzhou) Science & Technology Co., Ltd | 18.32 |
| Wuxi Suntech Power Co., Ltd., Luoyang Suntech Power Co., Ltd., Suntech Power Co., Ltd. and Wuxi Sun-shine Power Co., Ltd. | Wuxi Suntech Power Co., Ltd | 29.14 |
| | Luoyang Suntech Power Co., Ltd | 29.14 |
| | Suntech Power Co., Ltd | 29.14 |
| | Wuxi Sun-shine Power Co., Ltd | 29.14 |
| Baoding Tianwei Yingli New Energy Resources Co., Ltd | Baoding Tianwei Yingli New Energy Resources Co., Ltd | 24.48 |
| | Yingli Energy (China) Company Limited | 24.48 |
| Tianwei New Energy (Chengdu) PV Module Co., Ltd | Tianwei New Energy (Chengdu) PV Module Co., Ltd | 24.48 |
| Canadian Solar International Limited | Canadian Solar Manufacturing (Changshu) Inc | 24.48 |
| | Canadian Solar Manufacturing (Luoyang) Inc | 24.48 |
| Canadian Solar Manufacturing (Changshu) Inc | Canadian Solar Manufacturing (Changshu) Inc | 24.48 |
| Canadian Solar Manufacturing (Luoyang) Inc | Canadian Solar Manufacturing (Luoyang), Inc | 24.48 |
| Hanwha Solarone (Qidong) Co., Ltd | Hanwha Solarone (Qidong) Co., Ltd | 24.48 |
| CEEG (Shanghai) Solar Science Technology Co., Ltd | CEEG (Shanghai) Solar Science Technology Co., Ltd | 24.48 |
| | CEEG Nanjing Renewable Energy Co., Ltd | 24.48 |
| CEEG Nanjing Renewable Energy Co., Ltd | CEEG Nanjing Renewable Energy Co., Ltd | 24.48 |
| Jiawei Solarchina Co., Ltd | Jiawei Solarchina (Shenzhen) Co., Ltd | 24.48 |
| Yingli Energy (China) Company Limited | Yingli Energy (China) Company Limited | 24.48 |
| | Baoding Tianwei Yingli New Energy Resources Co., Ltd | 24.48 |
| LDK Solar Hi-tech (Nanchang) Co., Ltd | LDK Solar Hi-tech (Nanchang) Co., Ltd | 24.48 |
| LDK Solar Hi-tech (Suzhou) Co., Ltd | LDK Solar Hi-tech (Suzhou) Co., Ltd | 24.48 |
| Jiawei Solarchina (Shenzhen) Co., Ltd | Jiawei Solarchina (Shenzhen) Co., Ltd | 24.48 |
| Changzhou NESL Solartech Co., Ltd | Changzhou NESL Solartech Co., Ltd | 24.48 |
| China Sunergy (Nanjing) Co., Ltd | China Sunergy (Nanjing) Co., Ltd | 24.48 |
| Chint Solar (Zhejiang) Co., Ltd | Chint Solar (Zhejiang) Co., Ltd | 24.48 |
| Suzhou Shenglong PV-Tech Co., Ltd | Suzhou Shenglong PV–TECH Co., Ltd | 24.48 |
| tenKsolar (Shanghai) Co., Ltd | tenKsolar (Shanghai) Co., Ltd | 24.48 |
| Upsolar Group, Co., Ltd | HC Solar Power Co., Ltd | 24.48 |
| | Zhiheng Solar Inc | 24.48 |
| | Zhejiang Leye Photovoltaic Science & Technology Co., Ltd | 24.48 |
| | Tianwei New Energy (Chengdu) PV Module Co., Ltd | 24.48 |
| | Zhejiang ZG-Cells Co., Ltd | 24.48 |
| | Zhejiang Xinshun Guangfu Science and Technology Co., Ltd | 24.48 |
| | Zhejiang Jiutai New Energy Co., Ltd | 24.48 |
| Wanxiang Import & Export Co., Ltd | Zhejiang Wanxiang Solar Co., Ltd | 24.48 |
| Jinko Solar Import and Export Co., Ltd | Jinko Solar Co., Ltd | 24.48 |
| JinkoSolar International Limited | Jinko Solar Co., Ltd | 24.48 |
| CNPV Dongying Solar Power Co., Ltd | CNPV Dongying Solar Power Co., LTD | 24.48 |
| CSG PVTech Co., Ltd | CSG PVTech Co., Ltd | 24.48 |
| Delsolar Co., Ltd | DelSolar (Wujiang) Ltd | 24.48 |
| Dongfang Electric (Yixing) MAGI Solar Power Technology Co., Ltd. | Dongfang Electric (Yixing) MAGI Solar Power Technology Co., Ltd. | 24.48 |
| Eoplly New Energy Technology Co., Ltd | Eoplly New Energy Technology Co., Ltd | 24.48 |
| ERA Solar Co., Ltd | ERA Solar Co., Ltd | 24.48 |
| ET Solar Energy Limited | ET Solar Industry Limited | 24.48 |
| Hangzhou Zhejiang University Sunny Energy Science and Technology Co., Ltd. | Hangzhou Zhejiang University Sunny Energy Science and Technology Co., Ltd. | 24.48 |
| Himin Clean Energy Holdings Co., Ltd | Himin Clean Energy Holdings Co., Ltd | 24.48 |
| JA Solar Technology Yangzhou Co., Ltd | JingAo Solar Co., Ltd | 24.48 |
| Jetion Solar (China) Co., Ltd | Jetion Solar (China) Co., Ltd | 24.48 |
| Jiangsu Green Power PV Co., Ltd | Jiangsu Green Power PV Co., Ltd | 24.48 |
| Jiangsu Sunlink PV Technology Co., Ltd | Jiangsu Sunlink PV Technology Co., Ltd | 24.48 |
| JingAo Solar Co., Ltd | JingAo Solar Co., Ltd | 24.48 |
| Konca Solar Cell Co., Ltd | Konca Solar Cell Co., Ltd | 24.48 |
| Leye Photovoltaic Co., Ltd | Leye Photovoltaic Co., Ltd | 24.48 |

