## UNITED STATES COURT OF INTERNATIONAL TRADE
### BEFORE: THE HONORABLE DONALD C. POGUE, SENIOR JUDGE

| | |
|---|---|
| SUNPOWER CORP., | ) |
| Plaintiff, | ) |
| and | ) |
| CANADIAN SOLAR INC., *et. al.,* | ) |
| Plaintiff-Intervenors, | ) Consol. Court No. 15-00067 |
| v. | ) PUBLIC DOCUMENT |
| THE UNITED STATES, | ) |
| Defendant, | ) |
| and | ) |
| SOLARWORLD AMERICAS, INC., | ) |
| Defendant-Intervenor. | ) |

## APPENDIX TO
### CONSOLIDATED PLAINTIFFS' JOINT BRIEF IN SUPPORT OF THEIR RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

**/s/ John M. Gurley**

John M. Gurley
Diana Dimitriuc Quaia
Tina Termei
ARENT FOX LLP
1717 K Street, NW
Washington, DC 20036
(202) 857-6301

*Counsel for Canadian Solar Inc.,*
*Changzhou Trina Solar Energy Co., Ltd.,*
*China Sunergy (Nanjing) Co., Ltd., Chint*

**/s/ Craig A. Lewis**

Craig A. Lewis
Samantha  Clark Sewall
Wesley Verne Carrington
Hogan Lovells US LLP
Columbia Square Building
555 Thirteenth Street, NW.
Washington, DC 20004
(202) 637-8613

*Counsel for Shanghai BYD Co., Ltd. and BYD*
*(Shangluo) Industrial Co., Ltd.*

*Solar (Zhejiang) Co., Ltd., ET Solar Industry Ltd., Hefei JA Solar Technology Co., Ltd., Jinko Solar Co., Ltd., LDK Solar Hi-Tech (Nanchang) Co., Ltd., Perlight Solar Co., Ltd., ReneSola Jiangsu Ltd., Shanghai JA Solar Technology Co., Ltd., Shenzhen Sacred Industry Co., Ltd., Shenzhen Sungold Solar Co., Ltd., Sumec Hardware & Tools Co., Ltd., Sunny Apex Development Ltd., Wuhan FYY Technology Co., Ltd., Wuxi Suntech Power Co., Ltd., Zhongli Talesun Solar Co., Ltd., Znshine PV-Tech Co., Ltd.*

Dated: October 9, 2015

**SUNPOWER CORP. v. UNITED STATES**
**Consol. Court No. 15-00067**
**Before the Honorable Donald C. Pogue, Senior Judge**

**Appendix to Consolidated Plaintiffs' Brief in Support of Rule 56.2 Motion**

| Tab | Document | Pages Cited | AD P.R. | CVD P.R. |
|-----|----------|-------------|---------|----------|
| 1 | Petition for the Imposition of Antidumping and Countervailing Duties Pursuant to Sections 701 and 731 of the Tariff Act of 1930, as Amended, Vol. I, Common Issues and Injury (Dec. 31, 2013) | Cover, 5-11 | AD P.R. 1-10 | CVD P.R. 1-32 |
| 2 | Letter from Wiley Rein to Commerce and the ITC, re: Supplement II to Petition (Jan. 13, 2014) | Cover, 1-5 | AD P.R. 25 | CVD P.R. 45 |
| 3 | Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China and Taiwan, 79 Fed. Reg. 4661 (Dep't Commerce Jan. 29, 2014) (initiation AD inv.) | All | AD P.R. 852 | |
| 4 | Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China and Taiwan, 79 Fed. Reg. 4667 (Dep't Commerce Jan. 29, 2014) (initiation CVD inv.) | All | | CVD P.R. 70 |
| 5 | Letter from Sidley Austin LLP to Commerce, Inv. Nos. A-570-010, A-583-853, and C-570-011, re: Comments on Scope on behalf of Yingli Green Energy Holding Co. Ltd., Yingli Green Energy, Americas, Inc., Canadian Solar Inc., Changzhou Trina Solar Energy Co., Ltd., Wuxi Suntech Power Co., Ltd., Shanghai JA Solar Technology Co., Ltd., Hefei JA Solar Technology, Co., Ltd., and Jinko Solar Co., Ltd. and with the support of the China Chamber of Commerce for Import and Export of Machinery and Electronic Products ("CCCME") and its members (Feb. 18, 2014) | 1-2, Exhibit List Exhibit 1 Exhibit 2 Exhibit 3 | AD P.R. 125 | CVD P.R. 88 |
| 6 | Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China, 79 Fed. Reg. 33174 (Dep't Commerce June 10, 2014) (prelim. CVD determ.) | All | | CVD P.R. 278 |

| Tab | Document | Pages Cited | AD P.R. | CVD P.R. |
|---|---|---|---|---|
| 7 | Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China, 79 Fed. Reg. 44399 (Dep't Commerce July 31, 2014) (prelim. LTFV determ.) | All | AD P.R. 835 | |
| 8 | Commerce Letter to All Interested Parties, re: Opportunity to Submit Scope Comments (Oct. 3, 2014) | All | AD P.R. 765 | CVD P.R. 349 |
| 9 | Respondents' Case Brief (Oct. 16, 2015) | Cover, 1-27 | AD P.R. 780 | |
| 10 | Case Brief of Changzhou Trina Solar Energy Co., Ltd. (Oct. 16, 2014) | Cover, 1-12 | AD P.R. 784 | |
| 11 | Rebuttal Brief of Changzhou Trina Solar Energy Co., Ltd. (Oct. 23, 2014) | Cover, 1-6 | AD P.R. 804 | |
| 12 | Respondents' Rebuttal Brief (Oct. 27, 2014) | Cover, 1-19 | AD P.R. 808 | |
| 13 | Issues and Decision Memorandum for the Final Determination in the Countervailing Duty Investigation (Dec. 15, 2014) | 1, 4, 32-55 | | CVD P.R. 388 |
| 14 | Issues and Decision Memorandum For the Final Determination of Sales at Less Than Fair Value (Dec. 15, 2014) | 1-29 | AD P.R. 817 | |
| 15 | Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China, 79 Fed. Reg. 76962 (Dep't Commerce Dec. 23, 2014) (final CVD determ.) | All | | CVD P.R. 408 |
| 16 | Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China, 79 Fed. Reg. 76970 (Dep't Commerce Dec. 23, 2014) (final LTFV determ.) | All | AD P.R. 834 | |
| 17 | Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China, 80 Fed. Reg. 8592 (Dep't Commerce Feb. 18, 2015) (amended final CVD determ. and AD/CVD orders) | All | AD P.R. 853 | CVD P.R. 417 |

# TAB 1

**Petition for the Imposition of Antidumping and Countervailing Duties Pursuant to Sections 701 and 731 of the Tariff Act of 1930, as Amended, Vol. I, Common Issues and Injury (Dec. 31, 2013)**

**AD P.R. 1-10, CVD P.R. 1-32**

DOC Investigation Nos. A-570-010,
A-583-853, and C-570-011
Total Pages: 596
Investigation
Petitioner's Business Proprietary
Information has been removed from the
Table of Contents, pages 2, 9, 23, 35, 38,
40-42, 44-47, 49, 64-65, Exhibit List, and
Exhibits I-1, I-5, I-15, I-16, and I-18-I-22.
**PUBLIC VERSION**

BEFORE THE
**INTERNATIONAL TRADE ADMINISTRATION**
**UNITED STATES DEPARTMENT OF COMMERCE**
**AND THE**
**UNITED STATES INTERNATIONAL TRADE COMMISSION**

**CERTAIN CRYSTALLINE SILICON PHOTOVOLTAIC PRODUCTS**
**FROM THE PEOPLE'S REPUBLIC OF CHINA AND TAIWAN**

**PETITION FOR THE IMPOSITION**
**OF ANTIDUMPING AND COUNTERVAILING DUTIES PURSUANT TO**
**SECTIONS 701 AND 731 OF THE TARIFF ACT OF 1930, AS AMENDED**

**VOLUME I**

**COMMON ISSUES AND INJURY**

Timothy C. Brightbill, Esq.

**WILEY REIN LLP**
1776 K Street, N.W.
Washington, D.C. 20006
(202) 719-7000

*Counsel to SolarWorld Industries*
*America, Inc.*

December 31, 2013

25323.12

- Chinese producer Suntech took similar measures to avoid the duties.  In May 2012, an analyst stated that "Suntech will experience *no further impact*" from the case, because "{it is} sourcing all cells outside of China going forward for all {its} U.S. shipments, so {it has} no exposure to tariffs."[18]

- "Canadian Solar, which makes most of its panels in China, has been buying solar cells from Taiwan for years as part of its supply chain strategy, said Chief Financial Officer Michael Potter. Now all U.S.-bound modules would be made with these slightly more expensive Taiwanese cells to avoid the tariff."[19]

As a result, the remedy afforded by the first AD/CVD cases was substantially weakened, allowing increasing volumes of subject product to continue shipping large quantities of dumped and subsidized product into the U.S. market during the period (defined herein as 2010 – September 2013).

Even with the imposition of antidumping and countervailing duties on Chinese cells in 2012, imports of c-Si PV cells and modules[20] from China rose from a value of $1.2 billion in 2010 to $1.7 billion in 2012, and increased by 24 percent in September 2013, as compared to September 2012.[21]  As described above, from 2010 through early 2012, imports of modules from China consisted largely of modules assembled with Chinese cells.  Since that time, imports of modules from China have consisted almost entirely of modules assembled in China from solar cells completed or partially manufactured in Taiwan or other countries (*i.e.*, cells manufactured

---

[18]     *Trina, Suntech see higher margins despite import duties*, Reuters (May 23, 2012), attached at **Exhibit I-J** (emphasis added).

[19]     Braden Reddall, *Analysis: U.S. solar tariffs not slowing slide in panel prices*, Reuters (July 18, 2012), attached at **Exhibit I-1K**.

[20]     Subject imports include both imports of cells (HTSUS 8541.40.6030) and cells assembled into modules or panels (HTSUS 8541.40.6020).  These are the primary HTSUS subheadings covering c-Si PV cells, modules, and panels.  While subject modules or panels may be imported under HTSUS subheadings 8501.61.00.00 and 8507.20.80, the vast majority of subject imports over the period entered under HTSUS subheadings 8541.40.6020 and 8541.40.6030.  Accordingly, references to import volumes throughout this Petition include combined data from these two HTSUS subheadings.

[21]     *See* Import Data, attached at **Exhibit I-4**.

5

in Taiwan from Taiwanese inputs, or cells manufactured in Taiwan or other countries from Chinese inputs, including wafers).

Imports of c-Si PV cells and modules from Taiwan increased 85 percent, by value, from $277 million in 2010 to $424 million in 2012.[22] Taiwanese cell and module imports continued to increase this year, by 29 percent, from $328 million in January-September 2012 to more than $371 million in the same period in 2013.[23] And Taiwanese imports continue to rise – in September 2013 alone, imports of cells and modules from Taiwan were up 157 percent, as compared to September 2012.[24]

Despite steadily declining prices, overall U.S. imports of solar cells and modules from China and Taiwan are still massive – rising from a value of $1.5 <u>billion</u> in 2010 to $2.1 <u>billion</u> in 2012.[25] Recently, subject imports have continued to rise, with subject imports of cells and modules in September 2013 totaling $211.6 million, compared to $140.7 million in September 2012.[26]

Subject imports, which were pushed into the market through unfair pricing, far outpaced the growth in U.S. demand over the period. Subject producers and exporters used dumped prices to force volume into the U.S. market and gain market share. As a result, prices for subject merchandise caused prices in the entire market to collapse – a collapse that has continued throughout the POI. At a time when it should have been benefitting from healthy demand, the domestic industry suffered from significant and growing operating losses. Due to the collapse in

---

[22]    *Id.*
[23]    *Id.*
[24]    *Id.*
[25]    *Id.*
[26]    *Id.*

6

pricing caused by subject imports, numerous producers have declared bankruptcy and/or shut down U.S. operations, and hundreds of workers have been laid off. There is no doubt that subject imports caused and are causing material injury to the domestic industry.

Domestic producers and workers also are threatened with additional material injury if the unfair pricing practices of subject imports are not restrained by antidumping ("AD") and countervailing duty ("CVD") orders. With U.S. prices and profitability plummeting, several U.S. producers have already shuttered U.S. facilities, and as the rate of demand growth in the United States is expected to slow, the domestic industry is vulnerable to further material injury. In the absence of relief, the future of the domestic c-Si PV industry will be in peril. Subject producers have enormous and growing c-Si PV capacity, are export-oriented, and have demonstrated that they can and will rapidly ship huge volumes of dumped and subsidized product into the U.S. market, irrespective of actual demand. Indeed, the sheer size of Chinese and Taiwanese capacity compels subject producers and exporters to export virtually all of their production at dumped and subsidized prices. With trade remedies now in place against Chinese exports in the European Union ("EU") and EU demand peaking,[27] subject producers and exporters are poised to continue to increase shipments of dumped and subsidized product to the United States. Given the growing vulnerability of the U.S. industry, the industry's very existence will be in peril if AD and CVD orders are not imposed.

Separate volumes regarding the allegations of dumping by Chinese and Taiwanese producers and exporters, and countervailable subsidies provided to Chinese producers and exporters, are being filed simultaneously at both the U.S. Department of Commerce (the

---

[27]     Jonathan Stearns, *EU Nations Approve Pact With China on Solar-Panel Imports*, Bloomberg (Dec. 2, 2013), attached at **Exhibit I-1L.**

7

**PUBLIC VERSION**

"Department") and the U.S. International Trade Commission (the "Commission" or the "ITC"). Petitioner requests that antidumping and countervailing duties be imposed to offset the dumping and subsidy margins detailed in the specific AD and CVD volumes.

## I.   COMMON ISSUES

This section contains information required in AD and CVD petitions by 19 C.F.R. §§ 351.202(b)(1)-(9) and 19 C.F.R. § 207.11.

### A.   The Name and Address of the Petitioner (19 C.F.R. § 351.202(b)(1))

Petitioner is a company that produces the domestic like product in the United States. Accordingly, Petitioner is a domestic interested party within the meaning of 19 U.S.C. § 1677(9) and 19 C.F.R. § 351.102(b).  Petitioner's address and telephone number are provided in **Exhibit I-2**.

### B.   Identity of the Industry on Whose Behalf the Petition Is Filed (19 C.F.R. § 207.11(b)(2)(ii); 19 C.F.R. § 351.202(b)(2))

These Petitions are filed on behalf of the United States industry that produces certain c-Si PV products.  In addition to information relating to the Petitioner, the names, addresses, and telephone numbers of all other domestic producers in the United States during the POI are provided in **Exhibit I-3**.  According to the best information available to Petitioner, **Exhibits I-2** and **I-3** identify all known producers of the domestic like product in the United States.

### C.   Information Relating to the Degree of Industry Support for the Petitions (19 C.F.R. § 351.202(b)(3))

According to 19 U.S.C. §§1671a(c)(4)(A) and 1673a(c)(4)(A), a petition is filed by or on behalf of the domestic industry if: (1) petitioning domestic producers account for at least 25 percent of the total production of the domestic like product, and (2) domestic producers who support the petition account for more than 50 percent of the production of the domestic like

8

PUBLIC VERSION

Business Proprietary Information
Has Been Deleted

product produced by that portion of the industry expressing support for or opposition to the petition.

The Petitions meet both of these requirements. Based on production data for the entire U.S. industry published by the Solar Energy Industries Association ("SEIA")/GTM Research, a leading source for the solar industry and Petitioner's detailed knowledge of U.S. c-Si PV cell and module capacity and production, SolarWorld alone represented approximately [   ] percent of 2012 U.S. c-Si PV module production.[28]  [   *Narrative*

], produced [   ] MW of c-Si PV modules in the United States in 2012, bringing the percentage of production of those producers that support the petition to [*70*] percent.

With regard to c-Si PV cells, Petitioner SolarWorld again accounts for a majority of 2012 U.S. production. The Commission identified two U.S. producers of c-Si PV cells in 2012: SolarWorld and Suniva.[29]  SolarWorld produced [   ] MW of c-Si PV cells in 2012, while Suniva's entire U.S. manufacturing capacity in 2012 totaled 170 MW.[30] Thus, even assuming, conservatively, that Suniva's entire manufacturing capacity constituted cell production capacity, and that Suniva produced at full capacity in 2012 (an unlikely scenario), SolarWorld would still account for [   ] percent of U.S. c-Si PV cell production in 2012 – a clear majority.

Therefore, domestic producers who support the Petitions account for at least 25 percent of the total production of the domestic like product and more than 50 percent of the production of the domestic like product produced by that portion of the industry expressing support for or

---

[28]      According to SEIA/GTM Research's 2012 Solar Market Insight Report, a total of [*309*] MW of modules were produced in the United States in 2012. Solar Energy Industries Association, *U.S. Solar Market Insight: 2012 Year in Review* (2012) at 74, excerpts attached at **Exhibit I-5**. SolarWorld's produced [   ] MW of modules in the United States in 2012, thus accounting for [   ] percent of total U.S. production.

[29]      *See* USITC Pub. 4360 at VI-1.

[30]      Suniva, *Company Overview* (2012) at 2, excerpt attached at **Exhibit I-6**.

Filed By: tbrightbill@wileyrein.com, Filed Date: 12/31/13 11:43 AM, Submission Status: Approved

**PUBLIC VERSION**

opposition to the Petitions. This is consistent with the 2011 findings of the Department in the initial AD/CVD solar cases regarding industry support.[31]

### D.   Previous Requests for Import Relief for the Merchandise (19 C.F.R. § 351.202(b)(4))

Petitioner has previously filed for relief from imports of a portion of the products that constitute subject merchandise in this case under Section 701 and Section 731 of the Act. As discussed above, in October 2011, Petitioner filed petitions for the imposition of antidumping and countervailing duties on imports of c-Si PV cells, whether or not assembled into modules, from the People's Republic of China. After affirmative preliminary and final determinations by the Department of sales at less than fair value and countervailable subsidies, and affirmative preliminary and final injury determinations by the Commission, AD/CVD orders were imposed in December 2012.[32] (As noted below, the scope of this investigation specifically excludes merchandise already covered by these orders.)

Petitioner has not sought relief from subject imports under either Section 337 of the Act, Section 201 or Section 301 of the Trade Act of 1974, or under Section 232 of the Trade Expansion Act of 1962.

### E.   Scope of the Investigation and a Detailed Description of the Subject Merchandise (19 C.F.R. § 351.202(b)(5))

#### 1.   Scope of Investigation

The scope of this proceeding is defined as follows:

---

[31]     *See* Import Administration, Office of AD/CVD Operations, Countervailing Duty Investigation Initiation Checklist, re: *Certain Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China* (Nov. 8, 2011) at Attachment II, excerpt attached at **Exhibit I-7**.

[32]     *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 77 Fed. Reg. at 73,017; *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 77 Fed. Reg. at 73,018.

10

PUBLIC VERSION

The merchandise covered by this investigation is crystalline silicon photovoltaic cells, and modules, laminates and/or panels consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including building integrated materials. For purposes of this investigation, subject merchandise also includes modules, laminates and/or panels consisting of crystalline silicon photovoltaic cells completed or partially manufactured within a customs territory other than that subject country, using ingots, wafers, or partially manufactured cells sourced from the subject country.

Subject merchandise includes crystalline silicon photovoltaic cells of thickness equal to or greater than 20 micrometers, having a p/n junction formed by any means, whether or not the cell has undergone other processing, including, but not limited to, cleaning, etching, coating, and/or addition of materials (including, but not limited to, metallization and conductor patterns) to collect and forward the electricity that is generated by the cell.

Excluded from the scope of this investigation are thin film photovoltaic products produced from amorphous silicon (a-Si), cadmium telluride (CdTe), or copper indium gallium selenide (CIGS). Also excluded from the scope of this investigation are any products covered by the existing antidumping and countervailing duty orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the People's Republic of China – case numbers A-570-979 and C-570-980.

Merchandise covered by this investigation is currently classified in the Harmonized Tariff Schedule of the United States ("HTSUS") under subheadings 8501.61.0000, 8507.20.80, 8541.40.6020 and 8541.40.6030. These HTSUS subheadings are provided for convenience and customs purposes; the written description of the scope of this investigation is dispositive.

## 2. Technical Characteristics and Uses

C-Si PV cells, which are made from crystalline silicon, are the building blocks of solar photovoltaic power-generation systems. C-Si PV cells are produced from ultra-refined polysilicon. C-Si PV cells convert the energy of sunlight directly into electricity, by the photovoltaic effect. Specifically, c-Si PV cells have a positive-negative junction ("p/n junction"), which is an interface of a p-type semiconductor and an n-type semiconductor that is usually formed by dopant additions to create an intrinsic or extrinsic charge state.[33] The p/n

---

[33]    The p/n junction can be formed by several means, including, but not limited to, dopant diffusion (*i.e.*, the process of using a concentration gradient of one species along with temperature and/or energy to insert those species into another); ion implantation (*i.e.*, the process of using a potential field to accelerate charged species, colliding

Filed By: tbrightbill@wileyrein.com, Filed Date: 12/31/13 11:43 AM, Submission Status: Approved

**TAB 2**

**Letter from Wiley Rein to Commerce and the
ITC, re: Supplement II to Petition (Jan. 13, 2014)**

**AD P.R. 25, CVD P.R. 45**

Barcode:3173182-01 A-570-010 INV - Investigation -

DOC Investigation No. A-570-010, A-583-853, C-570-011
Total Pages: 58
Investigation
Business proprietary has been removed from the pages and exhibits identified in the cover letter.
**PUBLIC VERSION**

**BEFORE THE**
**INTERNATIONAL TRADE ADMINISTRATION**
**UNITED STATES DEPARTMENT OF COMMERCE**
**AND THE**
**UNITED STATES INTERNATIONAL TRADE COMMISSION**

---

**CERTAIN CRYSTALLINE SILICON PHOTOVOLTAIC PRODUCTS FROM THE PEOPLE'S REPUBLIC OF CHINA AND TAIWAN**

---

**PETITION FOR THE IMPOSITION**
**OF ANTIDUMPING AND COUNTERVAILING DUTIES PURSUANT TO**
**SECTIONS 701 and 731 OF THE TARIFF ACT OF 1930, AS AMENDED**

**VOLUME I**

**SUPPLEMENT II – INFORMATION RELATING TO**
**THE PEOPLE'S REPUBLIC OF CHINA AND TAIWAN – ANTIDUMPING AND**
**COUNTERVAILING DUTIES**

Timothy C. Brightbill, Esq.

**WILEY REIN LLP**
1776 K Street, N.W.
Washington, D.C. 20006
(202) 719-7000

*Counsel to SolarWorld Industries America, Inc.*

January 13, 2014

1335962v1  Filed By: tbrightbill@wileyrein.com, Filed Date: 1/13/14 9:52 AM, Submission Status: Approved

Barcode:3173182-01 A-570-010 INV - Investigation

PUBLIC DOCUMENT

**Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China ("PRC") and Taiwan**

General Issues Questionnaire

On behalf of Petitioner SolarWorld Industries America, Inc. ("Petitioner" or "SolarWorld"), this submission responds to the Department of Commerce's (the "Department") January 6, 2014 supplemental questions with regard to Volume I of the Petitions filed on December 31, 2013.[1] Each of the Department's questions is reproduced in bold text below, followed by Petitioner's response.

**Scope**

2. **In the second sentence of your proposed scope you state "{f}or purposes of this investigation, subject merchandise also includes modules, laminates and/or panels consisting of crystalline silicon photovoltaic cells completed or partially manufactured within a customs territory other than the subject country, using ingots, wafers, or partially manufactured cells sourced from the subject country." Please respond to the following with respect to this sentence:**

   a. **Currently, there is ambiguity in your proposed scope as to the amount or extent of production that must take place in the subject country for modules, laminates and/or panels ("solar panels") consisting of crystalline silicon photovoltaic cells ("solar cells") completed or partially manufactured within a customs territory other than the subject country to be covered by the scope. On page 13 of Volume I of your Petitions, you identify the manufacturing process for solar panels as consisting of five phases: (1) crystallization; (2) wafer production; (3) cell conversion; (4) module assembly; and (5) packing. With specific references to the production processes, please provide a revised scope containing a clear and specific definition of the amount or extent of production that must occur in the subject country in order to define solar cells and solar panels "completed or partially manufactured within a customs territory other than the subject country, using ingots, wafers, or partially manufactured cells sourced from the subject country."**

---

[1]     Petitioner responded to a number of the Department's January 6, 2014 supplemental questions in a previous submission, filed on January 9, 2014. *See* Letter from Wiley Rein LLP to Sec'y Commerce and Acting Sec'y of the International Trade Commission, re: *Supplement to Petition for the Imposition of Antidumping and Countervailing Duties: Certain Crystalline Silicon Photovoltaic Products from China and Taiwan* (Jan. 9, 2014) ("Petitioner's Jan. 9 Supplemental Response"). This submission responds to the remainder of the Department's supplemental questions.

1

Filed By: tbrightbill@wileyrein.com, Filed Date: 1/13/14 9:52 AM, Submission Status: Approved

Barcode:3173182-01 A-570-010 INV - Investigation  -

**PUBLIC DOCUMENT**

Of the five manufacturing process phases described in the Petition, packing (step 5) is not a step that is relevant to the scope analysis.  Phases (1) and (2) are closely related in the sense that wafer production adds relatively little value to the crystallized ingot.  The product of the third phase, cell conversion, is already the focus of the existing measures.

Petitioner intends that the present proceeding cover panels and modules assembled in a subject country (*e.g.*, China), even if the cells in those modules are produced in a different country (*e.g.*, Taiwan or a non-subject country), if those cells are made from ingots, wafers or partially manufactured cells that were manufactured in the subject country (*e.g.*, China).  This would cover situations where the panels or modules are assembled in a subject country from cells made in a different country but: 1) the ingots used for the wafers made into the cells were manufactured in the subject country; 2) the wafers made into the cells were manufactured in the subject country; or 3) the cell manufacturing process began in the subject country and then was completed in a non-subject country.  With reference to the steps described in the petition, this means that the scope covers module assembly (step 4) in a subject country, even if cell conversion (step 3) does not occur in the subject country, if either ingot crystallization (step 1), wafer production (step 2) or the beginning of cell conversion (step 3) also occurs in the same subject country.

To clarify these points, we propose revisions to the scope language as follows:

For purposes of this investigation, subject merchandise also includes modules, laminates and/or panels assembled in the subject country consisting of crystalline silicon photovoltaic cells that are completed or partially manufactured within a customs territory other than that subject country, using ingots that are manufactured in the subject country, wafers that are manufactured in the subject country, or cells where the manufacturing process begins in the subject country and is completed in a non-subject country.

2

Barcode:3173182-01 A-570-010 INV - Investigation   -

**PUBLIC DOCUMENT**

With regard to country of origin, this issue does not need to be addressed in the scope language.   However, Petitioner intends that country of origin would be determined through a two-step process:

1) By reference to the country of origin of the cell, consistent with the Department's investigation and final determination in *Solar Cells and Modules from China*;[2]

2) However, if the cell is completed or partially manufactured within a customs territory other than that subject country, and both the module, laminate, or panel and the input (either ingot, wafer, or partially manufactured cell) are manufactured in the same subject country (China or Taiwan), then the country of origin is the country of manufacture of the module, laminate, or panel and the input.   In other words, the country of origin is the country where two of the three primary manufacturing stages take place.

    **b. It may be ambiguous from this sentence whether "completed or partially manufactured within a customs territory other than the subject country" refers to 1) modules, laminates and/or panels; 2) the crystalline silicon photovoltaic cells contained in the modules, laminates and/or panels; or 3) both 1) and 2). As written, it appears that your scope may state that solar panels assembled in a country other than the subject country would not fall within the scope. Please revise this sentence to clarify what you intend to cover.**

In the sentence from the scope language quoted above, we intended "completed or partially manufactured within a customs territory other than the subject country" to refer to the c-Si PV cells contained in the modules, laminates and/or panels (*i.e.*, option 2 in the Department's question).   We suggest clarifying the scope language by adding "that are" prior to the phrase "completed or partially manufactured within a customs territory other than the subject country," as follows:

For purposes of this investigation, subject merchandise also includes modules, laminates and/or panels consisting of crystalline silicon photovoltaic cells that are completed or partially manufactured…

---

[2]    Petitioner notes that it has appealed aspects of the Department's final scope determination to the U.S. Court of International Trade. *See SolarWorld Industries America, Inc. v. United States*, CIT Consol. Court. No. 13-219. That appeal is currently pending.

3

**PUBLIC DOCUMENT**

    c.  **In the sentence above you use the phrase "sourced from the subject country." Do ingots, wafers, or partially manufactured cells produced in a country other than the subject country, but purchased from a reseller in the subject country meet this description? Or must the ingots, wafers, or partially manufactured cells be produced in the subject country? Please clarify your scope or explain why it is more appropriate for your proposed scope to specify "sourced from the subject country."**

The intent of the scope language was to refer to ingots, wafers or partially manufactured cells <u>produced in</u> the subject country.  However, this sentence has been additionally clarified in response to question 2a.  The revised version of our proposed scope appears in response to question 7 below.

7.  **Please provide a revised proposed scope as it should appear in the <u>Federal Register</u>, incorporating any changes made in response to the questions above.**

The merchandise covered by this investigation is crystalline silicon photovoltaic cells, and modules, laminates and/or panels consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including building integrated materials.  For purposes of this investigation, subject merchandise also includes modules, laminates and/or panels assembled in the subject country consisting of crystalline silicon photovoltaic cells that are completed or partially manufactured within a customs territory other than that subject country, using ingots that are manufactured in the subject country, wafers that are manufactured in the subject country, or cells where the manufacturing process begins in the subject country and is completed in a non-subject country.

Subject merchandise includes crystalline silicon photovoltaic cells of thickness equal to or greater than 20 micrometers, having a p/n junction formed by any means, whether or not the cell has undergone other processing, including, but not limited to, cleaning, etching, coating, and/or addition of materials (including, but not limited to, metallization and conductor patterns) to collect and forward the electricity that is generated by the cell.

Excluded from the scope of this investigation are thin film photovoltaic products produced from amorphous silicon (a-Si), cadmium telluride (CdTe), or copper indium gallium selenide (CIGS).    Also excluded from the scope of this investigation are any products covered by the existing antidumping and countervailing duty orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the People's Republic of China.  *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order*, 77 Fed. Reg. 73,018 (Dep't Commerce Dec. 7, 2012) (amended final deter. of sales at less than fair value, and

4

Barcode:3173182-01 A-570-010 INV - Investigation
PUBLIC DOCUMENT

antidumping duty order); *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 77 Fed. Reg. 73,017 (Dep't Commerce Dec. 7, 2012) (countervailing duty order).

Also excluded from the scope of this investigation are crystalline silicon photovoltaic cells, not exceeding 10,000mm² in surface area, that are permanently integrated into a consumer good whose function is other than power generation and that consumes the electricity generated by the integrated crystalline silicon photovoltaic cell. Where more than one cell is permanently integrated into a consumer good, the surface area for purposes of this exclusion shall be the total combined surface area of all cells that are integrated into the consumer good.

Merchandise covered by this investigation is currently classified in the Harmonized Tariff Schedule of the United States ("HTSUS") under subheadings 8501.61.0000, 8507.2080.30, 8507.2080.40, 8507.2080.60, 8507.2080.90, 8541.40.6020, 8541.40.6030 and 8501.31.8000. These HTSUS subheadings are provided for convenience and customs purposes; the written description of the scope of this investigation is dispositive.

## Injury

15. **To the extent you want the effect of imports from the PRC and Taiwan to be cumulated, address the following factors and provide reasonably available documentation to support your arguments: (1) the degree of fungibility between imports from the two subject countries and between the imports and the domestic like product; (2) the presence of sales or offers for sale of the imports and the domestic like product in the same geographic markets; (3) whether the imports and the domestic like product are handled in common or similar channels of distribution; and (4) whether the imports are present in the U.S. market simultaneously.**

For purposes of evaluating the volume and price effects for a determination of material injury by reason of subject imports, section 771(7)(G)(i) of the Tariff Act of 1930, as amended ("the Act"), requires the International Trade Commission ("the Commission") to cumulate subject imports from all countries as to which petitions were filed on the same day, if such imports compete with each other and with the domestic like product in the U.S. market.[3]   In assessing whether subject imports compete with each other and with the domestic like product, the Commission generally has considered four factors:

---

[3]    19 U.S.C. § 1677(7)(G)(i).

1368530-1
Filed By: tbrightbill@wileyrein.com, Filed Date: 1/13/14 9:52 AM, Submission Status: Approved

# TAB 3

## <u>Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China and Taiwan</u>, 79 Fed. Reg. 4661 (Dep't Commerce Jan. 29, 2014) (initiation AD inv.)

## AD P.R. 852



within 30 days of publication of this notice to *OIRA_Submission@omb.eop.gov.*

Dated: January 23, 2014.

**Gwellnar Banks,**

*Management Analyst, Office of the Chief Information Officer.*

[FR Doc. 2014–01624 Filed 1–28–14; 8:45 am]

**BILLING CODE 3510–22–P**

---

## DEPARTMENT OF COMMERCE

### Foreign-Trade Zones Board

**[B–83–2013]**

### Foreign-Trade Zone 138—Columbus, Ohio, Authorization of Production Activity, Rolls Royce Energy Systems, Inc. (Industrial Gas Turbines, Power Generation Turbines, and Generator Sets), Mount Vernon, Ohio

On September 5, 2013, the Columbus Regional Airport Authority, grantee of FTZ 138, submitted a notification of proposed production activity to the Foreign-Trade Zones (FTZ) Board on behalf of Rolls Royce Energy Systems, Inc., in Mount Vernon, Ohio.

The notification was processed in accordance with the regulations of the FTZ Board (15 CFR part 400), including notice in the **Federal Register** inviting public comment (78 FR 58995, 9–25–2013). The FTZ Board has determined that no further review of the activity is warranted at this time. The production activity described in the notification is authorized, subject to the FTZ Act and the FTZ Board's regulations, including Section 400.14.

Dated: January 21, 2014.

**Andrew McGilvray,**

*Executive Secretary.*

[FR Doc. 2014–01579 Filed 1–28–14; 8:45 am]

**BILLING CODE 3510–DS–P**

---

## DEPARTMENT OF COMMERCE

### Foreign-Trade Zones Board

**[B–4–2014]**

### Foreign-Trade Zone (FTZ) 221—Mesa, Arizona; Notification of Proposed Production Activity; Apple Inc./GT Advanced Technologies Inc. (Components for Consumer Electronics), Mesa, Arizona

Apple Inc./GT Advanced Technologies Inc. (Apple/GT) submitted a notification of proposed production activity to the FTZ Board for its facility in Mesa, Arizona. The notification conforming to the requirements of the regulations of the FTZ Board (15 CFR 400.22) was received on January 23, 2014.

A separate application for subzone designation at the Apple/GT facility is being processed under Section 400.31 of the Board's regulations (Doc. S–5–2014). Apple/GT requested authority to manufacture intermediate components for consumer electronics for export. Pursuant to 15 CFR 400.14(b), FTZ activity would be limited to the specific foreign-status materials and components and specific finished products described in the submitted notification (as described below) and subsequently authorized by the FTZ Board.

Production under FTZ procedures could exempt Apple/GT from customs duty payments on the foreign status components listed below used in the export production of sapphire material (duty rate 6.4%). Customs duties also could possibly be deferred or reduced on foreign status production equipment.

The components and materials sourced from abroad include white alumina block, forged metal industrial heat-treating equipment and diamond cutting wire (duty rate ranges from duty-free to 1.3%).

Public comment is invited from interested parties. Submissions shall be addressed to the Board's Executive Secretary at the address below. The closing period for their receipt is March 10, 2014.

A copy of the notification will be available for public inspection at the Office of the Executive Secretary, Foreign-Trade Zones Board, Room 21013, U.S. Department of Commerce, 1401 Constitution Avenue NW., Washington, DC 20230–0002, and in the ''Reading Room'' section of the Board's Web site, which is accessible via *www.trade.gov/ftz.*

For further information, contact Elizabeth Whiteman at *Elizabeth.Whiteman@trade.gov* or (202) 482–0473.

Dated: January 23, 2014.

**Andrew McGilvray,**

*Executive Secretary.*

[FR Doc. 2014–01727 Filed 1–28–14; 8:45 am]

**BILLING CODE 3510–DS–P**

---

## DEPARTMENT OF COMMERCE

### International Trade Administration

**[A–570–010, A–583–853]**

### Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China and Taiwan: Initiation of Antidumping Duty Investigations

**AGENCY:** Enforcement and Compliance, formerly Import Administration, International Trade Administration, Department of Commerce.

**DATES:** *Effective Date:* January 29, 2014.

**FOR FURTHER INFORMATION CONTACT:** Jeffrey Pedersen at (202) 482–2769 (the People's Republic of China (PRC)); or Karine Gziryan at (202) 482–4081 (Taiwan), AD/CVD Operations, Enforcement and Compliance, U.S. Department of Commerce, 14th Street and Constitution Avenue NW., Washington, DC 20230.

**SUPPLEMENTARY INFORMATION:**

**The Petitions**

On December 31, 2013, the Department of Commerce (the Department) received antidumping duty (AD) petitions concerning imports of certain crystalline silicon photovoltaic products (certain solar cells and panels) from the People's Republic of China (PRC) and Taiwan.[1] The Petitions were filed in proper form on behalf of SolarWorld Industries America, Inc. (Petitioner). Petitioner is a domestic producer of solar cells and panels. The Petitions were accompanied by a countervailing duty (CVD) petition on imports of certain solar cells and panels from the PRC. On January 3, 6, 9 and 10, 2014, the Department requested additional information and clarification of certain areas of the Petitions. Petitioner filed responses to these requests on January 8, 9, 13, 15, and 17, 2014.

In accordance with section 732(b) of the Tariff Act of 1930, as amended (the Act), Petitioner alleges that imports of certain solar cells and panels from the PRC and Taiwan are being, or are likely to be, sold in the United States at less than fair value within the meaning of section 731 of the Act and that such imports are materially injuring, and threatening material injury to, an industry in the United States. Also, consistent with section 732(b)(1) of the Act, the Petitions are accompanied by information reasonably available to Petitioner supporting its allegations.

The Department finds that Petitioner filed these Petitions on behalf of the domestic industry because Petitioner is an interested party as defined in section 771(9)(C) of the Act. The Department also finds that Petitioner has demonstrated sufficient industry support with respect to the initiation of

[1] *See* Petitions for the Imposition of Antidumping Duties on Imports of Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China and Taiwan,'' dated December 31, 2013 (the Petitions).

the AD investigations that Petitioner is requesting.[2]

## Periods of Investigations

Pursuant to 19 CFR 351.204(b)(1), because the Petitions were filed on December 31, 2013, the period of investigation (POI) for the PRC investigation is April 1, 2013, through September 30, 2013. The POI for the Taiwan investigation is October 1, 2012, through September 30, 2013.

## Scope of the Investigations

The products covered by these investigations are certain solar cells and panels from the PRC and Taiwan. For a full description of the scope of the investigations, see the "Scope of the Investigations" in Appendix I of this notice.

## Comments on the Scope of Investigations

During our review of the Petitions, the Department issued questions to, and received responses from, Petitioner pertaining to the proposed scope to ensure that the scope language in the Petitions would be an accurate reflection of the products for which the domestic industry is seeking relief. Also, on January 15, 2014, Suniva, Inc. ("Suniva"), a U.S. producer of certain solar cells and panels, submitted comments on the scope.[3] As discussed in the preamble to the regulations,[4] we are setting aside a period for interested parties to raise issues regarding product coverage. Parties should note that when considering product coverage with respect to these investigations, the Department will be informed by the product coverage decisions that it made in the investigations that resulted in the existing orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the PRC.[5] The Department encourages all interested parties to submit such comments by 5:00 p.m. Eastern Time on February 11, 2014. All comments must be filed on the records of the PRC and Taiwan AD investigations, as well as the concurrent PRC CVD investigation.

## Filing Requirements

All submissions to the Department must be filed electronically using Enforcement and Compliance's Antidumping and Countervailing Duty Centralized Electronic Service System (IA ACCESS).[6] An electronically filed document must be received successfully in its entirety by 5:00 p.m. on the date of the applicable deadline. Documents excepted from the electronic submission requirements must be filed manually (i.e., in paper form) with the APO/ Dockets Unit of Enforcement and Compliance, Room 1870, U.S. Department of Commerce, 14th Street and Constitution Avenue NW., Washington, DC 20230, and stamped with the date and time of receipt by the applicable deadline.

## Comments on Product Characteristics for Antidumping Duty Questionnaires

The Department requests comments from interested parties regarding the appropriate physical characteristics of certain solar cells and panels to be reported in response to the Department's AD questionnaires. This information will be used to identify the key physical characteristics of the subject merchandise in order to report the relevant factors and costs of production (COPs) accurately as well as to develop appropriate product-comparison criteria.

Interested parties may provide any information or comments that they feel are relevant to the development of an accurate list of physical characteristics. Specifically, they may provide comments as to which characteristics are appropriate to use as: (1) General product characteristics and (2) product-comparison criteria. We note that it is not always appropriate to use all product characteristics as product-comparison criteria. We base product-comparison criteria on meaningful commercial differences among products. In other words, while there may be some physical product characteristics utilized by manufacturers to describe certain solar cells and panels, it may be that only a select few product characteristics take into account commercially-meaningful physical characteristics. In addition, interested parties may comment on the order in which the physical characteristics should be used in matching products. Generally, the Department attempts to list the most important physical characteristics first and the least important characteristics last.

In order to consider the suggestions of interested parties in developing and issuing the AD questionnaires, we must receive comments on product characteristics by February 5, 2014. Rebuttal comments must be received by February 12, 2014. All comments and submissions to the Department must be filed electronically using IA ACCESS, as referenced above.

## Determination of Industry Support for the Petitions

Section 732(b)(1) of the Act requires that a petition be filed on behalf of the domestic industry. Section 732(c)(4)(A) of the Act provides that a petition meets this requirement if the domestic producers or workers who support the petition account for: (i) At least 25 percent of the total production of the domestic like product; and (ii) more than 50 percent of the production of the domestic like product produced by that portion of the industry expressing support for, or opposition to, the petition. Moreover, section 732(c)(4)(D) of the Act provides that, if the petition does not establish support of domestic producers or workers accounting for more than 50 percent of the total production of the domestic like product, the Department shall: (i) Poll the industry or rely on other information in order to determine if there is support for the petition, as required by subparagraph (A); or (ii) determine industry support using a statistically valid sampling method to poll the industry.

Section 771(4)(A) of the Act defines the "industry" as the producers as a whole of a domestic like product. Thus, to determine whether a petition has the requisite industry support, the statute directs the Department to look to producers and workers who produce the domestic like product. The U.S. International Trade Commission (ITC), which is responsible for determining whether "the domestic industry" has been injured, must also determine what constitutes a domestic like product in order to define the industry. While both the Department and the ITC must apply the same statutory definition regarding the domestic like product,[7] they do so for different purposes and pursuant to a separate and distinct authority. In addition, the Department's

---

[2] See the "Determination of Industry Support for the Petitions" section below.

[3] See Letter from Suniva, dated January 15, 2014.

[4] See Antidumping Duties; Countervailing Duties; Final Rule, 62 FR 27296, 27323 (May 19, 1997).

[5] In the investigations covering crystalline silicon photovoltaic cells, whether or not assembled into modules, from the PRC, the Department determined that modules, laminates, and panels produced in a third-country from cells produced in the PRC are covered by the scope of the investigations; however, modules, laminates, and panels produced in the PRC from cells produced in a third-country are not covered by the scope of the investigations.

[6] See Antidumping and Countervailing Duty Proceedings: Electronic Filing Procedures; Administrative Protective Order Procedures, 76 FR 39263 (July 6, 2011) for details of the Department's electronic filing requirements, which went into effect on August 5, 2011. Information on help using IA ACCESS can be found at https:// iaaccess.trade.gov/help.aspx and a handbook can be found at https://iaaccess.trade.gov/help/Hand book%20on%20Electronic%20Filling%20 Procedures.pdf.

[7] See section 771(10) of the Act

determination is subject to limitations of time and information. Although this may result in different definitions of the like product, such differences do not render the decision of either agency contrary to law.[8]

Section 771(10) of the Act defines the domestic like product as "a product which is like, or in the absence of like, most similar in characteristics and uses with, the article subject to an investigation under this title." Thus, the reference point from which the domestic like product analysis begins is "the article subject to an investigation" (*i.e.*, the class or kind of merchandise to be investigated, which normally will be the scope as defined in the petition).

With regard to the domestic like product, Petitioner offers a definition of the domestic like product that includes certain crystalline silicon photovoltaic cells and modules and notes that the like product definition in this proceeding is identical to the definition of the like product in the Department's and the ITC's investigation of crystalline silicon photovoltaic cells, whether or not assembled into modules, from China.[9] According to Petitioner, "{t}he definition of the domestic like product in the Petition differs only slightly from the proposed scope of the investigations . . ." and "slight differences in the definition of the domestic like product and the scope of an investigation are permissible under the statute . . ."[10] Based on our analysis of the information submitted on the record, we have determined that certain crystalline silicon photovoltaic cells and modules constitute a single domestic like product and we have analyzed industry support in terms of that domestic like product.[11]

In determining whether Petitioner has standing under section 732(c)(4)(A) of the Act, we considered the industry support data contained in the Petitions with reference to the domestic like product as defined in the Petitions. To establish industry support, Petitioner provided its own production of the domestic like product in 2012, and compared this to the estimated total production of the domestic like product for the entire domestic industry.[12] Petitioner obtained total 2012 production of the domestic like product using data published by Solar Energy Industries Association/Greentech Media Research in *U.S. Solar Market Insight 2012 Year in Review* and other publicly available data.[13] We have relied upon data Petitioner provided for purposes of measuring industry support.[14]

On January 10, 2014, in consultations the Department held with respect to the companion CVD case on imports of certain solar cells and modules from the PRC, the Government of China raised the issue of industry support.[15] On January 15, 2014, we received comments on industry support from Yingli Green Energy Holding Company Limited, Yingli Green Energy Americas, Inc., and Canadian Solar Inc (collectively, PRC Producers/Exporters).[16] Petitioner responded to the PRC Producers/Exporters' comments on January 15, 2014.[17] PRC Producers/Exporters filed a rebuttal to Petitioner on January 17, 2014.[18] For further discussion of these comments, see the PRC AD Initiation Checklist and the

Taiwan AD Initiation Checklist, at Attachment II.

Based on information provided in the Petitions, supplemental submissions, and other information readily available to the Department, we determine that Petitioner has met the statutory criteria for industry support under section 732(c)(4)(A)(i) of the Act because the domestic producers (or workers) who support the Petitions account for at least 25 percent of the total production of the domestic like product.[19] Based on information provided in the Petitions, the domestic producers (or workers) have met the statutory criteria for industry support under section 732(c)(4)(A)(ii) of the Act because the domestic producers (or workers) who support the Petitions account for more than 50 percent of the production of the domestic like product produced by that portion of the industry expressing support for, or opposition to, the Petitions. Accordingly, the Department determines that the Petitions were filed on behalf of the domestic industry within the meaning of section 732(b)(1) of the Act.[20]

The Department finds that Petitioner filed the Petitions on behalf of the domestic industry because it is an interested party as defined in section 771(9)(C) of the Act and that it has demonstrated sufficient industry support with respect to the AD investigations that it is requesting the Department initiate.[21]

**Allegations and Evidence of Material Injury and Causation**

Petitioner alleges that the U.S. industry producing the domestic like product is being materially injured, or is threatened with material injury, by reason of the imports of the subject merchandise sold at less than normal value (NV). In addition, Petitioner alleges that subject imports exceed the negligibility threshold provided for under section 771(24)(A) of the Act.[22]

Petitioner contends that the industry's injured condition is illustrated by reduced market share; underselling and price depression or suppression; lost sales and revenues; shuttered production and hindered capacity utilization; reduced employment; and decline in industry financial performance.[23] We have assessed the

---

[8] *See USEC, Inc.* v. *United States*, 132 F. Supp. 2d 1, 8 (CIT 2001) (citing *Algoma Steel Corp., Ltd.* v. *United States*, 688 F. Supp. 639, 644 (CIT 1988), *aff'd* 865 F.2d 240 (Fed. Cir. 1989)).

[9] *See* Volume I of the Petitions, at 24; *see also* General Issues Supplement to the Petitions, dated January 9, 2014 (General Issues Supplement), at Exhibit I–Supp–1; *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Initiation of Antidumping Duty Investigation*, 76 FR 70960, 70961 (November 16, 2011); *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Initiation of Countervailing Duty Investigation*, 76 FR 70966, 70967–8 (November 16, 2011); and *Crystalline Silicon Photovoltaic Cells and Modules From the People's Republic of China*, Inv. Nos. 701–TA–481 and 731–TA–1190 (Final) USITC Pub. 4360 (December 2012), at 6–12.

[10] *See* General Issues Supplement, at 4.

[11] *See* Antidumping Duty Investigation Initiation Checklist: Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China (PRC AD Initiation Checklist), at Attachment II, Analysis of Industry Support for the Antidumping and Countervailing Duty Petitions Covering Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China and Taiwan

(Attachment II); and Antidumping Duty Investigation Initiation Checklist: Certain Crystalline Silicon Photovoltaic Products from Taiwan (Taiwan AD Initiation Checklist), at Attachment II. These checklists are dated concurrently with, and hereby adopted by, this notice and are on file electronically via IA ACCESS. Access to documents filed via IA ACCESS is also available in the Central Records Unit (CRU), Room 7046 of the main Department of Commerce building.

[12] *See* Volume I of the Petitions, at 8–10 and Exhibits I–3, I–5, and I–6; *see also* General Issues Supplement, at 5–8 and Exhibits I–Supp–1, I–Supp–2, I–Supp–3 and I–Supp–6.

[13] *See* Volume I of the Petitions, at Exhibits I–5 and I–6.

[14] *See* PRC AD Initiation Checklist and Taiwan AD Initiation Checklist, at Attachment II.

[15] *See* Memorandum to the File from Vicki Flynn, dated January 14, 2014, titled "Placing Consultations Memorandum on the AD Records."

[16] *See* Letter from Yingli Green Energy Holding Company Limited, Yingli Green Energy Americas, Inc., and Canadian Solar Inc., dated January 14, 2014.

[17] *See* Letter from Petitioner, dated January 15, 2014.

[18] *See* Letter from Yingli Green Energy Holding Company Limited, Yingli Green Energy Americas, Inc., and Canadian Solar Inc., dated January 17, 2014.

[19] *See* PRC AD Initiation Checklist and Taiwan AD Initiation Checklist, at Attachment II.

[20] *Id.*

[21] *Id.*

[22] *See* General Issues Supplement, at 8 and Exhibit I–Supp–4.

[23] *See* Volume I of the Petitions, at 5–7, 20–22, 33–67 and Exhibits I–1, I–4, I–13 through I–14, I–
Continued

allegations and supporting evidence regarding material injury, threat of material injury, and causation, and we have determined that these allegations are properly supported by adequate evidence and meet the statutory requirements for initiation.[24]

### Allegations of Sales at Less Than Fair Value

The following is a description of the allegations of sales at less than fair value upon which the Department based its decision to initiate AD investigations of imports of certain solar cells and panels from the PRC and Taiwan. The sources of data for the deductions and adjustments relating to U.S. price and NV are discussed in greater detail in the country-specific initiation checklists.

### Constructed Export Price—PRC

Petitioner calculated constructed export price (CEP) based on an offer for sales of solar panels assembled in, and exported from, the subject country by a manufacturer of subject merchandise. Petitioner classified these offers as CEP transactions because it believed that this manufacturer's products were sold by their U.S. affiliates. Petitioner made deductions from the U.S. price for movement expenses, consistent with the delivery terms. Petitioner also deducted from the U.S. price U.S. selling expenses and CEP profit, both of which it estimated using the financial statements of First Solar, Inc., a U.S. producer of solar modules utilizing thin-film technologies.[25]

### Constructed Export Price—Taiwan

Petitioner calculated CEP based on offers for sales of solar panels which were exported from the subject country in the form of laminates and further manufactured in the United States by the U.S. affiliate of the Taiwanese producer of the laminates. Petitioner classified these offers as CEP transactions because it believed that these products were sold by the U.S. affiliate of the Taiwanese producer. Petitioner calculated the further manufacturing costs in the United States using its own production experience

and subtracted the further manufacturing cost related to the production of finished modules in the United States from the quoted U.S. price. Petitioner made deductions from the U.S. price for movement expenses, consistent with the delivery terms. Petitioner also deducted from the U.S. price U.S. indirect selling expenses and CEP profit, both of which it estimated using the financial statements of First Solar, Inc., a U.S. producer of solar modules utilizing thin-film technologies.[26]

### NV—PRC

Petitioner calculated NV for the panels assembled in the PRC using a methodology that was based on the conclusion that the solar cells that were used in the panels were produced in Taiwan from wafers manufactured in the PRC.[27] Petitioner states that the Department has long treated the PRC as a non-market economy (NME) country.[28] Accordingly, Petitioner calculated the portion of NV that was based on production performed in the PRC using the Department's NME methodology, as required by 19 CFR 351.202(b)(7)(i)(C) and 19 CFR 351.408. Specifically, Petitioner calculated the portion of NV relating to production performed in the PRC using factors of production (FOPs) valued in a surrogate market economy country, in accordance with section 773(c) of the Act. Petitioner contends that Thailand is the appropriate surrogate country for the PRC because: (1) It is at a level of economic development comparable to that of the PRC; (2) it is a significant producer of identical merchandise; and (3) that the availability and quality of data are good.[29]

In accordance with section 771(18)(C)(i) of the Act, the presumption of NME status remains in effect until revoked by the Department. The presumption of NME status for the PRC has not been revoked by the Department and, therefore, remains in effect for purposes of the initiation of this investigation. Hence, an NME methodology is appropriate for valuing production performed in the PRC. Moreover, based on the information provided by Petitioner, we believe that it is appropriate to use Thailand as a surrogate country for initiation purposes. After initiation of the investigation, interested parties will have the opportunity to submit

comments regarding surrogate country selection and, pursuant to 19 CFR 351.301(c)(3)(i), will be provided an opportunity to submit publicly available information to value factors of production no later than 30 days before the date of the preliminary determination. In addition, in the course of the investigation covering merchandise from the PRC, all parties, including the public, will have the opportunity to provide relevant information related to the issues of the PRC's NME status and the granting of separate rates to individual exporters.

Petitioner calculated a portion of the NV for the PRC Petition based on the cost of producing solar cells in Taiwan using PRC wafers. Petitioner determined the cost of the solar cells produced in Taiwan by valuing FOPs for the Taiwanese production using import prices in Taiwan.[30]

### Factors of Production

Petitioner based the FOPs for materials, labor, and energy on the consumption rates of a surrogate producer of panels. Petitioner asserts that these consumption rates are reasonably available information, which, to the best of its knowledge, are an appropriate surrogate for consumption of producers of the merchandise under consideration in the PRC because this surrogate producer is comparable to the PRC producers of the merchandise under consideration.[31]

### Valuation of Raw Materials and Packing Materials

Petitioner valued the FOPs for various raw material inputs used to produce subject merchandise in the PRC based on Thai import data for the POI from Global Trade Atlas (GTA) under corresponding Harmonized Tariff Schedule (HTS) numbers.[32] Petitioner added to the raw material surrogate values the inland freight charges reported for importing goods into Thailand, as published by the World Bank in *Doing Business 2014: Thailand*.[33] Petitioner excluded from its surrogate values all import values from countries previously determined by the Department to maintain broadly available, non-industry-specific export subsidies and from countries previously determined by the Department to be

---

[16] through I–20, and I–22 through I–30; General Issues Supplement, at 8–9 and Exhibits I–Supp–1, I–Supp–4 and I–Supp–5; and Second General Issues Supplement, dated January 13, 2014 (Second General Issues Supplement), at 5–11 and Exhibits I–Supp–7 through I–Supp–15.

[24] *See* PRC AD Initiation Checklist, at Attachment III, Analysis of Allegations and Evidence of Material Injury and Causation for the Petitions Covering Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and Taiwan (Attachment III); *see also* Taiwan AD Initiation Checklist, at Attachment III.

[25] For details regarding all adjustments to CEP, see the PRC AD Initiation Checklist at 6–8.

[26] For details regarding all adjustments to CEP, see the Taiwan AD Initiation Checklist at 6–8.

[27] *See* PRC AD Initiation Checklist, at 6.

[28] *See* Volume II of the Petitions, at 14.

[29] *Id.*, at 15–17, 23.

[30] *See* PRC AD Initiation Checklist, at 9.

[31] *See* Volume II of the Petitions, at 15, 22–23.

[32] *See* PRC AD Initiation Checklist, at 8; *see also* Volume II of the Petitions, at 26 and Exhibit II–21; First PRC AD Supplement, at 2–3.

[33] *See* Volume II of the Petitions, at Exhibits II–9; *see also* First PRC AD Supplement, at 7–8.

NME countries.[34] In addition, in accordance with the Department's practice, the average import value used as a surrogate excludes imports that were labeled as originating from an unidentified country. We revised the surrogate that Petitioner used to value aluminum frames and frame corners because Petitioner used a HTS number that had been rejected by the Department in a previous AD proceeding involving solar cells and panels from the PRC.[35]

For production performed in Taiwan for the module assembled in the PRC, Petitioner valued various raw material inputs based on Taiwan import data for the POI from GTA under the applicable HTS numbers.[36]

*Valuation of Energy*

For production performed in the PRC, Petitioner valued electricity using a 2012 electricity rate in Thai baht per kilowatt hour, as reported by the Thai Board of Investment.[37] In accordance with the Department's policy not to adjust energy tariffs for inflation if those tariffs are likely still in force, Petitioner did not adjust this value for inflation.[38]

---

[34] *See* Volume II of the Petitions, at Exhibits II– 19, II–20 and II–21.

[35] *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Final Determination of Sales at Less Than Fair Value, and Affirmative Final Determination of Critical Circumstances, in Part,* 77 FR 63791 (October 17, 2012) and the accompanying Issues and Decision Memorandum at Comment 16, as amended by *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order,* 77 FR 73018 (December 7, 2012); *see also* PRC AD Initiation Checklist, at Attachment V.

[36] *See* PRC AD Initiation Checklist, at 8; *see also* Volume II of the Petitions, at 26 and Exhibit II–21; First PRC AD Supplement, at 2–3.

[37] *See* Volume II of the Petitions, at 26 and Exhibit II–22.

[38] *Id.; see also Certain Kitchen Appliance Shelving and Racks from the People's Republic of China: Antidumping Duty Administrative Review, 2010–2011,* 77 FR 61385 (October 9, 2012), and accompanying Preliminary Decision Memorandum at 16, unchanged in *Certain Kitchen Appliance Shelving and Racks From the People's Republic of China: 2010–2011; Final Results of Antidumping Duty Administrative Review,* 78 FR 5414 (January 25, 2013); *Certain Activated Carbon From the People's Republic of China: Final Results and Partial Rescission of Second Antidumping Duty Administrative Review,* 75 FR 70208 (November 17, 2010), and accompanying Issues and Decision Memorandum at Comment 8; and *Certain Oil Country Tubular Goods From the People's Republic of China: Notice of Preliminary Determination of Sales at Less Than Fair Value, Affirmative Preliminary Determination of Critical Circumstances and Postponement of Final Determination,* 74 FR 59117 (November 17, 2009), unchanged in *Certain Oil Country Tubular Goods from the People's Republic of China: Final Determination of Sales at Less Than Fair Value, Affirmative Final Determination of Critical*

For production performed in Taiwan, Petitioner utilized Taiwanese electricity rates for industrial users as collected and disseminated by the U.S. Department of Energy.[39]

*Valuation of Labor*

For production performed in the PRC, Petitioner valued labor using information published in a 2013 industrial survey by the Thailand National Statistics Office.[40]

For production performed in Taiwan, Petitioner valued labor using 2012 data for Taiwan collected by the U.S. Bureau of Labor Statistics.[41] Petitioner adjusted this rate for inflation by utilizing the consumer price index, as reported by the U.S. Bureau of Labor Statistics.[42]

*Valuation of Factory Overhead, Selling, General and Administrative Expenses, and Profit*

Petitioner calculated factory overhead, selling, general and administrative expenses, and profit using data from the 2012–2013 financial statements of Hana Microelectronics Group, a Thai producer of electronics merchandise which Petitioner identified as comparable to the merchandise under consideration.[43]

**NV—Taiwan**

Petitioner based NV on price information from a Taiwanese producer of panels for panels sold in the subject country. Petitioner was not able to obtain a price quote for a laminate offered for sale in the home market during the POI, but did obtain a finished module price. The only alleged difference between the finished module and laminate is the final stage of the production of the module. Therefore, Petitioner believes that an adjustment to the home market price for the difference in merchandise is appropriate. Petitioner adjusted the home market price by subtracting from the offered price the further manufacturing cost related to the production of finished modules in the United States, based on Petitioner's own experience. Petitioner made adjustments to NV for movement expenses consistent with the sales

---

*Circumstances and Final Determination of Targeted Dumping,* 75 FR 20335 (April 19, 2010).

[39] *See* Volume II of the Petitions, at 26 and Exhibit II–22.

[40] *Id.,* at Exhibit II–23.

[41] *See* Volume II of the Petitions, at 27 and Exhibit II–24.

[42] *Id.*

[43] *See* PRC AD Initiation Checklist; *see* Volume II of the Petitions, at 28–29 and Exhibits II–19 and II–24; First PRC AD Supplement at 3–4, and Exhibit II–Supp–2.

terms. Petitioner made no other adjustments to NV.[44]

**Fair Value Comparisons**

Based on the data provided by Petitioner, there is reason to believe that imports of certain solar cells and panels from the PRC and Taiwan are being, or are likely to be, sold in the United States at less than fair value. Based on comparisons of CEP to NV, in accordance with section 773(a)(1) of the Act, the estimated dumping margin for certain solar cells and panels from Taiwan is 75.68 percent.[45] Based on a comparison of CEP to NV, in accordance with section 773(c) of the Act, the estimated dumping margin for certain solar cells and panels from the PRC is 165.04 percent.[46]

**Initiation of Antidumping Duty Investigations**

Section 732(b)(1) of the Act requires the Department to initiate an AD proceeding whenever an interested party files an AD petition on behalf of an industry that: (1) Alleges the elements necessary for the imposition of a duty under section 731 of the Act; and (2) is accompanied by information reasonably available to the petitioners supporting the allegations.

Based upon the examination of the Petitions on certain solar cells and panels from the PRC and Taiwan, we find that the Petitions meet the requirements of section 732 of the Act. Therefore, we are initiating AD investigations to determine whether imports of certain solar cells and panels from the PRC and Taiwan are being, or are likely to be, sold in the United States at less than fair value. In accordance with section 733(b)(1)(A) of the Act and 19 CFR 351.205(b)(1), unless postponed, we will make our preliminary determinations no later than 140 days after the date of this initiation.

**Respondent Selection**

The Petition for Taiwan names 21 companies as producers/exporters of certain solar cells and panels. Following the Department's standard practice in AD investigations involving market-economy countries, for the Taiwanese AD investigation we will select respondents based on U.S. Customs and Border Protection (CBP) data for U.S. imports of certain solar cells and panels. We intend to release CBP data to all parties with access to information protected by APO within five-business

---

[44] *See* Taiwan AD Initiation Checklist, at 8–9.

[45] *See* Taiwan Initiation Checklist.

[46] *See* PRC AD Initiation Checklist.

days of publication of this **Federal Register** notice. The Department invites comments regarding respondent selection within seven days of publication of this **Federal Register** notice.

The Petition for the PRC names 78 companies as producers/exporters of certain solar cells and panels. In accordance with the Department's standard practice in AD investigations involving NME countries, for respondent selection in the PRC AD investigation we intend to issue quantity and value (Q&V) questionnaires to each potential respondent named in the Petition and base respondent selection on the responses to our Q&V questionnaire. In addition, the Department will post the Q&V questionnaire along with the filing instructions on Enforcement and Compliance's Web site at *http://trade.gov/enforcement/news.asp*. Exporters and producers of certain solar cells and panels from the PRC that do not receive a Q&V questionnaire from the Department may still submit a response to the Q&V questionnaire using a copy of the questionnaire obtained from Enforcement and Compliance's Web site. The Q&V questionnaire must be submitted by all PRC producers/exporters no later than February 13, 2014. All Q&V questionnaires must be filed electronically using IA ACCESS.

**Separate Rates**

In order to obtain separate rate status in an NME investigation, exporters and producers must submit a separate rate application.[47] The specific requirements for submitting the separate rate application in the PRC investigation are outlined in detail in the application itself, which will be available on Enforcement and Compliance's Web site at *http://trade.gov/enforcement/news.asp* on the date of publication of this initiation notice in the **Federal Register**. The separate rate application will be due 60 days after publication of this initiation notice. All separate rate applications must be filed electronically using IA ACCESS. For exporters and producers who submit a separate rate application and have been selected as mandatory respondents, these exporters and producers will no longer be eligible for consideration for separate rate status unless they respond to all parts of the

AD questionnaire as mandatory respondents. The Department requires that PRC producers/exporters submit a response to both the Q&V questionnaire and the separate rate application by their respective deadlines in order to receive consideration for separate rate status.

**Use of Combination Rates**

The Department will calculate combination rates for certain respondents that are eligible for a separate rate in an NME investigation. The Separate Rates and Combination Rates Bulletin states:

{w}hile continuing the practice of assigning separate rates only to exporters, all separate rates that the Department will now assign in its NME investigations will be specific to those producers that supplied the exporter during the period of investigation. Note, however, that one rate is calculated for the exporter and all of the producers which supplied subject merchandise to it during the period of investigation. This practice applies both to mandatory respondents receiving an individually calculated separate rate as well as the pool of non-investigated firms receiving the weighted-average of the individually calculated rates. This practice is referred to as the application of "combination rates" because such rates apply to specific combinations of exporters and one or more producers. The cash-deposit rate assigned to an exporter will apply only to merchandise both exported by the firm in question *and* produced by a firm that supplied the exporter during the period of investigation.[48]

**Distribution of Copies of the Petitions**

In accordance with section 732(b)(3)(A) of the Act and 19 CFR 351.202(f), copies of the public version of the Petitions have been provided to the governments of the PRC and Taiwan via IA ACCESS. Because of the particularly large number of producers/exporters identified in the Petitions, the Department considers the service of the public version of the Petitions to the foreign producers/exporters to be satisfied by the provision of the public version of the Petition to the governments of the PRC and Taiwan, consistent with 19 CFR 351.203(c)(2).

**ITC Notification**

We have notified the ITC of our initiation, as required by section 732(d) of the Act.

**Preliminary Determinations by the ITC**

The ITC will preliminarily determine no later than February 14, 2014, whether there is a reasonable indication that imports of certain solar cells and panels from the PRC and Taiwan are

materially injuring, or threatening material injury to, a U.S. industry. A negative ITC determination for any country will result in the investigation being terminated with respect to that country; otherwise, these investigations will proceed according to statutory and regulatory time limits.

**Submission of Factual Information**

On April 10, 2013, the Department published *Definition of Factual Information and Time Limits for Submission of Factual Information: Final Rule*, 78 FR 21246 (April 10, 2013), which modified two regulations related to AD and CVD proceedings: the definition of factual information (19 CFR 351.102(b)(21)), and the time limits for the submission of factual information (19 CFR 351.301). The final rule identifies five categories of factual information in 19 CFR 351.102(b)(21), which are summarized as follows: (i) Evidence submitted in response to questionnaires; (ii) evidence submitted in support of allegations; (iii) publicly available information to value factors under 19 CFR 351.408(c) or to measure the adequacy of remuneration under 19 CFR 351.511(a)(2); (iv) evidence placed on the record by the Department; and (v) evidence other than factual information described in (i)–(iv). The final rule requires any party, when submitting factual information, to specify under which subsection of 19 CFR 351.102(b)(21) the information is being submitted and, if the information is submitted to rebut, clarify, or correct factual information already on the record, to provide an explanation identifying the information already on the record that the factual information seeks to rebut, clarify, or correct. The final rule also modified 19 CFR 351.301 so that, rather than providing general time limits, there are specific time limits based on the type of factual information being submitted. These modifications are effective for all proceeding segments initiated on or after May 10, 2013, and thus are applicable to these investigations. Please review the final rule, available at *http://www.gpo.gov/fdsys/pkg/FR-2013-04-10/pdf/2013-08227.pdf#page=1*, prior to submitting factual information in these investigations.

**Certification Requirements**

Any party submitting factual information in an AD or CVD proceeding must certify to the accuracy and completeness of that information.[49] Parties are hereby reminded that revised certification requirements are in effect

---

[47] *See* Policy Bulletin 05.1: Separate-Rates Practice and Application of Combination Rates in Antidumping Investigations involving Non-Market Economy Countries (April 5, 2005) (Separate Rates and Combination Rates Bulletin), available on the Department's Web site at *http://enforcement.trade.gov/policy/bull05-1.pdf*.

[48] *See* Separate Rates and Combination Rates Bulletin, at 6 (emphasis added).

[49] *See* section 782(b) of the Act.

for company/government officials, as well as their representatives. Investigations initiated on the basis of petitions filed on or after August 16, 2013, and other segments of any AD or CVD proceedings initiated on or after August 16, 2013, should use the formats for the revised certifications provided at the end of the *Final Rule*.[50] The Department intends to reject factual submissions if the submitting party does not comply with applicable revised certification requirements.

**Revised Extension of Time Limits Regulation**

On September 20, 2013, the Department modified its regulation concerning the extension of time limits for submissions in AD and CVD proceedings. The modification clarifies that parties may request an extension of time limits before a time limit established under Part 351 expires, or as otherwise specified by the Secretary. In general, an extension request will be considered untimely if it is filed after the time limit established under Part 351 expires. For submissions which are due from multiple parties simultaneously, an extension request will be considered untimely if it is filed after 10:00 a.m. on the due date. Examples include, but are not limited to: (1) Case and rebuttal briefs, filed pursuant to 19 CFR 351.309; (2) factual information to value factors under section 19 CFR 351.408(c), or to measure the adequacy of remuneration under section 19 CFR 351.511(a)(2), filed pursuant to 19 CFR 351.301(c)(3) and rebuttal, clarification and correction filed pursuant to 19 CFR 351.301(c)(3)(iv); (3) comments concerning the selection of a surrogate country and surrogate values and rebuttal; (4) comments concerning CBP data; and (5) Q&V questionnaires. Under certain circumstances, the Department may elect to specify a different time limit by which extension requests will be considered untimely for submissions which are due from multiple parties simultaneously. In such a case, the Department will inform parties in the letter or memorandum setting forth the deadline (including a specified time) by which extension requests must be filed to be considered timely. This modification also requires that an extension request must be made in a separate, stand-alone submission, and

clarifies the circumstances under which the Department will grant untimely-filed requests for the extension of time limits. These modifications are effective for all segments initiated on or after October 21, 2013. Please review *Extension of Time Limits; Final Rule,* available at *http://www.gpo.gov/fdsys/pkg/FR-2013-09-20/html/2013-22853.htm,* prior to submitting factual information in these segments.

**Notification to Interested Parties**

Interested parties must submit applications for disclosure under APO in accordance with 19 CFR 351.305. On January 22, 2008, the Department published *Antidumping and Countervailing Duty Proceedings: Documents Submission Procedures; APO Procedures,* 73 FR 3634 (January 22, 2008). Parties wishing to participate in these investigations should ensure that they meet the requirements of these procedures (*e.g.,* the filing of letters of appearance as discussed at 19 CFR 351.103(d)).

This notice is issued and published pursuant to section 777(i) of the Act and 19 CFR 351.203(c).

Dated: January 22, 2014.

**Paul Piquado,**

*Assistant Secretary for Enforcement and Compliance.*

**Appendix I**

**Scope of the Investigations**

The merchandise covered by these investigations is crystalline silicon photovoltaic cells, and modules, laminates and/or panels consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including building integrated materials. For purposes of these investigations, subject merchandise also includes modules, laminates and/or panels assembled in the subject country consisting of crystalline silicon photovoltaic cells that are completed or partially manufactured within a customs territory other than that subject country, using ingots that are manufactured in the subject country, wafers that are manufactured in the subject country, or cells where the manufacturing process begins in the subject country and is completed in a non-subject country.

Subject merchandise includes crystalline silicon photovoltaic cells of thickness equal to or greater than 20 micrometers, having a p/n junction formed by any means, whether or not the cell has undergone other processing, including, but not limited to, cleaning, etching, coating, and/or addition of materials (including, but not limited to, metallization and conductor patterns) to collect and forward the electricity that is generated by the cell.

Excluded from the scope of these investigations are thin film photovoltaic products produced from amorphous silicon (a-Si), cadmium telluride (CdTe), or copper indium gallium selenide (CIGS). Also excluded from the scope of these investigations are any products covered by the existing antidumping and countervailing duty orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the People's Republic of China. *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order,* 77 FR 73018 (December 7, 2012); *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Countervailing Duty Order,* 77 FR 73017 (December 7, 2012).

Also excluded from the scope of these investigations are crystalline silicon photovoltaic cells, not exceeding $10,000mm^2$ in surface area, that are permanently integrated into a consumer good whose function is other than power generation and that consumes the electricity generated by the integrated crystalline silicon photovoltaic cell. Where more than one cell is permanently integrated into a consumer good, the surface area for purposes of this exclusion shall be the total combined surface area of all cells that are integrated into the consumer good.

Merchandise covered by these investigations is currently classified in the Harmonized Tariff Schedule of the United States (HTSUS) under subheadings 8501.61.0000, 8507.20.8030, 8507.20.8040, 8507.20.8060, 8507.20.8090, 8541.40.6020, 8541.40.6030 and 8501.31.8000. These HTSUS subheadings are provided for convenience and customs purposes; the written description of the scope of these investigations is dispositive.

[FR Doc. 2014–01738 Filed 1–28–14; 8:45 am]

**BILLING CODE 3510–DS–P**

---

**DEPARTMENT OF COMMERCE**

**International Trade Administration**

**[C–570–011]**

**Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China: Initiation of Countervailing Duty Investigation**

**AGENCY:** Enforcement & Compliance, formerly Import Administration, International Trade Administration, Department of Commerce.

**DATES:** *Effective Date:* January 29, 2014.

**FOR FURTHER INFORMATION CONTACT:** Justin Neuman or Milton Koch, Office VII, AD/CVD Operations, Enforcement & Compliance, International Trade Administration, U.S. Department of Commerce, 14th Street and Constitution Avenue NW., Washington, DC 20230; telephone; (202) 482–0486 or (202) 482–2584, respectively.

**SUPPLEMENTARY INFORMATION:**

---

[50] *See Certification of Factual Information To Import Administration During Antidumping and Countervailing Duty Proceedings,* 78 FR 42678 (July 17, 2013) (*Final Rule*); *see also* frequently asked questions regarding the *Final Rule,* available at *http://enforcement.trade.gov/tlei/notices/factual_info_final_rule_FAQ_07172013.pdf.*

**TAB 4**

**<u>Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China and Taiwan</u>, 79 Fed. Reg. 4667 (Dep't Commerce Jan. 29, 2014) (initiation CVD inv.)**

**CVD P.R. 70**

for company/government officials, as well as their representatives. Investigations initiated on the basis of petitions filed on or after August 16, 2013, and other segments of any AD or CVD proceedings initiated on or after August 16, 2013, should use the formats for the revised certifications provided at the end of the *Final Rule*.[50] The Department intends to reject factual submissions if the submitting party does not comply with applicable revised certification requirements.

**Revised Extension of Time Limits Regulation**

On September 20, 2013, the Department modified its regulation concerning the extension of time limits for submissions in AD and CVD proceedings. The modification clarifies that parties may request an extension of time limits before a time limit established under Part 351 expires, or as otherwise specified by the Secretary. In general, an extension request will be considered untimely if it is filed after the time limit established under Part 351 expires. For submissions that are due from multiple parties simultaneously, an extension request will be considered untimely if it is filed after 10:00 a.m. on the due date. Examples include, but are not limited to: (1) Case and rebuttal briefs, filed pursuant to 19 CFR 351.309; (2) factual information to value factors under section 19 CFR 351.408(c), or to measure the adequacy of remuneration under section 19 CFR 351.511(a)(2), filed pursuant to 19 CFR 351.301(c)(3) and rebuttal, clarification and correction filed pursuant to 19 CFR 351.301(c)(3)(iv); (3) comments concerning the selection of a surrogate country and surrogate values and rebuttal; (4) comments concerning CBP data; and (5) Q&V questionnaires. Under certain circumstances, the Department may elect to specify a different time limit by which extension requests will be considered untimely for submissions which are due from multiple parties simultaneously. In such a case, the Department will inform parties in the letter or memorandum setting forth the deadline (including a specified time) by which extension requests must be filed to be considered timely. This modification also requires that an extension request must be made in a separate, stand-alone submission, and

clarifies the circumstances under which the Department will grant untimely-filed requests for the extension of time limits. These modifications are effective for all segments initiated on or after October 21, 2013. Please review *Extension of Time Limits; Final Rule,* available at *http://www.gpo.gov/fdsys/pkg/FR-2013-09-20/html/2013-22853.htm,* prior to submitting factual information in these segments.

**Notification to Interested Parties**

Interested parties must submit applications for disclosure under APO in accordance with 19 CFR 351.305. On January 22, 2008, the Department published *Antidumping and Countervailing Duty Proceedings: Documents Submission Procedures; APO Procedures,* 73 FR 3634 (January 22, 2008). Parties wishing to participate in these investigations should ensure that they meet the requirements of these procedures (*e.g.,* the filing of letters of appearance as discussed at 19 CFR 351.103(d)).

This notice is issued and published pursuant to section 777(i) of the Act and 19 CFR 351.203(c).

Dated: January 22, 2014.

**Paul Piquado,**

*Assistant Secretary for Enforcement and Compliance.*

**Appendix I**

**Scope of the Investigations**

The merchandise covered by these investigations is crystalline silicon photovoltaic cells, and modules, laminates and/or panels consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including building integrated materials. For purposes of these investigations, subject merchandise also includes modules, laminates and/or panels assembled in the subject country consisting of crystalline silicon photovoltaic cells that are completed or partially manufactured within a customs territory other than that subject country, using ingots that are manufactured in the subject country, or cells where the manufacturing process begins in the subject country and is completed in a non-subject country.

Subject merchandise includes crystalline silicon photovoltaic cells of thickness equal to or greater than 20 micrometers, having a p/n junction formed by any means, whether or not the cell has undergone other processing, including, but not limited to, cleaning, etching, coating, and/or addition of materials (including, but not limited to, metallization and conductor patterns) to collect and forward the electricity that is generated by the cell.

Excluded from the scope of these investigations are thin film photovoltaic products produced from amorphous silicon (a-Si), cadmium telluride (CdTe), or copper

indium gallium selenide (CIGS). Also excluded from the scope of these investigations are any products covered by the existing antidumping and countervailing duty orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the People's Republic of China. *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order,* 77 FR 73018 (December 7, 2012); *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Countervailing Duty Order,* 77 FR 73017 (December 7, 2012).

Also excluded from the scope of these investigations are crystalline silicon photovoltaic cells, not exceeding 10,000mm² in surface area, that are permanently integrated into a consumer good whose function is other than power generation and that consumes the electricity generated by the integrated crystalline silicon photovoltaic cell. Where more than one cell is permanently integrated into a consumer good, the surface area for purposes of this exclusion shall be the total combined surface area of all cells that are integrated into the consumer good.

Merchandise covered by these investigations is currently classified in the Harmonized Tariff Schedule of the United States (HTSUS) under subheadings 8501.61.0000, 8507.20.8030, 8507.20.8040, 8507.20.8060, 8507.20.8090, 8541.40.6020, 8541.40.6030 and 8501.31.8000. These HTSUS subheadings are provided for convenience and customs purposes; the written description of the scope of these investigations is dispositive.

[FR Doc. 2014–01738 Filed 1–28–14; 8:45 am]

**BILLING CODE 3510–DS–P**

---

**DEPARTMENT OF COMMERCE**

**International Trade Administration**

**[C–570–011]**

**Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China: Initiation of Countervailing Duty Investigation**

**AGENCY:** Enforcement & Compliance, formerly Import Administration, International Trade Administration, Department of Commerce.

**DATES:** *Effective Date:* January 29, 2014.

**FOR FURTHER INFORMATION CONTACT:** Justin Neuman or Milton Koch, Office VII, AD/CVD Operations, Enforcement & Compliance, International Trade Administration, U.S. Department of Commerce, 14th Street and Constitution Avenue NW., Washington, DC 20230; telephone; (202) 482–0486 or (202) 482–2584, respectively.

**SUPPLEMENTARY INFORMATION:**

---

[50] *See Certification of Factual Information To Import Administration During Antidumping and Countervailing Duty Proceedings,* 78 FR 42678 (July 17, 2013) (*Final Rule*); *see also* frequently asked questions regarding the *Final Rule,* available at *http://enforcement.trade.gov/tlei/notices/factual_info_final_rule_FAQ_07172013.pdf.*

**4668** **Federal Register** / Vol. 79, No. 19 / Wednesday, January 29, 2014 / Notices

## The Petition

On December 31, 2013, the Department of Commerce (the Department) received a countervailing duty (CVD) petition concerning imports of certain crystalline silicon photovoltaic products (certain solar cells and panels) from the People's Republic of China (PRC), filed in proper form by SolarWorld Industries America, Inc. (Petitioner), a domestic producer of certain solar cells and panels. The CVD petition was accompanied by an antidumping duty (AD) petition concerning imports of certain solar cells and panels.[1] Between January 3 and January 9, 2014, the Department requested additional information and clarification of certain areas of the Petition, and between January 7 and January 13, 2014, Petitioner filed a timely response to each request.[2]

In accordance with section 702(b)(1) of the Tariff Act of 1930, as amended (the Act), Petitioner alleges that producers/exporters of certain solar cells and panels in the PRC received countervailable subsidies under thirty-three programs within the meaning of sections 701 and 771(5) of the Act, and that imports from these producers/exporters materially injure, or threaten material injury to, an industry in the United States.

The Department finds that Petitioner filed this Petition on behalf of the domestic industry because it is an interested party defined in section 771(9)(C) of the Act, and that Petitioner has demonstrated sufficient industry support with respect to the CVD investigation that it is requesting the Department to initiate (*see* ''Determination of Industry Support for the Petition'' below).

### Period of Investigation

The period of investigation (POI) is January 1, 2012, through December 31, 2012, in accordance with 19 CFR 351.204(b)(2).

### Scope of the Investigation

The products covered by this investigation are certain solar cells and panels the PRC.[3]

## Comments on the Scope of the Investigation

During our review of the Petition, we solicited information from Petitioner to ensure that the proposed scope language is an accurate reflection of the products for which the domestic industry is seeking relief. Also, on January 15, 2014, Suniva, Inc. (Suniva), a U.S. producer of certain solar cells and panels, submitted comments on the scope.[4] Moreover, as discussed in the preamble to the Department's regulations,[5] we are setting aside a period for interested parties to raise issues regarding product coverage. Parties should note that when considering product coverage with respect to this investigation, the Department will be informed by the product coverage decisions that it made in the investigations that resulted in the existing orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the PRC.[6] The Department encourages all interested parties to submit such comments by February 11, 2014, which is 20 calendar days from the signature date of this notice. All comments must be filed on the record of the CVD investigation, as well as the concurrent AD investigations.

### Filing Requirements

All submissions to the Department must be filed electronically using Enforcement & Compliance's Antidumping and Countervailing Duty Centralized Electronic Service System (IA ACCESS). An electronically filed document must be received successfully in its entirety by the Department's electronic records system, IA ACCESS, by 5 p.m. on the due date. Documents excepted from the electronic submission requirements must be filed manually (*i.e.,* in paper form) with the Enforcement & Compliance's APO/ Dockets Unit, Room 1870, U.S. Department of Commerce, 14th Street and Constitution Avenue NW., Washington, DC 20230, and stamped with the date and time of receipt by the

deadline established by the Department.[7]

### Consultations

Pursuant to section 702(b)(4)(A)(ii) of the Act, on January 2, 2014, the Department invited representatives from the Government of China (GOC) for consultations with respect to the CVD Petition. Consultations were held with the GOC on January 10, 2014.[8]

### Determination of Industry Support for the Petition

Section 702(b)(1) of the Act requires that a petition be filed on behalf of the domestic industry. Section 702(c)(4)(A) of the Act provides that a petition meets this requirement if the domestic producers or workers who support the petition account for: (i) At least 25 percent of the total production of the domestic like product; and (ii) more than 50 percent of the production of the domestic like product produced by that portion of the industry expressing support for, or opposition to, the petition. Moreover, section 702(c)(4)(D) of the Act provides that, if the petition does not establish support of domestic producers or workers accounting for more than 50 percent of the total production of the domestic like product, the Department shall: (i) Poll the industry or rely on other information in order to determine if there is support for the petition, as required by subparagraph (A); or (ii) determine industry support using a statistically valid sampling method to poll the industry.

Section 771(4)(A) of the Act defines the ''industry'' as the producers as a whole of a domestic like product. Thus, to determine whether a petition has the requisite industry support, the statute directs the Department to look to producers and workers who produce the domestic like product. The U.S. International Trade Commission (ITC), which is responsible for determining whether ''the domestic industry'' has been injured, must also determine what constitutes a domestic like product in order to define the industry. While both the Department and the ITC must apply

---

[1] *See* ''Petition for the Imposition of Antidumping and Countervailing Duties Pursuant to Sections 701 and 731 of the Tariff Act of 1930, As Amended,'' (December 31, 2013) (Petition).

[2] *See* Petitioner's filings, ''Supplement to the China CVD Petition,'' (January 7, 2014) (China CVD Supplement); ''General Issues Supplement to the Petition,'' (January 9, 2014) (General Issues Supplement); and ''Second General Issues Supplement to the Petition,'' (January 13, 2014) (Second General Issues Supplement).

[3] *See* Appendix I of this notice for a full description of the scope of this investigation.

[4] *See* Letter from Suniva, ''Request for Comment Period on Scope for Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China,'' (January 15, 2014).

[5] *See Antidumping Duties; Countervailing Duties; Final Rule,* 62 FR 27296, 27323 (May 19, 1997).

[6] The AD and CVD Orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the PRC, cover modules, laminates, and panels produced in a third-country from cells produced in the PRC; however, modules, laminates, and panels produced in the PRC from cells produced in a third-country are not covered by the scope of the Orders.

[7] *See* 19 CFR 351.303(b)(1). Information on help using IAACCESS can be found at *https:// iaaccess.trade.gov/help.aspx* and a handbook can be found at *https://iaaccess.trade.gov/help/ Handbook%20on%20Electronic%20Filing%20 Procedures.pdf.*

[8] *See* Ex-Parte Memorandum to the File from Justin Neuman, International Trade Analyst, AD/CVD Operations, Office VII, Enforcement & Compliance, ''Consultations with Officials from the Government of the People's Republic of China Regarding the Countervailing Duty Petition Concerning Certain Crystalline Silicon Photovoltaic Products,'' (January 13, 2014) (Consultations Memorandum).

the same statutory definition regarding the domestic like product,[9] they do so for different purposes and pursuant to a separate and distinct authority. In addition, the Department's determination is subject to limitations of time and information. Although this may result in different definitions of the like product, such differences do not render the decision of either agency contrary to law.[10]

Section 771(10) of the Act defines the domestic like product as "a product which is like, or in the absence of like, most similar in characteristics and uses with, the article subject to an investigation under this title." Thus, the reference point from which the domestic like product analysis begins is "the article subject to an investigation" (*i.e.*, the class or kind of merchandise to be investigated, which normally will be the scope as defined in the petition).

With regard to the domestic like product, Petitioner offers a definition of the domestic like product that includes certain crystalline silicon photovoltaic cells and modules and notes that the like product definition in this proceeding is identical to the definition of the like product in the Department's and the ITC's investigation of crystalline silicon photovoltaic cells, whether or not assembled into modules, from China.[11] According to Petitioner, "{t}he definition of the domestic like product in the Petition differs only slightly from the proposed scope of the investigations . . ." and "slight differences in the definition of the domestic like product and the scope of an investigation are permissible under the statute. . . ."[12] Based on our analysis of the information submitted on the record, we have determined that certain crystalline silicon photovoltaic cells and modules constitute a single domestic like product and we have analyzed industry support in terms of that domestic like product.[13]

In determining whether Petitioner has standing under section 702(c)(4)(A) of the Act, we considered the industry support data contained in the Petition with reference to the domestic like product as defined in the Petition. To establish industry support, Petitioner provided its own production of the domestic like product in 2012, and compared this to the estimated total production of the domestic like product for the entire domestic industry.[14] Petitioner obtained total 2012 production of the domestic like product using data published by Solar Energy Industries Association/Greentech Media Research in *U.S. Solar Market Insight 2012 Year in Review* and other publicly available data.[15] We have relied upon data Petitioner provided for purposes of measuring industry support.[16]

On January 10, 2014, in its consultations with the Department, the GOC raised the issue of industry support.[17] On January 15, 2014, we received comments on industry support from Yingli Green Energy Holding Company Limited, Yingli Green Energy Americas, Inc., and Canadian Solar Inc. (collectively, PRC Producers/Exporters).[18] Petitioner responded to the PRC Producers/Exporters' comments on January 15, 2014.[19] PRC Producers/Exporters filed a rebuttal to Petitioner on January 17, 2014.[20] For further discussion of these comments, *see* the PRC CVD Initiation Checklist, at Attachment II.

Based on information provided in the Petition, supplemental submissions, and other information readily available to the Department, we determine that Petitioner has met the statutory criteria for industry support under section

702(c)(4)(A)(i) of the Act because the domestic producers (or workers) who support the Petition account for at least 25 percent of the total production of the domestic like product.[21] Based on information provided in the Petition, the domestic producers (or workers) have met the statutory criteria for industry support under section 702(c)(4)(A)(ii) of the Act because the domestic producers (or workers) who support the Petition account for more than 50 percent of the production of the domestic like product produced by that portion of the industry expressing support for, or opposition to, the Petition. Accordingly, the Department determines that the Petition was filed on behalf of the domestic industry within the meaning of section 702(b)(1) of the Act.[22]

The Department finds that Petitioner filed the Petition on behalf of the domestic industry because it is an interested party as defined in section 771(9)(C) of the Act and it has demonstrated sufficient industry support with respect to the countervailing duty investigation that it is requesting the Department initiate.[23]

**Injury Test**

Because the PRC is a "Subsidies Agreement Country" within the meaning of section 701(b) of the Act, section 701(a)(2) of the Act applies to this investigation. Accordingly, the ITC must determine whether imports of the subject merchandise from the PRC materially injure, or threaten material injury to, a U.S. industry.

**Allegations and Evidence of Material Injury and Causation**

Petitioner alleges that imports of the subject merchandise are benefitting from countervailable subsidies and that such imports are causing, or threaten to cause, material injury to the U.S. industry producing the domestic like product. In addition, Petitioner alleges that subject imports exceed the negligibility threshold provided for under section 771(24)(A) of the Act.[24]

Petitioner contends that the industry's injured condition is illustrated by reduced market share; underselling and price depression or suppression; lost sales and revenues; shuttered production and hindered capacity utilization; reduced employment; and decline in industry financial

---

[9] *See* section 771(10) of the Act.

[10] *See USEC, Inc.* v. *United States,* 132 F. Supp. 2d 1, 8 (CIT 2001) (citing *Algoma Steel Corp., Ltd.* v. *United States,* 688 F. Supp. 639, 644 (CIT 1988), *aff'd* 865 F.2d 240 (Fed. Cir. 1989)).

[11] *See* Volume I of the Petition, at 24; *see, also* General Issues Supplement, at Exhibit I–Supp–1; *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Initiation of Antidumping Duty Investigation,* 76 FR 70960, 70961 (November 16, 2011); *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Initiation of Countervailing Duty Investigation,* 76 FR 70966, 70967–8 (November 16, 2011); and *Crystalline Silicon Photovoltaic Cells and Modules from the People's Republic of China,* Inv. Nos. 701–TA–481 and 731–TA–1190 (Final) USITC Pub. 4360 (December 2012), at 6–12.

[12] *See* General Issues Supplement, at 4.

[13] *See* Countervailing Duty Investigation Initiation Checklist: Certain Crystalline Silicon

Photovoltaic Products from the People's Republic of China (PRC CVD Initiation Checklist), at Attachment II, Analysis of Industry Support for the Antidumping and Countervailing Duty Petitions Covering Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and Taiwan (Attachment II). This checklist is dated concurrently with this notice and on file electronically via IA ACCESS. Access to documents filed via IA ACCESS is also available in the Central Records Unit (CRU), Room 7046 of the main Department of Commerce building.

[14] *See* Volume I of the Petition, at 8–10 and Exhibits I–3, I–5, and I–6; *see also* General Issues Supplement, at 5–8 and Exhibits I–Supp–1, I–Supp–2, I–Supp–3 and I–Supp–6.

[15] *See* Volume I of the Petition, at Exhibits I–5 and I–6.

[16] *See* PRC CVD Initiation Checklist, at Attachment II.

[17] *See* Consultations Memorandum.

[18] *See* Letter from Yingli Green Energy Holding Company Limited, Yingli Green Energy Americas, Inc., and Canadian Solar Inc., (January 15, 2014).

[19] *See* Letter from Petitioner, (January 15, 2014).

[20] *See* Letter from Yingli Green Energy Holding Company Limited, Yingli Green Energy Americas, Inc., and Canadian Solar Inc., (January 17, 2014).

[21] *See* CVD Initiation Checklist, at Attachment II.

[22] *Id.*

[23] *Id.*

[24] *See* General Issues Supplement, at 8 and Exhibit I–Supp–4.

performance.[25] We have assessed the allegations and supporting evidence regarding material injury, threat of material injury, and causation, and we have determined that these allegations are properly supported by adequate evidence and meet the statutory requirements for initiation.[26]

## Initiation of Countervailing Duty Investigation

Section 702(b)(1) of the Act requires the Department to initiate a CVD proceeding whenever an interested party files a CVD petition on behalf of an industry that: (1) Alleges the elements necessary for an imposition of a duty under section 701(a) of the Act; and (2) is accompanied by information reasonably available to the petitioners supporting the allegations.

The Department has examined the Petition on certain solar cells and panels from the PRC and finds that it complies with the requirements of section 702(b)(1) of the Act. Therefore, in accordance with section 702(b)(1) of the Act, we are initiating a CVD investigation to determine whether producers/exporters of certain solar cells and panels in the PRC receive countervailable subsidies. For a discussion of evidence supporting our initiation determination, see the CVD Initiation Checklist which accompanies this notice.

Based on our review of the Petition, we find that there is sufficient information to initiate a CVD investigation of 28 alleged programs. For the other five programs alleged by Petitioner, we have determined that the requirements for initiation have not been met. For a full discussion of the basis for our decision to initiate or not initiate on each program, see the CVD Initiation Checklist.

## Respondent Selection

For this investigation, the Department intends to select respondents based on U.S. Customs and Border Protection (CBP) data for U.S. imports during the POI (i.e., calendar year 2012) under the following Harmonized Tariff Schedule of the United States numbers: 8501.61.0000, 8507.20.8030,

8507.20.8040, 8507.20.8060, 8507.20.8090, 8541.40.6020, 8541.40.6030, and 8501.31.8000. We intend to release the CBP data under Administrative Protective Order (APO) to all parties with access to information protected by APO within five days of the announcement of the initiation of this investigation. Interested parties may submit comments regarding the CBP data and respondent selection within seven calendar days of release of this data. We intend to make our decision regarding respondent selection within 20 days of publication of this **Federal Register** notice.

## Notification to Interested Parties

Interested parties must submit applications for disclosure under APO in accordance with 19 CFR 351.305(b). Instructions for filing such applications may be found on the Department's Web site at *http://enforcement.trade.gov/ apo/index.html.*

## Distribution of Copies of the CVD Petition

In accordance with section 702(b)(4)(A)(i) of the Act and 19 CFR 351.202(f), a copy of the public version of the Petition has been provided to the representatives of the GOC. Because of the particularly large number of producers/exporters identified in the Petition, the Department considers the service of the public version of the petition to the foreign producers/ exporters satisfied by the delivery of the public version to the GOC, consistent with 19 CFR 351.203(c)(2).

## ITC Notification

We have notified the ITC of our initiation, as required by section 702(d) of the Act.

## Preliminary Determination by the ITC

The ITC will preliminarily determine, within 45 days after the date on which the Petition was filed, whether there is a reasonable indication that imports of subsidized certain solar cells and panels from the PRC materially injure, or threaten material injury to, a U.S. industry.[27] A negative ITC determination will result in the investigation being terminated.[28] Otherwise, the investigation will proceed according to statutory and regulatory time limits.

## Submission of Factual Information

On April 10, 2013, the Department published *Definition of Factual Information and Time Limits for*

*Submission of Factual Information: Final Rule,* 78 FR 21246 (April 10, 2013), which modified two regulations related to AD and CVD proceedings: The definition of factual information (19 CFR 351.102(b)(21)), and the time limits for the submission of factual information (19 CFR 351.301). The final rule identifies five categories of factual information in 19 CFR 351.102(b)(21), which are summarized as follows: (i) Evidence submitted in response to questionnaires; (ii) evidence submitted in support of allegations; (iii) publicly available information to value factors under 19 CFR 351.408(c) or to measure the adequacy of remuneration under 19 CFR 351.511(a)(2); (iv) evidence placed on the record by the Department; and (v) evidence other than factual information described in (i)–(iv). The final rule requires any party, when submitting factual information, to specify under which subsection of 19 CFR 351.102(b)(21) the information is being submitted and, if the information is submitted to rebut, clarify, or correct factual information already on the record, to provide an explanation identifying the information already on the record that the factual information seeks to rebut, clarify, or correct. The final rule also modified 19 CFR 351.301 so that, rather than providing general time limits, there are specific time limits based on the type of factual information being submitted. These modifications are effective for all proceeding segments initiated on or after May 10, 2013, and thus are applicable to this investigation. Please review the final rule, available at *http://enforcement.trade.gov/frn/2013/ 1304frn/2013-08227.txt,* prior to submitting factual information in this investigation.

## Revised Extension of Time Limits Regulation

On September 20, 2013, the Department modified its regulation concerning the extension of time limits for submissions in AD and CVD proceedings.[29] The modification clarifies that parties may request an extension of time limits before a time limit established under Part 351 expires, or as otherwise specified by the Secretary. In general, an extension request will be considered untimely if it is filed after the time limit established under Part 351 expires. For submissions which are due from multiple parties simultaneously, an extension request will be considered untimely if it is filed after 10:00 a.m. on the due date. Examples include, but are not limited

[25] See Volume I of the Petition, at 5–7, 20–22, 33– 67 and Exhibits I–1, I–4, I–13 through I–14, I–16 through I–20, and I–22 through I–30; General Issues Supplement, at 8–9 and Exhibits I–Supp–1, I–Supp–4 and I–Supp–5; and Second General Issues Supplement, at 5–11 and Exhibits I–Supp–7 through I–Supp–15.

[26] See PRC CVD Initiation Checklist, at Attachment III, Analysis of Allegations and Evidence of Material Injury and Causation for the Petitions Covering Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and Taiwan.

[27] See section 703(a)(2) of the Act.
[28] See section 703(a)(1) of the Act.

[29] See Extension of Time Limits; Final Rule, 78 FR 57790 (September 20, 2013).

to: (1) Case and rebuttal briefs, filed pursuant to 19 CFR 351.309; (2) factual information to value factors under section 19 CFR 351.408(c), or to measure the adequacy of remuneration under section 19 CFR 351.511(a)(2), filed pursuant to 19 CFR 351.301(c)(3) and rebuttal, clarification and correction filed pursuant to 19 CFR 351.301(c)(3)(iv); (3) comments concerning the selection of a surrogate country and surrogate values and rebuttal; (4) comments concerning CBP data; and (5) quantity and value questionnaires. Under certain circumstances, the Department may elect to specify a different time limit by which extension requests will be considered untimely for submissions which are due from multiple parties simultaneously. In such a case, the Department will inform parties in the letter or memorandum setting forth the deadline (including a specified time) by which extension requests must be filed to be considered timely. This modification also requires that an extension request must be made in a separate, stand-alone submission, and clarifies the circumstances under which the Department will grant untimely-filed requests for the extension of time limits. These modifications are effective for all segments initiated on or after October 21, 2013. Please review the Extension of Time Limits; Final Rule, available at *http://www.gpo.gov//fdsys//pkg//FR-2013-09-20//html//2013-22853.htm,* prior to submitting factual information in this segment.

**Certification Requirements**

Any party submitting factual information in an AD or CVD proceeding must certify to the accuracy and completeness of that information.[30] Parties are hereby reminded that revised certification requirements are in effect for company/government officials as well as their representatives in all AD or CVD investigations or proceedings initiated on or after August 16, 2013, including this investigation.[31] The formats for the revised certifications are provided at the end of the *Final Rule.* The Department intends to reject factual submissions if the submitting party does not comply with the revised certification requirements.

This notice is issued and published pursuant to section 777(i) of the Act.

[30] *See* section 782(b) of the Act.
[31] *See Certification of Factual Information To Import Administration During Antidumping and Countervailing Duty Proceedings,* 78 FR 42678 (July 17, 2013) (*Final Rule*).

Dated: January 22, 2014.

**Paul Piquado,**
*Assistant Secretary for Enforcement & Compliance.*

**Appendix I**

**Scope of the Investigation**

The merchandise covered by this investigation is crystalline silicon photovoltaic cells, and modules, laminates and/or panels consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including building integrated materials. For purposes of this investigation, subject merchandise also includes modules, laminates and/or panels assembled in the subject country consisting of crystalline silicon photovoltaic cells that are completed or partially manufactured within a customs territory other than that subject country, using ingots that are manufactured in the subject country, wafers that are manufactured in the subject country, or cells where the manufacturing process begins in the subject country and is completed in a non-subject country.

Subject merchandise includes crystalline silicon photovoltaic cells of thickness equal to or greater than 20 micrometers, having a p/n junction formed by any means, whether or not the cell has undergone other processing, including, but not limited to, cleaning, etching, coating, and/or addition of materials (including, but not limited to, metallization and conductor patterns) to collect and forward the electricity that is generated by the cell.

Excluded from the scope of this investigation are thin film photovoltaic products produced from amorphous silicon (a-Si), cadmium telluride (CdTe), or copper indium gallium selenide (CIGS). Also excluded from the scope of this investigation are any products covered by the existing antidumping and countervailing duty orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the People's Republic of China. *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order,* 77 FR 73018 (December 7, 2012); *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Countervailing Duty Order,* 77 FR 73017 (December 7, 2012).

Also excluded from the scope of this investigation are crystalline silicon photovoltaic cells, not exceeding 10,000mm² in surface area, that are permanently integrated into a consumer good whose function is other than power generation and that consumes the electricity generated by the integrated crystalline silicon photovoltaic cell. Where more than one cell is permanently integrated into a consumer good, the surface area for purposes of this exclusion shall be the total combined surface area of all cells that are integrated into the consumer good.

Merchandise covered by this investigation is currently classified in the Harmonized

Tariff Schedule of the United States (HTSUS) under subheadings 8501.61.0000, 8507.20.8030, 8507.20.8040, 8507.20.8060, 8507.20.8090, 8541.40.6020, 8541.40.6030 and 8501.31.8000. These HTSUS subheadings are provided for convenience and customs purposes; the written description of the scope of this investigation is dispositive.

[FR Doc. 2014–01743 Filed 1–28–14; 8:45 am]

**BILLING CODE 3510–DS–P**

**DEPARTMENT OF COMMERCE**

**International Trade Administration**

**[Application No. 97–12A003]**

**Export Trade Certificate of Review**

**ACTION:** Notice of Application (97–12A003) to amend the Export Trade Certificate of Review held by the Association for the Administration of Rice Quotas, Inc.

**SUMMARY:** The Office of Trade and Economic Analysis ("OTEA") of the International Trade Administration, Department of Commerce, has received an application to amend an Export Trade Certificate of Review ("Certificate"). This notice summarizes the proposed amendment and requests comments relevant to whether the amended Certificate should be issued.

**FOR FURTHER INFORMATION CONTACT:** Joseph Flynn, Director, Office of Trade and Economic Analysis, International Trade Administration, (202) 482–5131 (this is not a toll-free number) or email at *etca@trade.gov.*

**SUPPLEMENTARY INFORMATION:** Title III of the Export Trading Company Act of 1982 (15 U.S.C. 4001–21) authorizes the Secretary of Commerce to issue Export Trade Certificates of Review. An Export Trade Certificate of Review protects the holder and the members identified in the Certificate from State and Federal government antitrust actions and from private treble damage antitrust actions for the export conduct specified in the Certificate and carried out in compliance with its terms and conditions. Section 302(b)(1) of the Export Trading Company Act of 1982 and 15 CFR 325.6(a) require the Secretary to publish a notice in the **Federal Register** identifying the applicant and summarizing its proposed export conduct.

**Request for Public Comments**

Interested parties may submit written comments relevant to the determination whether an amended Certificate should be issued. If the comments include any privileged or confidential business

**TAB 5**

**Letter from Sidley Austin LLP to Commerce, Inv. Nos. A-570-010, A-583-853, and C-570-011, re: Comments on Scope on behalf of Yingli Green Energy Holding Co. Ltd., Yingli Green Energy, Americas, Inc., Canadian Solar Inc., Changzhou Trina Solar Energy Co., Ltd., Wuxi Suntech Power Co., Ltd., Shanghai JA Solar Technology Co., Ltd., Hefei JA Solar Technology, Co., Ltd., and Jinko Solar Co., Ltd. and with the support of the China Chamber of Commerce for Import and Export of Machinery and Electronic Products ("CCCME") and its members (Feb. 18, 2014)**

**AD P.R. 125, CVD P.R. 88**

Barcode:3181443-01 A-570-010 INV - Investigation -



SIDLEY AUSTIN LLP
1501 K STREET, N.W.
WASHINGTON, D.C. 20005
(202) 736 8000
(202) 736 8711 FAX

BEIJING          HONG KONG       SHANGHAI
BOSTON           HOUSTON         SINGAPORE
BRUSSELS         LONDON          SYDNEY
CHICAGO          LOS ANGELES     TOKYO
DALLAS           NEW YORK        WASHINGTON, D.C.
FRANKFURT        PALO ALTO
GENEVA           SAN FRANCISCO

nellis@sidley.com
202.736.8075

FOUNDED 1866

# PUBLIC DOCUMENT

February 18, 2014

The Honorable Penny Pritzker
Secretary of Commerce
U.S. Department of Commerce
Constitution Avenue & 14th Street, NW
Washington, DC 20230

Case Nos.: A-570-010, A-583-853, and
C-570-011
Number of Pages: 89
Investigation

Attention:     Enforcement and Compliance
               APO/Dockets Unit, Room 1870

**THIS DOCUMENT CONTAINS NO
PROPRIETARY INFORMATION**

Re:     Certain Crystalline Silicon Photovoltaic Products from the People's Republic of
        China and Taiwan: Comments on Scope

Dear Madame Secretary:

On behalf of Yingli Green Energy Holding Company Limited, Yingli Green Energy

Americas, Inc., Canadian Solar Inc., Changzhou Trina Solar Energy Co., Ltd., Wuxi Suntech

Power Co., Ltd., Shanghai JA Solar Technology Co., Ltd., Hefei JA Solar Technology, Co., Ltd.,

and Jinko Solar Co., Ltd. (collectively, "Respondents"),[1] we hereby submit the following

---

[1]     This submission is made with the support of the China Chamber of Commerce for Import
and Export of Machinery and Electronic Products ("CCCME").  CCCME represents 90 major
Chinese producers and exporters of crystalline silicon photovoltaic ("CSPV") products,
including the companies listed above, as well as Sumec Hardware & Tools Co. Ltd, ET Solar
Group, ReneSola Ltd., Wuhan FYY Technology Co., Ltd., Jetion Solar (China) Co., Ltd.,
Tainergy Tech (KunShan) Co., Ltd., Realforce Power Co., Ltd., Lightway Green New Energy
Co., Ltd., and Shenzhen Sungold Solar Co., Ltd.

Barcode:3181443-01 A-570-010 INV - Investigation -

# SIDLEY
SIDLEY AUSTIN LLP

Honorable Penny Pritzker
February 18, 2014
Page 2

comments regarding the product coverage of the above-captioned investigations.[2]  According to

the Department's letter dated February 4, 2014, comments on product coverage are due by

today's date.

For the reasons discussed herein, Respondents submit that the first paragraph of the scope

of these investigations as currently defined is untenable.  The product scope description in that

paragraph should be modified to include only CSPV cells, and modules, laminates and/or panels

consisting of CSPV cells, which originate in a subject country based on the application of the

Department's "substantial transformation" test for determining country of origin.  Moreover,

Respondents note that when that test is applied, given that CSPV cells and modules from China

are already covered by the existing antidumping ("AD") and countervailing duty ("CVD") orders

and explicitly excluded from the scope of these investigations, no merchandise from China

remains within the scope of these investigations, and therefore these investigations should be

immediately terminated with respect to China.

Respondents proceed below by: first, discussing the relevant background; second,

explaining why the country of origin of CSPV cells, and therefore also the country of origin of a

CSPV module, is properly the country in which the CSPV cells are produced; and third,

explaining why Petitioner's proposed scope is untenable and should be rejected.

---

[2]      *See Certain Crystalline Silicon Photovoltaic Products from the People's Republic of
China and Taiwan: Initiation of Antidumping Duty Investigations*, 79 Fed. Reg. 4661, 4662
(January 29, 2014) ("AD Notice of Initiation"); *Certain Crystalline Silicon Photovoltaic
Products from the People's Republic of China: Initiation of Countervailing Duty Investigation*,
79 Fed. Reg. 4667, 4668 (January 29, 2014) ("CVD Notice of Initiation").

Barcode:3181443-01 A-570-010 INV - Investigation  -

## EXHIBIT LIST

**Exhibit 1**      **Excerpts from CSPV Cells and Modules from China, IDM**

**Exhibit 2**      **CSPV Cells and Modules from China, Scope Clarification Memo**

**Exhibit 3**      **Excerpts from SolarWorld's Post-Conference Brief**

**Exhibit 4**      **Commission Implementing Regulation (EU) No 1357/2013**

**Exhibit 5**      **Excerpts from SolarWorld's Case Brief on General Issues**

Barcode:3181443-01 A-570-010 INV - Investigation  -

# Exhibit 1

Excerpts from CSPV Cells and
Modules from China, IDM

Barcode:3181443-01 A-570-979   - Investigation   -



**UNITED STATES DEPARTMENT OF COMMERCE**
**International Trade Administration**
Washington, D.C. 20230

A-570-979
POI: 04/01/11-09/30/11
**Public Document**
AD/CVD O4: Team

October 9, 2012

**MEMORANDUM TO:**       Paul Piquado
                        Assistant Secretary
                          for Import Administration

**FROM:**               Christian Marsh
                        Deputy Assistant Secretary
                          for Antidumping and Countervailing Duty Operations

**SUBJECT:**            Issues and Decision Memorandum for the Final Determination in
                        the Antidumping Duty Investigation of Crystalline Silicon
                        Photovoltaic Cells, Whether or Not Assembled into Modules, from
                        the People's Republic of China

**SUMMARY:**

We have analyzed the case briefs, and rebuttal briefs, submitted by interested parties in the AD
duty investigation of solar cells from the PRC. As a result of our analysis, we have made
changes to the *Preliminary Determination*.

We recommend that you approve the positions described in the "Discussion of the Issues"
section of this Issues and Decision Memorandum. Below is the complete list of the issues in this
AD investigation for which we received comments.

**Case Issues:**

General Issues

Comment 1:   Scope of the Investigation
Comment 2:   Selection of Surrogate Financial Statements
Comment 3:   Date of Sale
Comment 4:   Surrogate Country
Comment 5:   Labor Rate
Comment 6:   Separate Rates
Comment 7:   Overhead Items
Comment 8:   Exclusion of Import Data with Values but Quantities of Zero
Comment 9:   Surrogate Value for Wafers
Comment 10:  Critical Circumstances
Comment 11:  Allegations of Fraud



Filed By: nellis@sidley.com, Filed Date: 2/18/14 1:23 PM, Submission Status: Approved

Barcode:3181443-01 A-570-010 INV - Investigation  -

Comment 12:  Application of *Sigma*
Comment 13:  Double Remedies and Concurrent AD and CVD Investigations
Comment 14:  Collection of Antidumping Duties
Comment 15:  Surrogate Value for Quartz Crucibles
Comment 16:  Surrogate Value for Aluminum Frames
Comment 17:  Surrogate Value for Tin Ribbon
Comment 18:  Surrogate Value for Glass Plate for Wafer Slicing

Issues Relating To Trina

Comment 19:  Unreported FOPs by Cell Suppliers and Tollers
Comment 20:  Ocean Freight Expenses
Comment 21:  Errors Identified at Trina U.S.'s Verification
Comment 22:  Source for Barge Freight
Comment 23:  Whether to Apply NME Freight Charges to All of Trina's Sales
Comment 24:  Surrogate Value for Polysilicon
Comment 25:  Surrogate Value for Suspension
Comment 26:  Surrogate Value for Trina's Back Sheet

Issues Relating To Wuxi Suntech

Comment 27:  Whether Partial AFA Should be Used in Place of Unreported FOPs
             for Modules Assembled Under Back-to-Back Agreements
Comment 28:  Whether Suntech America's Product Recall Expenses Should be
             Included In Indirect Selling Expenses
Comment 29:  Exclusion of South Korean MEP Data
Comment 30:  Acceptance of Minor Corrections Submitted at Verification
Comment 31:  Exclusion of Sample Sales from the Margin Calculation
Comment 32:  Valuing Inputs from NME Suppliers When the Inputs Were Used in Further
             Manufacturing
Comment 33:  Whether Partial AFA Should be Applied to Value Labor and Energy
             for Tolled Modules
Comment 34:  Whether the ISE Rate Should be Applied to Gross Unit Price Less
             Billing Adjustments and Early Payment Discounts
Comment 35:  Suntech Arizona Financial Expense Rate
Comment 36:  Whether Suntech America's Bad Debt Expense Should be Included
Comment 37:  Verification Findings
Comment 38:  Whether Certain Reported Market Economy Purchases Were Purchased from a
             Market Economy Supplier
Comment 39:  Surrogate Value for PEG
Comment 40:  Surrogate Value for Silica Purge of Liquid (IPA)
Comment 41:  Surrogate Value for Hydrochloric Acid
Comment 42:  Diamond Wire Saw Blade Surrogate Value
Comment 43:  Whether Back-to-Back Arrangements Should be Considered
             Purchases or Tolling

Filed By: nellis@sidley.com, Filed Date: 2/18/14 1:23 PM, Submission Status: Approved

Barcode:3181443-01 A-570-010 INV - Investigation  -

Issues Relating to Other Respondents

Comment 44:  Voluntary Respondent Treatment of Yingli
Comment 45:  Treatment of Jiasheng's Separate Rate Application
Comment 46:  Treatment of Chaori's Separate Rate Application

**Background:**

The Department published its preliminary determination of sales at LTFV, postponement of final determination, and affirmative preliminary determination of critical circumstances on May 25, 2012.[1]  On May 22 and 25, 2012, Delsolar Co., Ltd./DelSolar (Wujiang) Ltd. and JinkoSolar International Limited, respectively submitted requests that the Department correct errors in their company names that appeared in the *Preliminary Determination*.[2]  The Department made the requested corrections and published its *Preliminary Determination Correction* notice on June 25, 2012.[3]

Between May 28, 2012 and June 25, 2012, the Department conducted verifications of the mandatory respondents Wuxi Suntech, Trina, and certain of their affiliates.[4]

Between July 9, 2012, and July 26, 2012, Wuxi Suntech, Trina, and Petitioner submitted SV and rebuttal SV comments.

On July 24, 2012, and July 23, 2012, respectively, Wuxi Suntech and Trina submitted revised U.S. sales and FOP databases per the Department's request to provide updated databases reflecting the results of verification.

On July 30, 2012, Wuxi Suntech, Trina, Petitioner, Yingli, Jiasheng, Chaori, and the GOC submitted case briefs.  On July 31, 2012, Small Steps Solar, Ltd. submitted a case brief, which the Department rejected because it was untimely filed.[5]  Subsequently, the Department rejected Yingli's case brief because it contained certain new factual information.[6]  Yingli resubmitted its redacted case brief on August 3, 2012.[7]  On August 6, 2012, Wuxi Suntech, Trina, Petitioner,

---

[1] *See Preliminary Determination.*
[2] *See* Letter from JinkoSolar International Limited to the Department regarding, "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China; Ministerial Error in Preliminary Determination," dated May 25, 2012. *See also* Letter from DelSolar Co., Ltd. and DelSolar (Wujiang) Ltd. to the Department regarding, "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Request for Correction," dated May 22, 2012.
[3] *See Preliminary Determination Correction.*
[4] *See* the "Verification" section below.
[5] *See* Letter from the Department to Small Steps Solar, Ltd., regarding "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Small Steps Solar, Ltd.'s July 31, 2012, Submission," dated August 3, 2012.
[6] *See* Letter from the Department to Yingli, regarding "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: July 30, 2012 Case Brief of Yingli Green Energy Holding Company Limited and Yingli Green Energy Americas, Inc.," dated August 2, 2012.
[7] *See* Letter from Yingli to the Department, regarding "Crystalline Silicon Photovoltaic Celis, Whether or Not Assembled into Modules, from the People's Republic of China: Resubmission of Yingli's Case Brief," dated August 3, 2012.

Filed By: nellis@sidley.com, Filed Date: 2/18/14 1:23 PM, Submission Status: Approved

tenKsolar, SunPower, and Sumec Hardware *et al.*[8] submitted rebuttal briefs.  Further, Wuxi Suntech, Trina, and Yingli jointly submitted a rebuttal brief on August 6, 2012.

On June 25, 2012, Wuxi Suntech, Trina, Petitioner, and Yingli requested a hearing.  Based on these hearing requests, on August 14, 2012, the Department held a public hearing limited to issues raised in the case briefs and the rebuttal briefs.

On September 7, 2012, Petitioner requested that the Department re-open the record to consider new recently available public information which indicates that Wuxi Suntech submitted potentially fraudulent financial statements to the Department.[9]  On September 11, 2012, the Department reopened the record for parties to comment on Petitioner's allegation of fraud.  On September 14, 2012 and September 18, 2012, Wuxi Suntech and Petitioner filed comments and rebuttal comments, respectively, regarding the fraud issue raised by Petitioner.

## DISCUSSION OF THE ISSUES[10]

## GENERAL ISSUES

### Comment 1:  Scope of the Investigation

*Petitioner*
- All modules assembled in the PRC, regardless of the country in which the solar cell was manufactured, should be included in the scope of the investigation because, *inter alia*: (1) the Department is legally required to give effect to the intent of the petition which was to cover modules from the PRC; (2) doing so will facilitate effective enforcement by CBP and prevent circumvention; (3) all PRC modules, regardless of the origin of the cells, are dumped into the United States; (4) the PRC module industry benefits from subsidies; (5) circumvention will be prevented and; (6) competition, and, consequently, price setting, occurs primarily in the module distribution channel.
- The Department's preliminary substantial transformation analysis is flawed.  First, it was based on a two-stage production process (cell and module production) when there are actually three production stages (wafer, cell, and module production).  When wafer production is viewed as a separate process from cell production, cell production becomes the least costly of the three stages.  Second, the Department considered the cell as the essential active component of the module but both cells and modules are essential active components of the finished product.  Third, the Department should not conduct a linear

---

[8] The following separate rate companies jointly submitted a rebuttal brief: Sumec Hardware & Tools Co., Ltd., Ningbo Etdz Holdings Ltd., LDK Solar Hi-Tech (Nanchang) Co., Ltd., LDK Solar Hi-Tech (Suzhou) Co., Ltd., Ningbo Qixin Solar Electrical Appliance Co., Ltd., Ningbo Komaes Solar Technology Co., Ltd., Zhejiang Jiutai New Energy Co., Ltd., ET Solar Industry Limited, JingAo Solar Co., Ltd., Dongfang Electric (Yixing) MAGI Solar Power Technology Co., Ltd., Shanghai JA Solar Technology Co., Ltd., Jiangsu Sunlink PV Technology Co., Ltd., and JA Solar Technology Yangzhou Co., Ltd.
[9] *See* Letter from Petitioner to the Department, regarding "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Request to Reopen the Records to New Factual Information," dated September 7, 2012.
[10] A list of abbreviations, acronyms, and full cites to documents is at the end of this memorandum.

Filed By: nellis@sidley.com, Filed Date: 2/18/14 1:23 PM, Submission Status: Approved

       substantial transformation analysis but refine its substantial transformation test by
       focusing on the country where the aggregate of production occurs.

- Alternatively, the Department should clarify the scope to cover PRC modules containing
wafers that were converted into solar cells in third countries in order to prevent PRC
exporters from avoiding dumping duties by producing wafers in the PRC, sending them
to a third country to be processed into solar cells, and assembling those solar cells into
modules in the PRC before exporting them to the United States.

*Respondents Canadian Solar et al.,[11] Sumec Hardware et al.[12], TenKsolar and SunPower*

- The Department should maintain the scope of the investigation as defined in the
*Preliminary Determination* by continuing to exclude modules, laminates, and panels
produced in the PRC from solar cells produced in a third country because: (1) the
substantial transformation analysis used to clarify the scope is accurate, and properly
avoids creating conflicting country of origin findings for a single product; (2) Petitioner's
proposed alternative substantial transformation test is not supported by law or precedent;
(3) the Department is not legally required to accept Petitioner's scope revision when there
is an overarching reason to modify it; (4) circumvention concerns were addressed in the
Department's scope clarification and the clarified scope can be administered effectively;
and (5) at this late stage of the proceeding, the Department is not permitted to expand the
scope to cover PRC modules containing wafers that were converted into solar cells in
third countries.

**Department's Position**:  We continue to find that modules assembled in the PRC from solar
cells produced in third countries are not covered by the scope of this investigation.  Although
generally the Department will exercise its authority to define or clarify the scope of an
investigation in a manner that reflects the intent of the petition and provides the relief requested
by the petitioning industry, it cannot merely accept a scope proposed by the industry when the
agency's ability to administer any resulting order requires that it modify the proposed scope,
which is the case here.[13]  The scope of an AD or CVD order is limited to merchandise that is
produced in the country covered by the order.[14]  Thus, Petitioner's proposal that modules
assembled in the PRC using solar cells produced in third countries be covered by the scope could
only be accepted to the extent that it covers products determined to be of PRC origin.  In
determining the country-of-origin of a product, the Department's practice has been to conduct a

---

[11] On August 6, 2012, the following respondents filed a joint rebuttal brief regarding the scope of the investigation:
Canadian Solar, Inc.; Trina and its affiliate Trina U.S.; Wuxi Suntech and its affiliates, Suntech America and
Suntech Arizona; and Yingli Green Energy Holding and its affiliate, Yingli Green Energy Americas.
[12] On August 6, 2012, the following respondents filed a joint rebuttal brief regarding, *inter alia*, the scope of the
investigation: Sumec Hardware & Tools Co., Ltd.; Ningbo Etdz Holdings Ltd.; LDK Solar
Hi-Tech (Nanchang) Co., Ltd.; LDK Solar Hi-Tech (Suzhou) Co., Ltd.; Ningbo Qixin Solar
Electrical Appliance Co., Ltd.; Ningbo Komaes Solar Technology Co., Ltd.; Zhejiang Jiutai New Energy Co., Ltd.;
ET Solar Industry Limited; JingAo Solar Co., Ltd.; Dongfang Electric (Yixing) MAGI Solar Power Technology Co.,
Ltd.; Shanghai JA Solar Technology Co., Ltd.; Jiangsu Sunlink PV Technology Co., Ltd.; and JA Solar Technology
Yangzhou Co., Ltd. (collectively, "Sumec Hardware *et al.*").
[13] *See Ribbons from Taiwan Prelim*, 75 FR 7236, 7247 (February 18, 2010) (unchanged in *Ribbons from Taiwan
Final*, 75 FR 41804 (July 19, 2010); *see also Lumber from Canada*, and accompanying Issues and Decision
Memorandum at section entitled, "Scope Issues," which follows Comment 49.
[14] *See SSPC from Belgium*, and accompanying Issues and Decision Memorandum at Comment 4.

substantial transformation analysis.[15]  The CIT has upheld the Department's "substantial transformation" test as a means to carry out its country-of-origin analysis.[16]  Hence, this is the analysis that was conducted early in the investigation which we affirm in this final determination.  In its substantial transformation analysis, the Department found that solar cells are the "essential active component" that define the module/panel and that stringing third-country solar cells together and assembling them with other components into a module in the PRC does not constitute substantial transformation such that the assembled module could be considered a product of the PRC.  Contrary to Petitioner's claim, for the reasons explained below, the substantial transformation analysis performed by the Department was not flawed.

First, record evidence supports the Department's finding that the solar cell is the essential active component of the solar module.  Petitioner argues that certain physical qualities of the solar cell are changed when it is incorporated into a module, and, consequently, "both the solar cell and the components of the assembled module are essential active components of the finished product."[17]  In support of this argument, Petitioner states, *inter alia*, that an individual solar cell cannot generate a commercially significant amount of electricity until it is joined together with other cells during the module assembly process.  Petitioner further states that the processes of soldering individual solar cells together and laminating them, which occur during module assembly, changes the physical characteristics of the solar cell.  Petitioner, however, apparently misinterprets the essential component criterion of the Department's substantial transformation analysis.  Under this criterion, the Department considers whether processing in the exporting country changes the *important qualities or use of the component*.[18]  Thus, the Department's essential component analysis focused on the third-country solar cells shipped into, and processed in, the exporting country (the PRC) and the *significance* of the changes in physical qualities or use of the component that occurred as a result of the processing.  Evidence of a change or changes to the physical qualities of a component as a result of further processing does not inevitably lead to the conclusion that further processing substantially transformed the component.  In the instant investigation, the Department found that the essential component of solar modules/panels is the solar cell since the purpose of solar modules/panels is to convert sunlight into electricity and this process occurs in the solar cells.[19]  Accordingly, the Department considered whether the processing of solar cells into solar modules changes the nature or use of the solar cells.[20]  As stated in the Scope Clarification Memorandum, the Department found that a number of the *significant* physical characteristics of the solar cell were not changed during the module assembly process.[21]  As the ITC stated, "the physical characteristics and functions of

---

[15] *See, e.g., Glycine from India*, and accompanying Issues and Decision Memorandum at Comment 5; *see also SSPC from Belgium*, and accompanying Issues and Decision Memorandum at Comment 4.

[16] *See E.I. DuPont De Nemours & Company. v. United States*, 8 F. Supp. 2d 854, 858 (CIT 1998).

[17] *See* Petitioner's Case Brief at 7.

[18] *See also EPROMs*, 51 FR 39680, 39691-39692 (October 30, 1986).  Emphasis added.

[19] *See* Scope Clarification Memorandum at 6 (citing the Petition at Exhibit II-19 at 3).

[20] *See* Scope Clarification Memorandum at 6.

[21] *See* Scope Clarification Memorandum at 6-7 which states, *inter alia*, the following:
Module/panel assembly does not change the important qualities, *i.e.*, the physical or chemical characteristics, of the solar cell itself.  As stated in the original petition, solar cells are made from crystalline silicon wafers.  A dopant, which is a trace impurity element diffused into a thin layer of the wafers' surface to impart an opposite electrical orientation to the cell surface, creates the positive/negative junction that is needed for the conversion of sunlight into electricity, which is the purpose of solar cells.  Solar cells are normally coated with silicon nitride to increase light

-6-

cells and solar modules essentially are the same."[22]  Moreover, the Department noted that its finding that solar module assembly connects cells into their final end-use form but does not change the "essential active component," the solar cell, which defines the module/panel, is consistent with the Department's precedent.[23]  Accordingly, based on a consideration of record evidence and Department's precedent, the Department continues to find that the solar cell is the essential active component of the module.

Second, we disagree with Petitioner's contention that the extent of processing criterion does not support the Department's substantial transformation finding.  Petitioner believes the Department erred because it assumed modules are produced in two steps (cell production and module assembly) rather than three (wafer production, cell production, and module assembly) and alleges that out of these three steps, cell production is the least cost-intensive step.[24]  However, when considering the "extent of processing" criterion used in the substantial transformation analysis, the Department only needed to examine whether the assembly of solar cells into modules was substantial and/or significant.[25]  The Department did not need to identify each step undertaken in producing and assembling module components and then determine where the aggregate of production occurred to determine the country of origin of the module.  Petitioner's contention does not reject how the Department applies the substantial transformation test.[26]  The Department has explicitly acknowledged that solar module producers have identified more than two production stages.[27]

However, identifying the number of production stages and determining where most of these stages occur was not the issue in the Department's "extent of processing" analysis.  Rather, the Department examined the extent of processing at the module assembly stage in relation to the prior production stages and the nature of the processing at the module assembly stage to determine whether module assembly substantially transformed the solar cells such that the final product could be considered a product of the PRC. [28]  The Department concluded that the module assembly stage of production is principally an assembly process, which consists of stringing together solar cells, laminating them, and fitting them in a glass-covered aluminum frame for protection.[29]  For the reasons explained in the Scope Clarification Memorandum, the Department continues to find that the module assembly stage of production is a comparatively less sophisticated process than cell conversion or the production stages that precede it, and thus it does not substantially transform the solar cell.  We note that none of the evidence cited by

---

absorption (this results in a blue-purple color) and undergo a screening process where conductive metal is printed into the cell.  Metal conduits or busbars channel electricity generated by the cell into electricity collection points.  Citations omitted.

[22] See Scope Clarification Memorandum at 6 (citing *ITC Preliminary Determination* at 10).

[23] See Scope Clarification Memorandum at 6 (citing *EPROMs*).

[24] See Petitioner's Case Brief at 6.

[25] See Scope Clarification Memorandum at 7 (citing *Ribbons from Korea*, 69 FR 17645, 17647 (April 5, 2004).

[26] See, e.g., *EPROMs*.

[27] See Scope Clarification Memorandum at 7-8, states the following: Numerous interested parties, aside from Petitioner, argued that solar module/panel assembly is relatively insubstantial in terms of number of steps, inputs, research and development required, and time.  Consistent with these arguments, *Trina identified six stages of production when manufacturing solar modules/panels, five of which were dedicated to solar cell production and only one pertained to solar module/panel assembly*.  Emphasis added. Citations omitted.

[28] See Scope Clarification Memorandum at 7-8.

[29] See Scope Clarification Memorandum at 7.

-7-

Petitioner contradicts this finding.[30]  Additionally, because the Department finds that the application of its substantial transformation test is an appropriate means to resolve country-of-origin issues like the one presented in the instant investigation, the Department has not adopted Petitioner's suggestion to modify the test.

Furthermore, Petitioner's other arguments for why modules that are assembled in the PRC using third-country solar cells should be covered by the scope are not persuasive.  The Department agrees with Petitioner that the scope of these investigations always included modules from the PRC; however, as noted above, using a substantial transformation analysis the Department has determined that modules from the PRC are those that have been assembled in the PRC using solar cells produced in the PRC.  Additionally, the Department has determined that modules assembled in third countries using solar cells produced in the PRC are also PRC products covered by the scope.  While the Department will exercise its authority to define or clarify the scope of an investigation in a manner which reflects the intent of the petition and provides the relief requested by the petitioning industry, it may not accept a proposed scope that covers merchandise that originates from a third country not covered by the investigation.  As noted above, the scope of an AD or CVD order is limited to subject merchandise that originates in the country covered by the investigation.[31]  Petitioner argues that all modules assembled in the PRC must be covered by the scope, regardless of the origin of the solar cells, because they are benefitting from subsidies and being dumped in the United States and competition occurs in the module channel of distribution, but these concerns do not address the main issue.  The main issue is that an investigation covering modules from the PRC cannot at the same time cover modules whose country of origin is not the PRC.  Determining that all modules assembled in the PRC are covered by the scope of the investigation, no matter where the solar cells in the module were produced, would either necessitate making inconsistent country-of-origin determinations for a single product,[32] or require ignoring the country-of-origin when considering whether merchandise entering the United States is covered by the scope of the investigation.  Petitioner has not explained how its proposed scope could be adopted without such a result.  Moreover, even if the substantial transformation test focused on the country where the aggregate of production occurs, as suggested by Petitioner, Petitioner has not explained how such an analysis would support its request that the scope cover all modules assembled in the PRC, even when all of the other production steps occurred in a third country.  Lastly, Petitioner has the option of bringing additional petitions to address any dumping concerns it has regarding solar modules/panels assembled from solar cells produced in a third country.

With respect to Petitioner's contention that all modules assembled in the PRC must be included in the scope of the investigation in order for CBP to effectively enforce any order imposed and to prevent widespread circumvention, we note that the Department, working in conjunction with CBP, has taken additional measures to ensure that the scope of any order imposed as a result of the investigation will be enforced.  Specifically, the Department has informed CBP that

---

[30] *See* Petitioner's Case Brief at 9-11.
[31] *See SSPC from Belgium*, and accompanying Issues and Decision Memorandum at Comment 4.
[32] Namely, finding that module assembly in the PRC using solar cells produced in a third country constitutes substantial transformation and thus the country of origin of the module is the PRC while also finding that module assembly outside the PRC using PRC produced solar cells does not constitute substantial transformation and thus the country of origin of the module is the country where the solar cells were produced, the PRC.

Barcode:3181443-01 A-570-010 INV - Investigation  -

importers claiming that the solar panels/modules they import do not contain solar cells that were produced in the PRC are required to maintain importer certifications and documentation to that effect. Additionally, the Department has notified CBP that both the importer and exporter are required to maintain exporter certifications if the exporter of the panels/modules which the importer claims contain no PRC-produced solar cells is located in the PRC. These certifications and documents must be presented to CBP officials on request. As noted in the *Preliminary Determination*, if the certification or documentation is not provided, the Department has instructed CBP to suspend all unliquidated entries for which the certification or documentation were not provided and require the posting of a cash deposit or bond on those entries equal to the PRC-wide rate in effect at the time of the entry.[33] If a solar panel/module contains some solar cells produced in the PRC, but the importer is unable or unwilling to identify the total value of the panel/module that is subject merchandise, the Department has instructed CBP to require the posting of a cash deposit or bond on the total entered value of the panel/module equal to the PRC-wide rate in effect at the time of the entry. Thus, the Department has taken additional steps to ensure that efforts to evade enforcement of any order imposed as a result of this investigation will be identified and thwarted. If an importer is declaring the wrong country-of-origin for imported merchandise, this is a matter appropriately dealt with by CBP, and thus the Department will work closely with CBP in this regard.

Furthermore, the Department does not agree with the Petitioner's alternative request to clarify the scope of this investigation to include modules/panels produced in the PRC from solar cells produced in a third country when the wafer production process has occurred in the PRC. In the context of this investigation the Department is not deciding whether wafers produced in the PRC and converted into cells in a third country are a product of the third country. The Department also notes that unlike solar cells, wafers are not identified in the scope of this investigation. For the foregoing reasons, the Department has made no revisions to the scope of the investigation to implement Petitioner's proposals.

**Comment 2:   Selection of Surrogate Financial Statements**

In the *Preliminary Determination*, the Department valued SG&A expenses, OH and profit, using the audited financial statements for the fiscal year ending December 31, 2011, from the following companies: Team Precision, Hana, and KCE, which are all Thai producers of merchandise comparable to the merchandise under consideration that earned a before tax profit in 2011. While the Department found that all of these companies had received countervailable subsidies, there were no usable financial statements on the record for the *Preliminary Determination* for companies that did not receive countervailable subsidies.

After the *Preliminary Determination*, parties placed on the record new financial statements that the Department has considered below. Petitioner submitted financial statements for the following companies: Rohm, NEC Tokin, and Starck. In addition, the respondents submitted the financial statements of Styromatic. Interested parties have made arguments on which financial statements should be selected for the calculation of the financial ratios in the final determination. We have addressed each argument below.

---

[33] For a full discussion of the Department's certification requirements, see the *Preliminary Determination*.

Filed By: nellis@sidley.com, Filed Date: 2/18/14 1:23 PM, Submission Status: Approved

Barcode:3181443-01 A-570-010 INV - Investigation  -

# Exhibit 2

## CSPV Cells and Modules from China, Scope Clarification Memo

Barcode:3064751-01 A-570-979 INV - Investigation
Barcode:3181443-01 A-570-010 INV - Investigation



**UNITED STATES DEPARTMENT OF COMMERCE**
**International Trade Administration**
Washington, D.C. 20230

A-570-979
C-570-980
~~Proprietary Document~~
AD/CVD O4: JDP

*Public Version*

March 19, 2012

MEMORANDUM TO:     Gary Taverman
                   Acting Deputy Assistant Secretary
                     for Antidumping and Countervailing Duty Operations

THROUGH:           Abdelali Elouaradia
                   Director, Office 4
                   AD/CVD Operations

                   Howard Smith
                   Program Manager, Office 4
                   AD/CVD Operations

FROM:              Jeff Pedersen
                   Case Analyst
                     AD/CVD Operations, Office 4

SUBJECT:           Scope Clarification: Antidumping and Countervailing Duty
                   Investigations of Crystalline Silicon Photovoltaic Cells, Whether
                   or Not Assembled Into Modules, from the People's Republic of
                   China

<u>Summary</u>

One day prior to the initiation of the above-referenced investigations, Petitioner[1] submitted proposed scope language stating that the scope covers modules/panels produced in the People's Republic of China ("PRC") regardless of where the cells in the modules/panels were manufactured and covers modules/panels produced in a third-country from cells manufactured in the PRC. The Department did not include this proposed language in the scope because it did not have sufficient time to evaluate the language prior to initiation. Since that time we have evaluated Petitioner's proposed language and, for the reasons noted below, recommend clarifying the scope of these investigations to state that modules/panels produced in a third-country from cells produced in the PRC are covered by the scope; however, modules/panels produced in the PRC from cells produced in a third-country are not covered by the scope.

<u>Background</u>

On November 8, 2011, the Department of Commerce (the "Department") initiated antidumping duty ("AD") and countervailing duty ("CVD") investigations of crystalline silicon photovoltaic

---

[1] The petitioner is SolarWorld Industries America Inc. ("Petitioner").



cells ("solar cells"), whether or not assembled into solar modules, from the PRC.[2]  In the AD and CVD Initiation Notices the Department noted that Petitioner submitted revised scope language one day before initiation.  The revised language included, among other things, the following substantive provision:

> These proceedings cover … crystalline silicon PV modules/panels produced in the PRC, regardless of country of manufacture of the cells used to produce the modules or panels, … and crystalline silicon PV modules or panels produced in a third country from crystalline silicon PV cells manufactured in the PRC … .

See AD Initiation Notice, 76 FR at 70960; CVD Initiation Notice, 76 FR at 70967; see also Standing Analysis and Revised Scope Language:  Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China dated November 7, 2011 at Attachment 2.

The Department stated in the AD and CVD Initiation Notices that it has not adopted this specific revision recommended by Petitioner for the purposes of initiation.  The Department explained that because the recommendation was filed one day prior to the statutory deadline for initiation the Department did not have sufficient time nor the administrative resources to evaluate Petitioner's proposed language regarding merchandise produced using inputs from third-country markets, or merchandise processed in third-country markets.[3]

The AD and CVD Initiation Notices set aside a period for interested parties to raise issues regarding product coverage.  On November 28, 2011, we received comments from Petitioner, and the following interested parties:  SolarOne Solutions; Yingli Green Energy Holding Company Limited and Yingli Green Energy Americas, Inc. (collectively, "Yingli"); Canadian Solar Inc. ("Canadian Solar"); Wuxi Suntech Power Co., Ltd., Suntech America, Inc. and Suntech Arizona, Inc. (collectively, "Suntech"); Changzhou Trina Solar Energy Co. Ltd. ("Trina Solar"); DelSolar Co. Ltd. and DelSolar (Wujiang) Ltd. (collectively, "DelSolar"); tenKsolar (Shanghai) Co., Ltd. ("tenK"); Jiangsu Green Power PV Co., Ltd. ("Jiangsu Green"); Transform Solar; Suniva; Q-Cells North America; Hanwha SolarOne ("Qidong") Co., Ltd. ("SolarOne"); Shanghai BYD Company Limited ("Shanghai BYD"); and Konca Solar Cell Co., Ltd.  On December 1, 2011, SunPower Corporation submitted rebuttal comments, as did Yingli, Canadian Solar, Suntech, and Trina Solar on December 5, 2011, and Petitioner on December 13, 2011.[4]

---

[2] See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China:  Initiation of Antidumping Duty Investigation, 76 FR 70960 (November 16, 2011) ("AD Initiation Notice"); Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China:  Initiation of Countervailing Duty Investigation, 76 FR 70966 (November 16, 2011) ("CVD Initiation Notice") (collectively "AD and CVD Initiation Notices").

[3]  See AD Initiation Notice, 76 FR at 70960; CVD Initiation Notice, 76 FR at 70967.

[4] SolarOne, Shanghai BYD, tenK, Jiangsu Green, Zamp Solar, LLC, and Petitioner also submitted additional comments on the scope of this investigation but they were not applicable to the issue covered in this memorandum, country-of-origin.

2

Barcode:3047471-01 A-570-979 INV - Investigation

Barcode:3181443-01 A-570-010 INV - Investigation  –

<u>Scope</u>

The scope from the <u>AD and CVD Initiation Notices</u> is as follows:

The merchandise covered by this investigation are crystalline silicon photovoltaic cells, and modules, laminates, and panels, consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including, but not limited to, modules, laminates, panels and building integrated materials.

This investigation covers crystalline silicon photovoltaic cells of thickness equal to or greater than 20 micrometers, having a p/n junction formed by any means, whether or not the cell has undergone other processing, including, but not limited to, cleaning, etching, coating, and/or addition of materials (including, but not limited to, metallization and conductor patterns) to collect and forward the electricity that is generated by the cell.

Subject merchandise may be described at the time of importation as parts for final finished products that are assembled after importation, including, but not limited to, modules, laminates, panels, building-integrated modules, building-integrated panels, or other finished goods kits. Such parts that otherwise meet the definition of subject merchandise are included in the scope of this investigation.

Excluded from the scope of this investigation are thin film photovoltaic products produced from amorphous silicon (a-Si), cadmium telluride (CdTe), or copper indium gallium selenide (CIGS).

Also excluded from the scope of this investigation are crystalline silicon photovoltaic cells, not exceeding $10,000\text{mm}^2$ in surface area, that are permanently integrated into a consumer good whose function is other than power generation and that consumes the electricity generated by the integrated crystalline silicon photovoltaic cell. Where more than one cell is permanently integrated into a consumer good, the surface area for purposes of this exclusion shall be the total combined surface area of all cells that are integrated into the consumer good.

Merchandise covered by this investigation is currently classified in the Harmonized Tariff System of the United States ("HTSUS") under subheadings 8501.61.0000, 8507.20.80, 8541.40.6020 and 8541.40.6030. These HTSUS subheadings are provided for convenience and customs purposes; the written description of the scope of this investigation is dispositive.

<u>Parties' Comments</u>

Petitioner:

    o   The only way to address the material injury caused by Chinese cells and modules/panels is to include both modules/panels produced in the PRC regardless of

3

Barcode:3064751-01 A-570-975 INV - Investigation

Barcode:3181443-01 A-570-010 INV - Investigation -

cell origin and Chinese cells incorporated into modules/panels produced in third-countries in the scope of the investigations.

o  Not including language specifically covering third-country solar modules/panels made from PRC solar cells and PRC solar modules/panels made from third-country solar cells creates an unenforceable scope that can be easily circumvented.

o  Solar cell production and solar module assembly are equally import steps in producing a finished solar module.

o  Nearly all solar cell production is dedicated to producing solar modules/panels and all solar module/panel assembly relies on solar cells.

o  Some countervailable subsidies are specific to the production of solar modules/panels and other subsidies are available to production of both solar cells and solar modules/panels. Both types of subsidies demonstrate that module assembly, in addition to cell production, is an important stage of production.

Other Interested Parties:

o  The Department should reject Petitioner's attempt to expand the scope and not accept actions that would serve to evade the statutory standing requirements and the possibility of polling.

o  Petitioner has asked the Department to adopt two conflicting country-of-origin tests for purposes of these investigations.

o  The scope should be limited to solar cells made in the PRC or at most products containing solar cells made in the PRC.

o  The scope should not include solar modules/panels made from cells not manufactured in the PRC because a substantial transformation analysis indicates that assembling solar cells into solar modules/panels does not change the country-of-origin.

o  Solar module/panel assembly does not constitute substantial transformation because:

   ▪  Solar cells represent the majority of the total cost of solar modules/panels.

   ▪  The manufacture of solar cells is the technologically-critical portion of the production of solar modules/panels. Solar module/panel assembly is a low-tech final assembly requiring relatively unskilled labor.

   ▪  Solar module power output is determined by the solar cells in the solar module/panel and not solar module/panel assembly.

   ▪  Solar cells and solar modules/panels have the same end-use.

o  Including scope language to capture solar modules assembled in the PRC, regardless of where the cells were manufactured and solar modules assembled in third countries from cells manufactured in the PRC, would ignore judicial precedent stating that the scope of an antidumping duty order is "defined by the type of merchandise and the country-of-origin." [5]

---

[5] See Notice of Final Determination of Sales at Less Than Fair Value: Certain Cold-Rolled Carbon Steel Flat Products from Argentina, 58 FR 37062, 37065 (July 9, 1993) ("Cold-Rolled from Argentina") and noting that this statement was quoted by the Court of International Trade ("CIT") twice in Advanced Tech & Materials Co., Ltd. v. United States, No. 09-511, 2011 Ct. Intl. Trade LEXIS 136, *11 (CIT Oct. 12, 2011) ("Advanced Tech.") and Ugine and ALZ Belgium, N.V. v. United States, 517 F. Supp. 2d 1333, 1345 (CIT 2007) ("Ugine").

4

On March 7, 2012, and March 14, 2012, Petitioner and tenK, respectively submitted further comments concerning product coverage. Due to the timing of the submissions, we have been unable to consider these comments in this decision. We will consider these comments at a later date.

## Legal Framework

The scope of these investigations and the International Trade Commission final determination will determine the scope of any resulting AD and CVD orders. Because AD and CVD orders apply to merchandise from particular countries, determining the country where the merchandise is produced is fundamental to proper administration and enforcement of the AD and CVD statute. The scope of an AD or CVD order is limited to merchandise that originates in the country covered by the order.[6] The Department has explicitly stated that the scope of an antidumping duty order is "defined by the type of merchandise and the country-of-origin."[7]

In determining the country-of-origin of a product, the Department's practice has been to conduct a substantial transformation analysis.[8] The CIT has upheld the Department's "substantial transformation" analysis as a means to carry out its country-of-origin analysis.[9] The CIT stated that "{t}he 'substantial transformation' rule provides a yardstick for determining whether the processes performed on merchandise in a country are of such significance as to require that the resulting merchandise be considered the product of the country in which the transformation occurred."[10] Because the Petitioner's proposed scope language addresses modules/panels assembled, and cells produced, in a third country we have used a substantial transformation analysis to determine whether one or both of the scenarios described by Petitioner should be covered by the scope of these investigations.

## Analysis

The Department has applied, as appropriate, the following analyses in determining whether substantial transformation occurs, thereby changing a product's country-of-origin. These have

---

[6] See Stainless Steel Plate in Coils from Belgium: Final Results of Antidumping Duty Administrative Review, 69 FR 74495 (December 14, 2004) and the accompanying Issues and Decision Memorandum at Comment 4 ("SSPC Belgium").
[7] In Cold-Rolled from Argentina, 58 FR at 37065, the Department stated that "{t}he scope of an antidumping or countervailing duty order is defined by the type of merchandise and by the country of origin (e.g., widgets from Ruritania). For merchandise to be subject to an order it must meet both parameters, i.e., product type and country of origin. In determining country of origin for scope purposes, the Department applies a 'substantial transformation' rule." As noted above, this language was quoted by the CIT twice in Advanced Tech. at *11 and Ugine, 517 F. Supp. 2d at 1345.
[8] See, e.g., Notice of Final Determination of Sales at Less Than Fair Value: Glycine from India, 73 FR 16640 (March 28, 2008), and accompanying Issues and Decision Memorandum at Comment 5; see also SSPC Belgium, and accompanying Issues and Decision Memorandum at Comment 4.
[9] See E.I. DuPont De Nemours & Company. v. United States, 8 F. Supp. 2d 854, 858 (CIT 1998) ("Dupont").
[10] See Dupont (referencing Smith Corona Corp. v. United States, 811 F. Supp. 692, 695 (CIT 1993) as "noting that in determining if merchandise exported from an intermediate country is covered by an antidumping order, Commerce identified the country of origin by considering whether the essential component is substantially transformed in the country of exportation").

5

included: 1) whether the processed downstream product falls into a different class or kind of product when compared to the upstream product; 2) whether the essential component of the merchandise is substantially transformed in the country of exportation; or 3) the extent of processing.[11] We have examined these criteria in conducting our substantial transformation analysis:

Class or Kind

The Department "has generally found that substantial transformation has taken place when the upstream and downstream products fall within two different 'classes or kinds' of merchandise.... Conversely, the Department almost invariably determines substantial transformation has not taken place when both products are within the same 'class or kind' of merchandise."[12] The merchandise subject to an investigation, i.e., the class or kind of merchandise to be investigated, is described in the scope. The scope of these investigations covers both solar cells and solar modules/panels.[13] Thus solar cells and solar modules/panels are within the same "class or kind" of product. We further note that the International Trade Commission ("ITC") in its companion preliminary determination defined solar cells and solar modules/panels as one domestic like product.[14]

Essential Component

In examining whether the essential component of the merchandise is substantially transformed in the country of exportation, the Department considers whether processing in the exporting country changes the important qualities or use of the component.[15] The essential component of solar modules/panels is the solar cell since the purpose of solar modules/panels is to convert sunlight into electricity and this process occurs in the solar cells.[16] Thus, in this case, the Department is considering whether the processing of solar cells into solar modules/panels changes the nature or use of the solar cells.

Module/panel assembly does not change the important qualities, i.e., the physical or chemical characteristics, of the solar cell itself. As stated in the original petition, solar cells are made from crystalline silicon wafers. A dopant, which is a trace impurity element diffused into a thin layer of the wafers' surface to impart an opposite electrical orientation to the cell surface, creates the positive/negative junction that is needed for the conversion of sunlight into electricity, which is the purpose of solar cells. Solar cells are normally coated with silicon nitride to increase light

---

[11] See, e.g., Notice of Final Determination of Sales at Less Than Fair Value: Glycine from India, 73 FR 16640 (March 28, 2008), and accompanying Issues and Decision Memorandum at Comment 5.

[12] See Notice of Final Determination of Sales at Less Than Fair Value: Wax and Wax/Resin Thermal Transfer Ribbons from France, 69 FR 10674, 10675-10676 (March 8, 2004).

[13] See AD Initiation Notice, 76 FR at 70965 and CVD Initiation Notice, 76 FR at 70970.

[14] See Crystalline Silicon Photovoltaic Cells and Modules from China: Investigation Nos. 701-TA-481 and 731-TA-1190 (Preliminary), USITC Publication 4295 (December 2011) ("ITC Solar Cells and Modules Prelim") at 11.

[15] See also Erasable Programmable Read Only Memories (EPROMs) From Japan: Final Determination of Sales at Less Than Fair Value, 51 FR 39680, 39691-39692 (October 30, 1986) ("EPROMs").

[16] See Petition at Exhibit II-19 at 3.

6

absorption (this results in a blue-purple color) and undergo a screening process where conductive metal is printed into the cell. Metal conduits or busbars channel electricity generated by the cell into electricity collection points.[17]  None of these characteristics are changed during module/panel assembly. Petitioner, Trina Solar, a mandatory respondent, and the ITC all describe module assembly as stringing together 60 or 72 solar cells, laminating them, and fitting them in a glass-covered aluminum frame.[18]  These processes do not change the basic nature of a solar cell. Moreover, the function of a solar cell is not changed when assembled into modules/panels; the cell still functions to convert sunlight into electricity. The ITC also noted that "the physical characteristics and functions of cells and solar modules essentially are the same."[19]  The purpose of both solar cells and solar modules/panels is to convert sunlight into electricity. Thus, neither the physical qualities nor the function of solar cells are changed when they are assembled into modules/panels.

The instant case is similar to EPROMs.[20]  In EPROMs, the scope of the investigation included processed wafers and dice. In that case, the issue was whether processed wafers and dice that were produced in Japan, yet encapsulated in a third country, became a product of the country where the encapsulation occurred. The Department determined that the processed wafers or dice were not just a major component of the finished device, rather they were "the essential active component{s} which define{d} the merchandise under investigation."[21]  The Department further found that the assembly process in the third country was not a sophisticated process.[22]  Accordingly, the encapsulation of processed wafers or dice in a third country did not qualify as substantial transformation for purposes of determining country-of-origin. Similarly, solar module assembly connects cells into their final end-use form but does not change the "essential active component," the solar cell, which defines the module/panel.

Extent of Processing

When considering the extent of processing, we examine whether the processing was substantial and/or sophisticated.[23]  As noted above, module/panel assembly consists of stringing together solar cells, laminating them, and fitting them in a glass-covered aluminum frame for protection. Thus, this stage of production is principally an assembly process. Numerous interested parties, aside from Petitioner, argued that solar module/panel assembly is relatively insubstantial in terms of number of steps, inputs, research and development required, and time.[24]  Consistent with these arguments, Trina Solar identified six stages of production when manufacturing solar

---

[17] See Petition for the Imposition of Antidumping and Countervailing Duties: Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China, dated October 19, 2011 ("Petition") at Exhibit II-19 at 3.

[18] See Petition at Exhibit A-26. See also ITC Solar Cells and Modules Prelim at 6 and 10.

[19] See ITC Solar Cells and Modules Prelim at 10.

[20] See EPROMs.

[21] See EPROMs, 51 FR at 39692.

[22] See id.

[23] See, e.g., Notice of Final Determination of Sales at Not Less Than Fair Value: Wax and Wax/Resin Thermal Transfer Ribbon from the Republic of Korea, 69 FR 17645, 17647 (April 5, 2004).

[24] See November 28, 2011 scope comments submitted by tenK, Transform Solar, Suniva, and Q-Cells North America.

7

modules/panels, five of which were dedicated to solar cell production and only one pertained to solar module/panel assembly.[25] Petitioner and the ITC also indicated that solar module assembly is one stage of production.[26] Petitioner and Trina Solar also reported consuming many more types of inputs in cell production compared with module assembly.[27] Further, Trina Solar reported a production time for solar cells that is [      ] of module assembly.[28] Accordingly, the assembly of solar cells into solar modules does not rise to the level of changing the country-of-origin of the subject merchandise.

Based on our analysis of the foregoing factors we find that solar module assembly does not substantially transform solar cells such that it changes the country-of-origin. Solar cells and solar modules/panels are within the same class of merchandise. Further, module assembly does not substantially alter the essential nature of solar cells nor does it constitute significant processing such that it changes the country-of-origin of the cell, as it is an assembly process that only strings cells together, adding a protective covering and an aluminum base. Therefore, we believe the scope should be clarified to state that modules/panels produced in a third-country from solar cells produced in the PRC are covered by the scope; however, modules/panels produced in the PRC from solar cells produced in a third-country are not covered by the scope.

While we understand the intent of Petitioner's argument that the scope should cover solar modules/panels produced in the PRC, regardless of the origin of the solar cells, this is not tenable because doing so would either necessitate making inconsistent country-of-origin determinations for a single product,[29] or require ignoring the country-of-origin when considering whether merchandise entering the United States is covered by the scope of these investigations. A product can only have one country-of-origin for AD/CVD purposes, and AD and CVD investigations only cover products with a country-of-origin that is the country under investigation.[30] Petitioner has not cited any example where the Department has found that a product could have two countries-of-origin. Thus, while the Department is not excluding solar modules/panels from the scope of these investigations, in conjunction with the above described substantial transformation analysis, we are clarifying that where solar cell production occurs in a different country from solar module assembly, the country-of-origin of the solar modules/panels is the country in which the solar cell was produced.

---

[25] See also Trina Solar's January 10, 2012 Section A response at Exhibit A-26.
[26] See Petition at Exhibit A-26. See also ITC Solar Cells and Modules Prelim at 11 where the ITC noted in its preliminary determination that the "{p}roduction of the finished product, modules, involves four primary steps – crystallization, wafer production, cell conversion, and module assembly – along with packing and inspection of the final product. {Solar} cells undergo only one additional production step, the assembly into modules, before transformation into the finished product."
[27] See Trina Solar's February 6, 2012 Section D response at Exhibit D-4. See also Petition at Exhibits II-19 and II-20.
[28] See Trina Solar's February 6, 2012 Section D response at Exhibit D-4.
[29] Namely, finding that module assembly in the PRC using solar cells produced in a third-country constitutes substantial transformation and thus the country of origin of the module is the PRC while also finding that module assembly outside the PRC using PRC produced solar cells does not constitute substantial transformation and thus the country of origin of the module is the country where the solar cells were produced, the PRC.
[30] See Cold-Rolled from Argentina, 58 FR at 37065.

8

Barcode:3064751-01 A-570-979 INV - Investigation

Barcode:3181443-01 A-570-010 INV - Investigation   -

Petitioner's claim that not adopting their proposed language in the scope creates an unenforceable scope that can be easily circumvented. While we acknowledge that the Department has on occasion explicitly addressed the possibility of circumvention as a consideration in determining the country-of-origin of merchandise under investigation, circumvention is not the sole or controlling factor relied upon in making a country-of-origin determination.[31] Nonetheless, whether explicitly stated or not, the factors we consider for making country-of-origin determinations inherently reflect the agency's concern that the relief afforded by AD/CVD orders not be eviscerated by moving minor processing outside of the country covered by the order. Thus, circumvention concerns are reflected in the country-of-origin determination. As stated above, adopting the language proposed by Petitioner would result in two inconsistent country-of-origin determinations.

The Department routinely meets with U.S. Customs and Border Protection ("CBP") to ensure that our AD/CVD orders are enforced. Towards that end, and with respect to these cases in particular, the Department has begun an inter-agency dialogue with CBP that is designed to fulfill that goal. Specifically, Import Administration and CBP staff are meeting to develop procedures which will ensure that Chinese solar cells subject to any potential duties are properly identified at the border. Efforts to evade enforcement will be identified and thwarted. While the Department works closely with CBP, if an importer is declaring the wrong country-of-origin for imported merchandise, this is a matter appropriately dealt with by CBP. Lastly, Petitioner has the option of bringing additional petitions to address any dumping concerns it has regarding solar modules/panels assembled from solar cells produced in a third country.

---

[31] As demonstrated above, the Department considers various factors in a substantial transformation analysis.

9

Filed By: nellie@sidley.com, Filed Date: 2/18/14 1:23 PM, Submission Status: Approved
Filed By: Drew Jackson, Filed Date: 3/22/12 12:02 PM, Submission Status: Approved

## Recommendation

We recommend that the Department find that solar module/panel assembly does not constitute substantial transformation of the solar cells included in the module. We further recommend clarifying the scope of these investigations to state that modules/panels produced in a third-country from cells produced in the PRC are covered by the scope; however, modules/panels produced in the PRC from cells produced in a third-country are not covered by the scope.[32]

_____     _____
Agree               Disagree

_____
Gary Taverman
Acting Deputy Assistant Secretary
  for Antidumping and Countervailing Duty Operations

_____
3\19\12
Date

_____
[32] See Attachment I.

10

**Attachment I**

**Scope of the Investigation**

The merchandise covered by this investigation are crystalline silicon photovoltaic cells, and modules, laminates, and panels, consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including, but not limited to, modules, laminates, panels and building integrated materials.

This investigation covers crystalline silicon photovoltaic cells of thickness equal to or greater than 20 micrometers, having a p/n junction formed by any means, whether or not the cell has undergone other processing, including, but not limited to, cleaning, etching, coating, and/or addition of materials (including, but not limited to, metallization and conductor patterns) to collect and forward the electricity that is generated by the cell.

Subject merchandise may be described at the time of importation as parts for final finished products that are assembled after importation, including, but not limited to, modules, laminates, panels, building-integrated modules, building-integrated panels, or other finished goods kits. Such parts that otherwise meet the definition of subject merchandise are included in the scope of this investigation.

Excluded from the scope of this investigation are thin film photovoltaic products produced from amorphous silicon (a-Si), cadmium telluride (CdTe), or copper indium gallium selenide (CIGS).

Also excluded from the scope of this investigation are crystalline silicon photovoltaic cells, not exceeding 10,000mm$^2$ in surface area, that are permanently integrated into a consumer good whose function is other than power generation and that consumes the electricity generated by the integrated crystalline silicon photovoltaic cell. Where more than one cell is permanently integrated into a consumer good, the surface area for purposes of this exclusion shall be the total combined surface area of all cells that are integrated into the consumer good.

Modules, laminates, and panels produced in a third-country from cells produced in the PRC are covered by this investigation; however, modules, laminates, and panels produced in the PRC from cells produced in a third-country are not covered by this investigation.

Merchandise covered by this investigation is currently classified in the Harmonized Tariff System of the United States ("HTSUS") under subheadings 8501.61.0000, 8507.20.80, 8541.40.6020 and 8541.40.6030. These HTSUS subheadings are provided for convenience and customs purposes; the written description of the scope of this investigation is dispositive.

Barcode:3181443-01 A-570-010 INV - Investigation  -

# Exhibit 3

Excerpts from SolarWorld's
Post-Conference Brief

Barcode:3181443-01 A-570-010 INV - Investigation  -



**Wiley Rein LLP**

Timothy C. Brightbill
202.719.3138
tbrightbill@wileyrein.com

January 29, 2014

1776 K STREET NW
WASHINGTON, DC 20006
PHONE   202.719.7000
FAX   202.719.7049

7925 JONES BRANCH DRIVE
McLEAN, VA 22102
PHONE   703.905.2800
FAX   703.905.2820

www.wileyrein.com

Inv. Nos. 701-TA-511 and 731-TA-
1246-1247 (Preliminary)
**May Be Released Under APO**
**NON-CONFIDENTIAL VERSION**

<u>**VIA ELECTRONIC FILING AND**</u>
<u>**HAND DELIVERY**</u>

Ms. Lisa R. Barton
Acting Secretary
U.S. International Trade Commission
500 E Street, S.W.
Washington, D.C.  20436

Re:   ***Certain Crystalline Silicon Photovoltaic Products from China and
Taiwan:*** Post-Conference Brief & Answers to Staff Questions

Dear Acting Secretary Barton:

On behalf of SolarWorld Industries America, Inc. ("SolarWorld"), petitioner
and domestic interested party in this proceeding, please find enclosed four copies of
the non-confidential version of SolarWorld's Post-Conference Brief and Answers to
Staff Questions (**Exhibit 1**) in the above-referenced investigation.

The requisite certification is enclosed in accordance with Sections 201.6 and
207.3 of the Commission's rules.  In addition, in accordance with Section 201.16 of
the Commission's rules, the enclosed brief has been served, by hand delivery, on all
parties entitled to receive it as indicated on the attached public service list.

13401495.1

Barcode:3181443-01 A-570-010 INV - Investigation  -



Ms. Lisa R. Barton
January 29, 2014
Page 2

**NON-CONFIDENTIAL VERSION**

If you have any questions regarding this submission, please do not hesitate to contact the undersigned.

Respectfully submitted,

Timothy C. Brightbill, Esq.

**WILEY REIN LLP**
1776 K Street, N.W.
Washington, D.C. 20006
(202) 719-7000

*Counsel to SolarWorld Industries America, Inc.*

13401495.1

Barcode:3181443-01 A-570-010 INV - Investigation  -

BEFORE THE
UNITED STATES INTERNATIONAL TRADE COMMISSION

<table>
<tr><td>

**CERTAIN CRYSTALLINE SILICON PHOTOVOLTAIC PRODUCTS FROM CHINA AND TAIWAN**

</td><td>

Inv. Nos. 701-TA-511 and 731-TA-1246-1247 (Preliminary)

**Business Proprietary Information has been removed from pages 1-2, 5-7, 10, 12-13, 15-16, 18-19, 24-26, 29-36, 38-40, and 42-49; Exhibits 1, 3-5, 7, 8, 13-18, 24, 27, 32, 34, 42 and 44; and the Exhibit List**

<u>**NON-CONFIDENTIAL VERSION**</u>

</td></tr>
</table>

**POST-CONFERENCE BRIEF OF SOLARWORLD INDUSTRIES AMERICA, INC.
& ANSWERS TO STAFF QUESTIONS**

Timothy C. Brightbill, Esq.

**WILEY REIN LLP**
1776 K Street, N.W.
Washington, D.C. 20006
(202) 719-7000

*Counsel to SolarWorld Industries America, Inc.*

January 29, 2014

13401495.1

Barcode:3181443-01 A-570-010 INV - Investigation  -

# EXHIBIT 1

Barcode:3181443-01 A-570-010 INV - Investigation  -

NON-CONFIDENTIAL VERSION

## TABLE OF CONTENTS

SCOPE...................................................................................................................1
      MR. CASSISE, MS. DE FILIPPO, MS. HUGHES

SHIFT TO TAIWANESE CELLS ...........................................................................8
      MR. CASSISE, MS. HUGHES

QUESTIONNAIRE DATA......................................................................................17
      MS. LARSEN, MS. DE FILIPPO, MS. HUGHES

DOMESTIC LIKE PRODUCT: THIN FILM............................................................21
      MR. DAVID, MR. CASSISE, MS. HUGHES

MONO- VS. MULTI-CRYSTALLINE TECHNOLOGY ............................................33
      MS. LARSEN, MR. DAVID

RAW MATERIAL PRICES.....................................................................................40
      MR. BOYLAND, MS. HUGHES, MR. CASSISE

GOVERNMENT INCENTIVES..............................................................................45
      MR. CASSISE, MR. DAVID

COST REDUCTIONS............................................................................................52
      MR. BOYLAND

RESEARCH & DEVELOPMENT...........................................................................56
      MR. BOYLAND

EU TRADE CASE ................................................................................................58
      MR. CASSISE, MS. HUGHES

SOLARWORLD RESTRUCTURING .....................................................................62
      MR. BOYLAND

NATURAL GAS PRICES AND GRID PARITY.......................................................64
      MS. LARSEN, MR. CASSISE

NON-PRICE FACTORS: 72 CELL MODULES / 1000 VOLT MODULES / ZEP SYSTEM ...67
      MS. LARSEN, MR. CASSISE, MS. HUGHES, MR. DAVID

RELATED PARTIES.............................................................................................73
      MR. CASSISE, MS. HUGHES

NEGLIGIBILITY ..................................................................................................76
      MR. CASSISE, MS. HUGHES

CUMULATION .....................................................................................................78
      MS. HUGHES

i

13690944.2

Barcode:3181443-01 A-570-010 INV - Investigation -

NON-CONFIDENTIAL VERSION

## SCOPE

### Questions:

> MR. CASSISE:  I did notice the two out of three rule, the country of origin rule that you had stated in the January 13 commission. Where in the revised scope definition, though, would you say that lies? (Tr. at 40)

> MR. CASSISE:  So what are the primary manufacturing steps if we have now ingot, wafer, partially manufactured now means a portion of cell conversion. So using -- what processes are you intending to use when you state your two out of three country of origin rule? (Tr. at 43)

### Answer:

The first paragraph of the scope language of this proceeding, as initiated by the Department of Commerce, reads as follows:

> The merchandise covered by this investigation is crystalline silicon photovoltaic cells, and modules, laminates and/or panels consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including building integrated materials.  For purposes of this investigation, subject merchandise also includes modules, laminates and/or panels assembled in the subject country consisting of crystalline silicon photovoltaic cells that are completed or partially manufactured within a customs territory other than that subject country, using ingots that are manufactured in the subject country, wafers that are manufactured in the subject country, or cells where the manufacturing process begins in the subject country and is completed in a non-subject country.[1]

Thus, the scope language covers two general categories of merchandise:

(1) cells from Taiwan (whether they are imported directly as cells, or whether the cells are imported as modules assembled in Taiwan or in any third country); and

(2) modules from a subject country that are assembled from cells completed or partially manufactured in a third country from inputs manufactured in the subject country (i.e., ingots or wafers that are manufactured in the subject country, or cells where the manufacturing process begins in the subject country and is completed in another country).

---

[1]     Fact Sheet: Commerce Initiates Antidumping Duty Investigations of Imports of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and Taiwan and a Countervailing Duty Investigation of Imports of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China, attached at **Exhibit 25**.

13690944.2

Barcode:3181443-01 A-570-010 INV - Investigation  -

**NON-CONFIDENTIAL VERSION**

Category 2 (described in the second sentence of the first paragraph of the scope language[2])

encompasses the "two-out-of-three" scenario discussed at the Staff Conference.[3]

In its January 13, 2014 response to the Department of Commerce's supplemental

questions, Petitioner further explained the merchandise covered by category 2 above (the "two-

out-of-three" scenario) as:

> {P}anels and modules assembled in a subject country (*e.g.*, China), even if the
> cells in those modules are produced in a different country (*e.g.*, Taiwan or a non-
> subject country), if those cells are made from ingots, wafers or partially
> manufactured cells that were manufactured in the subject country (*e.g.*, China).
> This would cover situations where the panels or modules are assembled in a
> subject country from cells made in a different country but: 1) the ingots used for
> the wafers made into the cells were manufactured in the subject country; 2) the
> wafers made into the cells were manufactured in the subject country; or 3) the cell
> manufacturing process began in the subject country and then was completed in a
> non-subject country.   With reference to the steps described in the petition, this
> means that the scope covers module assembly (step 4) in a subject country, even
> if cell conversion (step 3) does not occur in the subject country, if either ingot
> crystallization (step 1), wafer production (step 2) or the beginning of cell
> conversion (step 3) also occurs in the same subject country.[4]

Therefore, using China as the subject country for an example, modules exported to the

United States from China, which undergo the following types of production processes, are

included in the scope of this investigation and considered subject merchandise from China:

> (1) ingots from China + module assembly in China;
>
> (2) wafers from China + module assembly in China; and/or
>
> (3) cells in which the manufacturing process began in China and was completed
> in another country + module assembly in China.

---

[2]    Tr. at 40 (Mr. Cassise).

[3]    *Id.* at 40 – 43.

[4]    Letter from Wiley Rein LLP to Sec'y Commerce and Acting Sec'y, Int'l Trade Comm'n, re: *Supplement II to Petition for the Imposition of Antidumping and Countervailing Duties: Certain Crystalline Silicon Photovoltaic Products from China and Taiwan* (Jan. 13, 2014) ("Jan. 13 Supplement") at 2.

2

Filed By: nellis@sidley.com, Filed Date: 2/18/14 1:23 PM, Submission Status: Approved

Barcode:3181443-01 A-570-010 INV - Investigation -

NON-CONFIDENTIAL VERSION

Each of these types of modules would be considered subject merchandise from China, within the scope of this investigation.

**Questions:**

> MR. CASSISE: {W}e can start with trying to define this "partially manufactured" term, which in the revised scope, you've added this clause at the end, where the manufacturing process begins in the subject country and is completed in a nonsubject country. Is that your definition of partially manufactured? Is that the definition in that clause? ... this clause... could mean less than cell conversion? (Tr. at 41)

> MS. DE FILIPPO: In the discussion on the partially manufactured cells, is that currently being done, or is that language put into the scope as more of a potential anticircumvention issue? ...{D}o we have knowledge that this -- this partial manufacturing or cells being manufactured here and then moved over here, is that currently being done, to your knowledge? (Tr. 103-104)

**Answer:**

With regard to the modules composed of cells for which the manufacturing process began in China and was completed in another country (i.e., "partially manufactured" cells),[5] there are a number of different steps in the cell production process at which production could be stopped, and the partially completed cells shipped from China to another country for finishing.[6] Respondents acknowledged this at the Staff Conference.[7] For example, in China, the cell producer could process the substrate through diffusion and creation of the p/n junction, but then send the cell to a factory in another location (e.g., in Taiwan) to be printed.[8] If that cell were to be then sent back to China for assembly into a module, that module would be subject

---

[5]      See Tr. at 41 (Mr. Brightbill) ("there have been reports that there will be initial manufacturing of the cell in China or in some cases even manufacture of nearly all of the cell in China, then sent off to a different location, Taiwan or somewhere else, for finishing, and then sent back to China to be made into a module").

[6]      See id. at 42 (Mr. Brinser) ("It is very feasible, and we've heard reports where cells can be processed up to a certain point, or the substrates can be processed up to a certain point in that cell transformation, basically packaged at that point, shipped off to a third country to basically be finished").

[7]      See id. at 238 (Mr. Mendenhall and Mr. Koerner).

[8]      See id. at 96-97 (Mr. Brinser).

3

13690944.2

Filed By: nellis@sidley.com, Filed Date: 2/18/14 1:23 PM, Submission Status: Approved

Barcode:3181443-01 A-570-010 INV - Investigation  -

**NON-CONFIDENTIAL VERSION**

merchandise from China, under the scope of this investigation.  "Partial manufacturing" of the cell in China could also include manufacturing that is less than cell conversion.[9]  In addition, it would cover situations in which "virtually all of the cell process would be done in China, sent to another country for the name of the other country's manufacturer to be put on the product and then to be sent back {to China}, so almost no actual manufacturing {occurred} in the other country."[10]

While "partial cell manufacturing" is not common and does not generally make sense in a normal commercial context, Petitioner believes that it has been used and could be further used in an effort to evade AD/CVD duties.

*Question:*

> MR. CASSISE:  So if we go to my categories of U.S. imports, if we could go down this list and see what is subject and what is not within the scope of this investigation, I think that will be helpful.  (Tr. at 47-48)

*Answer:*

For further clarification of the scope of this investigation, listed below are each of the "Categories of U.S. Imports" identified by Mr. Cassise at the Staff Conference, along with a brief identification of which categories include merchandise subject to this investigation, consistent with the answers Petitioner provided at the Staff Conference:

1) **Cells from China** – subject to the first solar AD/CVD investigation, and currently subject to duties under those AD/CVD orders;[11]

---

[9]       *See id.* at 47.

[10]      *Id.* at 104 (Mr. Brightbill).

[11]      *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 77 Fed. Reg. 73,017 (Dep't Commerce Dec. 7, 2012) (countervailing duty order); *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 77 Fed. Reg. 73,018 (Dep't Commerce Dec. 7, 2012) (amended final deter. of sales at less than fair value, and antidumping duty order).

4

13690944.2

**NON-CONFIDENTIAL VERSION**

2) **Modules from China using Chinese cells** – subject to the first solar AD/CVD investigation, and currently subject to duties under those AD/CVD orders;[12]

3) **Modules from China using Taiwanese cells** – subject merchandise; assuming that the cells are fully manufactured in Taiwan, the country of origin of these modules would be Taiwanese; if the cells were made in Taiwan from Chinese raw material inputs (*i.e.*, ingots, wafers or partially manufactured cells), as discussed above, the country of origin of these modules would be Chinese;

4) **Modules from China using third-country cells** – non-subject merchandise, unless the cells were made in a third country from Chinese raw material inputs (*i.e.*, ingots, wafers or partially manufactured cells) (in that case, the modules would be subject merchandise, with a Chinese country of origin);

5) **Cells from Taiwan** – subject merchandise;

6) **Modules from Taiwan using Chinese cells** – subject to the first solar AD/CVD investigation, and currently subject to duties under those AD/CVD orders[13] (unless the cells were made in China from Taiwanese raw material inputs (*i.e.*, ingots, wafers or partially manufactured cells); in that case, the modules would be subject merchandise, with a Taiwanese country of origin);

7) **Modules from Taiwan using Taiwanese cells** – subject merchandise;

8) **Modules from Taiwan using third-country cells** – non-subject merchandise, unless the cells were made in a third country from Taiwanese raw material inputs (*i.e.*, ingots, wafers or partially manufactured cells) (in that case, the modules would be subject merchandise, with a Taiwanese country of origin);

9) **Cells from third countries** – non-subject merchandise (unless the cells were produced from Taiwanese or Chinese raw material inputs, and then assembled into modules in the same subject country);

10) **Modules from third countries using Chinese cells** – subject to the first solar AD/CVD investigation, and currently subject to duties under those AD/CVD orders;[14]

---

[12]    *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 77 Fed. Reg. at 73,017; *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 77 Fed. Reg. at 73,018.

[13]    *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 77 Fed. Reg. 73,017 (Dep't Commerce Dec. 7, 2012) (countervailing duty order); *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 77 Fed. Reg. 73,018 (Dep't Commerce Dec. 7, 2012) (amended final deter. of sales at less than fair value, and antidumping duty order).

[14]    *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 77 Fed. Reg. 73,017 (Dep't Commerce Dec. 7, 2012) (countervailing duty order); *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 77 Fed.

13690944.2

Barcode:3181443-01 A-570-010 INV - Investigation -

Business Proprietary Information
Has Been Deleted

NON-CONFIDENTIAL VERSION

11) **Modules from third countries using Taiwanese cells** – subject merchandise, of Taiwanese origin; and

12) **Modules from third countries using third-country cells** – non-subject merchandise.

**Questions:**

*MR. CASSISE: So of our subcategories, the only real issue we have is the two out of three categories, we did not collect data subdividing subject and nonsubject for any for categories 4 and 8 and, well, possibly 9. I mean, do we have a sense of how big those categories would be?* (Tr. at 50)

*MS. HUGHES: It would be helpful if you could submit with your post conference brief whatever data you have from whatever sources there are, with respect to not just category 3 but 4, 8 and 9, because our questionnaires may not have covered all of these categories, if I've got that right.* (Tr. at 69)

**Answer:**

The Commission's questionnaires did request data on the production of modules falling into category 4 of Mr. Cassise's Categories of U.S. Imports.[15]  According to Chinese respondents' questionnaire responses, [

], although they did [

].[16]  It is unclear, however, the percentage of those modules assembled from foreign-sourced cells that may have been made from Chinese wafers, ingots or partially manufactured cells, thus rendering those modules subject to this investigation.

Similarly, the Commission's questionnaires did request data on the production of modules falling into category 8 of Mr. Cassise's Categories of U.S. Imports.[17]  Again, the

---

Reg. 73,018 (Dep't Commerce Dec. 7, 2012) (amended final deter. of sales at less than fair value, and antidumping duty order).

[15]     Foreign Producers' Questionnaire at II-16.

[16]     *See* Chinese Foreign Producer Compilation, attached at **Exhibit 7**.

[17]     Foreign Producers' Questionnaire at II-18.

6

Filed By: nellis@sidley.com, Filed Date: 2/18/14 1:23 PM, Submission Status: Approved

Barcode:3181443-01 A-570-010 INV - Investigation -

Business Proprietary Information    NON-CONFIDENTIAL VERSION
Has Been Deleted

percentages of Taiwanese modules assembled from other foreign-sourced cells were [

].[18]  The percentage of those

modules assembled from foreign-sourced cells that may have been made from Taiwanese wafers,

ingots or partially manufactured cells, thus rendering those modules subject to this investigation,

is unclear.   However, Petitioner is not currently aware of information that would lead it to

believe that such production is occurring in Taiwan on a widespread basis.

---

[18]      *See* Taiwanese Foreign Producer Compilation, attached at **Exhibit 8**.

7

# TAB 6

# <u>Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China</u>, 79 Fed. Reg.  33174 (Dep't Commerce June 10, 2014) (prelim. CVD determ.)

## CVD P.R. 278

warranted at this time. The production activity described in the notification is authorized, subject to the FTZ Act and the FTZ Board's regulations, including Section 400.14, and further subject to a restriction requiring that Firth Rixson Forgings LLC, admit all foreign status titanium products to FTZ 104 in privileged foreign status (19 CFR 146.41).

Dated: June 4, 2014.

**Andrew McGilvray,**
*Executive Secretary.*

[FR Doc. 2014–13509 Filed 6–9–14; 8:45 am]

**BILLING CODE 3510-DS-P**

---

## DEPARTMENT OF COMMERCE

### International Trade Administration

[A–570–924]

### Polyethylene Terephthalate Film, Sheet, and Strip From the People's Republic of China: Rescission of Antidumping Duty New Shipper Review

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** In response to a request from Now Plastics, Inc. ("Now Plastics") and its affiliate Huangshi Yucheng Trade Co., Ltd. ("Huangshi Yucheng") (collectively "Requestor"), the Department of Commerce ("the Department") initiated a new shipper review of the antidumping duty order on polyethylene terephthalate film, sheet, and strip from the People's Republic of China ("PRC") covering the period November 1, 2012 through March 31, 2013.[1] On February 4, 2014, Requestor timely withdrew its request for a new shipper review. Accordingly, the Department is rescinding the new shipper review with respect to Requestor.[2]

**DATES:** June 10, 2014.

**FOR FURTHER INFORMATION CONTACT:** Howard Smith or Jonathan Hill, AD/CVD Operations, Office IV, Enforcement & Compliance, International Trade Administration, Department of Commerce, 14th Street and Constitution Avenue NW., Washington, DC 20230; telephone: (202) 482–5193 or (202) 482–3518, respectively.

**SUPPLEMENTARY INFORMATION:**

### Rescission of New Shipper Review

On December 30, 2013, the Department initiated a new shipper review of Requestor, and on February 4, 2014, Requestor withdrew its new shipper review request. 19 CFR 351.214(f)(1) provides that, the Department may rescind a new shipper review if the party that requested the review withdraws its request for review within 60 days of the date of publication of the notice of initiation of the requested review. Given that Requestor timely withdrew its request for a new shipper review, the Department is rescinding the new shipper review of the antidumping duty order on polyethylene terephthalate film, sheet, and strip from the PRC with respect to Requestor. Consequently, Requestor will remain part of the PRC-wide entity.

### Assessment

Requestor remains under review in the ongoing administrative review covering the 2012–2013 period of review (POR) as part of the PRC-wide entity.[3] Therefore, the Department will not order liquidation of entries for Requestor. The Department intends to issue liquidation instructions for the PRC-wide entity, which will cover any entries by Requestor, 15 days after publication of the final results of the ongoing administrative review covering the 2012–2013 POR.

### Cash Deposit

The Department will notify U.S. Customs and Border Protection ("CBP") that bonding is no longer permitted to fulfill security requirements for subject merchandise produced and exported by Requestor that is entered, or withdrawn from warehouse, for consumption in the United States on or after the publication of this rescission notice in the **Federal Register.** The Department will notify CBP that a cash deposit of 76.72 percent should be collected for all shipments of subject merchandise by Requestor entered, or withdrawn from warehouse, for consumption in the United States on or after the publication of this rescission notice.

### Notifications to Interested Parties

This notice serves as a reminder to importers of their responsibility under 19 CFR 351.402(f)(2) to file a certificate regarding the reimbursement of antidumping duties prior to liquidation of the relevant entries during this review period. Failure to comply with this requirement could result in the Secretary's presumption that reimbursement of antidumping duties occurred and the subsequent assessment of double antidumping duties. This notice also serves as a reminder to parties subject to administrative protective order ("APO") of their responsibility concerning the return or destruction of proprietary information disclosed under APO in accordance with 19 CFR 351.305(a). Timely written notification of the return or destruction of APO materials, or conversion to judicial protective order, is hereby requested. Failure to comply with the regulations and terms of an APO is a violation which is subject to sanction.

We are issuing and publishing this rescission and notice in accordance with sections 751(a)(2)(B) and 777(i) of the Act and 19 CFR 351.214(f)(3).

Dated: June 2, 2013.

**Christian Marsh,**
*Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations.*

[FR Doc. 2014–13512 Filed 6–9–14; 8:45 am]

**BILLING CODE 3510-DS-P**

---

## DEPARTMENT OF COMMERCE

### International Trade Administration

[C–570–011]

### Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China: Preliminary Affirmative Countervailing Duty Determination

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** The Department of Commerce (the Department) preliminarily determines that countervailable subsidies are being provided to producers and exporters of certain crystalline silicon photovoltaic products (certain solar products) from the People's Republic of China (PRC). The period of investigation is January 1, 2012, through December 31, 2012. The final determination will be issued 75 days after the date of this preliminary determination unless otherwise extended. Interested parties are invited to comment on this preliminary determination.

**DATES:** *Effective Date:* June 10, 2014.

**FOR FURTHER INFORMATION CONTACT:** Gene Calvert or Justin Neuman, Office VII, AD/CVD Operations, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 14th Street and Constitution Avenue NW., Washington, DC 20230;

---

[1] *See Polyethylene Terephthalate Film, Sheet, and Strip From the People's Republic of China: Initiation of Antidumping Duty New Shipper Review,* 78 FR 79400 (December 30, 2013).

[2] *See Letter from Requestor to the Secretary of Commerce "Polyethylene Terephthalate (PET) Film from the People's Republic of China; A–570–924; Withdrawal of Request for New Shipper Review of Exports by Huangshi Yucheng Trade Co.," dated February 4, 2014.*

[3] *See Initiation of Antidumping and Countervailing Duty Administrative Reviews and Request for Revocation in Part,* 78 FR 79392 (December 30, 2013).

telephone: (202) 482–3586 and (202) 482–0486, respectively.

**SUPPLEMENTARY INFORMATION:**

## Scope of the Investigation

The merchandise covered by this investigation is crystalline silicon photovoltaic cells and modules, laminates and/or panels consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including building integrated materials.

For purposes of this investigation, subject merchandise also includes modules, laminates and/or panels assembled in the subject country consisting of crystalline silicon photovoltaic cells that are completed or partially manufactured within a customs territory other than that subject country, using ingots that are manufactured in the subject country, wafers that are manufactured in the subject country, or cells where the manufacturing process begins in the subject country and is completed in a non-subject country.

Subject merchandise includes crystalline silicon photovoltaic cells of thickness equal to or greater than 20 micrometers, having a p/n junction formed by any means, whether or not the cell has undergone other processing, including, but not limited to, cleaning, etching, coating, and/or addition of materials (including, but not limited to, metallization and conductor patterns) to collect and forward the electricity that is generated by the cell.

Excluded from the scope of this investigation are thin film photovoltaic products produced from amorphous silicon (a-Si), cadmium telluride (CdTe), or copper indium gallium selenide (CIGS). Also, excluded from the scope of this investigation are any products covered by the existing antidumping and countervailing duty orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the People's Republic of China.[1]

Also excluded from the scope of this investigation are crystalline silicon photovoltaic cells, not exceeding 10,000 mm² in surface area, that are permanently integrated into a consumer good whose function is other than power generation and that consumes the electricity generated by the integrated crystalline silicon photovoltaic cell. Where more than one cell is permanently integrated into a consumer good, the surface area for purposes of this exclusion shall be the total combined surface area of all cells that are integrated into the consumer good.

Merchandise covered by this investigation is currently classified in the Harmonized Tariff Schedule of the United States (HTSUS) under subheadings 8501.61.0000, 8507.20.8030, 8507.20.8040, 8507.20.8060, 8507.20.8090, 8541.40.6020, 8541.40.6030 and 8501.31.8000. These HTSUS subheadings are provided for convenience and customs purposes; the written description of the scope of this investigation is dispositive.

## Methodology

The Department is conducting this countervailing duty investigation in accordance with section 701 of the Tariff Act of 1930, as amended (the Act). For a full description of the methodology underlying our preliminary conclusions, including our reliance, in part, on adverse facts available, see the Preliminary Decision Memorandum.[2] The Preliminary Decision Memorandum is a public document and is on file electronically via Enforcement and Compliance's Antidumping and Countervailing Duty Centralized Electronic Service System (IA ACCESS). IA ACCESS is available to registered users at *http://iaaccess.trade.gov*, and is available to all parties in the Central Records Unit, room 7046 of the main Department of Commerce building. In addition, a complete version of the Preliminary Decision Memorandum can be accessed directly on the Internet at *http://enforcement.trade.gov/frn/index.html.* The signed Preliminary Decision Memorandum and the electronic versions of the Preliminary Decision Memorandum are identical in content.

## Preliminary Determination and Suspension of Liquidation

In accordance with section 703(d)(1)(A)(i) of the Act, we determine

separate subsidy rates for the individually-investigated producers/exporters of the subject merchandise, Wuxi Suntech Power Co., Ltd. and its cross-owned companies and Changzhou Trina Solar Energy Co., Ltd. and its cross-owned company.[3] We also calculated an all-others rate. In accordance with sections 703(d) and 705(c)(5)(A) of the Act, for companies not individually investigated, we apply an "all-others" rate, which is normally calculated by weighting the subsidy rates of the individual companies selected as mandatory respondents by those companies' exports of the subject merchandise to the United States. Under section 705(c)(5)(A)(i) of the Act, the all-others rate should exclude zero and *de minimis* rates calculated for the exporters and producers individually investigated as well as rates based entirely on facts otherwise available. Where the rates for the investigated companies are all zero or *de minimis,* or based entirely on facts otherwise available, section 705(c)(5)(A)(ii) of the Act instructs the Department to establish an all-others rate using "any reasonable method." Notwithstanding the language of section 705(c)(5)(A)(i) of the Act, we have not calculated the "all-others" rate by weight averaging the rates of the two individually investigated respondents, because doing so risks disclosure of proprietary information. Therefore, and consistent with the Department's practice where such risk exists, for the "all-others" rate, we calculated a simple average of the two responding firms' rates.[4] The overall preliminary subsidy rates are summarized in the table below:

| Company | Subsidy rate (%) |
|---|---|
| Wuxi Suntech Power Co., Ltd. | 35.21 |
| Changzhou Trina Solar Energy Co., Ltd. | 18.56 |
| All Others | 26.89 |

In accordance with sections 703(d)(1)(B) and (d)(2) of the Act, we are directing U.S. Customs and Border Protection (CBP) to suspend liquidation of all entries of certain solar products from the PRC that are entered, or withdrawn from warehouse, for consumption on or after the date of the publication of this notice in the **Federal Register**, and to require a cash deposit

---

[1] See *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order,* 77 FR 73018 (December 7, 2012); *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Countervailing Duty Order,* 77 FR 73017 (December 7, 2012).

[2] See Memorandum from Christian Marsh, Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations, to Paul Piquado, Assistant Secretary for Enforcement and Compliance regarding "Decision Memorandum for the Preliminary Determination in the Countervailing Duty Investigation of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China," dated concurrently with this notice (Preliminary Decision Memorandum). A list of topics discussed in the Preliminary Decision Memorandum can be found as an appendix to this notice.

[3] For a full list of the examined cross-owned companies, *see* the Preliminary Decision Memorandum.

[4] See, e.g., *Hardwood and Decorative Plywood from the People's Republic of China: Final Affirmative Countervailing Duty Determination; 2011,* 78 FR 58283 (September 23, 2013).

for such entries of merchandise in the amounts indicated above.

**Verification**

As provided in section 782(i)(1) of the Act, we intend to verify the information submitted by the respondents prior to making our final determination.

**Disclosure and Public Comment**

The Department intends to disclose to interested parties the calculations performed in connection with this preliminary determination within five days of its public announcement.[5] Interested parties may submit case and rebuttal briefs, as well as request a hearing.[6] For a schedule of the deadlines for filing case briefs, rebuttal briefs, and hearing requests, *see* the Preliminary Decision Memorandum.

**International Trade Commission Notification**

In accordance with section 703(f) of the Act, we will notify the International Trade Commission (ITC) of our determination. In addition, we are making available to the ITC all non-privileged and non-proprietary information relating to this investigation. We will allow the ITC access to all privileged and business proprietary information in our files, provided the ITC confirms that it will not disclose such information, either publicly or under an administrative protective order, without the written consent of the Assistant Secretary for Enforcement and Compliance.

In accordance with section 705(b)(2) of the Act, if our final determination is affirmative, the ITC will make its final determination within 45 days after the Department makes its final determination.

This determination is issued and published pursuant to sections 703(f) and 777(i) of the Act and 19 CFR 351.205(c).

Dated: June 2, 2014.

**Paul Piquado,**

*Assistant Secretary for Enforcement and Compliance.*

## Appendix

**List of Topics Discussed in the Preliminary Decision Memorandum**

I. Summary
II. Background
III. Scope Comments
IV. Scope of the Investigation
V. Respondent Selection
VI. Injury Test
VII. Application of the Countervailing Duty Law to Imports From the PRC
VIII. Subsidies Valuation
IX. Benchmarks and Discount Rates
X. Use of Facts Otherwise Available and Adverse Inferences
XI. Analysis of Programs
XII. ITC Notification
XIII. Disclosure and Public Comment
XIV. Verification
XV. Conclusion

[FR Doc. 2014–13510 Filed 6–9–14; 8:45 am]

BILLING CODE 3510–DS–P

[5] *See* 19 CFR 351.224(b).

[6] *See* 19 CFR 351.309(c)–(d), 19 CFR 351.310(c).

# DEPARTMENT OF COMMERCE

## National Telecommunications and Information Administration

## Commerce Spectrum Management Advisory Committee Meeting

**AGENCY:** National Telecommunications and Information Administration, U.S. Department of Commerce.

**ACTION:** Notice of open meeting.

**SUMMARY:** This notice announces a public meeting of the Commerce Spectrum Management Advisory Committee (Committee). The Committee provides advice to the Assistant Secretary of Commerce for Communications and Information and the National Telecommunications and Information Administration (NTIA) on spectrum management policy matters.

**DATES:** The meeting will be held on July 10, 2014, from 1 p.m. to 4 p.m., Eastern Daylight Time.

**ADDRESSES:** The meeting will be held at the Wiley Rein Conference Center, 1776 K Street, NW., Washington, DC 20006. Public comments may be mailed to Commerce Spectrum Management Advisory Committee, National Telecommunications and Information Administration, 1401 Constitution Avenue NW., Room 4099, Washington, DC 20230 or emailed to *BWashington@ntia.doc.gov*.

**FOR FURTHER INFORMATION CONTACT:** Bruce M. Washington, Designated Federal Officer, at (202) 482–6415 or *BWashington@ntia.doc.gov;* and/or visit NTIA's Web site at *http://www.ntia.doc.gov/category/csmac.*

**SUPPLEMENTARY INFORMATION:**

*Background:* The Committee provides advice to the Assistant Secretary of Commerce for Communications and Information on needed reforms to domestic spectrum policies and management in order to: license radio frequencies in a way that maximizes their public benefits; keep wireless networks as open to innovation as possible; and make wireless services available to all Americans. *See* Charter at *http://www.ntia.doc.gov/other-publication/2013/csmac-2013-charter.* This Committee is subject to the Federal Advisory Committee Act (FACA), 5 U.S.C. App. 2, and is consistent with the National Telecommunications and Information Administration Act, 47 U.S.C. 904(b). The Committee functions solely as an advisory body in compliance with the FACA. For more information about the Committee visit: *http://www.ntia.doc.gov/category/csmac.*

*Matters to Be Considered:* The Committee will receive reports on the progress of the following subcommittees established to help NTIA develop new or revised strategies for responding more efficiently and effectively to fundamental technological, operational, and other trends to continue advancement of delivering spectrum products, services, and solutions that will support the ever-increasing demand for spectrum:

1. Enforcement
2. Transitional Sharing
3. General Occupancy Measurements and Quantification of Federal Spectrum Use
4. Spectrum Management via Databases
5. Federal Access to Non-federal Bands
6. Spectrum Sharing Cost Recovery Alternatives

NTIA will post a detailed agenda on its Web site, *http://www.ntia.doc.gov/category/csmac*, prior to the meeting. To the extent that the meeting time and agenda permit, any member of the public may speak to or otherwise address the Committee regarding the agenda items. *See Open Meeting and Public Participation Policy,* available at *http://www.ntia.doc.gov/category/csmac.*

*Time and Date:* The meeting will be held on July 10, 2014, from 1 p.m. to 4 p.m., Eastern Daylight Time. The times and the agenda topics are subject to change. The meeting will be available via two-way audio link and may be webcast. Please refer to NTIA's Web site, *http://www.ntia.doc.gov/category/csmac*, for the most up-to-date meeting agenda and access information.

*Place:* The meeting will be held at the Wiley Rein Conference Center, 1776 K Street NW., Washington, DC 20006. The meeting will be open to the public and press on a first-come, first-served basis. Space is limited. The public meeting is physically accessible to people with disabilities. Individuals requiring accommodations, such as sign language interpretation or other ancillary aids, are asked to notify Mr. Washington at (202) 482–6415 or *BWashington@ntia.doc.gov* at least ten (10) business days before the meeting.

*Status:* Interested parties are invited to attend and to submit written

**TAB 7**

**Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China**, 79 Fed. Reg.  44399 (Dep't Commerce July 31, 2014) (prelim. LTFV determ.)

**AD P.R. 835**

**Federal Register**/Vol. 79, No. 147/Thursday, July 31, 2014/Notices **44399**

exporters will be 22.84 percent, as discussed in the "All Others Rate" section, above. These instructions suspending liquidation will remain in effect until further notice.

## U.S. International Trade Commission ("ITC") Notification

In accordance with section 735(d) of the Act, we notified the U.S. International Trade Commission ("ITC") of our final determination. As our final determination is affirmative, in accordance with section 735(b)(2) of the Act the ITC will determine within 45 days whether the domestic industry in the United States is materially injured, or threatened with material injury, by reason of imports or sales (or the likelihood of sales) for importation of the merchandise under consideration. If the ITC determines that such injury does exist, the Department will issue an antidumping duty order directing CBP to assess, upon further instruction by the Department, antidumping duties on all imports of the subject merchandise entered, or withdrawn from warehouse, for consumption on or after the effective date of the suspension of liquidation.

## Return or Destruction of Proprietary Information

This notice will serve as the only reminder to parties subject to administrative protective order ("APO") of their responsibility concerning the destruction of proprietary information disclosed under APO in accordance with 19 CFR 351.305(a)(3). Timely written notification of return/destruction of APO materials or conversion to judicial protective order is hereby requested. Failure to comply with the regulations and the terms of an APO is a sanctionable violation.

We are issuing and publishing this determination and notice in accordance with sections 735(d) and 777(i) of the Act.

Dated: July 24, 2014.

**Paul Piquado,**
*Assistant Secretary for Enforcement and Compliance.*

## Appendix—List of Topics Discussed in the Issues and Decision Memorandum

I. Summary
II. Background
III. Scope of the Investigation
IV. Margin Calculations
V. Discussion of the Issues
　1. Whether FerroVen and FASA Should Be Treated as a Single Entity
　2. FerroVen's Purchases of Quartz
　3. FerroVen's HM Interest Rate
　4. U.S. Import Duties
　5. Tax Adjustment to Certain HM Sales Based on Verification Observations
　6. CEP Offset

　7. General and Administrative Expense
　8. Depreciation
　9. Financial Expense Ratio
　10. FASA's G&A Rate
VI. Recommendation

[FR Doc. 2014–18061 Filed 7–30–14; 8:45 am]

**BILLING CODE 3510–DS–P**

---

## DEPARTMENT OF COMMERCE

### International Trade Administration

**[A–570–010]**

### Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China: Affirmative Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** The Department of Commerce ("Department") preliminarily determines that certain crystalline silicon photovoltaic products ("certain solar products") from the People's Republic of China ("PRC") are being, or are likely to be, sold in the United States at less than fair value ("LTFV"), as provided in section 733(b) of the Tariff Act of 1930, as amended ("the Act"). The period of investigation ("POI") is April 1, 2013, through September 30, 2013. The estimated weighted-average dumping margins of sales at LTFV are shown in the "Preliminary Determination" section of this notice. Interested parties are invited to comment on this preliminary determination.

**DATES:** *Effective Date:* July 31, 2014.

**FOR FURTHER INFORMATION CONTACT:** Jeffrey Pedersen or Thomas Martin, AD/CVD Operations, Office IV, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 14th Street and Constitution Avenue NW., Washington, DC 20230; telephone: (202) 482–2769 or (202) 482–3936, respectively.

**SUPPLEMENTARY INFORMATION:**

### Background

The Department published the notice of initiation of this investigation on January 29, 2014.[1] Pursuant to section 733(c)(1)(B) of the Act, the Department postponed this preliminary LTFV determination by a period of 43 days.[2]

---

[1] *See Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China and Taiwan: Initiation of Antidumping Duty Investigations,* 79 FR 4661 (January 29, 2014) ("*Initiation Notice*").

[2] *See Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China and*

## Scope of the Investigation

The merchandise covered by this investigation is crystalline silicon photovoltaic cells, and modules, laminates and/or panels consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including building integrated materials. For purposes of this investigation, subject merchandise also includes modules, laminates and/or panels assembled in the subject country consisting of crystalline silicon photovoltaic cells that are completed or partially manufactured within a customs territory other than that subject country, using ingots that are manufactured in the subject country, wafers that are manufactured in the subject country, or cells where the manufacturing process begins in the subject country and is completed in a non-subject country.

Subject merchandise includes crystalline silicon photovoltaic cells of thickness equal to or greater than 20 micrometers, having a p/n junction formed by any means, whether or not the cell has undergone other processing, including, but not limited to, cleaning, etching, coating, and/or addition of materials (including, but not limited to, metallization and conductor patterns) to collect and forward the electricity that is generated by the cell.

Excluded from the scope of this investigation are thin film photovoltaic products produced from amorphous silicon (a-Si), cadmium telluride (CdTe), or copper indium gallium selenide (CIGS). Also excluded from the scope of this investigation are any products covered by the existing antidumping and countervailing duty orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the People's Republic of China. *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order,* 77 FR 73018 (December 7, 2012); *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Countervailing Duty Order,* 77 FR 73017 (December 7, 2012).

Also excluded from the scope of this investigation are crystalline silicon photovoltaic cells, not exceeding 10,000mm² in surface area, that are permanently integrated into a consumer

---

*Taiwan: Postponement of Preliminary Determination of Antidumping Duty Investigations,* 79 FR 30084 (May 27, 2014).

good whose function is other than power generation and that consumes the electricity generated by the integrated crystalline silicon photovoltaic cell. Where more than one cell is permanently integrated into a consumer good, the surface area for purposes of this exclusion shall be the total combined surface area of all cells that are integrated into the consumer good.

Merchandise covered by this investigation is currently classified in the Harmonized Tariff Schedule of the United States (HTSUS) under subheadings 8501.61.0000, 8507.20.8030, 8507.20.8040, 8507.20.8060, 8507.20.8090, 8541.40.6020, 8541.40.6030 and 8501.31.8000. These HTSUS subheadings are provided for convenience and customs purposes; the written description of the scope of this investigation is dispositive.

**Methodology**

The Department conducted this investigation in accordance with section 731 of the Act. We calculated constructed export prices and export prices in accordance with section 772 of the Act. Because the PRC is a non-market economy within the meaning of section 771(18) of the Act, we calculated normal value ("NV") in accordance with section 773(c) of the Act. Further, we determined to apply facts otherwise available with an adverse inference to the PRC-wide entity in accordance with sections 776(a) and (b) of the Act.

For a full description of the methodology underlying our conclusions, *see* the "Decision Memorandum for the Preliminary Determination in the Antidumping Duty Investigation of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China" from Christian Marsh, Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations to Paul Piquado, Assistant Secretary for Enforcement and Compliance, ("Preliminary Decision Memorandum") dated concurrently with this determination and hereby adopted by this notice. The Preliminary Decision Memorandum is a public document and is made available to the public via Enforcement and Compliance's Antidumping and Countervailing Duty Centralized Electronic Service System ("IA ACCESS"). IA ACCESS is available to registered users at *http://iaaccess.trade.gov,* and is available to all parties in the Department's Central Records Unit, located in room 7046 of the main Department of Commerce building. In addition, a complete version of the Preliminary Decision Memorandum can be accessed directly on the Internet at *http://enforcement.trade.gov/frn/.* The signed Preliminary Decision Memorandum and the electronic version of the Preliminary Decision Memorandum are identical in content.

**Combination Rates**

In the *Initiation Notice,* the Department stated that it would calculate combination rates for the respondents that are eligible for a separate rate in this investigation. Policy Bulletin 05.1 describes this practice.[3]

**Preliminary Determination**

The Department preliminarily determines that the following weighted-average dumping margins exist for the exporter-producer combinations listed below during the period April 1, 2013 through September 30, 2013:

| Exporter | Producer | Weighted-average dumping margin (percent) |
| --- | --- | --- |
| Changzhou Trina Solar Energy Co., Ltd./Trina Solar (Changzhou) Science & Technology Co., Ltd. | Changzhou Trina Solar Energy Co., Ltd./Trina Solar (Changzhou) Science & Technology Co., Ltd. | 26.33 |
| Renesola Jiangsu Ltd./Renesola Zhejiang Ltd./Jinko Solar Co. Ltd./Jinko Solar Import and Export Co., Ltd. | Renesola Jiangsu Ltd./Jinko Solar Co. Ltd | 58.87 |
| Anji DaSol Solar Energy Science & Technology Co., Ltd ..... | Anji DaSol Solar Energy Science & Technology Co., Ltd ..... | 42.33 |
| Asun Energy Co., Ltd. (a/k/a Suzhou Asun Energy Co., Ltd.) | Asun Energy Co., Ltd. (a/k/a Suzhou Asun Energy Co., Ltd.). | 42.33 |
| Baoding Tianwei Yingli New Energy Resources Co., Ltd ...... | Baoding Tianwei Yingli New Energy Resources Co., Ltd., Yingli Energy (China) Co., Ltd, and Lixian Yingli New Energy Co., Ltd. | 42.33 |
| BYD (Shangluo) Industrial Co., Ltd ........................................ | BYD (Shangluo) Industrial Co., Ltd ........................................ | 42.33 |
| Canadian Solar International Limited .................................... | Canadian Solar Manufacturing (Luoyang) Inc., Canadian Solar Manufacturing (Changshu), Inc. | 42.33 |
| Canadian Solar Manufacturing (Changshu), Inc .................. | Canadian Solar Manufacturing (Changshu), Inc .................. | 42.33 |
| Canadian Solar Manufacturing (Luoyang) Inc ..................... | Canadian Solar Manufacturing (Luoyang) Inc ..................... | 42.33 |
| CEEG Nanjing Renewable Energy Co., Ltd ........................... | CEEG Nanjing Renewable Energy Co., Ltd ........................... | 42.33 |
| Changzhou Almaden Co., Ltd ................................................ | Changzhou Almaden Co., Ltd ................................................ | 42.33 |
| Chint Solar (Zhejiang) Co., Ltd .............................................. | Chint Solar (Zhejiang) Co., Ltd .............................................. | 42.33 |
| ET Solar Industry Limited ...................................................... | ET Solar Industry Limited ...................................................... | 42.33 |
| Hainan Yingli New Energy Resources Co. Ltd ...................... | Hainan Yingli New Energy Resources Co. Ltd ...................... | 42.33 |
| Hangzhou Zhejiang University Sunny Energy Science and Technology Co., Ltd. | Hangzhou Zhejiang University Sunny Energy Science and Technology Co., Ltd. | 42.33 |
| Hanwha SolarOne (Qidong) Co., Ltd ..................................... | Hanwha SolarOne (Qidong) Co., Ltd ..................................... | 42.33 |
| Hanwha SolarOne Hong Kong Limited .................................. | Hanwha SolarOne (Qidong) Co., Ltd ..................................... | 42.33 |
| Hefei JA Solar Technology Co., Ltd ...................................... | Hefei JA Solar Technology Co., Ltd ...................................... | 42.33 |
| Hengdian Group DMEGC Magnetics Co., Ltd ....................... | Hengdian Group DMEGC Magnetics Co., Ltd ....................... | 42.33 |
| Hengshui Yingli New Energy Resources Company Limited .. | Hengshui Yingli New Energy Resources Company Limited .. | 42.33 |
| Jiangyin Hareon Power Co., Ltd ............................................ | Jiangyin Xinhui Solar Co., Ltd.; Altusvia Energy Taicang Co., Ltd.; Hareon Solar Technology Co., Ltd. | 42.33 |
| Jiawei Solarchina Co., Ltd .................................................... | Jiawei Solarchina (Shenzhen) Co., Ltd ................................ | 42.33 |
| Jiawei Technology (HK) Ltd ................................................... | Shenzhen Jiawei Photovoltaic Lighting Co. Ltd .................. | 42.33 |
| LDK Solar Hi-Tech (Nanchang) Co., Ltd .............................. | LDK Solar Hi-Tech (Nanchang) Co., Ltd .............................. | 42.33 |
| Lixian Yingli New Energy Company Ltd ................................ | Lixian Yingli New Energy Company Ltd ................................ | 42.33 |

---

[3] *See* Enforcement and Compliance's Policy Bulletin No. 05.1, regarding, "Separate-Rates Practice and Application of Combination Rates in Antidumping Investigations involving Non-Market Economy Countries," (April 5, 2005) ("Policy Bulletin 05.1"), available on the Department's Web site at *http://enforcement.trade.gov/policy/bull05-1.pdf.*

| Exporter | Producer | Weighted-average dumping margin (percent) |
|---|---|---|
| MOTECH (Suzhou) Renewable Energy Co., Ltd .................. | MOTECH (Suzhou) Renewable Energy Co., Ltd .................. | 42.33 |
| Ningbo Qixin Solar Electrical Appliance Co., Ltd .................. | Ningbo Qixin Solar Electrical Appliance Co., Ltd .................. | 42.33 |
| Perlight Solar Co., Ltd ............................................................ | Perlight Solar Co., Ltd ............................................................ | 42.33 |
| Risen Energy Co., Ltd ............................................................ | Risen Energy Co., Ltd ............................................................ | 42.33 |
| Shanghai JA Solar Technology Co., Ltd .................................. | Shanghai JA Solar Technology Co., Ltd .................................. | 42.33 |
| Shanghai Solar Energy Science & Technology Co., Ltd ......... | Lianyungang Shenzhou New Energy Co., Ltd ......................... | 42.33 |
| Shenzhen Jiawei Photovoltaic Lighting Co. Ltd .................... | Shenzhen Jiawei Photovoltaic Lighting Co. Ltd .................... | 42.33 |
| Shenzhen Sungold Solar Co., Ltd ........................................... | Shenzhen Sungold Solar Co., Ltd ........................................... | 42.33 |
| Shenzhen Topray Solar Co., Ltd ............................................. | Shenzhen Topray Solar Co., Ltd ............................................. | 42.33 |
| Sun Earth Solar Power Co., Ltd .............................................. | Sun Earth Solar Power Co., Ltd .............................................. | 42.33 |
| Sunny Apex Development Ltd .................................................. | Shenzhen Jiawei Photovoltaic Lighting Co. Ltd., Wuhan FYY Technology Co., Ltd. | 42.33 |
| SunPower Systems SARL .......................................................... | SunEnergy (S.Z.) Co., Ltd ...................................................... | 42.33 |
| Upsolar Global Co., Ltd. and including Upsolar Group, Co., Ltd. | Shandong Dahai Group Co. Ltd .............................................. | 42.33 |
| Wanxiang Import & Export Co., Ltd ........................................ | Zhejiang Wanxiang Solar Co., Ltd .......................................... | 42.33 |
| Wuhan FYY Technology Co., Ltd ............................................. | Wuhan FYY Technology Co., Ltd ............................................. | 42.33 |
| Wuxi Suntech Power Co., Ltd .................................................. | Wuxi Suntech Power Co., Ltd .................................................. | 42.33 |
| Yingli Energy (China) Company Limited ................................... | Yingli Energy (China) Company Limited, Baoding Tianwei Yingli New Energy Resources Co., Ltd. and Lixian Yingli New Energy Co., Ltd. | 42.33 |
| Yingli Green Energy International Trading Limited ................. | Yingli Energy (China) Company Limited, Baoding Tianwei Yingli New Energy Resources Co., Ltd., and Hainan Yingli New Energy Resources Co., Ltd. | 42.33 |
| Zhongli Talesun Solar Co., Ltd. .............................................. | Zhongli Talesun Solar Co., Ltd ............................................... | 42.33 |
| PRC-Wide Rate ........................................................................ | | 165.04 |

**Disclosure and Public Comment**

We intend to disclose the calculations performed to parties in this proceeding within five days of the date of publication of this notice in accordance with 19 CFR 351.224(b). Case briefs or other written comments may be submitted to the Assistant Secretary for Enforcement and Compliance, through Enforcement and Compliance's electronic records system IA ACCESS, no later than seven days after the date on which the final verification report is issued in this proceeding.[4] Rebuttal briefs, limited to issues raised in case briefs, may be submitted through IA ACCESS no later than five days after the deadline for case briefs.[5] Pursuant to 19 CFR 351.309(c)(2) and (d)(2), parties who submit case briefs or rebuttal briefs in this proceeding are encouraged to submit with each argument: (1) A statement of the issue; (2) a brief summary of the argument; and (3) a table of authorities.

Pursuant to 19 CFR 351.310(c), interested parties who wish to request a hearing, or to participate in a hearing if one is requested, must submit a written request to the Assistant Secretary for Enforcement and Compliance, U.S. Department of Commerce, filed electronically through IA ACCESS. Electronically filed case briefs/written comments and hearing requests must be received successfully in their entirety by

the Department's electronic records system, IA ACCESS, by 5:00 p.m. Eastern Standard Time. Hearing requests must be received by the Department within 30 days after the date of publication of this notice[6] and should contain the party's name, address, and telephone number, the number of participants, and a list of the issues to be presented at the hearing. If a request for a hearing is made, the Department intends to hold the hearing at the U.S. Department of Commerce, 14th Street and Constitution Avenue NW., Washington, DC 20230, at a time and location to be determined. Parties should confirm by telephone the date, time, and location of the hearing two days before the scheduled date.

**Suspension of Liquidation**

In accordance with section 733(d)(2) of the Act, the Department will instruct U.S. Customs and Border Protection ("CBP") to suspend liquidation of all entries of certain solar products from the PRC, as described in the "Scope of the Investigation" section above, entered, or withdrawn from warehouse, for consumption on or after the date of publication of this notice in the **Federal Register**.

Pursuant to 19 CFR 351.205(d), the Department will instruct CBP to require a cash deposit[7] equal to the weighted-

average amount by which NV exceeds U.S. price, adjusted where appropriate for export subsidies[8] and estimated domestic subsidy pass-through,[9] as follows: (1) The cash deposit rate for the exporter/producer combinations listed in the table above will be the rate identified for that combination in the table; (2) for all combinations of PRC exporters/producers of merchandise under consideration that have not received their own separate rate above, the cash-deposit rate will be the cash deposit rate established for the PRC-wide entity, 164.04 percent; and (3) for all non-PRC exporters of the merchandise under consideration which have not received their own separate rate above, the cash-deposit rate will be the cash deposit rate applicable to the PRC exporter/producer combination that supplied that non-PRC exporter.

**Certification Requirements**

If an importer imports solar panels/modules that were assembled in the

---

[4] See 19 CFR 351.309(c).

[5] See 19 CFR 351.309(d).

[6] See 19 CFR 351.310(c).

[7] See Modification of Regulations Regarding the Practice of Accepting Bonds During the Provisional Measures Period in Antidumping and

Countervailing Duty Investigations, 76 FR 61042 (October 3, 2011).

[8] See section 772(c)(1)(C) of the Act. Unlike in administrative reviews, the Department calculates the adjustment for export subsidies in investigations not in the margin calculation, but in the cash deposit instructions issued to CBP. See Notice of Final Determination of Sales at Less Than Fair Value, and Negative Determination of Critical Circumstances: Certain Lined Paper Products from India, 71 FR 45012 (August 8, 2006), and accompanying Issues and Decision Memorandum at Comment 1.

[9] For further discussion see the Preliminary Decision Memorandum.

PRC and it claims the panels/modules do not contain solar cells manufactured in third countries using ingots, wafers, or partially produced solar cells manufactured in the PRC, the importer is required to maintain the importer certification included in the Department's cash deposit instructions. The importer and exporter are also required to maintain the exporter certification included in the Department's cash deposit instructions if the exporter of the panels/modules for which the importer is making the claim is located in the PRC. The importer and PRC-exporter are also required to maintain sufficient documentation supporting their certifications. We note that while importers and PRC-exporters will be required to maintain the aforementioned certifications and documentation, they will not have to provide this information to CBP as part of the entry documents, unless the certification or documentation is specifically requested by CBP.

If it is determined that the certification or documentation requirements noted in the certification have not been met, the Department intends to instruct CBP to suspend all unliquidated entries for which these requirements were not met and require the posting of an antidumping duty cash deposit on those entries equal to the PRC-wide rate in effect at the time of the entry.

If a solar panel/module assembled in the PRC contains some solar cells manufactured in third countries using ingots, wafers, or partially produced solar cells manufactured in the PRC, but the importer is unable, or unwilling, to identify the total value of the panel/module subject to provisional measures, the Department intends to instruct CBP to suspend all unliquidated entries for which the importer has failed to supply this information and require the posting of an antidumping duty cash deposit on the total entered value of the panel/module equal to the PRC-wide rate in effect at the time of the entry.

**Postponement of Final Determination and Extension of Provisional Measures**

Pursuant to requests from the mandatory respondents Changzhou Trina Solar Energy Co., Ltd.,[10] and Renesola Jiangsu Ltd.,[11] we are

postponing the final determination. Accordingly, we intend to make our final determination no later than 135 days after the date of publication of this preliminary determination, pursuant to section 735(a)(2) of the Act.[12] Further, Trina Solar and Renesola/Jinko requested to extend the application of the provisional measures prescribed under section 733(d) of the Act and 19 CFR 351.210(e)(2), from a four-month period to a six-month period. The suspension of liquidation described above will be extended accordingly.[13]

**International Trade Commission ("ITC") Notification**

In accordance with section 733(f) of the Act, we notified the ITC of our preliminary affirmative determination of sales at LTFV. Because the preliminary determination in this investigation is affirmative, section 735(b)(2) of the Act requires the ITC to make its final determination as to whether the domestic industry in the United States is materially injured, or threatened with material injury, by reason of imports of certain solar products from the PRC, or sales (or the likelihood of sales) for importation, of the merchandise under consideration before the later of 120 days after the date of this preliminary determination or 45 days after our final determination. Because we are postponing the deadline for our final determination to 135 days from the date of publication of this preliminary determination the ITC will make its final determination no later than 45 days after our final determination.

This determination is issued and published in accordance with sections 733(f) and 777(i)(1) of the Act and 19 CFR 351.205(c).

Dated: July 24, 2014.

**Paul Piquado,**
*Assistant Secretary for Enforcement and Compliance.*

**Attachment I**

**List of Topics Discussed in the Preliminary Decision Memorandum**

1. Summary
2. Background
3. Period of Investigation
4. Postponement of Preliminary Determination
5. Scope of the Investigation
6. Scope Comments
7. Selection of Respondents
8. Discussion of the Methodology
    a. Non-Market Economy Country
    b. Surrogate Country
    c. Surrogate Value Comments

d. Separate Rates
e. Margin for the Separate Rate Companies
f. Combination Rates
g. The PRC-Wide Entity
h. Application of Facts Available and Adverse Facts Available
i. Single Entity Treatment
j. Date of Sale
k. Fair Value Comparisons
l. Export Price
m. Constructed Export Price
n. Normal Value
o. Factor Valuation Methodology
p. Comparisons to Normal Value
q. Currency Conversion
9. Verification
10. Section 777A(f) of the Act
11. Conclusion

[FR Doc. 2014–18063 Filed 7–30–14; 8:45 am]

**BILLING CODE 3510–DS–P**

---

**DEPARTMENT OF COMMERCE**

**International Trade Administration**

**[C–570–011]**

**Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China: Alignment of Final Countervailing Duty Determination With Final Antidumping Duty Determination**

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** The Department of Commerce (the Department) is aligning the final determination in this countervailing duty (CVD) investigation of certain crystalline silicon photovoltaic products (certain solar products) from the People's Republic of China (the PRC) with the final determination in the companion antidumping duty (AD) investigation.

**DATES:** *Effective Date:* July 31, 2014.

**FOR FURTHER INFORMATION CONTACT:** Gene Calvert or Justin Neuman, AD/CVD Operations, Office VII, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 14th Street and Constitution Avenue NW., Washington, DC 20230; telephone: (202) 482–3586 or (202) 482–0486, respectively.

**SUPPLEMENTARY INFORMATION:**

**Background**

On January 22, 2014, the Department initiated the AD and CVD investigations on certain solar products from the PRC.[1]

---

[10] *See* letter from Changzhou Trina Solar Energy Co., Ltd. to the Secretary of Commerce regarding "Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China; Request for Postponement of Final Determination" dated July 9, 2014.

[11] *See* letter from Renesola Jiangsu Ltd. to the Secretary of Commerce regarding "Certain Crystalline Silicon Photovoltaic Products from

China; Request to Extend Final Determination" dated July 10, 2014.

[12] *See also* 19 CFR 351.210(b)(2) and (e).

[13] *Id.*

[1] *See Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China: Initiation of Countervailing Duty Investigation,* 79 FR 4667 (January 29, 2014), and *Certain Crystalline Silicon Photovoltaic Products From the People's*

**TAB 8**

**Commerce Letter to All Interested Parties, re: Opportunity to Submit Scope Comments (Oct. 3, 2014)**

**AD P.R. 765, CVD P.R. 349**

Barcode:3233173-01 A-570-010

**UNITED STATES DEPARTMENT OF COMMERCE**
**International Trade Administration**
Washington, D.C. 20230

A-570-010
C-570-011
A-583-853
Investigations
**Public Document**
E&C/IV: HS

October 3, 2014

TO ALL INTERESTED PARTIES

Re:    Antidumping and Countervailing Duty Investigations of Certain Crystalline Silicon
       Photovoltaic Products from the People's Republic of China and the Antidumping Duty
       Investigation of Certain Crystalline Silicon Photovoltaic Products from Taiwan:
       Opportunity to Submit Scope Comments

Interested parties have submitted comments on the scopes of the above-referenced antidumping
duty (AD) and countervailing duty (CVD) investigations, including certain concerns about the
scope's administrability and enforcement.  In response, the Department is considering the
possibility of the scope clarification described below and is providing interested parties with an
opportunity to submit comments.  Currently, the scopes of the AD and CVD investigations of
certain crystalline silicon photovoltaic products from the People's Republic of China (PRC) and
the scope of the AD investigation of certain crystalline silicon photovoltaic products from
Taiwan contain the following language:

> For purposes of this investigation, subject merchandise includes modules, laminates
> and/or panels assembled in the subject country consisting of crystalline silicon
> photovoltaic cells that are completed or partially manufactured within a customs
> territory other than that subject country, using ingots that are manufactured in the
> subject country, wafers that are manufactured in the subject country, or cells where the
> manufacturing process begins in the subject country and is completed in a non-subject
> country.

Specifically, we are considering a scope clarification that would make the following points:

-   For the PRC investigations, subject merchandise includes all modules, laminates
    and/or panels assembled in the PRC that contain crystalline silicon photovoltaic cells
    produced in a customs territory other than the PRC.
-   For the Taiwan investigation, subject merchandise includes all modules, laminates
    and/or panels assembled in Taiwan consisting of crystalline silicon photovoltaic cells
    produced in Taiwan or a customs territory other than Taiwan.[1]  In addition, subject
    merchandise will include modules, laminates, and panels assembled in a third-

---

[1] The scope of the Taiwan investigation and the PRC investigations would continue to exclude any products covered
by the existing AD and CVD orders on crystalline silicon photovoltaic cells, whether or not assembled into modules,
from the PRC.



Barcode:3233173-01 A-570-010 INV - Investigation -

country, other than the PRC, consisting of crystalline silicon photovoltaic cells produced in Taiwan.

Attached is the current scope language with draft edits that reflect language to implement the clarifications we are considering.  In addition to addressing the substance of the above contemplated clarifications, interested parties may also comment on the edits to the scope language that we are considering and/or propose alternative scope language to use if the Department were to implement such clarifications for purposes of the final determinations and any potential orders.  Interested parties should submit their comments with their case briefs.

Sincerely,

Howard Smith
Program Manager, Office IV
AD/CVD Operations
Enforcement and Compliance

**Attachment**

## Draft - China Scope of the Investigation

The merchandise covered by this investigation is ~~crystalline silicon photovoltaic cells, and~~ modules, laminates and/or panels consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including building integrated materials.  For purposes of this investigation, subject merchandise ~~also~~ includes modules, laminates and/or panels assembled in the ~~subject country~~ *People's Republic of China* consisting of crystalline silicon photovoltaic cells ~~that are completed or partially manufactured within~~ *produced in* a customs territory other than *the People's Republic of China* ~~that subject country, using ingots that are manufactured in the subject country, wafers that are manufactured in the subject country, or cells where the manufacturing process begins in the subject country and is completed in a non-subject country~~.

Subject merchandise includes *modules, laminates and/or panels assembled in the People's Republic of China consisting of* crystalline silicon photovoltaic cells of thickness equal to or greater than 20 micrometers, having a p/n junction formed by any means, whether or not the cell has undergone other processing, including, but not limited to, cleaning, etching, coating, and/or addition of materials (including, but not limited to, metallization and conductor patterns) to collect and forward the electricity that is generated by the cell.

Excluded from the scope of this investigation are thin film photovoltaic products produced from amorphous silicon (a-Si), cadmium telluride (CdTe), or copper indium gallium selenide (CIGS).  Also excluded from the scope of this investigation are any products covered by the existing antidumping and countervailing duty orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the People's Republic of China.  See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order, 77 FR 73018 (December 7, 2012); Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Countervailing Duty Order, 77 FR 73017 (December 7, 2012).

Also excluded from the scope of this investigation are *modules, laminates and/or panels assembled in the People's Republic of China, consisting of* crystalline silicon photovoltaic cells, not exceeding 10,000mm$^2$ in surface area, that are permanently integrated into a consumer good whose function is other than power generation and that consumes the electricity generated by the integrated crystalline silicon photovoltaic cell.  Where more than one *module* ~~cell~~ is permanently integrated into a consumer good, the surface area for purposes of this exclusion shall be the total combined surface area of all *modules* ~~cells~~ that are integrated into the consumer good.

Merchandise covered by this investigation is currently classified in the Harmonized Tariff Schedule of the United States (HTSUS) under subheadings 8501.61.0000, 8507.20.8030, 8507.20.8040, 8507.20.8060, 8507.20.8090, 8541.40.6020, 8541.40.6030 and 8501.31.8000.  These HTSUS subheadings are provided for convenience and customs purposes; the written description of the scope of this investigation is dispositive.

**Draft - Taiwan Scope of the Investigation**

The merchandise covered by this investigation is crystalline silicon photovoltaic cells, and modules, laminates and/or panels consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including building integrated materials.  For purposes of this investigation, subject merchandise ~~also~~ includes modules, laminates and/or panels assembled in ~~the subject country~~ *Taiwan* consisting of crystalline silicon photovoltaic cells ~~that are completed or partially manufactured within~~ *produced in Taiwan or* a customs territory other than *Taiwan* ~~that subject country, using ingots that are manufactured in the subject country, wafers that are manufactured in the subject country, or cells where the manufacturing process begins in the subject country and is completed in a non-subject country.~~  *Subject merchandise also includes modules, laminates, and panels assembled in a third-country other than the People's Republic of China consisting of crystalline silicon photovoltaic cells produced in Taiwan.*

Subject merchandise includes crystalline silicon photovoltaic cells of thickness equal to or greater than 20 micrometers, having a p/n junction formed by any means, whether or not the cell has undergone other processing, including, but not limited to, cleaning, etching, coating, and/or addition of materials (including, but not limited to, metallization and conductor patterns) to collect and forward the electricity that is generated by the cell.

Excluded from the scope of this investigation are thin film photovoltaic products produced from amorphous silicon (a-Si), cadmium telluride (CdTe), or copper indium gallium selenide (CIGS).  Also excluded from the scope of this investigation are any products covered by the existing antidumping and countervailing duty orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the People's Republic of China. See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order, 77 FR 73018 (December 7, 2012); Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Countervailing Duty Order, 77 FR 73017 (December 7, 2012).

Also excluded from the scope of this investigation are crystalline silicon photovoltaic cells, not exceeding 10,000mm$^2$ in surface area, that are permanently integrated into a consumer good whose function is other than power generation and that consumes the electricity generated by the integrated crystalline silicon photovoltaic cell.  Where more than one cell is permanently integrated into a consumer good, the surface area for purposes of this exclusion shall be the total combined surface area of all cells that are integrated into the consumer good.

Merchandise covered by this investigation is currently classified in the Harmonized Tariff Schedule of the United States (HTSUS) under subheadings 8501.61.0000, 8507.20.8030, 8507.20.8040, 8507.20.8060, 8507.20.8090, 8541.40.6020, 8541.40.6030 and 8501.31.8000.

These HTSUS subheadings are provided for convenience and customs purposes; the written description of the scope of this investigation is dispositive.

# TAB 9

# Respondents' Case Brief (Oct. 16, 2015)

# AD P.R. 804

Barcode:3235554-01 A-570-010 INV - Investigation   -

BEFORE THE
UNITED STATES DEPARTMENT OF COMMERCE

| | |
|---|---|
| In the Matter of: | ) |
| | ) |
| | ) Case Nos. A-570-010, A-583-853, and |
| CERTAIN CRYSTALLINE SILICON | ) C-570-011 |
| PHOTOVOLTAIC PRODUCTS FROM | ) Number of Pages: 74 |
| THE PEOPLE'S REPUBLIC OF CHINA | ) Investigation |
| AND TAIWAN | ) |
| | ) |

**THIS DOCUMENT CONTAINS NO
PROPRIETARY INFORMATION**

**CASE BRIEF OF**
**Canadian Solar Inc. and Canadian Solar (USA) Inc.; Changzhou Trina Solar Energy Co.,
Ltd.; China Sunergy (Nanjing) Co., Ltd.; ET Solar Industry Limited; Hanwha Solarone
(Qidong) Co., Ltd.; Hengdian Group DMEGC Magnetics Co., Ltd.; LDK Solar Hi-Tech
(Nanchang) Co., Ltd.; Shanghai BYD Co., Ltd. and Shangluo BYD Industrial Co., Ltd.;
Shanghai JA Solar Technology Co., Ltd. and Hefei JA Solar Technology Co., Ltd.; Sumec
Hardware & Tools Co., Ltd.; Wuxi Suntech Power Co., Ltd.; Wuxi Taichen Machinery &
Equipment Co., Ltd.; Yingli Green Energy Holding Company Ltd. and Yingli Green
Energy Americas, Inc.; and Zhejiang Heda Solar Technology Co., Ltd.**

Sidley Austin LLP
1501 K Street N.W.
Washington, D.C. 20005
(202) 736-8000

October 16, 2014

Barcode:3235554-01 A-570-010 INV - Investigation -

BEFORE THE
UNITED STATES DEPARTMENT OF COMMERCE

| | |
|---|---|
| In the Matter of: | ) |
| | ) |
| CERTAIN CRYSTALLINE SILICON | ) Case Nos. A-570-010, A-583-853, and |
| PHOTOVOLTAIC PRODUCTS FROM | ) C-570-011 |
| THE PEOPLE'S REPUBLIC OF CHINA | ) Number of Pages: XX |
| AND TAIWAN | ) Investigation |
| | ) |
| | ) |

**THIS DOCUMENT CONTAINS NO
PROPRIETARY INFORMATION**

**CASE BRIEF OF**
**Canadian Solar Inc. and Canadian Solar (USA) Inc.; Changzhou Trina Solar Energy Co.,
Ltd.; China Sunergy (Nanjing) Co., Ltd.; ET Solar Industry Limited; Hanwha Solarone
(Qidong) Co., Ltd.; Hengdian Group DMEGC Magnetics Co., Ltd.; LDK Solar Hi-Tech
(Nanchang) Co., Ltd.; Shanghai BYD Co., Ltd. and Shangluo BYD Industrial Co., Ltd.;
Shanghai JA Solar Technology Co., Ltd. and Hefei JA Solar Technology Co., Ltd.; Sumec
Hardware & Tools Co., Ltd.; Wuxi Suntech Power Co., Ltd.; Wuxi Taichen Machinery &
Equipment Co., Ltd.; Yingli Green Energy Holding Company Ltd. and Yingli Green
Energy Americas, Inc.; and Zhejiang Heda Solar Technology Co., Ltd.**

This brief is submitted on behalf of Canadian Solar Inc. and Canadian Solar (USA) Inc.;

Changzhou Trina Solar Energy Co., Ltd.; China Sunergy (Nanjing) Co., Ltd.; ET Solar Industry

Limited; Hanwha Solarone (Qidong) Co., Ltd.; Hengdian Group DMEGC Magnetics Co., Ltd.;

LDK Solar Hi-Tech (Nanchang) Co., Ltd.; Shanghai BYD Co., Ltd. and Shangluo BYD

Industrial Co., Ltd.; Shanghai JA Solar Technology Co., Ltd. and Hefei JA Solar Technology

Co., Ltd.; Sumec Hardware & Tools Co., Ltd.; Wuxi Suntech Power Co., Ltd.; Wuxi Taichen

Machinery & Equipment Co., Ltd.; Yingli Green Energy Holding Company Ltd. and Yingli

Green Energy Americas, Inc.; and Zhejiang Heda Solar Technology Co., Ltd.,[1] interested parties

---

[1]     This submission is made with the support of the China Chamber of Commerce for Import
and Export of Machinery and Electronic Products ("CCCME").  CCCME represents major

in the above-captioned investigations.  The Department's memorandum of October 9, 2014,

indicates that case briefs are to be filed by today's date.

# I.     STATEMENT OF FACTS

The Department initiated these antidumping ("AD") and countervailing duty ("CVD")

investigations concerning certain CSPV products from the People's Republic of China ("PRC"

or "China") and Taiwan on January 22, 2014, and in doing so, preliminarily adopted the

following paragraph proposed by SolarWorld Industries America, Inc. ("SolarWorld" or

"Petitioner") as the first paragraph of the scope of these investigations:[2]

> The merchandise covered by these investigations is crystalline
> silicon photovoltaic cells, and modules, laminates and/or panels
> consisting of crystalline silicon photovoltaic cells, whether or not
> partially or fully assembled into other products, including building
> integrated materials.  For purposes of these investigations, subject
> merchandise also includes modules, laminates, and/or panels
> assembled in the subject country consisting of crystalline silicon
> photovoltaic cells that are completed or partially manufactured
> within a customs territory other than that subject country, using
> ingots that are manufactured in the subject country, wafers that are
> manufactured in the subject country, or cells where the
> manufacturing process begins in the subject country and is
> completed in a non-subject country.[3]

---

Chinese producers and exporters of crystalline silicon photovoltaic ("CSPV") products,
including the companies listed above, as well as Astronergy (Zhejiang) Co., Ltd.; BYD Electric
Power Research Institute; Jetion Solar (China) Co., Ltd.; Jiangyin Hareon Power Co., Ltd.;
JinkoSolar Holding Co., Ltd.; Jumao Photonics (Xiamen) Co., Ltd.; Lightway Green New
Energy Co., Ltd.; LINYANG Electronics Co., Ltd.; Perlight Solar Co., Ltd.; RealForce Power
Co., Ltd.; Sainty Solar Co., Ltd.; Shenzhen Sungold Solar Co., Ltd.; SUMEC Machinery &
Electric Co., Ltd.; Taitong Electrical Industry (Taizhou) Co., Ltd.; Wuxi Jiacheng Solar Energy
Technology Co. Ltd.; Zhejiang Wanxiang Solar Co., Ltd.; and Zhongli Talesun Solar Co., Ltd.

[2]     The second sentence of the quoted paragraph has been referred to as the "two-out-of-
three" rule in these investigations.  Although Respondents do not consider that to be an accurate
description, for convenience, Respondents adopt that terminology as well.

[3]     *Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China
and Taiwan: Initiation of Antidumping Duty Investigations*, 79 Fed. Reg. 4661, 4667 (January
29, 2014) ("AD Notice of Initiation"); *Certain Crystalline Silicon Photovoltaic Products from*

2

While preliminarily adopting this scope language, the Department made clear that "when considering product coverage with respect to these investigations, the Department will be informed by the product coverage decisions that it made in the investigations that resulted in the existing orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the PRC."[4]  Further, the Department recalled that in those prior investigations, it had determined that "modules, laminates, and panels produced in a third-country from cells produced in the PRC are covered by the scope of the investigations; however, modules, laminates, and panels produced in the PRC from cells produced in a third-country are not covered by the scope of the investigations."[5]

The Department made that determination in the prior investigations because:

> {t}he scope of an AD or CVD order is limited to merchandise that originates in the country covered by the order.  The Department has explicitly stated that the scope of an antidumping duty order is "defined by the type of merchandise and the country-of-origin."
>
> In determining the country-of-origin of a product, the Department's practice has been to conduct a substantial transformation analysis.  The CIT has upheld the Department's "substantial transformation" analysis as a means to carry out its country-of-origin analysis.  The CIT stated that "{t}he 'substantial transformation' rule provides a yardstick for determining whether the processes performed on merchandise in a country are of such significance as to require that the resulting merchandise be considered the product of the country in which the transformation occurred."  Because the Petitioner's proposed scope language addresses modules/panels assembled, and cells produced in a third country, we have used a substantial transformation analysis to

---

*the People's Republic of China: Initiation of Countervailing Duty Investigation*, 79 Fed. Reg. 4667, 4671 (January 29, 2014) ("CVD Notice of Initiation").

[4]    AD Notice of Initiation, 79 Fed. Reg. at 4662; CVD Notice of Initiation, 79 Fed. Reg. at 4668.

[5]    AD Notice of Initiation, 79 Fed. Reg. at 4662 n.5; CVD Notice of Initiation, 79 Fed. Reg. at 4668 n.6.

3

determine whether one or both of the scenarios described by Petitioner should be covered by the scope of these investigations.[6]

And based on the application of that substantial transformation analysis, the Department determined in the prior investigations in unequivocal terms:

> {M}odule assembly does not substantially alter the essential nature of solar cells nor does it constitute significant processing such that it changes the country-of-origin of the cell …. Therefore, we believe the scope should be clarified to state that modules/panels produced in a third-country from solar cells produced in the PRC are covered by the scope; however, modules/panels produced in the PRC from solar cells produced in a third-country are not covered by the scope.
>
> … {I}n conjunction with the above described substantial transformation analysis, we are clarifying that where solar cell production occurs in a different country from solar module assembly, the country-of-origin of the solar modules/panels is the country in which the solar cell was produced.[7]

On February 18, 2014, Respondents submitted comments on the scope preliminarily adopted by the Department in initiating these investigations.[8]  In those comments, Respondents explained that the paragraph in the scope definition quoted above, laying out the "two-out-of-three" rule, is untenable because it leads to inconsistent and confusing results, and would make it difficult for the Department and U.S. Customs and Border Protection ("CBP") to enforce and administer any ensuing orders.  Further, Respondents submitted that the product scope description in this paragraph should be modified to include only CSPV cells, and modules,

---

[6]     Scope Clarification: Antidumping and Countervailing Duty Investigations of Crystalline Silicon Photovoltaic Cells, Whether or Not Incorporated Into Modules, from the People's Republic of China, March 19, 2012 ("CSPV Cells from China, Scope Clarification Memo"), at 5 (citations omitted) (attached hereto at Exhibit 1). *See also* Issues and Decision Memorandum for the Final Determination in the Antidumping Duty Investigation of Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China, October 9, 2012 ("CSPV Cells from China, IDM"), at 5-6 (attached hereto at Exhibit 2).
[7]     CSPV Cells from China, Scope Clarification Memo, at 8.
[8]     Letter from Sidley Austin LLP to the Hon. Penny S. Pritzker, DOC Case Nos. A-570-010, A-583-853, and C-570-011, dated February 18, 2014 ("Respondents' Scope Comments").

4

laminates and/or panels consisting of CSPV cells, which originate in a subject country based on the application of the Department's well-established and judicially-approved "substantial transformation" test for determining country of origin.  Respondents observed that when that test is applied, given that CSPV cells and modules from China are already covered by the existing AD and CVD orders and explicitly excluded from the scope of these investigations, no merchandise from China properly remains within the scope of these investigations, and therefore these investigations should be immediately terminated with respect to China.

On April 3, 2014, Petitioner submitted a rebuttal to Respondents' Scope Comments.[9]  On April 21, 2014, Respondents submitted a response to Petitioner's rebuttal,[10] explaining that Petitioner had not justified departing from the Department's use of a substantial transformation test to determine country of origin, and that Petitioner was incorrect that its proposed scope would not lead to inconsistent and confusing results and would not make it difficult for the Department and CBP to enforce and administer any ensuing orders.  Respondents again explained that lawful application of the Department's substantial transformation test would lead to the result that there should be no Chinese merchandise within the scope of these investigations.

On June 2, 2014, the Department issued its preliminary determination in the current CVD investigation involving China;[11] and on July 24, 2014, the Department issued its preliminary

---

[9]     Letter from Wiley Rein LLP to the Hon. Penny S. Pritzker, DOC Case Nos. A-570-010, A-583-853, and C-570-011, dated April 3, 2014 ("Petitioner's Scope Rebuttal").
[10]     Letter from Sidley Austin LLP to the Hon. Penny S. Pritzker, DOC Case Nos. A-570-010, A-583-853, and C-570-011, dated April 21, 2014 ("Respondents' Scope Response").
[11]     *Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: Preliminary Affirmative Countervailing Duty Determination*, 79 Fed. Reg. 33174 (June 10, 2014) ("China CVD Preliminary Determination").

5

Barcode:3235554-01 A-570-010 INV - Investigation  -

determinations in the current AD investigations involving China and Taiwan.[12] In each of its

preliminary determinations, the Department maintained the scope language it had initially

adopted in initiating these investigations (i.e., the "two-out-of-three" rule).[13]

Finally, on October 3, 2014, the Department issued a memorandum indicating it is

considering a so-called scope "clarification" that would drastically expand the scope of these

investigations far beyond that proposed by Petitioner.  The Department's October 3 proposal

would effectively discard the "two-out-of-three" rule and in its place establish that:

> - For the PRC investigations, subject merchandise includes all
> modules, laminates and/or panels assembled in the PRC that
> contain crystalline silicon photovoltaic cells produced in a customs
> territory other than the PRC.
>
> - For the Taiwan investigation, subject merchandise includes all
> modules, laminates and/or panels assembled in Taiwan consisting
> of crystalline silicon photovoltaic cells produced in Taiwan or a
> customs territory other than Taiwan.  In addition, subject
> merchandise will include modules, laminates, and panels
> assembled in a third-country, other than the PRC, consisting of
> crystalline silicon photovoltaic cells produced in Taiwan.[14]

Pursuant to its October 3 memorandum, the Department invited interested parties to submit

comments on its proposed scope clarification with their case briefs.  Respondents hereby submit

such comments.

---

[12]    *Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China:
Affirmative Preliminary Determination of Sales at Less Than Fair Value and Postponement of
Final Determination*, 79 Fed. Reg. 44399 (July 31, 2014) ("China AD Preliminary
Determination"); *Certain Crystalline Silicon Photovoltaic Products from Taiwan: Affirmative
Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final
Determination*, 79 Fed. Reg. 44395 (July 31, 2014) ("Taiwan AD Preliminary Determination").
[13]    *See* China CVD Preliminary Determination, 79 Fed. Reg. at 33175; China AD
Preliminary Determination, 79 Fed. Reg. at 44399; Taiwan AD Preliminary Determination, 79
Fed. Reg. at 44395.
[14]    Antidumping and Countervailing Duty Investigations of Certain Crystalline Silicon
Photovoltaic Products from the People's Republic of China and the Antidumping Duty
Investigation of Certain Crystalline Silicon Photovoltaic Products from Taiwan: Opportunity to
Submit Scope Comments, October 3, 2014 ("Scope Comments Memo") (footnote omitted).

6

Barcode:3235554-01 A-570-010 INV - Investigation  -

## II.    STATEMENT OF ISSUES AND SUMMARY OF ARGUMENTS

Respondents address three issues in this brief, and summarize their arguments with respect to each issue below.

   1.    Whether, in the final determinations, the Department should maintain the scope of these investigations as proposed by Petitioner.

In the final determinations, the Department cannot lawfully maintain the scope of these investigations as proposed by Petitioner (i.e., the "two-out-of-three" rule).  This is because Petitioner's proposed scope leads to inconsistent and confusing results (described below), and would make it impossible for the Department and CBP to effectively enforce and administer any ensuing orders.  Moreover, Petitioner has not provided any justification for the Department to depart from its well-established and judicially-approved policy of using a "substantial transformation" test to determine country of origin for AD/CVD purposes.

   2.    Whether, in the final determinations, the Department should further expand the scope of these investigations, as proposed in its memorandum dated October 3, 2014.

In the final determinations, the Department should not expand the scope of these investigations as proposed in its October 3, 2014, memorandum.  This is because the Department's proposed scope clarification: (i) amounts to an unlawful expansion of the scope of these investigations, at an extremely late stage of these proceedings, and well beyond Petitioner's intent; and (ii) is manifestly arbitrary and capricious.  On the latter point, the Department's proposed scope is arbitrary and capricious because it: (i) is inconsistent with the product coverage decisions made by the Department in the previous investigations concerning CSPV

7

Barcode:3235554-01 A-570-010 INV - Investigation  -

cells and modules from China, which the Department indicated it would "be informed by" in these investigations;[15] (ii) is inherently flawed; and (iii) is discriminatory and therefore inconsistent with the United States' World Trade Organization ("WTO") obligations.

If, despite the foregoing, the Department adopts its proposed scope clarification, the Department should modify the scope language for the Taiwan investigation to make clear that CSPV modules assembled in Taiwan from CSPV cells produced in China are excluded from the scope of the current Taiwan investigation.

> 3. Whether, in the final determinations, the Department should otherwise modify the scope of these investigations to bring it into conformity with the law and established practice.

In the final determinations, the Department should simply delete the second sentence of the first paragraph of the current scope (i.e., Petitioner's "two-out-of-three" rule) and apply its standard practice of using a "substantial transformation" test to determine the country of origin of products subject to the current investigations. When it does so, it must determine that all CSPV cells and modules properly from China are already within the scope of the existing AD/CVD orders on CSPV cells and modules from China. Accordingly, the present investigations with respect to China must be terminated.

## III. ARGUMENT

### A. The Department Should Not Maintain the Scope of These Investigations as Proposed by Petitioner

For the reasons previously expressed in Respondents' Scope Comments of February 18, 2014, and Respondents' Scope Response of April 21, 2014, the Department should not maintain

---

[15]   AD Notice of Initiation, 79 Fed. Reg. at 4662; CVD Notice of Initiation, 79 Fed. Reg. at 4668.

Filed By: nellis@sidley.com, Filed Date: 10/16/14 12:49 PM, Submission Status: Approved

Barcode:3235554-01 A-570-010 INV - Investigation  -

the scope of these investigations as proposed by Petitioner.  In particular, the Department should not maintain the "two-out-of-three" rule because it leads to unlawfully inconsistent and confusing results, and would make it difficult for the Department and CBP to enforce and administer any ensuing orders.  Moreover, Petitioner has not provided any justification for the Department to depart from its established and judicially-approved policy of using a "substantial transformation" test to determine country of origin for AD/CVD purposes.  Respondents now briefly summarize the discussion on these issues from its prior submissions.  However, for the avoidance of any doubt, Respondents note that they maintain all of the arguments made in Respondents' Scope Comments and Respondents' Scope Response, incorporate those arguments herein by reference, and request that the Department address those arguments in its final determinations.

First, Petitioner's proposed scope is legally untenable and should be rejected because its application leads to contradictory results.[16]  Specifically, when the two sentences of the first paragraph of Petitioner's proposed scope (quoted above) operate together – with the first sentence apparently determining CSPV cell and CSPV module origin according to the results of a "substantial transformation" test, and the second sentence attempting to supplement that test with a "two-out-of-three" rule that applies only to China and Taiwan – it becomes immediately apparent that the same product (*e.g.*, a module) can end up with two countries of origin, which the Department itself has explained is legally impermissible.[17]  Respondents previously provided numerous examples to illustrate this inherent flaw in Petitioner's proposed scope.[18]

---

[16]     *See* Respondents' Scope Comments at 19-24; Respondents' Scope Response at 14-21.
[17]     *See* CSPV Cells from China, Scope Clarification Memo, at 8.
[18]     *See* Respondents' Scope Comments at 20-24.

9

Second, Petitioner's scope proposal would be impossible for the Department and CBP to effectively enforce and administer.[19]  In this regard, importers and exporters of CSPV cells and modules would face a substantial burden to trace the origin of their inputs back to the ingots, because this is not something that they do, or have any reason to do, in their ordinary course of business.  The Department and CBP would also face a substantial burden to enforce and administer Petitioner's proposed scope, because even if importers and exporters could identify the origins of all their inputs (which Respondents maintain is virtually impossible), the Department would still need to find a coherent way to distinguish between subject and non-subject modules, including in complex scenarios where the inputs in a module were obtained from various sources.

Third, Petitioner provides no justification for the Department to depart from its established and judicially-approved substantial transformation test for determining country of origin.[20]  The only justifications that Petitioner identifies are references to its own "intent" and the alleged prevention of "evasion" of the Department's AD/CVD orders.  However, on the issue of "intent", the Department does not simply accept a petitioner's proposed scope where that scope will result in conflicting (and therefore unlawful) country-of-origin determinations and severe problems in the enforcement and administration of any AD/CVD orders that may arise.[21]  Further, on the issue of potential "evasion", the Court of International Trade has made clear that "{t}he 'substantial transformation' rule provides a means for Commerce to carry out its country

---

[19]     *See* Respondents' Scope Comments at 25-26; Respondents' Scope Response at 21-27.
[20]     *See* Respondents' Scope Response at 2-10.
[21]     *See* CSPV Cells from China, Scope Clarification Memo, at 8; CSPV Cells from China, IDM, at 5.  *See also* Petitioner's Scope Rebuttal at 3 (quoting Korea Washers I&D Memo at Cmt. 2) ("{While the Department} has the authority to define the scope of an investigation, that authority cannot be used to deprive the petitioner of relief with respect to products the petitioner clearly and explicitly intended to be included in the investigation, *unless the resulting order would be otherwise unadministrable*.") (italics added).

10

Barcode:3235554-01 A-570-010 INV - Investigation -

of origin examination and *properly guards against circumvention of existing antidumping orders.*"[22]   Finally, departing from the established "substantial transformation" test and applying Petitioner's novel "two-out-of-three" rule in this case would result in a violation of a number of the United States' WTO obligations, as explained in Respondents' previous submission on this issue.[23]

For these reasons, and others previously articulated by Respondents, the Department should reject the scope of these investigations as proposed by Petitioner.

### B.   The Department Should Not Expand the Scope of These Investigations as Described in Its Scope Comments Memo

Respondents concur with the Department's goal of eliminating the "two-out-of-three" rule from the scope of these investigations, because, as Respondents have explained above, the "two-out-of-three" rule leads to inconsistent and confusing results and an inability to effectively enforce and administer any ensuing orders.   However, the proposal presented in the Department's Scope Comments Memo of October 3 vastly expands the scope of these investigations – even beyond the unlawful and unadministrable scope proposed by Petitioner. The Department has made this proposal to expand the investigations with no prompting by the parties (including Petitioner), no support in the facts of this case, no policy justification, and no consideration of the consistency (or lack thereof) with the established principles governing the scope of antidumping and countervailing duty orders, including the established and judicially-approved substantial transformation rule. Respondents address these points below.

---

[22]   *E.I. Dupont De Nemours & Co. v. United States*, 8 F. Supp. 2d 854, 858-859 (Ct. Int'l Trade 1998) (italics added). *See also CSPV Cells and Modules from China*, Scope Clarification Memo, at 9 ("circumvention concerns are reflected in the country-of-origin determination").
[23]   *See* Respondents' Scope Response at 8-10.

Filed By: nellis@sidley.com, Filed Date: 10/16/14 12:49 PM, Submission Status: Approved

Barcode:3235554-01 A-570-010 INV - Investigation -

1.   The Department Should Not Adopt the Proposed Scope Expansion Because It Amounts to an Unlawful Expansion of the Scope of These Investigations, at an Extremely Late Stage of These Proceedings, and Well Beyond Petitioner's Intent

The Department's proposal amounts to a significant expansion of the scope of these investigations as compared with the scope proposed by Petitioner and preliminarily adopted by the Department.  Such a massive expansion of the scope is unlawful, especially at this late stage of these proceedings.

With respect to the current China investigations, as a result of Petitioner's two-out-of-three rule and the exclusion of products already covered by the existing AD/CVD orders, Petitioner's proposed scope for the current China investigations would cover only CSPV modules assembled in China from CSPV cells produced outside of China using ingots, wafers or partial cells produced in China.  The Department, however, proposes that the current China investigations cover all CSPV modules assembled in China from CSPV cells produced outside of China, regardless of the origin of the ingots, wafers or partial cells.  The Department would therefore bring within the scope of the current China investigations every CSPV module assembled in China from CSPV cells produced anywhere in the world outside of China, even though Petitioner petitioned for investigations on, and the Department initiated investigations on, a much narrower subset of such CSPV modules assembled in China.

The Department's proposal similarly results in a massive expansion of the current Taiwan investigation.  By operation of Petitioner's proposed scope, the current Taiwan investigation should cover: (i) CSPV cells produced in Taiwan; (ii) CSPV modules assembled in Taiwan from CSPV cells produced in Taiwan; (iii) CSPV modules assembled outside of Taiwan from CSPV

Filed By: nellis@sidley.com, Filed Date: 10/16/14 12:49 PM, Submission Status: Approved

cells produced in Taiwan;[24] and (iv) CSPV modules assembled in Taiwan from CSPV cells produced outside of Taiwan (or China[25]) using ingots, wafers or partial cells produced in Taiwan. However, the Department's proposal would expand category (iv) to cover all CSPV modules assembled in Taiwan from CSPV cells produced outside of Taiwan or China, regardless of the origin of the ingots, wafers or partial cells. The Department would therefore bring within the scope of the current Taiwan investigation every CSPV module assembled in Taiwan from CSPV cells produced anywhere in the world outside of Taiwan or China, even though Petitioner petitioned for an investigation, and the Department initiated an investigation, on a much narrower subset of such CSPV modules assembled in Taiwan.

The Court of International Trade has indicated that at a late stage of an AD/CVD investigation, and certainly at the final determination stage where the Department would execute its proposed scope expansion in these investigations, an expansion of the scope to include products that were understood to be excluded when the investigation began is legally impermissible because it raises procedural concerns. In this regard, in *Allegheny Bradford Corp. v. United States*, 342 F. Supp. 2d 1172 (Ct. Int'l Trade 2004), the Court explained:

> There is no clear point during the course of an antidumping investigation at which Commerce loses the ability to adjust the scope, but Commerce's discretion to define and clarify the scope of an investigation is limited in part by concerns for the finality of administrative action, *which caution against including a product that was understood to be excluded at the time the investigation began.*

---

[24]     Except that, pursuant to the two-out-of-three rule, a CSPV module assembled in China from CSPV cells produced in Taiwan using ingots, wafers, or partial cells produced in China would apparently be covered by the current China investigations.

[25]     China is mentioned here because CSPV modules assembled in Taiwan from CSPV cells produced in China are apparently already covered by the existing AD/CVD orders on CSPV cells and modules from China.

13

Barcode:3235554-01 A-570-010 INV - Investigation  -

*Id.* at 1187-88 (emphasis added).  In that case, the Court held that the Department erred in expanding the scope of the investigation concurrent with the issuance of the final determination because doing so "compromise{ed} the integrity of the investigation's prior stages".  *Id.* at 1188.

Similarly, in *Smith Corona Corp. v. United States*, 796 F. Supp. 1532 (Ct. Int'l Trade 1992), the Court held:

> *Commerce ... must exercise caution in redefining scope in midstream to include items which were clearly known about and excluded at the time of initiation of the investigation, and, indeed in this case, at the time of the preliminary determination.*
>
> Various procedural safeguards such as opportunities to respond and to be heard are built into the unfair trade laws.  *To change the scope definition at late stages of the proceedings deprives the parties of the full benefits of those procedures.*  Furthermore, the International Trade Commission ("ITC") must make its determination of like product and its determination of injury in relation to Commerce's definition of the class or kind of imported merchandise being investigated.  Late changes in scope definitions can cause problems with this process and can even lead to unintended divergences from commitments pursuant to international obligations.

*Id*. at 1535 (emphases added).

Here, the particular procedural concerns highlighted by the Court in the above two cases would also arise should the Department expand the scope of these investigations in the manner it has proposed in its final determinations.  Such procedural concerns would arise in both the Department's AD and CVD investigations and the ITC's injury investigation.

First, in these AD and CVD investigations, the Department has already collected and verified data on the much narrower scope it has hitherto defined for these investigations.  Therefore, the dumping margins and subsidy rates calculated by the Department will be based on data that are not consistent with the final expanded scope of these investigations.

14

Second, the ITC has already commenced the final phase of its injury investigation and issued questionnaires based on the scope hitherto defined by the Department.  If the Department modifies the scope as it has proposed, the data collected by the ITC for purposes of its final injury assessment will not be consistent with the modified scope of these investigations in critical respects.  For example,[26] in its U.S. Importers' Questionnaire, question III-2b seeks pricing data on only "{m}odules assembled in China using {non-Chinese} cells that contain some Chinese inputs (ingot, wafer, or partial cell)"; it does not seek pricing data on all modules assembled in China using non-Chinese cells.  The ITC will therefore not have import pricing data for the complete universe of what the Department would consider to be Chinese subject products in these investigations.  Further, question III-2d, which requests pricing data for CSPV modules containing cells produced in Malaysia for purposes of assessing the import pricing of non-subject products, will actually include pricing data for modules assembled in China or Taiwan using Malaysian cells, which the Department would now categorize as subject products.  The responses to question III-2d of the U.S. Importers' Questionnaire will therefore not enable the ITC to properly assess the import pricing of non-subject products – an inquiry that the ITC, in recent years, has considered an important part of its analysis.  These examples illustrate that the ITC will make its injury determination based on data that applies to a different and narrower scope than that which Department proposes to adopt for any orders that result from these investigations.  That mismatch raises the same serious procedural concerns that led the Court of International Trade to reject the Department's attempted scope expansions in *Allegheny Bradford* and *Smith Corona*.

---

[26]     Respondents note that the discussion in this paragraph is intended to be exemplary, and not an exhaustive discussion of the ways in which the ITC's final phase injury data will be inconsistent with the Department's modified scope for these investigations.

15

Barcode:3235554-01 A-570-010 INV - Investigation -

In addition to the procedural concerns that would arise as highlighted by the Court, the Department's own practice is not to expand the scope of an investigation beyond those products for which Petitioner seeks relief.  As the Department has said:

> … the domestic industry is in the best position to identify the imports that they compete against and believe to be unfairly traded.
>
> Moreover, a petitioning industry often must draw a bright line between the imports it wants covered and those it does not.  To the extent it can establish that the covered imports are dumped and the cause of material injury, it is entitled to relief under the statute, notwithstanding the fact that it may have excluded from the scope other products which may or may not also be the subject of injurious dumping.  It is appropriate not to make imports the subject of unnecessary antidumping proceedings.  It is also appropriate that the Department not force the petitioner to seek duties on products against its will.[27]

In the current case, Petitioner has not requested the expanded scope proposed by the Department, and nothing in the petition or its Petitioner's subsequent submissions to the Department or the ITC indicates otherwise.  To the contrary, although Respondents maintain that Petitioner's proposed "two-out-of-three" rule is itself unlawful and unadministrable, it manifested an intent to impose a narrower scope – i.e., covering modules assembled from cells produced outside of the subject country, with ingots, wafers, or partial cells from the subject country.  The Department therefore should not drastically expand the scope of these investigations to include additional CSPV modules as to which Petitioner itself has not requested protection under the AD/CVD laws.

For these reasons, the Department should not adopt the scope expansion proposed in its Scope Comments Memo.

---

[27]    *Initiation of Antidumping Duty Investigations: Spring Table Grapes From Chile and Mexico*, 66 Fed. Reg. 26831, 26833 (May 15, 2001) (footnote omitted).

Filed By: nellis@sidley.com, Filed Date: 10/16/14 12:49 PM, Submission Status: Approved

Barcode:3235554-01 A-570-010 INV - Investigation  -

2.   The Department Should Not Adopt the Proposed Scope Expansion Because It Is Manifestly Arbitrary and Capricious

The Department's proposed scope expansion is also arbitrary and capricious, which further warrants its rejection.  This is so because the Department's proposed scope expansion: (i) is inconsistent with the product coverage decisions it made in the previous investigations concerning CSPV cells and modules from China, which the Department indicated would "inform{ }" the current investigations;[28] (ii) is inherently flawed; and (iii) is discriminatory and therefore inconsistent with the United States' WTO obligations.

a.   The Department's Proposed Scope Expansion Is Inconsistent with the Product Coverage Decisions It Made in the Previous Investigations Concerning CSPV Cells and Modules from China

The Department is obliged to be consistent in its decision-making across its investigations.  As the Court of International Trade has explained, although an agency is not strictly bound to its precedent, "[i]t is a principle of administrative law that an 'agency must either conform to its prior norms and decisions or explain the reason for its departure from such precedent.'"  *Torrington Co. v. United States*, 745 F. Supp. 718, 727 (Ct. Int'l Trade 1990) (quoting *Mississippi Valley Gas Co. v. Federal Energy Regulatory Comm'n*, 659 F.2d 488, 506 (5th Cir. 1981)); *Neenah Foundry Co. v. United States*, 142 F. Supp. 2d 1008, 1022 (Ct. Int'l Trade 2001) ("[I]t it is *mandatory* that the ITA give a reasoned explanation for a departure from its established norms.") (emphasis in original); *Hussey Copper Ltd., v. United States*, 834 F. Supp. 413, 418 (Ct. Int'l Trade 1993) (It is "a general rule that an agency must either conform itself to its prior decisions or explain the reasons for its departure . . . .") (quoting *Citrosuco*

---

[28]   AD Notice of Initiation, 79 Fed. Reg. at 4662; CVD Notice of Initiation, 79 Fed. Reg. at 4668.

Filed By: nellis@sidley.com, Filed Date: 10/16/14 12:49 PM, Submission Status: Approved

*Paulista, S.A. v. United States*, 704 F. Supp. 1075, 1088 (Ct. Int'l Trade 1988)).[29]  Moreover, as indicated previously, in initiating these investigations the Department acknowledged that it would "be informed by the product coverage decisions that it made in the investigations that resulted in the existing orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the PRC."[30]  However, in its proposed scope "clarification," rather than being "informed by" its previous product coverage decisions, the Department has proposed a course of action that is blatantly inconsistent with those decisions.

To recall, in the previous investigations, the Department explained that "{t}he scope of an AD or CVD order is limited to merchandise that *originates in* the country covered by the order"[31] or "that is *produced in* the country covered by the order".[32]  To determine the country in which a product "originates" or is "produced", the Department explained that it applies a "substantial transformation" test, and this methodology has been upheld by the Court of International Trade.[33]  Applying that "substantial transformation" test, it determined that "module assembly does not substantially alter the essential nature of solar cells nor does it

---

[29]    *See also Borden, Inc. v. Federal Energy Regulatory Comm'n*, 855 F.2d 254, 261 (5th Cir. 1988) ("[T]he court must examine the manner in which the [Federal Energy Regulatory Commission] has employed the methods of regulation which it has itself selected . . . .") (quoting *In re Permian Basin Area Rate Cases*, 390 U.S. 747, 790-92 (1968)); *Laclede Gas Co. v. Federal Energy Regulatory Comm'n*, 722 F.2d 272, 275 (5th Cir. 1984) ("An agency must either conform to its prior precedent or explain its reasoning for departure from that precedent."); *Greater Boston Television Corp. v. F.C.C.*, 444 F.2d 841, 852 (D.C. Cir. 1970), cert. denied, 403 U.S. 923 (1971) ("[A]n agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored, and if an agency glosses over or swerves from prior precedents without discussion it may cross the line from the tolerably terse to the intolerably mute.").

[30]    AD Notice of Initiation, 79 Fed. Reg. at 4662; CVD Notice of Initiation, 79 Fed. Reg. at 4668.

[31]    CSPV Cells from China, Scope Clarification Memo, at 5 (emphasis added).

[32]    CSPV Cells from China, IDM, at 5 (emphasis added).

[33]    *See* CSPV Cells from China, Scope Clarification Memo, at 5; CSPV Cells from China, IDM, at 5-6.

18

constitute significant processing such that it changes the country-of-origin of the cell."[34] Therefore, "where solar cell production occurs in a different country from solar module assembly, the country-of-origin of the solar modules/panels is the country in which the solar cell was produced."[35]  These determinations could not be any clearer.

However, pursuant to the expansion of the scope proposed in the Department's Scope Comments Memo, it would now consider all CSPV modules "assembled in the PRC that contain {CSPV} cells produced in a customs territory other than the PRC" to be Chinese-origin products subject to the current China investigations; and it would now consider all CSPV modules "assembled in Taiwan consisting of {CSPV} cells produced in … a customs territory other than Taiwan" to be Taiwanese-origin products subject to the current Taiwan investigation.[36]  There is no way to reconcile the Department's current proposal with its product coverage decisions from the prior investigations; to the contrary, its current proposal entirely contradicts its prior product coverage decisions, with no explanation whatsoever.  There is no basis in its prior product coverage decisions for the country of module "assembly" to be the country of origin of the module for AD/CVD purposes.  Rather, as the Department previously said, that country of origin of the module for AD/CVD purposes "is the country in which the solar cell was produced."[37]

Moreover, Petitioner itself attempted to expand the scope of the prior investigations in the same exact manner in which the Department is proposing to do so now in the current investigations.  The Department, however, rejected Petitioner's attempted scope expansion in the prior investigations, explaining as follows:

---

[34]     CSPV Cells from China, Scope Clarification Memo, at 8.
[35]     CSPV Cells from China, Scope Clarification Memo, at 8.
[36]     Except that CSPV modules assembled in Taiwan consisting of CSPV cells produced in China would be Chinese-origin products subject to the existing AD/CVD orders.
[37]     CSPV Cells from China, Scope Clarification Memo, at 8.

19

Barcode:3235554-01 A-570-010 INV - Investigation -

> While we understand the intent of Petitioner's argument that the scope should cover solar modules/panels produced in the PRC, regardless of the origin of the solar cells, this is not tenable because doing so would either necessitate making inconsistent country-of-origin determinations for a single product, or require ignoring the country-of-origin when considering whether merchandise entering the United States is covered by the scope of these investigations. A product can only have one country-of-origin for AD/CVD purposes, and AD and CVD investigations only cover products with a country-of-origin that is the country under investigation.[38]

The reasoning applied by the Department in 2012 is as relevant now as it was then. Given the clear rejection of Petitioner's attempted scope expansion in the prior investigations, Respondents submit that the Department cannot now justify the very same scope expansion in the current investigations.

For these reasons, the Department's proposed scope expansion is inconsistent with its prior product coverage decisions. Such inconsistent conduct violates the basic principle of administrative law noted above, and therefore must be rejected by the Department.

          b.      The Department's Proposed Scope Expansion Is Inherently Flawed

The Department's proposed scope expansion is also inherently flawed, in that it suffers from the same problems that led to the Department's rejection of Petitioner's attempted scope expansion in the previous investigations – i.e., "making inconsistent country-of-origin determinations for a single product, or … ignoring the country-of-origin when considering whether merchandise entering the United States is covered by the scope".[39] The Department's proposal in conjunction with the scope of the existing orders results in the following categorization of different CSPV modules:

---

[38]      CSPV Cells from China, Scope Clarification Memo, at 8.
[39]      CSPV Cells from China, Scope Clarification Memo, at 8.

Filed By: nellis@sidley.com, Filed Date: 10/16/14 12:49 PM, Submission Status: Approved

Barcode:3235554-01 A-570-010 INV - Investigation -

|  | Country of Module Assembly | Country of Cell Production | Country of Origin | Subject to |
|---|---|---|---|---|
| (1) | China | China | China | Existing orders |
| (2) | Non-China | China | China | Existing orders |
| (3) | China | Non-China | China | Current China investigations |
| (4) | Taiwan | Taiwan | Taiwan | Current Taiwan investigation |
| (5) | Non-Taiwan Non-China | Taiwan | Taiwan | Current Taiwan investigation |
| (6) | Taiwan | Non-Taiwan Non-China | Taiwan | Current Taiwan investigation |

Several inherent flaws should be evident from this table:

- Lines (2) and (3) result in precisely the example of an "inconsistent country-of-origin determinations for a single product" provided by the Department in rejecting Petitioner's attempted scope expansion in the prior investigations: "Namely, finding that module assembly in the PRC using solar cells produced in a third-country constitutes substantial transformation and thus the country of origin of the module is the PRC while also finding that module assembly outside the PRC using PRC produced solar cells does not constitute substantial transformation and thus the country of origin of the module is the country where the solar cells were produced, the PRC."[40]

- Lines (5) and (6) result in the same "inconsistent country-of-origin determinations for a single product" with respect to Taiwan.

- Line (3) "ignor{es} the country-of-origin when considering whether merchandise entering the United States is covered by the scope of these investigations". This is because, pursuant to the Department's "substantial transformation" test, the

---

[40]      CSPV Cells from China, Scope Clarification Memo, at 8 n.29.

Filed By: nellis@sidley.com, Filed Date: 10/16/14 12:49 PM, Submission Status: Approved

country of origin of those modules is the country of cell production, yet the Department would consider them to be Chinese-origin products for purposes of the current China investigations.

- Pursuant to lines (3) and (5), a module assembled in China using cells produced in Taiwan is to be considered a Chinese-origin product subject to the current China investigations.  However, doing so "ignor{es} the country-of-origin when considering whether merchandise entering the United States is covered by the scope of these investigations", because pursuant to the Department's "substantial transformation" test, the country of origin of such a module is Taiwan.

- Line (6) "ignor{es} the country-of-origin when considering whether merchandise entering the United States is covered by the scope of these investigations".  This is because, pursuant to the Department's "substantial transformation" test, the country of origin of those modules should be the country of cell production, yet the Department would consider them to be Taiwanese-origin products for purposes of the current Taiwan investigation.

In sum, the proposal set out on the Department's Scope Comments Memo abandons the established and judicially-approved "substantial transformation" rule in favor of a drastic, ad hoc expansion of the scope that goes far beyond even the intent of Petitioner itself.  The Department's Scope Comments Memo provides no explanation for the proposal to jettison longstanding established policy regarding the definition of scope in AD/CVD proceedings in favor of this arbitrary result.  Nor does the Memo explain how the Department would reconcile the legal principles applied in the 2012 investigations with the proposed scope in the current

investigation.  Nor can the Department do so.  The proposed approach is inherently contradictory

and therefore unlawful.  This is the very definition of "arbitrary and capricious" agency action.

<div style="text-align:center">

c.  The Department's Proposed Scope Expansion Is Discriminatory
and Therefore Inconsistent with the United States' WTO
Obligations
</div>

Finally, the Department's proposed scope expansion gives rise to discrimination that

would violate a number of the United States' WTO obligations.  First, it would violate the United

States' obligation to provide most-favored nation ("MFN") treatment under Article I of the

General Agreement on Tariffs and Trade 1994 ("GATT 1994").  That provision requires that,

*inter alia*:

> With respect to customs duties and charges of any kind imposed on
> or in connection with importation or exportation …, and with
> respect to all rules and formalities in connection with importation
> and exportation, … any advantage, favour, privilege or immunity
> granted by any Member to any product originating in or destined
> for any other country shall be accorded immediately and
> unconditionally to the like product originating in or destined for
> the territories of all other Members.

In the current investigations, importantly, pursuant to lines (3) and (5) of the table above,

a module assembled in China using cells produced in Taiwan is to be considered a Chinese-

origin product subject to the current China investigations, while a module assembled in (for

example) Malaysia using cells produced in Taiwan is to be considered a Taiwanese-origin

product subject to the current Taiwan investigation.  The former product will therefore receive a

dumping margin based on a non-market economy methodology, while the latter product will

receive a dumping margin based on a market economy methodology.  Thus, the module

originating in China containing Taiwanese cells would be deprived of the advantage of market

<div style="text-align:center">

23
</div>

economy treatment provided to the like module originating in Malaysia containing Taiwanese cells.[41]

Second, the United States would also violate its commitments under the WTO Agreement on Rules of Origin.  Pursuant to Article 1.2 of that Agreement, it applies to rules of origin used in the application of AD/CVD duties.  Articles 2(c) and 2(d) then, respectively, require Members to ensure that "rules of origin shall not themselves create restrictive, distortive, or disruptive effects on international trade" and "shall not discriminate between other Members."  Here, the Department's proposed scope clarification is designed precisely to distort international trade and discriminate between the United States' treatment of imports from China and Taiwan on the one hand, and imports from other WTO Members on the other hand, by bringing additional products from China and Taiwan within the scope of any eventual AD/CVD orders that would otherwise not fall within that scope.  Specifically, the products in line (3) of the above table should not be considered Chinese, and the products in line (6) of the above table should not be considered Taiwanese pursuant to the Department's otherwise applicable substantial transformation test, yet the Department is proposing to bring these products within the scope of the current investigations by application of an inconsistent rule of origin.

Thus, the Department should also not adopt its proposed scope expansion because doing so would result in unwarranted discrimination and a violation of the United States' WTO obligations.

---

[41]     Respondents note that this scenario is discussed for illustrative purposes and does not mean that other situations may not also give rise to MFN violations if the Department adopts its proposed scope expansion.

Barcode:3235554-01 A-570-010 INV - Investigation -

3.   If the Department Nonetheless Adopts the Proposed Scope Expansion, It Should Make Certain Clarifying Edits to the Text of the Scope Definition

If, despite the foregoing arguments, the Department nonetheless adopts its proposed scope expansion, Respondents submit the Department should make at least one clarifying edit to the scope language for the Taiwan investigation.  In particular, Respondents' understanding is that all CSPV modules assembled outside of China using CSPV cells produced in China are covered by the existing AD/CVD orders on CSPV cells and modules from China, and the Department's intention in its Scope Comments Memo is that such products be excluded from the scope of the current China and Taiwan investigations.  This would mean that CSPV modules assembled in Taiwan from CSPV cells produced in China should be outside the scope of the current Taiwan investigation.  Accordingly, Respondents understand that the Department means for the phrase "except for the PRC" to be included in the following sentence on page 1 of its Scope Comments Memo:

> For the Taiwan investigation, subject merchandise includes all modules, laminates and/or panels assembled in Taiwan consisting of crystalline silicon photovoltaic cells produced in Taiwan or a customs territory other than Taiwan except for the PRC.

Based on this understanding, Respondents urge that the phrase "except for the People's Republic of China" be added to the end of the second sentence of the Department's proposed scope language for the Taiwan investigation as follows (if such language is to be adopted by the Department):

> For purposes of this investigation, subject merchandise includes modules, laminates and/or panels assembled in Taiwan consisting of crystalline silicon photovoltaic cells produced in Taiwan or a customs territory other than Taiwan except for the People's Republic of China.

Filed By: nellis@sidley.com, Filed Date: 10/16/14 12:49 PM, Submission Status: Approved

**C.    The Department Should Modify the Scope of These Investigations By Simply Deleting the Second Sentence of the Scope Definition, Apply Its Substantial Transformation Test to Determine Country of Origin, and Consequently Terminate These Investigations with Respect to China**

Rather than maintaining Petitioner's proposed scope for these investigations or adopting the scope expansion proposed by the Department on October 3, for the reasons previously expressed in Respondents' Scope Comments of February 18, 2014, and Respondents' Scope Response of April 21, 2014, the Department should simply delete the second sentence of the first paragraph of the current scope definition (i.e., Petitioner's "two-out-of-three" rule) and apply its standard practice of using a "substantial transformation" test to determine the country of origin of products subject to the current investigations.

As previously explained in Respondents' Scope Comments and Respondents' Scope Response (which again are incorporated herein by reference),[42] the Department already applied its "substantial transformation" test in the previous investigations and determined that the country of origin of a CSPV module, for AD/CVD purposes, is the country of origin of the CSPV cells used in that module.  Moreover, Respondents methodically applied the "substantial transformation" test to demonstrate that the country of origin of a CSPV cell is properly the country in which the cell is produced,[43] and Petitioner has never presented any evidence or argument to the contrary.  The Department should therefore find that the country of origin of a CSPV cell is the country of cell production.

When the Department reaches these conclusions, it will find that all CSPV cells and modules properly from China are already within the scope of the existing AD/CVD orders on CSPV cells and modules from China.  Accordingly, the present investigations with respect to China should be terminated.

---

[42]    *See* Respondents' Scope Comments at 10-19; Respondents' Scope Response at 11-14.
[43]    *See* Respondents' Scope Comments at 12-16; Respondents' Scope Response at 13-14.

26

Barcode:3235554-01 A-570-010 INV - Investigation -

## IV.    CONCLUSION

For the foregoing reasons, the Department should: (i) reject Petitioner's proposed two-out-of-three rule; (ii) decline to adopt its proposed scope expansion of October 3, 2014; and (iii) delete the second sentence of the scope definition and terminate these investigations with respect to China.

Respectfully submitted,

Neil R. Ellis
Richard L. A. Weiner
Brenda A. Jacobs
Rajib Pal
Shawn Higgins

Counsel to Canadian Solar Inc. and Canadian Solar (USA) Inc.; Changzhou Trina Solar Energy Co., Ltd.; China Sunergy (Nanjing) Co., Ltd.; ET Solar Industry Limited; Hanwha Solarone (Qidong) Co., Ltd.; Hengdian Group DMEGC Magnetics Co., Ltd.; LDK Solar Hi-Tech (Nanchang) Co., Ltd.; Shanghai BYD Co., Ltd. and Shangluo BYD Industrial Co., Ltd.; Shanghai JA Solar Technology Co., Ltd. and Hefei JA Solar Technology Co., Ltd.; Sumec Hardware & Tools Co., Ltd.; Wuxi Suntech Power Co., Ltd.; Wuxi Taichen Machinery & Equipment Co., Ltd.; Yingli Green Energy Holding Company Ltd. and Yingli Green Energy Americas, Inc.; and Zhejiang Heda Solar Technology Co., Ltd.

Dated: October 16, 2014

Filed By: nellis@sidley.com, Filed Date: 10/16/14 12:49 PM, Submission Status: Approved

**TAB 10**

**Case Brief of Changzhou Trina Solar Energy Co., Ltd. (Oct. 16, 2014)**

**AD P.R. 784**

**BEFORE THE UNITED STATES DEPARTMENT OF COMMERCE
INTERNATIONAL TRADE ADMINISTRATION
WASHINGTON, D.C.**

| | |
|---|---|
| _____ ) | |
| ) | |
| Certain Crystalline Silicon Photovoltaic Products ) | Case Number:  A-570-010 |
| from the People's Republic of China ) | Investigation |
| ) | |
| _____ ) | |

**PUBLIC DOCUMENT**

# CASE BRIEF OF
# CHANGZHOU TRINA SOLAR ENERGY CO., LTD.

Of Counsel:
John M. Gurley
Diana Dimitriuc Quaia
Keith F. Huffman

Arent Fox LLP
1717 K Street, N.W.
Washington, D.C.  20006

Date: October 16, 2014

# I.     INTRODUCTION

On behalf of Changzhou Trina Solar Energy Co., Ltd. ("Trina Solar"), we hereby provide comments on the Preliminary Determination issued by the U.S. Department of Commerce ("Department") in the antidumping duty investigation on *Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China* (the "Preliminary Determination").[1] These comments are submitted pursuant to 19 C.F.R. § 351.309(c) and the invitation to comment contained in the Preliminary Determination.

# II.    EXECUTIVE SUMMARY

The proposed scope language, as expanded by the Department in its October 3, 2014 memorandum is internally inconsistent.  Although the expanded scope language specifically references the existing AD/CVD Orders on solar cells, whether or not assembled into panels, from China, imposed in December 2012 ("*Solar I*"),[2] it is incompatible with the scope determination in *Solar I*.  The proposed expansion of the scope language to include modules assembled in China of non-Chinese cells is unlawful.  The proposed scope changes would include third country products in an investigation that was intended to cover products from *China*. Indeed, application of the Department's existing origin rule for solar modules indicates that all such modules sought to be included in these investigations are of third country origin, as the data on the record demonstrates.  Such a scope determination is unlawful under the statute, the Department's scope determination in *Solar I*, and the Department's application of its

---

[1] *Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China,* 79 Fed. Reg. 44399 (July 31, 2014) (prelim. determ. of LTFV sales) (the "*Preliminary Determination*").

[2] *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order*, 77 Fed. Reg. 73018 (Dep't Commerce December 7, 2012) and *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Countervailing Duty Order*, 77 Fed. Reg. 73017 (Dep't Commerce December 7, 2012) (collectively "*Solar I*," - all references to *Solar I* Issues & Decision Memo are to the AD memorandum).

1

substantial transformation test to determine the origin of products subject to AD/CVD duties.

Accordingly, this investigation should be rescinded and all cash deposits paid by U.S. importers

for solar panels entered under the current investigations should be released immediately.

## III.   THE EXPANDED SCOPE LANGUAGE IS INTERNALLY INCONSISTENT

### A.   Original Scope Language

Similar to the scope language in the notice of initiation, in the Preliminary Determination

the Department described the scope of the investigation, in relevant part, as follows:

> The merchandise covered by this investigation is crystalline silicon photovoltaic
> cells, and modules, laminates and/or panels consisting of crystalline silicon
> photovoltaic cells, whether or not partially or fully assembled into other products,
> including building integrated materials. For purposes of this investigation, subject
> merchandise also includes modules, laminates and/or panels assembled in the
> subject country consisting of crystalline silicon photovoltaic cells that are
> completed or partially manufactured within a customs territory other than that
> subject country, using ingots that are manufactured in the subject country, wafers
> that are manufactured in the subject country, or cells where the manufacturing
> process begins in the subject country and is completed in a non-subject country…
>
> …Also excluded from the scope of this investigation are any products covered by
> the existing antidumping and countervailing duty orders on crystalline silicon
> photovoltaic cells, whether or not assembled into modules, from the People's
> Republic of China. See Crystalline Silicon Photovoltaic Cells, Whether or Not
> Assembled Into Modules, From the People's Republic of China: Amended Final
> Determination of Sales at Less Than Fair Value, and Antidumping Duty Order, 77
> FR 73018 (December 7, 2012); Crystalline Silicon Photovoltaic Cells, Whether or
> Not Assembled Into Modules, From the People's Republic of China:
> Countervailing Duty Order, 77 FR 73017 (December 7, 2012). [3]

With respect to the Department's original scope language, Trina Solar hereby incorporates by

reference the scope comments filed on February 18, 2014 and April 21, 2014 by a group of

Chinese respondents, including Trina Solar, Yingli Green Energy Holding Company Limited,

Yingli Green Energy Americas, Inc., Canadian Solar Inc., Wuxi Suntech Power Co., Ltd.,

Shanghai JA Solar Technology Co., Ltd., Hefei JA Solar Technology, Co., Ltd., Jinko Solar Co.,

---

[3] *Preliminary Determination* at 44399.

Ltd. and other parties, that demonstrate the illegal and untenable nature of the scope of these investigations.[4]  The issues identified in the above-mentioned comments and the conclusion that the scope language should be rejected have been reinforced throughout the course of these investigations.  Trina Solar provides below additional comments regarding the scope of these investigations under the Department recent proposed amendments to the scope language.

## B.      Proposed Scope Language

On October 3, 2014, the Department issued a scope memorandum which proposes a much broader, and radically different, scope description:

> The merchandise covered by this investigation is ~~crystalline silicon photovoltaic cells, and~~ modules, laminates and/or panels consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including building integrated materials. For purposes of this investigation, subject merchandise ~~also~~ includes modules, laminates and/or panels assembled in the ~~subject country~~ *People's Republic of China* consisting of crystalline silicon photovoltaic cells ~~that are completed or partially manufactured within~~ *produced in* a customs territory other than *the People's Republic of China* ~~that subject country, using ingots that are manufactured in the subject country, wafers that are manufactured in the subject country, or cells where the manufacturing process begins in the subject country and is completed in a non-subject country~~. Subject merchandise includes *modules, laminates and/or panels assembled in the People's Republic of China* consisting of crystalline silicon photovoltaic cells of thickness equal to or greater than 20 micrometers, having a p/n junction formed by any means, whether or not the cell has undergone other processing, including, but not limited to, cleaning, etching, coating, and/or addition of materials (including, but not limited to, metallization and conductor patterns) to collect and forward the electricity that is generated by the cell…

> …Also excluded from the scope of this investigation are any products covered by the existing antidumping and countervailing duty orders on crystalline silicon

---

[4] *See* Letter from Sidley Austin LLP to the Hon. Penny S. Pritzker, DOC Case Nos. A-570-010, A-583-853, and C-570-011, regarding Comment on Scope, filed on behalf of a group of Chinese companies  (February 18, 2014); *see also* Letter from Sidley Austin LLP to the Hon. Penny S. Pritzker, DOC Case Nos. A-570-010, A-583-853, and C-570-011, regarding Response to Petitioner's Rebuttal on Scope, filed on behalf of a group of Chinese companies (April 21, 2014).

photovoltaic cells, whether or not assembled into modules, from the People's Republic of China.[5]

In its Scope Expansion Memo the Department explained that what it intends to accomplish with this scope description is the following:

- For the PRC investigations, subject merchandise includes all modules, laminates and/or panels assembled in the PRC that contain crystalline silicon photovoltaic cells produced in a customs territory other than the PRC.

- For the Taiwan investigation, subject merchandise includes all modules, laminates and/or panels assembled in Taiwan consisting of crystalline silicon photovoltaic cells produced in Taiwan or a customs territory other than Taiwan. In addition, subject merchandise will include modules, laminates, and panels assembled in a third-country, other than the PRC, consisting of crystalline silicon photovoltaic cells produced in Taiwan.[6]

However, the above-mentioned interpretation is incompatible with the Department's existing origin analysis under the AD/CVD Orders in *Solar I*. Such an interpretation of the expanded scope language is also internally inconsistent, as there is an express reference to *Solar I* in the third paragraph of the proposed scope language.

In *Solar I*, the Department considered Petitioner's request that all modules assembled in China must be covered by the scope regardless of the origin of the solar cells, but found that it could not lawfully adopt that scope language.[7] It then explained that "using a substantial transformation analysis, the Department has determined that modules from the PRC are those that have been assembled in the PRC using solar cells produced in the PRC."[8] In short, *Solar I* outlined a binary choice for solar panels produced in China: (1) if they use Chinese solar cells

---

[5] *Antidumping and Countervailing Duty Investigations of Certain Crystalline Silicon Photovoltaic Products, from the People's Republic of China and the Antidumping Duty Investigation of Certain Crystalline Silicon Photovoltaic Products from Taiwan: Opportunity to Submit Scope Comments* (Dep't Commerce October 3, 2014) at Attachment (the "*Scope Expansion*").

[6] *Scope Expansion* at 1.

[7] *See Solar I*, Issues and Decision Memorandum at 8 (Cmt. 1).

[8] *See id.*

AFDOCS/11350089.8

they are Chinese products for AD/CVD purposes, but (2) if they use third country cells they are not Chinese products for AD/CVD purposes.

There is no question that a scope determination under the current investigations must take into account the scope definition of *Solar I*.  Indeed, the Department already has stated that it "will be informed by the product coverage decisions that it made"[9] in the prior investigations. Thus, the starting point for identifying in-scope merchandise in these investigations is the scope of *Solar I*, including the Department's prior finding that the origin of the cells confers origin on the assembled module, panel or laminate.

*Therefore*, the proposed scope language seems to suggest a two step approach:

- *First*, under the third paragraph of the Scope Expansion, an importer would have to determine if the module, laminate or panel assembled in China, using third country cells is subject to the existing AD/CVD Orders in *Solar I*.

    - Under the Department's existing analysis in *Solar I*, panels made of third country cells and assembled in China are not of Chinese origin because the origin of the cell confers origin to the solar panel. Thus, such panels are not of Chinese origin for AD/CVD purposes.  As explained in *Solar I*[10] and as discussed below, a single product cannot have more than one country of origin for AD/CVD purposes.

- *Second*, after application of the existing origin rule, are there any panels assembled in China made of third country cells that are not described by the origin rule in *Solar I*?

    - The answer to that question is "*no*."  There are *no* panels assembled in China of third country cells that are not described by the origin rule in *Solar I*.

In short, there is no reasonable interpretation of the Scope Expansion under which any solar panels produced *in China* from third country cells can be described also by the new investigations brought against products *from China*.  Under the Department's existing analysis,

---

[9] *Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China and Taiwan: Initiation of Antidumping Duty Investigations*, 79 Fed. Reg. 4661, 4662 (January 29, 2014), and *Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China: Initiation of Countervailing Duty Investigation*, 79 Fed. Reg. 4667, 4668 (Dep't Commerce January 29, 2014).

[10] *See Solar I*, Issues and Decision Memorandum at 8 (Cmt. 1).

the origin of the solar cell confers origin to the solar panel. Therefore, importers must be able to rely on the Department's existing analysis in *Solar I* to determine the origin of their solar panels.

## IV.   THE SCOPE EXPANSION IS UNLAWFUL AND THUS THE DEPARTMENT SHOULD RESCIND THESE INVESTIGATIONS

### A.   The Scope Expansion Results in Two Inconsistent Country of Origin Determinations for the Same Product

U.S. law makes clear that a product can have a single country of origin for AD/CVD purposes.[11]  The scope of the investigation concerns particular products, *i.e.*, "the class or kind of merchandise" that "is being, or is likely to be, sold in the United States at less than its fair value." 19 U.S.C. § 1673a(c)(2).

Under the Department's existing analysis from the *Solar I* investigations, the assembly of cells into modules, panels or laminates is not a substantial transformation that would change the origin of the solar cell. As the Department explained in *Solar I*, "{b}ased on our analysis of the foregoing factors we find that solar module assembly does not substantially transform solar cells such that it changes the country-of-origin."[12]  Therefore, according to the Department's origin analysis for solar panels, which it already has determined to be "informed by" here, modules, panels and laminates assembled in China from third country origin cells *are third country-origin goods for AD/CVD purposes*.

However, under the Scope Expansion, such panels assembled in China of third country cells would be covered by the current AD/CVD orders on products *from China*, which means that in these investigations, the same products are deemed to be *of Chinese origin*.   With this

---

[11] *Ugine & ALZ Belgium, N.V. v. United States*, 31 CIT 1536, 1550, 517 F. Supp. 2d 1333, 1345 (2007), *aff'd* 551 F.3d 1339 (Fed. Cir. 2009).

[12] *Scope Clarification: Antidumping and Countervailing Duty Investigations of Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China*, March 19, 2012, at 8.

6

new scope proposal the Department has done exactly that which, in *Solar I*, it affirmed was *unlawful*: making two inconsistent country of origin determinations, as illustrated by the examples below:

*SOLAR I:*

| Scenario | Cell Production | Module Assembly | Subject Merchandise in *SOLAR I?* | Country of Origin |
|----------|-----------------|-----------------|-----------------------------------|-------------------|
| Scenario 1 | China | Japan | Yes | China |
| *Scenario 2* | *Taiwan* | *China* | *No* | *Taiwan* |
| Scenario 3 | Japan | China | No | Japan |

Current Investigations:

| Scenario | Cell Production | Module Assembly | Subject Merchandise? | Country of Origin |
|----------|-----------------|-----------------|----------------------|-------------------|
| Scenario 4 | China | Taiwan | No -  covered by *SOLAR I*[13] | China |
| *Scenario 5* | *Taiwan* | *China* | *Yes (China)* | *China* |
| Scenario 6 | Japan | China | Yes (China) | China |
| Scenario 7 | Japan | Taiwan | Yes (Taiwan) | Taiwan |
| Scenario 8 | Taiwan | Japan | Yes (Taiwan) | Taiwan |

As can be seen above, the identical products in ***cenarios 2 and 5***, and in scenarios 3 and 6 would have two different countries of origin for AD/CVD purposes.  With respect to the scope of the AD investigation of Taiwan, the products in scenario 7 and scenario 8 would be treated as if they have the same country of origin, Taiwan, even though application of the Department's origin rule in *Solar I* would result in the product of Scenario 8 being in-scope merchandise while the product in Scenario 7 would be third country merchandise for AD/CVD purposes.

---

[13] The *Solar I* scope is applicable.

7

In *Solar I*, the Department recognized that such a result would be unlawful.  The

Department fully explained why including modules with *non-Chinese* cells in the scope of the

orders on solar cells from *China* is not possible:

> **The main issue is that an investigation covering modules from the PRC cannot at the same time cover modules whose country of origin is not the PRC**.  Determining that all modules assembled in the PRC are covered by the scope of the investigation, no matter where the solar cells in the module were produced, would either necessitate making inconsistent country-of-origin determinations for a single product, or require ignoring the country-of origin when considering whether merchandise entering the United States is covered by the scope of the investigation.[14]

There is no error in the Department's logic or in the legal basis of that analysis. For the

same reasons fully explained in *Solar I*, the Department cannot lawfully adopt the Scope

Expansion in this case.   Simply put, the same product - third country cells assembled into

modules in China  - cannot be both of third country origin and of Chinese origin for AD/CVD

purposes.  Thus, the proposed Scope Expansion is incompatible with the Department's prior

product coverage decisions.

**B.**     **The Scope Expansion Would Result in the Application of AD/CVD Duties on Products That Are Not of Chinese Origin**

Applying AD/CVD duties to merchandise already found by the Department to be of third

country origin would be contrary to the fundamental terms and objectives of the U.S.

antidumping and countervailing duty laws.

The proposed scope is contrary to the statutory language at 19 U.S.C. § 1673(1), that

provides for the imposition of antidumping duties on "subject merchandise," defined as "the

class or kind of merchandise that is within the scope of an investigation, a review, a suspension

---

[14] *Solar I*, *Decision Memorandum* at 8 (footnote omitted) (emphasis added).

agreement, {or} an order...." *Id.* § 1677(25). This provision requires the Department to make a finding of dumping for a class or kind of merchandise *from a particular country*. *See E.I. Du Pont de Nemours & Co. v. United States*, 22 CIT 370, 375, 8 F. Supp. 2d 854, 859 (1998) ("{A}ntidumping orders apply to merchandise from particular countries ..."). Antidumping orders must specify both the class or kind of merchandise and the particular country from which the merchandise originates. "'For merchandise to be subject to an order, it must meet both parameters, *i.e.*, product type and country of origin.'" *Ugine & ALZ Belg., N.V. v. United States*, 31 CIT 1536, 1551, 517 F. Supp. 2d 1333, 1345 (2007).[15]  However, the Scope Expansion would result in the application of AD/CVD duties on products that are not of Chinese origin, which is not allowed under the statute.  In fact, the Scope Expansion would result in the application of AD/CVD duties on solar panels originating *everywhere in the world* except for China or Taiwan.

In other words, the Department is proposing to issue AD/CVD orders on solar panels from the entire world, regardless of origin.  But the scope of an order is limited to merchandise that is produced in the country covered by the order.[16]  When products are made in more than one country, it is important to determine *the* country of origin of the product, as the Court has clearly explained:

> The antidumping statute reflects Congress' recognition that country of origin determinations are vital to preserve the integrity of existing antidumping orders from potential circumvention through third country assembly, U.S. assembly, and transshipment of subject merchandise through intermediate countries. *See* 19 U.S.C. §§ 1677j, 1677b(a)(3). **Because antidumping orders apply to merchandise from particular countries, not individual producers, determining the country where the unfairly traded merchandise is produced**

---

[15] Citing *Certain Cold–Rolled Carbon Steel Flat Products from Argentina,* 58 Fed. Reg. 37062, 37065 (Dep't Commerce Jul. 9, 1993) (final determ.) ("The scope of an antidumping or countervailing duty order is defined by the *type of merchandise* and by the *country of origin* (e.g., widgets from Ruritania).")

[16] *See Stainless Steel Plate in Coils from Belgium,* 69 Fed. Reg. 74495 (Dep't of Commerce Dec. 14, 2004) (final results), and accompanying Issues and Decision Memorandum at 15 (cmt. 4).

**or manufactured is fundamental to the proper administration and enforcement of the antidumping statute**. *See* 19 US. C. § 1673; *see also* §§1677j, 1677b(a)(3). The "substantial transformation" rule provides a means for Commerce to carry out its country of origin examination and properly guards against circumvention of existing antidumping orders.[17]

Consistent with law, in *Solar I*, the Department determined the country of origin of modules containing non-Chinese cells by employing the substantial transformation test.[18]    In applying this test, Commerce found solar cells to be the essential component of modules – the country of origin determining component.  Therefore, the existing orders in *Solar I* already cover imports of solar panels whose country of origin is China and determine what panels are not of Chinese origin for AD/CVD purposes. The Department cannot ignore its own precedent. *Ugine & ALZ Belgium v. United States*, 551 F.3d 1339, 1349 (Fed. Cir. 2009) ("Nonetheless, Commerce is obligated to follow prior precedent absent some legitimate reason for departing from it.")  The current investigations are thus unlawful as to China.[19]

This is not to say that the Department's regulations or the statute do not address situations where subject merchandise may be completed or assembled in third countries.  However, that is not the situation before the Department in these investigations.  First, as the Department is aware, it may not expand AD/CVD proceedings involving merchandise from named foreign countries to include merchandise produced in unnamed foreign countries, *except* under the conditions of the anti-circumvention provisions of the statute, which require the existence of an AD or CVD order in force.[20] Second, such procedures deal with the scenario of "Merchandise Completed or

---

[17] *E.I. Du Pont de Nemours & Co. v. United States*, 22 CIT 370, 373, 8 F. Supp. 2d 854, 857 (1998) (emphasis added).

[18] *Solar I, Decision Memorandum* at 5-6.

[19] The scope of the Taiwanese investigation is also unlawful because it seeks to cover not only modules that are of Taiwanese origin, but also modules that, while assembled in Taiwan, are of third country origin.

[20] 19 U.S.C. § 1677j(b); 19 C.F.R. § 351.225(h).

10

Assembled in Other Foreign Countries," but this case presents the reverse scenario. The Scope Expansion seeks to include solar panels where the completion or assembly is in China, while the essential components of the solar panels, the solar cells, are from such unnamed foreign countries. The statute does not authorize a world-wide scope expansion under this scenario. In short, there is no legal basis for the Department to expand the scope of these investigations *against China and Taiwan* to cover solar panels with cells produced elsewhere in the world.

Such a scope definition may also be in violation of the United States' commitments under the WTO Agreement on Rules of Origin, which imposes an obligation on Members to ensure that "rules of origin shall not in themselves create restrictive, distortive, or disruptive effects on international trade" and "shall not discriminate  between other Members."  WTO Agreement on Rules of Origin, Art. 2(c) & (d).  The Scope Expansion, if adopted, would have precisely such a distortive and discriminatory effect on trade between Members because it would subject imports of modules made with any third country cells (*i.e.* products of a third country) to AD/CVD duties calculated for Chinese or Taiwanese products.

## V.    CONCLUSION

On behalf of Trina Solar, we respectfully request that the Department rescind the antidumping and countervailing duty investigations because they are based on an unlawful and implausible scope description.  As discussed below, the proposed scope language cannot reasonably be interpreted to include ***any*** solar modules, laminates or panels consisting of crystalline silicon photovoltaic cells that are not already described by the Department' origin rule in *Solar I*.  Further the Expanded Scope results in conflicting country of origin determinations that are not allowed under the statute and case law. Accordingly, this investigation should be rescinded and all cash deposits paid by U.S. importers for solar panels entered under the current

11

investigation numbers should be released immediately.

Respectfully submitted,

 **/s/ John M. Gurley**

John M. Gurley
Diana Dimitriuc Quaia
Keith F. Huffman

ARENT FOX LLP
1717 K Street, NW
Washington, DC 20036
(202) 857-6301

12

**Tab 11**

**Rebuttal Brief of Changzhou Trina Solar Energy Co., Ltd. (Oct. 23, 2014)**

**AD P.R. 804**

BEFORE THE UNITED STATES DEPARTMENT OF COMMERCE
INTERNATIONAL TRADE ADMINISTRATION
WASHINGTON, D.C.

Certain Crystalline Silicon Photovoltaic Products )
from the People's Republic of China )

)
)
)
)
)

Case Number:  A-570-010
Investigation

**PUBLIC VERSION**

Business Proprietary Information Deleted
from Pages 6 – 10.

Business Proprietary Information Deleted
from Brackets or Summarized

# REBUTTAL BRIEF OF
# CHANGZHOU TRINA SOLAR ENERGY CO., LTD.

Of Counsel:
John M. Gurley
Diana Dimitriuc Quaia
Keith F. Huffman
Arent Fox LLP
1717 K Street, N.W.
Washington, D.C.  20006

Date: October 22, 2014

Barcode:3237203-01 A-570-010 INV - Investigation  -
*Public Version*

## I.   INTRODUCTION

On behalf of Changzhou Trina Solar Energy Co., Ltd. ("Trina" ), we hereby provide

comments to rebut and clarify issues raised by petitioner, SolarWorld Americas, Inc.

("SolarWorld" or "Petitioner"), in its October 16, 2014 case brief,[1] addressing the preliminary

determination issued by the U.S. Department of Commerce ("Department") in the antidumping

duty investigation on *Certain Crystalline Silicon Photovoltaic Products From the People's*

*Republic of China* (the "*Preliminary Determination*").[2]  These rebuttal comments are submitted

pursuant to 19 C.F.R. § 351.309(d) and the invitation to comment contained in the *Preliminary*

*Determination*.

## II.   EXECUTIVE SUMMARY

### A.   Scope Comments

The scope language in the October 3 Scope Expansion Memorandum,[3] as well as the

scope description in the *Preliminary Determination*, share a critical flaw: they are both internally

inconsistent and conflict with the Department's origin determination in *Solar I*.[4]

### B.   Trina Specific Issues

None of the adjustments proposed by Petitioner are supported by the statute, the

Department's regulations or the facts before the Department.  Specifically, the Department

---

[1] Case Brief of SolarWorld Americas, Inc. (Oct. 16, 2014) ("SolarWorld Case Brief").

[2] *Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China,* 79 Fed. Reg. 44399 (July 31, 2014) (prelim. LTFV determ.), and accompanying Preliminary Decision Memorandum ("Prelim. Decision Memo.").

[3] Letter from the Department to All Interested Parties, re: Opportunity to Submit Scope Comments (Oct. 3, 2014) ("Scope Expansion Memorandum").

[4] *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China,* 77 Fed. Reg. 63791 (Dep't Commerce Oct. 17, 2012) (final determ.), and accompanying Issues & Decision Memorandum, amended by *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China,* 77 Fed. Reg. 73018 (Dep't Commerce Dec. 7, 2012) (amended final determ. & AD order); *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Countervailing Duty Order,* 77 Fed. Reg. 73017 (Dep't Commerce Dec. 7, 2012) (collectively "*Solar I,*" - all references to *Solar I* Issues & Decision Memo are to the AD memorandum ("*Solar I* I&D Memo")).

1

Filed By: gurley.john@arentfox.com, Filed Date: 10/23/14 3:49 PM, Submission Status: Approved

Barcode:3237203-01 A-570-010 INV - Investigation  -
*Public Version*

should reject these adjustments for the following reasons:

- Unpaid U.S. Sales: the payment date for the few unpaid sales was reported by Trina Solar in accordance with the Department's post verification instructions. Consistent with established agency practice these sales should be treated like any other normal POI sales and not as zero price sales.

- Quality Insurance Expense: consistent with the regulations and its practice, the Department should include only the portion of the quality insurance expenses that were incurred in the United States.

- Warranty Expenses: the Department should rely on the actual warranty expenses reported by Trina Solar in its U.S. sales database.

- FOP database: the Department should use Trina's post-verification FOP database.

### C.   The Department Should Continue To Use South Africa As The Surrogate Country

Contrary to Petitioner's allegations, South Africa remains the most appropriate surrogate country in this investigation. It is a significant producer of subject merchandise. The South African surrogate values are more specific and reliable than those of Thailand. Finally, the financial statement of Mustek remains the most appropriate financial statement on the record.

### D.   The Department Should Continue to Value Aluminum Frames Under South African HTS 7604.2965

The Department correctly selected South Africa HTS 7604.2965 to value aluminum frames. This classification most closely describes the input at issue. In contrast, Petitioner's recommendation - "articles of aluminum" is not specific and covers a wide range of items which have no resemblance at all to aluminum frames.

### E.   The Statute Requires A Full Adjustment for Countervailing Duties Based on Export Subsidies, Regardless of the Use of AFA

Under 19 U.S.C. § 1677a(c)(l)(C), the Department is required to make an adjustment to the AD duty to fully offset any countervailable export subsidy. Contrary to Petitioner's distorted interpretation of the statute and case law, there is nothing "optional" about the export subsidy

Barcode:3237203-01 A-570-010 INV - Investigation   -
*Public Version*

offset.[5]   Full allowance of this offset is required by the statutory language and legislative history. The legislative purpose of this provision was to comply with GATT Article VI.5 and the WTO Antidumping Agreement, and in particular to avoid subjecting respondents to both antidumping and countervailing duties to compensate for the same situation of dumping or export subsidization.  In concurrent AD and CVD investigations, the Department has consistently made such offsets in full in the form of a reduction of the AD cash deposit rate by the net export subsidy rate determined in the concurrent CVD investigation, including in cases where the export subsidy is calculated on the basis of adverse facts available ("AFA").  There is no basis for the Department to depart from its longstanding practice.

## III.   THE DEPARTMENT SHOULD RESCIND THE AD/CVD INVESTIGATIONS BECAUSE THEY ARE BASED ON A SCOPE DESCRIPTION THAT IS UNLAWFUL

In its case brief, Petitioner embraces the Department's expanded scope language as reflected in the Department's October 3, 2014 memorandum[6] and argues that it should be adopted for the final determination.[7]  In the alternative, Petitioner argues for the Department to maintain the scope language in the Preliminary Determination[8] which includes the "two-out-of three" rule that is both inconsistent with the existing AD/CVD Orders on solar cells, whether or not assembled into panels, from China, imposed in December 2012 ("*Solar I*"), and is unenforceable.  As Trina discussed in more detail in its case brief, the Scope Expansion would result in a scope that is both unlawful and implausible.[9]  The effect of the Scope Expansion is to impose worldwide AD/CVD orders in an investigation that was intended to cover products from

[5] SolarWorld Case Brief at 46.

[6] Scope Expansion Memorandum at Attachment.

[7] SolarWorld Case Brief at 4-5.

[8] SolarWorld  Case Brief at 8.

[9] *See* Trina Solar Case Brief at 5-11.

3

AFDOCS/11414784.1

Barcode:3237203-01 A-570-010 INV - Investigation  -
*Public Version*

*China.*  Such a scope determination is unlawful under the statute, the Department's scope

determination in *Solar I*, and the Department's application of its substantial transformation test to

determine the origin of products subject to AD/CVD duties.  Accordingly, as Trina argued in its

case brief, this investigation should be rescinded and all cash deposits paid by U.S. importers for

solar panels entered under the current investigations should be released immediately.

   Petitioner argues that the remedial purposes of the AD/CVD laws are best served by the

Scope Expansion.[10]  That self-serving argument is nothing more than a red herring. Petitioner

dedicated several pages of its case brief explaining its intent of including modules made in China

with non-Chinese cells in the scope and the Department's required deference to Petitioner's

intent.[11]  What is missing from Petitioner's case brief is the understanding of both the applicable

law, and the meaning of "deference."  Deference is not an absolute mandate for the Department

to simply adopt Petitioner's intent without regard to the legal consequences.  A mere rubber

stamping of all petitioners' intention, void of reason, is *not* what the Department is statutorily

tasked to carry out.  Rather, the Department has an important and active role in defining the

scope of the investigations: "{w}hile petitioners and other interested parties in the investigation

may propose the scope of merchandise to be investigated, Commerce alone defines the scope of

the AD order."[12]  While Petitioner is free to decide what scope description to include in a

petition, it cannot impose on the Department what rules determine the origin of merchandise

within that scope.[13]

   In this case, Petitioner's intended scope is contrary to the statutory language at 19 U.S.C.

---

[10] SolarWorld Case Brief at 7.

[11] SolarWorld Case Brief at 5-10.

[12] *King Supply Co. v. United States*, 674 F.3d 1343, 1345 (Fed. Cir. 2012).

[13] *See e.g. Erasable Programmable Read Only Memories (EPROMs) From Japan*, 51 Fed. Reg. 39680, 39691
(Dep't Commerce Oct. 30, 1986) (final LTFV determ.) ("*EPROMs*").

AFDOCS/11414784.1
Filed By: gurley.john@arentfox.com, Filed Date: 10/23/14 3:49 PM, Submission Status: Approved

Barcode:3237203-01 A-570-010 INV - Investigation -
*Public Version*

§ 1673(1), that provides for the imposition of antidumping duties on "subject merchandise," defined as "the class or kind of merchandise that is within the scope of an investigation, a review, a suspension agreement, {or} an order . . . ." 19 U.S.C. § 1677(25). This provision requires the Department to make a finding of dumping for a class or kind of merchandise from a particular country.[14] When products are made in more than one country, it is important to determine *the* country of origin of the product. In *Solar I*, the Department determined the country of origin of modules by employing the substantial transformation test. Through this test the Department found solar cells to be the essential component of modules – the country of origin determining component. Therefore, cells produced in China (*i.e.,* Chinese cells) dictate that the modules' country of origin is China, and in reverse, modules containing non-Chinese produced cells (*i.e.,* non-Chinese cells) possess the country of origin of where the cells were produced. However, under the Expanded Scope there is no reasonable interpretation that is *not* inconsistent with the origin rule in *Solar I*. And thus the proposed scope language has sunk into a miasma of incoherence. As the Federal Circuit recently explained, the Department has the responsibility to ensure that the scope of an investigation is administrable and sufficiently clear to provide "adequate notice of what conduct is regulated by the order."[15] That mandate cannot be achieved under either scope definition – neither the Scope Expansion nor the two-out-of three scope definition. The only lawful solution for the Department is to rescind these investigations.

With respect to the Department's original scope language, Trina Solar hereby incorporates by reference the scope arguments in the case brief filed on October 16, 2014 by a group of Chinese respondents, including Trina, Canadian Solar Inc. and Canadian Solar (USA)

---

[14] *See E.I. Du Pont de Nemours & Co. v. United States,* 8 F. Supp. 2d 854, 859 (Ct. Int'l Trade 1998) ("{A}ntidumping orders apply to merchandise from particular countries . . . .").

[15] *Mid Continent Nail Corp. v. United States,* 725 F.3d 1295, 1300 (Fed. Cir. 2013) (internal quotations omitted).

5

Filed By: gurley.john@arentfox.com, Filed Date: 10/23/14 3:49 PM, Submission Status: Approved

Inc.; China Sunergy (Nanjing) Co., Ltd.; ET Solar Industry Limited; Hanwha Solarone (Qidong)

Co., Ltd.; Hengdian Group DMEGC Magnetics Co., Ltd.; LDK Solar Hi-Tech (Nanchang) Co.,

Ltd.; Shanghai BYD Co., Ltd. and Shangluo BYD Industrial Co., Ltd.; Shanghai JA Solar

Technology Co., Ltd. and Hefei JA Solar Technology Co., Ltd.; Sumec Hardware & Tools Co.,

Ltd.; Wuxi Suntech Power Co., Ltd.; Wuxi Taichen Machinery & Equipment Co., Ltd.; Yingli

Green Energy Holding Company Ltd. and Yingli Green Energy Americas, Inc.; and Zhejiang

Heda Solar Technology Co., Ltd., that demonstrate the illegal and untenable nature of the scope

of these investigations.[16]

## IV.    TRINA-SPECIFIC ISSUES

### A.    The Department Should Treat Trina U.S.' Unpaid U.S. Sales As Normal Sales Not Zero Price Sales

In its first supplemental Section C response, Trina added a field BALANCEU to identify

each U.S. sale for which Trina U.S. had not received full payment.[17] These unpaid U.S. sales

included [          ] and [     ] which remained not fully paid as of the date of the U.S. sales

verification.[18] The Department's practice, where no date of payment is reported, is to assign the

latest possible date that the respondent could have submitted information regarding the date that

payment was made.[19] Consistent with its past practice, the Department requested in a post-

---

[16] *See* Respondents Case Brief filed by Sidley Austin LLP on behalf of a group of Chinese companies, DOC Case Nos. A-570-010, A-583-853, and C-570-011 (Oct. 16, 2014).

[17] Trina Solar First Supplemental Sections C - D Questionnaire Response (Questions 1-64), at 21 (Qu. 37) (June 18, 2014) ("Trina 1st Supp C-D Resp (Qu. 1-64)").

[18] Memorandum from J. Pedersen to the File, re: Verification of Trina Solar (U.S.) Inc. at 27 (Sept. 26, 2014) ("Trina's CEP Verification Report").

[19] *Carbon and Certain Alloy Steel Wire Rod From Mexico,* 70 Fed. Reg. 25809, 25811 (Dep't Commerce May 16, 2005) (final results admin. review); *Certain Frozen Warmwater Shrimp From India*, 76 Fed Reg 12025, 12030 (Dep't Commerce Mar. 4, 2011) (prelim. results, partial rescission & prelim. no shipment determ.) ("In accordance with the Department's practice, we have set the payment date for these sales equal to the last day Apex could submit new factual information to the Department (i.e., January 21, 2011, the last day of verification)"); *see also Certain Frozen Warmwater Shrimp From India*, 73 Fed. Reg. 40492 (Dep't Commerce July 15, 2008) (final results & partial rescission of review), and accompanying Issues and Decision Memorandum at 9 (Cmt. 5).

# Tab 12

# Respondents' Rebuttal Brief (Oct. 27, 2014)

# AD P.R. 808

BEFORE THE
UNITED STATES DEPARTMENT OF COMMERCE

| | |
|---|---|
| In the Matter of: | ) |
| | ) |
| | ) Case Nos. A-570-010, A-583-853, and |
| CERTAIN CRYSTALLINE SILICON | ) C-570-011 |
| PHOTOVOLTAIC PRODUCTS FROM | ) Number of Pages: 85 |
| THE PEOPLE'S REPUBLIC OF CHINA | ) Investigation |
| AND TAIWAN | ) |
| | ) |

**THIS DOCUMENT CONTAINS NO
PROPRIETARY INFORMATION**

**REBUTTAL BRIEF OF**
**Canadian Solar Inc. and Canadian Solar (USA) Inc.; Changzhou Trina Solar Energy Co.,
Ltd.; China Sunergy (Nanjing) Co., Ltd.; Chint Solar (Zhejiang) Co., Ltd; ET Solar
Industry Limited; Hanwha Solarone (Qidong) Co., Ltd.; Hengdian Group DMEGC
Magnetics Co., Ltd.; Jumao Photonic (Xiamen) Co., Ltd; LDK Solar Hi-Tech (Nanchang)
Co., Ltd.; Perlight Solar Co., Ltd.; Shanghai BYD Co., Ltd. and Shangluo BYD Industrial
Co., Ltd.; Shanghai JA Solar Technology Co., Ltd. and Hefei JA Solar Technology Co.,
Ltd.; Shenzhen Sacred Industry Co., Ltd.; Sumec Hardware & Tools Co., Ltd.; Wuxi
Suntech Power Co., Ltd.; Wuxi Taichen Machinery & Equipment Co., Ltd.; Yingli Green
Energy Holding Company Ltd. and Yingli Green Energy Americas, Inc.; Zhejiang Heda
Solar Technology Co., Ltd.; Zhongli Talesun Solar Co., Ltd.; and Znshine PV-Tech Co.,
LTD.**

Sidley Austin LLP
1501 K Street N.W.
Washington, D.C. 20005
(202) 736-8000

October 27, 2014

BEFORE THE
UNITED STATES DEPARTMENT OF COMMERCE

| | |
|---|---|
| In the Matter of: | ) |
| | ) |
| | ) Case Nos. A-570-010, A-583-853, and |
| CERTAIN CRYSTALLINE SILICON | ) C-570-011 |
| PHOTOVOLTAIC PRODUCTS FROM | ) Number of Pages: 85 |
| THE PEOPLE'S REPUBLIC OF CHINA | ) Investigation |
| AND TAIWAN | ) |
| | ) |

**THIS DOCUMENT CONTAINS NO
PROPRIETARY INFORMATION**

**REBUTTAL BRIEF OF**
**Canadian Solar Inc. and Canadian Solar (USA) Inc.; Changzhou Trina Solar Energy Co.,
Ltd.; China Sunergy (Nanjing) Co., Ltd.; Chint Solar (Zhejiang) Co., Ltd; ET Solar
Industry Limited; Hanwha Solarone (Qidong) Co., Ltd.; Hengdian Group DMEGC
Magnetics Co., Ltd.; Jumao Photonic (Xiamen) Co., Ltd; LDK Solar Hi-Tech (Nanchang)
Co., Ltd.; Perlight Solar Co., Ltd.; Shanghai BYD Co., Ltd. and Shangluo BYD Industrial
Co., Ltd.; Shanghai JA Solar Technology Co., Ltd. and Hefei JA Solar Technology Co.,
Ltd.; Shenzhen Sacred Industry Co., Ltd.; Sumec Hardware & Tools Co., Ltd.; Wuxi
Suntech Power Co., Ltd.; Wuxi Taichen Machinery & Equipment Co., Ltd.; Yingli Green
Energy Holding Company Ltd. and Yingli Green Energy Americas, Inc.; Zhejiang Heda
Solar Technology Co., Ltd.; Zhongli Talesun Solar Co., Ltd.; and Znshine PV-Tech Co.,
LTD.**

This brief is submitted on behalf of Canadian Solar Inc. and Canadian Solar (USA) Inc.;

Changzhou Trina Solar Energy Co., Ltd.; China Sunergy (Nanjing) Co., Ltd.; Chint Solar

(Zhejiang) Co., Ltd; ET Solar Industry Limited; Hanwha Solarone (Qidong) Co., Ltd.; Hengdian

Group DMEGC Magnetics Co., Ltd.; Jumao Photonic (Xiamen) Co., Ltd; LDK Solar Hi-Tech

(Nanchang) Co., Ltd.; Perlight Solar Co., Ltd.; Shanghai BYD Co., Ltd. and Shangluo BYD

Industrial Co., Ltd.; Shanghai JA Solar Technology Co., Ltd. and Hefei JA Solar Technology

Co., Ltd.; Shenzhen Sacred Industry Co., Ltd.; Sumec Hardware & Tools Co., Ltd.; Wuxi

Suntech Power Co., Ltd.; Wuxi Taichen Machinery & Equipment Co., Ltd.; Yingli Green

Energy Holding Company Ltd. and Yingli Green Energy Americas, Inc.; Zhejiang Heda Solar

Technology Co., Ltd.; Zhongli Talesun Solar Co., Ltd.; and Znshine PV-Tech Co., LTD.,[1]

interested parties in the above-captioned investigations.  This brief rebuts the arguments

concerning the scope of these investigations made by SolarWorld Americas, Inc. ("SolarWorld"

or "Petitioner") in its case briefs filed on October 16, 2014.[2]  The Department's memorandum of

October 21, 2014, indicates that rebuttal briefs concerning scope issues are to be filed by today's

date.

## I.      STATEMENT OF ISSUES AND SUMMARY OF ARGUMENTS

Respondents address two issues in this brief, and summarize their arguments with respect

to each issue below.

---

[1]      This submission is made with the support of the China Chamber of Commerce for Import and Export of Machinery and Electronic Products ("CCCME").  CCCME represents major Chinese producers and exporters of crystalline silicon photovoltaic ("CSPV") products, including the companies listed above, as well as Astronergy (Zhejiang) Co., Ltd.; BYD Electric Power Research Institute; Jetion Solar (China) Co., Ltd.; Jiangyin Hareon Power Co., Ltd.; JinkoSolar Holding Co., Ltd.; Lightway Green New Energy Co., Ltd.; LINYANG Electronics Co., Ltd.; RealForce Power Co., Ltd.; Sainty Solar Co., Ltd.; Shenzhen Sungold Solar Co., Ltd.; SUMEC Machinery & Electric Co., Ltd.; Taitong Electrical Industry (Taizhou) Co., Ltd.; Wuxi Jiacheng Solar Energy Technology Co. Ltd.; and Zhejiang Wanxiang Solar Co., Ltd.

[2]      Petitioner filed distinct case briefs in each of the three above-captioned investigations on October 16, 2014.  Respondents understand that Petitioner's arguments concerning the scope of these investigations are identical in each of its three case briefs.  *See* Case Brief of SolarWorld Americas, Inc., DOC Case No. A-570-010, dated October 16, 2014 ("SolarWorld's Case Brief"), at 4-10; Case Brief of SolarWorld Americas, Inc., DOC Case No. A-583-853, dated October 16, 2014, at 5-11; Case Brief of SolarWorld Americas, Inc., DOC Case No. C-570-011, dated October 16, 2014, at 2-8.  For convenience, Respondents cite below to Petitioner's scope arguments from its case brief in DOC Case No. A-570-010, which Respondents refer to as SolarWorld's Case Brief; however, Respondents' arguments in this brief should be considered to rebut Petitioner's arguments concerning scope in all three investigations.

Barcode:3237549-01 A-570-010 INV - Investigation  -

1.    Whether, in the final determinations, the Department should adopt the scope expansion proposed in its memorandum dated October 3, 2014.

In the final determinations, the Department should not expand the scope of these investigations as proposed in its October 3, 2014, memorandum.  Petitioner supports the Department's proposed scope expansion, claiming it would effectuate Petitioner's intent and prevent evasion or circumvention of any resulting antidumping ("AD") or countervailing duty ("CVD") orders.  However, Petitioner's arguments lack merit because: (i) the Department's proposed scope expansion is not consistent with Petitioner's intent as expressed throughout these proceedings, and Petitioner may not redefine and broaden its intent at this late stage of these proceedings; (ii) even if the Department's proposed scope expansion were consistent with Petitioner's intent, the Department cannot lawfully defer to Petitioner's intent when it results in an unlawful scope determination; and (iii) Petitioner's concerns regarding potential evasion or circumvention of AD/CVD orders are unfounded, as they are based on inapposite precedent and an incomplete understanding of the Department's "substantial transformation" test.  Accordingly, the Department should not adopt its proposed October 3 scope expansion.


2.    Whether, in the final determinations, the Department should maintain the scope of these investigations as proposed by Petitioner.

In the final determinations, the Department cannot lawfully maintain Petitioner's proposed scope for these investigations (i.e., the "two-out-of-three" rule), as Petitioner advocates in the alternative.  This is because Petitioner's proposed scope leads to contradictory results and would be impossible for the Department and U.S. Customs and Border Protection ("CBP") to effectively enforce and administer.  Moreover, Petitioner has provided no justification for the Department to depart from its well-established and judicially-approved "substantial transformation" test for determining country of origin for AD/CVD purposes.

3

Barcode:3237549-01 A-570-010 INV - Investigation -

## II.   ARGUMENT

Petitioner makes two arguments concerning the scope of these investigations, neither of which should be accepted by the Department.  First, Petitioner expresses its support for the Department's proposal of October 3, 2014,[3] and argues that the Department should expand the scope of these investigations along those lines.[4]  Second, in the alternative, Petitioner argues that the Department should maintain the scope of these investigations as proposed by Petitioner and initially adopted by the Department.[5]

Respondents have already addressed these issues in their own case brief filed on October 16, 2014,[6] which incorporated and built upon Respondents' previous submissions on the scope of these investigations.[7]  Specifically, Respondents explained why the Department should not adopt either of the approaches advocated by Petitioner.[8]  Rather, the Department should delete the second sentence of the current scope definition (i.e., the "two-out-of-three" rule) because it is untenable, apply its well-established and judicially-approved "substantial transformation" test for determining country of origin, and consequently terminate these investigations with respect to China.[9]

---

[3]   Antidumping and Countervailing Duty Investigations of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and the Antidumping Duty Investigation of Certain Crystalline Silicon Photovoltaic Products from Taiwan: Opportunity to Submit Scope Comments, October 3, 2014 ("Scope Comments Memo").

[4]   SolarWorld's Case Brief at 4-8.

[5]   SolarWorld's Case Brief at 8-10.

[6]   Respondents' Case Brief, DOC Case Nos. A-570-010, A-583-853, C-570-011, dated October 16, 2014 ("Respondents' Case Brief").

[7]   Letter from Sidley Austin LLP to the Hon. Penny S. Pritzker, DOC Case Nos. A-570-010, A-583-853, and C-570-011, dated February 18, 2014 ("Respondents' Scope Comments"); Letter from Sidley Austin LLP to the Hon. Penny S. Pritzker, DOC Case Nos. A-570-010, A-583-853, and C-570-011, dated April 21, 2014 ("Respondents' Scope Response").

[8]   Respondents' Case Brief at 8-25.

[9]   Respondents' Case Brief at 26.

Filed By: nellis@sidley.com, Filed Date: 10/27/14 1:06 PM, Submission Status: Approved

Barcode:3237549-01 A-570-010 INV - Investigation  -

Respondents now address the two arguments advanced by Petitioner concerning the scope of these investigations, and further explain why the Department should reject both of these arguments.

### A.   The Department Should Not Adopt the Scope Expansion Proposed in Its Memorandum Dated October 3, 2014

Petitioner urges the Department to adopt the scope expansion proposed in its October 3 Scope Comments Memo for essentially two reasons: (i) because it would effectuate Petitioner's intent; and (ii) because it would prevent evasion or circumvention of any resulting AD/CVD orders.[10]   Petitioner's arguments fail for three reasons.

First, as a factual matter, the Department's proposed scope expansion is not consistent with Petitioner's intent as expressed throughout these proceedings.  Petitioner's belated attempt to redefine and broaden its intent must fail.  Second, even if the Department's proposed scope expansion were consistent with Petitioner's intent, the law imposes limitations on the Department's deference to Petitioner's intent in defining the scope of AD/CVD investigations, and adoption of the Department's proposed scope expansion in the current investigations would exceed those limitations.  Third, Petitioner's allegation of potential evasion or circumvention of AD/CVD orders is a red herring, as it is based on inapposite precedent and an incomplete understanding of the Department's "substantial transformation" test.  Respondents now elaborate on these three points.

---

[10]   SolarWorld's Case Brief at 4-8.

Filed By: nellis@sidley.com, Filed Date: 10/27/14 1:06 PM, Submission Status: Approved

Barcode:3237549-01 A-570-010 INV - Investigation  -

1.  The Department's Proposed Scope Expansion Is Inconsistent with Petitioner's Intent as Expressed Throughout these Proceedings, and It Is Too Late in these Proceedings for Petitioner to Redefine and Broaden Its Intent

Petitioner is incorrect that the Department's proposed scope expansion is consistent with its intended scope for these investigations.  In fact, the Department's proposal amounts to a significant expansion of the scope of these investigations as compared with the scope proposed by Petitioner and preliminarily adopted by the Department.  Petitioner's attempt to redefine its intent in its case brief so as to support a massive expansion in the scope of these investigations at this late stage of these proceedings is unlawful.

Petitioner now asserts that its intent "has always been" that the current investigations would cover all CSPV cells and modules from China and Taiwan except for those products subject to the existing AD/CVD orders on CSPV cells from China, such that all CSPV cells and modules from China and Taiwan "would be subject to the scope of either these investigations or the first solar AD/CVD investigations."[11]  This assertion is factually incorrect.

Petitioner articulated the first paragraph of the scope of these investigations as follows in response to supplemental questions from the Department concerning Volume I of the Petition:

> The merchandise covered by this investigation is crystalline silicon photovoltaic cells, and modules, laminates and/or panels consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including building integrated materials.  *For purposes of this investigation, subject merchandise also includes modules, laminates, and/or panels assembled in the subject country consisting of crystalline silicon photovoltaic cells that are completed or partially manufactured within a customs territory other than that subject country, using ingots that are manufactured in the subject country, wafers that are manufactured in the subject country, or cells where the manufacturing process*

---

[11]   SolarWorld's Case Brief at 4-5.

6

> *begins in the subject country and is completed in a non-subject*
> *country.*[12]

The Department preliminarily adopted this very same paragraph, including the second sentence articulating Petitioner's "two-out-of-three" rule, as the first paragraph of the scope in initiating the current investigations.[13]

    In proposing the above paragraph for the scope of these investigations, and particularly the second sentence reflecting its "two-out-of-three" rule, Petitioner stated in no uncertain terms:

> Petitioner *intends* that the present proceeding cover panels and modules assembled in a subject country (*e.g.*, China), even if the cells in those modules are produced in a different country (*e.g.*, Taiwan or a non-subject country), *if those cells are made from ingots, wafers or partially manufactured cells that were manufactured in the subject country (e.g., China)*. This would cover situations where the panels or modules are assembled in a subject country from cells made in a different country but: 1) the ingots used for the wafers made into the cells were manufactured in the subject country; 2) the wafers made into the cells were manufactured in the subject country; or 3) the cell manufacturing process began in the subject country and then was completed in a non-subject country.[14]

Later, in rebutting Respondents' Scope Comments, Petitioner further made clear:

> {T}he scope's "two-out-of-three" rule is *intended* to <u>supplement</u> the Department's prior substantial transformation/country-of-origin determination. It only applies in the unique circumstances in which an input to a c-Si PV module is produced in a subject

---

[12]    Letter from Wiley Rein LLP to the Hon. Penny S. Pritzker and the Hon. Lisa R. Barton, DOC Case Nos. A-570-010, C-570-011, and A-583-853, and USITC Inv. Nos. 701-TA-511 and 731-TA-1246-1247 (Preliminary), dated January 13, 2014 ("Petition, Volume I, Supplement II"), at 4 (emphasis added).

[13]    *Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and Taiwan: Initiation of Antidumping Duty Investigations*, 79 Fed. Reg. 4661, 4667 (January 29, 2014) ("AD Notice of Initiation"); *Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: Initiation of Countervailing Duty Investigation*, 79 Fed. Reg. 4667, 4671 (January 29, 2014) ("CVD Notice of Initiation").

[14]    Petition, Volume I, Supplement II at 2 (emphases added).

country and the c-Si PV module is assembled in the same subject country.[15]

To recall, the Department's "prior substantial transformation/country-of-origin determination" was that "module assembly does not substantially alter the essential nature of solar cells nor does it constitute significant processing such that it changes the country-of-origin of the cell."[16]  Therefore, "where solar cell production occurs in a different country from solar module assembly, the country-of-origin of the solar modules/panels is the country in which the solar cell was produced."[17]

Consequently, with respect to CSPV modules, the first sentence of Petitioner's proposed scope for the current investigations captures CSPV modules assembled anywhere in the world from CSPV cells produced in a subject country (i.e., China or Taiwan).  However, CSPV modules assembled anywhere in the world from CSPV cells produced in China are already subject to the existing AD/CVD orders, and therefore are excluded from the scope of the current investigations.  That leaves only CSPV modules assembled anywhere in the world from CSPV cells produced in Taiwan as subject merchandise for the current investigations pursuant to the first sentence of Petitioner's proposed scope.

Then, as explained by Petitioner itself, the second sentence of Petitioner's proposed scope (i.e., the "two-out-of-three" rule) is intended to operate as a supplement to bring within the scope of the current investigations certain additional CSPV modules assembled in China and Taiwan that are not captured by the first sentence of the scope – namely, those CSPV modules assembled

---

[15]    Letter from Wiley Rein LLP to the Hon. Penny S. Pritzker, DOC Case Nos. A-570-010, A-583-853, and C-570-011, dated April 3, 2014 ("Petitioner's Scope Rebuttal"), at 6 (underline in original; italics added).
[16]    CSPV Cells from China, Scope Clarification Memo, at 8 (attached to Respondents' Case Brief as Exhibit 1).
[17]    CSPV Cells from China, Scope Clarification Memo, at 8 (attached to Respondents' Case Brief as Exhibit 1).

in a subject country from cells produced outside the subject country using ingots, wafers or partial cells produced in the subject country.

Thus, it should be plain that Petitioner intended for the current investigations to cover only a *subset* of modules assembled in China or Taiwan from third-country cells, not all modules assembled in China or Taiwan from third-country cells.  However, as Respondents previously explained, the Department's proposed scope expansion would bring within the scope of the current China investigations every CSPV module assembled in China from CSPV cells produced anywhere in the world outside of China; and it would bring within the scope of the current Taiwan investigation every CSPV module assembled in Taiwan from CSPV cells produced anywhere in the world outside of Taiwan or China.[18]  This constitutes a massive expansion of the scope of these investigations, and is not consistent with Petitioner's previously expressed intent.

As Respondents explained in their case brief, the Court of International Trade has indicated that expanding the scope of an AD/CVD investigation at a late stage, and certainly at the final determination stage, is legally impermissible because it raises severe procedural concerns.[19]  In *Allegheny Bradford Corp. v. United States*, 342 F. Supp. 2d 1172 (Ct. Int'l Trade 2004), the Court explained that "Commerce's discretion to define and clarify the scope of an investigation is limited in part by concerns for the finality of administrative action, *which caution against including a product that was understood to be excluded at the time the investigation began*," and it held that expanding the scope of an investigation concurrent with the issuance of the final determination "compromise{es} the integrity of the investigation's prior stages."  *Id.* at 1187-88 (emphasis added).  Similarly, in *Smith Corona Corp. v. United States*, 796 F. Supp. 1532 (Ct. Int'l Trade 1992), the Court held:

---

[18]     Respondents' Case Brief at 12-13.
[19]     Respondents' Case Brief at 13-15.

9

> *Commerce ... must exercise caution in redefining scope in midstream to include items which were clearly known about and excluded at the time of initiation of the investigation, and, indeed in this case, at the time of the preliminary determination.*

> Various procedural safeguards such as opportunities to respond and to be heard are built into the unfair trade laws. *To change the scope definition at late stages of the proceedings deprives the parties of the full benefits of those procedures.* Furthermore, the International Trade Commission ("ITC") must make its determination of like product and its determination of injury in relation to Commerce's definition of the class or kind of imported merchandise being investigated. Late changes in scope definitions can cause problems with this process and can even lead to unintended divergences from commitments pursuant to international obligations.

*Id.* at 1535 (emphases added).

Here, the particular procedural concerns highlighted by the Court in the above two cases would arise should the Department expand the scope of these investigations in the manner it has proposed in its final determinations. As explained in Respondents' case brief, such procedural concerns would arise in both the Department's AD/CVD investigations and the ITC's injury investigation because both agencies' determinations would be based on data that are not consistent with the final expanded scope of these investigations.[20]

For these reasons, it is now too late in these proceedings for Petitioner to redefine its intent and request the Department to expand the scope accordingly. The Department's proposal amounts to a significant expansion of the scope of these investigations as compared with the scope proposed by Petitioner and preliminarily adopted by the Department. Therefore, the Department may not lawfully adopt the scope expansion proposed in its Scope Comments Memo.

---

[20] Respondents' Case Brief at 14-15.

10

Barcode:3237549-01 A-570-010 INV - Investigation -

2.    The Department's Deference to Petitioner's Intent Is Not Unlimited

Even if the Department's proposed scope expansion would effectuate Petitioner's intent, the Department is not legally permitted to defer to Petitioner's intent without limitation. Rather, as Respondents have previously explained, the Department cannot simply accept Petitioner's proposed scope, regardless of Petitioner's intent, if that scope will result in unlawful country of origin determinations and problems in the enforcement and administration of any AD/CVD orders that may arise from the investigations.[21] Here, as Respondents explained in their case brief, the Department's proposed scope expansion would be unlawful because it is inconsistent with the product coverage decisions made by the Department in the previous investigations concerning CSPV cells from China, is inherently flawed in that it results in inconsistent country of origin determinations or requires ignoring the proper country of origin of a product, and violates the United States' World Trade Organization ("WTO") obligations.[22] Thus, regardless of Petitioner's intent, the Department may not lawfully adopt its proposed scope expansion.

Indeed, the Department made this patently clear in the prior CSPV investigations in rejecting Petitioner's identical assertion, based on its own intent, that those investigations should cover all CSPV modules assembled in China regardless of the origin of the cells:

> While we understand the intent of Petitioner's argument that the scope should cover solar modules/panels produced in the PRC, regardless of the origin of the solar cells, this is not tenable because doing so would either necessitate making inconsistent country-of-origin determinations for a single product, or require ignoring the country-of-origin when considering whether merchandise entering the United States is covered by the scope of these investigations. A product can only have one country-of-origin for AD/CVD purposes, and AD and CVD investigations

---

[21]    *See* Respondents' Scope Comments at 9-10; Respondents' Scope Response at 3-4.
[22]    Respondents' Case Brief at 17-24.

Filed By: nellis@sidley.com, Filed Date: 10/27/14 1:06 PM, Submission Status: Approved

only cover products with a country-of-origin that is the country under investigation.[23]

The Department itself understands very well that it need not, and can not, defer to Petitioner's intent in all circumstances. As the Department wrote in its brief to the Court of International Trade defending its product coverage decisions in the previous investigations:

> Commerce does indeed owe some deference to the intent of the petitioner. *See Downhole Pipe*, 887 F. Supp. 2d at 1319-20. *This deference is not absolute, however.* As we have explained, *Commerce is not relegated to the role of a mere scrivener. See Polites v. United States*, 780 F. Supp. 2d 1351, 1356 (Ct. Int'l Trade 2011) (explaining that although "countervailing duty and antidumping investigations are initiated by Commerce based on petitions filed by a domestic interested party, Commerce is responsible for determining the language in the final order.") (citation omitted), *aff'd*, 465 F. App'x 962 (Fed. Cir. 2012). Rather, Commerce may exercise its authority to define and clarify the scope if it is overly broad, *see Ad Hoc Shrimp*, 637 F. Supp. 2d at 1175; *Save Domestic Oil*, 240 F. Supp. 2d at 1351, or if the "resulting order would be otherwise unadministrable," *Large Residential Washers from Korea* at cmt. 2.[24]

Moreover, the Department explained to the Court that its previous product coverage decisions, based on application of its "substantial transformation" test, already results in the inclusion of all proper Chinese-origin CSPV cells and modules within the scope of the existing orders, consistent with Petitioner's apparent intent:

> Moreover, Commerce's determination *is* consistent with SolarWorld's expressed intent to cover all solar cells made in China and all solar modules made in China. SolarWorld is entitled to relief only from injury caused by reason of imports from the country under investigation. *See* 19 U.S.C. §§ 1671(a)(1), 1673(1); *DuPont*, 8 F. Supp. 2d at 859. Commerce does not impose duties applicable to one country to merchandise that is from a different country. *See Ugine & ALZ Belg., N.V. v. United*

---

[23]   CSPV Cells from China, Scope Clarification Memo, at 8 (attached to Respondents' Case Brief as Exhibit 1).

[24]   Defendant's Response in Opposition to Motion for Judgment Upon the Agency Record, *SolarWorld Industries America, Inc. v. United States*, Consol. Court No. 13-00219, dated May 5, 2014 ("United States' Response Brief") at 17 (emphases added) (attached hereto at Exhibit 1).

Barcode:3237549-01 A-570-010 INV - Investigation -

*States*, 517 F. Supp. 2d 1333, 1345 (Ct. Int'l Trade 2007), *aff'd*, 551 F.3d 1339.  Thus, regardless of whether SolarWorld intended to include solar modules assembled in China using third-country cells, because such modules are of third-country origin for antidumping and countervailing duty purposes, Commerce properly excluded them from the scope of the investigations and orders.[25]

All of this reasoning applied by the Department with respect to the 2012 investigations is equally relevant now.  Given the clear rejection of Petitioner's attempted scope expansion in the prior investigations, the Department cannot now justify the very same scope expansion in the current investigations, even if that were Petitioner's intent.  Rather, it should be evident that all proper Chinese-origin CSPV cells and modules are already covered by the existing orders, meaning the current investigations with respect to China should be terminated.  And it should also be evident that the current Taiwan investigation should cover only: (i) CSPV cells produced in Taiwan; and (ii) CSPV modules assembled anywhere in the world using CSPV cells produced in Taiwan, because only such modules are properly considered Taiwanese-origin modules for AD/CVD purposes.

3.      Determining Country of Origin Based on the "Substantial Transformation" Test Does Not Give Rise to Evasion or Circumvention Concerns

Petitioner raises fears of potential "avoidance, evasion and circumvention" of AD/CVD orders and "the creation of a loophole" if the Department does not adopt its proposed scope expansion.[26]  This argument is a red herring for two reasons.

First, Petitioner's argument is based on inapposite precedent.  Petitioner argues that "the Department often notes its intent to avoid creating opportunities for circumvention when

---

[25]    United States' Response Brief at 17-18 (emphasis in original) (attached hereto at Exhibit 1).

[26]    SolarWorld's Case Brief at 6-8.

13

defining the scope of an investigation," citing the Department's final determinations in *Large Newspaper Printing Presses and Components Thereof, Whether Assembled or Unassembled, from Germany* and *Cellular Mobile Telephones and Subassemblies from Japan*, as well as related case law from the Court of International Trade and the Court of Appeals for the Federal Circuit.[27]  However, those cases involved situations where the Department included upstream components or subassemblies of a product within the scope, in addition to the product itself, in order to prevent evasion of the antidumping orders.[28]  That is not the situation in the current investigations.  Rather, here, the Department proposes to expand the scope to include a downstream product (i.e., CSPV modules) assembled in a subject country from component products (i.e., CSPV cells), despite the fact that the Department has already determined, based on application of its well-established and judicially-approved "substantial transformation" test, that "module assembly does not substantially alter the essential nature of solar cells nor does it

---

[27]     SolarWorld's Case Brief at 6-7 and n.8-9.  Petitioner also references the fact that the recent EU AD/CVD orders on Chinese solar products apply to imports of CSPV modules and components "originating in or consigned from" China.  *Id.* at 7 and n.10.  Respondents fail to see relevance of this outcome under EU law for the current investigations, which must be in accordance with *U.S. law*.  As discussed further below, U.S. law requires that AD/CVD duties be imposed on a particular product that *originates in* (i.e., is from) a particular country, and therefore AD/CVD duties applicable to a product from a country may not be applied to that same product from a different country.  *See, e.g.*, CSPV Cells from China, Scope Clarification Memo, at 5 (attached to Respondents' Case Brief as Exhibit 1) ("{t}he scope of an AD or CVD order is limited to merchandise that *originates in* the country covered by the order") (emphasis added); United States' Response Brief at 17 (attached hereto at Exhibit 1) ("Commerce does not impose duties applicable to one country to merchandise that is from a different country.").

[28]     *See Notice of Final Determination of Sales at Less Than Fair Value: Large Newspaper Printing Presses and Components Thereof, Whether Assembled or Unassembled, From Germany*, 61 Fed. Reg. 38166, 38168-70 (July 23, 1996) (clarifying the scope to "include *incomplete LNPP systems, additions or components*" in order "to avoid creating loopholes for circumvention, including those arising from differing degrees of completeness of the imported merchandise") (emphasis added); *Cellular Mobile Telephones and Subassemblies From Japan; Final Determination of Sales at Less Than Fair Value*, 50 Fed. Reg. 45447, 45448 (October 31, 1985) (noting "{t}he primary purpose of *including subassemblies* in this investigation is to prevent evasion of the antidumping law") (emphasis added).

14

Barcode:3237549-01 A-570-010 INV - Investigation -

constitute significant processing such that it changes the country-of-origin of the cell," and therefore "the country-of-origin of the solar modules/panels is the country in which the solar cell was produced."[29]

Second, Petitioner fails to recognize that the Department's "substantial transformation" test already guards against potential circumvention. The Court of International Trade made this clear in *E.I. Dupont De Nemours & Co. v. United States*, 8 F. Supp. 2d 854 (Ct. Int'l Trade 1998) in recognizing the "substantial transformation" test as a "reasonable application of 19 U.S.C. § 1673(1)," the statutory provision that says antidumping orders are to be issued for "a class or kind of foreign merchandise."[30]

> The antidumping statute reflects Congress' recognition that country of origin determinations are vital to preserve the integrity of existing antidumping orders from potential circumvention through third country assembly, U.S. assembly, and transshipment of subject merchandise through intermediate countries. *See* 19 U.S.C. §§ 1677j, 1677b(a)(3). Because antidumping orders apply to merchandise from particular countries, not individual producers, determining the country where the unfairly traded merchandise is produced or manufactured is fundamental to the proper administration and enforcement of the antidumping statute. *See* 19 U.S.C. § 1673; see also §§ 1677j, 1677b(a)(3). The "substantial transformation" rule provides a means for Commerce to carry out its country of origin examination and *properly guards against circumvention of existing antidumping orders*.

*Id.* at 858-59 (emphasis added).

Thus, in the prior CSPV investigations, in rejecting similar circumvention concerns raised by Petitioner and instead relying on the results of its "substantial transformation" test, the Department wrote:

---

[29]   CSPV Cells from China, Scope Clarification Memo, at 8 (attached to Respondents' Case Brief as Exhibit 1).
[30]   The same is true for countervailing duty orders pursuant to 19 U.S.C. § 1671(a)(1), which provides that countervailing duty orders are to be issued for "a class or kind of merchandise imported, or sold (or likely to be sold) for importation, into the United States."

15

Barcode:3237549-01 A-570-010 INV - Investigation -

> While we acknowledge that the Department has on occasion explicitly addressed the possibility of circumvention as a consideration in determining the country-of-origin of merchandise under investigation, circumvention is not the sole or controlling factor relied upon in making a country-of-origin determination. Nonetheless, whether explicitly stated or not, the factors we consider for making country-of-origin determinations *inherently reflect* the agency's concern that the relief afforded by AD/CVD orders not be eviscerated by moving minor processing outside of the country covered by the order. Thus, *circumvention concerns are reflected in the country-of-origin determination.*[31]

In the present case, as previously explained,[32] the Department already applied its "substantial transformation" test in the prior investigations and determined that the country of origin of a CSPV module, for AD/CVD purposes, is the country of origin of the CSPV cells incorporated into that module. Moreover, Respondents methodically applied the "substantial transformation" test to demonstrate that the country of origin of a CSPV cell is properly the country in which the cell is produced.[33] Petitioner has never presented any evidence or argument to the contrary. The Department should therefore find that the country of origin of a CSPV cell is the country of cell production.

Once these findings are made, it is incorrect and disingenuous to characterize imports of CSPV modules assembled in China or Taiwan from third-country cells as potential "evasion" or "circumvention" of AD/CVD orders. Rather, as the Department itself stated previously, those "modules are of third-country origin for antidumping and countervailing duty purposes, {and therefore} properly excluded … from the scope of the investigations and orders," and "Commerce does not impose duties applicable to one country to merchandise that is from a

---

[31]     CSPV Cells from China, Scope Clarification Memo, at 9 (emphases added; internal citation omitted) (attached to Respondents' Case Brief as Exhibit 1).

[32]     *See* Respondents' Scope Comments at 10-19; Respondents' Scope Response at 11-14.

[33]     *See* Respondents' Scope Comments at 12-16; Respondents' Scope Response at 13-14.

Filed By: nellis@sidley.com, Filed Date: 10/27/14 1:06 PM, Submission Status: Approved

Barcode:3237549-01 A-570-010 INV - Investigation  -

different country."[34]  In other words, no evasion or circumvention concerns arise from concluding that Chinese-origin modules for AD/CVD purposes are those modules assembled anywhere in the world from cells produced in China, and such modules are already covered by the scope of the existing orders; and Taiwanese-origin modules for AD/CVD purposes are those modules assembled anywhere in the world from cells produced in Taiwan, and such modules should be the only modules covered by the scope of the current Taiwan investigation.

To the contrary, should the Department adopt its proposed scope expansion, the concern would then arise that the Department would no longer be applying AD/CVD duties to a particular product from a particular country, as it is required to do under U.S. law.  Rather, the Department would be applying AD/CVD duties to a product *without regard* to that product's country of origin (i.e., modules assembled in China or Taiwan from third-country cells, which may be produced anywhere in the world, and therefore are properly defined as third-country products).  This would be a grossly unreasonable application of the AD/CVD laws, for which reason the Department should decline to adopt its proposed scope expansion of October 3, 2014.

### B.   The Department Should Not Maintain the Scope of these Investigations as Proposed by Petitioner

Petitioner argues in the alternative that, should the Department not adopt its proposed scope expansion of October 3, 2014, the Department should maintain the scope of these investigations as proposed by Petitioner – i.e., maintain the "two-out-of-three" rule.[35]  Petitioner raises no new arguments in this regard, but rather relies once again on its alleged intent and its concerns regarding evasion.

---

[34]   United States' Response Brief at 17-18 (attached hereto at Exhibit 1).
[35]   SolarWorld's Case Brief at 8-10.

17

Barcode:3237549-01 A-570-010 INV - Investigation  -

Respondents have already explained in great detail why Petitioner's proposed scope is not viable and must be rejected by the Department.[36]  In short, Petitioner's proposed scope is legally untenable because its application leads to contradictory results and would be impossible for the Department and CBP to effectively enforce and administer.  Moreover, Petitioner has provided no justification for the Department to depart from its well-established and judicially-approved "substantial transformation" test for determining country of origin for AD/CVD purposes.  Petitioner's arguments regarding "intent" and "evasion" do not provide such justification, because the Department's deference to Petitioner's intent is not unbounded and because the "substantial transformation" test already guards against circumvention.  Accordingly, the Department should not maintain Petitioner's proposed scope for these investigations.

---

[36]      Respondents' Case Brief at 8-11, citing Respondents' Scope Comments at 19-26 and Respondents' Scope Response at 2-10, 14-27.

Filed By: nellis@sidley.com, Filed Date: 10/27/14 1:06 PM, Submission Status: Approved

Barcode:3237549-01 A-570-010 INV - Investigation -

## III.   CONCLUSION

For the foregoing reasons, the Department should neither adopt its proposed scope expansion of October 3, 2014, nor maintain the scope of these investigations as proposed by Petitioner.  Rather, for the reasons expressed in Respondents' Case Brief, Respondents' Scope Response, and Respondents' Scope Comments, the Department should delete the second sentence of the scope definition (i.e., the "two-out-of-three" rule), apply its "substantial transformation" test to determine country of origin, and terminate these investigations with respect to China.

Respectfully submitted,

Neil R. Ellis
Richard L. A. Weiner
Brenda A. Jacobs
Rajib Pal
Shawn Higgins

Canadian Solar Inc. and Canadian Solar (USA) Inc.; Changzhou Trina Solar Energy Co., Ltd.; China Sunergy (Nanjing) Co., Ltd.; Chint Solar (Zhejiang) Co., Ltd; ET Solar Industry Limited; Hanwha Solarone (Qidong) Co., Ltd.; Hengdian Group DMEGC Magnetics Co., Ltd.; Jumao Photonic (Xiamen) Co., Ltd; LDK Solar Hi-Tech (Nanchang) Co., Ltd.; Perlight Solar Co., Ltd.; Shanghai BYD Co., Ltd. and Shangluo BYD Industrial Co., Ltd.; Shanghai JA Solar Technology Co., Ltd. and Hefei JA Solar Technology Co., Ltd.; Shenzhen Sacred Industry Co., Ltd.; Sumec Hardware & Tools Co., Ltd.; Wuxi Suntech Power Co., Ltd.; Wuxi Taichen Machinery & Equipment Co., Ltd.; Yingli Green Energy Holding Company Ltd. and Yingli Green Energy Americas, Inc.; Zhejiang Heda Solar Technology Co., Ltd.; Zhongli Talesun Solar Co., Ltd.; and Znshine PV-Tech Co., LTD.

Dated: October 27, 2014

Filed By: nellis@sidley.com, Filed Date: 10/27/14 1:06 PM, Submission Status: Approved

**Tab 13**

**Issues and Decision Memorandum for the Final
Determination in the Countervailing Duty
Investigation (Dec. 15, 2014)**

**CVD P.R. 388**



UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

C-570-011
Investigation
**Public Document**
E&C Office VII: Team

**DATE:**               December 15, 2014

**MEMORANDUM TO:**      Paul Piquado
                        Assistant Secretary
                            For Enforcement and Compliance

**FROM:**               Christian Marsh
                        Deputy Assistant Secretary
                            for Antidumping and Countervailing Duty Operations

**SUBJECT:**            Issues and Decision Memorandum for the Final Determination in
                        the Countervailing Duty Investigation of Certain Crystalline
                        Silicon Photovoltaic Products from the People's Republic of China

## I.     SUMMARY

The Department of Commerce (the Department) determines that countervailable subsidies are being provided to producers and exporters of certain crystalline silicon photovoltaic products (certain solar products, or subject merchandise) from the People's Republic of China (the PRC), within the meaning of section 705 of the Tariff Act of 1930, as amended (the Act).[1]  Below is the complete list of issues in this investigation for which we received comments from interested parties:

Issues:
**Comment 1:**  Scope Comments and Scope Clarification
**Comment 2:**  Whether the Department Should Investigate the Effects of the GOC's Alleged Cyberhacking on this Investigation
**Comment 3:**  Whether Input Providers are "Authorities" Within the Meaning of the Act
**Comment 4:**  Whether the Provision of Chinese Polysilicon for LTAR is Countervailable
**Comment 5:**  Whether the Department Should Attribute Subsidies under the Provision of Polysilicon for LTAR Program to Wuxi Suntech's Cross-owned Companies
**Comment 6:**  Whether the Provision of Aluminum Extrusions for LTAR is Countervailable
**Comment 7:**  Whether the Provision of Solar Glass for LTAR is Countervailable
**Comment 8:**  Whether AFA is Applicable to Trina Solar's Land Purchases

---

[1] *See also* section 701(f) of the Act.



INTERNATIONAL
**T R A D E**
ADMINISTRATION

assembled in the PRC, consisting of crystalline silicon photovoltaic cells, not exceeding 10,000mm$^2$ in surface area, that are permanently integrated into a consumer good whose function is other than power generation and that consumes the electricity generated by the integrated crystalline silicon photovoltaic cells.  Where more than one module, laminate and/or panel is permanently integrated into a consumer good, the surface area for purposes of this exclusion shall be the total combined surface area of all modules, laminates and/or panels that are integrated into the consumer good.  Further, also excluded from the scope of this investigation are any products covered by the existing antidumping and countervailing duty orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, laminates and/or panels, from the PRC.[6]

Merchandise covered by this investigation is currently classified in the Harmonized Tariff Schedule of the United States (HTSUS) under subheadings 8501.61.0000, 8507.20.8030, 8507.20.8040, 8507.20.8060, 8507.20.8090, 8541.40.6020, 8541.40.6030 and 8501.31.8000. These HTSUS subheadings are provided for convenience and customs purposes; the written description of the scope of this investigation is dispositive.

## IV.    APPLICATION OF THE COUNTERVAILING DUTY LAW TO IMPORTS FROM THE PRC

On October 25, 2007, the Department published its final determination on coated free sheet paper from the PRC.[7]  In *CFS from the PRC*, the Department found that:

> . . . given the substantial differences between the Soviet-style economies and China's economy in recent years, the Department's previous decision not to apply the CVD law to these Soviet-style economies does not act as a bar to proceeding with a CVD investigation involving products from China.[8]

The Department affirmed its decision to apply the countervailing duty (CVD) law to the PRC in numerous subsequent determinations.[9]  Furthermore, on March 13, 2012, Public Law 112-99 was enacted, which confirms that the Department has authority to apply the CVD law to countries designated as non-market economies under section 771(18) of the Act, such as the PRC.[10]  The effective date provision of the enacted legislation makes clear that this provision applies to this proceeding.[11]

---

[6] *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order*, 77 FR 73018 (December 7, 2012); *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Countervailing Duty Order*, 77 FR 73017 (December 7, 2012).
[7] *See Coated Free Sheet Paper from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 72 FR 60645 (October 25, 2007) (*CFS from the PRC*), an accompanying Decision Memorandum at Comment 6.
[8] *Id.*
[9] *See, e.g., Circular Welded Carbon Quality Steel Pipe from the People's Republic of China: Final Affirmative Countervailing Duty Determination and Final Affirmative Determination of Critical Circumstances*, 73 FR 31966 (June 5, 2008) (*CWP from the PRC*) and accompanying Decision Memorandum at Comment 1.
[10] Section 1(a) is the relevant provision of Public Law 112-99 and is codified at section 701(f) of the Act.
[11] Public Law 112-99, 126 Stat. 265 §1(b).

Filed By: Gene Calvert, Filed Date: 12/17/14 12:45 PM, Submission Status: Approved

3. Tax Benefit Programs

    a. The Two Free/Three Half Program for FIEs
    b. Income Tax Reductions for Export-Oriented Enterprises
    c. Income Tax Benefits for FIEs Based on Geographic Locations
    d. Local Income Tax Exemption and Reduction Programs for "Productive" FIEs
    e. Tax Reductions for FIEs Purchasing Chinese-Made Equipment
    f. Tax Refunds for Reinvestment of FIE Profits in Export-Oriented Enterprises
    g. Tax Reductions for High and New-Technology Enterprises Involved in Designated Projects
    h. Preferential Income Tax Policy for Enterprises in the Northeast Region
    i. Guangdong Province Tax Programs

4. VAT and Tariff Exemptions for Purchases of Fixed Assets under the Foreign Trade Development Fund Program

## IX. ANALYSIS OF COMMENTS

## Comment 1: Scope Comments and Scope Clarification

On October 3, 2014, the Department issued a letter to all interested parties inviting parties to include in their case briefs comments concerning a possible clarification to the scope of the AD/CVD investigations that the Department was considering.[180]   The Department stated that the scope clarification under consideration contemplated the following:

- For the PRC investigations, subject merchandise would include all modules, laminates and/or panels assembled in the PRC that contain crystalline silicon photovoltaic cells produced in a customs territory other than the PRC.
- For the Taiwan investigation, subject merchandise would include all modules, laminates and/or panels assembled in Taiwan consisting of crystalline silicon photovoltaic cells produced in Taiwan or a customs territory other than Taiwan and would continue to exclude any products covered by the existing AD and CVD orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the PRC.  In addition, subject merchandise would include modules, laminates, and panels assembled in a third-country, other than the PRC, consisting of crystalline silicon photovoltaic cells produced in Taiwan.

Parties have commented on the scope clarification in this letter and made other scope comments addressed below.  Generally, Respondents oppose adopting the proposed scope clarification in the October 3rd Letter, while Petitioner argues that the Department should adopt the scopes

---

[180] *See* October 3, 2014 letter from Howard Smith, Program Manager, Office IV, AD/CVD Operations, Enforcement and Compliance, to All Interested Parties, re: *Antidumping and Countervailing Duty Investigations of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and the Antidumping Duty Investigation of Certain Crystalline Silicon Photovoltaic Products from Taiwan: Opportunity to Submit Scope Comments* (October 3, 2014) ("October 3rd Letter").

Filed By: Gene Calvert, Filed Date: 12/17/14 12:45 PM, Submission Status: Approved

proposed in the October 3rd Letter because they most effectively apply Petitioner's intent, would best effectuate the U.S. trade laws and provide effective relief to the injured domestic industry, and would be easily administrable and enforceable by the agencies involved. After considering comments, we have determined to clarify the scopes of the PRC AD and CVD investigations consistent with the October 3rd Letter. We address party comments in detail below.

Due to this revision in the scope, we are not requiring exporter and importer certifications. The revocation of the certification requirements previously established in this investigation does not change or rescind the certification requirements established in connection with the existing orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the PRC.

## A.    Consistency with *Solar I*[181] and Court Decisions

*Respondents:*
- The Department's proposed scope clarification is arbitrary because it is inconsistent with the product coverage decisions made by the Department in *Solar I* and also ignores country of origin decisions made by the Court of International Trade (referred to as either the "Court" or the "CIT") and the U.S. Court of Appeals for the Federal Circuit (CAFC), as well as country of origin criteria stated in the Act. Such arbitrary decisions are unlawful because, as the courts have noted, the Department has an obligation to be consistent in its decisions.
  - In *Solar I,* the Department made numerous decisions that directly ruled against establishing a scope that would find solar modules assembled in China but not containing Chinese solar cells subject to the order. The Department's determinations in *Solar I* were made on the following bases:
    - A product can only have one country of origin,[182]
    - AD and CVD investigations only cover products with a country of origin of the country under investigation,[183] and
    - The Department relies on the substantial transformation test to determine the country of origin of a product.[184]
    - In applying this substantial transformation test in *Solar I*, the Department determined that "module assembly does not substantially alter the essential nature of solar cells nor does it constitute significant processing

---

[181] *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Affirmative Countervailing Duty Determination and Final Affirmative Critical Circumstances Determination*, 77 FR 63788 (October 17, 2012) ("*Solar I CVD Final Determination*") and *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Final Determination of Sales at Less Than Fair Value, and Affirmative Final Determination of Critical Circumstances, in Part*, 77 FR 63791 (October 17, 2012) ("*Solar I AD Final Determination*") (these two investigations are referred to generally as "*Solar I*").
[182] *See Solar I AD Final Determination* and accompanying Issues and Decision Memorandum ("Solar I IDM") at Comment 1, page 8.
[183] *Id*.
[184] *Id.* at 5-6.

33

such that it changes the country of origin of the cell."[185] The Department found that the solar cell imparts the essential character of a solar module, and, therefore, the origin of the solar cell is determinative of the country of origin of the class or kind of merchandise at issue here.  Therefore, "where solar cell production occurs in a different country from solar module assembly, the country of origin of the solar modules/panels is the country in which the solar cell was produced."[186]

- ▪ If the approach in *Solar I* described above were applied to these investigations the conclusion would be that the scope of an CVD order must be limited to subject merchandise "produced" and "originating" in the country covered by the order, which here is China and Taiwan. Merchandise produced or originating in a country other than the country covered by an order, which based on the previous substantial transformation decision, includes solar modules assembled in China or Taiwan from solar cells produced in countries other than China or Taiwan, have a different country of origin than China or Taiwan, and thus may not be included in the scope of these investigations.

o Decisions by the CIT and the CAFC, as well as sections of the Act support finding that products under an investigation can only have one country of origin and that the basis for determining this is the substantial transformation test.

  - ▪ Applying the country of origin determination implied in the scope as proposed in the October 3rd Letter, as well as the criteria applied in *Solar I*, would result in a solar module assembled in one country containing another country's cell to have two countries of origin.  CIT decisions[187] have stated that a product can only have a single country of origin for AD and CVD purposes.

  - ▪ The scope as proposed in the October 3rd Letter is also contrary to the statutory language at Section 731 of the Act, which provides for the imposition of antidumping duties on "subject merchandise," defined as "the class or kind of merchandise that is within the scope of an investigation, a review, a suspension agreement, {or} an order...."[188]  This provision requires the Department to make a finding of dumping for a class or kind of merchandise from a particular country.[189]

  - ▪ The scope as proposed in the October 3rd Letter ignores the established criteria for determining the country of origin, which is the substantial transformation analysis.

---

[185] *See* March 19, 2012 Memorandum from Jeff Pedersen to Chris Marsh "Scope Clarification: Antidumping and Countervailing Duty Investigations of Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China ("Solar I Substantial Transformation Memorandum").  Included in December 15, 2014 Other Proceedings' Documents Memorandum at Attachment 1.

[186] *Id.*

[187] *See Ugine & ALZ Belgium, N.V. v. United States*, 517 F. Supp. 2d 1333, 1345 (CIT 2007) ("*Ugine I*"), *aff'd*, 551 F.3d 1339 ("*Ugine III*") (Fed. Cir. 2009).

[188] *Id.*; Section 771(25) of the Act.

[189] *See E.I. DuPont de Nemours & Co. v. United States*, 8 F. Supp. 2d 854, 859 (CIT 1998) ("*Du Pont*"); *see also Ugine I*, 517 F. Supp. 2d at 1345.

Filed By: Gene Calvert, Filed Date: 12/17/14 12:45 PM, Submission Status: Approved

- The CIT has determined that the "substantial transformation" analysis provides a means for the Department to carry out its country of origin examination and properly guards against circumvention of existing antidumping orders.[190]
  - The Department is prevented from contradicting these decisions in *Solar I* because the Department is obliged to be consistent in its decision-making across its investigations.
    - The CIT has explained that although an agency is not strictly bound to its precedent, "{i}t is a principle of administrative law that an 'agency must either conform to its prior norms and decisions or explain the reason for its departure from such precedent."[191]  The CAFC has similarly stated that the Department cannot ignore its own precedent absent some legitimate reason for departing from it.[192]
    - The Department has not articulated reasons for diverging from these decisions.  Instead, the Department stated in these investigations, that it is informed "by the product coverage decisions that it made" in *Solar I*.[193]

*Petitioner:*

- In the preliminary determination, the Department stated that it was continuing to analyze interested parties' scope comments, including comments on whether it is appropriate to apply a traditional substantial transformation or other analysis in determining the country of origin of certain solar modules described in the scope of the investigation.
- Petitioner supports the proposed scope clarification in the Department's October 3rd Letter, and requests that the Department adopt it for purposes of its final determination and any resulting CVD order.
- The Department's proposed scope clarification is fully consistent with the Petitioner's intent.  It has been clear since the start of the first solar AD/CVD investigations, and throughout the current investigations, that Petitioner's intent has always been to cover all cells from the PRC and all modules from the PRC and, now, all cells from Taiwan and all modules from Taiwan.[194]
- The Department's proposed scope clarification would best effectuate the U.S. trade laws and provide effective relief to the injured domestic industry, and would be easily administrable and enforceable by the agencies.
- The remedial purposes of the AD/CVD laws are best served by the proposed scope clarification.  The Department has determined that both cells and modules from the PRC and Taiwan are being dumped, and both Chinese cells and modules are subsidized.  As such, the law obligates Commerce to impose duties on these products.

---

[190] *See Du Pont*, 8 F. Supp. 2d at 857 (emphasis added).

[191] *See Torrington Co. v. United States*, 745 F. Supp. 718, 727 (CIT 1990) (quoting *Mississippi Valley Gas Co. v. Federal Energy Regulatory Comm'n*, 659 F.2d 488, 506 (5th Cir. 1981)); *Neenah Foundry Co. v. United States,* 142 F. Supp. 2d 1008, 1022 (CIT 2001); *Hussey Copper Ltd., v. United States*, 834 F. Supp. 413,418 (CIT 1993).

[192] *See Ugine III*, 551 F.3d at 1349.

[193] *See Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China and Taiwan: Initiation of Antidumping Duty Investigations¸* 79 FR 4661 (January 29, 2014) ("*Solar Products Initiation Notice*").

[194] *See*, *e.g.*, Solar I IDM at Comment 1.

Filed By: Gene Calvert, Filed Date: 12/17/14 12:45 PM, Submission Status: Approved

- Clarifying the scope language in the manner proposed by the Department would result in AD/CVD orders that are administrable and enforceable by the Department and U.S. Customs and Border Protection (CBP). Solar cells are not required to contain country of origin markings. It can be extremely difficult for CBP to determine the origin of various inputs in a solar module upon importation. On the other hand, all solar modules are clearly marked with country-of-origin and other identifying information. Covering all cells and modules from both the PRC and Taiwan, as described in the October 3rd Letter proposed scope clarification, would therefore significantly improve the enforceability of any future AD/CVD orders.

- To the extent that the Department's proposed scope clarification can be considered a departure from its prior country-of-origin determination, the agency is, of course, permitted to depart from its prior determinations.[195]

- Respondents' argument that the scope clarification results in a single product having two countries of origin is unfounded. Because the country-of-origin rules in the proposed scope clarifications provide a supplemental country-of-origin rule for those products not covered by the initial solar investigations, no product would at any time have two countries of origin.

- For example, Trina Solar claims that modules assembled in China with cells produced in Taiwan would result in identical products having two different countries of origin under the previous analysis and the proposed scope clarification.

- The proposed scope would also be consistent with international precedent. The recent European Union ("EU") AD/CVD investigations of Chinese solar products included "imports of crystalline silicon photovoltaic modules and key components (*i.e.*, cells and wafers) originating in or consigned from the People's Republic of China,"[196] recognizing that all cells and all modules from the subject country, in addition to other key components, must be covered.

- In the alternative, should the Department decide not to make its proposed clarification to the scope, these investigations should continue with the scope proposed by Petitioner and accepted by the Department for purposes of initiation and its preliminary determination.

**Department's Position**: After considering the facts and circumstances presented by the PRC AD and CVD investigations, as well as the parties' comments on the October 3rd Letter, for this final determination the Department has clarified the scope language of the PRC AD and CVD investigations such that subject merchandise includes all modules, laminates and/or panels assembled in the PRC that contain crystalline silicon photovoltaic cells produced in a customs territory other than the PRC. For a complete description of the scope of the investigation for this final determination, *see* section III above.

---

[195] *See Torrington*, 745 F. Supp. at 727.
[196] *See* Council Implementing Regulation (EU) No 1238/2013 of 2, Official Journal of the European Union (Dec. 2013).

Filed By: Gene Calvert, Filed Date: 12/17/14 12:45 PM, Submission Status: Approved

Upon initiation of these investigations, the Department set aside a period for interested parties to raise issues relating to product coverage, *i.e.*, scope.[197]  Interested parties submitted affirmative comments and rebuttal comments regarding product coverage. [198]   In the *Preliminary Determination* published on July 31, 2014, we announced that we are continuing to analyze the scope comments, including comments on whether it is appropriate to apply a traditional substantial transformation or other analysis in determining the country of origin of certain solar modules described in the scope of this investigation.[199]   Further, with respect to administering the PRC investigations, we explained that the scope of these investigations explicitly excludes any products covered by the existing AD and CVD orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the PRC.[200]  In response to interested parties' comments on the scope of this investigation (and prior to the deadlines for the submission of case and rebuttal briefs), in the October 3rd Letter the Department announced that it was considering the possibility of a scope clarification, described the possible clarification, and invited interested parties to submit comments on the clarification.  For the reasons discussed below, the Department determines that there are significant reasons for clarifying and modifying the scope of this investigation.

Importantly, it is within the Department's authority to do so.  The CAFC has explained that "the purpose of the petition is to propose an investigation," and the "purpose of the investigation is to determine what merchandise should be included in the final order."[201]  Therefore, the Department must be able to determine what merchandise should be covered by any final order.  Additionally, the purpose of the AD and CVD law is to provide a remedy, if appropriate, for alleged injury to the domestic industry that is caused by specified merchandise alleged to be dumped or unfairly subsidized.[202]  Accordingly, the Department's "practice is to provide ample deference to the Petitioner with respect to the definition of the product for which it seeks relief under the AD and CVD laws."[203]

---

[197] *See Solar Products Initiation Notice*, 79 FR at 4661; *see also Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China: Initiation of Countervailing Duty Investigation*, 79 FR4667 (January 29, 2014).

[198] *See* scope comment submissions, dated February 18, 2014, from Gintech; Motech; NextEra Energy, Inc.; SunEdison, Inc.; Suniva, Inc.; and Yingli Green Energy Holding Company Limited, Yingli Green Energy Americas, Inc., Canadian Solar Inc., Changzhou Trina Solar Energy Co., Ltd., Wuxi Suntech Power Co., Ltd., Shanghai JA Solar Technology Co., Ltd., Hefei JA Solar Technology Co., Ltd., and Jinko Solar Co., Ltd.; *see also* rebuttal scope comment submissions, dated April 3, 2014, from Petitioner, and dated April 21, 2014, from Yingli Green Energy Americas, Inc., Canadian Solar Inc., Changzhou Trina Solar Energy Co., Ltd., Wuxi Suntech Power Co., Ltd., Shanghai JA Solar Technology Co., Ltd., Hefei JA Solar Technology Co., Ltd., and Jinko Solar Co., Ltd.

[199] *See AD PDM* at 5; *see also* CVD PDM at 4 (collectively referred to as "Pre-Prelim Scope Comments").

[200] *Id.*

[201] *See Duferco Steel Inc. v. United States*, 296 F.3d 1087, 1096-97 (Fed. Cir. 2002) ("*Duferco*").

[202] *See* sections 731 and 701 of the Act; *see also United States v. American Home Assur. Co.*, 964 F. Supp. 2d 1342, 1352-53  ("Antidumping duties serve the distinct purpose of remedying the effect of unfair trade practices resulting in actual or threatened injury to domestic like-product producers." (*citing Canadian Wheat Bd. v. United States*, 641 F.3d 1344, 1351 (Fed. Cir. 2011))); *Wolff Shoe Co. v. United States*, 141 F.3d 1116, 1117 (Fed. Cir. 1998) (Countervailing duties "are levied on subsidized imports to offset the unfair competitive advantages created by foreign subsidies.").

[203] *See Large Residential Washers From the Republic of Korea*, 77 FR 46391, 46392 (August 3, 2012) and accompanying Issues and Decision Memorandum at Comment 2.  *See also Kern Liebers USA, Inc. v. United States*,

The CIT has stated that the Department "retains broad discretion to define and clarify the scope of an antidumping investigation in a manner which reflects the intent of the petition."[204]  Indeed, the CIT has confirmed that any scope clarifications made by the Department *should* be made in a manner which reflects the intent of the Petition, and that is what the scope clarification accomplishes here.[205]  The Petition[206] and Petitioner's comments in this investigation clearly demonstrate that the Petitioner's intent is a scope that covers all solar modules assembled in the PRC using third-country solar cells.  In its Petition to this investigation, the Petitioner stated its intent to include all of these modules in the scope, citing the "loophole" that resulted when, following the application of Department's substantial transformation analysis in the *Solar I* investigations, producers subject to the *Solar I* investigations increased exports to the United States of modules assembled in the PRC with non-PRC cells with the result of avoiding the reach of the *Solar I* AD and CVD orders.[207]  Indeed, in the Petition for this investigation, Petitioner noted that it had argued for a scope almost identical to the scope in the October 3rd Letter in Solar I and stated that the Department's refusal  to cover Chinese solar modules assembled from non-Chinese solar cells allowed Chinese companies to continue to ship solar modules to the United States duty free.[208]  In these investigations, the alleged injury to the domestic industry stems from certain solar modules that are assembled in the PRC using cells produced in third countries, modules which are not covered by the scope of *Solar I* and, thereby, exceed the reach of the remedy afforded by the *Solar I* AD and CVD orders.  In addition, taking the instant PRC investigations together with *Solar I*, the Petitioner has alleged that the domestic industry is being injured as a result of the unfair pricing of cells produced in the PRC, modules containing such cells, and modules assembled in the PRC with third-country cells, as well as unfair subsidization in the PRC of both cells and modules.

Beyond the Petitioner's intent, there are other facts and factors that the Department has found to be significant in considering the scope of these investigations.  For example, the record demonstrates that the solar products industry involves a complex and very adaptable global supply chain which allows producers to modify their production chains easily and quickly. Petitioner has cited statements by five large Chinese solar module producers and one U.S. importer of solar modules noting the ease with which they were able to modify their production

---

881 F. Supp. 618, 621 (CIT 1995) ("The agency generally exercises {its} broad discretion to define and clarify the scope of an antidumping investigation in a manner which reflects the intent of the petition").

[204] *See Minebea Co. v. United States*, 782 F. Supp. 117, 120 (CIT 1992).

[205] *See AMS Assocs. v. United States*, 881 F. Supp. 2d 1374, 1380 (CIT 2012) (explaining that "Commerce retains broad discretion to define and clarify the scope of an antidumping investigation in a manner which reflects the intent of the petition") (citation and quotation marks omitted), aff'd, 737 F.3d 1338 (Fed. Cir. 2013); *Kern Liebers USA, Inc. v. United States*, 881 F. Supp. 618, 621 (CIT 1995) (*citing Minebea*, 782 F. Supp. at 120).

[206] *See* "Petition for the Imposition of Antidumping and Countervailing Duties on Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and Taiwan," dated December 31, 2013 ("Petitions on China and Taiwan").

[207] *See* the Petition at 3, 5-6, 21, 34, 37, and 53; Letter from  Petitioner, "Re: Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: Case Brief of Solar World Americas, Inc.," dated October 16, 2014 at 5-6; Letter from Petitioner to the Department, "Re: Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and Taiwan: Rebuttal to Respondents' Scope Comments" (Apr. 3, 2014) at 11-13.

[208] *See* the Petitions on China and Taiwan, Volume 1 at 3-4.

Filed By: Gene Calvert, Filed Date: 12/17/14 12:45 PM, Submission Status: Approved

chain to avoid paying the AD and CVDs imposed by *Solar I*.[209] Further, there exist prior AD and CVD orders on related merchandise (i.e., solar cells and modules) from the PRC – *Solar I* – and following the initiation of the *Solar I* investigations and the imposition of those orders, there has been a shift in trade flows that has resulted in increased imports of non-subject modules produced in China.[210] Such imports – if they are dumped and/or unfairly subsidized and injurious – should not be beyond the reach of the AD and CVD laws.

The Department has also taken into account considerations regarding administrability, enforceability, and potential evasion. If these investigations result in an AD and/or CVD order, as relevant, the scope clarification adopted in this final determination will make the resulting order(s) substantially easier to administer and enforce (for both the Department and CBP), by helping to prevent significant and widespread evasion similar to the evasion that we have seen result from parties that exploit the substantial transformation analysis conducted in *Solar I*. As indicated in the Petition, although "imports of modules from China consisted largely of modules assembled with Chinese cells" from 2010 through early 2012, "{s}ince that time, imports of modules from China have consisted almost entirely of modules assembled in China from solar cells completed or partially manufactured in Taiwan or other countries (*i.e.*, cells manufactured in Taiwan from Taiwanese inputs, or cells manufactured in Taiwan or other countries from Chinese inputs, including wafers)."[211] The scope which was proposed in the Petition and on which we initiated investigations may result in the evasion of duties and, thus, ineffective relief to the Petitioner due to the complex and adaptable global supply chain that allows production processes for solar cells and modules to be easily moved across borders. With this scope clarification, it is the Department's intent to reduce as much as possible additional opportunities for evasion like those that resulted after the imposition of AD and CVD cash deposits in *Solar I*. The Department has a long-standing practice of taking potential circumvention concerns into consideration when defining the scope.[212] This practice has been upheld by the CIT and the CAFC.[213] Indeed, the Courts have recognized that the Department has "inherent power to

---

[209] *Id.* at 4-5.

[210] *Id.* at 3, 5-6, 21, 34, 37, and 53.

[211] *Id.* at 5-6; *see also Id.* at 21.

[212] *See, e.g., Notice of Final Determination of Sales at Less Than Fair Value: Large Newspaper Printing Presses and Components Thereof, Whether Assembled or Unassembled, From Germany*, 61 FR 38166, 38169 (July 23, 1996) ("We agree with the petitioner that incomplete merchandise by necessity must be included in the scope of these investigations. Given the very large size of {large newspaper printing presses and components thereof} and the complex importation process, complicated by the further manufacturing and/or installation activities performed in the United States by the respondents, it was the Department's intent to use the language at issue to avoid creating loopholes for circumvention, including those arising from differing degrees of completeness of the imported merchandise. The Department is concerned that, because of the great number of parts involved, there is the potential that a party may attempt to exclude its merchandise from the scope of these investigations on the basis of a lack of completion."); *Cellular Mobile Telephones and Subassemblies from Japan; Final Determination of Sales at Less Than Fair Value*, 50 FR 45447, 45448 (October 31, 1985) ("The determination to include subassemblies within the scope of the investigation was based on the need to prevent circumvention of any antidumping order on {cellular mobile telephones ("CMTs")} through the importation of major CMT subassemblies, and the Department's broader conclusion that the investigation properly should include subassemblies.").

[213] *See Mitsubishi Elec. Corp. v. United States,* 700 F. Supp. 538, 555 (CIT 1988) ("*Mitsubishi I*") ("{the Department} has a certain amount of discretion to expand the language of a petition to encompass the literal intent of the petition, ... with the purpose in mind of preventing the intentional evasion or circumvention of the

establish the parameters of the investigation so as to carry out its mandate to administer the law effectively and in accordance with its intent."[214]

Furthermore, certain interested parties commented that they did not track their merchandise in a way that would allow them to definitively report only that merchandise falling within the "two-out-of-three" scope proposed in the Petition.[215] The scope being adopted in these investigations resolves interested parties' concerns in this respect, by covering *all* modules assembled in the PRC from third-country cells. Under the scope being adopted for these final determinations, producers and exporters would not need to track for purposes of these proceedings the ingots, wafers, or partial cells that are being used in the third-country cells being assembled into modules in China.

Based on these considerations, and in order to evaluate whether there is unfair pricing and/or subsidization of modules assembled in the PRC using third-country cells, the Department finds it is appropriate to determine for purposes of these investigations that the country of origin of such modules is the PRC.

In determining the country-of-origin of a product, the Department's usual practice has been to conduct a substantial transformation analysis.[216] Consistent with its practice, the Department considered in *Solar I* whether it should apply its substantial transformation analysis and found that "the application of its substantial transformation test {was} an appropriate means to resolve country-of-origin issues like the one presented *in {that} investigation* …."[217] Based on this analysis, the Department determined that the solar cell was the essential active component of the module, that assembly of cells into modules did not constitute substantial transformation such

---

antidumping duty law."), *aff'd*, 898 F.2d 1577 (Fed. Cir. 1990); *see also Tung Mung Dev. Co. v. United States*, 26 CIT 969, 979 (CIT 2002) (citing *Mitsubishi I*, 700 F. Supp. at 555), *aff'd*, 354 F.3d 1371 (Fed. Cir. 2004).

[214] *See Torrington*, 745 F. Supp. at 728; *see also Mitsubishi Elec. Co. v. United States*, 898 F.2d 1577, 1582 (Fed. Cir. 1990) ("*Mitsubishi II*") ("The determination of the applicable scope of an antidumping order that will be effective to remedy the dumping that the {Department} has found lies largely in the {Department's} discretion").

[215] A group of some of the largest Chinese solar product producers stated that it is virtually impossible for importers to know and to trace the origin of the ingots and wafers in cells that are assembled into modules when the module manufacturers purchase the cells from third parties in other countries, or to distinguish between the value of modules with cells that meet Petitioner's "two-out-of-three" test and those that do not. *See* the February 18, 2014 Scope Comments Letter submitted by of Yingli Green Energy Holding Company Limited, Yingli Green Energy Americas, Inc., Canadian Solar Inc., Changzhou Trina Solar Energy Co., Ltd., Wuxi Suntech Power Co., Ltd., Shanghai JA Solar Technology Co., Ltd., Hefei JA Solar Technology, Co., Ltd., and Jinko Solar Co., Ltd. Further demonstrating tis, the mandatory respondent Changzhou Trina Solar Energy Co., Ltd. and Trina Solar (Changzhou) Science & Technology Co., Ltd. ("Trina Solar") stated that it does not know what country produced the wafers contained in its purchases of solar cells. *See* Trina Solar's April 22, 2014 response at Attachment A-1. Included in December 15, 2014 Other Proceedings' Documents Memorandum at Attachment 2. Similarly, Yingli Green Energy Holding Company and Yingli Green Energy Americas, Inc. and Canadian Solar Inc. noted that their respective company records do not specifically identify the origin of the wafers used to produce the cells Yingli purchased from non-Chinese suppliers. *See* both companies' February 14, 2014 quantity and value responses. Included in December 15, 2014 Other Proceedings' Documents Memorandum at Attachment 3.

[216] *See, e.g., Notice of Final Determination of Sales at Less Than Fair Value: Glycine from India*, 73 FR 16640 (March 28, 2008) and accompanying Issues and Decision Memorandum at Comment 5; *see also Stainless Steel Plate in Coils from Belgium: Final Results of Antidumping Duty Administrative Review*, 69 FR 74495 (December 14, 2004) and accompanying Issues and Decision Memorandum at Comment 4.

[217] *See Solar I IDM* at Comment 1, page 8 (emphasis added).

Filed By: Gene Calvert, Filed Date: 12/17/14 12:45 PM, Submission Status: Approved

that the assembled module could be considered a product of the country of assembly, and consequently, that modules assembled in the PRC from solar cells produced in third countries are not covered by the scope of that investigation.[218]

Although the Department routinely has found a substantial transformation analysis to be an appropriate means to determine the country of origin of merchandise under investigation, in the circumstances presented by these investigations and discussed above, the Department has determined that it needs to conduct additional analysis. Thus, contrary to certain parties' arguments, our adoption of the scope described in the October 3rd Letter is not arbitrary. Rather, it addresses the specific and special circumstances of these proceedings, as described above. Relying on the substantial transformation analysis alone could result in failure to provide relief to the domestic industry for alleged injury caused by a finished product produced in the subject country but which would be deemed to originate from a third-country for AD/CVD purposes if the traditional substantial transformation analysis were applied. In these particular proceedings, a rote application of a substantial transformation analysis would not allow the Department to address unfair pricing decisions and/or unfair subsidization concerning the modules that is taking place in the country of export. Consistent with sections 701 and 731 of the Act, the Department must be able to address such circumstances, and where appropriate, address unfair pricing decisions or unfair subsidization that is taking place in the exporting country where further manufacturing, such as assembly, occurs, notwithstanding that such activities may not necessarily result in a substantial transformation of merchandise. While the Department intends that a substantial transformation analysis will continue to be the primary manner in which it will evaluate country of origin in AD/CVD proceedings, given the facts presented by these investigations (and in light of the *Solar I* orders already in place, under which country of origin was already based on a substantial transformation analysis), the Department finds that its additional analysis is appropriate. We do not agree that our analysis is inconsistent with *Solar I*. Rather, in these investigations we are building upon our decisions in *Solar I* and finding, given the circumstances before us, that it is appropriate to go beyond our decision concerning country of origin from *Solar I* to address merchandise exported from China that is not subject to the *Solar I* orders and that is alleged to injure the domestic industry through unfair pricing and/or subsidization.

With regard to respondents' assertion that the scope clarification results in a single product having two countries of origin, we disagree. No product would at any time have two countries of origin for AD/CVD purposes. The country of origin of these modules, for AD/CVD purposes, is only the PRC. If an AD and/or CVD order results from these investigations, these modules would be subject to AD and/or CVD duties under the relevant order and not another solar-related order (*i.e.*, not *Solar I* or an order covering solar products from Taiwan, should that investigation result in an AD order). We also disagree with the Petitioner's assertion that Taiwanese cells assembled into a module in the PRC would result in a module of Taiwanese origin. With the scope clarification we have adopted for the PRC investigation, the PRC is the country of origin of all modules, laminates and/or panels assembled in the PRC that contain crystalline silicon photovoltaic cells produced in a customs territory other than the PRC.

---

[218] *See* Solar I IDM at Comment 1, page 5-7.

Filed By: Gene Calvert, Filed Date: 12/17/14 12:45 PM, Submission Status: Approved

## B.     Extent of the Scope Clarification

*Respondents:*

- The scope as proposed in the October 3rd Letter is not a clarification, but an unlawful expansion and alteration of the scope.
    - The scope as proposed in the October 3rd Letter eliminates entirely the "two out of three" principle incorporated into the scope of these investigations, adds to the scope solar modules made from solar cells from countries outside China and Taiwan, and thereby crafts a scope of the investigation that was never contemplated in the Petitions or in any other submission or determination before or after the initiation of these investigations.
    - Petitioner has not requested the expanded scope proposed by the Department, and nothing in the Petition or in Petitioner's subsequent submissions to the Department or the U.S. International Trade Commission ("ITC") indicates otherwise.
    - There are numerous CIT decisions demonstrating that a significant expansion and alteration of the scope as outlined in the October 3rd Letter goes far beyond what the CIT decisions have found permissible.[219]
    - The Department stated in *Softwood Lumber from Canada* that while it has the authority to define or clarify the scope of an investigation and must exercise this authority in a manner which reflects the intent of the Petition, the Department generally should not use its authority to define the scope of an investigation in a manner that would thwart the statutory mandate to provide the relief requested in the Petition. As a result, absent an "overarching reason to modify the scope in the Petition, the Department accepts it."[220]

*Petitioner:*

- The Department's clarification of the scope at this final phase in the proceedings is fair and reasonable, and would not be unlawful.  The CIT has specifically stated that the Department has the discretion to clarify the scope, even in a way that "expand{s} the language of a petition," in the course of an AD/CVD investigation.[221]  This decision was upheld by the CAFC.[222]
- The respondents themselves cite *Allegheny Bradford*, in which the CIT held that "{t}here is no clear point during the course of an antidumping investigation at which {the Department} loses the ability to adjust the scope."[223]
- The scope as proposed in the October 3rd Letter is fully consistent with Petitioner's intent.

---

[219] *See Minebea*, 782 F. Supp. at 120; *see also Allegheny Bradford Corp. v. United States*, 342 F. Supp. 2d 1172 (CIT 2004); *Smith Corona Corp. v. United States*, 796 F. Supp. 1532 (CIT 1992).
[220] *Notice of Final Determination of Sales at Less Than Fair Value: Certain Softwood Lumber Products from Canada*, 67 FR 15539, 15542 (April 2, 2002) ("*Softwood Lumber from Canada*").
[221] *See Mitsubishi I*, 700 F. Supp. at 555.
[222] *See Mitsubishi II*, 898 F.2d at 1577.
[223] *See Allegheny Bradford*, 342 F. Supp. 2d at 1187.

Filed By: Gene Calvert, Filed Date: 12/17/14 12:45 PM, Submission Status: Approved

- o   As demonstrated by its comments to *Solar I*, Petitioner's intent has always been to cover all cells from the PRC and all modules from the PRC.[224]  In fact, Petitioner filed the instant investigations specifically to close the loophole created as a result of the Department's scope determination in the first solar cases and to cover all cells and modules from the PRC, as well as address unfair trade practices in Taiwan that were exacerbated as a result of that scope determination.
- Moreover, in this case, the Department is even more justified than under other circumstances in adjusting the scope at this stage in these proceedings, as the Department has been very clear throughout these investigations that it is continuing to evaluate the scope, and that its country of origin determinations of related subject merchandise could change.[225]

**Department's Position:**  We disagree with respondents' contention that the proposed clarification of the scope in the October 3rd Letter, which we have adopted in these final determinations, does not reflect Petitioner's intent.  The record of this investigation demonstrates that Petitioner's intent would be reflected by a scope that covers all solar modules assembled in China using third-country cells.  Petitioner's stated motivation for filing its Petition is to close a "loophole" that resulted when producers subject to the *Solar I* investigations, following the Department's application of a substantial transformation analysis to fix the scope of that proceeding, increased imports of modules assembled in the PRC with non-PRC cells so as to avoid the reach of the *Solar I* orders.[226]  For instance, Petitioner stated that "imports of modules from China consisted largely of modules assembled with Chinese cells" from 2010 through early 2012, but that "{s}ince that time, imports of modules from China have consisted almost entirely of modules assembled in China from solar cells completed or partially manufactured in Taiwan or other countries (*i.e.*, cells manufactured in Taiwan from Taiwanese inputs, or cells manufactured in Taiwan or other countries from Chinese inputs, including wafers)."[227]  Petitioner also stated that "imports of Taiwanese {solar} cells and modules and Chinese modules assembled from non-Chinese cells continued to swamp the U.S. marketplace in the first nine months of 2013," despite the relief provided by the *Solar I* orders.[228]  Further, Petitioner contended that the Petition showed "that many Chinese solar producers ceased using Chinese-manufactured cells and began using third-country manufactured cells in their solar modules" as a result of the *Solar I* investigations.[229]  In addition, Petitioner cited reports confirming that "Chinese solar producers continue to use third-country cells, largely manufactured in Taiwan, to assemble into solar modules in China and export to the United States."[230]

The scope language of the Petition for these investigations is an expression of the Petitioner's intent, as noted above, to cover solar modules made in China using solar cells produced in third

---

[224] *See* Solar I IDM at Comment 1.
[225] *See, e.g.*, *Certain Crystalline Silicon Photovoltaic Products from Taiwan: Affirmative Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination*, 79 FR 44395 (July 31, 2014) and accompanying Preliminary Decision Memorandum at 5.
[226] *See* the 2013 CVD Petition on China at 3, 21, and 53.
[227] *See* the December 31, 2013 AD and CVD Petitions on China and Taiwan, Volume 1, at 5-6;  *see also id.* at 21.
[228] *Id.* at 34.
[229] *Id.* at 37.
[230] *Id.*

countries.  However, as discussed in Comment 1.A., the Department is taking into considerations concern about potential evasion of AD and/or CVD measures, as relevant.  The scope which was proposed in the Petition and on which we initiated the investigations, may itself result in the evasion of duties and, thus, ineffective relief to the Petitioner, due to the complex and very adaptable global supply chain that allows producers to modify their production chains easily and quickly.  Specifically, producers could simply have sourced their wafers from a country other than the subject country in order to avoid the "two out of three" language in the second sentence of that scope.  As a result, the Department explored whether modified scope language could more effectively implement Petitioner's intent while also mitigating evasion concerns and alleged complications in parties' ability to properly report subject merchandise to the Department in the context of its administrative proceeding and/or to CBP in connection with important,  and ultimately proposed the clarification in its October 3rd Letter.

Furthermore, in the parallel Taiwan AD investigation, the respondent companies have reported to the Department that following the implementation of the orders in *Solar I*, numerous Chinese companies began to contract with Taiwanese cell producers to manufacture cells for the purpose of exporting those cells to China for use in the production of panels, modules and laminates, and then to export those panels, modules and laminates to the United States.[231]  This series of transactions was allegedly implemented, at least for many transactions, to evade the order in *Solar I*, and there are emails and communications referenced in the Taiwan IDM which discuss this series of transactions and the reasoning behind those transactions.[232]  These communications substantiate the concerns expressed by the Petitioners in the Petition that the orders in *Solar I* have not adequately addressed the issues of Chinese dumping and unfair subsidization of solar panels, modules and laminates, and that a scope which specifically includes that merchandise in this investigation is necessary to address such concerns.

Even had Petitioner not expressly intended to include all solar modules assembled in China using third-country cells, the Department has the authority to identify such products in the scope of these investigations anticipating such configurations and thus serving to place parties on notice regarding how the Department might treat Chinese modules made from third-country cells if subsequent scope questions arise.[233]  In Comment 1.A above we discussed such reasons including, and beyond, Petitioner's intent.  One focus of the Department's analysis related to

---

[231] *See* the Issues and Decision Memorandum accompanying the final determination of the Antidumping and Countervailing Duty Investigations of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and the Antidumping Duty Investigation of Certain Crystalline Silicon Photovoltaic Products from Taiwan at Comment 4.

[232] *Id*.

[233] *See Mid Continent Nail Corp. v. United States*, 725 F.3d 1295, 1300-1301, 1305-06 (Fed. Cir. 2013) (for the proposition that if the Department anticipates the need for addressing foreseeable areas of dispute, it should do so prior to the order so as to put parties on notice of what conduct will be regulated by the order and what factors will be considered in regulating that conduct).  Although the Department cannot anticipate every possible permutation of solar products, as explained above, the Petition identified a shift in trade flows that resulted in increased imports of non-subject modules produced in China, and significant and widespread avoidance of the reach of *Solar I*.  Based on this information, the Department finds that it is appropriate for the scope of the final determination to address all third country modules, not just those that fall within the "two out of three" scope language proposed by the Petitioner, because doing so will put parties on notice, provide greater certainty for those subject to the order, and preserves resources for all of the parties involved, including the Department.

44

potential evasion. Information on the record indicates that parties have been able to evade the reach of the *Solar* I orders. Thus, even while the investigations focused on merchandise covered by the "two out of three" language rather than "third country cells," the Department anticipated that evasion concerns would likely arise for the original proposed scope. Through its modification of the scope of these investigations, the Department has identified a way of attempting to prevent such scenarios.[234]

We also do not agree that this clarification is a significant and, thus, impermissible expansion of the scope. As an initial matter, we note that Department's "practice is to provide ample deference to the Petitioner with respect to the definition of the product for which it seeks relief under the AD and CVD laws."[235] The clarification also addresses concerns (expressed by respondent parties and shared by the Department) regarding the administrability of the "two out of three" scope language that was originally proposed. Further, applying the scope clarification proposed in the October 3, 2014, Letter results in no change to Trina Solar and Renesola/Jinko's reported database.[236] This clarification will not require the Department to collect any additional information from parties because necessary information is already on the record. At the same time, by more clearly expressing Petitioner's intent of covering solar modules assembled in China using third-country solar cells, the scope as proposed in the October 3rd Letter will more effectively cover the solar modules from which Petitioner has been seeking relief. Moreover, the scope clarification results in a scope that, should this investigation result in an order, will be more administrable than the scope that was originally proposed.

## C.    Timeliness of a Potential Scope Clarification

*Respondents:*
- Even if the Department had the authority to expand the scope, it cannot do so this late in the investigation because it would result in the Department's final determination not being based on substantial evidence, would prevent finalizing the record and issuing a final decision, and would deny parties due process.
  - Essentially, at this stage in the proceeding, the Department has already completed its investigation of the factual record and thus is unable to supplement the record with additional sales. Thus, an expansion of the scope at this time to include products not already covered would mean that the antidumping margins and subsidy rates calculated by the Department will be based on data that are not consistent with the sales that would be subject to the final expanded scope of these investigations.

---

[234] *Id.* at 725 F.3d 1295, 1305-06.
[235] *See Large Residential Washers From the Republic of Korea,* 77 FR 46391, 46392 (August 3, 2012) and accompanying Issues and Decision Memorandum at Comment 2. *See also Kern Liebers,* 881 F. Supp. at 621.
[236] The Chinese mandatory respondents reported all U.S. sales containing third-country solar cells. *See* Trina Solar's May 13, 2014 submission at 1. Included in December 15, 2014 Other Proceedings' Documents Memorandum at Attachment 4. Renesola Zhejiang Ltd.'s ("Renesola") April 24, 2014 submission at 25. Included in December 15, 2014 Other Proceedings' Documents Memorandum at Attachment 5; and Jinko Solar Co. Ltd. and Jinko Solar Import and Export Co., Ltd.'s ("Jinko") February 13, 2014 submission at 2. Included in December 15, 2014 Other Proceedings' Documents Memorandum at Attachment 6.

Filed By: Gene Calvert, Filed Date: 12/17/14 12:45 PM, Submission Status: Approved

- o The CIT has stated that the Department's "discretion to define and clarify the scope of an investigation is limited in part by concerns for the finality of administrative action, which caution against including a product that was understood to be excluded at the time the investigation began."[237]  Thus, by including products that were not included in the Petition and were never the subject of the Department's investigation inquiries, the Department risks undermining the factual basis for its determination and raises concerns about the finality of its administrative actions.

- o The CIT has noted that the Department's decision to change scope language at a late stage in a proceeding can undermine the entire investigatory process.[238]

- o Reflecting these concerns, the Department denied a late request for scope clarification in the investigation of Coated Free Sheet from the PRC stating: "Moreover, we note that granting such a clarification would mean that a significant number of sales in the investigations would not be included in the margin calculations, raising a potential procedural safeguards concern."[239]

- o The Department has even gone so far as to say that it lacks the ability to change the scope after a preliminary determination, in part, because "{a}mending the scope language . . . would, in effect, serve to expand the current scope of subject merchandise that was subject to th{e} investigation at too late a stage in this proceeding."[240]

- o Because the scope change would occur at such a late stage in the proceeding, it denies due process for parties, especially parties that were not covered under the scope in effect during the *Preliminary Determination*.  These Chinese companies and U.S. importers that are not presently part of the proceeding have no opportunity to participate in the hearing or "to be heard" and cannot participate meaningfully in this investigation because the factual record is closed.

  - ▪ The CAFC held in *Transcom v. United States* that by not listing exporters in the initiation notice there was deficient notice to the affected parties. In that case, the CAFC stated that importers have the right to complain about procedural flaws in the administrative proceeding, including the Department's failure to provide adequate notice.  The CAFC went on to state that the Department's determination had to be overturned because the importer and its Chinese exporters had no notice of a change in the Department's non-market economy practice and, therefore, no opportunity

---

[237] *See Allegheny Bradford*, 342 F. Supp. 2d at 1187-1188, citing *Mitsubishi Heavy Indus., Ltd. v. United States*, 986 F. Supp. 1428, 1433 (CIT 1997).

[238] *See Smith Corona*, 796 F. Supp. at 1535.

[239] *See Smith Corona*, 796 F. Supp. at 1535.

[240] *See Final Determination of Sale at Less Than Fair Value: Sodium Hexametaphosphate from the People's Republic of China*, 73 Fed. Reg. 6479 (Feb. 4, 2008) ("*Sodium Hexametaphosphate from the PRC*"), and accompanying Issues and Decision Memorandum at Comment 1; *see also Notice of Final Determination of Sales at Less Than Fair Value and Affirmative Final Determination of Critical Circumstances: Certain Orange Juice from Brazil*, 71 Fed. Reg. 2183 (Jan. 13, 2006) ("*Certain Orange Juice from Brazil*"), and accompanying Issues and Decision Memorandum at Comment 2.

to submit evidence to demonstrate the exporters' independence from the state-controlled entity.[241]

*Petitioner:*

- The majority of modules being shipped from the PRC and Taiwan that would be subject to the scope under the Department's proposed scope clarification were also subject to the scope as it existed at the time data were collected from respondents and the *Preliminary Determination* was issued. Thus, the databases on which the Department will calculate final subsidy and dumping margins are largely consistent with the scope as stated in the Department's proposed scope clarification.

- The proposed scope clarification does not implicate due process concerns as the Department has made clear throughout these investigations that the scope of the investigations is subject to continuing evaluation, and that the country-of-origin determinations related to subject merchandise could change for the final determination.
  - Specifically, in the initiation notice, the Department invited comments on the scope of these investigations, clearly indicating to the public that the scope was potentially subject to modification.[242]
  - The Department again noted its ongoing evaluation of the scope in the *Preliminary Determination*, in which, after adopting Petitioner's proposed scope, the Department explained that it was continuing to analyze interested parties' scope comments, including comments on whether it is appropriate to apply a traditional substantial transformation or other analysis in determining the applicability of the investigation to certain solar modules described in the Petition.[243]

- Further, respondents have repeatedly claimed that it is nearly impossible for importers to know and to trace the origin of the ingots and wafers in cells that are assembled into modules when the module manufacturers purchase the cells from third parties in other countries. While Petitioner disputes this claim, if true, respondents and others would not have known for certain whether or not their products were subject to these investigations. Given this potential uncertainty, all exporters of potential subject merchandise should have filed quantity and value submissions and separate rate applications with the Department.

- Respondents' citations to *Allegheny Bradford* for support are inapposite to this investigation because as stated by the CIT, the issue in *Allegheny Bradford* was "whether Commerce may construe an antidumping order to cover products which bear a characteristic that cannot be reconciled with the language of the order."[244] These aspects

---

[241] *See Transcom, Inc. v. United States*, 182 F.3d 876, 880-84 (Fed. Cir. 1999).

[242] *See Solar Products Initiation Notice*, 79 FR at 4661.

[243] *See Preliminary Determination* and Accompanying Issues and Decision Memorandum ("China AD Prelim I&D Memo") at 5; *Certain Crystalline Silicon Photovoltaic Products From Taiwan: Affirmative Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination*, 79 FR 44395 (July 31, 2014) and accompanying Issues and Decision Memorandum ("Taiwan AD Prelim I&D Memo") at 5; *Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China: Preliminary Affirmative Countervailing Duty Determination,* 79 FR 33174 (June 10, 2014) and accompanying Issues and Decision Memorandum ("China CVD Prelim I&D Memo") at 4.

[244] *See Allegheny Bradford,* 342 F. Supp. 2d at 1188.

of *Allegheny Bradford* are, therefore, inapplicable to the current circumstances, in which Commerce is still formulating the final scope language, which will ultimately be included in any orders that are issued.

**Department's Position:**  We disagree with respondents.  As the CAFC explained, "the purpose of the petition is to propose an investigation," and the "purpose of the investigation is to determine what merchandise should be included in the final order."[245]  Ultimately, therefore, it is the Department's responsibility to define the scope of the investigation and ensuing order.[246] The Department "retains broad discretion to define and clarify the scope of an antidumping investigation in a manner which reflects the intent of the petition"[247] and has the authority to modify or clarify the scope at any time.  As the CAFC has recognized, the Department has "inherent power to establish the parameters of the investigation, so that it {is} not … tied to an initial scope definition that . . . may not make sense in light of the information available to {the Department} or subsequently obtained in the investigation."[248]  Similarly, the CIT has stated that the Department has a "certain amount of discretion to expand the language of a petition to encompass the literal intent of the petition, ... with the purpose in mind of preventing the intentional evasion or circumvention of the antidumping duty law."[249]  As even respondents themselves recognize, "{t}here is no clear point during the course of an antidumping investigation at which {the Department} loses the ability to adjust the scope…."[250]  Thus, the Department "may depart from the scope as proposed by a petition if it determines that petition to be overly broad, or insufficiently specific to allow proper investigation, or in any other way defective."[251]

Further, the scope modification adopted for the PRC AD and CVD final determinations has no impact on the data required from and submitted by the parties.  As noted above, application of the scope clarification proposed in the October 3rd Letter will result in no change in the reported sales of the mandatory respondents.  We further note that no interested parties have provided specific arguments about what changes would occur in the mandatory respondents' U.S. sales databases if the Department modified the scope as proposed in the October 3rd Letter.

Further mitigating the impact of applying the proposed scope clarification is the fact that most, if not all, parties reported in their Quantity and Value questionnaires all solar modules containing solar cells from third countries because they claim that they did not know the source of the wafer contained in the solar cells they purchased from third countries.[252]  While respondents have

---

[245] *See Duferco*, 296 F.3d at 1096-97.

[246] *Id.* at 1097; *accord Mitsubishi II*, 898 F.2d at 1582; *see also King Supply Co. v. United States*, 674 F.3d 1343, 1345, 1348 (Fed. Cir. 2012).

[247] *See Minebea*, 782 F. Supp. at 120.

[248] *See Duferco*, 296 F.3d at 1089 (citation and quotation marks omitted); *see also Save Domestic Oil, Inc. v. United States*, 240 F. Supp. 2d 1342, 1351 (CIT 2002).

[249] *See Mitsubishi I*, 700 F. Supp. at 555.

[250] *See Allegheny Bradford*, 342 F. Supp. 2d at, 1187.

[251] *Ad Hoc Shrimp Trade Action Comm. v. United States*, 637 F. Supp. 2d 1166, 1175 (CIT 2009) (citation and quotation marks omitted); *see also Allegheny Bradford*, 342 F. Supp. 2d at 1188.

[252] *See, e.g.*, the February 13, 2014 quantity and value submission by Jinko, the February 14, 2014 quantity and value responses of Yingli Green Energy Holding Company and Yingli Green Energy Americas, Inc., and Canadian

stated that there *may* be U.S. imports that were not covered by the scope of the *Preliminary Determination* that would be covered by the proposed scope clarification, they have not identified any such shipments.

The Department also disagrees with the respondents' claim that a scope clarification at this point in the investigation would deny due process to parties. The Department has made clear throughout these investigations that the scope of the investigations is subject to continuing evaluation, and that the country of origin determinations related to the subject merchandise could change for the final determination. Specifically, in the initiation notice, the Department invited comments on the scope of these investigations and numerous parties submitted comments.[253] The Department again noted in the *Preliminary Determination* that it was continuing to analyze interested parties' scope comments.[254] The very circumstances of these investigations, filed in response to the *Solar I* orders, and in which the Department explicitly stated that the *Solar II* investigations excluded merchandise covered by the *Solar I* orders, placed parties on notice that imports of solar products from China beyond those covered by the *Solar I* orders were potentially subject to the investigation. Thus, we find that our notifications that we were considering changes to the scope provided parties with adequate due process with regard to this scope clarification. In fact, the only citation by interested parties to an actual change to the *Preliminary Determination* that would result from a clarification of the scope as proposed in the October 3rd Letter concerns a situation where a party did in fact heed the Department's notice that product coverage was being reconsidered. One separate rate applicant, tenKsolar, reported to the Department that it had no shipments subject to the scope as stated in the *Preliminary Determination*[255] but, as a precautionary measure, it filed a separate rate application in the China investigation, which, as we note below, we have granted for this final determination.[256] The reaction of tenKsolar indicates that our notice of potential scope did, in fact, provide parties with adequate notification and due process. We also note that exporters of subject merchandise may still apply for review of their sales in the first administrative review should these investigations result in the imposition of an AD and/or CVD order, as relevant.

We note that respondents' reliance on *Sodium Hexametaphosphate from the PRC* and *Certain Orange Juice from Brazil* is misplaced. In both of these cases, the Department declined to modify the scope of the investigation because the modification requested by Petitioners was not a mere clarification, but rather would have been an expansion of the scope, and thus should have been proposed as an amendment to the petition prior to the initiation of the investigation.[257] In

---

Solar Inc. and April 22, 2014 response by Trina Solar at Attachment A-1 (Included in December 15, 2014 Other Proceedings' Documents Memorandum at Attachment 7).

[253] *See* Pre-Prelim Scope Comments.

[254] *See China AD Prelim I&D Memo* at 5; *Taiwan AD Prelim I&D Memo* at 5; *China CVD Prelim I&D Memo* at 4.

[255] *See* tenKsolar's February 12, 2014 quantity and value submission at Attachment I to the China investigation, where it reported no EP or CEP sales, but noted that it sold solar modules to the United States during the POI that it assembled with solar cells fabricated in Taiwan from Taiwan-origin wafers (Included in December 15, 2014 Other Proceedings' Documents Memorandum at Attachment 8).

[256] *See* tenKsolar's March 31, 2014 submission (Included in December 15, 2014 Other Proceedings' Documents Memorandum at Attachment 10).

[257] *See Sodium Hexametaphosphate from the PRC* at Comment 1; *see also Certain Orange Juice from Brazil*, at Comment 2.

Filed By: Gene Calvert, Filed Date: 12/17/14 12:45 PM, Submission Status: Approved

contrast, the Petitioner in this case did not request the clarification proposed in the October 3rd Letter. Instead, the Department proposed the clarification, in response to and taking account of interested parties' comments on the scope of these investigations. Further, we find that the modification adopted for the purpose of the final determination in the PRC AD and CVD investigations is not an expansion of the scope because the Petition expresses the Petitioner's intent to cover modules assembled in China using third-country solar cells. As noted above, the Petitioner stated its intent to include all of these modules in the scope in its Petition to this investigation, citing the "loophole" that resulted when, following the Department's substantial transformation analysis in the *Solar I* investigations, producers subject to the *Solar I* investigations increased imports of modules assembled in the PRC with non-PRC cells with the result of avoiding the reach of the *Solar I* AD and CVD orders.[258] Petitioner also stated that since early 2012 "imports of modules from China have consisted almost entirely of modules assembled in China from solar cells completed or partially manufactured in Taiwan *or other countries* ...."[259]

Similarly, the respondents' reliance on *Transcom* is also misplaced. In *Transcom*, the CAFC held that the Department did not provide sufficient notice to an importer that the antidumping duties on its exporters' products could be affected by an administrative review because the exporters were not named in the initiation notice and the Department had not announced a change in its non-market economy practice at the time it initiated the review.[260] However, *Transcom* is distinguishable from the instant case because it involved an administrative review, not an antidumping investigation, and a change in practice without notice rather than a modification or clarification to the scope of an investigation. Further, the Court explained that the statutory and regulatory notice provisions only require that "any reasonably informed party should be able to determine, from the published notice of initiation read in light of announced Department policy, whether particular entries in which it has an interest may be affected by the administrative review."[261] Here, the Department met its obligation to notify possible interested parties repeatedly and throughout the investigations, as explained above.

## D. Impact of a Scope Clarification on the ITC's Final Determination

*Respondents:*

- A substantial change in scope such as the one contained in the October 3rd Letter would undermine the ITC injury determination.
  - The ITC this late in the proceeding cannot send questionnaires to U.S. solar module producers, foreign producers of solar modules and U.S. importers of solar modules containing third-country solar cells. Thus, the ITC's injury determination will not cover the new products in question, which means that any

---

[258] *See* the December 31, 2013 AD and CVD Petitions on China and Taiwan, Volume 1, at 3, 5-6, 21, 34, 37, and 53; Solar World Case Brief at 5-6; Letter from Petitioner to the Department, "Re: Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and Taiwan: Rebuttal to Respondents' Scope Comments" (Apr. 3, 2014) at 11-13.

[259] *See* the December 31, 2013 AD and CVD Petitions on China and Taiwan, Volume 1, at 5-6 (emphasis added); *see also id.* at 21.

[260] *Transcom*, 185 F.3d at 881-883.

[261] *Id*. at 882-883.

50

antidumping and countervailing duty orders issued will be for products which the ITC has not determined injure the U.S. industry.

*Petitioner:*
- The majority of modules being shipped from the PRC and Taiwan that would be subject to the scope under the Department's proposed scope clarification, were also subject to the scope as it existed at the time data was collected from respondents and the *Preliminary Determination* was issued. Thus, the data bases on which the ITC will calculate final subsidy and dumping margins would likely be consistent with the data that would be included under the scope as stated in the Department's proposed scope clarification.
- While the ITC never has perfect import coverage in its investigations, the data the ITC will collect in the final phase of the investigation will be largely consistent with the scope as stated in the proposed scope clarification.

**Department's Position:** While respondents make arguments about the potential implications of the Department's scope clarification on the investigation underway at the ITC, the Department cannot speculate about what potential effect, if any, the Department's scope decision in these investigations may have on the ITC's investigation. With respect to the Department's China AD and CVD investigations, as we noted above, the scope clarification proposed in the October 3rd Letter and adopted for purposes of this final determination will result in no change to the reported sales of the mandatory respondents.

### E. Consistency of Scope as Clarified in the October 3rd Letter with the United States' WTO Obligations

*Respondents:*
- The World Trade Organization ("WTO") Agreement on Rules of Origin imposes an obligation on Members to ensure that "rules of origin shall not in themselves create restrictive, distortive, or disruptive effects on international trade" and "shall not discriminate between other Members."[262] The scope clarification proposed in the October 3rd Letter, if adopted, would have precisely such a distortive and discriminatory effect on trade between WTO Members because it would subject imports of modules made with any third-country cells to AD/CVD duties calculated for Chinese or Taiwanese products.
- The scope clarification proposed in the October 3rd Letter treats a module assembled in the PRC using cells produced in Taiwan as a Chinese origin product subject to the current PRC investigations, while it treats a solar module assembled in Malaysia using cells produced in Taiwan as a Taiwanese-origin product subject to the current Taiwan investigation. Thus, the solar module originating in China containing Taiwanese cells would be deprived of the advantage of market economy treatment provided to the like module originating in Malaysia containing Taiwanese cells. Therefore, it violates the

---

[262] *See* Articles 1.2, 2(c), and 2(d) of the WTO Agreement on Rules of Origin.

Filed By: Gene Calvert, Filed Date: 12/17/14 12:45 PM, Submission Status: Approved

United States' obligations under GATT to provide parties to GATT with most-favored nation treatment.[263]

*Petitioner:*

- Any "distortion" in international trade is the result of the unfair trade practices being engaged in by Chinese and Taiwanese solar manufacturers that these investigations are attempting to redress.

- The scope clarification also does not discriminate between the United States' treatment of imports from the PRC and Taiwan on the one hand, and imports from other WTO Members on the other hand, by bringing additional products from the PRC and Taiwan within the scope of any eventual AD/CVD orders that would otherwise not fall within that scope. Any solar cells and/or modules that fall within the scope clarification will be subject to equal treatment. And, contrary to respondent assertions, it would not subject "any third country cells" to AD/CVD duties; rather, it would subject imports of modules from the PRC and Taiwan – which have been determined to be dumped and subsidized – to lawfully calculated duties.

- Under the scope clarification proposed in the October 3rd Letter, the Non Market Economy ("NME") methodology would, appropriately, only be applied to cells originating in the PRC, as well as modules assembled in the PRC. Contrary to respondents' claims, cells and modules originating in the PRC, an NME country, are not entitled to ME treatment. On the other hand, given Taiwan's status as an ME country, cells originating in Taiwan (other than those destined for module-assembly in the PRC), as well as modules, laminates, and/or panels assembled in Taiwan, would appropriately be subject to duties calculated based on an ME methodology.

**Department's Position:** We disagree with respondents' claim regarding obligations under the WTO Agreement on Rules of Origin. The Department's determination here is consistent with U.S. law, which in turn is consistent with U.S. WTO obligations.

We also disagree that any orders will unfairly impact the trade of solar modules made with any third-country cells. As noted by Petitioner, the scope proposed in the October 3rd Letter and adopted in the final determinations would not subject third-country cells to AD/CVD duties. Instead, the scope covers imports of modules that the Department has determined to have a country of origin of the PRC for purposes of these investigations – and in the event of AD and CVD orders, provides a remedy for the unfair pricing practices involving, and subsidization of, such merchandise by imposing AD and CVD duties. Thus, any alleged distortions or disruptive effects on international trade are the result of the unfair trade practices being engaged in by

---

[263] Respondents cite to Article I of GATT 1994, which requires that: "with respect to customs duties and charges of any kind imposed on or in connection with importation or exportation ... , and with respect to all rules and formalities in connection with importation and exportation, ... any advantage, favour, privilege or immunity granted by any Member to any product originating in or destined for any other country shall be accorded immediately and unconditionally to the like product originating in or destined for the territories of all other Members." Respondents claim that subjecting solar cells from market economies to NME treatment because they are included in Chinese solar modules violates this GATT article.

Filed By: Gene Calvert, Filed Date: 12/17/14 12:45 PM, Submission Status: Approved

parties involved in the sale and manufacture of such products, not the result of the Department providing redress for these unfair trade practices.

We also disagree that the scope adopted in the PRC investigations unfairly subjects third-country solar cells assembled into solar modules in China to our NME methodology for calculating dumping margins. As explained above, the Department has determined that modules assembled in China using third-country solar cells, including Taiwanese solar cells, have a country of origin of China. This determination is consistent with the Petitioner's intent. In the Petition, Petitioner alleged that the unfair pricing of modules assembled in China is causing injury to the domestic industry. Although Petitioner also alleged that the unfair pricing of solar cells manufactured in Taiwan is causing injury to the domestic industry, the Petition indicates that Petitioner intended for injury resulting from the unfair pricing of a panel assembled in China to take precedence over the injury resulting from the unfair pricing of a Taiwanese solar cell. Therefore, we find that it is appropriate to focus on the alleged injurious unfair pricing and subsidization of these modules that are assembled in China, and, accordingly, that it is appropriate to apply the NME methodology in determining whether such panels are dumped. In contrast, panels assembled in Malaysia using Taiwanese cells involve no production of either cells or modules in an NME country. Moreover, the fact that there happens to be, in this instance, a concurrent investigation involving solar products from Taiwan has no relevance to what the appropriate methodology is for examining dumping of panels that are assembled in China in the separate investigation of modules from China. It would be appropriate to apply the NME methodology to modules assembled in China in this investigation even if there were no concurrent Taiwan investigation.

## F.   Administrability Concerns

*Respondents:*
- The scope as proposed in the October 3rd Letter cannot be administered or applied due to the numerous contradictions and overlaps with the PRC and Taiwan investigations and also with the *Solar I* order.
  - For the same solar module,
    - At times the country of origin would be based on substantial transformation, or where the solar cell is manufactured, such as in *Solar I* and partially in the ongoing investigation on Taiwan, but
    - At other times the country of origin would be determined by where the solar module assembly took place, such as in the ongoing investigation of the PRC and partially in the ongoing investigation of Taiwan.

*Petitioner:*
- While the country of origin analyses from the *Solar I* investigation and that proposed by the scope clarification may differ, they are not necessarily inconsistent, nor unclear.
- The proposed scope clarification specifically exempts products subject to the existing solar AD/CVD orders from these investigations.
- The country of origin rules in the proposed scope clarifications (providing a supplemental country of origin rule for those products not covered by the initial solar investigations) prevent any product from at any time having two countries of origin.

Filed By: Gene Calvert, Filed Date: 12/17/14 12:45 PM, Submission Status: Approved

**Department's Position:**  We disagree with respondents and find the scope as clarified in the October 3rd Letter to be administrable.  As noted by respondents, the country of origin criteria in *Solar I*, applicable to solar modules, differ from these investigations.  However, we determine that the scope of *Solar I* is very clear as it states that the country of origin of a solar module is determined by where the solar cell was produced.[264]  Not only is the scope and country of origin determination of *Solar I* clear, but the scope adopted in the final determinations of the current investigations emphasize that they do not alter, revise, or overlap the scope of *Solar I*.  Specifically, the scopes of the current China and Taiwan investigations each state that "excluded from the scope of this investigation are any products covered by the existing antidumping and countervailing duty orders on {*Solar I*}."[265]  Further, any possible overlaps between the current China and Taiwan investigations are eliminated by the scope language stating that solar cells assembled in China using solar cells manufactured in Taiwan are subject to the current China investigation and not the Taiwan investigation.[266]  Thus, we have eliminated any overlap of solar products subject to any of these investigations and those subject to *Solar I*.

Meanwhile, the modifications to the scope language of the *Preliminary Determination* proposed in the October 3rd Letter and adopted in these determinations result in single change:  that the country of origin of a solar module assembled in the PRC is the PRC.  We find this country of origin language likewise clear and easily applied.  Thus, while the country of origin criteria of *Solar I* and the country of origin analysis stated in the proposed clarification in the October 3rd Letter may differ, with the latter building upon the former, we find the approaches to be complementary and that identifying the proceeding to which a given solar module may be subject, based on these analyses, will be straightforward.  Further, any potential overlap in coverage that may have arisen due to the different country of origin criteria have been eliminated by the modified language provided in the October 3rd proposed clarification and adopted in the final determinations.

## G.      Treatment of U.S. Solar Cells Assembled into Solar Modules in China and Taiwan

*Respondents:*
- The Department must include a scope exemption for solar products assembled from cells of U.S. origin.  The Department has already determined that the country of origin of a solar panel is the country in which the solar cell was produced.  U.S. law prohibits application of AD/CVD duties to U.S. origin goods.

Petitioner did not comment on this issue.

**Department's Position**:  We disagree with respondents.  As noted above, contrary to respondents' assertions, we have only applied AD and CVD measures to products determined to

---

[264]  *See*, *e.g.*, *Solar I* where the scope explicitly states that it covers "Modules, laminates, and panels produced in a third-country from cells produced in the PRC are covered by this investigation; however, modules, laminates, and panels produced in the PRC from cells produced in a third-country are not covered by this investigation."  Further, *Solar I* included certifications in Appendix II, which require exporters and imports of solar modules "to substantiate the claim that the panels/modules do not contain solar cells produced in the People's Republic of China."
[265]  *See* the Attachment to the October 3rd Letter.
[266]  *See* the Attachment to the October 3rd Letter.

Filed By: Gene Calvert, Filed Date: 12/17/14 12:45 PM, Submission Status: Approved

have a country of origin of China.  We have not applied such measures to products determined to have a country of origin of the United States.

## H.    Comments Concerning the Scope of the Preliminary Determination

Parties have submitted comments concerning the scope of the investigation as defined in the *Preliminary Determination*.  Because we have clarified the scope consistent with the October 3rd Letter, we have not addressed comments that were only relevant to the scope of the investigation as defined in the *Preliminary Determination* and not relevant to the scope of this final determination.

**Comment 2: Whether the Department Should Investigate the Effects of the GOC's Alleged Cyberhacking on this Investigation**

*Petitioner's Comments:*
- The U.S. Department of Justice charged members of the People's Liberation Army (the military of the PRC) with cyber espionage against U.S. corporations for commercial advantage.  SolarWorld was among the U.S. corporations that were targeted.
- As the information allegedly stolen includes information related to SolarWorld's financial status, manufacturing metrics, and privileged attorney-client communications regarding trade litigation, the Department should investigate how this alleged cyberhacking may have affected the AD and CVD investigations.

*Wuxi Suntech's Rebuttal Comments:*
- Petitioner's allegations of cyberhacking by the GOC are not a proper subject to be addressed by U.S. AD and CVD laws.  The allegations do not refer to any of the legal elements of a subsidy.
- Any investigation of Petitioner's allegations should be addressed outside the confines of this investigation.

**Department's Position:**  As the agency charged with administering the antidumping and countervailing duty laws, the Department has the inherent authority to protect the integrity of its proceedings.  For example, the Court of Appeals for the Federal Circuit has recognized the Department's authority to ensure that our proceedings are not undermined by fraud.[267]  Similarly, the law apportions responsibility for justice across the spectrum of administrative agencies, each according to its legislative mandate.  For example, "it is Customs, not Commerce, that is charged with responsibility for enforcement of the laws prohibiting material false statements and omissions in customs entry documentation" under 19 U.S.C. § 1592.[268]

---

[267] *See, e.g., Tokyo Kikai Seisakusho, Ltd. v. United States*, 529 F.3d 1352, 1360-62 (Fed. Cir. 2008).

[268] *Mid Continent Nail Corp. v. United States*, 949 F. Supp. 2d 1247, 1283 (Ct. Int'l Trade 2013)("As such, even assuming that violations such as those alleged by {petitioner} may have occurred, the investigation of any such potential violations would fall squarely within Customs' domain.  Commerce here thus acted properly in referring to Customs the issue of whether certain companies may have acted negligently or fraudulently . . . .").

Filed By: Gene Calvert, Filed Date: 12/17/14 12:45 PM, Submission Status: Approved

**Tab 14**

**Issues and Decision Memorandum For the Final
Determination of Sales at Less Than Fair Value
(Dec. 15, 2014)**

**AD P.R. 817**



UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-570-010
Investigation
Public Document
E&C/IV: JDP/TEM

| | |
|---|---|
| DATE: | December 15, 2014 |
| MEMORANDUM TO: | Paul Piquado<br>Assistant Secretary<br>for Enforcement and Compliance |
| FROM: | Christian Marsh<br>Deputy Assistant Secretary<br>for Antidumping and Countervailing Duty Operations |
| SUBJECT: | Certain Crystalline Silicon Photovoltaic Products from the<br>People's Republic of China: Issues and Decision Memorandum for<br>the Final Determination of Sales at Less Than Fair Value |

# I. SUMMARY

The Department finds that certain solar products from the PRC are being, or are likely to be, sold in the United States at LTFV, as provided in section 735 of the Act. The POI is April 1, 2013, through September 30, 2013.

After analyzing the comments submitted by interested parties, and based on our findings at verification, we made certain changes to the margin calculations for the two mandatory respondents, which also results in a change to the weighted-average dumping margin calculations for the separate-rate companies that were not selected for individual examination. We recommend that you approve the positions described in the "Discussion of the Issues" section of this memorandum. Below is the complete list of the issues for which we received comments:

## Case Issues:

Comment 1: Scope of the Investigation
Comment 2: Whether to Select South Africa or Thailand as the Primary Surrogate Country
Comment 3: Whether to Offset the Cash Deposit Rate for Export Subsidies
Comment 4: Whether the Department Should Investigate the Effects of the GOC's Alleged Cyberhacking on this Investigation
Comment 5: Ultimate Ownership of Separate Rate Applicants
Comment 6: Separate Rate Applicants with Managers or Board Members with Ties to the Chinese Government

Comment 7:    Separate Rate Status of Lianyungang Shenzhou New Energy Co., Ltd.
Comment 8:    Separate Rate Status of Sumec Hardware & Tools Co., Ltd.
Comment 9:    The Appropriate Surrogate Value for Aluminum Frames
Comment 10:   The Appropriate Surrogate Value for Scrap Solar Cells
Comment 11:   Unpaid Sales
Comment 12:   Quality Insurance
Comment 13:   Warranty Costs
Comment 14:   Incorrect Allocation of Indirect Material, Labor and Electricity    Consumption
Comment 15:   Whether to Base Renesola/Jinko's Dumping Margin on Partial AFA
Comment 16:   Whether to Collapse Jinko and Renesola
Comment 17:   Whether to Use Market-Economy Purchase Prices to Value all of
              Renesola/Jinko's Solar Cells
Comment 18:   Whether to Adjust Renesola/Jinko's Cash Deposit Rate by the Full Amount of
              Domestic Subsidies
Comment 19:   Separate Rate Application of tenKsolar

## II.    BACKGROUND

The following events have taken place since the Department published the *Preliminary Determination* in this investigation on July 31, 2014.[1]  In August, 2014, the Department verified the information provided by the mandatory respondents Trina Solar and Renesola/Jinko.

On October 3, 2014, in response to interested parties' comments on the scope of this investigation, the Department announced that it was considering the possibility of a scope clarification, described the possible clarification, and provided interested parties with an opportunity to submit comments on the potential clarification.

On October 16, 2014, Trina Solar, Renesola/Jinko, Petitioner, the Government of the PRC, a U.S. importer, Suniva Inc., and certain separate rate applicants submitted case briefs.[2]  From

---

[1] *See Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China: Affirmative Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination,* 79 FR 44399 (July 31, 2014) ("*Preliminary Determination*").

2

October 22, 2014 to October 27, 2014 Trina Solar, Renesola/Jinko, Petitioner, and certain separate rate applicants submitted rebuttal briefs.[3]

Although certain parties requested that a hearing be held, on October 24, 2014, all hearing requests were subsequently withdrawn.  Thus, the Department did not hold a hearing with respect to this investigation.

## III.  SCOPE OF THE INVESTIGATION

---

[2] *See* Letter from fourteen separate rate applicants, "Re: Antidumping and Countervailing Duty Investigations of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China, and Antidumping Duty Investigation of Certain Crystalline Silicon Photo voltaic Products from Taiwan: Respondents' Case Brief," dated October 16, 2014; Letter from the PRC Government, "Re: Government of China's Case Brief: Certain Crystalline Silicon Photovoltaic Products from the People's Republic Of China," dated October 16, 2014;  Letter from Asun Energy Co., Ltd. (a/k/a Suzhou Asun Energy Co., Ltd.), "Re: Administrative Case Brief: Antidumping Duty Investigation of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China (A-570-010)," dated October 16, 2014; Letter from Trina Solar, "Re: Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China; Case Brief of Changzhou Trina Solar Energy Co., Ltd.," dated October 16, 2014; Letter from Renesola, "Re: Certain Crystalline Silicon Photovoltaic Products from China; Case Brief," dated October 16, 2014; Letter from Junco, "Re: Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: Case Brief," dated October 16, 2014; Letter from Hanwha QCELLS USA, Inc., "Re: Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China," dated October 16, 2014; Letter from Suniva, Inc., "Re: Case Brief on Scope Issues Certain Crystalline Silicon Photovoltaic Products from China and Taiwan," dated October 16, 2014;  Letter from tenKsolar (Shanghai) Co., Ltd., "Re: Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and Taiwan– Case Brief," dated October 16, 2014; Letter from SNJ Enterprises LLC dba Zamp Solar and Quebec Inc. dba RDK Products, "Re: Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: Case Brief," dated October 16, 2014;  Letter from  Petitioner, "Re: Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: Case Brief of Solar World Americas, Inc.," dated October 16, 2014.

[3] *See* Letter from Hanwha SolarOne (Qidong) Co., Ltd. and Hanwha SolarOne Hong Kong Limited, "Re: Rebuttal Brief: Antidumping Duty Investigation of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China (A-570-010)," dated October 22, 2014; Letter from  Asun Energy Co., Ltd. (a/k/a Suzhou Asun Energy Co., Ltd.), "Re: Rebuttal Brief: Antidumping/Countervailing Duty Investigations of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China," dated October 22, 2014;  Letter from  Shangluo BYD Industrial Co., Ltd. and Shanghai BYD Co., Ltd. "Re: Crystalline Silicon Photovoltaic Products from the People's Republic of China and Taiwan: Rebuttal Brief," dated October 22, 2014; Letter from Changzhou Almaden Co., Ltd., "Re: Crystalline Silicon Photovoltaic Products from P.R. China: Rebuttal Brief," dated October 22, 2014; Letter from Renesola "Re: Certain Crystalline Silicon Photovoltaic Products from China; Rebuttal Brief," dated October 22, 2014; Letter from  Petitioner, "Re: Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: Rebuttal Brief of Solar World Americas, Inc.," dated October 22, 2014; Letter from Trina Solar, "Re: Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: Rebuttal Brief of Changzhou Trina Solar Energy Co., Ltd.," dated October 22, 2014; *see also* Letter from fourteen separate rate applicants, "Re: Antidumping and Countervailing Duty Investigations of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China, and Antidumping Duty Investigation of Certain Crystalline Silicon Photo voltaic Products from Taiwan: Respondents' Rebuttal Brief," dated October 27, 2014; Letter from  Hanwha QCELLS USA, Inc. "Re: Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China," dated October 27, 2014; Letter from SNJ Enterprises LLC dba Zamp Solar LLC and Quebec Inc. dba RDK Products, "Re: Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: Rebuttal Brief," dated October 27, 2014; Letter from Petitioner, "Re: Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: SolarWorld's Rebuttal Brief on Scope," dated October 27, 2014.

The merchandise covered by this investigation is modules, laminates and/or panels consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including building integrated materials.  For purposes of this investigation, subject merchandise includes modules, laminates and/or panels assembled in the PRC consisting of crystalline silicon photovoltaic cells produced in a customs territory other than the PRC.

Subject merchandise includes modules, laminates and/or panels assembled in the PRC consisting of crystalline silicon photovoltaic cells of thickness equal to or greater than 20 micrometers, having a p/n junction formed by any means, whether or not the cell has undergone other processing, including, but not limited to, cleaning, etching, coating, and/or addition of materials (including, but not limited to, metallization and conductor patterns) to collect and forward the electricity that is generated by the cell.

Excluded from the scope of this investigation are thin film photovoltaic products produced from amorphous silicon (a-Si), cadmium telluride (CdTe), or copper indium gallium selenide (CIGS). Also excluded from the scope of this investigation are modules, laminates and/or panels assembled in the PRC, consisting of crystalline silicon photovoltaic cells, not exceeding 10,000mm$^2$ in surface area, that are permanently integrated into a consumer good whose function is other than power generation and that consumes the electricity generated by the integrated crystalline silicon photovoltaic cells.  Where more than one module, laminate and/or panel is permanently integrated into a consumer good, the surface area for purposes of this exclusion shall be the total combined surface area of all modules, laminates and/or panels that are integrated into the consumer good.  Further, also excluded from the scope of this investigation are any products covered by the existing antidumping and countervailing duty orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, laminates and/or panels, from the PRC.[4]

Merchandise covered by this investigation is currently classified in the Harmonized Tariff Schedule of the United States (HTSUS) under subheadings 8501.61.0000, 8507.20.8030, 8507.20.8040, 8507.20.8060, 8507.20.8090, 8541.40.6020, 8541.40.6030 and 8501.31.8000. These HTSUS subheadings are provided for convenience and customs purposes; the written description of the scope of this investigation is dispositive.

## IV. SEPARATE RATE COMPANIES

In proceedings involving NME countries, the Department holds a rebuttable presumption that all companies within the country are subject to government control and, thus, should be assessed a single AD rate.  It is the Department's policy to assign all exporters of the subject merchandise in an NME country this single rate unless an exporter can demonstrate that it is sufficiently independent so as to be entitled to a separate rate.

---

[4] See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order, 77 FR 73018 (December 7, 2012); Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Countervailing Duty Order, 77 FR 73017 (December 7, 2012).

4

In the instant investigation, the Department received timely-filed separate rate applications from 52 companies. In the *Preliminary Determination,* the Department granted 44 of the applicants (Separate Rate Applicants) separate rates. Interested parties submitted a number of comments regarding some of the companies applying for separate rate status. After considering the comments, with the exception of tenKsolar (Shanghai) Co., Ltd., the Department has not changed its position from the *Preliminary Determination* with respect to the companies seeking separate rate status. *See* Comment1 and Comments 5 through 8 below.

The Department continues to find that the evidence placed on the record of this investigation by the Separate Rate Applicants that were granted separate rate status in the *Preliminary Determination* demonstrates both *de jure* and *de facto* absence of government control with respect to each company's respective exports of the merchandise under investigation. Further, the Department continues to deny certain companies separate rate status.

The rate assigned to companies granted separate rate status that were not individually examined is normally determined based on the weighted-average of the estimated dumping margins calculated for exporters and producers individually investigated, excluding zero and *de minimis* margins or margins based entirely on FA.[5] In this investigation, we calculated above *de minimis* estimated weighted-average dumping margins that are not based on total FA for the two mandatory respondents, Trina Solar and Renesola/Jinko. Because we individually examined two companies in this investigation, basing the estimated dumping margin for the companies not individually examined on a weighted-average of the dumping margins for the two individually examined companies risks disclosure of BPI. Therefore, we calculated both a weighted-average of the dumping margins calculated for the two mandatory respondents using public values for their sales of subject merchandise and a simple average of these two dumping margins, and selected, as the separate rate, the average that provides a more accurate proxy for the weighted-average margin of both companies calculated using BPI.[6]

## V.   USE OF ADVERSE FACTS AVAILABLE

In the *Preliminary Determination*, we determined that 35 companies were part of the PRC-wide entity because these companies failed to respond the Department's questionnaires and, therefore,

---

[5] *See* section 735(c)(5)(A) of the Act.
[6] *See* the December 15, 2014, memorandum from Jeff Pedersen to the File entitled "Calculation of the Final Margin for Separate Rate Recipients." ("Trina Final Analysis Memorandum").

failed to qualify for a separate rate.[7] Further, we found that the PRC-wide entity withheld necessary information within the meaning of section 776(a) of the Act, and failed to cooperate by acting to the best of its ability to comply with the Department's requests for information within the meaning of section 776(b) of the Act. Specifically, the Department did not receive responses to its Q&V questionnaire from 35 PRC exporters and/or producers of merchandise under consideration that were named in the Petition and which the Department received confirmation that its issued Q&V questionnaire was delivered. As necessary information is not available on the record, and the PRC-wide entity withheld necessary information requested by the Department, failed to provide information by the established deadlines, and significantly impeded this proceeding by not submitting the requested quantity and value information, pursuant to sections 776(a)(1) and (a)(2)(A)-(C) of the Act, the Department is applying facts otherwise available. Furthermore, due to the PRC-wide entity's failure to provide information that was in its possession, the Department determined that the PRC-wide entity failed to cooperate and, thus, found it appropriate to base the PRC-wide rate on AFA. As AFA, we assigned the PRC-wide entity the petition margin of 165.04 percent.[8]

We received no comments on our *Preliminary Determination* with respect to the PRC-wide entity. Therefore, we have continued to assign to the PRC-wide entity an AD margin equal to the Petition margin of 165.04 percent. While we made certain changes to the margin calculations for Trina Solar and Renesola/Jinko since the *Preliminary Determination*, as outlined in the Issues and Decision Memorandum, these changes did not alter our preliminary corroboration analysis, which we continue to apply for purposes of this final determination.[9]

## VI. DISCUSSION OF THE ISSUES

### Comment 1: Scope of the Investigation

---

[7] *See Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China and Taiwan: Initiation of Antidumping Duty Investigations*, 79 FR 4661 (January 29, 2014) ("The Department requires that PRC producers/exporters submit a response to both the Q&V questionnaire and the separate rate application by their respective deadlines in order to receive consideration for separate rate status). Those companies are: Beijing Hope Industry, China Sunergy, CNPV, EGing, ENN Solar Energy, Era Solar, Goldpoly (Quanzhou), Himin Holdings, Jetion, Jia Yi Energy Technology, Jiasheng Photovoltaic Tech., Jiutai Energy, Komaes Solar, Leye Photovoltaic Science Tech., Magi Solar Technology, Perfectenergy, Polar Photovoltaics, Qiangsheng (QS Solar), Refine Solar, Risun Solar (JiangXi Ruijing Solar Power Co., Ltd.), Shanghai Chaori Solar Energy, Shangpin Solar, Shanshan Ulica, Shenglong PV-Tech, Shenzhen Global Solar Energy Tech., Shuqimeng Energy Tech, Skybasesolar, Solargiga Energy Holdings Ltd., Sopray Solar, Sunlink PV, Tianjin Jinneng Solar Cell, Topsolar, Trony, Weihai China Glass Solar, and Yuhan Sinosola. For an additional 12 PRC exporters and/or producers of merchandise that were named in "Petition for the Imposition of Antidumping and Countervailing Duties on Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and Taiwan," dated December 31, 2013 ("Petition"), the Department issued a questionnaire, but did not receive confirmation of delivery. Those companies are: Aiko Solar, Best Solar Hi-tech, Dai Hwa Industrial, Eoplly New Energy, Golden Partner development, Innovosolar, Jiangxi Green Power Co. Ltd., Sanjing Silicon, Sunflower, Sunvim Solar Technology, Yunnan Tianda, and Yunnan Zhuoye Energy. *See* Memorandum to the file from Erin Kearney, International Trade Analyst, Office 4, AD/CVD Operations on the subject "Delivery of Quantity and Value Questionnaires" dated March 12, 2014.
[8] *See Preliminary Determination* and accompanying Preliminary Decision Memorandum at Topic h.
[9] *Id.* at pages 16-17; Memorandum to the File, from Thomas Martin, International Trade Compliance Analyst, Office VI, AD/CVD Operations, "Antidumping Duty Investigation of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: Renesola Jiangsu Ltd., and Jinko Solar Import and Export Co., Ltd. Analysis Memorandum for the Final Determination."

On October 3, 2014, the Department issued a letter to all interested parties inviting parties to include in their case briefs comments concerning a possible clarification to the scope of the AD/CVD investigations that the Department was considering.[10]  The Department stated that the scope clarification under consideration contemplated the following:

- For the PRC investigations, subject merchandise would include all modules, laminates and/or panels assembled in the PRC that contain crystalline silicon photovoltaic cells produced in a customs territory other than the PRC.
- For the Taiwan investigation, subject merchandise would include all modules, laminates and/or panels assembled in Taiwan consisting of crystalline silicon photovoltaic cells produced in Taiwan or a customs territory other than Taiwan and would continue to exclude any products covered by the existing AD and CVD orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the PRC.  In addition, subject merchandise would include modules, laminates, and panels assembled in a third-country, other than the PRC, consisting of crystalline silicon photovoltaic cells produced in Taiwan.

Parties have commented on the scope clarification in this letter and made other scope comments addressed below.  Generally, Respondents oppose adopting the proposed scope clarification in the October 3rd Letter, while Petitioner argues that the Department should adopt the scopes proposed in the October 3rd Letter because they most effectively apply Petitioner's intent, would best effectuate the U.S. trade laws and provide effective relief to the injured domestic industry, and would be easily administrable and enforceable by the agencies involved.  After considering comments, we have determined to clarify the scopes of the PRC AD and CVD investigations consistent with the October 3rd Letter.  We address party comments in detail below.

Due to this clarification in the scope, we are not requiring exporter and importer certifications.  The revocation of the certification requirements previously established in this investigation does not change or rescind the certification requirements established in connection with the existing orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the PRC.

---

[10] See October 3, 2014 letter from Howard Smith, Program Manager, Office IV, AD/CVD Operations, Enforcement and Compliance, to All Interested Parties, re: *Antidumping and Countervailing Duty Investigations of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and the Antidumping Duty Investigation of Certain Crystalline Silicon Photovoltaic Products from Taiwan: Opportunity to Submit Scope Comments* (October 3, 2014) ("October 3rd Letter").

## A. Consistency with *Solar I*[11] and Court Decisions

*Respondents:*

- The Department's proposed scope clarification is arbitrary because it is inconsistent with the product coverage decisions made by the Department in *Solar I* and also ignores country of origin decisions made by the CIT and CAFC, as well as country of origin criteria stated in the Act. Such arbitrary decisions are unlawful because, as the courts have noted, the Department has an obligation to be consistent in its decisions.
  - In *Solar I,* the Department made numerous decisions that directly ruled against establishing a scope that would find solar modules assembled in China but not containing Chinese solar cells subject to the order. The Department's determinations in *Solar I* were made on the following bases:
    - A product can only have one country of origin,[12]
    - AD and CVD investigations only cover products with a country of origin of the country under investigation,[13] and
    - The Department relies on the substantial transformation test to determine the country of origin of a product.[14]
    - In applying this substantial transformation test in *Solar I*, the Department determined that "module assembly does not substantially alter the essential nature of solar cells nor does it constitute significant processing such that it changes the country of origin of the cell."[15] The Department found that the solar cell imparts the essential character of a solar module, and, therefore, the origin of the solar cell is determinative of the country of origin of the class or kind of merchandise at issue here. Therefore, "where solar cell production occurs in a different country from solar module assembly, the country of origin of the solar modules/panels is the country in which the solar cell was produced."[16]
    - If the approach in *Solar I* described above were applied to these investigations the conclusion would be that the scope of an AD order must be limited to subject merchandise "produced" and "originating" in the country covered by the order, which here is China and Taiwan. Merchandise produced or originating in a country other than the country

---

[11] *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Affirmative Countervailing Duty Determination and Final Affirmative Critical Circumstances Determination*, 77 FR 63788 (October 17, 2012) ("*Solar I CVD Final Determination*") and *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Final Determination of Sales at Less Than Fair Value, and Affirmative Final Determination of Critical Circumstances, in Part*, 77 FR 63791 (October 17, 2012) ("*Solar I AD Final Determination*") (these two investigations are referred to generally as "*Solar I*").

[12] *See Solar I AD Final Determination* and accompanying Issues and Decision Memorandum ("*Solar I IDM*") at Comment 1, page 8.

[13] *Id.*

[14] *Id* at 5-6.

[15] *See* March 19, 2012 Memorandum from Jeff Pedersen to Chris Marsh "Scope Clarification: Antidumping and Countervailing Duty Investigations of Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China ("*Solar I Substantial Transformation Memorandum*") (placed on the record of this proceeding on December 15, 2014).

[16] *Id.*

8

covered by an order, which based on the previous substantial transformation decision, includes solar modules assembled in China or Taiwan from solar cells produced in countries other than China or Taiwan, have a different country of origin than China or Taiwan, and thus may not be included in the scope of these investigations.

o  Decisions by the CIT and the CAFC, as well as sections of the Act support finding that products under an investigation can only have one country of origin and that the basis for determining this is the substantial transformation test.

    ■  Applying the country of origin determination implied in the scope as proposed in the October 3rd Letter, as well as the criteria applied in *Solar I*, would result in a solar module assembled in one country containing another country's cell to have two countries of origin.  CIT decisions[17] have stated that a product can only have a single country of origin for AD and CVD purposes.

    ■  The scope as proposed in the October 3rd Letter is also contrary to the statutory language at Section 731 of the Act, which provides for the imposition of antidumping duties on "subject merchandise," defined as "the class or kind of merchandise that is within the scope of an investigation, a review, a suspension agreement, {or} an order...."[18]  This provision requires the Department to make a finding of dumping for a class or kind of merchandise from a particular country.[19]

    ■  The scope as proposed in the October 3rd Letter ignores the established criteria for determining the country of origin, which is the substantial transformation analysis.

        •  The CIT has determined that the "substantial transformation" analysis provides a means for the Department to carry out its country of origin examination and properly guards against circumvention of existing antidumping orders.[20]

o  The Department is prevented from contradicting these decisions in *Solar I* because the Department is obliged to be consistent in its decision-making across its investigations.

    ■  The CIT has explained that although an agency is not strictly bound to its precedent, "{i}t is a principle of administrative law that an 'agency must either conform to its prior norms and decisions or explain the reason for its departure from such precedent."[21]  The CAFC has similarly stated that the Department cannot ignore its own precedent absent some legitimate reason for departing from it.[22]

---

[17] *See Ugine & ALZ Belgium, N.V. v. United States*, 517 F. Supp. 2d 1333, 1345 (CIT 2007) ("*Ugine I*"), *aff'd*, 551 F.3d 1339 ("*Ugine III*") (Fed. Cir. 2009).

[18] *Id.*; Section 771(25) of the Act.

[19] *See E.I. DuPont de Nemours & Co. v. United States*, 8 F. Supp. 2d 854, 859 (CIT 1998) ("*Du Pont*"); *see also Ugine I*, 517 F. Supp. 2d at 1345.

[20] *See Du Pont*, 8 F. Supp. 2d at 857 (emphasis added).

[21] *See Torrington Co. v. United States*, 745 F. Supp. 718, 727 (CIT 1990) (quoting *Mississippi Valley Gas Co. v. Federal Energy Regulatory Comm'n*, 659 F.2d 488, 506 (5th Cir. 1981)); *Neenah Foundry Co. v. United States,* 142 F. Supp. 2d 1008, 1022 (CIT 2001); *Hussey Copper Ltd., v. United States*, 834 F. Supp. 413,418 (CIT 1993).

[22] *See Ugine III*, 551 F.3d at 1349.

Filed By: Jeffrey Pedersen, Filed Date: 12/17/14 12:45 PM, Submission Status: Approved

▪ The Department has not articulated reasons for diverging from these decisions. Instead, the Department stated in these investigations, that it is informed "by the product coverage decisions that it made" in *Solar I*.[23]

*Petitioner:*

- In the preliminary determination, the Department stated that it was continuing to analyze interested parties' scope comments, including comments on whether it is appropriate to apply a traditional substantial transformation or other analysis in determining the country of origin of certain solar modules described in the scope of the investigation.

- Petitioner supports the proposed scope clarification in the Department's October 3rd Letter, and requests that the Department adopt it for purposes of its final determination and any resulting AD order.

- The Department's proposed scope clarification is fully consistent with the Petitioner's intent. It has been clear since the start of the first solar AD/CVD investigations, and throughout the current investigations, that Petitioner's intent has always been to cover all cells from the PRC and all modules from the PRC and, now, all cells from Taiwan and all modules from Taiwan.[24]

- The Department's proposed scope clarification would best effectuate the U.S. trade laws and provide effective relief to the injured domestic industry, and would be easily administrable and enforceable by the agencies.

- The remedial purposes of the AD/CVD laws are best served by the proposed scope clarification. The Department has determined that both cells and modules from the PRC and Taiwan are being dumped, and both Chinese cells and modules are subsidized. As such, the law obligates Commerce to impose duties on these products.

- Clarifying the scope language in the manner proposed by the Department would result in AD/CVD orders that are administrable and enforceable by the Department and CBP. Solar cells are not required to contain country of origin markings. It can be extremely difficult for CBP to determine the origin of various inputs in a solar module upon importation. On the other hand, all solar modules are clearly marked with country-of-origin and other identifying information. Covering all cells and modules from both the PRC and Taiwan, as described in the October 3rd Letter proposed scope clarification, would therefore significantly improve the enforceability of any future AD/CVD orders.

- To the extent that the Department's proposed scope clarification can be considered a departure from its prior country-of-origin determination, the agency is, of course, permitted to depart from its prior determinations.[25]

- Respondents' argument that the scope clarification results in a single product having two countries of origin is unfounded. Because the country-of-origin rules in the proposed scope clarifications provide a supplemental country-of-origin rule for those products not covered by the initial solar investigations, no product would at any time have two countries of origin. As an example, Trina Solar claims that modules assembled in China with cells produced in Taiwan would result in identical products having two different countries of origin under the previous analysis and the proposed scope clarification.

---

[23] *See Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China and Taiwan: Initiation of Antidumping Duty Investigations*, 79 FR 4661 (January 29, 2014) ("*Solar Products Initiation Notice*").
[24] *See, e.g.*, Solar I IDM at Comment 1.
[25] *See Torrington*, 745 F. Supp. at 727.

10

- The proposed scope would also be consistent with international precedent.  The recent EU AD/CVD investigations of Chinese solar products included "imports of crystalline silicon photovoltaic modules and key components (*i.e.*, cells and wafers) originating in or consigned from the People's Republic of China,"[26] recognizing that all cells and all modules from the subject country, in addition to other key components, must be covered.
- In the alternative, should the Department decide not to make its proposed clarification to the scope, these investigations should continue with the scope proposed by Petitioner and accepted by the Department for purposes of initiation and its preliminary determination.

**Department's Position**:

After considering the facts and circumstances presented by the PRC AD and CVD investigations, as well as the parties' comments on the October 3rd Letter, for this final determination the Department has clarified the scope language of the PRC AD and CVD investigations such that subject merchandise includes all modules, laminates and/or panels assembled in the PRC that contain crystalline silicon photovoltaic cells produced in a customs territory other than the PRC. For a complete description of the scope of the investigation for this final determination, *see* section III above.

Upon initiation of these investigations, the Department set aside a period for interested parties to raise issues relating to product coverage, *i.e.*, scope.[27]  Interested parties submitted affirmative comments and rebuttal comments regarding product coverage.[28]  In the *Preliminary Determination* published on July 31, 2014, we announced that the Department was continuing to analyze the scope comments, including comments on whether it was appropriate to apply a traditional substantial transformation or other analysis in determining the country of origin of certain solar modules described in the scope of this investigation.[29]  Further, with respect to administering the PRC investigations, we explained that the scope of these investigations explicitly excludes any products covered by the existing AD and CVD orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the PRC.[30]  In response to interested parties' comments on the scope of this investigation (and prior to the deadlines for the submission of case and rebuttal briefs), in the October 3rd Letter the Department announced that it was considering the possibility of a scope clarification, described the possible clarification, and invited interested parties to submit comments on the clarification.  For the reasons discussed

---

[26] *See* Council Implementing Regulation (EU) No 1238/2013 of 2, Official Journal of the European Union (Dec. 2013).

[27] *See Solar Products Initiation Notice*, 79 FR at 4661; *see also Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China: Initiation of Countervailing Duty Investigation*, 79 FR4667 (January 29, 2014).

[28] *See* scope comment submissions, dated February 18, 2014, from Gintech; Motech; Neo Solar Power Corporation; NextEra Energy, Inc.; SunEdison, Inc.; Suniva, Inc.; Solartech Energy Corp.; and Yingli Green Energy Holding Company Limited, Yingli Green Energy Americas, Inc., Canadian Solar Inc., Changzhou Trina Solar Energy Co., Ltd., Wuxi Suntech Power Co., Ltd., Shanghai JA Solar Technology Co., Ltd., Hefei JA Solar Technology Co., Ltd., and Jinko Solar Co., Ltd.; *see also* rebuttal scope comment submissions, dated April 3, 2014, from Petitioner, and dated April 21, 2014, from Yingli Green Energy Americas, Inc., Canadian Solar Inc., Changzhou Trina Solar Energy Co., Ltd., Wuxi Suntech Power Co., Ltd., Shanghai JA Solar Technology Co., Ltd., Hefei JA Solar Technology Co., Ltd., and Jinko Solar Co., Ltd.

[29] *See AD PDM* at 5; *see also* CVD PDM at 4.

[30] *See id.*

11

below, the Department determines that there are significant reasons for clarifying and modifying the scope of this investigation.

As a threshold matter, the Department has final authority to clarify and modify the scope in this proceeding in order to fulfill its statutory mandate.  The CAFC has explained that "the purpose of the petition is to propose an investigation," and the "purpose of the investigation is to determine what merchandise should be included in the final order."[31]  Therefore, the Department must be able to determine what merchandise should be covered by any final order.  Additionally, the purpose of the AD and CVD law is to provide a remedy, if appropriate, for alleged injury to the domestic industry that is caused by specified merchandise alleged to be dumped or unfairly subsidized.[32]  Accordingly, the Department's "practice is to provide ample deference to the Petitioner with respect to the definition of the product for which it seeks relief under the AD and CVD laws."[33]

The CIT has likewise stated that the Department "retains broad discretion to define and clarify the scope of an antidumping investigation in a manner which reflects the intent of the petition."[34]  Indeed, the CIT has confirmed that any scope clarifications made by the Department *should* be made in a manner which reflects the intent of the Petition, and that is what the scope clarification accomplishes here.[35]  The Petition[36] and Petitioner's comments in this investigation demonstrate that the Petitioner's intent is a scope that covers all solar modules assembled in the PRC using third-country solar cells.  In its Petition to this investigation, the Petitioner stated its intent to include all of these modules in the scope, citing the "loophole" that resulted when, following the application of Department's substantial transformation analysis in the *Solar I* investigations, producers subject to the *Solar I* investigations increased exports to the United States of modules assembled in the PRC with non-PRC cells with the result of avoiding the reach of the *Solar I* AD and CVD orders.[37]  Indeed, in the Petition for this investigation, Petitioner noted that it had argued for a scope almost identical to the scope in the October 3rd Letter in Solar I and stated

---

[31] *See Duferco Steel Inc. v. United States*, 296 F.3d 1087, 1096-97 (Fed. Cir. 2002) ("*Duferco*").

[32] *See* sections 731 and 701 of the Act; *see also United States v. American Home Assur. Co.*, 964 F. Supp. 2d 1342, 1352-53  ("Antidumping duties serve the distinct purpose of remedying the effect of unfair trade practices resulting in actual or threatened injury to domestic like-product producers." (*citing Canadian Wheat Bd. v. United States*, 641 F.3d 1344, 1351 (Fed. Cir. 2011))); *Wolff Shoe Co. v. United States*, 141 F.3d 1116, 1117 (Fed. Cir. 1998) (Countervailing duties "are levied on subsidized imports to offset the unfair competitive advantages created by foreign subsidies.").

[33] *See Large Residential Washers From the Republic of Korea*, 77 FR 46391, 46392 (August 3, 2012) and accompanying Issues and Decision Memorandum at Comment 2.  *See also Kern Liebers USA, Inc. v. United States*, 881 F. Supp. 618, 621 (CIT 1995) ("The agency generally exercises {its} broad discretion to define and clarify the scope of an antidumping investigation in a manner which reflects the intent of the petition").

[34] *See Minebea Co. v. United States*, 782 F. Supp. 117, 120 (CIT 1992).

[35] *See AMS Assocs. v. United States*, 881 F. Supp. 2d 1374, 1380 (CIT 2012) (explaining that "Commerce retains broad discretion to define and clarify the scope of an antidumping investigation in a manner which reflects the intent of the petition") (citation and quotation marks omitted), aff'd, 737 F.3d 1338 (Fed. Cir. 2013); *Kern Liebers USA, Inc. v. United States*, 881 F. Supp. 618, 621 (CIT 1995) (*citing Minebea*, 782 F. Supp. at 120).

[36] *See* "Petition for the Imposition of Antidumping and Countervailing Duties on Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and Taiwan," dated December 31, 2013 ("Petitions on China and Taiwan").

[37] *See* the Petition at 3, 5-6, 21, 34, 37, and 53; Letter from  Petitioner, "Re: Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: Case Brief of Solar World Americas, Inc.," dated October 16, 2014 at 5-6; Letter from Petitioner to the Department, "Re: Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and Taiwan: Rebuttal to Respondents' Scope Comments" (Apr. 3, 2014) at 11-13.

that the Department's refusal  to cover Chinese solar modules assembled from non-Chinese solar cells allowed Chinese companies to continue to ship solar modules to the United States duty free.[38]  In these investigations, the alleged injury to the domestic industry stems from certain solar modules that are assembled in the PRC using cells produced in third countries, modules which are not covered by the scope of *Solar I* and, thereby, exceed the reach of the remedy afforded by the *Solar I* AD and CVD orders.  In addition, taking the instant PRC investigations together with *Solar I*, the Petitioner has alleged that the domestic industry is being injured as a result of the unfair pricing of cells produced in the PRC, modules containing such cells, and modules assembled in the PRC with third-country cells, as well as unfair subsidization in the PRC of both cells and modules.

Beyond the Petitioner's intent, there are other facts and factors that the Department has found to be significant in considering the scope of these investigations.  For example, the record demonstrates that the solar products industry involves a complex and readily adaptable global supply chain which allows producers to modify their production chains easily and quickly.  Petitioner has cited statements by five large Chinese solar module producers and one U.S. importer of solar modules noting the ease with which they were able to modify their production chain to avoid paying the AD and CVDs imposed by *Solar I*.[39]  Further, there exist prior AD and CVD orders on related merchandise (i.e., solar cells and modules) from the PRC – *Solar I* – and following the initiation of the *Solar I* investigations and the imposition of those orders, there has been a shift in trade flows that has resulted in increased imports of non-subject modules produced in China.[40]  Such imports – if they are dumped and/or unfairly subsidized and injurious – should not be beyond the reach of the AD and CVD laws.

The Department has also taken into account considerations regarding administrability, enforceability, and potential evasion.  If these investigations result in an AD and/or CVD order, as relevant, the scope clarification adopted in this final determination will make the resulting order(s) substantially easier to administer and enforce (for both the Department and CBP), by helping to prevent significant and widespread evasion similar to the evasion that that has resulted due to parties that have exploited the substantial transformation analysis conducted in *Solar I*.  As indicated in the Petition, although "imports of modules from China consisted largely of modules assembled with Chinese cells" from 2010 through early 2012, "{s}ince that time, imports of modules from China have consisted almost entirely of modules assembled in China from solar cells completed or partially manufactured in Taiwan or other countries (*i.e.*, cells manufactured in Taiwan from Taiwanese inputs, or cells manufactured in Taiwan or other countries from Chinese inputs, including wafers)."[41]  The scope which was proposed in the Petition and on which we initiated investigations may result in the evasion of duties and, thus, ineffective relief to the Petitioner due to the complex and adaptable global supply chain that allows production processes for solar cells and modules to be easily moved across borders.  With this scope clarification, it is the Department's intent to reduce as much as possible additional opportunities for evasion like those that resulted after the imposition of AD and CVD cash

---

[38] *See* the Petitions on China and Taiwan, Volume 1 at 3-4.
[39] *See Id*. at 4-5.
[40] *See Id*. at 3, 5-6, 21, 34, 37, and 53.
[41] *See Id*. at 5-6; *see also Id*. at 21.

deposits in *Solar I*. The Department has a long-standing practice of taking potential circumvention concerns into consideration when defining the scope.[42] This practice has been upheld by the CIT and the CAFC.[43] Indeed, the Courts have recognized that the Department has "inherent power to establish the parameters of the investigation so as to carry out its mandate to administer the law effectively and in accordance with its intent."[44]

Furthermore, certain interested parties commented that they did not track their merchandise in a manner that would allow them to definitively report only that merchandise falling within the "two-out-of-three" scope proposed in the Petition.[45] The scope being adopted in these investigations resolves interested parties' concerns in this respect, by covering *all* modules assembled in the PRC from third-country cells. Under the scope being adopted for these final determinations, producers and exporters would not need to track for purposes of these proceedings the ingots, wafers, or partial cells that are being used in the third-country cells being assembled into modules in China.

---

[42] *See, e.g.*, *Notice of Final Determination of Sales at Less Than Fair Value: Large Newspaper Printing Presses and Components Thereof, Whether Assembled or Unassembled, From Germany*, 61 FR 38166, 38169 (July 23, 1996) ("We agree with the petitioner that incomplete merchandise by necessity must be included in the scope of these investigations. Given the very large size of {large newspaper printing presses and components thereof} and the complex importation process, complicated by the further manufacturing and/or installation activities performed in the United States by the respondents, it was the Department's intent to use the language at issue to avoid creating loopholes for circumvention, including those arising from differing degrees of completeness of the imported merchandise. The Department is concerned that, because of the great number of parts involved, there is the potential that a party may attempt to exclude its merchandise from the scope of these investigations on the basis of a lack of completion."); *Cellular Mobile Telephones and Subassemblies from Japan; Final Determination of Sales at Less Than Fair Value*, 50 FR 45447, 45448 (October 31, 1985) ("The determination to include subassemblies within the scope of the investigation was based on the need to prevent circumvention of any antidumping order on {cellular mobile telephones ("CMTs")} through the importation of major CMT subassemblies, and the Department's broader conclusion that the investigation properly should include subassemblies.").

[43] *See Mitsubishi Elec. Corp. v. United States*, 700 F. Supp. 538, 555 (CIT 1988) ("*Mitsubishi I*") ("{the Department} has a certain amount of discretion to expand the language of a petition to encompass the literal intent of the petition, ... with the purpose in mind of preventing the intentional evasion or circumvention of the antidumping duty law."), *aff'd*, 898 F.2d 1577 (Fed. Cir. 1990); *see also Tung Mung Dev. Co. v. United States*, 26 CIT 969, 979 (CIT 2002) (citing *Mitsubishi I*, 700 F. Supp. at 555), *aff'd*, 354 F.3d 1371 (Fed. Cir. 2004).

[44] *See Torrington*, 745 F. Supp. at 728; *see also Mitsubishi Elec. Co. v. United States*, 898 F.2d 1577, 1582 (Fed. Cir. 1990) ("*Mitsubishi II*") ("The determination of the applicable scope of an antidumping order that will be effective to remedy the dumping that the {Department} has found lies largely in the {Department's} discretion").

[45] A group of some of the largest Chinese solar product producers stated that it is virtually impossible for importers to know and to trace the origin of the ingots and wafers in cells that are assembled into modules when the module manufacturers purchase the cells from third parties in other countries, or to distinguish between the value of modules with cells that meet Petitioner's "two-out-of-three" test and those that do not. *See* the February 18, 2014 Scope Comments Letter submitted by of Yingli Green Energy Holding Company Limited, Yingli Green Energy Americas, Inc., Canadian Solar Inc., Changzhou Trina Solar Energy Co., Ltd., Wuxi Suntech Power Co., Ltd., Shanghai JA Solar Technology Co., Ltd., Hefei JA Solar Technology, Co., Ltd., and Jinko Solar Co., Ltd. Further demonstrating tis, the mandatory respondent Trina Solar stated that it does not know what country produced the wafers contained in its purchases of solar cells. *See* Trina Solar's April 22, 2014 response at Attachment A-1. Similarly, Yingli Green Energy Holding Company and Yingli Green Energy Americas, Inc. and Canadian Solar Inc. noted that their respective company records do not specifically identify the origin of the wafers used to produce the cells Yingli purchased from non-Chinese suppliers. *See* both companies' February 14, 2014 quantity and value responses.

Based on these considerations, and in order to evaluate whether there is unfair pricing and/or subsidization of modules assembled in the PRC using third-country cells, the Department finds it is appropriate to determine for purposes of these investigations that the country of origin of such modules is the PRC.

In determining the country-of-origin of a product, the Department's usual practice has been to conduct a substantial transformation analysis.[46]  Consistent with its practice, the Department considered in *Solar I* whether it should apply its substantial transformation analysis and found that "the application of its substantial transformation test {was} an appropriate means to resolve country-of-origin issues like the one presented *in {that} investigation* …."[47]  Based on this analysis and the facts in that proceeding, the Department determined in *Solar I* that the solar cell was the essential active component of the module, that assembly of cells into modules did not constitute substantial transformation such that the assembled module could be considered a product of the country of assembly, and consequently, that modules assembled in the PRC from solar cells produced in third countries were not covered by the scope of that investigation.[48]

Although the Department routinely has found a substantial transformation analysis to be an appropriate means to determine the country of origin of merchandise under investigation, in the circumstances presented by these investigations and discussed above, the Department has determined that it needs to conduct additional analysis.  Thus, contrary to certain parties' arguments, our adoption of the scope described in the October 3rd Letter is not arbitrary.  Rather, it addresses the specific and special circumstances of these proceedings, as described above.  Relying on the substantial transformation analysis alone could result in failure to provide relief to the domestic industry for alleged injury caused by a finished product produced in the subject country but which would be deemed to originate from a third-country for AD/CVD purposes if the traditional substantial transformation analysis were applied.  In these particular proceedings, a rote application of a substantial transformation analysis would not allow the Department to address unfair pricing decisions and/or unfair subsidization concerning the modules that is taking place in the country of export.  Consistent with sections 701 and 731 of the Act, the Department must be able to address such circumstances, and where appropriate, address unfair pricing decisions or unfair subsidization that is taking place in the exporting country where further manufacturing, such as assembly, occurs, notwithstanding that such activities may not necessarily result in a substantial transformation of merchandise.  While the Department intends that a substantial transformation analysis will continue to be the primary manner in which it will evaluate country of origin in AD/CVD proceedings, given the facts presented by these investigations (and in light of the *Solar I* orders already in place, under which country of origin was already based on a substantial transformation analysis), the Department finds that its additional analysis is appropriate.  We do not agree that our analysis is inconsistent with *Solar I*. Rather, in these investigations we are building upon our decisions in *Solar I* and finding, given

---

[46] *See, e.g.*, *Notice of Final Determination of Sales at Less Than Fair Value: Glycine from India*, 73 FR 16640 (March 28, 2008) and accompanying Issues and Decision Memorandum at Comment 5; *see also Stainless Steel Plate in Coils from Belgium: Final Results of Antidumping Duty Administrative Review*, 69 FR 74495 (December 14, 2004) and accompanying Issues and Decision Memorandum at Comment 4.
[47] *See* Solar I IDM at Comment 1, page 8 (emphasis added).
[48] *Id.* at Comment 1, page 5-7.

15

the circumstances before us, that it is appropriate to go beyond our decision concerning country of origin from *Solar I* to address merchandise exported from China that is not subject to the *Solar I* orders and that is alleged to injure the domestic industry through unfair pricing and/or subsidization.

With regard to respondents' assertion that the scope clarification results in a single product having two countries of origin, we disagree.  No product would at any time have two countries of origin for AD/CVD purposes.  The country of origin of these modules, for AD/CVD purposes, is only the PRC.  If an AD and/or CVD order results from these investigations, these modules would be subject to AD and/or CVD duties under the relevant order and not another solar-related order (*i.e.*, not *Solar I* or an order covering solar products from Taiwan, should that investigation result in an AD order).  We also disagree with the Petitioner's assertion that Taiwanese cells assembled into a module in the PRC would result in a module of Taiwanese origin.  With the scope clarification we have adopted for the PRC investigation, the PRC is the country of origin of all modules, laminates and/or panels assembled in the PRC that contain crystalline silicon photovoltaic cells produced in a customs territory other than the PRC.

## B.     Extent of the Scope Clarification

*Respondents:*
- The scope as proposed in the October 3rd Letter is not a clarification, but an unlawful expansion and alteration of the scope.
    - The scope as proposed in the October 3rd Letter eliminates entirely the "two out of three" principle incorporated into the scope of these investigations, adds to the scope solar modules made from solar cells from countries outside China and Taiwan, and thereby crafts a scope of the investigation that was never contemplated in the Petitions or in any other submission or determination before or after the initiation of these investigations.
    - Petitioner has not requested the expanded scope proposed by the Department, and nothing in the Petition or in Petitioner's subsequent submissions to the Department or the ITC indicates otherwise.
    - There are numerous CIT decisions demonstrating that a significant expansion and alteration of the scope as outlined in the October 3rd Letter goes far beyond what the CIT decisions have found permissible.[49]
    - The Department stated in *Softwood Lumber from Canada* that while it has the authority to define or clarify the scope of an investigation and must exercise this authority in a manner which reflects the intent of the Petition, the Department generally should not use its authority to define the scope of an investigation in a manner that would thwart the statutory mandate to provide the relief requested in the Petition. As a result, absent an "overarching reason to modify the scope in the Petition, the Department accepts it."[50]

---

[49] *See Minebea*, 782 F. Supp. at 120; *see also Allegheny Bradford Corp. v. United States*, 342 F. Supp. 2d 1172 (CIT 2004); *Smith Corona Corp. v. United States*, 796 F. Supp. 1532 (CIT 1992).
[50] *Notice of Final Determination of Sales at Less Than Fair Value: Certain Softwood Lumber Products from Canada*, 67 FR 15539, 15542 (April 2, 2002) ("*Softwood Lumber from Canada*").

Barcode:3247470-01 A-570-010 INV - Investigation -

*Petitioner:*

- The Department's clarification of the scope at this final phase in the proceedings is fair and reasonable, and would not be unlawful. The CIT has specifically stated that the Department has the discretion to clarify the scope, even in a way that "expand{s} the language of a petition," in the course of an AD/CVD investigation.[51] This decision was upheld by the CAFC.[52]

- The respondents themselves cite *Allegheny Bradford*, in which the CIT held that "{t}here is no clear point during the course of an antidumping investigation at which {the Department} loses the ability to adjust the scope."[53]

- The scope as proposed in the October 3rd Letter is fully consistent with Petitioner's intent.

  o As demonstrated by its comments to *Solar I*, Petitioner's intent has always been to cover all cells from the PRC and all modules from the PRC.[54] In fact, Petitioner filed the instant investigations specifically to close the loophole created as a result of the Department's scope determination in the first solar cases and to cover all cells and modules from the PRC, as well as address unfair trade practices in Taiwan that were exacerbated as a result of that scope determination.

- Moreover, in this case, the Department is even more justified than under other circumstances in adjusting the scope at this stage in these proceedings, as the Department has been very clear throughout these investigations that it is continuing to evaluate the scope, and that its country of origin determinations of related subject merchandise could change.[55]

**Department's Position:**

We disagree with Respondents' contention that the proposed clarification of the scope in the October 3rd Letter, which we have adopted in these final determinations, does not reflect Petitioner's intent. The record of this investigation demonstrates that Petitioner's intent would be reflected by a scope that covers all solar modules assembled in China using third-country cells. Petitioner's stated motivation for filing its Petition is to close a "loophole" that resulted when producers subject to the *Solar I* investigations, following the Department's application of a substantial transformation analysis to fix the scope of that proceeding, increased imports of modules assembled in the PRC with non-PRC cells so as to avoid the reach of the *Solar I* orders.[56] For instance, Petitioner stated that "imports of modules from China consisted largely of modules assembled with Chinese cells" from 2010 through early 2012, but that "{s}ince that time, imports of modules from China have consisted almost entirely of modules assembled in China from solar cells completed or partially manufactured in Taiwan or other countries (*i.e.*,

---

[51] *See Mitsubishi I*, 700 F. Supp. at 555.
[52] *See Mitsubishi II,* 898 F.2d at 1577.
[53] *See Allegheny Bradford*, 342 F. Supp. 2d at 1187.
[54] *See* Solar I IDM at Comment 1.
[55] *See e.g.*, *Certain Crystalline Silicon Photovoltaic Products from Taiwan: Affirmative Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination*, 79 FR 44395 (July 31, 2014) and accompanying Preliminary Decision Memorandum at 5.
[56] *See* the December 31, 2013 AD Petitions on China and Taiwan, Volume 1, at 3, 21, and 53, and the December 31, 2013 CVD Petition on China at 3, 21, and 53.

Filed By: Jeffrey Pedersen, Filed Date: 12/17/14 12:45 PM, Submission Status: Approved

cells manufactured in Taiwan from Taiwanese inputs, or cells manufactured in Taiwan or other countries from Chinese inputs, including wafers)."[57]  Petitioner also stated that "imports of Taiwanese {solar} cells and modules and Chinese modules assembled from non-Chinese cells continued to swamp the U.S. marketplace in the first nine months of 2013," despite the relief provided by the *Solar I* orders.[58]  Further, Petitioner contended that the Petition showed "that many Chinese solar producers ceased using Chinese-manufactured cells and began using third-country manufactured cells in their solar modules" as a result of the *Solar I* investigations.[59]  In addition, Petitioner cited reports confirming that "Chinese solar producers continue to use third-country cells, largely manufactured in Taiwan, to assemble into solar modules in China and export to the United States."[60]

The scope language of the Petition for these investigations is an expression of the Petitioner's intent, as noted above, to cover solar modules made in China using solar cells produced in third countries.  However, as discussed in Comment 1.A., the Department is taking into considerations concern about potential evasion of AD and/or CVD measures, as relevant.  The scope which was proposed in the Petition and on which we initiated the investigations, may itself result in the evasion of duties and, thus, ineffective relief to the Petitioner, due to the complex and readily adaptable global supply chain that allows producers to modify their production chains easily and quickly.  Specifically, producers could simply have sourced their wafers from a country other than the subject country in order to avoid the "two out of three" language in the second sentence of that scope.  As a result, the Department explored whether modified scope language could more effectively implement Petitioner's intent while also mitigating evasion concerns and alleged complications in parties' ability to properly report subject merchandise to the Department in the context of its administrative proceeding and/or to CBP,  and ultimately proposed the clarification in its October 3rd Letter.

Furthermore, in the parallel Taiwan AD investigation, the respondent companies have reported to the Department that following the implementation of the orders in *Solar I*, numerous Chinese companies began to contract with Taiwanese cell producers to manufacture cells for the purpose of exporting those cells to China for use in the production of panels, modules and laminates, and then to export those panels, modules and laminates to the United States.[61]  This series of transactions was allegedly implemented, at least for many transactions, to evade the order in *Solar I*, and there are emails and communications referenced in the Taiwan IDM which discuss this series of transactions and the reasoning behind those transactions.[62]  These communications substantiate the concerns expressed by the Petitioners in the Petition that the orders in *Solar I* have not adequately addressed the issues of Chinese dumping and unfair subsidization of solar panels, modules and laminates, and that a scope which specifically includes that merchandise in this investigation is necessary to address such concerns.

---

[57] *See* the December 31, 2013 AD Petitions on China and Taiwan, Volume 1, at 5-6; *see also id.* at 21.

[58] *Id.* at 34.

[59] *Id.* at 37.

[60] *Id.*

[61] *See* the Issues and Decision Memorandum accompanying the to the final determination of the Antidumping and Countervailing Duty Investigations of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and the Antidumping Duty Investigation of Certain Crystalline Silicon Photovoltaic Products from Taiwan at Comment 4.

[62] *Id.*

Filed By: Jeffrey Pedersen, Filed Date: 12/17/14 12:45 PM, Submission Status: Approved

Even had Petitioner not expressly intended to include all solar modules assembled in China using third-country cells, the Department has the authority to identify such products in the scope of these investigations anticipating such configurations and thus serving to place parties on notice regarding how the Department might treat Chinese modules made from third-country cells if subsequent scope questions arise.[63] In Comment 1.A above we discussed such reasons including, and beyond, Petitioner's intent. One focus of the Department's analysis related to potential evasion. Information on the record indicates that parties have been able to evade the reach of the *Solar* I orders. Thus, even while the investigations focused on merchandise covered by the "two out of three" language rather than "third country cells," the Department anticipated that evasion concerns would likely arise for the original proposed scope. Through its modification of the scope of these investigations, the Department has developed a mechanism to prevent such scenarios.[64]

We also do not agree that this clarification is an impermissible expansion of the scope. As an initial matter, we note that Department's "practice is to provide ample deference to the Petitioner with respect to the definition of the product for which it seeks relief under the AD and CVD laws."[65] As noted above, the question of scope coverage has been a recurrent issue raised by interested parties and the Department throughout this proceeding. The clarification also addresses concerns (expressed by respondent parties and shared by the Department) regarding the administrability of the "two out of three" scope language that was originally proposed. Further, applying the scope clarification proposed in the October 3, 2014, Letter results in no change to Trina Solar and Renesola/Jinko's reported database.[66] This clarification will not require the Department to collect any additional information from parties because necessary information is already on the record. At the same time, by more clearly expressing Petitioner's intent of covering solar modules assembled in China using third-country solar cells, the scope as proposed in the October 3rd Letter will more effectively cover the solar modules from which Petitioner has been seeking relief. Moreover, the scope clarification results in a scope that, should this investigation result in an order, will be more administrable than the scope that was originally proposed.

## C.    Timeliness of a Potential Scope Clarification

---

[63] *See Mid Continent Nail Corp. v. United States*, 725 F.3d 1295, 1300-1301, 1305-06 (Fed. Cir. 2013) (for the proposition that if the Department anticipates the need for addressing foreseeable areas of dispute, it should do so prior to the order so as to put parties on notice of what conduct will be regulated by the order and what factors will be considered in regulating that conduct). Although the Department cannot anticipate every possible permutation of solar products, as explained above, the Petition identified a shift in trade flows that resulted in increased imports of non-subject modules produced in China, and significant and widespread avoidance of the reach of *Solar I*. Based on this information, the Department finds that it is appropriate for the scope of the final determination to address all third country modules, not just those that fall within the "two out of three" scope language proposed by the Petitioner, because doing so will put parties on notice, provide greater certainty for those subject to the order, and preserves resources for all of the parties involved, including the Department.

[64] *See id.* at 725 F.3d 1295, 1305-06.

[65] See *Large Residential Washers From the Republic of Korea*, 77 FR 46391, 46392 (August 3, 2012) and accompanying Issues and Decision Memorandum at Comment 2. *See also Kern Liebers*, 881 F. Supp. at 621.

[66] The Chinese mandatory respondents reported all U.S. sales containing third-country solar cells. *See* Trina Solar's May 13, 2014 submission at 1, Renesola's April 24, 2014 submission at 25, and Jinko's February 13, 2014 submission at 2.

Filed By: Jeffrey Pedersen, Filed Date: 12/17/14 12:45 PM, Submission Status: Approved

*Respondents:*

- Even if the Department had the authority to expand the scope, it cannot do so this late in the investigation because it would result in the Department's final determination not being based on substantial evidence, would prevent finalizing the record and issuing a final decision, and would deny parties due process.

  o Essentially, at this stage in the proceeding, the Department has already completed its investigation of the factual record and thus is unable to supplement the record with additional sales. Thus, an expansion of the scope at this time to include products not already covered would mean that the dumping margins and subsidy rates calculated by the Department will be based on data that are not consistent with the sales that would be subject to the final expanded scope of these investigations.

  o The change in scope under consideration is also not allowable under the Act because it would result in the calculations of the final determination being based on only a subset of subject merchandise. Any dumping margin contained in an AD order must be based on analysis of the entirety of the subject merchandise.[67] More specifically, an AD order may only be imposed if the agency determines that "a class or kind of foreign merchandise is being, or is likely to be, sold in the United States at less than its fair value."[68] The term "class or kind of foreign merchandise" is synonymous with the term "subject merchandise"[69] and necessarily includes all products within the scope of the AD investigation, rather than a subset of these products.

  o The CIT has stated that the Department's "discretion to define and clarify the scope of an investigation is limited in part by concerns for the finality of administrative action, which caution against including a product that was understood to be excluded at the time the investigation began."[70] Thus, by including products that were not included in the Petition and were never the subject of the Department's investigation inquiries, the Department risks undermining the factual basis for its determination and raises concerns about the finality of its administrative actions.

  o The CIT has noted that the Department's decision to change scope language at a late stage in a proceeding can undermine the entire investigatory process.[71]

  o Reflecting these concerns, the Department denied a late request for scope clarification in the investigation of Coated Free Sheet from the PRC stating: "Moreover, we note that granting such a clarification would mean that a significant number of sales in the investigations would not be included in the margin calculations, raising a potential procedural safeguards concern."[72]

  o The Department has even gone so far as to say that it lacks the ability to change the scope after a preliminary determination, in part, because "{a}mending the scope language . . . would, in effect, serve to expand the current scope of subject

---

[67] *See* Section 771(25) and (35)(A)-(B) of the Act.
[68] *See* Section 731 of the Act.
[69] *See* Section 771(25) of the Act.
[70] *See Allegheny Bradford*, 342 F. Supp. 2d at 1187-1188, citing *Mitsubishi Heavy Indus., Ltd. v. United States*, 986 F. Supp. 1428, 1433 (CIT 1997).
[71] *See Smith Corona*, 796 F. Supp. at 1535.
[72] *Id.*

20

merchandise that was subject to th{e} investigation at too late a stage in this proceeding."[73]

- o Because the scope change would occur at such a late stage in the proceeding, it denies due process for parties, especially parties that were not covered under the scope in effect during the *Preliminary Determination*. These Chinese companies and U.S. importers that are not presently part of the proceeding have no opportunity to participate in the hearing or "to be heard" and cannot participate meaningfully in this investigation because the factual record is closed.
    - ▪ The CAFC held in *Transcom v. United States* that by not listing exporters in the initiation notice there was deficient notice to the affected parties. In that case, the CAFC stated that importers have the right to complain about procedural flaws in the administrative proceeding, including the Department's failure to provide adequate notice. The CAFC went on to state that the Department's determination had to be overturned because the importer and its Chinese exporters had no notice of a change in the Department's non-market economy practice and, therefore, no opportunity to submit evidence to demonstrate the exporters' independence from the state-controlled entity.[74]

*Petitioner:*
- The majority of modules being shipped from the PRC and Taiwan that would be subject to the scope under the Department's proposed scope clarification were also subject to the scope as it existed at the time data were collected from respondents and the *Preliminary Determination* was issued. Thus, the databases on which the Department will calculate final subsidy and dumping margins are largely consistent with the scope as stated in the Department's proposed scope clarification.
- The proposed scope clarification does not implicate due process concerns as the Department has made clear throughout these investigations that the scope of the investigations is subject to continuing evaluation, and that the country-of-origin determinations related to subject merchandise could change for the final determination.
    - o Specifically, in the initiation notice, the Department invited comments on the scope of these investigations, clearly indicating to the public that the scope was potentially subject to modification.[75]
    - o The Department again noted its ongoing evaluation of the scope in the *Preliminary Determination*, in which, after adopting Petitioner's proposed scope, the Department explained that it was continuing to analyze interested parties' scope comments, including comments on whether it is appropriate to apply a traditional substantial transformation or other analysis in determining the

---

[73] *See Final Determination of Sale at Less Than Fair Value: Sodium Hexametaphosphate from the People's Republic of China*, 73 Fed. Reg. 6479 (Feb. 4, 2008) ("*Sodium Hexametaphosphate from the PRC*"), and accompanying Issues and Decision Memorandum at Comment 1; *see also Notice of Final Determination of Sales at Less Than Fair Value and Affirmative Final Determination of Critical Circumstances: Certain Orange Juice from Brazil*, 71 Fed. Reg. 2183 (Jan. 13, 2006) ("*Certain Orange Juice from Brazil*"), and accompanying Issues and Decision Memorandum at Comment 2.
[74] *See Transcom, Inc. v. United States*, 182 F.3d 876, 880-84 (Fed. Cir. 1999).
[75] *See Solar Products Initiation Notice*, 79 FR at 4661.

Filed By: Jeffrey Pedersen, Filed Date: 12/17/14 12:45 PM, Submission Status: Approved

applicability of the investigation to certain solar modules described in the Petition.[76]

- Further, Respondents have repeatedly claimed that it is nearly impossible for importers to know and to trace the origin of the ingots and wafers in cells that are assembled into modules when the module manufacturers purchase the cells from third parties in other countries. While Petitioner disputes this claim, if true, Respondents and others would not have known for certain whether or not their products were subject to these investigations. Given this potential uncertainty, all exporters of potential subject merchandise should have filed quantity and value submissions and separate rate applications with the Department.

- Respondents' citations to *Allegheny Bradford* for support are inapposite to this investigation because as stated by the CIT, the issue in *Allegheny Bradford* was "whether Commerce may construe an antidumping order to cover products which bear a characteristic that cannot be reconciled with the language of the order."[77] These aspects of *Allegheny Bradford* are, therefore, inapplicable to the current circumstances, in which Commerce is still formulating the final scope language, which will ultimately be included in any orders that are issued.

**Department's Position:**

We disagree with Respondents. As the CAFC explained, "the purpose of the petition is to propose an investigation," and the "purpose of the investigation is to determine what merchandise should be included in the final order."[78] Ultimately, therefore, it is the Department's responsibility to define the scope of the investigation and ensuing order.[79] The Department "retains broad discretion to define and clarify the scope of an antidumping investigation in a manner which reflects the intent of the petition"[80] and has the authority to modify or clarify the scope at any time. As the CAFC has recognized, the Department has "inherent power to establish the parameters of the investigation, so that it {is} not … tied to an initial scope definition that . . . may not make sense in light of the information available to {the Department} or subsequently obtained in the investigation."[81] Similarly, the CIT has stated that the Department has a "certain amount of discretion to expand the language of a petition to encompass the literal intent of the petition, ... with the purpose in mind of preventing the intentional evasion or circumvention of the antidumping duty law."[82] As even respondents

---

[76] *See Preliminary Determination* and Accompanying Issues and Decision Memorandum ("China AD Prelim I&D Memo") at 5; *Certain Crystalline Silicon Photovoltaic Products From Taiwan: Affirmative Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination,* 79 FR 44395 (July 31, 2014) and accompanying Issues and Decision Memorandum ("Taiwan AD Prelim I&D Memo") at 5; *Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China: Preliminary Affirmative Countervailing Duty Determination,* 79 FR 33174 (June 10, 2014) and accompanying Issues and Decision Memorandum ("China CVD Prelim I&D Memo") at 4.

[77] *See Allegheny Bradford,* 342 F. Supp. 2d at 1188.

[78] *See Duferco,* 296 F.3d at 1096-97.

[79] *Id.* at 1097; *accord Mitsubishi II,* 898 F.2d at 1582; *see also King Supply Co. v. United States,* 674 F.3d 1343, 1345, 1348 (Fed. Cir. 2012).

[80] *See Minebea,* 782 F. Supp. at 120.

[81] *See Duferco,* 296 F.3d at 1089 (citation and quotation marks omitted); *see also Save Domestic Oil, Inc. v. United States,* 240 F. Supp. 2d 1342, 1351 (CIT 2002).

[82] *See Mitsubishi I,* 700 F. Supp. at 555.

Filed By: Jeffrey Pedersen, Filed Date: 12/17/14 12:45 PM, Submission Status: Approved

themselves recognize, "{t}here is no clear point during the course of an antidumping investigation at which {the Department} loses the ability to adjust the scope…."[83]  Thus, the Department "may depart from the scope as proposed by a petition if it determines that petition to be overly broad, or insufficiently specific to allow proper investigation, or in any other way defective."[84]

Further, the scope modification adopted for the PRC AD and CVD final determinations was no impact on the data required from and submitted by the parties.  As noted above, application of the scope clarification proposed in the October 3rd Letter will result in no change in the reported sales of the mandatory respondents.  We further note that no interested parties have provided specific arguments about what changes would occur in the mandatory respondents' U.S. sales databases if the Department modified the scope as proposed in the October 3rd Letter.

Further mitigating the impact of applying the proposed scope clarification is the fact that most, if not all, parties reported in their Quantity and Value questionnaires all solar modules containing solar cells from third countries because they claim that they did not know the source of the wafer contained in the solar cells they purchased from third countries.[85]  While Respondents have stated that there *may* be U.S. imports that were not covered by the scope of the *Preliminary Determination* that would be covered by the proposed scope clarification, they have not identified any such shipments.

The Department also disagrees with the Respondents' claim that a scope clarification at this point in the investigation would deny due process to parties.  The Department has made clear throughout these investigations that the scope of the investigations was subject to continuing evaluation, and that the country of origin determinations related to the subject merchandise could change for the final determination.  Specifically, in the initiation notice, the Department invited comments on the scope of these investigations and numerous parties submitted comments.[86]  The Department again noted in the *Preliminary Determination* that it was continuing to analyze interested parties' scope comments.[87]  The very circumstances of these investigations, filed in response to the *Solar I* orders, and in which the Department explicitly stated that the *Solar II* investigations excluded merchandise covered by the *Solar I* orders, placed parties on notice that imports of solar products from China beyond those covered by the *Solar I* orders were

---

[83] *See Allegheny Bradford*, 342 F. Supp. 2d at, 1187.

[84] *Ad Hoc Shrimp Trade Action Comm. v. United States*, 637 F. Supp. 2d 1166, 1175 (CIT 2009) (citation and quotation marks omitted); *see also Allegheny Bradford*, 342 F. Supp. 2d at 1188.

[85] *See, e.g.*, the February 13, 2014 quantity and value submission by Jinko, the February 14, 2014 quantity and value responses of Yingli Green Energy Holding Company and Yingli Green Energy Americas, Inc., and Canadian Solar Inc. and April 22, 2014 response by Trina Solar at Attachment A-1.

[86] *See* scope comment submissions, dated February 18, 2014, from Gintech; Motech; Neo Solar Power Corporation; NextEra Energy, Inc.; SunEdison, Inc.; Suniva, Inc.; Solartech Energy Corp.; and Yingli Green Energy Holding Company Limited, Yingli Green Energy Americas, Inc., Canadian Solar Inc., Changzhou Trina Solar Energy Co., Ltd., WuxiSuntech Power Co., Ltd., Shanghai JA Solar Technology Co., Ltd., Hefei JA Solar Technology Co., Ltd., and Jinko Solar Co., Ltd.; *see also* rebuttal scope comment submissions, dated April3, 2014, from Petitioner, and dated April21, 2014, from Yingli Green Energy Americas, Inc., Canadian Solar Inc., Changzhou Trina Solar Energy Co., Ltd., Wuxi Suntech Power Co., Ltd., Shanghai JA Solar Technology Co., Ltd., Hefei JA Solar Technology Co., Ltd., and Jinko Solar Co., Ltd.

[87] *See China AD Prelim I&D Memo* at 5; *Taiwan AD Prelim I&D Memo* at 5; *China CVD Prelim I&D Memo* at 4.

Filed By: Jeffrey Pedersen, Filed Date: 12/17/14 12:45 PM, Submission Status: Approved

potentially subject to the investigation.  Thus, we find that our notifications that we were considering changes to the scope provided parties with adequate due process with regard to this scope clarification.  In fact, the only citation by interested parties to an actual change to the *Preliminary Determination* that would result from a clarification of the scope as proposed in the October 3rd Letter concerns a situation where a party did in fact heed the Department's notice that product coverage was being reconsidered:  One separate rate applicant, tenKsolar, reported to the Department that it had no shipments subject to the scope as stated in the *Preliminary Determination*[88] but, as a precautionary measure, it filed a separate rate application in the China investigation, which, as we note below, we have granted for this final determination.[89]  The action by tenKsolar indicates that our notice of potential scope clarifications did, in fact, provide parties with adequate notification and due process.  We also note that exporters of subject merchandise may still apply for review of their sales in the first administrative review should these investigations result in the imposition of an AD and/or CVD order, as relevant.

We note that Respondents' reliance on *Sodium Hexametaphosphate from the PRC* and *Certain Orange Juice from Brazil* is misplaced.  In both of these cases, the Department declined to modify the scope of the investigation because the modification requested by Petitioners was not a mere clarification, but rather would have been an expansion of the scope, and thus should have been proposed as an amendment to the petition prior to the initiation of the investigation.[90]  In contrast, the Petitioner in this case did not request the clarification proposed in the October 3rd Letter.  Instead, the Department proposed the clarification, in response to and taking account of interested parties' comments on the scope of these investigations.  Further, we find that the modification adopted for the purpose of the final determination in the PRC AD and CVD investigations is not an expansion of the scope because the Petition expresses the Petitioner's intent to cover modules assembled in China using third-country solar cells.  As noted above, the Petitioner stated its intent to include all of these modules in the scope in its Petition to this investigation, citing the "loophole" that resulted when, following the Department's substantial transformation analysis in the *Solar I* investigations, producers subject to the *Solar I* investigations increased imports of modules assembled in the PRC with non-PRC cells with the result of avoiding the reach of the *Solar I* AD and CVD orders.[91]  Petitioner also stated that since early 2012 "imports of modules from China have consisted almost entirely of modules assembled in China from solar cells completed or partially manufactured in Taiwan *or other countries* …."[92]

---

[88]  *See* tenKsolar's February 12, 2014 quantity and value submission at Attachment I to the China investigation, where it reported no EP or CEP sales, but noted that it sold solar modules to the United States during the POI that it assembled with solar cells fabricated in Taiwan from Taiwan-origin wafers.

[89]  *See* tenKsolar's March 31, 2014 submission.

[90]  *See Sodium Hexametaphosphate from the PRC* at Comment 1; *see also Certain Orange Juice from Brazil*, at Comment 2.

[91]  *See* the December 31, 2013 AD Petitions on China and Taiwan, Volume 1, at 3, 5-6, 21, 34, 37, and 53; Solar World Case Brief at 5-6; Letter from Petitioner to the Department, "Re: Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and Taiwan: Rebuttal to Respondents' Scope Comments" (Apr. 3, 2014) at 11-13.

[92]  *See* the December 31, 2013 AD Petitions on China and Taiwan, Volume 1, at 5-6 (emphasis added); *see also id.* at 21.

Similarly, the Respondents' reliance on *Transcom* is also misplaced.  In *Transcom*, the CAFC held that the Department did not provide sufficient notice to an importer that the antidumping duties on its exporters' products could be affected by an administrative review because the exporters were not named in the initiation notice and the Department had not announced a change in its non-market economy practice at the time it initiated the review.[93]  However, *Transcom* is distinguishable from the instant case because it involved an administrative review, not an antidumping investigation, and a change in practice without notice rather than a modification or clarification to the scope of an investigation.  Further, the Court explained that the statutory and regulatory notice provisions only require that "any reasonably informed party should be able to determine, from the published notice of initiation read in light of announced Department policy, whether particular entries in which it has an interest may be affected by the administrative review."[94]  Here, the Department met its obligation to notify possible interested parties repeatedly and throughout the investigations, as explained above.

**D.**     **Impact of a Scope Clarification on the ITC's Final Determination**

*Respondents:*
- A substantial change in scope such as the one contained in the October 3rd Letter would undermine the ITC injury determination.
    - The ITC this late in the proceeding cannot send questionnaires to U.S. solar module producers, foreign producers of solar modules and U.S. importers of solar modules containing third-country solar cells.  Thus, the ITC's injury determination will not cover the new products in question, which means that any antidumping and countervailing duty orders issued will be for products which the ITC has not determined injure the U.S. industry.

*Petitioner:*
- The majority of modules being shipped from the PRC and Taiwan that would be subject to the scope under the Department's proposed scope clarification, were also subject to the scope as it existed at the time data was collected from respondents and the *Preliminary Determination* was issued.  Thus, the data bases on which the ITC will calculate final subsidy and dumping margins would likely be consistent with the data that would be included under the scope as stated in the Department's proposed scope clarification.
- While the ITC never has perfect import coverage in its investigations, the data the ITC will collect in the final phase of the investigation will be largely consistent with the scope as stated in the proposed scope clarification.

**Department's Position:**  While respondents make arguments about the potential implications of the Department's scope clarification on the investigation underway at the ITC, the Department cannot speculate about what potential effect, if any, the Department's scope decision in these investigations may have on the ITC's investigation.  With respect to the Department's China AD and CVD investigations, as we noted above, the scope clarification proposed in the October 3rd

---

[93] *Transcom*, 185 F.3d at 881-883.
[94] *Id*. at 882-883.

Letter and adopted for purposes of this final determination will result in no change to the reported sales of the mandatory respondents.

### E.   Consistency of the Scope as Clarified in the October 3rd Letter be Consistent with the United States' WTO Obligations

*Respondents:*

- The WTO Agreement on Rules of Origin imposes an obligation on Members to ensure that "rules of origin shall not in themselves create restrictive, distortive, or disruptive effects on international trade" and "shall not discriminate between other Members."[95] The scope clarification proposed in the October 3rd Letter, if adopted, would have precisely such a distortive and discriminatory effect on trade between WTO Members because it would subject imports of modules made with any third-country cells to AD/CVD duties calculated for Chinese or Taiwanese products.

- The scope clarification proposed in the October 3rd Letter treats a module assembled in the PRC using cells produced in Taiwan as a Chinese origin product subject to the current PRC investigations, while it treats a solar module assembled in Malaysia using cells produced in Taiwan as a Taiwanese-origin product subject to the current Taiwan investigation. Thus, the solar module originating in China containing Taiwanese cells would be deprived of the advantage of market economy treatment provided to the like module originating in Malaysia containing Taiwanese cells. Therefore, it violates the United States' obligations under GATT to provide parties to GATT with most-favored nation treatment.[96]

*Petitioner:*

- Any "distortion" in international trade is the result of the unfair trade practices being engaged in by Chinese and Taiwanese solar manufacturers that these investigations are attempting to redress.

- The scope clarification also does not discriminate between the United States' treatment of imports from the PRC and Taiwan on the one hand, and imports from other WTO Members on the other hand, by bringing additional products from the PRC and Taiwan within the scope of any eventual AD/CVD orders that would otherwise not fall within that scope. Any solar cells and/or modules that fall within the scope clarification will be subject to equal treatment. And, contrary to Respondent assertions, it would not subject "any third country cells" to AD/CVD duties; rather, it would subject imports of modules from the PRC and Taiwan – which have been determined to be dumped and subsidized – to lawfully calculated duties.

- Under the scope clarification proposed in the October 3rd Letter, the NME methodology would, appropriately, only be applied to cells originating in the PRC, as well as modules

---

[95] *See* Articles 1.2, 2(c), and 2(d) of the WTO Agreement on Rules of Origin.
[96] Respondents cite to Article I of GATT 1994, which requires that: "with respect to customs duties and charges of any kind imposed on or in connection with importation or exportation ... , and with respect to all rules and formalities in connection with importation and exportation, ... any advantage, favour, privilege or immunity granted by any Member to any product originating in or destined for any other country shall be accorded immediately and unconditionally to the like product originating in or destined for the territories of all other Members." Respondents claim that subjecting solar cells from market economies to NME treatment because they are included in Chinese solar modules violates this GATT article.

assembled in the PRC.  Contrary to Respondents' claims, cells and modules originating in the PRC, an NME country, are not entitled to ME treatment.  On the other hand, given Taiwan's status as an ME country, cells originating in Taiwan (other than those destined for module-assembly in the PRC), as well as modules, laminates, and/or panels assembled in Taiwan, would appropriately be subject to duties calculated based on an ME methodology.

**Department's Position:**

We disagree with Respondents' claim regarding obligations under the WTO Agreement on Rules of Origin.  The Department's determination here is consistent with U.S. law, which in turn is consistent with U.S. WTO obligations.

We also disagree that any orders will unfairly impact the trade of solar modules made with any third-country cells.  As noted by Petitioner, the scope proposed in the October 3rd Letter and adopted in the final determinations would not subject third-country cells to AD/CVD duties.  Instead, the scope covers imports of modules that the Department has determined to have a country of origin of the PRC for purposes of these investigations – and in the event of AD and CVD orders, provides a remedy for the unfair pricing practices involving, and subsidization of, such merchandise by imposing AD and CVD duties.  Thus, any alleged distortions or disruptive effects on international trade are the result of the unfair trade practices being engaged in by parties involved in the sale and manufacture of such products, not the result of the Department providing redress for these unfair trade practices.

We also disagree that the scope adopted in the PRC investigations unfairly subjects third-country solar cells assembled into solar modules in China to our NME methodology for calculating dumping margins.  As explained above, the Department has determined that modules assembled in China using third-country solar cells, including Taiwanese solar cells, have a country of origin of China.  This determination is consistent with the Petitioner's intent.  In the Petition, Petitioner alleged that the unfair pricing of modules assembled in China is causing injury to the domestic industry.  Although  Petitioner also alleged that the unfair pricing of solar cells manufactured in Taiwan is causing injury to the domestic industry, the Petition indicates that Petitioner intended for injury resulting from the unfair pricing of a panel assembled in China to take precedence over the injury resulting from the unfair pricing of a Taiwanese solar cell.  Therefore, we find that it is appropriate to focus on the alleged injurious unfair pricing and subsidization of these modules that are assembled in China, and, accordingly, that it is appropriate to apply the NME methodology in determining whether such panels are dumped.  In contrast, panels assembled in Malaysia using Taiwanese cells involve no production of either cells or modules in an NME country.  Moreover, the fact that there happens to be, in this instance, a concurrent investigation involving solar products from Taiwan has no relevance to what the appropriate methodology is for examining dumping of panels that are assembled in China in the separate investigation of modules from China.  It would be appropriate to apply the NME methodology to modules assembled in China in this investigation even if there were no concurrent Taiwan investigation.

**F.    Administrability Concerns**
*Respondents:*

- The scope as proposed in the October 3rd Letter cannot be administered or applied due to the numerous contradictions and overlaps with the PRC and Taiwan investigations and also with the *Solar I* order.
  - o For the same solar module,
    - At times the country of origin would be based on substantial transformation, or where the solar cell is manufactured, such as in *Solar I* and partially in the ongoing investigation on Taiwan, but
    - At other times the country of origin would be determined by where the solar module assembly took place, such as in the ongoing investigation of the PRC and partially in the ongoing investigation of Taiwan.

*Petitioner:*
- While the country of origin analyses from the *Solar I* investigation and that proposed by the scope clarification may differ, they are not necessarily inconsistent, nor unclear.
- The proposed scope clarification specifically exempts products subject to the existing solar AD/CVD orders from these investigations.
- The country of origin rules in the proposed scope clarifications (providing a supplemental country of origin rule for those products not covered by the initial solar investigations) prevent any product from at any time having two countries of origin.

**Department's Position:**

We disagree with Respondents and find the scope as clarified in the October 3rd Letter to be administrable.  As noted by Respondents, the country of origin criteria in *Solar I*, applicable to solar modules, differ from these investigations.  However, we determine that the scope of *Solar I* is very clear as it states that the country of origin of a solar module is determined by where the solar cell was produced.[97]  Not only is the scope and country of origin determination of *Solar I* clear, but the scopes adopted in the final determinations of the current investigations emphasize that they do not alter, revise, or overlap the scope of *Solar I*.  Specifically, the scopes of the current China and Taiwan investigations each state that "excluded from the scope of this investigation are any products covered by the existing antidumping and countervailing duty orders on {*Solar I*}."[98]  Further, any possible overlaps between the current China and Taiwan investigations are eliminated by the scope language stating that solar cells assembled in China using solar cells manufactured in Taiwan are subject to the current China investigation and not the Taiwan investigation.[99]  Thus, we have eliminated any overlap of solar products subject to any of these investigations and those subject to *Solar I*.

Meanwhile, the modifications to the scope language of the *Preliminary Determination* proposed in the October 3rd Letter and adopted in these determinations result in single change:  that the

---

[97] *See e.g.*, *Solar I* where the scope explicitly states that it covers "Modules, laminates, and panels produced in a third-country from cells produced in the PRC are covered by this investigation; however, modules, laminates, and panels produced in the PRC from cells produced in a third-country are not covered by this investigation."  Further, *Solar I* included certifications in Appendix II, which require exporters and imports of solar modules "to substantiate the claim that the panels/modules do not contain solar cells produced in the People's Republic of China."
[98] *See* the Attachment to the October 3rd Letter.
[99] *Id.*

Filed By: Jeffrey Pedersen, Filed Date: 12/17/14 12:45 PM, Submission Status: Approved

country of origin of a solar module assembled in the PRC is the PRC.  We find this country of
origin language likewise clear and easily applied.  Thus, while the country of origin criteria of
*Solar I* and the country of origin analysis stated in the proposed clarification in the October 3rd
Letter may differ, with the latter building upon the former, we find the approaches to be
complementary and that identifying the proceeding to which a given solar module may be
subject, based on these analyses, will be straightforward.  Further, any potential overlap in
coverage that may have arisen due to the different country of origin criteria have been eliminated
by the modified language provided in the October 3rd proposed clarification and adopted in the
final determinations.

**G.    Treatment of U.S. Solar Cells Assembled into Solar Modules in China and Taiwan**
*Respondents:*
- The Department must include a scope exemption for solar products assembled from cells
  of U.S. origin.  The Department has already determined that the country of origin of a
  solar panel is the country in which the solar cell was produced.  U.S. law prohibits
  application of AD/CVD duties to U.S. origin goods.

Petitioner did not comment on this issue.

**Department's Position**:

We disagree with Respondents.  As noted above, contrary to Respondents' assertions, we have
only applied AD and CVD measures to products determined to have a country of origin of
China.  We have not applied such measures to products determined to have a country of origin of
the United States.

**H.    Comments Concerning the Scope of the Preliminary Determination**

Parties have submitted comments concerning the scope of the investigation as defined in the
*Preliminary Determination*.  Because we have clarified the scope consistent with the October 3rd
Letter, we have not addressed comments that were only relevant to the scope of the investigation
as defined in the *Preliminary Determination* and not relevant to the scope of this final
determination.

**Comment 2:    Whether to Select South Africa or Thailand as the Primary Surrogate
                Country**

*Petitioner*
- The record does not demonstrate that South Africa was a "significant producer" of
  merchandise identical or comparable to solar products during the POI, making South
  Africa unsuitable as a source of surrogate values.  The Department must give appropriate
  meaning to the language "significant producer" by comparing each country's exports or
  production capacity to world production.[100]  The value of exports from the next closest
  country to Thailand on the Department's list – Indonesia – was barely one-fourth of the

---

[100] *See* Policy Bulletin 04.1: Non-Market Economy Surrogate Country Selection Process (March 1, 2004) ("Policy
Bulletin 04.1") available at http://enforcement.trade.gov/policy/index.html.

Filed By: Jeffrey Pedersen, Filed Date: 12/17/14 12:45 PM, Submission Status: Approved

# TAB 15

## <u>Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China</u>, 79 Fed. Reg. 76962 (Dep't Commerce Dec. 23, 2014) (final CVD determ.)

## CVD P.R. 408

which subsection of 19 CFR 351.102(b)(21) the information is being submitted and, if the information is submitted to rebut, clarify, or correct factual information already on the record, to provide an explanation identifying the information already on the record that the factual information seeks to rebut, clarify, or correct. The final rule also modified 19 CFR 351.301 so that, rather than providing general time limits, there are specific time limits based on the type of factual information being submitted. These modifications are effective for all segments initiated on or after May 10, 2013. Please review the final rule, available at *http://enforcement.trade.gov/frn/2013/1304frn/2013–08227.txt*, prior to submitting factual information in this segment.

Any party submitting factual information in an antidumping duty or countervailing duty proceeding must certify to the accuracy and completeness of that information.[7] Parties are hereby reminded that revised certification requirements are in effect for company/government officials as well as their representatives. Ongoing segments of any antidumping duty or countervailing duty proceedings initiated on or after March 14, 2011 should use the formats for the revised certifications provided at the end of the *Interim Final Rule*.[8] All segments of any antidumping duty or countervailing duty proceedings initiated on or after August 16, 2013, should use the formats for the revised certifications provided at the end of the *Final Rule*.[9] The Department intends to reject factual submissions in any proceeding segments if the submitting party does not comply with applicable revised certification requirements.

**Revised Extension of Time Limits Regulation**

On September 20, 2013, the Department modified its regulation concerning the extension of time limits for submissions in antidumping and countervailing duty proceedings: *Final*

---

[7] *See* section 782(b) of the Act.

[8] *See Certification of Factual Information to Import Administration during Antidumping and Countervailing Duty Proceedings: Interim Final Rule*, 76 FR 7491 (February 10, 2011) (''*Interim Final Rule*''), amending 19 CFR 351.303(g)(1) and (2); *Certification of Factual Information to Import Administration during Antidumping and Countervailing Duty Proceedings: Supplemental Interim Final Rule*, 76 FR 54697 (September 2, 2011).

[9] *See Certification of Factual Information To Import Administration During Antidumping and Countervailing Duty Proceedings*, 78 FR 42678 (July 17, 2013) (''*Final Rule*''); *see also* the frequently asked questions regarding the *Final Rule*, available at *http://enforcement.trade.gov/tlei/notices/factual_info_final_rule_FAQ_07172013.pdf*.

*Rule*, 78 FR 57790 (September 20, 2013). The modification clarifies that parties may request an extension of time limits before a time limit established under Part 351 expires, or as otherwise specified by the Secretary. In general, an extension request will be considered untimely if it is filed after the time limit established under Part 351 expires. For submissions which are due from multiple parties simultaneously, an extension request will be considered untimely if it is filed after 10:00 a.m. on the due date. Examples include, but are not limited to: (1) Case and rebuttal briefs, filed pursuant to 19 CFR 351.309; (2) factual information to value factors under 19 CFR 351.408(c), or to measure the adequacy of remuneration under 19 CFR 351.511(a)(2), filed pursuant to 19 CFR 351.301(c)(3) and rebuttal, clarification and correction filed pursuant to 19 CFR 351.301(c)(3)(iv); (3) comments concerning the selection of a surrogate country and surrogate values and rebuttal; (4) comments concerning U.S. Customs and Border Protection data; and (5) quantity and value questionnaires. Under certain circumstances, the Department may elect to specify a different time limit by which extension requests will be considered untimely for submissions which are due from multiple parties simultaneously. In such a case, the Department will inform parties in the letter or memorandum setting forth the deadline (including a specified time) by which extension requests must be filed to be considered timely. This modification also requires that an extension request must be made in a separate, stand-alone submission, and clarifies the circumstances under which the Department will grant untimely-filed requests for the extension of time limits. These modifications are effective for all segments initiated on or after October 21, 2013. Please review the final rule, available at *http://www.gpo.gov/fdsys/pkg/FR-2013-09-20/html/2013-22853.htm*, prior to submitting factual information in these segments.

These initiations and this notice are in accordance with section 751(a) of the Act (19 U.S.C. 1675(a)) and 19 CFR 351.221(c)(1)(i).

Dated: December 17, 2014.

**Christian Marsh,**

*Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations.*

[FR Doc. 2014–30074 Filed 12–22–14; 8:45 am]

**BILLING CODE 3510–DS–P**

---

**DEPARTMENT OF COMMERCE**

**International Trade Administration**

**[C–570–011]**

**Countervailing Duty Investigation of Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China: Final Affirmative Countervailing Duty Determination**

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** The Department of Commerce (the Department) published the *Preliminary Determination* of the countervailing duty (CVD) investigation of certain crystalline silicon photovoltaic products (certain solar products) from the People's Republic of China (the PRC) on June 10, 2014.[1] The Department determines that countervailable subsidies are being provided to producers and exporters of certain solar products from the PRC. For information on the estimated subsidy rates, *see* the ''Suspension of Liquidation'' section of this notice. The period of investigation (POI) is January 1, 2012, through December 31, 2012.

**DATES:** *Effective Date:* December 23, 2014.

**FOR FURTHER INFORMATION CONTACT:** Gene Calvert or Justin Neuman, AD/CVD Operations, Office VII, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 14th Street and Constitution Avenue NW., Washington, DC 20230; Phone: (202) 482–3586, or (202) 482–0486, respectively.

**SUPPLEMENTARY INFORMATION:**

**Background**

The petitioner, SolarWorld Americas, Inc., filed its petition with the Department on December 31, 2013, seeking the imposition of countervailing duties on certain solar products from the PRC and we initiated this investigation on January 29, 2014.[2] The Department published the *Preliminary Determination* on June 10, 2014. On

---

[1] *See Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China: Preliminary Affirmative Countervailing Duty Determination*, 79 FR 33174 (June 10, 2014) (*Preliminary Determination*).

[2] *See* Letter from Petitioner, ''Petition for the Imposition of Antidumping and Countervailing Duties: Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and Taiwan,'' (December 31, 2013) (the petition); *Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China: Initiation of Countervailing Duty Investigation*, 79 FR 4667 (January 29, 2014) (Initiation Notice).

June 9, 2014, the Government of the People's Republic of China submitted a ministerial error allegation regarding aspects of the *Preliminary Determination*. On June 10, 2014, the mandatory company respondents, Changzhou Trina Solar Energy Co., Ltd. and its cross-owned affiliate Trina Solar (Changzhou) Science & Technology Co., Ltd. (Collectively, Trina Solar), and Wuxi Suntech Power Co., Ltd. and its cross-owned affiliates also submitted a ministerial error allegation. On July 31, 2014, we aligned the final determination in this investigation with the final determination in the companion antidumping duty investigation on certain solar products from the PRC.[3] On August 15, 2014, the Department rejected the Government of the People's Republic of China's (the GOC's) June 9, 2014, ministerial error allegation, as well as Trina Solar's and Wuxi Suntech's June 10, 2014, submissions, explaining that their submissions were noncompliant with the Department's procedures for submitting factual information. Trina Solar and Wuxi Suntech each timely resubmitted their ministerial error allegations on August 19, 2014. On August 21, 2014, the Department determined that no ministerial errors exist with respect to Trina Solar's and Wuxi Suntech's allegations.[4] Between August 20 and September 2, 2014, we conducted verification of the questionnaire responses submitted by the GOC, Trina Solar, and Wuxi Suntech.[5]

On October 3, 2014, in response to interested parties' comments on the scope of this investigation, the Department announced that it was considering the possibility of a scope clarification, described the possible clarification, and provided interested parties with an opportunity to submit comments on the potential clarification.[6]

Between October 16 and October 27, 2014, interested parties submitted case and rebuttal briefs. We did not conduct a hearing in this proceeding, as any requests for a hearing were timely withdrawn. A full discussion of the issues raised by parties for this final determination may be found in the Final Decision Memorandum.[7] The Final Decision Memorandum is a public document and is on file electronically via Enforcement and Compliance's Antidumping and Countervailing Duty Centralized Electronic Service System (ACCESS).[8] ACCESS is available to registered users at *http://access.trade.gov*, and is available to all parties in the Central Records Unit, room 7046 of the main Department of Commerce building. In addition, a complete version of the Final Decision Memorandum can be accessed directly at *http://enforcement.trade.gov/frn/*. The signed Final Decision Memorandum and the electronic version are identical in content.

## Scope Comments and Scope Clarification

As indicated in the "Background" section above, the Department received comments regarding the scope of this investigation from numerous interested parties. The Department summarized these comments and addressed them in the accompanying Final Decision Memorandum.[9] As explained in the Final Decision Memorandum, to facilitate the scope's administrability and enforcement, we have clarified the scope language such that subject merchandise includes all modules, laminates and/or panels assembled in the PRC that contain crystalline silicon photovoltaic cells produced in a customs territory other than the PRC.[10]

The scope of the investigation for this final determination is below.

## Scope of the Investigation

The merchandise covered by this investigation is modules, laminates and/or panels consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including integrated materials. For purposes of this investigation, subject merchandise includes modules, laminates and/or panels assembled in the PRC consisting of crystalline silicon photovoltaic cells produced in a customs territory other than the PRC.

Subject merchandise includes modules, laminates and/or panels assembled in the PRC consisting of crystalline silicon photovoltaic cells of thickness equal to or greater than 20 micrometers, having a p/n junction formed by any means, whether or not the cell has undergone other processing, including, but not limited to, cleaning, etching, coating, and/or addition of materials (including, but not limited to, metallization and conductor patterns) to collect and forward the electricity that is generated by the cell.

Excluded from the scope of this investigation are thin film photovoltaic products produced from amorphous silicon (a-Si), cadmium telluride (CdTe), or copper indium gallium selenide (CIGS). Also excluded from the scope of this investigation are modules, laminates and/or panels assembled in the PRC, consisting of crystalline silicon photovoltaic cells, not exceeding 10,000mm² in surface area, that are permanently integrated into a consumer good whose function is other than power generation and that consumes the electricity generated by the integrated crystalline silicon photovoltaic cells. Where more than one module, laminate and/or panel is permanently integrated into a consumer good, the surface area for purposes of this exclusion shall be the total combined surface area of all modules, laminates and/or panels that are integrated into the consumer good. Further, also excluded from the scope of this investigation are any products covered by the existing antidumping and countervailing duty orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, laminates and/or panels, from the PRC.[11]

---

[3] *See Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China: Alignment of Final Countervailing Duty Determination With Final Antidumping Duty Determination*, 79 FR 44402 (July 31, 2014).

[4] *See* Department Memorandum, "Allegations of Ministerial Errors in the Preliminary Determination," (August 21, 2014).

[5] *See* Department Memoranda, "Verification of the Questionnaire Responses Submitted by Changzhou Trina Solar Energy Co., Ltd. and its Cross-Owned Companies," (October 2, 2014); "Verification of the Questionnaire Responses Submitted by the Government of the People's Republic of China," (October 3, 2014); and "Verification of the Questionnaire Responses Submitted by Wuxi Suntech Power Co., Ltd. and its Cross-Owned Companies," (October 3, 2014).

[6] *See* Letter to All Interested Parties, "Antidumping and Countervailing Duty Investigations of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and the Antidumping Duty Investigation of

Certain Crystalline Silicon Photovoltaic Products from Taiwan: Opportunity to Submit Scope Comments," (October 3, 2014).

[7] *See* the Department's Memorandum to Paul Piquado, Assistant Secretary for Enforcement and Compliance, "Issues and Decision Memorandum for the Final Determination in the Countervailing Duty Investigation of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China," dated concurrently with this notice and hereby adopted by this notice (Final Decision Memorandum).

[8] On November 24, 2014, Enforcement and Compliance changed the name of Enforcement and Compliance's AD and CVD Centralized Electronic Service System (IA ACCESS) to AD and CVD Centralized Electronic Service System (ACCESS). The Web site location was changed from *http://iaaccess.trade.gov* to *http://access.trade.gov*. The Final Rule changing the references to the Regulations can be found at 79 FR 69046 (November 20, 2014).

[9] *See* Final Decision Memorandum at Comment 1, "Scope Comments and Scope Clarification."

[10] *Id.*

[11] *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order*, 77 FR 73018 (December 7, 2012); *Crystalline Silicon Photovoltaic*
Continued

Merchandise covered by this investigation is currently classified in the Harmonized Tariff Schedule of the United States (HTSUS) under subheadings 8501.61.0000, 8507.20.8030, 8507.20.8040, 8507.20.8060, 8507.20.8090, 8541.40.6020, 8541.40.6030 and 8501.31.8000. These HTSUS subheadings are provided for convenience and customs purposes; the written description of the scope of this investigation is dispositive.

**Analysis of Subsidy Programs and Comments Received**

The subsidy programs under investigation and the issues raised in the case and rebuttal briefs by parties in this investigation are discussed in the Final Decision Memorandum. A list of the issues that parties raised, and to which we responded in the Final Decision Memorandum, is attached to this notice as an Appendix.

**Use of Adverse Facts Available**

The Department notes that, in making these findings, we relied, in part, on facts available and, because one or more respondents did not act to the best of their ability to respond to the Department's requests for information, we drew an adverse inference where appropriate in selecting from among the facts otherwise available.[12] For further information, *see* the section ''Use of Facts Otherwise Available and Adverse Inferences,'' in the Final Decision Memorandum.

**Suspension of Liquidation**

In accordance with section 705(c)(1)(B)(i) of the Act, we calculated a rate for each company respondent. Section 705(c)(5)(A)(i) of the Act states that, for companies not individually investigated, we will determine an ''all others'' rate equal to the weighted-average countervailable subsidy rates established for exporters and producers individually investigated, excluding zero and *de minimis* countervailable subsidy rates, and any rates determined entirely under section 776 of the Act.

In accordance with section 703(d) and 705(c)(5)(A) of the Act, for companies not investigated, we apply an ''all others'' rate, which is normally calculated by weighing the subsidy rates of the individual companies selected as respondents by those companies' exports of the subject merchandise to the United States. Under section 705(c)(5)(A)(i) of the Act, the all others rate should exclude zero and *de minimis* rates calculated for the exporters and producers individually investigated. Where the rates for the investigated companies are all zero or *de minimis*, section 705(c)(5)(A)(ii) of the Act instructs the Department to establish an all others rate using ''any reasonable method.'' Notwithstanding the language of section 705(c)(5)(A)(i) of the Act, we have not calculated the all others rate by weight averaging the rates of the two individually investigated company respondents, because doing so risks disclosure of proprietary information. Therefore, and consistent with the Department's practice, for the all others rate, we calculated a simple average of the two company respondents' rates.[13] We determine the total estimated net countervailable subsidy rates to be:

| Company | Subsidy Rate (*ad valorem*) (Percent) |
|---|---|
| Wuxi Suntech Power Co., Ltd. ....................... | 27.64 |
| Changzhou Trina Solar Energy Co., Ltd. ................... | 49.79 |
| All Others .............................. | 38.72 |

As a result of our *Preliminary Determination,* and pursuant to section 703(d) of the Act, we instructed U.S. Customs and Border Protection (CBP) to suspend liquidation of all entries of merchandise under consideration from the PRC that were entered or withdrawn from warehouse, for consumption, on or after June 10, the date of publication of the *Preliminary Determination* in the **Federal Register**. In accordance with section 703(d) of the Act, we issued instructions to CBP to discontinue the suspension of liquidation for CVD purposes for subject merchandise entered, or withdrawn from warehouse, on or after October 8, 2014, but to continue the suspension of liquidation of all entries from June 10, 2014 through October 7, 2014.[14]

If the U.S. International Trade Commission (the ITC) issues a final affirmative injury determination, we will issue a CVD order and will reinstate the suspension of liquidation under section 706(a) of the Act and will require a cash deposit of estimated CVDs for such entries of subject merchandise in the amounts indicated above. If the ITC determines that material injury, or threat of material injury, does not exist, this proceeding will be terminated and all estimated duties deposited or securities posted as a result of the suspension of liquidation will be refunded or canceled.

**ITC Notification**

In accordance with section 705(d) of the Act, we will notify the ITC of our determination. In addition, we are making available to the ITC all non-privileged and non-proprietary information related to this investigation. We will allow the ITC access to all privileged and business proprietary information in our files, provided the ITC confirms that it will not disclose such information, either publicly or under an administrative protective order (APO), without the written consent of the Assistant Secretary for Enforcement and Compliance.

**Return or Destruction of Proprietary Information**

In the event the ITC issues a final negative injury determination, this notice will serve as the only reminder to parties subject to an APO of their responsibility concerning the destruction of proprietary information disclosed under APO in accordance with 19 CFR 351.305(a)(3). Timely written notification of the return/destruction of APO materials or conversion to judicial protective order is hereby requested. Failure to comply with the regulations and terms of an APO is a violation which is subject to sanction.

This determination is issued and published pursuant to sections 705(d) and 777(i) of the Act.

Dated: December 15, 2014.

**Paul Piquado,**
*Assistant Secretary for Enforcement and Compliance.*

**Appendix—Final Decision Memorandum**

I. Summary
II. Background
III. Scope of the Investigation
IV. Application of the Countervailing Duty Law to Imports from the PRC
V. Subsidies Valuation Information
VI. Benchmarks and Discount Rates
VII. Use of Facts Otherwise Available and Adverse Inferences
VIII. Analysis of Programs

---

*Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Countervailing Duty Order,* 77 FR 73017 (December 7, 2012).

[12] *See* sections 776(a) and (b) of the Tariff Act of 1930, as amended (the Act).

[13] *See, e.g., Countervailing Duty Investigation of Chlorinated Isocyanurates From the People's Republic of China: Preliminary Determination and Alignment of Final Determination With Final Antidumping Determination,* 79 FR 10097 (February 24, 2014), unchanged in *Countervailing Duty Investigation of Chlorinated Isocyanurates From the People's Republic of China: Final Affirmative Countervailing Duty Determination,* 79 FR 56560 (September 22, 2014).

[14] *See* CBP's Antidumping Duty and Countervailing Duty Message Database, *http://adcvd.cbp.dhs.gov/adcvdweb/,* at Message No. 4283302 (October 10, 2014).

IX. Analysis of Comments
Comment 1: Scope Comments and Scope Clarification
Comment 2: Whether the Department Should Investigate the Effects of the GOC's Alleged Cyberhacking on this Investigation
Comment 3: Whether Input Providers are "Authorities" Within the Meaning of the Act
Comment 4: Whether the Provision of Chinese Polysilicon for LTAR is Countervailable
Comment 5: Whether the Department Should Attribute Subsidies Under the Provision of Polysilicon for LTAR Program to Wuxi Suntech's Cross-owned Companies
Comment 6: Whether the Provision of Aluminum Extrusions for LTAR is Countervailable
Comment 7: Whether the Provision of Solar Glass for LTAR is Countervailable
Comment 8: Whether AFA is Applicable to Trina Solar's Land Purchases
Comment 9: Whether All Banks in China Offering Preferential Loans to Respondents Constitute "Authorities"
Comment 10: Whether the Department Should Adjust Its Benefit Calculations for Loans Received by Wuxi Suntech and Zhenjiang Ren De
Comment 11: Whether the High or New Technology Tax Program is Specific
Comment 12: Whether the Tax Offsets for R&D under the Enterprise Income Tax Law Program is Specific
Comment 13: Whether the Department Should Adjust Its Benefit Calculation for Wuxi Suntech's Use of the "Preferential Income Tax Program for High or New Technology Enterprises" and for the "Tax Offsets for R&D under the Enterprise Income Tax Law" Programs
Comment 14: Whether the Golden Sun Program is Countervailable
Comment 15: Whether the Department Should Countervail the "Discovered Subsidies" or Subsidies Discovered During the Course of Verification
Comment 16: Whether the Department Should Apply AFA to the Ex-Im Bank Buyer's Credit Program
Comment 17: Whether the Department Should Find Trina Solar and Wuxi Suntech to be Uncreditworthy
Comment 18: Whether the Department Should Adjust the Sales Denominators Used in Calculating Subsidy Benefits for Wuxi Suntech
Comment 19: Whether the Department Should Accept the Minor Corrections Presented by Wuxi Suntech at Verification
X. Recommendation Attachment

[FR Doc. 2014–30071 Filed 12–22–14; 8:45 am]

**BILLING CODE 3510-DS-P**

# DEPARTMENT OF COMMERCE

## International Trade Administration

**[A–570–901]**

## Certain Lined Paper Products From the People's Republic of China: Notice of Rescission of Antidumping Duty Administrative Review

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**DATES:** *Effective Date:* December 23, 2014.

**FOR FURTHER INFORMATION CONTACT:** Stephanie Moore or Cindy Robinson AD/CVD Operations, Office III, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 14th Street and Constitution Avenue NW., Washington, DC 20230; telephone: (202) 482–3692 or (202) 482–3797, respectively.

**SUPPLEMENTARY INFORMATION:**

### Background

On September 2, 2014, the Department of Commerce (the Department) published a notice of opportunity to request an administrative review of the antidumping duty order on certain lined paper products from the People's Republic of China.[1] Pursuant to a request from the Association of American School Paper Suppliers and its individual members (petitioners),[2] the Department published in the **Federal Register** the notice of initiation of this antidumping duty administrative review with respect to Shanghai Lian Li Paper Products Co., Ltd. (Shanghai Lian Li) for the period September 1, 2013, through August 31, 2014.

On October 30, 2014, the Department published the Notice of Initiation.[3] On November 24, 2014, Petitioners timely withdrew their request for administrative review of the antidumping duty order with respect to Shanghai Lian Li.

### Rescission of the 2013–2014 Administrative Review

Pursuant to 19 CFR 351.213(d)(1), the Secretary will rescind an administrative review, in whole or in part, if the parties that requested a review withdraw the request within 90 days of the date of publication of the notice of initiation of the requested review. The instant review was initiated on October 30, 2014.[4] Petitioners withdrew their request for a review on November 24, 2014, which is within the 90-day deadline. No other party requested an administrative review of this segment of the proceeding. Therefore, in accordance with 19 CFR 351.213(d)(1), we are rescinding this review of the antidumping duty order on certain lined paper products from the People's Republic of China.

### Assessment

Antidumping duties shall be assessed at rates equal to the cash deposit of estimated antidumping duties required at the time of entry, or withdrawal from warehouse, for consumption, during the period September 1, 2013, through August 31, 2014.

The Department intends to issue appropriate assessment instructions directly to CBP 15 days after publication of this notice.

### Notification to Importers

This notice serves as a reminder to importers of their responsibility under 19 CFR 351.402(f)(2) to file a certificate regarding the reimbursement of antidumping duties prior to liquidation of the relevant entries during this review period. Failure to comply with this requirement could result in the Secretary's presumption that reimbursement of antidumping duties occurred and the subsequent increase in the amount of antidumping duties reimbursed.

### Notification Regarding Administrative Protective Order

This notice serves as a final reminder to parties subject to administrative protective orders (APOs) of their responsibility concerning the disposition of proprietary information disclosed under an APO in accordance with 19 CFR 351.305(a)(3), which continues to govern business proprietary information in this segment of the proceeding. Timely written notification of the return/destruction of APO materials or conversion to judicial protective order is hereby requested. Failure to comply with the regulations and terms of an APO is a violation which is subject to sanction.

This notice is issued and published in accordance with section 777(i)(1) of the Tariff Act of 1930, as amended, and 19 CFR 351.213(d)(4).

---

[1] *See Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity To Request Administrative Review,* 79 FR 51958 (September 2, 2014).

[2] The individual members are ACCO Brands USA LLC; Norcom, Inc.; and Top Flight, Inc.

[3] *See Initiation of Antidumping and Countervailing Duty Administrative Reviews,* 79 FR 64565 (October 30, 2014) (*Initiation*).

[4] *See id.*

**TAB 16**

**Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China**, 79 Fed. Reg. 76970 (Dep't Commerce Dec. 23, 2014) (final LTFV determ.)

**AD P.R. 834**

12. Whether the Department Should Reallocate to Prime Products the Production Costs of Off-Grade Cells Reported to the Department as Non-Prime Products (Non-Prime Products)

13. Whether the Department Should Adjust the Affiliated Supplier's Cost of Wafers Before Testing Gintech's Transfer Prices with the Affiliated Wafer Supplier (Affiliated's COP)

14. Whether the Department Should Include Losses Related to Inventory Disposals in Gintech's G&A Expense Rate (Inventory Disposals)

15. Whether the Department Should Include LCM Adjustments in Gintech's Reported Costs (LCM Adjustments)

16. Whether the Department Should Account for the Differences between Gintech's Total Cost Accounting System Costs and its Total Reported Costs (Methodological Difference)

17. Whether the Department Should Adjust Gintech's Financial Expense Rate for Certain Items Identified at Verification (Financial Expense Rate)

C. Issues Involving Motech

18. Whether to Include Reported ''Indirect'' Sales in the Calculation of U.S. Price

19. Whether to Exclude Sales of Modules Produced by Motech's Affiliate in the PRC

20. Whether U.S. Indirect Selling Expenses Should Not Include Expenses for R&D

21. Whether Motech's Short-Term Interest Rate Should be used to Calculate U.S. Credit and Inventory Carrying Cost

22. Whether U.S. Warehousing Expense Calculation Should be Revised

23. Whether a Different Basis Should be Used for Certain Payment Dates

24. Whether a Downward Adjustment Should be Made to the Price for a Home Market Transaction

25. Whether Grade Z Cells Should Bear the Same Cost as Grades A and B Cells

26. Whether the Inventory Adjustment Ratio Should be Revised

27. Whether the Financial Expense Ratio Calculation Should Include the Gains on Foreign Currency Translation

28. Whether the Cost for One of Motech's Modules CONNUMs Should be Adjusted

V. Recommendation

## Appendix II

### Importer Certification

I hereby certify that I am an official of (insert name of company importing solar panels/modules), that I have knowledge of the facts regarding the importation of the solar panels/modules or other products containing solar panels/modules that entered under entry number(s) (insert entry number(s) covered by the certification), and that these solar panels/modules do not contain solar cells produced in Taiwan.

By signing this certificate, I also hereby certify that (insert name of company importing solar panels/modules) maintains sufficient documentation supporting this certification for all solar cells used to produce the solar panels/modules imported under the above-referenced entry number(s).

I understand that agents of the importer, such as brokers, are not permitted to make this certification. Also, I am aware that records pertaining to this certification may be requested by CBP. I understand that this certification must be completed at the time of the entry. I also understand that failure to maintain the required certification or failure to substantiate the claim that the panels/modules do not contain solar cells produced in Taiwan will result in suspension of all unliquidated entries for which these requirements were not met and the requirement that the importer post an AD cash deposit on those entries equal to the applicable rate in effect at the time of entry.[1]

_____

Name of Company Official

_____

Title

_____

Date

### Exporter Certification

I hereby certify that I am an official of (insert name of company exporting solar panels/modules), that I have knowledge of the facts regarding the exportation of the solar panels/modules or other products containing the solar panels/modules identified below, and that these solar panels/modules do not contain solar cells produced in Taiwan.

By signing this certificate, I also hereby certify that (insert name of company exporting solar panels/modules) maintains sufficient documentation supporting this certification for all solar cells used to produce the solar panels/modules identified below. I am aware that records pertaining to this certification may be subject to verification by Department of Commerce officials and I consent to verification with respect to this certification and these records. I understand that this certification must be completed at the time of shipment. I also understand that failure to maintain the required certification or failure to substantiate the claim that the panels/modules do not contain solar cells produced in Taiwan will result in suspension of all unliquidated entries for which these requirements were not met and the requirement that the importer post an AD cash deposit on those entries equal to the applicable rate in effect at the time of entry. The exports covered by this certification are (insert invoice numbers, purchase order numbers, export documentation, etc. to identify the exports covered by the certification).

_____

Name of Company Official

_____

[1] However, if the certification also does not meet the requirements set forth in *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Final Determination of Sales at Less Than Fair Value, and Affirmative Final Determination of Critical Circumstances, in Part*, 77 FR 63791 (October 17, 2012) (*Solar I*), then the applicable rate is the appropriate rate as set forth in the *Solar I* order.

_____

Title

_____

Date

[FR Doc. 2014–30107 Filed 12–22–14; 8:45 am]

**BILLING CODE 3510–DS–P**

_____

## DEPARTMENT OF COMMERCE

### International Trade Administration

**[A–570–010]**

**Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China: Final Determination of Sales at Less Than Fair Value**

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**DATES:** *Effective Date:* December 23, 2014.

**SUMMARY:** The Department of Commerce (the Department) determines that certain crystalline silicon photovoltaic products (certain solar products) from the People's Republic of China (PRC) are being, or are likely to be, sold in the United States at less than fair value (LTFV), as provided in section 735 of the Tariff Act of 1930, as amended (the Act). The final weighted-average dumping margins for this investigation are listed in the ''Final Determination Margins'' section below.

**FOR FURTHER INFORMATION CONTACT:** Jeffrey Pedersen or Thomas Martin, AD/CVD Operations, Office IV, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 14th Street and Constitution Avenue NW., Washington, DC 20230; telephone: (202) 482–2769 or (202) 482–3936, respectively.

**SUPPLEMENTARY INFORMATION:**

### Background

The Department published the preliminary determination in the LTFV investigation of certain solar products from the PRC on July 31, 2014.[1] The following events occurred since the preliminary determination. Between August 4 and 14, 2014, the Department conducted a verification of Changzhou Trina Solar Energy Co., Ltd. and Trina Solar (Changzhou) Science & Technology Co., Ltd. (collectively, Trina

_____

[1] See *Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China: Affirmative Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination*, 79 FR 44399 (July 31, 2014) (''*Preliminary Determination*'').

Solar) in Changzhou, PRC, and conducted a verification of their U.S. sales affiliate, Trina Solar (U.S.) Inc., in San Jose, California. Between August 7 and 20, 2014, the Department conducted a verification of Renesola Jiangsu Ltd., Renesola America Inc., Jinko Solar Import and Export Co., Ltd., and Jinko Solar (U.S.) Inc., in Shanghai and Yixing, PRC, and in San Francisco, California.[2] The Department issued the verification reports regarding Trina Solar on September 26, 2014.[3] The Department issued the verification reports regarding Renesola/Jinko on September 30 and October 2, 2014.[4]

On October 3, 2014, in response to interested parties' comments on the scope of this investigation, the Department announced that it was considering the possibility of a scope clarification, described the possible clarification, and provided interested

---

[2] The Department is treating the Renesola and Jinko companies under investigation as a single entity hereinafter collectively referred to as Renesola/Jinko. *See* Memorandum to Paul Piquado, Assistant Secretary for Enforcement and Compliance, From Christian Marsh, Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations regarding Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: Issues and Decision Memorandum for the Final Determination of Sales at Less Than Fair Value (''Issues and Decision Memorandum'') dated concurrently with and hereby adopted by this notice (''Issues and Decision Memorandum'') at Comment 16.

[3] *See* Memorandum to the File, from Erin Kearney, Patrick O'Connor, and Jeff Pedersen, International Trade Compliance Analysts, AD/CVD Operations, Office IV, titled ''Verification of the Sales and Factors of Production Information Submitted by Changzhou Trina Solar Energy Co., Ltd. in the Antidumping Duty Investigation of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China (''PRC''),'' dated September 26, 2014; *see* Memorandum to the File, from Patrick O'Connor and Jeff Pedersen, International Trade Compliance Analysts, AD/CVD Operations, Office IV, titled ''Verification of Trina Solar (U.S.) Inc. in the Antidumping Duty Investigation of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China (''PRC''),'' dated September 26, 2014.

[4] *See* Memorandum to the File, from Thomas Martin, Lilit Astvatsatrian, Theresa Deeley, International Trade Compliance Analysts, AD/CVD Operations, Office IV, titled ''Verification of the Sales Responses of Renesola America Inc. in the Antidumping Investigation of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China,'' dated September 30, 2014; *see* Memorandum to the File, from Thomas Martin, Lilit Astvatsatrian, Theresa Deeley, International Trade Compliance Analysts, AD/CVD Operations, Office IV, titled ''Verification of Jinko Solar Import & Export Co., Ltd. and Jinko Solar (U.S.) Inc. in the Antidumping Duty Investigation of Certain Crystalline Silicon Photovoltaic Products, from the People's Republic of China (''PRC''),'' dated September 30, 2014; *see* Memorandum to the File, from Thomas Martin, Lilit Astvatsatrian, Theresa Deeley, International Trade Compliance Analysts, AD/CVD Operations, Office IV, titled ''Verification of the Sales and Factors Responses of Renesola Jiangsu Ltd. in the Antidumping Duty Investigation of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China,'' dated October 2, 2014.

parties with an opportunity to submit comments on the potential clarification.[5]

On October 16, 2014, Trina Solar, Renesola/Jinko, SolarWorld Americas Inc. (Petitioner) (formerly SolarWorld Industries America, Inc.), the Government of the PRC, a U.S. importer, Suniva Inc., and certain separate rate applicants submitted case briefs.[6] From October 22, 2014 to October 27, 2014, Trina Solar, Renesola/Jinko, Petitioner, and certain separate rate applicants submitted rebuttal briefs.[7]

---

[5] *See* Letter to All Interested Parties ''Re: Antidumping and Countervailing Duty Investigations of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and the Antidumping Duty Investigation of Certain Crystalline Silicon Photovoltaic Products from Taiwan: Opportunity to Submit Scope Comments,'' dated October 3, 2014.

[6] *See* Letter from fourteen separate rate applicants, ''Re: Antidumping and Countervailing Duty Investigations of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China, and Antidumping Duty Investigation of Certain Crystalline Silicon Photo voltaic Products from Taiwan: Respondents' Case Brief,'' dated October 16, 2014; Letter from the PRC Government, ''Re: Government of China's Case Brief: Certain Crystalline Silicon Photovoltaic Products from the People's Republic Of China,'' dated October 16, 2014; Letter from Asun Energy Co., Ltd. (a/k/a Suzhou Asun Energy Co., Ltd.), ''Re: Administrative Case Brief: Antidumping Duty Investigation of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China (A–570–010),'' dated October 16, 2014; Letter from Trina, ''Re: Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China; Case Brief of Changzhou Trina Solar Energy Co., Ltd.,'' dated October 16, 2014; Letter from Renesola, ''Re: Certain Crystalline Silicon Photovoltaic Products from China; Case Brief,'' dated October 16, 2014; Letter from Junco, ''Re: Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: Case Brief,'' dated October 16, 2014; Letter from Hanwha QCELLS USA, Inc., ''Re: Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China,'' dated October 16, 2014; Letter from Suniva, Inc., ''Re: Case Brief on Scope Issues Certain Crystalline Silicon Photovoltaic Products from China and Taiwan,'' dated October 16, 2014; Letter from tenKsolar (Shanghai) Co., Ltd., ''Re: Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and Taiwan– Case Brief,'' dated October 16, 2014; Letter from SNJ Enterprises LLC dba Zamp Solar and Quebec Inc. dba RDK Products, ''Re: Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: Case Brief,'' dated October 16, 2014; Letter from Petitioner, ''Re: Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: Case Brief of Solar World Americas, Inc.,'' dated October 16, 2014.

[7] *See* Letter from Hanwha SolarOne (Qidong) Co., Ltd. and Hanwha SolarOne Hong Kong Limited, ''Re: Rebuttal Brief: Antidumping Duty Investigation of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China (A–570–010),'' dated October 22, 2014; Letter from Asun Energy Co., Ltd. (a/k/a Suzhou Asun Energy Co., Ltd.), ''Re: Rebuttal Brief: Antidumping/ Countervailing Duty Investigations of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China,'' dated October 22, 2014; Letter from Shangluo BYD Industrial Co., Ltd. and Shanghai BYD Co., Ltd. ''Re: Certain Crystalline Silicon Photovoltaic Products from the People's Republic of

Although certain parties requested that a hearing be held, on October 24, 2014, all requests were subsequently withdrawn. Thus, the Department did not hold a hearing with respect to this investigation.

## Period of Investigation

The period of investigation (POI) is April 1, 2013, through September 30, 2013. This period corresponds to the two most recent fiscal quarters prior to the month of the filing of the petition, which was December 2013.[8]

## Scope Comments and Scope Clarification

As indicated in the ''Background'' section above, the Department received comments regarding the scope of this investigation from numerous interested parties. The Department summarized these comments and addressed them in the accompanying Issues and Decision Memorandum.[9] As explained in the Issues and Decision Memorandum, we have clarified the scope language such that subject merchandise includes all modules, laminates and/or panels assembled in the PRC that contain crystalline silicon photovoltaic cells produced in a customs territory other than the PRC.[10] The scope of the investigation for this final determination is below.

---

China and Taiwan: Rebuttal Brief,'' dated October 22, 2014; Letter from Changzhou Almaden Co., Ltd., ''Re: Crystalline Silicon Photovoltaic Products from P.R. China: Rebuttal Brief,'' dated October 22, 2014; Letter from Renesola ''Re: Certain Crystalline Silicon Photovoltaic Products from China; Rebuttal Brief,'' dated October 22, 2014; Letter from Petitioner, ''Re: Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: Rebuttal Brief of Solar World Americas, Inc.,'' dated October 22, 2014; Letter from Trina, ''Re: Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: Rebuttal Brief of Changzhou Trina Solar Energy Co., Ltd.,'' dated October 22, 2014. *see also* Letter from fourteen separate rate applicants, ''Re: Antidumping and Countervailing Duty Investigations of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China, and Antidumping Duty Investigation of Certain Crystalline Silicon Photo voltaic Products from Taiwan: Respondents' Rebuttal Brief,'' dated October 27, 2014; Letter from Hanwha QCELLS USA, Inc. ''Re: Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China,'' dated October 27, 2014; Letter from SNJ Enterprises LLC dba Zamp Solar LLC and Quebec Inc. dba RDK Products, ''Re: Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: Rebuttal Brief,'' dated October 27, 2014; Letter from Petitioner, ''Re: Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: SolarWorld's Rebuttal Brief on Scope,'' dated October 27, 2014.

[8] 19 CFR 351.204(b)(1).

[9] *See* Issues and Decision Memorandum.

[10] *Id.* at Comment 1.

## Certifications No Longer Required for This Proceeding

In the *Preliminary Determination,* the Department announced that (1) if an importer imports solar modules that were assembled in the PRC and (2) claims the solar modules do not contain solar cells manufactured in third countries using ingots, wafers, or partially produced solar cells manufactured in the PRC, the importer and PRC exporter of those solar modules are required to certify the claim and maintain documentation supporting the certifications.[11] However, given the clarification to the scope language, the Department is revoking the importer and exporter certification requirements announced in the *Preliminary Determination.* Importers and PRC exporters will not be required to maintain the certifications identified in the *Preliminary Determination* for merchandise entered, or withdrawn from warehouse, for consumption on or after July 31, 2014, the date of publication of the *Preliminary Determination* notice in the **Federal Register**. The revocation of the certification requirements previously established in this investigation does not change or rescind the certification requirements established in connection with the existing AD order on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the PRC.[12]

## Scope of the Investigation

The merchandise covered by this investigation is modules, laminates and/or panels consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including building integrated materials. For purposes of this investigation, subject merchandise includes modules, laminates and/or panels assembled in the PRC consisting of crystalline silicon photovoltaic cells produced in a customs territory other than the PRC.

Subject merchandise includes modules, laminates and/or panels

assembled in the PRC consisting of crystalline silicon photovoltaic cells of thickness equal to or greater than 20 micrometers, having a p/n junction formed by any means, whether or not the cell has undergone other processing, including, but not limited to, cleaning, etching, coating, and/or addition of materials (including, but not limited to, metallization and conductor patterns) to collect and forward the electricity that is generated by the cell.

Excluded from the scope of this investigation are thin film photovoltaic products produced from amorphous silicon (a-Si), cadmium telluride (CdTe), or copper indium gallium selenide (CIGS). Also excluded from the scope of this investigation are modules, laminates and/or panels assembled in the PRC, consisting of crystalline silicon photovoltaic cells, not exceeding 10,000mm$^2$ in surface area, that are permanently integrated into a consumer good whose function is other than power generation and that consumes the electricity generated by the integrated crystalline silicon photovoltaic cells. Where more than one module, laminate and/or panel is permanently integrated into a consumer good, the surface area for purposes of this exclusion shall be the total combined surface area of all modules, laminates and/or panels that are integrated into the consumer good. Further, also excluded from the scope of this investigation are any products covered by the existing antidumping and countervailing duty orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, laminates and/or panels, from the PRC.[13]

Merchandise covered by this investigation is currently classified in the Harmonized Tariff Schedule of the United States (HTSUS) under subheadings 8501.61.0000, 8507.20.8030, 8507.20.8040, 8507.20.8060, 8507.20.8090, 8541.40.6020, 8541.40.6030 and 8501.31.8000. These HTSUS subheadings are provided for convenience and customs purposes; the

written description of the scope of this investigation is dispositive.

## Analysis of Comments Received

All issues raised in the case and rebuttal briefs by parties to this investigation are addressed in the Issues and Decision Memorandum. A list of the issues which the parties raised and to which the Department responded in the Issues and Decision Memorandum is attached to this notice as an Appendix. The Issues and Decision Memorandum is a public document and is on file electronically via Enforcement and Compliance's Antidumping and Countervailing Duty Centralized Electronic Service System (ACCESS). ACCESS is available to registered users at *http://access.trade.gov* and it is available to all parties in the Central Records Unit, room 7046 of the main Department of Commerce building. In addition, a complete version of the Issues and Decision Memorandum can be accessed directly at *http:// enforcement.trade.gov/frn/.* The signed and electronic versions of the Issues and Decision Memorandum are identical in content.

Changes to the Margin Calculations Since the Preliminary Determination

Based on the Department's analysis of the comments received and our findings at verification, we made certain changes to the margin calculations. For a discussion of these changes, *see* the Issues and Decision Memorandum, the company-specific analysis and surrogate value memoranda, and the separate rate calculation memorandum, all dated concurrently with this notice.

## Verification

As provided in section 782(i) of the Act and 19 CFR 351.307(b)(1)(i), in August 2014, the Department verified the information submitted by Trina Solar and Renesola/Jinko for use in the final determination. The Department used standard verification procedures, including examination of relevant accounting and production records and original source documents provided by Trina Solar and Renesola/Jinko.

## Final Determination Margins

The Department determines that the following weighted-average dumping margins exist for the period April 1, 2013 through September 30, 2013.

---

[11] *Preliminary Determination,* 79 FR 44901–44902.

[12] *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Affirmative Countervailing Duty Determination and Final Affirmative Critical Circumstances Determination,* 77 FR 63788 (October 17, 2012) ("crystalline silicon photovoltaic cells, whether or not assembled into modules, from the PRC").

[13] *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order,* 77 FR 73018 (December 7, 2012); *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Countervailing Duty Order,* 77 FR 73017 (December 7, 2012).

**Federal Register** / Vol. 79, No. 246 / Tuesday, December 23, 2014 / Notices   **76973**

| Exporter | Producer | Weighted-average dumping margin (percent) |
|---|---|---|
| Changzhou Trina Solar Energy Co., Ltd./Trina Solar (Changzhou) Science & Technology Co., Ltd. | Changzhou Trina Solar Energy Co., Ltd./Trina Solar (Changzhou) Science & Technology Co., Ltd. | 26.71 |
| Renesola Jiangsu Ltd./Renesola Zhejiang Ltd./Jinko Solar Co. Ltd./Jinko Solar Import and Export Co., Ltd. | Renesola Jiangsu Ltd./Jinko Solar Co. Ltd. ............................ | 78.42 |
| Anji DaSol Solar Energy Science & Technology Co., Ltd. ...... | Anji DaSol Solar Energy Science & Technology Co., Ltd. ...... | 52.13 |
| Asun Energy Co., Ltd. (a/k/a Suzhou Asun Energy Co., Ltd.) | Asun Energy Co., Ltd. (a/k/a Suzhou Asun Energy Co., Ltd.) | 52.13 |
| Baoding Tianwei Yingli New Energy Resources Co. , Ltd. ...... | Baoding Tianwei Yingli New Energy Resources Co., Ltd., Yingli Energy (China) Co., Ltd., and Lixian Yingli New Energy Co., Ltd.. | 52.13 |
| BYD (Shangluo) Industrial Co., Ltd. ........................................... | BYD (Shangluo) Industrial Co., Ltd. ........................................... | 52.13 |
| Canadian Solar International Limited ........................................ | Canadian Solar Manufacturing (Luoyang) Inc., Canadian Solar Manufacturing (Changshu), Inc. | 52.13 |
| Canadian Solar Manufacturing (Changshu), Inc ..................... | Canadian Solar Manufacturing (Changshu), Inc ..................... | 52.13 |
| Canadian Solar Manufacturing (Luoyang) Inc ........................ | Canadian Solar Manufacturing (Luoyang) Inc ........................ | 52.13 |
| CEEG Nanjing Renewable Energy Co., Ltd. ............................. | CEEG Nanjing Renewable Energy Co., Ltd. ............................. | 52.13 |
| Changzhou Almaden Co., Ltd. .................................................. | Changzhou Almaden Co., Ltd. .................................................. | 52.13 |
| Chint Solar (Zhejiang) Co., Ltd. ............................................... | Chint Solar (Zhejiang) Co., Ltd. ............................................... | 52.13 |
| ET Solar Industry Limited ......................................................... | ET Solar Industry Limited ......................................................... | 52.13 |
| Hainan Yingli New Energy Resources Co. Ltd. ........................ | Hainan Yingli New Energy Resources Co. Ltd. ........................ | 52.13 |
| Hangzhou Zhejiang University Sunny Energy Science and Technology Co., Ltd. | Hangzhou Zhejiang University Sunny Energy Science and Technology Co., Ltd. | 52.13 |
| Hanwha SolarOne (Qidong) Co., Ltd. ....................................... | Hanwha SolarOne (Qidong) Co., Ltd. ....................................... | 52.13 |
| Hanwha SolarOne Hong Kong Limited ..................................... | Hanwha SolarOne (Qidong) Co., Ltd. ....................................... | 52.13 |
| Hefei JA Solar Technology Co., Ltd. ........................................ | Hefei JA Solar Technology Co., Ltd. ........................................ | 52.13 |
| Hengdian Group DMEGC Magnetics Co., Ltd. ......................... | Hengdian Group DMEGC Magnetics Co., Ltd. ......................... | 52.13 |
| Hengshui Yingli New Energy Resources Company Limited .... | Hengshui Yingli New Energy Resources Company Limited ... | 52.13 |
| Jiangyin Hareon Power Co., Ltd. .............................................. | Jiangyin Xinhui Solar Co., Ltd.; Altusvia Energy Taicang Co., Ltd.; Hareon Solar Technology Co., Ltd.. | 52.13 |
| Jiawei Solarchina Co., Ltd. ....................................................... | Jiawei Solarchina (Shenzhen) Co., Ltd. ................................... | 52.13 |
| Jiawei Technology (HK) Ltd. ..................................................... | Shenzhen Jiawei Photovoltaic Lighting Co. Ltd. ..................... | 52.13 |
| LDK Solar Hi-Tech (Nanchang) Co., Ltd. ................................. | LDK Solar Hi-Tech (Nanchang) Co., Ltd. ................................. | 52.13 |
| Lixian Yingli New Energy Company Ltd. ................................... | Lixian Yingli New Energy Company Ltd. ................................... | 52.13 |
| MOTECH (Suzhou) Renewable Energy Co., Ltd. ...................... | MOTECH (Suzhou) Renewable Energy Co., Ltd. ...................... | 52.13 |
| Ningbo Qixin Solar Electrical Appliance Co., Ltd. .................... | Ningbo Qixin Solar Electrical Appliance Co., Ltd. .................... | 52.13 |
| Perlight Solar Co., Ltd. ............................................................. | Perlight Solar Co., Ltd. ............................................................. | 52.13 |
| Risen Energy Co., Ltd. .............................................................. | Risen Energy Co., Ltd. .............................................................. | 52.13 |
| Shanghai JA Solar Technology Co., Ltd. .................................. | Shanghai JA Solar Technology Co., Ltd. .................................. | 52.13 |
| Shanghai Solar Energy Science & Technology Co., Ltd. ......... | Lianyungang Shenzhou New Energy Co., Ltd. ......................... | 52.13 |
| Shenzhen Jiawei Photovoltaic Lighting Co. Ltd. ..................... | Shenzhen Jiawei Photovoltaic Lighting Co. Ltd. ..................... | 52.13 |
| Shenzhen Sungold Solar Co., Ltd. ........................................... | Shenzhen Sungold Solar Co., Ltd. ........................................... | 52.13 |
| Shenzhen Topray Solar Co., Ltd. ............................................. | Shenzhen Topray Solar Co., Ltd. ............................................. | 52.13 |
| Sun Earth Solar Power Co., Ltd. .............................................. | Sun Earth Solar Power Co., Ltd. .............................................. | 52.13 |
| Sunny Apex Development Ltd. ................................................... | Shenzhen Jiawei Photovoltaic Lighting Co. Ltd., Wuhan FYY Technology Co., Ltd.. | 52.13 |
| SunPower Systems SARL .......................................................... | SunEnergy (S.Z.) Co., Ltd. ....................................................... | 52.13 |
| tenKsolar (Shanghai) Co., Ltd. ................................................. | tenKsolar (Shanghai) Co., Ltd. ................................................. | 52.13 |
| Upsolar Global Co., Ltd. and including Upsolar Group, Co., Ltd. | Shandong Dahai Group Co., Ltd. ............................................. | 52.13 |
| Wanxiang Import & Export Co., Ltd. ......................................... | Zhejiang Wanxiang Solar Co., Ltd. .......................................... | 52.13 |
| Wuhan FYY Technology Co., Ltd. ............................................. | Wuhan FYY Technology Co., Ltd. ............................................. | 52.13 |
| Wuxi Suntech Power Co., Ltd. .................................................. | Wuxi Suntech Power Co., Ltd. .................................................. | 52.13 |
| Yingli Energy (China) Company Limited .................................. | Yingli Energy (China) Company Limited, Baoding Tianwei Yingli New Energy Resources Co., Ltd. and Lixian Yingli New Energy Co., Ltd.. | 52.13 |
| Yingli Green Energy International Trading Limited .................. | Yingli Energy (China) Company Limited, Baoding Tianwei Yingli New Energy Resources Co., Ltd., and Hainan Yingli New Energy Resources Co., Ltd.. | 52.13 |
| Zhongli Talesun Solar Co., Ltd. ............................................... | Zhongli Talesun Solar Co., Ltd. ............................................... | 52.13 |
| PRC-Wide Rate | | 165.04 |

**PRC-Wide Entity**

Consistent with the *Preliminary Determination,* the PRC-wide entity includes, among other companies, CSG PVTech Co., Ltd.; Lianyungang Shenzhou New Energy Co., Ltd.; Lightway Green New Energy Co., Ltd.; SunEnergy (S.Z.) Co., Ltd.; SunPower Corporation (U.S.); Jiawei Solarchina (Shenzhen) Co., Ltd.; and Sumec Hardware & Tools Co., Ltd. We found these companies either have not demonstrated an absence of *de facto* government control, or did not have a sales transaction during the POI that provided a basis for granting separate rate status.[14]

[14] *See* the memorandum from Jeff Pedersen, Senior International Trade Analyst, Office IV, AD/ CVD Operations to Abdelali Elouaradia, Director,
Continued

The PRC-wide entity also includes 35 PRC exporters and/or producers of the merchandise under consideration during the POI that did not respond to the Department's request for information.[15] These companies withheld necessary information, failed to provide information by the established deadlines, and significantly impeded this proceeding by not submitting the requested quantity and value information within the meaning of sections 776(a)(1) and (a)(2)(A)–(C) of the Act, and further, failed to cooperate by not acting to the best of their ability to comply with the Department's requests for information within the meaning of section 776(b) of the Act. Therefore, we are continuing to apply adverse facts available to the PRC-wide entity. *See* Issues and Decision Memorandum for further discussion.

**Disclosure**

We intend to disclose to parties the calculations performed in this proceeding within five days of the date of publication of this notice in accordance with 19 CFR 351.224(b).

**Separate Rate**

The rate assigned to companies granted separate rate status that were not individually examined is normally determined based on the weighted-average of the estimated dumping margins calculated for exporters and producers individually investigated, excluding zero and *de minimis* margins or margins based entirely on facts available (FA).[16] In this investigation,

we calculated above *de minimis* estimated weighted-average dumping margins that are not based on total FA for the two mandatory respondents, Trina Solar and Renesola/Jinko. Because we individually examined two companies in this investigation, basing the estimated dumping margin for the companies not individually examined on a weighted-average of the dumping margins for the two individually examined companies risks disclosure of business proprietary information (BPI). Therefore, we calculated both a weighted-average of the dumping margins calculated for the two mandatory respondents using public values for their sales of subject merchandise and a simple average of these two dumping margins, and selected, as the separate rate, the average that provides a more accurate proxy for the weighted-average margin of both companies calculated using BPI.[17]

**Continuation of Suspension of Liquidation**

In accordance with section 735(c)(1)(B) of the Act, the Department will instruct U.S. Customs and Border Protection (CBP) to continue to suspend liquidation of all appropriate entries of certain solar products from the PRC as described in the ''Scope of the Investigation'' section, which were entered, or withdrawn from warehouse, for consumption on or after July 31, 2014, the date of publication in the **Federal Register** of the notice of an affirmative preliminary determination that certain solar products are being, or are likely to be, sold in the United States at LTFV. Further, consistent with our practice, where the product from the PRC under investigation is also subject to a concurrent countervailing duty (CVD) investigation, the Department will instruct CBP to require a cash deposit [18] equal to the weighted-average amount by which the normal value exceeds U.S. price, adjusted where appropriate for export subsidies and estimated domestic subsidy pass-through.[19] The cash deposit rates, before any adjustments for export subsidies and estimated domestic subsidy pass-through,[20] are as follows: (1) For each

exporter/producer combination listed in the table above, the cash deposit rate will be equal to the dumping margin listed for that exporter/producer combination in the table; (2) for all other combinations of PRC exporters/producers of the merchandise under consideration, the cash deposit rate will be equal to the dumping margin established for the PRC-wide entity; and (3) for all non-PRC exporters of the merchandise under consideration which have not received their own separate rate above, the cash deposit rate will be equal to the cash deposit rate applicable to the PRC exporter/producer combination that supplied that non-PRC exporter. These suspension-of-liquidation instructions will remain in effect until further notice.

**ITC Notification**

In accordance with section 735(d) of the Act, we notified the International Trade Commission (ITC) of the final affirmative determination of sales at LTFV. As the Department's final determination is affirmative, in accordance with section 735(b)(2) of the Act, the ITC will determine, within 45 days, whether the domestic industry in the United States is materially injured, or threatened with material injury, by reason of imports of subject merchandise, or sales (or the likelihood of sales) for importation, of the subject merchandise. If the ITC determines that such injury does not exist, this proceeding will be terminated and all estimated duties deposited as a result of the suspension of liquidation will be refunded. If the ITC determines that such injury does exist, the Department will issue an antidumping duty order directing CBP to assess, upon further instructions by the Department, antidumping duties on all imports of the subject merchandise entered, or withdrawn from warehouse, for consumption on or after the effective date of the suspension of liquidation.

**Return or Destruction of Proprietary Information**

This notice also serves as a reminder to the parties subject to administrative protective order (APO) of their responsibility concerning the disposition of propriety information

Office IV AD/CVD Operations regarding ''Companies Not Receiving a Separate Rate,'' dated July 24, 2014; *see also* Comments 7 and 8 of the Issues and Decision Memorandum.

[15] Those companies are: Beijing Hope Industry, China Sunergy, CNPV, EGing, ENN Solar Energy, Era Solar, Goldpoly (Quanzhou), Himin Holdings, Jetion, Jia Yi Energy Technology, Jiasheng Photovoltaic Tech., Jiutai Energy, Komaes Solar, Leye Photovoltaic Science Tech., Magi Solar Technology, Perfectenergy, Polar Photovoltaics, Qiangsheng (QS Solar), Refine Solar, Risun Solar (JiangXi Ruijing Solar Power Co., Ltd.), Shanghai Chaori Solar Energy, Shangpin Solar, Shanshan Ulica, Shenglong PV-Tech, Shenzhen Global Solar Energy Tech., Shuqimeng Energy Tech., Skybasesolar, Solargiga Energy Holdings Ltd., Sopray Solar, Sunlink PV, Tianjin Jinneng Solar Cell, Topsolar, Trony, Weihai China Glass Solar, and Yuhan Sinosola. For an additional 12 PRC exporters and/or producers of merchandise that were named in the Petition, the Department issued a questionnaire, but did not receive confirmation of delivery. Those companies are: Aiko Solar, Best Solar Hi-tech, Dai Hwa Industrial, Eoplly New Energy, Golden Partner development, Innovosolar, Jiangxi Green Power Co. Ltd., Sanjing Silicon, Sunflower, Sunvim Solar Technology, Yunnan Tianda, and Yunnan Zhuoye Energy. *See* memorandum to the file from Erin Kearney, International Trade Analyst, Office 4, AD/CVD Operations on the subject ''Delivery of Quantity and Value Questionnaires'' dated March 12, 2014.

[16] *See* section 735(c)(5)(A) of the Act.

[17] *See* the December 15, 2014, memorandum from Jeff Pedersen to the File entitled ''Calculation of the Final Margin for Separate Rate Recipients.''

[18] *See* Modification of Regulations Regarding the Practice of Accepting Bonds During the Provisional Measures Period in Antidumping and Countervailing Duty Investigations, 76 FR 61042 (October 3, 2011).

[19] *See* sections 772(c)(1)(C) and 777A(f) of the Act.

[20] With respect to a final affirmative countervailing duty determination in the

companion investigation, because the provisional measures period has expired, Commerce will only order the resumption of the suspension of liquidation, and require cash deposits for countervailing duties equal to the final subsidy rates, if the U.S. International Trade Commission issues a final affirmative injury determination. In the event of a final affirmative injury determination, the Department will make an adjustment to AD cash deposits where appropriate for export subsidies and estimated domestic subsidy pass-through.

disclosed under APO in accordance with 19 CFR 351.305. Timely written notification of return or destruction of APO materials or conversion to judicial protective order is hereby requested. Failure to comply with the regulations and terms of an APO is a sanctionable violation.

This determination is issued and published in accordance with sections 735(d) and 777(i)(1) of the Act.

Dated: December 15, 2014.

**Paul Piquado,**

*Assistant Secretary for Enforcement and Compliance.*

**Appendix**

**List of Topics Discussed in the Issues and Decision Memorandum**

I. Summary
II. Background
III. Scope of the Investigation
IV. Separate Rate Companies
V. Use of Adverse Facts Available
VI. Discussion of the Issues
Comment 1. Scope of the Investigation
Comment 2. Whether to Select South Africa or Thailand as the Primary Surrogate Country
Comment 3. Whether to Offset the Cash Deposit Rate for Export Subsidies
Comment 4. Whether the Department Should Investigate the Effects of the GOC's Alleged Cyberhacking on this Investigation
Comment 5. Ultimate Ownership of Separate Rate Applicants
Comment 6. Separate Rate Applicants with Managers or Board Members with Ties to the Chinese Government
Comment 7. Separate Rate Status of Lianyungang Shenzhou New Energy Co., Ltd.
Comment 8. Separate Rate Status of Sumec Hardware & Tools Co., Ltd.
Comment 9. The Appropriate Surrogate Value for Aluminum Frames
Comment 10. The Appropriate Surrogate Value for Scrap Solar Cells
Comment 11. Unpaid Sales
Comment 12. Quality Insurance
Comment 13. Warranty Costs
Comment 14. Incorrect Allocation of Indirect Material, Labor, and Electricity Consumption
Comment 15. Whether to Base Renesola/Jinko's Dumping Margin on Partial AFA
Comment 16. Whether to Collapse Jinko and Renesola
Comment 17. Whether to Use Market-Economy Purchase Prices to Value all of Renesola/Jinko's Solar Cells
Comment 18. Whether to Adjust Renesola/Jinko's Cash Deposit Rate by the Full Amount of Domestic Subsidies

Comment 19. Separate Rate Application of tenKsolar
VII. Recommendation

[FR Doc. 2014–30092 Filed 12–22–14; 8:45 am]

**BILLING CODE 3510–DS–P**

---

**DEPARTMENT OF COMMERCE**

**National Oceanic and Atmospheric Administration**

**RIN 0648–XD660**

**Takes of Marine Mammals Incidental to Specified Activities; Seabird and Pinniped Research Activities in Central California, 2015–2016**

**AGENCY:** National Marine Fisheries Service (NMFS), National Oceanic and Atmospheric Administration (NOAA), Commerce.

**ACTION:** Notice; proposed incidental harassment authorization; request for comments.

**SUMMARY:** We, NMFS, have received an application from Point Blue Conservation Science (Point Blue) requesting an Incidental Harassment Authorization (Authorization) to take marine mammals, by harassment, incidental to conducting proposed seabird research activities on Southeast Farallon Island, Año Nuevo Island, and Point Reyes National Seashore in central California from January 2015 through January 2016. Per the Marine Mammal Protection Act, we are requesting comments on our proposal to issue an Authorization to Point Blue to incidentally harass, by Level B harassment only, four species of marine mammals during the year-long monitoring project.

**ADDRESSES:** Address comments on the application to Jolie Harrison, Chief, Permits and Conservation Division, Office of Protected Resources, National Marine Fisheries Service, 1315 East-West Highway, Silver Spring, MD 20910. The mailbox address for providing email comments is *ITP.Cody@noaa.gov*. You must include 0648–XD660 in the subject line. We are not responsible for email comments sent to addresses other than the one provided here. Comments sent via email, including all attachments, must not exceed a 25-megabyte file size. NMFS is not responsible for email comments sent to addresses other than the one provided here.

Instructions: All submitted comments are a part of the public record and NMFS will post them to *http://www.nmfs.noaa.gov/pr/permits/incidental/military.htm* without change. All Personal Identifying Information (for

example, name, address, etc.) voluntarily submitted by the commenter may be publicly accessible. Do not submit confidential business information or otherwise sensitive or protected information.

To obtain an electronic copy of the application, a list of the references used in this document, and Point Blue's Authorization request, visit the Internet at: *http://www.nmfs.noaa.gov/pr/permits/incidental/military.htm*.

NMFS prepared an Environmental Assessment (EA) in 2014 titled "Issuance of an Incidental Harassment Authorization to Point Blue Conservation Science and Partners to Take Marine Mammals by Harassment Incidental to Seabird and Pinniped Research Conducted in Central California." We provided relevant environmental information to the public through a notice for a previous proposed authorization (78 FR 66686, November 6, 2013) and considered public comments received in response prior to finalizing our EA.

At that time, NMFS concluded that issuance of an annual Authorization would not significantly affect the quality of the human environment and issued a Finding of No Significant Impact (FONSI) regarding issuing an Authorization for Point Blue's 2014–2015 seabird research activities. In conjunction with Point Blue's 2015–2016 application, NMFS will review the 2014 EA to determine whether supplementation is necessary. Information from Point Blue's application, NMFS' 2014 EA, and this notice collectively provide the environmental information related to a proposed issuance of the Authorization for public review and comment. An electronic copy of the EA for this activity is available upon request (see **ADDRESSES**).

**FOR FURTHER INFORMATION CONTACT:** Jeannine Cody, Office of Protected Resources, NMFS (301) 427–8401.

**SUPPLEMENTARY INFORMATION:** Section 101(a)(5)(D) of the Marine Mammal Protection Act of 1972, as amended (MMPA; 16 U.S.C. 1361 *et seq.*) directs the Secretary of Commerce to allow, upon request, the incidental, but not intentional, taking of small numbers of marine mammals of a species or population stock, by U.S. citizens who engage in a specified activity (other than commercial fishing) within a specified geographical region if, after NMFS provides a notice of a proposed authorization to the public for review and comment: (1) NMFS makes certain findings; and (2) the taking is limited to harassment.

# TAB 17

## <u>Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China</u>, 80 Fed. Reg. 8592 (Dep't Commerce Feb. 18, 2015) (amended final CVD determ. and AD/CVD orders)

## AD P.R. 853, CVD P.R. 417

**8592**      **Federal Register** / Vol. 80, No. 32 / Wednesday, February 18, 2015 / Notices

*bis.doc.gov* no later than February 26, 2015.

A limited number of seats will be available during the public session of the meeting. Reservations are not accepted. To the extent time permits, members of the public may present oral statements to the Committee. The public may submit written statements at any time before or after the meeting. However, to facilitate distribution of public presentation materials to Committee members, the Committee suggests that presenters forward the public presentation materials prior to the meeting to Ms. Springer via email.

For more information, call Yvette Springer at (202) 482–2813.

Dated: February 12, 2015.

**Yvette Springer,**

*Committee Liaison Officer.*

[FR Doc. 2015–03325 Filed 2–17–15; 8:45 am]

**BILLING CODE 3510–JT–P**

---

**DEPARTMENT OF COMMERCE**

**Bureau of Industry and Security**

**Technical Advisory Committees; Notice of Recruitment of Private-Sector Members**

**SUMMARY:** Seven Technical Advisory Committees (TACs) advise the Department of Commerce on the technical parameters for export controls applicable to dual-use commodities and technology and on the administration of those controls. The TACs are composed of representatives from industry representatives, academic leaders and U.S. Government representing diverse points of view on the concerns of the exporting community. Industry representatives are selected from firms producing a broad range of goods, technologies, and software presently controlled for national security, non-proliferation, foreign policy, and short supply reasons or that are proposed for such controls, balanced to the extent possible among large and small firms.

TAC members are appointed by the Secretary of Commerce and serve terms of not more than four consecutive years. The membership reflects the Department's commitment to attaining balance and diversity. TAC members must obtain secret-level clearances prior to appointment. These clearances are necessary so that members may be permitted access to the classified information needed to formulate recommendations to the Department of Commerce. Each TAC meets approximately four times per year. Members of the Committees will not be compensated for their services.

The seven TACs are responsible for advising the Department of Commerce on the technical parameters for export controls and the administration of those controls within the following areas: Information Systems TAC: Control List Categories 3 (electronics), 4 (computers), and 5 (telecommunications and information security); Materials TAC: Control List Category 1 (materials, chemicals, microorganisms, and toxins); Materials Processing Equipment TAC: Control List Category 2 (materials processing); Regulations and Procedures TAC: The Export Administration Regulations (EAR) and Procedures for implementing the EAR; Sensors and Instrumentation TAC: Control List Category 6 (sensors and lasers); Transportation and Related Equipment TAC: Control List Categories 7 (navigation and avionics), 8 (marine), and 9 (propulsion systems, space vehicles, and related equipment) and the Emerging Technology and Research Advisory Committee: (1) The identification of emerging technologies and research and development activities that may be of interest from a dual-use perspective; (2) the prioritization of new and existing controls to determine which are of greatest consequence to national security; (3) the potential impact of dual-use export control requirements on research activities; and (4) the threat to national security posed by the unauthorized exports of technologies.

To respond to this recruitment notice, please send a copy of your resume to Ms. Yvette Springer at *Yvette.Springer@ bis.doc.gov*.

*Deadline:* This Notice of Recruitment will be open for one year from its date of publication in the **Federal Register**.

**FOR FURTHER INFORMATION CONTACT:** Ms. Yvette Springer on (202) 482–2813.

Dated: February 12, 2015.

**Yvette Springer,**

*Committee Liaison Officer.*

[FR Doc. 2015–03323 Filed 2–17–15; 8:45 am]

**BILLING CODE 3510–JT–P**

---

**DEPARTMENT OF COMMERCE**

**International Trade Administration**

**[A–570–010, C–570–011]**

**Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China: Antidumping Duty Order; and Amended Final Affirmative Countervailing Duty Determination and Countervailing Duty Order**

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** Based on affirmative final determinations by the Department of Commerce (the Department) and the International Trade Commission (the ITC), the Department is issuing antidumping duty (AD) and countervailing duty (CVD) orders on certain crystalline silicon photovoltaic products (certain solar products) from the People's Republic of China (the PRC). Also, as explained in this notice, the Department is amending its final affirmative CVD determination to correct an error regarding the inclusion of a subsidy program that was not properly reflected on the record of the CVD investigation.

**DATES:** *Effective Date:* February 18, 2015.

**FOR FURTHER INFORMATION CONTACT:** Jeff Pedersen at (202) 482–2769 or Thomas Martin at (202) 482–3936 (AD); or Gene Calvert at (202) 482–3586 or Justin Neuman at (202) 482–0486 (CVD), AD/ CVD Operations, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 14th Street and Constitution Avenue NW., Washington, DC 20230.

**SUPPLEMENTARY INFORMATION:**

**Background**

On December 23, 2014, the Department published its affirmative final determination of sales at less than fair value (LTFV) in the AD investigation of certain solar products from the PRC,[1] and its final affirmative determination that countervailable subsidies are being provided to producers and exporters of certain solar products from the PRC.[2] On February 5, 2015, the ITC notified the Department of its final determination pursuant to

---

[1] *See Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China: Final Determination of Sales at Less Than Fair Value,* 79 FR 76970 (December 23, 2014).

[2] *See Countervailing Duty Investigation of Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China: Final Affirmative Countervailing Duty Determination,* 79 FR 76962 (December 23, 2014) (*CVD Final Determination*).

sections 735(d) and 705(d) of the Tariff Act of 1930, as amended (the Act), that an industry in the United States is materially injured within the meaning of sections 735(b)(1)(A)(i) and 705(b)(1)(A)(i) of the Act by reason of LTFV imports and subsidized imports of subject merchandise from the PRC.[3]

## Scope of the Orders

The merchandise covered by these orders are modules, laminates and/or panels consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including building integrated materials. For purposes of these orders, subject merchandise includes modules, laminates and/or panels assembled in the PRC consisting of crystalline silicon photovoltaic cells produced in a customs territory other than the PRC.

Subject merchandise includes modules, laminates and/or panels assembled in the PRC consisting of crystalline silicon photovoltaic cells of thickness equal to or greater than 20 micrometers, having a p/n junction formed by any means, whether or not the cell has undergone other processing, including, but not limited to, cleaning, etching, coating, and/or addition of materials (including, but not limited to, metallization and conductor patterns) to collect and forward the electricity that is generated by the cell.

Excluded from the scope of these orders are thin film photovoltaic products produced from amorphous silicon (a-Si), cadmium telluride (CdTe), or copper indium gallium selenide (CIGS). Also excluded from the scope of these orders are modules, laminates and/or panels assembled in the PRC, consisting of crystalline silicon photovoltaic cells, not exceeding 10,000 mm$^2$ in surface area, that are permanently integrated into a consumer good whose function is other than power generation and that consumes the electricity generated by the integrated crystalline silicon photovoltaic cells. Where more than one module, laminate and/or panel is permanently integrated into a consumer good, the surface area for purposes of this exclusion shall be the total combined surface area of all modules, laminates and/or panels that are integrated into the consumer good. Further, also excluded from the scope of these orders are any products covered by the existing antidumping and countervailing duty orders on crystalline silicon photovoltaic cells,

whether or not assembled into modules, laminates and/or panels, from the PRC.[4]

Merchandise covered by these orders is currently classified in the Harmonized Tariff Schedule of the United States (HTSUS) under subheadings 8501.61.0000, 8507.20.8030, 8507.20.8040, 8507.20.8060, 8507.20.8090, 8541.40.6020, 8541.40.6030 and 8501.31.8000. These HTSUS subheadings are provided for convenience and customs purposes; the written description of the scope of these orders is dispositive.

## Amendment to the CVD Final Determination

On December 23, 2014, the Department published its affirmative final determination in the CVD investigation.[5] On December 24, 2014, Changzhou Trina Solar Energy Co., Ltd. (Trina Solar) and Wuxi Suntech Power Co., Ltd. (Wuxi Suntech), respondents in the CVD investigation, submitted timely ministerial error allegations and requested that the Department correct the alleged ministerial errors in the subsidy margin calculations.[6] On December 29, 2014, SolarWorld Americas, Inc., the petitioner in the CVD investigation, submitted timely rebuttal comments on Trina Solar's and Wuxi Suntech's allegations.[7] No other interested party submitted ministerial error allegations or replied to Trina Solar's or Wuxi Suntech's submissions.

After analyzing comments and rebuttals from all interested parties, we determined, in accordance with section 705(e) of the Act and 19 CFR 351.224(e), that we made a ministerial error in our calculations for the *CVD Final Determination* with respect to Trina

Solar. At the verification of Trina Solar's questionnaire responses, we discovered unreported subsidy programs in Trina Solar's accounting system. We translated certain line items from that accounting system at verification and found that every translated line item represented a countervailable subsidy in our *CVD Final Determination*. In so doing, we inadvertently countervailed a subsidy program that did not appear among the list of translated subsidy programs submitted as a verification exhibit.[8] This amended final CVD determination corrects this error and revises the *ad valorem* subsidy rate for Trina Solar.

In the *CVD Final Determination*, we based the estimated subsidy rate for "all others" by calculating the simple average of Trina Solar's and Wuxi Suntech's estimated subsidy rates.[9] Because the subsidy rate for all others is based on the rates for Trina Solar and Wuxi Suntech, and the rate for Trina Solar changed because of the aforementioned ministerial error, we have revised the calculation for the estimated subsidy rate for all others in this amended final CVD determination.[10] The amended estimated *ad valorem* subsidy rates are provided below.

## Antidumping Duty Order

As stated above, on February 5, 2015, in accordance with section 735(d) of the Act, the ITC notified the Department of its final determination in this investigation, in which it found that an industry in the United States is materially injured within the meaning of section 735(b)(1)(A)(i) of the Act by reason of imports of certain solar products from the PRC.[11] Because the ITC determined that imports of certain solar products from the PRC are materially injuring a U.S. industry, unliquidated entries of such merchandise from the PRC, entered or withdrawn from warehouse, for consumption are subject to the assessment of antidumping duties.

Therefore, in accordance with section 736(a)(1) of the Act, the Department will direct U.S. Customs and Border Protection (CBP) to assess, upon further instruction by the Department, antidumping duties equal to the amount

---

[3] *See* the ITC Notification Letter to the Deputy Assistant Secretary for Enforcement and Compliance referencing ITC Investigation Nos. 701–TA–511 and 731–TA–1246–1247 (February 5, 2015).

[4] *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order,* 77 FR 73018 (December 7, 2012); *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Countervailing Duty Order,* 77 FR 73017 (December 7, 2012).

[5] *See CVD Final Determination.*

[6] *See* the Letter to the Secretary from Trina Solar, "Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: Ministerial Errors Allegation," (December 24, 2014); *see also* the Letter to the Secretary from Wuxi Suntech, "Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: Ministerial Error Comments of Wuxi Suntech Power Co., Ltd.," (December 24, 2014).

[7] *See* the Letter to the Secretary, "Crystalline Silicon Photovoltaic Products from the People's Republic of China: Response to Trina's Ministerial Error Allegation," (December 29, 2014); *see also* the Letter to the Secretary, "Crystalline Silicon Photovoltaic Products from the People's Republic of China: Response to Suntech's Ministerial Error Comments," (December 29, 2014).

[8] For a detailed discussion of all alleged ministerial errors, as well as the Department's analysis, *see* the memorandum, "Amended Final Determination in the Countervailing Duty Investigation of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: Ministerial Error Memorandum," (February 6, 2015) (Ministerial Error Memorandum).

[9] *See CVD Final Determination,* 79 FR at 76964.

[10] *See* Ministerial Error Memorandum at 10.

[11] *See ITC Determination.*

by which the normal value of the merchandise exceeds the export price (or constructed export price) of the merchandise, for all relevant entries of certain solar products from the PRC. These antidumping duties will be assessed on unliquidated entries of certain solar products from the PRC entered, or withdrawn from warehouse, for consumption on or after July 31, 2014, the date of publication of the *AD Preliminary Determination*,[12] but will not include entries occurring after the expiration of the provisional measures period and before publication of the ITC's final injury determination as further described below.

**Continuation of Suspension of Liquidation (AD)**

In accordance with section 735(c)(1)(B) of the Act, the Department will instruct CBP to continue to suspend liquidation of all appropriate entries of certain solar products from the PRC as described in the "Scope of the Orders" section, which were entered, or withdrawn from warehouse, for consumption on or after July 31, 2014, the date of publication in the **Federal Register** of the notice of an affirmative preliminary determination that certain solar products are being, or are likely to be, sold in the United States at LTFV. Further, consistent with our practice, where the product from the PRC under investigation is also subject to a concurrent CVD investigation, the Department will instruct CBP to require a cash deposit [13] equal to the weighted-average amount by which the normal value exceeds U.S. price, adjusted where appropriate for export subsidies

and estimated domestic subsidy pass-through.[14] The cash deposit rates, before any adjustments for export subsidies and estimated domestic subsidy pass-through, are as follows: (1) For each exporter/producer combination listed in the table below, the cash deposit rate will be equal to the dumping margin listed for that exporter/producer combination in the table; (2) for all other combinations of PRC exporters/producers of the merchandise under consideration, the cash deposit rate will be equal to the dumping margin established for the PRC-wide entity; and (3) for all non-PRC exporters of the merchandise under consideration which have not received their own separate rate above, the cash deposit rate will be equal to the cash deposit rate applicable to the PRC exporter/producer combination that supplied that non-PRC exporter. These suspension-of-liquidation instructions will remain in effect until further notice.

Accordingly, effective on the date of publication of the ITC's final affirmative injury determination, CBP will require, at the same time as importers would normally deposit estimated duties on this subject merchandise, a cash deposit equal to the estimated weighted-average dumping margins indicated below, adjusted, where appropriate, for export subsidies and estimated domestic subsidy pass-through, as discussed above.[15]

**Provisional Measures (AD)**

Section 733(d) of the Act states that instructions issued pursuant to an affirmative preliminary determination in an AD investigation may not remain

in effect for more than four months except where exporters representing a significant proportion of exports of the subject merchandise request the Department to extend that four-month period to no more than six months. At the request of exporters that account for a significant proportion of certain solar products from the PRC, we extended the four-month period to no more than six months in this case.[16] As stated above, in the investigation covering certain solar products from the PRC, the Department published the preliminary determination in the AD investigation on July 31, 2014. Therefore, the six-month period beginning on the date of publication of the preliminary determination in the AD investigation ended on January 27, 2015. Furthermore, section 737(b) of the Act states that definitive duties are to begin on the date of publication of the ITC's final injury determination.

Therefore, in accordance with section 733(d) of the Act and our practice, we will instruct CBP to terminate the suspension of liquidation and to liquidate, without regard to antidumping duties, unliquidated entries of certain solar products from the PRC, entered, or withdrawn from warehouse, for consumption on or after January 27, 2015, the date the provisional measures expired, until and through the day preceding the date of publication of the ITC's final injury determination in the **Federal Register**.

**Estimated Weighted-Average Dumping Margins**

The estimated weighted-average dumping margins are as follows:

| Exporter | Producer | Weighted-average dumping margin (percent) |
|---|---|---|
| Changzhou Trina Solar Energy Co., Ltd./Trina Solar (Changzhou) Science & Technology Co., Ltd. | Changzhou Trina Solar Energy Co., Ltd./Trina Solar (Changzhou) Science & Technology Co., Ltd. | 26.71 |
| Renesola Jiangsu Ltd./Renesola Zhejiang Ltd./Jinko Solar Co. Ltd./Jinko Solar Import and Export Co., Ltd. | Renesola Jiangsu Ltd./Jinko Solar Co. Ltd .......................... | 78.42 |
| Anji DaSol Solar Energy Science & Technology Co., Ltd ..... | Anji DaSol Solar Energy Science & Technology Co., Ltd ..... | 52.13 |
| Asun Energy Co., Ltd. (a/k/a Suzhou Asun Energy Co., Ltd.) | Asun Energy Co., Ltd. (a/k/a Suzhou Asun Energy Co., Ltd.). | 52.13 |
| Baoding Tianwei Yingli New Energy Resources Co. , Ltd .... | Baoding Tianwei Yingli New Energy Resources Co., Ltd., Yingli Energy (China) Co., Ltd., and Lixian Yingli New Energy Co., Ltd. | 52.13 |
| BYD (Shangluo) Industrial Co., Ltd ........................................ | BYD (Shangluo) Industrial Co., Ltd .................................... | 52.13 |
| Canadian Solar International Limited ...................................... | Canadian Solar Manufacturing (Luoyang) Inc., Canadian Solar Manufacturing (Changshu), Inc. | 52.13 |

---

[12] *See Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China: Affirmative Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination*, 79 FR 44399 (July 31, 2014) (*AD Preliminary Determination*).

[13] *See* Modification of Regulations Regarding the Practice of Accepting Bonds During the Provisional Measures Period in Antidumping and

Countervailing Duty Investigations, 76 FR 61042 (October 3, 2011).

[14] *See* sections 772(c)(1)(C) and 777A(f) of the Act.

[15] With respect to the final affirmative countervailing duty determination in the companion investigation, because the provisional measures period has expired, the Department will only order the resumption of the suspension of liquidation, and require cash deposits for

countervailing duties equal to the final subsidy rates, upon issuance of a final affirmative injury determination by the ITC. As a result, the Department will make an adjustment to AD cash deposits, where appropriate, for export subsidies and estimated domestic subsidy pass-through as of the date of publication of the ITC's final affirmative injury determination.

[16] *See AD Preliminary Determination*, 79 FR at 44396.

| Exporter | Producer | Weighted-average dumping margin (percent) |
|---|---|---|
| Canadian Solar Manufacturing (Changshu), Inc ................... | Canadian Solar Manufacturing (Changshu), Inc ................... | 52.13 |
| Canadian Solar Manufacturing (Luoyang) Inc ........................ | Canadian Solar Manufacturing (Luoyang) Inc ........................ | 52.13 |
| CEEG Nanjing Renewable Energy Co., Ltd ......................... | CEEG Nanjing Renewable Energy Co., Ltd ......................... | 52.13 |
| Changzhou Almaden Co., Ltd ............................................. | Changzhou Almaden Co., Ltd ............................................. | 52.13 |
| Chint Solar (Zhejiang) Co., Ltd .......................................... | Chint Solar (Zhejiang) Co., Ltd .......................................... | 52.13 |
| ET Solar Industry Limited ................................................... | ET Solar Industry Limited ................................................... | 52.13 |
| Hainan Yingli New Energy Resources Co. Ltd ................... | Hainan Yingli New Energy Resources Co. Ltd ................... | 52.13 |
| Hangzhou Zhejiang University Sunny Energy Science and Technology Co., Ltd. | Hangzhou Zhejiang University Sunny Energy Science and Technology Co., Ltd. | 52.13 |
| Hanwha SolarOne (Qidong) Co., Ltd ................................. | Hanwha SolarOne (Qidong) Co., Ltd ................................. | 52.13 |
| Hanwha SolarOne Hong Kong Limited ............................... | Hanwha SolarOne (Qidong) Co., Ltd ................................. | 52.13 |
| Hefei JA Solar Technology Co., Ltd ................................... | Hefei JA Solar Technology Co., Ltd ................................... | 52.13 |
| Hengdian Group DMEGC Magnetics Co., Ltd .................... | Hengdian Group DMEGC Magnetics Co., Ltd .................... | 52.13 |
| Hengshui Yingli New Energy Resources Company Limited .. | Hengshui Yingli New Energy Resources Company Limited .. | 52.13 |
| Jiangyin Hareon Power Co., Ltd ........................................ | Jiangyin Xinhui Solar Co., Ltd.; Altusvia Energy Taicang Co., Ltd.; Hareon Solar Technology Co., Ltd. | 52.13 |
| Jiawei Solarchina Co., Ltd ................................................. | Jiawei Solarchina (Shenzhen) Co., Ltd .............................. | 52.13 |
| Jiawei Technology (HK) Ltd ................................................ | Shenzhen Jiawei Photovoltaic Lighting Co. Ltd ................. | 52.13 |
| LDK Solar Hi-Tech (Nanchang) Co., Ltd ........................... | LDK Solar Hi-Tech (Nanchang) Co., Ltd ........................... | 52.13 |
| Lixian Yingli New Energy Company Ltd .............................. | Lixian Yingli New Energy Company Ltd .............................. | 52.13 |
| MOTECH (Suzhou) Renewable Energy Co., Ltd ................ | MOTECH (Suzhou) Renewable Energy Co., Ltd ................ | 52.13 |
| Ningbo Qixin Solar Electrical Appliance Co., Ltd ............... | Ningbo Qixin Solar Electrical Appliance Co., Ltd ............... | 52.13 |
| Perlight Solar Co., Ltd ....................................................... | Perlight Solar Co., Ltd ....................................................... | 52.13 |
| Risen Energy Co., Ltd ....................................................... | Risen Energy Co., Ltd ....................................................... | 52.13 |
| Shanghai JA Solar Technology Co., Ltd ............................ | Shanghai JA Solar Technology Co., Ltd ............................ | 52.13 |
| Shanghai Solar Energy Science & Technology Co., Ltd ....... | Lianyungang Shenzhou New Energy Co., Ltd .................... | 52.13 |
| Shenzhen Jiawei Photovoltaic Lighting Co. Ltd ................. | Shenzhen Jiawei Photovoltaic Lighting Co. Ltd ................. | 52.13 |
| Shenzhen Sungold Solar Co., Ltd ..................................... | Shenzhen Sungold Solar Co., Ltd ..................................... | 52.13 |
| Shenzhen Topray Solar Co., Ltd ....................................... | Shenzhen Topray Solar Co., Ltd ....................................... | 52.13 |
| Sun Earth Solar Power Co., Ltd ........................................ | Sun Earth Solar Power Co., Ltd ........................................ | 52.13 |
| Sunny Apex Development Ltd ............................................. | Shenzhen Jiawei Photovoltaic Lighting Co. Ltd.,, ............... Wuhan FYY Technology Co., Ltd .................................... | 52.13 |
| SunPower Systems SARL ................................................... | SunEnergy (S.Z.) Co., Ltd ................................................. | 52.13 |
| tenKsolar (Shanghai) Co., Ltd ........................................... | tenKsolar (Shanghai) Co., Ltd ........................................... | 52.13 |
| Upsolar Global Co., Ltd. and including Upsolar Group, Co., Ltd. | Shandong Dahai Group Co. Ltd ....................................... | 52.13 |
| Wanxiang Import & Export Co., Ltd ................................... | Zhejiang Wanxiang Solar Co., Ltd .................................... | 52.13 |
| Wuhan FYY Technology Co., Ltd ....................................... | Wuhan FYY Technology Co., Ltd ....................................... | 52.13 |
| Wuxi Suntech Power Co., Ltd ............................................ | Wuxi Suntech Power Co., Ltd ............................................ | 52.13 |
| Yingli Energy (China) Company Limited ............................. | Yingli Energy (China) Company Limited, Baoding Tianwei Yingli New Energy Resources Co. , Ltd. and Lixian Yingli New Energy Co. , Ltd. | 52.13 |
| Yingli Green Energy International Trading Limited ................ | Yingli Energy (China) Company Limited, Baoding Tianwei Yingli New Energy Resources Co., Ltd.,. and Hainan Yingli New Energy Resources Co., Ltd .............. | 52.13 |
| Zhongli Talesun Solar Co., Ltd .......................................... | Zhongli Talesun Solar Co., Ltd .......................................... | 52.13 |
| PRC-Wide Rate | | 165.04 |

## Countervailing Duty Order

As stated above, on February 5, 2015, in accordance with section 705(d) of the Act, the ITC notified the Department of its final determination in this investigation, in which it found that an industry in the United States is materially injured within the meaning of section 705(b)(1)(A)(i) of the Act by reason of imports of certain solar products from the PRC.[17]

Therefore, in accordance with section 706(a) of the Act, the Department will direct CBP to assess, upon further instruction by the Department, countervailing duties equal to the amounts listed below for all relevant entries of certain solar products from the PRC. These countervailing duties will be assessed on unliquidated entries of certain solar products from the PRC entered, or withdrawn from warehouse, for consumption on or after June 10, 2014, the date of publication of the *CVD Preliminary Determination*,[18] and before October 8, 2014, the date on which the Department instructed CBP to discontinue the suspension of liquidation in accordance with section 703(d) of the Act. Section 703(d) of the Act states that the suspension of liquidation pursuant to a preliminary determination may not remain in effect for more than four months. Entries of certain solar products from the PRC made on or after October 8, 2014, and prior to the date of publication of the ITC's final determination in the **Federal Register** are not liable for the assessment of countervailing duties, due to the Department's discontinuation, effective October 8, 2014, of the suspension of liquidation.

## Suspension of Liquidation (CVD)

In accordance with section 706 of the Act, we will instruct CBP to reinstitute the suspension of liquidation on all relevant entries of certain solar products from the PRC. We will also instruct CBP

---

[17] *See* ITC Determination.

[18] *See Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China: Preliminary Affirmative Countervailing Duty Determination,* 79 FR 33174 (June 10, 2014) (*CVD Preliminary Determination*).

to require cash deposits equal to the amounts indicated below. These instructions suspending liquidation will remain in effect until further notice. Accordingly, effective on the date of publication of the ITC's final affirmative injury determination, CBP will require, at the same time as importers would normally deposit estimated duties on this subject merchandise, cash deposits equal to the amounts indicated below: [19]

| Company | Subsidy rate (percent) (*ad valorem*) |
|---|---|
| Wuxi Suntech Power Co., Ltd | 27.64 |
| Changzhou Trina Solar Energy Co., Ltd | 49.21 |
| All Others | 38.43 |

**Notifications to Interested Parties**

This notice constitutes the antidumping duty and countervailing duty orders with respect to certain solar products from the PRC pursuant to sections 736(a) and 706(a) of the Act. Interested parties can find an updated list of orders currently in effect by either visiting *http://enforcement.trade.gov/ stats/iastats1.html* or by contacting the Department's Central Records Unit, Room 7046 of the main Commerce Building.

These orders and the amended *CVD Final Determination* are published in accordance with sections 705(e), 706(a), 736(a), and 777(i) of the Act, and 19 CFR 351.211(b) and 351.224(e).

Dated: February 10, 2015.

**Paul Piquado,**
*Assistant Secretary for Enforcement and Compliance.*

[FR Doc. 2015–03183 Filed 2–17–15; 8:45 am]

**BILLING CODE 3510-DS-P**

---

**DEPARTMENT OF COMMERCE**

**International Trade Administration**

**[A–583–853]**

**Certain Crystalline Silicon Photovoltaic Products From Taiwan: Antidumping Duty Order**

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.
**SUMMARY:** Based on affirmative final determinations by the Department of Commerce (the "Department") and the International Trade Commission (the "ITC"), the Department is issuing an antidumping duty ("AD") order on certain crystalline silicon photovoltaic

products ("certain solar products") from Taiwan.
**DATES:** *Effective Date:* February 18, 2015.

**FOR FURTHER INFORMATION CONTACT:** Charles Riggle or Magd Zalok AD/CVD Operations, Enforcement and Compliance, U.S. Department of Commerce, 14th Street and Constitution Avenue NW., Washington, DC 20230; telephone: (202) 482–0650 or (202) 482–4162.

**SUPPLEMENTARY INFORMATION:**

**Background**

In accordance with sections 735(d) and 777(i)(1) of the Tariff Act of 1930, as amended (the "Act") and 19 CFR 351.210(c), on December 23, 2014, the Department published an affirmative final determination of sales at less than fair value ("LTFV") in the investigation of certain solar products from Taiwan.[1] On February 5, 2015, the ITC notified the Department of its affirmative determinations that an industry in the United States is materially injured within the meaning of section 735(b)(1)(A)(i) of the Act by reason of LTFV imports of certain solar products from the People's Republic of China and Taiwan.[2]

**Scope of the Order**

The merchandise covered by this order is crystalline silicon photovoltaic cells, and modules, laminates and/or panels consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including building integrated materials.

Subject merchandise includes crystalline silicon photovoltaic cells of thickness equal to or greater than 20 micrometers, having a p/n junction formed by any means, whether or not the cell has undergone other processing, including, but not limited to, cleaning, etching, coating, and/or addition of materials (including, but not limited to, metallization and conductor patterns) to collect and forward the electricity that is generated by the cell.

Modules, laminates, and panels produced in a third-country from cells produced in Taiwan are covered by this investigation. However, modules, laminates, and panels produced in Taiwan from cells produced in a third-country are not covered by this investigation.

Excluded from the scope of this investigation are thin film photovoltaic products produced from amorphous silicon (a-Si), cadmium telluride (CdTe), or copper indium gallium selenide (CIGS). Also excluded from the scope of this investigation are crystalline silicon photovoltaic cells, not exceeding 10,000 $mm^2$ in surface area, that are permanently integrated into a consumer good whose function is other than power generation and that consumes the electricity generated by the integrated crystalline silicon photovoltaic cells. Where more than one cell is permanently integrated into a consumer good, the surface area for purposes of this exclusion shall be the total combined surface area of all cells that are integrated into the consumer good.

Further, also excluded from the scope of this investigation are any products covered by the existing antidumping and countervailing duty orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the People's Republic of China ("PRC").[3] Also excluded from the scope of this investigation are modules, laminates, and panels produced in the PRC from crystalline silicon photovoltaic cells produced in Taiwan that are covered by an existing proceeding on such modules, laminates, and panels from the PRC.

Merchandise covered by this investigation is currently classified in the Harmonized Tariff Schedule of the United States ("HTSUS") under subheadings 8501.61.0000, 8507.20.8030, 8507.20.8040, 8507.20.8060, 8507.20.8090, 8541.40.6020, 8541.40.6030 and 8501.31.8000. These HTSUS subheadings are provided for convenience and customs purposes; the written description of the scope of this investigation is dispositive.

**Antidumping Duty Order**

As stated above, on February 5, 2015, in accordance with section 735(d) of the Act, the ITC notified the Department of its final determination in its investigation, in which it found that an industry in the United States is materially injured by reason of imports of certain solar products from Taiwan. Because the ITC determined that imports of certain solar products from

---

[19] *See* section 706(a)(3) of the Act.

[1] *See Certain Crystalline Silicon Photovoltaic Products: Final Determination of Sales at Less Than Fair Value,* 79 FR 76966 (December 23, 2014).

[2] *See* ITC Notification letter to the Deputy Assistant Secretary for Enforcement and Compliance referencing ITC Investigation Nos. 701–TA–511 and 731–TA–1246–1247 (Final).

[3] *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order,* 77 FR 73018 (December 7, 2012); *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Countervailing Duty Order,* 77 FR 73017 (December 7, 2012).