UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE JUDGE DONALD C. POGUE, SENIOR JUDGE

_____

| | |
|---|---|
| SUNPOWER CORPORATION and ) | |
| SUNPOWER CORPORATION, SYSTEMS, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| and ) | |
| ) | |
| SUNIVA, INC., *ET AL.*, ) | |
| ) | |
| Consolidated Plaintiffs, ) | |
| ) | |
| and ) | |
| ) | |
| CANADIAN SOLAR INC., *ET AL.*, ) | |
| ) | |
| Plaintiff-Intervenors, ) | |
| ) | |
| v. ) | Consol. Court No. 15-00067 |
| ) | |
| UNITED STATES, ) | |
| ) | |
| Defendant, ) | |
| ) | |
| and ) | |
| ) | |
| SOLARWORLD AMERICAS, INC., ) | |
| ) | |
| Defendant-Intervenor. ) | |

_____)

## <u>ORDER</u>

Upon consideration of plaintiffs', consolidated plaintiff's, and plaintiff-intervenors'

motions for judgment upon the administrative record, responses thereto, replies, and all other

papers, it is hereby

ORDERED that the motions are denied, and it is further

ORDERED that judgment shall enter in favor of the United States.

Dated: _____, 2016          _____
       New York, New York                              SENIOR JUDGE

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE JUDGE DONALD C. POGUE, SENIOR JUDGE
_____

| | |
|---|---|
| SUNPOWER CORPORATION and | ) |
| SUNPOWER CORPORATION, SYSTEMS, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| and | ) |
| | ) |
| SUNIVA, INC., *ET AL.*, | ) |
| | ) |
| Consolidated Plaintiffs, | ) |
| | ) |
| and | ) |
| | ) |
| CANADIAN SOLAR INC., *ET AL.*, | ) |
| | ) |
| Plaintiff-Intervenors, | ) |
| | ) |
| v. | )  Consol. Court No. 15-00067 |
| | ) |
| UNITED STATES, | ) |
| | ) |
| Defendant, | ) |
| | ) |
| and | ) |
| | ) |
| SOLARWORLD AMERICAS, INC., | ) |
| | ) |
| Defendant-Intervenor. | ) |
_____)

## DEFENDANT'S OPPOSITION TO
## MOTIONS FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General

JEANNE E. DAVIDSON
Director

REGINALD T. BLADES, JR.
Assistant Director

OF COUNSEL:

REBECCA CANTU
Senior Attorney
Office of the Chief Counsel
   for Trade Enforcement & Compliance
U.S. Department of Commerce

MELISSA M. DEVINE
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 616-0341
Fax: (202) 514-8624
Email:  melissa.m.devine@usdoj.gov

February 9, 2016

Attorneys for Defendant

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................... ii

STATEMENT PURSUANT TO RULE 56.2 ......................................................... 2

    I.   Administrative Determinations Under Review .................................................. 2

    II.  Issue Presented For Review ............................................................................ 3

STATEMENT OF FACTS ...................................................................................... 3

    I.   *Solar I* Investigations .................................................................................... 3

    II.  *Solar II* Investigations .................................................................................. 5

        A.  Initiations And Preliminary Determinations ................................................. 5

        B.   Commerce's Proposed Scope Clarification .................................................. 8

        C.  Final Determinations And Orders ................................................................ 9

        D.  The Present Action .................................................................................... 10

SUMMARY OF THE ARGUMENT ..................................................................... 11

ARGUMENT ......................................................................................................... 14

    I.   Standard Of Review ....................................................................................... 14

    II.  Legal Framework Of Scope Determinations In Investigations ........................ 15

        A.   Country Of Origin ...................................................................................... 17

        B.   Imposition Of Antidumping and Countervailing Duty Orders ................... 19

    III.  Commerce's Final Scope Determination Is Supported By Substantial Evidence And In Accordance With Law ........................................................................... 20

        A.   Commerce Provided A Reasonable Explanation For Departing From A Substantial Transformation Analysis ........................................................................... 20

        B.  Commerce Provided An Adequate Explanation Of Its Country-Of-Origin Analysis.... 26

        C.  Commerce's Scope Clarification Is Consistent With Petitioner's Intent ...................... 29

        D.   Commerce's Consideration of Administrability, Enforcement, And Evasion In Its Country-Of-Origin Analysis Is Reasonable ................................................. 32

        E.   Commerce Reasonably Exercised Its Authority To Clarify The Scope In Its Final Determination ......................................................................................... 36

    IV.   Commerce's Determinations Regarding Modules Assembled In China Using United States Solar Cells Is Reasonable .................................................................. 46

    V.  .SunPower And Suniva Fail To Demonstrate Error In Commerce's Instructions to CBP Or Improper Suspension of Liquidation ................................................................. 48

    VI.   This Court Should Not Direct Commerce To Revoke The *Solar II* Orders .................. 50

    VII.  The Legality Of The Scope Language Proposed In The Petition Is Irrelevant ............. 51

CONCLUSION ...................................................................................................... 51

i

# TABLE OF AUTHORITIES

## Cases

*Ad Hoc Shrimp Trade Action Comm. v. United States,*
  637 F. Supp. 2d 1166 (Ct. Int'l Trade 2009) ........................................ 16, 17, 41

*Advanced Tech. & Materials Co. v. United States,*
  No. 09-00511, 2011 WL 5191016 (Ct. Int'l Trade Oct. 12, 2011)........................................ 18

*Aleaciones Laminadas, C.A. v. United States,*
  966 F.2d 660 (Fed. Cir. 1992)........................................ 35

*Allegheny Bradford Corp. v. United States,*
  342 F. Supp. 2d 1172 (Ct. Int'l Trade 2004) ........................................ 16, 39, 41

*Aluminum Extrusions Fair Trade Comm. v. United States,*
  938 F. Supp. 2d 1337 (Ct. Int'l Trade 2013) ........................................ 45

*Am. Ass'n of Exps. & Importers-Textile & Apparel Grp. v. United States,*
  751 F.2d 1239 (Fed. Cir. 1985)........................................ 36

*AMS Assocs. v. United States,*
  881 F. Supp. 2d 1374 (Ct. Int'l Trade 2012) ........................................ 15, 21

*Appleton Papers Inc. v. United States,*
  929 F. Supp. 2d 1329 (Ct. Int'l Trade 2013) ........................................ 19, 32, 34

*Borden, Inc. v. United States,*
  23 Ct. Int'l Trade 372 (1999)........................................ 38

*Bowman Transp., Inc. v. Ark.–Best Freight Sys., Inc.,*
  419 U.S. 281 (1974)........................................ 27, 47

*Canadian Wheat Bd. v. United States,*
  641 F.3d 1344 (Fed. Cir. 2011)........................................ 24, 36

*Ceramark Tech., Inc. v. United States,*
  61 F. Supp. 3d 1371 (Ct. Int'l Trade 2015) ........................................ 45

*Ceramica Regiomontana, S.A. v. United States,*
  64 F.3d 1579 (Fed. Cir. 1995)........................................ 24, 36

*Chevron U.S.A., Inc. v. Natural Res. Def. Council,*
  467 U.S. 837 (1984)........................................ 35

*Cleo Inc. v. United States,*
  30 Ct. Int'l Trade 1380 (2006)........................................ 19

*Co-Steel Raritan, Inc. v. ITC,*
  357 F.3d 1294 (Fed. Cir. 2004)........................................ 42

*Consol. Edison Co. of N.Y. v. NLRB,*
  305 U.S. 197 (1938)........................................ 15

*Consolo v. Fed. Mar. Comm'n,*
 383 U.S. 607 (1966) .............................................................................. 15

*Cosco Home & Office Prods. v. United States,*
 350 F. Supp. 2d 1294 (Ct. Int'l Trade 2004) ...................................... 36

*Downhole Pipe & Equip. LP v. United States,*
 887 F. Supp. 2d 1311 (Ct. Int'l Trade 2012) ...................................... 15

*Duferco Steel, Inc. v. United States,*
 296 F.3d 1087 (Fed. Cir. 2002).............................................. 16, 26, 41

*E.I. Du Pont de Nemours & Co. v. United States,*
 8 F. Supp. 2d 854 (Ct. Int'l Trade 1998) ............................ 17, 18, 19, 35

*Engel Indus. v. Lockformer Co.,*
 166 F.3d 1379 (Fed. Cir. 1999).......................................................... 48

*Ericsson GE Mobile Commc'ns, Inc. v. United States,*
 60 F.3d 778 (Fed. Cir. 1995).............................................................. 20

*Jacob Siegel Co. v. FTC,*
 327 U.S. 608 (1946).......................................................................... 50

*King Supply Co. v. United States,*
 674 F.3d 1343 (Fed. Cir. 2012).......................................................... 16

*Maverick Tube Corp. v. United States,*
 107 F. Supp. 3d 1318 (Ct. Int'l Trade 2015) ...................................... 51

*Mid Continent Nail Corp. v. United States,*
 712 F. Supp. 2d 1370 (Ct. Int'l Trade 2010) .................................. 36, 38

*Mid Continent Nail Corp. v. United States,*
 725 F.3d 1295 (Fed. Cir. 2013).......................................................... 38

*Minebea Co. v. United States,*
 782 F. Supp. 117 (Ct. Int'l Trade 1992) ............................................ 21

*Mitsubishi Elec. Corp. v. United States,*
 700 F. Supp. 538 (Ct. Int'l Trade 1988) .................................. 32, 34, 36

*Mitsubishi Elec. Corp. v. United States,*
 898 F.2d 1577 (Fed. Cir. 1990).................................................. *passim*

*Mitsubishi Heavy Indus. v. United States,*
 986 F. Supp. 1428 (Ct. Int'l Trade 1997) ...................................... 17, 33

*Mittal Steel Point Lisas Ltd. v. United States,*
 548 F.3d 1375 (Fed. Cir. 2008).................................................... 45, 47

*MTZ Polyfilms, Ltd. v. United States,*
 717 F. Supp. 2d 1346 (Ct. Int'l Trade 2010) ...................................... 23

iii

*Muller Comercial de Mexico, S. de R.L. de C.V. v. United States*,
   807 F. Supp. 2d 1361 (Ct. Int'l Trade 2011) ........................................ 23

*Muskrat v. United States*,
   219 U.S. 346 (1911) ............................................................................. 51

*N. Am. Rubber Thread Co. v. United States*,
   533 F. Supp. 2d 1290 (Ct. Int'l Trade 2007) ........................................ 23

*Nat'l Park Hospitality Ass'n v. DOI*,
   538 U.S. 803 (2003) ............................................................................. 51

*Packfood Pub. Co. v. United States*,
   753 F. Supp. 2d 1334 (Ct. Int'l Trade 2011) ........................................ 23

*Peer Bearing Co.-Changshan v. United States*,
   804 F. Supp. 2d 1337 (Ct. Int'l Trade 2011) ........................................ 23

*Royal Business Machines, Inc. v. United States*,
   507 F. Supp. 1007 (Ct. Int'l Trade 1980) ........................................ 39, 41

*S. Prairie Constr. Co. v. Local No. 627*,
   425 U.S. 800 (1976) ......................................................................... 50, 51

*Sandvik Steel Co. v. United States*,
   164 F.3d 596 (Fed. Cir. 1998) ............................................................. 45

*Save Domestic Oil, Inc. v. United States*,
   240 F. Supp. 2d 1342 (Ct. Int'l Trade 2002) .................................... 16, 23

*Save Domestic Oil, Inc. v. United States*,
   357 F.3d 1278 (Fed. Cir. 2004) ......................................................... 16, 23

*Sichuan Changhong Elec. Co. v. United States*,
   466 F. Supp. 2d 1323 (Ct. Int'l Trade 2006) ........................................ 38

*Smith Corona Corp. v. United States*,
   796 F. Supp. 1532 (Ct. Int'l Trade 1992) ......................................... 39, 40

*Thai Pineapple Public Co. v. United States*,
   187 F.3d 1362 (Fed. Cir. 1999) ........................................................... 22

*Torrington Co. v. United States*,
   745 F. Supp. 718 (Ct. Int'l Trade 1990) ............................................... 33

*Tung Mung Dev. Co. v. United States*,
   219 F. Supp. 2d 1333 (Ct. Int'l Trade 2002) .................................... 33, 36

*Ugine & ALZ Belgium v. United States*,
   551 F.3d 1339 (Fed. Cir. 2009) ............................................ 18, 19, 26, 35

*United States v. Eurodif S.A.*,
   555 U.S. 305 (2009) ..................................................................... *passim*

*United States v. Zannino*,
   895 F.2d 1 (1st Cir. 1990) ........................................................................ 48, 49

*Universal Camera Corp. v. NLRB*,
   340 U.S. 474 (1951) ........................................................................................ 22

*W. Watersheds Project v. Foss*,
   No. CV 04-168-MHW, 2006 WL 2868846 (D. Idaho Oct. 5, 2006) ................... 50

*Walgreen Co. v. United States*,
   620 F.3d 1350 (Fed. Cir. 2010) ..................................................................... 16

*Wheatland Tube Co. v. United States*,
   161 F.3d 1365 (Fed. Cir. 1998) ................................................................ 27, 47

## Statutes

19 U.S.C. § 1516a .............................................................................................. 14, 51

19 U.S.C. § 1671 ........................................................................................ 15, 17, 19, 24

19 U.S.C. § 1671a .................................................................................................. 15

19 U.S.C. § 1671d ............................................................................................. 19, 51

19 U.S.C. § 1671e .................................................................................................. 19

19 U.S.C. § 1673 ............................................................................................. *passim*

19 U.S.C. § 1673a .................................................................................................. 15

19 U.S.C. § 1673d ............................................................................................. 19, 51

19 U.S.C. § 1673e .................................................................................................. 19

19 U.S.C. § 1677 .................................................................................................. 17

## Regulations

19 C.F.R. § 351.301 .............................................................................................. 45

19 C.F.R. § 351.302 .............................................................................................. 45

## Administrative Decisions

*Antidumping Duties; Countervailing Duties*,
   62 Fed. Reg. 27,296 (Dep't of Commerce May 19, 1997) ...................................... 17

