## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

SUNPOWER CORPORATION,

                **Plaintiff,**

and

CANADIAN SOLAR INC., *et al.*,

                **Plaintiff-Intervenors,**

      **v.**

UNITED STATES,

                **Defendant,**

and

SOLARWORLD AMERICAS, INC.,

                **Defendant-Intervenor.**

Consol. Court No. 15-00067

Before: Hon. Donald C. Pogue, Senior Judge

**PUBLIC DOCUMENT**

**Contains No Business Proprietary Information**

## DEFENDANT-INTERVENOR SOLARWORLD AMERICAS, INC.'S RESPONSE BRIEF

Timothy C. Brightbill, Esq.
Laura El-Sabaawi, Esq.

**WILEY REIN LLP**
1776 K Street, N.W.
Washington, D.C.  20006
(202) 719-7000

*Counsel to SolarWorld Americas, Inc.*

February 9, 2016

Consol. Ct. No. 15-00067

## TABLE OF CONTENTS

I.   INTRODUCTION.................................................................................................................1

II.  RULE 56.2 STATEMENT ....................................................................................................2

    A.    Administrative Decision Sought to Be Reviewed ...................................................2

    B.    Statement of Issues Presented and Summary of Arguments ...................................3

          1.    Whether Commerce's scope clarification, which clarified the scope to include solar modules assembled in China from third-country cells, was supported by substantial evidence and otherwise in accordance with law? 3

          2.    Whether Commerce's decision not to rely solely on its substantial transformation test was reasonable, lawful and, given the unique facts before it, necessary to fulfill its statutory mandate? ...................................3

          3.    Whether Petitioner's original "two-out-of-three" rule scope was supported by substantial evidence and otherwise in accordance with law? .................4

          4.    Whether Commerce's determination not to exclude from the scope solar modules assembled in China from U.S.-origin cells was supported by substantial evidence and otherwise in accordance with law? ......................4

          5.    Whether Commerce's determination not to limit the application of the clarified scope only to entries made after publication of the AD/CVD orders was supported by substantial evidence and otherwise in accordance with law? ...................................................................................................5

III. STANDARD OF REVIEW ...................................................................................................5

IV.  STATEMENT OF FACTS ....................................................................................................6

V.   ARGUMENT........................................................................................................................12

    A.    Commerce's Scope Clarification Is Supported by Substantial Evidence and Otherwise Consistent with Law ...........................................................................12

          1.    Commerce's Scope Clarification Properly Effectuated the Intent of the Petitioner ...................................................................................................13

          2.    Commerce Reasonably Exercised Its Discretion to Expand the Scope Language in Order to Prevent Evasion of the Orders ...............................15

          3.    Commerce's Clarification of the Scope Was Timely ...............................21

    B.    Commerce's Determination Not to Rely Solely on the Substantial Transformation Test Was Reasonable, Lawful and Necessary to Fulfill Its Statutory Mandate and Did Not Result in Contradictory Country-of-Origin Rules ...................................28

          1.    Commerce's Determination Not to Rely Solely on a Substantial Transformation Analysis Was Reasonable, Lawful, Required to Fulfil Its Statutory Mandate and Fully Explained ...................................................28

          2.    Commerce's Scope Determination Did Not Result in Contradictory Country-of-Origin Rules for the Same Merchandise or the Same Merchandise Being Subject to Multiple AD/CVD Orders ........................31

i

Consol. Ct. No. 15-00067

      C.      The Preliminary Scope, Incorporating the Two-out-of-Three Rule, Was Also Supported by Substantial Evidence and Consistent with Law ..............................33

      D.      Commerce's Determination Not to Include an Explicit Exemption from the Scope for Solar Modules Assembled in China from U.S.-Origin Cells Was Supported by Substantial Evidence and Consistent with Law.....................................................34

      E.      Commerce Properly Did Not Limit the Application of the Revised Scope to Prospective Entries Only.....................................................................................35

VI.    CONCLUSION ...........................................................................................................38

13948578.1

Consol. Ct. No. 15-00067

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Ad Hoc Shrimp Trade Action Comm. v. United States*,
    637 F. Supp. 2d 1166 (Ct. Int'l Trade 2009) .......................................................15

*Allegheny Bradford Corp. v. United States*,
    342 F. Supp. 2d 1172 (Ct. Int'l Trade 2004) .......................................................22

*Allied Tube Conduit Corp. v. United States*,
    374 F. Supp. 2d 1257 (Ct. Int'l Trade 2005) .......................................................28

*American Bearing Mfrs. Ass'n v. United States*,
    28 C.I.T. 1698 (2004) .............................................................................................28

*Atchison, Topeka Santa Fe Ry. Co. v. Wichita Bd. of Trade*,
    412 U.S. 800 (1973)................................................................................................28

*Cathedral Candle Co. v. U.S. Int'l Trade Comm'n*,
    27 C.I.T. 1541 (2003) ............................................................................................23

*Chevron U.S.A., Inc. v. National Resources Defense Council, Inc.*,
    467 U.S. 837 (1984).........................................................................................6, 35

*Consolo v. Fed. Mar. Comm'n*,
    383 U.S. 607 (1966).................................................................................................6

*Corus Staal BV v. United States*,
    502 F. 3d 1370 (Fed. Cir. 2007)............................................................................36

*Diversified Prods. Corp. v. United States*,
    572 F. Supp. 882 (Ct. Int'l Trade 1983) ..............................................................14

*E.I. Dupont De Nemours & Co. v. United States*,
    22 C.I.T. 370 (1998) ......................................................................................30, 35

*Fujitsu General Ltd. v. United States*,
    88 F.3d 1034 (Fed. Cir. 1996)...............................................................................31

*Huvis Corp. v. United States*,
    570 F.3d 1347 (Fed. Cir. 2009)............................................................................29

*Koyo Seiko Co., Ltd. v. United States*,
    17 C.I.T. 1076 (1993) .................................................................................13, 30, 35

iii

Consol. Ct. No. 15-00067

*Melamine Chemicals, Inc. v. United States*,
    732 F.2d 924 (Fed. Cir. 1984)..................................................................................................31

*Mitsubishi Elec. Corp. v. United States*,
    12 C.I.T. 1025 (1988), *aff'd*, 898 F.2d 1577 (Fed. Cir. 1990)....................................16, 18, 19

*Mitsubishi Elec. Corp. v. United States*,
    898 F.2d 1577 (Fed. Cir. 1990).................................................................................................16

*NTN Bearing Corp. of America v. United States*,
    14 C.I.T. 623 (1990) ...........................................................................................................13, 15

*Pakfood Pub. Co. v. United States*,
    453 Fed. Appx. 986 (Fed. Cir. 2011)........................................................................................29

*PT Pindo Deli Pulp & Paper Mills v. United States*,
    825 F. Supp. 2d 1310 (Ct. Int'l Trade 2012) ...........................................................................15

*Qingdao Sea-Line Trading Co. v. United States*,
    766 F.3d 1378 (Fed. Cir. 2014).................................................................................................36

*Smith Corona Corp. v. United States*,
    796 F. Supp. 1532 (Ct. Int'l Trade 1992) ................................................................................22

*Torrington Co. v. United States*,
    19 C.I.T. 403 (1995), *aff'd*, 127 F.3d 1077 (Fed. Cir. 1997).....................................................6

*Tung Mung Dev. Co. v. United States*,
    26 C.I.T. 969 (2002), *aff'd*, 354 F.3d 1371 (Fed. Cir. 2004)....................................................16

*U.S. Steel Group v. United States*,
    18 C.I.T. 1190, aff'd 96 F.3d 1352 (Fed. Cir. 1996) ...............................................................28

*Universal Camera Corp. v. N.L.R.B.*,
    340 U.S. 474 (1951)....................................................................................................................5

*Wheatland Tube Co. v. United States*,
    495 F.3d 1355 (Fed. Cir. 2007)..................................................................................................6

**FEDERAL STATUTES**

19 U.S.C. § 1516a(b)(l)(B)(i) ...........................................................................................................5

19 U.S.C. § 1673.............................................................................................................................34

28 U.S.C. § 2637(d) ........................................................................................................................36

iv

Consol. Ct. No. 15-00067

**FEDERAL REGULATIONS**

19 C.F.R. § 351.206(a)..................................................................................................37

**ADMINISTRATIVE MATERIALS**

*Aluminum Extrusions From the People's Republic of China*, 76 Fed. Reg. 18,524 (Dep't
  Commerce Apr. 4, 2011) ...................................................................................14

*Cellular Mobile Telephones and Subassemblies from Japan*, 50 Fed. Reg. 45,447 (Dep't
  Commerce Oct. 31, 1985).................................................................................13

*Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China*,
  79 Fed. Reg. 76,970 (Dep't Commerce Dec. 23, 2014) ...........................................2

*Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China*,
  79 Fed. Reg. 76,962 (Dep't Commerce Dec. 23, 2014) ...........................................2

*Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China*,
  79 Fed. Reg. 44,399 (Dep't Commerce July 31, 2014) ....................................10, 24

*Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China*,
  80 Fed. Reg. 8,592 (Dep't Commerce Feb. 18, 2015).............................................2

*Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China
  and Taiwan*, 79 Fed. Reg. 4,661 (Dep't Commerce Jan. 29, 2014) ....................10, 23

*Certain Crystalline Silicon Photovoltaic Products from China and Taiwan*,
  Inv. Nos. 701-TA-511 and 731-TA-1246-1247 (Final), USITC Pub. 4519 (Feb. 2015)
  at 7.........................................................................................................25, 28

*Certain Crystalline Silicon Photovoltaic Products From Taiwan*, 79 Fed. Reg. 44,395
  (Dep't Commerce July 31, 2014)......................................................................24

*Certain Crystalline Silicon Photovoltaic Products from Taiwan*, 80 Fed. Reg. 8,596
  (Dep't Commerce Feb. 18, 2015) ......................................................................12

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the
  People's Republic of China*, 77 Fed. Reg. 63,788 (Dep't Commerce Oct. 17, 2012)..............8

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the
  People's Republic of China*, 77 Fed. Reg. 63,791 (Dep't Commerce Oct. 17, 2012)..............8

*Large Newspaper Printing Presses and Components Thereof, Whether Assembled or
  Unassembled, from Germany*, 61 Fed. Reg. 38,166, 38,169 (Dep't Commerce July
  23, 1996) ...................................................................................................19

