# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

SUNPOWER CORPORATION,

          **Plaintiff,**

     and

CANADIAN SOLAR INC., *et al.*,

          **Plaintiff-Intervenors,**

     v.

UNITED STATES,

          **Defendant,**

     and

SOLARWORLD AMERICAS, INC.,

          **Defendant-Intervenor.**

Consol. Court No. 15-00067

Before: Hon. Donald C. Pogue, Senior Judge

**PUBLIC DOCUMENT**

**Contains No Business Proprietary Information**

## APPENDIX TO DEFENDANT-INTERVENOR SOLARWORLD AMERICAS, INC.'S RESPONSE BRIEF

Timothy C. Brightbill, Esq.
Laura El-Sabaawi, Esq.

**WILEY REIN LLP**
1776 K Street, N.W.
Washington, D.C.  20006
(202) 719-7000

*Counsel to SolarWorld Americas, Inc.*

February 12, 2016

Consol. Court No. 15-00067                          **PUBLIC DOCUMENT**

*SunPower Corporation v. United States*
United States Court of International Trade
Consol. Court No. 15-00067

**Public Appendix to Defendant-Intervenor SolarWorld Americas, Inc.'s Response Brief**

| Tab No. | Document | Pages | Record Document |
|---|---|---|---|
| 1 | Issues and Decision Memorandum accompanying *Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China*, 79 Fed. Reg. 76,970 (Dep't Commerce Dec. 23, 2014) (final deter. of sales at less than fair value) | 1-29 | AD PR Doc. 817 |
| 2 | Issues and Decision Memorandum accompanying *Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China*, 79 Fed. Reg. 76,962 (Dep't Commerce Dec. 23, 2014) (final affirmative countervailing duty deter.) | 1-4, 32-55 | CVD PR Doc. 388 |
| 3 | Petition for the Imposition of Antidumping and Countervailing Duties, *Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and Taiwan*, vol. I (Dec. 31, 2013) | 1-11 | AD PR Doc. 1-10 |
| 4 | Letter from Howard Smith, Program Manager, to Wiley Rein LLP, re: *Petitions for the Imposition of Antidumping Duties on Imports of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and Taiwan and Countervailing Duties on Imports of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: Supplemental Questions* (Jan. 6, 2014) | All | AD PR Doc. 17 |
| 5 | *Supplement II to Petition for the Imposition of Antidumping and Countervailing Duties: Certain Crystalline Silicon Photovoltaic Products from China and Taiwan* (Jan. 13, 2014) | 1-2 | AD PR Doc. 25 |
| 6 | Letter from Howard Smith to All Interested Parties, re: *Antidumping and Countervailing Duty Investigations of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and the Antidumping Duty Investigation of Certain Crystalline Silicon Photovoltaic Products from Taiwan: Opportunity to Submit Scope Comments* (Oct. 3, 2014) | All | AD PR Doc. 765 |

Consol. Court No. 15-00067                    **PUBLIC DOCUMENT**

| Tab No. | Document | Pages | Record Document |
|---------|----------|-------|-----------------|
| 7 | Letter from Wiley Rein LLP to Sec'y Commerce, re: *Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: Case Brief of SolarWorld Americas, Inc.* (Oct. 17, 2014) | 1-7 | AD PR Doc. 795 |
| 8 | Letter from Wiley Rein LLP to Sec'y Commerce, re: *Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: SolarWorld's Rebuttal Brief on Scope* (Oct. 27, 2014) | 1-20 | AD PR Doc. 811 |
| 9 | Letter from Wiley Rein LLP to Sec'y of Commerce, re: *Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and Taiwan: Rebuttal to Respondents' Scope Comments* (Apr. 3, 2014) | 11-13 | AD PR Doc. 327-328 |
| 10 | Letter from Sidley Austin LLP to Sec'y Commerce, re: *Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and Taiwan: Comments on Scope* (Feb. 18, 2014) | 25 | AD PR Doc. 125 |
| 11 | Letter from Perkins Coie LLP to Sec'y Commerce re: *Certain Crystalline Silicon Photovoltaic Products from China and Taiwan; Gintech Comments on Scope* (Feb. 18, 2014) | 14 | AD PR Doc. 131 |
| 12 | Letter from Trade Pacific PLLC to Sec'y Commerce, re: *Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: Separate Rate Application* (Mar. 31, 2014) | 3-4 | AD PR Doc. 291 |
| 13 | Letter from Arent Fox LLP to Sec'y Commerce, re: *Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China; Case Brief of Changzhou Trina Solar Energy Co., Ltd.* (Oct. 16, 2014) | All | AD PR Doc. 784 |
| 14 | Letter from Steptoe & Johnson LLP to Sec'y Commerce, re: *Case Brief on Scope Issues: Certain Crystalline Silicon Photovoltaic Products from China and Taiwan* (Oct. 16, 2014) | All | AD PR Doc. 787 |

Consol. Court No. 15-00067                    **PUBLIC DOCUMENT**

| Tab No. | Document | Pages | Record Document |
|---------|----------|-------|-----------------|
| 1 | Issues and Decision Memorandum accompanying *Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China*, 79 Fed. Reg. 76,970 (Dep't Commerce Dec. 23, 2014) (final deter. of sales at less than fair value) | 1-29 | AD PR Doc. 817 |

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-570-010
Investigation
Public Document
E&C/IV: JDP/TEM

DATE: December 15, 2014

MEMORANDUM TO: Paul Piquado
Assistant Secretary
for Enforcement and Compliance

FROM: Christian Marsh
Deputy Assistant Secretary
for Antidumping and Countervailing Duty Operations

SUBJECT: Certain Crystalline Silicon Photovoltaic Products from the
People's Republic of China: Issues and Decision Memorandum for
the Final Determination of Sales at Less Than Fair Value

---

## I. SUMMARY

The Department finds that certain solar products from the PRC are being, or are likely to be, sold in the United States at LTFV, as provided in section 735 of the Act. The POI is April 1, 2013, through September 30, 2013.

After analyzing the comments submitted by interested parties, and based on our findings at verification, we made certain changes to the margin calculations for the two mandatory respondents, which also results in a change to the weighted-average dumping margin calculations for the separate-rate companies that were not selected for individual examination. We recommend that you approve the positions described in the "Discussion of the Issues" section of this memorandum. Below is the complete list of the issues for which we received comments:

**Case Issues:**

Comment 1: Scope of the Investigation
Comment 2: Whether to Select South Africa or Thailand as the Primary Surrogate Country
Comment 3: Whether to Offset the Cash Deposit Rate for Export Subsidies
Comment 4: Whether the Department Should Investigate the Effects of the GOC's Alleged Cyberhacking on this Investigation
Comment 5: Ultimate Ownership of Separate Rate Applicants
Comment 6: Separate Rate Applicants with Managers or Board Members with Ties to the Chinese Government



Comment 7:    Separate Rate Status of Lianyungang Shenzhou New Energy Co., Ltd.
Comment 8:    Separate Rate Status of Sumec Hardware & Tools Co., Ltd.
Comment 9:    The Appropriate Surrogate Value for Aluminum Frames
Comment 10:   The Appropriate Surrogate Value for Scrap Solar Cells
Comment 11:   Unpaid Sales
Comment 12:   Quality Insurance
Comment 13:   Warranty Costs
Comment 14:   Incorrect Allocation of Indirect Material, Labor and Electricity      Consumption
Comment 15:   Whether to Base Renesola/Jinko's Dumping Margin on Partial AFA
Comment 16:   Whether to Collapse Jinko and Renesola
Comment 17:   Whether to Use Market-Economy Purchase Prices to Value all of
              Renesola/Jinko's Solar Cells
Comment 18:   Whether to Adjust Renesola/Jinko's Cash Deposit Rate by the Full Amount of
              Domestic Subsidies
Comment 19:   Separate Rate Application of tenKsolar

## II.   BACKGROUND

The following events have taken place since the Department published the *Preliminary Determination* in this investigation on July 31, 2014.[1]  In August, 2014, the Department verified the information provided by the mandatory respondents Trina Solar and Renesola/Jinko.

On October 3, 2014, in response to interested parties' comments on the scope of this investigation, the Department announced that it was considering the possibility of a scope clarification, described the possible clarification, and provided interested parties with an opportunity to submit comments on the potential clarification.

On October 16, 2014, Trina Solar, Renesola/Jinko, Petitioner, the Government of the PRC, a U.S. importer, Suniva Inc., and certain separate rate applicants submitted case briefs.[2]  From

---

[1] *See Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China: Affirmative Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination,* 79 FR 44399 (July 31, 2014) ("*Preliminary Determination*").

October 22, 2014 to October 27, 2014 Trina Solar, Renesola/Jinko, Petitioner, and certain separate rate applicants submitted rebuttal briefs.[3]

Although certain parties requested that a hearing be held, on October 24, 2014, all hearing requests were subsequently withdrawn.  Thus, the Department did not hold a hearing with respect to this investigation.

## III.   SCOPE OF THE INVESTIGATION

---

[2] *See* Letter from fourteen separate rate applicants, "Re: Antidumping and Countervailing Duty Investigations of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China, and Antidumping Duty Investigation of Certain Crystalline Silicon Photo voltaic Products from Taiwan: Respondents' Case Brief," dated October 16, 2014; Letter from the PRC Government, "Re: Government of China's Case Brief: Certain Crystalline Silicon Photovoltaic Products from the People's Republic Of China," dated October 16, 2014;  Letter from Asun Energy Co., Ltd. (a/k/a Suzhou Asun Energy Co., Ltd.), "Re: Administrative Case Brief: Antidumping Duty Investigation of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China (A-570-010)," dated October 16, 2014; Letter from Trina Solar, "Re: Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China; Case Brief of Changzhou Trina Solar Energy Co., Ltd.," dated October 16, 2014; Letter from Renesola, "Re: Certain Crystalline Silicon Photovoltaic Products from China; Case Brief," dated October 16, 2014; Letter from Junco, "Re: Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: Case Brief," dated October 16, 2014; Letter from Hanwha QCELLS USA, Inc., "Re: Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China," dated October 16, 2014; Letter from Suniva, Inc., "Re: Case Brief on Scope Issues Certain Crystalline Silicon Photovoltaic Products from China and Taiwan," dated October 16, 2014;  Letter from tenKsolar (Shanghai) Co., Ltd., "Re: Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and Taiwan– Case Brief," dated October 16, 2014; Letter from SNJ Enterprises LLC dba Zamp Solar and Quebec Inc. dba RDK Products, "Re: Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: Case Brief," dated October 16, 2014;  Letter from Petitioner, "Re: Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: Case Brief of Solar World Americas, Inc.," dated October 16, 2014.

[3] *See* Letter from Hanwha SolarOne (Qidong) Co., Ltd. and Hanwha SolarOne Hong Kong Limited, "Re: Rebuttal Brief: Antidumping Duty Investigation of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China (A-570-010)," dated October 22, 2014; Letter from Asun Energy Co., Ltd. (a/k/a Suzhou Asun Energy Co., Ltd.), "Re: Rebuttal Brief: Antidumping/Countervailing Duty Investigations of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China," dated October 22, 2014;  Letter from Shangluo BYD Industrial Co., Ltd. and Shanghai BYD Co., Ltd. "Re: Crystalline Silicon Photovoltaic Products from the People's Republic of China and Taiwan: Rebuttal Brief," dated October 22, 2014; Letter from Changzhou Almaden Co., Ltd., "Re: Crystalline Silicon Photovoltaic Products from P.R. China: Rebuttal Brief," dated October 22, 2014; Letter from Renesola "Re: Certain Crystalline Silicon Photovoltaic Products from China; Rebuttal Brief," dated October 22, 2014; Letter from  Petitioner, "Re: Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: Rebuttal Brief of Solar World Americas, Inc.," dated October 22, 2014; Letter from Trina Solar, "Re: Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: Rebuttal Brief of Changzhou Trina Solar Energy Co., Ltd.," dated October 22, 2014; *see also* Letter from fourteen separate rate applicants, "Re: Antidumping and Countervailing Duty Investigations of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China, and Antidumping Duty Investigation of Certain Crystalline Silicon Photo voltaic Products from Taiwan: Respondents' Rebuttal Brief," dated October 27, 2014; Letter from  Hanwha QCELLS USA, Inc. "Re: Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China," dated October 27, 2014; Letter from SNJ Enterprises LLC dba Zamp Solar LLC and Quebec Inc. dba RDK Products, "Re: Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: Rebuttal Brief," dated October 27, 2014; Letter from Petitioner, "Re: Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: SolarWorld's Rebuttal Brief on Scope," dated October 27, 2014.

The merchandise covered by this investigation is modules, laminates and/or panels consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including building integrated materials. For purposes of this investigation, subject merchandise includes modules, laminates and/or panels assembled in the PRC consisting of crystalline silicon photovoltaic cells produced in a customs territory other than the PRC.

Subject merchandise includes modules, laminates and/or panels assembled in the PRC consisting of crystalline silicon photovoltaic cells of thickness equal to or greater than 20 micrometers, having a p/n junction formed by any means, whether or not the cell has undergone other processing, including, but not limited to, cleaning, etching, coating, and/or addition of materials (including, but not limited to, metallization and conductor patterns) to collect and forward the electricity that is generated by the cell.

Excluded from the scope of this investigation are thin film photovoltaic products produced from amorphous silicon (a-Si), cadmium telluride (CdTe), or copper indium gallium selenide (CIGS). Also excluded from the scope of this investigation are modules, laminates and/or panels assembled in the PRC, consisting of crystalline silicon photovoltaic cells, not exceeding 10,000mm$^2$ in surface area, that are permanently integrated into a consumer good whose function is other than power generation and that consumes the electricity generated by the integrated crystalline silicon photovoltaic cells. Where more than one module, laminate and/or panel is permanently integrated into a consumer good, the surface area for purposes of this exclusion shall be the total combined surface area of all modules, laminates and/or panels that are integrated into the consumer good. Further, also excluded from the scope of this investigation are any products covered by the existing antidumping and countervailing duty orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, laminates and/or panels, from the PRC.[4]

Merchandise covered by this investigation is currently classified in the Harmonized Tariff Schedule of the United States (HTSUS) under subheadings 8501.61.0000, 8507.20.8030, 8507.20.8040, 8507.20.8060, 8507.20.8090, 8541.40.6020, 8541.40.6030 and 8501.31.8000. These HTSUS subheadings are provided for convenience and customs purposes; the written description of the scope of this investigation is dispositive.

## IV.    SEPARATE RATE COMPANIES

In proceedings involving NME countries, the Department holds a rebuttable presumption that all companies within the country are subject to government control and, thus, should be assessed a single AD rate. It is the Department's policy to assign all exporters of the subject merchandise in an NME country this single rate unless an exporter can demonstrate that it is sufficiently independent so as to be entitled to a separate rate.

---

[4] See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order, 77 FR 73018 (December 7, 2012); Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Countervailing Duty Order, 77 FR 73017 (December 7, 2012).

In the instant investigation, the Department received timely-filed separate rate applications from 52 companies. In the *Preliminary Determination,* the Department granted 44 of the applicants (Separate Rate Applicants) separate rates. Interested parties submitted a number of comments regarding some of the companies applying for separate rate status. After considering the comments, with the exception of tenKsolar (Shanghai) Co., Ltd., the Department has not changed its position from the *Preliminary Determination* with respect to the companies seeking separate rate status. *See* Comment1 and Comments 5 through 8 below.

The Department continues to find that the evidence placed on the record of this investigation by the Separate Rate Applicants that were granted separate rate status in the *Preliminary Determination* demonstrates both *de jure* and *de facto* absence of government control with respect to each company's respective exports of the merchandise under investigation. Further, the Department continues to deny certain companies separate rate status.

The rate assigned to companies granted separate rate status that were not individually examined is normally determined based on the weighted-average of the estimated dumping margins calculated for exporters and producers individually investigated, excluding zero and *de minimis* margins or margins based entirely on FA.[5] In this investigation, we calculated above *de minimis* estimated weighted-average dumping margins that are not based on total FA for the two mandatory respondents, Trina Solar and Renesola/Jinko. Because we individually examined two companies in this investigation, basing the estimated dumping margin for the companies not individually examined on a weighted-average of the dumping margins for the two individually examined companies risks disclosure of BPI. Therefore, we calculated both a weighted-average of the dumping margins calculated for the two mandatory respondents using public values for their sales of subject merchandise and a simple average of these two dumping margins, and selected, as the separate rate, the average that provides a more accurate proxy for the weighted-average margin of both companies calculated using BPI.[6]

## V.   USE OF ADVERSE FACTS AVAILABLE

In the *Preliminary Determination,* we determined that 35 companies were part of the PRC-wide entity because these companies failed to respond the Department's questionnaires and, therefore,

---

[5] *See* section 735(c)(5)(A) of the Act.
[6] *See* the December 15, 2014, memorandum from Jeff Pedersen to the File entitled "Calculation of the Final Margin for Separate Rate Recipients." ("Trina Final Analysis Memorandum").

failed to qualify for a separate rate.[7]  Further, we found that the PRC-wide entity withheld necessary information within the meaning of section 776(a) of the Act, and failed to cooperate by acting to the best of its ability to comply with the Department's requests for information within the meaning of section 776(b) of the Act.  Specifically, the Department did not receive responses to its Q&V questionnaire from 35 PRC exporters and/or producers of merchandise under consideration that were named in the Petition and for which the Department received confirmation that its issued Q&V questionnaire was delivered.  As necessary information is not available on the record, and the PRC-wide entity withheld necessary information requested by the Department, failed to provide information by the established deadlines, and significantly impeded this proceeding by not submitting the requested quantity and value information, pursuant to sections 776(a)(1) and (a)(2)(A)-(C) of the Act, the Department is applying facts otherwise available.  Furthermore, due to the PRC-wide entity's failure to provide information that was in its possession, the Department determined that the PRC-wide entity failed to cooperate and, thus, found it appropriate to base the PRC-wide rate on AFA.  As AFA, we assigned the PRC-wide entity the petition margin of 165.04 percent.[8]

We received no comments on our *Preliminary Determination* with respect to the PRC-wide entity.  Therefore, we have continued to assign to the PRC-wide entity an AD margin equal to the Petition margin of 165.04 percent.  While we made certain changes to the margin calculations for Trina Solar and Renesola/Jinko since the *Preliminary Determination*, as outlined in the Issues and Decision Memorandum, these changes did not alter our preliminary corroboration analysis, which we continue to apply for purposes of this final determination.[9]

## VI.   DISCUSSION OF THE ISSUES

### Comment 1:  Scope of the Investigation

---

[7] *See Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China and Taiwan: Initiation of Antidumping Duty Investigations*, 79 FR 4661 (January 29, 2014) ("The Department requires that PRC producers/exporters submit a response to both the Q&V questionnaire and the separate rate application by their respective deadlines in order to receive consideration for separate rate status).  Those companies are:  Beijing Hope Industry, China Sunergy, CNPV, EGing, ENN Solar Energy, Era Solar, Goldpoly (Quanzhou), Himin Holdings, Jetion, Jia Yi Energy Technology, Jiasheng Photovoltaic Tech., Jiutai Energy, Komaes Solar, Leye Photovoltaic Science Tech., Magi Solar Technology, Perfectenergy, Polar Photovoltaics, Qiangsheng (QS Solar), Refine Solar, Risun Solar (JiangXi Ruijing Solar Power Co., Ltd.), Shanghai Chaori Solar Energy, Shangpin Solar, Shanshan Ulica, Shenglong PV-Tech, Shenzhen Global Solar Energy Tech., Shuqimeng Energy Tech, Skybasesolar, Solargiga Energy Holdings Ltd., Sopray Solar, Sunlink PV,  Tianjin Jinneng Solar Cell, Topsolar, Trony, Weihai China Glass Solar, and Yuhan Sinosola.  For an additional 12 PRC exporters and/or producers of merchandise that were named in "Petition for the Imposition of Antidumping and Countervailing Duties on Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and Taiwan," dated December 31, 2013 ("Petition"), the Department issued a questionnaire, but did not receive confirmation of delivery.  Those companies are:  Aiko Solar, Best Solar Hi-tech, Dai Hwa Industrial, Eoplly New Energy, Golden Partner development, Innovosolar, Jiangxi Green Power Co. Ltd., Sanjing Silicon, Sunflower, Sunvim Solar Technology, Yunnan Tianda, and Yunnan Zhuoye Energy.  *See* Memorandum to the file from Erin Kearney, International Trade Analyst, Office 4, AD/CVD Operations on the subject "Delivery of Quantity and Value Questionnaires" dated March 12, 2014.
[8] *See Preliminary Determination* and accompanying Preliminary Decision Memorandum at Topic h.
[9] *Id.* at pages 16-17; Memorandum to the File, from Thomas Martin, International Trade Compliance Analyst, Office VI, AD/CVD Operations, "Antidumping Duty Investigation of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China:  Renesola Jiangsu Ltd., and Jinko Solar Import and Export Co., Ltd. Analysis Memorandum for the Final Determination."

On October 3, 2014, the Department issued a letter to all interested parties inviting parties to include in their case briefs comments concerning a possible clarification to the scope of the AD/CVD investigations that the Department was considering.[10]  The Department stated that the scope clarification under consideration contemplated the following:

- For the PRC investigations, subject merchandise would include all modules, laminates and/or panels assembled in the PRC that contain crystalline silicon photovoltaic cells produced in a customs territory other than the PRC.
- For the Taiwan investigation, subject merchandise would include all modules, laminates and/or panels assembled in Taiwan consisting of crystalline silicon photovoltaic cells produced in Taiwan or a customs territory other than Taiwan and would continue to exclude any products covered by the existing AD and CVD orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the PRC.  In addition, subject merchandise would include modules, laminates, and panels assembled in a third-country, other than the PRC, consisting of crystalline silicon photovoltaic cells produced in Taiwan.

Parties have commented on the scope clarification in this letter and made other scope comments addressed below.  Generally, Respondents oppose adopting the proposed scope clarification in the October 3rd Letter, while Petitioner argues that the Department should adopt the scopes proposed in the October 3rd Letter because they most effectively apply Petitioner's intent, would best effectuate the U.S. trade laws and provide effective relief to the injured domestic industry, and would be easily administrable and enforceable by the agencies involved.  After considering comments, we have determined to clarify the scopes of the PRC AD and CVD investigations consistent with the October 3rd Letter.  We address party comments in detail below.

Due to this clarification in the scope, we are not requiring exporter and importer certifications. The revocation of the certification requirements previously established in this investigation does not change or rescind the certification requirements established in connection with the existing orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the PRC.

---

[10] *See* October 3, 2014 letter from Howard Smith, Program Manager, Office IV, AD/CVD Operations, Enforcement and Compliance, to All Interested Parties, re: *Antidumping and Countervailing Duty Investigations of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and the Antidumping Duty Investigation of Certain Crystalline Silicon Photovoltaic Products from Taiwan: Opportunity to Submit Scope Comments* (October 3, 2014) ("October 3rd Letter").

A.      **Consistency with _Solar I_[11] and Court Decisions**

_Respondents:_
- The Department's proposed scope clarification is arbitrary because it is inconsistent with the product coverage decisions made by the Department in _Solar I_ and also ignores country of origin decisions made by the CIT and CAFC, as well as country of origin criteria stated in the Act. Such arbitrary decisions are unlawful because, as the courts have noted, the Department has an obligation to be consistent in its decisions.
  - In _Solar I_, the Department made numerous decisions that directly ruled against establishing a scope that would find solar modules assembled in China but not containing Chinese solar cells subject to the order. The Department's determinations in _Solar I_ were made on the following bases:
    - A product can only have one country of origin,[12]
    - AD and CVD investigations only cover products with a country of origin of the country under investigation,[13] and
    - The Department relies on the substantial transformation test to determine the country of origin of a product.[14]
    - In applying this substantial transformation test in _Solar I_, the Department determined that "module assembly does not substantially alter the essential nature of solar cells nor does it constitute significant processing such that it changes the country of origin of the cell."[15] The Department found that the solar cell imparts the essential character of a solar module, and, therefore, the origin of the solar cell is determinative of the country of origin of the class or kind of merchandise at issue here. Therefore, "where solar cell production occurs in a different country from solar module assembly, the country of origin of the solar modules/panels is the country in which the solar cell was produced."[16]
    - If the approach in _Solar I_ described above were applied to these investigations the conclusion would be that the scope of an AD order must be limited to subject merchandise "produced" and "originating" in the country covered by the order, which here is China and Taiwan. Merchandise produced or originating in a country other than the country

---

[11] _See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Affirmative Countervailing Duty Determination and Final Affirmative Critical Circumstances Determination_, 77 FR 63788 (October 17, 2012) ("_Solar I CVD Final Determination_") and _Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Final Determination of Sales at Less Than Fair Value, and Affirmative Final Determination of Critical Circumstances, in Part_, 77 FR 63791 (October 17, 2012) ("_Solar I AD Final Determination_") (these two investigations are referred to generally as "_Solar I_").

[12] _See Solar I AD Final Determination_ and accompanying Issues and Decision Memorandum ("Solar I IDM") at Comment 1, page 8.

[13] _Id._

[14] _Id_ at 5-6.

[15] _See_ March 19, 2012 Memorandum from Jeff Pedersen to Chris Marsh "Scope Clarification: Antidumping and Countervailing Duty Investigations of Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China ("Solar I Substantial Transformation Memorandum") (placed on the record of this proceeding on December 15, 2014).

[16] _Id._

covered by an order, which based on the previous substantial transformation decision, includes solar modules assembled in China or Taiwan from solar cells produced in countries other than China or Taiwan, have a different country of origin than China or Taiwan, and thus may not be included in the scope of these investigations.

o Decisions by the CIT and the CAFC, as well as sections of the Act support finding that products under an investigation can only have one country of origin and that the basis for determining this is the substantial transformation test.

▪ Applying the country of origin determination implied in the scope as proposed in the October 3rd Letter, as well as the criteria applied in *Solar I*, would result in a solar module assembled in one country containing another country's cell to have two countries of origin. CIT decisions[17] have stated that a product can only have a single country of origin for AD and CVD purposes.

▪ The scope as proposed in the October 3rd Letter is also contrary to the statutory language at Section 731 of the Act, which provides for the imposition of antidumping duties on "subject merchandise," defined as "the class or kind of merchandise that is within the scope of an investigation, a review, a suspension agreement, {or} an order...."[18] This provision requires the Department to make a finding of dumping for a class or kind of merchandise from a particular country.[19]

▪ The scope as proposed in the October 3rd Letter ignores the established criteria for determining the country of origin, which is the substantial transformation analysis.

• The CIT has determined that the "substantial transformation" analysis provides a means for the Department to carry out its country of origin examination and properly guards against circumvention of existing antidumping orders.[20]

o The Department is prevented from contradicting these decisions in *Solar I* because the Department is obliged to be consistent in its decision-making across its investigations.

▪ The CIT has explained that although an agency is not strictly bound to its precedent, "{i}t is a principle of administrative law that an 'agency must either conform to its prior norms and decisions or explain the reason for its departure from such precedent."[21] The CAFC has similarly stated that the Department cannot ignore its own precedent absent some legitimate reason for departing from it.[22]

---

[17] *See Ugine & ALZ Belgium, N.V. v. United States*, 517 F. Supp. 2d 1333, 1345 (CIT 2007) ("*Ugine I*"), *aff'd*, 551 F.3d 1339 ("*Ugine III*") (Fed. Cir. 2009).

[18] *Id.*; Section 771(25) of the Act.

[19] *See E.I. DuPont de Nemours & Co. v. United States*, 8 F. Supp. 2d 854, 859 (CIT 1998) ("*Du Pont*"); *see also Ugine I*, 517 F. Supp. 2d at 1345.

[20] *See Du Pont*, 8 F. Supp. 2d at 857 (emphasis added).

[21] *See Torrington Co. v. United States*, 745 F. Supp. 718, 727 (CIT 1990) (quoting *Mississippi Valley Gas Co. v. Federal Energy Regulatory Comm'n*, 659 F.2d 488, 506 (5th Cir. 1981)); *Neenah Foundry Co. v. United States*, 142 F. Supp. 2d 1008, 1022 (CIT 2001); *Hussey Copper Ltd., v. United States*, 834 F. Supp. 413,418 (CIT 1993).

[22] *See Ugine III*, 551 F.3d at 1349.

- The Department has not articulated reasons for diverging from these decisions. Instead, the Department stated in these investigations, that it is informed "by the product coverage decisions that it made" in *Solar I*.[23]

*Petitioner:*

- In the preliminary determination, the Department stated that it was continuing to analyze interested parties' scope comments, including comments on whether it is appropriate to apply a traditional substantial transformation or other analysis in determining the country of origin of certain solar modules described in the scope of the investigation.
- Petitioner supports the proposed scope clarification in the Department's October 3rd Letter, and requests that the Department adopt it for purposes of its final determination and any resulting AD order.
- The Department's proposed scope clarification is fully consistent with the Petitioner's intent. It has been clear since the start of the first solar AD/CVD investigations, and throughout the current investigations, that Petitioner's intent has always been to cover all cells from the PRC and all modules from the PRC and, now, all cells from Taiwan and all modules from Taiwan.[24]
- The Department's proposed scope clarification would best effectuate the U.S. trade laws and provide effective relief to the injured domestic industry, and would be easily administrable and enforceable by the agencies.
- The remedial purposes of the AD/CVD laws are best served by the proposed scope clarification. The Department has determined that both cells and modules from the PRC and Taiwan are being dumped, and both Chinese cells and modules are subsidized. As such, the law obligates Commerce to impose duties on these products.
- Clarifying the scope language in the manner proposed by the Department would result in AD/CVD orders that are administrable and enforceable by the Department and CBP. Solar cells are not required to contain country of origin markings. It can be extremely difficult for CBP to determine the origin of various inputs in a solar module upon importation. On the other hand, all solar modules are clearly marked with country-of-origin and other identifying information. Covering all cells and modules from both the PRC and Taiwan, as described in the October 3rd Letter proposed scope clarification, would therefore significantly improve the enforceability of any future AD/CVD orders.
- To the extent that the Department's proposed scope clarification can be considered a departure from its prior country-of-origin determination, the agency is, of course, permitted to depart from its prior determinations.[25]
- Respondents' argument that the scope clarification results in a single product having two countries of origin is unfounded. Because the country-of-origin rules in the proposed scope clarifications provide a supplemental country-of-origin rule for those products not covered by the initial solar investigations, no product would at any time have two countries of origin. As an example, Trina Solar claims that modules assembled in China with cells produced in Taiwan would result in identical products having two different countries of origin under the previous analysis and the proposed scope clarification.

---

[23] *See Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China and Taiwan: Initiation of Antidumping Duty Investigations*, 79 FR 4661 (January 29, 2014) ("*Solar Products Initiation Notice*").
[24] *See, e.g.*, Solar I IDM at Comment 1.
[25] *See Torrington*, 745 F. Supp. at 727.

- The proposed scope would also be consistent with international precedent. The recent EU AD/CVD investigations of Chinese solar products included "imports of crystalline silicon photovoltaic modules and key components (*i.e.*, cells and wafers) originating in or consigned from the People's Republic of China,"[26] recognizing that all cells and all modules from the subject country, in addition to other key components, must be covered.
- In the alternative, should the Department decide not to make its proposed clarification to the scope, these investigations should continue with the scope proposed by Petitioner and accepted by the Department for purposes of initiation and its preliminary determination.

**Department's Position**:

After considering the facts and circumstances presented by the PRC AD and CVD investigations, as well as the parties' comments on the October 3rd Letter, for this final determination the Department has clarified the scope language of the PRC AD and CVD investigations such that subject merchandise includes all modules, laminates and/or panels assembled in the PRC that contain crystalline silicon photovoltaic cells produced in a customs territory other than the PRC. For a complete description of the scope of the investigation for this final determination, *see* section III above.

Upon initiation of these investigations, the Department set aside a period for interested parties to raise issues relating to product coverage, *i.e.*, scope.[27] Interested parties submitted affirmative comments and rebuttal comments regarding product coverage.[28] In the *Preliminary Determination* published on July 31, 2014, we announced that the Department was continuing to analyze the scope comments, including comments on whether it was appropriate to apply a traditional substantial transformation or other analysis in determining the country of origin of certain solar modules described in the scope of this investigation.[29] Further, with respect to administering the PRC investigations, we explained that the scope of these investigations explicitly excludes any products covered by the existing AD and CVD orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the PRC.[30] In response to interested parties' comments on the scope of this investigation (and prior to the deadlines for the submission of case and rebuttal briefs), in the October 3rd Letter the Department announced that it was considering the possibility of a scope clarification, described the possible clarification, and invited interested parties to submit comments on the clarification. For the reasons discussed

---

[26] *See* Council Implementing Regulation (EU) No 1238/2013 of 2, Official Journal of the European Union (Dec. 2013).
[27] *See Solar Products Initiation Notice*, 79 FR at 4661; *see also Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China: Initiation of Countervailing Duty Investigation*, 79 FR4667 (January 29, 2014).
[28] *See* scope comment submissions, dated February 18, 2014, from Gintech; Motech; Neo Solar Power Corporation; NextEra Energy, Inc.; SunEdison, Inc.; Suniva, Inc.; Solartech Energy Corp.; and Yingli Green Energy Holding Company Limited, Yingli Green Energy Americas, Inc., Canadian Solar Inc., Changzhou Trina Solar Energy Co., Ltd., Wuxi Suntech Power Co., Ltd., Shanghai JA Solar Technology Co., Ltd., Hefei JA Solar Technology Co., Ltd., and Jinko Solar Co., Ltd.; *see also* rebuttal scope comment submissions, dated April 3, 2014, from Petitioner, and dated April 21, 2014, from Yingli Green Energy Americas, Inc., Canadian Solar Inc., Changzhou Trina Solar Energy Co., Ltd., Wuxi Suntech Power Co., Ltd., Shanghai JA Solar Technology Co., Ltd., Hefei JA Solar Technology Co., Ltd., and Jinko Solar Co., Ltd.
[29] *See AD PDM* at 5; *see also* CVD PDM at 4.
[30] *See id.*

11

below, the Department determines that there are significant reasons for clarifying and modifying the scope of this investigation.

As a threshold matter, the Department has final authority to clarify and modify the scope in this proceeding in order to fulfill its statutory mandate. The CAFC has explained that "the purpose of the petition is to propose an investigation," and the "purpose of the investigation is to determine what merchandise should be included in the final order."[31] Therefore, the Department must be able to determine what merchandise should be covered by any final order. Additionally, the purpose of the AD and CVD law is to provide a remedy, if appropriate, for alleged injury to the domestic industry that is caused by specified merchandise alleged to be dumped or unfairly subsidized.[32] Accordingly, the Department's "practice is to provide ample deference to the Petitioner with respect to the definition of the product for which it seeks relief under the AD and CVD laws."[33]

The CIT has likewise stated that the Department "retains broad discretion to define and clarify the scope of an antidumping investigation in a manner which reflects the intent of the petition."[34] Indeed, the CIT has confirmed that any scope clarifications made by the Department *should* be made in a manner which reflects the intent of the Petition, and that is what the scope clarification accomplishes here.[35] The Petition[36] and Petitioner's comments in this investigation demonstrate that the Petitioner's intent is a scope that covers all solar modules assembled in the PRC using third-country solar cells. In its Petition to this investigation, the Petitioner stated its intent to include all of these modules in the scope, citing the "loophole" that resulted when, following the application of Department's substantial transformation analysis in the *Solar I* investigations, producers subject to the *Solar I* investigations increased exports to the United States of modules assembled in the PRC with non-PRC cells with the result of avoiding the reach of the *Solar I* AD and CVD orders.[37] Indeed, in the Petition for this investigation, Petitioner noted that it had argued for a scope almost identical to the scope in the October 3rd Letter in Solar I and stated

---

[31] *See Duferco Steel Inc. v. United States*, 296 F.3d 1087, 1096-97 (Fed. Cir. 2002) ("*Duferco*").

[32] *See* sections 731 and 701 of the Act; *see also United States v. American Home Assur. Co.*, 964 F. Supp. 2d 1342, 1352-53 ("Antidumping duties serve the distinct purpose of remedying the effect of unfair trade practices resulting in actual or threatened injury to domestic like-product producers." (*citing Canadian Wheat Bd. v. United States*, 641 F.3d 1344, 1351 (Fed. Cir. 2011))); *Wolff Shoe Co. v. United States*, 141 F.3d 1116, 1117 (Fed. Cir. 1998) (Countervailing duties "are levied on subsidized imports to offset the unfair competitive advantages created by foreign subsidies.").

[33] *See Large Residential Washers From the Republic of Korea,* 77 FR 46391, 46392 (August 3, 2012) and accompanying Issues and Decision Memorandum at Comment 2. *See also Kern Liebers USA, Inc. v. United States,* 881 F. Supp. 618, 621 (CIT 1995) ("The agency generally exercises {its} broad discretion to define and clarify the scope of an antidumping investigation in a manner which reflects the intent of the petition").

[34] *See Minebea Co. v. United States*, 782 F. Supp. 117, 120 (CIT 1992).

[35] *See AMS Assocs. v. United States*, 881 F. Supp. 2d 1374, 1380 (CIT 2012) (explaining that "Commerce retains broad discretion to define and clarify the scope of an antidumping investigation in a manner which reflects the intent of the petition") (citation and quotation marks omitted), aff'd, 737 F.3d 1338 (Fed. Cir. 2013); *Kern Liebers USA, Inc. v. United States*, 881 F. Supp. 618, 621 (CIT 1995) (*citing Minebea*, 782 F. Supp. at 120).

[36] *See* "Petition for the Imposition of Antidumping and Countervailing Duties on Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and Taiwan," dated December 31, 2013 ("Petitions on China and Taiwan").

[37] *See* the Petition at 3, 5-6, 21, 34, 37, and 53; Letter from Petitioner, "Re: Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: Case Brief of Solar World Americas, Inc.," dated October 16, 2014 at 5-6; Letter from Petitioner to the Department, "Re: Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and Taiwan: Rebuttal to Respondents' Scope Comments" (Apr. 3, 2014) at 11-13.

that the Department's refusal to cover Chinese solar modules assembled from non-Chinese solar cells allowed Chinese companies to continue to ship solar modules to the United States duty free.[38] In these investigations, the alleged injury to the domestic industry stems from certain solar modules that are assembled in the PRC using cells produced in third countries, modules which are not covered by the scope of *Solar I* and, thereby, exceed the reach of the remedy afforded by the *Solar I* AD and CVD orders. In addition, taking the instant PRC investigations together with *Solar I*, the Petitioner has alleged that the domestic industry is being injured as a result of the unfair pricing of cells produced in the PRC, modules containing such cells, and modules assembled in the PRC with third-country cells, as well as unfair subsidization in the PRC of both cells and modules.

Beyond the Petitioner's intent, there are other facts and factors that the Department has found to be significant in considering the scope of these investigations. For example, the record demonstrates that the solar products industry involves a complex and readily adaptable global supply chain which allows producers to modify their production chains easily and quickly. Petitioner has cited statements by five large Chinese solar module producers and one U.S. importer of solar modules noting the ease with which they were able to modify their production chain to avoid paying the AD and CVDs imposed by *Solar I*.[39] Further, there exist prior AD and CVD orders on related merchandise (i.e., solar cells and modules) from the PRC – *Solar I* – and following the initiation of the *Solar I* investigations and the imposition of those orders, there has been a shift in trade flows that has resulted in increased imports of non-subject modules produced in China.[40] Such imports – if they are dumped and/or unfairly subsidized and injurious – should not be beyond the reach of the AD and CVD laws.

The Department has also taken into account considerations regarding administrability, enforceability, and potential evasion. If these investigations result in an AD and/or CVD order, as relevant, the scope clarification adopted in this final determination will make the resulting order(s) substantially easier to administer and enforce (for both the Department and CBP), by helping to prevent significant and widespread evasion similar to the evasion that that has resulted due to parties that have exploited the substantial transformation analysis conducted in *Solar I*. As indicated in the Petition, although "imports of modules from China consisted largely of modules assembled with Chinese cells" from 2010 through early 2012, "{s}ince that time, imports of modules from China have consisted almost entirely of modules assembled in China from solar cells completed or partially manufactured in Taiwan or other countries (*i.e.*, cells manufactured in Taiwan from Taiwanese inputs, or cells manufactured in Taiwan or other countries from Chinese inputs, including wafers)."[41] The scope which was proposed in the Petition and on which we initiated investigations may result in the evasion of duties and, thus, ineffective relief to the Petitioner due to the complex and adaptable global supply chain that allows production processes for solar cells and modules to be easily moved across borders. With this scope clarification, it is the Department's intent to reduce as much as possible additional opportunities for evasion like those that resulted after the imposition of AD and CVD cash

---

[38] *See* the Petitions on China and Taiwan, Volume 1 at 3-4.
[39] *See Id.* at 4-5.
[40] *See Id.* at 3, 5-6, 21, 34, 37, and 53.
[41] *See Id.* at 5-6; *see also Id.* at 21.

13

deposits in *Solar I*. The Department has a long-standing practice of taking potential circumvention concerns into consideration when defining the scope.[42] This practice has been upheld by the CIT and the CAFC.[43] Indeed, the Courts have recognized that the Department has "inherent power to establish the parameters of the investigation so as to carry out its mandate to administer the law effectively and in accordance with its intent."[44]

Furthermore, certain interested parties commented that they did not track their merchandise in a manner that would allow them to definitively report only that merchandise falling within the "two-out-of-three" scope proposed in the Petition.[45] The scope being adopted in these investigations resolves interested parties' concerns in this respect, by covering *all* modules assembled in the PRC from third-country cells. Under the scope being adopted for these final determinations, producers and exporters would not need to track for purposes of these proceedings the ingots, wafers, or partial cells that are being used in the third-country cells being assembled into modules in China.

---

[42] *See, e.g., Notice of Final Determination of Sales at Less Than Fair Value: Large Newspaper Printing Presses and Components Thereof, Whether Assembled or Unassembled, From Germany*, 61 FR 38166, 38169 (July 23, 1996) ("We agree with the petitioner that incomplete merchandise by necessity must be included in the scope of these investigations. Given the very large size of {large newspaper printing presses and components thereof} and the complex importation process, complicated by the further manufacturing and/or installation activities performed in the United States by the respondents, it was the Department's intent to use the language at issue to avoid creating loopholes for circumvention, including those arising from differing degrees of completeness of the imported merchandise. The Department is concerned that, because of the great number of parts involved, there is the potential that a party may attempt to exclude its merchandise from the scope of these investigations on the basis of a lack of completion."); *Cellular Mobile Telephones and Subassemblies from Japan; Final Determination of Sales at Less Than Fair Value*, 50 FR 45447, 45448 (October 31, 1985) ("The determination to include subassemblies within the scope of the investigation was based on the need to prevent circumvention of any antidumping order on {cellular mobile telephones ("CMTs")} through the importation of major CMT subassemblies, and the Department's broader conclusion that the investigation properly should include subassemblies.").

[43] *See Mitsubishi Elec. Corp. v. United States*, 700 F. Supp. 538, 555 (CIT 1988) ("*Mitsubishi I*") ("{the Department} has a certain amount of discretion to expand the language of a petition to encompass the literal intent of the petition, ... with the purpose in mind of preventing the intentional evasion or circumvention of the antidumping duty law."), *aff'd*, 898 F.2d 1577 (Fed. Cir. 1990); *see also Tung Mung Dev. Co. v. United States*, 26 CIT 969, 979 (CIT 2002) (citing *Mitsubishi I*, 700 F. Supp. at 555), *aff'd*, 354 F.3d 1371 (Fed. Cir. 2004).

[44] *See Torrington*, 745 F. Supp. at 728; *see also Mitsubishi Elec. Co. v. United States*, 898 F.2d 1577, 1582 (Fed. Cir. 1990) ("*Mitsubishi II*") ("The determination of the applicable scope of an antidumping order that will be effective to remedy the dumping that the {Department} has found lies largely in the {Department's} discretion").

[45] A group of some of the largest Chinese solar product producers stated that it is virtually impossible for importers to know and to trace the origin of the ingots and wafers in cells that are assembled into modules when the module manufacturers purchase the cells from third parties in other countries, or to distinguish between the value of modules with cells that meet Petitioner's "two-out-of-three" test and those that do not. *See* the February 18, 2014 Scope Comments Letter submitted by Yingli Green Energy Holding Company Limited, Yingli Green Energy Americas, Inc., Canadian Solar Inc., Changzhou Trina Solar Energy Co., Ltd., Wuxi Suntech Power Co., Ltd., Shanghai JA Solar Technology Co., Ltd., Hefei JA Solar Technology, Co., Ltd., and Jinko Solar Co., Ltd. Further demonstrating tis, the mandatory respondent Trina Solar stated that it does not know what country produced the wafers contained in its purchases of solar cells. *See* Trina Solar's April 22, 2014 response at Attachment A-1. Similarly, Yingli Green Energy Holding Company and Yingli Green Energy Americas, Inc. and Canadian Solar Inc. noted that their respective company records do not specifically identify the origin of the wafers used to produce the cells Yingli purchased from non-Chinese suppliers. *See* both companies' February 14, 2014 quantity and value responses.

Based on these considerations, and in order to evaluate whether there is unfair pricing and/or subsidization of modules assembled in the PRC using third-country cells, the Department finds it is appropriate to determine for purposes of these investigations that the country of origin of such modules is the PRC.

In determining the country-of-origin of a product, the Department's usual practice has been to conduct a substantial transformation analysis.[46]  Consistent with its practice, the Department considered in *Solar I* whether it should apply its substantial transformation analysis and found that "the application of its substantial transformation test {was} an appropriate means to resolve country-of-origin issues like the one presented *in {that} investigation* …."[47]  Based on this analysis and the facts in that proceeding, the Department determined in *Solar I* that the solar cell was the essential active component of the module, that assembly of cells into modules did not constitute substantial transformation such that the assembled module could be considered a product of the country of assembly, and consequently, that modules assembled in the PRC from solar cells produced in third countries were not covered by the scope of that investigation.[48]

Although the Department routinely has found a substantial transformation analysis to be an appropriate means to determine the country of origin of merchandise under investigation, in the circumstances presented by these investigations and discussed above, the Department has determined that it needs to conduct additional analysis.  Thus, contrary to certain parties' arguments, our adoption of the scope described in the October 3rd Letter is not arbitrary.  Rather, it addresses the specific and special circumstances of these proceedings, as described above. Relying on the substantial transformation analysis alone could result in failure to provide relief to the domestic industry for alleged injury caused by a finished product produced in the subject country but which would be deemed to originate from a third-country for AD/CVD purposes if the traditional substantial transformation analysis were applied.  In these particular proceedings, a rote application of a substantial transformation analysis would not allow the Department to address unfair pricing decisions and/or unfair subsidization concerning the modules that is taking place in the country of export.  Consistent with sections 701 and 731 of the Act, the Department must be able to address such circumstances, and where appropriate, address unfair pricing decisions or unfair subsidization that is taking place in the exporting country where further manufacturing, such as assembly, occurs, notwithstanding that such activities may not necessarily result in a substantial transformation of merchandise.  While the Department intends that a substantial transformation analysis will continue to be the primary manner in which it will evaluate country of origin in AD/CVD proceedings, given the facts presented by these investigations (and in light of the *Solar I* orders already in place, under which country of origin was already based on a substantial transformation analysis), the Department finds that its additional analysis is appropriate.  We do not agree that our analysis is inconsistent with *Solar I.* Rather, in these investigations we are building upon our decisions in *Solar I* and finding, given

---

[46] *See, e.g., Notice of Final Determination of Sales at Less Than Fair Value: Glycine from India*, 73 FR 16640 (March 28, 2008) and accompanying Issues and Decision Memorandum at Comment 5; *see also Stainless Steel Plate in Coils from Belgium: Final Results of Antidumping Duty Administrative Review*, 69 FR 74495 (December 14, 2004) and accompanying Issues and Decision Memorandum at Comment 4.

[47] *See* Solar I IDM at Comment 1, page 8 (emphasis added).

[48] *Id.* at Comment 1, page 5-7.

the circumstances before us, that it is appropriate to go beyond our decision concerning country of origin from *Solar I* to address merchandise exported from China that is not subject to the *Solar I* orders and that is alleged to injure the domestic industry through unfair pricing and/or subsidization.

With regard to respondents' assertion that the scope clarification results in a single product having two countries of origin, we disagree. No product would at any time have two countries of origin for AD/CVD purposes. The country of origin of these modules, for AD/CVD purposes, is only the PRC. If an AD and/or CVD order results from these investigations, these modules would be subject to AD and/or CVD duties under the relevant order and not another solar-related order (*i.e.*, not *Solar I* or an order covering solar products from Taiwan, should that investigation result in an AD order). We also disagree with the Petitioner's assertion that Taiwanese cells assembled into a module in the PRC would result in a module of Taiwanese origin. With the scope clarification we have adopted for the PRC investigation, the PRC is the country of origin of all modules, laminates and/or panels assembled in the PRC that contain crystalline silicon photovoltaic cells produced in a customs territory other than the PRC.

## B.      Extent of the Scope Clarification

*Respondents:*
- The scope as proposed in the October 3rd Letter is not a clarification, but an unlawful expansion and alteration of the scope.
  - The scope as proposed in the October 3rd Letter eliminates entirely the "two out of three" principle incorporated into the scope of these investigations, adds to the scope solar modules made from solar cells from countries outside China and Taiwan, and thereby crafts a scope of the investigation that was never contemplated in the Petitions or in any other submission or determination before or after the initiation of these investigations.
  - Petitioner has not requested the expanded scope proposed by the Department, and nothing in the Petition or in Petitioner's subsequent submissions to the Department or the ITC indicates otherwise.
  - There are numerous CIT decisions demonstrating that a significant expansion and alteration of the scope as outlined in the October 3rd Letter goes far beyond what the CIT decisions have found permissible.[49]
  - The Department stated in *Softwood Lumber from Canada* that while it has the authority to define or clarify the scope of an investigation and must exercise this authority in a manner which reflects the intent of the Petition, the Department generally should not use its authority to define the scope of an investigation in a manner that would thwart the statutory mandate to provide the relief requested in the Petition. As a result, absent an "overarching reason to modify the scope in the Petition, the Department accepts it."[50]

---

[49] *See Minebea*, 782 F. Supp. at 120; *see also Alleghany Bradford Corp. v. United States*, 342 F. Supp. 2d 1172 (CIT 2004); *Smith Corona Corp. v. United States*, 796 F. Supp. 1532 (CIT 1992).
[50] *Notice of Final Determination of Sales at Less Than Fair Value: Certain Softwood Lumber Products from Canada*, 67 FR 15539, 15542 (April 2, 2002) ("*Softwood Lumber from Canada*").

*Petitioner:*

- The Department's clarification of the scope at this final phase in the proceedings is fair and reasonable, and would not be unlawful. The CIT has specifically stated that the Department has the discretion to clarify the scope, even in a way that "expand{s} the language of a petition," in the course of an AD/CVD investigation.[51] This decision was upheld by the CAFC.[52]
- The respondents themselves cite *Allegheny Bradford*, in which the CIT held that "{t}here is no clear point during the course of an antidumping investigation at which {the Department} loses the ability to adjust the scope."[53]
- The scope as proposed in the October 3rd Letter is fully consistent with Petitioner's intent.
  - As demonstrated by its comments to *Solar I*, Petitioner's intent has always been to cover all cells from the PRC and all modules from the PRC.[54] In fact, Petitioner filed the instant investigations specifically to close the loophole created as a result of the Department's scope determination in the first solar cases and to cover all cells and modules from the PRC, as well as address unfair trade practices in Taiwan that were exacerbated as a result of that scope determination.
- Moreover, in this case, the Department is even more justified than under other circumstances in adjusting the scope at this stage in these proceedings, as the Department has been very clear throughout these investigations that it is continuing to evaluate the scope, and that its country of origin determinations of related subject merchandise could change.[55]

**Department's Position:**

We disagree with Respondents' contention that the proposed clarification of the scope in the October 3rd Letter, which we have adopted in these final determinations, does not reflect Petitioner's intent. The record of this investigation demonstrates that Petitioner's intent would be reflected by a scope that covers all solar modules assembled in China using third-country cells. Petitioner's stated motivation for filing its Petition is to close a "loophole" that resulted when producers subject to the *Solar I* investigations, following the Department's application of a substantial transformation analysis to fix the scope of that proceeding, increased imports of modules assembled in the PRC with non-PRC cells so as to avoid the reach of the *Solar I* orders.[56] For instance, Petitioner stated that "imports of modules from China consisted largely of modules assembled with Chinese cells" from 2010 through early 2012, but that "{s}ince that time, imports of modules from China have consisted almost entirely of modules assembled in China from solar cells completed or partially manufactured in Taiwan or other countries (*i.e.*,

---

[51] *See Mitsubishi I*, 700 F. Supp. at 555.
[52] *See Mitsubishi II*, 898 F.2d at 1577.
[53] *See Allegheny Bradford*, 342 F. Supp. 2d at 1187.
[54] *See Solar I IDM* at Comment 1.
[55] *See e.g., Certain Crystalline Silicon Photovoltaic Products from Taiwan: Affirmative Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination*, 79 FR 44395 (July 31, 2014) and accompanying Preliminary Decision Memorandum at 5.
[56] *See* the December 31, 2013 AD Petitions on China and Taiwan, Volume 1, at 3, 21, and 53, and the December 31, 2013 CVD Petition on China at 3, 21, and 53.

cells manufactured in Taiwan from Taiwanese inputs, or cells manufactured in Taiwan or other countries from Chinese inputs, including wafers)."[57] Petitioner also stated that "imports of Taiwanese {solar} cells and modules and Chinese modules assembled from non-Chinese cells continued to swamp the U.S. marketplace in the first nine months of 2013," despite the relief provided by the *Solar I* orders.[58] Further, Petitioner contended that the Petition showed "that many Chinese solar producers ceased using Chinese-manufactured cells and began using third-country manufactured cells in their solar modules" as a result of the *Solar I* investigations.[59] In addition, Petitioner cited reports confirming that "Chinese solar producers continue to use third-country cells, largely manufactured in Taiwan, to assemble into solar modules in China and export to the United States."[60]

The scope language of the Petition for these investigations is an expression of the Petitioner's intent, as noted above, to cover solar modules made in China using solar cells produced in third countries. However, as discussed in Comment 1.A., the Department is taking into considerations concern about potential evasion of AD and/or CVD measures, as relevant. The scope which was proposed in the Petition and on which we initiated the investigations, may itself result in the evasion of duties and, thus, ineffective relief to the Petitioner, due to the complex and readily adaptable global supply chain that allows producers to modify their production chains easily and quickly. Specifically, producers could simply have sourced their wafers from a country other than the subject country in order to avoid the "two out of three" language in the second sentence of that scope. As a result, the Department explored whether modified scope language could more effectively implement Petitioner's intent while also mitigating evasion concerns and alleged complications in parties' ability to properly report subject merchandise to the Department in the context of its administrative proceeding and/or to CBP, and ultimately proposed the clarification in its October 3rd Letter.

Furthermore, in the parallel Taiwan AD investigation, the respondent companies have reported to the Department that following the implementation of the orders in *Solar I*, numerous Chinese companies began to contract with Taiwanese cell producers to manufacture cells for the purpose of exporting those cells to China for use in the production of panels, modules and laminates, and then to export those panels, modules and laminates to the United States.[61] This series of transactions was allegedly implemented, at least for many transactions, to evade the order in *Solar I*, and there are emails and communications referenced in the Taiwan IDM which discuss this series of transactions and the reasoning behind those transactions.[62] These communications substantiate the concerns expressed by the Petitioners in the Petition that the orders in *Solar I* have not adequately addressed the issues of Chinese dumping and unfair subsidization of solar panels, modules and laminates, and that a scope which specifically includes that merchandise in this investigation is necessary to address such concerns.

---

[57] *See* the December 31, 2013 AD Petitions on China and Taiwan, Volume 1, at 5-6; *see also id.* at 21.
[58] *Id.* at 34.
[59] *Id.* at 37.
[60] *Id.*
[61] *See* the Issues and Decision Memorandum accompanying the to the final determination of the Antidumping and Countervailing Duty Investigations of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and the Antidumping Duty Investigation of Certain Crystalline Silicon Photovoltaic Products from Taiwan at Comment 4.
[62] *Id.*

Even had Petitioner not expressly intended to include all solar modules assembled in China using third-country cells, the Department has the authority to identify such products in the scope of these investigations anticipating such configurations and thus serving to place parties on notice regarding how the Department might treat Chinese modules made from third-country cells if subsequent scope questions arise.[63]  In Comment 1.A above we discussed such reasons including, and beyond, Petitioner's intent.  One focus of the Department's analysis related to potential evasion.  Information on the record indicates that parties have been able to evade the reach of the *Solar I* orders.  Thus, even while the investigations focused on merchandise covered by the "two out of three" language rather than "third country cells," the Department anticipated that evasion concerns would likely arise for the original proposed scope.  Through its modification of the scope of these investigations, the Department has developed a mechanism to prevent such scenarios.[64]

We also do not agree that this clarification is an impermissible expansion of the scope.  As an initial matter, we note that Department's "practice is to provide ample deference to the Petitioner with respect to the definition of the product for which it seeks relief under the AD and CVD laws."[65]  As noted above, the question of scope coverage has been a recurrent issue raised by interested parties and the Department throughout this proceeding.  The clarification also addresses concerns (expressed by respondent parties and shared by the Department) regarding the administrability of the "two out of three" scope language that was originally proposed.  Further, applying the scope clarification proposed in the October 3, 2014, Letter results in no change to Trina Solar and Renesola/Jinko's reported database.[66]  This clarification will not require the Department to collect any additional information from parties because necessary information is already on the record.  At the same time, by more clearly expressing Petitioner's intent of covering solar modules assembled in China using third-country solar cells, the scope as proposed in the October 3rd Letter will more effectively cover the solar modules from which Petitioner has been seeking relief.  Moreover, the scope clarification results in a scope that, should this investigation result in an order, will be more administrable than the scope that was originally proposed.

## C.      Timeliness of a Potential Scope Clarification

---

[63] *See Mid Continent Nail Corp. v. United States*, 725 F.3d 1295, 1300-1301, 1305-06 (Fed. Cir. 2013) (for the proposition that if the Department anticipates the need for addressing foreseeable areas of dispute, it should do so prior to the order so as to put parties on notice of what conduct will be regulated by the order and what factors will be considered in regulating that conduct).  Although the Department cannot anticipate every possible permutation of solar products, as explained above, the Petition identified a shift in trade flows that resulted in increased imports of non-subject modules produced in China, and significant and widespread avoidance of the reach of *Solar I*.  Based on this information, the Department finds that it is appropriate for the scope of the final determination to address all third country modules, not just those that fall within the "two out of three" scope language proposed by the Petitioner, because doing so will put parties on notice, provide greater certainty for those subject to the order, and preserves resources for all of the parties involved, including the Department.

[64] *See id.* at 725 F.3d 1295, 1305-06.

[65] See *Large Residential Washers From the Republic of Korea*, 77 FR 46391, 46392 (August 3, 2012) and accompanying Issues and Decision Memorandum at Comment 2.  *See also Kern Liebers*, 881 F. Supp. at 621.

[66] The Chinese mandatory respondents reported all U.S. sales containing third-country solar cells.  *See* Trina Solar's May 13, 2014 submission at 1, Renesola's April 24, 2014 submission at 25, and Jinko's February 13, 2014 submission at 2.

*Respondents:*

- Even if the Department had the authority to expand the scope, it cannot do so this late in the investigation because it would result in the Department's final determination not being based on substantial evidence, would prevent finalizing the record and issuing a final decision, and would deny parties due process.
  - o Essentially, at this stage in the proceeding, the Department has already completed its investigation of the factual record and thus is unable to supplement the record with additional sales. Thus, an expansion of the scope at this time to include products not already covered would mean that the dumping margins and subsidy rates calculated by the Department will be based on data that are not consistent with the sales that would be subject to the final expanded scope of these investigations.
  - o The change in scope under consideration is also not allowable under the Act because it would result in the calculations of the final determination being based on only a subset of subject merchandise. Any dumping margin contained in an AD order must be based on analysis of the entirety of the subject merchandise.[67] More specifically, an AD order may only be imposed if the agency determines that "a class or kind of foreign merchandise is being, or is likely to be, sold in the United States at less than its fair value."[68] The term "class or kind of foreign merchandise" is synonymous with the term "subject merchandise"[69] and necessarily includes all products within the scope of the AD investigation, rather than a subset of these products.
  - o The CIT has stated that the Department's "discretion to define and clarify the scope of an investigation is limited in part by concerns for the finality of administrative action, which caution against including a product that was understood to be excluded at the time the investigation began."[70] Thus, by including products that were not included in the Petition and were never the subject of the Department's investigation inquiries, the Department risks undermining the factual basis for its determination and raises concerns about the finality of its administrative actions.
  - o The CIT has noted that the Department's decision to change scope language at a late stage in a proceeding can undermine the entire investigatory process.[71]
  - o Reflecting these concerns, the Department denied a late request for scope clarification in the investigation of Coated Free Sheet from the PRC stating: "Moreover, we note that granting such a clarification would mean that a significant number of sales in the investigations would not be included in the margin calculations, raising a potential procedural safeguards concern."[72]
  - o The Department has even gone so far as to say that it lacks the ability to change the scope after a preliminary determination, in part, because "{a}mending the scope language . . . would, in effect, serve to expand the current scope of subject

---

[67] *See* Section 771(25) and (35)(A)-(B) of the Act.
[68] *See* Section 731 of the Act.
[69] *See* Section 771(25) of the Act.
[70] *See Allegheny Bradford*, 342 F. Supp. 2d at 1187-1188, citing *Mitsubishi Heavy Indus., Ltd. v. United States*, 986 F. Supp. 1428, 1433 (CIT 1997).
[71] *See Smith Corona*, 796 F. Supp. at 1535.
[72] *Id.*

merchandise that was subject to th{e} investigation at too late a stage in this proceeding."[73]

o Because the scope change would occur at such a late stage in the proceeding, it denies due process for parties, especially parties that were not covered under the scope in effect during the *Preliminary Determination*. These Chinese companies and U.S. importers that are not presently part of the proceeding have no opportunity to participate in the hearing or "to be heard" and cannot participate meaningfully in this investigation because the factual record is closed.

▪ The CAFC held in *Transcom v. United States* that by not listing exporters in the initiation notice there was deficient notice to the affected parties. In that case, the CAFC stated that importers have the right to complain about procedural flaws in the administrative proceeding, including the Department's failure to provide adequate notice. The CAFC went on to state that the Department's determination had to be overturned because the importer and its Chinese exporters had no notice of a change in the Department's non-market economy practice and, therefore, no opportunity to submit evidence to demonstrate the exporters' independence from the state-controlled entity.[74]

*Petitioner:*

• The majority of modules being shipped from the PRC and Taiwan that would be subject to the scope under the Department's proposed scope clarification were also subject to the scope as it existed at the time data were collected from respondents and the *Preliminary Determination* was issued. Thus, the databases on which the Department will calculate final subsidy and dumping margins are largely consistent with the scope as stated in the Department's proposed scope clarification.

• The proposed scope clarification does not implicate due process concerns as the Department has made clear throughout these investigations that the scope of the investigations is subject to continuing evaluation, and that the country-of-origin determinations related to subject merchandise could change for the final determination.

o Specifically, in the initiation notice, the Department invited comments on the scope of these investigations, clearly indicating to the public that the scope was potentially subject to modification.[75]

o The Department again noted its ongoing evaluation of the scope in the *Preliminary Determination*, in which, after adopting Petitioner's proposed scope, the Department explained that it was continuing to analyze interested parties' scope comments, including comments on whether it is appropriate to apply a traditional substantial transformation or other analysis in determining the

---

[73] *See Final Determination of Sale at Less Than Fair Value: Sodium Hexametaphosphate from the People's Republic of China*, 73 Fed. Reg. 6479 (Feb. 4, 2008) ("*Sodium Hexametaphosphate from the PRC*"), and accompanying Issues and Decision Memorandum at Comment 1; *see also Notice of Final Determination of Sales at Less Than Fair Value and Affirmative Final Determination of Critical Circumstances: Certain Orange Juice from Brazil*, 71 Fed. Reg. 2183 (Jan. 13, 2006) ("*Certain Orange Juice from Brazil*"), and accompanying Issues and Decision Memorandum at Comment 2.

[74] *See Transcom, Inc. v. United States*, 182 F.3d 876, 880-84 (Fed. Cir. 1999).

[75] *See Solar Products Initiation Notice*, 79 FR at 4661.

21

applicability of the investigation to certain solar modules described in the Petition.[76]

- Further, Respondents have repeatedly claimed that it is nearly impossible for importers to know and to trace the origin of the ingots and wafers in cells that are assembled into modules when the module manufacturers purchase the cells from third parties in other countries. While Petitioner disputes this claim, if true, Respondents and others would not have known for certain whether or not their products were subject to these investigations. Given this potential uncertainty, all exporters of potential subject merchandise should have filed quantity and value submissions and separate rate applications with the Department.

- Respondents' citations to *Allegheny Bradford* for support are inapposite to this investigation because as stated by the CIT, the issue in *Allegheny Bradford* was "whether Commerce may construe an antidumping order to cover products which bear a characteristic that cannot be reconciled with the language of the order."[77] These aspects of *Allegheny Bradford* are, therefore, inapplicable to the current circumstances, in which Commerce is still formulating the final scope language, which will ultimately be included in any orders that are issued.

**Department's Position:**

We disagree with Respondents. As the CAFC explained, "the purpose of the petition is to propose an investigation," and the "purpose of the investigation is to determine what merchandise should be included in the final order."[78] Ultimately, therefore, it is the Department's responsibility to define the scope of the investigation and ensuing order.[79] The Department "retains broad discretion to define and clarify the scope of an antidumping investigation in a manner which reflects the intent of the petition"[80] and has the authority to modify or clarify the scope at any time. As the CAFC has recognized, the Department has "inherent power to establish the parameters of the investigation, so that it {is} not ... tied to an initial scope definition that . . . may not make sense in light of the information available to {the Department} or subsequently obtained in the investigation."[81] Similarly, the CIT has stated that the Department has a "certain amount of discretion to expand the language of a petition to encompass the literal intent of the petition, ... with the purpose in mind of preventing the intentional evasion or circumvention of the antidumping duty law."[82] As even respondents

---

[76] *See Preliminary Determination* and Accompanying Issues and Decision Memorandum ("China AD Prelim I&D Memo") at 5; *Certain Crystalline Silicon Photovoltaic Products From Taiwan: Affirmative Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination*, 79 FR 44395 (July 31, 2014) and accompanying Issues and Decision Memorandum ("Taiwan AD Prelim I&D Memo") at 5; *Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China: Preliminary Affirmative Countervailing Duty Determination,* 79 FR 33174 (June 10, 2014) and accompanying Issues and Decision Memorandum ("China CVD Prelim I&D Memo") at 4.
[77] *See Allegheny Bradford,* 342 F. Supp. 2d at 1188.
[78] *See Duferco,* 296 F.3d at 1096-97.
[79] *Id.* at 1097; *accord Mitsubishi II,* 898 F.2d at 1582; *see also King Supply Co. v. United States,* 674 F.3d 1343, 1345, 1348 (Fed. Cir. 2012).
[80] *See Minebea,* 782 F. Supp. at 120.
[81] *See Duferco,* 296 F.3d at 1089 (citation and quotation marks omitted); *see also Save Domestic Oil, Inc. v. United States,* 240 F. Supp. 2d 1342, 1351 (CIT 2002).
[82] *See Mitsubishi I,* 700 F. Supp. at 555.

themselves recognize, "{t}here is no clear point during the course of an antidumping investigation at which {the Department} loses the ability to adjust the scope...."[83] Thus, the Department "may depart from the scope as proposed by a petition if it determines that petition to be overly broad, or insufficiently specific to allow proper investigation, or in any other way defective."[84]

Further, the scope modification adopted for the PRC AD and CVD final determinations was no impact on the data required from and submitted by the parties. As noted above, application of the scope clarification proposed in the October 3rd Letter will result in no change in the reported sales of the mandatory respondents. We further note that no interested parties have provided specific arguments about what changes would occur in the mandatory respondents' U.S. sales databases if the Department modified the scope as proposed in the October 3rd Letter.

Further mitigating the impact of applying the proposed scope clarification is the fact that most, if not all, parties reported in their Quantity and Value questionnaires all solar modules containing solar cells from third countries because they claim that they did not know the source of the wafer contained in the solar cells they purchased from third countries.[85] While Respondents have stated that there *may* be U.S. imports that were not covered by the scope of the *Preliminary Determination* that would be covered by the proposed scope clarification, they have not identified any such shipments.

The Department also disagrees with the Respondents' claim that a scope clarification at this point in the investigation would deny due process to parties. The Department has made clear throughout these investigations that the scope of the investigations was subject to continuing evaluation, and that the country of origin determinations related to the subject merchandise could change for the final determination. Specifically, in the initiation notice, the Department invited comments on the scope of these investigations and numerous parties submitted comments.[86] The Department again noted in the *Preliminary Determination* that it was continuing to analyze interested parties' scope comments.[87] The very circumstances of these investigations, filed in response to the *Solar I* orders, and in which the Department explicitly stated that the *Solar II* investigations excluded merchandise covered by the *Solar I* orders, placed parties on notice that imports of solar products from China beyond those covered by the *Solar I* orders were

---

[83] *See Allegheny Bradford*, 342 F. Supp. 2d at, 1187.

[84] *Ad Hoc Shrimp Trade Action Comm. v. United States*, 637 F. Supp. 2d 1166, 1175 (CIT 2009) (citation and quotation marks omitted); *see also Allegheny Bradford*, 342 F. Supp. 2d at 1188.

[85] *See, e.g.*, the February 13, 2014 quantity and value submission by Jinko, the February 14, 2014 quantity and value responses by Yingli Green Energy Holding Company and Yingli Green Energy Americas, Inc., and Canadian Solar Inc. and April 22, 2014 response by Trina Solar at Attachment A-1.

[86] *See* scope comment submissions, dated February 18, 2014, from Gintech; Motech; Neo Solar Power Corporation; NextEra Energy, Inc.; SunEdison, Inc.; Suniva, Inc.; Solartech Energy Corp.; and Yingli Green Energy Holding Company Limited, Yingli Green Energy Americas, Inc., Canadian Solar Inc., Changzhou Trina Solar Energy Co., Ltd., WuxiSuntech Power Co., Ltd., Shanghai JA Solar Technology Co., Ltd., Hefei JA Solar Technology Co., Ltd., and Jinko Solar Co., Ltd.; *see also* rebuttal scope comment submissions, dated April3, 2014, from Petitioner, and dated April21, 2014, from Yingli Green Energy Americas, Inc., Canadian Solar Inc., Changzhou Trina Solar Energy Co., Ltd., Wuxi Suntech Power Co., Ltd., Shanghai JA Solar Technology Co., Ltd., Hefei JA Solar Technology Co., Ltd., and Jinko Solar Co., Ltd.

[87] *See China AD Prelim I&D Memo* at 5; *Taiwan AD Prelim I&D Memo* at 5; *China CVD Prelim I&D Memo* at 4.

potentially subject to the investigation. Thus, we find that our notifications that we were considering changes to the scope provided parties with adequate due process with regard to this scope clarification. In fact, the only citation by interested parties to an actual change to the *Preliminary Determination* that would result from a clarification of the scope as proposed in the October 3rd Letter concerns a situation where a party did in fact heed the Department's notice that product coverage was being reconsidered: One separate rate applicant, tenKsolar, reported to the Department that it had no shipments subject to the scope as stated in the *Preliminary Determination*[88] but, as a precautionary measure, it filed a separate rate application in the China investigation, which, as we note below, we have granted for this final determination.[89] The action by tenKsolar indicates that our notice of potential scope clarifications did, in fact, provide parties with adequate notification and due process. We also note that exporters of subject merchandise may still apply for review of their sales in the first administrative review should these investigations result in the imposition of an AD and/or CVD order, as relevant.

We note that Respondents' reliance on *Sodium Hexametaphosphate from the PRC* and *Certain Orange Juice from Brazil* is misplaced. In both of these cases, the Department declined to modify the scope of the investigation because the modification requested by Petitioners was not a mere clarification, but rather would have been an expansion of the scope, and thus should have been proposed as an amendment to the petition prior to the initiation of the investigation.[90] In contrast, the Petitioner in this case did not request the clarification proposed in the October 3rd Letter. Instead, the Department proposed the clarification, in response to and taking account of interested parties' comments on the scope of these investigations. Further, we find that the modification adopted for the purpose of the final determination in the PRC AD and CVD investigations is not an expansion of the scope because the Petition expresses the Petitioner's intent to cover modules assembled in China using third-country solar cells. As noted above, the Petitioner stated its intent to include all of these modules in the scope in its Petition to this investigation, citing the "loophole" that resulted when, following the Department's substantial transformation analysis in the *Solar I* investigations, producers subject to the *Solar I* investigations increased imports of modules assembled in the PRC with non-PRC cells with the result of avoiding the reach of the *Solar I* AD and CVD orders.[91] Petitioner also stated that since early 2012 "imports of modules from China have consisted almost entirely of modules assembled in China from solar cells completed or partially manufactured in Taiwan *or other countries* ...."[92]

---

[88] *See* tenKsolar's February 12, 2014 quantity and value submission at Attachment I to the China investigation, where it reported no EP or CEP sales, but noted that it sold solar modules to the United States during the POI that it assembled with solar cells fabricated in Taiwan from Taiwan-origin wafers.

[89] *See* tenKsolar's March 31, 2014 submission.

[90] *See Sodium Hexametaphosphate from the PRC* at Comment 1; *see also Certain Orange Juice from Brazil*, at Comment 2.

[91] *See* the December 31, 2013 AD Petitions on China and Taiwan, Volume 1, at 3, 5-6, 21, 34, 37, and 53; Solar World Case Brief at 5-6; Letter from Petitioner to the Department, "Re: Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and Taiwan: Rebuttal to Respondents' Scope Comments" (Apr. 3, 2014) at 11-13.

[92] *See* the December 31, 2013 AD Petitions on China and Taiwan, Volume 1, at 5-6 (emphasis added); *see also id.* at 21.

24

Similarly, the Respondents' reliance on *Transcom* is also misplaced.  In *Transcom*, the CAFC held that the Department did not provide sufficient notice to an importer that the antidumping duties on its exporters' products could be affected by an administrative review because the exporters were not named in the initiation notice and the Department had not announced a change in its non-market economy practice at the time it initiated the review.[93]  However, *Transcom* is distinguishable from the instant case because it involved an administrative review, not an antidumping investigation, and a change in practice without notice rather than a modification or clarification to the scope of an investigation.  Further, the Court explained that the statutory and regulatory notice provisions only require that "any reasonably informed party should be able to determine, from the published notice of initiation read in light of announced Department policy, whether particular entries in which it has an interest may be affected by the administrative review."[94]  Here, the Department met its obligation to notify possible interested parties repeatedly and throughout the investigations, as explained above.

## D.   Impact of a Scope Clarification on the ITC's Final Determination

*Respondents:*
- A substantial change in scope such as the one contained in the October 3rd Letter would undermine the ITC injury determination.
  - o   The ITC this late in the proceeding cannot send questionnaires to U.S. solar module producers, foreign producers of solar modules and U.S. importers of solar modules containing third-country solar cells.  Thus, the ITC's injury determination will not cover the new products in question, which means that any antidumping and countervailing duty orders issued will be for products which the ITC has not determined injure the U.S. industry.

*Petitioner:*
- The majority of modules being shipped from the PRC and Taiwan that would be subject to the scope under the Department's proposed scope clarification, were also subject to the scope as it existed at the time data was collected from respondents and the *Preliminary Determination* was issued.  Thus, the data bases on which the ITC will calculate final subsidy and dumping margins would likely be consistent with the data that would be included under the scope as stated in the Department's proposed scope clarification.
- While the ITC never has perfect import coverage in its investigations, the data the ITC will collect in the final phase of the investigation will be largely consistent with the scope as stated in the proposed scope clarification.

**Department's Position:**  While respondents make arguments about the potential implications of the Department's scope clarification on the investigation underway at the ITC, the Department cannot speculate about what potential effect, if any, the Department's scope decision in these investigations may have on the ITC's investigation.  With respect to the Department's China AD and CVD investigations, as we noted above, the scope clarification proposed in the October 3rd

---

[93] *Transcom*, 185 F.3d at 881-883.
[94] *Id.* at 882-883.

Letter and adopted for purposes of this final determination will result in no change to the reported sales of the mandatory respondents.

## E.  Consistency of the Scope as Clarified in the October 3rd Letter be Consistent with the United States' WTO Obligations

*Respondents:*

- The WTO Agreement on Rules of Origin imposes an obligation on Members to ensure that "rules of origin shall not in themselves create restrictive, distortive, or disruptive effects on international trade" and "shall not discriminate between other Members."[95] The scope clarification proposed in the October 3rd Letter, if adopted, would have precisely such a distortive and discriminatory effect on trade between WTO Members because it would subject imports of modules made with any third-country cells to AD/CVD duties calculated for Chinese or Taiwanese products.

- The scope clarification proposed in the October 3rd Letter treats a module assembled in the PRC using cells produced in Taiwan as a Chinese origin product subject to the current PRC investigations, while it treats a solar module assembled in Malaysia using cells produced in Taiwan as a Taiwanese-origin product subject to the current Taiwan investigation. Thus, the solar module originating in China containing Taiwanese cells would be deprived of the advantage of market economy treatment provided to the like module originating in Malaysia containing Taiwanese cells. Therefore, it violates the United States' obligations under GATT to provide parties to GATT with most-favored nation treatment.[96]

*Petitioner:*

- Any "distortion" in international trade is the result of the unfair trade practices being engaged in by Chinese and Taiwanese solar manufacturers that these investigations are attempting to redress.

- The scope clarification also does not discriminate between the United States' treatment of imports from the PRC and Taiwan on the one hand, and imports from other WTO Members on the other hand, by bringing additional products from the PRC and Taiwan within the scope of any eventual AD/CVD orders that would otherwise not fall within that scope. Any solar cells and/or modules that fall within the scope clarification will be subject to equal treatment. And, contrary to Respondent assertions, it would not subject "any third country cells" to AD/CVD duties; rather, it would subject imports of modules from the PRC and Taiwan – which have been determined to be dumped and subsidized – to lawfully calculated duties.

- Under the scope clarification proposed in the October 3rd Letter, the NME methodology would, appropriately, only be applied to cells originating in the PRC, as well as modules

---

[95] *See* Articles 1.2, 2(c), and 2(d) of the WTO Agreement on Rules of Origin.

[96] Respondents cite to Article I of GATT 1994, which requires that: "with respect to customs duties and charges of any kind imposed on or in connection with importation or exportation ... , and with respect to all rules and formalities in connection with importation and exportation, ... any advantage, favour, privilege or immunity granted by any Member to any product originating in or destined for any other country shall be accorded immediately and unconditionally to the like product originating in or destined for the territories of all other Members." Respondents claim that subjecting solar cells from market economies to NME treatment because they are included in Chinese solar modules violates this GATT article.

assembled in the PRC. Contrary to Respondents' claims, cells and modules originating in the PRC, an NME country, are not entitled to ME treatment. On the other hand, given Taiwan's status as an ME country, cells originating in Taiwan (other than those destined for module-assembly in the PRC), as well as modules, laminates, and/or panels assembled in Taiwan, would appropriately be subject to duties calculated based on an ME methodology.

**Department's Position:**

We disagree with Respondents' claim regarding obligations under the WTO Agreement on Rules of Origin. The Department's determination here is consistent with U.S. law, which in turn is consistent with U.S. WTO obligations.

We also disagree that any orders will unfairly impact the trade of solar modules made with any third-country cells. As noted by Petitioner, the scope proposed in the October 3rd Letter and adopted in the final determinations would not subject third-country cells to AD/CVD duties. Instead, the scope covers imports of modules that the Department has determined to have a country of origin of the PRC for purposes of these investigations – and in the event of AD and CVD orders, provides a remedy for the unfair pricing practices involving, and subsidization of, such merchandise by imposing AD and CVD duties. Thus, any alleged distortions or disruptive effects on international trade are the result of the unfair trade practices being engaged in by parties involved in the sale and manufacture of such products, not the result of the Department providing redress for these unfair trade practices.

We also disagree that the scope adopted in the PRC investigations unfairly subjects third-country solar cells assembled into solar modules in China to our NME methodology for calculating dumping margins. As explained above, the Department has determined that modules assembled in China using third-country solar cells, including Taiwanese solar cells, have a country of origin of China. This determination is consistent with the Petitioner's intent. In the Petition, Petitioner alleged that the unfair pricing of modules assembled in China is causing injury to the domestic industry. Although Petitioner also alleged that the unfair pricing of solar cells manufactured in Taiwan is causing injury to the domestic industry, the Petition indicates that Petitioner intended for injury resulting from the unfair pricing of a panel assembled in China to take precedence over the injury resulting from the unfair pricing of a Taiwanese solar cell. Therefore, we find that it is appropriate to focus on the alleged injurious unfair pricing and subsidization of these modules that are assembled in China, and, accordingly, that it is appropriate to apply the NME methodology in determining whether such panels are dumped. In contrast, panels assembled in Malaysia using Taiwanese cells involve no production of either cells or modules in an NME country. Moreover, the fact that there happens to be, in this instance, a concurrent investigation involving solar products from Taiwan has no relevance to what the appropriate methodology is for examining dumping of panels that are assembled in China in the separate investigation of modules from China. It would be appropriate to apply the NME methodology to modules assembled in China in this investigation even if there were no concurrent Taiwan investigation.

**F.    Administrability Concerns**
*Respondents:*

27

- The scope as proposed in the October 3rd Letter cannot be administered or applied due to the numerous contradictions and overlaps with the PRC and Taiwan investigations and also with the *Solar I* order.
  - For the same solar module,
    - At times the country of origin would be based on substantial transformation, or where the solar cell is manufactured, such as in *Solar I* and partially in the ongoing investigation on Taiwan, but
    - At other times the country of origin would be determined by where the solar module assembly took place, such as in the ongoing investigation of the PRC and partially in the ongoing investigation of Taiwan.

*Petitioner:*
- While the country of origin analyses from the *Solar I* investigation and that proposed by the scope clarification may differ, they are not necessarily inconsistent, nor unclear.
- The proposed scope clarification specifically exempts products subject to the existing solar AD/CVD orders from these investigations.
- The country of origin rules in the proposed scope clarifications (providing a supplemental country of origin rule for those products not covered by the initial solar investigations) prevent any product from at any time having two countries of origin.

**Department's Position:**

We disagree with Respondents and find the scope as clarified in the October 3rd Letter to be administrable. As noted by Respondents, the country of origin criteria in *Solar I*, applicable to solar modules, differ from these investigations. However, we determine that the scope of *Solar I* is very clear as it states that the country of origin of a solar module is determined by where the solar cell was produced.[97] Not only is the scope and country of origin determination of *Solar I* clear, but the scopes adopted in the final determinations of the current investigations emphasize that they do not alter, revise, or overlap the scope of *Solar I*. Specifically, the scopes of the current China and Taiwan investigations each state that "excluded from the scope of this investigation are any products covered by the existing antidumping and countervailing duty orders on {*Solar I*}."[98] Further, any possible overlaps between the current China and Taiwan investigations are eliminated by the scope language stating that solar cells assembled in China using solar cells manufactured in Taiwan are subject to the current China investigation and not the Taiwan investigation.[99] Thus, we have eliminated any overlap of solar products subject to any of these investigations and those subject to *Solar I*.

Meanwhile, the modifications to the scope language of the *Preliminary Determination* proposed in the October 3rd Letter and adopted in these determinations result in single change: that the

---

[97] *See e.g.*, *Solar I* where the scope explicitly states that it covers "Modules, laminates, and panels produced in a third-country from cells produced in the PRC are covered by this investigation; however, modules, laminates, and panels produced in the PRC from cells produced in a third-country are not covered by this investigation." Further, *Solar I* included certifications in Appendix II, which require exporters and imports of solar modules "to substantiate the claim that the panels/modules do not contain solar cells produced in the People's Republic of China."
[98] *See* the Attachment to the October 3rd Letter.
[99] *Id.*

country of origin of a solar module assembled in the PRC is the PRC. We find this country of origin language likewise clear and easily applied. Thus, while the country of origin criteria of *Solar I* and the country of origin analysis stated in the proposed clarification in the October 3rd Letter may differ, with the latter building upon the former, we find the approaches to be complementary and that identifying the proceeding to which a given solar module may be subject, based on these analyses, will be straightforward. Further, any potential overlap in coverage that may have arisen due to the different country of origin criteria have been eliminated by the modified language provided in the October 3rd proposed clarification and adopted in the final determinations.

**G.      Treatment of U.S. Solar Cells Assembled into Solar Modules in China and Taiwan**
*Respondents:*
   • The Department must include a scope exemption for solar products assembled from cells of U.S. origin. The Department has already determined that the country of origin of a solar panel is the country in which the solar cell was produced. U.S. law prohibits application of AD/CVD duties to U.S. origin goods.

Petitioner did not comment on this issue.

**Department's Position**:

We disagree with Respondents. As noted above, contrary to Respondents' assertions, we have only applied AD and CVD measures to products determined to have a country of origin of China. We have not applied such measures to products determined to have a country of origin of the United States.

**H.      Comments Concerning the Scope of the Preliminary Determination**

Parties have submitted comments concerning the scope of the investigation as defined in the *Preliminary Determination*. Because we have clarified the scope consistent with the October 3rd Letter, we have not addressed comments that were only relevant to the scope of the investigation as defined in the *Preliminary Determination* and not relevant to the scope of this final determination.

**Comment 2:   Whether to Select South Africa or Thailand as the Primary Surrogate Country**

*Petitioner*
   • The record does not demonstrate that South Africa was a "significant producer" of merchandise identical or comparable to solar products during the POI, making South Africa unsuitable as a source of surrogate values. The Department must give appropriate meaning to the language "significant producer" by comparing each country's exports or production capacity to world production.[100] The value of exports from the next closest country to Thailand on the Department's list – Indonesia – was barely one-fourth of the

---

[100] *See* Policy Bulletin 04.1: Non-Market Economy Surrogate Country Selection Process (March 1, 2004) ("Policy Bulletin 04.1") available at http://enforcement.trade.gov/policy/index.html.

**PUBLIC DOCUMENT**

| Tab No. | Document | Pages | Record Document |
|---------|----------|-------|-----------------|
| 2 | Issues and Decision Memorandum accompanying *Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China*, 79 Fed. Reg. 76,962 (Dep't Commerce Dec. 23, 2014) (final affirmative countervailing duty deter.) | 1-4, 32-55 | CVD PR Doc. 388 |

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

C-570-011
Investigation
**Public Document**
E&C Office VII: Team

| | |
|---|---|
| **DATE:** | December 15, 2014 |
| **MEMORANDUM TO:** | Paul Piquado<br>Assistant Secretary<br>  For Enforcement and Compliance |
| **FROM:** | Christian Marsh<br>Deputy Assistant Secretary<br>  for Antidumping and Countervailing Duty Operations |
| **SUBJECT:** | Issues and Decision Memorandum for the Final Determination in the Countervailing Duty Investigation of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China |

## I.    SUMMARY

The Department of Commerce (the Department) determines that countervailable subsidies are being provided to producers and exporters of certain crystalline silicon photovoltaic products (certain solar products, or subject merchandise) from the People's Republic of China (the PRC), within the meaning of section 705 of the Tariff Act of 1930, as amended (the Act).[1]  Below is the complete list of issues in this investigation for which we received comments from interested parties:

Issues:
**Comment 1:**  Scope Comments and Scope Clarification
**Comment 2:**  Whether the Department Should Investigate the Effects of the GOC's Alleged Cyberhacking on this Investigation
**Comment 3:**  Whether Input Providers are "Authorities" Within the Meaning of the Act
**Comment 4:**  Whether the Provision of Chinese Polysilicon for LTAR is Countervailable
**Comment 5:**  Whether the Department Should Attribute Subsidies under the Provision of Polysilicon for LTAR Program to Wuxi Suntech's Cross-owned Companies
**Comment 6:**  Whether the Provision of Aluminum Extrusions for LTAR is Countervailable
**Comment 7:**  Whether the Provision of Solar Glass for LTAR is Countervailable
**Comment 8:**  Whether AFA is Applicable to Trina Solar's Land Purchases

---

[1] *See also* section 701(f) of the Act.



INTERNATIONAL
**TRADE**
ADMINISTRATION

**Comment 9:** Whether All Banks in China Offering Preferential Loans to Respondents
Constitute "Authorities"

**Comment 10:** Whether the Department Should Adjust Its Benefit Calculations for Loans
Received by Wuxi Suntech and Zhenjiang Ren De

**Comment 11:** Whether the High or New Technology Tax Program is Specific

**Comment 12:** Whether the Tax Offsets for R&D under the Enterprise Income Tax Law Program
is Specific

**Comment 13:** Whether the Department Should Adjust Its Benefit Calculation for Wuxi
Suntech's Use of the "Preferential Income Tax Program for High or New
Technology Enterprises" and for the "Tax Offsets for R&D under the Enterprise
Income Tax Law" Programs

**Comment 14:** Whether the Golden Sun Program is Countervailable

**Comment 15:** Whether the Department Should Countervail the "Discovered Subsidies" or
Subsidies Discovered During the Course of Verification

**Comment 16:** Whether the Department Should Apply AFA to the Ex-Im Bank Buyer's Credit
Program

**Comment 17:** Whether the Department Should Find Trina Solar and Wuxi Suntech to be
Uncreditworthy

**Comment 18:** Whether the Department Should Adjust the Sales Denominators Used in
Calculating Subsidy Benefits for Wuxi Suntech

**Comment 19:** Whether the Department Should Accept the Minor Corrections Presented by
Wuxi Suntech at Verification

## II.    BACKGROUND

### A.    Case History

The mandatory company respondents in this proceeding are Changzhou Trina Solar Energy Co.,
Ltd. and its cross-owned affiliate Trina Solar (Changzhou) Science & Technology Co., Ltd.
(collectively, Trina Solar), and Wuxi Suntech Power Co., Ltd. and its cross-owned affiliates[2]
(collectively, Wuxi Suntech).  On June 10, 2014, the Department published the *Preliminary
Determination* in this proceeding.[3]  On June 9, 2014, the Government of the People's Republic
of China (the GOC) submitted a ministerial error allegation regarding the benchmark tariff rate
the Department used for the provision of solar glass for less than adequate remuneration
(LTAR).  On June 10, 2014, Trina Solar and Wuxi Suntech each filed ministerial allegations
with respect to various aspects of the *Preliminary Determination*.  Between July 15 and July 25,

---

[2] The cross-owned companies identified by Wuxi Suntech are:  Suntech Power Co., Ltd. (Shanghai Suntech),
Zhenjiang Rietech New Energy Science & Technology Co., Ltd. (Zhenjiang Rietech), Zhenjiang Ren De New
Energy Science & Technology Co., Ltd. (Zhenjiang Ren De), Luoyang Suntech Power Co., Ltd. (Luoyang Suntech),
Wuxi Sunshine Power Co., Ltd. (Wuxi Sunshine), Yangzhou Rietech Renewal Energy Co., Ltd. (Yangzhou
Rietech), Suntech Energy Engineering Co., Ltd. (Suntech Energy), and Kuttler Automation Systems (Suzhou) Co.,
Ltd. (Suzhou Kuttler).

[3] *See Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China: Preliminary
Affirmative Countervailing Duty Determination*, 79 FR 33174 (June 10, 2014) (*Preliminary Determination*) and its
accompanying Preliminary Decision Memorandum.

2014, we issued supplemental questionnaires to the GOC, Trina Solar, and Wuxi Suntech, for which we received timely responses between July 29 and August 7, 2014.

On July 31, 2014, we aligned the final determination in this investigation with the final determination in the companion antidumping duty (AD) investigation of certain solar products from the PRC. On August 15, 2014, the Department rejected the GOC's June 9, 2014, ministerial error allegation, as well as Trina Solar's and Wuxi Suntech's June 10, 2014, submissions, explaining that their submissions were noncompliant with the Department's procedures for submitting factual information. Trina Solar and Wuxi Suntech each timely resubmitted their ministerial error allegations on August 19, 2014. On August 21, 2014, the Department determined that no ministerial errors exist with respect to Trina Solar's and Wuxi Suntech's allegations.[4] Between August 20 and September 2, 2014, we conducted verification of the questionnaire responses submitted by the GOC, Trina Solar, and Wuxi Suntech.[5] Between October 16 and October 27, 2014, interested parties submitted case and rebuttal briefs. We did not conduct a hearing in this proceeding, as all requests for a hearing were timely withdrawn.

### B.    Period of Investigation

The period of investigation (POI) for which we are measuring subsidies is January 1, 2012, through December 31, 2012.

## III.   SCOPE OF THE INVESTIGATION

The merchandise covered by this investigation is modules, laminates and/or panels consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including building integrated materials. For purposes of this investigation, subject merchandise includes modules, laminates and/or panels assembled in the PRC consisting of crystalline silicon photovoltaic cells produced in a customs territory other than the PRC.

Subject merchandise includes modules, laminates and/or panels assembled in the PRC consisting of crystalline silicon photovoltaic cells of thickness equal to or greater than 20 micrometers, having a p/n junction formed by any means, whether or not the cell has undergone other processing, including, but not limited to, cleaning, etching, coating, and/or addition of materials (including, but not limited to, metallization and conductor patterns) to collect and forward the electricity that is generated by the cell.

Excluded from the scope of this investigation are thin film photovoltaic products produced from amorphous silicon (a-Si), cadmium telluride (CdTe), or copper indium gallium selenide (CIGS). Also excluded from the scope of this investigation are modules, laminates and/or panels

---

[4] *See* Department Memorandum, "Allegations of Ministerial Errors in the Preliminary Determination," (August 21, 2014).

[5] *See* Department Memoranda, "Verification of the Questionnaire Responses Submitted by Changzhou Trina Solar Entergy Co., Ltd. and its Cross-Owned Companies," (October 2, 2014) (Trina Solar VR); "Verification of the Questionnaire Responses Submitted by the Government of the People's Republic of China," (October 3, 2014) (GOC VR); and "Verification of the Questionnaire Responses Submitted by Wuxi Suntech Power Co., Ltd. and its Cross-Owned Companies," (October 3, 2014) (Wuxi Suntech VR).

assembled in the PRC, consisting of crystalline silicon photovoltaic cells, not exceeding 10,000mm$^2$ in surface area, that are permanently integrated into a consumer good whose function is other than power generation and that consumes the electricity generated by the integrated crystalline silicon photovoltaic cells.  Where more than one module, laminate and/or panel is permanently integrated into a consumer good, the surface area for purposes of this exclusion shall be the total combined surface area of all modules, laminates and/or panels that are integrated into the consumer good.  Further, also excluded from the scope of this investigation are any products covered by the existing antidumping and countervailing duty orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, laminates and/or panels, from the PRC.[6]

Merchandise covered by this investigation is currently classified in the Harmonized Tariff Schedule of the United States (HTSUS) under subheadings 8501.61.0000, 8507.20.8030, 8507.20.8040, 8507.20.8060, 8507.20.8090, 8541.40.6020, 8541.40.6030 and 8501.31.8000. These HTSUS subheadings are provided for convenience and customs purposes; the written description of the scope of this investigation is dispositive.

## IV.   APPLICATION OF THE COUNTERVAILING DUTY LAW TO IMPORTS FROM THE PRC

On October 25, 2007, the Department published its final determination on coated free sheet paper from the PRC.[7]  In *CFS from the PRC*, the Department found that:

> . . . given the substantial differences between the Soviet-style economies and China's economy in recent years, the Department's previous decision not to apply the CVD law to these Soviet-style economies does not act as a bar to proceeding with a CVD investigation involving products from China.[8]

The Department affirmed its decision to apply the countervailing duty (CVD) law to the PRC in numerous subsequent determinations.[9]  Furthermore, on March 13, 2012, Public Law 112-99 was enacted, which confirms that the Department has authority to apply the CVD law to countries designated as non-market economies under section 771(18) of the Act, such as the PRC.[10]  The effective date provision of the enacted legislation makes clear that this provision applies to this proceeding.[11]

---

[6] *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order*, 77 FR 73018 (December 7, 2012); *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Countervailing Duty Order*, 77 FR 73017 (December 7, 2012).

[7] *See Coated Free Sheet Paper from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 72 FR 60645 (October 25, 2007) (*CFS from the PRC*), an accompanying Decision Memorandum at Comment 6.

[8] *Id.*

[9] *See, e.g., Circular Welded Carbon Quality Steel Pipe from the People's Republic of China: Final Affirmative Countervailing Duty Determination and Final Affirmative Determination of Critical Circumstances*, 73 FR 31966 (June 5, 2008) (*CWP from the PRC*) and accompanying Decision Memorandum at Comment 1.

[10] Section 1(a) is the relevant provision of Public Law 112-99 and is codified at section 701(f) of the Act.

[11] Public Law 112-99, 126 Stat. 265 §1(b).

3. Tax Benefit Programs

    a. The Two Free/Three Half Program for FIEs
    b. Income Tax Reductions for Export-Oriented Enterprises
    c. Income Tax Benefits for FIEs Based on Geographic Locations
    d. Local Income Tax Exemption and Reduction Programs for "Productive" FIEs
    e. Tax Reductions for FIEs Purchasing Chinese-Made Equipment
    f. Tax Refunds for Reinvestment of FIE Profits in Export-Oriented Enterprises
    g. Tax Reductions for High and New-Technology Enterprises Involved in Designated Projects
    h. Preferential Income Tax Policy for Enterprises in the Northeast Region
    i. Guangdong Province Tax Programs

4. VAT and Tariff Exemptions for Purchases of Fixed Assets under the Foreign Trade Development Fund Program

## IX.    ANALYSIS OF COMMENTS

**Comment 1:  Scope Comments and Scope Clarification**

On October 3, 2014, the Department issued a letter to all interested parties inviting parties to include in their case briefs comments concerning a possible clarification to the scope of the AD/CVD investigations that the Department was considering.[180]  The Department stated that the scope clarification under consideration contemplated the following:

- For the PRC investigations, subject merchandise would include all modules, laminates and/or panels assembled in the PRC that contain crystalline silicon photovoltaic cells produced in a customs territory other than the PRC.
- For the Taiwan investigation, subject merchandise would include all modules, laminates and/or panels assembled in Taiwan consisting of crystalline silicon photovoltaic cells produced in Taiwan or a customs territory other than Taiwan and would continue to exclude any products covered by the existing AD and CVD orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the PRC.  In addition, subject merchandise would include modules, laminates, and panels assembled in a third-country, other than the PRC, consisting of crystalline silicon photovoltaic cells produced in Taiwan.

Parties have commented on the scope clarification in this letter and made other scope comments addressed below.  Generally, Respondents oppose adopting the proposed scope clarification in the October 3rd Letter, while Petitioner argues that the Department should adopt the scopes

---

[180] *See* October 3, 2014 letter from Howard Smith, Program Manager, Office IV, AD/CVD Operations, Enforcement and Compliance, to All Interested Parties, re: *Antidumping and Countervailing Duty Investigations of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and the Antidumping Duty Investigation of Certain Crystalline Silicon Photovoltaic Products from Taiwan: Opportunity to Submit Scope Comments* (October 3, 2014) ("October 3rd Letter").

proposed in the October 3rd Letter because they most effectively apply Petitioner's intent, would best effectuate the U.S. trade laws and provide effective relief to the injured domestic industry, and would be easily administrable and enforceable by the agencies involved. After considering comments, we have determined to clarify the scopes of the PRC AD and CVD investigations consistent with the October 3rd Letter. We address party comments in detail below.

Due to this revision in the scope, we are not requiring exporter and importer certifications. The revocation of the certification requirements previously established in this investigation does not change or rescind the certification requirements established in connection with the existing orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the PRC.

## A.    Consistency with *Solar I*[181] and Court Decisions

*Respondents:*
- The Department's proposed scope clarification is arbitrary because it is inconsistent with the product coverage decisions made by the Department in *Solar I* and also ignores country of origin decisions made by the Court of International Trade (referred to as either the "Court" or the "CIT") and the U.S. Court of Appeals for the Federal Circuit (CAFC), as well as country of origin criteria stated in the Act. Such arbitrary decisions are unlawful because, as the courts have noted, the Department has an obligation to be consistent in its decisions.
  - In *Solar I,* the Department made numerous decisions that directly ruled against establishing a scope that would find solar modules assembled in China but not containing Chinese solar cells subject to the order. The Department's determinations in *Solar I* were made on the following bases:
    - A product can only have one country of origin,[182]
    - AD and CVD investigations only cover products with a country of origin of the country under investigation,[183] and
    - The Department relies on the substantial transformation test to determine the country of origin of a product.[184]
    - In applying this substantial transformation test in *Solar I,* the Department determined that "module assembly does not substantially alter the essential nature of solar cells nor does it constitute significant processing

---

[181] *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Affirmative Countervailing Duty Determination and Final Affirmative Critical Circumstances Determination*, 77 FR 63788 (October 17, 2012) ("*Solar I CVD Final Determination*") and *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Final Determination of Sales at Less Than Fair Value, and Affirmative Final Determination of Critical Circumstances, in Part*, 77 FR 63791 (October 17, 2012) ("*Solar I AD Final Determination*") (these two investigations are referred to generally as "*Solar I*").
[182] *See Solar I AD Final Determination* and accompanying Issues and Decision Memorandum ("Solar I IDM") at Comment 1, page 8.
[183] *Id.*
[184] *Id.* at 5-6.

such that it changes the country of origin of the cell."[185] The Department found that the solar cell imparts the essential character of a solar module, and, therefore, the origin of the solar cell is determinative of the country of origin of the class or kind of merchandise at issue here.  Therefore, "where solar cell production occurs in a different country from solar module assembly, the country of origin of the solar modules/panels is the country in which the solar cell was produced."[186]

- ▪ If the approach in *Solar I* described above were applied to these investigations the conclusion would be that the scope of an CVD order must be limited to subject merchandise "produced" and "originating" in the country covered by the order, which here is China and Taiwan. Merchandise produced or originating in a country other than the country covered by an order, which based on the previous substantial transformation decision, includes solar modules assembled in China or Taiwan from solar cells produced in countries other than China or Taiwan, have a different country of origin than China or Taiwan, and thus may not be included in the scope of these investigations.

  o Decisions by the CIT and the CAFC, as well as sections of the Act support finding that products under an investigation can only have one country of origin and that the basis for determining this is the substantial transformation test.

  - ▪ Applying the country of origin determination implied in the scope as proposed in the October 3rd Letter, as well as the criteria applied in *Solar I*, would result in a solar module assembled in one country containing another country's cell to have two countries of origin.  CIT decisions[187] have stated that a product can only have a single country of origin for AD and CVD purposes.

  - ▪ The scope as proposed in the October 3rd Letter is also contrary to the statutory language at Section 731 of the Act, which provides for the imposition of antidumping duties on "subject merchandise," defined as "the class or kind of merchandise that is within the scope of an investigation, a review, a suspension agreement, {or} an order...."[188]  This provision requires the Department to make a finding of dumping for a class or kind of merchandise from a particular country.[189]

  - ▪ The scope as proposed in the October 3rd Letter ignores the established criteria for determining the country of origin, which is the substantial transformation analysis.

---

[185] *See* March 19, 2012 Memorandum from Jeff Pedersen to Chris Marsh "Scope Clarification: Antidumping and Countervailing Duty Investigations of Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China ("Solar I Substantial Transformation Memorandum").  Included in December 15, 2014 Other Proceedings' Documents Memorandum at Attachment 1.

[186] *Id.*

[187] *See Ugine & ALZ Belgium, N.V. v. United States*, 517 F. Supp. 2d 1333, 1345 (CIT 2007) ("*Ugine I*"), *aff'd*, 551 F.3d 1339 ("*Ugine III*") (Fed. Cir. 2009).

[188] *Id.*; Section 771(25) of the Act.

[189] *See E.I. DuPont de Nemours & Co. v. United States*, 8 F. Supp. 2d 854, 859 (CIT 1998) ("*Du Pont*"); *see also Ugine I*, 517 F. Supp. 2d at 1345.

- The CIT has determined that the "substantial transformation" analysis provides a means for the Department to carry out its country of origin examination and properly guards against circumvention of existing antidumping orders.[190]
  o The Department is prevented from contradicting these decisions in *Solar I* because the Department is obliged to be consistent in its decision-making across its investigations.
    - The CIT has explained that although an agency is not strictly bound to its precedent, "{i}t is a principle of administrative law that an 'agency must either conform to its prior norms and decisions or explain the reason for its departure from such precedent."[191]  The CAFC has similarly stated that the Department cannot ignore its own precedent absent some legitimate reason for departing from it.[192]
    - The Department has not articulated reasons for diverging from these decisions.  Instead, the Department stated in these investigations, that it is informed "by the product coverage decisions that it made" in *Solar I*.[193]

*Petitioner:*
- In the preliminary determination, the Department stated that it was continuing to analyze interested parties' scope comments, including comments on whether it is appropriate to apply a traditional substantial transformation or other analysis in determining the country of origin of certain solar modules described in the scope of the investigation.
- Petitioner supports the proposed scope clarification in the Department's October 3rd Letter, and requests that the Department adopt it for purposes of its final determination and any resulting CVD order.
- The Department's proposed scope clarification is fully consistent with the Petitioner's intent.  It has been clear since the start of the first solar AD/CVD investigations, and throughout the current investigations, that Petitioner's intent has always been to cover all cells from the PRC and all modules from the PRC and, now, all cells from Taiwan and all modules from Taiwan.[194]
- The Department's proposed scope clarification would best effectuate the U.S. trade laws and provide effective relief to the injured domestic industry, and would be easily administrable and enforceable by the agencies.
- The remedial purposes of the AD/CVD laws are best served by the proposed scope clarification.  The Department has determined that both cells and modules from the PRC and Taiwan are being dumped, and both Chinese cells and modules are subsidized.  As such, the law obligates Commerce to impose duties on these products.

---

[190] *See Du Pont*, 8 F. Supp. 2d at 857 (emphasis added).
[191] *See Torrington Co. v. United States*, 745 F. Supp. 718, 727 (CIT 1990) (quoting *Mississippi Valley Gas Co. v. Federal Energy Regulatory Comm'n*, 659 F.2d 488, 506 (5th Cir. 1981)); *Neenah Foundry Co. v. United States*, 142 F. Supp. 2d 1008, 1022 (CIT 2001); *Hussey Copper Ltd., v. United States*, 834 F. Supp. 413,418 (CIT 1993).
[192] *See Ugine III*, 551 F.3d at 1349.
[193] *See Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China and Taiwan: Initiation of Antidumping Duty Investigations*, 79 FR 4661 (January 29, 2014) ("*Solar Products Initiation Notice*").
[194] *See, e.g.*, Solar I IDM at Comment 1.

- Clarifying the scope language in the manner proposed by the Department would result in AD/CVD orders that are administrable and enforceable by the Department and U.S. Customs and Border Protection (CBP). Solar cells are not required to contain country of origin markings. It can be extremely difficult for CBP to determine the origin of various inputs in a solar module upon importation. On the other hand, all solar modules are clearly marked with country-of-origin and other identifying information. Covering all cells and modules from both the PRC and Taiwan, as described in the October 3rd Letter proposed scope clarification, would therefore significantly improve the enforceability of any future AD/CVD orders.
- To the extent that the Department's proposed scope clarification can be considered a departure from its prior country-of-origin determination, the agency is, of course, permitted to depart from its prior determinations.[195]
- Respondents' argument that the scope clarification results in a single product having two countries of origin is unfounded. Because the country-of-origin rules in the proposed scope clarifications provide a supplemental country-of-origin rule for those products not covered by the initial solar investigations, no product would at any time have two countries of origin.
- For example, Trina Solar claims that modules assembled in China with cells produced in Taiwan would result in identical products having two different countries of origin under the previous analysis and the proposed scope clarification.
- The proposed scope would also be consistent with international precedent. The recent European Union ("EU") AD/CVD investigations of Chinese solar products included "imports of crystalline silicon photovoltaic modules and key components (*i.e.*, cells and wafers) originating in or consigned from the People's Republic of China,"[196] recognizing that all cells and all modules from the subject country, in addition to other key components, must be covered.
- In the alternative, should the Department decide not to make its proposed clarification to the scope, these investigations should continue with the scope proposed by Petitioner and accepted by the Department for purposes of initiation and its preliminary determination.

**Department's Position**: After considering the facts and circumstances presented by the PRC AD and CVD investigations, as well as the parties' comments on the October 3rd Letter, for this final determination the Department has clarified the scope language of the PRC AD and CVD investigations such that subject merchandise includes all modules, laminates and/or panels assembled in the PRC that contain crystalline silicon photovoltaic cells produced in a customs territory other than the PRC. For a complete description of the scope of the investigation for this final determination, *see* section III above.

---

[195] *See Torrington*, 745 F. Supp. at 727.
[196] *See* Council Implementing Regulation (EU) No 1238/2013 of 2, Official Journal of the European Union (Dec. 2013).

Upon initiation of these investigations, the Department set aside a period for interested parties to raise issues relating to product coverage, *i.e.*, scope.[197] Interested parties submitted affirmative comments and rebuttal comments regarding product coverage.[198] In the *Preliminary Determination* published on July 31, 2014, we announced that we are continuing to analyze the scope comments, including comments on whether it is appropriate to apply a traditional substantial transformation or other analysis in determining the country of origin of certain solar modules described in the scope of this investigation.[199] Further, with respect to administering the PRC investigations, we explained that the scope of these investigations explicitly excludes any products covered by the existing AD and CVD orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the PRC.[200] In response to interested parties' comments on the scope of this investigation (and prior to the deadlines for the submission of case and rebuttal briefs), in the October 3rd Letter the Department announced that it was considering the possibility of a scope clarification, described the possible clarification, and invited interested parties to submit comments on the clarification. For the reasons discussed below, the Department determines that there are significant reasons for clarifying and modifying the scope of this investigation.

Importantly, it is within the Department's authority to do so. The CAFC has explained that "the purpose of the petition is to propose an investigation," and the "purpose of the investigation is to determine what merchandise should be included in the final order."[201] Therefore, the Department must be able to determine what merchandise should be covered by any final order. Additionally, the purpose of the AD and CVD law is to provide a remedy, if appropriate, for alleged injury to the domestic industry that is caused by specified merchandise alleged to be dumped or unfairly subsidized.[202] Accordingly, the Department's "practice is to provide ample deference to the Petitioner with respect to the definition of the product for which it seeks relief under the AD and CVD laws."[203]

---

[197] *See Solar Products Initiation Notice*, 79 FR at 4661; *see also Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China: Initiation of Countervailing Duty Investigation*, 79 FR4667 (January 29, 2014).

[198] *See* scope comment submissions, dated February 18, 2014, from Gintech; Motech; NextEra Energy, Inc.; SunEdison, Inc.; Suniva, Inc.; and Yingli Green Energy Holding Company Limited, Yingli Green Energy Americas, Inc., Canadian Solar Inc., Changzhou Trina Solar Energy Co., Ltd., Wuxi Suntech Power Co., Ltd., Shanghai JA Solar Technology Co., Ltd., Hefei JA Solar Technology Co., Ltd., and Jinko Solar Co., Ltd.; *see also* rebuttal scope comment submissions, dated April 3, 2014, from Petitioner, and dated April 21, 2014, from Yingli Green Energy Americas, Inc., Canadian Solar Inc., Changzhou Trina Solar Energy Co., Ltd., Wuxi Suntech Power Co., Ltd., Shanghai JA Solar Technology Co., Ltd., Hefei JA Solar Technology Co., Ltd., and Jinko Solar Co., Ltd.

[199] *See AD PDM* at 5; *see also* CVD PDM at 4 (collectively referred to as "Pre-Prelim Scope Comments").

[200] *Id.*

[201] *See Duferco Steel Inc. v. United States*, 296 F.3d 1087, 1096-97 (Fed. Cir. 2002) ("*Duferco*").

[202] *See* sections 731 and 701 of the Act; *see also United States v. American Home Assur. Co.*, 964 F. Supp. 2d 1342, 1352-53 ("Antidumping duties serve the distinct purpose of remedying the effect of unfair trade practices resulting in actual or threatened injury to domestic like-product producers." (*citing Canadian Wheat Bd. v. United States*, 641 F.3d 1344, 1351 (Fed. Cir. 2011))); *Wolff Shoe Co. v. United States*, 141 F.3d 1116, 1117 (Fed. Cir. 1998) (Countervailing duties "are levied on subsidized imports to offset the unfair competitive advantages created by foreign subsidies.").

[203] *See Large Residential Washers From the Republic of Korea*, 77 FR 46391, 46392 (August 3, 2012) and accompanying Issues and Decision Memorandum at Comment 2. *See also Kern Liebers USA, Inc. v. United States*,

The CIT has stated that the Department "retains broad discretion to define and clarify the scope of an antidumping investigation in a manner which reflects the intent of the petition."[204] Indeed, the CIT has confirmed that any scope clarifications made by the Department *should* be made in a manner which reflects the intent of the Petition, and that is what the scope clarification accomplishes here.[205]   The Petition[206] and Petitioner's comments in this investigation clearly demonstrate that the Petitioner's intent is a scope that covers all solar modules assembled in the PRC using third-country solar cells.  In its Petition to this investigation, the Petitioner stated its intent to include all of these modules in the scope, citing the "loophole" that resulted when, following the application of Department's substantial transformation analysis in the *Solar I* investigations, producers subject to the *Solar I* investigations increased exports to the United States of modules assembled in the PRC with non-PRC cells with the result of avoiding the reach of the *Solar I* AD and CVD orders.[207]  Indeed, in the Petition for this investigation, Petitioner noted that it had argued for a scope almost identical to the scope in the October 3rd Letter in Solar I and stated that the Department's refusal  to cover Chinese solar modules assembled from non-Chinese solar cells allowed Chinese companies to continue to ship solar modules to the United States duty free.[208]  In these investigations, the alleged injury to the domestic industry stems from certain solar modules that are assembled in the PRC using cells produced in third countries, modules which are not covered by the scope of *Solar I* and, thereby, exceed the reach of the remedy afforded by the *Solar I* AD and CVD orders.  In addition, taking the instant PRC investigations together with *Solar I*, the Petitioner has alleged that the domestic industry is being injured as a result of the unfair pricing of cells produced in the PRC, modules containing such cells, and modules assembled in the PRC with third-country cells, as well as unfair subsidization in the PRC of both cells and modules.

Beyond the Petitioner's intent, there are other facts and factors that the Department has found to be significant in considering the scope of these investigations.  For example, the record demonstrates that the solar products industry involves a complex and very adaptable global supply chain which allows producers to modify their production chains easily and quickly.  Petitioner has cited statements by five large Chinese solar module producers and one U.S. importer of solar modules noting the ease with which they were able to modify their production

---

881 F. Supp. 618, 621 (CIT 1995) ("The agency generally exercises {its} broad discretion to define and clarify the scope of an antidumping investigation in a manner which reflects the intent of the petition").

[204] *See Minebea Co. v. United States*, 782 F. Supp. 117, 120 (CIT 1992).

[205] *See AMS Assocs. v. United States*, 881 F. Supp. 2d 1374, 1380 (CIT 2012) (explaining that "Commerce retains broad discretion to define and clarify the scope of an antidumping investigation in a manner which reflects the intent of the petition") (citation and quotation marks omitted), aff'd, 737 F.3d 1338 (Fed. Cir. 2013); *Kern Liebers USA, Inc. v. United States*, 881 F. Supp. 618, 621 (CIT 1995) (*citing Minebea*, 782 F. Supp. at 120).

[206] *See* "Petition for the Imposition of Antidumping and Countervailing Duties on Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and Taiwan," dated December 31, 2013 ("Petitions on China and Taiwan").

[207] *See* the Petition at 3, 5-6, 21, 34, 37, and 53; Letter from  Petitioner, "Re: Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: Case Brief of Solar World Americas, Inc.," dated October 16, 2014 at 5-6; Letter from Petitioner to the Department, "Re: Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and Taiwan: Rebuttal to Respondents' Scope Comments" (Apr. 3, 2014) at 11-13.

[208] *See* the Petitions on China and Taiwan, Volume 1 at 3-4.

chain to avoid paying the AD and CVDs imposed by *Solar I*.[209] Further, there exist prior AD and CVD orders on related merchandise (i.e., solar cells and modules) from the PRC – *Solar I* – and following the initiation of the *Solar I* investigations and the imposition of those orders, there has been a shift in trade flows that has resulted in increased imports of non-subject modules produced in China.[210] Such imports – if they are dumped and/or unfairly subsidized and injurious – should not be beyond the reach of the AD and CVD laws.

The Department has also taken into account considerations regarding administrability, enforceability, and potential evasion. If these investigations result in an AD and/or CVD order, as relevant, the scope clarification adopted in this final determination will make the resulting order(s) substantially easier to administer and enforce (for both the Department and CBP), by helping to prevent significant and widespread evasion similar to the evasion that we have seen result from parties that exploit the substantial transformation analysis conducted in *Solar I*. As indicated in the Petition, although "imports of modules from China consisted largely of modules assembled with Chinese cells" from 2010 through early 2012, "{s}ince that time, imports of modules from China have consisted almost entirely of modules assembled in China from solar cells completed or partially manufactured in Taiwan or other countries (*i.e.*, cells manufactured in Taiwan from Taiwanese inputs, or cells manufactured in Taiwan or other countries from Chinese inputs, including wafers)."[211] The scope which was proposed in the Petition and on which we initiated investigations may result in the evasion of duties and, thus, ineffective relief to the Petitioner due to the complex and adaptable global supply chain that allows production processes for solar cells and modules to be easily moved across borders. With this scope clarification, it is the Department's intent to reduce as much as possible additional opportunities for evasion like those that resulted after the imposition of AD and CVD cash deposits in *Solar I*. The Department has a long-standing practice of taking potential circumvention concerns into consideration when defining the scope.[212] This practice has been upheld by the CIT and the CAFC.[213] Indeed, the Courts have recognized that the Department has "inherent power to

---

[209] *Id.* at 4-5.

[210] *Id.* at 3, 5-6, 21, 34, 37, and 53.

[211] *Id.* at 5-6; *see also Id.* at 21.

[212] *See, e.g., Notice of Final Determination of Sales at Less Than Fair Value: Large Newspaper Printing Presses and Components Thereof, Whether Assembled or Unassembled, From Germany,* 61 FR 38166, 38169 (July 23, 1996) ("We agree with the petitioner that incomplete merchandise by necessity must be included in the scope of these investigations. Given the very large size of {large newspaper printing presses and components thereof} and the complex importation process, complicated by the further manufacturing and/or installation activities performed in the United States by the respondents, it was the Department's intent to use the language at issue to avoid creating loopholes for circumvention, including those arising from differing degrees of completeness of the imported merchandise. The Department is concerned that, because of the great number of parts involved, there is the potential that a party may attempt to exclude its merchandise from the scope of these investigations on the basis of a lack of completion."); *Cellular Mobile Telephones and Subassemblies from Japan; Final Determination of Sales at Less Than Fair Value,* 50 FR 45447, 45448 (October 31, 1985) ("The determination to include subassemblies within the scope of the investigation was based on the need to prevent circumvention of any antidumping order on {cellular mobile telephones ("CMTs")} through the importation of major CMT subassemblies, and the Department's broader conclusion that the investigation properly should include subassemblies.").

[213] *See Mitsubishi Elec. Corp. v. United States,* 700 F. Supp. 538, 555 (CIT 1988) ("*Mitsubishi I*") ("{the Department} has a certain amount of discretion to expand the language of a petition to encompass the literal intent of the petition, ... with the purpose in mind of preventing the intentional evasion or circumvention of the

establish the parameters of the investigation so as to carry out its mandate to administer the law effectively and in accordance with its intent."[214]

Furthermore, certain interested parties commented that they did not track their merchandise in a way that would allow them to definitively report only that merchandise falling within the "two-out-of-three" scope proposed in the Petition.[215]  The scope being adopted in these investigations resolves interested parties' concerns in this respect, by covering *all* modules assembled in the PRC from third-country cells.  Under the scope being adopted for these final determinations, producers and exporters would not need to track for purposes of these proceedings the ingots, wafers, or partial cells that are being used in the third-country cells being assembled into modules in China.

Based on these considerations, and in order to evaluate whether there is unfair pricing and/or subsidization of modules assembled in the PRC using third-country cells, the Department finds it is appropriate to determine for purposes of these investigations that the country of origin of such modules is the PRC.

In determining the country-of-origin of a product, the Department's usual practice has been to conduct a substantial transformation analysis.[216]  Consistent with its practice, the Department considered in *Solar I* whether it should apply its substantial transformation analysis and found that "the application of its substantial transformation test {was} an appropriate means to resolve country-of-origin issues like the one presented *in {that} investigation* ...."[217]  Based on this analysis, the Department determined that the solar cell was the essential active component of the module, that assembly of cells into modules did not constitute substantial transformation such

---

antidumping duty law."), *aff'd*, 898 F.2d 1577 (Fed. Cir. 1990); *see also Tung Mung Dev. Co. v. United States*, 26 CIT 969, 979 (CIT 2002) (citing *Mitsubishi I,* 700 F. Supp. at 555), *aff'd*, 354 F.3d 1371 (Fed. Cir. 2004).

[214] *See Torrington*, 745 F. Supp. at 728; *see also Mitsubishi Elec. Co. v. United States*, 898 F.2d 1577, 1582 (Fed. Cir. 1990) ("*Mitsubishi II*") ("The determination of the applicable scope of an antidumping order that will be effective to remedy the dumping that the {Department} has found lies largely in the {Department's} discretion").

[215] A group of some of the largest Chinese solar product producers stated that it is virtually impossible for importers to know and to trace the origin of the ingots and wafers in cells that are assembled into modules when the module manufacturers purchase the cells from third parties in other countries, or to distinguish between the value of modules with cells that meet Petitioner's "two-out-of-three" test and those that do not.  *See* the February 18, 2014 Scope Comments Letter submitted by of Yingli Green Energy Holding Company Limited, Yingli Green Energy Americas, Inc., Canadian Solar Inc., Changzhou Trina Solar Energy Co., Ltd., Wuxi Suntech Power Co., Ltd., Shanghai JA Solar Technology Co., Ltd., Hefei JA Solar Technology, Co., Ltd., and Jinko Solar Co., Ltd.  Further demonstrating tis, the mandatory respondent Changzhou Trina Solar Energy Co., Ltd. and Trina Solar (Changzhou) Science & Technology Co., Ltd. ("Trina Solar") stated that it does not know what country produced the wafers contained in its purchases of solar cells.  *See* Trina Solar's April 22, 2014 response at Attachment A-1.  Included in December 15, 2014 Other Proceedings' Documents Memorandum at Attachment 2.  Similarly, Yingli Green Energy Holding Company and Yingli Green Energy Americas, Inc. and Canadian Solar Inc. noted that their respective company records do not specifically identify the origin of the wafers used to produce the cells Yingli purchased from non-Chinese suppliers.  *See* both companies' February 14, 2014 quantity and value responses. Included in December 15, 2014 Other Proceedings' Documents Memorandum at Attachment 3.

[216] *See, e.g.*, *Notice of Final Determination of Sales at Less Than Fair Value: Glycine from India*, 73 FR 16640 (March 28, 2008) and accompanying Issues and Decision Memorandum at Comment 5; *see also Stainless Steel Plate in Coils from Belgium: Final Results of Antidumping Duty Administrative Review*, 69 FR 74495 (December 14, 2004) and accompanying Issues and Decision Memorandum at Comment 4.

[217] *See* Solar I IDM at Comment 1, page 8 (emphasis added).

that the assembled module could be considered a product of the country of assembly, and consequently, that modules assembled in the PRC from solar cells produced in third countries are not covered by the scope of that investigation.[218]

Although the Department routinely has found a substantial transformation analysis to be an appropriate means to determine the country of origin of merchandise under investigation, in the circumstances presented by these investigations and discussed above, the Department has determined that it needs to conduct additional analysis. Thus, contrary to certain parties' arguments, our adoption of the scope described in the October 3rd Letter is not arbitrary. Rather, it addresses the specific and special circumstances of these proceedings, as described above. Relying on the substantial transformation analysis alone could result in failure to provide relief to the domestic industry for alleged injury caused by a finished product produced in the subject country but which would be deemed to originate from a third-country for AD/CVD purposes if the traditional substantial transformation analysis were applied. In these particular proceedings, a rote application of a substantial transformation analysis would not allow the Department to address unfair pricing decisions and/or unfair subsidization concerning the modules that is taking place in the country of export. Consistent with sections 701 and 731 of the Act, the Department must be able to address such circumstances, and where appropriate, address unfair pricing decisions or unfair subsidization that is taking place in the exporting country where further manufacturing, such as assembly, occurs, notwithstanding that such activities may not necessarily result in a substantial transformation of merchandise. While the Department intends that a substantial transformation analysis will continue to be the primary manner in which it will evaluate country of origin in AD/CVD proceedings, given the facts presented by these investigations (and in light of the *Solar I* orders already in place, under which country of origin was already based on a substantial transformation analysis), the Department finds that its additional analysis is appropriate. We do not agree that our analysis is inconsistent with *Solar I*. Rather, in these investigations we are building upon our decisions in *Solar I* and finding, given the circumstances before us, that it is appropriate to go beyond our decision concerning country of origin from *Solar I* to address merchandise exported from China that is not subject to the *Solar I* orders and that is alleged to injure the domestic industry through unfair pricing and/or subsidization.

With regard to respondents' assertion that the scope clarification results in a single product having two countries of origin, we disagree. No product would at any time have two countries of origin for AD/CVD purposes. The country of origin of these modules, for AD/CVD purposes, is only the PRC. If an AD and/or CVD order results from these investigations, these modules would be subject to AD and/or CVD duties under the relevant order and not another solar-related order (*i.e.*, not *Solar I* or an order covering solar products from Taiwan, should that investigation result in an AD order). We also disagree with the Petitioner's assertion that Taiwanese cells assembled into a module in the PRC would result in a module of Taiwanese origin. With the scope clarification we have adopted for the PRC investigation, the PRC is the country of origin of all modules, laminates and/or panels assembled in the PRC that contain crystalline silicon photovoltaic cells produced in a customs territory other than the PRC.

---

[218] *See* Solar I IDM at Comment 1, page 5-7.

**B.      Extent of the Scope Clarification**

*Respondents:*

- The scope as proposed in the October 3rd Letter is not a clarification, but an unlawful expansion and alteration of the scope.
  - o The scope as proposed in the October 3rd Letter eliminates entirely the "two out of three" principle incorporated into the scope of these investigations, adds to the scope solar modules made from solar cells from countries outside China and Taiwan, and thereby crafts a scope of the investigation that was never contemplated in the Petitions or in any other submission or determination before or after the initiation of these investigations.
  - o Petitioner has not requested the expanded scope proposed by the Department, and nothing in the Petition or in Petitioner's subsequent submissions to the Department or the U.S. International Trade Commission ("ITC") indicates otherwise.
  - o There are numerous CIT decisions demonstrating that a significant expansion and alteration of the scope as outlined in the October 3rd Letter goes far beyond what the CIT decisions have found permissible.[219]
  - o The Department stated in *Softwood Lumber from Canada* that while it has the authority to define or clarify the scope of an investigation and must exercise this authority in a manner which reflects the intent of the Petition, the Department generally should not use its authority to define the scope of an investigation in a manner that would thwart the statutory mandate to provide the relief requested in the Petition. As a result, absent an "overarching reason to modify the scope in the Petition, the Department accepts it."[220]

*Petitioner:*

- The Department's clarification of the scope at this final phase in the proceedings is fair and reasonable, and would not be unlawful.  The CIT has specifically stated that the Department has the discretion to clarify the scope, even in a way that "expand{s} the language of a petition," in the course of an AD/CVD investigation.[221]  This decision was upheld by the CAFC.[222]
- The respondents themselves cite *Allegheny Bradford*, in which the CIT held that "{t}here is no clear point during the course of an antidumping investigation at which {the Department} loses the ability to adjust the scope."[223]
- The scope as proposed in the October 3rd Letter is fully consistent with Petitioner's intent.

---

[219] *See Minebea*, 782 F. Supp. at 120; *see also Allegheny Bradford Corp. v. United States*, 342 F. Supp. 2d 1172 (CIT 2004); *Smith Corona Corp. v. United States*, 796 F. Supp. 1532 (CIT 1992).
[220] *Notice of Final Determination of Sales at Less Than Fair Value: Certain Softwood Lumber Products from Canada*, 67 FR 15539, 15542 (April 2, 2002) ("*Softwood Lumber from Canada*").
[221] *See Mitsubishi I*, 700 F. Supp. at 555.
[222] *See Mitsubishi II*, 898 F.2d at 1577.
[223] *See Allegheny Bradford*, 342 F. Supp. 2d at 1187.

      o  As demonstrated by its comments to *Solar I*, Petitioner's intent has always been to cover all cells from the PRC and all modules from the PRC.[224]  In fact, Petitioner filed the instant investigations specifically to close the loophole created as a result of the Department's scope determination in the first solar cases and to cover all cells and modules from the PRC, as well as address unfair trade practices in Taiwan that were exacerbated as a result of that scope determination.

- Moreover, in this case, the Department is even more justified than under other circumstances in adjusting the scope at this stage in these proceedings, as the Department has been very clear throughout these investigations that it is continuing to evaluate the scope, and that its country of origin determinations of related subject merchandise could change.[225]

**Department's Position:**  We disagree with respondents' contention that the proposed clarification of the scope in the October 3rd Letter, which we have adopted in these final determinations, does not reflect Petitioner's intent.  The record of this investigation demonstrates that Petitioner's intent would be reflected by a scope that covers all solar modules assembled in China using third-country cells.  Petitioner's stated motivation for filing its Petition is to close a "loophole" that resulted when producers subject to the *Solar I* investigations, following the Department's application of a substantial transformation analysis to fix the scope of that proceeding, increased imports of modules assembled in the PRC with non-PRC cells so as to avoid the reach of the *Solar I* orders.[226]  For instance, Petitioner stated that "imports of modules from China consisted largely of modules assembled with Chinese cells" from 2010 through early 2012, but that "{s}ince that time, imports of modules from China have consisted almost entirely of modules assembled in China from solar cells completed or partially manufactured in Taiwan or other countries (*i.e.*, cells manufactured in Taiwan from Taiwanese inputs, or cells manufactured in Taiwan or other countries from Chinese inputs, including wafers)."[227]  Petitioner also stated that "imports of Taiwanese {solar} cells and modules and Chinese modules assembled from non-Chinese cells continued to swamp the U.S. marketplace in the first nine months of 2013," despite the relief provided by the *Solar I* orders.[228]  Further, Petitioner contended that the Petition showed "that many Chinese solar producers ceased using Chinese-manufactured cells and began using third-country manufactured cells in their solar modules" as a result of the *Solar I* investigations.[229]  In addition, Petitioner cited reports confirming that "Chinese solar producers continue to use third-country cells, largely manufactured in Taiwan, to assemble into solar modules in China and export to the United States."[230]

The scope language of the Petition for these investigations is an expression of the Petitioner's intent, as noted above, to cover solar modules made in China using solar cells produced in third

---

[224] *See* Solar I IDM at Comment 1.
[225] *See, e.g., Certain Crystalline Silicon Photovoltaic Products from Taiwan: Affirmative Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination*, 79 FR 44395 (July 31, 2014) and accompanying Preliminary Decision Memorandum at 5.
[226] *See* the 2013 CVD Petition on China at 3, 21, and 53.
[227] *See* the December 31, 2013 AD and CVD Petitions on China and Taiwan, Volume 1, at 5-6; *see also id.* at 21.
[228] *Id.* at 34.
[229] *Id.* at 37.
[230] *Id.*

countries. However, as discussed in Comment 1.A., the Department is taking into considerations concern about potential evasion of AD and/or CVD measures, as relevant. The scope which was proposed in the Petition and on which we initiated the investigations, may itself result in the evasion of duties and, thus, ineffective relief to the Petitioner, due to the complex and very adaptable global supply chain that allows producers to modify their production chains easily and quickly. Specifically, producers could simply have sourced their wafers from a country other than the subject country in order to avoid the "two out of three" language in the second sentence of that scope. As a result, the Department explored whether modified scope language could more effectively implement Petitioner's intent while also mitigating evasion concerns and alleged complications in parties' ability to properly report subject merchandise to the Department in the context of its administrative proceeding and/or to CBP in connection with important, and ultimately proposed the clarification in its October 3rd Letter.

Furthermore, in the parallel Taiwan AD investigation, the respondent companies have reported to the Department that following the implementation of the orders in *Solar I*, numerous Chinese companies began to contract with Taiwanese cell producers to manufacture cells for the purpose of exporting those cells to China for use in the production of panels, modules and laminates, and then to export those panels, modules and laminates to the United States.[231] This series of transactions was allegedly implemented, at least for many transactions, to evade the order in *Solar I*, and there are emails and communications referenced in the Taiwan IDM which discuss this series of transactions and the reasoning behind those transactions.[232] These communications substantiate the concerns expressed by the Petitioners in the Petition that the orders in *Solar I* have not adequately addressed the issues of Chinese dumping and unfair subsidization of solar panels, modules and laminates, and that a scope which specifically includes that merchandise in this investigation is necessary to address such concerns.

Even had Petitioner not expressly intended to include all solar modules assembled in China using third-country cells, the Department has the authority to identify such products in the scope of these investigations anticipating such configurations and thus serving to place parties on notice regarding how the Department might treat Chinese modules made from third-country cells if subsequent scope questions arise.[233] In Comment 1.A above we discussed such reasons including, and beyond, Petitioner's intent. One focus of the Department's analysis related to

---

[231] *See* the Issues and Decision Memorandum accompanying the final determination of the Antidumping and Countervailing Duty Investigations of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and the Antidumping Duty Investigation of Certain Crystalline Silicon Photovoltaic Products from Taiwan at Comment 4.

[232] *Id.*

[233] *See Mid Continent Nail Corp. v. United States*, 725 F.3d 1295, 1300-1301, 1305-06 (Fed. Cir. 2013) (for the proposition that if the Department anticipates the need for addressing foreseeable areas of dispute, it should do so prior to the order so as to put parties on notice of what conduct will be regulated by the order and what factors will be considered in regulating that conduct). Although the Department cannot anticipate every possible permutation of solar products, as explained above, the Petition identified a shift in trade flows that resulted in increased imports of non-subject modules produced in China, and significant and widespread avoidance of the reach of *Solar I*. Based on this information, the Department finds that it is appropriate for the scope of the final determination to address all third country modules, not just those that fall within the "two out of three" scope language proposed by the Petitioner, because doing so will put parties on notice, provide greater certainty for those subject to the order, and preserves resources for all of the parties involved, including the Department.

potential evasion. Information on the record indicates that parties have been able to evade the reach of the *Solar* I orders. Thus, even while the investigations focused on merchandise covered by the "two out of three" language rather than "third country cells," the Department anticipated that evasion concerns would likely arise for the original proposed scope. Through its modification of the scope of these investigations, the Department has identified a way of attempting to prevent such scenarios.[234]

We also do not agree that this clarification is a significant and, thus, impermissible expansion of the scope. As an initial matter, we note that Department's "practice is to provide ample deference to the Petitioner with respect to the definition of the product for which it seeks relief under the AD and CVD laws."[235] The clarification also addresses concerns (expressed by respondent parties and shared by the Department) regarding the administrability of the "two out of three" scope language that was originally proposed. Further, applying the scope clarification proposed in the October 3, 2014, Letter results in no change to Trina Solar and Renesola/Jinko's reported database.[236] This clarification will not require the Department to collect any additional information from parties because necessary information is already on the record. At the same time, by more clearly expressing Petitioner's intent of covering solar modules assembled in China using third-country solar cells, the scope as proposed in the October 3rd Letter will more effectively cover the solar modules from which Petitioner has been seeking relief. Moreover, the scope clarification results in a scope that, should this investigation result in an order, will be more administrable than the scope that was originally proposed.

## C.    Timeliness of a Potential Scope Clarification

*Respondents:*
- Even if the Department had the authority to expand the scope, it cannot do so this late in the investigation because it would result in the Department's final determination not being based on substantial evidence, would prevent finalizing the record and issuing a final decision, and would deny parties due process.
  - Essentially, at this stage in the proceeding, the Department has already completed its investigation of the factual record and thus is unable to supplement the record with additional sales. Thus, an expansion of the scope at this time to include products not already covered would mean that the antidumping margins and subsidy rates calculated by the Department will be based on data that are not consistent with the sales that would be subject to the final expanded scope of these investigations.

---

[234] *Id.* at 725 F.3d 1295, 1305-06.
[235] *See Large Residential Washers From the Republic of Korea,* 77 FR 46391, 46392 (August 3, 2012) and accompanying Issues and Decision Memorandum at Comment 2. *See also Kern Liebers,* 881 F. Supp. at 621.
[236] The Chinese mandatory respondents reported all U.S. sales containing third-country solar cells. *See* Trina Solar's May 13, 2014 submission at 1. Included in December 15, 2014 Other Proceedings' Documents Memorandum at Attachment 4. Renesola Zhejiang Ltd.'s ("Renesola") April 24, 2014 submission at 25. Included in December 15, 2014 Other Proceedings' Documents Memorandum at Attachment 5; and Jinko Solar Co. Ltd. and Jinko Solar Import and Export Co., Ltd.'s ("Jinko") February 13, 2014 submission at 2. Included in December 15, 2014 Other Proceedings' Documents Memorandum at Attachment 6.

o The CIT has stated that the Department's "discretion to define and clarify the scope of an investigation is limited in part by concerns for the finality of administrative action, which caution against including a product that was understood to be excluded at the time the investigation began."[237] Thus, by including products that were not included in the Petition and were never the subject of the Department's investigation inquiries, the Department risks undermining the factual basis for its determination and raises concerns about the finality of its administrative actions.

o The CIT has noted that the Department's decision to change scope language at a late stage in a proceeding can undermine the entire investigatory process.[238]

o Reflecting these concerns, the Department denied a late request for scope clarification in the investigation of Coated Free Sheet from the PRC stating: "Moreover, we note that granting such a clarification would mean that a significant number of sales in the investigations would not be included in the margin calculations, raising a potential procedural safeguards concern."[239]

o The Department has even gone so far as to say that it lacks the ability to change the scope after a preliminary determination, in part, because "{a}mending the scope language . . . would, in effect, serve to expand the current scope of subject merchandise that was subject to th{e} investigation at too late a stage in this proceeding."[240]

o Because the scope change would occur at such a late stage in the proceeding, it denies due process for parties, especially parties that were not covered under the scope in effect during the *Preliminary Determination*. These Chinese companies and U.S. importers that are not presently part of the proceeding have no opportunity to participate in the hearing or "to be heard" and cannot participate meaningfully in this investigation because the factual record is closed.

  ▪ The CAFC held in *Transcom v. United States* that by not listing exporters in the initiation notice there was deficient notice to the affected parties. In that case, the CAFC stated that importers have the right to complain about procedural flaws in the administrative proceeding, including the Department's failure to provide adequate notice. The CAFC went on to state that the Department's determination had to be overturned because the importer and its Chinese exporters had no notice of a change in the Department's non-market economy practice and, therefore, no opportunity

---

[237] *See Allegheny Bradford*, 342 F. Supp. 2d at 1187-1188, citing *Mitsubishi Heavy Indus., Ltd. v. United States*, 986 F. Supp. 1428, 1433 (CIT 1997).

[238] *See Smith Corona*, 796 F. Supp. at 1535.

[239] *See Smith Corona*, 796 F. Supp. at 1535.

[240] *See Final Determination of Sale at Less Than Fair Value: Sodium Hexametaphosphate from the People's Republic of China*, 73 Fed. Reg. 6479 (Feb. 4, 2008) ("*Sodium Hexametaphosphate from the PRC*"), and accompanying Issues and Decision Memorandum at Comment 1; *see also Notice of Final Determination of Sales at Less Than Fair Value and Affirmative Final Determination of Critical Circumstances: Certain Orange Juice from Brazil*, 71 Fed. Reg. 2183 (Jan. 13, 2006) ("*Certain Orange Juice from Brazil*"), and accompanying Issues and Decision Memorandum at Comment 2.

to submit evidence to demonstrate the exporters' independence from the
state-controlled entity.[241]

*Petitioner:*

- The majority of modules being shipped from the PRC and Taiwan that would be subject
  to the scope under the Department's proposed scope clarification were also subject to the
  scope as it existed at the time data were collected from respondents and the *Preliminary
  Determination* was issued. Thus, the databases on which the Department will calculate
  final subsidy and dumping margins are largely consistent with the scope as stated in the
  Department's proposed scope clarification.
- The proposed scope clarification does not implicate due process concerns as the
  Department has made clear throughout these investigations that the scope of the
  investigations is subject to continuing evaluation, and that the country-of-origin
  determinations related to subject merchandise could change for the final determination.
  - o Specifically, in the initiation notice, the Department invited comments on the
    scope of these investigations, clearly indicating to the public that the scope was
    potentially subject to modification.[242]
  - o The Department again noted its ongoing evaluation of the scope in the
    *Preliminary Determination*, in which, after adopting Petitioner's proposed scope,
    the Department explained that it was continuing to analyze interested parties'
    scope comments, including comments on whether it is appropriate to apply a
    traditional substantial transformation or other analysis in determining the
    applicability of the investigation to certain solar modules described in the
    Petition.[243]
- Further, respondents have repeatedly claimed that it is nearly impossible for importers to
  know and to trace the origin of the ingots and wafers in cells that are assembled into
  modules when the module manufacturers purchase the cells from third parties in other
  countries. While Petitioner disputes this claim, if true, respondents and others would not
  have known for certain whether or not their products were subject to these investigations.
  Given this potential uncertainty, all exporters of potential subject merchandise should
  have filed quantity and value submissions and separate rate applications with the
  Department.
- Respondents' citations to *Allegheny Bradford* for support are inapposite to this
  investigation because as stated by the CIT, the issue in *Allegheny Bradford* was "whether
  Commerce may construe an antidumping order to cover products which bear a
  characteristic that cannot be reconciled with the language of the order."[244] These aspects

---

[241] *See Transcom, Inc. v. United States*, 182 F.3d 876, 880-84 (Fed. Cir. 1999).

[242] *See Solar Products Initiation Notice*, 79 FR at 4661.

[243] *See Preliminary Determination* and Accompanying Issues and Decision Memorandum ("China AD Prelim I&D
Memo") at 5; *Certain Crystalline Silicon Photovoltaic Products From Taiwan: Affirmative Preliminary
Determination of Sales at Less Than Fair Value and Postponement of Final Determination*, 79 FR 44395 (July 31,
2014) and accompanying Issues and Decision Memorandum ("Taiwan AD Prelim I&D Memo") at 5; *Certain
Crystalline Silicon Photovoltaic Products From the People's Republic of China: Preliminary Affirmative
Countervailing Duty Determination*, 79 FR 33174 (June 10, 2014) and accompanying Issues and Decision
Memorandum ("China CVD Prelim I&D Memo") at 4.

[244] *See Allegheny Bradford*, 342 F. Supp. 2d at 1188.

of *Allegheny Bradford* are, therefore, inapplicable to the current circumstances, in which Commerce is still formulating the final scope language, which will ultimately be included in any orders that are issued.

**Department's Position:** We disagree with respondents. As the CAFC explained, "the purpose of the petition is to propose an investigation," and the "purpose of the investigation is to determine what merchandise should be included in the final order."[245] Ultimately, therefore, it is the Department's responsibility to define the scope of the investigation and ensuing order.[246] The Department "retains broad discretion to define and clarify the scope of an antidumping investigation in a manner which reflects the intent of the petition"[247] and has the authority to modify or clarify the scope at any time. As the CAFC has recognized, the Department has "inherent power to establish the parameters of the investigation, so that it {is} not ... tied to an initial scope definition that . . . may not make sense in light of the information available to {the Department} or subsequently obtained in the investigation."[248] Similarly, the CIT has stated that the Department has a "certain amount of discretion to expand the language of a petition to encompass the literal intent of the petition, ... with the purpose in mind of preventing the intentional evasion or circumvention of the antidumping duty law."[249] As even respondents themselves recognize, "{t}here is no clear point during the course of an antidumping investigation at which {the Department} loses the ability to adjust the scope...."[250] Thus, the Department "may depart from the scope as proposed by a petition if it determines that petition to be overly broad, or insufficiently specific to allow proper investigation, or in any other way defective."[251]

Further, the scope modification adopted for the PRC AD and CVD final determinations has no impact on the data required from and submitted by the parties. As noted above, application of the scope clarification proposed in the October 3rd Letter will result in no change in the reported sales of the mandatory respondents. We further note that no interested parties have provided specific arguments about what changes would occur in the mandatory respondents' U.S. sales databases if the Department modified the scope as proposed in the October 3rd Letter.

Further mitigating the impact of applying the proposed scope clarification is the fact that most, if not all, parties reported in their Quantity and Value questionnaires all solar modules containing solar cells from third countries because they claim that they did not know the source of the wafer contained in the solar cells they purchased from third countries.[252] While respondents have

---

[245] *See Duferco*, 296 F.3d at 1096-97.
[246] *Id.* at 1097; *accord Mitsubishi II*, 898 F.2d at 1582; *see also King Supply Co. v. United States*, 674 F.3d 1343, 1345, 1348 (Fed. Cir. 2012).
[247] *See Minebea*, 782 F. Supp. at 120.
[248] *See Duferco*, 296 F.3d at 1089 (citation and quotation marks omitted); *see also Save Domestic Oil, Inc. v. United States*, 240 F. Supp. 2d 1342, 1351 (CIT 2002).
[249] *See Mitsubishi I*, 700 F. Supp. at 555.
[250] *See Allegheny Bradford*, 342 F. Supp. 2d at, 1187.
[251] *Ad Hoc Shrimp Trade Action Comm. v. United States*, 637 F. Supp. 2d 1166, 1175 (CIT 2009) (citation and quotation marks omitted); *see also Allegheny Bradford*, 342 F. Supp. 2d at 1188.
[252] *See, e.g.*, the February 13, 2014 quantity and value submission by Jinko, the February 14, 2014 quantity and value responses of Yingli Green Energy Holding Company and Yingli Green Energy Americas, Inc., and Canadian

stated that there *may* be U.S. imports that were not covered by the scope of the *Preliminary Determination* that would be covered by the proposed scope clarification, they have not identified any such shipments.

The Department also disagrees with the respondents' claim that a scope clarification at this point in the investigation would deny due process to parties. The Department has made clear throughout these investigations that the scope of the investigations is subject to continuing evaluation, and that the country of origin determinations related to the subject merchandise could change for the final determination. Specifically, in the initiation notice, the Department invited comments on the scope of these investigations and numerous parties submitted comments.[253] The Department again noted in the *Preliminary Determination* that it was continuing to analyze interested parties' scope comments.[254] The very circumstances of these investigations, filed in response to the *Solar I* orders, and in which the Department explicitly stated that the *Solar II* investigations excluded merchandise covered by the *Solar I* orders, placed parties on notice that imports of solar products from China beyond those covered by the *Solar I* orders were potentially subject to the investigation. Thus, we find that our notifications that we were considering changes to the scope provided parties with adequate due process with regard to this scope clarification. In fact, the only citation by interested parties to an actual change to the *Preliminary Determination* that would result from a clarification of the scope as proposed in the October 3rd Letter concerns a situation where a party did in fact heed the Department's notice that product coverage was being reconsidered. One separate rate applicant, tenKsolar, reported to the Department that it had no shipments subject to the scope as stated in the *Preliminary Determination*[255] but, as a precautionary measure, it filed a separate rate application in the China investigation, which, as we note below, we have granted for this final determination.[256] The reaction of tenKsolar indicates that our notice of potential scope did, in fact, provide parties with adequate notification and due process. We also note that exporters of subject merchandise may still apply for review of their sales in the first administrative review should these investigations result in the imposition of an AD and/or CVD order, as relevant.

We note that respondents' reliance on *Sodium Hexametaphosphate from the PRC* and *Certain Orange Juice from Brazil* is misplaced. In both of these cases, the Department declined to modify the scope of the investigation because the modification requested by Petitioners was not a mere clarification, but rather would have been an expansion of the scope, and thus should have been proposed as an amendment to the petition prior to the initiation of the investigation.[257] In

---

Solar Inc. and April 22, 2014 response by Trina Solar at Attachment A-1 (Included in December 15, 2014 Other Proceedings' Documents Memorandum at Attachment 7).

[253] *See* Pre-Prelim Scope Comments.

[254] *See China AD Prelim I&D Memo* at 5; *Taiwan AD Prelim I&D Memo* at 5; *China CVD Prelim I&D Memo* at 4.

[255] *See* tenKsolar's February 12, 2014 quantity and value submission at Attachment I to the China investigation, where it reported no EP or CEP sales, but noted that it sold solar modules to the United States during the POI that it assembled with solar cells fabricated in Taiwan from Taiwan-origin wafers (Included in December 15, 2014 Other Proceedings' Documents Memorandum at Attachment 8).

[256] *See* tenKsolar's March 31, 2014 submission (Included in December 15, 2014 Other Proceedings' Documents Memorandum at Attachment 10).

[257] *See Sodium Hexametaphosphate from the PRC* at Comment 1; *see also Certain Orange Juice from Brazil*, at Comment 2.

contrast, the Petitioner in this case did not request the clarification proposed in the October 3rd Letter. Instead, the Department proposed the clarification, in response to and taking account of interested parties' comments on the scope of these investigations. Further, we find that the modification adopted for the purpose of the final determination in the PRC AD and CVD investigations is not an expansion of the scope because the Petition expresses the Petitioner's intent to cover modules assembled in China using third-country solar cells. As noted above, the Petitioner stated its intent to include all of these modules in the scope in its Petition to this investigation, citing the "loophole" that resulted when, following the Department's substantial transformation analysis in the *Solar I* investigations, producers subject to the *Solar I* investigations increased imports of modules assembled in the PRC with non-PRC cells with the result of avoiding the reach of the *Solar I* AD and CVD orders.[258] Petitioner also stated that since early 2012 "imports of modules from China have consisted almost entirely of modules assembled in China from solar cells completed or partially manufactured in Taiwan *or other countries* ...."[259]

Similarly, the respondents' reliance on *Transcom* is also misplaced. In *Transcom*, the CAFC held that the Department did not provide sufficient notice to an importer that the antidumping duties on its exporters' products could be affected by an administrative review because the exporters were not named in the initiation notice and the Department had not announced a change in its non-market economy practice at the time it initiated the review.[260] However, *Transcom* is distinguishable from the instant case because it involved an administrative review, not an antidumping investigation, and a change in practice without notice rather than a modification or clarification to the scope of an investigation. Further, the Court explained that the statutory and regulatory notice provisions only require that "any reasonably informed party should be able to determine, from the published notice of initiation read in light of announced Department policy, whether particular entries in which it has an interest may be affected by the administrative review."[261] Here, the Department met its obligation to notify possible interested parties repeatedly and throughout the investigations, as explained above.

## D.    Impact of a Scope Clarification on the ITC's Final Determination

*Respondents:*
- A substantial change in scope such as the one contained in the October 3rd Letter would undermine the ITC injury determination.
  - The ITC this late in the proceeding cannot send questionnaires to U.S. solar module producers, foreign producers of solar modules and U.S. importers of solar modules containing third-country solar cells. Thus, the ITC's injury determination will not cover the new products in question, which means that any

---

[258] *See* the December 31, 2013 AD and CVD Petitions on China and Taiwan, Volume 1, at 3, 5-6, 21, 34, 37, and 53; Solar World Case Brief at 5-6; Letter from Petitioner to the Department, "Re: Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and Taiwan: Rebuttal to Respondents' Scope Comments" (Apr. 3, 2014) at 11-13.

[259] *See* the December 31, 2013 AD and CVD Petitions on China and Taiwan, Volume 1, at 5-6 (emphasis added); *see also id.* at 21.

[260] *Transcom*, 185 F.3d at 881-883.

[261] *Id.* at 882-883.

antidumping and countervailing duty orders issued will be for products which the ITC has not determined injure the U.S. industry.

*Petitioner:*
- The majority of modules being shipped from the PRC and Taiwan that would be subject to the scope under the Department's proposed scope clarification, were also subject to the scope as it existed at the time data was collected from respondents and the *Preliminary Determination* was issued. Thus, the data bases on which the ITC will calculate final subsidy and dumping margins would likely be consistent with the data that would be included under the scope as stated in the Department's proposed scope clarification.
- While the ITC never has perfect import coverage in its investigations, the data the ITC will collect in the final phase of the investigation will be largely consistent with the scope as stated in the proposed scope clarification.

**Department's Position:**  While respondents make arguments about the potential implications of the Department's scope clarification on the investigation underway at the ITC, the Department cannot speculate about what potential effect, if any, the Department's scope decision in these investigations may have on the ITC's investigation.  With respect to the Department's China AD and CVD investigations, as we noted above, the scope clarification proposed in the October 3rd Letter and adopted for purposes of this final determination will result in no change to the reported sales of the mandatory respondents.

### E.    Consistency of Scope as Clarified in the October 3rd Letter with the United States' WTO Obligations

*Respondents:*
- The World Trade Organization ("WTO") Agreement on Rules of Origin imposes an obligation on Members to ensure that "rules of origin shall not in themselves create restrictive, distortive, or disruptive effects on international trade" and "shall not discriminate between other Members."[262]  The scope clarification proposed in the October 3rd Letter, if adopted, would have precisely such a distortive and discriminatory effect on trade between WTO Members because it would subject imports of modules made with any third-country cells to AD/CVD duties calculated for Chinese or Taiwanese products.
- The scope clarification proposed in the October 3rd Letter treats a module assembled in the PRC using cells produced in Taiwan as a Chinese origin product subject to the current PRC investigations, while it treats a solar module assembled in Malaysia using cells produced in Taiwan as a Taiwanese-origin product subject to the current Taiwan investigation.  Thus, the solar module originating in China containing Taiwanese cells would be deprived of the advantage of market economy treatment provided to the like module originating in Malaysia containing Taiwanese cells.  Therefore, it violates the

---

[262] *See* Articles 1.2, 2(c), and 2(d) of the WTO Agreement on Rules of Origin.

United States' obligations under GATT to provide parties to GATT with most-favored nation treatment.[263]

*Petitioner:*

- Any "distortion" in international trade is the result of the unfair trade practices being engaged in by Chinese and Taiwanese solar manufacturers that these investigations are attempting to redress.

- The scope clarification also does not discriminate between the United States' treatment of imports from the PRC and Taiwan on the one hand, and imports from other WTO Members on the other hand, by bringing additional products from the PRC and Taiwan within the scope of any eventual AD/CVD orders that would otherwise not fall within that scope. Any solar cells and/or modules that fall within the scope clarification will be subject to equal treatment. And, contrary to respondent assertions, it would not subject "any third country cells" to AD/CVD duties; rather, it would subject imports of modules from the PRC and Taiwan – which have been determined to be dumped and subsidized – to lawfully calculated duties.

- Under the scope clarification proposed in the October 3rd Letter, the Non Market Economy ("NME") methodology would, appropriately, only be applied to cells originating in the PRC, as well as modules assembled in the PRC. Contrary to respondents' claims, cells and modules originating in the PRC, an NME country, are not entitled to ME treatment. On the other hand, given Taiwan's status as an ME country, cells originating in Taiwan (other than those destined for module-assembly in the PRC), as well as modules, laminates, and/or panels assembled in Taiwan, would appropriately be subject to duties calculated based on an ME methodology.

**Department's Position:** We disagree with respondents' claim regarding obligations under the WTO Agreement on Rules of Origin. The Department's determination here is consistent with U.S. law, which in turn is consistent with U.S. WTO obligations.

We also disagree that any orders will unfairly impact the trade of solar modules made with any third-country cells. As noted by Petitioner, the scope proposed in the October 3rd Letter and adopted in the final determinations would not subject third-country cells to AD/CVD duties. Instead, the scope covers imports of modules that the Department has determined to have a country of origin of the PRC for purposes of these investigations – and in the event of AD and CVD orders, provides a remedy for the unfair pricing practices involving, and subsidization of, such merchandise by imposing AD and CVD duties. Thus, any alleged distortions or disruptive effects on international trade are the result of the unfair trade practices being engaged in by

---

[263] Respondents cite to Article I of GATT 1994, which requires that: "with respect to customs duties and charges of any kind imposed on or in connection with importation or exportation ... , and with respect to all rules and formalities in connection with importation and exportation, ... any advantage, favour, privilege or immunity granted by any Member to any product originating in or destined for any other country shall be accorded immediately and unconditionally to the like product originating in or destined for the territories of all other Members." Respondents claim that subjecting solar cells from market economies to NME treatment because they are included in Chinese solar modules violates this GATT article.

parties involved in the sale and manufacture of such products, not the result of the Department providing redress for these unfair trade practices.

We also disagree that the scope adopted in the PRC investigations unfairly subjects third-country solar cells assembled into solar modules in China to our NME methodology for calculating dumping margins. As explained above, the Department has determined that modules assembled in China using third-country solar cells, including Taiwanese solar cells, have a country of origin of China. This determination is consistent with the Petitioner's intent. In the Petition, Petitioner alleged that the unfair pricing of modules assembled in China is causing injury to the domestic industry. Although Petitioner also alleged that the unfair pricing of solar cells manufactured in Taiwan is causing injury to the domestic industry, the Petition indicates that Petitioner intended for injury resulting from the unfair pricing of a panel assembled in China to take precedence over the injury resulting from the unfair pricing of a Taiwanese solar cell. Therefore, we find that it is appropriate to focus on the alleged injurious unfair pricing and subsidization of these modules that are assembled in China, and, accordingly, that it is appropriate to apply the NME methodology in determining whether such panels are dumped. In contrast, panels assembled in Malaysia using Taiwanese cells involve no production of either cells or modules in an NME country. Moreover, the fact that there happens to be, in this instance, a concurrent investigation involving solar products from Taiwan has no relevance to what the appropriate methodology is for examining dumping of panels that are assembled in China in the separate investigation of modules from China. It would be appropriate to apply the NME methodology to modules assembled in China in this investigation even if there were no concurrent Taiwan investigation.

## F.    Administrability Concerns

*Respondents:*
- The scope as proposed in the October 3rd Letter cannot be administered or applied due to the numerous contradictions and overlaps with the PRC and Taiwan investigations and also with the *Solar I* order.
  - For the same solar module,
    - At times the country of origin would be based on substantial transformation, or where the solar cell is manufactured, such as in *Solar I* and partially in the ongoing investigation on Taiwan, but
    - At other times the country of origin would be determined by where the solar module assembly took place, such as in the ongoing investigation of the PRC and partially in the ongoing investigation of Taiwan.

*Petitioner:*
- While the country of origin analyses from the *Solar I* investigation and that proposed by the scope clarification may differ, they are not necessarily inconsistent, nor unclear.
- The proposed scope clarification specifically exempts products subject to the existing solar AD/CVD orders from these investigations.
- The country of origin rules in the proposed scope clarifications (providing a supplemental country of origin rule for those products not covered by the initial solar investigations) prevent any product from at any time having two countries of origin.

**Department's Position:**  We disagree with respondents and find the scope as clarified in the October 3rd Letter to be administrable.  As noted by respondents, the country of origin criteria in *Solar I*, applicable to solar modules, differ from these investigations.  However, we determine that the scope of *Solar I* is very clear as it states that the country of origin of a solar module is determined by where the solar cell was produced.[264]  Not only is the scope and country of origin determination of *Solar I* clear, but the scope adopted in the final determinations of the current investigations emphasize that they do not alter, revise, or overlap the scope of *Solar I*.  Specifically, the scopes of the current China and Taiwan investigations each state that "excluded from the scope of this investigation are any products covered by the existing antidumping and countervailing duty orders on {*Solar I*}."[265]  Further, any possible overlaps between the current China and Taiwan investigations are eliminated by the scope language stating that solar cells assembled in China using solar cells manufactured in Taiwan are subject to the current China investigation and not the Taiwan investigation.[266]  Thus, we have eliminated any overlap of solar products subject to any of these investigations and those subject to *Solar I*.

Meanwhile, the modifications to the scope language of the *Preliminary Determination* proposed in the October 3rd Letter and adopted in these determinations result in single change:  that the country of origin of a solar module assembled in the PRC is the PRC.  We find this country of origin language likewise clear and easily applied.  Thus, while the country of origin criteria of *Solar I* and the country of origin analysis stated in the proposed clarification in the October 3rd Letter may differ, with the latter building upon the former, we find the approaches to be complementary and that identifying the proceeding to which a given solar module may be subject, based on these analyses, will be straightforward.  Further, any potential overlap in coverage that may have arisen due to the different country of origin criteria have been eliminated by the modified language provided in the October 3rd proposed clarification and adopted in the final determinations.

## G.      Treatment of U.S. Solar Cells Assembled into Solar Modules in China and Taiwan

*Respondents:*
- The Department must include a scope exemption for solar products assembled from cells of U.S. origin.  The Department has already determined that the country of origin of a solar panel is the country in which the solar cell was produced.  U.S. law prohibits application of AD/CVD duties to U.S. origin goods.

Petitioner did not comment on this issue.

**Department's Position**:  We disagree with respondents.  As noted above, contrary to respondents' assertions, we have only applied AD and CVD measures to products determined to

---

[264] *See, e.g.*, *Solar I* where the scope explicitly states that it covers "Modules, laminates, and panels produced in a third-country from cells produced in the PRC are covered by this investigation; however, modules, laminates, and panels produced in the PRC from cells produced in a third-country are not covered by this investigation."  Further, *Solar I* included certifications in Appendix II, which require exporters and imports of solar modules "to substantiate the claim that the panels/modules do not contain solar cells produced in the People's Republic of China."
[265] *See* the Attachment to the October 3rd Letter.
[266] *See* the Attachment to the October 3rd Letter.

have a country of origin of China.  We have not applied such measures to products determined to have a country of origin of the United States.

## H.    Comments Concerning the Scope of the Preliminary Determination

Parties have submitted comments concerning the scope of the investigation as defined in the *Preliminary Determination*.  Because we have clarified the scope consistent with the October 3rd Letter, we have not addressed comments that were only relevant to the scope of the investigation as defined in the *Preliminary Determination* and not relevant to the scope of this final determination.

### Comment 2: Whether the Department Should Investigate the Effects of the GOC's Alleged Cyberhacking on this Investigation

*Petitioner's Comments:*
- The U.S. Department of Justice charged members of the People's Liberation Army (the military of the PRC) with cyber espionage against U.S. corporations for commercial advantage.  SolarWorld was among the U.S. corporations that were targeted.
- As the information allegedly stolen includes information related to SolarWorld's financial status, manufacturing metrics, and privileged attorney-client communications regarding trade litigation, the Department should investigate how this alleged cyberhacking may have affected the AD and CVD investigations.

*Wuxi Suntech's Rebuttal Comments:*
- Petitioner's allegations of cyberhacking by the GOC are not a proper subject to be addressed by U.S. AD and CVD laws.  The allegations do not refer to any of the legal elements of a subsidy.
- Any investigation of Petitioner's allegations should be addressed outside the confines of this investigation.

**Department's Position:**  As the agency charged with administering the antidumping and countervailing duty laws, the Department has the inherent authority to protect the integrity of its proceedings.  For example, the Court of Appeals for the Federal Circuit has recognized the Department's authority to ensure that our proceedings are not undermined by fraud.[267]  Similarly, the law apportions responsibility for justice across the spectrum of administrative agencies, each according to its legislative mandate.  For example, "it is Customs, not Commerce, that is charged with responsibility for enforcement of the laws prohibiting material false statements and omissions in customs entry documentation" under 19 U.S.C. § 1592.[268]

---

[267] *See, e.g., Tokyo Kikai Seisakusho, Ltd. v. United States*, 529 F.3d 1352, 1360-62 (Fed. Cir. 2008).

[268] *Mid Continent Nail Corp. v. United States*, 949 F. Supp. 2d 1247, 1283 (Ct. Int'l Trade 2013)("As such, even assuming that violations such as those alleged by {petitioner} may have occurred, the investigation of any such potential violations would fall squarely within Customs' domain.  Commerce here thus acted properly in referring to Customs the issue of whether certain companies may have acted negligently or fraudulently . . . .").

**PUBLIC DOCUMENT**

| Tab No. | Document | Pages | Record Document |
|---|---|---|---|
| 3 | Petition for the Imposition of Antidumping and Countervailing Duties, *Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and Taiwan*, vol. I (Dec. 31, 2013) | 1-11 | AD PR Doc. 1-10 |



December 31, 2013

1776 K STREET NW
WASHINGTON, DC 20006
PHONE   202.719.7000
FAX   202.719.7049

7925 JONES BRANCH DRIVE
McLEAN, VA 22102
PHONE   703.905.2800
FAX   703.905.2820

www.wileyrein.com

DOC Case Nos. A-570-010, C-570-011, and A-583-853
USITC Inv. Nos. 701-TA- __ and 731-TA-___ - ___
Total Pages: 3244
Investigation
Business Proprietary Information has been removed from the pages and exhibits identified in this cover letter.
**PUBLIC VERSION**

**BY HAND DELIVERY**

The Honorable Penny S. Pritzker
Secretary of Commerce
Attention: Import Administration
APO/Dockets Unit, Room 1870
U.S. Department of Commerce
14th Street and Constitution Avenue, N.W.
Washington, D.C. 20230

The Honorable Lisa R. Barton
Acting Secretary
U.S. International Trade Commission
500 E Street, S.W., Room 112
Washington, D.C.  20436

Re:   Petition for the Imposition of Antidumping and Countervailing Duties: *Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and Taiwan*

Dear Secretary Pritzker and Acting Secretary Barton:

We file the enclosed petitions on behalf of SolarWorld Industries America, Inc. ("Petitioner"), pursuant to Sections 701 and 731 of the Tariff Act of 1930 with respect to unfairly traded imports of certain crystalline silicon photovoltaic products from the People's Republic of China and Taiwan (hereinafter "c-SiPV Cells and Modules").

13363507.1



Hon. Penny S. Pritzker
Hon. Lisa R. Barton
December 31, 2013
Page 2

We request that certain information contained in the text and exhibits of this petition be protected as business proprietary information pursuant to 19 C.F.R. § 201.6(b) and 19 C.F.R. § 351.304(a)(1)(i) (2013). The release of the information for which we seek proprietary treatment would cause substantial harm to the competitive position of Petitioner and its information sources, and would impair the ability of the Department of Commerce and the International Trade Commission to obtain the information necessary to perform their statutory functions.

Specifically, Petitioner requests business proprietary treatment for the information enclosed in square brackets ("[]") on the pages and in the exhibits indicated as follows:

(1) *Business or trade secrets concerning the nature of a product or production process, production data, costs of production, consumption rates, trade secrets, information regarding domestic producers' proprietary manufacturing processes, including the types of raw materials used and their quantities, and distribution costs* (19 C.F.R. § 351.105(c)(1) – (3)): contained in Volume I: pages 9, 35, 44-47, 49, 64-65 and Exhibit I-22; Volume II: pages 18-19, 22-24, 30 and Exhibits II-16, II-19, II-20, and II-25. Petitioner requests proprietary treatment of this data because it is proprietary business information, the disclosure of which would cause substantial harm to the competitive interests of Petitioner.

(2) *Data on the terms of individual sales or offers for sale, including sales dates, sales prices, product characteristics, destinations, payment terms, names of particular customers, distributors, or suppliers, and other sale-related business secrets* (19 C.F.R. §§ 351.105(c)(4) – (5)): contained in Volume I: pages 40, 42, and Exhibits I-5, I-19 and I-20; Volume II: The Table of Contents, pages 2, 4-5, 9-11, 13, and 30, and Exhibits II-2, II-5, II-8, II-11, and II-25; Volume IV: The Table of Contents, pages 2-4, 7-8, 10-13, and Exhibits IV-2, IV-3, IV-5, IV-11, IV-14, IV-16, and IV-17. This request also covers the same data used in the calculations of the ex-factory export prices, ex-factory normal values, and dumping margins. Petitioner requests proprietary treatment for this data because it would disclose the identity of the sources of information to persons knowledgeable in the industry producing the subject merchandise. Disclosure of the identity of these sources would compromise their ability to obtain such information in the future and subject them to commercial retaliation. As a result, disclosure of the information would cause substantial harm to the competitive interests of Petitioner and to its sources.

13363507.1



Hon. Penny S. Pritzker
Hon. Lisa R. Barton
December 31, 2013
Page 3

(3)     *The identities of Petitioner's customers, including the identities of customers from whom Petitioner lost sales or revenues because of unfair import competition, and information tending to identify those customers or their locations* (19 C.F.R. § 351.105(c)(6) (2011)), contained in Volume I: 38, 40-42 and Exhibitis I-1, I-15, I-16, I-19-I-21; Volume II: page 10 and Exhibits II-2 and II-8; Volume IV: page 7 and Exhibits IV-2 and IV-5. Petitioner requests proprietary treatment for this data because it is proprietary business information, the disclosure of which would cause substantial harm to Petitioner. In certain cases, we bracketed publicly available information because this information would tend to reveal customer identities, the disclosure of which could subject them to commercial retaliation.

(4)     *Names of individuals or organizations that provided price, cost, and other production, freight, sales or market information, information which would tend to identify those individuals or organizations, and other information that would cause harm to the providers' and/or submitter's competitive position* (19 C.F.R. § 351.105(c)(9) (2011)), contained in Volume I: page 38 and Exhibit I-19; Volume II: pages 1, 3-5, 18, 22-23, the Exhibit List, and Exhibits II-1, II-2, II-4, and II-16; Volume III: pages 38-40, the Exhibit List, and Exhibits III-55 and III-57-66; and Volume IV: page 1 the Exhibit List, and Exhibits IV-1, IV-2, and IV-14. Petitioner requests proprietary treatment for this data because its disclosure would cause harm to the sources' ability to perform their jobs, would compromise their ability to obtain such information in the future, and would subject them to commercial retaliation. In addition, disclosure of the sources of sales data would tend to disclose customer identities. Therefore, this information is proprietary business information, the disclosure of which would cause substantial harm to Petitioner.

(5) *Any other specific business information the release of which to the public would cause substantial harm to the competitive position of the submitter* (19 C.F.R. § 351.105(c)(11) (2011)), contained in Volume I: pages 2, 9, 23, 41, 44 and Exhibits I-1, I-5, and I-18. Volume II: pages 4, 11, 13, 18-19, 22-23, the Exhibit List, and Exhibits II-1, II-4, II-8, II-16, II-20, and II-25; Volume III: Volume III: pages 38-40, the Exhibit List, and Exhibits III-55 and III-57-66; and Volume IV: pages 7, 11-12, the Exhibit List, and Exhibits IV-1, IV-3, IV-5, IV-10, IV-14, IV-16, and IV-17. This data includes information obtained from proprietary subscription sources, as well as other data the public disclosure which would harm the commercial position of the submitters and would interfere with the Department of Commerce's and the



Hon. Penny S. Pritzker
Hon. Lisa R. Barton
December 31, 2013
Page 4

International Trade Commission's ability to obtain similar information in future investigations.

Pursuant to 19 C.F.R. § 351.304(c)(1) (2011), we have ranged sufficient numerical data in the public version of the petition to provide a reasonable understanding of the contents of that information. We have ranged data regarding prices. However, we have not ranged data regarding costs or adjustments; this data is not susceptible to ranging because the disclosure even of ranged data would reveal or permit the discovery of confidential information and would therefore cause harm to Petitioner. Where a number is too small to permit effective ranging, we have so indicated by the use of asterisks.

If you have any questions regarding these matters, please do not hesitate to contact the undersigned.

Respectfully submitted,

Timothy C. Brightbill, Esq.

**WILEY REIN LLP**
1776 K Street, N.W.
Washington, D.C. 20006
(202) 719-7000

*Counsel to SolarWorld Industries America Inc.*

13363507.1

## ATTORNEY CERTIFICATION

***Certain Crystalline Silicon Photovoltaic Products from China and Taiwan***
Inv. Nos. 701-TA-___-____ and 731-TA-_____-____ (Preliminary)

In accordance with section 207.3(a) of the Commission's rules (19 C.F.R. § 207.3(a)), I, Timothy C. Brightbill, of Wiley Rein LLP, counsel to SolarWorld Industries America, Inc., certify that under penalty of perjury under the laws of the United States of America and pursuant to the Commission's regulations:

(1)   I have read the foregoing submission in the above referenced case;

(2)   to the best of my knowledge and belief, the information contained therein is accurate and complete; and

(3)   in accordance with section 201.6(b)(3)(iii) of the Commission's rules (19 C.F.R. 206.6(b)(3)(iii), that information substantially identical to that for which we request confidential treatment is not available to the general public and the public disclosure of such information would cause substantial harm to the persons, firms, and other entities from which the information was obtained.

_____
Timothy C. Brightbill

DISTRICT OF COLUMBIA: SS
Sworn and subscribed to before me
this December 31, 2013.

_____
Notary Public

My commission expires: 6/30/18



13682181.1

# REPRESENTATIVE CERTIFICATION

I, Timothy C. Brightbill, with Wiley Rein LLP, counsel to SolarWorld Industries America, Inc., certify that I have read the attached submission of Petitions for the Imposition of Antidumping and Countervailing Duties, filed on December 31, 2013, pursuant to {the antidumping duty investigations of *certain crystalline silicon photovoltaic products from the People's Republic of China* (A-570-010) *and Taiwan* (A-583-853), and the countervailing duty investigation of *certain crystalline silicon photovoltaic products from the People's Republic of China* (C-570-011)}. In my capacity as {COUNSEL} of this submission, I certify that the information contained in this submission is accurate and complete to the best of my knowledge. I am aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: _____

Timothy C. Brightbill, Esq.

Date: December 31, 2013

13682575.1

## COMPANY CERTIFICATION

I, Ben Santarris, Strategic Affairs Director, currently employed by SolarWorld Industries America, Inc., certify that I prepared or otherwise supervised the preparation of the attached submission of Petitions for the Imposition of Antidumping and Countervailing Duties, filed on December 31, 2013, pursuant to {the antidumping duty investigations of *certain crystalline silicon photovoltaic products from the People's Republic of China* (A-570-**010**) *and Taiwan* (A-583-**853**), and the countervailing duty investigation of *certain crystalline silicon photovoltaic products from the People's Republic of China* (C-570-**011**)}. I certify that the public information and any business proprietary information of SolarWorld Industries America, Inc. contained in this submission is accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: _Ben Smith_

(name)

Date: _12/29/13_

DOC Investigation Nos. A-570-010,
A-583-853, and C-570-011
Total Pages: 596
Investigation
Petitioner's Business Proprietary
Information has been removed from the
Table of Contents, pages 2, 9, 23, 35, 38,
40-42, 44-47, 49, 64-65, Exhibit List, and
Exhibits I-1, I-5, I-15, I-16, and I-18-I-22.
**PUBLIC VERSION**

BEFORE THE
**INTERNATIONAL TRADE ADMINISTRATION**
**UNITED STATES DEPARTMENT OF COMMERCE**
**AND THE**
**UNITED STATES INTERNATIONAL TRADE COMMISSION**

---

**CERTAIN CRYSTALLINE SILICON PHOTOVOLTAIC PRODUCTS**
**FROM THE PEOPLE'S REPUBLIC OF CHINA AND TAIWAN**

---

PETITION FOR THE IMPOSITION
**OF ANTIDUMPING AND COUNTERVAILING DUTIES PURSUANT TO**
**SECTIONS 701 AND 731 OF THE TARIFF ACT OF 1930, AS AMENDED**

**VOLUME I**

**COMMON ISSUES AND INJURY**

Timothy C. Brightbill, Esq.

**WILEY REIN LLP**
1776 K Street, N.W.
Washington, D.C. 20006
(202) 719-7000

*Counsel to SolarWorld Industries*
*America, Inc.*

December 31, 2013

Table of Contents

Page

I.  COMMON ISSUES.................................................................................8

    A.  The Name and Address of the Petitioner (19 C.F.R. § 351.202(b)(1)) .............8

    B.  Identity of the Industry on Whose Behalf the Petition Is Filed (19 C.F.R. § 207.11(b)(2)(ii); 19 C.F.R. § 351.202(b)(2)) .........................................8

    C.  Information Relating to the Degree of Industry Support for the Petitions (19 C.F.R. § 351.202(b)(3)).................................................8

    D.  Previous Requests for Import Relief for the Merchandise (19 C.F.R. § 351.202(b)(4)) ................................................................................10

    E.  Scope of the Investigation and a Detailed Description of the Subject Merchandise (19 C.F.R. § 351.202(b)(5)).......................................10

        1.  Scope of Investigation ..............................................................10

        2.  Technical Characteristics and Uses ............................................11

        3.  Production Methodology ..........................................................13

        4.  Tariff Classification ................................................................17

    F.  The Name of the Home Market Country and the Name of Any Intermediate Country Through Which the Merchandise Is Transshipped (19 C.F.R.       § 351.202(b)(6)) ................................17

    G.  The Names and Addresses of Each Person Believed to Sell the Merchandise at Less Than Normal Value and the Proportion of Total Exports to the United States (19 C.F.R. § 351.202 (b)(7)(i)(A)).....................18

    H.  All Factual Information Related to the Calculation of Export Price and the Constructed Export Price of the Subject Merchandise and the Normal Value of the Foreign Like Product for Non-Market Economy Countries (19 C.F.R. § 351.202(b)(7)(i)(B) and (C)).............................18

    I.  The Names and Addresses of Each Person Believed to Benefit from a Countervailable Subsidy Who Exports the Subject Merchandise to the United States and the Proportion of Total Exports to the United States (19 C.F.R. § 351.202 (b)(7)(ii)(A)) ........................................19

    J.  The Alleged Countervailable Subsidies and Factual Information Relevant to the Alleged Countervailable Subsidies (19 C.F.R. § 351.202 (b)(7)(ii)(B)) ................................................................20

    K.  The Volume and Value of the Merchandise Imported During the Most Recent Three-Year Period (19 C.F.R. § 351.202(b)(8))..................20

Table of Contents
(continued)

Business Proprietary Information
Has Been Deleted

Page

L.      The Names and Addresses of Each Entity the Petitioner Believes
        Imports or Is Likely to Import the Merchandise (19 C.F.R. §
        207.11(b)(2)(iii); 19 C.F.R. § 351.202(b)(9)) ..................................................23

II.     DOMESTIC LIKE PRODUCT AND DOMESTIC INDUSTRY.....................................23

        A.     Domestic Like Product .................................................................................23

               1.     Physical Characteristics and Uses ..........................................25

               2.     Interchangeability ..................................................................26

               3.     Channels of Distribution.........................................................27

               4.     Customer and Producer Perceptions.........................................28

               5.     Common Manufacturing Facilities, Production Processes, and Employees28

               6.     Price ........................................................................................29

        B.     Conclusion ....................................................................................................30

        C.     Domestic Industry.........................................................................................30

               1.     Related Parties .......................................................................30

III.    THE DOMESTIC INDUSTRY PRODUCING THE DOMESTIC LIKE
        PRODUCT IS MATERIALLY INJURED BY REASON OF UNFAIRLY
        TRADED IMPORTS FROM CHINA AND TAIWAN .................................................33

        A.     The Volume and Market Share of Subject Imports Increased During
               the Period.......................................................................................................36

        B.     Unfairly Traded Subject Imports Have Had Significant Negative
               Price Effects on the Domestic Industry .......................................................39

        C.     Unfairly Traded Subject Imports Have Had an Injurious Impact on
               the Domestic Industry ..................................................................................44

               1.     [                              ] Demonstrate the Injurious Impact of the
                      Substantial Volumes of Unfairly Traded Subject Imports ........................45

               2.     Numerous U.S. Producers Have Shuttered U.S. Production, Reduced
                      Workforces, and/or Declared Bankruptcy ..............................................46

               3.     The Domestic Producers that Remain Have Not Been Able to Effectively
                      Utilize Their Existing Capacity ..............................................................49

IV.     THE DOMESTIC INDUSTRY IS THREATENED WITH MATERIAL INJURY
        BY REASON OF UNFAIRLY TRADED SUBJECT IMPORTS .................................49

Table of Contents
(continued)

Page

A.   All Issues Relevant to the Commission's Threat of Material Injury
Analysis Should Be Considered in Light of the Current Weakness in
the Global Economy ......................................................................53

B.   China Encourages Exportation of Subject Merchandise Through
Countervailable Subsidies.............................................................56

C.   Subject Producers Have Significant Volumes of New and Unused
Capacity, Which Indicate the Likelihood of Substantially Increased
Imports..........................................................................................58

D.   The Volume and Market Penetration of Subject Imports Have
Increased, Indicating the Likelihood of Substantially Increased
Imports..........................................................................................63

E.   Subject Imports are Entering at Prices that are Likely to Have a
Significant Depressing or Suppressing Effect on Domestic Prices, and
are Likely to Increase Demand for Further Imports ......................64

F.   Inventories of the Subject Merchandise Threaten the Domestic
Industry with Additional Material Injury.......................................64

G.   Subject Imports Are Hindering the Existing Development and
Production Efforts of the Domestic Industry .................................65

H.   Other Demonstrable Adverse Trends Indicate the Probability that
There is Likely to Be Material Injury by Reason of Subject Imports ...........65

V.   CONCLUSION..............................................................................67

PUBLIC VERSION

**BEFORE THE**
**UNITED STATES DEPARTMENT OF COMMERCE**
**AND THE**
**UNITED STATES INTERNATIONAL TRADE COMMISSION**
**WASHINGTON, D.C.**

**PETITION FOR THE IMPOSITION**
**OF ANTIDUMPING AND COUNTERVAILING DUTIES ON**
**CERTAIN CRYSTALLINE SILICON PHOTOVOLTAIC PRODUCTS**
**FROM THE PEOPLE'S REPUBLIC OF CHINA AND TAIWAN**

These Petitions are presented on behalf of SolarWorld Industries America Inc. ("SolarWorld" or "Petitioner") and are supported by the Coalition for American Solar Manufacturing.[1]  Petitioner alleges that crystalline silicon photovoltaic ("c-Si PV")[2] products[3] imported from the People's Republic of China and Taiwan are being or are likely to be sold at less than normal value within the meaning of section 731 of the Tariff Act of 1930, *as amended*, 19 U.S.C. § 1673 (hereinafter "the Act" or "the Tariff Act").  Petitioner further alleges that Chinese producers and exporters of c-Si PV products imported into the United States have benefited from subsidies that are countervailable within the meaning of section 701 of the Act, *as amended*, 19 U.S.C. § 1671.  Finally, Petitioner alleges that these unfairly traded imports are a cause of material injury to the United States domestic industry producing c-Si PV products and threaten to cause further material injury if remedial action is not taken.  These Petitions contain information reasonably available to Petitioner in support of these allegations and are filed in conformity with 19 C.F.R. § 351.202 and 19 C.F.R. § 207.11.

---

[1]     The Coalition for American Solar Manufacturing consists of approximately 240 companies, including U.S. solar manufacturers, installers and distributors.  *See* http://www.americansolarmanufacturing.org/members/.

[2]     U.S. producers of thin-film solar products are not part of the domestic c-Si PV industry on whose behalf these Petitions are being filed.

[3]     The terms "module" and "panel" are used interchangeably herein.  For purposes of this Petition, both terms refer to multiple c-Si PV cells strung together.

PUBLIC VERSION

Business Proprietary Information
Has Been Deleted

As described in detail below, from 2010 through the third quarter of 2013 (the period of investigation or "POI"), the Chinese and Taiwanese c-Si PV industries have made a deliberate and concerted effort to push large and growing volumes of subject imports into the U.S. market using dumped and subsidized pricing, causing material injury to the domestic industry.  In the initial part of the POI, the Chinese solar industry was responsible for the massive volumes of c-Si PV products that entered into the United States and injured the U.S. solar industry.  As stated by various industry members and commentators:

- "Suntech, to build market share, is selling solar panels on the American market for less than the cost of the materials, assembly and shipping."[4] – Shi Zhengron, chief executive and founder of Suntech Power Holdings, a Chinese manufacturer of c-Si PV cells and panels that, at times during the POI, was the world's largest producer.

- "The Chinese strategy is very clear. They are engaging in predatory financing and they're trying to drive everybody else out of the market. When you've got free money you can out-dump everybody below cost. . . . If something isn't done, no one will be making solar PV in the U.S."[5] – Bryan Ashley, former chief marketing officer for Suniva Inc.

- "When it comes to . . . solar panels, the differential in labor costs is relatively small, but if we don't get busy – if {China} continue{s} to give free land, subsidies and rig their currency – we're going to lose all production of solar panels in this country, the prediction is, within five years."[6] – Rep. Sander Levin.

- Recognizing the perilous situation facing the U.S. solar industry, Senate Finance trade subcommittee Chairman Ron Wyden urged the U.S. Government to take

---

[4]     Keith Bradsher, *China Racing Ahead of U.S. in the Drive to Go Solar*, The N.Y. Times (Aug. 25, 2009), attached at **Exhibit I-1A**.  This article sparked a firestorm of press articles in which Dr. Shi claimed that he had misunderstood the newspaper's question, despite having been asked about the issue twice in the original interview. *See* Keith Bradsher, *Chinese Solar Firm Revises Price Remark*, The N.Y. Times (Aug. 27, 2009), attached at **Exhibit I-1B**.

[5]     Stephen Lacey, *How China Dominates Solar Power: Huge Loans from the Chinese Development Bank are Helping Chinese Solar Companies Push American Solar Firms Out of the Market*, The Guardian (Sept. 12, 2011), attached at **Exhibit I-1C**.

[6]     [ *Article* ], attached at **Exhibit I-1D**.

PUBLIC VERSION

"aggressive action" to counter China's unfair trade practices, including self-initiating a trade remedy case against Chinese subject imports.[7]

These unfair trade practices culminated in AD/CVD cases against c-Si PV cells, whether or not assembled into modules, from China,[8] and a unanimous affirmative material injury determination by the International Trade Commission ("the Commission").[9]   Accordingly, in March and May 2012, preliminary AD and CVD duties, respectively, were imposed on Chinese c-Si PV cells, whether or not assembled into modules,[10] and in December 2012, AD/CVD orders were issued and final duties were imposed, at margins ranging from 30 to 250 percent.[11]

However, even before preliminary duties were imposed on Chinese c-Si PV cells, Chinese and Taiwanese solar producers changed their production models slightly in order to exploit a loophole in the scope of the AD/CVD orders, evade the duties, and continue pushing dumped and subsidized product into the U.S. market.   Despite the domestic industry's repeated requests, the Department of Commerce's ("the Department") final AD/CVD determinations

---

[7]     *Id.*

[8]     *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China,* 76 Fed. Reg. 70,960 (Dep't Commerce Nov. 16, 2011) (initiation of antidumping duty investigation); *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China,* 76 Fed. Reg. 70,966 (Dep't Commerce Nov. 16, 2011) (initiation of countervailing duty investigation).

[9]     *Crystalline Silicon Photovoltaic Cells and Modules from the People's Republic of China,* Inv. Nos. 701-TA-481 and 731-TA-1190 (Final) USITC Pub. 4360 at 6-12 (Dec. 2012) ("USITC Pub. 4360").

[10]     *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China,* 77 Fed. Reg. 17,439 (Dep't Commerce Mar. 26, 2012) (prelim. affirmative countervailing duty deter.); *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China,* 77 Fed. Reg. 31,309 (Dep't Commerce May 25, 2012) (prelim. deter. of sales at less than fair value, postponement of final deter. and affirmative prelim. deter. of critical circumstances).

[11]     *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China,* 77 Fed. Reg. 73,017 (Dep't Commerce Dec. 7, 2012) (countervailing duty order); *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China,* 77 Fed. Reg. 73,018 (Dep't Commerce Dec. 7, 2012) (amended final deter. of sales at less than fair value, and antidumping duty order).

PUBLIC VERSION

failed to cover Chinese solar modules assembled from non-Chinese solar cells,[12] allowing

Chinese solar producers to begin using cells fully or partially manufactured in Taiwan in the

modules they assembled for export to the United States, and to export those modules, duty-free,

to the U.S. market.  As a result, Chinese producers have been using – or claiming to use –

Taiwanese and other non-Chinese cells in their module production, even prior to the imposition

of preliminary duties in March and May 2012, as they themselves have explained:

- In November 2011, the president of Grape Solar, a large U.S. importer of Chinese modules, "said that Chinese manufacturers wanted to keep wafer production in China, but were making plans to ship wafers to Taiwan or South Korea for conversion into solar cells, as one way to potentially avoid any new tariffs the United States Commerce Department might decide to impose."[13]

- In a 2011 earnings conference call, a JA Solar Holding Co., Ltd. executive stated the company's intent to try to avoid any future order that would be issued: "{t}o be prudent, I think we need to have a solution, a *work-around* solution," he said.  He noted that the company has strategic partners it has worked with in the past that can provide products.[14]

- The Chief Commercial Officer of Trina Solar Limited stated in the company's fourth quarter 2011 earnings conference call: "{g}oing forward… we're looking at alternatives that wouldn't be subject to those duties."[15]  In May 2012, *Recharge* reported that "in the future, {Trina} will outsource cells from Canada or Taiwan to work around the tariffs."[16] In June 2012, the President of Trina Solar Europe stated that "the modules that we're shipping now to the U.S. have solar cells that are made from outside of China and so in that sense we're not so affected by {the tariffs}."[17]

---

[12]      Petitioner has challenged this determination at the U.S. Court of International Trade, and the appeal is pending.

[13]      Keith Bradsher, *China Bends to U.S. Complaint on Solar Panels but Plans Retaliation*, The N.Y. Times (Nov. 21, 2011), attached at **Exhibit I-1E.**

[14]      Erin Coe, *US Duties May Spur Chinese Solar Cos. To Move Operations*, Law 360 (Nov. 23, 2011), attached at **Exhibit I-1F** (emphasis added).

[15]      *Trina Solar's CEO Discusses Q4 2011 Results - Earnings Call Transcript*, Seeking Alpha (Feb. 23, 2012), attached at **Exhibit I-1G.**

[16]      Dominique Patton, *Trina Solar takes $26m against US duties as it posts Q1 loss*, Recharge (May 23, 2012), attached at **Exhibit I-1H.**

[17]      Jonathan Gifford, *Trina Solar: EU trade case major setback for PV*, pv magazine (June 8, 2012), attached at **Exhibit I-1I.**

PUBLIC VERSION

- Chinese producer Suntech took similar measures to avoid the duties.  In May 2012, an analyst stated that "Suntech will experience *no further impact*" from the case, because "{it is} sourcing all cells outside of China going forward for all {its} U.S. shipments, so {it has} no exposure to tariffs."[18]

- "Canadian Solar, which makes most of its panels in China, has been buying solar cells from Taiwan for years as part of its supply chain strategy, said Chief Financial Officer Michael Potter.  Now all U.S.-bound modules would be made with these slightly more expensive Taiwanese cells to avoid the tariff."[19]

As a result, the remedy afforded by the first AD/CVD cases was substantially weakened, allowing increasing volumes of subject product to continue shipping large quantities of dumped and subsidized product into the U.S. market during the period (defined herein as 2010 – September 2013).

Even with the imposition of antidumping and countervailing duties on Chinese cells in 2012, imports of c-Si PV cells and modules[20] from China rose from a value of $1.2 billion in 2010 to $1.7 billion in 2012, and increased by 24 percent in September 2013, as compared to September 2012.[21]  As described above, from 2010 through early 2012, imports of modules from China consisted largely of modules assembled with Chinese cells.  Since that time, imports of modules from China have consisted almost entirely of modules assembled in China from solar cells completed or partially manufactured in Taiwan or other countries (*i.e.*, cells manufactured

---

[18]      *Trina, Suntech see higher margins despite import duties*, Reuters (May 23, 2012), attached at **Exhibit I-J** (emphasis added).

[19]      Braden Reddall, *Analysis: U.S. solar tariffs not slowing slide in panel prices*, Reuters (July 18, 2012), attached at **Exhibit I-1K**.

[20]      Subject imports include both imports of cells (HTSUS 8541.40.6030) and cells assembled into modules or panels (HTSUS 8541.40.6020).  These are the primary HTSUS subheadings covering c-Si PV cells, modules, and panels.  While subject modules or panels may be imported under HTSUS subheadings 8501.61.00.00 and 8507.20.80, the vast majority of subject imports over the period entered under HTSUS subheadings 8541.40.6020 and 8541.40.6030.  Accordingly, references to import volumes throughout this Petition include combined data from these two HTSUS subheadings.

[21]      *See* Import Data, attached at **Exhibit I-4**.

PUBLIC VERSION

in Taiwan from Taiwanese inputs, or cells manufactured in Taiwan or other countries from Chinese inputs, including wafers).

Imports of c-Si PV cells and modules from Taiwan increased 85 percent, by value, from $277 million in 2010 to $424 million in 2012.[22] Taiwanese cell and module imports continued to increase this year, by 29 percent, from $328 million in January-September 2012 to more than $371 million in the same period in 2013.[23] And Taiwanese imports continue to rise – in September 2013 alone, imports of cells and modules from Taiwan were up 157 percent, as compared to September 2012.[24]

Despite steadily declining prices, overall U.S. imports of solar cells and modules from China and Taiwan are still massive – rising from a value of $1.5 billion in 2010 to $2.1 billion in 2012.[25] Recently, subject imports have continued to rise, with subject imports of cells and modules in September 2013 totaling $211.6 million, compared to $140.7 million in September 2012.[26]

Subject imports, which were pushed into the market through unfair pricing, far outpaced the growth in U.S. demand over the period. Subject producers and exporters used dumped prices to force volume into the U.S. market and gain market share. As a result, prices for subject merchandise caused prices in the entire market to collapse – a collapse that has continued throughout the POI. At a time when it should have been benefitting from healthy demand, the domestic industry suffered from significant and growing operating losses. Due to the collapse in

---

[22]   *Id.*

[23]   *Id.*

[24]   *Id.*

[25]   *Id.*

[26]   *Id.*

PUBLIC VERSION

pricing caused by subject imports, numerous producers have declared bankruptcy and/or shut down U.S. operations, and hundreds of workers have been laid off. There is no doubt that subject imports caused and are causing material injury to the domestic industry.

Domestic producers and workers also are threatened with additional material injury if the unfair pricing practices of subject imports are not restrained by antidumping ("AD") and countervailing duty ("CVD") orders. With U.S. prices and profitability plummeting, several U.S. producers have already shuttered U.S. facilities, and as the rate of demand growth in the United States is expected to slow, the domestic industry is vulnerable to further material injury. In the absence of relief, the future of the domestic c-Si PV industry will be in peril. Subject producers have enormous and growing c-Si PV capacity, are export-oriented, and have demonstrated that they can and will rapidly ship huge volumes of dumped and subsidized product into the U.S. market, irrespective of actual demand. Indeed, the sheer size of Chinese and Taiwanese capacity compels subject producers and exporters to export virtually all of their production at dumped and subsidized prices. With trade remedies now in place against Chinese exports in the European Union ("EU") and EU demand peaking,[27] subject producers and exporters are poised to continue to increase shipments of dumped and subsidized product to the United States. Given the growing vulnerability of the U.S. industry, the industry's very existence will be in peril if AD and CVD orders are not imposed.

Separate volumes regarding the allegations of dumping by Chinese and Taiwanese producers and exporters, and countervailable subsidies provided to Chinese producers and exporters, are being filed simultaneously at both the U.S. Department of Commerce (the

---

[27]    Jonathan Stearns, *EU Nations Approve Pact With China on Solar-Panel Imports*, Bloomberg (Dec. 2, 2013), attached at **Exhibit I-1L**.

PUBLIC VERSION

"Department") and the U.S. International Trade Commission (the "Commission" or the "ITC"). Petitioner requests that antidumping and countervailing duties be imposed to offset the dumping and subsidy margins detailed in the specific AD and CVD volumes.

## I.   COMMON ISSUES

This section contains information required in AD and CVD petitions by 19 C.F.R. §§ 351.202(b)(1)-(9) and 19 C.F.R. § 207.11.

### A.   The Name and Address of the Petitioner (19 C.F.R. § 351.202(b)(1))

Petitioner is a company that produces the domestic like product in the United States. Accordingly, Petitioner is a domestic interested party within the meaning of 19 U.S.C. § 1677(9) and 19 C.F.R. § 351.102(b).  Petitioner's address and telephone number are provided in **Exhibit I-2**.

### B.   Identity of the Industry on Whose Behalf the Petition Is Filed (19 C.F.R. § 207.11(b)(2)(ii); 19 C.F.R. § 351.202(b)(2))

These Petitions are filed on behalf of the United States industry that produces certain c-Si PV products.  In addition to information relating to the Petitioner, the names, addresses, and telephone numbers of all other domestic producers in the United States during the POI are provided in **Exhibit I-3**.  According to the best information available to Petitioner, **Exhibits I-2** and **I-3** identify all known producers of the domestic like product in the United States.

### C.   Information Relating to the Degree of Industry Support for the Petitions (19 C.F.R. § 351.202(b)(3))

According to 19 U.S.C. §§1671a(c)(4)(A) and 1673a(c)(4)(A), a petition is filed by or on behalf of the domestic industry if: (1) petitioning domestic producers account for at least 25 percent of the total production of the domestic like product, and (2) domestic producers who support the petition account for more than 50 percent of the production of the domestic like

PUBLIC VERSION
Business Proprietary Information
Has Been Deleted

product produced by that portion of the industry expressing support for or opposition to the petition.

The Petitions meet both of these requirements. Based on production data for the entire U.S. industry published by the Solar Energy Industries Association ("SEIA")/GTM Research, a leading source for the solar industry and Petitioner's detailed knowledge of U.S. c-Si PV cell and module capacity and production, SolarWorld alone represented approximately [   ] percent of 2012 U.S. c-Si PV module production.[28]  [  *Narrative*

], produced [   ] MW of c-Si PV modules in the United States in 2012, bringing the percentage of production of those producers that support the petition to [*70*] percent.

With regard to c-Si PV cells, Petitioner SolarWorld again accounts for a majority of 2012 U.S. production. The Commission identified two U.S. producers of c-Si PV cells in 2012: SolarWorld and Suniva.[29] SolarWorld produced [   ] MW of c-Si PV cells in 2012, while Suniva's entire U.S. manufacturing capacity in 2012 totaled 170 MW.[30] Thus, even assuming, conservatively, that Suniva's entire manufacturing capacity constituted cell production capacity, and that Suniva produced at full capacity in 2012 (an unlikely scenario), SolarWorld would still account for [   ] percent of U.S. c-Si PV cell production in 2012 – a clear majority.

Therefore, domestic producers who support the Petitions account for at least 25 percent of the total production of the domestic like product and more than 50 percent of the production of the domestic like product produced by that portion of the industry expressing support for or

---

[28]   According to SEIA/GTM Research's 2012 Solar Market Insight Report, a total of [*309*] MW of modules were produced in the United States in 2012. Solar Energy Industries Association, *U.S. Solar Market Insight: 2012 Year in Review* (2012) at 74, excerpts attached at **Exhibit I-5**. SolarWorld's produced [   ] MW of modules in the United States in 2012, thus accounting for [   ] percent of total U.S. production.

[29]   *See* USITC Pub. 4360 at VI-1.

[30]   Suniva, *Company Overview* (2012) at 2, excerpt attached at **Exhibit I-6**.

PUBLIC VERSION

opposition to the Petitions.  This is consistent with the 2011 findings of the Department in the initial AD/CVD solar cases regarding industry support.[31]

**D.** **Previous Requests for Import Relief for the Merchandise (19 C.F.R. § 351.202(b)(4))**

Petitioner has previously filed for relief from imports of a portion of the products that constitute subject merchandise in this case under Section 701 and Section 731 of the Act.  As discussed above, in October 2011, Petitioner filed petitions for the imposition of antidumping and countervailing duties on imports of c-Si PV cells, whether or not assembled into modules, from the People's Republic of China.  After affirmative preliminary and final determinations by the Department of sales at less than fair value and countervailable subsidies, and affirmative preliminary and final injury determinations by the Commission, AD/CVD orders were imposed in December 2012.[32]  (As noted below, the scope of this investigation specifically excludes merchandise already covered by these orders.)

Petitioner has not sought relief from subject imports under either Section 337 of the Act, Section 201 or Section 301 of the Trade Act of 1974, or under Section 232 of the Trade Expansion Act of 1962.

**E.** **Scope of the Investigation and a Detailed Description of the Subject Merchandise (19 C.F.R. § 351.202(b)(5))**

**1.** **Scope of Investigation**

The scope of this proceeding is defined as follows:

---

[31] *See* Import Administration, Office of AD/CVD Operations, Countervailing Duty Investigation Initiation Checklist, re: *Certain Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China* (Nov. 8, 2011) at Attachment II, excerpt attached at **Exhibit I-7.**

[32] *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China,* 77 Fed. Reg. at 73,017; *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China,* 77 Fed. Reg. at 73,018.

PUBLIC VERSION

The merchandise covered by this investigation is crystalline silicon photovoltaic cells, and modules, laminates and/or panels consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including building integrated materials. For purposes of this investigation, subject merchandise also includes modules, laminates and/or panels consisting of crystalline silicon photovoltaic cells completed or partially manufactured within a customs territory other than that subject country, using ingots, wafers, or partially manufactured cells sourced from the subject country.

Subject merchandise includes crystalline silicon photovoltaic cells of thickness equal to or greater than 20 micrometers, having a p/n junction formed by any means, whether or not the cell has undergone other processing, including, but not limited to, cleaning, etching, coating, and/or addition of materials (including, but not limited to, metallization and conductor patterns) to collect and forward the electricity that is generated by the cell.

Excluded from the scope of this investigation are thin film photovoltaic products produced from amorphous silicon (a-Si), cadmium telluride (CdTe), or copper indium gallium selenide (CIGS). Also excluded from the scope of this investigation are any products covered by the existing antidumping and countervailing duty orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the People's Republic of China – case numbers A-570-979 and C-570-980.

Merchandise covered by this investigation is currently classified in the Harmonized Tariff Schedule of the United States ("HTSUS") under subheadings 8501.61.0000, 8507.20.80, 8541.40.6020 and 8541.40.6030. These HTSUS subheadings are provided for convenience and customs purposes; the written description of the scope of this investigation is dispositive.

## 2. Technical Characteristics and Uses

C-Si PV cells, which are made from crystalline silicon, are the building blocks of solar photovoltaic power-generation systems. C-Si PV cells are produced from ultra-refined polysilicon. C-Si PV cells convert the energy of sunlight directly into electricity, by the photovoltaic effect. Specifically, c-Si PV cells have a positive-negative junction ("p/n junction"), which is an interface of a p-type semiconductor and an n-type semiconductor that is usually formed by dopant additions to create an intrinsic or extrinsic charge state.[33] The p/n

---

[33] The p/n junction can be formed by several means, including, but not limited to, dopant diffusion (*i.e.*, the process of using a concentration gradient of one species along with temperature and/or energy to insert those species into another); ion implantation (*i.e.*, the process of using a potential field to accelerate charged species, colliding

**PUBLIC DOCUMENT**

| Tab No. | Document | Pages | Record Document |
|---|---|---|---|
| 4 | Letter from Howard Smith, Program Manager, to Wiley Rein LLP, re: *Petitions for the Imposition of Antidumping Duties on Imports of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and Taiwan and Countervailing Duties on Imports of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: Supplemental Questions* (Jan. 6, 2014) | All | AD PR Doc. 17 |

Barcode:3172506-01 A-570-010 INV - Investigation -



**UNITED STATES DEPARTMENT OF COMMERCE**
International Trade Administration
Washington, D.C. 20230

A-570-010, A-583-853,
C-570-011
Investigations
~~Business Proprietary Document~~
PCAU: WAS
Public Version

January 6, 2014

Timothy C. Brightbill
Wiley Rein LLP
1776 K Street, NW
Washington, DC 20006

Re: Petitions for the Imposition of Antidumping Duties on Imports of Certain Crystalline Silicon
Photovoltaic Products from the People's Republic of China and Taiwan and Countervailing
Duties on Imports of Certain Crystalline Silicon Photovoltaic Products from the People's
Republic of China: Supplemental Questions

Dear Mr. Brightbill:

This letter concerns your December 31, 2013, petitions (Petitions) filed with the Department of
Commerce (Department) on behalf of your client, SolarWorld Industries America Inc., for the imposition
of antidumping duties on imports of certain crystalline silicon photovoltaic products (certain solar cells
and panels) from the People's Republic of China and Taiwan and countervailing duties on imports of
certain solar cells and panels from the People's Republic of China. We have reviewed the Petitions and
have identified certain issues that require clarification, as specified in the attachment to this letter.

Your response to these questions is due to the Department no later than **close of business (5:00 pm),
January 8, 2014.**

We remind you that with certain, limited exceptions, all submissions for all proceedings must be filed
electronically using Enforcement and Compliance's (formerly, Import Administration) Antidumping and
Countervailing Duty Centralized Electronic Service System (IA ACCESS). An electronically filed
document must be received successfully in its entirety by the Department's electronic records system, IA
ACCESS, by the time and date noted above. Documents excepted from the electronic submission
requirements must be filed manually (i.e., in paper form) with the APO/Dockets Unit in Room 1870 and
stamped with the date and time of receipt by the deadline noted above. For your convenience, the
Department has the following resources available online to assist you in complying with these electronic
filing procedures:

IA ACCESS: Help Link
https://iaaccess.trade.gov/help.aspx

IA ACCESS: External User Guide
https://iaaccess.trade.gov/help/IA%20ACCESS%20User%20Guide.pdf



IA ACCESS: Handbook on Electronic Filing Procedures
https://iaaccess.trade.gov/help/Handbook%20on%20Electronic%20Filling%20Procedures.pdf

Federal Register notice: Antidumping and Countervailing Duty Proceedings: Electronic Filing
Procedures; Administrative Protective Order Procedures, 76 FR 39263 (July 6, 2011)
http://www.gpo.gov/fdsys/pkg/FR-2011-07-06/pdf/2011-16352.pdf

We will place a copy of your business proprietary response and a copy of the corresponding public
version on the official record for each case. We will also place a copy of the public version in our public
file for each case, which is open to the general public.

Please note that the Department issued a final rule with respect to certification requirements, effective
August 16, 2013. Parties are hereby reminded that revised certification requirements are in effect for
company/government officials as well as their representatives. All segments of any antidumping duty or
countervailing duty proceedings initiated on or after August 16, 2013, should use the formats for the
revised certifications provided at the end of the Final Rule. See Certification of Factual Information To
Import Administration During Antidumping and Countervailing Duty Proceedings, 78 FR 42678 (July 17,
2013) (Final Rule); see also the frequently asked questions regarding the Final Rule, available at the
following: http://ia.ita.doc.gov/tlei/notices/factual_info_final_rule_FAQ_07172013.pdf. The Department
intends to reject factual submissions if the submitting party does not comply with applicable revised
certification requirements.

All submissions of business proprietary information that do not contain a statement permitting their
release under an Administrative Protective Order (APO), as required by section 777(b)(1)(B)(ii) of the
Tariff Act of 1930, as amended, 19 CFR 351.304(b)(1) and 19 CFR 351.303(d)(2)(v) will be rejected at
the time of filing. Please place this statement in the upper right-hand corner of your cover letter. If you
object to the release of certain information under APO, you must state in full your reasons for objecting.

Please note that, in accordance with 19 CFR 351.303(c)(1), which was recently amended, the one-day lag
rule does not apply to pre-initiation submissions, including amendments to the Petitions.

If you have any questions, please contact Vicki Flynn at (202) 482-1756 or Whitney Schablik at (202)
482-2539.

Sincerely,

for Howard Smith
Program Manager
AD/CVD Operations, Office IV
Enforcement and Compliance (formerly Import Administration)

Attachment

2

**Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China ("PRC") and Taiwan**

General Issues Questionnaire

In your response, please replicate each question and then provide your answer. All questions refer to your December 31, 2013, Petitions.

General

1. Please provide the cover page and relevant pages of the International Trade Commission (ITC) reports cited in footnote 9 (on page 3), footnote 29 (on page 9), footnotes 56-59 (on page 24), footnotes 61-75 (on pages 25-29), footnote 77 (on page 30), footnote 90 (on page 33), footnote 112 (on page 39), and footnotes 132 and 133 (on page 43) of Volume I of the Petitions.

Scope

2. In the second sentence of your proposed scope you state "{f}or purposes of this investigation, subject merchandise also includes modules, laminates and/or panels consisting of crystalline silicon photovoltaic cells completed or partially manufactured within a customs territory other than the subject country, using ingots, wafers, or partially manufactured cells sourced from the subject country." Please respond to the following with respect to this sentence:

   a. Currently, there is ambiguity in your proposed scope as to the amount or extent of production that must take place in the subject country for modules, laminates and/or panels ("solar panels") consisting of crystalline silicon photovoltaic cells ("solar cells") completed or partially manufactured within a customs territory other than the subject country to be covered by the scope. On page 13 of Volume I of your Petitions, you identify the manufacturing process for solar panels as consisting of five phases: (1) crystallization; (2) wafer production; (3) cell conversion; (4) module assembly; and (5) packing. With specific references to the production processes, please provide a revised scope containing a clear and specific definition of the amount or extent of production that must occur in the subject country in order to define solar cells and solar panels "completed or partially manufactured within a customs territory other than the subject country, using ingots, wafers, or partially manufactured cells sourced from the subject country."

   b. It may be ambiguous from this sentence whether "completed or partially manufactured within a customs territory other than the subject country" refers to 1) modules, laminates and/or panels; 2) the crystalline silicon photovoltaic cells contained in the modules, laminates and/or panels; or 3) both 1) and 2). As written, it appears that your scope may state that solar panels assembled in a country other than the subject country would not fall within the scope. Please revise this sentence to clarify what you intend to cover.

3

   c. In the sentence above you use the phrase "**sourced** from the subject country." Do ingots, wafers, or partially manufactured cells produced in a country other than the subject country, but purchased from a reseller in the subject country meet this description? Or must the ingots, wafers, or partially manufactured cells be **produced** in the subject country? Please clarify your scope or explain why it is more appropriate for your proposed scope to specify "sourced from the subject country."

3. The existing antidumping duty and countervailing duty orders on solar cells from the PRC includes the following exclusion:

> Crystalline silicon photovoltaic cells, not exceeding 10,000mm$^2$ in surface area, that are permanently integrated into a consumer good whose function is other than power generation and that consumes the electricity generated by the integrated crystalline silicon photovoltaic cell. Where more than one cell is permanently integrated into a consumer good, the surface area for purposes of this exclusion shall be the total combined surface area of all cells that are integrated into the consumer good.

Do you intend for such cells to be included in your proposed scope?

4. In paragraph three of your proposed scope you indicate that the scope excludes any products covered by the existing antidumping and countervailing duty orders on crystalline silicon photovoltaic cells and you provide the case numbers. Please revise this sentence to provide the full cite to the orders rather than the case numbers (i.e., See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order, 77 FR 73018 (December 7, 2012) and Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Countervailing Duty Order, 77 FR 73017 (December 7, 2012)).

5. Please revise your proposed scope to include all Harmonized Tariff Schedule of the United States ("HTSUS") subheadings at the 10-digit level. It appears there are four subheadings under HTSUS 8507.20.80. Do you intend to include all of them? Please specify.

6. The scope of the existing antidumping and countervailing duty orders on crystalline silicon photovoltaic cells includes HTSUS subheading 8501.31.8000. Please include this HTSUS subheading in your revised scope.

7. Please provide a revised proposed scope as it should appear in the Federal Register, incorporating any changes made in response to the questions above.

Domestic Like Product

8. On page 30 of Volume I of the Petitions you state that the "like product in this proceeding is contiguous to the scope of this proceeding." Please explain what you mean by "contiguous."

4

Barcode:3172506-01 A-570-010 INV - Investigation -

9. We note that your domestic like product definition differs from your proposed scope of the Petitions. Please explain why this is appropriate and how you have properly calculated industry support given the differences.

## Industry Support

10. We note that your industry support data are provided in megawatts. Please explain why this is an appropriate measure of production for purposes of calculating industry support.

11. On page 8 and in Exhibits I-2 and I-3 of Volume I of the Petitions, you identify 17 total domestic producers of certain crystalline silicon photovoltaic products (certain solar cells and panels). Please explain how the universe of producers was established and provide supporting documentation (e.g., an affidavit from an individual with knowledge of the industry) for your response.

12. Do the data on U.S. module production from U.S. Solar Market Insight: 2012 Year in Review (in Exhibit I-5) include all modules produced in the United States? Provide supporting documentation for your response, to the extent it is reasonably available.

13. On pages 31-32 of Volume I of the Petitions, you state that there are two companies, Motech Americas, LLC and Suntech Arizona, Inc., which assemble solar panels in the United States. We note, however, that you have not included these producers as part of the domestic industry in Exhibit I-3. Please identify where these two companies are included in your industry support calculation or revise your calculation to include their 2012 module production.

14. On page 9 of Volume I of the Petitions, you state that [
          ], supports the Petitions. Please provide evidence (e.g., an affidavit or signed letter of support) from a company official at [          ] that they support the petition. Please also provide supporting documentation for the how you determined that [          ] produced
[          ] megawatts of certain solar panels.

## Injury

15. To the extent you want the effect of imports from the PRC and Taiwan to be cumulated, address the following factors and provide reasonably available documentation to support your arguments: (1) the degree of fungibility between imports from the two subject countries and between the imports and the domestic like product; (2) the presence of sales or offers for sale of the imports and the domestic like product in the same geographic markets; (3) whether the imports and the domestic like product are handled in common or similar channels of distribution; and (4) whether the imports are present in the U.S. market simultaneously.

16. Though you state that imports are significant, it is never stated that subject imports are not negligible. Please comment on the negligibility of subject imports. Per Section 771(24)(A)(i) of the Tariff Act of 1930, as amended, please demonstrate that imports from

5

the PRC and Taiwan were not negligible during the most recent 12-month period for which data are available.

17. We note that in Exhibit I-4, you have only provided import value data.  Please revise this exhibit to also include import volume data for the time periods 2010 - 2012, January - September 2012, and January - September 2013.

18. In Exhibit I-19 you provide supporting evidence for lost sales.  To the extent possible, please also provide examples of lost revenue.

19. We note that you have alleged injury and threat of injury by reason of subject imports as evident in reduced market share, increased import volumes, and increased market penetration.  However, there is no documentation of U.S. consumption data, import volume trends, or market share calculations in the Petitions.  Please elaborate on these factors and provide information that supports your injury arguments.

Consol. Court No. 15-00067                                  **PUBLIC DOCUMENT**

| Tab No. | Document | Pages | Record Document |
|---------|----------|-------|-----------------|
| 5 | *Supplement II to Petition for the Imposition of Antidumping and Countervailing Duties: Certain Crystalline Silicon Photovoltaic Products from China and Taiwan* (Jan. 13, 2014) | 1-2 | AD PR Doc. 25 |



January 13, 2014

1776 K STREET NW
WASHINGTON, DC 20006
PHONE  202.719.7000
FAX  202.719.7049

7925 JONES BRANCH DRIVE
McLEAN, VA 22102
PHONE  703.905.2800
FAX  703.905.2820

www.wileyrein.com

DOC Case Nos. A- 583-853, A-570-
010, C-570-011
USITC Inv. Nos. 701-TA-511 and
731-TA-1246 - 1247 (Prelim)
Total Pages: 75
Investigation
Business Proprietary Information in
the exhibits identified in this cover
letter has been removed.
**PUBLIC VERSION**

**BY ELECTRONIC FILING AND
HAND DELIVERY**

The Honorable Penny S. Pritzker
Secretary of Commerce
Attention: Enforcement and Compliance
APO/Dockets Unit, Room 1870
U.S. Department of Commerce
14th Street and Constitution Avenue, N.W.
Washington, D.C. 20230

The Honorable Lisa R. Barton
Acting Secretary
U.S. International Trade Commission
500 E Street, S.W., Room 112
Washington, D.C.  20436

Re:     Supplement  II  to  Petition  for  the  Imposition  of
        Antidumping   and   Countervailing   Duties:   *Certain
        Crystalline Silicon Photovoltaic Products from China
        and Taiwan*

Dear Secretary Pritzker and Acting Secretary Barton:

        On behalf of SolarWorld Industries America, Inc. ("Petitioner"),
we hereby submit our response to the U.S. Department of Commerce's

13363507.1

DOC Investigation No.  A-570-010, A-583-853, C-570-011
Total Pages: 58
Investigation
Business proprietary has been removed from the pages and exhibits identified in the cover letter.
**PUBLIC VERSION**

BEFORE THE
**INTERNATIONAL TRADE ADMINISTRATION
UNITED STATES DEPARTMENT OF COMMERCE
AND THE
UNITED STATES INTERNATIONAL TRADE COMMISSION**

**CERTAIN CRYSTALLINE SILICON PHOTOVOLTAIC PRODUCTS
FROM THE PEOPLE'S REPUBLIC OF CHINA AND TAIWAN**

PETITION FOR THE IMPOSITION
**OF ANTIDUMPING AND COUNTERVAILING DUTIES PURSUANT TO
SECTIONS 701 and 731 OF THE TARIFF ACT OF 1930, AS AMENDED**

**VOLUME I**

SUPPLEMENT II – INFORMATION RELATING TO
**THE PEOPLE'S REPUBLIC OF CHINA AND TAIWAN – ANTIDUMPING AND
COUNTERVAILING DUTIES**

Timothy C. Brightbill, Esq.

**WILEY REIN LLP**
1776 K Street, N.W.
Washington, D.C.  20006
(202) 719-7000

*Counsel to SolarWorld Industries
America, Inc.*

January 13, 2014

13359691.3

**PUBLIC DOCUMENT**

**Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China ("PRC") and Taiwan**

General Issues Questionnaire

On behalf of Petitioner SolarWorld Industries America, Inc. ("Petitioner" or "SolarWorld"), this submission responds to the Department of Commerce's (the "Department") January 6, 2014 supplemental questions with regard to Volume I of the Petitions filed on December 31, 2013.[1] Each of the Department's questions is reproduced in bold text below, followed by Petitioner's response.

**Scope**

2. **In the second sentence of your proposed scope you state "{f}or purposes of this investigation, subject merchandise also includes modules, laminates and/or panels consisting of crystalline silicon photovoltaic cells completed or partially manufactured within a customs territory other than the subject country, using ingots, wafers, or partially manufactured cells sourced from the subject country." Please respond to the following with respect to this sentence:**

    a. **Currently, there is ambiguity in your proposed scope as to the amount or extent of production that must take place in the subject country for modules, laminates and/or panels ("solar panels") consisting of crystalline silicon photovoltaic cells ("solar cells") completed or partially manufactured within a customs territory other than the subject country to be covered by the scope. On page 13 of Volume I of your Petitions, you identify the manufacturing process for solar panels as consisting of five phases: (1) crystallization; (2) wafer production; (3) cell conversion; (4) module assembly; and (5) packing. With specific references to the production processes, please provide a revised scope containing a clear and specific definition of the amount or extent of production that must occur in the subject country in order to define solar cells and solar panels "completed or partially manufactured within a customs territory other than the subject country, using ingots, wafers, or partially manufactured cells sourced from the subject country."**

---

[1]    Petitioner responded to a number of the Department's January 6, 2014 supplemental questions in a previous submission, filed on January 9, 2014. *See* Letter from Wiley Rein LLP to Sec'y Commerce and Acting Sec'y of the International Trade Commission, re: *Supplement to Petition for the Imposition of Antidumping and Countervailing Duties: Certain Crystalline Silicon Photovoltaic Products from China and Taiwan* (Jan. 9, 2014) ("Petitioner's Jan. 9 Supplemental Response"). This submission responds to the remainder of the Department's supplemental questions.

1

**PUBLIC DOCUMENT**

Of the five manufacturing process phases described in the Petition, packing (step 5) is not a step that is relevant to the scope analysis. Phases (1) and (2) are closely related in the sense that wafer production adds relatively little value to the crystallized ingot. The product of the third phase, cell conversion, is already the focus of the existing measures.

Petitioner intends that the present proceeding cover panels and modules assembled in a subject country (*e.g.*, China), even if the cells in those modules are produced in a different country (*e.g.*, Taiwan or a non-subject country), if those cells are made from ingots, wafers or partially manufactured cells that were manufactured in the subject country (*e.g.*, China). This would cover situations where the panels or modules are assembled in a subject country from cells made in a different country but: 1) the ingots used for the wafers made into the cells were manufactured in the subject country; 2) the wafers made into the cells were manufactured in the subject country; or 3) the cell manufacturing process began in the subject country and then was completed in a non-subject country. With reference to the steps described in the petition, this means that the scope covers module assembly (step 4) in a subject country, even if cell conversion (step 3) does not occur in the subject country, if either ingot crystallization (step 1), wafer production (step 2) or the beginning of cell conversion (step 3) also occurs in the same subject country.

To clarify these points, we propose revisions to the scope language as follows:

For purposes of this investigation, subject merchandise also includes modules, laminates and/or panels assembled in the subject country consisting of crystalline silicon photovoltaic cells that are completed or partially manufactured within a customs territory other than that subject country, using ingots that are manufactured in the subject country, wafers that are manufactured in the subject country, or cells where the manufacturing process begins in the subject country and is completed in a non-subject country.

2

Consol. Court No. 15-00067                          **PUBLIC DOCUMENT**

| Tab No. | Document | Pages | Record Document |
|---------|----------|-------|-----------------|
| 6 | Letter from Howard Smith to All Interested Parties, re: *Antidumping and Countervailing Duty Investigations of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and the Antidumping Duty Investigation of Certain Crystalline Silicon Photovoltaic Products from Taiwan: Opportunity to Submit Scope Comments* (Oct. 3, 2014) | All | AD PR Doc. 765 |



**UNITED STATES DEPARTMENT OF COMMERCE**
**International Trade Administration**
Washington, D.C. 20230

A-570-010
C-570-011
A-583-853
Investigations
**Public Document**
E&C/IV: HS

October 3, 2014

TO ALL INTERESTED PARTIES

Re:     Antidumping and Countervailing Duty Investigations of Certain Crystalline Silicon
        Photovoltaic Products from the People's Republic of China and the Antidumping Duty
        Investigation of Certain Crystalline Silicon Photovoltaic Products from Taiwan:
        Opportunity to Submit Scope Comments

Interested parties have submitted comments on the scopes of the above-referenced antidumping
duty (AD) and countervailing duty (CVD) investigations, including certain concerns about the
scope's administrability and enforcement.  In response, the Department is considering the
possibility of the scope clarification described below and is providing interested parties with an
opportunity to submit comments.  Currently, the scopes of the AD and CVD investigations of
certain crystalline silicon photovoltaic products from the People's Republic of China (PRC) and
the scope of the AD investigation of certain crystalline silicon photovoltaic products from
Taiwan contain the following language:

> For purposes of this investigation, subject merchandise includes modules, laminates
> and/or panels assembled in the subject country consisting of crystalline silicon
> photovoltaic cells that are completed or partially manufactured within a customs
> territory other than that subject country, using ingots that are manufactured in the
> subject country, wafers that are manufactured in the subject country, or cells where the
> manufacturing process begins in the subject country and is completed in a non-subject
> country.

Specifically, we are considering a scope clarification that would make the following points:

- For the PRC investigations, subject merchandise includes all modules, laminates
  and/or panels assembled in the PRC that contain crystalline silicon photovoltaic cells
  produced in a customs territory other than the PRC.
- For the Taiwan investigation, subject merchandise includes all modules, laminates
  and/or panels assembled in Taiwan consisting of crystalline silicon photovoltaic cells
  produced in Taiwan or a customs territory other than Taiwan.[1]  In addition, subject
  merchandise will include modules, laminates, and panels assembled in a third-

---

[1] The scope of the Taiwan investigation and the PRC investigations would continue to exclude any products covered
by the existing AD and CVD orders on crystalline silicon photovoltaic cells, whether or not assembled into modules,
from the PRC.



country, other than the PRC, consisting of crystalline silicon photovoltaic cells produced in Taiwan.

Attached is the current scope language with draft edits that reflect language to implement the clarifications we are considering.  In addition to addressing the substance of the above contemplated clarifications, interested parties may also comment on the edits to the scope language that we are considering and/or propose alternative scope language to use if the Department were to implement such clarifications for purposes of the final determinations and any potential orders.  Interested parties should submit their comments with their case briefs.

Sincerely

Howard Smith
Program Manager, Office IV
AD/CVD Operations
Enforcement and Compliance

Attachment

**Draft - China Scope of the Investigation**

The merchandise covered by this investigation is ~~crystalline silicon photovoltaic cells, and~~ modules, laminates and/or panels consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including building integrated materials. For purposes of this investigation, subject merchandise ~~also~~ includes modules, laminates and/or panels assembled in the ~~subject country~~ *People's Republic of China* consisting of crystalline silicon photovoltaic cells ~~that are completed or partially manufactured within~~ *produced in* a customs territory other than *the People's Republic of China* ~~that subject country, using ingots that are manufactured in the subject country, wafers that are manufactured in the subject country, or cells where the manufacturing process begins in the subject country and is completed in a non-subject country.~~

Subject merchandise includes *modules, laminates and/or panels assembled in the People's Republic of China consisting of* crystalline silicon photovoltaic cells of thickness equal to or greater than 20 micrometers, having a p/n junction formed by any means, whether or not the cell has undergone other processing, including, but not limited to, cleaning, etching, coating, and/or addition of materials (including, but not limited to, metallization and conductor patterns) to collect and forward the electricity that is generated by the cell.

Excluded from the scope of this investigation are thin film photovoltaic products produced from amorphous silicon (a-Si), cadmium telluride (CdTe), or copper indium gallium selenide (CIGS). Also excluded from the scope of this investigation are any products covered by the existing antidumping and countervailing duty orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the People's Republic of China. See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order, 77 FR 73018 (December 7, 2012); Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Countervailing Duty Order, 77 FR 73017 (December 7, 2012).

Also excluded from the scope of this investigation are *modules, laminates and/or panels assembled in the People's Republic of China, consisting of* crystalline silicon photovoltaic cells, not exceeding $10,000mm^2$ in surface area, that are permanently integrated into a consumer good whose function is other than power generation and that consumes the electricity generated by the integrated crystalline silicon photovoltaic cell. Where more than one *module* ~~cell~~ is permanently integrated into a consumer good, the surface area for purposes of this exclusion shall be the total combined surface area of all *modules* ~~cells~~ that are integrated into the consumer good.

Merchandise covered by this investigation is currently classified in the Harmonized Tariff Schedule of the United States (HTSUS) under subheadings 8501.61.0000, 8507.20.8030, 8507.20.8040, 8507.20.8060, 8507.20.8090, 8541.40.6020, 8541.40.6030 and 8501.31.8000. These HTSUS subheadings are provided for convenience and customs purposes; the written description of the scope of this investigation is dispositive.

**Draft - Taiwan Scope of the Investigation**

The merchandise covered by this investigation is crystalline silicon photovoltaic cells, and modules, laminates and/or panels consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including building integrated materials.  For purposes of this investigation, subject merchandise ~~also~~ includes modules, laminates and/or panels assembled in ~~the subject country~~ *Taiwan* consisting of crystalline silicon photovoltaic cells ~~that are completed or partially manufactured within~~ *produced in Taiwan or* a customs territory other than *Taiwan* ~~that subject country, using ingots that are manufactured in the subject country, wafers that are manufactured in the subject country, or cells where the manufacturing process begins in the subject country and is completed in a non-subject country.~~ *Subject merchandise also includes modules, laminates, and panels assembled in a third-country other than the People's Republic of China consisting of crystalline silicon photovoltaic cells produced in Taiwan.*

Subject merchandise includes crystalline silicon photovoltaic cells of thickness equal to or greater than 20 micrometers, having a p/n junction formed by any means, whether or not the cell has undergone other processing, including, but not limited to, cleaning, etching, coating, and/or addition of materials (including, but not limited to, metallization and conductor patterns) to collect and forward the electricity that is generated by the cell.

Excluded from the scope of this investigation are thin film photovoltaic products produced from amorphous silicon (a-Si), cadmium telluride (CdTe), or copper indium gallium selenide (CIGS). Also excluded from the scope of this investigation are any products covered by the existing antidumping and countervailing duty orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the People's Republic of China. See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order, 77 FR 73018 (December 7, 2012); Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Countervailing Duty Order, 77 FR 73017 (December 7, 2012).

Also excluded from the scope of this investigation are crystalline silicon photovoltaic cells, not exceeding 10,000mm$^2$ in surface area, that are permanently integrated into a consumer good whose function is other than power generation and that consumes the electricity generated by the integrated crystalline silicon photovoltaic cell.  Where more than one cell is permanently integrated into a consumer good, the surface area for purposes of this exclusion shall be the total combined surface area of all cells that are integrated into the consumer good.

Merchandise covered by this investigation is currently classified in the Harmonized Tariff Schedule of the United States (HTSUS) under subheadings 8501.61.0000, 8507.20.8030, 8507.20.8040, 8507.20.8060, 8507.20.8090, 8541.40.6020, 8541.40.6030 and 8501.31.8000.

These HTSUS subheadings are provided for convenience and customs purposes; the written description of the scope of this investigation is dispositive.

Consol. Court No. 15-00067                    **PUBLIC DOCUMENT**

| Tab No. | Document | Pages | Record Document |
|---------|----------|-------|-----------------|
| 7 | Letter from Wiley Rein LLP to Sec'y Commerce, re: *Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: Case Brief of SolarWorld Americas, Inc.* (Oct. 17, 2014) | 1-7 | AD PR Doc. 795 |



Timothy C. Brightbill
202.719.3138
tbrightbill@wileyrein.com

1776 K STREET NW
WASHINGTON, DC 20006
PHONE  202.719.7000
FAX  202.719.7049

7925 JONES BRANCH DRIVE
McLEAN, VA 22102
PHONE  703.905.2800
FAX  703.905.2820

www.wileyrein.com

October 17, 2014

DOC Case No. A-570-010
Total Pages: 68
Investigation
AD/CVD Operations, Office IV
**Trina's Business Proprietary
Information has been removed from
pages 2, 14-18, 33, 35, and 52
Renesola's Proprietary Information
has been removed from page 13, 52
and Ex. 1
Sumec's Business Proprietary
Information has been removed from
pages 52 and 55
PUBLIC VERSION**

**VIA ELECTRONIC FILING**

The Honorable Penny Pritzker
Secretary of Commerce
Attention: Enforcement and Compliance
APO/Dockets Unit, Room 1870
U.S. Department of Commerce
14th Street and Constitution Avenue, N.W.
Washington, D.C. 20230

Re:   ***Certain Crystalline Silicon Photovoltaic Products from the People's
Republic of China***: Case Brief of SolarWorld Americas, Inc.

Dear Secretary Pritzker:

On behalf of SolarWorld Americas, Inc. ("Petitioner"), we respectfully

submit the enclosed case brief for consideration by the Department of Commerce

("Department") in accordance with 19 C.F.R. § 351.309(c) in its upcoming final

determination in the above-referenced investigation. This case brief is timely filed

13791843.2

# BEFORE THE UNITED STATES DEPARTMENT OF COMMERCE

| | |
|---|---|
| **CERTAIN CRYSTALLINE SILICON PHOTOVOLTAIC PRODUCTS FROM THE PEOPLE'S REPUBLIC OF CHINA** | DOC Case No.  A-570-010<br>Total Pages: 61<br>Investigation<br>AD/CVD Operations, Office IV<br>**Trina's Business Proprietary Information has been removed from pages 2, 14-18, 33, 35, and 52**<br>**Renesola's Proprietary Information has been removed from pages 13, 52 and Ex. 1**<br>**Sumec's Business Proprietary Information has been removed from pages 52 and 55**<br>**PUBLIC VERSION** |

## CASE BRIEF OF SOLARWORLD AMERICAS, INC.

Timothy C. Brightbill, Esq.
Laura El-Sabaawi, Esq.
Usha Neelakantan, Esq.

**WILEY REIN LLP**
1776 K Street, N.W.
Washington, D.C.  20006
(202) 719-7000

*Counsel to SolarWorld Americas, Inc.*

October 17, 2014

13791843.2

Table of Contents

Page

I.     EXECUTIVE SUMMARY ....................................................................................1

II.    SCOPE COMMENTS...........................................................................................4

III.   THE DEPARTMENT SHOULD INVESTIGATE THE EFFECTS OF THE GOC'S ALLEGED
       CYBERHACKING ON THIS INVESTIGATION........................................................10

IV.    THE DEPARTMENT SHOULD APPLY PARTIAL ADVERSE FACTS AVAILABLE TO THE
       CALCULATION OF RENESOLA'S NORMAL VALUE...............................................12

V.     TRINA-SPECIFIC ISSUES ................................................................................14

       A.    The Department Should Treat Sales that Were Still Unpaid as of the Date
             of Verification as Zero Price Sales .......................................................14

       B.    The Department Should Include Trina U.S.'s Actual Payments for Quality
             Insurance in the Reported Indirect Selling Expenses ...........................15

       C.    The Department Should Apply the Warranty Accrual Rate to U.S. Selling
             Expenses ..............................................................................................17

       D.    The Department Should Increase Certain of Trina's Reported Factors of
             Production to Account for the Inflated Denominator Used in the Original
             Calculations .........................................................................................18

VI.    THE DEPARTMENT SHOULD SELECT THAILAND AS THE SURROGATE COUNTRY IN
       ITS FINAL DETERMINATION ...........................................................................18

       A.    The South African Market for Photovoltaic Products Is Distorted .......20

       B.    Unlike Thailand, South Africa Is Not a Significant Producer of Identical or
             Comparable Merchandise .....................................................................24

             1.    The Department Must Give Meaning to the Statutory "Significant
                   Producer" Language ..................................................................26

             2.    Thailand Is a Significant Producer, Whereas South Africa Is Not...........28

       C.    The Record Is Not Incomplete or Less Preferable with Respect to Thai
             Surrogate Values...................................................................................32

             1.    The Thai HTS Is More Specific Than the South African HTS .................33

             2.    The Record Contains Surrogate Values from Thailand That the
                   Department Stated Were Not on the Record ...............................37

       D.    The Department Cannot and Should Not Use Mustek as a Source of
             Surrogate Values...................................................................................38

VII.   THE DEPARTMENT SHOULD UTILIZE CERTAIN THAI SURROGATE VALUES TO
       VALUE RESPONDENTS' FACTORS OF PRODUCTION ...........................................44

Table of Contents
(continued)

Page

VIII.   THE DEPARTMENT SHOULD NOT ALLOW AN OFFSET TO THE DUMPING MARGIN
        FOR EXPORT SUBSIDIES FOUND TO BE COUNTERVAILABLE AND QUANTIFIED
        USING ADVERSE FACTS AVAILABLE ..................................................................46

        A.     In Investigations, the Export Subsidy Countervailing Duty Offset Is
               Optional ..............................................................................................46

        B.     An Export Subsidy Offset Should Not Be Applied to an Antidumping
               Duty Calculation Because it Nullifies the Purpose of the Department's
               AFA Policy ...........................................................................................47

        C.     The Department Lacks the Information Required to Make an Accurate
               Offsetting Adjustment to the Dumping Margin......................................49

IX.     THE DEPARTMENT SHOULD DENY SEPARATE RATES TO A NUMBER OF
        RESPONDENTS IN THIS INVESTIGATION ..........................................................51

        A.     The Department Should Deny Separate Rates to Companies That Have
               Failed to Provide Ownership Information ..............................................51

        B.     The Department Should Deny Separate Rates to Applicants Owned or
               Controlled by Chinese Government Officials or China's State-Owned
               Assets Supervision and Administration Commission................................54

               1.     Entities Controlled by Officials from the Chinese People's Political
                      Consultative Conference or Communist Party of China ...........................54

               2.     Entities Owned or Controlled by the State-Owned Assets
                      Supervision and Administration Commission..........................................55

X.      CONCLUSION ..............................................................................................56

PUBLIC VERSION

On behalf of SolarWorld Americas, Inc. ("Petitioner"), this case brief is presented to the Department of Commerce ("the Department") in accordance with 19 C.F.R. § 351.309(c) and the deadline established by the Department's October 6, 2014 memorandum.[1]

## I.   **EXECUTIVE SUMMARY**

**For its final determination, the Department should adopt its proposed scope clarification or, in the alternative, maintain the scope from the preliminary determination.**

- The Department should adopt the scope clarification language it proposed on October 3, as the proposed clarification would best address the continued unfair trade practices of China and Taiwan, is consistent with Petitioner's intent and would result in AD/CVD orders that are effective and enforceable.

- Should the Department decide not to adopt its proposed scope clarification, it should maintain the current scope of the investigations, including the "two-out-of-three" rule for purposes of the final determination.

**The Department should conduct an investigation into the effects of the Government of China's alleged cyber-hacking of SolarWorld on this investigation.**

- As SolarWorld explained in July 2014 comments to the Department, Chinese military hackers have been charged with undertaking cyber espionage against U.S. corporations, including SolarWorld, for commercial advantage.

- As the information allegedly stolen included information related to SolarWorld's cash flow, manufacturing metrics, production line and costs, as well as privileged attorney-client communications relating to ongoing trade litigation, the Department should promptly conduct a thorough investigation into how the alleged cyber-hacking may have affected this antidumping duty investigation.

**Given the substantial errors in Renesola's reported factors of production discovered upon verification, the Department should apply partial adverse facts available to calculate normal value for Renesola.**

- At verification, the Department discovered numerous substantial errors in Renesola's reported factors of production, including: improperly included

---

[1]   *See* Letter from Howard Smith, Program Manager, Office IV, AD/CVD Operations, to All Interested Parties, re: *Antidumping and Countervailing Duty Investigations of Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China and Antidumping Duty Investigation of Certain Crystalline Silicon Photovoltaic Products From Taiwan: Notification of the Deadline for the Submission of Case Briefs and Rebuttal Briefs* (Oct. 6, 2014).

PUBLIC VERSION

Business Proprietary Information
Has Been Deleted

inverters, endcaps, connectors and gateways in the gross unit prices for reported U.S. transactions; the failure to properly report wafer and cell yield losses and improper claimed offsets for scrap cells; issues related to reported labor usage rates; and errors in identifying the country of origin for claimed market economy purchases.

- As a result, the Department should assign to each Renesola CONNUM, as facts available, the higher of the highest reported FOP for any CONNUM or 2) the FOPs set forth in the Petition for this investigation.

- If the Department finds Renesola's factors of production information to be usable, it should adjust the gross unit prices for U.S. transactions as described below, increase reported cell usage quantities by the loss rate that the Department was able to estimate at verification, deny Renesola's scrap cell offset, and decline to use Renesola's claimed market economy purchases in valuing its reported FOPs.

**The Department should make a number of adjustments in its calculation of Trina's dumping margin for the final determination.**

- The Department should treat the still-unpaid sales discovered at Trina's U.S. sales verification as zero-price sales.

- The Department should include Trina U.S.'s payments for quality insurance in its reported indirect selling expenses.  Because Trina failed to provide the [                                        ], the Department should use the amount of the [                                        ], as facts available.

- The Department should reduce Trina's U.S. prices to account for the accrued warranty costs [                                        ], applying the [     ] percent accrual rate to gross U.S. price.

- The Department should increase Trina's reported factors of production to account for Trina's substantially over-reporting of its surface area, which resulted in a significantly inflated denominator.

**The Department should select Thailand as the surrogate country for the final determination.**

- The Department should select Thailand, and not South Africa, as the surrogate country for purposes of its final determination.

- Due to local content and other restrictions in the country, the South African solar market is distorted and cannot serve as a basis for surrogate values.  In addition, unlike Thailand, South Africa is not a producer of merchandise identical or comparable to solar products.

2

PUBLIC VERSION

- Thailand is a preferable source of surrogate values, as the Thai HTS is more specific than the South African HTS. In addition, the record does contains surrogate values from Thailand that the Department stated in the preliminary determination were not on the record.

- Regardless of the surrogate country selected, the Department should not use South African "computer assembler" Mustek as a source of financial ratios for the final determination, as it is not a producer of identical or comparable merchandise, and its financial statement does not contain separate line items for selling, general and administrative expenses.

**The Department should value respondents' factors of production using Thai surrogate values.**

- The Department should utilize surrogate values from Thailand, under HTS heading 7616, to value respondents' aluminum corner keys and aluminum frames in the final determination.

**The Department should not offset the dumping margins calculated in this investigation by the amount of any export subsidy that is calculated based on adverse facts available in the companion countervailing duty investigation.**

- In an original investigation, the statute does not require the Department to offset the dumping margins by the amount of any export subsidies calculated in a companion countervailing duty investigation, and the Department should not make such an offset in this case.

- The Department especially should not offset the dumping margin when the export subsidy rate is calculated based on adverse facts available. To do so would defeat the purpose of the application of adverse facts available, as the effect on the respondent would be essentially neutral. In addition, when the export subsidy rate is calculated based on adverse facts available, the Department lacks the information required to make an accurate offsetting adjustment to the dumping margin.

**The Department should deny separate rates to a number of respondents in this investigation that have failed to rebut the presumption of government control and demonstrate their independence from the Government of China.**

- For the final determination, the Department should not grant separate rates to respondents that have failed to provide information regarding their ultimate ownership and/or that are owned or controlled by Chinese Government officials or China's State-Owned Assets Supervision and Administration Commission.

3

PUBLIC VERSION

## II.    SCOPE COMMENTS

On October 3, 2014, the Department issued a memo to all interested parties requesting comments on a proposed clarification to the scope of the AD/CVD investigations.[2]  Petitioner supports the Department's proposed scope clarification, as it is consistent with the Petitioner's intent, would best effectuate the U.S. trade laws and provide effective relief to the injured domestic industry, and would be easily administrable and enforceable by the agencies.  In the alternative, should the Department decide not to make the proposed clarification to the scope, Petitioner submits that the investigations should continue with the scope proposed by Petitioners and accepted by the Department for purposes of its preliminary determination.

### A.    The Department Should Adopt Its October 3 Proposed Scope Clarification

For the final determination, the Department should adopt its October 3 proposed scope clarification, which would clarify the scope language to make the following points:

- For the PRC investigations, subject merchandise includes all modules, laminates and/or panels assembled in the PRC that contain crystalline silicon photovoltaic cells produced in a customs territory other than the PRC.

- For the Taiwan investigation, subject merchandise includes all modules, laminates, and/or panels assembled in Taiwan consisting of crystalline silicon photovoltaic cells produced in Taiwan or a customs territory other than Taiwan. In addition, subject merchandise will include modules, laminates, and panels assembled in a third-country, other than the PRC, consisting of crystalline silicon photovoltaic cells produced in Taiwan.[3]

In other words, the Department's proposed clarification would ensure that all Chinese cells and all Chinese modules, as well as all Taiwanese cells and all Taiwanese modules, would

---

[2]    Letter from Howard Smith, Program Manager, Office IV, AD/CVD Operations, Enforcement and Compliance, to All Interested Parties, re: *Antidumping and Countervailing Duty Investigations of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and the Antidumping Duty Investigation of Certain Crystalline Silicon Photovoltaic Products from Taiwan: Opportunity to Submit Scope Comments* (Oct. 3, 2014) ("Oct. 3 Scope Clarification Memo").

[3]    *Id.* at Attachment, p. 1-2

PUBLIC VERSION

be subject to the scope of either these investigations or the first solar AD/CVD investigations.[4] SolarWorld fully supports this proposed scope clarification and urges the Department to adopt it for the final determination, as the clarification effectuates the intent of the Petitioner and would result in effective, administrable and enforceable AD/CVD orders. AD/CVD orders with the scope proposed by the Department would finally provide the relief from unfair trade practices that the U.S. solar industry has sought for years.

It has been clear since the start of the first solar AD/CVD investigations, and throughout the current investigations, that SolarWorld's intent has always been to cover all cells from China and all modules from China and, now, all cells from Taiwan and all modules from Taiwan. Indeed, SolarWorld filed the instant investigations specifically in order to close the loophole created as a result of the Department's scope determination in the first solar cases and to cover all cells and modules from China, as well as to expand the investigations to Taiwan to address unfair trade practices that were exacerbated as a result of that scope determination.[5] The Department's proposed scope clarification is in accordance with this longstanding intent of the petitioning domestic industry.

The Department itself has long recognized that it should define the scope of a trade remedy investigation according to the intent of the petitioner. The agency's "practice is to provide ample deference to the petitioner with respect to the definition of the product for which it

---

[4]     Product subject to the initial solar investigations would remain subject to only those AD/CVD orders. *Id.* at n. 1.

[5]     *See, e.g.,* Letter from Wiley Rein LLP to Sec'y of Commerce, re: *Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and Taiwan: Rebuttal to Respondents' Scope Comments* (Apr. 3, 2014) ("SolarWorld's Scope Rebuttal Comments").

**PUBLIC VERSION**

seeks relief under the AD and CVD laws."[6]   The U.S. Court of International Trade ("CIT") has confirmed that any scope clarifications made by the Department should be made "in a manner which reflects the intent of the petition."[7]   Therefore, adoption of the Department's proposed scope clarification is in accordance with the law and the agency's practice, as it effectuates Petitioner's intent, as clearly expressed throughout these and the initial solar investigations.

Importantly, the Department's proposed scope clarification would also result in AD/CVD orders that are effective, helping to prevent significant and widespread avoidance, evasion and circumvention of the orders.   As the Department is well aware, its scope determination in the initial solar AD/CVD investigations unintentionally resulted in the creation of a loophole, facilitating widespread evasion of the current AD/CVD orders.   Coverage of all cells and modules from China and all cells and modules from Taiwan, as the Department's scope clarification would provide, would close the loophole and prevent such evasion, resulting in AD/CVD orders that would effectively address unfairly traded imports and remedy the harm suffered by the domestic industry.

Adoption of the proposed scope clarification would therefore be consistent with the Department's practice in this manner as well, as the Department often notes its intent to avoid creating opportunities for circumvention when defining the scope of an investigation.[8]   The

---

[6]   Issues and Decision Memorandum accompanying *Large Residential Washers From the Republic of Korea*, 77 Fed. Reg. 46,391, 46,392 (Dep't Commerce Aug. 3, 2012) (prelim. deter. of sales at less than fair value and postponement of final deter.) (unchanged in final) at cmt. 2.

[7]   *See Kern Liebers USA, Inc. v. United States*, 881 F. Supp. 618, 621 (Ct. Int'l Trade 1995) ("The agency generally exercises {its} broad discretion to define and clarify the scope of an antidumping investigation in a manner which reflects the intent of the petition").

[8]   *See, e.g., Large Newspaper Printing Presses and Components Thereof, Whether Assembled or Unassembled, from Germany*, 61 Fed. Reg. 38,166, 38,169 (Dep't Commerce July 23, 1996) (notice of final deter. of sales at less than fair value) ("{I}t was the Department's intent to use the language at issue to avoid creating loopholes from circumvention..."); *Cellular Mobile Telephones and Subassemblies from Japan*, 50 Fed. Reg.

**PUBLIC VERSION**

Department's practice of taking evasion concerns into consideration when defining the scope has been upheld by the CIT and the Court of Appeals for the Federal Circuit.[9]   The proposed scope would also be consistent with international precedent.   The recent European Union ("EU") AD/CVD investigations of Chinese solar products included "imports of crystalline silicon photovoltaic modules and key components (i.e. cells and wafers) originating in or consigned from the People's Republic of China,"[10] recognizing that all cells and all modules from the subject country, in addition to other key components, must be covered.

The remedial purposes of the AD/CVD laws are also best served by this scope clarification.   The Department has determined that both cells and modules from China and Taiwan are being dumped, and both Chinese cells and modules are subsidized.   As such, the law obligates Commerce to impose duties on these products.

Finally, the clarifying scope language proposed by the Department would result in AD/CVD orders that are administrable and enforceable by the Department and U.S. Customs and Border Protection ("CBP").   As the Department is aware, c-Si PV cells are not required to contain country of origin markings.   While it is possible for solar producers to track their inputs through the production process in a manner that allows for the identification of the origin of

---

45,447, 45,448 (Dep't Commerce Oct. 31, 1985) (final deter. of sales at less than fair value) ("The primary purpose of including subassemblies in this investigation is to prevent evasion of the antidumping law").

[9]      *See Mitsubishi Elec. Corp v. United States*, 700 F. Supp. 538, 555 (Ct. Int'l Trade 1988) ("The ITA has a certain amount of discretion to expand the language of a petition… with the purpose in mind of preventing the intentional evasion or circumvention of the antidumping duty law"), *aff'd*, 898 F.2d 1577 (Fed. Cir. 1990) ("As the Court of International Trade properly pointed out, the {agency} was sensitive to any type of evasion of an {AD} order… {Commerce} justifiably decided to make the {AD} order applicable to {the merchandise}, because of the potential of {that merchandise} to be used to evade the order") (internal citation omitted). *See also Tung Mung Dev. Co. v. United States*, 26 CIT 969, 979, (2002), *aff'd*, 354 F.3d 1371 (Fed. Cir. 2004).

[10]      *See Council Implementing Regulation (EU) No 1238/2013 of 2*, Official Journal of the European Union (Dec. 2013).

**PUBLIC DOCUMENT**

| Tab No. | Document | Pages | Record Document |
|---------|----------|-------|-----------------|
| 8 | Letter from Wiley Rein LLP to Sec'y Commerce, re: *Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: SolarWorld's Rebuttal Brief on Scope* (Oct. 27, 2014) | 1-20 | AD PR Doc. 811 |



Timothy C. Brightbill
202.719.3138
tbrightbill@wileyrein.com

1776 K STREET NW
WASHINGTON, DC 20006
PHONE  202.719.7000
FAX  202.719.7049

7925 JONES BRANCH DRIVE
McLEAN, VA 22102
PHONE  703.905.2800
FAX  703.905.2820

www.wileyrein.com

October 27, 2014

DOC Case No.: A-570-010
Total Pages: 36
Investigation
AD/CVD Operations, Office VII
**Contains No Business
Proprietary Information
PUBLIC DOCUMENT**

**VIA ELECTRONIC FILING**

The Honorable Penny Pritzker
Secretary of Commerce
Attention: Enforcement and Compliance
APO/Dockets Unit, Room 1870
U.S. Department of Commerce
14th Street and Constitution Avenue, N.W.
Washington, D.C. 20230

Re:  ***Certain Crystalline Silicon Photovoltaic Products from the People's
Republic of China***:  SolarWorld's Rebuttal Brief on Scope

Dear Secretary Pritzker:

On behalf of SolarWorld Americas, Inc. ("Petitioner"), we respectfully

submit the enclosed rebuttal brief in accordance with 19 C.F.R. § 351.309(d) for

consideration by the Department of Commerce (the "Department") in its upcoming

final determination in the above-referenced investigation. This rebuttal brief is

timely filed pursuant to the deadlines set forth in the Department's schedule.[1]

---

[1] *See* Letter from Howard Smith, Program Manager, Office IV, AD/CVD Operations, to All
Interested Parties, re: *Antidumping Duty Investigations of Certain Crystalline Silicon Photovoltaic
Products from the People's Republic of China and Taiwan and Countervailing Duty Investigation of
Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: Notification
of Extension of the Deadline for the Submission of Rebuttal Scope Comments* (Oct. 21, 2014).

13795782.1

## BEFORE THE UNITED STATES DEPARTMENT OF COMMERCE

| | |
|---|---|
| **CERTAIN CRYSTALLINE SILICON PHOTOVOLTAIC PRODUCTS FROM THE PEOPLE'S REPUBLIC OF CHINA** | DOC Case No. A-570-010<br>Total Pages: 30<br>Investigation<br>AD/CVD Operations, Office VII<br>**Contains No Business Proprietary Information**<br>**PUBLIC DOCUMENT** |

## SOLARWORLD'S REBUTTAL BRIEF ON SCOPE

Timothy C. Brightbill, Esq.
Laura El-Sabaawi, Esq.
Usha Neelakantan, Esq.

**WILEY REIN LLP**
1776 K Street, N.W.
Washington, D.C.  20006
(202) 719-7000

*Counsel to SolarWorld Americas, Inc.*

October 27, 2014

TABLE OF CONTENTS

Page

A.  THE DEPARTMENT SHOULD ADOPT ITS OCTOBER 3 PROPOSED SCOPE
     CLARIFICATION ................................................................................................1

     1.   The Department Is Justified in Adopting the Proposed Scope Clarification at
          This Stage in the Proceedings ..........................................................................2

     2.   The Department's Proposed Scope Clarification Is Consistent with
          Petitioner's Intent ..........................................................................................5

     3.   Adoption of the Proposed Scope Clarification Would Not Lead to Inconsistent
          Country-of-Origin Determinations ....................................................................7

     4.   Adoption of the Proposed Scope Clarification Would Lead to Enforceable
          AD/CVD Orders that Effectively Remediate the Injury Caused to the
          Domestic Solar Industry ...................................................................................8

     5.   The Department's Proposed Scope Clarification Does Not Conflict with U.S.
          WTO Obligations .........................................................................................10

     6.   Adoption of the Proposed Scope Clarification Does Not Violate Respondents'
          Due Process Rights .......................................................................................13

B.  IN THE ALTERNATIVE, THE DEPARTMENT SHOULD MAINTAIN THE SCOPE
     FROM THE PRELIMINARY DETERMINATION ..................................................18

     1.   The Scope Does Not Contradict, But Rather Supplements, the Department's
          Previous Substantial Transformation Finding...................................................18

     2.   AD/CVD Orders Issued Under the Preliminary Scope Would Be Effective,
          Enforceable and Not Unduly Burdensome .......................................................20

C.  THE DEPARTMENT SHOULD NOT DELETE THE TWO-OUT-OF-THREE RULE
     IN THE CURRENT SCOPE..............................................................................25

i

TABLE OF AUTHORITIES

**Page(s)**

CASES

*Ad Hoc Shrimp Trade Action Comm. v. United States,* 637 F. Supp. 2d 1166 (Ct. Int'l Ttade
   2009)...................................................................................................................................4

*Allegheny Bradford Corp. v. United States,*
   342 F. Supp. 2d 1172 (Ct. Int'l Trade 2004) ...................................................2, 3, 4

*Cathedral Candle Co. v. U.S. Int'l Trade Comm'n,*
   27 CIT 1541 (2003) ...........................................................................................15

*Diversified Products Corporation v. United States,*
   6 CIT 155 (1983) ................................................................................................10

*Mitsubishi Elec. Corp. v. United States,*
   700 F. Supp. 538 (Ct. Int'l Trade 1988) ...........................................................*passim*

*Mitsubishi Elec. Corp. v. United States,*
   898 F.2d 1577 (Fed. Cir. 1990) ............................................................................2

*Torrington Co. v. United States,*
   745 F. Supp 718 (CIT 1990)..................................................................................7

*Tung Mung Dev. Co. v. United States,*
   26 CIT 969 (2002) ..........................................................................................9, 25

FEDERAL REGULATIONS

19 C.F.R. § 351.216.................................................................................................17

ADMINISTRATIVE MATERIALS

*Cellular Mobile Telephones and Subassemblies from Japan,* 50 Fed. Reg. 45,447 (Dep't
   Commerce Oct. 31, 1985).........................................................................9, 10, 25

*Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China,* 79 Fed.
   Reg. 33,174 (Dep't Commerce June 10, 2014) .........................................12, 14, 26

*Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China,* 79 Fed.
   Reg. 44,399 (Dep't Commerce July 31, 2014)...............................................*passim*

*Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and
   Taiwan,* 79 Fed. Reg. 4,661 (Dep't Commerce Jan. 29, 2014) ...............................15

ii

*Certain Crystalline Silicon Photovoltaic Products from Taiwan*, 79 Fed. Reg. 44,395 (Dep't Commerce July 31, 2014) ................................................................................................... 3, 12

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China*, 77 Fed. Reg. 63,791 (Dep't Commerce Oct. 17, 2012) ......... 6, 21

*Large Newspaper Printing Presses and Components Thereof, Whether Assembled or Unassembled, from Germany*, 61 Fed. Reg. 38,166 (Dep't Commerce July 23, 1996) ...... 9, 25

*Large Residential Washer from the Republic of Korea*, 77 Fed. Reg. 75,988 (Dep't Commerce Dec. 26, 2014) ............................................................................................................ 26

*Spring Table Grapes From Chile and Mexico*, 66 Fed. Reg. 26,831 (Dep't Commerce May 15, 2001) ........................................................................................................................ 6

iii

PUBLIC DOCUMENT

## REBUTTAL BRIEF: SCOPE

The various scope arguments advanced by respondents in their case briefs are misplaced and unpersuasive, and they should be rejected by the Department. Contrary to respondents' arguments, the Department should adopt its October 3 proposed scope clarification, as it is consistent with the Petitioner's intent, would best effectuate the U.S. trade laws and provide effective relief to the injured domestic industry, and would be easily administrable and enforceable by the agencies. In the alternative, should the Department decide not to make its proposed clarification to the scope, these investigations should continue with the scope proposed by Petitioner and accepted by the Department for purposes of initiation and its preliminary determination. The Department should not delete the "two-out-of-three" rule and terminate the investigation as to China, as advanced by respondents.

### A.    The Department Should Adopt Its October 3 Proposed Scope Clarification

The Department should adopt its October 3 proposed scope clarification for the final determination, which would ensure that all Chinese cells and all Chinese modules, as well as all Taiwanese cells and all Taiwanese modules, would be subject to the scope of either these investigations or the first solar AD/CVD investigations.[1] As set forth in SolarWorld's case briefs,[2] the clarification effectuates the intent of the Petitioner and would result in effective, administrable and enforceable AD/CVD orders. AD/CVD orders with the scope proposed by the

---

[1]    Products subject to the 2012 solar investigations and resulting AD/CVD orders would remain subject to only those AD/CVD orders. Letter from Howard Smith, Program Manager, Office IV, AD/CVD Operations, Enforcement and Compliance, to All Interested Parties, re: *Antidumping and Countervailing Duty Investigations of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and the Antidumping Duty Investigation of Certain Crystalline Silicon Photovoltaic Products from Taiwan: Opportunity to Submit Scope Comments* (Oct. 3, 2014) ("Scope Clarification Memo") at n. 1.

[2]    *See* Letter from Wiley Rein LLP to Sec'y of Commerce, re: *Crystalline Silicon Photovoltaic Products from China: Case Brief* (Oct. 16, 2014) at 4-5 ("SolarWorld's Case Brief"); Letter from Wiley Rein LLP to Sec'y of Commerce, re: *Crystalline Silicon Photovoltaic Products from Taiwan: Case Brief* (Oct. 16, 2014) at 6.

1

PUBLIC DOCUMENT

Department would finally provide the relief from unfair trade practices that the U.S. solar industry has sought for years.

### 1. The Department Is Justified in Adopting the Proposed Scope Clarification at This Stage in the Proceedings

Respondents argue that adoption of the proposed scope clarification would amount to an "unlawful expansion of the scope… at an extremely late stage of these proceedings."[3] However, contrary to respondents' assertions, the Department's clarification of the scope at this final phase in the proceedings is fair and reasonable, and would not be unlawful.

### a. The Department Can Clarify the Scope at This Stage in the Proceedings

The Court of International Trade ("CIT") has specifically stated that Commerce has the discretion to clarify the scope, even in a way that "expand{s} the language of a petition," in the course of an AD/CVD investigation.[4] This decision was upheld by the U.S. Court of Appeals for the Federal Circuit.[5]

The CIT has likewise stated that Commerce's authority to clarify the scope is not confined to, for example, the initiation phase of a proceeding. As respondents themselves cite,[6] the court noted in *Allegheny Bradford Corp. v. United States*: "{t}here is no clear point during the court of an antidumping investigation at which {the Department} loses the ability to adjust the scope."[7]

---

[3]    *See* Letter from Sidley Austin LLP to Sec'y of Commerce, re: *Antidumping and Countervailing Duty Investigation of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China, and Antidumping Duty Investigation of Certain Crystalline Silicon Photovoltaic Products from Taiwan: Respondents' Case Brief* ("Sidley Respondents' Case Brief") at 12.

[4]    *Mitsubishi Elec. Corp. v. United States*, 700 F. Supp. 538, 555 (Ct. Int'l Trade 1988) ("The ITA has a certain amount of discretion to *expand the language of a petition*… with the purpose in mind of preventing the intentional evasion or circumvention of the antidumping duty law") (emphasis added).

[5]    *Mitsubishi Elec. Corp. v. United States*, 898 F.2d 1577 (Fed. Cir. 1990).

[6]    Sidley Respondents' Case Brief at 12.

[7]    *Allegheny Bradford Corp. v. United States*, 342 F. Supp. 2d 1172, 1187 (Ct. Int'l Trade 2004).

2

PUBLIC DOCUMENT

Moreover, in this case, the Department is even more justified than under other circumstances in adjusting the scope at this stage in the proceeding, as the Department has been very clear throughout this investigation thus far that it is continuing to evaluate the scope, and that its country-of-origin determinations related subject merchandise could change. In the preliminary determination, for example, the Department explicitly stated that it was "continuing to analyze interested parties' scope comments, including comments on whether it is appropriate to apply a traditional substantial transformation or other analysis in determining the country of origin of certain solar modules described in the scope of the investigation."[8]  Thus, the respondents were clearly on notice that the Department's method of determining country-of-origin in this investigation could change for the final determination, and their arguments on this point must fail.

        b.      The Investigations Conducted Thus Far by the Department and the International Trade Commission Are Consistent with Adoption of the Proposed Scope Clarification

Similarly, the fact that the Department and the International Trade Commission (the "Commission") have issued preliminary determinations and are now in the final phase of their investigations does not prevent the adoption of the Department's proposed scope clarification, contrary to respondents' assertions.[9]

As an initial matter, respondents' citations to *Allegheny Bradford Corp. v. United States* for the assertion that expanding the scope would "compromise the integrity of the investigation's

---

[8]      Issues and Decision Memorandum accompanying *Certain Crystalline Silicon Photovoltaic Products from Taiwan*, 79 Fed. Reg. 44,395 (Dep't Commerce July 31, 2014) ("affirm. prelim. deter. of sales at less than fair value and postponement of final deter.) ("Taiwan Prelim I&D Memo") at 5.

[9]      *See, e.g.,* Sidley Respondents' Case Brief at 14-15; Letter from Trade Pacific PLLC to Sec'y of Commerce, re: *Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and Taiwan – Case Brief* (Oct. 16, 2014) ("TenKsolar's Case Brief") at 6-8; Letter from Orrick, Herrington & Sutcliffe LLP to Sec'y of Commerce, re: Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China (Oct. 16, 2014) ("Hanwha QCells' Case Brief") at 5-7.

PUBLIC DOCUMENT

prior stages" are inapposite.[10]  The issue involved in *Allegheny Bradford*, in the CIT's own words, was "whether Commerce may construe an antidumping order to cover products which bear a characteristic that <u>cannot be reconciled with the language of the order</u>."[11]  An AD order had already been issued in the case underlying that appeal, and the court's primary analysis involved the consistency of a post-investigation scope ruling by the Department with the language of that order.[12]  These aspects of *Allegheny Bradford* are therefore inapplicable to the current circumstances, in which Commerce is still formulating the final scope language, which will ultimately be included in any orders that are issued.[13]

In addition, the adoption of the proposed scope clarification is fully consistent with the investigation the Department has conducted thus far.  Petitioner has stated throughout this proceeding its well-supported belief that the majority of solar panels exported by China during the period of investigation consisted of solar panels consisting of cells made in Taiwan, either

---

[10]     *Allegheny Bradford Corp.*, 342 F. Supp. 2d at 1188.  *See* Sidley Respondents' Case Brief at 14; TenKsolar's Case Brief at 6; GOC's Case Brief at 8.

[11]     *Allegheny Bradford Corp.*, 342 F. Supp. 2d at 1183.

[12]     *See id.* at 1189-90.  As the CIT explained in *Ad Hoc Shrimp Trade Action Comm. v. United States*, an analysis of the scope while an antidumping duty investigation is ongoing, prior to issuance of an order, and analysis of the scope in a post-order scope ruling are not analogous.  637 F. Supp. 2d 1166, 1181 (CIT 2009) (stating, with reference to arguments of the Defendant in that case, "*Duferco* involved a challenge to a scope ruling construing an already-issued antidumping duty order, not a challenge to the Department's scope language as set forth in a final LTFV determination and the resulting antidumping duty order. *Duferco* stands for the principle that Commerce, in making a scope ruling after the issuance of an antidumping duty order, lacks the authority to construe scope language in the order to cover certain merchandise if there is no language in the order that includes or can reasonably be interpreted to include that merchandise. *Tak Fat Trading Co.*, like *Duferco*, involved a scope ruling construing an antidumping duty order and therefore is also inapposite") (internal citations omitted).

[13]     To the extent that the CIT considered the Department's amendment of the scope in its final determination in the case underlying *Allegheny Bradford*, such analysis is also inapplicable here, as the Department's scope amendment in that case occurred at a later time than in the instant proceeding – *i.e.*, "after completion of the ITC investigation." *Allegheny Bradford Corp.*, 342 F. Supp. 2d at 1188.  Moreover, in that case, the court appeared to take issue with the Department's "lack of a thorough inquiry" when amending the scope for purposes of its final determination. *See id.* at 1188.  Here, to the contrary, and as evidenced by the extensive comment submitted by interested parties on this issue, the Department is obviously conducting a thorough inquiry into the appropriateness of adopting its proposed scope clarification.

4

PUBLIC DOCUMENT

with or without Chinese-made inputs.[14] In other words, the majority of modules being shipped from China and Taiwan, that would be subject to the scope under the Department's proposed scope clarification, were also subject to the scope as it existed at the time data was collected from respondents and the preliminary determination was issued. Thus, the data based on which the Department will calculate final subsidy and dumping margins are largely consistent with the scope as stated in the Department's proposed scope clarification.

The same applies to the Commission's injury investigation. While the Commission never has perfect import coverage in its investigations, the data the Commission will collect in the final phase of the investigation will be largely consistent with the scope as stated in the proposed scope clarification. In other words, the Commission will obtain data on a significant and meaningful percentage of all modules exported from China and all modules exported from Taiwan – *i.e.*, subject merchandise under the proposed scope clarification. The Commission will therefore be able to reach a well-informed determination on material injury based on the scope outlined in the Department's proposed clarification.

## 2. The Department's Proposed Scope Clarification Is Consistent with Petitioner's Intent

Respondents claim that the Department's proposed scope clarification goes beyond, or even is contrary to, Petitioner's intent.[15] The respondents are wrong. Specifically, respondents argue that "the Department's own practice is not to expand the scope of an investigation beyond

---

[14] *See* Petition for the Imposition of Antidumping and Countervailing Duties, *Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and Taiwan*, vol. I (Dec. 31, 2013) at 4-5.

[15] *See, e.g.*, Sidley Respondents' Case Brief at 16; Letter from Curtis, Mallet-Prevost, Colt & Mosle LLP to Sec'y of Commerce, re: *Government of China's Case Brief: Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China* (Oct. 16, 2014) ("GOC's Case Brief ") at 9; Letter from Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP to Sec'y of Commerce, re: *Administrative Case Brief: Antidumping Duty Investigation of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China (A-570-010)* ("Asun's Case Brief") at 3.

**PUBLIC DOCUMENT**

those products for which Petitioner seeks relief."[16] As an initial matter, it is clearly not the case that this is contrary to the Department's practice because, as noted above, the CIT has specifically held that the Department "has a certain amount of discretion to expand the language of a petition."[17] In addition, the case cited by respondents to establish this so-called practice notes that "{i}t is also appropriate that the Department not force the petitioner to seek duties on products against its will."[18]

Here, the Department's proposed scope clarification is quite far from "forc{ing} the petitioner to seek duties on products against its will." To the contrary, the Department's proposed scope clarification is fully consistent with SolarWorld's intent. It has been clear since the start of the first solar AD/CVD investigations, and throughout the current investigations, that SolarWorld's intent has always been to cover all cells from China and all modules from China and, now, all cells from Taiwan and all modules from Taiwan.[19] Indeed, SolarWorld filed the instant investigations specifically in order to close the loophole created as a result of the Department's scope determination in the first solar cases and to cover all cells and modules from China, as well as to expand the investigations to Taiwan to address unfair trade practices that were exacerbated as a result of that scope determination.[20] The Department's proposed scope clarification is in accordance with this longstanding intent of the petitioning domestic industry.

---

[16]    Sidley Respondents' Case Brief at 16.

[17]    *Mitsubishi Elec. Corp.*, 700 F. Supp. at 555.

[18]    *See Spring Table Grapes From Chile and Mexico*, 66 Fed. Reg. 26,831, 26,833 (Dep't Commerce May 15, 2001) (initiation of antidumping duty investigations); Sidley Respondents' Case Brief at 16.

[19]    *See, e.g.*, Issues and Decision Memorandum accompanying *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules*, 77 Fed. Reg. 63,791 (Dep't Commerce Oct. 17, 2012) (final deter. of sales at less than fair value, and affirmative final deter. of critical circumstances, in part) at cmt. 1.

[20]    *See, e.g.*, Letter from Wiley Rein LLP to Sec'y of Commerce, re: *Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and Taiwan: Rebuttal to Respondents' Scope Comments* (Apr. 3, 2014) ("SolarWorld's Scope Rebuttal Comments").

6

PUBLIC DOCUMENT

### 3.   Adoption of the Proposed Scope Clarification Would Not Lead to Inconsistent Country-of-Origin Determinations

Respondents argue that the Department's proposed scope clarification would result in inconsistent country-of-origin determinations for a single product, as it does not duplicate the country-of-origin reasoning advanced by the Department in the 2012 solar investigations.[21] First, to the extent that the Department's proposed scope clarification can be considered a departure from its prior country-of-origin determination, the agency is, of course, permitted to depart from its prior determinations.[22]  It is simply required to explain the reasons for its departure when doing so.  In this case, the Department has a sound and reasoned basis, supported by law and substantial evidence, for its adoption of the proposed scope clarification, including the necessity of the clarification in order to effectively address the dumping and subsidies of respondents and injury suffered by the domestic solar industry, as well as for adminstrability and enforcement purposes.

In addition, while the country-of-origin analyses from the first solar investigation and that proposed by the scope clarification may differ, they are not necessarily inconsistent, nor unclear. The proposed scope clarification specifically exempts products subject to the existing solar AD/CVD orders from these investigations.[23]  Respondents' argument that the scope clarification results in a single product having two countries of origin is unfounded.[24]  Because the country-of-origin rules in the proposed scope clarifications provides a supplemental country-of-origin

---

[21]      *See, e.g.*, Sidley Respondents' Case Brief at 17-3.

[22]      *See Torrington Co. v. United States*, 745 F. Supp 718, 727 (CIT 1990) ("{i}t is a principle of administrative law that an agency must either conform to its prior norms and decisions *or explain the reason for its departure from such precedent*" (emphasis added) (internal quotation omitted).

[23]      Scope Clarification Memo at n.1.

[24]      *See, e.g.*, Letter from Arent Fox LLP to Sec'y of Commerce, re: *Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: Case Brief of Changzhou Trina Solar Energy Co., Ltd.* (Oct. 16, 2014) ("Trina's Case Brief") at 9-11.

7

PUBLIC DOCUMENT

rule for those products not covered by the initial solar investigations, no product would at any time have two countries of origin.  For example, in its case brief, Trina mistakenly claims that "identical products... would have two different countries of origin" under the proposed scope clarification, and purports to support this claim with country-of-origin examples in the table on pages 10-11 of its case brief.  Specifically, Trina states that the example product in scenarios 2 and 5 of its table, which it identifies as "Cell production: Taiwan; Module assembly: China," would have two different origins under the Department's previous analysis in the 2012 solar investigations and under the proposed scope clarification.  Of course, that is not the case.  Such modules would continue to be of Taiwanese origin.  The Department specifically accounts for this in its proposed scope clarification, noting that "subject merchandise {from Taiwan} will include modules... assembled in a third-country, *other than the PRC*, consisting of {c-Si PV} cells produced in Taiwan."[25]  Thus, Taiwanese cells assembled into a module in China would result in a module of Taiwanese origin, consistent with the Department's prior analysis.[26]

### 4. Adoption of the Proposed Scope Clarification Would Lead to Enforceable AD/CVD Orders that Effectively Remediate the Injury Caused to the Domestic Solar Industry

Importantly, the Department's proposed scope clarification would also result in AD/CVD orders that are effective, helping to prevent significant and widespread avoidance, evasion and circumvention of the orders.  As the Department is well aware, its scope determination in the initial solar AD/CVD investigations unintentionally resulted in the creation of a loophole, facilitating widespread evasion of the current AD/CVD orders.  Coverage of all cells and modules from China and all cells and modules from Taiwan, as the Department's scope clarification would provide, would close the loophole and prevent such evasion, resulting in

---

[25]   Scope Clarification Memo at Attachment p. 2 (emphasis added).

[26]   *See, e.g.*, Trina's Case Brief at 10.

13793365.2

**PUBLIC DOCUMENT**

AD/CVD orders that would effectively address unfairly traded imports and remedy the harm suffered by the domestic industry.

Adoption of the proposed scope clarification would therefore be consistent with the Department's practice in this manner as well, as the Department often notes its intent to avoid creating opportunities for circumvention when defining the scope of an investigation.[27] The Department's practice of taking evasion concerns into consideration when defining the scope has been upheld by the CIT and the Court of Appeals for the Federal Circuit.[28] The proposed scope would also be consistent with international precedent. The recent European Union ("EU") AD/CVD investigations of Chinese solar products included "imports of crystalline silicon photovoltaic modules and key components (i.e. cells and wafers) originating in or consigned from the People's Republic of China,"[29] recognizing that all cells and all modules from the subject country, in addition to other key components, must be covered. An agreement between the EU and certain Chinese producers also adopted this scope, and, as such, even Chinese respondents and the government of China must recognize its potential validity.

The remedial purposes of the AD/CVD laws are also best served by this scope clarification. The Department has determined that both cells and modules from China and

---

[27]     See, e.g., Large Newspaper Printing Presses and Components Thereof, Whether Assembled or Unassembled, from Germany, 61 Fed. Reg. 38,166, 38,169 (Dep't Commerce July 23, 1996) (notice of final deter. of sales at less than fair value") ("{I}t was the Department's intent to use the language at issue to avoid creating loopholes from circumvention..."); Cellular Mobile Telephones and Subassemblies from Japan, 50 Fed. Reg. 45,447, 45,448 (Dep't Commerce Oct. 31, 1985) (final deter. of sales at less than fair value) ("The primary purpose of including subassemblies in this investigation is to prevent evasion of the antidumping law").

[28]     See Mitsubishi Elec. Corp, 700 F. Supp. at 555 ("The ITA has a certain amount of discretion to expand the language of a petition... with the purpose in mind of preventing the intentional evasion or circumvention of the antidumping duty law"), aff'd, 898 F.2d 1577 (Fed. Cir. 1990) ("As the Court of International Trade properly pointed out, the {agency} was sensitive to any type of evasion of an {AD} order... {Commerce} justifiably decided to make the {AD} order applicable to {the merchandise}, because of the potential of {that merchandise} to be used to evade the order") (internal citation omitted). See also Tung Mung Dev. Co. v. United States, 26 CIT 969, 979, (2002), aff'd, 354 F.3d 1371 (Fed. Cir. 2004).

[29]     See Council Implementing Regulation (EU) No 1238/2013 of 2, Official Journal of the European Union (Dec. 2013).

9

PUBLIC DOCUMENT

Taiwan are being dumped, and both Chinese cells and modules are subsidized. As such, the law obligates Commerce to impose duties on these products.

Finally, the clarifying scope language proposed by the Department would result in AD/CVD orders that are administrable and enforceable by the Department and U.S. Customs and Border Protection ("CBP"). As the Department is aware, c-Si PV cells are not required to contain country of origin markings. While it is possible for solar producers to track their inputs through the production process in a manner that allows for the identification of the origin of various inputs to a module,[30] it can be extremely difficult for CBP to determine the origin of various inputs in a solar module upon importation. On the other hand, all solar modules are clearly marked with country-of-origin and other identifying information. Covering all cells and modules from both China and Taiwan, as described in the October 3 proposed scope clarification, would therefore significantly improve the enforceability of any future AD/CVD orders. Commerce "has an inherent power to establish the parameters of the investigation so as to carry out its mandate to administer the law effectively and in accordance with its intent,"[31] and adoption of the proposed scope clarification would significantly enhance the agency's ability to administer the AD/CVD laws effectively.

5.   The Department's Proposed Scope Clarification Does Not Conflict with U.S. WTO Obligations

Respondents claim that adopting the Department's proposed scope clarification will violate the United States' obligation to provide most-favored nation ("MFN") treatment by subjecting certain cells produced in market economy countries but assembled into modules in

---

[30]   *See, e.g.*, SolarWorld's Scope Rebuttal Comments at 14-18.

[31]   *Cellular Mobile Telephones and Subassemblies*, 50 Fed. Reg. at 45,448. *See also, e.g., Diversified Products Corporation v. United States*, 6 CIT 155 (1983).

10

PUBLIC DOCUMENT

China to dumping margins calculated using a non-market economy methodology.[32]  The United States' obligations under the MFN provision, however, are irrelevant to this issue and should be rejected.

Under the proposed clarification, the non-market economy methodology would, appropriately, only be applied to cells originating in China, as well as modules, laminates, and/or panels assembled in China.[33]  Contrary to Respondents' claims, cells and "module{s} originating in China," a non-market economy country, are not entitled to market-economy treatment.  On the other hand, given Taiwan's status as a market economy country, cells originating in Taiwan (other than those destined for module-assembly in China), as well as modules, laminates, and/or panels assembled in Taiwan, would appropriately be subject to duties calculated based on a market economy methodology.  It is unclear to Petitioner how such conduct would violate the United States' obligations on MFN treatment.  To the extent that Respondents' are claiming that using a market economy methodology to calculate dumping margins is an "advantage, favour, privilege, or immunity," that will not be afforded to Taiwanese cells shipped to China,[34] this argument is unexplained, unsupported and, frankly, nonsensical.  Moreover, the MFN provision does not require the United States to ignore unfair trade practices being engaged in by foreign producers.  Indeed, the AD and CVD laws are recognized exceptions to MFN treatment, according to the rules of GATT Article VI, the WTO Antidumping Agreement, and the Agreement on Subsidies and Countervailing Measures.

Respondents also claim that adoption of the proposed scope clarification would violate the United States' obligations under the World Trade Organization ("WTO") Agreement on

---

[32]     *See* Sidley Respondents' Case Brief at 23-24; GOC's Case Brief at 5.

[33]     *See* Scope Clarification Memo at Attachment p. 1.

[34]     *See* Sidley Respondents' Case Brief at 23-24.

11

Rules of Origin.[35]   Contrary to their assertions that the clarification "is designed to distort international trade," the Department's proposed scope clarification is designed to ensure that the orders resulting from these investigations are effective and enforceable, and adequately address the substantial evasion that occurred as a result of the loophole in the existing AD/CVD orders on Chinese product.  The "distortion" in international trade is the result of the unfair trade practices being engaged in by Chinese and Taiwanese solar manufacturers that these investigations are attempting to redress.

In addition, the scope clarification does not "discriminate between the United States' treatment of imports from China and Taiwan on the one hand, and imports from other WTO Members on the other hand, by bringing additional products from China and Taiwan within the scope of any eventual AD/CVD orders that would otherwise not fall within that scope."[36]  As mentioned previously, the Department has the authority expand the scope of a petition.[37] Moreover, it is unclear to Petitioner how the proposed scope clarification discriminates between WTO-member products.   Imports of solar products from China and Taiwan have been preliminarily found to be dumped and subsidized.[38]  The Department must ensure that all such dumping and subsidization is remedied in a manner that also limits the potential for circumvention of any future orders.[39]  The Department's scope clarification ensures only that

---

[35]    *See* Sidley Respondents' Case Brief at 24; Trina's Case Brief at 14; Hanwha QCells' Case Brief at 9; GOC's Case Brief at 5.

[36]    *See* Sidley Respondents' Case Brief at 24.

[37]    *See Mitsubishi Elec. Corp.*, 700 F. Supp. at 555.

[38]    *See, e.g.,* Taiwan Prelim I&D Memo; Issues and Decision accompanying *Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China*, 79 Fed. Reg. 44,399 (Dep't Commerce July 31, 2014) (affirm. prelim. deter. of sales at less than fair value and postponement of final deter.) ("China AD Prelim I&D Memo"); Issues and Decision accompanying *Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China*, 79 Fed. Reg. 33,174 (Dep't Commerce June 10, 2014) (prelim. affirm. countervailing duty deter. ) ("China CVD Prelim I&D Memo").

[39]    *See Mitsubishi Elec. Corp.*, 700 F. Supp. at 555.

12

**PUBLIC DOCUMENT**

such requirements are met. Any solar cells and/or modules that fall within the scope clarification will be subject to equal treatment. And, contrary to Trina's assertions, it would not subject "any third country cells" to AD/CVD duties;[40] rather it would subject imports of modules from China and Taiwan—which have been determined to be dumped and subsidized—to lawfully calculated duties.[41]

In sum, Respondent's arguments that the proposed scope clarification is violative of the United States' obligations under the WTO are unavailing and should be rejected. Indeed, all of respondents' arguments against the adoption of the Department's October 3 proposed scope clarification must fail. SolarWorld supports the proposed scope clarification and requests that the Department adopt it for purposes of its final determinations and any resulting AD/CVD orders.

### 6.   Adoption of the Proposed Scope Clarification Does Not Violate Respondents' Due Process Rights

Respondents claim that the Department's proposed scope clarification is a violation of due process, particularly as it pertains to the separate rate application process.[42] Notwithstanding the Department's authority to clarify the scope during the course of investigations, even in a way that "expand{s} the language of a petition,"[43] the proposed scope clarification does not implicate

---

[40]     *See* Trina's Case Brief at 14.

[41]     Notably, any solar cell manufacturer in WTO-member countries other than China and Taiwan who wishes to avoid antidumping and/or countervailing duties on imports of their products to the United States should simply ensure that they, as well as their module assemblers, do not engage in such unfair trade practices.

[42]     *See* Letter from Perkins Coie LLP to Sec'y of Commerce, re: *Certain Crystalline Silicon Photovoltaic Products from Taiwan; Gintech Case Brief* (Oct. 16, 2014) ("Gintech's Case Brief") at 21 (claiming that certain parties had "virtually no notice or opportunity to participate in this investigation"); Sidley Respondents' Case Brief at 13 (claiming that the proposed scope clarification "raises procedural concerns"); Letter from Dorsey & Whitney LLP to Sec'y of Commerce, re: *Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: Case Brief* (Oct. 16, 2014) ("Zamp Solar's Case Brief") at 12-15.

[43]     *Mitsubishi Elec. Corp.*, 700 F. Supp. at 555 ("The ITA has a certain amount of discretion to <u>expand the language of a petition</u>... with the purpose in mind of preventing the intentional evasion or circumvention of the antidumping duty law").

13

due process concerns as all parties have been on notice of the scope, and potential changes thereto, since these investigations were initiated.

As mentioned previously, the Department has made clear throughout these investigations that the scope of the investigations is subject to continuing evaluation, and that the country-of-origin determinations related to subject merchandise could change for the final determination. Specifically, in the initiation notice, the Department invited comments on the scope of these investigations, clearly indicating to the public that the scope was subject to modification:

> During our review of the Petitions, the Department issued questions to, and received responses from, Petitioner pertaining to the proposed scope to ensure that the scope language in the Petitions would be an accurate reflection of the products for which the domestic industry is seeking relief. Also, on January 15, 2014, Suniva, Inc. ("Suniva"), a U.S. producer of certain solar cells and panels, submitted comments on the scope.   As discussed in the preamble to the regulations, we are setting aside a period for interested parties to raise issues regarding product coverage . . . The Department encourages all interested parties to submit such comments by 5:00 p.m. Eastern Time on February 11, 2014. All comments must be filed on the records of the PRC and Taiwan AD investigations, as well as the concurrent PRC CVD investigation.[44]

The Department again noted its ongoing evaluation of the scope in the preliminary determination, in which, after adopting Petitioner's proposed scope, the Department explained that it was:

> continuing to analyze interested parties' scope comments, including comments on whether it is appropriate to apply a traditional substantial transformation or other analysis in determining the country of origin of certain solar modules described in the scope of the investigation.[45]

All manufacturers, exporters, and/or importers of Chinese and Taiwanese cells and modules, therefore, were on notice that the Department's country of origin determination, and hence the

---

[44]    *Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and Taiwan,* 79 Fed. Reg. 4,661, 4,667 (Dep't Commerce Jan. 29, 2014) (initiation of antidumping duty inv.) (emphasis added); *Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China,* 79 Fed. Reg. 4,667, 4,671 (Dep't Commerce Jan. 29, 2014) (initiation of countervailing duty inv.) (emphasis added).

[45]    China AD Prelim I&D Memo at 5; Taiwan AD Prelim I&D Memo at 5; China CVD Prelim I&D Memo at 4.

14

**PUBLIC DOCUMENT**

scope of these investigations, could change. Thus it is not true that Respondents had "no opportunity to participate in the proceeding or 'to be heard' and cannot participate meaningfully in this investigation because the factual record is closed."[46] To the contrary, Respondents were given ample notice of and opportunity to participate in these proceedings.

Further, manufacturers, exporters, and importers of solar cells <u>and</u> modules from China and Taiwan have been on notice since initiation that modules manufactured using non-Chinese and non-Taiwanese origin cells are potentially subject to these investigations. The Department's initiation notice, stated:

> The merchandise covered by these investigations is crystalline silicon photovoltaic cells, and modules, laminates and/or panels consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including building integrated materials.

> For purposes of these investigations, subject merchandise also includes modules, laminates and/or panels assembled in the subject country consisting of crystalline silicon photovoltaic cells that are completed or partially manufactured within a customs territory <u>other than that subject country</u>, using ingots that are manufactured in the subject country, wafers that are manufactured in the subject country, or cells where the manufacturing process begins in the subject country and is completed <u>in a non-subject country</u>.[47]

This initiation notice was published in the *Federal Register* and is thus considered to have provided constructive notice to parties potentially impacted by these investigations.[48] Thus, all parties, including manufacturers, exporters and/or importers who supplied modules, laminates and/or panels that were made using non-Chinese and non-Taiwanese cells were put on notice not only of these proceedings, but also of the fact that their sales were potentially subject to these

---

[46]     *See* Zamp Solar's Case Brief at 13.

[47]     *Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and Taiwan*, 79 Fed. Reg. 4,661 (Dep't Commerce Jan. 29, 2014) (initiation of antidumping duty inv.) (emphasis added); *Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China*, 79 Fed. Reg. 4,667 (Dep't Commerce Jan. 29, 2014) (initiation of countervailing duty inv.)

[48]     *See Cathedral Candle Co. v. U.S. Int'l Trade Comm'n*, 27 CIT 1541, 1549 n. 10, 285 F.Supp.2d 1371, 1378 n. 10 (2003) ("It is well established by both statutes and cases that the publication of an item in the Federal Register constitutes constructive notice of anything within that item.").

PUBLIC DOCUMENT

investigations, unless they could determine, that the wafers/ingots used to manufacture the third-country cells were of non-Chinese or non-Taiwanese origin. Yet, as Respondents have repeatedly claimed in these investigations, it is "virtually impossible for importers to know and to trace the origin of the ingots and wafers in cells that are assembled into modules when the module manufacturers purchase the cells from third parties in other countries."[49] While SolarWorld disputes this claim,[50] if true, Respondents and others would not have known for certain whether or not their products were subject to these investigations. Given this potential uncertainty, Respondents such as Zamp Solar should have filed quantity and value submissions and separate rate applications with the Department, as others did.[51] They failed to do so.

Zamp Solar's reliance on the Federal Circuit's holding in *Transcom Inc. v. United States* is misplaced.[52] In *Transcom*, the Department had failed to follow its own regulations when it attempted to apply the China-wide rate to exporters that had not been identified in its initiation notice for an antidumping administrative review.[53] In upholding the challenge, the Federal Circuit found that such exporters were not on notice that the proceeding could impact their antidumping rates.[54] The Federal Circuit also explicitly noted that the Department's conduct

---

[49] *See* Letter from Sidley Austin LLP to Sec'y Commerce, re: *Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and Taiwan: Comments on Scope* at 25 (Feb. 18, 2014); Letter from Perkins Coie LLP to Sec'y Commerce re: *Certain Crystalline Silicon Photovoltaic Products from China and Taiwan; Gintech Comments on Scope* at 14 (Feb. 18, 2014) ("importers would need to know where the initial step, creation of an ingot, took place to determine which products are within the scope of these investigations").

[50] *See* Letter from Wiley Rein LLP to Sec'y of Commerce, re: *Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and Taiwan: Rebuttal to Respondents' Scope Comments* at 14-18 (Apr. 3, 2014).

[51] *See, e.g.*, Letter from Alston & Bird LLP to Sec'y of Commerce, re: *Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China – Separate Rate Application* (Mar. 28, 2014); Letter from Sidley Austin LLP to Sec'y of Commerce, re: *Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China; Canadian Solar's Response to the Department's Quantity and Value Questionnaire* (Feb 14, 2014).

[52] Zamp Solar's Case Brief at 14-15.

[53] 182 F.3d 876, 876 (Fed. Cir. 1999).

[54] *Id.*

16

PUBLIC DOCUMENT

could not be upheld because the party at issue "*had no reason to expect* that the antidumping duties on its . . . products could be affected by {the} proceedings . . . ."[55] The circumstances here are very different. The Department is not required to list in the notice of initiation of an investigation all manufacturers, exporters, and importers who could be subject to eventual AD/CVD orders. Moreover, as explained above, the parties at issue here *did* have reason to expect that any duties imposed could affect their products. Yet, they chose not to separate rate applications or otherwise participate until after the factual record had closed.

Finally, notwithstanding the above, to the extent there remains due process concerns over the adoption of the Department's proposed scope clarification, such concerns could be fully and adequately addressed following a final determination on scope in this investigation. For example, the Department could initiate a changed circumstances review, pursuant to 19 C.F.R. § 351.216. In such a review, the Department could provide to all parties who did not submit separate rate applications in this investigation the opportunity to submit such applications for the Department's consideration. However, to be entitled to a separate rate, the parties would be required to demonstrate that their products were *not* subject to the scope as provided in the Department's January 29, 2014 initiation notice[56] but are subject to the October 3 modified scope. Any parties whose merchandise is subject to the scope as initiated on January 29 but who failed to submit separate rate applications in this investigation would not be entitled to a separate rate.

In sum, Respondents' arguments that the adoption of the Department's proposed scope clarification would violate their due process rights are without merit. The Department should

---

[55]   *Id.* at 881 (emphasis added).

[56]   *Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and Taiwan*, 79 Fed. Reg. 4,661, 4,667 (Dep't Commerce Jan. 29, 2014) (initiation of antidumping duty inv.).

PUBLIC DOCUMENT

reject these claims, as Respondents were on notice of the potential for the scope of these investigations to change, but chose to forego early participation.

**B.    In the Alternative, the Department Should Maintain the Scope from the Preliminary Determination**

As noted in SolarWorld's case brief,[57] should the Department decide not to adopt its October 3 proposed scope clarification, it should maintain for the final determination the scope that has been in place since the Department initiated these investigations and upon which the Department issued its preliminary determinations (the "preliminary scope").[58]   Specifically, despite respondents' arguments to the contrary, the scope of the final determination should include the so-called "two-out-of-three" rule (*i.e.*, "subject merchandise includes modules, laminates and/or panels assembled in the subject country consisting of crystalline silicon photovoltaic cells that are completed or partially manufactured within a customs territory other than that subject country, using ingots that are manufactured in the subject country, wafers that are manufactured in the subject country, or cells where the manufacturing process begins in the subject country and is completed in a non-subject country"[59]).

**1.    The Scope Does Not Contradict, But Rather Supplements, the Department's Previous Substantial Transformation Finding**

Respondents argue that SolarWorld has not provided a justification for the Department to depart from its substantial transformation test, and that the preliminary scope of this investigation is inconsistent with or contradicts the scope determination in 2012 solar AD/CVD

---

[57]     SolarWorld's Case Brief at 4-10.

[58]     *See* China AD Prelim I&D Memo at 4-5.

[59]     Letter from Howard Smith, Program Manager, Office IV, to All Interested Parties, re: *Antidumping and Countervailing Duty Investigations of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and the Antidumping Duty Investigation of Certain Crystalline Silicon Photovoltaic Products from Taiwan: Opportunity to Submit Scope Comments* (Oct. 3, 2014).

PUBLIC DOCUMENT

investigations.[60]   However, as SolarWorld has previously explained,[61] the preliminary scope's "two-out-of-three" rule is intended to underline the Department's prior substantial transformation/country-of-origin determination.  It only applies in the unique circumstances in which an input to a c-Si PV module is produced in a subject country and the c-Si PV module is assembled in the same subject country.

In the first solar AD/CVD investigations, as respondents point out,[62] the Department applied its substantial transformation analysis to determine the country-of-origin of solar modules, and found that a c-Si PV cell does not undergo a substantial transformation during the module production process.[63]  Thus, the Department concluded that a c-Si PV module retains the country of origin of the c-Si PV cells from which it is assembled.[64]

Under the preliminary scope of this investigation, in circumstances in which a c-Si PV cell undergoes its full production process in a single country and is assembled into a module in a different country (whether subject or not) before being exported to the United States, SolarWorld presumes that the Department's substantial transformation analysis and country-of-origin determination from the first solar AD/CVD investigations would continue to apply (i.e., the module would retain the country of origin of the cells from which it was assembled).  Similarly, if a c-Si PV cell is partially produced in two non-subject countries, or partially produced in a

---

[60]     See, e.g., GOC Case Brief at 3.

[61]     SolarWorld's Case Brief at 8-10.

[62]     See, e.g., GOC Case Brief at 3.

[63]     See Memorandum from Jeff Pedersen, Case Analyst, Through Abdelali Elouradia, Director, and Howard Smith, Program Manager, Office 4, to Gary Taverman, Acting Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations, re: Scope Clarification: Antidumping and Countervailing Duty Investigations of Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China (Mar. 19, 2012) ("Prelim Scope Clarification Memo"), attached to Petitioner's April 3 Scope Rebuttal Comments at Exhibit 1.

[64]     See id.  SolarWorld has appealed this aspect of the Department's final determination in the first solar investigations to the Court of International Trade, where the appeal is currently pending. See SolarWorld Industries America, Inc. v. United States, CIT Court No. 13-00219.

19

PUBLIC DOCUMENT

non-subject country and partially produced in a subject country, SolarWorld expects that the Department's substantial transformation analysis and country-of-origin determination from the first solar AD/CVD investigations would, again, continue to apply (*i.e.*, the module would retain the country of origin of the cell, as determined by the Department).

The "two-out-of-three" rule in the current scope of the investigations thus would not "overrule" or "ignore" the Department's previous analysis, but would apply only in the unique circumstances in which an input (*i.e.*, ingot, wafer or partially manufactured cell) is produced in a subject country, and the module assembly is completed in that same subject country – a circumstance not explicitly considered by the Department in its previous analysis. The "two-out-of-three" rule in the preliminary scope is intended to be in addition to and a supplement to the Department's previous analysis,[65] not to overrule or replace the Department's previous determination. Thus, respondents' claims that the current scope is inconsistent with the Department's previous substantial transformation analysis and country-of-origin determination are unfounded.

### 2. AD/CVD Orders Issued Under the Preliminary Scope Would Be Effective, Enforceable and Not Unduly Burdensome

Respondents continue to argue that the "two-out-of-three" rule in the preliminary scope is not administrable and will unduly burden foreign producers and importers.[66] However, while these investigations and the existing solar AD/CVD orders may be more complex than other AD/CVD investigations, AD/CVD orders issued using the preliminary scope would be administrable and enforceable by the Department and CBP.

---

[65]     Letter from Steptoe & Johnson LLP to Sec'y of Commerce, re: *Comments on the Scope and Request for Scope Revisions Certain Crystalline Silicon Photovoltaic Products from China and Taiwan* (Feb. 18, 2014) at 2. *See also id.* at 5 ("In other words, Petitioner is saying that the first step is to follow the Department's existing substantial transformation analysis").

[66]     *See, e.g.*, GOC Case Brief at 3-4; Sidley Respondents' Case Brief at 10-16.

Consol. Court No. 15-00067                    **PUBLIC DOCUMENT**

| Tab No. | Document | Pages | Record Document |
|---------|----------|-------|-----------------|
| 9 | Letter from Wiley Rein LLP to Sec'y of Commerce, re: *Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and Taiwan: Rebuttal to Respondents' Scope Comments* (Apr. 3, 2014) | 11-13 | AD PR Doc. 327-328 |



Timothy C. Brightbill
202.719.3138
trade@wileyrein.com

1776 K STREET NW
WASHINGTON, DC 20006
PHONE 202.719.7000
FAX 202.719.7049

7925 JONES BRANCH DRIVE
McLEAN, VA 22102
PHONE 703.905.2800
FAX 703.905.2820

www.wileyrein.com

April 3, 2014

DOC Case Nos.: A-570-010;
A-583-853; C-570-011
Total Pages: 156
Investigations
AD/CVD Operations, Office 4
Contains No Business Proprietary
Information
**PUBLIC DOCUMENT**

**VIA ELECTRONIC FILING**

The Honorable Penny Pritzker
Secretary of Commerce
Attn: Enforcement and Compliance
APO/Dockets Unit, Room 1870
U.S. Department of Commerce
14th Street and Constitution Ave., NW
Washington, D.C. 20230

Re:     ***Certain Crystalline Silicon Photovoltaic Products from the
         People's Republic of China and Taiwan***: Rebuttal to Respondents'
         Scope Comments

Dear Secretary Pritzker:

On behalf of SolarWorld Industries America Inc. ("SolarWorld" or

"Petitioner"), we hereby submit to the Department of Commerce (the

"Department") the following comments in response to the comments submitted by

certain respondents, including Yingli Green Energy Holding Company Limited,

Yingli Green Energy Americas, Inc., Canadian Solar Inc., Changzhou Trina Solar

Energy Co., Ltd., Wuxi Suntech Power Co., Ltd., Shanghai JA Solar Technology

Co., Ltd., Hefei JA Solar Technology Co., Ltd. and Jinko Solar Co., Ltd.

(collectively, the "Sidley Respondents"), Motech Industries, Inc. ("Motech"),



Hon. Penny Pritzker
April 3, 2014
Page 11

PUBLIC DOCUMENT

Certain of respondents' arguments are predicated on the assumption that the Department has made a determination of the cell's country-of-origin and, therefore, these arguments must fail. For example, the Sidley Respondents claim that the current scope would lead to inconsistent results, as a module made in Taiwan, from a cell made in Malaysia, using wafers/ingots made in Taiwan would be considered Taiwanese under the scope of these investigations, conflicting with the Department's "'substantial transformation' test, the application of which would make these modules Malaysian."[24] In so arguing, the Sidley Respondents assume, with no basis, that the Department would consider the cell to be of Malaysian origin, when in fact the Department has made no such determination.[25] SunEdison's arguments are similarly based upon assumptions regarding the Department's country-of-origin determinations for c-Si PV cells[26] and should be rejected.

**D.     The Scope Must Include the "Two-Out-Of-Three" Rule to Prevent Widespread Evasion of Duties**

The current scope of the investigations, including the "two-out-of-three" rule is essential to prevent widespread evasion of the Department's AD/CVD orders. In the first solar AD/CVD investigations, SolarWorld argued at length that the inclusion of all modules imported from China was necessary to prevent the

---

[24]     Sidley Respondents Scope Comments at 21-22.

[25]     Even if the Department would consider the cell to be of Malaysian origin, the scope of this investigation would not conflict with the substantial transformation test, as discussed above. *See* supra at 5-10.

[26]     *See* SunEdison Scope Comments at 10.



Hon. Penny Pritzker
April 3, 2014
Page 12

pervasive evasion of duties that would be imposed in that case.[27] In response to the circumvention concerns, the Department noted, in part, that "Petitioner has the option of bringing additional petitions."[28] Of course, SolarWorld has now been forced to do just that, as our concerns regarding evasion of duties in the first case have largely been realized. The scope of the current investigations, particularly including the "two-out-of-three" rule, is essential to address the evasion by Chinese solar producers and exporters of the duties imposed by the current AD/CVD orders.

As SolarWorld argued throughout the first solar investigations,[29] and as demonstrated in the Petition for the current investigations,[30] Chinese and Taiwanese solar producers changed their production models slightly in order to exploit a loophole in the scope of the AD/CVD orders, evade the duties, and continue pushing dumped and subsidized product into the U.S. market. Should the Department to again permit respondents' to dictate the scope of these investigations, such evasion will undoubtedly continue. Indeed, Chinese solar producers will continue to find new third countries to which they can ship wafers for conversion into cells, then import the cells back into China for assembly into modules – continually evading any AD/CVD duties. Thus, to avoid creating the opportunity

---

[27]    *See* Letter from Wiley Rein LLP to Sec'y of Commerce, re: *Crystalline Silicon Photovoltaic Cells from the People's Republic of China: Scope Comments* (Nov. 28, 2011) ("Petitioner's Scope Comments"); Letter from Wiley Rein LLP to Sec'y of Commerce, re: *Crystalline Silicon Photovoltaic Cells from the People's Republic of China: Scope Rebuttal Comments* (Dec. 14, 2011) ("Petitioner's Rebuttal Comments"), attached at **Exhibit 10**.

[28]    Prelim Scope Clarification Memo at 9, attached at **Exhibit 1**.

[29]    *See, e.g.,* Petitioner's Scope Comments and Petitioner's Rebuttal Comments.

[30]    *See, e.g.,* SolarWorld Petition, vol. I at 3-5.



**PUBLIC DOCUMENT**

for significant evasion, it is imperative that the scope of the current investigations continue to include the "two-out-of-three" rule.

When defining the scope of AD/CVD investigations, the Department has for decades stated its intent to avoid creating opportunities for circumvention or evasion of duties.[31]   The Department's actions to define the scope of investigations to prevent evasion of the AD/CVD laws have been upheld by the CIT and the Court of Appeals for the Federal Circuit.[32]   The Department should act consistently with its practice here, and reject respondents' attempts to eviscerate the scope language in order to permit the continued evasion of AD/CVD duties.

### E.   The Scope of the Investigations Will Not Impose a Substantial Undue Burden on Subject Importers or Exporters

Respondents argue that maintaining the current scope of the investigations would impose substantial difficulties and risks on exporters and importers of subject

---

[31]     *See, e.g., Large Newspaper Printing Presses and Components Thereof, Whether Assembled or Unassembled, from Germany,* 61 Fed. Reg. 38,166, 38,169 (Dep't Commerce July 23, 1996) (final deter.) ("it was {Commerce's} intent to use the language at issue to avoid creating loopholes from circumvention"); *Cellular Mobile Telephones and Subassemblies from Japan,* 50 Fed. Reg. 45,447, 45,448 (Dep't Commerce Oct. 31, 1985) (final deter. of sales at less than fair value) ("The primary purpose of including subassemblies in this investigation is to prevent evasion of the {AD} law"). *See also* Enforcement and Compliance Antidumping Manual (2009) at Chapter 2 at 13 ("Commerce tries to ensure that the description of the merchandise is not so narrow that obvious circumvention issues could arise in the future should an order be imposed"); Prelim Scope Clarification Memo at 9, attached at **Exhibit 1.**

[32]     *See Mitsubishi Elec. Corp v. United States,* 700 F. Supp. 538, 552 (Ct. Int'l Trade 1988) ("The ITA has a certain amount of discretion to expand the language of a petition, ...with the purpose in mind of <u>preventing the intentional evasion or circumvention of the antidumping duty law</u>") (emphasis added), aff'd, 898 F.2d 1577, 1582 (Fed. Cir. 1990) ("As the Court of International Trade properly pointed out, the {agency} was sensitive to any type of evasion of an {AD} order... {Commerce} justifiably decided to make the {AD} order applicable to {the merchandise}, because of the potential of {that merchandise} to be used to evade the order") (internal citation omitted). *See also Tung Mung Dev. Co. v. United States,* 26 CIT 969, 979, (2002), *aff'd,* 354 F.3d 1371 (Fed. Cir. 2004).

**PUBLIC DOCUMENT**

| Tab No. | Document | Pages | Record Document |
|---------|----------|-------|-----------------|
| 10 | Letter from Sidley Austin LLP to Sec'y Commerce, re: *Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and Taiwan: Comments on Scope* (Feb. 18, 2014) | 25 | AD PR Doc. 125 |



SIDLEY AUSTIN LLP
1501 K STREET, N.W.
WASHINGTON, D.C. 20005
(202) 736 8000
(202) 736 8711 FAX

| BEIJING | HONG KONG | SHANGHAI |
| BOSTON | HOUSTON | SINGAPORE |
| BRUSSELS | LONDON | SYDNEY |
| CHICAGO | LOS ANGELES | TOKYO |
| DALLAS | NEW YORK | WASHINGTON, D.C. |
| FRANKFURT | PALO ALTO | |
| GENEVA | SAN FRANCISCO | |

nellis@sidley.com
202.736.8075

FOUNDED 1866

## PUBLIC DOCUMENT

February 18, 2014

The Honorable Penny Pritzker
Secretary of Commerce
U.S. Department of Commerce
Constitution Avenue & 14ᵗʰ Street, NW
Washington, DC 20230

Case Nos.: A-570-010, A-583-853, and
C-570-011
Number of Pages: 89
Investigation

Attention:      Enforcement and Compliance
                APO/Dockets Unit, Room 1870

**THIS DOCUMENT CONTAINS NO
PROPRIETARY INFORMATION**

Re:      Certain Crystalline Silicon Photovoltaic Products from the People's Republic of
         China and Taiwan: Comments on Scope

Dear Madame Secretary:

On behalf of Yingli Green Energy Holding Company Limited, Yingli Green Energy

Americas, Inc., Canadian Solar Inc., Changzhou Trina Solar Energy Co., Ltd., Wuxi Suntech

Power Co., Ltd., Shanghai JA Solar Technology Co., Ltd., Hefei JA Solar Technology, Co., Ltd.,

and Jinko Solar Co., Ltd. (collectively, "Respondents"),[1] we hereby submit the following

---

[1]      This submission is made with the support of the China Chamber of Commerce for Import
and Export of Machinery and Electronic Products ("CCCME"). CCCME represents 90 major
Chinese producers and exporters of crystalline silicon photovoltaic ("CSPV") products,
including the companies listed above, as well as Sumec Hardware & Tools Co. Ltd, ET Solar
Group, ReneSola Ltd., Wuhan FYY Technology Co., Ltd., Jetion Solar (China) Co., Ltd.,
Tainergy Tech (KunShan) Co., Ltd., Realforce Power Co., Ltd., Lightway Green New Energy
Co., Ltd., and Shenzhen Sungold Solar Co., Ltd.



SIDLEY AUSTIN LLP

Honorable Penny Pritzker
February 18, 2014
Page 25

> B.   *Petitioner's Proposed Scope Would Impose Substantial Burdens on Exporters and*
> *Importers and Would Be Difficult for the Department and CBP to Enforce and*
> *Administer*

Aside from untenable results, Petitioner's proposed scope would impose substantial

burdens and risks on exporters and importers and would create an administrative nightmare for

the Department and CBP.  Exporters and importers of Chinese modules currently are required to

certify and document claims that their modules do not contain Chinese cells.  Importers of

modules that contain both Chinese and non-Chinese cells must identify the value of the Chinese

cells.  Failure to meet these requirements results in imposition of a cash deposit or bond equal to

the PRC-wide rate in effect at the time of entry.

It is difficult enough to meet these requirements when importers of modules need only

certify the origin of finished cells.  It is virtually impossible for importers to know and to trace

the origin of the ingots and wafers in cells that are assembled into modules when the module

manufacturers purchase the cells from third parties in other countries, or to distinguish between

the value of modules with cells that meet Petitioner's "two-out-of-three" test and those that do

not.[54]  Indeed, in the previous investigations, even while proposing a similar "two-out-of-three"

---

[54]     Respondents use cells from a single manufacturer in any given module, but cell
manufacturers may use wafers or ingots from many different countries.  The "two-out-of-three"
rule does not specify how origin is to be determined in circumstances where, for example, a
module is assembled in China using cells from a single Taiwanese supplier, but those cells were
produced from wafers or ingots from varying sources, some of which may be China or Taiwan.
In other words, what happens if, for example, a module is assembled in China using 60 cells
obtained from a Taiwanese cell supplier, where all of the wafers were cut in Taiwan, but 30 of
the wafers were made from Chinese ingots and 30 of the wafers were made from Taiwanese
ingots?  Is this module Chinese, Taiwanese, or both?  If both, which duty is it subject to at the
time of entry?  The possibilities for complex examples of this kind are limitless.  As just one
more example, what is the origin of a module assembled in China using 60 cells from a single

Consol. Court No. 15-00067 **PUBLIC DOCUMENT**

| Tab No. | Document | Pages | Record Document |
|---------|----------|-------|-----------------|
| 11 | Letter from Perkins Coie LLP to Sec'y Commerce re: *Certain Crystalline Silicon Photovoltaic Products from China and Taiwan; Gintech Comments on Scope* (Feb. 18, 2014) | 14 | AD PR Doc. 131 |



700 Thirteenth Street N.W.
Washington, D.C. 20005-3960
PHONE: 202.654.6200
FAX: 202.654.6211
www.perkinscoie.com

David S. Christy, Jr.
PHONE:  (202) 654-6310
FAX.   (202) 654-9990
EMAIL:  DChristy@perkinscoie.com

February 18, 2014

**PUBLIC DOCUMENT**
**Case Nos.: A-583-853, A-570-010, C-570-011**
**Total Pages:**
**AD/CVD Investigations**
**AD/CVD Operations, Offices 4 and 6**

**BY IA ACCESS**

Secretary of Commerce
Attn:  Import Administration
APO/Dockets Unit, Room 1870
U.S. Department of Commerce
14th Street and Constitution Avenue, N.W.
Washington, D.C.  20230

Re:     **Certain Crystalline Silicon Photovoltaic Products from China and Taiwan;**
         **Gintech Comments on Scope**

Dear Madam Secretary:

On behalf of Gintech Energy Corporation (Gintech), we submit scope comments in the

above-captioned investigations pursuant to the Department's notice of initiation.[1]  These

comments are timely filed in accordance with the Department's extended deadline.[2]

---

[1] *See Certain Crystalline Silicon Photovoltaic Products from China and Taiwan,* 79 Fed. Reg. 4661, 4662 (Jan. 29, 2014) (*Initiation Notice*).
[2] *See* Letter from Howard Smith, Program Manager, to Interested Parties, *Extension of Deadlines for Scope and Product Characteristics Comments* (Feb. 4, 2014).

112680-0001/LEGAL29468055.1

ANCHORAGE · BEIJING · BELLEVUE · BOISE · CHICAGO · DALLAS · DENVER · LOS ANGELES · MADISON · NEW YORK
PALO ALTO · PHOENIX · PORTLAND · SAN DIEGO · SAN FRANCISCO · SEATTLE · SHANGHAI · TAIPEI · WASHINGTON, D.C.

Perkins Coie LLP

Secretary of Commerce
February 18, 2014
Page 14

solar modules can involve a number of parties, often in multiple countries.[34]  Similarly, CSPV

cell manufacturers procure wafers from many sources, including numerous suppliers located in

many different countries.

Under Petitioner's proposed scope, importers would need to know where the initial step,

creation of an ingot, took place to determine which products are within the scope of these

investigations.  This would be tremendously burdensome for CSPV cell producers as well as for

U.S. importers of CSPV modules.  Petitioner's proposed scope would, accordingly, inject

uncertainty into the market for U.S. companies using CSPV modules in projects.

Similarly, if the Department were to adopt Petitioner's proposed two-out-of-three rule,

modules containing *Taiwanese* cells would be treated by purchasers and U.S. importers as

subject to the *Chinese* antidumping duty (ADD) and countervailing duty (CVD) orders, even

where Petitioner intended the modules to be subject to the Taiwanese ADD order.  For modules

shipped from China, downstream parties may fear that the annual administrative review process

would reveal a connection to China in the pre-cell-conversion processing of inputs used in

Taiwanese cells.  This would occur where differences exist between Taiwan ADD margins and

the sum of Chinese ADD and CVD margins.  Thus, importers may regard all modules from

China, including those containing Taiwanese-origin cells without a connection to China in the

pre-cell conversion processing stages, as subject to *Chinese* ADDs and CVDs even though,

---

[34] *See, e.g.*, *id.* at I-18 ("These are discrete production steps that may be done in different plants or locations. Companies may source products at each stage of the value chain or produce the products in-house.").  *See* <u>Attachment</u> 4.

Consol. Court No. 15-00067                    **PUBLIC DOCUMENT**

| Tab No. | Document | Pages | Record Document |
|---------|----------|-------|-----------------|
| 12 | Letter from Trade Pacific PLLC to Sec'y Commerce, re: *Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: Separate Rate Application* (Mar. 31, 2014) | 3-4 | AD PR Doc. 291 |

# TRADE PACIFIC PLLC

### International Lawyers and Consultants
719 A Street, NE
Washington, DC 20002

Telephone: (202) 223-3760
Facsimile: (202) 223-3763

March 31, 2014

A-570-010
Total No. of Pages: 58
Investigation
POI: 4/1/2013 – 9/30/2013
AD/CVD/EC: Office IX

### PUBLIC VERSION

Business proprietary information contained
on pages 5-7, 13, and 16 and in Exhibits 1-12
have been ranged or deleted.

The Honorable Penny S. Pritzker
Secretary of Commerce
Attn: Enforcement and Compliance
APO Dockets Unit, Room 1870
U.S. Department of Commerce
14th Street and Constitution Avenue, NW
Washington, DC 20230

Attn:   Howard Smith, Patrick O'Connor

Re:   <u>Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China:</u>
       <u>Separate Rate Application</u>

Dear Secretary Pritzker:

On behalf of tenKsolar (Shanghai) Co., Ltd., a foreign exporter of merchandise

potentially subject to the above-captioned investigation, and tenKsolar, Inc., a U.S. importer of

merchandise potentially subject to the above-captioned review (collectively, "tenKsolar"), we

submit tenKsolar's separate rate application.

Pursuant to 19 C.F.R. § 351.304(a)(i), tenKsolar requests proprietary treatment of the

## OFFICE OF AD/CVD OPERATIONS
### PEOPLE'S REPUBLIC OF CHINA ("PRC")
# SEPARATE RATE APPLICATION
### AND REQUIRED SUPPORTING DOCUMENTATION

**REQUESTER(S):**     tenKsolar (Shanghai) Co., Ltd. ("tenKsolar Shanghai")

**REPRESENTATION:**     Robert G. Gosselink
Trade Pacific PLLC
719 A Street, NE
Washington, DC  20002

Office: 202-223-3760
Fax:     202-223-3763
Email: rgosselink@tradepacificlaw.com

**CASE:**     Certain Crystalline Silicon Photovoltaic Products from the
People's Republic of China

**PERIOD OF INVESTIGATION:**  April 1, 2013 - September 30, 2013

**DEADLINE FOR SUBMISSION:**     March 31, 2014

**FILING INSTRUCTIONS:**     *See* "Instructions for Filing the Application" at Section V.
*See also* http://enforcement.trade.gov/filing/index.html

PUBLIC VERSION

**\*3. The applicant certifies the accuracy of and can document the following statements: (check any of the following that apply)**

☐    **a. It has exported, or has sold for export, subject merchandise to the United States during the period of investigation.**

☐    **b. It has, under its own name(s), made a shipment of merchandise that was entered for consumption in the United States.**

☐    **c. It has, sold the merchandise during the period of investigation to an unaffiliated third-country customer for export to the United States (there must be either a sale or entry during the period of investigation to proceed with the separate-rate request).**

ANSWER:    As explained in the quantity and value response submitted on February 12, 2014, of all the photovoltaic panels exported from China to the United States by tenKsolar Shanghai, none of the solar cells incorporated in those panels were manufactured within a customs territory other than China using ingots that were manufactured in China, wafers that were manufactured in China, or cells where the manufacturing process began in China and was completed in a customs territory other than China. During the POI, all of the tenKsolar Shanghai exports of photovoltaic panels incorporated either solar cells fabricated in Taiwan from non-Chinese-origin wafers or ingots *or* solar cells fabricated in Malaysia from non-Chinese-origin wafers or ingots. Thus, tenKsolar believes that none of its exports of photovoltaic panels are subject to this investigation and that the company does not have any exports of subject merchandise to the United States during the period of investigation. The written scope of this investigation remains slightly ambiguous, but tenKsolar Shanghai's understanding is informed and confirmed by Petitioner's own statements. In its Post-Conference Brief at the International Trade Commission ("ITC"), Petitioner stated that the scope of the investigation against China covered modules assembled in China incorporating either ingots from China, wafers from China, or cells in which

Page 3

PUBLIC VERSION

the manufacturing process began in China and was completed in another country.[2]

That said, tenKsolar Shanghai is submitting this separate rate application out of an abundance of caution that the Department might reach a different conclusion regarding the scope of this investigation.

**\*4. ☒ The applicant certifies that it will, to the maximum extent possible, provide a direct legible photocopy (not a copy of a copy) of <u>all</u> of the following original documents for the first sale by invoice date of subject merchandise to an <u>unaffiliated</u> customer in the United States during the POI for a commercial transaction.[3] These documents must not be altered in any way. If your firm's first sale by invoice date during the period of investigation was a sample sale, a sale of non-commercial quantities, or a sale to an affiliated party, identify this sale and provide documentation on another sale.[4] If providing documentation on another sale during the period of investigation, attach an explanation of why providing documentation for the first sale during the period of investigation was not possible. If you are not able to supply completely legible photocopies of any documents required below, you must supply the most legible photocopies available, complete the additional certification in Appendix B, and include an explanation in it of why submission of all the photocopies in completely legible form is not possible.**

**A.   The U.S. Customs 7501 Entry Summary <u>or</u> the U.S. FDA Release Form.[5]**

**If the exporter is unable to obtain the relevant U.S. Customs 7501 Entry Summary or U.S. FDA Release Form, the exporter must explain why it is unable to submit these documents and provide documentation that it has attempted to obtain these documents from its customers.**

**B.   The bill of lading.**
**C.   The commercial invoice.**
**D.   The packing list.**
**E.   Documentation demonstrating receipt of payment.**

**All the documents above must pertain to the same sale (normally, the first sale by invoice date during the POI, unless one of the conditions discussed above applies). In addition to providing these documents, you must provide a narrative explanation of how the documents relate to one another and what the specific links are among the documents. If volumes or values do not exactly match from one document to the next, the applicant must**

---

[2] See e.g., IAAccess Barcode 3181732-01, Suniva Inc Scope Comments, Feb 18, 2014, Attachment 1, excerpting, ITC Post-Conference Brief of Solarward Industries America, Exhibit 1, page 2.

[3] If you are not able to supply completely legible photocopies of any documents requested in the application, you must attach an explanation of why submission of completely legible photocopies is not possible.

[4] If your firm has *only* made sales to affiliated parties during the period of review, you must provide evidence of the first sale to an *unaffiliated* U.S. customer by the affiliated party to qualify for a separate rate.

[5] If the merchandise was entered into the United States informally using Customs Form 368 or 368A because the value of the entry was USD $2000 or less, provide a copy of Customs Form 368 or 368A.

**PUBLIC DOCUMENT**

| Tab No. | Document | Pages | Record Document |
|---------|----------|-------|-----------------|
| 13 | Letter from Arent Fox LLP to Sec'y Commerce, re: *Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China; Case Brief of Changzhou Trina Solar Energy Co., Ltd.* (Oct. 16, 2014) | All | AD PR Doc. 784 |

# Arent Fox

**Arent Fox LLP** / Attorneys at Law
Los Angeles, CA / New York, NY / San Francisco, CA / **Washington, DC**
www.arentfox.com

October 16, 2014

**John M. Gurley**
Partner
202.857.6301 DIRECT
202.857.6395 FAX
john.gurley@arentfox.com

**VIA ELECTRONIC FILING**

Case Number:  A-570-010
Total Pages: 21
Investigation
AD/CVD Operations, Office VII

The Honorable Penny S. Pritzker
Secretary of Commerce
Attention: Enforcement and Compliance
APO/Dockets Unit, Room 1870
U.S. Department of Commerce
14th Street & Constitution Avenue, N.W.
Washington, D.C. 20230

**PUBLIC DOCUMENT**

Attn:   Jeff Pedersen
        Erin Kearney

Re:    *Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China;*
       Case Brief of Changzhou Trina Solar Energy Co., Ltd.

Dear Madam Secretary,

On behalf Changzhou Trina Solar Energy Co., Ltd. ("Trina Solar"), we hereby submit

our Case Brief in the above-captioned proceeding.  This brief contains no business proprietary

information and is being served accordingly on those parties on the Public Service List attached

to this letter.

555 West Fifth Street, 48th Floor    1675 Broadway              55 Second Street, 21st Floor      1717 K Street, NW
Los Angeles, CA 90013-1065          New York, NY 10019-5820    San Francisco, CA 94105-3470     Washington, DC 20036-5342
T 213.629.7400  F 213.629.7401      T 212.484.3900  F 212.484.3990   T 415.757.5500  F 415.757.5501   T 202.857.6000  F 202.857.6395

The Honorable Penny Pritzker
October 16, 2014
Page 2

# Arent Fox

Please contact the undersigned should you have any questions regarding this submission

Respectfully submitted,

**/s/ John M. Gurley**
John M. Gurley
Diana Dimitriuc Quaia
Keith F. Huffman

*Counsel to Changzhou Trina Solar Energy Co., Ltd.*

## REPRESENTATIVE CERTIFICATION

I, John M. Gurley, with Arent Fox LLP, counsel to Changzhou Trina Solar Energy Co., Ltd. ("Trina"), certify that I have read the attached submission of Case Brief of Changzhou Trina Solar Energy Co., Ltd. filed on October 16, 2014, pursuant to the Antidumping Duty Investigation of *Crystalline Silicon Photovoltaic Products from People's Republic Of China* (A-570-010). In my capacity as a counsel of this submission, I certify that the information contained in this submission is accurate and complete to the best of my knowledge. I am aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

*Signature:* _____

*Date:* _____10 -16 - 2014_____

**PUBLIC SERVICE LIST**
*Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China*
**Investigation (A-570-010)**

The undersigned hereby certifies that on this 16th day of October, 2014, copies of the foregoing were sent via hand delivery or first class mail (*) to the following parties:

Timothy C. Brightbill, Esq.
Wiley Rein LLP
1776 K Street, NW
Washington, DC 20006

Gregory S. McCue, Esq.
Steptoe & Johnson LLP
1330 Connecticut Street, NW
Washington, DC 20036

Neil R. Ellis, Esq.
Sidley Austin LLP
1501 K Street, NW
Washington, DC 20005

Craig A. Lewis, Esq.
Hogan Lovells US LLP
555 13th Street, NW
Washington, DC 20004

Matthew J. McConkey, Esq.
Mayer Brown LLP
1999 K Street, NW
Washington, DC 20006-1101

Lizbeth R. Levinson, Esq.
Kutak Rock LLP
1101 Connecticut Avenue, NW
Suite 10000
Washington, DC 20036-4374

Daniel J. Gerkin, Esq.
K&L Gates LLP
1601 K Street, NW
Washington, DC 20006

Gregory S. Menegaz, Esq.
deKieffer & Horgan
1455 Pennsylvania Avenue, Suite 900B
Washington, DC 20004

Francis J. Sailer, Esq.
Grunfeld, Desiderio, Lebowitz, Silverman &
Klestadt LLP
1201 New York Ave., NW, Suite 650
Washington, DC 20005

David S. Christy, Jr. Esq.
Perkins Coie LLP
700 13th Street, NW
Washington, DC 20005-3960

Robert G. Gosselink, Esq.
Trade Pacific PLLC
719 A Street, NE
Washington, DC 20002

William E. Perry, Esq.*
Dorsey & Whitney LLP
701 Fifth Avenue
Suite 6100
Seattle, WA 98104-7043

Adams C. Lee, Esq.
White & Case LLP
701 Thirteenth Street, NW
Washington, DC 20005-3807

Edmund W. Sim, Esq.
Appleton Luff PTE Ltd
1025 Connecticut Avenue, NW, Suite 1000
Washington, DC 20036

Daniel L. Porter, Esq.
Curtis, Mallet-Prevost, Colt & Mosle LLP
1717 Pennsylvania Ave., NW
Washington, DC 20006

Alexander H. Schaefer, Esq.
Crowell & Moring LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004-2595

David A. Riggle, Esq.
Riggle & Craven
5515 North Cumberland Avenue
Suite 803
Chicago, Illinois 60656

Nithya Nagarajan, Esq.
Law Offices of Nithya Nagarajan
9101 Friars Road
Bethesda, MD 20817

Jeffrey S. Neeley, Esq.
Husch Blackwell LLP
750 17th Street, NW, Suite 900
Washington, DC 20006

Thomas Peele, Esq
Baker & McKenzie
815 Connecticut Avenue, N.W.
Washington, DC 20006

Lifern Dai
Gaopeng & Partners
28th/F, Silver Tower, 2 North Dongsanhuan
Road
Beijing 100027, People's Republic of China

Harry L. Clark, Esq.
Orrick, Herrington & Sutcliffe LLP
1152 15th Street, NW
Washington, DC 20005-1706

  /s/ Nataliya Slyepicheva
Nataliya Slyepicheva, Paralegal

**BEFORE THE UNITED STATES DEPARTMENT OF COMMERCE**
**INTERNATIONAL TRADE ADMINISTRATION**
**WASHINGTON, D.C.**

|  |  |
|---|---|
| )<br>)<br>Certain Crystalline Silicon Photovoltaic Products   )<br>from the People's Republic of China   )<br>)<br>)<br>) | Case Number:  A-570-010<br>Investigation |

**PUBLIC DOCUMENT**

# CASE BRIEF OF
# CHANGZHOU TRINA SOLAR ENERGY CO., LTD.

Of Counsel:
John M. Gurley
Diana Dimitriuc Quaia
Keith F. Huffman

Arent Fox LLP
1717 K Street, N.W.
Washington, D.C.  20006

Date: October 16, 2014

AFDOCS/11350089.8

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ........................................................................................................ 1

II.     EXECUTIVE SUMMARY ......................................................................................... 1

III.    THE EXPANDED SCOPE LANGUAGE IS INTERNALLY INCONSISTENT ............. 2

        A.     Original Scope Language .................................................................................. 2

        B.     Proposed Scope Language ................................................................................ 3

IV.     THE SCOPE EXPANSION IS UNLAWFUL AND THUS THE DEPARTMENT
        SHOULD RESCIND THESE INVESTIGATIONS ......................................................... 6

        A.     The Scope Expansion Results in Two Inconsistent Country of Origin
               Determinations for the Same Product ................................................................ 6

        B.     The Scope Expansion Would Result in the Application of AD/CVD Duties on
               Products That Are Not of Chinese Origin ........................................................... 8

V.      CONCLUSION ............................................................................................................ 11

-i-

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*E.I. Du Pont de Nemours & Co. v. United States,*
    22 CIT 370, 8 F. Supp. 2d 854 (1998) ....................................................8, 10

*Ugine & ALZ Belgium, N.V. v. United States,*
    31 CIT 1536, 517 F. Supp. 2d 1333 (2007), *aff'd* 551 F.3d 1339 (Fed. Cir. 2009) .............6, 9

*Ugine & ALZ Belgium v. United States,*
    551 F.3d 1339 (Fed. Cir. 2009)....................................................................10

**STATUTES**

19 U.S.C. § 1673a(c)(2) ...................................................................................6

19 U.S.C. § 1673(1) .........................................................................................8

19 U.S.C. § 1677(25) .......................................................................................8

19 U.S.C. § 1677j(b) ......................................................................................10

**REGULATIONS**

19 C.F.R. § 351.225(h) ..................................................................................10

19 C.F.R. § 351.309(c)......................................................................................1

**ADMINISTRATIVE DETERMINATIONS**

*Certain Cold–Rolled Carbon Steel Flat Products from Argentina,*
    58 Fed. Reg. 37062 (Dep't Commerce Jul. 9, 1993) (final determ.).........................9

*Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China,*
    79 Fed. Reg. 44399 (July 31, 2014) (prelim. determ. of LTFV sales) ..................1, 2

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From
    the People's Republic of China: Amended Final Determination of Sales at Less Than
    Fair Value, and Antidumping Duty Order,* 77 Fed. Reg. 73018 (Dep't Commerce
    December 7, 2012)....................................................................................... passim

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From
    the People's Republic of China: Countervailing Duty Order,*
    77 Fed. Reg. 73017 (Dep't Commerce December 7, 2012) .....................................1

*Stainless Steel Plate in Coils from Belgium,*
    69 Fed. Reg. 74495 (Dep't Commerce Dec. 14, 2004) (final results), and
    accompanying Issues & Decision Memorandum ..................................................9

AFDOCS/11350089.8

## TABLE OF AUTHORITIES

**OTHER AUTHORITIES**

WTO Agreement on Rules of Origin, Art. 2(c) & (d) ....................................................................11

## I.    INTRODUCTION

On behalf of Changzhou Trina Solar Energy Co., Ltd. ("Trina Solar"), we hereby provide

comments on the Preliminary Determination issued by the U.S. Department of Commerce

("Department") in the antidumping duty investigation on *Certain Crystalline Silicon*

*Photovoltaic Products From the People's Republic of China* (the "Preliminary Determination").[1]

These comments are submitted pursuant to 19 C.F.R. § 351.309(c) and the invitation to comment

contained in the Preliminary Determination.

## II.    EXECUTIVE SUMMARY

The proposed scope language, as expanded by the Department in its October 3, 2014

memorandum is internally inconsistent. Although the expanded scope language specifically

references the existing AD/CVD Orders on solar cells, whether or not assembled into panels,

from China, imposed in December 2012 ("*Solar I*"),[2] it is incompatible with the scope

determination in *Solar I*. The proposed expansion of the scope language to include modules

assembled in China of non-Chinese cells is unlawful. The proposed scope changes would

include third country products in an investigation that was intended to cover products from

*China*. Indeed, application of the Department's existing origin rule for solar modules indicates

that all such modules sought to be included in these investigations are of third country origin, as

the data on the record demonstrates. Such a scope determination is unlawful under the statute,

the Department's scope determination in *Solar I*, and the Department's application of its

---

[1] *Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China,* 79 Fed. Reg. 44399 (July 31, 2014) (prelim. determ. of LTFV sales) (the "*Preliminary Determination*").

[2] *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order,* 77 Fed. Reg. 73018 (Dep't Commerce December 7, 2012) and *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Countervailing Duty Order,* 77 Fed. Reg. 73017 (Dep't Commerce December 7, 2012) (collectively "*Solar I*," - all references to *Solar I* Issues & Decision Memo are to the AD memorandum).

1

substantial transformation test to determine the origin of products subject to AD/CVD duties.

Accordingly, this investigation should be rescinded and all cash deposits paid by U.S. importers

for solar panels entered under the current investigations should be released immediately.

## III.   THE EXPANDED SCOPE LANGUAGE IS INTERNALLY INCONSISTENT

### A.   Original Scope Language

Similar to the scope language in the notice of initiation, in the Preliminary Determination

the Department described the scope of the investigation, in relevant part, as follows:

> The merchandise covered by this investigation is crystalline silicon photovoltaic cells, and modules, laminates and/or panels consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including building integrated materials. For purposes of this investigation, subject merchandise also includes modules, laminates and/or panels assembled in the subject country consisting of crystalline silicon photovoltaic cells that are completed or partially manufactured within a customs territory other than that subject country, using ingots that are manufactured in the subject country, wafers that are manufactured in the subject country, or cells where the manufacturing process begins in the subject country and is completed in a non-subject country...

> ...Also excluded from the scope of this investigation are any products covered by the existing antidumping and countervailing duty orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the People's Republic of China. See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order, 77 FR 73018 (December 7, 2012); Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Countervailing Duty Order, 77 FR 73017 (December 7, 2012). [3]

With respect to the Department's original scope language, Trina Solar hereby incorporates by

reference the scope comments filed on February 18, 2014 and April 21, 2014 by a group of

Chinese respondents, including Trina Solar, Yingli Green Energy Holding Company Limited,

Yingli Green Energy Americas, Inc., Canadian Solar Inc., Wuxi Suntech Power Co., Ltd.,

Shanghai JA Solar Technology Co., Ltd., Hefei JA Solar Technology, Co., Ltd., Jinko Solar Co.,

---

[3] *Preliminary Determination* at 44399.

Ltd. and other parties, that demonstrate the illegal and untenable nature of the scope of these investigations.[4] The issues identified in the above-mentioned comments and the conclusion that the scope language should be rejected have been reinforced throughout the course of these investigations. Trina Solar provides below additional comments regarding the scope of these investigations under the Department recent proposed amendments to the scope language.

### B. Proposed Scope Language

On October 3, 2014, the Department issued a scope memorandum which proposes a much broader, and radically different, scope description:

> The merchandise covered by this investigation is ~~crystalline silicon photovoltaic cells, and~~ modules, laminates and/or panels consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including building integrated materials. For purposes of this investigation, subject merchandise ~~also~~ includes modules, laminates and/or panels assembled in the ~~subject country~~ *People's Republic of China* consisting of crystalline silicon photovoltaic cells ~~that are completed or partially manufactured within~~ *produced in* a customs territory other than *the People's Republic of China* ~~that subject country, using ingots that are manufactured in the subject country, wafers that are manufactured in the subject country, or cells where the manufacturing process begins in the subject country and is completed in a non-subject country~~. Subject merchandise includes *modules, laminates and/or panels assembled in the People's Republic of China* consisting of crystalline silicon photovoltaic cells of thickness equal to or greater than 20 micrometers, having a p/n junction formed by any means, whether or not the cell has undergone other processing, including, but not limited to, cleaning, etching, coating, and/or addition of materials (including, but not limited to, metallization and conductor patterns) to collect and forward the electricity that is generated by the cell...
>
> ...Also excluded from the scope of this investigation are any products covered by the existing antidumping and countervailing duty orders on crystalline silicon

---

[4] *See* Letter from Sidley Austin LLP to the Hon. Penny S. Pritzker, DOC Case Nos. A-570-010, A-583-853, and C-570-011, regarding Comment on Scope, filed on behalf of a group of Chinese companies (February 18, 2014); *see also* Letter from Sidley Austin LLP to the Hon. Penny S. Pritzker, DOC Case Nos. A-570-010, A-583-853, and C-570-011, regarding Response to Petitioner's Rebuttal on Scope, filed on behalf of a group of Chinese companies (April 21, 2014).

3

photovoltaic cells, whether or not assembled into modules, from the People's
Republic of China.[5]

In its Scope Expansion Memo the Department explained that what it intends to accomplish with

this scope description is the following:

- For the PRC investigations, subject merchandise includes all modules, laminates
  and/or panels assembled in the PRC that contain crystalline silicon photovoltaic cells
  produced in a customs territory other than the PRC.

- For the Taiwan investigation, subject merchandise includes all modules, laminates
  and/or panels assembled in Taiwan consisting of crystalline silicon photovoltaic cells
  produced in Taiwan or a customs territory other than Taiwan.  In addition, subject
  merchandise will include modules, laminates, and panels assembled in a third-
  country, other than the PRC, consisting of crystalline silicon photovoltaic cells
  produced in Taiwan.[6]

However, the above-mentioned interpretation is incompatible with the Department's

existing origin analysis under the AD/CVD Orders in *Solar I*. Such an interpretation of the

expanded scope language is also internally inconsistent, as there is an express reference to *Solar

I* in the third paragraph of the proposed scope language.

In *Solar I*, the Department considered Petitioner's request that all modules assembled in

China must be covered by the scope regardless of the origin of the solar cells, but found that it

could not lawfully adopt that scope language.[7]  It then explained that "using a substantial

transformation analysis, the Department has determined that modules from the PRC are those

that have been assembled in the PRC using solar cells produced in the PRC."[8]  In short, *Solar I*

outlined a binary choice for solar panels produced in China: (1)  if they use Chinese solar cells

---

[5] *Antidumping and Countervailing Duty Investigations of Certain Crystalline Silicon Photovoltaic Products, from
the People's Republic of China and the Antidumping Duty Investigation of Certain Crystalline Silicon Photovoltaic
Products from Taiwan: Opportunity to Submit Scope Comments* (Dep't Commerce October 3, 2014) at Attachment
(the "*Scope Expansion*").

[6] *Scope Expansion* at 1.

[7] *See Solar I*, Issues and Decision Memorandum at 8 (Cmt. 1).

[8] *See id.*

4

they are Chinese products for AD/CVD purposes, but (2) if they use third country cells they are

not Chinese products for AD/CVD purposes.

There is no question that a scope determination under the current investigations must take

into account the scope definition of *Solar I*. Indeed, the Department already has stated that it

"will be informed by the product coverage decisions that it made"[9] in the prior investigations.

Thus, the starting point for identifying in-scope merchandise in these investigations is the scope

of *Solar I*, including the Department's prior finding that the origin of the cells confers origin on

the assembled module, panel or laminate.

*Therefore*, the proposed scope language seems to suggest a two step approach:

- *First*, under the third paragraph of the Scope Expansion, an importer would have to determine if the module, laminate or panel assembled in China, using third country cells is subject to the existing AD/CVD Orders in *Solar I*.

  o Under the Department's existing analysis in *Solar I*, panels made of third country cells and assembled in China are not of Chinese origin because the origin of the cell confers origin to the solar panel. Thus, such panels are not of Chinese origin for AD/CVD purposes. As explained in *Solar I*[10] and as discussed below, a single product cannot have more than one country of origin for AD/CVD purposes.

- *Second*, after application of the existing origin rule, are there any panels assembled in China made of third country cells that are not described by the origin rule in *Solar I*?

  o The answer to that question is "*no*." There are *no* panels assembled in China of third country cells that are not described by the origin rule in *Solar I*.

In short, there is no reasonable interpretation of the Scope Expansion under which any

solar panels produced *in China* from third country cells can be described also by the new

investigations brought against products *from China*. Under the Department's existing analysis,

[9] *Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China and Taiwan: Initiation of Antidumping Duty Investigations*, 79 Fed. Reg. 4661, 4662 (January 29, 2014), and *Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China: Initiation of Countervailing Duty Investigation*, 79 Fed. Reg. 4667, 4668 (Dep't Commerce January 29, 2014).

[10] *See Solar I*, Issues and Decision Memorandum at 8 (Cmt. 1).

the origin of the solar cell confers origin to the solar panel. Therefore, importers must be able to

rely on the Department's existing analysis in *Solar I* to determine the origin of their solar panels.

## IV.   THE SCOPE EXPANSION IS UNLAWFUL AND THUS THE DEPARTMENT SHOULD RESCIND THESE INVESTIGATIONS

### A.   The Scope Expansion Results in Two Inconsistent Country of Origin Determinations for the Same Product

U.S. law makes clear that a product can have a single country of origin for AD/CVD

purposes.[11] The scope of the investigation concerns particular products, *i.e.*, "the class or kind of

merchandise" that "is being, or is likely to be, sold in the United States at less than its fair value."

19 U.S.C. § 1673a(c)(2).

Under the Department's existing analysis from the *Solar I* investigations, the assembly of

cells into modules, panels or laminates is not a substantial transformation that would change the

origin of the solar cell. As the Department explained in *Solar I*, "{b}ased on our analysis of the

foregoing factors we find that solar module assembly does not substantially transform solar cells

such that it changes the country-of-origin."[12] Therefore, according to the Department's origin

analysis for solar panels, which it already has determined to be "informed by" here, modules,

panels and laminates assembled in China from third country origin cells ***are third country-origin***

***goods for AD/CVD purposes***.

However, under the Scope Expansion, such panels assembled in China of third country

cells would be covered by the current AD/CVD orders on products *from China*, which means

that in these investigations, the same products are deemed to be *of Chinese origin*.   With this

---

[11] *Ugine & ALZ Belgium, N.V. v. United States*, 31 CIT 1536, 1550, 517 F. Supp. 2d 1333, 1345 (2007), *aff'd* 551 F.3d 1339 (Fed. Cir. 2009).

[12] *Scope Clarification: Antidumping and Countervailing Duty Investigations of Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China*, March 19, 2012, at 8.

6

new scope proposal the Department has done exactly that which, in *Solar I*, it affirmed was *unlawful*: making two inconsistent country of origin determinations, as illustrated by the examples below:

*SOLAR I:*

| Scenario | Cell Production | Module Assembly | Subject Merchandise in *SOLAR I*? | Country of Origin |
|---|---|---|---|---|
| Scenario 1 | China | Japan | Yes | China |
| *Scenario 2* | *Taiwan* | *China* | *No* | *Taiwan* |
| Scenario 3 | Japan | China | No | Japan |

Current Investigations:

| Scenario | Cell Production | Module Assembly | Subject Merchandise? | Country of Origin |
|---|---|---|---|---|
| Scenario 4 | China | Taiwan | No - covered by *SOLAR I*[13] | China |
| *Scenario 5* | *Taiwan* | *China* | *Yes (China)* | *China* |
| Scenario 6 | Japan | China | Yes (China) | China |
| Scenario 7 | Japan | Taiwan | Yes (Taiwan) | Taiwan |
| Scenario 8 | Taiwan | Japan | Yes (Taiwan) | Taiwan |

As can be seen above, the identical products in *cenarios 2 and 5*, and in scenarios 3 and 6 would have two different countries of origin for AD/CVD purposes. With respect to the scope of the AD investigation of Taiwan, the products in scenario 7 and scenario 8 would be treated as if they have the same country of origin, Taiwan, even though application of the Department's origin rule in *Solar I* would result in the product of Scenario 8 being in-scope merchandise while the product in Scenario 7 would be third country merchandise for AD/CVD purposes.

---

[13] The *Solar I* scope is applicable.

In *Solar I*, the Department recognized that such a result would be unlawful.  The Department fully explained why including modules with *non-Chinese* cells in the scope of the orders on solar cells from *China* is not possible:

> **The main issue is that an investigation covering modules from the PRC cannot at the same time cover modules whose country of origin is not the PRC**.  Determining that all modules assembled in the PRC are covered by the scope of the investigation, no matter where the solar cells in the module were produced, would either necessitate making inconsistent country-of-origin determinations for a single product, or require ignoring the country-of origin when considering whether merchandise entering the United States is covered by the scope of the investigation.[14]

There is no error in the Department's logic or in the legal basis of that analysis. For the same reasons fully explained in *Solar I*, the Department cannot lawfully adopt the Scope Expansion in this case.   Simply put, the same product - third country cells assembled into modules in China  - cannot be both of third country origin and of Chinese origin for AD/CVD purposes.  Thus, the proposed Scope Expansion is incompatible with the Department's prior product coverage decisions.

### B.    The Scope Expansion Would Result in the Application of AD/CVD Duties on Products That Are Not of Chinese Origin

Applying AD/CVD duties to merchandise already found by the Department to be of third country origin would be contrary to the fundamental terms and objectives of the U.S. antidumping and countervailing duty laws.

The proposed scope is contrary to the statutory language at 19 U.S.C. § 1673(1), that provides for the imposition of antidumping duties on "subject merchandise," defined as "the class or kind of merchandise that is within the scope of an investigation, a review, a suspension

---

[14] *Solar I, Decision Memorandum* at 8 (footnote omitted) (emphasis added).

agreement, {or} an order...." *Id.* § 1677(25). This provision requires the Department to make a

finding of dumping for a class or kind of merchandise *from a particular country*. *See E.I. Du

Pont de Nemours & Co. v. United States*, 22 CIT 370, 375, 8 F. Supp. 2d 854, 859 (1998)

("{A}ntidumping orders apply to merchandise from particular countries ..."). Antidumping

orders must specify both the class or kind of merchandise and the particular country from which

the merchandise originates. "'For merchandise to be subject to an order, it must meet both

parameters, *i.e.*, product type and country of origin.'" *Ugine & ALZ Belg., N.V. v. United States,*

31 CIT 1536, 1551, 517 F. Supp. 2d 1333, 1345 (2007).[15] However, the Scope Expansion would

result in the application of AD/CVD duties on products that are not of Chinese origin, which is

not allowed under the statute. In fact, the Scope Expansion would result in the application of

AD/CVD duties on solar panels originating *everywhere in the world* except for China or Taiwan.

In other words, the Department is proposing to issue AD/CVD orders on solar panels

from the entire world, regardless of origin. But the scope of an order is limited to merchandise

that is produced in the country covered by the order.[16] When products are made in more than

one country, it is important to determine *the* country of origin of the product, as the Court has

clearly explained:

> The antidumping statute reflects Congress' recognition that country of origin
> determinations are vital to preserve the integrity of existing antidumping orders
> from potential circumvention through third country assembly, U.S. assembly, and
> transshipment of subject merchandise through intermediate countries. *See* 19
> U.S.C. §§ 1677j, 1677b(a)(3). **Because antidumping orders apply to
> merchandise from particular countries, not individual producers,
> determining the country where the unfairly traded merchandise is produced**

---

[15] Citing *Certain Cold–Rolled Carbon Steel Flat Products from Argentina,* 58 Fed. Reg. 37062, 37065 (Dep't
Commerce Jul. 9, 1993) (final determ.) ("The scope of an antidumping or countervailing duty order is defined by the
*type of merchandise* and by the *country of origin* (e.g., widgets from Ruritania).")

[16] *See Stainless Steel Plate in Coils from Belgium,* 69 Fed. Reg. 74495 (Dep't of Commerce Dec. 14, 2004) (final
results), and accompanying Issues and Decision Memorandum at 15 (cmt. 4).

9

**or manufactured is fundamental to the proper administration and enforcement of the antidumping statute.** *See* 19 US. C. § 1673; *see also* §§1677j, 1677b(a)(3). The "substantial transformation" rule provides a means for Commerce to carry out its country of origin examination and properly guards against circumvention of existing antidumping orders.[17]

Consistent with law, in *Solar I,* the Department determined the country of origin of modules containing non-Chinese cells by employing the substantial transformation test.[18] In applying this test, Commerce found solar cells to be the essential component of modules – the country of origin determining component. Therefore, the existing orders in *Solar I* already cover imports of solar panels whose country of origin is China and determine what panels are not of Chinese origin for AD/CVD purposes. The Department cannot ignore its own precedent. *Ugine & ALZ Belgium v. United States*, 551 F.3d 1339, 1349 (Fed. Cir. 2009) ("Nonetheless, Commerce is obligated to follow prior precedent absent some legitimate reason for departing from it.") The current investigations are thus unlawful as to China.[19]

This is not to say that the Department's regulations or the statute do not address situations where subject merchandise may be completed or assembled in third countries. However, that is not the situation before the Department in these investigations. First, as the Department is aware, it may not expand AD/CVD proceedings involving merchandise from named foreign countries to include merchandise produced in unnamed foreign countries, *except* under the conditions of the anti-circumvention provisions of the statute, which require the existence of an AD or CVD order in force.[20] Second, such procedures deal with the scenario of "Merchandise Completed or

---

[17] *E.I. Du Pont de Nemours & Co. v. United States*, 22 CIT 370, 373, 8 F. Supp. 2d 854, 857 (1998) (emphasis added).

[18] *Solar I, Decision Memorandum* at 5-6.

[19] The scope of the Taiwanese investigation is also unlawful because it seeks to cover not only modules that are of Taiwanese origin, but also modules that, while assembled in Taiwan, are of third country origin.

[20] 19 U.S.C. § 1677j(b); 19 C.F.R. § 351.225(h).

10

Assembled in Other Foreign Countries," but this case presents the reverse scenario. The Scope Expansion seeks to include solar panels where the completion or assembly is in China, while the essential components of the solar panels, the solar cells, are from such unnamed foreign countries. The statute does not authorize a world-wide scope expansion under this scenario. In short, there is no legal basis for the Department to expand the scope of these investigations *against China and Taiwan* to cover solar panels with cells produced elsewhere in the world.

Such a scope definition may also be in violation of the United States' commitments under the WTO Agreement on Rules of Origin, which imposes an obligation on Members to ensure that "rules of origin shall not in themselves create restrictive, distortive, or disruptive effects on international trade" and "shall not discriminate between other Members." WTO Agreement on Rules of Origin, Art. 2(c) & (d). The Scope Expansion, if adopted, would have precisely such a distortive and discriminatory effect on trade between Members because it would subject imports of modules made with any third country cells (*i.e.* products of a third country) to AD/CVD duties calculated for Chinese or Taiwanese products.

## V. CONCLUSION

On behalf of Trina Solar, we respectfully request that the Department rescind the antidumping and countervailing duty investigations because they are based on an unlawful and implausible scope description. As discussed below, the proposed scope language cannot reasonably be interpreted to include *any* solar modules, laminates or panels consisting of crystalline silicon photovoltaic cells that are not already described by the Department' origin rule in *Solar I*. Further the Expanded Scope results in conflicting country of origin determinations that are not allowed under the statute and case law. Accordingly, this investigation should be rescinded and all cash deposits paid by U.S. importers for solar panels entered under the current

11

investigation numbers should be released immediately.

Respectfully submitted,

 **/s/ John M. Gurley**

John M. Gurley
Diana Dimitriuc Quaia
Keith F. Huffman

ARENT FOX LLP
1717 K Street, NW
Washington, DC 20036
(202) 857-6301

12

**PUBLIC DOCUMENT**

| Tab No. | Document | Pages | Record Document |
|---|---|---|---|
| 14 | Letter from Steptoe & Johnson LLP to Sec'y Commerce, re: *Case Brief on Scope Issues: Certain Crystalline Silicon Photovoltaic Products from China and Taiwan* (Oct. 16, 2014) | All | AD PR Doc. 787 |

Gregory S. McCue
202 429 6421
gmccue@steptoe.com

1330 Connecticut Avenue, NW
Washington, DC 20036-1795
202 429 3000 main
www.steptoe.com



**Steptoe**
STEPTOE & JOHNSON LLP

October 16, 2014

**PUBLIC DOCUMENT**

Case Nos.  A-570-010
A-583-853
C-570-011

Investigations

Total Number of Pages:  23

AD/CVD Operations
Office IV

**via electronic filing in IA ACCESS**

The Honorable Penny Pritzker
Secretary of Commerce
U.S. Department of Commerce
<u>Attn</u>: Enforcement and Compliance
APO/Dockets Unit, Room 1870
14th Street & Pennsylvania Ave., NW
Washington, DC  20230

Re:   **Case Brief on Scope Issues**
**Certain Crystalline Silicon Photovoltaic Products**
**<u>from China and Taiwan</u>**

Dear Secretary Pritzker:

On behalf of our client, Suniva, Inc., a U.S. producer of crystalline silicon photovoltaic ("CSPV") products, we hereby submit this case brief in the above-referenced investigations.

In its memorandum dated October 9, 2014, the Department set the date for case briefs as no later than October 16, 2014.  Accordingly, this case brief is timely filed.

U.S. Department of Commerce
October 16, 2014
page 2



**Public Document**

     This case brief is being filed electronically, through IA ACCESS.  Copies of this submission are being served today on the parties indicated in the certificate of service accompanying this case brief.

     If the Department has any questions regarding this submission or requires any additional information, please do not hesitate to contact Greg M<sup>c</sup>Cue at 202-429-6421 or by e-mail at gmccue@steptoe.com.

     Thank you in advance for your consideration.

Sincerely,

Gregory S. M<sup>c</sup>Cue

*Counsel to Suniva, Inc.*

BEFORE THE UNITED STATES DEPARTMENT OF COMMERCE
INTERNATIONAL TRADE ADMINISTRATION

|  |  |
|---|---|
| _____ )<br>**Certain Crystalline Silicon** )<br>**Photovoltaic Products** )<br>**from China and Taiwan** )<br>_____ ) | Case Nos.    A-570-010<br>A-583-853<br>C-570-011<br><br>Investigations |

**Public Document**

# CASE BRIEF OF

# SUNIVA, INC.

Gregory S. M<sup>c</sup>Cue

STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC  20036

Counsel to Suniva, Inc.

Dated:  October 16, 2014

**Public Document**

# Table of Contents

Page

Summary of the Argument……………………………………………………………………………i

Table of Authorities……………………………………………………………………………………ii

Case Brief

I.     Introduction ................................................................................................ 1

II.    Background.................................................................................................. 3

III.    If Adopted, the Proposed Clarification Must Contain a Scope Exclusion for CSPV Products Assembled from U.S.-origin Cells .............. 4

    A.    CSPV modules, panels and laminates are of U.S. origin if assembled from cells of U.S. origin ................................................ 5

    B.    An origin analysis cannot result in duties applied to U.S.-origin goods ...................................................................................... 6

        1.    U.S. AD/CVD law prohibits application of duties to U.S.-origin goods............................................................... 6

        2.    The Department has recognized the imperative not to apply AD/CVD duties to U.S.-origin goods .......................... 9

    C.    Fairly simple exclusion language would avoid application of duties to U.S. origin CSPV products ........................................... 11

IV.    Conclusion ............................................................................................... 11

**Public Document**

## **Summary of the Argument**

If the Department adopts the original scope proposed for these investigations, the Department also must include a scope exemption for CSPV products assembled from cells of U.S. origin, as described by Suniva in its scope comments dated February 18, 2014, which we incorporate herein, in full, by reference.  The Department already has found in its recent investigation into these very same products, that CSPV cells do not experience a substantial transformation when assembled into modules and panels.  Moreover, the Department already has stated, in these investigations, that it "will be informed by the product coverage decisions that it made" in the prior CSPV investigations.  Thus, a module assembled in China or Taiwan using U.S.-origin cells does not experience a substantial transformation and retains the U.S. origin for AD/CVD purposes.  U.S. law prohibits application of AD/CVD duties to U.S. origin goods.  Accordingly, the original scope, which would apply duties, in some instances, based on input source and assembly site, regardless of cell origin, also must include an explicit exemption to avoid application of AD/CVD duties to U.S.-origin CSPV products, that is, to CSPV products assembled from U.S.-origin cells.

Moreover, if the Department adopts the original scope, a revision is necessary to confirm that when goods are subject due to an analysis of the pre-cell input source and the site of assembly, those two events must have occurred in the ***same*** subject country, rather than merely in ***either*** subject country.

Alternatively, if the Department adopts the proposed scope clarification (released on October 3, 2014, hereinafter, "clarification"), this clarification also would apply duties to CSPV products assembled in the subject countries, regardless of the origin of the cells used.  If that clarification is adopted, the Department similarly must include an exception for CSPV products assembled from U.S.-origin cells, for all the same reasons described in Suniva's prior scope comments and herein.

**Public Document**

# Table of Authorities

**STATUTES**

19 U.S.C. § 1671a(c)(4)(A)………………………………………………………..…...7

19 U.S.C. § 1671a(c)(4)(B)(i)……………………………………………………………7

19 U.S.C. § 1671c(a)(2)(B)(iii)…………………………………………………………7

19 U.S.C. § 1671c(a)(2)(C)(ii)………………………………………………………...7

19 U.S.C. § 1673(1)…………………………………………………………………8

19 U.S.C. § 1673b(c)(1)(A)(ii)………………………………………………………8

19 U.S.C. § 1673c(c)(1)(A)……………………………………………………………8

19 U.S.C. § 1673c(c)(2)(A)(i)…………………………………………………………8

19 U.S.C. § 1673a(a)(2)(A)(iii)………………………………………………………8

19 U.S.C. § 1675a(a)(2)(D)…………………………………………………………9

19 U.S.C. § 1677(3)…………………………………………………………………9

19 U.S.C. § 1677(7)(F)(VI)…………………………………………………………9

19 U.S.C. § 1677j(a)(3)(B)…………………………………………………………9

**ADMINISTRATIVE MATERIALS**

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules,*
*From the People's Republic of China: Countervailing Duty Order,*
77 Fed. Reg. 73,017 (December 7, 2012)…………………………………………..…1

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules,*
*From the People's Republic of China: Amended Final Determination of Sales*
*at Less Than Fair Value, and Antidumping Duty Order,*
77 Fed. Reg. 73,018 (December 7, 2012)…………………………………………..…1

*Certain Crystalline Silicon Photovoltaic Products From the People's Republic*
*of China and Taiwan: Initiation of Antidumping Duty Investigations,*
79 FR 4,661 (January 29, 2014)……………………………………………………1, 4, 5

**Public Document**

*Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China: Initiation of Countervailing Duty Investigation,*
79 FR 4,667 (January 29, 2014)……………………………………………………………1, 4, 5

*Scope Clarification:  Antidumping and Countervailing Duty Investigations of Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China,* March 19, 2012……………………………………………4, 5

*Notice of Initiation of Countervailing Duty Investigation: Dynamic Random Access Memory Semiconductors from the Republic of Korea,*
67 FR 70,927 (Nov. 27, 2002)……………………………………………………………………5

*Notice of Final Determination of Sales at Less Than Fair Value: Certain Cold-Rolled Carbon Steel Flat Products From Argentina,*
58 Fed. Reg. 37,062 (July 9, 1993)………………………………………………...……10

## CASES

*M.M. & P. Maritime Advancement, Training, Educ. & Safety Program v. Department of Commerce,* 729 F.2d 748 (Fed. Cir. 1984)………………………………………………...6



**Steptoe**
STEPTOE & JOHNSON LLP

**Public Document**

## <u>Case Brief of Suniva, Inc.</u>

Suniva, Inc., a U.S. producer of crystalline silicon photovoltaic ("CSPV") products, hereby submits this case brief in the above-referenced investigations.

## I.   <u>Introduction</u>

The first paragraph of the scope of these investigations, as originally proposed by Petitioners and as published in the Department's Notices of Initiation,[1] is as follows.

> The merchandise covered by this investigation is crystalline silicon photovoltaic cells, and modules, laminates and/or panels consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including building integrated materials. For purposes of this investigation, subject merchandise also includes modules, laminates and/or panels assembled in the subject country consisting of crystalline silicon photovoltaic cells that are completed or partially manufactured within a customs territory other than that subject country, using ingots that are manufactured in the subject country, wafers that are manufactured in the subject country, or cells where the manufacturing process begins in the subject country and is completed in a non-subject country.

In this investigation, the second sentence above has become known in these investigations as the "2 out of 3" rule.[2] As explained by Petitioner in various comments, the 2 out of 3 rule was intended to be in addition to and a supplement to the Department's existing origin analysis in the prior CSPV investigations.[3]

---

[1] *Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China and Taiwan: Initiation of Antidumping Duty Investigations*, 79 Fed. Reg. 4,661, 4,662 (January 29, 2014), and *Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China: Initiation of Countervailing Duty Investigation*, 79 Fed. Reg. 4,667, 4,668 (January 29, 2014) (hereinafter collectively, "Notices of Initiation").

[2] *See, e.g.*, ITC Post-Conference Brief, by Wiley Rein on behalf of SolarWorld Industries America, Inc., dated January 29, 2014 at Exhibit 1, pages 1-2 (relevant excerpts included at Attachment 1 to Suniva's scope comments, dated February 18, 2014).

[3] *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order*, 77 Fed. Reg. 73,018 (December 7, 2012) and *Crystalline Silicon*

U.S. Department of Commerce
October 16, 2014
page 2



**Steptoe**
STEPTOE & JOHNSON LLP

**Public Document**

In its scope comments dated February 18, 2014,[4] Suniva explained two issues arising out of potential application of the 2 out of 3 rule:

> First, if the Department were to adopt the analysis in the 2 out of 3 rule, it cannot do so in a way that would apply duties to products already defined by the Department as being of U.S. origin.  U.S. antidumping and countervailing duty law makes specific reference to duties on foreign merchandise and to protection of domestic production.  Accordingly, we requested that the scope be revised to incorporate an exclusion for CSPV products assembled using U.S.-origin cells.

> Second, because there are two countries at issue in these investigations, we noted that it is not clear on the face of the scope language which are the "two" countries in which 2 out of 3 events must occur in order for the merchandise to be subject.  However, Petitioner's consistent comments[5] explained its intention that the same country must be both of the "2 out of 3."  In order to improve clarity for the CSPV industry and to avoid any enforcement confusion by U.S. Customs and Border Protection ("CBP"), Suniva requested that the scope be revised to include the word "same".

Should the Department finalize these orders using the 2 out of 3 rule, or something like it, Suniva reiterates its request that the Department make the revisions noted above, for all the reasons described in Suniva's scope comments dated February 18, 2014, which we incorporate herein in full, by reference.

Since the Department most recently released a proposed scope clarification, this case brief focuses on that proposal.  In its notice dated October 3, 2014, the Department described a potential scope clarification and an opportunity to comment.  We greatly appreciate the opportunity to comment in this case brief.  The proposed clarification would revise the first paragraph to read as follows:

> The merchandise covered by this investigation is modules, laminates and/or panels consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including building integrated materials.

---

*Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Countervailing Duty Order*, 77 Fed. Reg. 73,017 (December 7, 2012).

[4] We incorporate herein by reference Suniva's prior scope comments in full.

[5] As described in Suniva's scope comments at pages 14-18 and corresponding attachments.  *See also* Petitioner's Rebuttal to Respondents' Scope Comments, dated April 3, 2014 at page 24 ("...should the Department find Suniva's suggested clarification to be necessary, Petitioner does not oppose this revision of the scope.").

U.S. Department of Commerce
October 16, 2014
page 3



**Steptoe**
STEPTOE & JOHNSON LLP

**Public Document**

> *For purposes of this investigation, subject merchandise includes modules, laminates and/or panels assembled in the People's Republic of China consisting of crystalline silicon photovoltaic cells produced in a customs territory other than the People's Republic of China.* (emphasis added)

The Department described a comparable clarification to the scope of the investigation involving Taiwan, so that the scope of the Taiwan order would cover CSPV products assembled in Taiwan or assembled using cells produced in Taiwan.

For many of the same reasons described in Suniva's scope comments, we respectfully submit that the Department must recognize that the proposed scope clarification, if adopted, also would need to include an explicit exemption for CSPV products assembled using U.S.-origin cells.

II.   **Background**

As described in Suniva's prior scope comments, Suniva is the leading American manufacturer of high-efficiency, cost-competitive PV solar cells and modules. The company is known worldwide for its high-quality solar products, patented low-cost manufacturing technology, and long-term reliable performance.

Suniva is a venture-backed company, evolved from Georgia Tech's University Center of Excellence for Photovoltaic Research and Education ("UCEP") – one of the most advanced crystalline photovoltaic labs in world.  In fact, UCEP is partially funded by the U.S. Department of Energy and has been since the inception of UCEP in 1992. Today, Suniva's corporate offices, manufacturing plant and R&D labs are headquartered in Norcross, Georgia, just 12 miles from Georgia Tech.  The company employs approximately 250 people, with a growth of more than 50 skilled employees in the last 12 months.  Recently, Suniva announced a second U.S. plant in Saginaw Michigan.  At current planned capacity, this new plant will employ 350 additional employees.

Suniva has a large production of CSPV cells in the United States.  The company has a history of technology innovation and has developed over 50 patents.  Recently, the U.S. Department of Energy awarded Suniva significant research grants for future cell designs.

Since its inception in 2008, Suniva has led the industry in high-performance, affordable CSPV cells. The company makes record-setting 21+% conversion efficiency full-size cells in its labs, and averages 19+% efficiency daily on its production lines – manufacturing the world's highest commercially-available cell efficiencies using low manufacturing costs.



**Public Document**

### III.    If Adopted, the Proposed Clarification Must Contain a Scope Exclusion for CSPV Products Assembled from U.S.-origin Cells

The proposed scope clarification necessarily would be in addition to or deviation the Department's usual substantial transformation origin analysis established in the 2012 CSPV orders.  As a U.S. producer of the subject merchandise, Suniva respectfully submits that the Department can only add to or deviate from its substantial transformation analysis in a way that would be consistent with the fundamental objectives of the U.S. antidumping and countervailing duty laws.  Specifically, U.S. law is designed to apply duties to foreign merchandise and to protect domestic production.  The Department has already found that modules, panels and laminates assembled from U.S.-origin cells are of U.S. origin for AD/CVD purposes.  Accordingly, the proposed clarification should contain a scope exclusion for CSPV products assembled from U.S.-origin cells.

In its Rebuttal Scope Comments,[6] Petitioner quibbled with Suniva's scope comments stating that "the Department has not yet determined - in this case or any previous case - the specific point in the c-Si PV cell production process at which the cell adopts a country of origin."  Divining such a "specific point" for all possible production scenarios is entirely unnecessary.  The Department already has found, in its recent, prior investigation into these very same products, that CSPV modules and panels, assembled from cells, do not experience a substantial transformation.[7]  Moreover, the Department already has stated that, in these investigations, it "will be informed by the product coverage decisions that it made"[8] in the prior CSPV investigations.  Thus, a module assembled in China or Taiwan using U.S.-origin cells does not experience a substantial transformation and retains the U.S. origin of the cell, unchanged.  As detailed below, U.S. law prohibits application of AD/CVD duties to U.S. origin goods.  Thus, both the 2 out of 3 proposal and the newly-proposed scope clarification require an additional exemption to avoid application of AD/CVD duties to U.S. origin CSPV products, that is, CSPV products assembled from U.S.-origin cells.  This necessary conclusion is not undone simply by imagining some hypothetical alternative where so little U.S. work is done that the cell never achieved U.S. origin in the first instance.

---

[6] Dated April 3, 2014, at page 23.

[7] *Scope Clarification:  Antidumping and Countervailing Duty Investigations of Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China*, March 19, 2012, at page 8.

[8] Notices of Initiation.

U.S. Department of Commerce
October 16, 2014
page 5



**Public Document**

### A.    CSPV modules, panels and laminates are of U.S. origin if assembled from cells of U.S. origin

Under the Department's existing analysis from the prior CSPV investigations, the assembly of cells into modules, panels or laminates is not a substantial transformation that would change the origin carried by the cell.  As the Department explained in the prior CSPV investigations, "{b}ased on our analysis of the foregoing factors we find that solar module assembly does not substantially transform solar cells such that it changes the country-of-origin."[9]

As noted above, the Department already has stated that, in these investigations, it "will be informed by the product coverage decisions that it made"[10] in the prior investigations.  Thus, the starting point for the origin analysis in these investigations is the Department's prior finding that the origin of the cells determines the origin of the assembled module, panel or laminate.  Indeed, the Department's prior finding that cell conversion confers origin, and that subsequent assembly does not, is thoroughly consistent with its long-standing analyses of similar products.  Since at least 1986, the Department has repeatedly found that processing of silicon wafers through fabrication and assembly into finished semiconductors is a substantial transformation that confers origin.  In 2002, the Department stated:

> We have considered this issue carefully and, as stated in the
> "scope of investigation" section above, have determined that
> processed wafers fabricated outside Korea and assembled
> into finished semiconductors in Korea are not included in the
> scope. The principal reason for this determination is that in
> numerous past proceedings on DRAMs and similar products
> such as EPROMs, the Department has consistently
> maintained that the country of origin is the country where
> wafer fabrication occurs. Given those precedents, we are
> unwilling to adopt different criteria for determining origin
> absent compelling information that new criteria are
> appropriate.[11]

---

[9] *Scope Clarification*, March 19, 2012, at page 8.

[10] Notices of Initiation.

[11] *Notice of Initiation of Countervailing Duty Investigation:  Dynamic Random Access Memory Semiconductors from the Republic of Korea*, 67 FR 70,927, 70,928 (Nov. 27, 2002) (emphasis added).

U.S. Department of Commerce
October 16, 2014
page 6



**Public Document**

Therefore, according to the Department's existing (and long-standing) analysis, which it already has determined to be "informed by" here, modules, panels and laminates assembled from U.S.-origin cells are U.S.-origin goods for AD/CVD purposes.

While the Department may revise or clarify its analysis, it must explain its rationale for doing so.[12]  As part of such an explanation, any such additional analysis adopted by the Department must be consistent with the fundamental objectives of U.S. antidumping and countervailing duty law.  U.S. statutes repeatedly express that duties are to be applied to foreign merchandise and that domestic production is to be protected, as described below.  Accordingly, domestically-produced goods, such as U.S. origin cells and products assembled therefrom, must be acknowledged for unique consideration, and receive a specific scope exclusion, if the scope clarification is adopted.

## B.   An origin analysis cannot result in duties applied to U.S.-origin goods

If the proposed clarification were to be applied to modules, panels and laminates assembled from U.S.-origin cells, at would appear to applying duties to U.S.-origin merchandise.  However, any clarification of the existing origin rule for CSPV merchandise cannot be applied to such U.S.-origin merchandise.

### 1.   *U.S. AD/CVD law prohibits application of duties to U.S.-origin goods*

Applying duties to merchandise already found by the Department to be of U.S.-origin would be contrary to the fundamental terms and objectives of the U.S. antidumping and countervailing duty laws.  U.S. law makes clear that duties are to be applied to "foreign" merchandise and that "domestic" production is to be protected.  Thus, in any new revision to, or extension of, the origin analysis for CSPV products, the unique statutory status of U.S. origin merchandise must be taken into account.  A review[13] of the explicit terms of U.S. law makes these objectives clear:

---

[12] "An agency is obligated to follow precedent, and if it chooses to change, it must explain why." *M.M. & P. Maritime Advancement, Training, Educ. & Safety Program v. Department of Commerce*, 729 F.2d 748, 755 (Fed. Cir. 1984).

[13] The citations herein are only examples of "domestic" and "foreign" from the statute, focusing especially, albeit not exclusively, on the Department, rather than the ITC.  We believe these examples are illustrative, representative and thoroughly consistent, but not exhaustive.

U.S. Department of Commerce
October 16, 2014
page 7



**Public Document**

- In determining industry support, the Department is required to consider whether the petition has the support of:

    > (i) the domestic producers or workers who support the petition account for at least 25 percent of the total **production of the domestic like product**, and

    > (ii) the domestic producers or workers who support the petition account for more than 50 percent of the **production of the domestic like product** produced by that portion of the industry expressing support for or opposition to the petition.

    19 U.S.C. § 1671a(c)(4)(A) (emphasis added).  Clearly, the objective of the statute is to collect opinions representing domestic products, because domestic products are to be protected.  Accordingly, the Department's analysis cannot result in duties applied to products that the Department itself already has defined as **domestic**.

- In analyzing the views of domestic producers, U.S. law directs the Department to "disregard the position of **domestic** producers who oppose the petition, if such producers are related to **foreign** producers, as defined in section 1677(4)(B)(ii) of this title, unless such domestic producers demonstrate that their interests as domestic producers would be adversely affected by the imposition of a countervailing duty order."  19 U.S.C. § 1671a(c)(4)(B)(i) (emphasis added).  U.S. law explicitly differentiates between domestic producers, who are to be protected by the law, and foreign producers.  Thus, U.S.-produced merchandise similarly must be protected.

- Regarding a quantitative restriction agreement, U.S. law requires the Department to consider:  "(iii) the relative impact on the competitiveness of **the domestic industry producing the like merchandise**, including any such impact on employment and investment in that industry."  19 U.S.C. § 1671c(a)(2)(B)(iii) (emphasis added).  Thus, U.S. law makes clear that the Department is to take special care to contemplate the impact on domestic products.

- In considering whether to terminate an investigation with a quantitative restriction agreement, U.S. law requires the Department to consult with: "potentially affected producers and workers in **the domestic industry**



***producing the like merchandise***, including producers and workers not party to the investigation." 19 U.S.C. § 1671c(a)(2)(C)(ii) (emphasis added).  U.S. law makes clear that the Department is required to take into account the view of those responsible for domestic production.

- Antidumping duties are imposed when the Department finds that "a class of kind of ***foreign*** merchandise" is being dumped in the United States.  19 U.S.C. § 1673(1) (emphasis added).  Clearly, where solar cells are of U.S. origin, then U.S. origin cells assembled into modules abroad do not lose U.S. origin and are not "foreign merchandise."

- In considering whether to terminate an AD investigation with a quantitative restriction agreement, U.S. law requires the Department to consider whether, under the proposed agreement, "the suppression or undercutting of price levels of ***domestic products*** by imports of that merchandise will be prevented…".  19 U.S.C. § 1673c(c)(1)(A) (emphasis added).  U.S. law makes clear that the Department is required to focus on the impact of its decisions on domestic products.

- In considering whether to terminate an AD investigation with a quantitative restriction agreement, U.S. law allows the Department to find "extraordinary circumstances" where, in part, "suspension of an investigation will be more beneficial to the ***domestic industry*** than continuation of the investigation…".  19 U.S.C. § 1673c(c)(2)(A)(i) (emphasis added).  U.S. law makes clear that the Department is required to focus on the impact of its decisions on domestic producers.

- In the event the Department were to consider self-initiating an antidumping duty investigation, a monitoring system can be established if, among other factors, "in the judgment of the administering authority this extraordinary pattern is causing a serious commercial problem for the ***domestic industry***." 19 U.S.C. § 1673a(a)(2)(A)(iii) (emphasis added).  U.S. law requires the Department to be on the lookout for and to protect against problems that impact domestic products.

- In sunset reviews, U.S. law requires an examination of "the potential for product-shifting if ***production facilities in the foreign country***, which can be used to produce the subject merchandise, are currently being used to



**Public Document**

produce other products." 19 U.S.C. § 1675a(a)(2)(D) (emphasis added). Clearly, U.S. law is focused on foreign production facilities and their products, *not* U.S. production facilities and their products.

- In a threat of injury analysis, U.S. law requires consideration of "…the potential for product-shifting if *production facilities in the foreign country*, which can be used to produce the subject merchandise, are currently being used to produce other products…". 19 U.S.C. § 1677(7)(F)(VI) (emphasis added). Clearly, U.S. law is focused on foreign production facilities and their products, *not* U.S. production facilities and their products.

- U.S. AD/CVD law defines "country" as "a *foreign* country, a political subdivision, dependent territory, or possession of a foreign country…". 19 U.S.C. § 1677(3) (emphasis added). Thus, where U.S. law directs calculations and analyses to be made for products from or actions in a country, it is meant to be a "foreign" country, not intended for products or merchandise originating from the United States.

- In an anticircumvention inquiry, the analysis is required to consider "whether the manufacturer or exporter of the parts or components is affiliated with the person who assembles or completes the merchandise sold in the United States from the *parts or components produced in the foreign country* with respect to which the order or finding described in paragraph (1) applies…". 19 U.S.C. § 1677j(a)(3)(B) (emphasis added). Clearly, U.S. law is focused on merchandise produced in a foreign country, not merchandise produced in the United States.

In light of all the above, it is clear that U.S. law expects and requires that duties will be applied only to foreign, not domestic, products and that domestic production is specifically identified for special consideration under U.S. law.

> 2.    *The Department has recognized the imperative not to apply AD/CVD duties to U.S.-origin goods*

The Department has noted this type of statutory imperative in analysis of the connections between the ADD/CVD laws and the U.S. Customs provisions regarding American Goods Returned ("AGR"):



**Public Document**

> The AD/CVD provisions provide for the assessment of duties only on products of the subject foreign country-not on products of the United States. (See, e.g., section 303 of the Act (whenever any country bestows a subsidy on any article "manufactured or produced in such country" CVD duties shall be imposed on "such article or merchandise"); see also section 701 of the Act; and section 771(16) of the Act (defining such or similar merchandise as merchandise subject to the investigation and similar merchandise "produced in the same country").) Therefore, **even if a U.S. origin product** is deemed to be "foreign" for Customs purposes, **it is not subject to AD and CVD duties unless it is transformed through processing or manufacture into a product of the subject country**.[14]

Thus, applying this logic, since U.S. origin CSPV cells are not transformed by module or similar assembly then, as the Department stated above, such CSPV goods are "not subject to AD and CVD duties...".

In another case, the Department previously recognized that goods that would be considered of U.S. origin (or at least would be considered duty paid in the United States) should not be subject merchandise for AD/CVD purposes upon re-importation into the United States.  The Department so found in DRAMs from Korea in 1993. According to a CBP administrative message (copy at Attachment 3 to Suniva's scope comments dated February 18, 2014), the Department advised CBP that antidumping duties would **not** apply to (1) memory modules assembled in the United States from Korean DRAMS imported prior to the effective date of the order, then exported and returned after the effective date of the order; and (2) memory modules assembled in the United States using Korean DRAMS imported after the effective date of the order, then exported and returned.  These results applied even though the DRAMs from Korea order applied a country of origin analysis based on wafer fabrication.  Assembly did not confer origin.  Nonetheless, after being in the United States, and being subject to duties, if any, these products were not subject to duties again upon return.  For CSPV products, the case is even stronger because wafers clearly **are** substantially transformed in the United States into cells, and **are not** substantially transformed when assembled into modules abroad.

---

[14] *Notice of Final Determination of Sales at Less Than Fair Value: Certain Cold-Rolled Carbon Steel Flat Products From Argentina*, 58 Fed. Reg. 37,062, 37.065 (July 9, 1993) (emphasis added).

U.S. Department of Commerce
October 16, 2014
page 11



**Public Document**

**C.     Fairly simple exclusion language would avoid application of duties to U.S. origin CSPV products**

The statutory provisions described above demonstrate that the fundamental structure and objective of the U.S. antidumping and countervailing duty law is the application of duties to foreign merchandise in order to protect domestic production. Domestically produced goods are uniquely provided for in U.S. law, as shown above. The Department has already ruled that CSPV products made from U.S.-origin cells are also of U.S. origin for ADD/CVD purposes. Accordingly, such goods should receive special treatment in the Department's implementation of this scope. Fortunately, implementation of the statutory mandate is simple:  if the Department were to adopt the proposed scope clarification, it also should include an explicit exclusion for domestic merchandise.

In order to implement the statutory imperatives, described above, a simple exclusion should be added along with the proposed clarification, as follows:

> For purposes of this investigation, subject merchandise does not include modules, laminates and/or panels consisting of crystalline silicon photovoltaic cells produced in the United States, no matter where assembled.

This exclusion language is designed to match the language and structure already present in the proposed scope so that it can (and should) be added to the scope of all three investigations, as written.

The Department already has used certifications to administer the existing orders against CSPV products from China.  Such certifications would be relatively simple to collect, especially from companies proven to have significant U.S. cell production facilities.  Moreover, most cells have unique or identifying designs or features that could be used by U.S. Customs and Border Protection ("CBP") to confirm identity.  As noted above, any implementation of the proposed scope clarification would need to include an exception for modules and panels assembled from U.S. origin cells.  And, any such exception could allow for companies to present their distinguishing cell characteristics to CBP for simple, consistent administration and enforcement.

**IV.     Conclusion**

If the Department chooses to implement the scope description involving the so-called "2 out of 3 rule", Suniva respectfully reiterates the request in its prior scope comments that such scope language should:

U.S. Department of Commerce
October 16, 2014
page 12



**Public Document**

(1) exclude modules, laminates and/or panels assembled in the subject country consisting of CSPV cells that are products of the United States, and

(2) insert the word "same" into the scope language, as shown above, in order to confirm that the two events out of three must occur in the very same country, rather than in either subject country.

Alternatively, if the Department were to implement the scope language in the recently-proposed clarification, Suniva submits that such language also should exclude CSPV products assembled from solar cells of U.S. origin.

If the Department has any questions regarding this submission or requires any additional information, please do not hesitate to contact Greg McCue at 202-429-6421 or by e-mail at gmccue@steptoe.com.

Thank you in advance for your consideration.

Sincerely,

Gregory S. McCue

*Counsel to Suniva, Inc.*

## COMPANY CERTIFICATION

I, **Matt Card, Vice President of Global Sales & Marketing,** currently employed by Suniva, Inc. certify that I reviewed the attached Case Brief dated October 16, 2014, regarding the Department of Commerce's Antidumping and Countervailing Duty Investigations on Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and Taiwan, Case Nos. A-583-853, A-570-010, and C-570-011.

I certify that the information contained in this submission is accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceedings, the Department may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that I am filing a copy of this signed certification with this submission to the U.S. Department of Commerce and that Suniva's counsel or I will retain the original for a five-year period commencing with the filing of this document.  The original will be available for inspection by U.S. Department of Commerce officials.

Signature: _____ Date:  October 16, 2014

## CERTIFICATION

I, Gregory S. McCue, with Steptoe & Johnson LLP, counsel to Suniva, Inc. ("Suniva"), certify that I reviewed the attached October 16, 2014 submission of the Case Brief pursuant to the Department of Commerce's Antidumping and Countervailing Duty Investigations on Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and Taiwan, Case Nos. A-583-853, A-570-010, and C-570-011. In my capacity as counsel of this submission, I certify that the information contained in this submission is accurate and complete to the best of my knowledge. I am aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceedings, the Department may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that I am filing a copy of this signed certification with this submission to the U.S. Department of Commerce and that I will retain the original for a five-year period commencing with the filing of this document. The original will be available for inspection by U.S. Department of Commerce officials.

*Signature:* _____

*Date:* ___10 / 16 / 2014_____

# PUBLIC CERTIFICATE OF SERVICE

**Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and Taiwan**

**Case Nos. A-570-010, C-570-011, A-583-853**

I, Carolyn Jackson, hereby certify that on October 16, 2014, I caused a copy of the attached submission to be served, via first class mail or email, on the parties listed below:

Timothy C. Brightbill, Esq.
Wiley Rein LLP
1776 K Street NW
Washington, D.C. 20006

Neil R. Ellis, Esq.
Sidley Austin LLP
1501 K Street, NW
Washington, DC 2005

David S. Christy, Jr., Esq.
Perkins Coie LLP
700 13th Street, NW
Washington, DC 2005

Mark E. Pardo
GDLSK LLP
1201 New York Ave. NW
Suite 650
Washington, DC 2005

Francis J. Sailer, Esq.
GDLSK LLP
1201 New York Ave. NW
Suite 650
Washington, DC 2005

John M. Gurley, Esq.
Arent Fox LLP
1717 K Street, NW
Washington, DC 20036

Matthew J. McConkey, Esq.
Mayer Brown LLP
1999 K Street, NW
Washington, DC 20006

Liu Fang, First Secretary
Embassy of the People's Republic of China
Economic Commercial Office
2133 Wisconsin Avenue, NW
Washington, D.C. 20007

Marguerite Trossevin, Esq.
Jochum Shore & Trossevin, PC
1100 H Street, NW
Suite 910
Washington, DC 20005

Adams C. Lee, Esq.
White & Case LLP
701 13th Street NW
Washington, DC 20005

Richard P. Ferrin, Esq.
Drinker Biddle & Reath LLP
1500 K Street NW
Washington, DC 20005

Gregory S. Menegaz, Esq.
deKieffer & Horgan
1455 Pennsylvania Ave.
Suite 900B
Washington, DC 20004

Craig A. Lewis, Esq.
Hogan Lovells US LLP
555 13th Street, NW
Washington, DC 20004

Robert G. Gosselink, Esq.
Trade Pacific PLLC
719 A Street, NE
Washington, DC  20002

Jeffrey S. Neeley, Esq.
Barnes, Richardson & Colburn LLP
11 Dupont Circle, NW
Suite 500
Washington, DC 20036

Lizbeth R. Levinson, Esq.
Kutak Rock LLP
1101 Connecticut Avenue, NW
Suite 10000
Washington, DC 20036

William E. Perry, Esq.
Dorsey & Whitney LLP
701 Fifth Avenue
Suite 6100
Seattle, WA 98104

Daniel L. Porter, Esq.
Curtis, Mallet-Prevost, Colt & Mosle LLP
1717 Pennsylvania Ave., NW
Washington, DC 20006

Thomas Peele, Esq
Baker & McKenzie
815 Connecticut Ave., NW
Washington, DC 20006

Lifren Dai
Gaopeng & Partners
28th/f, Silver Tower 2 North Dongsanhuan Rd.
Beijing 100027
People's Republic of China

Nithya Nagarajan, Esq.
Law Offices of Nithya Nagarajan
9101 Friars Road
Bethesda, MD 20817

William H. Barringer, Esq.
Curtis, Mallet-Prevost, Colt & Mosle LLP
1717 Pennsylvania Ave., NW
Washington, DC 20004

J. Kevin Horgan, Esq.
deKieffer & Horgan PLLC
1455 Pennsylvania Ave., NW
Suite 900B
Washington, DC 20002

Julie C. Mendoza, Esq.
Morris, Manning & Martin LLP
1401 Eye Street, NW
Suite 600
Washington, DC 20005

Daniel J. Gerkin, Esq.
K&L Gates LLP
1601 K Street, NW
Washington, DC 20036

Edmund W. Sim, Esq.
Appleton Luff PTE Ltd.
1025 Connecticut Ave., NW
Suite 1000
Washington, DC 20036

Dean Kaplan, Esq.
Hogan Lovells LLP
555 13th St, NW
Washington, DC 20004

David A. Riggle, Esq.
Riggle & Craven
5515 North Cumberland Ane
Suite 803
Chicago, IL 60656

Alexander H. Schafer, Esq.
Crowell & Moring LLP
1001 Pennsylvania Ave., NW
Washington, DC 20004

Harry L. Clark, Esq.
Orrick, Herrington & Sutcliffe LLP
1125 15th St., NW
Washington, DC 20005

Peter J. Koenig, Esq.
Squire Patton Boggs (US) LLP
1200 19th St., NW
Suite 300
Washington, DC 20036

Carolyn Jackson
Project Assistant
Steptoe & Johnson LLP