[12] *See Preliminary Determination.*

| Exporter | Producer | Weighted-average percent margin |
|---|---|---|
| Lightway Green New Energy Co., Ltd | Lightway Green New Energy Co., Ltd | 24.48 |
| Motech (Suzhou) Renewable Energy Co., Ltd | Motech (Suzhou) Renewable Energy Co., Ltd | 24.48 |
| Ningbo ETDZ Holdings, Ltd | Hangzhou Zhejiang University Sunny Energy Science and Technology Co., LTD. | 24.48 |
| Ningbo Komaes Solar Technology Co., Ltd | Ningbo Komaes Solar Technology Co., Ltd | 24.48 |
| Ningbo Qixin Solar Electrical Appliance Co., Ltd | Ningbo Qixin Solar Electrical Appliance Co., Ltd | 24.48 |
| Ningbo Ulica Solar Science & Technology Co., Ltd | Ningbo Ulica Solar Science & Technology Co., Ltd | 24.48 |
| Perlight Solar Co., Ltd | Perlight Solar Co., Ltd | 24.48 |
| Risen Energy Co., Ltd | Risen Energy Co., Ltd | 24.48 |
| Shanghai BYD Company Limited | Shanghai BYD Company Limited | 24.48 |
| Shanghai JA Solar Technology Co., Ltd | Shanghai JA Solar Technology Co., Ltd | 24.48 |
| Shanghai Solar Energy Science & Technology Co., Ltd | Shanghai Solar Energy Science & Technology Co., Ltd | 24.48 |
| Shenzhen Topray Solar Co., Ltd | Shenzhen Topray Solar Co., Ltd | 24.48 |
| Solarbest Energy-Tech (Zhejiang) Co., Ltd | Solarbest Energy-Tech (Zhejiang) Co., Ltd | 24.48 |
| Sopray Energy Co., Ltd | Sopray Energy Co., Ltd | 24.48 |
| Sumec Hardware & Tools Co., Ltd | Phono Solar Technology Co., Ltd | 24.48 |
| Sun Earth Solar Power Co., Ltd | Sun Earth Solar Power Co., Ltd | 24.48 |
| Yuhuan Sinosola Science & Technology Co., Ltd | Yuhuan Sinosola Science & Technology Co., Ltd | 24.48 |
| Yuhuan Solar Energy Source Co., Ltd | Yuhuan Solar Energy Source Co., Ltd | 24.48 |
| Zhejiang Jiutai New Energy Co., Ltd | Zhejiang Topoint Photovoltaic Co., Ltd | 24.48 |
| Zhejiang Shuqimeng Photovoltaic Technology Co., Ltd | Zhejiang Shuqimeng Photovoltaic Technology Co., Ltd | 24.48 |
| Zhejiang Sunflower Light Energy Science & Technology Limited Liability Company. | Zhejiang Sunflower Light Energy Science & Technology Limited Liability Company. | 24.48 |
| PRC-Wide Rate | | 249.96 |