*Cellular Mobile Telephones and Subassemblies From Japan*,
   50 Fed. Reg. 45,447 (Dep't of Commerce Oct. 31, 1985) ................................. 33-34

*Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China and Taiwan*,
   79 Fed. Reg. 4,661 (Dep't of Commerce Jan. 29, 2014) ....................................................... 6, 7

*Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China*,
   79 Fed. Reg. 4,667 (Dep't of Commerce Jan. 29, 2014) ........................................................ 6

*Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China*,
   79 Fed. Reg. 44,399 (Dep't of Commerce July 31, 2014) ....................................................... 8

*Certain Crystalline Silicon Photovoltaic Products From Taiwan*,
   80 Fed. Reg. 8,596 (Dep't of Commerce Feb. 18, 2015) .................................................... 25-26

*Certain Crystalline Silicon Photovoltaic Products From Taiwan*,
   79 Fed. Reg. 76,966 (Dep't of Commerce Dec. 23, 2014) ..................................................... 28

*Crystalline Silicon Photovoltaic Products From the People's Republic of China*,
   79 Fed. Reg. 76,970 (Dep't of Commerce Dec. 23, 2014)............................................... 2, 9, 10

*Crystalline Silicon Photovoltaic Products From the People's Republic of China*,
   79 Fed. Reg. 76,962 (Dep't of Commerce Dec. 23, 2014)............................................... 3, 9, 10

*Crystalline Silicon Photovoltaic Products From the People's Republic of China*,
   80 Fed. Reg. 8,592 (Dep't of Commerce Feb. 18, 2015) ............................................... 3, 10, 25

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China*,
   77 Fed. Reg. 63,791 (Dep't of Commerce Oct. 17, 2012)...................................................... 3

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*,
   77 Fed. Reg. 63,788 (Dep't of Commerce Oct. 17, 2012)...................................................... 3

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*,
   77 Fed. Reg. 73,018 (Dep't of Commerce Dec. 7, 2012) ....................................................... 4

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*,
   77 Fed. Reg. 73,017 (Dep't of Commerce Dec. 7, 2012) ....................................................... 4

*Crystalline Silicon Photovoltaic Products From the People's Republic of China*,
   79 Fed. Reg. 33,174 (Dep't of Commerce June 10, 2014) ...................................................... 7

*Glycine from India*,
   73 Fed. Reg. 16,640 (Dep't of Commerce Mar. 28, 2008) ................................................. 18-19

*Large Newspaper Printing Presses and Components Thereof, Whether Assembled or Unassembled, From Germany*,
    61 Fed. Reg. 38,166 (Dep't of Commerce July 23, 1996) ......................................................... 33

*Large Residential Washers From the Republic of Korea*,
    77 Fed. Reg. 75,988 (Dep't of Commerce Dec. 26, 2012) ........................................................ 15

*Stainless Steel Plate in Coils from Belgium*,
    69 Fed. Reg. 74,495 (Dep't of Commerce Dec. 14, 2004) ....................................................... 17

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE JUDGE DONALD C. POGUE, SENIOR JUDGE
_____

|  |  |  |
|---|---|---|
| SUNPOWER CORPORATION and | ) | |
| SUNPOWER CORPORATION, SYSTEMS, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| SUNIVA, INC., *ET AL.*, | ) | |
| | ) | |
| Consolidated Plaintiffs, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| CANADIAN SOLAR INC., *ET AL.*, | ) | |
| | ) | |
| Plaintiff-Intervenors, | ) | |
| | ) | |
| v. | ) | Consol. Court No. 15-00067 |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| SOLARWORLD AMERICAS, INC., | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |
_____)

## DEFENDANT'S OPPOSITION TO
## MOTIONS FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD

Pursuant to Rule 56.2 of this Court's rules, defendant, the United States, respectfully

opposes the motions for judgment upon the agency record filed by plaintiffs, SunPower

Corporation and SunPower Corporation, Systems (together, SunPower), consolidated plaintiff

Suniva, Inc. (Suniva), and plaintiff-intervenors Canadian Solar *et al.*[1] (together, Canadian Solar) and consolidated plaintiffs Shanghai BYD Co., Ltd. and BYD (Shangluo) Industrial Co., Ltd. (together, BYD).[2]  The motions challenge the Department of Commerce's (Commerce) scope determination in the antidumping and countervailing duty investigations concerning certain crystalline silicon photovoltaic products (solar products)[3] from China (*Solar II*).  Commerce's determination is based upon substantial evidence and is in accordance with law.  Accordingly, we respectfully request that the Court deny the motions and enter judgment for the United States.

## STATEMENT PURSUANT TO RULE 56.2

I.    Administrative Determinations Under Review

Under review is Commerce's final scope determination and the scope published in the *Solar II* antidumping and countervailing duty final determinations and orders.  *See Crystalline Silicon Photovoltaic Products From the People's Republic of China*, 79 Fed. Reg. 76,970 (Dep't of Commerce Dec. 23, 2014) (final antidumping duty determ.), Canadian Solar App'x Tab 16,

---

[1] Canadian Solar plaintiff-intervenors comprise Canadian Solar Inc., Changzhou Trina Solar Energy Co., Ltd., China Sunergy (Nanjing) Co., Ltd., Chint Solar (Zhejiang) Co., Ltd., ET Solar Industry Ltd., Hefei JA Solar Technology Co., Ltd., Jinko Solar Co., Ltd., LDK Solar Hi-Tech (Nanchang) Co., Ltd., Perlight Solar Co., Ltd., ReneSola Jiangsu Ltd., Shanghai JA Solar Technology Co., Ltd., Shenzhen Sacred Industry Co., Ltd., Shenzhen Sungold Solar Co., Ltd., Sumec Hardware & Tools Co., Ltd., Sunny Apex Development Ltd., Wuhan FYY Technology Co., Ltd., Wuxi Suntech Power Co., Ltd., Zhongli Talesun Solar Co., Ltd., and Znshine PV-Tech Co., Ltd.

[2] Canadian Solar and BYD filed a combined Rule 56.2 motion and accompanying brief. For purposes of brevity, we refer to the arguments made in that brief as being made by Canadian Solar only.

Plaintiff-intervenors Yingli Green Energy Holding Co., Ltd. and Yingli Green Energy Americas, Inc. (together, Yingli) have filed a separate motion, wherein they "adopt{} the arguments presented by consolidated plaintiffs Canadian Solar Inc. *et al.* in their joint motion for judgment on the agency record{.}"  Yingli Br. at 2, Dkt. No. 57.  Therefore, references to Canadian Solar hereafter include Yingli.

[3] "Solar products" includes all modules, laminates and/or panels.  "Modules" and "panels" are interchangeable; for consistency, we use only "modules."

and accompanying Issues and Decision Memorandum(AD IDM), Canadian Solar App'x Tab 14, *available at* http://ia.ita.doc.gov/frn/summary/prc/2014-30092-1.pdf; *Crystalline Silicon Photovoltaic Products From the People's Republic of China*, 79 Fed. Reg. 76,962 (Dep't of Commerce Dec. 23, 2014) (final countervailing duty determ.), Canadian Solar App'x Tab 15, and accompanying IDM, Canadian Solar App'x Tab 13, *available at* http://ia.ita.doc.gov/frn/summary/prc/2014-30071-1.pdf.  *See also Crystalline Silicon Photovoltaic Products From the People's Republic of China*, 80 Fed. Reg. 8,592 (Dep't of Commerce Feb. 18, 2015) (amended final countervailing duty determination and antidumping and countervailing duty orders), Canadian Solar App'x Tab 17.

II.    Issue Presented For Review

Whether Commerce's final scope determination that solar modules assembled in China using solar cells produced in a third country are covered by the scope of the *Solar II* investigations and orders, is supported by substantial evidence and in accordance with law.

## STATEMENT OF FACTS

I.    *Solar I* Investigations

On October 9, 2012, Commerce issued affirmative determinations in its antidumping and countervailing duty investigations covering crystalline silicon photovoltaic cells, whether or not assembled into modules, from China (*Solar I*).  *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China*, 77 Fed. Reg. 63,791 (Dep't of Commerce Oct. 17, 2012) (final antidumping duty determ.), and accompanying IDM (*Solar I* AD IDM), *available at* http://ia.ita.doc.gov/frn/summary/PRC/2012-25580-1.pdf; *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 77 Fed. Reg. 63,788 (Dep't of Commerce Oct. 17, 2012) (final

3

countervailing duty determ.), and accompanying IDM, *available at* http://ia.ita.doc.gov/frn/summary/PRC/2012-25564-1.pdf.

In those investigations, Commerce applied a substantial transformation analysis to determine the country of origin of modules assembled using cells produced in China. Commerce determined that module assembly does not substantially transform solar cells such that it changes the country of origin of the solar module. Accordingly, Commerce concluded that, for purposes of the *Solar I* investigations, when solar cell production occurs in a different country from module assembly, the county of origin of a module is the country in which the cell was produced. *See* Canadian Solar App'x Tab 5, Ex. 2 at 8 (*Solar I* Scope Clarification Mem., March 19, 2012). Commerce thus clarified that, for purposes of the *Solar I* investigations, (1) modules assembled in a third country using cells produced in China were covered by the scope of the *Solar I* investigations, and (2) modules assembled in China using cells produced in a third country were not covered by the *Solar I* scope. *Solar I* AD IDM at 5-9; Canadian Solar App'x Tab 5, Ex. 2 at 1, 10.

Following the U.S. International Trade Commission's (ITC) affirmative injury determination, Commerce published the antidumping and countervailing duty orders on solar cells from China on December 7, 2012. *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 77 Fed. Reg. 73,018 (Dep't of Commerce Dec. 7, 2012) (amended antidumping duty final determ. and order); *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 77 Fed. Reg. 73,017 (Dep't of Commerce Dec. 7, 2012) (countervailing duty order).

II.     *Solar II* Investigations

   A.     Initiations And Preliminary Determinations

On December 31, 2013, domestic producer Solar World Americas, Inc. (SolarWorld)

filed a petition with Commerce and the ITC alleging that imports of solar productsfrom China

were being, or were likely to be, sold in the United States at less than fair value, that producers

and exporters of those solar products had benefitted from countervailable subsidies, and that the

imports were materially injuring or threatening material injury to domestic industry.  SunPower

App'x Tab 9.

Solar World's proposed scope defined subject merchandise from China, in relevant part,

as "{solar} cells,{[4]} and modules, laminates and/or panels consisting of {solar} cells, whether or

not partially or fully assembled into other products, including building integrated materials."  *Id.*,

Volume I at 11.  Subject merchandise also included "modules, laminates, and/or panels

consisting of {solar} cells completed or partially manufactured within a customs territory other

than that subject country, using ingots, wafers, or partially manufactured cells sourced from the

subject country."  *Id.*  Citing a "loophole" in the *Solar I* orders, SolarWorld explained that its

intent was to cover modules assembled in China using third-country cells, imports of which had

increased significantly during and after the *Solar I* investigations.  *Id.* at 3, 4-6, 21, 34, 37, 53.  In

addition, the proposed scope expressly excluded any solar products covered by the *Solar I*

orders.  *Id*. at 11.

---

[4] Solar cells are made from crystalline silicon wafers.  SunPower Appx Tab 9, Volume I
at 13-15.  A dopant creates the positive/negative subjection that is needed for the conversion of
sunlight into electricity.  *Id.* at 11-12.  Solar modules are assembled by stringing together
multiple solar cells (commonly 60 to 72 cells), laminating them, and fitting them in a glass-
covered aluminum frame.  *Id.* at 16.

On January 6, 2014, Commerce requested that SolarWorld clarify its proposed scope because there was ambiguity as to the extent of production that had to take place in China for solar products consisting of cells completed or partially manufactured in a third country to be covered by the scope.  SunPower App'x Tab 10 at 3.  On January 13, 2014, Solar World responded that it "intend{ed} that the present proceeding cover panels and modules assembled in a subject country (*e.g.*, China), even if the cells in those modules are produced in a different country (*e.g.*, Taiwan or a non-subject country), if those cells are made from ingots, wafers, or partially manufactured cells that were manufactured in the subject country (*e.g.,* China)."  SunPower App'x Tab 11, Volume I Supplement II at 2.  Solar World also stated that the scope "would cover situations where the panels or modules are assembled in a subject country from cells made in a different country but:  1) the ingots used for the wafers made into the cells were manufactured in the subject country; 2) the wafers made into the cells were manufactured in the subject country; or 3) the cell manufacturing process began in the subject country and then was completed in a non-subject country."  *Id.*

On January 22, 2014, Commerce initiated an antidumping duty investigation to determine whether imports of solar products from China were being sold at less than fair value and a countervailing duty investigation to determine whether manufacturers, producers, or exporters of solar products in China received countervailable subsidies.  *Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China and Taiwan*, 79 Fed. Reg. 4,661 (Dep't of Commerce Jan. 29, 2014) (init. AD inv.) (*AD Initiation*), Canadian Solar App'x Tab 3; *Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China*, 79 Fed. Reg. 4,667 (Dep't of Commerce Jan. 29, 2014) (init. countervailing duty inv.), Canadian Solar App'x Tab 4.  Based on SolarWorld's clarification, the scope of the investigations differed

6

slightly from that proposed in the petition, and defined subject merchandise as "{solar} cells, and

modules, laminates and/or panels consisting of {solar} cells, whether or not partially or fully

assembled into other products, including building integrated materials{,}" including:

> modules, laminates and/or panels assembled in the subject country
> consisting of {solar} cells that are completed or partially
> manufactured within a customs territory other than that subject
> country, using ingots that are manufactured in the subject country,
> wafers that are manufactured in the subject country, or cells where
> the manufacturing process begins in the subject country and is
> completed in a non-subject country. [5]

*AD Initiation*, 79 Fed. Reg. at 4,667.