13948578.1

Consol. Ct. No. 15-00067

*Small Diameter Graphic Electrodes from the People's Republic of China*, 74 Fed. Reg.
2,049 (Dep't Commerce Jan. 14, 2009)...................................................................................15

13948578.1

Consol. Ct. No. 15-00067

## I.   **INTRODUCTION**

Pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade, SolarWorld Americas, Inc. ("SolarWorld" or "Petitioner") submits this brief in response to the Rule 56.2 Motion for Judgment on the Agency Record and accompanying Brief in Support of Rule 56.2 Motion for Judgment on the Agency Record filed by Sunpower Corporation ("Sunpower"); Motion for Judgment on the Agency Record and Brief in Support of Its Motion for Judgment upon the Agency Record filed by Suniva, Inc. ("Suniva"); Joint Rule 56.2 Motion for Judgment on the Agency Record and Joint Brief in Support of Their Rule 56.2 Motion for Judgment on the Agency Record filed by Canadian Solar Inc., Changzhou Trina Solar Energy Co., Ltd., China Sunergy (Nanjing) Co., Ltd., Chint Solar (Zhejiang) Co., Ltd., ET Solar Industry Ltd., Hefei JA Solar Technology Co., Ltd., Jinko Solar Co., Ltd., LDK Solar Hi-Tech (Nanchang) Co., Ltd., Perlight Solar Co., Ltd., ReneSola Jiangsu Ltd., Shanghai JA Solar Technology Co., Ltd., Shenzhen Sacred Industry Co., Ltd., Shenzhen Sungold Solar Co., Ltd., Sumec Hardware & Tools Co., Ltd., Sunny Apex Development Ltd., Wuhan FYY Technology Co., Ltd., Wuxi Suntech Power Co., Ltd., Zhongli Talesun Solar Co., Ltd., Znshine PV-Tech Co., Ltd., as well as Consolidated Plaintiffs Shanghai BYD Co., Ltd. and BYD (Shangluo) Industrial Co., Ltd. (collectively, "Consolidated Plaintiffs"); and Motion for Judgment on the Agency Record filed by Consolidated Plaintiff-Intervenors Yingli Green Energy Holding Company Limited and Yingli Green Energy Americas, Inc. (collectively, "Yingli"). Br. in Supp. of Sunpower Corp.'s Rule 56.2 Mot. for J. on the Agency R. (Oct. 5, 2015), ECF No. 59 ("Sunpower Br."); Br. of Consolidated Pl. Suniva, Inc. in Supp. of Its Mot. for J. on the Agency R. (Oct. 5, 2015), ECF No. 58-1 ("Suniva Br."); Consolidated-Pls.' Joint Br. in Supp. of Their Rule 56.2 Mot. for J. on the Agency R. (Oct. 5, 2015), ECF No. 61 ("Consolidated Pls. Br."); Mot. of Consolidated Pl.-

1

Consol. Ct. No. 15-00067

Intervenors Yingli Green Energy Holding Co., Ltd. and Yingli Green Energy Americas, Inc. for

J. on the Agency R. (Oct. 5, 2015), ECF No. 57.

## II.   RULE 56.2 STATEMENT

### A.   Administrative Decision Sought to Be Reviewed

The administrative determination challenged herein is the U.S. Department of

Commerce's ("Commerce") final scope determination in the antidumping duty ("AD") and

countervailing duty ("CVD") investigations of *Certain Crystalline Silicon Photovoltaic Products*

*from the People's Republic of China*.   The final AD and CVD determinations were issued on

December 15, 2014 and published in the Federal Register on December 23, 2014.   *See* Issues and

Decision Memorandum accompanying *Certain Crystalline Silicon Photovoltaic Products from*

*the People's Republic of China*, 79 Fed. Reg. 76,970 (Dep't Commerce Dec. 23, 2014) (final

deter. of sales at less than fair value), AD PR 817 ("AD I&D Memo"); Issues and Decision

Memorandum accompanying *Certain Crystalline Silicon Photovoltaic Products from the*

*People's Republic of China*, 79 Fed. Reg. 76,962 (Dep't Commerce Dec. 23, 2014) (final

affirmative countervailing duty deter.), CVD PR 388 ("CVD I&D Memo"). [1] The AD/CVD

orders were published in the Federal Register on February 18, 2015.   *Certain Crystalline Silicon*

*Photovoltaic Products from the People's Republic of China*, 80 Fed. Reg. 8,592 (Dep't

Commerce Feb. 18, 2015) (antidumping duty order; and amended final affirmative

countervailing duty deter. and countervailing duty order).

---

[1]   Documents contained in the public antidumping duty administrative record are identified by name and date, "AD PR," and the corresponding record number.   Documents contained in the public countervailing duty administrative record are identified by name and date, "CVD PR," and the corresponding record number.

**B.**     **Statement of Issues Presented and Summary of Arguments**

    **1.**     **Whether Commerce's scope clarification, which clarified the scope to include solar modules assembled in China from third-country cells, was supported by substantial evidence and otherwise in accordance with law?**

Yes. Consistent with its authority to define the scope of the investigation, Commerce's scope clarification, adopted for the final determination, was supported by substantial evidence and otherwise in accordance with law. Commerce's final scope language appropriately reflected the intent of the Petitioner.  To the extent that Commerce's scope clarification expanded the scope language from that drafted in the petition, it was well within the agency's authority to do so, in order to prevent the intentional evasion or circumvention of the AD/CVD laws and to ensure that the AD/CVD orders were administrable and enforceable.  Moreover, Commerce's scope clarification was appropriately made at the time of the final determination, as the agency had specifically put all interested parties on notice throughout various stages of the proceeding that it was still in the process of evaluating and defining the scope language.

    **2.**     **Whether Commerce's decision not to rely solely on its substantial transformation test was reasonable, lawful and, given the unique facts before it, necessary to fulfill its statutory mandate?**

Yes. Given the unique circumstances in the underlying proceeding, Commerce's determination not to rely solely on its substantial transformation analysis to define the scope was reasonable, lawful and fully explained.  While courts have found the substantial transformation test permissible, Commerce is not required, by law or even by its own regulations, to apply that test to determine country-of-origin and define the scope of any investigation.  Rather, because the statute does not set forth how it is to determine what constitutes "foreign merchandise," Commerce may utilize any reasonable method to do so.

Commerce's scope determination did not result in contradictory country-of-origin rules for the same merchandise or the same merchandise being subject to multiple AD/CVD orders, as Plaintiffs contend. Rather, as explained further below, under the rules set forth in the scopes of the first and second solar investigations, any given solar cell or module is only possibly subject to one set of AD/CVD orders.

### 3. Whether Petitioner's original "two-out-of-three" rule scope was supported by substantial evidence and otherwise in accordance with law?

Yes. While Commerce did not adopt the "two-out-of-three" rule scope in its final determination, if it had, such determination also would have been supported by substantial evidence and consistent with law. As noted above, Commerce was not required to adhere solely to its substantial transformation analysis in defining the scope. Moreover, the two-out-of-three rule proposed by Petitioner did not conflict with the scope of the first solar investigations, as it only would have applied in the unique circumstances in which an input to a c-Si PV cell was produced in a subject country and the c-Si PV module was assembled in the same subject country. Thus, the two-out-of-three rule would reasonably have provided a complementary country-of-origin approach, like the final scope ultimately adopted by Commerce in Solar II.

### 4. Whether Commerce's determination not to exclude from the scope solar modules assembled in China from U.S.-origin cells was supported by substantial evidence and otherwise in accordance with law?

Yes. Commerce appropriately determined that modules assembled in China from non-Chinese cells were Chinese-origin products and covered them under the final scope of the AD/CVD orders. As such, Chinese modules assembled from U.S.-origin cells are not, as Suniva claims, U.S.-origin products. Such modules are Chinese products, which benefit from countervailable subsidies in China and which are dumped into the United States, and thus are

4

properly covered by the scope of the AD/CVD orders. As such, Commerce's determination not to provide a specific exclusion for Chinese solar modules assembled from U.S.-origin cells was supported by substantial evidence and otherwise in accordance with law.

> **5.    Whether Commerce's determination not to limit the application of the clarified scope only to entries made after publication of the AD/CVD orders was supported by substantial evidence and otherwise in accordance with law?**

Yes. Consistent with its typical procedure in imposing AD/CVD orders, and with U.S. Customs and Border Protection's longstanding practice in collecting such duties, Commerce acted appropriately in applying its final scope definition to entries made on or after the date of publication of the preliminary determination in the underlying investigations. Plaintiff Suniva provides no convincing rationale for the agencies to change their well-established practice in the administration of the AD/CVD laws. Moreover, it appears that Suniva failed to exhaust its administrative remedies with regard to this argument and, as such, it is not properly raised on appeal.

## III.   STANDARD OF REVIEW

Under the Tariff Act of 1930, as amended (the "Act"), the Court reviews a Commerce determination in the course of AD/CVD investigations by assessing whether it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(l)(B)(i). The Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 477 (1951) (citation omitted). According to the Court, substantial evidence is "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative

5

agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966) (citation omitted).

Congress intended, and this Court has affirmed that, "Commerce is afforded great latitude in the choice of methodology to be employed in {AD and CVD} investigations." *Torrington Co. v. United States*, 19 C.I.T. 403, 409 (1995), *aff'd*, 127 F.3d 1077 (Fed. Cir. 1997) (citation omitted). As long as Commerce's methodology is reasonable and its conclusions are supported by substantial evidence, "the Court will not impose its own views as to the sufficiency of the agency's investigation or question the agency's methodology." *Id.* (citation omitted).

To determine whether an agency's determination is in accordance with law, the Court conducts the two-step analysis articulated in *Chevron U.S.A., Inc. v. National Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984). Under the first step of this analysis, the Court must determine whether Congress has spoken directly to the exact question at issue. If so, the Court is required to give effect to the "unambiguously expressed intent of Congress." *Wheatland Tube Co. v. United States*, 495 F.3d 1355, 1359 (Fed. Cir. 2007) (quoting *Chevron U.S.A.*, 467 U.S. at 842-43). If Congress has not spoken directly to the exact question at issue, the Court must determine whether Commerce's interpretation is based on a reasonable construction. As courts have routinely emphasized, Commerce's construction need not be the only reasonable interpretation or even the most reasonable interpretation to be based on a reasonable construction. *Id.* at 1359-60.