With regard to the ITC's negative critical circumstances determination on imports of the solar cells from the PRC, we will instruct CBP to lift suspension and to release any bond or other security, and refund any cash deposit made, to secure the payment of estimated antidumping duties with respect to entries of the merchandise entered, or withdrawn from warehouse, for consumption on or after February 25, 2012 (*i.e.,* 90 days prior to the date of publication of the *Preliminary Determination*), but before May 25, 2012.

This notice constitutes the antidumping duty order with respect to solar cells from the PRC pursuant to section 736(a) of the Act. Interested parties may contact the Department's Central Records Unit, Room 7043 of the main Commerce building, for copies of an updated list of antidumping duty orders currently in effect.

This order and amended final determination are published in accordance with sections 736(a) and 735(e) of the Act and 19 CFR 351.211 and 351.224(e).

Dated: December 3, 2012.

**Ronald K. Lorentzen,**

*Acting Assistant Secretary for Import Administration.*

[FR Doc. 2012–29668 Filed 12–6–12; 8:45 am]

**BILLING CODE 3510–DS–P**

**DEPARTMENT OF COMMERCE**

**International Trade Administration**

**[A–357–818]**

**Lemon Juice From Argentina: Final Results of the Expedited First Sunset Review of the Suspended Antidumping Duty Investigation**

**AGENCY:** Import Administration, International Trade Administration, Department of Commerce.

**DATES:** *Effective Date:* December 7, 2012.

**SUMMARY:** On August 1, 2012, the Department of Commerce ("Department") published in the **Federal Register** the notice of initiation of the sunset review of the suspended antidumping duty investigation on lemon juice from Argentina. The Department has conducted an expedited sunset review of this suspended investigation. As a result of this sunset review, the Department finds that termination of the suspended antidumping duty investigation would be likely to lead to continuation or recurrence of dumping at the rates identified in the "Final Results of Review" section of this notice.

**FOR FURTHER INFORMATION CONTACT:** Julie Santoboni or Anne D'Alauro, Office of Policy, Bilateral Agreements Unit, Import Administration, International Trade Administration, U.S. Department of Commerce, 14th Street and Constitution Avenue NW., Washington, DC 20230; telephone (202) 482–3063 and (202) 482–4830, respectively.

**SUPPLEMENTARY INFORMATION:**

**Background**

On August 1, 2012, the Department initiated a sunset review of the suspended antidumping duty investigation on lemon juice from Argentina, pursuant to section 751(c) of the Tariff Act of 1930, as amended ("the Act"). *See Initiation of Five-Year ("Sunset") Review,* 77 FR 45589 (August 1, 2012). The Department received a notice of intent to participate from domestic interested party Ventura Coastal LLC ("Ventura"), a joint venture between Ventura Coastal and Sunkist Growers, Inc. (petitioner in the underlying investigation), within the deadline specified in 19 CFR 351.218(d)(1)(i). Ventura claimed interested party status under section 771(9)(C) of the Act as a manufacturer, producer, or wholesaler in the United States of a domestic like product.