Consistent with its normal practice, Commerce established a period for interested parties

to raise issues and file comments regarding product coverage. *Id.* at 4,662. Between February

18, 2014, and April 21, 2014, Commerce received scope comments and rebuttal scope comments

from numerous interested parties, including Canadian Solar, Suniva, SunPower, Yingli, and

SolarWorld. *See* P.D. 698 at 2 & n.4 (AD Preliminary Decision Memorandum (AD PDM)).[6]

On June 2, 2014, Commerce issued its preliminary determination that countervailable

subsidies were being provided to producers and exporters of solar products from China. *Certain*

*Crystalline Silicon Photovoltaic Products From the People's Republic of China*, 79 Fed. Reg.

33,174 (Dep't of Commerce June 10, 2014) (prelim. determ.), Canadian Solar App'x Tab 6, and

accompanying PDM (CVD PDM), CVD P.D. 267. Commerce also issued its preliminary

---

[5] Interested parties referred to this as the "two-out-of-three" rule, because a product
would qualify as subject merchandise if it contained Chinese input (ingots, wafers, or partially
manufactured cells) and assembly of the module occurred in China, notwithstanding the
manufacture or completion of the cell in a third country.

[6] Citations to public documents (P.D.) and confidential documents (C.D.) refer to the
record of the antidumping duty investigation. When we cite to record documents from only the
antidumping duty investigation, either there is no comparable document in the countervailing
duty record or the comparable countervailing duty documents are identical. References to the
countervailing duty investigation record are denoted by "CVD P.D." or "CVD C.D."

determination that sales of solar products from China were being, or were likely to be, sold in the United States at less than fair value on July 24, 2014. *Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China*, 79 Fed. Reg. 44,399 (Dep't of Commerce July 31, 2014) (AD prelim. determ.), Canadian Solar App'x 7, and accompanying AD PDM.  In its preliminary determinations, Commerce continued to define the scope of the investigations as it had in the initiation, but stated that it was continuing to analyze the interested parties' scope comments, AD PDM at 5; CVD PDM at 4, "including comments on whether it is appropriate to apply a traditional substantial transformation or other analysis in determining the country of origin of certain solar modules described in the scope of the investigation."  AD PDM at 5.

    B.    <u>Commerce's Proposed Scope Clarification</u>

On October 3, 2014, Commerce notified the interested parties that it was considering a possible clarification to the scope of these investigations and invited all interested parties to include comments in their case briefs concerning the potential scope clarification.  *See* Canadian Solar App'x Tab 8.  Commerce explained that it was considering clarifying that the subject merchandise would include all modules, laminates, and/or panels assembled in China that contained solar cells produced in a customs territory other than China.  *Id.* at 1.  Commerce also provided the interested parties with an edited scope that incorporated language to implement the clarification under consideration so that they could comment and propose alternative language. *Id.* at 2 & Attachment.

Interested parties filed timely case and rebuttal briefs in October 2014 that included comments on the scope of the investigations.  *See* AD IDM at 2-3; Canadian Solar App'x Tab 9

at 8-27 (respondents[7]); Canadian Solar App'x Tab 10 at 1-12 (Changzhou Trina Solar Energy Co., Ltd.); Suniva App'x Tab 11 at 4-11 (Suniva); P.D. 785 at 12 (Renesola Jiangsu Ltd.); P.D. 795 at 4-10 (SolarWorld); P.D. 801 at 3-9 (Shangluo BYD Industrial Co., Ltd. and Shanghai BYD Co., Ltd. rebuttal); Canadian Solar App'x Tab 11 at 3-6 (Changzhou Trina Solar Energy Co., Ltd. rebuttal); Canadian Solar App'x Tab 12 at 5-19 (respondents' rebuttal[8]); P.D. 811 at 1-27 (SolarWorld rebuttal).

      C.      <u>Final Determinations And Orders</u>

On December 15, 2014, Commerce issued a final affirmative determination of sales at less than fair value and a final affirmative determination of countervailable subsidies. *Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China*, 79 Fed. Reg. 76,970; *Countervailing Duty Investigation of Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China*, 79 Fed. Reg. 76,962. Commerce clarified the scopes of the antidumping and countervailing duty investigations consistent with its October 3rd letter.

---

[7] Filed on behalf of: Canadian Solar Inc. and Canadian Solar (USA) Inc.; Changzhou Trina Solar Energy Co., Ltd.; China Sunergy (Nanjing) Co., Ltd.; ET Solar Industry Limited; Hanwha Solarone (Qidong) Co., Ltd.; Hengdian Group DMEGC Magnetics Co., Ltd.; LDK Solar Hi-Tech (Nanchang) Co., Ltd.; Shanghai BYD Co., Ltd. and Shangluo BYD Industrial Co., Ltd.; Shanghai JA Solar Technology Co., Ltd. and Hefei JA Solar Technology Co., Ltd.; Sumec Hardware & Tools Co., Ltd.; Wuxi Suntech Power Co., Ltd.; Wuxi Taichen Machinery & Equipment Co., Ltd.; Yingli Green Energy Holding Company Ltd. and Yingli Green Energy Americas, Inc.; and Zhejiang Heda Solar Technology Co., Ltd.

[8] Filed on behalf of: Canadian Solar Inc. and Canadian Solar (USA) Inc.; Changzhou Trina Solar Energy Co., Ltd.; China Sunergy (Nanjing) Co., Ltd.; Chint Solar (Zhejiang) Co., Ltd; ET Solar Industry Limited; Hanwha Solarone (Qidong) Co., Ltd.; Hengdian Group DMEGC Magnetics Co., Ltd.; Jumao Photonic (Xiamen) Co., Ltd; LDK Solar Hi-Tech (Nanchang) Co., Ltd.; Perlight Solar Co., Ltd.; Shanghai BYD Co., Ltd. and Shangluo BYD Industrial Co., Ltd.; Shanghai JA Solar Technology Co., Ltd. and Hefei JA Solar Technology Co., Ltd.; Shenzhen Sacred Industry Co., Ltd.; Sumec Hardware & Tools Co., Ltd.; Wuxi Suntech Power Co., Ltd.; Wuxi Taichen Machinery & Equipment Co., Ltd.; Yingli Green Energy Holding Company Ltd. and Yingli Green Energy Americas, Inc.; Zhejiang Heda Solar Technology Co., Ltd.; Zhongli Talesun Solar Co., Ltd.; and Znshine PV-Tech Co., Ltd.

AD IDM at 7.  Thus, the scope of the final determinations covered, "modules, laminates and/ or panels consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including building integrated materials," including "modules, laminates and/or panels assembled in {China} consisting of crystalline silicon photovoltaic cells produced in a customs territory other than {China}." *See Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China*, 79 Fed. Reg. at 76,971-72; *Countervailing Duty Investigation of Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China*, 79 Fed. Reg. at 76,963.  Commerce based this clarification on its finding that modules assembled in China using third-country cells have a Chinese country of origin.  AD IDM at 11, 15.

The ITC determined that the United States industry was materially injured by reason of imports of solar products that "had been found by { } Commerce to be sold in the United States at less than fair value { }, and subsidized by the government of China{.}"  P.D. 844 at 1.  On February 18, 2015, Commerce published its amended countervailing duty determination (curing certain ministerial errors in the calculation for one respondent), and antidumping and countervailing duty orders on solar products from China.  *Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China*, 80 Fed. Reg. at 8,592.

D.    The Present Action

In April 2015, SunPower, Suniva, BYD, Canadian Solar *et al*., Jinko Solar Co., Ltd. *et al.*, Trina, and SolarWorld filed complaints with the Court challenging Commerce's final antidumping and countervailing duty determinations.  *See* Compl. *SunPower Corp. v. United States* (No. 15-00067), Dkt. No. 16; Compl. *Suniva, Inc. v. United States* (No. 15-00071), Dkt. No. 10; Compl. *Shanghai BYD Co. v United States* (No. 15-00083), Dkt. No. 11, and (No. 15-

00087), Dkt. No. 11; Compl. *Canadian Solar Inc. v. United States* (No. 15-00088), Dkt. No. 10, and (No. 15-00089), Dkt. No. 10; Compl. *Jinko Solar Co. v. United States* (No. 15-00080), Dkt. No. 9; Compl. *Changzhou Trina Solar Energy Co. v. United States* (No. 15-00068), Dkt. No. 10; Compl. *SolarWorld Americas, Inc. v. United States* (No. 15-00085), Dkt. No. 10, and (No. 15-00086), Dkt. No. 10.

SunPower, BYD, Canadian Solar, Trina, and SolarWorld subsequently amended their respective complaints. *See* Am. Compl. *SunPower Corp. v. United States* (No. 15-00067), Dkt. No. 71; Am. Compl. *Shanghai BYD Co. v United States* (No. 15-00083), Dkt. No. 12, and (No. 15-00087), Dkt. No. 12; Am. Compl. *Canadian Solar Inc. v. United States* (No. 15-00088), Dkt. No. 11, and (No. 15-00089), Dkt. No. 11; Am. Compl. *Changzhou Trina Solar Energy Co. v. United States* (No. 15-00068), Dkt. No. 11; Am. Compl. *SolarWorld Americas, Inc. v. United States* (No. 15-00085), Dkt. 36, and (No. 15-00086), Dkt. No. 34.

In July 2015, the Court consolidated the cases with claims limited to challenges of Commerce's final scope determination in the investigations, *i.e.*, Nos. 15-00067, 15-00071, 15-00083, 15-00087, 15-00088, and 15-00089, under *SunPower Corp. v. United States* (No. 15-00067), Dkt. No. 31.

## SUMMARY OF THE ARGUMENT

Commerce's scope determination that solar modules assembled in China using cells produced in third countries have a country of origin of China, and ensuing determination to clarify the scope of the investigations, are supported by substantial evidence and in accordance with law.

Underlying SunPower's, Canadian Solar's, and Suniva's appeals are the flawed claims that Commerce's *Solar II* investigations and resulting orders cover purportedly non-Chinese

goods, and that the scopes of the *Solar I* and *Solar II* orders are in conflict.  Their position

reflects a fundamental misunderstanding of Commerce's *Solar I* and *Solar II* orders, and should

be rejected.

In *Solar I*, Commerce applied the substantial transformation test to determine which solar

cells were subject to the *Solar I* investigation and resulting orders; in doing so, Commerce

determined that certain merchandise – *i.e.,* solar modules containing solar cells produced in

China – were Chinese for the purposes of coverage under the *Solar I* orders.

Subsequently, in response to another petition filed by SolarWorld, Commerce initiated a

second set of solar investigations – *Solar II* – that analyzed merchandise that fell beyond the

scope of *Solar I*.  In those proceedings, Commerce determined that, for purposes of *Solar II*, use

of the substantial transformation analysis would not be appropriate for determining the country

of origin of the merchandise at issue.  Commerce concluded that it was instead appropriate to use

an alternative country-of-origin analysis, in which it evaluated SolarWorld's intent to address a

"loophole" created by the *Solar I* investigations, the nature of the solar product industry with its

complex and readily adaptable global supply chain, and the administrability, enforceability, and

potential evasion of any resulting order.  In light of its analysis, Commerce determined that the

country of origin of modules assembled in China from third-country cells is China.  Commerce

therefore clarified the scope language in the final determinations so that Chinese modules

assembled with third-country cells would be expressly covered.

In other words, *Solar II* does not, as SunPower, Canadian Solar, and Suniva contend,

cover non-Chinese merchandise or merchandise covered by *Solar I*.  The *Solar II* orders cover

merchandise determined to be Chinese pursuant to an alternative country-of-origin analysis that

Commerce deemed appropriate in light of the circumstances and concerns present in these

proceedings.  In making their argument, SunPower, Canadian Solar, and Suniva incorrectly presume that Commerce should have applied the substantial transformation analysis to determine the country of origin of the solar merchandise beyond the scope of *Solar I*.  But as we will explain in more detail below, Commerce has the discretion to deviate from a substantial transformation analysis, and reasonably departed from that analysis in *Solar II*.

Similarly, that Commerce applied the substantial transformation analysis in *Solar I*, and regularly applies that analysis in other antidumping and countervailing duty proceedings, is of limited relevance to the reasonableness of Commerce's country-of-origin analysis and resulting scope clarifications in *Solar II*.  Commerce supported its departure from its usual approach of determining country-of-origin with a detailed and reasoned explanation based upon the specific facts on the records of the *Solar II* investigations.  The scope clarification is consistent with SolarWorld's intent expressed in its petition to seek redress from injury caused to the domestic industry as a result of circumvention of the *Solar I* orders, *i.e.*, the significant increase in imports of Chinese solar modules made from third-country cells that are not covered by the *Solar I* orders.  Moreover, Commerce was well within its discretion to consider issues of evasion, administrability, and enforceability of the orders, as well as its statutory mandate to protect domestic industry from unfair pricing and subsidization, in determining the country of origin of the merchandise under investigation.

Furthermore, notwithstanding SunPower's and Canadian Solar's arguments to the contrary, Commerce's clarification of the scope of the *Solar II* investigations did not deprive interested parties of notice and the opportunity to respond to that clarification.  Instead, Commerce notified the parties in its preliminary determinations that it was continuing to evaluate what would be the appropriate analysis for determining country of origin.  Soon thereafter,

Commerce proposed a possible scope clarification that would result in modules assembled in China using third-country cells being expressly covered by the scope of the investigations, and requested comments from interested parties. The parties responded, including the plaintiffs in this case, and provided detailed comments on Commerce's proposed clarification. Commerce considered the parties' comments and addressed the parties' concerns at length in its final determinations, and consequently provided interested parties the process to which they were entitled.

SunPower's, Canadian Solar's, and Suniva's remaining arguments are likewise meritless. SunPower and Suniva claim that Commerce may apply the revised scope prospectively only, thereby suggesting that non-subject merchandise has been improperly suspended. But they fail to identify any entries that were suspended in a manner inconsistent with Commerce's cash deposit instructions following the preliminary determinations, final determinations, and orders, and have otherwise failed to develop their argument. Canadian Solar's contention that this Court should direct Commerce to revoke the *Solar II* orders is an improper request for relief. Finally, whether the "two-out-of-three" rule proposed in the petition is supported by the record or consistent with law is not relevant, because Commerce did not apply the petition's proposed scope language in the final determination; therefore, this Court should not reach that issue.