## IV.    STATEMENT OF FACTS

On October 19, 2011, SolarWorld filed petitions with Commerce and the U.S. International Trade Commission ("ITC"), requesting that the agencies initiate AD and CVD investigations on imports of crystalline silicon photovoltaic ("c-Si PV" or "solar") cells and c-Si PV modules from the People's Republic of China ("China" or "the PRC") (the "Solar I"

6

Consol. Ct. No. 15-00067

investigations). *See* Consolidated Pls. Br. at Ex. 1 (*Petition for the Imposition of Antidumping and Countervailing Duties* (Oct. 19, 2011)).

Commerce issued several supplemental questionnaires on Solarworld's Petition in Solar I prior to initiation of that investigation, to which SolarWorld responded.   In particular, in response to clarification questions from Commerce, SolarWorld submitted, prior to initiation and "as discussed with {Commerce}," "a revised scope description that clarifie{d} that the scope of {the} proceedings covers {c-Si} PV cells produced in China; modules and panels assembled in China from {c-Si} PV cells, regardless of whether the cells are manufactured in China or a third country; and {c-Si} PV modules and panels produced in a third country from {c-Si} PV cells manufactured in China." Letter from Wiley Rein LLP to Sec'y of Commerce, re: *Crystalline Silicon Photovoltaic Cells from the People's Republic of China: Standing Analysis and Revised Scope Language* (Nov. 7, 2011) at 3, excerpt attached at **Exhibit 1**.   Specifically, SolarWorld proposed to add the following clarifying language to the scope of the investigations:

> These proceedings cover {c-Si} PV cells, whether exported directly to the United States or via third countries; {c-Si} PV modules/panels produced in the PRC, regardless of the country of manufacture of the cells used to produce the modules or panels, and whether exported directly to the United States or via third countries; and {c-Si} PV modules or panels produced in a third country from {c-Si} PV cells manufactured in the PRC, whether exported directly to the United States or via third countries.

*Id.* at Attachment 2.

Contrary to substantial argument from SolarWorld throughout the course of the Solar I investigations, in its final determinations, Commerce found that modules produced in China from third-country cells were <u>not</u> covered by the scope of the investigation.[2]   *See* Issues and Decision

---

[2]      SolarWorld appealed Commerce's scope determination in Solar I, but later withdrew its appeal, in part because the agency's scope determination in Solar II helped to close the scope loophole left open as a result of the first case.   *See SolarWorld Americas, Inc. v. United States*, CIT Ct. No. 13-219.

Memorandum accompanying *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China*, 77 Fed. Reg. 63,791 (Dep't Commerce Oct. 17, 2012) (final deter. of sales at less than fair value, and affirm. final deter. of critical circumstances, in part) at Comment 1; Issues and Decision Memorandum accompanying *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China*, 77 Fed. Reg. 63,788 (Dep't Commerce Oct. 17, 2012) (final affirm. countervailing duty deter. and final affirm. critical circumstances deter.) at Comment 32. Commerce found that modules produced in a third country from Chinese cells were covered by the scope, but that modules produced in China from third-country cells were <u>not</u> covered by the scope. *See id.* The agency relied on a traditional "substantial transformation" country-of-origin analysis in making that determination, found that cells did not undergo a substantial transformation when assembled into modules, and thus concluded that modules assembled in China from third-country origin cells retain a third-country country-of-origin and were not subject to the Solar I AD/CVD investigations. *See id.*

The scope as defined by Commerce in Solar I created a significant loophole through which Chinese producers were able to continue shipping huge volumes of unfairly traded solar cells and modules to the United States (as SolarWorld had argued that it would). As a result, SolarWorld was forced to file new AD/CVD investigations (the "Solar II" investigations), only one year after the conclusion of the Solar I investigations, in an attempt to obtain the full trade remedy relief it initially sought with the first cases. *See Petition for the Imposition of Antidumping and Countervailing Duties* (Dec. 31, 2013), PR 1-10 ("Solar II Petition"). In the Solar II Petition, SolarWorld proposed a scope, which stated in relevant part:

> The merchandise covered by this investigation is {c-Si PV} cells, and modules, laminates and/or panels consisting of {c-Si PV} cells, whether or not partially or

8

> fully assembled into other products, including building integrated materials. For purposes of this investigation, subject merchandise also includes modules, laminates and/or panels consisting of {c-Si PV} cells completed or partially manufactured within a customs territory other than that subject country, using ingots, wafers, or partially manufactured cells sourced from the subject country.

*Id.* at 10-11.

Commerce issued a supplemental questionnaire to SolarWorld, requesting additional information "as to the amount or extent of production that must take place in the subject country for modules, laminates and/or panels... consisting of {c-Si PV} cells... completed or partially manufactured within a territory other than the subject country to be covered by the scope." Letter from Howard Smith, Program Manager, to Wiley Rein LLP, re: *Petitions for the Imposition of Antidumping Duties on Imports of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and Taiwan and Countervailing Duties on Imports of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: Supplemental Questions* (Jan. 6, 2014), AD PR 17 at 3. In response, SolarWorld revised the first paragraph of its scope language as follows:

> ...subject merchandise also includes modules, laminates and/or panels assembled in the subject country consisting of {c-Si PV} cells that are completed or partially manufactured within a customs territory other than that subject country, using ingots that are manufactured in the subject country, wafers that are manufactured in the subject country, or cells where the manufacturing process begins in the subject country and is completed in a non-subject country.

*Supplement II to Petition for the Imposition of Antidumping and Countervailing Duties: Certain Crystalline Silicon Photovoltaic Products from China and Taiwan* (Jan. 13, 2014), PR 25 at 2.

For purposes of initiation, Commerce adopted a slightly modified version of SolarWorld's proffered scope language, including the so-called "two-out-of-three" rule set forth above. *See Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China and Taiwan*, 79 Fed. Reg. 4,661, 4,667 (Dep't Commerce Jan. 29, 2014) (initiation of

9

antidumping duty investigations). The agency also noted that it was "setting aside a period for interested parties to raise issues" regarding the scope of the investigations. *Id.* at 4,662.

In its preliminary determination in the investigations, Commerce maintained the scope language from the initiation notice. *See* Issues and Decision Memorandum accompanying *Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China*, 79 Fed. Reg. 44,399 (Dep't Commerce July 31, 2014) (affirmative prelim. deter. of sales at less than fair value and postponement of final deter.) ("China AD Prelim I&D Memo") at 4-5. However, the agency also noted that it was "continuing to analyze interested parties' scope comments, including comments on whether it is appropriate to apply a traditional substantial transformation or other analysis in determining the country of origin of certain solar modules described in the scope of the investigation." *Id.* at 5.

On October 3, 2014, prior to the deadline for submission of case and rebuttal briefs, Commerce issued a memorandum to all interested parties requesting comments on a proposed clarification to the scope of the investigations. Letter from Howard Smith to All Interested Parties, re: *Antidumping and Countervailing Duty Investigations of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and the Antidumping Duty Investigation of Certain Crystalline Silicon Photovoltaic Products from Taiwan: Opportunity to Submit Scope Comments* (Oct. 3, 2014), PR 765 ("Oct. 3 Scope Clarification Memo"). In the memorandum, Commerce proposed to clarify the scope language to make the following points:

- For the China investigations, subject merchandise would include all modules, laminates and/or panels assembled in China that contain c-Si PV cells produced in a customs territory other than China.

- For the Taiwan investigation, subject merchandise would include all modules, laminates, and/or panels assembled in Taiwan consisting of c-Si PV cells produced in Taiwan or a customs territory other than Taiwan. In addition, subject

> merchandise would include modules, laminates, and panels assembled in a third-country, other than China, consisting of c-Si PV cells produced in Taiwan.

*Id.* at Attachment, p. 1-2. In other words, Commerce's proposed clarification would ensure that all Chinese cells and all Chinese modules, as well as all Taiwanese cells and all Taiwanese modules, would be subject to the scope of either the Solar I or the Solar II investigations.

SolarWorld and a number of respondents submitted case and rebuttal briefs, including substantial comments on the scope of the investigations and Commerce's proposed scope clarification. In its briefs, SolarWorld argued that Commerce "should adopt the scope clarification language it proposed on October 3, as the proposed clarification would best address the continued unfair trade practices of China and Taiwan, {was} consistent with Petitioner's intent and would result in AD/CVD orders that {would be} effective and enforceable." Letter from Wiley Rein LLP to Sec'y Commerce, re: *Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: Case Brief of SolarWorld Americas, Inc.* (Oct. 17, 2014), AD PR 795 ("SolarWorld AD Case Brief") at 1-7. *See also* Letter from Wiley Rein LLP to Sec'y Commerce, re: *Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: SolarWorld's Rebuttal Brief on Scope* (Oct. 27, 2014), AD PR 811 ("SolarWorld Scope Rebuttal Brief") at 1-18.

In its final determinations, consistent with Petitioner's requests, Commerce adopted its October 3, 2014 proposed clarification in defining the scope of the Chinese AD and CVD orders. The scope of the AD/CVD orders reads in relevant part as follows:

> The merchandise covered by these orders are modules, laminates and/or panels consisting of {c-Si PV} cells, whether or not partially or fully assembled into other products, including building integrated materials. For purposes of these orders, subject merchandise includes modules, laminates and/or panels assembled in the PRC consisting of {c-Si PV} cells produced in a customs territory other than the PRC.

> ...{E}xcluded from the scope of these orders are any products covered by the existing {AD} and {CVD} orders on {c-Si PV} cells, whether or not assembled into modules, laminates and/or panels, from the PRC.

*See, e.g.*, *Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China*, 80 Fed. Reg. at 8,593 (emphasis added).   For the Taiwan AD order, Commerce defined the scope, in relevant part, as follows:

> The merchandise covered by this order is crystalline silicon photovoltaic cells, and modules, laminates and/or panels consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including building integrated materials.

> ...Modules, laminates, and panels produced in a third-country from cells produced in Taiwan are covered by this investigation. However, modules, laminates, and panels produced in Taiwan from cells produced in a third-country are not covered by this investigation.

*Certain Crystalline Silicon Photovoltaic Products from Taiwan*, 80 Fed. Reg. 8,596 (Dep't Commerce Feb. 18, 2015) (antidumping duty order).