On August 31, 2012, the Department received a substantive response from Ventura. In addition to meeting the other requirements of 19 CFR 351.218(d)(3), Ventura provided information on the volume and value of Argentine exports of lemon juice to the United States. The Department received no responses from other parties to this proceeding. As a result, pursuant to section 751(c)(3)(B) of the Act and 19 CFR 351.218(e)(1)(ii)(C)(2), the Department conducted an expedited (120-day) sunset review.

As explained in the memorandum from the Assistant Secretary for Import

Dated: December 3, 2012.

**Ronald K. Lorentzen,**

*Acting Assistant Secretary for Import Administration.*

Appendix

**List of Topics Discussed in the Preliminary Decision Memorandum**

Targeted Dumping Allegations
Application of the Average-to-Transaction Methodology
Results of the Targeted Dumping Analysis
Comparisons to Normal Value
Product Comparisons
Date of Sale
Level of Trade/Constructed Export Price Offset
Constructed Export Price
Normal Value
  A. Selection of Comparison Market
  B. Affiliated Party Transactions and Arm's Length Test
  C. Cost of Production
  1. Calculation of Cost of Production
  2. Test of Comparison Market Sales Prices
  3. Results of the COP Test
  D. Constructed Value
  E. Calculation of Normal Value Based on Comparison Market Prices Currency Conversion

[FR Doc. 2012–29635 Filed 12–6–12; 8:45 am]

**BILLING CODE 3510–DS–P**

---

## DEPARTMENT OF COMMERCE

### International Trade Administration

[C–570–980]

**Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Countervailing Duty Order**

**AGENCY:** Import Administration, International Trade Administration, Department of Commerce.

**SUMMARY:** Based on an affirmative final determination by the U.S. International Trade Commission (ITC), the Department of Commerce (the Department) is issuing a countervailing duty order on crystalline silicon photovoltaic cells, whether or not assembled into modules (solar cells), from the People's Republic of China (PRC). On November 30, 2012, the ITC notified the Department of its affirmative determination of material injury to a U.S. industry.[1]

**DATES:** *Effective Date:* December 7, 2012.

**FOR FURTHER INFORMATION CONTACT:** Gene Calvert, Jun Jack Zhao, or Emily Halle, AD/CVD Operations, Office 6, Import Administration, U.S. Department of Commerce, Room 7866, 14th Street

and Constitution Avenue NW., Washington, DC 20230; telephone: (202) 482–3586, (202) 482–1396, or (202) 482–0176, respectively.

**SUPPLEMENTARY INFORMATION:**

**Case History**

In accordance with section 705(d) of the Tariff Act of 1930, as amended (the Act), on October 17, 2012, the Department published its final determination in the countervailing duty investigation of solar cells from the PRC.[2]

**Scope of the Order**

The merchandise covered by this order is crystalline silicon photovoltaic cells, and modules, laminates, and panels, consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including, but not limited to, modules, laminates, panels and building integrated materials.

This order covers crystalline silicon photovoltaic cells of thickness equal to or greater than 20 micrometers, having a p/n junction formed by any means, whether or not the cell has undergone other processing, including, but not limited to, cleaning, etching, coating, and/or addition of materials (including, but not limited to, metallization and conductor patterns) to collect and forward the electricity that is generated by the cell.

Merchandise under consideration may be described at the time of importation as parts for final finished products that are assembled after importation, including, but not limited to, modules, laminates, panels, building-integrated modules, building-integrated panels, or other finished goods kits. Such parts that otherwise meet the definition of merchandise under consideration are included in the scope of this order.

Excluded from the scope of this order are thin film photovoltaic products produced from amorphous silicon (a-Si), cadmium telluride (CdTe), or copper indium gallium selenide (CIGS).