## **ARGUMENT**

I.    Standard Of Review

This Court sustains Commerce's final determinations unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law{.}"  19 U.S.C. § 1516a(b)(1)(B)(i).  "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Consol. Edison Co. of N.Y. v. NLRB*, 305

U.S. 197, 229 (1938). Even if it is possible to draw two inconsistent conclusions from the record evidence, this does not mean that Commerce's findings are unsupported by substantial evidence. *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966). Further, Commerce's statutory "interpretation{s} govern{} in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous." *United States v. Eurodif S.A.*, 555 U.S. 305, 316 (2009) (citation omitted).

II.  Legal Framework Of Scope Determinations In Investigations

Upon receipt of a petition, Commerce must determine, based upon the information available to it, whether a subsidy or antidumping investigation is warranted to determine if (a) the government of a country is providing a countervailable subsidy with respect to the manufacture, production, or export of "a class or kind" of merchandise, or (b) a "class or kind" of foreign merchandise is being sold in the United States at less than fair value. 19 U.S.C. §§ 1671(a)(1), 1671a(a), 1673(1), 1673a(a)(1).

Because Commerce "owes deference to the intent of the proposed scope of an antidumping {or a countervailing duty} investigation as expressed in an antidumping {or a countervailing duty} petition{,}" *Downhole Pipe & Equip. LP v. United States*, 887 F. Supp. 2d 1311, 1319 (Ct. Int'l Trade 2012) (quotation and citation omitted), *aff'd,* 776 F.3d 1369 (Fed. Cir. 2015), it accepts the "class or kind" of merchandise described in the petition scope as proposed, "{a}bsent an overarching reason to modify" the scope. *Large Residential Washers From the Republic of Korea*, 77 Fed. Reg. 75,988 (Dep't of Commerce Dec. 26, 2012), and accompanying IDM at 11 (citation and quotation marks omitted), *available at* http://enforcement.trade.gov/frn/summary/KOREA-SOUTH/2012-31104-1.pdf; *see also AMS Assocs. v. United States*, 881 F. Supp. 2d 1374, 1380 (Ct. Int'l Trade 2012) (explaining that

"Commerce retains broad discretion to define and clarify the scope of an antidumping investigation in a manner which reflects the intent of the petition." (citation and quotation marks omitted)), *aff'd*, 737 F.3d 1338 (Fed. Cir. 2013).

"{T}he purpose of the petition is to propose an investigation{,}" however, and the "purpose of the investigation is to determine what merchandise should be included in the final order." *Duferco Steel, Inc. v. United States*, 296 F.3d 1087, 1096 (Fed. Cir. 2002) (citation omitted). Ultimately, therefore, it is Commerce's responsibility to determine what merchandise should be covered by any final order, thereby defining the scope of the investigation. *Id.* at 1097; *accord Mitsubishi Elec. Corp. v. United States*, 898 F.2d 1577, 1582 (Fed. Cir. 1990) (*Mitsubishi II*); *see also King Supply Co. v. United States*, 674 F.3d 1343, 1345, 1348 (Fed. Cir. 2012); *Walgreen Co. v. United States*, 620 F.3d 1350, 1355-56 (Fed. Cir. 2010).

Accordingly, Commerce has "inherent power to establish the parameters of the investigation, so that it {is} not . . . tied to an initial scope definition that . . . may not make sense in light of the information available to {Commerce} or subsequently obtained in the investigation." *Duferco*, 296 F.3d at 1089 (citation and quotation marks omitted); *see also Save Domestic Oil, Inc. v. United States*, 240 F. Supp. 2d 1342, 1351 (Ct. Int'l Trade 2002), *aff'd*, 357 F.3d 1278 (Fed. Cir. 2004). Thus, Commerce "may depart from the scope as proposed by a petition if it determines that petition to be overly broad, or insufficiently specific to allow proper investigation, or in any other way defective." *Ad Hoc Shrimp Trade Action Comm. v. United States*, 637 F. Supp. 2d 1166, 1175 (Ct. Int'l Trade 2009) (citation and quotation marks omitted); *see also Allegheny Bradford Corp. v. United States*, 342 F. Supp. 2d 1172, 1188 (Ct. Int'l Trade 2004). Commerce's authority to define and clarify the scope of the investigation "is limited by the requirement that it be exercised reasonably and that any consequent determination be

16

supported by substantial evidence in the administrative record." *Mitsubishi Heavy Indus. v. United States*, 986 F. Supp. 1428, 1433 (Ct. Int'l Trade 1997) (citation omitted); *see also Ad Hoc Shrimp*, 637 F. Supp. 2d at 1181.

Consistent with this authority, Commerce's practice is to evaluate the scope of the investigation and to request from the interested parties comments regarding product coverage. *See Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296, 27,323 (Dep't of Commerce May 19, 1997) (final rule). Based upon its analysis of the scope, the comments upon product coverage, and record evidence gathered during the proceeding, Commerce may determine that the scope of the investigation (and any ensuing antidumping or countervailing duty order) should include more or less merchandise than the scope proposed by the petitioner.

A.      Country Of Origin

To determine whether the proposed scope is sufficiently specific, Commerce considers, among other factors, whether the scope is limited to a class or kind of merchandise from the country covered by the investigation. *See* 19 U.S.C. §§ 1671(a)(1), 1673(1); *E.I. Du Pont de Nemours & Co. v. United States*, 8 F. Supp. 2d 854, 859 (Ct. Int'l Trade 1998) (*Du Pont*) ("Because antidumping orders apply to merchandise from particular countries, not individual producers, determining the country where the unfairly traded merchandise is produced or manufactured is fundamental to the proper administration and enforcement of the antidumping statute." (citations omitted)); *Stainless Steel Plate in Coils from Belgium*, 69 Fed. Reg. 74,495 (Dep't of Commerce Dec. 14, 2004) (final determ.) and accompanying IDM at 15, *available at* http://enforcement.trade.gov/frn/summary/belgium/E4-3641-1.pdf (*Plate from Belgium*) ("{A}ntidumping duty orders must be applied on a country-specific basis. The {statute} limits the term 'country' for purposes of antidumping proceedings." (citing 19 U.S.C. § 1677(3)).

Although section 1677(3) defines "country" to mean "a foreign country, a political subdivision, dependent territory, or possession of a foreign country," the statute does not define "foreign" or provide a standard for Commerce to apply in determining whether the merchandise at issue in an investigation is a domestic product or a product of a foreign country. *Du Pont*, 8 F. Supp. 2d at 858. Consequently, Commerce "has discretion in defining the criteria for country-of-origin determinations." *Ugine & ALZ Belgium v. United States*, 551 F.3d 1339, 1349 (Fed. Cir. 2009) (citation omitted); *see also Eurodif*, 555 U.S. at 316.

In general, the country of origin of a product is the country in which the merchandise is produced or manufactured. *See Advanced Tech. & Materials Co. v. United States*, No. 09-00511, 2011 WL 5191016, at *4 (Ct. Int'l Trade Oct. 12, 2011) ("The scope of an antidumping duty order is 'defined by the type of merchandise and the country of origin (*e.g.*, widgets from Ruritania)' and therefore the determination of where the merchandise is *produced or manufactured* is a fundamental step in the administration of the antidumping laws." (emphasis omitted and further emphasis added) (citation omitted)), *aff'd*, 581 F. App'x 900 (Fed. Cir. 2014) (*per curiam*); *Solar I* AD IDM at 5 ("The scope of an {antidumping or countervailing duty} order is limited to merchandise that is produced in the country covered by the order." (footnote omitted)). In many situations, a product is manufactured entirely in the country that is subject to an investigation or order, and thus its country of origin can be readily determined.

In certain scenarios, such as when merchandise is partially manufactured or is processed in multiple countries, there may be a question as to which country is the country of manufacture – and thus the country of origin – for antidumping and countervailing duty purposes. To determine country of origin in those cases, Commerce's practice has been to conduct a "substantial transformation" analysis. AD IDM at 15 (citing *Glycine from India*, 73 Fed. Reg.

18

16,640 (Dep't of Commerce Mar. 28, 2008) (final determ.), and accompanying IDM at 5,

*available at* http://ia.ita.doc.gov/frn/summary/INDIA/E8-6450-1.pdf; *Plate from Belgium* at 14-

15).  The Court has sustained that analysis.  *Appleton Papers Inc. v. United States*, 929 F. Supp.

2d 1329, 1336 (Ct. Int'l Trade 2013) (citing *Du Pont*, 8 F. Supp. 2d at 858-59).  That practice is

not codified in statute or regulation, however, and Commerce has the discretion to depart from it.

*See Ugine*, 551 F.3d at 1349.

      B.      <u>Imposition Of Antidumping and Countervailing Duty Orders</u>

      If Commerce's final decision in the antidumping or countervailing duty investigation is

affirmative, the ITC must issue a final determination as to whether a United States industry is

being injured, threatened with injury, or materially retarded by reason of imports of that

merchandise.  19 U.S.C. §§ 1671(a)(2), 1673(2).  The ITC's "like product" determination may

differ from Commerce's "class or kind" determination, however, and the ITC may determine that

the domestic industry is injured with respect to only a subset of the like products, Commerce

therefore may issue an order that covers only merchandise for which both Commerce's and the

ITC's determinations were affirmative.  *Id.* §§ 1671e(a); 1673e(a); *see also Cleo Inc. v. United*

*States*, 30 Ct. Int'l Trade 1380, 1383 (2006) (citation omitted), *aff'd*, 501 F.3d 1291 (Fed. Cir.

2007).

      If both Commerce's and the ITC's final results of an antidumping and/or countervailing

duty investigation are affirmative, Commerce publishes an order imposing duties upon

merchandise covered by the scope of the investigation.  19 U.S.C. §§ 1673d(c)(2), 1673e(a),

1671d(c)(2), 1671e(a).  Commerce's order shall include, among other things, "a description of

the subject merchandise, in such detail as the administering authority deems necessary{.}"  *Id.*

§§ 1671e(a)(2), 1673e(a)(2).  Commerce possesses discretion to determine the scope of an order

that will best effectuate the statutory purpose and most effectively remedy the alleged subsidies or dumping. *Mitsubishi II*, 898 F.2d at 1582-83. Because Commerce is "charged with administering the antidumping {and countervailing} duty program," and is "responsible for interpreting the antidumping {or countervailing} duty order and determining whether certain products fall within the scope of the order as interpreted{,}" *Ericsson GE Mobile Commc'ns, Inc. v. United States*, 60 F.3d 778, 783 (Fed. Cir. 1995), Commerce seeks to ensure that the scope of the investigation and ensuing order are administrable.

III.   **Commerce's Final Scope Determination Is Supported By Substantial Evidence And In Accordance With Law**

Commerce's country-of-origin analysis and determination that solar products assembled in China using third-country cells are Chinese in origin are supported by substantial evidence and in accordance with law, and Commerce reasonably modified the scope of the *Solar II* investigations in its final determinations to clarify that such merchandise is subject to the investigations and ensuing orders. SunPower's, Canadian Solar's, and Suniva's challenges to Commerce's scope determinations are without merit.

A.   **Commerce Provided A Reasonable Explanation For Departing From A Substantial Transformation Analysis**

In its final determinations, Commerce explained the country-of-origin analysis underlying its finding that modules assembled in China using third-country cells are Chinese in origin, and why it chose to depart from the typical substantial transformation analysis. AD IDM at 11-29. This explanation is reasonable and should be sustained.

Commerce did not apply a substantial transformation analysis to determine country of origin, but rather, having determined that use of this analysis would not be appropriate, performed additional analysis by examining three factors. First, consistent with the principle that

Commerce must define and clarify the scope of an antidumping investigation consistent with the intent of the petition, *see AMS*, 881 F. Supp. 2d at 1380 (quoting *Minebea Co. v. United States*, 782 F. Supp. 117, 120 (Ct. Int'l Trade 1992), *aff'd*, 984 F.2d 1178 (Fed. Cir. 1993)) (quotation marks omitted), Commerce considered SolarWorld's intent, as reflected in the petition.  AD IDM at 12-13.  Commerce found, based on the petition and SolarWorld's comments in the investigation, that SolarWorld intended the scope to cover all solar modules assembled in China using third-country cells to address a "loophole" created by application of the substantial transformation analysis in the *Solar I* investigations (*i.e.*, the exclusion of all modules consisting of non-Chinese cells), and subsequently exploited by the solar industry following the *Solar I* investigations.  *Id.* at 12-13, 17-18.

Second, Commerce considered the unique nature of the solar products industry, which "involves a complex and readily adaptable global supply chain" that "allows producers to modify their production chains easily and quickly."  *Id.* at 13.  Record evidence demonstrated that several Chinese producers and an importer of solar modules had modified their production chain to avoid paying antidumping and countervailing duties imposed by the *Solar I* orders.  In addition, the record established that there had been a shift in trade flows that resulted in increased imports of non-subject modules produced in China, *i.e.*, modules containing third-country cells.  *Id.* at 13.

Third, Commerce considered the administrability, enforceability, and potential evasion of any resulting order.  *Id.* at 13-14.  With respect to administrability, certain producers and importers of Chinese solar products participating in the investigations noted the difficulty in reporting merchandise falling within the "two-out-of-three" language in the proposed scope, given that they did not track their merchandise in a manner that would allow them to trace the

origin of the ingots and wafers in cells that are assembled into modules in China. *Id.* at 14 &
n.45.  Because the scope clarification would simplify the criteria for reporting subject
merchandise and facilitate the accurate reporting of subject merchandise, *id.* at 14, Commerce
found that the scope clarification would make administration substantially easier for itself, U.S.
Customs and Border Protection (CBP), and for producers and exporters of solar products, *id.* at
13, 14.  Regarding enforceability and potential evasion, Commerce found that the scope
proposed in the petition and initiated upon could result in the evasion of duties, and thus, would
provide ineffective relief to the domestic industry.  The complexity and adaptability of the global
supply chain would allow parties to avoid the reach of the "two-out-of-three" rule in petitioner's
proposed scope simply by sourcing their wafers from a country other than China. *Id.* at 13, 18.