## V.   **ARGUMENT**

### A.   **Commerce's Scope Clarification Is Supported by Substantial Evidence and Otherwise Consistent with Law**

As Plaintiffs recognize, Commerce "has considerable discretion to determine the scope based on the results of its investigation."   SunPower Br. at 10.   Indeed, the courts have repeatedly held that Commerce "has inherent authority to define the scope of an {AD/CVD} investigation." *See NTN Bearing Corp. of America v. United States*, 14 C.I.T. 623, 627 (1990); *Koyo Seiko Co., Ltd. v. United States*, 17 C.I.T. 1076, 1078 (1993). *See also Cellular Mobile Telephones and Subassemblies from Japan*, 50 Fed. Reg. 45,447, 45,449 (Dep't Commerce Oct. 31, 1985) (final deter. of sales at less than fair value) (Commerce "has an inherent power to establish the parameters of the investigation so as to carry out its mandate to administer the law effectively and in accordance with its intent").   In the underlying proceeding, contrary to

12

Plaintiffs' arguments, Commerce properly exercised its clear authority to define the scope of the investigations in a manner supported by substantial evidence and otherwise consistent with law.

### 1. Commerce's Scope Clarification Properly Effectuated the Intent of the Petitioner

Plaintiffs argue that Commerce improperly expanded the scope beyond that stated in the petition and intended by Petitioner, to include all Chinese assembled modules incorporating third-country cells. *See* Sunpower Br. at 11; Consoldiated Pls. Br. at 22-25. Contrary to their claims, Commerce's final scope language appropriately reflected the intent of the Petitioner, consistent with the agency's obligations under law.

Since the start of the Solar I investigations, and throughout the Solar II investigations, it was clear that petitioner SolarWorld's intent was always to cover all cells from China and all modules from China and, in Solar II, all cells from Taiwan and all modules from Taiwan. Commerce properly recognized this in its final determination. *See* CVD I&D Memo, CVD PR 388 at 38 ("The Petition and Petitioner's comments in this investigation clearly demonstrate that the Petitioner's intent is a scope that covers all solar modules assembled in {China} using third-country solar cells"). Indeed, SolarWorld "argued for a scope almost identical to the scope {in Commerce's clarified scope language} in Solar I." *Id.* SolarWorld filed the Solar II cases specifically in order to close the loophole created as a result of Commerce's failure to define a comprehensive scope in the requested manner in Solar I and to address unfair trade practices that were exacerbated as a result of that scope determination. *See, e.g.*, Letter from Wiley Rein LLP to Sec'y of Commerce, re: *Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and Taiwan: Rebuttal to Respondents' Scope Comments* (Apr. 3, 2014), PR 327-328 ("SolarWorld's Scope Rebuttal Comments") at11-13. While Consolidated Plaintiffs cast doubt on Commerce's "attempt{} to ground its decision in {a} characterization of

13

Consol. Ct. No. 15-00067

Petitioner's 'intent,'" Consolidated Pls. Br. at 22, the final scope language was in fact fully in accordance with Petitioner's intent, as shown by the clear statements of the Petitioner itself to that effect. *See, e.g.*, SolarWorld AD Case Brief, AD PR 795 at 4-5 ("SolarWorld fully supports this proposed scope clarification and urges the Department to adopt it for the final determination, as the clarification effectuates the intent of the Petitioner and would result in effective, administrable and enforceable AD/CVD orders") (emphasis added); SolarWorld Scope Rebuttal Brief, AD PR 811 at 6 (Commerce's "proposed scope clarification is fully consistent with SolarWorld's intent") (emphasis added).

The final scope of the Solar II cases was thus defined in accordance with this longstanding intent of the petitioning domestic industry, consistent with Commerce's obligations under law. *See, e.g.*, SunPower Br. at 12 (referencing Commerce's "authority and discretion to define and clarify the scope of an investigation to reflect the intent of the petitioner") (internal citation omitted); *Diversified Prods. Corp. v. United States*, 572 F. Supp. 882 (Ct. Int'l Trade 1983); Issues and Decision Memorandum accompanying *Aluminum Extrusions From the People's Republic of China*, 76 Fed. Reg. 18,524 (Dep't Commerce Apr. 4, 2011) (final deter. of sales at less than fair value) at cmt. 3 ("Although {Commerce} has the authority to define or clarify the scope of an investigation…, {it} must use this authority in a manner which reflects the intent of the petition and fulfills {its} statutory mandate to provide the relief requested by the petitioning industry") (emphasis added).  Indeed, any other scope definition would have fallen short of fully effectuating Petitioner's intent and providing the relief requested by the domestic industry.

14

### 2.   Commerce Reasonably Exercised Its Discretion to Expand the Scope Language in Order to Prevent Evasion of the Orders

To the extent that Commerce's scope clarification did expand the scope language from that drafted in the petition, as Plaintiffs contend, it was well within the agency's authority to do so, consistent with its "inherent authority to define the scope." *See NTN Bearing Corp. of America*, 14 C.I.T. at 627; SunPower Br. at 11; Consolidated Pls. Br. at 24. Indeed, Commerce has the authority to define and clarify the scope of an AD/CVD investigation, <u>even to include products within the scope that were not specifically mentioned by the petitioner in the scope language drafted in the petition</u>. *See, e.g., PT Pindo Deli Pulp & Paper Mills v. United States*, 825 F. Supp. 2d 1310, 1318-1320 (Ct. Int'l Trade 2012); *Ad Hoc Shrimp Trade Action Comm. v. United States*, 637 F. Supp. 2d 1166, 1175 (Ct. Int'l Trade 2009) (Commerce "may depart from the scope as proposed by a petition if it determines that petition to be overly broad, or insufficiently specific to allow proper investigation, or in any other way defective"). Commerce has done so in the past, consistent with its authority. *See, e.g.,* Issues and Decision Memorandum accompanying *Small Diameter Graphic Electrodes from the People's Republic of China*, 74 Fed. Reg. 2,049 (Dep't Commerce Jan. 14, 2009) (final deter. of sales at less than fair value and affirm. deter. of critical circumstances) at cmt. 2.

The courts have specifically held that Commerce "has a certain amount of discretion to expand the language of a petition… with the purpose in mind of preventing the intentional evasion or circumvention of the {AD} law."[3] *Mitsubishi Elec. Corp. v. United States*, 12 C.I.T. 1025, 1046 (1988), *aff'd*, 898 F.2d 1577 (Fed. Cir. 1990) ("As the Court of International Trade

---

[3]   This clear statement of Commerce's "discretion to expand the language of a petition… with the purpose in mind of preventing the intentional evasion or circumvention" refutes Consolidated Plaintiffs' contention that Commerce may only "turn to examining enforcement and circumvention" once its scope and country-of-origin analyses have been completed. *See Mitsubishi Elec. Corp.*, 12 C.I.T. at 1046; Consolidated Pls. Br. at 26-27.

properly pointed out, the {agency} was sensitive to any type of evasion of an {AD} order...

{Commerce} justifiably decided to make the {AD} order applicable to {the merchandise},

because of the potential of {that merchandise} to be used to evade the order") (internal citation

omitted). *Mitsubishi Elec. Corp. v. United States*, 898 F.2d 1577, 1582 (Fed. Cir. 1990). *See*

*also Tung Mung Dev. Co. v. United States*, 26 C.I.T. 969, 979 (2002), *aff'd*, 354 F.3d 1371 (Fed.

Cir. 2004).

Plaintiffs fail to recognize that the final scope as defined by Commerce in Solar II was

essential to prevent the "intentional evasion or circumvention" of the AD/CVD orders. Subject

producers in China had already shown their desire and ability to go to great lengths, including by

using third-country cells, to circumvent the AD/CVD orders issued as a result of Solar I, and to

do so successfully. *See, e.g.*, Solar II Petition PR 1-10 at 3-6. Commerce appropriately

recognized that "the solar products industry involves a complex and very adaptable global supply

chain which allows producers to modify their production chains easily and quickly." CVD I&D

Memo, CVD PR 388 at 38. Indeed, as SolarWorld explained in the Solar II Petition:

> Despite the domestic industry's repeated requests, {Commerce's} final AD/CVD
> determinations {in Solar I} failed to cover Chinese solar modules assembled from
> non-Chinese solar cells, allowing Chinese solar producers to begin using cells
> fully or partially manufactured in Taiwan in the modules they assembled for
> export to the United States, and to export those modules, duty-free, to the U.S.
> market. As a result, Chinese producers have been using - or claiming to use -
> Taiwanese and other non-Chinese cells in their module production, even prior to
> the imposition of preliminary duties in March and May 2012, as they themselves
> have explained:
>
> - In November 2011, the president of Grape Solar, a large U.S. importer of
>   Chinese modules, 'said that Chinese manufacturers wanted to keep wafer
>   production in China, but were making plans to ship wafers to Taiwan or
>   South Korea for conversion into solar cells, as one way to potentially
>   avoid any new tariffs the United States Commerce Department might
>   decide to impose.'
>
> - In a 2011 earnings conference call, a JA Solar Holding Co., Ltd. executive
>   stated the company's intent to try to avoid any future order that would be

16

issued: "{t}o be prudent, I think we need to have a solution, a <u>work-around solution</u>," he said. He noted that the company has strategic partners it has worked with in the past that can provide products.

- The Chief Commercial Officer of Trina Solar Limited stated in the company's fourth quarter 2011 earnings conference call: "{g}oing forward ... we're looking at alternatives that wouldn't be subject to those duties." In May 2012, Recharge reported that 'in the future, {Trina} will <u>outsource cells from Canada or Taiwan to work around the tariffs.</u>'

- In June 2012, the President of Trina Solar Europe stated that "the modules that we're shipping now to the U.S. have <u>solar cells that are made from outside of China and so in that sense we're not so affected</u> by {the tariffs}."

- Chinese producer Suntech took similar measures to avoid the duties. In May 2012, an analyst stated that "Suntech will experience no further impact" from the case, because "{it is} <u>sourcing all cells outside of China</u> going forward for all {its} U.S. shipments, so {it has} no exposure to tariffs."

- "Canadian Solar, which makes most of its panels in China, has been <u>buying solar cells from Taiwan</u> for years as part of its supply chain strategy, said Chief Financial Officer Michael Potter. Now all U.S.-bound modules would be made with these slightly more expensive Taiwanese cells to avoid the tariff."

*Id.* at 3-5 (emphasis added) (internal citations omitted). Commerce also uncovered additional evidence of the evasion of the Solar I orders in connection with its investigations in Solar II, noting in its final determination that:

...in the parallel Taiwan AD investigation, the respondent companies have reported to the {agency} that following the implementation of the orders in Solar I, numerous Chinese companies began to contract with Taiwanese cell producers to manufacture cells for the purpose of exporting those cells to China for use in the production of panels, modules and laminates, and then to export those panels, modules and laminates to the United States. This series of transactions was allegedly implemented, at least for many transactions, to evade the order in Solar I, and there are emails and communications referenced in the Taiwan {Issues and Decision Memorandum} which discuss this series of transactions and the reasoning behind those transactions. These communications substantiate the concerns expressed by the Petitioners in the Petition that the orders in Solar I have not adequately addressed the issues of Chinese dumping and unfair subsidization of solar panels, modules and laminates, and that a scope which specifically

17

includes that merchandise in this investigation is necessary to address such concerns.