Also excluded from the scope of this order are crystalline silicon photovoltaic cells, not exceeding $10{,}000_{mm^2}$ in surface area, that are permanently integrated into a consumer good whose function is other than power generation and that consumes the electricity generated by the integrated crystalline silicon photovoltaic cell. Where more

than one cell is permanently integrated into a consumer good, the surface area for purposes of this exclusion shall be the total combined surface area of all cells that are integrated into the consumer good.

Modules, laminates, and panels produced in a third-country from cells produced in the PRC are covered by this order; however, modules, laminates, and panels produced in the PRC from cells produced in a third-country are not covered by this order.

Merchandise covered by this order is currently classified in the Harmonized Tariff System of the United States ("HTSUS") under subheadings 8501.61.0000, 8507.20.80, 8541.40.6020, 8541.40.6030, and 8501.31.8000.[3] These HTSUS subheadings are provided for convenience and customs purposes; the written description of the scope of this order is dispositive.

**Countervailing Duty Order**

On November 30, 2012, the ITC notified the Department of its final determination, pursuant to section 705(b)(1)(A)(i) of the Act, that an industry in the United States is materially injured as a result of subsidized imports from the PRC. The ITC also determined that critical circumstances do not exist with respect to subject imports from the PRC.

As a result of the ITC's final determination, in accordance with section 706(a) of the Act, the Department will direct CBP to assess, upon further instruction by the Department, countervailing duties on unliquidated entries of solar cells from the PRC entered, or withdrawn from warehouse, for consumption on or after March 26, 2012, the date on which the Department published its preliminary countervailing duty determination in the **Federal Register**, and before July 24, 2012, the date on which the Department instructed CBP to discontinue the suspension of liquidation in accordance with section 703(d) of the Act. Section 703(d) of the Act states that the suspension of liquidation pursuant to a preliminary determination may not remain in effect for more than four months. Entries of solar cells from the PRC made on or after July 24, 2012, and prior to the date of publication of the ITC's final determination in the **Federal Register** are not liable for the assessment of countervailing duties, due

---

[1] *See Crystalline Silicon Photovoltaic Cells and Modules from China, Investigation Nos. 701–TA–481 and 731–TA–1190 (Final), USITC Publication 4360 (November 2012).*

[2] *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Affirmative Countervailing Duty Determination and Final Affirmative Critical Circumstances Determination, 77 FR 63788 (October 17, 2012).*

[3] U.S. Customs and Border Protection (CBP) provided notification that HTSUS number 8501.31.8000 should be added to the scope of the order, as certain articles under this number might fall within the scope. *See* the May 16, 2012 Memorandum to The File, "ACE Case Reference File Update."

to the Department's discontinuation, effective July 24, 2012, of the suspension of liquidation.

The ITC determined that critical circumstances do not exist with respect to subject imports from the PRC. Because of the ITC's negative determination of critical circumstances, the Department will direct CBP to refund all cash deposits collected on entries of solar cells from the PRC which were entered, or withdrawn from warehouse, for consumption on or after

December 27, 2011, and before March 26, 2012. The interest provisions of section 778 of the Act do not apply.

In accordance with section 706 of the Act, the Department will direct CBP to reinstitute the suspension of liquidation of solar cells from the PRC, effective the date of publication of the ITC's notice of final determination in the **Federal Register,** and to assess, upon further advice from the Department pursuant to section 706(a)(1) of the Act, countervailing duties for each entry of

the subject merchandise in an amount based on the net countervailable subsidy rates for the subject merchandise. On or after the date of publication of the ITC's final injury determination in the **Federal Register,** CBP must require, at the same time as importers would normally deposit estimated duties on this merchandise, a cash deposit equal to the rates noted below:

| Company | Subsidy rate |
|---|---|
| Changzhou Trina Solar Energy Co., Ltd.; Trina Solar (Changzhou) Science and Technology Co., Ltd. (collectively, Trina Solar) | 15.97 percent *ad valorem*. |
| Wuxi Suntech Power Co., Ltd.; Luoyang Suntech Power Co., Ltd.; Suntech Power Co., Ltd.; Yangzhou Rietech Renewal Energy Co., Ltd.; Zhenjiang Huantai Silicon Science & Technology Co., Ltd.; Kuttler Automation Systems (Suzhou) Co., Ltd.; Shenzhen Suntech Power Co., Ltd.; Wuxi Sunshine Power Co., Ltd.; Wuxi University Science Park International Incubator Co., Ltd.; Yangzhou Suntech Power Co., Ltd.; and Zhenjiang Rietech New Energy Science & Technology Co., Ltd; (collectively, Wuxi Suntech) | 14.78 percent *ad valorem*. |
| All Others Rate .................................................................................................................................... | 15.24 percent *ad valorem*. |