 Based on these factors, and "to evaluate whether there is unfair pricing and/or
subsidization of modules assembled in {China} using third-country cells," Commerce found that
it was appropriate to determine, for purposes of the *Solar II* investigations, that the country of
origin of such modules is China. *Id.* at 15.  Commerce's approach in defining the scope of these
investigations, as well as its explanation for that choice, are reasonable and supported by the
record. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951) (a reviewing court may
not "displace the {agency's} choice between two fairly conflicting views, even though the court
would justifiably have made a different choice had the matter been before it *de novo*."); *Thai
Pineapple Public Co. v. United States*, 187 F.3d 1362, 1365 (Fed. Cir. 1999) ("The
methodologies relied upon by Commerce in making its determinations are presumptively
correct.") (citation omitted).

 SunPower, Canadian Solar, and Suniva contend that Commerce's final scope
determination is unlawful, because Commerce deviated from its practice of applying the

substantial transformation analysis to determine country of origin. *See*, *e.g.*, Canadian Solar Br. at 14-18, 21, 27-29; SunPower Br. at 13-16; Suniva Br. at 11-14, 21-23. As support, they cite to several cases from this Court that have sustained Commerce's substantial transformation analysis, Commerce's country-of-origin determination in the *Solar I* investigations, and Commerce's determinations in other proceedings.

But deviation from prior practice does not itself render Commerce's final scope determination improper. Because Commerce possesses "significant discretion" in determining country of origin, *Peer Bearing Co.-Changshan v. United States*, 804 F. Supp. 2d 1337, 1342 (Ct. Int'l Trade 2011) (citation omitted), Commerce is not strictly bound to the substantial transformation analysis. As with all established agency practices, Commerce "may adapt its views and practices to the particular circumstances of the case at hand" as long as it does so in a manner consistent with law, provides a reasonable explanation for doing so, and supports its decision with substantial evidence on the record. *MTZ Polyfilms, Ltd. v. United States*, 717 F. Supp. 2d 1346, 1365 (Ct. Int'l Trade 2010) (quoting *Save Domestic Oil*, 240 F. Supp. 2d at 1357) (quotation marks omitted); *see Save Domestic Oil*, 357 F.3d at 1283-84; *Packfood Pub. Co. v. United States*, 753 F. Supp. 2d 1334, 1341-42 (Ct. Int'l Trade 2011), *aff'd*, 453 F. App'x 986 (Fed. Cir. 2011); *Muller Comercial de Mexico, S. de R.L. de C.V. v. United States*, 807 F. Supp. 2d 1361, 1367-68 (Ct. Int'l Trade 2011); *Trs. in Bankr. of N. Am. Rubber Thread Co. v. United States*, 533 F. Supp. 2d 1290, 1297 (Ct. Int'l Trade 2007), *rev'd in part on other grounds*, 593 F.3d 1346 (Fed. Cir. 2010).

In this case, Commerce provided a reasonable explanation for departing from a substantial transformation analysis in its final determinations. Commerce acknowledged that it has routinely found a substantial transformation analysis to be an appropriate means of

determining the country of origin of merchandise, and used such an analysis in the *Solar I*

investigations (resulting in a finding that modules assembled in China using third-country cells

were not covered by those investigations).  AD IDM at 15.  Commerce concluded that it would

not be appropriate to do so in these *Solar II* investigations, however.  *Id.* at 15-16.  In these

investigations, the alleged injury to the domestic industry stems, in part, from modules

assembled in China using third-country cells.  Those modules are not covered by the *Solar I*

orders and "exceed the reach of the remedy afforded" by those orders.  *Id.* at 13; *see* SunPower

App'x Tab 9, Volume I at 1, 3, 7, 21, 53.  Because the purpose of the trade remedy law is to

provide relief to domestic industries suffering material injury from unfairly traded imports, *see*

*Canadian Wheat Bd. v. United States,* 641 F.3d 1344, 1351 (Fed. Cir. 2011); *Ceramica*

*Regiomontana, S.A. v. United States*, 64 F.3d 1579, 1580 (Fed. Cir. 1995), Commerce reasonably

determined that it must, when appropriate, be able to "address unfair pricing decisions or unfair

subsidization that is taking place in the exporting country where further manufacturing, such as

assembly, occurs, notwithstanding that such activities may not necessarily result in a substantial

transformation of merchandise{,}" AD IDM at 15 (citing 19 U.S.C. §§ 1671, 1673); *see id.* at 12

& n.32.  In that context, Commerce concluded that "{r}elying on the substantial transformation

analysis alone could result in failure to provide relief to the domestic industry for alleged injury

caused by a finished product produced in the subject country but which would be deemed to

originate from a third-country for {antidumping and countervailing duty} purposes{.}"  *Id.* at 15.

In other words, the rote application of a substantial transformation analysis (a practice

developed by Commerce, and not an analysis required by statute or regulation) would be

unreasonable; that would preclude an investigation of that merchandise and any examination of

whether that merchandise was being unfairly priced or subsidized – a result that is inconsistent

with the intent of the trade remedy laws.  That outcome also would have been unreasonable because the record in the *Solar II* investigations reflected widespread evasion of the *Solar I* orders, AD IDM 13, 15, unlike previous proceedings in which Commerce declined to apply an alternative country-of-origin analysis.  *See, e.g., Plate from Belgium* at 14 ("Petitioners do not point to any particular evidence of circumvention{.}") (cited in Canadian Solar Br. at 15, 34, 41).

Canadian Solar and SunPower further assert that Commerce's final scope determination is unlawful because it results in "identical" or "the same" merchandise having two countries of origin.  *See, e.g.,* Canadian Solar Br. at 12-13, 18-20, 29, 35, 40; SunPower Br. at 13-14.  As discussed above, however, Commerce reasonably determined that it was appropriate to apply a different country-of-origin analysis to modules assembled in China using third-country cells. Although a different country-of-origin analysis may apply to merchandise falling within the same class or kind (*i.e.*, solar cells and solar modules), depending on where the solar cell is produced, no one single product can have two countries of origin.  *See* AD IDM at 16.  After a module is assembled, the country of assembly would be known and the country where the cells contained in the modules were produced would be known.  Modules consisting of cells produced in China are subject to only the *Solar I* orders, irrespective of whether the module was assembled in China or a third country.  *See* Canadian Solar App'x Tab 5, Ex. 2 at 8; *Solar I* AD IDM at 5. Modules assembled in China using third-country cells are subject to only the *Solar II* orders.  AD IDM at 16.  Furthermore, the *Solar II* orders expressly exclude merchandise covered by the *Solar I* orders, *see Crystalline Silicon Photovoltaic Products From the People's Republic of China*, 80 Fed. Reg. at 8,593, and the order on solar products from Taiwan expressly excludes merchandise covered by the *Solar II* orders, *see Certain Crystalline Silicon Photovoltaic Products From*

*Taiwan*, 80 Fed. Reg. 8,596 (Dep't of Commerce Feb. 18, 2015) (antidumping duty order).

There is therefore no overlap or conflict.

SunPower contends that Commerce's determination to use an alternative country-of-origin analysis is unreasonable, absent any request by petitioner, and that Commerce should have instead required SolarWorld to request the initiation of investigations covering solar cells from other countries (as it did for Taiwan). SunPower Br. at 15-16. But SunPower misapprehends Commerce's primary authority in determining the scope of an investigation. As this Court has held, although the petitioner serves an important role because "the purpose of the petition is to propose an investigation," the responsibility and the authority to define the scope of the investigation and any resulting order lies with *Commerce*. *Duferco*, 296 F.3d at 1096-97; *accord Mitsubishi II*, 898 F.2d at 1582. Commerce's authority should not be diminished while the petitioner's role in establishing the scope is enhanced. In addition, because the statute does not provide a standard for determining country of origin, it is solely within Commerce's discretion to define the criteria for country- of-origin determinations, *see Ugine*, 551 F.3d at 1349; *see also Eurodif*, 555 U.S. at 316, and Commerce's authority is not dictated by interested party requests.

B.     Commerce Provided An Adequate Explanation Of Its Country-Of-Origin Analysis

Canadian Solar and SunPower repeatedly assert that Commerce did not explain its country-of-origin analysis or decision making process. *See, e.g.,* Canadian Solar Br. at 25, 27-29, 40-41; SunPower Br. at 16-21. But the parties ignore the explanation provided in Commerce's final determinations, which details both the factors that Commerce considered in making its country-of-origin determination and why Commerce determined that it was not appropriate to apply a substantial transformation analysis. AD IDM 12-15; *see supra* section III.A.

Their claim is also premised on an erroneous reading of Commerce's final scope determinations. Both Canadian Solar and SunPower improperly conflate Commerce's country-of-origin analysis and its reasons for departure from the substantial transformation test. Canadian Solar Br. at 22-28; SunPower Br. at 16-21. Separate from its discussion of its departure from prior practice, *see* AD IDM at 15 (beginning with the first full paragraph), Commerce's country-of-origin analysis spans several pages, within which Commerce evaluated SolarWorld's intent, the nature of the solar products industry, and concerns of adminsitrability, enforcement, and evasion. *Id.* at 12-15. As Commerce clearly explained, "{b}ased on these considerations, and in order to evaluate whether there is unfair pricing and/or subsidization of modules assembled in {China} using third-country cells, {Commerce} finds it appropriate to determine for purposes of these investigations that the country of origin of such modules is {China}." *Id.* at 15. That is the "additional analysis" of country of origin to which Commerce refers. *Id.*

Canadian Solar also asserts that Commerce did not explain why its *Solar II* country-of-origin determination was different than that in *Solar I*. Canadian Solar Br. at 19, 40. But Commerce's decisional path is reasonably discernable. *See Bowman Transp., Inc. v. Ark.–Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974) (explaining that a court may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."); *Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1369-70 (Fed. Cir. 1998). Commerce's scope analysis identifies the circumstances distinguishing the *Solar II* investigations from those of the *Solar I* investigations: (1) pre-existing orders, the scope of which was determined in part by use of a substantial transformation analysis, and which cover only a segment of the same class or kind of merchandise imported into the United States (*i.e.*, solar modules containing Chinese cells); and

(2) a significant shift in trade flows that resulted in increased imports into the United States of modules excluded from the *Solar I* orders (*i.e.*, modules assembled in China with third-country cells) that resulted in the continued injury to the domestic industry alleged by the petitioner.  AD IDM at 13, 15.  For Commerce to disregard these circumstances in reaching its determination in the *Solar II* investigations would have been unreasonable, not only because this information was on the record of the investigations, but also because it would have resulted in an incomplete understanding of the intent behind SolarWorld's petition.

Additionally, Canadian Solar and SunPower complain that the scope definition of the *Solar II* investigations arbitrarily departs from the scope definition in the orders covering solar cells from Taiwan.  Canadian Solar Br. 18, 19, 29; SunPower Br. at 13-14; *see also Certain Crystalline Silicon Photovoltaic Products From Taiwan*, 79 Fed. Reg. 76,966 (Dep't of Commerce Dec. 23, 2014) (final determ.), and accompanying IDM, *available at* http://enforcement.trade.gov/frn/summary/taiwan/2014-30107-1.pdf.  Although Commerce did not identify the Taiwan order by name, Commerce's path is once again discernable.  Commerce adequately explained why use of the substantial transformation analysis – which it used in the Taiwan investigation – was inappropriate for purposes of the *Solar II* investigations.  Like other circumstances in which Commerce has applied the substantial transformation test, the Taiwan investigation had a context distinct from the *Solar II* investigations, because there was no prior investigation or order covering a segment of the class or kind of merchandise at issue in the investigation, no prior determination regarding the country of origin of solar products produced in Taiwan, and no evidence that parties were evading a prior Taiwanese order.

C.      Commerce's Scope Clarification Is Consistent With Petitioner's Intent

Moreover, Canadian Solar and SunPower unpersuasively contend that Commerce's scope clarification is inconsistent with SolarWorld's intent which, they assert, as evidenced by the proposed scope language and supported in the supplement to the petition, was to cover only the subset of Chinese-assembled solar products incorporating third-country cells captured by the "two-out-of-three" rule. *See, e.g.,* Canadian Solar Br. at 22-26; SunPower Br. at 11, 16-18. Canadian Solar's and SunPower's claim, however, places undue weight on the scope language proposed by SolarWorld. They ignore statements throughout the petition demonstrating that SolarWorld intended the scope of the investigations to cover all solar products assembled in China using third-country cells.

As SolarWorld explained, its motivation for filing the petition was to close a "loophole" in the *Solar I* orders (*i.e.*, the exclusion of solar modules assembled from third-country cells that resulted from Commerce's use of a substantial transformation analysis in the *Solar I* investigation to determine country of origin), which led to Chinese module producers increasing exports to the United States of these modules produced with third-country cells to avoid antidumping and countervailing duties as well as continued harm to the domestic solar products industry. AD IDM at 12-13, 17-18. For example, SolarWorld stated that "Chinese and Taiwanese solar producers changed their production models slightly in order to exploit a loophole in the scope of the {*Solar I*} {antidumping and countervailing duty} orders, evade the duties, and continue pushing dumped and subsidized product into the {United States} market." SunPower App'x Tab 9, Volume I at 3. It also asserted that the data provided in the petition "plainly show how China and Taiwan have used the loophole from the prior trade case to avoid antidumping and countervailing duties, thereby continuing the harm to the domestic solar

industry{,}" *id.* at 21, that "many Chinese solar producers ceased using Chinese-manufactured

cells and began using third-country manufactured cells in their solar modules, as a result of the

{*Solar I* investigations}," *id.* at 37, and that the "absence of {antidumping} and {countervailing

duty} orders that close the current loophole for Chinese and Taiwanese imports …. {would} put

the very future of the industry at risk{,}" *id.* at 53.