CVD I&D Memo, CVD PR 388 at 44.

With such clear and substantial evidence of subject producers' intentions and ability to evade the AD/CVD orders, Commerce's determination "to expand the language of a petition... {in order to prevent} the intentional evasion or circumvention of the {AD} law" was reasonable and, indeed, necessary. *See Mitsubishi Elec. Corp. v. United States*, 12 C.I.T. at 1046. Indeed, Commerce found that, under the preliminary scope, "producers could simply have sourced their wafers from a country other than the subject country" and thus would evade the Solar II AD/CVD orders in addition to the Solar I AD/CVD orders. CVD I&D Memo, CVD PR 388 at 44. As a result, Commerce reasonably modified the scope language to "more effectively implement Petitioner's intent while also mitigating evasion concerns." *Id.*

While Consolidated Plaintiffs argue that these producers were not technically "circumventing" the order by changing their production process so that their products did not fall within the scope, *see* Consolidated Pls. Br. at 26, this is beside the point. Subject producers, at the very least (and likely in addition to substantial actual "circumvention" of the order), undertook significant efforts to <u>evade</u> the AD/CVD orders. As Commerce explained in its final determination, "following the initiation of the Solar I investigations and the imposition of those orders, there has been a shift in trade flows that has resulted in increased imports of non-subject modules produced in China. <u>Such imports – if they are dumped and/or unfairly subsidized and injurious – should not be beyond the reach of the AD and CVD laws.</u>" CVD I&D Memo, CVD PR 388 at 39 (emphasis added). Thus, Commerce reasonably determined, consistent with its authority under the statute, that its final scope definition was required "to prevent significant and widespread evasion similar to the evasion that... result{ed} from parties that exploit{ed} the

18

substantial transformation analysis conducted in Solar I." *Id.  See also Mitsubishi Elec. Corp.*, 12 C.I.T. at 1046 (referencing Commerce's "discretion to expand the language of a petition... with the purpose in mind of preventing the intentional <u>evasion or circumvention</u> of the {AD} law") (emphasis added).

Commerce's definition of the scope so as "to reduce as much as possible additional opportunities for evasion like those that resulted after the imposition of AD and CVD cash deposits in Solar I" was also fully consistent with its "long-standing practice of taking potential circumvention concerns into consideration when defining the scope." CVD I&D Memo, CVD PR 388 at 39.  *See also Large Newspaper Printing Presses and Components Thereof, Whether Assembled or Unassembled, from Germany*, 61 Fed. Reg. 38,166, 38,169 (Dep't Commerce July 23, 1996) (notice of final deter. of sales at less than fair value) ("... it was the {agency's} intent to use the language at issue to avoid creating loopholes for circumvention, including those arising from differing degrees of completeness of the imported merchandise"); *Cellular Mobile Telephones and Subassemblies from Japan*, 50 Fed. Reg. 45,447, 45,448 (Dep't Commerce Oct. 31, 1985) (final deter. of sales at less than fair value) ("The determination to include subassemblies within the scope of the investigation was based on the need to prevent circumvention of any {AD} order..."). *See also* Enforcement and Compliance Antidumping Manual (2015) at Chapter 2 at 13 (Commerce "tries to ensure that the description of the merchandise is not so narrow that obvious circumvention issues could arise in the future should an order be imposed").

While these substantial evasion concerns were significant enough on their own to justify the agency's modification to the scope language, Commerce also reasonably took into account the ability of its own agency and of U.S. Customs and Border Protection ("CBP") to administer

the orders when defining the scope.   Respondents in the underlying proceeding repeatedly

claimed that they were unable to report their production and shipments in accordance with the

two-out-of-three rule included in the scope as it existed at the time of initiation and the

preliminary determination, or had significant difficulty doing so.   While Commerce and CBP

"ably have demonstrated that they can effectively administer scope language that addresses

imported merchandise, as well as certain key constituent components," *see* SunPower Br. at 19,

in this case, subject producers were allegedly unable to accurately track the origin of those key

constituent components, hindering Commerce's ability to administer any order that depended on

the origin of the components.   For example, respondents stated that it was "virtually impossible

for importers to know and to trace the origin of the ingots and wafers in cells that are assembled

into modules when the module manufacturers purchase the cells from third parties in other

countries," which would have been required to accurately report merchandise consistent with the

preliminary scope. Letter from Sidley Austin LLP to Sec'y Commerce, re: *Certain Crystalline*

*Silicon Photovoltaic Products from the People's Republic of China and Taiwan: Comments on*

*Scope* (Feb. 18, 2014), AD PR 125 at 25.   *See also* Letter from Perkins Coie LLP to Sec'y

Commerce re: *Certain Crystalline Silicon Photovoltaic Products from China and Taiwan;*

*Gintech Comments on Scope* (Feb. 18, 2014), AD PR 131 at 14.   *See also* CVD I&D Memo,

CVD PR 388 at 48 ("most, if not all, parties reported in their Quantity and Value questionnaires

all solar modules containing solar cells from third countries because they claim that they did not

know the source of the wafer contained in the solar cells they purchased from third countries").

Commerce's scope modification also took into account these significant administrability

concerns, "mitigating… alleged complications in parties' ability to properly report subject

merchandise to {Commerce} in the context of its administrative proceeding and/or to CBP."

20

CVD I&D Memo, CVD PR 388 at 44. *See also* SolarWorld Scope Rebuttal Brief, AD PR 811 at

10 ("Commerce 'has an inherent power to establish the parameters of the investigation so as to

carry out its mandate to administer the law effectively and in accordance with its intent,' and

adoption of the proposed scope clarification would significantly enhance the agency's ability to

administer the AD/CVD laws effectively") (citing *Cellular Mobile Telephones and*

*Subassemblies*, 50 Fed. Reg. at 45,448).

As such, Commerce's revision of the scope language to protect against further significant

circumvention and evasion of the AD/CVD orders, and to promote the administrability and

enforcement of the orders, was reasonable and consistent with law.

### 3.   Commerce's Clarification of the Scope Was Timely

Plaintiffs' further claim that Commerce's "late hour" scope clarification raised "serious

due process concerns" and rendered Commerce's and the ITC's determinations unsupported by

substantial evidence are without merit. *See* Consolidated Pls. Br. at 30-33.

While it may be true that Commerce "must exercise caution in redefining scope in

midstream" of an investigation, *Smith Corona Corp. v. United States*, 796 F. Supp. 1532, 1535

(Ct. Int'l Trade 1992), appropriate caution was exercised in this case, as shown by the agency's

efforts throughout the investigation to notify the parties of potential changes to the scope and

permit multiple sets of comments thereon, as described below.  Moreover, it is similarly true that

"{t}here is no clear point during the court of an antidumping investigation at which {Commerce}

loses the ability to adjust the scope." *Allegheny Bradford Corp. v. United States*, 342 F. Supp.

2d 1172, 1187 (Ct. Int'l Trade 2004).  Indeed, as Commerce explained in its final determination:

> The CAFC has explained that "the purpose of the petition is to propose an
> investigation," and the "purpose of the investigation is to determine what
> merchandise should be included in the final order."

CVD I&D Memo, CVD PR 388 at 37 (citing *Duferco Steel Inc. v. United States*, 296 F. 3d 1087, 1096-97 (Fed. Cir. 2002). *See also id.* at 48. As such, the agency must be permitted to utilize the information it learns during the course of the investigation to properly define the scope, and the timing of Commerce's scope clarification here was proper.

Consolidated Plaintiffs state that "Commerce gave parties no indication that it was contemplating expanding the scope until October 3, 2014, at a very late stage of the investigations." Consolidated Pls. Br. at 31. This is simply wrong. Quite to the contrary, "{t}he very circumstances of {the Solar II} investigations, filed in response to the Solar I orders, and in which {Commerce} explicitly stated that the Solar II investigations excluded merchandise covered by the Solar I orders, placed parties on notice that imports of solar products from China beyond those covered by the Solar I orders were potentially subject to the investigation." CVD I&D Memo, CVD PR 388 at 49.

Beyond those circumstances, Commerce specifically put all interested parties on notice throughout various stages of the proceeding that it was still in the process of considering parties' scope comments, and thus that the scope of the investigations could very well change prior to the final determinations. *See* CVD I&D Memo, CVD PR 388 at 37, 49; SolarWorld Scope Rebuttal Brief, AD PR 811 at 14 (Commerce "made clear throughout these investigations that the scope of the investigations is subject to continuing evaluation, and that the country-of-origin determinations related to subject merchandise could change for the final determination"). Specifically, in the initiation notice at the very outset of the proceedings, Commerce invited comments on the scope of the investigations, clearly indicating that the scope was subject to modification, as follows:

> During our review of the Petitions, the {agency} issued questions to, and received responses from, Petitioner pertaining to the proposed scope to ensure that the

22

scope language in the Petitions would be an accurate reflection of the products for which the domestic industry is seeking relief. Also, on January 15, 2014, Suniva, Inc. ("Suniva"), a U.S. producer of certain solar cells and panels, submitted comments on the scope. As discussed in the preamble to the regulations, we are setting aside a period for interested parties to raise issues regarding product coverage . . . {Commerce} encourages all interested parties to submit such comments by 5:00 p.m. Eastern Time on February 11, 2014. All comments must be filed on the records of the {China} and Taiwan AD investigations, as well as the concurrent {China} CVD investigation.

*Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and Taiwan*, 79 Fed. Reg. 4,661, 4,667 (Dep't Commerce Jan. 29, 2014) (initiation of antidumping duty inv.). These initiation notices were published in the *Federal Register* and thus are considered to have provided constructive notice to parties potentially impacted by these investigations. *See Cathedral Candle Co. v. U.S. Int'l Trade Comm'n*, 27 C.I.T. 1541, 1549 n. 10 (2003) ("It is well established by both statutes and cases that the publication of an item in the Federal Register constitutes constructive notice of anything within that item").