This notice constitutes the countervailing duty order with respect to solar cells from the PRC pursuant to section 706(a) of the Act. Interested parties may contact the Department's Central Records Unit, Room 7046 of the main Commerce building, for copies of an updated list of countervailing duty orders currently in effect.

This countervailing duty order is issued and published in accordance with sections 705(c)(2) and 706 of the Act, and 19 CFR 351.211.

Dated: December 3, 2012.

**Ronald K. Lorentzen,**

*Acting Assistant Secretary for Import Administration.*

[FR Doc. 2012–29669 Filed 12–6–12; 8:45 am]

**BILLING CODE 3510–DS–P**

---

**DEPARTMENT OF COMMERCE**

**International Trade Administration**

**[A–570–979]**

**Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order**

**AGENCY:** Import Administration, International Trade Administration, Department of Commerce.

**DATES:** *Effective Date:* December 7, 2012.

**SUMMARY:** Based on affirmative final determinations by the Department of Commerce (the "Department") and the International Trade Commission ("ITC"), the Department is issuing an

antidumping duty order on crystalline silicon photovoltaic cells, whether or not assembled into modules ("solar cells"), from the People's Republic of China ("PRC"). In addition, the Department is amending its final determination to correct certain ministerial errors.

**FOR FURTHER INFORMATION CONTACT:** Jeffrey Pedersen, Krisha Hill, or Drew Jackson, AD/CVD Operations, Office 4, Import Administration, International Trade Administration, U.S. Department of Commerce, 14th Street and Constitution Avenue NW., Washington, DC 20230; telephone: (202) 482–2769, (202) 482–4037, or (202) 482–4406, respectively.

**SUPPLEMENTARY INFORMATION:**

**Background**

In accordance with sections 735(d) and 777(i)(1) of the Tariff Act of 1930, as amended ("Act"), on October 17, 2012, the Department published the final determination of sales at less than fair value, and affirmative final determination of critical circumstances, in part, in the antidumping duty investigation of solar cells from the PRC.[1] On November 30, 2012, the ITC notified the Department of its affirmative determination of material injury to a U.S. industry.[2] In addition,

the ITC notified the Department of its final determination that critical circumstances do not exist with respect to imports of solar cells from the PRC that are subject to the Department's affirmative critical circumstances finding.[3]

*Scope of the Order*

The merchandise covered by this order is crystalline silicon photovoltaic cells, and modules, laminates, and panels, consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including, but not limited to, modules, laminates, panels and building integrated materials.

This order covers crystalline silicon photovoltaic cells of thickness equal to or greater than 20 micrometers, having a p/n junction formed by any means, whether or not the cell has undergone other processing, including, but not limited to, cleaning, etching, coating, and/or addition of materials (including, but not limited to, metallization and conductor patterns) to collect and forward the electricity that is generated by the cell.

Merchandise under consideration may be described at the time of importation as parts for final finished products that are assembled after importation, including, but not limited to, modules, laminates, panels, building-integrated modules, building-integrated panels, or other finished goods kits. Such parts that otherwise meet the definition of merchandise

---

[1] See *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Final Determination of Sales at Less Than Fair Value, and Affirmative Final Determination of Critical Circumstances, in Part,* 77 FR 63791 (October 17, 2012) ("Final Determination").

[2] See *Crystalline Silicon Photovoltaic Cells and Modules from China (Investigation Nos. 701–TA–*

481 *and 731–TA–1190 (Final), USITC Publication 4360, November 2012).*

[3] See *id.*