SolarWorld further explained that there had been a significant shift in the merchandise

being imported into the United States, stating that although imports of modules from China

consisted largely of modules assembled with Chinese cells from 2010 through early 2012, since

that time, the majority of modules imported from China are "modules assembled in China from

solar cells completed or partially manufactured in Taiwan or other countries{.}"  AD IDM at 17-

18 (quoting SunPower App'x Tab 9, Volume I at 5-6); *see also* SunPower App'x Tab 9, Volume

I at 21 (since 2012 "the vast majority of Chinese modules entering the United States use (or

claim to use) non-Chinese cells."), 37.  SolarWorld also stated that "'Chinese modules assembled

from non-Chinese cells continued to swamp the {United States} marketplace in the first nine

months of 2013,' despite the relief provided by the *Solar I* orders."  AD IDM at 18 (quoting

SunPower App'x Tab 9, Volume I at 34).

Canadian Solar and SunPower also ignore SolarWorld's subsequent statements affirming

its intent to cover such modules.  As SolarWorld explained in its case brief, its intent "since the

start of the first solar {antidumping and countervailing duty} investigations, and throughout the

current investigations," was to "cover all cells from China and all modules from China{.}"  P.D.

795 at 5.  Further, it "filed the instant investigations specifically in order to close the loophole

created as a result of {Commerce's} scope determination in the first solar cases and to cover all

cells and modules from China{ } … to address unfair trade practices that were exacerbated as a

result of {the scope determination in the *Solar I* investigations}." *Id.* SolarWorld also expressly

acknowledged that Commerce's proposed scope clarification was "in accordance with this

longstanding intent of the petitioning domestic industry." *Id.*

In sum, SolarWorld intended to address unfair pricing and subsidization of Chinese solar

modules from producers that were relocating their cell production to a third country to avoid a

finding that "substantial transformation" occurred in China. That would, in turn, for purposes of

the *Solar I* orders, allow them to designate modules containing such cells as originating from a

third country and to export their merchandise to the United States duty-free. Accordingly,

Commerce properly concluded that SolarWorld's intent was to cover all modules assembled in

China consisting of third-country cells. Commerce therefore reasonably exercised its discretion

to modify the scope as proposed in the petition to clarify the scope and to correct the discrepancy

between SolarWorld's intended scope and the "two-out-of-three" rule proposed in the petition.

Canadian Solar also asserts that Commerce cannot rely on SolarWorld's intent in any

event, because the petitioner improperly sought to obtain a remedy against certain Chinese

producers of solar products rather than against merchandise from China. Canadian Solar Br. at

24-25. Canadian Solar, however, mischaracterizes SolarWorld's intent by isolating certain

evidence provided in the petition and cited by Commerce in its final determinations. *See AD

IDM* at 13 & n.39. In the petition, SolarWorld alleged that Chinese solar producers "changed

their production models slightly in order to exploit the loophole in the {*Solar I* orders},"

SunPower App'x Tab 9, Volume I at 3, and cited statements from five large Chinese solar

module producers and one United States importer of solar modules as evidence that supported

this claim. *Id.* at 4-5. Notably, these statements comprised only part of the supporting

information provided by SolarWorld, which also included other evidence, such as import data,

*id.* at 5-7, to establish the complexity and adaptability of the solar industry's global supply chain. The Chinese solar producers' and importer's statements and the totality of the record evidence do not demonstrate that SolarWorld sought a remedy against particular foreign companies, but rather, that it sought a remedy against harm resulting from a substantive increase in the merchandise imported into the United States after the *Solar I* investigations and orders.

> D.     Commerce's Consideration of Administrability, Enforcement, And Evasion In Its Country-Of-Origin Analysis Is Reasonable

Canadian Solar and SunPower further assert that Commerce improperly considered administrability, enforceability, and evasion factors in its country-of-origin analysis because: (i) the agency may not consider these factors in a country-of-origin analysis or use them to support a departure from a substantial transformation analysis, Canadian Solar Br. at 26, 40; (ii) the resulting scope clarification is a disproportionate response to such concerns, SunPower Br. 18-19; and (iii) the trade remedy laws provide alternative mechanisms for addressing these concerns, Canadian Solar Br. at 36; SunPower Br. 20. These claims have no merit.

First, both the United States Court of Appeals for the Federal Circuit and this Court have recognized that Commerce may consider evasion or circumvention in defining the scope of an investigation. *See Mitsubishi II*, 898 F.2d at 1582 (Commerce "justifiably decided to make the antidumping order applicable to all subassemblies other than those of minimum value, because of the potential of all of those subassemblies *to be used to evade the order*." (emphasis added)); *Mitsubishi Elec. Corp. v. United States*, 700 F. Supp. 538, 555 (Ct. Int'l Trade 1988) (*Mitsubishi I*) (Commerce has a "certain amount of discretion to expand the language of a petition to encompass the literal intent of the petition, ... with the purpose in mind of preventing *the intentional evasion or circumvention* of the antidumping duty law." (emphasis added)), *aff'd*, 898 F.2d 1577 (Fed. Cir. 1990); *see also Appleton Papers*, 929 F. Supp. 2d at 1337; *Tung Mung*

*Dev. Co. v. United States*, 219 F. Supp. 2d 1333, 1343 (Ct. Int'l Trade 2002), *aff'd*, 354 F.3d

1371 (Fed. Cir. 2004).  The courts have also recognized that Commerce has "inherent power to

establish the parameters of the investigation so as to carry out its mandate to administer the law

effectively and in accordance with its intent." *Torrington Co. v. United States*, 745 F. Supp. 718,

728 (Ct. Int'l Trade 1990) (citation and quotation marks omitted), *aff'd*, 938 F.2d 1276 (Fed. Cir.

1991); *see also Mitsubishi II*, 898 F.2d at 1582-83 ("The determination of the applicable scope of

an antidumping order that will be effective to remedy the dumping that {Commerce} has found

lies largely in {Commerce's} discretion").  Thus, Commerce's decision to consider evasion and

circumvention as part of its country-of-origin analysis was a proper exercise of its discretion to

define the scope of an investigation.

Second, Canadian Solar and SunPower ignore Commerce's long standing practice of

considering circumvention concerns when defining the scope.  AD IDM at 14.  For example, in

*Large Newspaper Printing Presses from Germany*, Commerce clarified that incomplete

merchandise was covered by the scope, explaining that it was concerned that "a party may

attempt to exclude its merchandise from the scope of these investigations on the basis of a lack

of completion{,}" and that its intent was to "avoid creating loopholes for circumvention,

including those arising from differing degrees of completeness of the imported merchandise."

*Large Newspaper Printing Presses and Components Thereof, Whether Assembled or

Unassembled, From Germany*, 61 Fed. Reg. 38,166, 38,169 (Dep't of Commerce July 23, 1996),

*sustained by Mitsubishi Heavy Indus.*, 986 F. Supp. at 1434 ("Commerce's scope clarification

represents a reasonable attempt by Commerce to balance respondents' concerns for finality and

the fairness of Commerce's investigation, with the statutory duty to issue an effective and

administrable antidumping duty order."); *see also Cellular Mobile Telephones and*

*Subassemblies From Japan*, 50 Fed. Reg. 45,447, 45,448 (Dep't of Commerce Oct. 31, 1985)

(final determ.) ("The determination to include subassemblies within the scope of the

investigation was based on the *need to prevent circumvention* of any antidumping order on

{cellular mobile telephones (CMTs)} through the importation of major CMT subassemblies, and

{Commerce's} broader conclusion that the investigation properly should include

subassemblies." (emphasis added)), *sustained by Mitsubishi I*, 700 F. Supp. at 556, *aff'd*,

*Mitsubishi II*, 898 F.2d at 1582-83.

Third, Commerce's scope determination reasonably addressed the administrability and

enforceability issues apparent from the record and interested parties' comments, including those

from producers and importers of subject merchandise.  Rather than unfairly burdening trade, as

SunPower contends, SunPower Br. at 19, the clarification instead simplifies the criteria by which

products qualify as subject merchandise.  During the investigations, certain parties reported that

they do not currently track where the ingots, wafers, or partial cells used in third-country cells

being assembled into modules in China are produced, and that it would be "virtually impossible"

for importers to have that information.  *See* AD IDM at 14 & n.45.  By eliminating the need for

producers, exporters, and importers to track that information, Commerce improved the likelihood

that parties would be able to determine whether their products are covered by these *Solar II*

orders and properly report the merchandise at the time of entry.

Nevertheless, and notwithstanding its purported concern about the extent to which the

scope burdens trade, SunPower asserts that Commerce should have instead required

certifications to administer the scope.  SunPower Br. at 19.  But Commerce's decision is

discretionary, because there is no statutory or regulatory requirement that Commerce institute a

certification program.  *See Appleton Papers*, 929 F. Supp. 2d at 1337.  In these investigations,

34

Commerce exercised its discretion to determine how best to administer the scope and determined

that it was appropriate to choose another approach, particularly in light of record information

indicating that Chinese companies would have difficulties tracking their merchandise to identify

which merchandise falls within the scope of the "two-out-of-three" rule.  *See Suramerica de*

*Aleaciones Laminadas, C.A. v. United States*, 966 F.2d 660, 665 (Fed. Cir. 1992) (holding that

policy decisions are left to Commerce's discretion).  SunPower consequently fails to establish

that Commerce's clarification of the scope to improve the orders' administrability or

enforceability is unreasonable.

Fourth, Canadian Solar's and SunPower's contentions that Commerce may address

circumvention or evasion concerns under only the anti-circumvention provisions of the statute,

*see* Canadian Solar Br. at 26-27, 35-36; SunPower Br. at 20, is based on a myopic interpretation

of the law.  That the provisions governing investigations do not specify that Commerce may

consider circumvention or evasion in determining the country of origin of a product does not

mean that Commerce is precluded from doing so.  Commerce enjoys maximum deference in

interpreting a statute when a provision is silent with respect to the precise question.  *See, e.g.,*

*Chevron U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 843 (1984); *Eurodif*, 555 U.S.

at 316.  The statute does not define "foreign" or provide a standard for Commerce to apply in

determining whether the merchandise under investigation is a domestic product or a product of a

foreign country.  *See Du Pont*, 8 F. Supp. 2d at 858.  In light of the statute's silence, Commerce

has discretion in defining the criteria for country-of-origin determinations, and thus may consider

circumvention or evasion, if appropriate.  *See Ugine*, 551 F.3d at 1349.

Moreover, if Canadian Solar's and SunPower's arguments were accepted, Commerce

would be unable to administer the trade remedy laws in accordance with legislative intent, *see*

*Tung Mung*, 219 F. Supp. 2d at 1343; *Mitsubishi I*, 700 F. Supp. at 556, because Commerce

would be prohibited from ensuring that a scope that encompassed a petitioner's intent was not

vulnerable to circumvention or evasion.  Because the general purpose of the trade remedy law is

to provide relief to domestic industries suffering material injury from unfairly traded imports, *see*

*Canadian Wheat Bd.,* 641 F.3d at 1351; *Ceramica Regiomontana*, 64 F.3d at 1580, Congress

could not have intended to preclude Commerce from ensuring during the investigation that the

scope could reasonably cover those imports of subject merchandise causing the alleged injury to

the domestic industry.

      E.      Commerce Reasonably Exercised Its Authority To Clarify The Scope In Its Final
             Determination

      In addition, Canadian Solar and SunPower assert that the timing of Commerce's scope

clarification calls into question the finality and validity of the final determinations in the *Solar II*

investigations, because the interested parties were denied "due process"[9] and the record does not

support Commerce's final determinations.  Canadian Solar Br. at 30-33; SunPower Br. at 21-24.

These claims should be rejected.  As we explain below, the interested parties received notice and

sufficient opportunity to comment on Commerce's scope clarification, and Commerce exercised

---

[9] Canadian Solar and SunPower frame the issue as one of "due process."  Canadian Solar Br. at 31; SunPower Br. at 22, 23.  Parties do not have a property interest in importing into the United States and thus there is no constitutional "due process" right in Commerce proceedings. *See Am. Ass'n of Exps. & Importers-Textile & Apparel Grp. v. United States*, 751 F.2d 1239, 1250 (Fed. Cir. 1985); *see also, e.g., Tianjin Magnesium Int'l Co. v. United States*, No. 09-00535, 2011 Ct. Intl. Trade LEXIS 16, at *12 (Ct. Int'l Trade Feb. 11, 2011), *aff'd*, 475 F. App'x. 340 (Fed. Cir. 2012) (*per curiam*); *Cosco Home & Office Prods. v. United States,* 350 F. Supp. 2d 1294, 1301 (Ct. Int'l Trade 2004), *aff'd*, 158 F. App'x 284 (Fed. Cir. 2005) (*per curiam*).  This Court has previously framed the issue as whether Commerce provided sufficient administrative process, that is, some type of notice and opportunity to respond (typically that provided by statute and agency regulation).  *See, e.g., Mid Continent Nail Corp. v. United States*, 712 F. Supp. 2d 1370, 1375 (Ct. Int'l Trade 2010).  Thus, we have framed the issue in a similar manner.

its authority to clarify the scope of the investigation reasonably and supported its determinations with substantial evidence.

> i.    The Interested Parties Were Afforded The Process To Which They Were Entitled

Canadian Solar and SunPower assert that Commerce's clarification of the scope in its final determinations deprived the interested parties of sufficient notice of Commerce's intent to clarify scope and unlawfully curtailed the parties' ability to avail themselves of procedural safeguards.  Canadian Solar Br. at 31-32; SunPower Br. at 21-22.  This claim is meritless.