In the preliminary determination, Commerce again noted its ongoing evaluation of the scope. After preliminarily adopting Petitioner's proposed scope, the agency explained that it was:

continuing to analyze interested parties' scope comments, including comments on whether it is appropriate to apply a traditional substantial transformation or other analysis in determining the country of origin of certain solar modules described in the scope of the investigation.

China AD Prelim I&D Memo at 5 (emphasis added). *See also* Issue and Decision Memorandum accompanying *Certain Crystalline Silicon Photovoltaic Products From Taiwan*, 79 Fed. Reg. 44,395 (Dep't Commerce July 31, 2014) (affirm. Preliminary deter. of sales at less than fair value and postponement of final deter.) at 5. Contrary to Plaintiffs' suggestion, then, all manufacturers, exporters and/or importers of Chinese and Taiwanese cells and modules were on

23

notice that Commerce's country-of-origin determination, and the scope of the investigations, could change.

Further, the parties were on notice particularly that modules manufactured using non-Chinese and non-Taiwanese origin cells were potentially subject to these investigations. Commerce's initiation notice stated in part:

> For purposes of these investigations, subject merchandise also includes modules, laminates and/or panels assembled in the subject country consisting of crystalline silicon photovoltaic cells that are completed or partially manufactured within a customs territory <u>other than that subject country</u>, using ingots that are manufactured in the subject country, wafers that are manufactured in the subject country, or cells where the manufacturing process begins in the subject country and is completed <u>in a non-subject country</u>.

*Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and Taiwan*, 79 Fed. Reg. at 4,667; *Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China*, 79 Fed. Reg. at 4,671.

Given this clear notice from Commerce, even the ITC later stated that it "recognized early in these investigations that changes in the scopes were likely." *Certain Crystalline Silicon Photovoltaic Products from China and Taiwan*, Inv. Nos. 701-TA-511 and 731-TA-1246-1247 (Final), USITC Pub. 4519 (Feb. 2015) at 7.  At least one respondent, tenKsolar, also took heed of Commerce's notice, filing a separate rate application in the China investigation even though it had no shipments subject to the scope of that investigation as it was stated in the preliminary determination. *See* Letter from Trade Pacific PLLC to Sec'y Commerce, re: *Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: Separate Rate Application* (Mar. 31, 2014), AD PR 291 at 4 ("tenKsolar Shanghai is submitting this separate rate application out of an abundance of caution that the {agency} might reach a different conclusion regarding the scope of this investigation").  Commerce granted the application, and noted that "the reaction of tenKsolar indicates that our notice of potential scope {changes} did, in fact,

provide parties with adequate notification and due process." CVD I&D Memo, CVD PR 388 at
49. As such, the parties had substantial notice of the likelihood of the scope changes that did
indeed result in the final determination.

Moreover, the parties had ample opportunity to comment on the proposed scope
clarification in both their case and rebuttal briefs, and many did so.[4] *See, e.g.*, Letter from Arent
Fox LLP to Sec'y Commerce, re: *Certain Crystalline Silicon Photovoltaic Products from the
People's Republic of China; Case Brief of Changzhou Trina Solar Energy Co., Ltd.* (Oct. 16,
2014), AD PR 784 at 1-2, 5-15; Letter from Steptoe & Johnson LLP to Sec'y Commerce, re:
*Case Brief on Scope Issues: Certain Crystalline Silicon Photovoltaic Products from China and
Taiwan* (Oct. 16, 2014), AD PR 787.

Finally, Plaintiffs argue that the timing of Commerce's scope clarification was improper
because the agency's investigation focused on subject merchandise as defined at initiation and
the preliminary determination, not on such merchandise as ultimately defined, rendering the
agency's determination unsupported by substantial evidence. *See* SunPower Br. at 12-13;
Consolidated Pls. Br. at 33. But it is not the case that, as SunPower implies, Commerce's
investigation "cover{ed} one category of products, but its final determination cover{ed} another
category of products," nor that "the investigations before Commerce and the ITC were conducted
under a vastly different scope definition than the final scope language." SunPower Br. at 12-13;
Consolidated Pls. Br. at 33.

Rather, in the underlying investigation, there was a substantial overlap between the
category of subject merchandise as defined at initiation and the preliminary determination and
the category of subject merchandise as defined at the final determination. Petitioner stated

---

[4]     Notably, SunPower, a Plaintiff in this appeal, chose <u>not</u> to submit a case or rebuttal brief
to the agency making arguments regarding the scope.

Consol. Ct. No. 15-00067

throughout the proceeding its well-supported belief that the majority of solar panels exported by Chinese producers during the period of investigation consisted of solar panels consisting of cells made in Taiwan, either with or without Chinese-made inputs. *See, e.g.*, Solar II Petition, AD PR 1-10 at 4-5. In other words, the majority of modules shipped from China and Taiwan, which were subject to the scope under the scope clarification, were also subject to the scope as it existed at the time that data was collected from respondents and the preliminary determination was issued. In fact, Commerce specifically found that the scope clarification did not affect the evidence on which its final determination was based, because "applying the scope clarification... result{ed} in no change to {the mandatory respondents'} reported database{s}." CVD I&D Memo, CVD PR 388 at 45. *See also id.* at 48 ("the scope modification adopted for the PRC AD and CVD final determinations has no impact on the data required from and submitted by the parties") (emphasis added). "The Chinese mandatory respondents reported all U.S. sales containing third-country solar cells." *Id.* at 45, n. 236. In fact, not only the mandatory respondents, but "most, if not all, parties reported in their Quantity and Value questionnaires all solar modules containing solar cells from third countries because they claim that they did not know the source of the wafer contained in the solar cells they purchased from third countries." *Id.* at 48.

As such, the scope clarification did not require Commerce "to collect any additional information from parties because {the} necessary information {was} already on the record." *Id.* at 45. Thus, the data based on which Commerce calculated final subsidy and dumping margins were consistent with the final scope of the investigations, and Plaintiffs' contentions are unwarranted.

Consolidated Plaintiffs also imply that the evidence on which the ITC's determinations were based was insufficient as a result of the final scope definition. *See* Consolidated Pls. Br. at 33. However, the parties presented argument specifically on this point to the ITC, and the agency concluded that it had substantial record evidence on which to base its final affirmative determinations. Indeed, in its final determination, the ITC explained that "{t}he manner in which {it} collected the data in these investigations permitted the agency and the parties to consider and evaluate the implications of various possible scope definitions to the {ITC's} analysis," and that it even "took the unusual step of giving the parties an additional opportunity, before the closure of the record to new factual information, to submit comments concerning the implications of Commerce's final determinations in addition to their scheduled final comment submissions." *Certain Crystalline Silicon Photovoltaic Products from China and Taiwan*, Inv. Nos. 701-TA-511 and 731-TA-1246-1247 (Final), USITC Pub. 4519 (Feb. 2015) at 7-8. *See also American Bearing Mfrs. Ass'n v. United States*, 28 C.I.T. 1698, 1724-25 n.22 (2004); *U.S. Steel Group v. United States*, 18 C.I.T. 1190, 1203, aff'd 96 F.3d 1352 (Fed. Cir. 1996) (the ITC "is not required to gather 100% coverage in the questionnaire responses before it can make a determination"). This additional opportunity to comment specifically gave all parties the ability to address any impact of the final determination on the final injury determination. In sum, contrary to Plaintiffs' arguments, the agency's final determinations, including the scope clarification, were reasonable, supported by substantial evidence and otherwise consistent with law.

27

**B.    Commerce's Determination Not to Rely Solely on the Substantial Transformation Test Was Reasonable, Lawful and Necessary to Fulfill Its Statutory Mandate and Did Not Result in Contradictory Country-of-Origin Rules**

Plaintiffs' arguments that Commerce inappropriately failed to limit itself to its traditional substantial transformation analysis and thereby created contradictory country-of-origin rules for the same merchandise are similarly without merit. *See* SunPower Br. at 13-16; Consolidated Pls. Br. at 15-21.

**1.    Commerce's Determination Not to Rely Solely on a Substantial Transformation Analysis Was Reasonable, Lawful, Required to Fulfil Its Statutory Mandate and Fully Explained**

While Commerce typically relies on a substantial transformation analysis to determine country-of-origin in AD/CVD proceedings, *see* Consolidated Pls. Br. at 38-39, it is well-established that an agency may depart from its past practice in a manner that is consistent with law and supported by substantial evidence, as long as it adequately articulates the reasons for the change. *See, e.g.*, *Atchison, Topeka Santa Fe Ry. Co. v. Wichita Bd. of Trade*, 412 U.S. 800, 808 (1973); *Allied Tube Conduit Corp. v. United States*, 374 F. Supp. 2d 1257, 1262 (Ct. Int'l Trade 2005). *See also* Consolidated Pls. Br. at 37 (citing *Trs. in Bankr. of N. Am. Rubber Thread Co. v. United States*, 31 C.I.T. 2040, 2047 (2007) ("Commerce has the discretion to change its policies and practices as long as they are reasonable and consistent with their statutory mandatory {and} may adapt its views and practices to the particular circumstances of the case at hand, so long as the agency's decisions are explained and supported by substantial evidence on the record") (internal citations omitted)).

Indeed, "to challenge Commerce's determination as an unreasoned departure from past practice, {the challenging party has} the burden of showing that 'Commerce consistently followed a contrary practice in similar circumstances and provided no reasonable explanation for

the change in practice.'" *Pakfood Pub. Co. v. United States*, 453 Fed. Appx. 986, 989 (Fed. Cir. 2011).   *See also Huvis Corp. v. United States*, 570 F.3d 1347, 1353 (Fed. Cir. 2009) (Commerce's deviation from an established practice will not be disturbed if "its methodology is permissible under the statute and . . . it had good reasons for the new methodology"). Here, Commerce's determination not to rely solely on its substantial transformation analysis was reasonable, lawful and fully explained and, as such, was not arbitrary and capricious. *See* Consolidated Pls. Br. at 37-41.

As an initial matter, while SunPower and Consolidated Plaintiffs note frequently that the substantial transformation test is "judicially approved," *see* SunPower Br. at 13, 16; Consolidated Pls. Br. at 15, Commerce is <u>not</u> required by statute, or even by its own regulations, to apply the substantial transformation test. As such, Consolidated Plaintiffs' statement that "{i}t is well established by this Court, as well as the Federal Circuit, that Commerce country of origin determinations are conducted by the use of the 'substantial transformation' test" is substantially misleading. Consolidated Pls. Br. at 29. In fact, the Court has held merely that Commerce's use of the substantial transformation test to determine country-of-origin "is <u>a</u> <u>permissible application</u> of the statute." *E.I. Dupont De Nemours & Co. v. United States*, 22 C.I.T. 370, 373 (1998) (emphasis added). It has not ruled that Commerce is in any way <u>required</u> to utilize this test, or that the test is the <u>only</u> permissible method of determining country-of-origin. To the contrary, the Court has recognized that the statute does not strictly set forth how Commerce is to define "foreign merchandise," and thus the Court must defer to Commerce's reasonable interpretation regarding how such merchandise should be defined. *See id.*; *Koyo Seiko Co. v. United States*, 36 F.3d 1565, 1573 (Fed. Cir. 1994).