The administrative record demonstrates that Commerce not only put the interested parties on notice that it was considering the appropriate analysis to determine country of origin, but also notified the parties of the potential scope clarification and afforded them two opportunities to comment on product coverage.  First, consistent with its normal practice, Commerce provided the interested parties with an opportunity to file comments regarding product coverage following initiation of the investigations.  AD IDM at 11; AD PDM at 2 & n.4.  Numerous interested parties filed scope comments and rebuttal comments, including Canadian Solar, Suniva, Yingli, and SolarWorld.  AD IDM at 23 & n.86.  Second, Commerce considered these comments in issuing its preliminary determinations, and it expressly notified the parties that it was continuing to analyze the parties' scope submissions, "including comments on whether it is appropriate to apply a traditional substantial transformation *or other analysis* in determining the country of origin of certain solar modules described in the scope of the investigation."  AD PDM at 5 (emphasis added); *see also* CVD PDM at 4 ("{Commerce} is continuing to analyze the scope comments received in these investigations.").

Third, in its October 3, 2014 letter, Commerce notified the interested parties that it was considering clarifying the scope, and provided an opportunity for the parties to both comment on

the substance of the contemplated clarification in their case briefs and to provide additional edits

to the scope language or to propose alternative language.  Canadian Solar App'x Tab 8.  In

response, interested parties, including Canadian Solar, Suniva, SunPower, Yingli, and

SolarWorld, addressed the proposed scope clarification in their case and rebuttal briefs.

Canadian Solar App'x Tab 9 at 8-27 (respondents); Canadian Solar App'x Tab 10 at 2-11

(Changzhou Trina Solar Energy Co., Ltd.); Suniva App'x Tab 11 at 4-11 (Suniva); P.D. 785 at

12 (Renesola Jiangsu Ltd.); P.D. 795 at 4-10 (SolarWorld); P.D. 801 at 3-9 (Shangluo BYD

Industrial Co., Ltd. and Shanghai BYD Co., Ltd. rebuttal); Canadian Solar App'x Tab 11 at 3-6

(Changzhou Trina Solar Energy Co., Ltd. rebuttal); Canadian Solar App'x Tab 12 at 5-19

(respondents' rebuttal); P.D. 811 at 1-27 (SolarWorld rebuttal).

Therefore, the record demonstrates that Commerce repeatedly notified the interested

parties of its continued deliberations regarding scope, and thereby provided the parties "fair

warning" of a change to the scope.  *Mid Continent Nail Corp. v. United States*, 725 F.3d 1295,

1300 (Fed. Cir. 2013) (citation omitted).  And Commerce then gave the parties more than

adequate opportunity to comment on the proposed scope clarification.  *See, e.g., Mid Continent

Nail*, 712 F. Supp. 2d at 1375 ("If, however, a plaintiff makes thoughtful comments that

Commerce addresses in its determination, then, 'as a practical matter, {the plaintiff} was not

substantially deprived of an opportunity to be heard before the agency." (quoting *Borden, Inc. v.

United States*, 23 Ct. Int'l Trade 372, 375 n.3 (1999), *rev'd in part on other grounds*, 7 F. App'x

938 (Fed. Cir. 2001)) (quotation marks omitted) (alterations in original)); *Tianjin Magnesium*,

2011 Ct. Intl. Trade LEXIS 16, at *13; *Sichuan Changhong Elec. Co. v. United States*, 466 F.

Supp. 2d 1323, 1327 (Ct. Int'l Trade 2006) (rejecting plaintiff's claims that the ITC "denied

{plaintiff} a meaningful opportunity to participate in the administrative proceeding by having

only four days to review and comment on the updated financial information and by not being permitted to submit new factual information."). The parties therefore received the process to which they were entitled.

Although Canadian Solar and SunPower analogize the *Solar II* investigations to the proceedings at issue in *Allegheny*, *Smith Corona*, and *Royal Business Machines*, their reliance on these cases is misplaced. Canadian Solar Br. Br. at 32; SunPower Br. at 12-13; *Allegheny*, 342 F. Supp. 2d at 1187; *Smith Corona Corp. v. United States*, 796 F. Supp. 1532, 1535 (Ct. Int'l Trade 1992); *Royal Business Machines, Inc. v. United States*, 507 F. Supp. 1007, 1014 (Ct. Int'l Trade 1980), *aff'd*, 669 F.2d 692 (C.C.P.A. 1982).

In *Allegheny*, which concerned an appeal of a scope ruling, the Court held that Commerce could not rely on a scope determination made during the investigation to interpret the language of the order, because the determination was made at a late stage in the investigation, was reached without a thorough inquiry, and was based on unpersuasive reasoning. 342 F. Supp. at 1187-90. In contrast to *Allegheny*, and as explained above, Commerce conducted a thorough inquiry prior to reaching its final scope determination in the *Solar II* investigations by providing the interested parties with notice of the possible scope clarification, soliciting and considering comments from the parties on the clarification, and providing a fulsome explanation of its final scope decision.

Further, the Court in *Allegheny* explained that concerns of finality "caution against including a product that was *understood to be excluded at the time the investigation began*." *Allegheny*, 342 F. Supp. 2d at 1187-88 (emphasis added). That scenario was not present in the *Solar II* investigations, and thus the reasoning in *Allegheny* has no application in this case. As discussed in section III.B, the record demonstrates that SolarWorld's expressed intent was to cover modules assembled in China using third-country cells and that there was a discrepancy

between this intent and the scope language proposed in the petition.  Given this discrepancy, it
would be unreasonable to afford greater weight to the "two-out-of-three" language proposed in
the petition than to SolarWorld's stated intent, or to conclude that the proposed scope language
established such a clear understanding of what was covered by the investigation that Commerce
could not reasonably exercise its discretion to clarify the scope language to be consistent with
petitioner's intent.

Smith Corona is also distinguishable from the Solar II investigations.  In Smith Corona,
Commerce determined not to expand the scope of the investigation, as requested by the
petitioner, because the petitioner's request (made after the preliminary determination) was
untimely and vague.  796 F. Supp. at 1534.  The Court sustained Commerce's determination,
explaining that Commerce "must exercise caution in redefining scope in midstream to include
items which were clearly known about and excluded at the time of initiation of the
investigation," and that changing the scope at late stages of the investigation could deprive the
parties of the full benefit of procedural safeguards like the opportunity to respond and to be
heard.  Id. at 1535 (emphasis added).  Unlike Smith Corona, in which the petitioner requested a
scope modification for the first time following the preliminary determination and in response to a
mandatory respondent changing its operations during the investigation, in this case, SolarWorld
expressed its intent in the petition to cover modules assembled in China using third-country cells.
Moreover, the interested parties in this case received the full benefit of the procedural safeguards
provided in the trade remedy laws, because they were notified of the potential scope clarification
and given an opportunity to comment.

Royal Business Machines is also of limited relevance to this case.  Although the Court
explained that "{e}ach stage of the statutory proceeding maintains the scope passed on from the

40

previous stage{ }" and that "the class or kind of merchandise described in the petition, which

becomes the subject of investigation … is the subject of the preliminary injury determination …

and the final determinations," 507 F. Supp. at 1014, the Federal Circuit has since recognized that

the scope proposed in the petition does not rigidly dictate the scope of the investigation.  Instead,

Commerce is granted a significant amount of discretion throughout the proceeding to determine

"the applicable scope of an antidumping order that will be effective to remedy the dumping that

{Commerce} has found."  *Mitsubishi II*, 898 F.2d at 1582-83.  It is in fact *Commerce's*

"responsibility to determine the proper scope" of an "investigation and of the antidumping

order," *id.* at 1582, and although the "petition initially determines the scope of the investigation,"

Commerce is not tied to an initial scope definition that "may not make sense in light of the

information available to {Commerce} or subsequently obtained in the investigation{,}" *Duferco*,

296 F.3d at 1089 (citation and quotation marks omitted).  Similarly, the Court has acknowledged

that "there is no clear point during the course of an antidumping investigation at which

Commerce loses the ability to adjust the scope," *Allegheny*, 342 F. Supp. 2d at 1187, and that

Commerce may depart from the scope as proposed by a petition if the petition is in some way

"defective," *Ad Hoc Shrimp*, 637 F. Supp. 2d at 1175.  Accordingly, Commerce is not bound by

the language of the petition for the length of the investigation.

Canadian Solar moreover argues that Commerce's clarification of scope contradicted its

practice to identify scope early on in the administrative proceeding.  Canadian Solar Br. at 30.

Although it is preferable to define the scope of an investigation as early in the process as

possible, each investigation is unique, and Commerce has the flexibility to adjust the scope as the

facts and circumstances require.  *See Duferco*, 296 F.3d at 1089 ("Commerce has inherent power

to establish the parameters of the investigation, so that it would not be tied to an initial scope

definition that . . . may not make sense in light of the information available to {Commerce} or subsequently obtained in the investigation." (citation and quotation marks omitted)).  The scope of the order can change during the investigation and is not final until the order is published.

Finally, Canadian Solar contends that the ITC's like product and injury findings are unsupported by substantial evidence as a result of the timing of Commerce's scope clarification. Canadian Solar Br. at 32-33.  The validity of the ITC's final determination is not at issue in this action, however.  Canadian Solar's cause of action is limited to a challenge to Commerce's *Solar II* investigations and orders.  *See* Am. Compl. *Canadian Solar Inc. v. United States* (No. 15-00088), Dkt. No. 11 at ¶¶1-3, and (No. 15-00089), Dkt. No. 11 at ¶¶1-3.  Indeed, the case to which Canadian Solar cites, *Co-Steel Raritan*, Canadian Solar Br. at 32, was an action to challenge a decision of the ITC, not Commerce.  *See Co-Steel Raritan, Inc. v. ITC*, 357 F.3d 1294 (Fed. Cir. 2004).  To the extent Canadian Solar is attempting to argue that Commerce's orders cover merchandise not included within the scope of the ITC's injury determination, those claims also are inconsistent with the record.  Following Commerce's final determinations, the ITC allowed for submission of factual information concerning the revision of Commerce's scope, invited comments from the parties, and considered Commerce's scope clarification when finding material injury to domestic industry.  *See, e.g.,* P.D. 844 at 8, I-4, I-13–I-17, Appendix E.

  ii. <u>The Record Supports Commerce's Final Determinations</u>

SunPower's and Canadian Solar's challenges to the substantiality of the evidence supporting Commerce's scope determination are likewise unpersuasive.  SunPower Br. at 21-24; Canadian Solar Br. at 31.

SunPower contends that the record does not support Commerce's antidumping margin calculations, because the information is limited to sales subject to the scope in effect at the outset

of the investigation.  SunPower Br. at 21-22 & n.6.  But the record includes information

concerning all sales of merchandise covered by the scope as defined in the final determinations.

As Commerce explained, the mandatory respondents[10] in the antidumping duty investigation

reported all United States sales of solar products containing third-country cells, not just those

that met the "two-out-of-three" rule, *i.e.*, containing ingots, wafers, or partially completed cells

manufactured in China.  *See* AD IDM at 19 & n.66 (citing P.D. 397 at C-1 (Trina Solar Sec. C

response) (noting that the database included United States sales of modules assembled in China

using Taiwanese cells); P.D. 372 at 25 (Renesola Sec. A response) ("The laminates, panels and

modules that Renesola { } sold to the {United States} during the {period of investigation} were

produced from solar cells manufactured in Taiwan and Korea."); P.D. 101, Attach. I at 2 n.1

(Jinko Solar quantity and value (Q&V) questionnaire response) (noting that respondent assumed

all its sales during the period of investigation were subject to the scope of the investigation)); *see*

*also* P.D. 120 at 1-2 (Trina Solar Q&V questionnaire response) ("We have reported all sales of

Chinese modules not covered by the scope of the original investigations."); P.D. 398 at 2

(Renesola Sec. C response) ("the subject merchandise reported in this response consists of

modules which were assembled in China using cells produced in Korea and Taiwan.  All of

Renesola's sales during the {period of investigation} were of modules assembled in China using

cells produced in Korea and Taiwan.").

Similarly, application of the scope clarification had little if any impact on the separate

rate respondents.  Most separate rate respondents reported in their Q&V questionnaire responses

all solar modules containing solar cells from third countries, because they claimed that they did

---

[10] The mandatory respondents in the antidumping duty investigation were Changzhou Trina Solar Energy Co., Ltd. and Trina Solar (Changzhou) Science & Technology Co., Ltd. (collectively, Trina Solar), and Renesola Jiangsu Ltd., Renesola Zhejiang Ltd. (Renesola), Jinko Solar Co. Ltd. and Jinko Solar Import and Export Co., Ltd.  *See* AD PDM at 3 & n.10.

not know the source of the wafer contained in the solar cells they purchased from third countries. AD IDM at 23 & n.85 (citing P.D. 101, Attach. I at 2 n.1 (Jinko Solar); P.D. 116 at 4 (Yingli Green Energy Holding Company and Yingli Green Energy Americas, Inc.); P.D. 117 at 3-4 (Canadian Solar); P.D. 364 at Exhibit A-1 (Trina Solar)); *see also* P.D. 90 at 2 (Wuhan FYY Technology Co., Ltd.); P.D. 95 at 2 (Shenzhen Jiawei Photovoltaic Lighting Co. Ltd.); P.D. 97 at 2 (Sunergy (S.Z.) Co., Ltd.); P.D. 98 at 2 (Jiawei Solarchina Co., Ltd.); P.D. 106 at 2-3 (SunPower Systems SARL); C.D. 49/P.D. 109 at 7 (Motech (Suzhou) Renewable Energy Co., Ltd.); C.D. 50/P.D. 110 at 7 (CEEG Nanjing Renewable Energy Co., Lt.); C.D. 52/P.D. 112 at 8 (Hanwha Solarone (Qidong) Co., Ltd.); C.D. 64/P.D. 128 at 8 (Asun Energy Co., Ltd.); C.D. 65/P.D. 129 at 8 (Hanwha Solarone Hong Kong Limited).  These repeated statements during the investigations by interested parties contradict SunPower's assertion that "there is no definitive evidence in the record" on this point.  SunPower Br. at 22 n.6.  Consequently, the scope clarification resulted in no change to either of the mandatory respondents' United States sales database, or the separate rate respondents' reported quantity and value, and did not require Commerce to collect any additional information from the companies because the necessary information was already on the record.  AD IDM at 19, 23.