Further, Commerce did not "ignore its own precedent," as Consolidated Plaintiffs claim. Consolidated Pls. Br. at 35. To the contrary, the agency explicitly acknowledged its "routine" reliance on the substantial transformation analysis. CVD I&D Memo, CVD PR 388 at 41. *See also* Consolidated Pls. Br. at 38-39. Commerce addressed its past precedent straightforwardly, and fully explained "the specific and special circumstances" of the underlying proceeding and thus its legitimate and carefully considered reasons for conducting additional analysis beyond that of its typical substantial transformation analysis. *See* CVD I&D Memo, CVD PR 388 at 41. Most notably, Commerce stated that "rote application of a substantial transformation analysis" in the case, as respondents seem to argue was required, *see, e.g.*, Consolidated Pls.' Br. at 29, "would not {have} allow{ed} {Commerce} to address unfair pricing decisions and/or unfair subsidization concerning the modules that {took} place in the country of export." CVD I&D Memo, CVD PR 388 at 41. "Consistent with sections 701 and 731 of the Act, {Commerce} must be able to address such circumstances, and where appropriate, address unfair pricing decisions or unfair subsidization that is taking place in the exporting country where further manufacturing, such as assembly, occurs, notwithstanding that such activities may not necessarily result in a substantial transformation of merchandise." *Id.*

In other words, were Commerce required to blindly adhere to its substantial transformation analysis simply because it had applied such an analysis in the past, the agency would have been unable to fulfill its statutory mandate to effectively administer the AD/CVD laws. *See, e.g.*, *Melamine Chemicals, Inc. v. United States*, 732 F.2d 924, 930 (Fed. Cir. 1984); *Fujitsu General Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) ("the International Trade Administration is the 'master' of the antidumping laws") (quoting *Torrington Co. v. United States*, 68 F.3d 1347, 1351 (Fed. Cir. 1995)). As such, Commerce was fully justified, and

30

Consol. Ct. No. 15-00067

did not act arbitrarily or capriciously, in determining that an analysis beyond that envisioned by its traditional substantial transformation analysis was required by the specific facts and circumstances presented in the underlying proceeding, and it fully explained the careful reasoning behind its determination.

>    **2.    Commerce's Scope Determination Did Not Result in Contradictory Country-of-Origin Rules for the Same Merchandise or the Same Merchandise Being Subject to Multiple AD/CVD Orders**

Plaintiffs further err in arguing that the agency's definition of the scope in the underlying proceeding resulted in "identical modules" having "two countries of origin for trade remedy purposes" or being subject to two sets of AD/CVD orders.  SunPower Br. at 14.  *See also* Consolidated Pls. Br. at 18-20, 29, 35-37.

As Commerce explained in its final determination, "no product… at any time {has} two countries of origin for AD/CVD purposes" as a result of the final scope definition.  CVD I&D Memo, CVD PR 388 at 41.  For instance, this can be demonstrated using the example set forth by SunPower: c-Si PV modules that are toll assembled in China incorporating cells originating in either Malaysia or the Philippines.  *See* SunPower Br. at 14.  Such modules, taking into account the scope definitions of Solar I and Solar II, are Chinese-origin modules subject only to the Solar II AD/CVD orders.  They are not, as SunPower implies, *see id.*, Malaysian or Philippine modules under Solar I.  In fact, they are not subject to Solar I at all.  The subject country in Solar I was China, and the final scope in that proceeding defined modules assembled in a third country from Chinese-origin cells, as well as modules assembled in China from Chinese-origin cells, to be modules of Chinese-origin.  *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China*, 77 Fed. Reg. at 63,792-93. Modules assembled in China from Malaysian or Philippine cells are not subject to the Solar I AD/CVD orders.  With the scope of Solar II, as defined in the final determination, such modules

are Chinese-origin and subject to the Solar II AD/CVD orders. *See* CVD I&D Memo, CVD PR 388 at 54 ("we find the {country-of-origin} approaches {from Solar I and Solar II} to be complementary and that identifying the proceeding to which a given solar module may be subject, based on these analyses, will be straightforward").

Consolidated Plaintiffs set forth a similar example: modules assembled in China from Singaporean-origin cells. *See* Consolidated Pls. Br. at 36. Such modules are not subject to Solar I. Rather, they fall clearly within the scope of Solar II, as defined by Commerce, and are subject to the Solar II AD/CVD orders. Thus, the scope determinations do <u>not</u> "allow{} two orders applying to the same product." *See* Consolidated Pls. Br. at 35. Applying the rules set forth in the Solar I and Solar II scopes, any given solar cell or module is only possibly subject to one set of AD/CVD orders.

For similar reasons, Consolidated Plaintiffs' repeated contentions that Commerce imposed "worldwide orders on solar modules assembled in China," duties on products "originating <u>everywhere in the world</u>," and AD/CVD "orders on solar panels from the entire world," in violation of the statute, are wrong. Consolidated Plaintiffs Br. at 18, 34 (emphasis in original). The Solar I AD/CVD orders apply to modules assembled in <u>China</u> from <u>Chinese</u> cells, as well as modules assembled in third countries from <u>Chinese</u> cells. The Solar II Chinese AD/CVD orders apply to modules assembled in <u>China</u> from non-Chinese cells, while the Solar II Taiwanese AD order applies to modules assembled in <u>Taiwan</u> from <u>Taiwanese</u> cells, as well as modules assembled in third countries from <u>Taiwanese</u> cells. Solar cells and modules that are not produced either in China or Taiwan (*i.e.*, that are solely produced in other regions of "the entire world") are not subject to either the Solar I or Solar II AD/CVD orders. Rather, duties apply to products with origins of <u>China</u> and <u>Taiwan</u> (*i.e.*, the subject countries), consistent with the

32

statute. As such, Plaintiffs' arguments that Commerce inappropriately defined the scope of Solar II so that identical products have two countries of origin for trade remedy purposes or are subject to two sets of AD/CVD orders must fail.

**C.     The Preliminary Scope, Incorporating the Two-out-of-Three Rule, Was Also Supported by Substantial Evidence and Consistent with Law**

Although Commerce modified the scope for the final determination and the two-out-of-three rule is not reflected in the scope of the orders, SunPower argues that the two-out-of-three rule scope formulation included in the scope at initiation and at the preliminary determination also "should be rejected." SunPower Br. at 24-25. To the extent that the issue is properly raised in this appeal, *see id.* at 1 (challenging Commerce's "final scope determination"), SolarWorld submits that, were Commerce to have adopted the two-out-of-three rule, such determination also would have been supported by substantial evidence and consistent with law.

Contrary to SunPower's assertions, Commerce was not required to adhere to its Solar I substantial transformation analysis in the underlying proceeding. As discussed in section V.A.2 above, Commerce provided significant justifications, which it explained at length in the final determination, for determining not to rely solely on that analysis, including the substantial risk of evasion of the orders and Commerce's ability to effectively administer the AD/CVD laws.

Moreover, the two-out-of-three rule in the scope did not conflict with the Solar I scope, as it only would have applied in the unique circumstances in which an input to a c-Si PV cell was produced in a subject country and the c-Si PV module was assembled in the same subject country. *See, e.g.*, SolarWorld Scope Rebuttal Brief, AD PR 811 at 18-20. Thus, rather than contradicting the Solar I scope, the two-out-of-three rule would have provided a complementary country-of-origin approach, like the final scope ultimately adopted by Commerce in Solar II.

33

SunPower's argument with regard to the two-out-of-three rule scope is misplaced and without merit.

**D.**   **Commerce's Determination Not to Include an Explicit Exemption from the Scope for Solar Modules Assembled in China from U.S.-Origin Cells Was Supported by Substantial Evidence and Consistent with Law**

Suniva claims that Commerce's final scope determination in Solar II was not in accordance with law because it allegedly imposes duties on Suniva's domestic merchandise. See Suniva Br. at 10-15. Suniva's argument must fail, for the following reasons.

As Suniva notes, "U.S. law gives Commerce the authority to impose AD duties only on 'foreign merchandise.'" *Id.* at 10. However, as noted above, the statute does not set forth how Commerce is to define such "foreign merchandise." *See generally* 19 U.S.C. § 1673. Specifically, as the Court has stated, "{t}he statute does not define 'foreign'; nor does it contain a standard for Commerce to apply in determining whether the merchandise at issue is a domestic product or a product of a foreign nation." *E.I. Dupont De Nemours & Co.*, 22 C.I.T. at 373. In such circumstances, where Congress has not provided clear guidance on an issue, the standard set forth in *Chevron* dictates that the courts will defer to the agency's interpretation of the statute as long as that interpretation is reasonable. *Chevron*, 467 U.S. at 842-43. *See also Koyo Seiko Co.*, 36 F.3d at 1573 (Fed. Cir. 1994). In the underlying proceeding, Commerce reasonably determined that c-Si PV cells not of Chinese-origin, which are assembled into modules in China, are Chinese-origin modules and, as such, "foreign merchandise" that is subject to the Solar II AD/CVD orders. *See* CVD I&D Memo, CVD PR 388 at 54-55 ("we have only applied AD and CVD measures to products determined to have a country of origin of China").

Suniva's contention that Commerce "has confirmed that a substantial transformation is required to convert U.S.-origin merchandise into foreign merchandise" is unsupported and incorrect. Suniva Br. at 11. As discussed at length in section V.B.1 above, while Commerce

34

Consol. Ct. No. 15-00067

may have a practice of utilizing the substantial transformation analysis, it has not "confirmed" that this approach is <u>required</u> to determine country-of-origin. *See, e.g.*, CVD I&D Memo, CVD PR 388 at 41. To the contrary, Commerce reasonably determined not to rely solely on the substantial transformation analysis in the underlying proceeding, and determined that Chinese modules assembled from non-Chinese cells are Chinese-origin products covered by the orders. As such, in the China investigations, Commerce "only applied AD and CVD measures to products determined to have a country of origin of China." *Id.* at 54-55.