Furthermore, Canadian Solar argues that the record does not support Commerce's final determinations, because the timing of Commerce's proposed scope clarification occurred after the record was closed to new factual information, which purportedly precluded respondents from submitting new factual evidence addressing the proposed scope definition.  Canadian Solar Br. at 31.  Canadian Solar does not identify any information that it could have submitted, but did not. More importantly, despite having the opportunity to comment on the proposed clarification, Canadian Solar has not identified any record evidence indicating either (i) that it, or any other

interested party attempted to submit new factual information related to the proposed scope clarification, and (ii) that Commerce rejected such information.  Accordingly, Canadian Solar failed to exhaust its administrative remedies and the Court should disregard Canadian Solar's argument.  *See Mittal Steel Point Lisas Ltd. v. United States*, 548 F.3d 1375, 1383-84 (Fed. Cir. 2008); *Sandvik Steel Co. v. United States*, 164 F.3d 596, 599 (Fed. Cir. 1998).

None of the exceptions to exhaustion applies.  For example, Canadian Solar has failed to demonstrate that an attempt to submit factual evidence would have been futile, *i.e.*, that it would have been required to go through obviously useless motions to preserve its rights.  *See Ceramark Tech., Inc. v. United States*, 61 F. Supp. 3d 1371, 1375 (Ct. Int'l Trade 2015); *Aluminum Extrusions Fair Trade Comm. v. United States*, 938 F. Supp. 2d 1337, 1341 (Ct. Int'l Trade 2013).  The regulations allow parties to seek permission to file untimely factual information at any point in the proceeding.  Section 351.301(a) of Commerce's regulations states that, notwithstanding deadlines for the submission of factual information, Commerce "may request any person to submit factual information at any time during a proceeding or provide additional opportunities to submit factual information."  Correspondingly, 19 C.F.R. § 351.302(b) provides that Commerce may, for "good cause," extend any time limit for the submission for factual information.  Further, section 351.302(c) states that interested parties may file an extension request after a deadline has expired if they demonstrate that an "extraordinary circumstance" exists (*i.e.*, an unexpected event that precluded a party from timely filing an extension request).  Thus, Canadian Solar could have requested, given notification of the proposed clarification after the preliminary determinations, that Commerce extend the deadline for factual information related to scope.  It did not do so.  In the absence of such a request, or a determination by

Commerce regarding the request, there is no basis to conclude that the interested parties were precluded from submitting relevant scope information to Commerce.

IV.     Commerce's Determinations Regarding Modules Assembled In China Using United States Solar Cells Is Reasonable

Next, Suniva contends that Commerce's final scope determination is unlawful, because the final scope purportedly covers United States domestic merchandise (*i.e.*, solar products with a United States country of origin) even though Commerce may impose antidumping and countervailing duties on only "foreign" merchandise.  Suniva Br. at 10-15.  It claims further that Commerce erred by refusing to craft an exception in the *Solar II* orders' scope language for modules produced with United States cells.  *Id.* at 15-22.  Suniva's claims are meritless, because the scope of the *Solar II* investigations and resulting orders does not cover any United States domestic merchandise.  *See* AD IDM at 29.

First, the solar products covered by the *Solar II* orders are of Chinese origin, not United States origin.  Commerce has not published orders on domestic merchandise.  By operation of *Solar II*, solar modules assembled in China and consisting of third-country cells are products of China.  Thus, as Commerce explained, "we have only applied {antidumping} and {countervailing duty} measures to products determined to have a country of origin of China.  We have not applied such measures to products determined to have country of origin of the United States."  AD IDM at 29.

Suniva is correct that 19 U.S.C. § 1673 instructs that antidumping duties apply to "foreign merchandise."  But, as we explained above, the term "foreign" is not defined.  Suniva provides no authority to suggest that Commerce may not exercise its gap-filling authority to determine, on a case-by-case basis, what merchandise is "foreign" for purposes of the statute.  *See Eurodif*, 555 U.S. at 316.  And, due to the particular facts on the record of these

46

investigations and its determination that the substantial transformation test was not appropriate to determine country of origin, Commerce's interpretation of "foreign merchandise" in this case to cover modules assembled in China is reasonable and entitled to deference.

Second, Commerce did not err when refusing to include a scope exception for Suniva's solar products assembled in China from United States cells.  It was not necessary to add an exclusion for modules containing United States cells, because Commerce determined that Suniva's merchandise is Chinese, not United States, in origin for purposes of the *Solar II* investigations.  AD IDM at 29; *see also id.* at 11-19.[11]  Suniva's request for that exception was erroneously premised on its belief that Commerce should apply a substantial transformation analysis and on its assertion that its merchandise had a United States country of origin.  *See id.* at 29; Suniva App'x Tab 11 at 11.  Again, Commerce had the discretion to depart from its substantial transformation analysis and to conduct an alternative country-of-origin analysis for the *Solar II* investigation, and its choice is supported by substantial evidence and is in accordance with law.

Suniva contends that, without the exception, the *Solar II* orders apply duties to "domestic products" and thereby harms, not protects, the domestic industry.  Suniva Br. at 15.  Not only does Suniva once again erroneously assume that Commerce was required to use the substantial transformation analysis, but also Suniva did not argue in the underlying investigation that the absence of an exclusion would result in harm to the domestic industry, and as a result failed to exhaust its administrative remedies with respect to this claim.  *Mittal Steel*, 548 F.3d at 1383-84. Further, the broad assertion of harm to the "domestic industry" improperly implies that Suniva's

---

[11] Although Commerce's explanation on Suniva's issue on page 29 of the AD IDM is brief, *id.* at 29, its determination is built on the fulsome explanation in the previous sections of the AD IDM, and therefore Commerce's path is reasonably discernable and should be sustained. *See Bowman*, 419 U.S. at 285-86; *Wheatland Tube*, 161 F.3d at 1369-70.

position represents the domestic industry as a whole.  The record demonstrates that there were only two United States producers of solar cells at the time the investigations were initiated: Suniva and SolarWorld.  C.D. 22/P.D. 38, Attachment II at Tables 1 and 2 (showing respective percentage of production).  Crucially, SolarWorld – the petitioner in the underlying investigations and a significant producer of cells in the United States – supported Commerce's scope clarification, and made no allegations that a scope as adopted in the final determinations would harm the domestic industry.  P.D. 795 at 4-8.

V.     SunPower And Suniva Fail To Demonstrate Error In Commerce's Instructions to CBP Or Improper Suspension of Liquidation

SunPower and Suniva further contend that, even if this Court sustains Commerce's final determinations, nonetheless this Court should hold that Commerce's final scope should apply only on or after the date of the publication of the final determinations, or alternatively, the orders.  SunPower Br. at 24; Suniva Br. at 23.  Their claim is premised on their purported lack of notice of Commerce's scope clarification.  But Suniva and SunPower fail to explain how Commerce has acted improperly.  Despite their assertion of "retroactive" application of Commerce's scope clarification, they fail to provide any evidence to support it, and they otherwise fail to develop their argument such that we can respond.  This issue therefore is waived and this Court should disregard this issue.  *See Engel Indus. v. Lockformer Co.*, 166 F.3d 1379, 1383 (Fed. Cir. 1999); *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived").

In any event, the record evidence in fact belies their claim and there is no evidence that Commerce has "retroactively" applied the final scope definition.  Commerce's suspension and cash deposit instructions applied the clarified scope, for purposes of the *Solar II* antidumping

duty proceeding, to merchandise entering *on or after* the publication of the antidumping final

determination.  Further, Commerce's suspension and cash deposits instructions applied the

clarified scope, for purposes of the *Solar II* countervailing duty proceeding, to merchandise

entering *on or after* the date of the ITC's affirmative injury determination following the

publication of the countervailing duty final determination.

Following publication of the preliminary countervailing duty determination in the

*Federal Register* on June 10, 2014, Commerce instructed CBP to suspend and collect cash

deposits for entries covered by the scope in the countervailing preliminary determination (*i.e.,*

meeting the "two-out-of-three" test) and that entered the United States on or after June 10, 2014.

*See* CVD P.D. 287 ¶2 (message no. 4163305) (citing message no. 4034301, notice of inv.

initiation); *id.* ¶4.  Similarly, following publication of the preliminary antidumping duty

determination on July 31, 2014, Commerce instructed CBP to suspend the liquidation of and to

collect cash deposits for entries covered by the scope in the preliminary determination and that

entered the United States on or after July 31, 2014.  *See* P.D. 747 at ¶2 (message no. 4220303)

(citing message no. 4034303, notice of inv. initiation); *id.* ¶4.

Subsequently, after publication of the final antidumping determination on December 23,

2014, Commerce instructed CBP to suspend the liquidation of and to collect cash deposits for

entries covered by the scope in the final antidumping determination and that entered the United

States on or after December 23, 2014.  P.D. 833 at ¶4 (message no. 5002303); P.D. 836 at ¶4

(same).  Following the publication of the orders on February 18, 2015, Commerce instructed

CBP to suspend the liquidation of and to collect cash deposits for entries covered by the scope of

the antidumping order and that entered the United States on or after February 18, 2015, P.D. 846

at ¶3 (message no. 5051302), and covered by the scope of the countervailing duty order and that

entered on or after February 10, 2015 (the date of publication of the ITC's final injury

determination), CVD P.D. 416 ¶3 (message no. 5051303, regarding amending final

determination and order).[12]

Neither Suniva nor SunPower has identified any language in these or any other

instructions issued by Commerce that is in error, nor have they provided any evidence that

entries were improperly suspended between the preliminary and final determinations in the

investigations (*i.e.* that merchandise *not* covered by the scope published in the preliminary

determinations was suspended by CBP).  Absent that evidence, SunPower and Suniva have not

demonstrated any injury, and thus the Court should reject their claim.

VI.  <u>This Court Should Not Direct Commerce To Revoke The *Solar II* Orders</u>

Canadian Solar contends that it is appropriate for this Court to direct Commerce to

revoke the *Solar II* orders.  Canadian Solar Br. at 14.  This is not a proper request for relief.  *See*

*Jacob Siegel Co. v. FTC,* 327 U.S. 608, 611-12 (1946) ("Here, as in the case of orders of other

administrative agencies under comparable statutes, judicial review is limited. It extends no

further than to ascertain whether the {agency} made an allowable judgment in its choice of the

remedy."); *W. Watersheds Project v. Foss*, No. CV 04-168-MHW, 2006 WL 2868846, at *2 (D.

Idaho Oct. 5, 2006) ("{A} court cannot direct the substance of an agency determination on

remand." (citing *S. Prairie Constr. Co. v. Local No. 627*, 425 U.S. 800 (1976))).  If the Court

were to agree with SunPower's, Canadian Solar's, or Suniva's theory of the case that the scope

language in Commerce's final determinations constitutes an unlawful departure from its prior

decisions, and to determine that Commerce's final determinations are unsupported by substantial

---

[12] Commerce did not issue instructions notifying CBP following the final countervailing duty determination, because the provisional measures period for suspension of liquidation and collection of cash deposits of entries covered by the countervailing duty investigation had expired on October 8, 2014.  *See* CVD P.D. 355 ¶¶1, 4 (message no. 4283302).

evidence or contrary to law, the only proper remedy would be to remand for reconsideration or for further explanation. *Id.*; *cf. also Maverick Tube Corp. v. United States,* 107 F. Supp. 3d 1318, 1340 n.6 (Ct. Int'l Trade 2015) ("Commerce may depart from past practices for good reason, but must provide a reasoned explanation for its departure." (citing *Nippon Steel Corp. v. ITC*, 494 F.3d 1371, 1378 n.5 (Fed. Cir. 2007)).

## VII.   The Legality Of The Scope Language Proposed In The Petition Is Irrelevant

Finally, SunPower argues that the scope language that SolarWorld originally proposed in the petition, *i.e.*, the "two-out-of-three" rule, is unsupported by substantial evidence and contrary to law.  SunPower Br. at 24.  Commerce, however, properly determined that this issue was mooted by the change in the scope definition and thus is irrelevant, because Commerce did not use the "two-out-of-three" rule to define scope in its final determinations and consequent antidumping and countervailing duty orders.  AD IDM at 29.  This Court reviews Commerce's *final* determinations, 19 U.S.C. §§ 1516a(a)(2)(B)(i), 1671d(a), 1673d(a), and in any event, because the issue is moot, any decision by this Court concerning the "two-out-of-three" proposed scope language would constitute an impermissible advisory opinion.  *See Muskrat v. United States*, 219 U.S. 346, 361 (1911) (Judicial power is limited by Article III to deciding actual "cases" or "controversies").  To the extent SunPower speculates that Commerce could conceivably later adopt the "two-out-of-three" rule following proceedings before this Court, its challenge is premature and not ripe for adjudication.  *See Nat'l Park Hospitality Ass'n v. DOI*, 538 U.S. 803, 807-08 (2003).

## CONCLUSION

For these reasons, we respectfully request that the Court deny the plaintiffs' motions for judgment upon the administrative record and enter judgment for the United States.

Respectfully submitted,

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/Reginald T. Blades, Jr.
REGINALD T. BLADES, JR.
Assistant Director

OF COUNSEL:

REBECCA CANTU
Senior Attorney
Office of the Chief Counsel
   for Trade Enforcement & Compliance
U.S. Department of Commerce

s/Melissa M. Devine
MELISSA M. DEVINE
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 616-0341
Fax: (202) 514-8624
Email:  melissa.m.devine@usdoj.gov

February 9, 2016

Attorneys for Defendant

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify, pursuant to section 2(B)(1) of the Standard Chambers Procedures of this Court and this Court's July 1, 2015, scheduling order, that this brief contains 14,864 words, excluding the table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature, as calculated by the word processing system used to prepare this brief (Microsoft Word).

<u>s/ Melissa M. Devine</u>
Melissa M. Devine
Trial Attorney
Department of Justice
Civil Division