Notably, Commerce acted reasonably in covering all Chinese modules assembled from non-Chinese cells, regardless of cell origin, within the scope of the AD/CVD orders because such products were being dumped and subsidized and were injurious to the U.S. solar industry. If Suniva had been granted the scope exclusion that it sought, the unfair dumping and subsidization of those Chinese modules would have been outside the reach of the AD/CVD laws. As Commerce noted in its final determination, "rote application of a substantial transformation analysis... would not {have} allow{ed} {Commerce} to address unfair pricing decisions and/or unfair subsidization concerning the modules that {took} place in the country of export." CVD I&D Memo, CVD PR 388 at 41. The inability to address these unfair trade practices would not have adequately "protect{ed} the domestic industry producing the domestic like product," which Suniva acknowledges is the "central aim of U.S. AD/CVD law." Suniva Br. at 16.

### E.      Commerce Properly Did Not Limit the Application of the Revised Scope to Prospective Entries Only

Finally, Suniva's brief argument that Commerce's revised scope definition should apply only to entries made on or after the date of publication of the AD/CVD orders is without merit. *See* Suniva Br. at 23.

As an initial matter, Suniva did not raise this argument in its case brief below, and thus failed to exhaust its administrative remedies. *See generally* Letter from Steptoe & Johnson LLP to Sec'y of Commerce, re: *Case Brief on Scope Issues Certain Crystalline Silicon Photovoltaic Products from China and Taiwan* (Oct. 16, 2014), AD PR 787. *See also* 28 U.S.C. § 2637(d); *Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1388 (Fed. Cir. 2014) ("Commerce regulations require the presentation of all issues and arguments in a party's case brief, and we have held that a party's failure to raise an argument before Commerce constitutes a failure to exhaust its administrative remedies") (footnote omitted). Indeed, there is generally "'strict view' of the requirement that parties exhaust their administrative remedies before… Commerce in trade cases." *Corus Staal BV v. United States*, 502 F. 3d 1370, 1379 (Fed. Cir. 2007) (internal citation omitted). Suniva did not even attempt to argue that any of the recognized exceptions to the exhaustion requirement excuse apply in this case. *See* Suniva Br. at 23. As such, Suniva should be precluded from raising this argument before the Court.

On the merits as well, Suniva's claims must fail. Any "prospective only" application of the scope language would be contrary to Commerce's and CBP's longstanding practice regarding the imposition and collection of AD/CVD duties. As stated in Commerce's regulations, unless critical circumstances are found to exist, AD and CVD duties are generally "imposed on entries of subject merchandise made on or after the date on which the Secretary {of Commerce} first imposes provisional measures (most often the date on which notice of an affirmative preliminary determination is published in the Federal Register)." 19 C.F.R. § 351.206(a). *See also* Enforcement and Compliance Antidumping Manual (2015) at Chapter 19 at 3 ("the collection of duties by CBP during and after an investigation typically follows a simple pattern: cash deposits or bonds equal to the preliminary margins are collected from the publication date of the

Consol. Ct. No. 15-00067

preliminary determination…; cash deposits or bonds equal to the final margins from the publication date of the final determination; cash deposits or bonds equal to the amended final margins (if need be) from the publication date of the amended final determination; and cash deposits only equal to the final margins (or amended final margins) from the publication date of the AD Order").

A scope clarification at the time of the final determination does not change this well-established practice for administering the AD/CVD laws.  As noted in section V.A.3. above, the parties subject to the underlying investigations were on notice throughout the proceeding that Commerce remained in the process of evaluating the scope language and were well aware that the scope could change for the final determination.  There is thus no reason that the agencies should be required to apply one scope definition for purposes of a certain subset of entries, and a slightly different scope definition for purposes of a later subset of entries.

As such, the basis for Suniva's argument is not clear.  This lack of clarity is especially true given that Suniva attempts to incorporate "the arguments submitted by the other Consolidated Plaintiffs on this point," *See* Suniva Br. at 23, yet no other Plaintiff made this argument in their brief to the Court.  *See generally* SunPower Br.; Consolidated Pls. Br.  In sum, Suniva's argument has no basis in law or agency practice, and should be rejected.

37

Consol. Ct. No. 15-00067

## VI.   **CONCLUSION**

For the foregoing reasons, SolarWorld respectfully requests that the Court deny the motions for judgment on the agency record submitted by SunPower, Suniva, Consolidated Plaintiffs and Yingli, and find that the agency decisions described above are supported by substantial evidence and otherwise in accordance with law.

Respectfully submitted,

Timothy C. Brightbill, Esq.
Laura El-Sabaawi, Esq.

**WILEY REIN LLP**
1776 K Street, NW
Washington, DC 20006
(202) 719-7000

February 9, 2015                    *Counsel to SolarWorld Americas, Inc.*

38

CERTIFICATE OF COMPLIANCE

Pursuant to Chambers Procedure 2(B)(1), and Senior Judge Pogue's consolidation Order dated July 1, 2015, the undersigned certifies that this response brief complies with the word limitation requirement for Defendant-intervenor's response brief of 22,000 words. The word count for SolarWorld Americas, Inc.'s Response Brief, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2010), is 11,914 words.

(Signature of Attorney)

Timothy C. Brightbill
(Name of Attorney)

SolarWorld Americas, Inc.
(Representative Of)

February 9, 2016
(Date)

# EXHIBIT 1

*Excerpts of SolarWorld's Standing Analysis and Revised*

*Scope Language from Solar I*



Barcode:3039866-01 A-570-979 INV - Investigation   -

1776 K STREET NW
WASHINGTON, DC 20006
PHONE  202.719.7000
FAX   202.719.7049

7925 JONES BRANCH DRIVE
McLEAN, VA 22102
PHONE  703.905.2800
FAX   703.905.2820

www.wileyrein.com

November 7, 2011

Timothy C. Brightbill
202.719.3138
tbrightbill@wileyrein.com

DOC Investigation Nos.:
A-570-979 and C-570-980
USITC Investigation Nos. 701-TA-481 and
731-TA-1190 (Preliminary)
Total Pages: 28
Investigation
IA/NME/04
Business Proprietary Information removed on
pages 2 and 3, and Attachment 1.
**PUBLIC VERSION**

**BY ELECTRONIC FILING**
**AND HAND DELIVERY**

The Honorable John E. Bryson
Secretary of Commerce
Attn: Import Administration
APO/Dockets Unit, Room 1870
U.S. Department of Commerce
14th Street and Constitution Ave., NW
Washington, D.C.  20230

Mr. James R. Holbein
Secretary
U.S. International Trade Commission
500 E Street, S.W., Room 112
Washington, D.C.  20436

Re:   *Crystalline Silicon Photovoltaic Cells from the People's Republic Of*
*China*: Standing Analysis and Revised Scope Language

Dear Secretary Bryson and Secretary Holbein:

On behalf of SolarWorld Industries America Inc. ("Petitioner"), we are

hereby submitting an alternative standing analysis based on U.S. crystalline silicon

photovoltaic ("PV") module/panel production that demonstrates that the Petitions in

Barcode:3039866-01 A-570-979 INV - Investigation   -



The Hon. John E. Bryson
Mr. James R. Holbein
November 7, 2011
Page 3

**1**, when known positions of support and neutrality on the Petitions are taken into account, U.S. crystalline silicon PV module/panel producers representing [ NUMBER ] percent of the remaining module/panel production in 2010 support the Petitions. Therefore, domestic module/panel producers that support the Petitions account for at least 25 percent of the total production of crystalline silicon PV modules/panels and more than 50 percent of the production of crystalline silicon PV modules/panels produced by that portion of the industry expressing support for or opposition to the Petitions.

Additionally, as discussed with the Department, Petitioner has provided, at **Attachment 2**, a revised scope description that clarifies that the scope of these proceedings covers crystalline silicon PV cells produced in China; modules and panels assembled in China from crystalline silicon PV cells, regardless of whether the cells are manufactured in China or a third country; and crystalline silicon PV modules and panels produced in a third country from crystalline silicon PV cells manufactured in China. This merchandise is covered by the scope regardless of whether it is exported directly to the United States from China or to the United States via third countries.

Barcode:3039866-04 A-570-979 INV - Investigation  -

## ATTACHMENT 2

The merchandise subject to these proceedings consists of crystalline silicon photovoltaic ("PV") cells and modules/panels, whether or not partially or fully assembled into other products, including, but not limited to, panels, laminates and building integrated materials.

These proceedings cover crystalline silicon PV cells of thickness equal to or greater than 20 micrometers, having a p/n junction formed by any means, whether or not the cell has undergone other processing, including, but not limited to, cleaning, etching, coating, and/or addition of materials (including, but not limited to, metallization and conductor patterns) to collect and forward the electricity that is generated by the cell.

These proceedings cover crystalline silicon PV cells, whether exported directly to the United States or via third countries; crystalline silicon PV modules/panels produced in the PRC, regardless of the country of manufacture of the cells used to produce the modules or panels, and whether exported directly to the United States or via third countries; and crystalline silicon PV modules or panels produced in a third country from crystalline silicon PV cells manufactured in the PRC, whether exported directly to the United States or via third countries.

Subject merchandise may be described at the time of importation as parts for final finished products that are assembled after importation, including, but not limited to, modules, laminates, panels, building-integrated modules, building-integrated panels, or other finished goods kits. Such parts that otherwise meet the definition of subject merchandise are included in the scope of this proceeding.

Excluded from the scope of these proceedings are thin film PV products produced from amorphous silicon (a-Si), cadmium telluride (CdTe), or copper indium gallium selenide (CIGS).

Also excluded from the scope of these proceedings are crystalline silicon PV cells, not exceeding 10,000mm$^2$ in surface area, that are permanently integrated into a consumer good whose function is other than power generation and that consumes the electricity generated by the integrated crystalline silicon PV cell. Where more than one cell is permanently integrated into a consumer good, the surface area for purposes of this exclusion shall be the total combined surface area of all cells that are integrated into the consumer good.

Unless explicitly excluded from the scope of these proceedings, crystalline silicon PV cells possessing the physical characteristics of subject merchandise are covered by these proceedings.

Merchandise covered by these proceedings is currently classified in the Harmonized Tariff System of the United States ("HTSUS") under subheadings 8501.61.00.00, 8507.20.80, 8541.40.60.20 and 8541.40.60.30. These HTSUS subheadings are provided for convenience and customs purposes; the written description of the scope of these proceedings is dispositive.