**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE:  HON. DONALD C. POGUE, JUDGE**

_____
)
SUNPOWER CORP.,                                              )
)
Plaintiff,                               )
)
and                                      )
)
SUNIVA, INC., et al.,                                          )
)
Consolidated Plaintiffs,      )
)               Consol. Court No. 15-00067
and                                      )
)
CANADIAN SOLAR INC. et al.,                          )
)
Intervenor Plaintiffs,        )
v.                                           )
)
UNITED STATES,                                               )
)
Defendant.                             )
)
and                                      )
)
SOLARWORLD AMERICAS, INC.,                        )
)
Intervenor Defendant.      )
_____)

**APPENDIX TO REPLY BRIEF OF CONSOLIDATED PLAINTIFF SUNIVA, INC.**

Gregory S. McCue

*Counsel for Suniva, Inc.*

Dated:  March 29, 2016

*SunPower Corp. v. United States*
*Consol. Ct. No. 15-00067*
**Before The Honorable Donald C. Pogue, Judge**

**APPENDIX TO REPLY BRIEF OF CONSOLIDATED PLAINTIFF SUNIVA, INC.**

| Tab | Document | Pages | AD P.R.# | CVD P.R.# |
|---|---|---|---|---|
| 1 | AD Final Determination (Dec. 23, 2014) | All | 823 | |
| 2 | CVD Final Determination (Dec. 23, 2014) | All | | 404 |
| 3 | Amended CVD Final Determination and AD/CVD Orders (Feb. 18, 2015) | All | 842 | |
| 4 | Amended CVD Final Determination and AD/CVD Orders (Feb. 18, 2015) | All | | 413 |
| 5 | CVD IDM (Dec. 15, 2014) | 1, 54-55 | | 384 |
| 6 | Scope Clarification (Mar. 19, 2012), Exhibit 2 to Comments on Scope submitted on behalf of Yingli Green Energy Holding Company Limited *et al*. (Feb. 18, 2014) | 1, Exhibit 2 | 124 | |
| 7 | Scope Clarification (Mar. 19, 2012), Exhibit 2 to Comments on Scope submitted on behalf of Yingli Green Energy Holding Company Limited *et al*. (Feb. 18, 2014) | 1, Exhibit 2 | | 87 |
| 8 | AD Notice of Initiation (Jan. 29, 2014) | All | 841 | |
| 9 | CVD Notice of Initiation (Jan. 29, 2014) | All | | 69 |
| 10 | AD IDM (Dec. 15, 2014) | 1, 29 | 809 | |
| 11 | Petition (Dec. 31, 2013) | 1-4 | 2 | |

| 12 | Petition<br>(Dec. 31, 2013) | 1-4 | | 1 |
|---|---|---|---|---|
| 13 | Suniva Request for Comment Period<br>(Jan. 15, 2014) | 1-9 | 35 | |
| 14 | Suniva Request for Comment Period<br>(Jan. 15, 2014) | 1-9 | | 56 |
| 15 | Suniva Comments on the Scope<br>(Feb. 18, 2014) | 1-3 | 131 | |
| 16 | Suniva Comments on the Scope<br>(Feb. 18, 2014) | 1-3 | | 91 |
| 17 | Suniva Case Brief<br>(Oct. 16, 2014) | 1, 3-4, 6-9 | 779 | |
| 18 | Suniva Case Brief<br>(Oct. 16, 2014) | 1, 3-4, 6-9 | | 357 |
| 19 | Message No. 5002303<br>(Jan. 2, 2015) | 1-3 | 822 | |
| 20 | Message No. 5002303<br>(Jan. 2, 2015) | 1-3 | 825 | |
| 21 | Message No. 5051302<br>(Feb. 20, 2015) | 1-3 | 836 | |
| 22 | Message No. 5051303<br>(Feb. 20, 2015) | All | | 412 |

# Tab 1

# AD P.R. Doc. 823

# AD Final Determination
# (Dec. 23, 2014)

12. Whether the Department Should Reallocate to Prime Products the Production Costs of Off-Grade Cells Reported to the Department as Non-Prime Products (Non-Prime Products)
13. Whether the Department Should Adjust the Affiliated Supplier's Cost of Wafers Before Testing Gintech's Transfer Prices with the Affiliated Wafer Supplier (Affiliated's COP)
14. Whether the Department Should Include Losses Related to Inventory Disposals in Gintech's G&A Expense Rate (Inventory Disposals)
15. Whether the Department Should Include LCM Adjustments in Gintech's Reported Costs (LCM Adjustments)
16. Whether the Department Should Account for the Differences between Gintech's Total Cost Accounting System Costs and its Total Reported Costs (Methodological Difference)
17. Whether the Department Should Adjust Gintech's Financial Expense Rate for Certain Items Identified at Verification (Financial Expense Rate)

C. Issues Involving Motech
18. Whether to Include Reported ''Indirect'' Sales in the Calculation of U.S. Price
19. Whether to Exclude Sales of Modules Produced by Motech's Affiliate in the PRC
20. Whether U.S. Indirect Selling Expenses Should Not Include Expenses for R&D
21. Whether Motech's Short-Term Interest Rate Should be used to Calculate U.S. Credit and Inventory Carrying Cost
22. Whether U.S. Warehousing Expense Calculation Should be Revised
23. Whether a Different Basis Should be Used for Certain Payment Dates
24. Whether a Downward Adjustment Should be Made to the Price for a Home Market Transaction
25. Whether Grade Z Cells Should Bear the Same Cost as Grades A and B Cells
26. Whether the Inventory Adjustment Ratio Should be Revised
27. Whether the Financial Expense Ratio Calculation Should Include the Gains on Foreign Currency Translation
28. Whether the Cost for One of Motech's Modules CONNUMs Should be Adjusted

V. Recommendation

## Appendix II

**Importer Certification**

I hereby certify that I am an official of (insert name of company importing solar panels/modules), that I have knowledge of the facts regarding the importation of the solar panels/modules or other products containing solar panels/modules that entered under entry number(s) (insert entry number(s) covered by the certification), and that these solar panels/modules do not contain solar cells produced in Taiwan.

By signing this certificate, I also hereby certify that (insert name of company importing solar panels/modules) maintains sufficient documentation supporting this certification for all solar cells used to produce the solar panels/modules imported under the above-referenced entry number(s).

I understand that agents of the importer, such as brokers, are not permitted to make this certification. Also, I am aware that records pertaining to this certification may be requested by CBP. I understand that this certification must be completed at the time of the entry. I also understand that failure to maintain the required certification or failure to substantiate the claim that the panels/modules do not contain solar cells produced in Taiwan will result in suspension of all unliquidated entries for which these requirements were not met and the requirement that the importer post an AD cash deposit on those entries equal to the applicable rate in effect at the time of entry.[1]

Name of Company Official

Title

Date

**Exporter Certification**

I hereby certify that I am an official of (insert name of company exporting solar panels/modules), that I have knowledge of the facts regarding the exportation of the solar panels/modules or other products containing the solar panels/modules identified below, and that these solar panels/modules do not contain solar cells produced in Taiwan.

By signing this certificate, I also hereby certify that (insert name of company exporting solar panels/modules) maintains sufficient documentation supporting this certification for all solar cells used to produce the solar panels/modules identified below. I am aware that records pertaining to this certification may be subject to verification by Department of Commerce officials and I consent to verification with respect to this certification and these records. I understand that this certification must be completed at the time of shipment. I also understand that failure to maintain the required certification or failure to substantiate the claim that the panels/modules do not contain solar cells produced in Taiwan will result in suspension of all unliquidated entries for which these requirements were not met and the requirement that the importer post an AD cash deposit on those entries equal to the applicable rate in effect at the time of entry.[1] The exports covered by this certification are (insert invoice numbers, purchase order numbers, export documentation, etc. to identify the exports covered by the certification).

Name of Company Official

---

[1] However, if the certification also does not meet the requirements set forth in *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Final Determination of Sales at Less Than Fair Value, and Affirmative Final Determination of Critical Circumstances, in Part,* 77 FR 63791 (October 17, 2012) (*Solar I*), then the applicable rate is the appropriate rate as set forth in the *Solar I* order.

Title

Date

[FR Doc. 2014–30107 Filed 12–22–14; 8:45 am]
**BILLING CODE 3510–DS–P**

## DEPARTMENT OF COMMERCE

### International Trade Administration

[A–570–010]

## Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China: Final Determination of Sales at Less Than Fair Value

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**DATES:** *Effective Date:* December 23, 2014.

**SUMMARY:** The Department of Commerce (the Department) determines that certain crystalline silicon photovoltaic products (certain solar products) from the People's Republic of China (PRC) are being, or are likely to be, sold in the United States at less than fair value (LTFV), as provided in section 735 of the Tariff Act of 1930, as amended (the Act). The final weighted-average dumping margins for this investigation are listed in the ''Final Determination Margins'' section below.

**FOR FURTHER INFORMATION CONTACT:** Jeffrey Pedersen or Thomas Martin, AD/ CVD Operations, Office IV, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 14th Street and Constitution Avenue NW., Washington, DC 20230; telephone: (202) 482–2769 or (202) 482–3936, respectively.

**SUPPLEMENTARY INFORMATION:**

### Background

The Department published the preliminary determination in the LTFV investigation of certain solar products from the PRC on July 31, 2014.[1] The following events occurred since the preliminary determination. Between August 4 and 14, 2014, the Department conducted a verification of Changzhou Trina Solar Energy Co., Ltd. and Trina Solar (Changzhou) Science & Technology Co., Ltd. (collectively, Trina

---

[1] *See Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China: Affirmative Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination,* 79 FR 44399 (July 31, 2014) (''Preliminary Determination'').

Solar) in Changzhou, PRC, and conducted a verification of their U.S. sales affiliate, Trina Solar (U.S.) Inc., in San Jose, California. Between August 7 and 20, 2014, the Department conducted a verification of Renesola Jiangsu Ltd., Renesola America Inc., Jinko Solar Import and Export Co., Ltd., and Jinko Solar (U.S.) Inc., in Shanghai and Yixing, PRC, and in San Francisco, California.[2] The Department issued the verification reports regarding Trina Solar on September 26, 2014.[3] The Department issued the verification reports regarding Renesola/Jinko on September 30 and October 2, 2014.[4]

On October 3, 2014, in response to interested parties' comments on the scope of this investigation, the Department announced that it was considering the possibility of a scope clarification, described the possible clarification, and provided interested

parties with an opportunity to submit comments on the potential clarification.[5]

On October 16, 2014, Trina Solar, Renesola/Jinko, SolarWorld Americas Inc. (Petitioner) (formerly SolarWorld Industries America, Inc.), the Government of the PRC, a U.S. importer, Suniva Inc., and certain separate rate applicants submitted case briefs.[6] From October 22, 2014 to October 27, 2014, Trina Solar, Renesola/Jinko, Petitioner, and certain separate rate applicants submitted rebuttal briefs.[7]

Although certain parties requested that a hearing be held, on October 24, 2014, all requests were subsequently withdrawn. Thus, the Department did not hold a hearing with respect to this investigation.

**Period of Investigation**

The period of investigation (POI) is April 1, 2013, through September 30, 2013. This period corresponds to the two most recent fiscal quarters prior to the month of the filing of the petition, which was December 2013.[8]

**Scope Comments and Scope Clarification**

As indicated in the "Background" section above, the Department received comments regarding the scope of this investigation from numerous interested parties. The Department summarized these comments and addressed them in the accompanying Issues and Decision Memorandum.[9] As explained in the Issues and Decision Memorandum, we have clarified the scope language such that subject merchandise includes all modules, laminates and/or panels assembled in the PRC that contain crystalline silicon photovoltaic cells produced in a customs territory other than the PRC.[10] The scope of the investigation for this final determination is below.

---

[2] The Department is treating the Renesola and Jinko companies under investigation as a single entity hereinafter collectively referred to as Renesola/Jinko. *See* Memorandum to Paul Piquado, Assistant Secretary for Enforcement and Compliance, From Christian Marsh, Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations regarding Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China for the Final Determination of Sales at Less Than Fair Value," dated concurrently with and hereby adopted by this notice ("Issues and Decision Memorandum") at Comment 16.

[3] *See* Memorandum to the File, from Erin Kearney, Patrick O'Connor, and Jeff Pedersen, International Trade Compliance Analysts, AD/CVD Operations, Office IV, titled "Verification of the Sales and Factors of Production Information Submitted by Changzhou Trina Solar Energy Co., Ltd. in the Antidumping Duty Investigation of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China ("PRC")," dated September 26, 2014; *see* Memorandum to the File, from Patrick O'Connor and Jeff Pedersen, International Trade Compliance Analysts, AD/CVD Operations, Office IV, titled "Verification of Trina Solar (U.S.) Inc. in the Antidumping Duty Investigation of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China ("PRC")," dated September 26, 2014.

[4] *See* Memorandum to the File, from Thomas Martin, Lilit Astvatsatrian, Theresa Deeley, International Trade Compliance Analysts, AD/CVD Operations, Office IV, titled "Verification of the Sales Responses of Renesola America Inc. in the Antidumping Investigation of Certain Silicon Crystalline Photovoltaic Products from the People's Republic of China," dated September 30, 2014; *see* Memorandum to the File, from Thomas Martin, Lilit Astvatsatrian, Theresa Deeley, International Trade Compliance Analysts, AD/CVD Operations, Office IV, titled "Verification of Jinko Solar Import & Export Co., Ltd. and Jinko Solar (U.S.) Inc. in the Antidumping Duty Investigation of Certain Crystalline Silicon Photovoltaic Products, from the People's Republic of China ("PRC")," dated September 30, 2014; *see* Memorandum to the File, from Thomas Martin, Lilit Astvatsatrian, Theresa Deeley, International Trade Compliance Analysts, AD/CVD Operations, Office IV, titled "Verification of the Sales and Factors Responses of Renesola Jiangsu Ltd. in the Antidumping Duty Investigation of Certain Silicon Crystalline Photovoltaic Products from the People's Republic of China," dated October 2, 2014.

[5] *See* Letter to All Interested Parties "Re: Antidumping and Countervailing Duty Investigations of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and the Antidumping Duty Investigation of Certain Crystalline Silicon Photovoltaic Products from Taiwan: Opportunity to Submit Scope Comments," dated October 3, 2014.

[6] *See* Letter from fourteen separate rate applicants, "Re: Antidumping and Countervailing Duty Investigations of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China, and Antidumping Duty Investigation of Certain Crystalline Silicon Photo voltaic Products from Taiwan: Respondents' Case Brief," dated October 16, 2014; Letter from the PRC Government, "Re: Government of China's Case Brief: Certain Crystalline Silicon Photovoltaic Products from the People's Republic Of China," dated October 16, 2014; Letter from Asun Energy Co., Ltd. (a/k/a Suzhou Asun Energy Co., Ltd.), "Re: Administrative Case Brief: Antidumping Duty Investigation of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China (A–570–010)," dated October 16, 2014; Letter from Trina, "Re: Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China; Case Brief of Changzhou Trina Solar Energy Co., Ltd.," dated October 16, 2014; Letter from Renesola, "Re: Certain Crystalline Silicon Photovoltaic Products from China: Case Brief," dated October 16, 2014; Letter from Junco, "Re: Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: Case Brief," dated October 16, 2014; Letter from Hanwha QCELLS USA, Inc., "Re: Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China," dated October 16, 2014; Letter from Suniva, Inc., "Re: Case Brief on Scope Issues Certain Crystalline Silicon Photovoltaic Products from China and Taiwan," dated October 16, 2014; Letter from tenKsolar (Shanghai) Co., Ltd., "Re: Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and Taiwan– Case Brief," dated October 16, 2014; Letter from SNJ Enterprises LLC dba Zamp Solar and Quebec Inc. dba RDK Products, "Re: Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: Case Brief," dated October 16, 2014; Letter from Petitioner, "Re: Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: Case Brief of Solar World Americas, Inc.," dated October 16, 2014.

[7] *See* Letter from Hanwha SolarOne (Qidong) Co., Ltd. and Hanwha SolarOne Hong Kong Limited, "Re: Rebuttal Brief: Antidumping Duty Investigation of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China (A–570–010)," dated October 22, 2014; Letter from Asun Energy Co., Ltd. (a/k/a Suzhou Asun Energy Co., Ltd.), "Re: Rebuttal Brief: Antidumping/ Countervailing Duty Investigations of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China," dated October 22, 2014; Letter from Shangluo BYD Industrial Co., Ltd. and Shanghai BYD Co., Ltd. "Re: Crystalline Silicon Photovoltaic Products from the People's Republic of

China and Taiwan: Rebuttal Brief," dated October 22, 2014; Letter from Changzhou Almaden Co., Ltd., "Re: Crystalline Silicon Photovoltaic Products from P.R. China: Rebuttal Brief," dated October 22, 2014; Letter from Renesola "Re: Certain Crystalline Silicon Photovoltaic Products from China; Rebuttal Brief," dated October 22, 2014; Letter from Petitioner, "Re: Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: Rebuttal Brief of Solar World Americas, Inc.," dated October 22, 2014; Letter from Trina, "Re: Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: Rebuttal Brief of Changzhou Trina Solar Energy Co., Ltd.," dated October 22, 2014. *see also* Letter from fourteen separate rate applicants, "Re: Antidumping and Countervailing Duty Investigations of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China, and Antidumping Duty Investigation of Certain Crystalline Silicon Photo voltaic Products from Taiwan: Respondents' Rebuttal Brief," dated October 27, 2014; Letter from Hanwha QCELLS USA, Inc. "Re: Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China," dated October 27, 2014; Letter from SNJ Enterprises LLC dba Zamp Solar LLC and Quebec Inc. dba RDK Products, "Re: Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: Rebuttal Brief," dated October 27, 2014; Letter from Petitioner, "Re: Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: SolarWorld's Rebuttal Brief on Scope," dated October 27, 2014.

[8] 19 CFR 351.204(b)(1).

[9] *See* Issues and Decision Memorandum.

[10] *Id.* at Comment 1.

## Certifications No Longer Required for This Proceeding

In the *Preliminary Determination,* the Department announced that (1) if an importer imports solar modules that were assembled in the PRC and (2) claims the solar modules do not contain solar cells manufactured in third countries using ingots, wafers, or partially produced solar cells manufactured in the PRC, the importer and PRC exporter of those solar modules are required to certify the claim and maintain documentation supporting the certifications.[11] However, given the clarification to the scope language, the Department is revoking the importer and exporter certification requirements announced in the *Preliminary Determination.* Importers and PRC exporters will not be required to maintain the certifications identified in the *Preliminary Determination* for merchandise entered, or withdrawn from warehouse, for consumption on or after July 31, 2014, the date of publication of the *Preliminary Determination* notice in the **Federal Register**. The revocation of the certification requirements previously established in this investigation does not change or rescind the certification requirements established in connection with the existing AD order on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the PRC.[12]

## Scope of the Investigation

The merchandise covered by this investigation is modules, laminates and/or panels consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including building integrated materials. For purposes of this investigation, subject merchandise includes modules, laminates and/or panels assembled in the PRC consisting of crystalline silicon photovoltaic cells produced in a customs territory other than the PRC.

Subject merchandise includes modules, laminates and/or panels assembled in the PRC consisting of crystalline silicon photovoltaic cells of thickness equal to or greater than 20 micrometers, having a p/n junction formed by any means, whether or not the cell has undergone other processing, including, but not limited to, cleaning, etching, coating, and/or addition of materials (including, but not limited to, metallization and conductor patterns) to collect and forward the electricity that is generated by the cell.

Excluded from the scope of this investigation are thin film photovoltaic products produced from amorphous silicon (a-Si), cadmium telluride (CdTe), or copper indium gallium selenide (CIGS). Also excluded from the scope of this investigation are modules, laminates and/or panels assembled in the PRC, consisting of crystalline silicon photovoltaic cells, not exceeding 10,000mm$^2$ in surface area, that are permanently integrated into a consumer good whose function is other than power generation and that consumes the electricity generated by the integrated crystalline silicon photovoltaic cells. Where more than one module, laminate and/or panel is permanently integrated into a consumer good, the surface area for purposes of this exclusion shall be the total combined surface area of all modules, laminates and/or panels that are integrated into the consumer good. Further, also excluded from the scope of this investigation are any products covered by the existing antidumping and countervailing duty orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, laminates and/or panels, from the PRC.[13]

Merchandise covered by this investigation is currently classified in the Harmonized Tariff Schedule of the United States (HTSUS) under subheadings 8501.61.0000, 8507.20.8030, 8507.20.8040, 8507.20.8060, 8507.20.8090, 8541.40.6020, 8541.40.6030 and 8501.31.8000. These HTSUS subheadings are provided for convenience and customs purposes; the

written description of the scope of this investigation is dispositive.

### Analysis of Comments Received

All issues raised in the case and rebuttal briefs by parties to this investigation are addressed in the Issues and Decision Memorandum. A list of the issues which the parties raised and to which the Department responded in the Issues and Decision Memorandum is attached to this notice as an Appendix. The Issues and Decision Memorandum is a public document and is on file electronically via Enforcement and Compliance's Antidumping and Countervailing Duty Centralized Electronic Service System (ACCESS). ACCESS is available to registered users at *http://access.trade.gov* and it is available to all parties in the Central Records Unit, room 7046 of the main Department of Commerce building. In addition, a complete version of the Issues and Decision Memorandum can be accessed directly at *http://enforcement.trade.gov/frn/.* The signed and electronic versions of the Issues and Decision Memorandum are identical in content.

Changes to the Margin Calculations Since the Preliminary Determination

Based on the Department's analysis of the comments received and our findings at verification, we made certain changes to the margin calculations. For a discussion of these changes, *see* the Issues and Decision Memorandum, the company-specific analysis and surrogate value memoranda, and the separate rate calculation memorandum, all dated concurrently with this notice.

### Verification

As provided in section 782(i) of the Act and 19 CFR 351.307(b)(1)(i), in August 2014, the Department verified the information submitted by Trina Solar and Renesola/Jinko for use in the final determination. The Department used standard verification procedures, including examination of relevant accounting and production records and original source documents provided by Trina Solar and Renesola/Jinko.

### Final Determination Margins

The Department determines that the following weighted-average dumping margins exist for the period April 1, 2013 through September 30, 2013.

---

[11] *Preliminary Determination,* 79 FR 44901–44902.

[12] *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Affirmative Countervailing Duty Determination and Final Affirmative Critical Circumstances Determination,* 77 FR 63788 (October 17, 2012) ("crystalline silicon photovoltaic cells, whether or not assembled into modules, from the PRC").

[13] *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order,* 77 FR 73018 (December 7, 2012); *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Countervailing Duty Order,* 77 FR 73017 (December 7, 2012).

| Exporter | Producer | Weighted-average dumping margin (percent) |
|---|---|---|
| Changzhou Trina Solar Energy Co., Ltd./Trina Solar (Changzhou) Science & Technology Co., Ltd. | Changzhou Trina Solar Energy Co., Ltd./Trina Solar (Changzhou) Science & Technology Co., Ltd. | 26.71 |
| Renesola Jiangsu Ltd./Renesola Zhejiang Ltd./Jinko Solar Co. Ltd./Jinko Solar Import and Export Co., Ltd. | Renesola Jiangsu Ltd./Jinko Solar Co. Ltd. ........................... | 78.42 |
| Anji DaSol Solar Energy Science & Technology Co., Ltd. ...... | Anji DaSol Solar Energy Science & Technology Co., Ltd. ...... | 52.13 |
| Asun Energy Co., Ltd. (a/k/a Suzhou Asun Energy Co., Ltd.) | Asun Energy Co., Ltd. (a/k/a Suzhou Asun Energy Co., Ltd.) | 52.13 |
| Baoding Tianwei Yingli New Energy Resources Co. , Ltd. ...... | Baoding Tianwei Yingli New Energy Resources Co., Ltd., Yingli Energy (China) Co., Ltd., and Lixian Yingli New Energy Co., Ltd.. | 52.13 |
| BYD (Shangluo) Industrial Co., Ltd. ...................................... | BYD (Shangluo) Industrial Co., Ltd. ...................................... | 52.13 |
| Canadian Solar International Limited | Canadian Solar Manufacturing (Luoyang) Inc., Canadian Solar Manufacturing (Changshu), Inc. | 52.13 |
| Canadian Solar Manufacturing (Changshu), Inc | Canadian Solar Manufacturing (Changshu), Inc | 52.13 |
| Canadian Solar Manufacturing (Luoyang) Inc ......................... | Canadian Solar Manufacturing (Luoyang) Inc ......................... | 52.13 |
| CEEG Nanjing Renewable Energy Co., Ltd. ........................... | CEEG Nanjing Renewable Energy Co., Ltd. ........................... | 52.13 |
| Changzhou Almaden Co., Ltd. ............................................... | Changzhou Almaden Co., Ltd. ............................................... | 52.13 |
| Chint Solar (Zhejiang) Co., Ltd. | Chint Solar (Zhejiang) Co., Ltd. | 52.13 |
| ET Solar Industry Limited | ET Solar Industry Limited | 52.13 |
| Hainan Yingli New Energy Resources Co. Ltd. | Hainan Yingli New Energy Resources Co. Ltd. | 52.13 |
| Hangzhou Zhejiang University Sunny Energy Science and Technology Co., Ltd. | Hangzhou Zhejiang University Sunny Energy Science and Technology Co., Ltd. | 52.13 |
| Hanwha SolarOne (Qidong) Co., Ltd. ..................................... | Hanwha SolarOne (Qidong) Co., Ltd. ..................................... | 52.13 |
| Hanwha SolarOne Hong Kong Limited | Hanwha SolarOne (Qidong) Co., Ltd. ..................................... | 52.13 |
| Hefei JA Solar Technology Co., Ltd. | Hefei JA Solar Technology Co., Ltd. | 52.13 |
| Hengdian Group DMEGC Magnetics Co., Ltd. ........................ | Hengdian Group DMEGC Magnetics Co., Ltd. ........................ | 52.13 |
| Hengshui Yingli New Energy Resources Company Limited .... | Hengshui Yingli New Energy Resources Company Limited ... | 52.13 |
| Jiangyin Hareon Power Co., Ltd. ........................................... | Jiangyin Xinhui Solar Co., Ltd.; Altusvia Energy Taicang Co., Ltd.; Hareon Solar Technology Co., Ltd.. | 52.13 |
| Jiawei Solarchina Co., Ltd. | Jiawei Solarchina (Shenzhen) Co., Ltd. ................................. | 52.13 |
| Jiawei Technology (HK) Ltd. | Shenzhen Jiawei Photovoltaic Lighting Co. Ltd. .................... | 52.13 |
| LDK Solar Hi-Tech (Nanchang) Co., Ltd. ............................... | LDK Solar Hi-Tech (Nanchang) Co., Ltd. ............................... | 52.13 |
| Lixian Yingli New Energy Company Ltd. | Lixian Yingli New Energy Company Ltd. | 52.13 |
| MOTECH (Suzhou) Renewable Energy Co., Ltd. ..................... | MOTECH (Suzhou) Renewable Energy Co., Ltd. ..................... | 52.13 |
| Ningbo Qixin Solar Electrical Appliance Co., Ltd. .................. | Ningbo Qixin Solar Electrical Appliance Co., Ltd. .................. | 52.13 |
| Perlight Solar Co., Ltd. | Perlight Solar Co., Ltd. | 52.13 |
| Risen Energy Co., Ltd. | Risen Energy Co., Ltd. | 52.13 |
| Shanghai JA Solar Technology Co., Ltd. ............................... | Shanghai JA Solar Technology Co., Ltd. ............................... | 52.13 |
| Shanghai Solar Energy Science & Technology Co., Ltd. ........ | Lianyungang Shenzhou New Energy Co., Ltd. ........................ | 52.13 |
| Shenzhen Jiawei Photovoltaic Lighting Co. Ltd. ................... | Shenzhen Jiawei Photovoltaic Lighting Co. Ltd. ................... | 52.13 |
| Shenzhen Sungold Solar Co., Ltd. | Shenzhen Sungold Solar Co., Ltd. | 52.13 |
| Shenzhen Topray Solar Co., Ltd. | Shenzhen Topray Solar Co., Ltd. | 52.13 |
| Sun Earth Solar Power Co., Ltd. | Sun Earth Solar Power Co., Ltd. | 52.13 |
| Sunny Apex Development Ltd. ................................................ | Shenzhen Jiawei Photovoltaic Lighting Co. Ltd., Wuhan FYY Technology Co., Ltd.. | 52.13 |
| SunPower Systems SARL | SunEnergy (S.Z.) Co., Ltd. | 52.13 |
| tenKsolar (Shanghai) Co., Ltd. .............................................. | tenKsolar (Shanghai) Co., Ltd. .............................................. | 52.13 |
| Upsolar Global Co., Ltd. and including Upsolar Group, Co., Ltd.. | Shandong Dahai Group Co. Ltd. | 52.13 |
| Wanxiang Import & Export Co., Ltd. | Zhejiang Wanxiang Solar Co., Ltd. | 52.13 |
| Wuhan FYY Technology Co., Ltd. | Wuhan FYY Technology Co., Ltd. | 52.13 |
| Wuxi Suntech Power Co., Ltd. | Wuxi Suntech Power Co., Ltd. | 52.13 |
| Yingli Energy (China) Company Limited ................................. | Yingli Energy (China) Company Limited, Baoding Tianwei Yingli New Energy Resources Co., Ltd. and Lixian Yingli New Energy Co., Ltd.. | 52.13 |
| Yingli Green Energy International Trading Limited ................. | Yingli Energy (China) Company Limited, Baoding Tianwei Yingli New Energy Resources Co., Ltd., and Hainan Yingli New Energy Resources Co., Ltd.. | 52.13 |
| Zhongli Talesun Solar Co., Ltd. ............................................. | Zhongli Talesun Solar Co., Ltd. ............................................. | 52.13 |
| PRC-Wide Rate | | 165.04 |

**PRC-Wide Entity**

Consistent with the *Preliminary Determination,* the PRC-wide entity includes, among other companies, CSG PVTech Co., Ltd.; Lianyungang Shenzhou New Energy Co., Ltd.; Lightway Green New Energy Co., Ltd.; SunEnergy (S.Z.) Co., Ltd.; SunPower Corporation (U.S.); Jiawei Solarchina (Shenzhen) Co., Ltd.; and Sumec Hardware & Tools Co., Ltd. We found these companies either have not demonstrated an absence of *de facto* government control, or did not have a sales transaction during the POI that provided a basis for granting separate rate status.[14]

[14] *See* the memorandum from Jeff Pedersen, Senior International Trade Analyst, Office IV, AD/CVD Operations to Abdelali Elouaradia, Director,

Continued

The PRC-wide entity also includes 35 PRC exporters and/or producers of the merchandise under consideration during the POI that did not respond to the Department's request for information.[15] These companies withheld necessary information, failed to provide information by the established deadlines, and significantly impeded this proceeding by not submitting the requested quantity and value information within the meaning of sections 776(a)(1) and (a)(2)(A)–(C) of the Act, and further, failed to cooperate by not acting to the best of their ability to comply with the Department's requests for information within the meaning of section 776(b) of the Act. Therefore, we are continuing to apply adverse facts available to the PRC-wide entity. *See* Issues and Decision Memorandum for further discussion.

**Disclosure**

We intend to disclose to parties the calculations performed in this proceeding within five days of the date of publication of this notice in accordance with 19 CFR 351.224(b).

**Separate Rate**

The rate assigned to companies granted separate rate status that were not individually examined is normally determined based on the weighted-average of the estimated dumping margins calculated for exporters and producers individually investigated, excluding zero and *de minimis* margins or margins based entirely on facts available (FA).[16] In this investigation,

we calculated above *de minimis* estimated weighted-average dumping margins that are not based on total FA for the two mandatory respondents, Trina Solar and Renesola/Jinko. Because we individually examined two companies in this investigation, basing the estimated dumping margin for the companies not individually examined on a weighted-average of the dumping margins for the two individually examined companies risks disclosure of business proprietary information (BPI). Therefore, we calculated both a weighted-average of the dumping margins calculated for the two mandatory respondents using public values for their sales of subject merchandise and a simple average of these two dumping margins, and selected, as the separate rate, the average that provides a more accurate proxy for the weighted-average margin of both companies calculated using BPI.[17]

**Continuation of Suspension of Liquidation**

In accordance with section 735(c)(1)(B) of the Act, the Department will instruct U.S. Customs and Border Protection (CBP) to continue to suspend liquidation of all appropriate entries of certain solar products from the PRC as described in the "Scope of the Investigation" section, which were entered, or withdrawn from warehouse, for consumption on or after July 31, 2014, the date of publication in the **Federal Register** of the notice of an affirmative preliminary determination that certain solar products are being, or are likely to be, sold in the United States at LTFV. Further, consistent with our practice, where the product from the PRC under investigation is also subject to a concurrent countervailing duty (CVD) investigation, the Department will instruct CBP to require a cash deposit[18] equal to the weighted-average amount by which the normal value exceeds U.S. price, adjusted where appropriate for export subsidies and estimated domestic subsidy pass-through.[19] The cash deposit rates, before any adjustments for export subsidies and estimated domestic subsidy pass-through,[20] are as follows: (1) For each

exporter/producer combination listed in the table above, the cash deposit rate will be equal to the dumping margin listed for that exporter/producer combination in the table; (2) for all other combinations of PRC exporters/ producers of the merchandise under consideration, the cash deposit rate will be equal to the dumping margin established for the PRC-wide entity; and (3) for all non-PRC exporters of the merchandise under consideration which have not received their own separate rate above, the cash deposit rate will be equal to the cash deposit rate applicable to the PRC exporter/producer combination that supplied that non-PRC exporter. These suspension-of-liquidation instructions will remain in effect until further notice.

**ITC Notification**

In accordance with section 735(d) of the Act, we notified the International Trade Commission (ITC) of the final affirmative determination of sales at LTFV. As the Department's final determination is affirmative, in accordance with section 735(b)(2) of the Act, the ITC will determine, within 45 days, whether the domestic industry in the United States is materially injured, or threatened with material injury, by reason of imports of subject merchandise, or sales (or the likelihood of sales) for importation, of the subject merchandise. If the ITC determines that such injury does not exist, this proceeding will be terminated and all estimated duties deposited as a result of the suspension of liquidation will be refunded. If the ITC determines that such injury does exist, the Department will issue an antidumping duty order directing CBP to assess, upon further instructions by the Department, antidumping duties on all imports of the subject merchandise entered, or withdrawn from warehouse, for consumption on or after the effective date of the suspension of liquidation.

**Return or Destruction of Proprietary Information**

This notice also serves as a reminder to the parties subject to administrative protective order (APO) of their responsibility concerning the disposition of propriety information

---

Office IV AD/CVD Operations regarding "Companies Not Receiving a Separate Rate," dated July 24, 2014; *see also* Comments 7 and 8 of the Issues and Decision Memorandum.

[15] Those companies are: Beijing Hope Industry, China Sunergy, CNPV, EGing, ENN Solar Energy, Era Solar, Goldpoly (Quanzhou), Himin Holdings, Jetion, Jia Yi Energy Technology, Jiasheng Photovoltaic Tech., Jiutai Energy, Komaes Solar, Leye Photovoltaic Science Tech., Magi Solar Technology, Perfectenergy, Polar Photovoltaics, Qiangsheng (QS Solar), Refine Solar, Risun Solar (JiangXi Ruijing Solar Power Co., Ltd.), Shanghai Chaori Solar Energy, Shangpin Solar, Shanshan Ulica, Shenglong PV-Tech, Shenzhen Global Solar Energy Tech., Shuqimeng Energy Tech, Skybasesolar, Solargiga Energy Holdings Ltd., Sopray Solar, Sunlink PV, Tianjin Jinneng Solar Cell, Topsolar, Trony, Weihai China Glass Solar, and Yuhan Sinosola. For an additional 12 PRC exporters and/or producers of merchandise that were named in the Petition, the Department issued a questionnaire, but did not receive confirmation of delivery. Those companies are: Aiko Solar, Best Solar Hi-tech, Dai Hwa Industrial, Eoplly New Energy, Golden Partner development, Innovosolar, Jiangxi Green Power Co. Ltd., Sanjing Silicon, Sunflower, Sunvim Solar Technology, Yunnan Tianda, and Yunnan Zhuoye Energy. *See* memorandum to the file from Erin Kearney, International Trade Analyst, Office 4, AD/CVD Operations on the subject "Delivery of Quantity and Value Questionnaires" dated March 12, 2014.

[16] *See* section 735(c)(5)(A) of the Act.

[17] *See* the December 15, 2014, memorandum from Jeff Pedersen to the File entitled "Calculation of the Final Margin for Separate Rate Recipients."

[18] *See* Modification of Regulations Regarding the Practice of Accepting Bonds During the Provisional Measures Period in Antidumping and Countervailing Duty Investigations, 76 FR 61042 (October 3, 2011).

[19] *See* sections 772(c)(1)(C) and 777A(f) of the Act.

[20] With respect to a final affirmative countervailing duty determination in the

companion investigation, because the provisional measures period has expired, Commerce will only order the resumption of the suspension of liquidation, and require cash deposits for countervailing duties equal to the final subsidy rates, if the U.S. International Trade Commission issues a final affirmative injury determination. In the event of a final affirmative injury determination, the Department will make an adjustment to AD cash deposits where appropriate for export subsidies and estimated domestic subsidy pass-through.

disclosed under APO in accordance with 19 CFR 351.305. Timely written notification of return or destruction of APO materials or conversion to judicial protective order is hereby requested. Failure to comply with the regulations and terms of an APO is a sanctionable violation.

This determination is issued and published in accordance with sections 735(d) and 777(i)(1) of the Act.

Dated: December 15, 2014.

**Paul Piquado,**

*Assistant Secretary for Enforcement and Compliance.*

## Appendix

**List of Topics Discussed in the Issues and Decision Memorandum**

I. Summary
II. Background
III. Scope of the Investigation
IV. Separate Rate Companies
V. Use of Adverse Facts Available
VI. Discussion of the Issues
Comment 1. Scope of the Investigation
Comment 2. Whether to Select South Africa or Thailand as the Primary Surrogate Country
Comment 3. Whether to Offset the Cash Deposit Rate for Export Subsidies
Comment 4. Whether the Department Should Investigate the Effects of the GOC's Alleged Cyberhacking on this Investigation
Comment 5. Ultimate Ownership of Separate Rate Applicants
Comment 6. Separate Rate Applicants with Managers or Board Members with Ties to the Chinese Government
Comment 7. Separate Rate Status of Lianyungang Shenzhou New Energy Co., Ltd.
Comment 8. Separate Rate Status of Sumec Hardware & Tools Co., Ltd.
Comment 9. The Appropriate Surrogate Value for Aluminum Frames
Comment 10. The Appropriate Surrogate Value for Scrap Solar Cells
Comment 11. Unpaid Sales
Comment 12. Quality Insurance
Comment 13. Warranty Costs
Comment 14. Incorrect Allocation of Indirect Material, Labor, and Electricity Consumption
Comment 15. Whether to Base Renesola/ Jinko's Dumping Margin on Partial AFA
Comment 16. Whether to Collapse Jinko and Renesola
Comment 17. Whether to Use Market-Economy Purchase Prices to Value all of Renesola/Jinko's Solar Cells
Comment 18. Whether to Adjust Renesola/Jinko's Cash Deposit Rate by the Full Amount of Domestic Subsidies

Comment 19. Separate Rate Application of tenKsolar
VII. Recommendation

[FR Doc. 2014–30092 Filed 12–22–14; 8:45 am]

**BILLING CODE 3510–DS–P**

---

## DEPARTMENT OF COMMERCE

### National Oceanic and Atmospheric Administration

#### RIN 0648–XD660

### Takes of Marine Mammals Incidental to Specified Activities; Seabird and Pinniped Research Activities in Central California, 2015–2016

**AGENCY:** National Marine Fisheries Service (NMFS), National Oceanic and Atmospheric Administration (NOAA), Commerce.

**ACTION:** Notice; proposed incidental harassment authorization; request for comments.

**SUMMARY:** We, NMFS, have received an application from Point Blue Conservation Science (Point Blue) requesting an Incidental Harassment Authorization (Authorization) to take marine mammals, by harassment, incidental to conducting proposed seabird research activities on Southeast Farallon Island, Año Nuevo Island, and Point Reyes National Seashore in central California from January 2015 through January 2016. Per the Marine Mammal Protection Act, we are requesting comments on our proposal to issue an Authorization to Point Blue to incidentally harass, by Level B harassment only, four species of marine mammals during the year-long monitoring project.

**ADDRESSES:** Address comments on the application to Jolie Harrison, Chief, Permits and Conservation Division, Office of Protected Resources, National Marine Fisheries Service, 1315 East-West Highway, Silver Spring, MD 20910. The mailbox address for providing email comments is *ITP.Cody@ noaa.gov.* You must include 0648– XD660 in the subject line. We are not responsible for email comments sent to addresses other than the one provided here. Comments sent via email, including all attachments, must not exceed a 25-megabyte file size. NMFS is not responsible for email comments sent to addresses other than the one provided here.

Instructions: All submitted comments are a part of the public record and NMFS will post them to *http:// www.nmfs.noaa.gov/pr/permits/ incidental/military.htm* without change. All Personal Identifying Information (for

example, name, address, etc.) voluntarily submitted by the commenter may be publicly accessible. Do not submit confidential business information or otherwise sensitive or protected information.

To obtain an electronic copy of the application, a list of the references used in this document, and Point Blue's Authorization request, visit the Internet at: *http://www.nmfs.noaa.gov/pr/ permits/incidental/military.htm.*

NMFS prepared an Environmental Assessment (EA) in 2014 titled "Issuance of an Incidental Harassment Authorization to Point Blue Conservation Science and Partners to Take Marine Mammals by Harassment Incidental to Seabird and Pinniped Research Conducted in Central California." We provided relevant environmental information to the public through a notice for a previous proposed authorization (78 FR 66686, November 6, 2013) and considered public comments received in response prior to finalizing our EA.

At that time, NMFS concluded that issuance of an annual Authorization would not significantly affect the quality of the human environment and issued a Finding of No Significant Impact (FONSI) regarding issuing an Authorization for Point Blue's 2014– 2015 seabird research activities. In conjunction with Point Blue's 2015– 2016 application, NMFS will review the 2014 EA to determine whether supplementation is necessary. Information from Point Blue's application, NMFS' 2014 EA, and this notice collectively provide the environmental information related to a proposed issuance of the Authorization for public review and comment. An electronic copy of the EA for this activity is available upon request (see **ADDRESSES**).

**FOR FURTHER INFORMATION CONTACT:** Jeannine Cody, Office of Protected Resources, NMFS (301) 427–8401.

**SUPPLEMENTARY INFORMATION:** Section 101(a)(5)(D) of the Marine Mammal Protection Act of 1972, as amended (MMPA; 16 U.S.C. 1361 *et seq.*) directs the Secretary of Commerce to allow, upon request, the incidental, but not intentional, taking of small numbers of marine mammals of a species or population stock, by U.S. citizens who engage in a specified activity (other than commercial fishing) within a specified geographical region if, after NMFS provides a notice of a proposed authorization to the public for review and comment: (1) NMFS makes certain findings; and (2) the taking is limited to harassment.

# Tab 2

# CVD P.R. Doc. 404

## CVD Final Determination
## (Dec. 23, 2014)

which subsection of 19 CFR 351.102(b)(21) the information is being submitted and, if the information is submitted to rebut, clarify, or correct factual information already on the record, to provide an explanation identifying that the factual information seeks to rebut, clarify, or correct. The final rule also modified 19 CFR 351.301 so that, rather than providing general time limits, there are specific time limits based on the type of factual information being submitted. These modifications are effective for all segments initiated on or after May 10, 2013. Please review the final rule, available at *http://enforcement.trade.gov/frn/2013/1304frn/2013-08227.txt,* prior to submitting factual information in this segment.

Any party submitting factual information in an antidumping duty or countervailing duty proceeding must certify to the accuracy and completeness of that information.[7] Parties are hereby reminded that revised certification requirements are in effect for company/government officials as well as their representatives. Ongoing segments of any antidumping duty or countervailing duty proceedings initiated on or after March 14, 2011 should use the formats for the revised certifications provided at the end of the *Interim Final Rule.*[8] All segments of any antidumping duty or countervailing duty proceedings initiated on or after August 16, 2013, should use the formats for the revised certifications provided at the end of the *Final Rule.*[9] The Department intends to reject factual submissions in any proceeding segments if the submitting party does not comply with applicable revised certification requirements.

## Revised Extension of Time Limits Regulation

On September 20, 2013, the Department modified its regulation concerning the extension of time limits for submissions in antidumping and countervailing duty proceedings: *Final*

Rule, 78 FR 57790 (September 20, 2013). The modification clarifies that parties may request an extension of time limits before a time limit established under Part 351 expires, or as otherwise specified by the Secretary. In general, an extension request will be considered untimely if it is filed after the time limit established under Part 351 expires. For submissions which are due from multiple parties simultaneously, an extension request will be considered untimely if it is filed after 10:00 a.m. on the due date. Examples include, but are not limited to: (1) Case and rebuttal briefs, filed pursuant to 19 CFR 351.309; (2) factual information to value factors under 19 CFR 351.408(c), or to measure the adequacy of remuneration under 19 CFR 351.511(a)(2), filed pursuant to 19 CFR 351.301(c)(3) and rebuttal, clarification and correction filed pursuant to 19 CFR 351.301(c)(3)(iv); (3) comments concerning the selection of a surrogate country and surrogate values and rebuttal; (4) comments concerning U.S. Customs and Border Protection data; and (5) quantity and value questionnaires. Under certain circumstances, the Department may elect to specify a different time limit by which extension requests will be considered untimely for submissions which are due from multiple parties simultaneously. In such a case, the Department will inform parties in the letter or memorandum setting forth the deadline (including a specified time) by which extension requests must be filed to be considered timely. This modification also requires that an extension request must be made in a separate, stand-alone submission, and clarifies the circumstances under which the Department will grant untimely-filed requests for the extension of time limits. These modifications are effective for all segments initiated on or after October 21, 2013. Please review the final rule, available at *http://www.gpo.gov/fdsys/pkg/FR-2013-09-20/html/2013-22853.htm,* prior to submitting factual information in these segments.

These initiations and this notice are in accordance with section 751(a) of the Act (19 U.S.C. 1675(a)) and 19 CFR 351.221(c)(1)(i).

Dated: December 17, 2014.

**Christian Marsh,**

*Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations.*

[FR Doc. 2014–30074 Filed 12–22–14; 8:45 am]

**BILLING CODE 3510–DS–P**

---

## DEPARTMENT OF COMMERCE

### International Trade Administration

[C–570–011]

## Countervailing Duty Investigation of Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China: Final Affirmative Countervailing Duty Determination

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** The Department of Commerce (the Department) published the *Preliminary Determination* of the countervailing duty (CVD) investigation of certain crystalline silicon photovoltaic products (certain solar products) from the People's Republic of China (the PRC) on June 10, 2014.[1] The Department determines that countervailable subsidies are being provided to producers and exporters of certain solar products from the PRC. For information on the estimated subsidy rates, *see* the "Suspension of Liquidation" section of this notice. The period of investigation (POI) is January 1, 2012, through December 31, 2012.

**DATES:** *Effective Date:* December 23, 2014.

**FOR FURTHER INFORMATION CONTACT:** Gene Calvert or Justin Neuman, AD/CVD Operations, Office VII, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 14th Street and Constitution Avenue NW., Washington, DC 20230; Phone: (202) 482–3586, or (202) 482–0486, respectively.

**SUPPLEMENTARY INFORMATION:**

### Background

The petitioner, SolarWorld Americas, Inc., filed its petition with the Department on December 31, 2013, seeking the imposition of countervailing duties on certain solar products from the PRC and we initiated this investigation on January 29, 2014.[2] The Department published the *Preliminary Determination* on June 10, 2014. On

---

[7] *See* section 782(b) of the Act.

[8] *See Certification of Factual Information to Import Administration During Antidumping and Countervailing Duty Proceedings: Interim Final Rule,* 76 FR 7491 (February 10, 2011) ("*Interim Final Rule*"), amending 19 CFR 351.303(g)(1) and (2); *Certification of Factual Information to Import Administration during Antidumping and Countervailing Duty Proceedings: Supplemental Interim Final Rule,* 76 FR 54697 (September 2, 2011).

[9] *See Certification of Factual Information To Import Administration During Antidumping and Countervailing Duty Proceedings,* 78 FR 42678 (July 17, 2013) ("*Final Rule*"); *see also* the frequently asked questions regarding the *Final Rule,* available at *http://enforcement.trade.gov/tlei/notices/factual_info_final_rule_FAQ_07172013.pdf.*

[1] *See Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China: Preliminary Affirmative Countervailing Duty Determination,* 79 FR 33174 (June 10, 2014) (*Preliminary Determination*).

[2] *See* Letter from Petitioner, "Petition for the Imposition of Antidumping and Countervailing Duties: Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and Taiwan," (December 31, 2013) (the petition); *Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China: Initiation of Countervailing Duty Investigation,* 79 FR 4667 (January 29, 2014) (Initiation Notice).

June 9, 2014, the Government of the People's Republic of China submitted a ministerial error allegation regarding aspects of the *Preliminary Determination.* On June 10, 2014, the mandatory company respondents, Changzhou Trina Solar Energy Co., Ltd. and its cross-owned affiliate Trina Solar (Changzhou) Science & Technology Co., Ltd. (Collectively, Trina Solar), and Wuxi Suntech Power Co., Ltd. and its cross-owned affiliates also submitted a ministerial error allegation. On July 31, 2014, we aligned the final determination in this investigation with the final determination in the companion antidumping duty investigation on certain solar products from the PRC.[3] On August 15, 2014, the Department rejected the Government of the People's Republic of China's (the GOC's) June 9, 2014, ministerial error allegation, as well as Trina Solar's and Wuxi Suntech's June 10, 2014, submissions, explaining that their submissions were noncompliant with the Department's procedures for submitting factual information. Trina Solar and Wuxi Suntech each timely resubmitted their ministerial error allegations on August 19, 2014. On August 21, 2014, the Department determined that no ministerial errors exist with respect to Trina Solar's and Wuxi Suntech's allegations.[4] Between August 20 and September 2, 2014, we conducted verification of the questionnaire responses submitted by the GOC, Trina Solar, and Wuxi Suntech.[5]

On October 3, 2014, in response to interested parties' comments on the scope of this investigation, the Department announced that it was considering the possibility of a scope clarification, described the possible clarification, and provided interested parties with an opportunity to submit comments on the potential clarification.[6]

Between October 16 and October 27, 2014, interested parties submitted case and rebuttal briefs. We did not conduct a hearing in this proceeding, as any requests for a hearing were timely withdrawn. A full discussion of the issues raised by parties for this final determination may be found in the Final Decision Memorandum.[7] The Final Decision Memorandum is a public document and is on file electronically via Enforcement and Compliance's Antidumping and Countervailing Duty Centralized Electronic Service System (ACCESS).[8] ACCESS is available to registered users at *http://access.trade.gov,* and is available to all parties in the Central Records Unit, room 7046 of the main Department of Commerce building. In addition, a complete version of the Final Decision Memorandum can be accessed directly at *http://enforcement.trade.gov/frn/.* The signed Final Decision Memorandum and the electronic version are identical in content.

## Scope Comments and Scope Clarification

As indicated in the "Background" section above, the Department received comments regarding the scope of this investigation from numerous interested parties. The Department summarized these comments and addressed them in the accompanying Final Decision Memorandum.[9] As explained in the Final Decision Memorandum, to facilitate the scope's administrability and enforcement, we have clarified the scope language such that subject merchandise includes all modules, laminates and/or panels assembled in the PRC that contain crystalline silicon photovoltaic cells produced in a customs territory other than the PRC.[10]

The scope of the investigation for this final determination is below.

## Scope of the Investigation

The merchandise covered by this investigation is modules, laminates and/or panels consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including building integrated materials. For purposes of this investigation, subject merchandise includes modules, laminates and/or panels assembled in the PRC consisting of crystalline silicon photovoltaic cells produced in a customs territory other than the PRC.

Subject merchandise includes modules, laminates and/or panels assembled in the PRC consisting of crystalline silicon photovoltaic cells of thickness equal to or greater than 20 micrometers, having a p/n junction formed by any means, whether or not the cell has undergone other processing, including, but not limited to, cleaning, etching, coating, and/or addition of materials (including, but not limited to, metallization and conductor patterns) to collect and forward the electricity that is generated by the cell.

Excluded from the scope of this investigation are thin film photovoltaic products produced from amorphous silicon (a-Si), cadmium telluride (CdTe), or copper indium gallium selenide (CIGS). Also excluded from the scope of this investigation are modules, laminates and/or panels assembled in the PRC, consisting of crystalline silicon photovoltaic cells, not exceeding 10,000mm² in surface area, that are permanently integrated into a consumer good whose function is other than power generation and that consumes the electricity generated by the integrated crystalline silicon photovoltaic cells. Where more than one module, laminate and/or panel is permanently integrated into a consumer good, the surface area for purposes of this exclusion shall be the total combined surface area of all modules, laminates and/or panels that are integrated into the consumer good. Further, also excluded from the scope of this investigation are any products covered by the existing antidumping and countervailing duty orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, laminates and/or panels, from the PRC.[11]

---

[3] *See Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China: Alignment of Final Countervailing Duty Determination With Final Antidumping Duty Determination,* 79 FR 44402 (July 31, 2014).

[4] *See* Department Memorandum, "Allegations of Ministerial Errors in the Preliminary Determination," (August 21, 2014).

[5] *See* Department Memoranda, "Verification of the Questionnaire Responses Submitted by Changzhou Trina Solar Energy Co., Ltd. and its Cross-Owned Companies," (October 2, 2014); "Verification of the Questionnaire Responses Submitted by the Government of the People's Republic of China," (October 3, 2014); and "Verification of the Questionnaire Responses Submitted by Wuxi Suntech Power Co., Ltd. and its Cross-Owned Companies," (October 3, 2014).

[6] *See* Letter to All Interested Parties, "Antidumping and Countervailing Duty Investigations of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and the Antidumping Duty Investigation of

Certain Crystalline Silicon Photovoltaic Products from Taiwan: Opportunity to Submit Scope Comments," (October 3, 2014).

[7] *See* the Department's Memorandum to Paul Piquado, Assistant Secretary for Enforcement and Compliance, "Issues and Decision Memorandum for the Final Determination in the Countervailing Duty Investigation of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China," dated concurrently with this notice and hereby adopted by this notice (Final Decision Memorandum).

[8] On November 24, 2014, Enforcement and Compliance changed the name of Enforcement and Compliance's AD and CVD Centralized Electronic Service System (IA ACCESS) to AD and CVD Centralized Electronic Service System (ACCESS). The Web site location was changed from *http://iaaccess.trade.gov* to *http://access.trade.gov.* The Final Rule changing the references to the Regulations can be found at 79 FR 69046 (November 20, 2014).

[9] *See* Final Decision Memorandum at Comment 1, "Scope Comments and Scope Clarification."

[10] *Id.*

[11] *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order,* 77 FR 73018 (December 7, 2012); *Crystalline Silicon Photovoltaic*
Continued

Merchandise covered by this investigation is currently classified in the Harmonized Tariff Schedule of the United States (HTSUS) under subheadings 8501.61.0000, 8507.20.8030, 8507.20.8040, 8507.20.8060, 8507.20.8090, 8541.40.6020, 8541.40.6030 and 8501.31.8000. These HTSUS subheadings are provided for convenience and customs purposes; the written description of the scope of this investigation is dispositive.

**Analysis of Subsidy Programs and Comments Received**

The subsidy programs under investigation and the issues raised in the case and rebuttal briefs by parties in this investigation are discussed in the Final Decision Memorandum. A list of the issues that parties raised, and to which we responded in the Final Decision Memorandum, is attached to this notice as an Appendix.

**Use of Adverse Facts Available**

The Department notes that, in making these findings, we relied, in part, on facts available and, because one or more respondents did not act to the best of their ability to respond to the Department's requests for information, we drew an adverse inference where appropriate in selecting from among the facts otherwise available.[12] For further information, *see* the section "Use of Facts Otherwise Available and Adverse Inferences," in the Final Decision Memorandum.

**Suspension of Liquidation**

In accordance with section 705(c)(1)(B)(i) of the Act, we calculated a rate for each company respondent. Section 705(c)(5)(A)(i) of the Act states that, for companies not individually investigated, we will determine an "all others" rate equal to the weighted-average countervailable subsidy rates established for exporters and producers individually investigated, excluding zero and *de minimis* countervailable subsidy rates, and any rates determined entirely under section 776 of the Act.

In accordance with section 703(d) and 705(c)(5)(A) of the Act, for companies not investigated, we apply an "all others" rate, which is normally calculated by weighing the subsidy rates of the individual companies selected as respondents by those companies' exports of the subject merchandise to

the United States. Under section 705(c)(5)(A)(i) of the Act, the all others rate should exclude zero and *de minimis* rates calculated for the exporters and producers individually investigated. Where the rates for the investigated companies are all zero or *de minimis,* section 705(c)(5)(A)(ii) of the Act instructs the Department to establish an all others rate using "any reasonable method." Notwithstanding the language of section 705(c)(5)(A)(i) of the Act, we have not calculated the all others rate by weight averaging the rates of the two individually investigated company respondents, because doing so risks disclosure of proprietary information. Therefore, and consistent with the Department's practice, for the all others rate, we calculated a simple average of the two company respondents' rates.[13] We determine the total estimated net countervailable subsidy rates to be:

| Company | Subsidy Rate (*ad valorem*) (Percent) |
|---|---|
| Wuxi Suntech Power Co., Ltd. | 27.64 |
| Changzhou Trina Solar Energy Co., Ltd. | 49.79 |
| All Others | 38.72 |

As a result of our *Preliminary Determination,* and pursuant to section 703(d) of the Act, we instructed U.S. Customs and Border Protection (CBP) to suspend liquidation of all entries of merchandise under consideration from the PRC that were entered or withdrawn from warehouse, for consumption, on or after June 10, the date of publication of the *Preliminary Determination* in the **Federal Register**. In accordance with section 703(d) of the Act, we issued instructions to CBP to discontinue the suspension of liquidation for CVD purposes for subject merchandise entered, or withdrawn from warehouse, on or after October 8, 2014, but to continue the suspension of liquidation of all entries from June 10, 2014 through October 7, 2014.[14]

If the U.S. International Trade Commission (the ITC) issues a final

affirmative injury determination, we will issue a CVD order and will reinstate the suspension of liquidation under section 706(a) of the Act and will require a cash deposit of estimated CVDs for such entries of subject merchandise in the amounts indicated above. If the ITC determines that material injury, or threat of material injury, does not exist, this proceeding will be terminated and all estimated duties deposited or securities posted as a result of the suspension of liquidation will be refunded or canceled.

**ITC Notification**

In accordance with section 705(d) of the Act, we will notify the ITC of our determination. In addition, we are making available to the ITC all non-privileged and non-proprietary information related to this investigation. We will allow the ITC access to all privileged and business proprietary information in our files, provided the ITC confirms that it will not disclose such information, either publicly or under an administrative protective order (APO), without the written consent of the Assistant Secretary for Enforcement and Compliance.

**Return or Destruction of Proprietary Information**

In the event the ITC issues a final negative injury determination, this notice will serve as the only reminder to parties subject to an APO of their responsibility concerning the destruction of proprietary information disclosed under APO in accordance with 19 CFR 351.305(a)(3). Timely written notification of the return/destruction of APO materials or conversion to judicial protective order is hereby requested. Failure to comply with the regulations and terms of an APO is a violation which is subject to sanction.

This determination is issued and published pursuant to sections 705(d) and 777(i) of the Act.

Dated: December 15, 2014.

**Paul Piquado,**
*Assistant Secretary for Enforcement and Compliance.*

**Appendix—Final Decision Memorandum**

I. Summary
II. Background
III. Scope of the Investigation
IV. Application of the Countervailing Duty Law to Imports from the PRC
V. Subsidies Valuation Information
VI. Benchmarks and Discount Rates
VII. Use of Facts Otherwise Available and Adverse Inferences
VIII. Analysis of Programs

---

*Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Countervailing Duty Order,* 77 FR 73017 (December 7, 2012).

[12] *See* sections 776(a) and (b) of the Tariff Act of 1930, as amended (the Act).

[13] *See, e.g., Countervailing Duty Investigation of Chlorinated Isocyanurates From the People's Republic of China: Preliminary Determination and Alignment of Final Determination With Final Antidumping Determination,* 79 FR 10097 (February 24, 2014), unchanged in *Countervailing Duty Investigation of Chlorinated Isocyanurates From the People's Republic of China: Final Affirmative Countervailing Duty Determination,* 79 FR 56560 (September 22, 2014).

[14] *See* CBP's Antidumping Duty and Countervailing Duty Message Database, *http://adcvd.cbp.dhs.gov/adcvdweb/,* at Message No. 4283302 (October 10, 2014).

IX. Analysis of Comments
Comment 1: Scope Comments and Scope Clarification
Comment 2: Whether the Department Should Investigate the Effects of the GOC's Alleged Cyberhacking on this Investigation
Comment 3: Whether Input Providers are ''Authorities'' Within the Meaning of the Act
Comment 4: Whether the Provision of Chinese Polysilicon for LTAR is Countervailable
Comment 5: Whether the Department Should Attribute Subsidies Under the Provision of Polysilicon for LTAR Program to Wuxi Suntech's Cross-owned Companies
Comment 6: Whether the Provision of Aluminum Extrusions for LTAR is Countervailable
Comment 7: Whether the Provision of Solar Glass for LTAR is Countervailable
Comment 8: Whether AFA is Applicable to Trina Solar's Land Purchases
Comment 9: Whether All Banks in China Offering Preferential Loans to Respondents Constitute ''Authorities''
Comment 10: Whether the Department Should Adjust Its Benefit Calculations for Loans Received by Wuxi Suntech and Zhenjiang Ren De
Comment 11: Whether the High or New Technology Tax Program is Specific
Comment 12: Whether the Tax Offsets for R&D under the Enterprise Income Tax Law Program is Specific
Comment 13: Whether the Department Should Adjust Its Benefit Calculation for Wuxi Suntech's Use of the ''Preferential Income Tax Program for High or New Technology Enterprises'' and for the ''Tax Offsets for R&D under the Enterprise Income Tax Law'' Programs
Comment 14: Whether the Golden Sun Program is Countervailable
Comment 15: Whether the Department Should Countervail the ''Discovered Subsidies'' or Subsidies Discovered During the Course of Verification
Comment 16: Whether the Department Should Apply AFA to the Ex-Im Bank Buyer's Credit Program
Comment 17: Whether the Department Should Find Trina Solar and Wuxi Suntech to be Uncreditworthy
Comment 18: Whether the Department Should Adjust the Sales Denominators Used in Calculating Subsidy Benefits for Wuxi Suntech
Comment 19: Whether the Department Should Accept the Minor Corrections Presented by Wuxi Suntech at Verification
X. Recommendation Attachment

[FR Doc. 2014–30071 Filed 12–22–14; 8:45 am]

**BILLING CODE 3510–DS–P**

---

## DEPARTMENT OF COMMERCE

### International Trade Administration

**[A–570–901]**

**Certain Lined Paper Products From the People's Republic of China: Notice of Rescission of Antidumping Duty Administrative Review**

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**DATES:** *Effective Date:* December 23, 2014.

**FOR FURTHER INFORMATION CONTACT:** Stephanie Moore or Cindy Robinson AD/CVD Operations, Office III, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 14th Street and Constitution Avenue NW., Washington, DC 20230; telephone: (202) 482–3692 or (202) 482–3797, respectively.

**SUPPLEMENTARY INFORMATION:**

### Background

On September 2, 2014, the Department of Commerce (the Department) published a notice of opportunity to request an administrative review of the antidumping duty order on certain lined paper products from the People's Republic of China.[1] Pursuant to a request from the Association of American School Paper Suppliers and its individual members (petitioners),[2] the Department published in the **Federal Register** the notice of initiation of this antidumping duty administrative review with respect to Shanghai Lian Li Paper Products Co., Ltd. (Shanghai Lian Li) for the period September 1, 2013, through August 31, 2014.

On October 30, 2014, the Department published the Notice of Initiation.[3] On November 24, 2014, Petitioners timely withdrew their request for administrative review of the antidumping duty order with respect to Shanghai Lian Li.

### Rescission of the 2013–2014 Administrative Review

Pursuant to 19 CFR 351.213(d)(1), the Secretary will rescind an administrative review, in whole or in part, if the parties that requested a review withdraw the

request within 90 days of the date of publication of the notice of initiation of the requested review. The instant review was initiated on October 30, 2014.[4] Petitioners withdrew their request for a review on November 24, 2014, which is within the 90-day deadline. No other party requested an administrative review of this segment of the proceeding. Therefore, in accordance with 19 CFR 351.213(d)(1), we are rescinding this review of the antidumping duty order on certain lined paper products from the People's Republic of China.

### Assessment

Antidumping duties shall be assessed at rates equal to the cash deposit of estimated antidumping duties required at the time of entry, or withdrawal from warehouse, for consumption, during the period September 1, 2013, through August 31, 2014.

The Department intends to issue appropriate assessment instructions directly to CBP 15 days after publication of this notice.

### Notification to Importers

This notice serves as a reminder to importers of their responsibility under 19 CFR 351.402(f)(2) to file a certificate regarding the reimbursement of antidumping duties prior to liquidation of the relevant entries during this review period. Failure to comply with this requirement could result in the Secretary's presumption that reimbursement of antidumping duties occurred and the subsequent increase in the amount of antidumping duties reimbursed.

### Notification Regarding Administrative Protective Order

This notice serves as a final reminder to parties subject to administrative protective orders (APOs) of their responsibility concerning the disposition of proprietary information disclosed under an APO in accordance with 19 CFR 351.305(a)(3), which continues to govern business proprietary information in this segment of the proceeding. Timely written notification of the return/destruction of APO materials or conversion to judicial protective order is hereby requested. Failure to comply with the regulations and terms of an APO is a violation which is subject to sanction.

This notice is issued and published in accordance with section 777(i)(1) of the Tariff Act of 1930, as amended, and 19 CFR 351.213(d)(4).

---

[1] *See Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity To Request Administrative Review,* 79 FR 51958 (September 2, 2014).

[2] The individual members are ACCO Brands USA LLC; Norcom, Inc.; and Top Flight, Inc.

[3] *See Initiation of Antidumping and Countervailing Duty Administrative Reviews,* 79 FR 64565 (October 30, 2014) (*Initiation*).

[4] *See id.*

# Tab 3

# AD P.R. Doc. 842

# Amended CVD Final Determination and AD/CVD Orders
# (Feb. 18, 2015)

**8592** **Federal Register** / Vol. 80, No. 32 / Wednesday, February 18, 2015 / Notices

bis.doc.gov no later than February 26, 2015.

A limited number of seats will be available during the public session of the meeting. Reservations are not accepted. To the extent time permits, members of the public may present oral statements to the Committee. The public may submit written statements at any time before or after the meeting. However, to facilitate distribution of public presentation materials to Committee members, the Committee suggests that presenters forward the public presentation materials prior to the meeting to Ms. Springer via email.

For more information, call Yvette Springer at (202) 482–2813.

Dated: February 12, 2015.

**Yvette Springer,**

*Committee Liaison Officer.*

[FR Doc. 2015–03325 Filed 2–17–15; 8:45 am]

**BILLING CODE 3510–JT–P**

---

## DEPARTMENT OF COMMERCE

### Bureau of Industry and Security

### Technical Advisory Committees; Notice of Recruitment of Private-Sector Members

**SUMMARY:** Seven Technical Advisory Committees (TACs) advise the Department of Commerce on the technical parameters for export controls applicable to dual-use commodities and technology and on the administration of those controls. The TACs are composed of representatives from industry representatives, academic leaders and U.S. Government representing diverse points of view on the concerns of the exporting community. Industry representatives are selected from firms producing a broad range of goods, technologies, and software presently controlled for national security, non-proliferation, foreign policy, and short supply reasons or that are proposed for such controls, balanced to the extent possible among large and small firms.

TAC members are appointed by the Secretary of Commerce and serve terms of not more than four consecutive years. The membership reflects the Department's commitment to attaining balance and diversity. TAC members must obtain secret-level clearances prior to appointment. These clearances are necessary so that members may be permitted access to the classified information needed to formulate recommendations to the Department of Commerce. Each TAC meets approximately four times per year. Members of the Committees will not be compensated for their services.

The seven TACs are responsible for advising the Department of Commerce on the technical parameters for export controls and the administration of those controls within the following areas: Information Systems TAC: Control List Categories 3 (electronics), 4 (computers), and 5 (telecommunications and information security); Materials TAC: Control List Category 1 (materials, chemicals, microorganisms, and toxins); Materials Processing Equipment TAC: Control List Category 2 (materials processing); Regulations and Procedures TAC: The Export Administration Regulations (EAR) and Procedures for implementing the EAR; Sensors and Instrumentation TAC: Control List Category 6 (sensors and lasers); Transportation and Related Equipment TAC: Control List Categories 7 (navigation and avionics), 8 (marine), and 9 (propulsion systems, space vehicles, and related equipment) and the Emerging Technology and Research Advisory Committee: (1) The identification of emerging technologies and research and development activities that may be of interest from a dual-use perspective; (2) the prioritization of new and existing controls to determine which are of greatest consequence to national security; (3) the potential impact of dual-use export control requirements on research activities; and (4) the threat to national security posed by the unauthorized exports of technologies.

To respond to this recruitment notice, please send a copy of your resume to Ms. Yvette Springer at *Yvette.Springer@ bis.doc.gov.*

*Deadline:* This Notice of Recruitment will be open for one year from its date of publication in the **Federal Register**.

**FOR FURTHER INFORMATION CONTACT:** Ms. Yvette Springer on (202) 482–2813.

Dated: February 12, 2015.

**Yvette Springer,**

*Committee Liaison Officer.*

[FR Doc. 2015–03323 Filed 2–17–15; 8:45 am]

**BILLING CODE 3510–JT–P**

---

## DEPARTMENT OF COMMERCE

### International Trade Administration

[A–570–010, C–570–011]

### Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China: Antidumping Duty Order; and Amended Final Affirmative Countervailing Duty Determination and Countervailing Duty Order

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** Based on affirmative final determinations by the Department of Commerce (the Department) and the International Trade Commission (the ITC), the Department is issuing antidumping duty (AD) and countervailing duty (CVD) orders on certain crystalline silicon photovoltaic products (certain solar products) from the People's Republic of China (the PRC). Also, as explained in this notice, the Department is amending its final affirmative CVD determination to correct an error regarding the inclusion of a subsidy program that was not properly reflected on the record of the CVD investigation.

**DATES:** *Effective Date:* February 18, 2015.

**FOR FURTHER INFORMATION CONTACT:** Jeff Pedersen at (202) 482–2769 or Thomas Martin at (202) 482–3936 (AD); or Gene Calvert at (202) 482–3586 or Justin Neuman at (202) 482–0486 (CVD), AD/ CVD Operations, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 14th Street and Constitution Avenue NW., Washington, DC 20230.

**SUPPLEMENTARY INFORMATION:**

### Background

On December 23, 2014, the Department published its affirmative final determination of sales at less than fair value (LTFV) in the AD investigation of certain solar products from the PRC,[1] and its final affirmative determination that countervailable subsidies are being provided to producers and exporters of certain solar products from the PRC.[2] On February 5, 2015, the ITC notified the Department of its final determination pursuant to

---

[1] *See Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China: Final Determination of Sales at Less Than Fair Value,* 79 FR 76970 (December 23, 2014).

[2] *See Countervailing Duty Investigation of Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China: Final Affirmative Countervailing Duty Determination,* 79 FR 76962 (December 23, 2014) (*CVD Final Determination*).

sections 735(d) and 705(d) of the Tariff Act of 1930, as amended (the Act), that an industry in the United States is materially injured within the meaning of sections 735(b)(1)(A)(i) and 705(b)(1)(A)(i) of the Act by reason of LTFV imports and subsidized imports of subject merchandise from the PRC.[3]

## Scope of the Orders

The merchandise covered by these orders are modules, laminates and/or panels consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including building integrated materials. For purposes of these orders, subject merchandise includes modules, laminates and/or panels assembled in the PRC consisting of crystalline silicon photovoltaic cells produced in a customs territory other than the PRC.

Subject merchandise includes modules, laminates and/or panels assembled in the PRC consisting of crystalline silicon photovoltaic cells of thickness equal to or greater than 20 micrometers, having a p/n junction formed by any means, whether or not the cell has undergone other processing, including, but not limited to, cleaning, etching, coating, and/or addition of materials (including, but not limited to, metallization and conductor patterns) to collect and forward the electricity that is generated by the cell.

Excluded from the scope of these orders are thin film photovoltaic products produced from amorphous silicon (a-Si), cadmium telluride (CdTe), or copper indium gallium selenide (CIGS). Also excluded from the scope of these orders are modules, laminates and/or panels assembled in the PRC, consisting of crystalline silicon photovoltaic cells, not exceeding 10,000 mm² in surface area, that are permanently integrated into a consumer good whose function is other than power generation and that consumes the electricity generated by the integrated crystalline silicon photovoltaic cells. Where more than one module, laminate and/or panel is permanently integrated into a consumer good, the surface area for purposes of this exclusion shall be the total combined surface area of all modules, laminates and/or panels that are integrated into the consumer good. Further, also excluded from the scope of these orders are any products covered by the existing antidumping and countervailing duty orders on crystalline silicon photovoltaic cells,

whether or not assembled into modules, laminates and/or panels, from the PRC.[4]

Merchandise covered by these orders is currently classified in the Harmonized Tariff Schedule of the United States (HTSUS) under subheadings 8501.61.0000, 8507.20.8030, 8507.20.8040, 8507.20.8060, 8507.20.8090, 8541.40.6020, 8541.40.6030 and 8501.31.8000. These HTSUS subheadings are provided for convenience and customs purposes; the written description of the scope of these orders is dispositive.

## Amendment to the CVD Final Determination

On December 23, 2014, the Department published its affirmative final determination in the CVD investigation.[5] On December 24, 2014, Changzhou Trina Solar Energy Co., Ltd. (Trina Solar) and Wuxi Suntech Power Co., Ltd. (Wuxi Suntech), respondents in the CVD investigation, submitted timely ministerial error allegations and requested that the Department correct the alleged ministerial errors in the subsidy margin calculations.[6] On December 29, 2014, SolarWorld Americas, Inc., the petitioner in the CVD investigation, submitted timely rebuttal comments on Trina Solar's and Wuxi Suntech's allegations.[7] No other interested party submitted ministerial error allegations or replied to Trina Solar's or Wuxi Suntech's submissions.

After analyzing comments and rebuttals from all interested parties, we determined, in accordance with section 705(e) of the Act and 19 CFR 351.224(e), that we made a ministerial error in our calculations for the *CVD Final Determination* with respect to Trina

Solar. At the verification of Trina Solar's questionnaire responses, we discovered unreported subsidy programs in Trina Solar's accounting system. We translated certain line items from that accounting system at verification and found that every translated line item represented a countervailable subsidy in our *CVD Final Determination*. In so doing, we inadvertently countervailed a subsidy program that did not appear among the list of translated subsidy programs submitted as a verification exhibit.[8] This amended final CVD determination corrects this error and revises the *ad valorem* subsidy rate for Trina Solar.

In the *CVD Final Determination,* we based the estimated subsidy rate for "all others" by calculating the simple average of Trina Solar's and Wuxi Suntech's estimated subsidy rates.[9] Because the subsidy rate for all others is based on the rates for Trina Solar and Wuxi Suntech, and the rate for Trina Solar changed because of the aforementioned ministerial error, we have revised the calculation for the estimated subsidy rate for all others in this amended final CVD determination.[10] The amended estimated *ad valorem* subsidy rates are provided below.

## Antidumping Duty Order

As stated above, on February 5, 2015, in accordance with section 735(d) of the Act, the ITC notified the Department of its final determination in its investigation, in which it found that an industry in the United States is materially injured within the meaning of section 735(b)(1)(A)(i) of the Act by reason of imports of certain solar products from the PRC.[11] Because the ITC determined that imports of certain solar products from the PRC are materially injuring a U.S. industry, unliquidated entries of such merchandise from the PRC, entered or withdrawn from warehouse, for consumption are subject to the assessment of antidumping duties.

Therefore, in accordance with section 736(a)(1) of the Act, the Department will direct U.S. Customs and Border Protection (CBP) to assess, upon further instruction by the Department, antidumping duties equal to the amount

---

[3] *See* the ITC Notification Letter to the Deputy Assistant Secretary for Enforcement and Compliance referencing ITC Investigation Nos. 701–TA–511 and 731–TA–1246–1247 (February 5, 2015).

[4] *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order,* 77 FR 73018 (December 7, 2012); *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Countervailing Duty Order,* 77 FR 73017 (December 7, 2012).

[5] *See CVD Final Determination.*

[6] *See* the Letter to the Secretary from Trina Solar, "Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: Ministerial Errors Allegation," (December 24, 2014); *see also* the Letter to the Secretary from Wuxi Suntech, "Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: Ministerial Error Comments of Wuxi Suntech Power Co., Ltd.," (December 24, 2014).

[7] *See* the Letter to the Secretary, "Crystalline Silicon Photovoltaic Products from the People's Republic of China: Response to Trina's Ministerial Error Allegation," (December 29, 2014); *see also* the Letter to the Secretary, "Crystalline Silicon Photovoltaic Products from the People's Republic of China: Response to Suntech's Ministerial Error Comments," (December 29, 2014).

[8] For a detailed discussion of all alleged ministerial errors, as well as the Department's analysis, *see* the memorandum, "Amended Final Determination in the Countervailing Duty Investigation of Certain Crystalline Silicon Photovoltaic Products of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: Ministerial Error Allegations," (February 6, 2015) (Ministerial Error Memorandum).

[9] *See CVD Final Determination,* 79 FR at 76964.

[10] *See* Ministerial Error Memorandum at 10.

[11] *See ITC Determination.*

by which the normal value of the merchandise exceeds the export price (or constructed export price) of the merchandise, for all relevant entries of certain solar products from the PRC. These antidumping duties will be assessed on unliquidated entries of certain solar products from the PRC entered, or withdrawn from warehouse, for consumption on or after July 31, 2014, the date of publication of the *AD Preliminary Determination*,[12] but will not include entries occurring after the expiration of the provisional measures period and before publication of the ITC's final injury determination as further described below.

**Continuation of Suspension of Liquidation (AD)**

In accordance with section 735(c)(1)(B) of the Act, the Department will instruct CBP to continue to suspend liquidation of all appropriate entries of certain solar products from the PRC as described in the "Scope of Orders" section, which were entered, or withdrawn from warehouse, for consumption on or after July 31, 2014, the date of publication in the **Federal Register** of the notice of an affirmative preliminary determination that certain solar products are being, or are likely to be, sold in the United States at LTFV. Further, consistent with our practice, where the product from the PRC under investigation is also subject to a concurrent CVD investigation, the Department will instruct CBP to require a cash deposit[13] equal to the weighted-average amount by which the normal value exceeds U.S. price, adjusted where appropriate for export subsidies

and estimated domestic subsidy pass-through.[14] The cash deposit rates, before any adjustments for export subsidies and estimated domestic subsidy pass-through, are as follows: (1) For each exporter/producer combination listed in the table below, the cash deposit rate will be equal to the dumping margin listed for that exporter/producer combination in the table; (2) for all other combinations of PRC exporters/producers of the merchandise under consideration, the cash deposit rate will be equal to the dumping margin established for the PRC-wide entity; and (3) for all non-PRC exporters of the merchandise under consideration which have not received their own separate rate above, the cash deposit rate will be equal to the cash deposit rate applicable to the PRC exporter/producer combination that supplied that non-PRC exporter. These suspension-of-liquidation instructions will remain in effect until further notice.

Accordingly, effective on the date of publication of the ITC's final affirmative injury determination, CBP will require, at the same time as importers would normally deposit estimated duties on this subject merchandise, a cash deposit equal to the estimated weighted-average dumping margins indicated below, adjusted, where appropriate, for export subsidies and estimated domestic subsidy pass-through, as discussed above.[15]

**Provisional Measures (AD)**

Section 733(d) of the Act states that instructions issued pursuant to an affirmative preliminary determination in an AD investigation may not remain

in effect for more than four months except where exporters representing a significant proportion of exports of the subject merchandise request the Department to extend that four-month period to no more than six months. At the request of exporters that account for a significant proportion of certain solar products from the PRC, we extended the four-month period to no more than six months in this case.[16] As stated above, in the investigation covering certain solar products from the PRC, the Department published the preliminary determination in the AD investigation on July 31, 2014. Therefore, the six-month period beginning on the date of publication of the preliminary determination in the AD investigation ended on January 27, 2015. Furthermore, section 737(b) of the Act states that definitive duties are to begin on the date of publication of the ITC's final injury determination.

Therefore, in accordance with section 733(d) of the Act and our practice, we will instruct CBP to terminate the suspension of liquidation and to liquidate, without regard to antidumping duties, unliquidated entries of certain solar products from the PRC, entered, or withdrawn from warehouse, for consumption on or after January 27, 2015, the date the provisional measures expired, until and through the day preceding the date of publication of the ITC's final injury determination in the **Federal Register**.

**Estimated Weighted-Average Dumping Margins**

The estimated weighted-average dumping margins are as follows:

| Exporter | Producer | Weighted-average dumping margin (percent) |
|---|---|---|
| Changzhou Trina Solar Energy Co., Ltd./Trina Solar (Changzhou) Science & Technology Co., Ltd. | Changzhou Trina Solar Energy Co., Ltd./Trina Solar (Changzhou) Science & Technology Co., Ltd. | 26.71 |
| Renesola Jiangsu Ltd./Renesola Zhejiang Ltd./Jinko Solar Co. Ltd./Jinko Solar Import and Export Co., Ltd. | Renesola Jiangsu Ltd./Jinko Solar Co. Ltd .......................... | 78.42 |
| Anji DaSol Solar Energy Science & Technology Co., Ltd ..... | Anji DaSol Solar Energy Science & Technology Co., Ltd ..... | 52.13 |
| Asun Energy Co., Ltd. (a/k/a Suzhou Asun Energy Co., Ltd.) | Asun Energy Co., Ltd. (a/k/a Suzhou Asun Energy Co., Ltd.). | 52.13 |
| Baoding Tianwei Yingli New Energy Resources Co. , Ltd .... | Baoding Tianwei Yingli New Energy Resources Co., Ltd., Yingli Energy (China) Co., Ltd., and Lixian Yingli New Energy Co., Ltd. | 52.13 |
| BYD (Shangluo) Industrial Co., Ltd ........................................ | BYD (Shangluo) Industrial Co., Ltd ........................................ | 52.13 |
| Canadian Solar International Limited ..................................... | Canadian Solar Manufacturing (Luoyang) Inc., Canadian Solar Manufacturing (Changshu), Inc. | 52.13 |

[12] *See Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China: Affirmative Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination,* 79 FR 44399 (July 31, 2014) (*AD Preliminary Determination*).

[13] *See Modification of Regulations Regarding the Practice of Accepting Bonds During the Provisional Measures Period in Antidumping and

Countervailing Duty Investigations,* 76 FR 61042 (October 3, 2011).

[14] *See* sections 772(c)(1)(C) and 777A(f) of the Act.

[15] With respect to the final affirmative countervailing duty determination in the companion investigation, because the provisional measures period has expired, the Department will only order the resumption of the suspension of liquidation, and require cash deposits for

countervailing duties equal to the final subsidy rates, upon issuance of a final affirmative injury determination by the ITC. As a result, the Department will make an adjustment to AD cash deposits, where appropriate, for export subsidies and estimated domestic subsidy pass-through as of the date of publication of the ITC's final affirmative injury determination.

[16] *See AD Preliminary Determination,* 79 FR at 44396.

| Exporter | Producer | Weighted-average dumping margin (percent) |
|---|---|---|
| Canadian Solar Manufacturing (Changshu), Inc .................. | Canadian Solar Manufacturing (Changshu), Inc .................. | 52.13 |
| Canadian Solar Manufacturing (Luoyang) Inc ...................... | Canadian Solar Manufacturing (Luoyang) Inc ...................... | 52.13 |
| CEEG Nanjing Renewable Energy Co., Ltd ........................ | CEEG Nanjing Renewable Energy Co., Ltd ........................ | 52.13 |
| Changzhou Almaden Co., Ltd ............................................ | Changzhou Almaden Co., Ltd ............................................ | 52.13 |
| Chint Solar (Zhejiang) Co., Ltd ........................................ | Chint Solar (Zhejiang) Co., Ltd ........................................ | 52.13 |
| ET Solar Industry Limited ................................................. | ET Solar Industry Limited ................................................. | 52.13 |
| Hainan Yingli New Energy Resources Co. Ltd ................... | Hainan Yingli New Energy Resources Co. Ltd ................... | 52.13 |
| Hangzhou Zhejiang University Sunny Energy Science and Technology Co., Ltd. | Hangzhou Zhejiang University Sunny Energy Science and Technology Co., Ltd. | 52.13 |
| Hanwha SolarOne (Qidong) Co., Ltd ................................. | Hanwha SolarOne (Qidong) Co., Ltd ................................. | 52.13 |
| Hanwha SolarOne Hong Kong Limited ............................... | Hanwha SolarOne (Qidong) Co., Ltd ................................. | 52.13 |
| Hefei JA Solar Technology Co., Ltd .................................. | Hefei JA Solar Technology Co., Ltd .................................. | 52.13 |
| Hengdian Group DMEGC Magnetics Co., Ltd ..................... | Hengdian Group DMEGC Magnetics Co., Ltd ..................... | 52.13 |
| Hengshui Yingli New Energy Resources Company Limited .. | Hengshui Yingli New Energy Resources Company Limited .. | 52.13 |
| Jiangyin Hareon Power Co., Ltd ....................................... | Jiangyin Xinhui Solar Co., Ltd.; Altusvia Energy Taicang Co., Ltd.; Hareon Solar Technology Co., Ltd. | 52.13 |
| Jiawei Solarchina Co., Ltd ............................................... | Jiawei Solarchina (Shenzhen) Co., Ltd ............................. | 52.13 |
| Jiawei Technology (HK) Ltd .............................................. | Shenzhen Jiawei Photovoltaic Lighting Co. Ltd .................. | 52.13 |
| LDK Solar Hi-Tech (Nanchang) Co., Ltd ........................... | LDK Solar Hi-Tech (Nanchang) Co., Ltd ........................... | 52.13 |
| Lixian Yingli New Energy Company Ltd ............................. | Lixian Yingli New Energy Company Ltd ............................. | 52.13 |
| MOTECH (Suzhou) Renewable Energy Co., Ltd ................. | MOTECH (Suzhou) Renewable Energy Co., Ltd ................. | 52.13 |
| Ningbo Qixin Solar Electrical Appliance Co., Ltd ............... | Ningbo Qixin Solar Electrical Appliance Co., Ltd ............... | 52.13 |
| Perlight Solar Co., Ltd ..................................................... | Perlight Solar Co., Ltd ..................................................... | 52.13 |
| Risen Energy Co., Ltd ..................................................... | Risen Energy Co., Ltd ..................................................... | 52.13 |
| Shanghai JA Solar Technology Co., Ltd ............................ | Shanghai JA Solar Technology Co., Ltd ............................ | 52.13 |
| Shanghai Solar Energy Science & Technology Co., Ltd ...... | Lianyungang Shenzhou New Energy Co., Ltd .................... | 52.13 |
| Shenzhen Jiawei Photovoltaic Lighting Co. Ltd .................. | Shenzhen Jiawei Photovoltaic Lighting Co. Ltd .................. | 52.13 |
| Shenzhen Sungold Solar Co., Ltd ..................................... | Shenzhen Sungold Solar Co., Ltd ..................................... | 52.13 |
| Shenzhen Topray Solar Co., Ltd ....................................... | Shenzhen Topray Solar Co., Ltd ....................................... | 52.13 |
| Sun Earth Solar Power Co., Ltd ....................................... | Sun Earth Solar Power Co., Ltd ....................................... | 52.13 |
| Sunny Apex Development Ltd ........................................... | Shenzhen Jiawei Photovoltaic Lighting Co. Ltd., ............... Wuhan FYY Technology Co., Ltd. | 52.13 |
| SunPower Systems SARL ................................................. | SunEnergy (S.Z.) Co., Ltd ................................................ | 52.13 |
| tenKsolar (Shanghai) Co., Ltd .......................................... | tenKsolar (Shanghai) Co., Ltd .......................................... | 52.13 |
| Upsolar Global Co., Ltd. and including Upsolar Group, Co., Ltd. | Shandong Dahai Group Co. Ltd ........................................ | 52.13 |
| Wanxiang Import & Export Co., Ltd ................................... | Zhejiang Wanxiang Solar Co., Ltd .................................... | 52.13 |
| Wuhan FYY Technology Co., Ltd ...................................... | Wuhan FYY Technology Co., Ltd ...................................... | 52.13 |
| Wuxi Suntech Power Co., Ltd ........................................... | Wuxi Suntech Power Co., Ltd ........................................... | 52.13 |
| Yingli Energy (China) Company Limited ............................. | Yingli Energy (China) Company Limited, Baoding Tianwei Yingli New Energy Resources Co. , Ltd. and Lixian Yingli New Energy Co. , Ltd. | 52.13 |
| Yingli Green Energy International Trading Limited ............... | Yingli Energy (China) Company Limited, Baoding Tianwei Yingli New Energy Resources Co., Ltd,. and Hainan Yingli New Energy Resources Co., Ltd ............. | 52.13 |
| Zhongli Talesun Solar Co., Ltd ......................................... | Zhongli Talesun Solar Co., Ltd ......................................... | 52.13 |
| PRC-Wide Rate | | 165.04 |

## Countervailing Duty Order

As stated above, on February 5, 2015, in accordance with section 705(d) of the Act, the ITC notified the Department of its final determination in this investigation, in which it found that an industry in the United States is materially injured within the meaning of section 705(b)(1)(A)(i) of the Act by reason of imports of certain solar products from the PRC.[17]

Therefore, in accordance with section 706(a) of the Act, the Department will direct CBP to assess, upon further instruction by the Department, countervailing duties equal to the amounts listed below for all relevant

entries of certain solar products from the PRC. These countervailing duties will be assessed on unliquidated entries of certain solar products from the PRC entered, or withdrawn from warehouse, for consumption on or after June 10, 2014, the date of publication of the *CVD Preliminary Determination*,[18] and before October 8, 2014, the date on which the Department instructed CBP to discontinue the suspension of liquidation in accordance with section 703(d) of the Act. Section 703(d) of the Act states that the suspension of

---

[17] *See ITC Determination.*

[18] *See Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China: Preliminary Affirmative Countervailing Duty Determination,* 79 FR 33174 (June 10, 2014) (*CVD Preliminary Determination*).

liquidation pursuant to a preliminary determination may not remain in effect for more than four months. Entries of certain solar products from the PRC made on or after October 8, 2014, and prior to the date of publication of the ITC's final determination in the **Federal Register** are not liable for the assessment of countervailing duties, due to the Department's discontinuation, effective October 8, 2014, of the suspension of liquidation.

## Suspension of Liquidation (CVD)

In accordance with section 706 of the Act, we will instruct CBP to reinstitute the suspension of liquidation on all relevant entries of certain solar products from the PRC. We will also instruct CBP

to require cash deposits equal to the amounts indicated below. These instructions suspending liquidation will remain in effect until further notice. Accordingly, effective on the date of publication of the ITC's final affirmative injury determination, CBP will require, at the same time as importers would normally deposit estimated duties on this subject merchandise, cash deposits equal to the amounts indicated below: [19]

| Company | Subsidy rate (percent) (*ad valorem*) |
|---|---|
| Wuxi Suntech Power Co., Ltd ..................... | 27.64 |
| Changzhou Trina Solar Energy Co., Ltd ..................... | 49.21 |
| All Others .............................. | 38.43 |

**Notifications to Interested Parties**

This notice constitutes the antidumping duty and countervailing duty orders with respect to certain solar products from the PRC pursuant to sections 736(a) and 706(a) of the Act. Interested parties can find an updated list of orders currently in effect by either visiting *http://enforcement.trade.gov/ stats/iastats1.html* or by contacting the Department's Central Records Unit, Room 7046 of the main Commerce Building.

These orders and the amended *CVD Final Determination* are published in accordance with sections 705(e), 706(a), 736(a), and 777(i) of the Act, and 19 CFR 351.211(b) and 351.224(e).

Dated: February 10, 2015.

**Paul Piquado,**

*Assistant Secretary for Enforcement and Compliance.*

[FR Doc. 2015–03183 Filed 2–17–15; 8:45 am]

**BILLING CODE 3510–DS–P**

---

**DEPARTMENT OF COMMERCE**

**International Trade Administration**

**[A–583–853]**

**Certain Crystalline Silicon Photovoltaic Products From Taiwan: Antidumping Duty Order**

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** Based on affirmative final determinations by the Department of Commerce (the ''Department'') and the International Trade Commission (the ''ITC''), the Department is issuing an antidumping duty (''AD'') order on certain crystalline silicon photovoltaic

products (''certain solar products'') from Taiwan.

**DATES:** *Effective Date:* February 18, 2015.

**FOR FURTHER INFORMATION CONTACT:** Charles Riggle or Magd Zalok AD/CVD Operations, Enforcement and Compliance, U.S. Department of Commerce, 14th Street and Constitution Avenue NW., Washington, DC 20230; telephone: (202) 482–0650 or (202) 482–4162.

**SUPPLEMENTARY INFORMATION:**

**Background**

In accordance with sections 735(d) and 777(i)(1) of the Tariff Act of 1930, as amended (the ''Act'') and 19 CFR 351.210(c), on December 23, 2014, the Department published an affirmative final determination of sales at less than fair value (''LTFV'') in the investigation of certain solar products from Taiwan.[1] On February 5, 2015, the ITC notified the Department of its affirmative determinations that an industry in the United States is materially injured within the meaning of section 735(b)(1)(A)(i) of the Act by reason of LTFV imports of certain solar products from the People's Republic of China and Taiwan.[2]

**Scope of the Order**

The merchandise covered by this order is crystalline silicon photovoltaic cells, and modules, laminates and/or panels consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including building integrated materials.

Subject merchandise includes crystalline silicon photovoltaic cells of thickness equal to or greater than 20 micrometers, having a p/n junction formed by any means, whether or not the cell has undergone other processing, including, but not limited to, cleaning, etching, coating, and/or addition of materials (including, but not limited to, metallization and conductor patterns) to collect and forward the electricity that is generated by the cell.

Modules, laminates, and panels produced in a third-country from cells produced in Taiwan are covered by this investigation. However, modules, laminates, and panels produced in Taiwan from cells produced in a third-country are not covered by this investigation.

Excluded from the scope of this investigation are thin film photovoltaic products produced from amorphous silicon (a-Si), cadmium telluride (CdTe), or copper indium gallium selenide (CIGS). Also excluded from the scope of this investigation are crystalline silicon photovoltaic cells, not exceeding 10,000 mm² in surface area, that are permanently integrated into a consumer good whose function is other than power generation and that consumes the electricity generated by the integrated crystalline silicon photovoltaic cells. Where more than one cell is permanently integrated into a consumer good, the surface area for purposes of this exclusion shall be the total combined surface area of all cells that are integrated into the consumer good.

Further, also excluded from the scope of this investigation are any products covered by the existing antidumping and countervailing duty orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the People's Republic of China (''PRC'').[3] Also excluded from the scope of this investigation are modules, laminates, and panels produced in the PRC from crystalline silicon photovoltaic cells produced in Taiwan that are covered by an existing proceeding on such modules, laminates, and panels from the PRC.

Merchandise covered by this investigation is currently classified in the Harmonized Tariff Schedule of the United States (''HTSUS'') under subheadings 8501.61.0000, 8507.20.8030, 8507.20.8040, 8507.20.8060, 8507.20.8090, 8541.40.6020, 8541.40.6030 and 8501.31.8000. These HTSUS subheadings are provided for convenience and customs purposes; the written description of the scope of this investigation is dispositive.

**Antidumping Duty Order**

As stated above, on February 5, 2015, in accordance with section 735(d) of the Act, the ITC notified the Department of its final determination in its investigation, in which it found that an industry in the United States is materially injured by reason of imports of certain solar products from Taiwan. Because the ITC determined that imports of certain solar products from

---

[19] *See* section 706(a)(3) of the Act.

[1] *See Certain Crystalline Silicon Photovoltaic Products: Final Determination of Sales at Less Than Fair Value,* 79 FR 76966 (December 23, 2014).

[2] *See* ITC Notification letter to the Deputy Assistant Secretary for Enforcement and Compliance referencing ITC Investigation Nos. 701–TA–511 and 731–TA–1246–1247 (Final).

[3] *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order,* 77 FR 73018 (December 7, 2012); *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Countervailing Duty Order,* 77 FR 73017 (December 7, 2012).

# Tab 4

# CVD P.R. Doc. 413

# Amended CVD Final Determination and AD/CVD Orders (Feb. 18, 2015)

bis.doc.gov no later than February 26, 2015.

A limited number of seats will be available during the public session of the meeting. Reservations are not accepted. To the extent time permits, members of the public may present oral statements to the Committee. The public may submit written statements at any time before or after the meeting. However, to facilitate distribution of public presentation materials to Committee members, the Committee suggests that presenters forward the public presentation materials prior to the meeting to Ms. Springer via email.

For more information, call Yvette Springer at (202) 482–2813.

Dated: February 12, 2015.

**Yvette Springer,**

*Committee Liaison Officer.*

[FR Doc. 2015–03325 Filed 2–17–15; 8:45 am]

**BILLING CODE 3510–JT–P**

---

## DEPARTMENT OF COMMERCE

### Bureau of Industry and Security

### Technical Advisory Committees; Notice of Recruitment of Private-Sector Members

**SUMMARY:** Seven Technical Advisory Committees (TACs) advise the Department of Commerce on the technical parameters for export controls applicable to dual-use commodities and technology and on the administration of those controls. The TACs are composed of representatives from industry representatives, academic leaders and U.S. Government representing diverse points of view on the concerns of the exporting community. Industry representatives are selected from firms producing a broad range of goods, technologies, and software presently controlled for national security, non-proliferation, foreign policy, and short supply reasons or that are proposed for such controls, balanced to the extent possible among large and small firms.

TAC members are appointed by the Secretary of Commerce and serve terms of not more than four consecutive years. The membership reflects the Department's commitment to attaining balance and diversity. TAC members must obtain secret-level clearances prior to appointment. These clearances are necessary so that members may be permitted access to the classified information needed to formulate recommendations to the Department of Commerce. Each TAC meets approximately four times per year. Members of the Committees will not be compensated for their services.

The seven TACs are responsible for advising the Department of Commerce on the technical parameters for export controls and the administration of those controls within the following areas: Information Systems TAC: Control List Categories 3 (electronics), 4 (computers), and 5 (telecommunications and information security); Materials TAC: Control List Category 1 (materials, chemicals, microorganisms, and toxins); Materials Processing Equipment TAC: Control List Category 2 (materials processing); Regulations and Procedures TAC: The Export Administration Regulations (EAR) and Procedures for implementing the EAR; Sensors and Instrumentation TAC: Control List Category 6 (sensors and lasers); Transportation and Related Equipment TAC: Control List Categories 7 (navigation and avionics), 8 (marine), and 9 (propulsion systems, space vehicles, and related equipment) and the Emerging Technology and Research Advisory Committee: (1) The identification of emerging technologies and research and development activities that may be of interest from a dual-use perspective; (2) the prioritization of new and existing controls to determine which are of greatest consequence to national security; (3) the potential impact of dual-use export control requirements on research activities; and (4) the threat to national security posed by the unauthorized exports of technologies.

To respond to this recruitment notice, please send a copy of your resume to Ms. Yvette Springer at *Yvette.Springer@bis.doc.gov.*

*Deadline:* This Notice of Recruitment will be open for one year from its date of publication in the **Federal Register**.

**FOR FURTHER INFORMATION CONTACT:** Ms. Yvette Springer on (202) 482–2813.

Dated: February 12, 2015.

**Yvette Springer,**

*Committee Liaison Officer.*

[FR Doc. 2015–03323 Filed 2–17–15; 8:45 am]

**BILLING CODE 3510–JT–P**

---

## DEPARTMENT OF COMMERCE

### International Trade Administration

[A–570–010, C–570–011]

### Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China: Antidumping Duty Order; and Amended Final Affirmative Countervailing Duty Determination and Countervailing Duty Order

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** Based on affirmative final determinations by the Department of Commerce (the Department) and the International Trade Commission (the ITC), the Department is issuing antidumping duty (AD) and countervailing duty (CVD) orders on certain crystalline silicon photovoltaic products (certain solar products) from the People's Republic of China (the PRC). Also, as explained in this notice, the Department is amending its final affirmative CVD determination to correct an error regarding the inclusion of a subsidy program that was not properly reflected on the record of the CVD investigation.

**DATES:** *Effective Date:* February 18, 2015.

**FOR FURTHER INFORMATION CONTACT:** Jeff Pedersen at (202) 482–2769 or Thomas Martin at (202) 482–3936 (AD); or Gene Calvert at (202) 482–3586 or Justin Neuman at (202) 482–0486 (CVD), AD/CVD Operations, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 14th Street and Constitution Avenue NW., Washington, DC 20230.

**SUPPLEMENTARY INFORMATION:**

### Background

On December 23, 2014, the Department published its affirmative final determination of sales at less than fair value (LTFV) in the AD investigation of certain solar products from the PRC,[1] and its final affirmative determination that countervailable subsidies are being provided to producers and exporters of certain solar products from the PRC.[2] On February 5, 2015, the ITC notified the Department of its final determination pursuant to

---

[1] *See Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China: Final Determination of Sales at Less Than Fair Value,* 79 FR 76970 (December 23, 2014).

[2] *See Countervailing Duty Investigation of Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China: Final Affirmative Countervailing Duty Determination,* 79 FR 76962 (December 23, 2014) (*CVD Final Determination*).

sections 735(d) and 705(d) of the Tariff Act of 1930, as amended (the Act), that an industry in the United States is materially injured within the meaning of sections 735(b)(1)(A)(i) and 705(b)(1)(A)(i) of the Act by reason of LTFV imports and subsidized imports of subject merchandise from the PRC.[3]

## Scope of the Orders

The merchandise covered by these orders are modules, laminates and/or panels consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including building integrated materials. For purposes of these orders, subject merchandise includes modules, laminates and/or panels assembled in the PRC consisting of crystalline silicon photovoltaic cells produced in a customs territory other than the PRC.

Subject merchandise includes modules, laminates and/or panels assembled in the PRC consisting of crystalline silicon photovoltaic cells of thickness equal to or greater than 20 micrometers, having a p/n junction formed by any means, whether or not the cell has undergone other processing, including, but not limited to, cleaning, etching, coating, and/or addition of materials (including, but not limited to, metallization and conductor patterns) to collect and forward the electricity that is generated by the cell.

Excluded from the scope of these orders are thin film photovoltaic products produced from amorphous silicon (a-Si), cadmium telluride (CdTe), or copper indium gallium selenide (CIGS). Also excluded from the scope of these orders are modules, laminates and/or panels assembled in the PRC, consisting of crystalline silicon photovoltaic cells, not exceeding 10,000 mm$^2$ in surface area, that are permanently integrated into a consumer good whose function is other than power generation and that consumes the electricity generated by the integrated crystalline silicon photovoltaic cells. Where more than one module, laminate and/or panel is permanently integrated into a consumer good, the surface area for purposes of this exclusion shall be the total combined surface area of all modules, laminates and/or panels that are integrated into the consumer good. Further, also excluded from the scope of these orders are any products covered by the existing antidumping and countervailing duty orders on crystalline silicon photovoltaic cells,

whether or not assembled into modules, laminates and/or panels, from the PRC.[4]

Merchandise covered by these orders is currently classified in the Harmonized Tariff Schedule of the United States (HTSUS) under subheadings 8501.61.0000, 8507.20.8030, 8507.20.8040, 8507.20.8060, 8507.20.8090, 8541.40.6020, 8541.40.6030 and 8501.31.8000. These HTSUS subheadings are provided for convenience and customs purposes; the written description of the scope of these orders is dispositive.

## Amendment to the CVD Final Determination

On December 23, 2014, the Department published its affirmative final determination in the CVD investigation.[5] On December 24, 2014, Changzhou Trina Solar Energy Co., Ltd. (Trina Solar) and Wuxi Suntech Power Co., Ltd. (Wuxi Suntech), respondents in the CVD investigation, submitted timely ministerial error allegations and requested that the Department correct the alleged ministerial errors in the subsidy margin calculations.[6] On December 29, 2014, SolarWorld Americas, Inc., the petitioner in the CVD investigation, submitted timely rebuttal comments on Trina Solar's and Wuxi Suntech's allegations.[7] No other interested party submitted ministerial error allegations or replied to Trina Solar's or Wuxi Suntech's submissions.

After analyzing comments and rebuttals from all interested parties, we determined, in accordance with section 705(e) of the Act and 19 CFR 351.224(e), that we made a ministerial error in our calculations for the *CVD Final Determination* with respect to Trina

Solar. At the verification of Trina Solar's questionnaire responses, we discovered unreported subsidy programs in Trina Solar's accounting system. We translated certain line items from that accounting system at verification and found that every translated line item represented a countervailable subsidy in our *CVD Final Determination.* In so doing, we inadvertently countervailed a subsidy program that did not appear among the list of translated subsidy programs submitted as a verification exhibit.[8] This amended final CVD determination corrects this error and revises the *ad valorem* subsidy rate for Trina Solar.

In the *CVD Final Determination,* we based the estimated subsidy rate for "all others" by calculating the simple average of Trina Solar's and Wuxi Suntech's estimated subsidy rates.[9] Because the subsidy rate for all others is based on the rates for Trina Solar and Wuxi Suntech, and the rate for Trina Solar changed because of the aforementioned ministerial error, we have revised the calculation for the estimated subsidy rate for all others in this amended final CVD determination.[10] The amended estimated *ad valorem* subsidy rates are provided below.

## Antidumping Duty Order

As stated above, on February 5, 2015, in accordance with section 735(d) of the Act, the ITC notified the Department of its final determination in its investigation, in which it found that an industry in the United States is materially injured within the meaning of section 735(b)(1)(A)(i) of the Act by reason of imports of certain solar products from the PRC.[11] Because the ITC determined that imports of certain solar products from the PRC are materially injuring a U.S. industry, unliquidated entries of such merchandise from the PRC, entered or withdrawn from warehouse, for consumption are subject to the assessment of antidumping duties.

Therefore, in accordance with section 736(a)(1) of the Act, the Department will direct U.S. Customs and Border Protection (CBP) to assess, upon further instruction by the Department, antidumping duties equal to the amount

---

[3] *See* the ITC Notification Letter to the Deputy Assistant Secretary for Enforcement and Compliance referencing ITC Investigation Nos. 701–TA–511 and 731–TA–1246–1247 (February 5, 2015).

[4] *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order,* 77 FR 73018 (December 7, 2012); *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Countervailing Duty Order,* 77 FR 73017 (December 7, 2012).

[5] *See CVD Final Determination.*

[6] *See* the Letter to the Secretary from Trina Solar, "Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: Ministerial Errors Allegation," (December 24, 2014); *see also* the Letter to the Secretary from Wuxi Suntech, "Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: Ministerial Error Comments of Wuxi Suntech Power Co., Ltd.," (December 24, 2014).

[7] *See* the Letter to the Secretary, "Crystalline Silicon Photovoltaic Products from the People's Republic of China: Response to Trina's Ministerial Error Allegation," (December 29, 2014); *see also* the Letter to the Secretary, "Crystalline Silicon Photovoltaic Products from the People's Republic of China: Response to Suntech's Ministerial Error Comments," (December 29, 2014).

[8] For a detailed discussion of all alleged ministerial errors, as well as the Department's analysis, *see* the memorandum, "Amended Final Determination in the Countervailing Duty Investigation of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: Ministerial Error Allegations," (February 6, 2015) (Ministerial Error Memorandum).

[9] *See CVD Final Determination,* 79 FR at 76964.

[10] *See* Ministerial Error Memorandum at 10.

[11] *See* ITC Determination.

by which the normal value of the merchandise exceeds the export price (or constructed export price) of the merchandise, for all relevant entries of certain solar products from the PRC. These antidumping duties will be assessed on unliquidated entries of certain solar products from the PRC entered, or withdrawn from warehouse, for consumption on or after July 31, 2014, the date of publication of the *AD Preliminary Determination*,[12] but will not include entries occurring after the expiration of the provisional measures period and before publication of the ITC's final injury determination as further described below.

**Continuation of Suspension of Liquidation (AD)**

In accordance with section 735(c)(1)(B) of the Act, the Department will instruct CBP to continue to suspend liquidation of all appropriate entries of certain solar products from the PRC as described in the "Scope of Orders" section, which were entered, or withdrawn from warehouse, for consumption on or after July 31, 2014, the date of publication in the **Federal Register** of the notice of an affirmative preliminary determination that certain solar products are being, or are likely to be, sold in the United States at LTFV. Further, consistent with our practice, where the product from the PRC under investigation is also subject to a concurrent CVD investigation, the Department will instruct CBP to require a cash deposit[13] equal to the weighted-average amount by which the normal value exceeds U.S. price, adjusted where appropriate for export subsidies

and estimated domestic subsidy pass-through.[14] The cash deposit rates, before any adjustments for export subsidies and estimated domestic subsidy pass-through, are as follows: (1) For each exporter/producer combination listed in the table below, the cash deposit rate will be equal to the dumping margin listed for that exporter/producer combination in the table; (2) for all other combinations of PRC exporters/producers of the merchandise under consideration, the cash deposit rate will be equal to the dumping margin established for the PRC-wide entity; and (3) for all non-PRC exporters of the merchandise under consideration which have not received their own separate rate above, the cash deposit rate will be equal to the cash deposit rate applicable to the PRC exporter/producer combination that supplied that non-PRC exporter. These suspension-of-liquidation instructions will remain in effect until further notice.

Accordingly, effective on the date of publication of the ITC's final affirmative injury determination, CBP will require, at the same time as importers would normally deposit estimated duties on this subject merchandise, a cash deposit equal to the estimated weighted-average dumping margins indicated below, adjusted, where appropriate, for export subsidies and estimated domestic subsidy pass-through, as discussed above.[15]

**Provisional Measures (AD)**

Section 733(d) of the Act states that instructions issued pursuant to an affirmative preliminary determination in an AD investigation may not remain

in effect for more than four months except where exporters representing a significant proportion of exports of the subject merchandise request the Department to extend that four-month period to no more than six months. At the request of exporters that account for a significant proportion of certain solar products from the PRC, we extended the four-month period to no more than six months in this case.[16] As stated above, in the investigation covering certain solar products from the PRC, the Department published the preliminary determination in the AD investigation on July 31, 2014. Therefore, the six-month period beginning on the date of publication of the preliminary determination in the AD investigation ended on January 27, 2015. Furthermore, section 737(b) of the Act states that definitive duties are to begin on the date of publication of the ITC's final injury determination.

Therefore, in accordance with section 733(d) of the Act and our practice, we will instruct CBP to terminate the suspension of liquidation and to liquidate, without regard to antidumping duties, unliquidated entries of certain solar products from the PRC, entered, or withdrawn from warehouse, for consumption on or after January 27, 2015, the date the provisional measures expired, until and through the day preceding the date of publication of the ITC's final injury determination in the **Federal Register**.

**Estimated Weighted-Average Dumping Margins**

The estimated weighted-average dumping margins are as follows:

| Exporter | Producer | Weighted-average dumping margin (percent) |
|---|---|---|
| Changzhou Trina Solar Energy Co., Ltd./Trina Solar (Changzhou) Science & Technology Co., Ltd. | Changzhou Trina Solar Energy Co., Ltd./Trina Solar (Changzhou) Science & Technology Co., Ltd. | 26.71 |
| Renesola Jiangsu Ltd./Renesola Zhejiang Ltd./Jinko Solar Co. Ltd./Jinko Solar Import and Export Co., Ltd. | Renesola Jiangsu Ltd./Jinko Solar Co. Ltd ............................ | 78.42 |
| Anji DaSol Solar Energy Science & Technology, Co., Ltd ..... | Anji DaSol Solar Energy Science & Technology, Co., Ltd ..... | 52.13 |
| Asun Energy Co., Ltd. (a/k/a Suzhou Asun Energy Co., Ltd.) | Asun Energy Co., Ltd. (a/k/a Suzhou Asun Energy Co., Ltd.). | 52.13 |
| Baoding Tianwei Yingli New Energy Resources Co. , Ltd .... | Baoding Tianwei Yingli New Energy Resources Co., Ltd., Yingli Energy (China) Co., Ltd., and Lixian Yingli New Energy Co., Ltd. | 52.13 |
| BYD (Shangluo) Industrial Co., Ltd ........................................ | BYD (Shangluo) Industrial Co., Ltd ........................................ | 52.13 |
| Canadian Solar International Limited ..................................... | Canadian Solar Manufacturing (Luoyang) Inc., Canadian Solar Manufacturing (Changshu), Inc. | 52.13 |

---

[12] *See Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China: Affirmative Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination,* 79 FR 44399 (July 31, 2014) (*AD Preliminary Determination*).

[13] *See* Modification of Regulations Regarding the Practice of Accepting Bonds During the Provisional Measures Period in Antidumping and

Countervailing Duty Investigations, 76 FR 61042 (October 3, 2011).

[14] *See* sections 772(c)(1)(C) and 777A(f) of the Act.

[15] With respect to the final affirmative countervailing duty determination in the companion investigation, because the provisional measures period has expired, the Department will only order the resumption of the suspension of liquidation, and require cash deposits for

countervailing duties equal to the final subsidy rates, upon issuance of a final affirmative injury determination by the ITC. As a result, the Department will make an adjustment to AD cash deposits, where appropriate, for export subsidies and estimated domestic subsidy pass-through as of the date of publication of the ITC's final affirmative injury determination.

[16] *See AD Preliminary Determination,* 79 FR at 44396.

| Exporter | Producer | Weighted-average dumping margin (percent) |
|---|---|---|
| Canadian Solar Manufacturing (Changshu), Inc ..................... | Canadian Solar Manufacturing (Changshu), Inc ..................... | 52.13 |
| Canadian Solar Manufacturing (Luoyang) Inc ......................... | Canadian Solar Manufacturing (Luoyang) Inc ......................... | 52.13 |
| CEEG Nanjing Renewable Energy Co., Ltd ............................. | CEEG Nanjing Renewable Energy Co., Ltd ............................. | 52.13 |
| Changzhou Almaden Co., Ltd ................................................. | Changzhou Almaden Co., Ltd ................................................. | 52.13 |
| Chint Solar (Zhejiang) Co., Ltd ............................................. | Chint Solar (Zhejiang) Co., Ltd ............................................. | 52.13 |
| ET Solar Industry Limited ...................................................... | ET Solar Industry Limited ...................................................... | 52.13 |
| Hainan Yingli New Energy Resources Co. Ltd ....................... | Hainan Yingli New Energy Resources Co. Ltd ....................... | 52.13 |
| Hangzhou Zhejiang University Sunny Energy Science and Technology Co., Ltd. | Hangzhou Zhejiang University Sunny Energy Science and Technology Co., Ltd. | 52.13 |
| Hanwha SolarOne (Qidong) Co., Ltd ..................................... | Hanwha SolarOne (Qidong) Co., Ltd ..................................... | 52.13 |
| Hanwha SolarOne Hong Kong Limited .................................. | Hanwha SolarOne (Qidong) Co., Ltd ..................................... | 52.13 |
| Hefei JA Solar Technology Co., Ltd ...................................... | Hefei JA Solar Technology Co., Ltd ...................................... | 52.13 |
| Hengdian Group DMEGC Magnetics Co., Ltd ........................ | Hengdian Group DMEGC Magnetics Co., Ltd ........................ | 52.13 |
| Hengshui Yingli New Energy Resources Company Limited .. | Hengshui Yingli New Energy Resources Company Limited .. | 52.13 |
| Jiangyin Hareon Power Co., Ltd ............................................ | Jiangyin Xinhui Solar Co., Ltd.; Altusvia Energy Taicang Co., Ltd.; Hareon Solar Technology Co., Ltd. | 52.13 |
| Jiawei Solarchina Co., Ltd .................................................... | Jiawei Solarchina (Shenzhen) Co., Ltd ................................ | 52.13 |
| Jiawei Technology (HK) Ltd ................................................... | Shenzhen Jiawei Photovoltaic Lighting Co. Ltd .................... | 52.13 |
| LDK Solar Hi-Tech (Nanchang) Co., Ltd .............................. | LDK Solar Hi-Tech (Nanchang) Co., Ltd .............................. | 52.13 |
| Lixian Yingli New Energy Company Ltd ................................. | Lixian Yingli New Energy Company Ltd ................................. | 52.13 |
| MOTECH (Suzhou) Renewable Energy Co., Ltd .................... | MOTECH (Suzhou) Renewable Energy Co., Ltd .................... | 52.13 |
| Ningbo Qixin Solar Electrical Appliance Co., Ltd .................. | Ningbo Qixin Solar Electrical Appliance Co., Ltd .................. | 52.13 |
| Perlight Solar Co., Ltd .......................................................... | Perlight Solar Co., Ltd .......................................................... | 52.13 |
| Risen Energy Co., Ltd ........................................................... | Risen Energy Co., Ltd ........................................................... | 52.13 |
| Shanghai JA Solar Technology Co., Ltd ............................... | Shanghai JA Solar Technology Co., Ltd ............................... | 52.13 |
| Shanghai Solar Energy Science & Technology Co., Ltd ....... | Lianyungang Shenzhou New Energy Co., Ltd ....................... | 52.13 |
| Shenzhen Jiawei Photovoltaic Lighting Co. Ltd ................... | Shenzhen Jiawei Photovoltaic Lighting Co. Ltd ................... | 52.13 |
| Shenzhen Sungold Solar Co., Ltd ......................................... | Shenzhen Sungold Solar Co., Ltd ......................................... | 52.13 |
| Shenzhen Topray Solar Co., Ltd ........................................... | Shenzhen Topray Solar Co., Ltd ........................................... | 52.13 |
| Sun Earth Solar Power Co., Ltd ............................................ | Sun Earth Solar Power Co., Ltd ............................................ | 52.13 |
| Sunny Apex Development Ltd ................................................ | Shenzhen Jiawei Photovoltaic Lighting Co. Ltd.,  Wuhan FYY Technology Co., Ltd. | 52.13 |
| SunPower Systems SARL ...................................................... | SunEnergy (S.Z.) Co., Ltd ..................................................... | 52.13 |
| tenKsolar (Shanghai) Co., Ltd .............................................. | tenKsolar (Shanghai) Co., Ltd .............................................. | 52.13 |
| Upsolar Global Co., Ltd. and including Upsolar Group, Co., Ltd. | Shandong Dahai Group Co. Ltd ............................................. | 52.13 |
| Wanxiang Import & Export Co., Ltd ....................................... | Zhejiang Wanxiang Solar Co., Ltd ........................................ | 52.13 |
| Wuhan FYY Technology Co., Ltd .......................................... | Wuhan FYY Technology Co., Ltd .......................................... | 52.13 |
| Wuxi Suntech Power Co., Ltd ............................................... | Wuxi Suntech Power Co., Ltd ............................................... | 52.13 |
| Yingli Energy (China) Company Limited ................................ | Yingli Energy (China) Company Limited, Baoding Tianwei Yingli New Energy Resources Co. , Ltd. and Lixian Yingli New Energy Co. , Ltd. | 52.13 |
| Yingli Green Energy International Trading Limited ................ | Yingli Energy (China) Company Limited, Baoding Tianwei Yingli New Energy Resources Co., Ltd,.  and Hainan Yingli New Energy Resources Co., Ltd ............. | 52.13 |
| Zhongli Talesun Solar Co., Ltd ............................................. | Zhongli Talesun Solar Co., Ltd ............................................. | 52.13 |
| PRC-Wide Rate | | 165.04 |

## Countervailing Duty Order

As stated above, on February 5, 2015, in accordance with section 705(d) of the Act, the ITC notified the Department of its final determination in this investigation, in which it found that an industry in the United States is materially injured within the meaning of section 705(b)(1)(A)(i) of the Act by reason of imports of certain solar products from the PRC.[17]

Therefore, in accordance with section 706(a) of the Act, the Department will direct CBP to assess, upon further instruction by the Department, countervailing duties equal to the amounts listed below for all relevant entries of certain solar products from the PRC. These countervailing duties will be assessed on unliquidated entries of certain solar products from the PRC entered, or withdrawn from warehouse, for consumption on or after June 10, 2014, the date of publication of the *CVD Preliminary Determination*,[18] and before October 8, 2014, the date on which the Department instructed CBP to discontinue the suspension of liquidation in accordance with section 703(d) of the Act. Section 703(d) of the Act states that the suspension of liquidation pursuant to a preliminary determination may not remain in effect for more than four months. Entries of certain solar products from the PRC made on or after October 8, 2014, and prior to the date of publication of the ITC's final determination in the **Federal Register** are not liable for the assessment of countervailing duties, due to the Department's discontinuation, effective October 8, 2014, of the suspension of liquidation.

## Suspension of Liquidation (CVD)

In accordance with section 706 of the Act, we will instruct CBP to reinstitute the suspension of liquidation on all relevant entries of certain solar products from the PRC. We will also instruct CBP

---

[17] *See ITC Determination.*

[18] *See Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China: Preliminary Affirmative Countervailing Duty Determination,* 79 FR 33174 (June 10, 2014) (*CVD Preliminary Determination*).

to require cash deposits equal to the amounts indicated below. These instructions suspending liquidation will remain in effect until further notice. Accordingly, effective on the date of publication of the ITC's final affirmative injury determination, CBP will require, at the same time as importers would normally deposit estimated duties on this subject merchandise, cash deposits equal to the amounts indicated below: [19]

| Company | Subsidy rate (percent) (ad valorem) |
| --- | --- |
| Wuxi Suntech Power Co., Ltd ..................... | 27.64 |
| Changzhou Trina Solar Energy Co., Ltd ...................... | 49.21 |
| All Others ............................... | 38.43 |

**Notifications to Interested Parties**

This notice constitutes the antidumping duty and countervailing duty orders with respect to certain solar products from the PRC pursuant to sections 736(a) and 706(a) of the Act. Interested parties can find an updated list of orders currently in effect by either visiting *http://enforcement.trade.gov/ stats/iastats1.html* or by contacting the Department's Central Records Unit, Room 7046 of the main Commerce Building.

These orders and the amended *CVD Final Determination* are published in accordance with sections 705(e), 706(a), 736(a), and 777(i) of the Act, and 19 CFR 351.211(b) and 351.224(e).

Dated: February 10, 2015.

**Paul Piquado,**

*Assistant Secretary for Enforcement and Compliance.*

[FR Doc. 2015–03183 Filed 2–17–15; 8:45 am]

**BILLING CODE 3510–DS–P**

---

**DEPARTMENT OF COMMERCE**

**International Trade Administration**

**[A–583–853]**

**Certain Crystalline Silicon Photovoltaic Products From Taiwan: Antidumping Duty Order**

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** Based on affirmative final determinations by the Department of Commerce (the "Department") and the International Trade Commission (the "ITC"), the Department is issuing an antidumping duty ("AD") order on certain crystalline silicon photovoltaic

products ("certain solar products") from Taiwan.

**DATES:** *Effective Date:* February 18, 2015.

**FOR FURTHER INFORMATION CONTACT:** Charles Riggle or Magd Zalok AD/CVD Operations, Enforcement and Compliance, U.S. Department of Commerce, 14th Street and Constitution Avenue NW., Washington, DC 20230; telephone: (202) 482–0650 or (202) 482–4162.

**SUPPLEMENTARY INFORMATION:**

**Background**

In accordance with sections 735(d) and 777(i)(1) of the Tariff Act of 1930, as amended (the "Act") and 19 CFR 351.210(c), on December 23, 2014, the Department published an affirmative final determination of sales at less than fair value ("LTFV") in the investigation of certain solar products from Taiwan.[1] On February 5, 2015, the ITC notified the Department of its affirmative determinations that an industry in the United States is materially injured within the meaning of section 735(b)(1)(A)(i) of the Act by reason of LTFV imports of certain solar products from the People's Republic of China and Taiwan.[2]

**Scope of the Order**

The merchandise covered by this order is crystalline silicon photovoltaic cells, and modules, laminates and/or panels consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including building integrated materials.

Subject merchandise includes crystalline silicon photovoltaic cells of thickness equal to or greater than 20 micrometers, having a p/n junction formed by any means, whether or not the cell has undergone other processing, including, but not limited to, cleaning, etching, coating, and/or addition of materials (including, but not limited to, metallization and conductor patterns) to collect and forward the electricity that is generated by the cell.

Modules, laminates, and panels produced in a third-country from cells produced in Taiwan are covered by this investigation. However, modules, laminates, and panels produced in Taiwan from cells produced in a third-country are not covered by this investigation.

Excluded from the scope of this investigation are thin film photovoltaic products produced from amorphous silicon (a-Si), cadmium telluride (CdTe), or copper indium gallium selenide (CIGS). Also excluded from the scope of this investigation are crystalline silicon photovoltaic cells, not exceeding 10,000 mm² in surface area, that are permanently integrated into a consumer good whose function is other than power generation and that consumes the electricity generated by the integrated crystalline silicon photovoltaic cells. Where more than one cell is permanently integrated into a consumer good, the surface area for purposes of this exclusion shall be the total combined surface area of all cells that are integrated into the consumer good.

Further, also excluded from the scope of this investigation are any products covered by the existing antidumping and countervailing duty orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the People's Republic of China ("PRC").[3] Also excluded from the scope of this investigation are modules, laminates, and panels produced in the PRC from crystalline silicon photovoltaic cells produced in Taiwan that are covered by an existing proceeding on such modules, laminates, and panels from the PRC.

Merchandise covered by this investigation is currently classified in the Harmonized Tariff Schedule of the United States ("HTSUS") under subheadings 8501.61.0000, 8507.20.8030, 8507.20.8040, 8507.20.8060, 8507.20.8090, 8541.40.6020, 8541.40.6030 and 8501.31.8000. These HTSUS subheadings are provided for convenience and customs purposes; the written description of the scope of this investigation is dispositive.

**Antidumping Duty Order**

As stated above, on February 5, 2015, in accordance with section 735(d) of the Act, the ITC notified the Department of its final determination in its investigation, in which it found that an industry in the United States is materially injured by reason of imports of certain solar products from Taiwan. Because the ITC determined that imports of certain solar products from

---

[19] *See* section 706(a)(3) of the Act.

[1] *See Certain Crystalline Silicon Photovoltaic Products: Final Determination of Sales at Less Than Fair Value,* 79 FR 76966 (December 23, 2014).

[2] *See* ITC Notification letter to the Deputy Assistant Secretary for Enforcement and Compliance referencing ITC Investigation Nos. 701–TA–511 and 731–TA–1246–1247 (Final).

[3] *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order,* 77 FR 73018 (December 7, 2012); *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Countervailing Duty Order,* 77 FR 73017 (December 7, 2012).

# Tab 5

# CVD P.R. Doc. 384

## CVD IDM
## (Dec. 15, 2014)

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

C-570-011
Investigation
**Public Document**
E&C Office VII: Team

| | |
|---|---|
| **DATE:** | December 15, 2014 |
| **MEMORANDUM TO:** | Paul Piquado<br>Assistant Secretary<br>    For Enforcement and Compliance |
| **FROM:** | Christian Marsh<br>Deputy Assistant Secretary<br>    for Antidumping and Countervailing Duty Operations |
| **SUBJECT:** | Issues and Decision Memorandum for the Final Determination in the Countervailing Duty Investigation of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China |

## I.    SUMMARY

The Department of Commerce (the Department) determines that countervailable subsidies are being provided to producers and exporters of certain crystalline silicon photovoltaic products (certain solar products, or subject merchandise) from the People's Republic of China (the PRC), within the meaning of section 705 of the Tariff Act of 1930, as amended (the Act).[1]  Below is the complete list of issues in this investigation for which we received comments from interested parties:

Issues:
**Comment 1:**  Scope Comments and Scope Clarification
**Comment 2:**  Whether the Department Should Investigate the Effects of the GOC's Alleged Cyberhacking on this Investigation
**Comment 3:**  Whether Input Providers are "Authorities" Within the Meaning of the Act
**Comment 4:**  Whether the Provision of Chinese Polysilicon for LTAR is Countervailable
**Comment 5:**  Whether the Department Should Attribute Subsidies under the Provision of Polysilicon for LTAR Program to Wuxi Suntech's Cross-owned Companies
**Comment 6:**  Whether the Provision of Aluminum Extrusions for LTAR is Countervailable
**Comment 7:**  Whether the Provision of Solar Glass for LTAR is Countervailable
**Comment 8:**  Whether AFA is Applicable to Trina Solar's Land Purchases

---

[1] *See also* section 701(f) of the Act.



INTERNATIONAL
**T R A D E**
ADMINISTRATION

**Department's Position:**  We disagree with respondents and find the scope as clarified in the October 3rd Letter to be administrable.  As noted by respondents, the country of origin criteria in *Solar I*, applicable to solar modules, differ from these investigations.  However, we determine that the scope of *Solar I* is very clear as it states that the country of origin of a solar module is determined by where the solar cell was produced.[264]  Not only is the scope and country of origin determination of *Solar I* clear, but the scope adopted in the final determinations of the current investigations emphasize that they do not alter, revise, or overlap the scope of *Solar I*. Specifically, the scopes of the current China and Taiwan investigations each state that "excluded from the scope of this investigation are any products covered by the existing antidumping and countervailing duty orders on {*Solar I*}."[265]  Further, any possible overlaps between the current China and Taiwan investigations are eliminated by the scope language stating that solar cells assembled in China using solar cells manufactured in Taiwan are subject to the current China investigation and not the Taiwan investigation.[266]  Thus, we have eliminated any overlap of solar products subject to any of these investigations and those subject to *Solar I*.

Meanwhile, the modifications to the scope language of the *Preliminary Determination* proposed in the October 3rd Letter and adopted in these determinations result in single change:  that the country of origin of a solar module assembled in the PRC is the PRC.  We find this country of origin language likewise clear and easily applied.  Thus, while the country of origin criteria of *Solar I* and the country of origin analysis stated in the proposed clarification in the October 3rd Letter may differ, with the latter building upon the former, we find the approaches to be complementary and that identifying the proceeding to which a given solar module may be subject, based on these analyses, will be straightforward.  Further, any potential overlap in coverage that may have arisen due to the different country of origin criteria have been eliminated by the modified language provided in the October 3rd proposed clarification and adopted in the final determinations.

## G.   Treatment of U.S. Solar Cells Assembled into Solar Modules in China and Taiwan

*Respondents:*
- The Department must include a scope exemption for solar products assembled from cells of U.S. origin.  The Department has already determined that the country of origin of a solar panel is the country in which the solar cell was produced.  U.S. law prohibits application of AD/CVD duties to U.S. origin goods.

Petitioner did not comment on this issue.

**Department's Position**:  We disagree with respondents.  As noted above, contrary to respondents' assertions, we have only applied AD and CVD measures to products determined to

---

[264] *See*, *e.g.*, *Solar I* where the scope explicitly states that it covers "Modules, laminates, and panels produced in a third-country from cells produced in the PRC are covered by this investigation; however, modules, laminates, and panels produced in the PRC from cells produced in a third-country are not covered by this investigation."  Further, *Solar I* included certifications in Appendix II, which require exporters and imports of solar modules "to substantiate the claim that the panels/modules do not contain solar cells produced in the People's Republic of China."
[265] *See* the Attachment to the October 3rd Letter.
[266] *See* the Attachment to the October 3rd Letter.

Filed By: Gene Calvert, Filed Date: 12/17/14 12:45 PM, Submission Status: Approved

have a country of origin of China. We have not applied such measures to products determined to have a country of origin of the United States.

## H. Comments Concerning the Scope of the Preliminary Determination

Parties have submitted comments concerning the scope of the investigation as defined in the *Preliminary Determination*. Because we have clarified the scope consistent with the October 3rd Letter, we have not addressed comments that were only relevant to the scope of the investigation as defined in the *Preliminary Determination* and not relevant to the scope of this final determination.

**Comment 2: Whether the Department Should Investigate the Effects of the GOC's Alleged Cyberhacking on this Investigation**

*Petitioner's Comments:*
- The U.S. Department of Justice charged members of the People's Liberation Army (the military of the PRC) with cyber espionage against U.S. corporations for commercial advantage. SolarWorld was among the U.S. corporations that were targeted.
- As the information allegedly stolen includes information related to SolarWorld's financial status, manufacturing metrics, and privileged attorney-client communications regarding trade litigation, the Department should investigate how this alleged cyberhacking may have affected the AD and CVD investigations.

*Wuxi Suntech's Rebuttal Comments:*
- Petitioner's allegations of cyberhacking by the GOC are not a proper subject to be addressed by U.S. AD and CVD laws. The allegations do not refer to any of the legal elements of a subsidy.
- Any investigation of Petitioner's allegations should be addressed outside the confines of this investigation.

**Department's Position:** As the agency charged with administering the antidumping and countervailing duty laws, the Department has the inherent authority to protect the integrity of its proceedings. For example, the Court of Appeals for the Federal Circuit has recognized the Department's authority to ensure that our proceedings are not undermined by fraud.[267] Similarly, the law apportions responsibility for justice across the spectrum of administrative agencies, each according to its legislative mandate. For example, "it is Customs, not Commerce, that is charged with responsibility for enforcement of the laws prohibiting material false statements and omissions in customs entry documentation" under 19 U.S.C. § 1592.[268]

---

[267] *See, e.g.*, *Tokyo Kikai Seisakusho, Ltd. v. United States*, 529 F.3d 1352, 1360-62 (Fed. Cir. 2008).
[268] *Mid Continent Nail Corp. v. United States*, 949 F. Supp. 2d 1247, 1283 (Ct. Int'l Trade 2013)("As such, even assuming that violations such as those alleged by {petitioner} may have occurred, the investigation of any such potential violations would fall squarely within Customs' domain. Commerce here thus acted properly in referring to Customs the issue of whether certain companies may have acted negligently or fraudulently . . . .").

Filed By: Gene Calvert, Filed Date: 12/17/14 12:45 PM, Submission Status: Approved

# Tab 6

# AD P.R. Doc. 124

**Scope Clarification (Mar. 19, 2012), Exhibit 2 to Comments on Scope submitted on behalf of Yingli Green Energy Holding Company Limited et al. (Feb. 18, 2014)**



| SIDLEY AUSTIN LLP | BEIJING | HONG KONG | SHANGHAI |
|---|---|---|---|
| 1501 K STREET, N.W. | BOSTON | HOUSTON | SINGAPORE |
| WASHINGTON, D.C. 20005 | BRUSSELS | LONDON | SYDNEY |
| (202) 736 8000 | CHICAGO | LOS ANGELES | TOKYO |
| (202) 736 8711 FAX | DALLAS | NEW YORK | WASHINGTON, D.C. |
| | FRANKFURT | PALO ALTO | |
| | GENEVA | SAN FRANCISCO | |

nellis@sidley.com
202.736.8075

FOUNDED 1866

## PUBLIC DOCUMENT

February 18, 2014

The Honorable Penny Pritzker
Secretary of Commerce
U.S. Department of Commerce
Constitution Avenue & 14th Street, NW
Washington, DC 20230

Case Nos.: A-570-010, A-583-853, and
C-570-011
Number of Pages: 89
Investigation

Attention:   Enforcement and Compliance
APO/Dockets Unit, Room 1870

**THIS DOCUMENT CONTAINS NO
PROPRIETARY INFORMATION**

Re:   Certain Crystalline Silicon Photovoltaic Products from the People's Republic of
China and Taiwan: Comments on Scope

Dear Madame Secretary:

On behalf of Yingli Green Energy Holding Company Limited, Yingli Green Energy

Americas, Inc., Canadian Solar Inc., Changzhou Trina Solar Energy Co., Ltd., Wuxi Suntech

Power Co., Ltd., Shanghai JA Solar Technology Co., Ltd., Hefei JA Solar Technology, Co., Ltd.,

and Jinko Solar Co., Ltd. (collectively, "Respondents"),[1] we hereby submit the following

---

[1]      This submission is made with the support of the China Chamber of Commerce for Import
and Export of Machinery and Electronic Products ("CCCME"). CCCME represents 90 major
Chinese producers and exporters of crystalline silicon photovoltaic ("CSPV") products,
including the companies listed above, as well as Sumec Hardware & Tools Co. Ltd, ET Solar
Group, ReneSola Ltd., Wuhan FYY Technology Co., Ltd., Jetion Solar (China) Co., Ltd.,
Tainergy Tech (KunShan) Co., Ltd., Realforce Power Co., Ltd., Lightway Green New Energy
Co., Ltd., and Shenzhen Sungold Solar Co., Ltd.

# Exhibit 2

## CSPV Cells and Modules from China, Scope Clarification Memo

Barcode:3064751-01 A-570-979 INV - Investigation -



**UNITED STATES DEPARTMENT OF COMMERCE**
International Trade Administration
Washington, D.C. 20230

A-570-979
C-570-980
~~Proprietary Document~~
AD/CVD O4: JDP

*Public Version*

March 19, 2012

MEMORANDUM TO:        Gary Taverman
                      Acting Deputy Assistant Secretary
                        for Antidumping and Countervailing Duty Operations

THROUGH:              Abdelali Elouaradia
                      Director, Office 4
                      AD/CVD Operations

                      Howard Smith
                      Program Manager, Office 4
                      AD/CVD Operations

FROM:                 Jeff Pedersen
                      Case Analyst
                        AD/CVD Operations, Office 4

SUBJECT:              Scope Clarification: Antidumping and Countervailing Duty
                      Investigations of Crystalline Silicon Photovoltaic Cells, Whether
                      or Not Assembled Into Modules, from the People's Republic of
                      China

<u>Summary</u>

One day prior to the initiation of the above-referenced investigations, Petitioner[1] submitted
proposed scope language stating that the scope covers modules/panels produced in the People's
Republic of China ("PRC") regardless of where the cells in the modules/panels were
manufactured and covers modules/panels produced in a third-country from cells manufactured in
the PRC. The Department did not include this proposed language in the scope because it did not
have sufficient time to evaluate the language prior to initiation. Since that time we have
evaluated Petitioner's proposed language and, for the reasons noted below, recommend
clarifying the scope of these investigations to state that modules/panels produced in a third-
country from cells produced in the PRC are covered by the scope; however, modules/panels
produced in the PRC from cells produced in a third-country are not covered by the scope.

<u>Background</u>

On November 8, 2011, the Department of Commerce (the "Department") initiated antidumping
duty ("AD") and countervailing duty ("CVD") investigations of crystalline silicon photovoltaic

---

[1] The petitioner is SolarWorld Industries America Inc. ("Petitioner").



cells ("solar cells"), whether or not assembled into solar modules, from the PRC.[2]  In the <u>AD and CVD Initiation Notices</u> the Department noted that Petitioner submitted revised scope language one day before initiation.  The revised language included, among other things, the following substantive provision:

> These proceedings cover … crystalline silicon PV modules/panels produced in the PRC, regardless of country of manufacture of the cells used to produce the modules or panels, … and crystalline silicon PV modules or panels produced in a third country from crystalline silicon PV cells manufactured in the PRC … .

<u>See</u> <u>AD Initiation Notice</u>, 76 FR at 70960; <u>CVD Initiation Notice</u>, 76 FR at 70967; <u>see also</u> Standing Analysis and Revised Scope Language:  Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China dated November 7, 2011 at Attachment 2.

The Department stated in the <u>AD and CVD Initiation Notices</u> that it has not adopted this specific revision recommended by Petitioner for the purposes of initiation.  The Department explained that because the recommendation was filed one day prior to the statutory deadline for initiation the Department did not have sufficient time nor the administrative resources to evaluate Petitioner's proposed language regarding merchandise produced using inputs from third-country markets, or merchandise processed in third-country markets.[3]

The <u>AD and CVD Initiation Notices</u> set aside a period for interested parties to raise issues regarding product coverage.  On November 28, 2011, we received comments from Petitioner, and the following interested parties:  SolarOne Solutions; Yingli Green Energy Holding Company Limited and Yingli Green Energy Americas, Inc. (collectively, "Yingli"); Canadian Solar Inc. ("Canadian Solar"); Wuxi Suntech Power Co., Ltd., Suntech America, Inc. and Suntech Arizona, Inc. (collectively, "Suntech"); Changzhou Trina Solar Energy Co. Ltd. ("Trina Solar"); DelSolar Co. Ltd. and DelSolar (Wujiang) Ltd. (collectively, "DelSolar"); tenKsolar (Shanghai) Co., Ltd. ("tenK"); Jiangsu Green Power PV Co., Ltd. ("Jiangsu Green"); Transform Solar; Suniva; Q-Cells North America; Hanwha SolarOne ("Qidong") Co., Ltd. ("SolarOne"); Shanghai BYD Company Limited ("Shanghai BYD"); and Konca Solar Cell Co., Ltd.  On December 1, 2011, SunPower Corporation submitted rebuttal comments, as did Yingli, Canadian Solar, Suntech, and Trina Solar on December 5, 2011, and Petitioner on December 13, 2011.[4]

---

[2] <u>See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China:  Initiation of Antidumping Duty Investigation</u>, 76 FR 70960 (November 16, 2011) ("<u>AD Initiation Notice</u>"); <u>Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China:  Initiation of Countervailing Duty Investigation</u>, 76 FR 70966 (November 16, 2011) ("<u>CVD Initiation Notice</u>") (collectively "<u>AD and CVD Initiation Notices</u>").
[3] <u>See AD Initiation Notice</u>, 76 FR at 70960; <u>CVD Initiation Notice</u>, 76 FR at 70967.
[4] SolarOne, Shanghai BYD, tenK, Jiangsu Green, Zamp Solar, LLC, and Petitioner also submitted additional comments on the scope of this investigation but they were not applicable to the issue covered in this memorandum, country-of-origin.

Barcode:3181443-01 A-570-010 INV - Investigation -

Barcode:3064751-01 A-570-979 INV - Investigation -

Scope

The scope from the AD and CVD Initiation Notices is as follows:

The merchandise covered by this investigation are crystalline silicon photovoltaic cells, and modules, laminates, and panels, consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including, but not limited to, modules, laminates, panels and building integrated materials.

This investigation covers crystalline silicon photovoltaic cells of thickness equal to or greater than 20 micrometers, having a p/n junction formed by any means, whether or not the cell has undergone other processing, including, but not limited to, cleaning, etching, coating, and/or addition of materials (including, but not limited to, metallization and conductor patterns) to collect and forward the electricity that is generated by the cell.

Subject merchandise may be described at the time of importation as parts for final finished products that are assembled after importation, including, but not limited to, modules, laminates, panels, building-integrated modules, building-integrated panels, or other finished goods kits. Such parts that otherwise meet the definition of subject merchandise are included in the scope of this investigation.

Excluded from the scope of this investigation are thin film photovoltaic products produced from amorphous silicon (a-Si), cadmium telluride (CdTe), or copper indium gallium selenide (CIGS).

Also excluded from the scope of this investigation are crystalline silicon photovoltaic cells, not exceeding 10,000mm$^2$ in surface area, that are permanently integrated into a consumer good whose function is other than power generation and that consumes the electricity generated by the integrated crystalline silicon photovoltaic cell. Where more than one cell is permanently integrated into a consumer good, the surface area for purposes of this exclusion shall be the total combined surface area of all cells that are integrated into the consumer good.

Merchandise covered by this investigation is currently classified in the Harmonized Tariff System of the United States ("HTSUS") under subheadings 8501.61.0000, 8507.20.80, 8541.40.6020 and 8541.40.6030. These HTSUS subheadings are provided for convenience and customs purposes; the written description of the scope of this investigation is dispositive.

Parties' Comments

Petitioner:

    o   The only way to address the material injury caused by Chinese cells and modules/panels is to include both modules/panels produced in the PRC regardless of

3

cell origin and Chinese cells incorporated into modules/panels produced in third-countries in the scope of the investigations.

- o Not including language specifically covering third-country solar modules/panels made from PRC solar cells and PRC solar modules/panels made from third-country solar cells creates an unenforceable scope that can be easily circumvented.
- o Solar cell production and solar module assembly are equally import steps in producing a finished solar module.
- o Nearly all solar cell production is dedicated to producing solar modules/panels and all solar module/panel assembly relies on solar cells.
- o Some countervailable subsidies are specific to the production of solar modules/panels and other subsidies are available to production of both solar cells and solar modules/panels. Both types of subsidies demonstrate that module assembly, in addition to cell production, is an important stage of production.

Other Interested Parties:

- o The Department should reject Petitioner's attempt to expand the scope and not accept actions that would serve to evade the statutory standing requirements and the possibility of polling.
- o Petitioner has asked the Department to adopt two conflicting country-of-origin tests for purposes of these investigations.
- o The scope should be limited to solar cells made in the PRC or at most products containing solar cells made in the PRC.
- o The scope should not include solar modules/panels made from cells not manufactured in the PRC because a substantial transformation analysis indicates that assembling solar cells into solar modules/panels does not change the country-of-origin.
- o Solar module/panel assembly does not constitute substantial transformation because:
  - ▪ Solar cells represent the majority of the total cost of solar modules/panels.
  - ▪ The manufacture of solar cells is the technologically-critical portion of the production of solar modules/panels. Solar module/panel assembly is a low-tech final assembly requiring relatively unskilled labor.
  - ▪ Solar module power output is determined by the solar cells in the solar module/panel and not solar module/panel assembly.
  - ▪ Solar cells and solar modules/panels have the same end-use.
- o Including scope language to capture solar modules assembled in the PRC, regardless of where the cells were manufactured and solar modules assembled in third countries from cells manufactured in the PRC, would ignore judicial precedent stating that the scope of an antidumping duty order is "defined by the type of merchandise and the country-of-origin." [5]

---

[5] See Notice of Final Determination of Sales at Less Than Fair Value: Certain Cold-Rolled Carbon Steel Flat Products from Argentina, 58 FR 37062, 37065 (July 9, 1993) ("Cold-Rolled from Argentina") and noting that this statement was quoted by the Court of International Trade ("CIT") twice in Advanced Tech & Materials Co., Ltd. v. United States, No. 09-511, 2011 Ct. Intl. Trade LEXIS 136, *11 (CIT Oct. 12, 2011) ("Advanced Tech.") and Ugine and ALZ Belgium, N.V. v. United States, 517 F. Supp. 2d 1333, 1345 (CIT 2007) ("Ugine").

4

Barcode:3181443-01 A-570-010 INV - Investigation -

Barcode:3064751-01 A-570-979 INV - Investigation -

On March 7, 2012, and March 14, 2012, Petitioner and tenK, respectively submitted further comments concerning product coverage. Due to the timing of the submissions, we have been unable to consider these comments in this decision. We will consider these comments at a later date.

## Legal Framework

The scope of these investigations and the International Trade Commission final determination will determine the scope of any resulting AD and CVD orders. Because AD and CVD orders apply to merchandise from particular countries, determining the country where the merchandise is produced is fundamental to proper administration and enforcement of the AD and CVD statute. The scope of an AD or CVD order is limited to merchandise that originates in the country covered by the order.[6] The Department has explicitly stated that the scope of an antidumping duty order is "defined by the type of merchandise and the country-of-origin."[7]

In determining the country-of-origin of a product, the Department's practice has been to conduct a substantial transformation analysis.[8] The CIT has upheld the Department's "substantial transformation" analysis as a means to carry out its country-of-origin analysis.[9] The CIT stated that "{t}he 'substantial transformation' rule provides a 'yardstick for determining whether the processes performed on merchandise in a country are of such significance as to require that the resulting merchandise be considered the product of the country in which the transformation occurred."[10] Because the Petitioner's proposed scope language addresses modules/panels assembled, and cells produced, in a third country we have used a substantial transformation analysis to determine whether one or both of the scenarios described by Petitioner should be covered by the scope of these investigations.

## Analysis

The Department has applied, as appropriate, the following analyses in determining whether substantial transformation occurs, thereby changing a product's country-of-origin. These have

---

[6] See Stainless Steel Plate in Coils from Belgium: Final Results of Antidumping Duty Administrative Review, 69 FR 74495 (December 14, 2004) and the accompanying Issues and Decision Memorandum at Comment 4 ("SSPC Belgium").
[7] In Cold-Rolled from Argentina, 58 FR at 37065, the Department stated that "{t}he scope of an antidumping or countervailing duty order is defined by the type of merchandise and by the country of origin (e.g., widgets from Ruritania). For merchandise to be subject to an order it must meet both parameters, i.e., product type and country of origin. In determining country of origin for scope purposes, the Department applies a 'substantial transformation' rule." As noted above, this language was quoted by the CIT twice in Advanced Tech. at *11 and Ugine, 517 F. Supp. 2d at 1345.
[8] See, e.g., Notice of Final Determination of Sales at Less Than Fair Value: Glycine from India, 73 FR 16640 (March 28, 2008), and accompanying Issues and Decision Memorandum at Comment 5; see also SSPC Belgium, and accompanying Issues and Decision Memorandum at Comment 4.
[9] See E.I. DuPont De Nemours & Company, v. United States, 8 F. Supp. 2d 854, 858 (CIT 1998) ("Dupont").
[10] See Dupont (referencing Smith Corona Corp. v. United States, 811 F. Supp. 692, 695 (CIT 1993) as "noting that in determining if merchandise exported from an intermediate country is covered by an antidumping order, Commerce identified the country of origin by considering whether the essential component is substantially transformed in the country of exportation").

5

included:  1) whether the processed downstream product falls into a different class or kind of product when compared to the upstream product; 2) whether the essential component of the merchandise is substantially transformed in the country of exportation; or 3) the extent of processing.[11]  We have examined these criteria in conducting our substantial transformation analysis:

Class or Kind

The Department "has generally found that substantial transformation has taken place when the upstream and downstream products fall within two different 'classes or kinds' of merchandise.... Conversely, the Department almost invariably determines substantial transformation has not taken place when both products are within the same 'class or kind'."[12]  The merchandise subject to an investigation, i.e., the class or kind of merchandise to be investigated, is described in the scope.  The scope of these investigations covers both solar cells and solar modules/panels.[13]  Thus solar cells and solar modules/panels are within the same "class or kind" of product.  We further note that the International Trade Commission ("ITC") in its companion preliminary determination defined solar cells and solar modules/panels as one domestic like product.[14]

Essential Component

In examining whether the essential component of the merchandise is substantially transformed in the country of exportation, the Department considers whether processing in the exporting country changes the important qualities or use of the component.[15]  The essential component of solar modules/panels is the solar cell since the purpose of solar modules/panels is to convert sunlight into electricity and this process occurs in the solar cells.[16]  Thus, in this case, the Department is considering whether the processing of solar cells into solar modules/panels changes the nature or use of the solar cells.

Module/panel assembly does not change the important qualities, i.e., the physical or chemical characteristics, of the solar cell itself.  As stated in the original petition, solar cells are made from crystalline silicon wafers.  A dopant, which is a trace impurity element diffused into a thin layer of the wafers' surface to impart an opposite electrical orientation to the cell surface, creates the positive/negative junction that is needed for the conversion of sunlight into electricity, which is the purpose of solar cells.  Solar cells are normally coated with silicon nitride to increase light

---

[11] See, e.g., Notice of Final Determination of Sales at Less Than Fair Value: Glycine from India, 73 FR 16640 (March 28, 2008), and accompanying Issues and Decision Memorandum at Comment 5.
[12] See Notice of Final Determination of Sales at Less Than Fair Value: Wax and Wax/Resin Thermal Transfer Ribbons from France, 69 FR 10674, 10675-10676 (March 8, 2004).
[13] See AD Initiation Notice, 76 FR at 70965 and CVD Initiation Notice, 76 FR at 70970.
[14] See Crystalline Silicon Photovoltaic Cells and Modules from China: Investigation Nos. 701-TA-481 and 731-TA-1190 (Preliminary), USITC Publication 4295 (December 2011) ("ITC Solar Cells and Modules Prelim") at 11.
[15] See also Erasable Programmable Read Only Memories (EPROMs) From Japan: Final Determination of Sales at Less Than Fair Value, 51 FR 39680, 39691-39692 (October 30, 1986) ("EPROMs").
[16] See Petition at Exhibit II-19 at 3.

6

absorption (this results in a blue-purple color) and undergo a screening process where conductive metal is printed into the cell. Metal conduits or busbars channel electricity generated by the cell into electricity collection points.[17] None of these characteristics are changed during module/panel assembly. Petitioner, Trina Solar, a mandatory respondent, and the ITC all describe module assembly as stringing together 60 or 72 solar cells, laminating them, and fitting them in a glass-covered aluminum frame.[18] These processes do not change the basic nature of a solar cell. Moreover, the function of a solar cell is not changed when assembled into modules/panels; the cell still functions to convert sunlight into electricity. The ITC also noted that "the physical characteristics and functions of cells and solar modules essentially are the same."[19] The purpose of both solar cells and solar modules/panels is to convert sunlight into electricity. Thus, neither the physical qualities nor the function of solar cells are changed when they are assembled into modules/panels.

The instant case is similar to EPROMs.[20] In EPROMs, the scope of the investigation included processed wafers and dice. In that case, the issue was whether processed wafers and dice that were produced in Japan, yet encapsulated in a third country, became a product of the country where the encapsulation occurred. The Department determined that the processed wafers or dice were not just a major component of the finished device, rather they were "the essential active component{s} which define{d} the merchandise under investigation."[21] The Department further found that the assembly process in the third country was not a sophisticated process.[22] Accordingly, the encapsulation of processed wafers or dice in a third country did not qualify as substantial transformation for purposes of determining country-of-origin. Similarly, solar module assembly connects cells into their final end-use form but does not change the "essential active component," the solar cell, which defines the module/panel.

Extent of Processing

When considering the extent of processing, we examine whether the processing was substantial and/or sophisticated.[23] As noted above, module/panel assembly consists of stringing together solar cells, laminating them, and fitting them in a glass-covered aluminum frame for protection. Thus, this stage of production is principally an assembly process. Numerous interested parties, aside from Petitioner, argued that solar module/panel assembly is relatively insubstantial in terms of number of steps, inputs, research and development required, and time.[24] Consistent with these arguments, Trina Solar identified six stages of production when manufacturing solar

---

[17] See Petition for the Imposition of Antidumping and Countervailing Duties: Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China, dated October 19, 2011 ("Petition") at Exhibit II-19 at 3.
[18] See Petition at Exhibit A-26. See also ITC Solar Cells and Modules Prelim at 6 and 10.
[19] See ITC Solar Cells and Modules Prelim at 10.
[20] See EPROMs.
[21] See EPROMs, 51 FR at 39692.
[22] See id.
[23] See, e.g., Notice of Final Determination of Sales at Not Less Than Fair Value: Wax and Wax/Resin Thermal Transfer Ribbon from the Republic of Korea, 69 FR 17645, 17647 (April 5, 2004).
[24] See November 28, 2011 scope comments submitted by tenK, Transform Solar, Suniva, and Q-Cells North America.

7

Barcode:3181443-01 A-570-010 INV - Investigation  -

Barcode:3064751-01 A-570-979 INV - Investigation  -

modules/panels, five of which were dedicated to solar cell production and only one pertained to solar module/panel assembly.[25]  Petitioner and the ITC also indicated that solar module assembly is one stage of production.[26]  Petitioner and Trina Solar also reported consuming many more types of inputs in cell production compared with module assembly.[27]  Further, Trina Solar reported a production time for solar cells that is [          ] of module assembly.[28]  Accordingly, the assembly of solar cells into solar modules does not rise to the level of changing the country-of-origin of the subject merchandise.

Based on our analysis of the foregoing factors we find that solar module assembly does not substantially transform solar cells such that it changes their country-of-origin.  Solar cells and solar modules/panels are within the same class of merchandise.  Further, module assembly does not substantially alter the essential nature of solar cells nor does it constitute significant processing such that it changes the country-of-origin of the cell, as it is an assembly process that only strings cells together, adding a protective covering and an aluminum base.  Therefore, we believe the scope should be clarified to state that modules/panels produced in a third-country from solar cells produced in the PRC are covered by the scope; however, modules/panels produced in the PRC from solar cells produced in a third-country are not covered by the scope.

While we understand the intent of Petitioner's argument that the scope should cover solar modules/panels produced in the PRC, regardless of the origin of the solar cells, this is not tenable because doing so would either necessitate making inconsistent country-of-origin determinations for a single product,[29] or require ignoring the country-of-origin when considering whether merchandise entering the United States is covered by the scope of these investigations.  A product can only have one country-of-origin for AD/CVD purposes, and AD and CVD investigations only cover products with a country-of-origin that is the country under investigation.[30]  Petitioner has not cited any example where the Department has found that a product could have two countries-of-origin.  Thus, while the Department is not excluding solar modules/panels from the scope of these investigations, in conjunction with the above described substantial transformation analysis, we are clarifying that where solar cell production occurs in a different country from solar module assembly, the country-of-origin of the solar modules/panels is the country in which the solar cell was produced.

---

[25] See also Trina Solar's January 10, 2012 Section A response at Exhibit A-26.

[26] See Petition at Exhibit A-26.  See also ITC Solar Cells and Modules Prelim at 11 where the ITC noted in its preliminary determination that the "{p}roduction of the finished product, modules, involves four primary steps – crystallization, wafer production, cell conversion, and module assembly – along with packing and inspection of the final product. {Solar} cells undergo only one additional production step, the assembly into modules, before transformation into the finished product."

[27] See Trina Solar's February 6, 2012 Section D response at Exhibit D-4.  See also Petition at Exhibits II-19 and II-20.

[28] See Trina Solar's February 6, 2012 Section D response at Exhibit D-4.

[29] Namely, finding that module assembly in the PRC using solar cells produced in a third-country constitutes substantial transformation and thus the country of origin of the module is the PRC while also finding that module assembly outside the PRC using PRC produced solar cells does not constitute substantial transformation and thus the country of origin of the module is the country where the solar cells were produced, the PRC.

[30] See Cold-Rolled from Argentina, 58 FR at 37065.

8

Barcode:3181443-01 A-570-010 INV - Investigation   -

Barcode:3064751-01 A-570-979 INV - Investigation   -

Petitioner's claim that not adopting their proposed language in the scope creates an unenforceable scope that can be easily circumvented. While we acknowledge that the Department has on occasion explicitly addressed the possibility of circumvention as a consideration in determining the country-of-origin of merchandise under investigation, circumvention is not the sole or controlling factor relied upon in making a country-of-origin determination.[31] Nonetheless, whether explicitly stated or not, the factors we consider for making country-of-origin determinations inherently reflect the agency's concern that the relief afforded by AD/CVD orders not be eviscerated by moving minor processing outside of the country covered by the order. Thus, circumvention concerns are reflected in the country-of-origin determination. As stated above, adopting the language proposed by Petitioner would result in two inconsistent country-of-origin determinations.

The Department routinely meets with U.S. Customs and Border Protection ("CBP") to ensure that our AD/CVD orders are enforced. Towards that end, and with respect to these cases in particular, the Department has begun an inter-agency dialogue with CBP that is designed to fulfill that goal. Specifically, Import Administration and CBP staff are meeting to develop procedures which will ensure that Chinese solar cells subject to any potential duties are properly identified at the border. Efforts to evade enforcement will be identified and thwarted. While the Department works closely with CBP, if an importer is declaring the wrong country-of-origin for imported merchandise, this is a matter appropriately dealt with by CBP. Lastly, Petitioner has the option of bringing additional petitions to address any dumping concerns it has regarding solar modules/panels assembled from solar cells produced in a third country.

---

[31] As demonstrated above, the Department considers various factors in a substantial transformation analysis.

9

## Recommendation

We recommend that the Department find that solar module/panel assembly does not constitute substantial transformation of the solar cells included in the module.  We further recommend clarifying the scope of these investigations to state that modules/panels produced in a third-country from cells produced in the PRC are covered by the scope; however, modules/panels produced in the PRC from cells produced in a third-country are not covered by the scope.[32]

_____✓_____        _____
Agree                          Disagree

_____
Gary Taverman
Acting Deputy Assistant Secretary
  for Antidumping and Countervailing Duty Operations

_____3\19\12_____
Date

---

[32] See Attachment I.

10

## Attachment I

## Scope of the Investigation

The merchandise covered by this investigation are crystalline silicon photovoltaic cells, and modules, laminates, and panels, consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including, but not limited to, modules, laminates, panels and building integrated materials.

This investigation covers crystalline silicon photovoltaic cells of thickness equal to or greater than 20 micrometers, having a p/n junction formed by any means, whether or not the cell has undergone other processing, including, but not limited to, cleaning, etching, coating, and/or addition of materials (including, but not limited to, metallization and conductor patterns) to collect and forward the electricity that is generated by the cell.

Subject merchandise may be described at the time of importation as parts for final finished products that are assembled after importation, including, but not limited to, modules, laminates, panels, building-integrated modules, building-integrated panels, or other finished goods kits. Such parts that otherwise meet the definition of subject merchandise are included in the scope of this investigation.

Excluded from the scope of this investigation are thin film photovoltaic products produced from amorphous silicon (a-Si), cadmium telluride (CdTe), or copper indium gallium selenide (CIGS).

Also excluded from the scope of this investigation are crystalline silicon photovoltaic cells, not exceeding 10,000mm$^2$ in surface area, that are permanently integrated into a consumer good whose function is other than power generation and that consumes the electricity generated by the integrated crystalline silicon photovoltaic cell. Where more than one cell is permanently integrated into a consumer good, the surface area for purposes of this exclusion shall be the total combined surface area of all cells that are integrated into the consumer good.

Modules, laminates, and panels produced in a third-country from cells produced in the PRC are covered by this investigation; however, modules, laminates, and panels produced in the PRC from cells produced in a third-country are not covered by this investigation.

Merchandise covered by this investigation is currently classified in the Harmonized Tariff System of the United States ("HTSUS") under subheadings 8501.61.0000, 8507.20.80, 8541.40.6020 and 8541.40.6030. These HTSUS subheadings are provided for convenience and customs purposes; the written description of the scope of this investigation is dispositive.

# Tab 7

# CVD P.R. Doc. 87

**Scope Clarification (Mar. 19, 2012), Exhibit 2 to Comments on Scope submitted on behalf of Yingli Green Energy Holding Company Limited et al. (Feb. 18, 2014)**



SIDLEY AUSTIN LLP
1501 K STREET, N.W.
WASHINGTON, D.C. 20005
(202) 736 8000
(202) 736 8711 FAX

BEIJING        HONG KONG       SHANGHAI
BOSTON         HOUSTON         SINGAPORE
BRUSSELS       LONDON          SYDNEY
CHICAGO        LOS ANGELES     TOKYO
DALLAS         NEW YORK        WASHINGTON, D.C.
FRANKFURT      PALO ALTO
GENEVA         SAN FRANCISCO

nellis@sidley.com
202.736.8075

FOUNDED 1866

## PUBLIC DOCUMENT

February 18, 2014

The Honorable Penny Pritzker
Secretary of Commerce
U.S. Department of Commerce
Constitution Avenue & 14th Street, NW
Washington, DC 20230

Case Nos.: A-570-010, A-583-853, and
C-570-011
Number of Pages: 89
Investigation

Attention:    Enforcement and Compliance
              APO/Dockets Unit, Room 1870

**THIS DOCUMENT CONTAINS NO
PROPRIETARY INFORMATION**

Re:    Certain Crystalline Silicon Photovoltaic Products from the People's Republic of
       China and Taiwan: Comments on Scope

Dear Madame Secretary:

On behalf of Yingli Green Energy Holding Company Limited, Yingli Green Energy

Americas, Inc., Canadian Solar Inc., Changzhou Trina Solar Energy Co., Ltd., Wuxi Suntech

Power Co., Ltd., Shanghai JA Solar Technology Co., Ltd., Hefei JA Solar Technology, Co., Ltd.,

and Jinko Solar Co., Ltd. (collectively, "Respondents"),[1] we hereby submit the following

---

[1]    This submission is made with the support of the China Chamber of Commerce for Import
and Export of Machinery and Electronic Products ("CCCME"). CCCME represents 90 major
Chinese producers and exporters of crystalline silicon photovoltaic ("CSPV") products,
including the companies listed above, as well as Sumec Hardware & Tools Co. Ltd, ET Solar
Group, ReneSola Ltd., Wuhan FYY Technology Co., Ltd., Jetion Solar (China) Co., Ltd.,
Tainergy Tech (KunShan) Co., Ltd., Realforce Power Co., Ltd., Lightway Green New Energy
Co., Ltd., and Shenzhen Sungold Solar Co., Ltd.

Barcode:3181444-01 C-570-011 INV - Investigation

# Exhibit 2

## CSPV Cells and Modules from China,
## Scope Clarification Memo

**UNITED STATES DEPARTMENT OF COMMERCE**
**International Trade Administration**
Washington, D.C. 20230

A-570-979
C-570-980
~~Proprietary Document~~
AD/CVD O4: JDP

*Public Version*

March 19, 2012

MEMORANDUM TO:    Gary Taverman
                  Acting Deputy Assistant Secretary
                    for Antidumping and Countervailing Duty Operations

THROUGH:          Abdelali Elouaradia
                  Director, Office 4
                  AD/CVD Operations

                  Howard Smith
                  Program Manager, Office 4
                  AD/CVD Operations

FROM:             Jeff Pedersen
                  Case Analyst
                    AD/CVD Operations, Office 4

SUBJECT:          Scope Clarification: Antidumping and Countervailing Duty
                  Investigations of Crystalline Silicon Photovoltaic Cells, Whether
                  or Not Assembled Into Modules, from the People's Republic of
                  China

<u>Summary</u>

One day prior to the initiation of the above-referenced investigations, Petitioner[1] submitted proposed scope language stating that the scope covers modules/panels produced in the People's Republic of China ("PRC") regardless of where the cells in the modules/panels were manufactured and covers modules/panels produced in a third-country from cells manufactured in the PRC. The Department did not include this proposed language in the scope because it did not have sufficient time to evaluate the language prior to initiation. Since that time we have evaluated Petitioner's proposed language and, for the reasons noted below, recommend clarifying the scope of these investigations to state that modules/panels produced in a third-country from cells produced in the PRC are covered by the scope; however, modules/panels produced in the PRC from cells produced in a third-country are not covered by the scope.

<u>Background</u>

On November 8, 2011, the Department of Commerce (the "Department") initiated antidumping duty ("AD") and countervailing duty ("CVD") investigations of crystalline silicon photovoltaic

---

[1] The petitioner is SolarWorld Industries America Inc. ("Petitioner").



Barcode:3181444-01 C-570-011 INV - Investigation

Barcode:3064751-01 A-570-979 INV - Investigation -

cells ("solar cells"), whether or not assembled into solar modules, from the PRC.[2]  In the <u>AD and CVD Initiation Notices</u> the Department noted that Petitioner submitted revised scope language one day before initiation.  The revised language included, among other things, the following substantive provision:

> These proceedings cover ... crystalline silicon PV modules/panels produced in the PRC, regardless of country of manufacture of the cells used to produce the modules or panels, ... and crystalline silicon PV modules or panels produced in a third country from crystalline silicon PV cells manufactured in the PRC ... .

<u>See AD Initiation Notice</u>, 76 FR at 70960; <u>CVD Initiation Notice</u>, 76 FR at 70967; <u>see also</u> Standing Analysis and Revised Scope Language:  Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China dated November 7, 2011 at Attachment 2.

The Department stated in the <u>AD and CVD Initiation Notices</u> that it has not adopted this specific revision recommended by Petitioner for the purposes of initiation.  The Department explained that because the recommendation was filed one day prior to the statutory deadline for initiation the Department did not have sufficient time nor the administrative resources to evaluate Petitioner's proposed language regarding merchandise produced using inputs from third-country markets, or merchandise processed in third-country markets.[3]

The <u>AD and CVD Initiation Notices</u> set aside a period for interested parties to raise issues regarding product coverage.  On November 28, 2011, we received comments from Petitioner, and the following interested parties:  SolarOne Solutions; Yingli Green Energy Holding Company Limited and Yingli Green Energy Americas, Inc. (collectively, "Yingli"); Canadian Solar Inc. ("Canadian Solar"); Wuxi Suntech Power Co., Ltd., Suntech America, Inc. and Suntech Arizona, Inc. (collectively, "Suntech"); Changzhou Trina Solar Energy Co. Ltd. ("Trina Solar"); DelSolar Co. Ltd. and DelSolar (Wujiang) Ltd. (collectively, "DelSolar"); tenKsolar (Shanghai) Co., Ltd. ("tenK"); Jiangsu Green Power PV Co., Ltd. ("Jiangsu Green"); Transform Solar; Suniva; Q-Cells North America; Hanwha SolarOne ("Qidong") Co., Ltd. ("SolarOne"); Shanghai BYD Company Limited ("Shanghai BYD"); and Konca Solar Cell Co., Ltd.  On December 1, 2011, SunPower Corporation submitted rebuttal comments, as did Yingli, Canadian Solar, Suntech, and Trina Solar on December 5, 2011, and Petitioner on December 13, 2011.[4]

---

[2] <u>See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China:  Initiation of Antidumping Duty Investigation</u>, 76 FR 70960 (November 16, 2011) ("<u>AD Initiation Notice</u>"); <u>Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China:  Initiation of Countervailing Duty Investigation</u>, 76 FR 70966 (November 16, 2011) ("<u>CVD Initiation Notice</u>") (collectively "<u>AD and CVD Initiation Notices</u>").
[3] <u>See AD Initiation Notice</u>, 76 FR at 70960; <u>CVD Initiation Notice</u>, 76 FR at 70967.
[4] SolarOne, Shanghai BYD, tenK, Jiangsu Green, Zamp Solar, LLC, and Petitioner also submitted additional comments on the scope of this investigation but they were not applicable to the issue covered in this memorandum, country-of-origin.

2

## Scope

The scope from the <u>AD and CVD Initiation Notices</u> is as follows:

The merchandise covered by this investigation are crystalline silicon photovoltaic cells, and modules, laminates, and panels, consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including, but not limited to, modules, laminates, panels and building integrated materials.

This investigation covers crystalline silicon photovoltaic cells of thickness equal to or greater than 20 micrometers, having a p/n junction formed by any means, whether or not the cell has undergone other processing, including, but not limited to, cleaning, etching, coating, and/or addition of materials (including, but not limited to, metallization and conductor patterns) to collect and forward the electricity that is generated by the cell.

Subject merchandise may be described at the time of importation as parts for final · finished products that are assembled after importation, including, but not limited to, modules, laminates, panels, building-integrated modules, building-integrated panels, or other finished goods kits.  Such parts that otherwise meet the definition of subject merchandise are included in the scope of this investigation.

Excluded from the scope of this investigation are thin film photovoltaic products produced from amorphous silicon (a-Si), cadmium telluride (CdTe), or copper indium gallium selenide (CIGS).

Also excluded from the scope of this investigation are crystalline silicon photovoltaic cells, not exceeding 10,000mm$^2$ in surface area, that are permanently integrated into a consumer good whose function is other than power generation and that consumes the electricity generated by the integrated crystalline silicon photovoltaic cell.  Where more than one cell is permanently integrated into a consumer good, the surface area for purposes of this exclusion shall be the total combined surface area of all cells that are integrated into the consumer good.

Merchandise covered by this investigation is currently classified in the Harmonized Tariff System of the United States ("HTSUS") under subheadings 8501.61.0000, 8507.20.80, 8541.40.6020 and 8541.40.6030.  These HTSUS subheadings are provided for convenience and customs purposes; the written description of the scope of this investigation is dispositive.

## Parties' Comments

Petitioner:

    o   The only way to address the material injury caused by Chinese cells and modules/panels is to include both modules/panels produced in the PRC regardless of

3

Barcode:3161444-01 C-570-011 INV - Investigation

Barcode:3064751-01 A-570-979 INV - Investigation  -

cell origin and Chinese cells incorporated into modules/panels produced in third-countries in the scope of the investigations.

o· Not including language specifically covering third-country solar modules/panels made from PRC solar cells and PRC solar modules/panels made from third-country solar cells creates an unenforceable scope that can be easily circumvented.

o  Solar cell production and solar module assembly are equally import steps in producing a finished solar module.

o  Nearly all solar cell production is dedicated to producing solar modules/panels and all solar module/panel assembly relies on solar cells.

o  Some countervailable subsidies are specific to the production of solar modules/panels and other subsidies are available to production of both solar cells and solar modules/panels.  Both types of subsidies demonstrate that module assembly, in addition to cell production, is an important stage of production.

Other Interested Parties:

o  The Department should reject Petitioner's attempt to expand the scope and not accept actions that would serve to evade the statutory standing requirements and the possibility of polling.

o  Petitioner has asked the Department to adopt two conflicting country-of-origin tests for purposes of these investigations.

o  The scope should be limited to solar cells made in the PRC or at most products containing solar cells made in the PRC.

o  The scope should not include solar modules/panels made from cells not manufactured in the PRC because a substantial transformation analysis indicates that assembling solar cells into solar modules/panels does not change the country-of-origin.

o  Solar module/panel assembly does not constitute substantial transformation because:

  ▪  Solar cells represent the majority of the total cost of solar modules/panels. ·
  ▪  The manufacture of solar cells is the technologically-critical portion of the . production of solar modules/panels.  Solar module/panel assembly is a low-tech final assembly requiring relatively unskilled labor.
  ▪  Solar module power output is determined by the solar cells in the solar module/panel and not solar module/panel assembly.
  ▪  Solar cells and solar modules/panels have the same end-use.

o  Including scope language to capture solar modules assembled in the PRC, regardless of where the cells were manufactured and solar modules assembled in third countries from cells manufactured in the PRC, would ignore judicial precedent stating that the scope of an antidumping duty order is "defined by the type of merchandise and the country-of-origin." [5]

---

[5] See Notice of Final Determination of Sales at Less Than Fair Value: Certain Cold-Rolled Carbon Steel Flat Products from Argentina, 58 FR 37062, 37065 (July 9, 1993) ("Cold-Rolled from Argentina") and noting that this statement was quoted by the Court of International Trade ("CIT") twice in Advanced Tech & Materials Co., Ltd. v. United States, No. 09-511, 2011 Ct. Intl. Trade LEXIS 136, *11 (CIT Oct. 12, 2011) ("Advanced Tech.") and Ugine and ALZ Belgium, N.V. v. United States, 517 F. Supp. 2d 1333, 1345 (CIT 2007) ("Ugine").

4

Barcode:3181444-01 C-570-011 INV - Investigation

Barcode:3064751-01 A-570-979 INV - Investigation -

On March 7, 2012, and March 14, 2012, Petitioner and tenK, respectively submitted further comments concerning product coverage. Due to the timing of the submissions, we have been unable to consider these comments in this decision. We will consider these comments at a later date.

## Legal Framework

The scope of these investigations and the International Trade Commission final determination will determine the scope of any resulting AD and CVD orders. Because AD and CVD orders apply to merchandise from particular countries, determining the country where the merchandise is produced is fundamental to proper administration and enforcement of the AD and CVD statute. The scope of an AD or CVD order is limited to merchandise that originates in the country covered by the order.[6] The Department has explicitly stated that the scope of an antidumping duty order is "defined by the type of merchandise and the country-of-origin."[7]

In determining the country-of-origin of a product, the Department's practice has been to conduct a substantial transformation analysis.[8] The CIT has upheld the Department's "substantial transformation" analysis as a means to carry out its country-of-origin analysis.[9] The CIT stated that "{t}he 'substantial transformation' rule provides a yardstick for determining whether the processes performed on merchandise in a country are of such significance as to require that the resulting merchandise be considered the product of the country in which the transformation occurred."[10] Because the Petitioner's proposed scope language addresses modules/panels assembled, and cells produced, in a third country we have used a substantial transformation analysis to determine whether one or both of the scenarios described by Petitioner should be covered by the scope of these investigations.

## Analysis

The Department has applied, as appropriate, the following analyses in determining whether substantial transformation occurs, thereby changing a product's country-of-origin. These have

---

[6] See Stainless Steel Plate in Coils from Belgium: Final Results of Antidumping Duty Administrative Review, 69 FR 74495 (December 14, 2004) and the accompanying Issues and Decision Memorandum at Comment 4 ("SSPC Belgium").
[7] In Cold-Rolled from Argentina, 58 FR at 37065, the Department stated that "{t}he scope of an antidumping or countervailing duty order is defined by the type of merchandise and by the country of origin (e.g., widgets from Ruritania). For merchandise to be subject to an order it must meet both parameters, i.e., product type and country of origin. In determining country of origin for scope purposes, the Department applies a 'substantial transformation' rule." As noted above, this language was quoted by the CIT twice in Advanced Tech. at *11 and Ugine, 517 F. Supp. 2d at 1345.
[8] See, e.g., Notice of Final Determination of Sales at Less Than Fair Value: Glycine from India, 73 FR 16640 (March 28, 2008), and accompanying Issues and Decision Memorandum at Comment 5; see also SSPC Belgium, and accompanying Issues and Decision Memorandum at Comment 4.
[9] See E.I. DuPont De Nemours & Company. v. United States, 8 F. Supp. 2d 854, 858 (CIT 1998) ("Dupont").
[10] See Dupont (referencing Smith Corona Corp. v. United States, 811 F. Supp. 692, 695 (CIT 1993) as "noting that in determining if merchandise exported from an intermediate country is covered by an antidumping order, Commerce identified the country of origin by considering whether the essential component is substantially transformed in the country of exportation").

5

included:  1) whether the processed downstream product falls into a different class or kind of product when compared to the upstream product; 2) whether the essential component of the merchandise is substantially transformed in the country of exportation; or 3) the extent of processing.[11]  We have examined these criteria in conducting our substantial transformation analysis:

Class or Kind

The Department "has generally found that substantial transformation has taken place when the upstream and downstream products fall within two different 'classes or kinds' of merchandise.... Conversely, the Department almost invariably determines substantial transformation has not taken place when both products are within the same 'class or kind' of merchandise."[12]  The merchandise subject to an investigation, i.e., the class or kind of merchandise to be investigated, is described in the scope.  The scope of these investigations covers both solar cells and solar modules/panels.[13]  Thus solar cells and solar modules/panels are within the same "class or kind" of product.  We further note that the International Trade Commission ("ITC") in its companion preliminary determination defined solar cells and solar modules/panels as one domestic like product.[14]

Essential Component

In examining whether the essential component of the merchandise is substantially transformed in the country of exportation, the Department considers whether processing in the exporting country changes the important qualities or use of the component.[15]  The essential component of solar modules/panels is the solar cell since the purpose of solar modules/panels is to convert sunlight into electricity and this process occurs in the solar cells.[16]  Thus, in this case, the Department is considering whether the processing of solar cells into solar modules/panels changes the nature or use of the solar cells.

Module/panel assembly does not change the important qualities, i.e., the physical or chemical characteristics, of the solar cell itself.  As stated in the original petition, solar cells are made from crystalline silicon wafers.  A dopant, which is a trace impurity element diffused into a thin layer of the wafers' surface to impart an opposite electrical orientation to the cell surface, creates the positive/negative junction that is needed for the conversion of sunlight into electricity, which is the purpose of solar cells.  Solar cells are normally coated with silicon nitride to increase light

---

[11] See, e.g., Notice of Final Determination of Sales at Less Than Fair Value: Glycine from India, 73 FR 16640 (March 28, 2008), and accompanying Issues and Decision Memorandum at Comment 5.
[12] See Notice of Final Determination of Sales at Less Than Fair Value: Wax and Wax/Resin Thermal Transfer Ribbons from France, 69 FR 10674, 10675-10676 (March 8, 2004).
[13] See AD Initiation Notice, 76 FR at 70965 and CVD Initiation Notice, 76 FR at 70970.
[14] See Crystalline Silicon Photovoltaic Cells and Modules from China: Investigation Nos. 701-TA-481 and 731-TA-1190 (Preliminary), USITC Publication 4295 (December 2011) ("ITC Solar Cells and Modules Prelim") at 11.
[15] See also Erasable Programmable Read Only Memories (EPROMs) From Japan; Final Determination of Sales at Less Than Fair Value, 51 FR 39680, 39691-39692 (October 30, 1986) ("EPROMs").
[16] See Petition at Exhibit II-19 at 3.

6

Barcode:3181444-01 C-570-011 INV - Investigation   -

Barcode:3064751-01 A-570-979 INV - Investigation   -

absorption (this results in a blue-purple color) and undergo a screening process where conductive metal is printed into the cell. Metal conduits or busbars channel electricity generated by the cell into electricity collection points.[17] None of these characteristics are changed during module/panel assembly. Petitioner, Trina Solar, a mandatory respondent, and the ITC all describe module assembly as stringing together 60 or 72 solar cells, laminating them, and fitting them in a glass-covered aluminum frame.[18] These processes do not change the basic nature of a solar cell. Moreover, the function of a solar cell is not changed when assembled into modules/panels; the cell still functions to convert sunlight into electricity. The ITC also noted that "the physical characteristics and functions of cells and solar modules generally are the same."[19] The purpose of both solar cells and solar modules/panels is to convert sunlight into electricity. Thus, neither the physical qualities nor the function of solar cells are changed when they are assembled into modules/panels.

The instant case is similar to EPROMs.[20] In EPROMs, the scope of the investigation included processed wafers and dice. In that case, the issue was whether processed wafers and dice that were produced in Japan, yet encapsulated in a third country, became a product of the country where the encapsulation occurred. The Department determined that the processed wafers or dice were not just a major component of the finished device, rather they were "the essential active component{s} which define{d} the merchandise under investigation." [21] The Department further found that the assembly process in the third country was not a sophisticated process.[22] Accordingly, the encapsulation of processed wafers or dice in a third country did not qualify as substantial transformation for purposes of determining country-of-origin. Similarly, solar module assembly connects cells into their final end-use form but does not change the "essential active component," the solar cell, which defines the module/panel.

Extent of Processing

When considering the extent of processing, we examine whether the processing was substantial and/or sophisticated.[23] As noted above, module/panel assembly consists of stringing together solar cells, laminating them, and fitting them in a glass-covered aluminum frame for protection. Thus, this stage of production is principally an assembly process. Numerous interested parties, aside from Petitioner, argued that solar module/panel assembly is relatively insubstantial in terms of number of steps, inputs, research and development required, and time.[24] Consistent with these arguments, Trina Solar identified six stages of production when manufacturing solar

---

[17] See Petition for the Imposition of Antidumping and Countervailing Duties: Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China, dated October 19, 2011 ("Petition") at Exhibit II-19 at 3.

[18] See Petition at Exhibit A-26. See also ITC Solar Cells and Modules Prelim at 6 and 10.

[19] See ITC Solar Cells and Modules Prelim at 10.

[20] See EPROMs.

[21] See EPROMs, 51 FR at 39692.

[22] See id.

[23] See, e.g., Notice of Final Determination of Sales at Not Less Than Fair Value: Wax and Wax/Resin Thermal Transfer Ribbon from the Republic of Korea, 69 FR 17645, 17647 (April 5, 2004).

[24] See November 28, 2011 scope comments submitted by tenK, Transform Solar, Suniva, and Q-Cells North America.

7

Barcode:3181444-01 C-570-011 INV - Investigation  -

Barcode:3064751-01 A-570-979 INV - Investigation  -

modules/panels, five of which were dedicated to solar cell production and only one pertained to solar module/panel assembly.[25]  Petitioner and the ITC also indicated that solar module assembly is one stage of production.[26]  Petitioner and Trina Solar also reported consuming many more types of inputs in cell production compared with module assembly.[27]  Further, Trina Solar reported a production time for solar cells that is [          ] of module assembly.[28]  Accordingly, the assembly of solar cells into solar modules does not rise to the level of changing the country-of-origin of the subject merchandise.

Based on our analysis of the foregoing factors we find that solar module assembly does not substantially transform solar cells such that it changes the country-of-origin.  Solar cells and solar modules/panels are within the same class of merchandise.  Further, module assembly does not substantially alter the essential nature of solar cells nor does it constitute significant processing such that it changes the country-of-origin of the cell, as it is an assembly process that only strings cells together, adding a protective covering and an aluminum base.  Therefore, we believe the scope should be clarified to state that modules/panels produced in a third-country from solar cells produced in the PRC are covered by the scope; however, modules/panels produced in the PRC from solar cells produced in a third-country are not covered by the scope.

While we understand the intent of Petitioner's argument that the scope should cover solar modules/panels produced in the PRC, regardless of the origin of the solar cells, this is not tenable because doing so would either necessitate making inconsistent country-of-origin determinations for a single product,[29] or require ignoring the country-of-origin when considering whether merchandise entering the United States is covered by the scope of these investigations.  A product can only have one country-of-origin for AD/CVD purposes, and AD and CVD investigations only cover products with a country-of-origin that is the country under investigation.[30]  Petitioner has not cited any example where the Department has found that a product could have two countries-of-origin.  Thus, while the Department is not excluding solar modules/panels from the scope of these investigations, in conjunction with the above described substantial transformation analysis, we are clarifying that where solar cell production occurs in a different country from solar module assembly, the country-of-origin of the solar modules/panels is the country in which the solar cell was produced.

---

[25] See also Trina Solar's January 10, 2012 Section A response at Exhibit A-26.

[26] See Petition at Exhibit A-26.  See also ITC Solar Cells and Modules Prelim at 11 where the ITC noted in its preliminary determination that the "{p}roduction of the finished product, modules, involves four primary steps – crystallization, wafer production, cell conversion, and module assembly – along with packing and inspection of the final product. {Solar} cells undergo only one additional production step, the assembly into modules, before transformation into the finished product."

[27] See Trina Solar's February 6, 2012 Section D response at Exhibit D-4.  See also Petition at Exhibits II-19 and II-20.

[28] See Trina Solar's February 6, 2012 Section D response at Exhibit D-4.

[29] Namely, finding that module assembly in the PRC using solar cells produced in a third-country constitutes substantial transformation and thus the country of origin of the module is the PRC while also finding that module assembly outside the PRC using PRC produced solar cells does not constitute substantial transformation and thus the country of origin of the module is the country where the solar cells were produced, the PRC.

[30] See Cold-Rolled from Argentina, 58 FR at 37065.

8

Petitioner's claim that not adopting their proposed language in the scope creates an unenforceable scope that can be easily circumvented. While we acknowledge that the Department has on occasion explicitly addressed the possibility of circumvention as a consideration in determining the country-of-origin of merchandise under investigation, circumvention is not the sole or controlling factor relied upon in making a country-of-origin determination.[31] Nonetheless, whether explicitly stated or not, the factors we consider for making country-of-origin determinations inherently reflect the agency's concern that the relief afforded by AD/CVD orders not be eviscerated by moving minor processing outside of the country covered by the order. Thus, circumvention concerns are reflected in the country-of-origin determination. As stated above, adopting the language proposed by Petitioner would result in two inconsistent country-of-origin determinations.

The Department routinely meets with U.S. Customs and Border Protection ("CBP") to ensure that our AD/CVD orders are enforced. Towards that end, and with respect to these cases in particular, the Department has begun an inter-agency dialogue with CBP that is designed to fulfill that goal. Specifically, Import Administration and CBP staff are meeting to develop procedures which will ensure that Chinese solar cells subject to any potential duties are properly identified at the border. Efforts to evade enforcement will be identified and thwarted. While the Department works closely with CBP, if an importer is declaring the wrong country-of-origin for imported merchandise, this is a matter appropriately dealt with by CBP. Lastly, Petitioner has the option of bringing additional petitions to address any dumping concerns it has regarding solar modules/panels assembled from solar cells produced in a third country.

---

[31] As demonstrated above, the Department considers various factors in a substantial transformation analysis.

9

Barcode:3181444-01 C-570-011 INV - Investigation -

Barcode:3064751-01 A-570-979 INV - Investigation -

## Recommendation

We recommend that the Department find that solar module/panel assembly does not constitute substantial transformation of the solar cells included in the module. We further recommend clarifying the scope of these investigations to state that modules/panels produced in a third-country from cells produced in the PRC are covered by the scope; however, modules/panels produced in the PRC from cells produced in a third-country are not covered by the scope.[32]

_____ ✓          _____

Agree                   Disagree


_____

Gary Taverman
Acting Deputy Assistant Secretary
 for Antidumping and Countervailing Duty Operations


_____3\19\12_____

Date

_____

[32] See Attachment I.

10

**Attachment I**

**Scope of the Investigation**

The merchandise covered by this investigation are crystalline silicon photovoltaic cells, and modules, laminates, and panels, consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including, but not limited to, modules, laminates, panels and building integrated materials.

This investigation covers crystalline silicon photovoltaic cells of thickness equal to or greater than 20 micrometers, having a p/n junction formed by any means, whether or not the cell has undergone other processing, including, but not limited to, cleaning, etching, coating, and/or addition of materials (including, but not limited to, metallization and conductor patterns) to collect and forward the electricity that is generated by the cell.

Subject merchandise may be described at the time of importation as parts for final finished products that are assembled after importation, including, but not limited to, modules, laminates, panels, building-integrated modules, building-integrated panels, or other finished goods kits. Such parts that otherwise meet the definition of subject merchandise are included in the scope of this investigation.

Excluded from the scope of this investigation are thin film photovoltaic products produced from amorphous silicon (a-Si), cadmium telluride (CdTe), or copper indium gallium selenide (CIGS).

Also excluded from the scope of this investigation are crystalline silicon photovoltaic cells, not exceeding $10,000\text{mm}^2$ in surface area, that are permanently integrated into a consumer good whose function is other than power generation and that consumes the electricity generated by the integrated crystalline silicon photovoltaic cell. Where more than one cell is permanently integrated into a consumer good, the surface area for purposes of this exclusion shall be the total combined surface area of all cells that are integrated into the consumer good.

Modules, laminates, and panels produced in a third-country from cells produced in the PRC are covered by this investigation; however, modules, laminates, and panels produced in the PRC from cells produced in a third-country are not covered by this investigation.

Merchandise covered by this investigation is currently classified in the Harmonized Tariff System of the United States ("HTSUS") under subheadings 8501.61.0000, 8507.20.80, 8541.40.6020 and 8541.40.6030. These HTSUS subheadings are provided for convenience and customs purposes; the written description of the scope of this investigation is dispositive.

# Tab 8

# AD P.R. Doc. 841

## AD Notice of Initiation
## (Jan. 29, 2014)

within 30 days of publication of this notice to *OIRA_Submission@ omb.eop.gov.*

Dated: January 23, 2014.

**Gwellnar Banks,**
*Management Analyst, Office of the Chief Information Officer.*

[FR Doc. 2014–01624 Filed 1–28–14; 8:45 am]

BILLING CODE 3510-22-P

---

## DEPARTMENT OF COMMERCE

### Foreign-Trade Zones Board

[B–83–2013]

### Foreign-Trade Zone 138—Columbus, Ohio, Authorization of Production Activity, Rolls Royce Energy Systems, Inc. (Industrial Gas Turbines, Power Generation Turbines, and Generator Sets), Mount Vernon, Ohio

On September 5, 2013, the Columbus Regional Airport Authority, grantee of FTZ 138, submitted a notification of proposed production activity to the Foreign-Trade Zones (FTZ) Board on behalf of Rolls Royce Energy Systems, Inc., in Mount Vernon, Ohio.

The notification was processed in accordance with the regulations of the FTZ Board (15 CFR part 400), including notice in the **Federal Register** inviting public comment (78 FR 58995, 9–25– 2013). The FTZ Board has determined that no further review of the activity is warranted at this time. The production activity described in the notification is authorized, subject to the FTZ Act and the FTZ Board's regulations, including Section 400.14.

Dated: January 21, 2014.

**Andrew McGilvray,**
*Executive Secretary.*

[FR Doc. 2014–01579 Filed 1–28–14; 8:45 am]

BILLING CODE 3510-DS-P

---

## DEPARTMENT OF COMMERCE

### Foreign-Trade Zones Board

[B–4–2014]

### Foreign-Trade Zone (FTZ) 221—Mesa, Arizona; Notification of Proposed Production Activity; Apple Inc./GT Advanced Technologies Inc. (Components for Consumer Electronics), Mesa, Arizona

Apple Inc./GT Advanced Technologies Inc. (Apple/GT) submitted a notification of proposed production activity to the FTZ Board for its facility in Mesa, Arizona. The notification conforming to the requirements of the regulations of the FTZ Board (15 CFR 400.22) was received on January 23, 2014.

A separate application for subzone designation at the Apple/GT facility is being processed under Section 400.31 of the Board's regulations (Doc. S–5–2014). Apple/GT requested authority to manufacture intermediate components for consumer electronics for export. Pursuant to 15 CFR 400.14(b), FTZ activity would be limited to the specific foreign-status materials and components and specific finished products described in the submitted notification (as described below) and subsequently authorized by the FTZ Board.

Production under FTZ procedures could exempt Apple/GT from customs duty payments on the foreign status components listed below used in the export production of sapphire material (duty rate 6.4%). Customs duties also could possibly be deferred or reduced on foreign status production equipment.

The components and materials sourced from abroad include white alumina block, forged metal industrial heat-treating equipment and diamond cutting wire (duty rate ranges from duty-free to 1.3%).

Public comment is invited from interested parties. Submissions shall be addressed to the Board's Executive Secretary at the address below. The closing period for their receipt is March 10, 2014.

A copy of the notification will be available for public inspection at the Office of the Executive Secretary, Foreign-Trade Zones Board, Room 21013, U.S. Department of Commerce, 1401 Constitution Avenue NW., Washington, DC 20230–0002, and in the "Reading Room" section of the Board's Web site, which is accessible via *www.trade.gov/ftz.*

For further information, contact Elizabeth Whiteman at *Elizabeth.Whiteman@trade.gov* or (202) 482–0473.

Dated: January 23, 2014.

**Andrew McGilvray,**
*Executive Secretary.*

[FR Doc. 2014–01727 Filed 1–28–14; 8:45 am]

BILLING CODE 3510-DS-P

---

## DEPARTMENT OF COMMERCE

### International Trade Administration

[A–570–010, A–583–853]

### Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China and Taiwan: Initiation of Antidumping Duty Investigations

**AGENCY:** Enforcement and Compliance, formerly Import Administration,

International Trade Administration, Department of Commerce.

**DATES:** *Effective Date:* January 29, 2014.

**FOR FURTHER INFORMATION CONTACT:** Jeffrey Pedersen at (202) 482–2769 (the People's Republic of China (PRC)); or Karine Gziryan at (202) 482–4081 (Taiwan), AD/CVD Operations, Enforcement and Compliance, U.S. Department of Commerce, 14th Street and Constitution Avenue NW., Washington, DC 20230.

**SUPPLEMENTARY INFORMATION:**

### The Petitions

On December 31, 2013, the Department of Commerce (the Department) received antidumping duty (AD) petitions concerning imports of certain crystalline silicon photovoltaic products (certain solar cells and panels) from the People's Republic of China (PRC) and Taiwan.[1] The Petitions were filed in proper form on behalf of SolarWorld Industries America, Inc. (Petitioner). Petitioner is a domestic producer of solar cells and panels. The Petitions were accompanied by a countervailing duty (CVD) petition on imports of certain solar cells and panels from the PRC. On January 3, 6, 9 and 10, 2014, the Department requested additional information and clarification of certain areas of the Petitions. Petitioner filed responses to these requests on January 8, 9, 13, 15, and 17, 2014.

In accordance with section 732(b) of the Tariff Act of 1930, as amended (the Act), Petitioner alleges that imports of certain solar cells and panels from the PRC and Taiwan are being, or are likely to be, sold in the United States at less than fair value within the meaning of section 731 of the Act and that such imports are materially injuring, and threatening material injury to, an industry in the United States. Also, consistent with section 732(b)(1) of the Act, the Petitions are accompanied by information reasonably available to Petitioner supporting its allegations.

The Department finds that Petitioner filed these Petitions on behalf of the domestic industry because Petitioner is an interested party as defined in section 771(9)(C) of the Act. The Department also finds that Petitioner has demonstrated sufficient industry support with respect to the initiation of

---

[1] *See* Petitions for the Imposition of Antidumping Duties on Imports of Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China and Taiwan," dated December 31, 2013 (the Petitions).

the AD investigations that Petitioner is requesting.[2]

## Periods of Investigations

Pursuant to 19 CFR 351.204(b)(1), because the Petitions were filed on December 31, 2013, the period of investigation (POI) for the PRC investigation is April 1, 2013, through September 30, 2013. The POI for the Taiwan investigation is October 1, 2012, through September 30, 2013.

## Scope of the Investigations

The products covered by these investigations are certain solar cells and panels from the PRC and Taiwan. For a full description of the scope of the investigations, see the ''Scope of the Investigations'' in Appendix I of this notice.

## Comments on the Scope of Investigations

During our review of the Petitions, the Department issued questions to, and received responses from, Petitioner pertaining to the proposed scope to ensure that the scope language in the Petitions would be an accurate reflection of the products for which the domestic industry is seeking relief. Also, on January 15, 2014, Suniva, Inc. (''Suniva''), a U.S. producer of certain solar cells and panels, submitted comments on the scope.[3] As discussed in the preamble to the regulations,[4] we are setting aside a period for interested parties to raise issues regarding product coverage. Parties should note that when considering product coverage with respect to these investigations, the Department will be informed by the product coverage decisions that it made in the investigations that resulted in the existing orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the PRC.[5] The Department encourages all interested parties to submit such comments by 5:00 p.m. Eastern Time on February 11, 2014. All comments must be filed on the records of the PRC and Taiwan AD investigations, as well as the concurrent PRC CVD investigation.

## Filing Requirements

All submissions to the Department must be filed electronically using Enforcement and Compliance's Antidumping and Countervailing Duty Centralized Electronic Service System (IA ACCESS).[6] An electronically filed document must be received successfully in its entirety by 5:00 p.m. on the date of the applicable deadline. Documents excepted from the electronic submission requirements must be filed manually (*i.e.*, in paper form) with the APO/ Dockets Unit of Enforcement and Compliance, Room 1870, U.S. Department of Commerce, 14th Street and Constitution Avenue NW., Washington, DC 20230, and stamped with the date and time of receipt by the applicable deadline.

## Comments on Product Characteristics for Antidumping Duty Questionnaires

The Department requests comments from interested parties regarding the appropriate physical characteristics of certain solar cells and panels to be reported in response to the Department's AD questionnaires. This information will be used to identify the key physical characteristics of the subject merchandise in order to report the relevant factors and costs of production (COPs) accurately as well as to develop appropriate product-comparison criteria.

Interested parties may provide any information or comments that they feel are relevant to the development of an accurate list of physical characteristics. Specifically, they may provide comments as to which characteristics are appropriate to use as: (1) General product characteristics and (2) product-comparison criteria. We note that it is not always appropriate to use all product characteristics as product-comparison criteria. We base product-comparison criteria on meaningful commercial differences among products. In other words, while there may be some physical product characteristics utilized by manufacturers to describe certain solar cells and panels, it may be that only a select few product characteristics take into account commercially-meaningful physical characteristics. In addition, interested parties may comment on the order in which the physical characteristics should be used in matching products. Generally, the Department attempts to list the most important physical characteristics first and the least important characteristics last.

In order to consider the suggestions of interested parties in developing and issuing the AD questionnaires, we must receive comments on product characteristics by February 5, 2014. Rebuttal comments must be received by February 12, 2014. All comments and submissions to the Department must be filed electronically using IA ACCESS, as referenced above.

## Determination of Industry Support for the Petitions

Section 732(b)(1) of the Act requires that a petition be filed on behalf of the domestic industry. Section 732(c)(4)(A) of the Act provides that a petition meets this requirement if the domestic producers or workers who support the petition account for: (i) At least 25 percent of the total production of the domestic like product; and (ii) more than 50 percent of the production of the domestic like product produced by that portion of the industry expressing support for, or opposition to, the petition. Moreover, section 732(c)(4)(D) of the Act provides that, if the petition does not establish support of domestic producers or workers accounting for more than 50 percent of the total production of the domestic like product, the Department shall: (i) Poll the industry or rely on other information in order to determine if there is support for the petition, as required by subparagraph (A); or (ii) determine industry support using a statistically valid sampling method to poll the industry.

Section 771(4)(A) of the Act defines the ''industry'' as the producers as a whole of a domestic like product. Thus, to determine whether a petition has the requisite industry support, the statute directs the Department to look to producers and workers who produce the domestic like product. The U.S. International Trade Commission (ITC), which is responsible for determining whether ''the domestic industry'' has been injured, must also determine what constitutes a domestic like product in order to define the industry. While both the Department and the ITC must apply the same statutory definition regarding the domestic like product,[7] they do so for different purposes and pursuant to a separate and distinct authority. In addition, the Department's

---

[2] *See* the ''Determination of Industry Support for the Petitions'' section below.

[3] *See* Letter from Suniva, dated January 15, 2014.

[4] *See Antidumping Duties; Countervailing Duties; Final Rule*, 62 FR 27296, 27323 (May 19, 1997).

[5] In the investigations covering crystalline silicon photovoltaic cells, whether or not assembled into modules, from the PRC, the Department determined that modules, laminates, and panels produced in a third-country from cells produced in the PRC are covered by the scope of the investigations; however, modules, laminates, and panels produced in the PRC from cells produced in a third-country are not covered by the scope of the investigations.

[6] *See Antidumping and Countervailing Duty Proceedings: Electronic Filing Procedures; Administrative Protective Order Procedures*, 76 FR 39263 (July 6, 2011) for details of the Department's electronic filing requirements, which went into effect on August 5, 2011. Information on help using IA ACCESS can be found at *https:// iaaccess.trade.gov/help.aspx* and a handbook can be found at *https://iaaccess.trade.gov/help/Hand book%20on%20Electronic%20Filling%20 Procedures.pdf.*

[7] *See* section 771(10) of the Act

determination is subject to limitations of time and information. Although this may result in different definitions of the like product, such differences do not render the decision of either agency contrary to law.[8]

Section 771(10) of the Act defines the domestic like product as "a product which is like, or in the absence of like, most similar in characteristics and uses with, the article subject to an investigation under this title." Thus, the reference point from which the domestic like product analysis begins is "the article subject to an investigation" (*i.e.,* the class or kind of merchandise to be investigated, which normally will be the scope as defined in the petition).

With regard to the domestic like product, Petitioner offers a definition of the domestic like product that includes certain crystalline silicon photovoltaic cells and modules and notes that the like product definition in this proceeding is identical to the definition of the like product in the Department's and the ITC's investigation of crystalline silicon photovoltaic cells, whether or not assembled into modules, from China.[9] According to Petitioner, "{t}he definition of the domestic like product in the Petition differs only slightly from the proposed scope of the investigations . . ." and "slight differences in the definition of the domestic like product and the scope of an investigation are permissible under the statute . . ."[10] Based on our analysis of the information submitted on the record, we have determined that certain crystalline silicon photovoltaic cells and modules constitute a single domestic like product and we have analyzed industry support in terms of that domestic like product.[11]

In determining whether Petitioner has standing under section 732(c)(4)(A) of the Act, we considered the industry support data contained in the Petitions with reference to the domestic like product as defined in the Petitions. To establish industry support, Petitioner provided its own production of the domestic like product in 2012, and compared this to the estimated total production of the domestic like product for the entire domestic industry.[12] Petitioner obtained total 2012 production of the domestic like product using data published by Solar Energy Industries Association/Greentech Media Research in *U.S. Solar Market Insight 2012 Year in Review* and other publicly available data.[13] We have relied upon data Petitioner provided for purposes of measuring industry support.[14]

On January 10, 2014, in consultations the Department held with respect to the companion CVD case on imports of certain solar cells and modules from the PRC, the Government of China raised the issue of industry support.[15] On January 15, 2014, we received comments on industry support from Yingli Green Energy Holding Company Limited, Yingli Green Energy Americas, Inc., and Canadian Solar Inc (collectively, PRC Producers/Exporters).[16] Petitioner responded to the PRC Producers/Exporters' comments on January 15, 2014.[17] PRC Producers/Exporters filed a rebuttal to Petitioner on January 17, 2014.[18] For further discussion of these comments, see the PRC AD Initiation Checklist and the

Taiwan AD Initiation Checklist, at Attachment II.

Based on information provided in the Petitions, supplemental submissions, and other information readily available to the Department, we determine that Petitioner has met the statutory criteria for industry support under section 732(c)(4)(A)(i) of the Act because the domestic producers (or workers) who support the Petitions account for at least 25 percent of the total production of the domestic like product.[19] Based on information provided in the Petitions, the domestic producers (or workers) have met the statutory criteria for industry support under section 732(c)(4)(A)(ii) of the Act because the domestic producers (or workers) who support the Petitions account for more than 50 percent of the production of the domestic like product produced by that portion of the industry expressing support for, or opposition to, the Petitions. Accordingly, the Department determines that the Petitions were filed on behalf of the domestic industry within the meaning of section 732(b)(1) of the Act.[20]

The Department finds that Petitioner filed the Petitions on behalf of the domestic industry because it is an interested party as defined in section 771(9)(C) of the Act and that it has demonstrated sufficient industry support with respect to the AD investigations that it is requesting the Department initiate.[21]

**Allegations and Evidence of Material Injury and Causation**

Petitioner alleges that the U.S. industry producing the domestic like product is being materially injured, or is threatened with material injury, by reason of the imports of the subject merchandise sold at less than normal value (NV). In addition, Petitioner alleges that subject imports exceed the negligibility threshold provided for under section 771(24)(A) of the Act.[22]

Petitioner contends that the industry's injured condition is illustrated by reduced market share; underselling and price depression or suppression; lost sales and revenues; shuttered production and hindered capacity utilization; reduced employment; and decline in industry financial performance.[23] We have assessed the

---

[8] *See USEC, Inc.* v. *United States,* 132 F. Supp. 2d 1, 8 (CIT 2001) (citing *Algoma Steel Corp., Ltd.* v. *United States,* 688 F. Supp. 639, 644 (CIT 1988), *aff'd* 865 F.2d 240 (Fed. Cir. 1989)).

[9] *See* Volume I of the Petitions, at 24; *see also* General Issues Supplement to the Petitions, dated January 9, 2014 (General Issues Supplement), at Exhibit I–Supp–1; *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Initiation of Antidumping Duty Investigation,* 76 FR 70960, 70961 (November 16, 2011); *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Initiation of Countervailing Duty Investigation,* 76 FR 70966, 70967–8 (November 16, 2011); and *Crystalline Silicon Photovoltaic Cells and Modules From the People's Republic of China,* Inv. Nos. 701–TA–481 and 731–TA–1190 (Final) USITC Pub. 4360 (December 2012), at 6–12.

[10] *See* General Issues Supplement, at 4.

[11] *See* Antidumping Duty Investigation Initiation Checklist: Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China (PRC AD Initiation Checklist), at Attachment II, Analysis of Industry Support for the Antidumping and Countervailing Duty Petitions Covering Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China and Taiwan

(Attachment II); and Antidumping Duty Investigation Initiation Checklist: Certain Crystalline Silicon Photovoltaic Products from Taiwan (Taiwan AD Initiation Checklist), at Attachment II. These checklists are dated concurrently with, and hereby adopted by, this notice and are on file electronically via IA ACCESS. Access to documents filed via IA ACCESS is also available in the Central Records Unit (CRU), Room 7046 of the main Department of Commerce building.

[12] *See* Volume I of the Petitions, at 8–10 and Exhibits I–3, I–5, and I–6; *see also* General Issues Supplement, at 5–8 and Exhibits I–Supp–1, I–Supp–2, I–Supp–3 and I–Supp–6.

[13] *See* Volume I of the Petitions, at Exhibits I–5 and I–6.

[14] *See* PRC AD Initiation Checklist and Taiwan AD Initiation Checklist, at Attachment II.

[15] *See* Memorandum to the File from Vicki Flynn, dated January 14, 2014, titled "Placing Consultations Memorandum on the AD Records."

[16] *See* Letter from Yingli Green Energy Holding Company Limited, Yingli Green Energy Americas, Inc., and Canadian Solar Inc., dated January 14, 2014.

[17] *See* Letter from Petitioner, dated January 15, 2014.

[18] *See* Letter from Yingli Green Energy Holding Company Limited, Yingli Green Energy Americas, Inc., and Canadian Solar Inc., dated January 17, 2014.

[19] *See* PRC AD Initiation Checklist and Taiwan AD Initiation Checklist, at Attachment II.

[20] *Id.*

[21] *Id.*

[22] *See* General Issues Supplement, at 8 and Exhibit I–Supp–4.

[23] *See* Volume I of the Petitions, at 5–7, 20–22, 33–67 and Exhibits I–1, I–4, I–13 through I–14, I–
Continued

allegations and supporting evidence regarding material injury, threat of material injury, and causation, and we have determined that these allegations are properly supported by adequate evidence and meet the statutory requirements for initiation.[24]

## Allegations of Sales at Less Than Fair Value

The following is a description of the allegations of sales at less than fair value upon which the Department based its decision to initiate AD investigations of imports of certain solar cells and panels from the PRC and Taiwan. The sources of data for the deductions and adjustments relating to U.S. price and NV are discussed in greater detail in the country-specific initiation checklists.

## Constructed Export Price—PRC

Petitioner calculated constructed export price (CEP) based on an offer for sales of solar panels assembled in, and exported from, the subject country by a manufacturer of subject merchandise. Petitioner classified these offers as CEP transactions because it believed that this manufacturer's products were sold by their U.S. affiliates. Petitioner made deductions from the U.S. price for movement expenses, consistent with the delivery terms. Petitioner also deducted from the U.S. price U.S. selling expenses and CEP profit, both of which it estimated using the financial statements of First Solar, Inc., a U.S. producer of solar modules utilizing thin-film technologies.[25]

## Constructed Export Price—Taiwan

Petitioner calculated CEP based on offers for sales of solar panels which were exported from the subject country in the form of laminates and further manufactured in the United States by the U.S. affiliate of the Taiwanese producer of the laminates. Petitioner classified these offers as CEP transactions because it believed that these products were sold by the U.S. affiliate of the Taiwanese producer. Petitioner calculated the further manufacturing costs in the United States using its own production experience

and subtracted the further manufacturing cost related to the production of finished modules in the United States from the quoted U.S. price. Petitioner made deductions from the U.S. price for movement expenses, consistent with the delivery terms. Petitioner also deducted from the U.S. price U.S. indirect selling expenses and CEP profit, both of which it estimated using the financial statements of First Solar, Inc., a U.S. producer of solar modules utilizing thin-film technologies.[26]

## NV—PRC

Petitioner calculated NV for the panels assembled in the PRC using a methodology that was based on the conclusion that the solar cells that were used in the panels were produced in Taiwan from wafers manufactured in the PRC.[27] Petitioner states that the Department has long treated the PRC as a non-market economy (NME) country.[28] Accordingly, Petitioner calculated the portion of NV that was based on production performed in the PRC using the Department's NME methodology, as required by 19 CFR 351.202(b)(7)(i)(C) and 19 CFR 351.408. Specifically, Petitioner calculated the portion of NV relating to production performed in the PRC using factors of production (FOPs) valued in a surrogate market economy country, in accordance with section 773(c) of the Act. Petitioner contends that Thailand is the appropriate surrogate country for the PRC because: (1) It is at a level of economic development comparable to that of the PRC; (2) it is a significant producer of identical merchandise; and (3) that the availability and quality of data are good.[29]

In accordance with section 771(18)(C)(i) of the Act, the presumption of NME status remains in effect until revoked by the Department. The presumption of NME status for the PRC has not been revoked by the Department and, therefore, remains in effect for purposes of the initiation of this investigation. Hence, an NME methodology is appropriate for valuing production performed in the PRC. Moreover, based on the information provided by Petitioner, we believe that it is appropriate to use Thailand as a surrogate country for initiation purposes. After initiation of the investigation, interested parties will have the opportunity to submit

comments regarding surrogate country selection and, pursuant to 19 CFR 351.301(c)(3)(i), will be provided an opportunity to submit publicly available information to value factors of production no later than 30 days before the date of the preliminary determination. In addition, in the course of the investigation covering merchandise from the PRC, all parties, including the public, will have the opportunity to provide relevant information related to the issues of the PRC's NME status and the granting of separate rates to individual exporters.

Petitioner calculated a portion of the NV for the PRC Petition based on the cost of producing solar cells in Taiwan using PRC wafers. Petitioner determined the cost of the solar cells produced in Taiwan by valuing FOPs for the Taiwanese production using import prices in Taiwan.[30]

## Factors of Production

Petitioner based the FOPs for materials, labor, and energy on the consumption rates of a surrogate producer of panels. Petitioner asserts that these consumption rates are reasonably available information, which, to the best of its knowledge, are an appropriate surrogate for consumption of producers of the merchandise under consideration in the PRC because this surrogate producer is comparable to the PRC producers of the merchandise under consideration.[31]

## Valuation of Raw Materials and Packing Materials

Petitioner valued the FOPs for various raw material inputs used to produce subject merchandise in the PRC based on Thai import data for the POI from Global Trade Atlas (GTA) under corresponding Harmonized Tariff Schedule (HTS) numbers.[32] Petitioner added to the raw material surrogate values the inland freight charges reported for importing goods into Thailand, as published by the World Bank in *Doing Business 2014: Thailand*.[33] Petitioner excluded from its surrogate values all import values from countries previously determined by the Department to maintain broadly available, non-industry-specific export subsidies and from countries previously determined by the Department to be

---

[16] through I–20, and I–22 through I–30; General Issues Supplement, at 8–9 and Exhibits I–Supp–1, I–Supp–4 and I–Supp–5; and Second General Issues Supplement, dated January 13, 2014 (Second General Issues Supplement), at 5–11 and Exhibits I–Supp–7 through I–Supp–15.

[24] *See* PRC AD Initiation Checklist, at Attachment III, Analysis of Allegations and Evidence of Material Injury and Causation for the Petitions Covering Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and Taiwan (Attachment III); *see also* Taiwan AD Initiation Checklist, at Attachment III.

[25] For details regarding all adjustments to CEP, see the PRC AD Initiation Checklist at 6–8.

[26] For details regarding all adjustments to CEP, see the Taiwan AD Initiation Checklist at 6–8.

[27] *See* PRC AD Initiation Checklist, at 6.

[28] *See* Volume II of the Petitions, at 14.

[29] *Id.*, at 15–17, 23.

[30] *See* PRC AD Initiation Checklist, at 9.

[31] *See* Volume II of the Petitions, at 15, 22–23.

[32] *See* PRC AD Initiation Checklist, at 8; *see also* Volume II of the Petitions, at 26 and Exhibit II–21; First PRC AD Supplement, at 2–3.

[33] *See* Volume II of the Petitions, at Exhibits II–9; *see also* First PRC AD Supplement, at 7–8.

NME countries.[34] In addition, in accordance with the Department's practice, the average import value used as a surrogate excludes imports that were labeled as originating from an unidentified country. We revised the surrogate that Petitioner used to value aluminum frames and frame corners because Petitioner used a HTS number that had been rejected by the Department in a previous AD proceeding involving solar cells and panels from the PRC.[35]

For production performed in Taiwan for the module assembled in the PRC, Petitioner valued various raw material inputs based on Taiwan import data for the POI from GTA under the applicable HTS numbers.[36]

*Valuation of Energy*

For production performed in the PRC, Petitioner valued electricity using a 2012 electricity rate in Thai baht per kilowatt hour, as reported by the Thai Board of Investment.[37] In accordance with the Department's policy not to adjust energy tariffs for inflation if those tariffs are likely still in force, Petitioner did not adjust this value for inflation.[38]

For production performed in Taiwan, Petitioner utilized Taiwanese electricity rates for industrial users as collected and disseminated by the U.S. Department of Energy.[39]

*Valuation of Labor*

For production performed in the PRC, Petitioner valued labor using information published in a 2013 industrial survey by the Thailand National Statistics Office.[40]

For production performed in Taiwan, Petitioner valued labor using 2012 data for Taiwan collected by the U.S. Bureau of Labor Statistics.[41] Petitioner adjusted this rate for inflation by utilizing the consumer price index, as reported by the U.S. Bureau of Labor Statistics.[42]

*Valuation of Factory Overhead, Selling, General and Administrative Expenses, and Profit*

Petitioner calculated factory overhead, selling, general and administrative expenses, and profit using data from the 2012–2013 financial statements of Hana Microelectronics Group, a Thai producer of electronics merchandise which Petitioner identified as comparable to the merchandise under consideration.[43]

**NV—Taiwan**

Petitioner based NV on price information from a Taiwanese producer of panels for panels sold in the subject country. Petitioner was not able to obtain a price quote for a laminate offered for sale in the home market during the POI, but did obtain a finished module price. The only alleged difference between the finished module and laminate is the final stage of the production of the module. Therefore, Petitioner believes that an adjustment to the home market price for the difference in merchandise is appropriate. Petitioner adjusted the home market price by subtracting from the offered price the further manufacturing cost related to the production of finished modules in the United States, based on Petitioner's own experience. Petitioner made adjustments to NV for movement expenses consistent with the sales

terms. Petitioner made no other adjustments to NV.[44]

**Fair Value Comparisons**

Based on the data provided by Petitioner, there is reason to believe that imports of certain solar cells and panels from the PRC and Taiwan are being, or are likely to be, sold in the United States at less than fair value. Based on comparisons of CEP to NV, in accordance with section 773(a)(1) of the Act, the estimated dumping margin for certain solar cells and panels from Taiwan is 75.68 percent.[45] Based on a comparison of CEP to NV, in accordance with section 773(c) of the Act, the estimated dumping margin for certain solar cells and panels from the PRC is 165.04 percent.[46]

**Initiation of Antidumping Duty Investigations**

Section 732(b)(1) of the Act requires the Department to initiate an AD proceeding whenever an interested party files an AD petition on behalf of an industry that: (1) Alleges the elements necessary for the imposition of a duty under section 731 of the Act; and (2) is accompanied by information reasonably available to the petitioners supporting the allegations.

Based upon the examination of the Petitions on certain solar cells and panels from the PRC and Taiwan, we find that the Petitions meet the requirements of section 732 of the Act. Therefore, we are initiating AD investigations to determine whether imports of certain solar cells and panels from the PRC and Taiwan are being, or are likely to be, sold in the United States at less than fair value. In accordance with section 733(b)(1)(A) of the Act and 19 CFR 351.205(b)(1), unless postponed, we will make our preliminary determinations no later than 140 days after the date of this initiation.

**Respondent Selection**

The Petition for Taiwan names 21 companies as producers/exporters of certain solar cells and panels. Following the Department's standard practice in AD investigations involving market-economy countries, for the Taiwanese AD investigation we will select respondents based on U.S. Customs and Border Protection (CBP) data for U.S. imports of certain solar cells and panels. We intend to release CBP data under Administrative Protective Order (APO) to all parties with access to information protected by APO within five-business

[34] *See* Volume II of the Petitions, at Exhibits II–19, II–20 and II–21.

[35] *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Final Determination of Sales at Less Than Fair Value, and Affirmative Final Determination of Critical Circumstances, in Part,* 77 FR 63791 (October 17, 2012) and the accompanying Issues and Decision Memorandum at Comment 16, as amended by *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order,* 77 FR 73018 (December 7, 2012); *see also* PRC AD Initiation Checklist, at Attachment V.

[36] *See* PRC AD Initiation Checklist, at 8; *see also* Volume II of the Petitions, at 26 and Exhibit II–21; First PRC AD Supplement, at 2–3.

[37] *See* Volume II of the Petitions, at 26 and Exhibit II–22.

[38] *Id.; see also Certain Kitchen Appliance Shelving and Racks from the People's Republic of China: Antidumping Duty Administrative Review, 2010–2011,* 77 FR 61385 (October 9, 2012), and accompanying Preliminary Decision Memorandum at 16, unchanged in *Certain Kitchen Appliance Shelving and Racks From the People's Republic of China; 2010–2011; Final Results of Antidumping Duty Administrative Review,* 78 FR 5414 (January 25, 2013); *Certain Activated Carbon From the People's Republic of China: Final Results and Partial Rescission of Second Antidumping Duty Administrative Review,* 75 FR 70208 (November 17, 2010), and accompanying Issues and Decision Memorandum at Comment 4; and *Certain Oil Country Tubular Goods From the People's Republic of China: Notice of Preliminary Determination of Sales at Less Than Fair Value, Affirmative Preliminary Determination of Critical Circumstances and Postponement of Final Determination,* 74 FR 59117 (November 17, 2009), unchanged in *Certain Oil Country Tubular Goods from the People's Republic of China: Final Determination of Sales at Less Than Fair Value, Affirmative Final Determination of Critical*

*Circumstances and Final Determination of Targeted Dumping,* 75 FR 20335 (April 19, 2010).

[39] *See* Volume II of the Petitions, at 26 and Exhibit II–22.

[40] *Id.,* at Exhibit II–23.

[41] *See* Volume II of the Petitions, at 27 and Exhibit II–24.

[42] *Id.*

[43] *See* PRC AD Initiation Checklist; *see* Volume II of the Petitions, at 28–29 and Exhibits II–19 and II–24; First PRC AD Supplement at 3–4, and Exhibit II–Supp–2.

[44] *See* Taiwan AD Initiation Checklist, at 8–9.

[45] *See* Taiwan Initiation Checklist.

[46] *See* PRC AD Initiation Checklist.

days of publication of this **Federal Register** notice. The Department invites comments regarding respondent selection within seven days of publication of this **Federal Register** notice.

The Petition for the PRC names 78 companies as producers/exporters of certain solar cells and panels. In accordance with the Department's standard practice in AD investigations involving NME countries, for respondent selection in the PRC AD investigation we intend to issue quantity and value (Q&V) questionnaires to each potential respondent named in the Petition and base respondent selection on the responses to our Q&V questionnaire. In addition, the Department will post the Q&V questionnaire along with the filing instructions on Enforcement and Compliance's Web site at *http://trade.gov/enforcement/news.asp*. Exporters and producers of certain solar cells and panels from the PRC that do not receive a Q&V questionnaire from the Department may still submit a response to the Q&V questionnaire using a copy of the questionnaire obtained from Enforcement and Compliance's Web site. The Q&V questionnaire must be submitted by all PRC producers/exporters no later than February 13, 2014. All Q&V questionnaires must be filed electronically using IA ACCESS.

## Separate Rates

In order to obtain separate rate status in an NME investigation, exporters and producers must submit a separate rate application.[47] The specific requirements for submitting the separate rate application in the PRC investigation are outlined in detail in the application itself, which will be available on Enforcement and Compliance's Web site at *http://trade.gov/enforcement/news.asp* on the date of publication of this initiation notice in the **Federal Register**. The separate rate application will be due 60 days after publication of this initiation notice. All separate rate applications must be filed electronically using IA ACCESS. For exporters and producers who submit a separate rate application and have been selected as mandatory respondents, these exporters and producers will no longer be eligible for consideration for separate rate status unless they respond to all parts of the

AD questionnaire as mandatory respondents. The Department requires that PRC producers/exporters submit a response to both the Q&V questionnaire and the separate rate application by their respective deadlines in order to receive consideration for separate rate status.

## Use of Combination Rates

The Department will calculate combination rates for certain respondents that are eligible for a separate rate in an NME investigation. The Separate Rates and Combination Rates Bulletin states:

{w}hile continuing the practice of assigning separate rates only to exporters, all separate rates that the Department will now assign in its NME investigations will be specific to those producers that supplied the exporter during the period of investigation. Note, however, that one rate is calculated for the exporter and all of the producers which supplied subject merchandise to it during the period of investigation. This practice applies both to mandatory respondents receiving an individually calculated separate rate as well as the pool of non-investigated firms receiving the weighted-average of the individually calculated rates. This practice is referred to as the application of ''combination rates'' because such rates apply to specific combinations of exporters and one or more producers. The cash-deposit rate assigned to an exporter will apply only to merchandise both exported by the firm in question *and* produced by a firm that supplied the exporter during the period of investigation.[48]

## Distribution of Copies of the Petitions

In accordance with section 732(b)(3)(A) of the Act and 19 CFR 351.202(f), copies of the public version of the Petitions have been provided to the governments of the PRC and Taiwan via IA ACCESS. Because of the particularly large number of producers/exporters identified in the Petitions, the Department considers the service of the public version of the Petitions to the foreign producers/exporters to be satisfied by the provision of the public version of the Petition to the governments of the PRC and Taiwan, consistent with 19 CFR 351.203(c)(2).

## ITC Notification

We have notified the ITC of our initiation, as required by section 732(d) of the Act.

## Preliminary Determinations by the ITC

The ITC will preliminarily determine no later than February 14, 2014, whether there is a reasonable indication that imports of certain solar cells and panels from the PRC and Taiwan are

materially injuring, or threatening material injury to, a U.S. industry. A negative ITC determination for any country will result in the investigation being terminated with respect to that country; otherwise, these investigations will proceed according to statutory and regulatory time limits.

## Submission of Factual Information

On April 10, 2013, the Department published *Definition of Factual Information and Time Limits for Submission of Factual Information: Final Rule,* 78 FR 21246 (April 10, 2013), which modified two regulations related to AD and CVD proceedings: the definition of factual information (19 CFR 351.102(b)(21)), and the time limits for the submission of factual information (19 CFR 351.301). The final rule identifies five categories of factual information in 19 CFR 351.102(b)(21), which are summarized as follows: (i) Evidence submitted in response to questionnaires; (ii) evidence submitted in support of allegations; (iii) publicly available information to value factors under 19 CFR 351.408(c) or to measure the adequacy of remuneration under 19 CFR 351.511(a)(2); (iv) evidence placed on the record by the Department; and (v) evidence other than factual information described in (i)–(iv). The final rule requires any party, when submitting factual information, to specify under which subsection of 19 CFR 351.102(b)(21) the information is being submitted and, if the information is submitted to rebut, clarify, or correct factual information already on the record, to provide an explanation identifying the information already on the record that the factual information seeks to rebut, clarify, or correct. The final rule also modified 19 CFR 351.301 so that, rather than providing general time limits, there are specific time limits based on the type of factual information being submitted. These modifications are effective for all proceeding segments initiated on or after May 10, 2013, and thus are applicable to these investigations. Please review the final rule, available at *http://www.gpo.gov/fdsys/pkg/FR-2013-04-10/pdf/2013-08227.pdf#page=1,* prior to submitting factual information in these investigations.

## Certification Requirements

Any party submitting factual information in an AD or CVD proceeding must certify to the accuracy and completeness of that information.[49] Parties are hereby reminded that revised certification requirements are in effect

---

[47] *See* Policy Bulletin 05.1: Separate-Rates Practice and Application of Combination Rates in Antidumping Investigations involving Non-Market Economy Countries (April 5, 2005) (Separate Rates and Combination Rates Bulletin), available on the Department's Web site at *http://enforcement.trade.gov/policy/bull05-1.pdf*.

[48] *See* Separate Rates and Combination Rates Bulletin, at 6 (emphasis added).

[49] *See* section 782(b) of the Act.

for company/government officials, as well as their representatives. Investigations initiated on the basis of petitions filed on or after August 16, 2013, and other segments of any AD or CVD proceedings initiated on or after August 16, 2013, should use the formats for the revised certifications provided at the end of the *Final Rule.*[50] The Department intends to reject factual submissions if the submitting party does not comply with applicable revised certification requirements.

**Revised Extension of Time Limits Regulation**

On September 20, 2013, the Department modified its regulation concerning the extension of time limits for submissions in AD and CVD proceedings. The modification clarifies that parties may request an extension of time limits before a time limit established under Part 351 expires, or as otherwise specified by the Secretary. In general, an extension request will be considered untimely if it is filed after the time limit established under Part 351 expires. For submissions which are due from multiple parties simultaneously, an extension request will be considered untimely if it is filed after 10:00 a.m. on the due date. Examples include, but are not limited to: (1) Case and rebuttal briefs, filed pursuant to 19 CFR 351.309; (2) factual information to value factors under section 19 CFR 351.408(c), or to measure the adequacy of remuneration under section 19 CFR 351.511(a)(2), filed pursuant to 19 CFR 351.301(c)(3) and rebuttal, clarification and correction filed pursuant to 19 CFR 351.301(c)(3)(iv); (3) comments concerning the selection of a surrogate country and surrogate values and rebuttal; (4) comments concerning CBP data; and (5) Q&V questionnaires. Under certain circumstances, the Department may elect to specify a different time limit by which extension requests will be considered untimely for submissions which are due from multiple parties simultaneously. In such a case, the Department will inform parties in the letter or memorandum setting forth the deadline (including a specified time) by which extension requests must be filed to be considered timely. This modification also requires that an extension request must be made in a separate, stand-alone submission, and

clarifies the circumstances under which the Department will grant untimely-filed requests for the extension of time limits. These modifications are effective for all segments initiated on or after October 21, 2013. Please review *Extension of Time Limits; Final Rule,* available at *http://www.gpo.gov/fdsys/pkg/FR-2013-09-20/html/2013-22853.htm,* prior to submitting factual information in these segments.

**Notification to Interested Parties**

Interested parties must submit applications for disclosure under APO in accordance with 19 CFR 351.305. On January 22, 2008, the Department published *Antidumping and Countervailing Duty Proceedings: Documents Submission Procedures; APO Procedures,* 73 FR 3634 (January 22, 2008). Parties wishing to participate in these investigations should ensure that they meet the requirements of these procedures (*e.g.,* the filing of letters of appearance as discussed at 19 CFR 351.103(d)).

This notice is issued and published pursuant to section 777(i) of the Act and 19 CFR 351.203(c).

Dated: January 22, 2014.

**Paul Piquado,**

*Assistant Secretary for Enforcement and Compliance.*

**Appendix I**

**Scope of the Investigations**

The merchandise covered by these investigations is crystalline silicon photovoltaic cells, and modules, laminates and/or panels consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including building integrated materials. For purposes of these investigations, subject merchandise also includes modules, laminates and/or panels assembled in the subject country consisting of crystalline silicon photovoltaic cells that are completed or partially manufactured within a customs territory other than that subject country, using ingots that are manufactured in the subject country, wafers that are manufactured in the subject country, or cells where the manufacturing process begins in the subject country and is completed in a non-subject country.

Subject merchandise includes crystalline silicon photovoltaic cells of thickness equal to or greater than 20 micrometers, having a p/n junction formed by any means, whether or not the cell has undergone other processing, including, but not limited to, cleaning, etching, coating, and/or addition of materials (including, but not limited to, metallization and conductor patterns) to collect and forward the electricity that is generated by the cell.

Excluded from the scope of these investigations are thin film photovoltaic products produced from amorphous silicon (a-Si), cadmium telluride (CdTe), or copper

indium gallium selenide (CIGS). Also excluded from the scope of these investigations are any products covered by the existing antidumping and countervailing duty orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the People's Republic of China. *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order,* 77 FR 73018 (December 7, 2012); *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Countervailing Duty Order,* 77 FR 73017 (December 7, 2012).

Also excluded from the scope of these investigations are crystalline silicon photovoltaic cells, not exceeding 10,000mm² in surface area, that are permanently integrated into a consumer good whose function is other than power generation and that consumes the electricity generated by the integrated crystalline silicon photovoltaic cell. Where more than one cell is permanently integrated into a consumer good, the surface area for purposes of this exclusion shall be the total combined surface area of all cells that are integrated into the consumer good.

Merchandise covered by these investigations is currently classified in the Harmonized Tariff Schedule of the United States (HTSUS) under subheadings 8501.61.0000, 8507.20.8030, 8507.20.8040, 8507.20.8060, 8507.20.8090, 8541.40.6020, 8541.40.6030 and 8501.31.8000. These HTSUS subheadings are provided for convenience and customs purposes; the written description of the scope of these investigations is dispositive.

[FR Doc. 2014–01738 Filed 1–28–14; 8:45 am]

**BILLING CODE 3510–DS–P**

---

**DEPARTMENT OF COMMERCE**

**International Trade Administration**

**[C–570–011]**

**Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China: Initiation of Countervailing Duty Investigation**

**AGENCY:** Enforcement & Compliance, formerly Import Administration, International Trade Administration, Department of Commerce.

**DATES:** *Effective Date:* January 29, 2014.

**FOR FURTHER INFORMATION CONTACT:** Justin Neuman or Milton Koch, Office VII, AD/CVD Operations, Enforcement & Compliance, International Trade Administration, U.S. Department of Commerce, 14th Street and Constitution Avenue NW., Washington, DC 20230; telephone, (202) 482–0486 or (202) 482–2584, respectively.

**SUPPLEMENTARY INFORMATION:**

---

[50] *See Certification of Factual Information To Import Administration During Antidumping and Countervailing Duty Proceedings,* 78 FR 42678 (July 17, 2013) (*Final Rule*); *see also* frequently asked questions regarding the *Final Rule,* available at *http://enforcement.trade.gov/tlei/notices/factual_info_final_rule_FAQ_07172013.pdf.*

# Tab 9

# CVD P.R. Doc. 69

# CVD Notice of Initiation
# (Jan. 29, 2014)

for company/government officials, as well as their representatives. Investigations initiated on the basis of petitions filed on or after August 16, 2013, and other segments of any AD or CVD proceedings initiated on or after August 16, 2013, should use the formats for the revised certifications provided at the end of the *Final Rule*.[50] The Department intends to reject factual submissions if the submitting party does not comply with applicable revised certification requirements.

**Revised Extension of Time Limits Regulation**

On September 20, 2013, the Department modified its regulation concerning the extension of time limits for submissions in AD and CVD proceedings. The modification clarifies that parties may request an extension of time limits before a time limit established under Part 351 expires, or as otherwise specified by the Secretary. In general, an extension request will be considered untimely if it is filed after the time limit established under Part 351 expires. For submissions which are due from multiple parties simultaneously, an extension request will be considered untimely if it is filed after 10:00 a.m. on the due date. Examples include, but are not limited to: (1) Case and rebuttal briefs, filed pursuant to 19 CFR 351.309; (2) factual information to value factors under section 19 CFR 351.408(c), or to measure the adequacy of remuneration under section 19 CFR 351.511(a)(2), filed pursuant to 19 CFR 351.301(c)(3) and rebuttal, clarification and correction filed pursuant to 19 CFR 351.301(c)(3)(iv); (3) comments concerning the selection of a surrogate country and surrogate values and rebuttal; (4) comments concerning CBP data; and (5) Q&V questionnaires. Under certain circumstances, the Department may elect to specify a different time limit by which extension requests will be considered untimely for submissions which are due from multiple parties simultaneously. In such a case, the Department will inform parties in the letter or memorandum setting forth the deadline (including a specified time) by which extension requests must be filed to be considered timely. This modification also requires that an extension request must be made in a separate, stand-alone submission, and

clarifies the circumstances under which the Department will grant untimely-filed requests for the extension of time limits. These modifications are effective for all segments initiated on or after October 21, 2013. Please review *Extension of Time Limits; Final Rule*, available at *http://www.gpo.gov/fdsys/pkg/FR-2013-09-20/html/2013-22853.htm*, prior to submitting factual information in these segments.

**Notification to Interested Parties**

Interested parties must submit applications for disclosure under APO in accordance with 19 CFR 351.305. On January 22, 2008, the Department published *Antidumping and Countervailing Duty Proceedings: Documents Submission Procedures; APO Procedures*, 73 FR 3634 (January 22, 2008). Parties wishing to participate in these investigations should ensure that they meet the requirements of these procedures (*e.g.,* the filing of letters of appearance as discussed in 19 CFR 351.103(d)).

This notice is issued and published pursuant to section 777(i) of the Act and 19 CFR 351.203(c).

Dated: January 22, 2014.

**Paul Piquado,**
*Assistant Secretary for Enforcement and Compliance.*

**Appendix I**

**Scope of the Investigations**

The merchandise covered by these investigations is crystalline silicon photovoltaic cells, and modules, laminates and/or panels consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including building integrated materials. For purposes of these investigations, subject merchandise also includes modules, laminates and/or panels assembled in the subject country consisting of crystalline silicon photovoltaic cells that are completed or partially manufactured within a customs territory other than that subject country, using ingots that are manufactured in the subject country, wafers that are manufactured in the subject country, or cells where the manufacturing process begins in the subject country and is completed in a non-subject country.

Subject merchandise includes crystalline silicon photovoltaic cells of thickness equal to or greater than 20 micrometers, having a p/n junction formed by any means, whether or not the cell has undergone other processing, including, but not limited to, cleaning, etching, coating, and/or addition of materials (including, but not limited to, metallization and conductor patterns) to collect and forward the electricity that is generated by the cell.

Excluded from the scope of these investigations are thin film photovoltaic products produced from amorphous silicon (a-Si), cadmium telluride (CdTe), or copper

indium gallium selenide (CIGS). Also excluded from the scope of these investigations are any products covered by the existing antidumping and countervailing duty orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the People's Republic of China. *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order*, 77 FR 73018 (December 7, 2012); *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Countervailing Duty Order*, 77 FR 73017 (December 7, 2012).

Also excluded from the scope of these investigations are crystalline silicon photovoltaic cells, not exceeding 10,000mm$^2$ in surface area, that are permanently integrated into a consumer good whose function is other than power generation and that consumes the electricity generated by the integrated crystalline silicon photovoltaic cell. Where more than one cell is permanently integrated into a consumer good, the surface area for purposes of this exclusion shall be the total combined surface area of all cells that are integrated into the consumer good.

Merchandise covered by these investigations is currently classified in the Harmonized Tariff Schedule of the United States (HTSUS) under subheadings 8501.61.0000, 8507.20.8030, 8507.20.8040, 8507.20.8060, 8507.20.8090, 8541.40.6020, 8541.40.6030 and 8501.31.8000. These HTSUS subheadings are provided for convenience and customs purposes; the written description of the scope of these investigations is dispositive.

[FR Doc. 2014–01738 Filed 1–28–14; 8:45 am]

**BILLING CODE 3510–DS–P**

**DEPARTMENT OF COMMERCE**

**International Trade Administration**

**[C–570–011]**

**Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China: Initiation of Countervailing Duty Investigation**

**AGENCY:** Enforcement & Compliance, formerly Import Administration, International Trade Administration, Department of Commerce.

**DATES:** *Effective Date:* January 29, 2014.

**FOR FURTHER INFORMATION CONTACT:** Justin Neuman or Milton Koch, Office VII, AD/CVD Operations, Enforcement & Compliance, International Trade Administration, U.S. Department of Commerce, 14th Street and Constitution Avenue NW., Washington, DC 20230; telephone, (202) 482–0486 or (202) 482–2584, respectively.

**SUPPLEMENTARY INFORMATION:**

[50] *See Certification of Factual Information To Import Administration During Antidumping and Countervailing Duty Proceedings*, 78 FR 42678 (July 17, 2013) (*Final Rule*); *see also* frequently asked questions regarding the *Final Rule*, available at *http://enforcement.trade.gov/tlei/notices/factual_info_final_rule_FAQ_07172013.pdf*.

## The Petition

On December 31, 2013, the Department of Commerce (the Department) received a countervailing duty (CVD) petition concerning imports of certain crystalline silicon photovoltaic products (certain solar cells and panels) from the People's Republic of China (PRC), filed in proper form by SolarWorld Industries America, Inc. (Petitioner), a domestic producer of certain solar cells and panels. The CVD petition was accompanied by an antidumping duty (AD) petition concerning imports of certain solar cells and panels.[1] Between January 3 and January 9, 2014, the Department requested additional information and clarification of certain areas of the Petition, and between January 7 and January 13, 2014, Petitioner filed a timely response to each request.[2]

In accordance with section 702(b)(1) of the Tariff Act of 1930, as amended (the Act), Petitioner alleges that producers/exporters of certain solar cells and panels in the PRC received countervailable subsidies under thirty-three programs within the meaning of sections 701 and 771(5) of the Act, and that imports from these producers/exporters materially injure, or threaten material injury to, an industry in the United States.

The Department finds that Petitioner filed this Petition on behalf of the domestic industry because it is an interested party defined in section 771(9)(C) of the Act, and that Petitioner has demonstrated sufficient industry support with respect to the CVD investigation that it is requesting the Department to initiate (see "Determination of Industry Support for the Petition" below).

## Period of Investigation

The period of investigation (POI) is January 1, 2012, through December 31, 2012, in accordance with 19 CFR 351.204(b)(2).

## Scope of the Investigation

The products covered by this investigation are certain solar cells and panels the PRC.[3]

## Comments on the Scope of the Investigation

During our review of the Petition, we solicited information from Petitioner to ensure that the proposed scope language is an accurate reflection of the products for which the domestic industry is seeking relief. Also, on January 15, 2014, Suniva, Inc. (Suniva), a U.S. producer of certain solar cells and panels, submitted comments on the scope.[4] Moreover, as discussed in the preamble to the Department's regulations,[5] we are setting aside a period for interested parties to raise issues regarding product coverage. Parties should note that when considering product coverage with respect to this investigation, the Department will be informed by the product coverage decisions that it made in the investigations that resulted in the existing orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the PRC.[6] The Department encourages all interested parties to submit such comments by February 11, 2014, which is 20 calendar days from the signature date of this notice. All comments must be filed on the record of the CVD investigation, as well as the concurrent AD investigations.

## Filing Requirements

All submissions to the Department must be filed electronically using Enforcement & Compliance's Antidumping and Countervailing Duty Centralized Electronic Service System (IA ACCESS). An electronically filed document must be received successfully in its entirety by the Department's electronic records system, IA ACCESS, by 5 p.m. on the due date. Documents excepted from the electronic submission requirements must be filed manually (i.e., in paper form) with the Enforcement & Compliance's APO/Dockets Unit, Room 1870, U.S. Department of Commerce, 14th Street and Constitution Avenue NW., Washington, DC 20230, and stamped with the date and time of receipt by the

deadline established by the Department.[7]

## Consultations

Pursuant to section 702(b)(4)(A)(ii) of the Act, on January 2, 2014, the Department invited representatives from the Government of China (GOC) for consultations with respect to the CVD Petition. Consultations were held with the GOC on January 10, 2014.[8]

## Determination of Industry Support for the Petition

Section 702(b)(1) of the Act requires that a petition be filed on behalf of the domestic industry. Section 702(c)(4)(A) of the Act provides that a petition meets this requirement if the domestic producers or workers who support the petition account for: (i) At least 25 percent of the total production of the domestic like product; and (ii) more than 50 percent of the production of the domestic like product produced by that portion of the industry expressing support for, or opposition to, the petition. Moreover, section 702(c)(4)(D) of the Act provides that, if the petition does not establish support of domestic producers or workers accounting for more than 50 percent of the total production of the domestic like product, the Department shall: (i) Poll the industry or rely on other information in order to determine if there is support for the petition, as required by subparagraph (A); or (ii) determine industry support using a statistically valid sampling method to poll the industry.

Section 771(4)(A) of the Act defines the "industry" as the producers as a whole of a domestic like product. Thus, to determine whether a petition has the requisite industry support, the statute directs the Department to look to producers and workers who produce the domestic like product. The U.S. International Trade Commission (ITC), which is responsible for determining whether "the domestic industry" has been injured, must also determine what constitutes a domestic like product in order to define the industry. While both the Department and the ITC must apply

---

[1] See "Petition for the Imposition of Antidumping and Countervailing Duties Pursuant to Sections 701 and 731 of the Tariff Act of 1930, As Amended," (December 31, 2013) (Petition).

[2] See Petitioner's filings, "Supplement to the China CVD Petition," (January 7, 2014) (China CVD Supplement); "General Issues Supplement to the Petition," (January 9, 2014) (General Issues Supplement); and "Second General Issues Supplement to the Petition," (January 13, 2014) (Second General Issues Supplement).

[3] See Appendix I of this notice for a full description of the scope of this investigation.

[4] See Letter from Suniva, "Request for Comment Period on Scope for Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China," (January 15, 2014).

[5] See Antidumping Duties; Countervailing Duties; Final Rule, 62 FR 27296, 27323 (May 19, 1997).

[6] The AD and CVD Orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the PRC, cover modules, laminates, and panels produced in a third-country from cells produced in the PRC; however, modules, laminates, and panels produced in the PRC from cells produced in a third-country are not covered by the scope of the Orders.

[7] See 19 CFR 351.303(b)(1). Information on help using IAACCESS can be found at https://iaaccess.trade.gov/help.aspx and a handbook can be found at https://iaaccess.trade.gov/help/Handbook%20on%20Electronic%20Filing%20Procedures.pdf.

[8] See Ex-Parte Memorandum to the File from Justin Neuman, International Trade Analyst, AD/CVD Operations, Office VII, Enforcement & Compliance, "Consultations with Officials from the Government of the People's Republic of China Regarding the Countervailing Duty Petition Concerning Certain Crystalline Silicon Photovoltaic Products," (January 13, 2014) (Consultations Memorandum).

the same statutory definition regarding the domestic like product,[9] they do so for different purposes and pursuant to a separate and distinct authority. In addition, the Department's determination is subject to limitations of time and information. Although this may result in different definitions of the like product, such differences do not render the decision of either agency contrary to law.[10]

Section 771(10) of the Act defines the domestic like product as "a product which is like, or in the absence of like, most similar in characteristics and uses with, the article subject to an investigation under this title." Thus, the reference point from which the domestic like product analysis begins is "the article subject to an investigation" (*i.e.,* the class or kind of merchandise to be investigated, which normally will be the scope as defined in the petition).

With regard to the domestic like product, Petitioner offers a definition of the domestic like product that includes certain crystalline silicon photovoltaic cells and modules and notes that the like product definition in this proceeding is identical to the definition of the like product in the Department's and the ITC's investigation of crystalline silicon photovoltaic cells, whether or not assembled into modules, from China.[11] According to Petitioner, "{t}he definition of the domestic like product in the Petition differs only slightly from the proposed scope of the investigations . . ." and "slight differences in the definition of the domestic like product and the scope of an investigation are permissible under the statute. . . ."[12] Based on our analysis of the information submitted on the record, we have determined that certain crystalline silicon photovoltaic cells and modules constitute a single domestic like product and we have analyzed industry support in terms of that domestic like product.[13]

In determining whether Petitioner has standing under section 702(c)(4)(A) of the Act, we considered the industry support data contained in the Petition with reference to the domestic like product as defined in the Petition. To establish industry support, Petitioner provided its own production of the domestic like product in 2012, and compared this to the estimated total production of the domestic like product for the entire domestic industry.[14] Petitioner obtained total 2012 production of the domestic like product using data published by Solar Energy Industries Association/Greentech Media Research in *U.S. Solar Market Insight 2012 Year in Review* and other publicly available data.[15] We have relied upon data Petitioner provided for purposes of measuring industry support.[16]

On January 10, 2014, in its consultations with the Department, the GOC raised the issue of industry support.[17] On January 15, 2014, we received comments on industry support from Yingli Green Energy Holding Company Limited, Yingli Green Energy Americas, Inc., and Canadian Solar Inc. (collectively, PRC Producers/ Exporters).[18] Petitioner responded to the PRC Producers/Exporters' comments on January 15, 2014.[19] PRC Producers/ Exporters filed a rebuttal to Petitioner on January 17, 2014.[20] For further discussion of these comments, *see* the PRC CVD Initiation Checklist, at Attachment II.

Based on information provided in the Petition, supplemental submissions, and other information readily available to the Department, we determine that Petitioner has met the statutory criteria for industry support under section

702(c)(4)(A)(i) of the Act because the domestic producers (or workers) who support the Petition account for at least 25 percent of the total production of the domestic like product.[21] Based on information provided in the Petition, the domestic producers (or workers) have met the statutory criteria for industry support under section 702(c)(4)(A)(ii) of the Act because the domestic producers (or workers) who support the Petition account for more than 50 percent of the production of the domestic like product produced by that portion of the industry expressing support for, or opposition to, the Petition. Accordingly, the Department determines that the Petition was filed on behalf of the domestic industry within the meaning of section 702(b)(1) of the Act.[22]

The Department finds that Petitioner filed the Petition on behalf of the domestic industry because it is an interested party as defined in section 771(9)(C) of the Act and it has demonstrated sufficient industry support with respect to the countervailing duty investigation that it is requesting the Department initiate.[23]

**Injury Test**

Because the PRC is a "Subsidies Agreement Country" within the meaning of section 701(b) of the Act, section 701(a)(2) of the Act applies to this investigation. Accordingly, the ITC must determine whether imports of the subject merchandise from the PRC materially injure, or threaten material injury to, a U.S. industry.

**Allegations and Evidence of Material Injury and Causation**

Petitioner alleges that imports of the subject merchandise are benefitting from countervailable subsidies and that such imports are causing, or threaten to cause, material injury to the U.S. industry producing the domestic like product. In addition, Petitioner alleges that subject imports exceed the negligibility threshold provided for under section 771(24)(A) of the Act.[24]

Petitioner contends that the industry's injured condition is illustrated by reduced market share; underselling and price depression or suppression; lost sales and revenues; shuttered production and hindered capacity utilization; reduced employment; and decline in industry financial

[9] *See* section 771(10) of the Act.

[10] *See USEC, Inc.* v. *United States,* 132 F. Supp. 2d 1, 8 (CIT 2001) (citing *Algoma Steel Corp., Ltd.* v. *United States,* 688 F. Supp. 639, 644 (CIT 1988), *aff'd* 865 F.2d 240 (Fed. Cir. 1989)).

[11] *See* Volume I of the Petition, at 24; *see, also* General Issues Supplement, at Exhibit I–Supp–1; *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Initiation of Antidumping Duty Investigation,* 76 FR 70960, 70961 (November 16, 2011); *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Initiation of Countervailing Duty Investigation,* 76 FR 70966, 70967–8 (November 16, 2011); and *Crystalline Silicon Photovoltaic Cells and Modules from the People's Republic of China,* Inv. Nos. 701–TA–481 and 731–TA–1190 (Final) USITC Pub. 4360 (December 2012), at 6–12.

[12] *See* General Issues Supplement, at 4.

[13] *See* Countervailing Duty Investigation Initiation Checklist: Certain Crystalline Silicon

Photovoltaic Products from the People's Republic of China (PRC CVD Initiation Checklist), at Attachment II, Analysis of Industry Support for the Antidumping and Countervailing Duty Petitions Covering Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and Taiwan (Attachment II). This checklist is dated concurrently with this notice and on file electronically via IA ACCESS. Access to documents filed via IA ACCESS is also available in the Central Records Unit (CRU), Room 7046 of the main Department of Commerce building.

[14] *See* Volume I of the Petition, at 8–10 and Exhibits I–3, I–5, and I–6; *see also* General Issues Supplement, at 5–8 and Exhibits I–Supp–1, I–Supp–2, I–Supp–3 and I–Supp–6.

[15] *See* Volume I of the Petition, at Exhibits I–5 and I–6.

[16] *See* PRC CVD Initiation Checklist, at Attachment II.

[17] *See* Consultations Memorandum.

[18] *See* Letter from Yingli Green Energy Holding Company Limited, Yingli Green Energy Americas, Inc., and Canadian Solar Inc., (January 15, 2014).

[19] *See* Letter from Petitioner, (January 15, 2014).

[20] *See* Letter from Yingli Green Energy Holding Company Limited, Yingli Green Energy Americas, Inc., and Canadian Solar Inc., (January 17, 2014).

[21] *See* CVD Initiation Checklist, at Attachment II.

[22] *Id.*

[23] *Id.*

[24] *See* General Issues Supplement, at 8 and Exhibit I–Supp–4.

performance.[25] We have assessed the allegations and supporting evidence regarding material injury, threat of material injury, and causation, and we have determined that these allegations are properly supported by adequate evidence and meet the statutory requirements for initiation.[26]

## Initiation of Countervailing Duty Investigation

Section 702(b)(1) of the Act requires the Department to initiate a CVD proceeding whenever an interested party files a CVD petition on behalf of an industry that: (1) Alleges the elements necessary for an imposition of a duty under section 701(a) of the Act; and (2) is accompanied by information reasonably available to the petitioners supporting the allegations.

The Department has examined the Petition on certain solar cells and panels from the PRC and finds that it complies with the requirements of section 702(b)(1) of the Act. Therefore, in accordance with section 702(b)(1) of the Act, we are initiating a CVD investigation to determine whether producers/exporters of certain solar cells and panels in the PRC receive countervailable subsidies. For a discussion of evidence supporting our initiation determination, *see* the CVD Initiation Checklist which accompanies this notice.

Based on our review of the Petition, we find that there is sufficient information to initiate a CVD investigation of 28 alleged programs. For the other five programs alleged by Petitioner, we have determined that the requirements for initiation have not been met. For a full discussion of the basis for our decision to initiate or not initiate on each program, *see* the CVD Initiation Checklist.

## Respondent Selection

For this investigation, the Department intends to select respondents based on U.S. Customs and Border Protection (CBP) data for U.S. imports during the POI (*i.e.,* calendar year 2012) under the following Harmonized Tariff Schedule of the United States numbers: 8501.61.0000, 8507.20.8030,

8507.20.8040, 8507.20.8060, 8507.20.8090, 8541.40.6020, 8541.40.6030, and 8501.31.8000. We intend to release the CBP data under Administrative Protective Order (APO) to all parties with access to information protected by APO within five days of the announcement of the initiation of this investigation. Interested parties may submit comments regarding the CBP data and respondent selection within seven calendar days of release of this data. We intend to make our decision regarding respondent selection within 20 days of publication of this **Federal Register** notice.

## Notification to Interested Parties

Interested parties must submit applications for disclosure under APO in accordance with 19 CFR 351.305(b). Instructions for filing such applications may be found on the Department's Web site at *http://enforcement.trade.gov/apo/index.html.*

## Distribution of Copies of the CVD Petition

In accordance with section 702(b)(4)(A)(i) of the Act and 19 CFR 351.202(f), a copy of the public version of the Petition has been provided to the representatives of the GOC. Because of the particularly large number of producers/exporters identified in the Petition, the Department considers the service of the public version of the petition to the foreign producers/exporters satisfied by the delivery of the public version to the GOC, consistent with 19 CFR 351.203(c)(2).

## ITC Notification

We have notified the ITC of our initiation, as required by section 702(d) of the Act.

## Preliminary Determination by the ITC

The ITC will preliminarily determine, within 45 days after the date on which the Petition was filed, whether there is a reasonable indication that imports of subsidized certain solar cells and panels from the PRC materially injure, or threaten material injury to, a U.S. industry.[27] A negative ITC determination will result in the investigation being terminated.[28] Otherwise, the investigation will proceed according to statutory and regulatory time limits.

## Submission of Factual Information

On April 10, 2013, the Department published *Definition of Factual Information and Time Limits for*

*Submission of Factual Information: Final Rule,* 78 FR 21246 (April 10, 2013), which modified two regulations related to AD and CVD proceedings: The definition of factual information (19 CFR 351.102(b)(21)), and the time limits for the submission of factual information (19 CFR 351.301). The final rule identifies five categories of factual information in 19 CFR 351.102(b)(21), which are summarized as follows: (i) Evidence submitted in response to questionnaires; (ii) evidence submitted in support of allegations; (iii) publicly available information to value factors under 19 CFR 351.408(c) or to measure the adequacy of remuneration under 19 CFR 351.511(a)(2); (iv) evidence placed on the record by the Department; and (v) evidence other than factual information described in (i)–(iv). The final rule requires any party, when submitting factual information, to specify under which subsection of 19 CFR 351.102(b)(21) the information is being submitted and, if the information is submitted to rebut, clarify, or correct factual information already on the record, to provide an explanation identifying the information already on the record that the factual information seeks to rebut, clarify, or correct. The final rule also modified 19 CFR 351.301 so that, rather than providing general time limits, there are specific time limits based on the type of factual information being submitted. These modifications are effective for all proceeding segments initiated on or after May 10, 2013, and thus are applicable to this investigation. Please review the final rule, available at *http://enforcement.trade.gov/frn/2013/1304frn/2013-08227.txt,* prior to submitting factual information in this investigation.

## Revised Extension of Time Limits Regulation

On September 20, 2013, the Department modified its regulation concerning the extension of time limits for submissions in AD and CVD proceedings.[29] The modification clarifies that parties may request an extension of time limits before a time limit established under Part 351 expires, or as otherwise specified by the Secretary. In general, an extension request will be considered untimely if it is filed after the time limit established under Part 351 expires. For submissions which are due from multiple parties simultaneously, an extension request will be considered untimely if it is filed after 10:00 a.m. on the due date. Examples include, but are not limited

---

[25] *See* Volume I of the Petition, at 5–7, 20–22, 33–67 and Exhibits I–1, I–4, I–13 through I–14, I–16 through I–20, and I–22 through I–30; General Issues Supplement, at 8–9 and Exhibits I–Supp–1, I–Supp–4 and I–Supp–5; and Second General Issues Supplement, at 5–11 and Exhibits I–Supp–7 through I–Supp–15.

[26] *See* PRC CVD Initiation Checklist, at Attachment III, Analysis of Allegations and Evidence of Material Injury and Causation for the Petitions Covering Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and Taiwan.

[27] *See* section 703(a)(2) of the Act.
[28] *See* section 703(a)(1) of the Act.

[29] *See* Extension of Time Limits; Final Rule, 78 FR 57790 (September 20, 2013).

to: (1) Case and rebuttal briefs, filed pursuant to 19 CFR 351.309; (2) factual information to value factors under section 19 CFR 351.408(c), or to measure the adequacy of remuneration under section 19 CFR 351.511(a)(2), filed pursuant to 19 CFR 351.301(c)(3) and rebuttal, clarification and correction filed pursuant to 19 CFR 351.301(c)(3)(iv); (3) comments concerning the selection of a surrogate country and surrogate values and rebuttal; (4) comments concerning CBP data; and (5) quantity and value questionnaires. Under certain circumstances, the Department may elect to specify a different time limit by which extension requests will be considered untimely for submissions which are due from multiple parties simultaneously. In such a case, the Department will inform parties in the letter or memorandum setting forth the deadline (including a specified time) by which extension requests must be filed to be considered timely. This modification also requires that an extension request must be made in a separate, stand-alone submission, and clarifies the circumstances under which the Department will grant untimely-filed requests for the extension of time limits. These modifications are effective for all segments initiated on or after October 21, 2013. Please review the Extension of Time Limits; Final Rule, available at *http://www.gpo.gov//fdsys//pkg//FR-2013-09-20//html//2013-22853.htm,* prior to submitting factual information in this segment.

**Certification Requirements**

Any party submitting factual information in an AD or CVD proceeding must certify to the accuracy and completeness of that information.[30] Parties are hereby reminded that revised certification requirements are in effect for company/government officials as well as their representatives in all AD or CVD investigations or proceedings initiated on or after August 16, 2013, including this investigation.[31] The formats for the revised certifications are provided at the end of the *Final Rule.* The Department intends to reject factual submissions if the submitting party does not comply with the revised certification requirements.

This notice is issued and published pursuant to section 777(i) of the Act.

---

[30] *See* section 782(b) of the Act.
[31] *See Certification of Factual Information To Import Administration During Antidumping and Countervailing Duty Proceedings,* 78 FR 42678 (July 17, 2013) (*Final Rule*).

---

Dated: January 22, 2014.

**Paul Piquado,**
*Assistant Secretary for Enforcement & Compliance.*

**Appendix I**

**Scope of the Investigation**

The merchandise covered by this investigation is crystalline silicon photovoltaic cells, and modules, laminates and/or panels consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including building integrated materials. For purposes of this investigation, subject merchandise also includes modules, laminates and/or panels assembled in the subject country consisting of crystalline silicon photovoltaic cells that are completed or partially manufactured within a customs territory other than that subject country, using ingots that are manufactured in the subject country, wafers that are manufactured in the subject country, or cells where the manufacturing process begins in the subject country and is completed in a non-subject country.

Subject merchandise includes crystalline silicon photovoltaic cells of thickness equal to or greater than 20 micrometers, having a p/n junction formed by any means, whether or not the cell has undergone other processing, including, but not limited to, cleaning, etching, coating, and/or addition of materials (including, but not limited to, metallization and conductor patterns) to collect and forward the electricity that is generated by the cell.

Excluded from the scope of this investigation are thin film photovoltaic products produced from amorphous silicon (a-Si), cadmium telluride (CdTe), or copper indium gallium selenide (CIGS). Also excluded from the scope of this investigation are any products covered by the existing antidumping and countervailing duty orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the People's Republic of China. *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order,* 77 FR 73018 (December 7, 2012); *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Countervailing Duty Order,* 77 FR 73017 (December 7, 2012).

Also excluded from the scope of this investigation are crystalline silicon photovoltaic cells, not exceeding 10,000mm$^2$ in surface area, that are permanently integrated into a consumer good whose function is other than power generation and that consumes the electricity generated by the integrated crystalline silicon photovoltaic cell. Where more than one cell is permanently integrated into a consumer good, the surface area for purposes of this exclusion shall be the total combined surface area of all cells that are integrated into the consumer good.

Merchandise covered by this investigation is currently classified in the Harmonized

Tariff Schedule of the United States (HTSUS) under subheadings 8501.61.0000, 8507.20.8030, 8507.20.8040, 8507.20.8060, 8507.20.8090, 8541.40.6020, 8541.40.6030 and 8501.31.8000. These HTSUS subheadings are provided for convenience and customs purposes; the written description of the scope of this investigation is dispositive.

[FR Doc. 2014–01743 Filed 1–28–14; 8:45 am]

**BILLING CODE 3510–DS–P**

---

**DEPARTMENT OF COMMERCE**

**International Trade Administration**

**[Application No. 97–12A003]**

**Export Trade Certificate of Review**

**ACTION:** Notice of Application (97–12A003) to amend the Export Trade Certificate of Review held by the Association for the Administration of Rice Quotas, Inc.

**SUMMARY:** The Office of Trade and Economic Analysis ("OTEA") of the International Trade Administration, Department of Commerce, has received an application to amend an Export Trade Certificate of Review ("Certificate"). This notice summarizes the proposed amendment and requests comments relevant to whether the amended Certificate should be issued.

**FOR FURTHER INFORMATION CONTACT:** Joseph Flynn, Director, Office of Trade and Economic Analysis, International Trade Administration, (202) 482–5131 (this is not a toll-free number) or email at *etca@trade.gov.*

**SUPPLEMENTARY INFORMATION:** Title III of the Export Trading Company Act of 1982 (15 U.S.C. 4001–21) authorizes the Secretary of Commerce to issue Export Trade Certificates of Review. An Export Trade Certificate of Review protects the holder and the members identified in the Certificate from State and Federal government antitrust actions and from private treble damage antitrust actions for the export conduct specified in the Certificate and carried out in compliance with its terms and conditions. Section 302(b)(1) of the Export Trading Company Act of 1982 and 15 CFR 325.6(a) require the Secretary to publish a notice in the **Federal Register** identifying the applicant and summarizing its proposed export conduct.

**Request for Public Comments**

Interested parties may submit written comments relevant to the determination whether an amended Certificate should be issued. If the comments include any privileged or confidential business

# Tab 10

# AD P.R. Doc. 809

## AD IDM
## (Dec. 15, 2014)

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-570-010
Investigation
Public Document
E&C/IV: JDP/TEM

| | |
|---|---|
| DATE: | December 15, 2014 |
| MEMORANDUM TO: | Paul Piquado<br>Assistant Secretary<br>for Enforcement and Compliance |
| FROM: | Christian Marsh<br>Deputy Assistant Secretary<br>for Antidumping and Countervailing Duty Operations |
| SUBJECT: | Certain Crystalline Silicon Photovoltaic Products from the<br>People's Republic of China: Issues and Decision Memorandum for<br>the Final Determination of Sales at Less Than Fair Value |

## I.   SUMMARY

The Department finds that certain solar products from the PRC are being, or are likely to be, sold in the United States at LTFV, as provided in section 735 of the Act. The POI is April 1, 2013, through September 30, 2013.

After analyzing the comments submitted by interested parties, and based on our findings at verification, we made certain changes to the margin calculations for the two mandatory respondents, which also results in a change to the weighted-average dumping margin calculations for the separate-rate companies that were not selected for individual examination. We recommend that you approve the positions described in the "Discussion of the Issues" section of this memorandum. Below is the complete list of the issues for which we received comments:

**Case Issues:**

Comment 1:   Scope of the Investigation
Comment 2:   Whether to Select South Africa or Thailand as the Primary Surrogate Country
Comment 3:   Whether to Offset the Cash Deposit Rate for Export Subsidies
Comment 4:   Whether the Department Should Investigate the Effects of the GOC's Alleged
             Cyberhacking on this Investigation
Comment 5:   Ultimate Ownership of Separate Rate Applicants
Comment 6:   Separate Rate Applicants with Managers or Board Members with Ties to the
             Chinese Government



country of origin of a solar module assembled in the PRC is the PRC.  We find this country of origin language likewise clear and easily applied.  Thus, while the country of origin criteria of *Solar I* and the country of origin analysis stated in the proposed clarification in the October 3rd Letter may differ, with the latter building upon the former, we find the approaches to be complementary and that identifying the proceeding to which a given solar module may be subject, based on these analyses, will be straightforward.  Further, any potential overlap in coverage that may have arisen due to the different country of origin criteria have been eliminated by the modified language provided in the October 3rd proposed clarification and adopted in the final determinations.

## G.  Treatment of U.S. Solar Cells Assembled into Solar Modules in China and Taiwan
*Respondents:*
- The Department must include a scope exemption for solar products assembled from cells of U.S. origin.  The Department has already determined that the country of origin of a solar panel is the country in which the solar cell was produced.  U.S. law prohibits application of AD/CVD duties to U.S. origin goods.

Petitioner did not comment on this issue.

**Department's Position**:

We disagree with Respondents.  As noted above, contrary to Respondents' assertions, we have only applied AD and CVD measures to products determined to have a country of origin of China.  We have not applied such measures to products determined to have a country of origin of the United States.

## H.  Comments Concerning the Scope of the Preliminary Determination

Parties have submitted comments concerning the scope of the investigation as defined in the *Preliminary Determination*.  Because we have clarified the scope consistent with the October 3rd Letter, we have not addressed comments that were only relevant to the scope of the investigation as defined in the *Preliminary Determination* and not relevant to the scope of this final determination.

## Comment 2:  Whether to Select South Africa or Thailand as the Primary Surrogate Country

*Petitioner*
- The record does not demonstrate that South Africa was a "significant producer" of merchandise identical or comparable to solar products during the POI, making South Africa unsuitable as a source of surrogate values.  The Department must give appropriate meaning to the language "significant producer" by comparing each country's exports or production capacity to world production.[100]  The value of exports from the next closest country to Thailand on the Department's list – Indonesia – was barely one-fourth of the

---

[100] *See* Policy Bulletin 04.1: Non-Market Economy Surrogate Country Selection Process (March 1, 2004) ("Policy Bulletin 04.1") available at http://enforcement.trade.gov/policy/index.html.

29

# Tab 11

# AD P.R. Doc. 2

**Petition**
**(Dec. 31, 2013)**



December 31, 2013

1776 K STREET NW
WASHINGTON, DC 20006
PHONE  202.719.7000
FAX   202.719.7049

7925 JONES BRANCH DRIVE
McLEAN, VA 22102
PHONE  703.905.2800
FAX  703.905.2820

www.wileyrein.com

DOC Case Nos. A-570-010, C-570-011, and A-583-853
USITC Inv. Nos. 701-TA- __ and 731-TA-___ - ___
Total Pages: 3244
Investigation
Business Proprietary Information has been removed from the pages and exhibits identified in this cover letter.
**PUBLIC VERSION**

**BY HAND DELIVERY**

The Honorable Penny S. Pritzker
Secretary of Commerce
Attention: Import Administration
APO/Dockets Unit, Room 1870
U.S. Department of Commerce
14th Street and Constitution Avenue, N.W.
Washington, D.C. 20230

The Honorable Lisa R. Barton
Acting Secretary
U.S. International Trade Commission
500 E Street, S.W., Room 112
Washington, D.C.  20436

Re:   Petition for the Imposition of Antidumping and Countervailing Duties: *Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and Taiwan*

Dear Secretary Pritzker and Acting Secretary Barton:

We file the enclosed petitions on behalf of SolarWorld Industries America, Inc. ("Petitioner"), pursuant to Sections 701 and 731 of the Tariff Act of 1930 with respect to unfairly traded imports of certain crystalline silicon photovoltaic products from the People's Republic of China and Taiwan (hereinafter "c-SiPV Cells and Modules").

13363507.1

# Tab 12

# CVD P.R. Doc. 1

## Petition
## (Dec. 31, 2013)



December 31, 2013

1776 K STREET NW
WASHINGTON, DC 20006
PHONE   202.719.7000
FAX   202.719.7049

7925 JONES BRANCH DRIVE
McLEAN, VA 22102
PHONE   703.905.2800
FAX   703.905.2820

www.wileyrein.com

DOC Case Nos. A-570-010, C-570-011, and A-583-853
USITC Inv. Nos. 701-TA- __ and 731-TA-___ - ___
Total Pages: 3244
Investigation
Business Proprietary Information has been removed from the pages and exhibits identified in this cover letter.
**PUBLIC VERSION**

**BY HAND DELIVERY**

The Honorable Penny S. Pritzker
Secretary of Commerce
Attention: Import Administration
APO/Dockets Unit, Room 1870
U.S. Department of Commerce
14th Street and Constitution Avenue, N.W.
Washington, D.C. 20230

The Honorable Lisa R. Barton
Acting Secretary
U.S. International Trade Commission
500 E Street, S.W., Room 112
Washington, D.C.  20436

Re:    Petition for the Imposition of Antidumping and Countervailing Duties: *Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and Taiwan*

Dear Secretary Pritzker and Acting Secretary Barton:

We file the enclosed petitions on behalf of SolarWorld Industries America, Inc. ("Petitioner"), pursuant to Sections 701 and 731 of the Tariff Act of 1930 with respect to unfairly traded imports of certain crystalline silicon photovoltaic products from the People's Republic of China and Taiwan (hereinafter "c-SiPV Cells and Modules").

13363507.1

# Tab 13

# AD P.R. Doc. 35

# Suniva Request for Comment Period (Jan. 15, 2014)

Gregory S. McCue
202 429 6421
gmccue@steptoe.com

**Steptoe**
STEPTOE & JOHNSON LLP

1330 Connecticut Avenue, NW
Washington, DC 20036-1795
202 429 3000 main
www.steptoe.com

January 15, 2014

**PUBLIC DOCUMENT**

Case Nos.  A-570-010
A-583-853
C-570-011

Number of Pages  27

Investigations

AD CVD Operations

This document does not contain
business proprietary information

**via electronic filing in IA ACCESS**

The Honorable Penny Pritzker
Secretary of Commerce
U.S. Department of Commerce
Attn: Enforcement and Compliance
APO/Dockets Unit, Room 1870
14th Street & Pennsylvania Ave., NW
Washington, DC 20230

Re:  **Request for Comment Period on Scope for
Certain Crystalline Silicon Photovoltaic Products
from the People 's Republic of China and Taiwan**

Dear Secretary Pritzker:

On behalf of our client Suniva, Inc., a U.S. producer of the subject merchandise,
we respectfully request that the Department set aside a period for interested parties to
raise issues regarding product coverage, exactly as was done in the prior investigations
into certain solar cells, just over two years ago.  See attached Notices of Initiation from
the prior investigations, at **Attachment 1**.

BEIJING    BRUSSELS    CENTURY CITY    CHICAGO    LONDON    LOS ANGELES    NEW YORK    PHOENIX    WASHINGTON

Barcode:3174060-01 A-570-010 INV - Investigation  -

U.S. Department of Commerce
January 15, 2014
page 5



**Public Document**

> Furthermore, Petitioner's other arguments for why
> modules that are assembled in the PRC using third-country
> solar cells should be covered by the scope are not
> persuasive. The Department agrees with Petitioner that the
> scope of these investigations always included modules from
> the PRC; however, as noted above, using a substantial
> transformation analysis the Department has determined that
> modules from the PRC are those that have been assembled
> in the PRC using solar cells produced in the PRC.

Issues and Decision Memorandum, at pages 7-8.  As a result of the final decision on
scope, and to assist with implementation of these issues, the Department instituted a
certification procedure for exporters and importers to confirm the origin of the cells used
in imported modules.

The petition notes that this substantial transformation issue is still on appeal at
the U.S Court of International Trade.  Petition, vol. I, footnote 12.  Presumably, if the
court proceedings were to alter the scope results in the prior investigation, that would
impact the current proceedings.  The proposed scope does not address how subject
merchandise would be defined in that event.

## A Comment Period for Product Coverage is Necessary

As noted above, the petition and the petitioner have stated state repeatedly that
the new petition is connected to and in reaction to the results of the last case on solar
cells.  It appears that scope of the new petition is an attempt to overturn or circumvent
the Department's substantial transformation analysis for these products.  In any case,
the confusion connected to the last investigation properly led the Department to set
aside "a period for interested parties to raise issues regarding product coverage."  No
less is necessary in this investigation, an explicit outgrowth of the earlier investigation.

Indeed, on its face, the proposed scope in this new petition raises several
immediate questions of product coverage and administration.  We discuss a few of
these complications below.  We do not present this information as an exhaustive list, but
to demonstrate the important and potentially confusing issues raised by the lack of
clarity in some of the proposed scope language.  Where the issues are so numerous
and central, this is precisely the type of situation, as provided by the preamble to the
Department regulations, where a comment period is needed.

For example, the proposed scope states that it means to cover modules
"assembled in the subject country consisting of … cells that are completely or partially
manufactured within a customs territory other than that subject country," using ingots,
wafers or partially manufactured cells produced in the subject country.  It appears that

Barcode:3174060-01 A-570-010 INV - Investigation -

U.S. Department of Commerce
January 15, 2014
page 6



**Public Document**

this means when an ingot is produced in China, and that ingot is used to produce a cell in Jamaica[2], then that cell is assembled in China into a module, that module would be subject merchandise when imported into the United States. This has the potential to raise enormous confusion since the Department said in the prior investigation that such a cell made in Jamaica is not substantially transformed by assembly into a module in China. In other words, the scope as currently written apparently seeks to overturn the Department's detailed substantial transformation analysis. Under this proposed scope, apparently, a Chinese ingot does not lose Chinese origin and become a Jamaican cell. Or, perhaps, petitioners intend that the Jamaican cell somehow loses Jamaican origin upon assembly into a module in China, which would be fully in conflict with the Department's detailed substantial transformation analysis of this type of merchandise.

In addition, the proposed scope language ties subject merchandise incorporating cells not made in China or Taiwan to the site of ingot crystallization, wafer production or initial cell conversion. The scope does not make clear how it should be interpreted if those steps do not occur in the same country. For example, if the ingot is crystallized in China but the wafer is produced in Taiwan, does this mean that early production steps are considered to have occurred in China? Or would it be Taiwan? If the cell is made in Jamaica and the module is assembled in China, this ingot/wafer analysis could make a critical difference for determining whether the merchandise is subject and which order should apply. Essentially, the proposed scope language is silent on this point and lumps the ingot and wafer steps together in its analysis.

The confusion and potential absurdity is especially apparent when applied to Suniva's production. Suniva has a large production of cells in the United States. Suniva is a venture-backed company spun out of the Georgia Institute of Technology's photovoltaic program. The company has a history of technology innovation and has developed over fifty patents. Recently, the U.S. Department of Energy awarded Suniva significant research grants for future cell designs. The company employs approximately 270 people, with a growth of more than fifty skilled employees in the past year.

If the above interpretation of the scope is petitioner's intended outcome then Suniva's U.S.-origin cells, when shipped to China, possibly could be subject to duties upon return. In other words, the cells are of U.S. origin, when shipped to China they experience a relatively minor operation, described by the Department as "a comparatively less sophisticated process than cell conversion," as noted above. Upon importation into the United States, these modules are not of Chinese origin for ADD/CVD purposes, as clearly described by the Department. Nonetheless, the proposed scope of the instant petition seems to be proposing that duties would be applied to these U.S.-origin goods. This seems unreasonable on its face and, at a minimum, strong support for the need to set aside a comment period in this case.

---

[2] Just an example country for discussion, chosen at random.

Barcode:3174060-01 A-570-010 INV - Investigation -

U.S. Department of Commerce
January 15, 2014
page 7



**Public Document**

The potential confusion extends far beyond Suniva.  As a further example, imagine an ingot from China, made into a cell in Jamaica and then made into a module in Iceland.[3]   The proposed scope, in the second sentence of the first paragraph, seems to state that the scope is meant to cover:

- modules,

- consisting of cells from a customs territory other than that subject country,

- using ingots/wafers from the subject country.

Does this mean that the scope is intended to cover modules from Iceland, that incorporate cells from Jamaica, just because the finished good started with an ingot from China?  Is this a further attempt to overturn the Department's clear substantial transformation analysis as provided in the prior investigations?  Is such a result possible where the only input from China/Taiwan is an ingot, but ingots themselves are non-subject merchandise and would not be subject if an ingot were imported directly to the United States?  This is a petition against "cells and modules, laminates and/or panels…"  Could such a petition possibly apply to finished products that include Chinese ingots, no matter what has been done to the ingot since it left China?  These interpretations seem strained but, nonetheless, are left open by the language of the scope.

In Supplement II to the petition, filed on January 13, 2014, the petitioner proposes adjusting the language to say that the scope applies to modules, laminates and/or panels "assembled in the subject country…"  This would seem to address the China/Jamaica/Iceland example above (since such a module would have been assembled in Iceland, not a subject country), but whether this change will be implemented is uncertain.  Certainty in this area is critical both for industry decisions and for implementation and enforcement by U.S. Customs and Border Protection.  The industry – and the Department – certainly have a right to examine and know for certain what is meant to be covered.

Further confusion is present because two countries are subject to these investigations.  As noted above, the proposed scope states that it intends to cover

- modules …

- consisting of cells from a customs territory other than *that* subject country,

- using ingots, wafers … from *the* subject country.

_____

[3] Another random example country, just for discussion.

Barcode:3174060-01 A-570-010 INV - Investigation  -

U.S. Department of Commerce
January 15, 2014
page 8



**Steptoe**
STEPTOE & JOHNSON LLP

**Public Document**

So, it is clear that the scope seeks to cover modules made in a subject country using cells made somewhere else, in some circumstances.  But what circumstances?  Is it only where the ingot was from *the same* subject country as the module assembly?  Does this mean that where the module is made in China and the cell is made in Jamaica, the module is only subject if the cell used an ingot from China, *but not from* Taiwan?  In other words, does the country of origin of the ingot need to match the origin of the module assembly?  The proposed scope says "using ingots, wafers … from *the* subject country."  The proposed language does not identify ingots from *either* subject country.

        In Supplement II to the petition, filed on January 13, 2014, the petitioner proposes further revisions to the scope, but still states that scope is based where the ingots, wafers or other initial cell conversion, occur in the "*the* subject country" (emphasis added).  The discussion section of the supplement uses the phrase "the *same* country" (emphasis added), which would seem to suggest a match between the country of ingot production and the country of module assembly would be required.  However, the proposed revised scope language does not use the phrase "the same subject country" which leaves the scope unclear and subject to uncertain interpretation and enforcement.

        Finally, there is a question regarding whether a certification will be required at the time of importation, and if so, in what form.  The certification process under the existing orders has required substantial time and effort from exporters and importers to prepare and maintain.  Whether another certification will be required, and if so, its format, is clearly an important issue to be discussed.

        These questions all are fundamental to the industry and to the administration of this scope, if it were to go into effect at the border.  In such a case, this is precisely why the preamble to the Department's regulations provide for a comment period early in the investigation.

        The Department must take the same step here, as it did in response to the last petition regarding solar products.  We respectfully request that the Department "set{} aside a period for interested parties to raise issues regarding product coverage", as it did in the last investigations.

# Tab 14

# CVD P.R. Doc. 56

# Suniva Request for Comment Period (Jan. 15, 2014)

Gregory S. McCue
202 429 6421
gmccue@steptoe.com

**Steptoe**
STEPTOE & JOHNSON LLP

1330 Connecticut Avenue, NW
Washington, DC 20036-1795
202 429 3000 main
www.steptoe.com

January 15, 2014

**PUBLIC DOCUMENT**

Case Nos.  A-570-010
A-583-853
C-570-011

Number of Pages  _27_

Investigations

AD CVD Operations

This document does not contain
business proprietary information

**via electronic filing in IA ACCESS**

The Honorable Penny Pritzker
Secretary of Commerce
U.S. Department of Commerce
Attn: Enforcement and Compliance
APO/Dockets Unit, Room 1870
14th Street & Pennsylvania Ave., NW
Washington, DC 20230

Re:     **Request for Comment Period on Scope for
Certain Crystalline Silicon Photovoltaic Products
from the People 's Republic of China and Taiwan**

Dear Secretary Pritzker:

On behalf of our client Suniva, Inc., a U.S. producer of the subject merchandise,
we respectfully request that the Department set aside a period for interested parties to
raise issues regarding product coverage, exactly as was done in the prior investigations
into certain solar cells, just over two years ago.  See attached Notices of Initiation from
the prior investigations, at **Attachment 1**.

BEIJING     BRUSSELS     CENTURY CITY     CHICAGO     LONDON     LOS ANGELES     NEW YORK     PHOENIX     WASHINGTON

Barcode:3174062-01 C-570-011 INV - Investigation -

U.S. Department of Commerce
January 15, 2014
page 5



<u>**Public Document**</u>

> Furthermore, Petitioner's other arguments for why
> modules that are assembled in the PRC using third-country
> solar cells should be covered by the scope are not
> persuasive. The Department agrees with Petitioner that the
> scope of these investigations always included modules from
> the PRC; however, as noted above, using a substantial
> transformation analysis the Department has determined that
> modules from the PRC are those that have been assembled
> in the PRC using solar cells produced in the PRC.

Issues and Decision Memorandum, at pages 7-8.  As a result of the final decision on
scope, and to assist with implementation of these issues, the Department instituted a
certification procedure for exporters and importers to confirm the origin of the cells used
in imported modules.

The petition notes that this substantial transformation issue is still on appeal at
the U.S Court of International Trade.  Petition, vol. I, footnote 12.  Presumably, if the
court proceedings were to alter the scope results in the prior investigation, that would
impact the current proceedings.  The proposed scope does not address how subject
merchandise would be defined in that event.

## <u>A Comment Period for Product Coverage is Necessary</u>

As noted above, the petition and the petitioner have stated state repeatedly that
the new petition is connected to and in reaction to the results of the last case on solar
cells.  It appears that scope of the new petition is an attempt to overturn or circumvent
the Department's substantial transformation analysis for these products.  In any case,
the confusion connected to the last investigation properly led the Department to set
aside "a period for interested parties to raise issues regarding product coverage."  No
less is necessary in this investigation, an explicit outgrowth of the earlier investigation.

Indeed, on its face, the proposed scope in this new petition raises several
immediate questions of product coverage and administration.  We discuss a few of
these complications below.  We do not present this information as an exhaustive list, but
to demonstrate the important and potentially confusing issues raised by the lack of
clarity in some of the proposed scope language.  Where the issues are so numerous
and central, this is precisely the type of situation, as provided by the preamble to the
Department regulations, where a comment period is needed.

For example, the proposed scope states that it means to cover modules
"assembled in the subject country consisting of … cells that are completely or partially
manufactured within a customs territory other than that subject country," using ingots,
wafers or partially manufactured cells produced in the subject country.  It appears that

U.S. Department of Commerce
January 15, 2014
page 6



Public Document

this means when an ingot is produced in China, and that ingot is used to produce a cell in Jamaica[2], then that cell is assembled in China into a module, that module would be subject merchandise when imported into the United States. This has the potential to raise enormous confusion since the Department said in the prior investigation that such a cell made in Jamaica is not substantially transformed by assembly into a module in China. In other words, the scope as currently written apparently seeks to overturn the Department's detailed substantial transformation analysis. Under this proposed scope, apparently, a Chinese ingot does not lose Chinese origin and become a Jamaican cell. Or, perhaps, petitioners intend that the Jamaican cell somehow loses Jamaican origin upon assembly into a module in China, which would be fully in conflict with the Department's detailed substantial transformation analysis of this type of merchandise.

In addition, the proposed scope language ties subject merchandise incorporating cells not made in China or Taiwan to the site of ingot crystallization, wafer production or initial cell conversion. The scope does not make clear how it should be interpreted if those steps do not occur in the same country. For example, if the ingot is crystallized in China but the wafer is produced in Taiwan, does this mean that early production steps are considered to have occurred in China? Or would it be Taiwan? If the cell is made in Jamaica and the module is assembled in China, this ingot/wafer analysis could make a critical difference for determining whether the merchandise is subject and which order should apply. Essentially, the proposed scope language is silent on this point and lumps the ingot and wafer steps together in its analysis.

The confusion and potential absurdity is especially apparent when applied to Suniva's production. Suniva has a large production of cells in the United States. Suniva is a venture-backed company spun out of the Georgia Institute of Technology's photovoltaic program. The company has a history of technology innovation and has developed over fifty patents. Recently, the U.S. Department of Energy awarded Suniva significant research grants for future cell designs. The company employs approximately 270 people, with a growth of more than fifty skilled employees in the past year.

If the above interpretation of the scope is petitioner's intended outcome then Suniva's U.S.-origin cells, when shipped to China, possibly could be subject to duties upon return. In other words, the cells are of U.S. origin, when shipped to China they experience a relatively minor operation, described by the Department as "a comparatively less sophisticated process than cell conversion," as noted above. Upon importation into the United States, these modules are not of Chinese origin for ADD/CVD purposes, as clearly described by the Department. Nonetheless, the proposed scope of the instant petition seems to be proposing that duties would be applied to these U.S.-origin goods. This seems unreasonable on its face and, at a minimum, strong support for the need to set aside a comment period in this case.

---

[2] Just an example country for discussion, chosen at random.

U.S. Department of Commerce
January 15, 2014
page 7



**Public Document**

The potential confusion extends far beyond Suniva. As a further example, imagine an ingot from China, made into a cell in Jamaica and then made into a module in Iceland.[3]  The proposed scope, in the second sentence of the first paragraph, seems to state that the scope is meant to cover:

- modules,

- consisting of cells from a customs territory other than that subject country,

- using ingots/wafers from the subject country.

Does this mean that the scope is intended to cover modules from Iceland, that incorporate cells from Jamaica, just because the finished good started with an ingot from China? Is this a further attempt to overturn the Department's clear substantial transformation analysis as provided in the prior investigations? Is such a result possible where the only input from China/Taiwan is an ingot, but ingots themselves are non-subject merchandise and would not be subject if an ingot were imported directly to the United States? This is a petition against "cells and modules, laminates and/or panels…" Could such a petition possibly apply to finished products that include Chinese ingots, no matter what has been done to the ingot since it left China? These interpretations seem strained but, nonetheless, are left open by the language of the scope.

In Supplement II to the petition, filed on January 13, 2014, the petitioner proposes adjusting the language to say that the scope applies to modules, laminates and/or panels "assembled in the subject country…" This would seem to address the China/Jamaica/Iceland example above (since such a module would have been assembled in Iceland, not a subject country), but whether this change will be implemented is uncertain. Certainty in this area is critical both for industry decisions and for implementation and enforcement by U.S. Customs and Border Protection. The industry – and the Department – certainly have a right to examine and know for certain what is meant to be covered.

Further confusion is present because two countries are subject to these investigations. As noted above, the proposed scope states that it intends to cover

- modules …

- consisting of cells from a customs territory other than *that* subject country,

- using ingots, wafers … from *the* subject country.

---

[3] Another random example country, just for discussion.

U.S. Department of Commerce
January 15, 2014
page 8



**Steptoe**
STEPTOE & JOHNSON LLP

**Public Document**

So, it is clear that the scope seeks to cover modules made in a subject country using cells made somewhere else, in some circumstances.  But what circumstances?  Is it only where the ingot was from *the same* subject country as the module assembly?  Does this mean that where the module is made in China and the cell is made in Jamaica, the module is only subject if the cell used an ingot from China, *but not from* Taiwan?  In other words, does the country of origin of the ingot need to match the origin of the module assembly?  The proposed scope says "using ingots, wafers … from *the* subject country."  The proposed language does not identify ingots from *either* subject country.

In Supplement II to the petition, filed on January 13, 2014, the petitioner proposes further revisions to the scope, but still states that scope is based where the ingots, wafers or other initial cell conversion, occur in the "*the* subject country" (emphasis added).  The discussion section of the supplement uses the phrase "the *same* country" (emphasis added), which would seem to suggest a match between the country of ingot production and the country of module assembly would be required.  However, the proposed revised scope language does not use the phrase "the same subject country" which leaves the scope unclear and subject to uncertain interpretation and enforcement.

Finally, there is a question regarding whether a certification will be required at the time of importation, and if so, in what form.  The certification process under the existing orders has required substantial time and effort from exporters and importers to prepare and maintain.  Whether another certification will be required, and if so, its format, is clearly an important issue to be discussed.

These questions all are fundamental to the industry and to the administration of this scope, if it were to go into effect at the border.  In such a case, this is precisely why the preamble to the Department's regulations provide for a comment period early in the investigation.

The Department must take the same step here, as it did in response to the last petition regarding solar products.  We respectfully request that the Department "set{} aside a period for interested parties to raise issues regarding product coverage", as it did in the last investigations.

# Tab 15

# AD P.R. Doc. 131

## Suniva Comments on the Scope
## (Feb. 18, 2014)

Gregory S. McCue
202 429 6421
gmccue@steptoe.com

1330 Connecticut Avenue, NW
Washington, DC 20036-1795
202 429 3000 main
www.steptoe.com



February 18, 2014

**PUBLIC DOCUMENT**

Case Nos.  A-570-010
A-583-853
C-570-011
Investigations

Total Number of Pages: <u>54</u>

AD/CVD Operations

**via electronic filing in IA ACCESS**

The Honorable Penny Pritzker
Secretary of Commerce
U.S. Department of Commerce
Attn: Enforcement and Compliance
APO/Dockets Unit, Room 1870
14th Street & Pennsylvania Ave., NW
Washington, DC 20230

Re:  **Comments on the Scope and Request for Scope Revisions
Certain Crystalline Silicon Photovoltaic Products
from China and Taiwan**

Dear Secretary Pritzker:

On behalf of our client, Suniva, Inc., a U.S. producer of crystalline silicon photovoltaic ("CSPV") products, we respectfully request that the Department revise the published scope of the above-referenced investigations, as discussed below.  We file these comments within the period for scope comments, as set aside[1] by the Department for these investigations.

---

[1] In its memorandum dated February 4, 2014, the Department extended the date for scope comments to February 18, 2014.  Accordingly, these comments are timely.



U.S. Department of Commerce
February 18, 2014
page 2

**Public Document**

In its Notices of Initiation,[2] the Department mentioned that Suniva requested this period for comments.[3]  We greatly appreciate the Department's decision to allow for comments on the scope in these investigations.

## I.      Introduction

The first paragraph of the scope of these investigations, as published in the Department's Notices of Initiation, is as follows.

> The merchandise covered by this investigation is crystalline silicon photovoltaic cells, and modules, laminates and/or panels consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including building integrated materials. *For purposes of this investigation, subject merchandise also includes modules, laminates and/or panels assembled in the subject country consisting of crystalline silicon photovoltaic cells that are completed or partially manufactured within a customs territory other than that subject country, using ingots that are manufactured in the subject country, wafers that are manufactured in the subject country, or cells where the manufacturing process begins in the subject country and is completed in a non-subject country.*

The second sentence above has been referred to by the Petitioner as the "2 out of 3" rule.[4]  As explained by Petitioner (described below), the 2 out of 3 rule is intended to be in addition to and a supplement to the Department's existing origin analysis in the prior

---

[2] *Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China and Taiwan: Initiation of Antidumping Duty Investigations*, 79 FR 4,661, 4,662 (January 29, 2014), and *Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China: Initiation of Countervailing Duty Investigation*, 79 FR 4,667, 4,668 (January 29, 2014). (hereinafter, "Notices of Initiation").

[3] Request for Comment Period on Scope, Letter from Steptoe & Johnson on behalf of Suniva, dated January 15, 2014.

[4] *See, e.g.*, ITC Post-Conference Brief, by Wiley Rein on behalf of SolarWorld Industries America, Inc., dated January 29, 2014 at Exhibit 1, pages 1-2 (excerpts at **Attachment 1**) (hereinafter, "SW ITC Post-Conf. Brief").

U.S. Department of Commerce
February 18, 2014
page 3



**Public Document**

CSPV investigations.[5]  In light of the 2 out of 3 rule, Suniva respectfully requests two revisions to the scope of these investigations.

First, if the Department is to expand into a new analysis, in addition to its existing origin rule from the prior CSPV investigations, it cannot do so in a way that would apply duties to products already defined by the Department as being of U.S. origin.  U.S. antidumping and countervailing duty law makes specific reference to duties on foreign merchandise and to protection of domestic production.  Accordingly, we respectfully request that the scope be revised to incorporate an exclusion for CSPV products assembled using U.S.-origin cells.

Second, because there are two countries at issue in these investigations, it is not clear on the face of the scope language which are the "two" countries in which 2 out of 3 events must occur in order for the merchandise to be subject.  However, Petitioner's consistent, repeated comments (made outside the written scope language) explain its intention that the "same" country must be both of the "2 out of 3."  In order to improve clarity for the CSPV industry and to avoid any enforcement confusion by U.S. Customs and Border Protection ("CBP"), the scope should be revised to include this word "same" in the way used by Petitioner in multiple statements.

## II.   Background

Suniva is the leading American manufacturer of high-efficiency, cost-competitive PV solar cells and modules. The company is known worldwide for its high-quality solar products, patented low-cost manufacturing technology, and long-term reliable performance.

Suniva is a venture-backed company, evolved from Georgia Tech's University Center of Excellence for Photovoltaic Research and Education ("UCEP") – one of the most advanced crystalline photovoltaic labs in world.  In fact, UCEP is partially funded by the U.S. Department of Energy and has been since the inception of UCEP in 1992. Today, Suniva's corporate offices, manufacturing plant and R&D labs are headquartered in Norcross, Georgia, just 12 miles from Georgia Tech.  The company employs approximately 250 people, with a growth of more than 50 skilled employees in the last 12 months.

---

[5] *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order*, 77 Fed. Reg. 73,018 (December 7, 2012) and *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Countervailing Duty Order*, 77 Fed. Reg. 73,017 (December 7, 2012).

U.S. Department of Commerce
February 18, 2014
page 4



Public Document

Suniva has a large production of CSPV cells in the United States.  The company has a history of technology innovation and has developed over 50 patents.  Recently, the U.S. Department of Energy awarded Suniva significant research grants for future cell designs.

Since its inception in 2008, Suniva has led the industry in high-performance, affordable CSPV cells. The company makes record-setting 20+% conversion efficiency full-size cells in its labs, and averages 19+% efficiency daily on its production lines – manufacturing the world's highest commercially-available cell efficiencies using low manufacturing costs.

## III.     The "2 out of 3" Rule Must Contain a Scope Exclusion for CSPV Products Assembled from U.S.-origin Cells

The 2 out of 3 rule would be an analysis in addition to the Department's usual substantial transformation origin analysis.  As a U.S. producer of the subject merchandise, Suniva respectfully submits that the Department can only add to or deviate from its substantial transformation analysis in a way that would be consistent with the fundamental objectives of the U.S. antidumping and countervailing duty laws.  Specifically, U.S. law is designed to apply duties to foreign merchandise and to protect domestic production.  The Department has already found that cells converted in the United States are of U.S. origin.  Consequently, under this analysis, modules, panels and laminates assembled from U.S.-origin cells are of U.S. origin for ADD/CVD purposes.  Accordingly, the 2 out of 3 rule should contain a scope exclusion for CSPV products assembled from U.S.-origin cells.

### A.     CSPV modules, panels and laminates are of U.S. origin if assembled from cells of U.S. origin

In a letter to the Department revising the scope, Petitioner explained that it:

> … intends that country of origin would be determined through a two-step process:
>
> 1) By reference to the country of origin of the cell, consistent with the Department's investigation and final determination in Solar Cells and Modules from China;
>
> 2) However, if the cell is completed or partially manufactured within a customs territory other than that subject country, and both the module, laminate, or panel and the input (either ingot, wafer, or partially manufactured cell) are manufactured

# Tab 16

# CVD P.R. Doc. 91

## Suniva Comments on the Scope
## (Feb. 18, 2014)



Gregory S. McCue
202 429 6421
gmccue@steptoe.com

1330 Connecticut Avenue, NW
Washington, DC 20036-1795
202 429 3000 main
www.steptoe.com

February 18, 2014                                 **PUBLIC DOCUMENT**

                                         Case Nos.  A-570-010
                                                    A-583-853
                                                    C-570-011
                                                    Investigations

                                     Total Number of Pages: 54

                                              AD/CVD Operations

**via electronic filing in IA ACCESS**

The Honorable Penny Pritzker
Secretary of Commerce
U.S. Department of Commerce
Attn: Enforcement and Compliance
APO/Dockets Unit, Room 1870
14th Street & Pennsylvania Ave., NW
Washington, DC 20230

          **Re:   Comments on the Scope and Request for Scope Revisions
                  Certain Crystalline Silicon Photovoltaic Products
                  from China and Taiwan**

Dear Secretary Pritzker:

          On behalf of our client, Suniva, Inc., a U.S. producer of crystalline silicon
photovoltaic ("CSPV") products, we respectfully request that the Department revise the
published scope of the above-referenced investigations, as discussed below.  We file
these comments within the period for scope comments, as set aside[1] by the Department
for these investigations.

---

          [1] In its memorandum dated February 4, 2014, the Department extended the date for
scope comments to February 18, 2014.  Accordingly, these comments are timely.

U.S. Department of Commerce
February 18, 2014
page 2



**Public Document**

In its Notices of Initiation,[2] the Department mentioned that Suniva requested this period for comments.[3]  We greatly appreciate the Department's decision to allow for comments on the scope in these investigations.

## I.  Introduction

The first paragraph of the scope of these investigations, as published in the Department's Notices of Initiation, is as follows.

> The merchandise covered by this investigation is crystalline silicon photovoltaic cells, and modules, laminates and/or panels consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including building integrated materials. *For purposes of this investigation, subject merchandise also includes modules, laminates and/or panels assembled in the subject country consisting of crystalline silicon photovoltaic cells that are completed or partially manufactured within a customs territory other than that subject country, using ingots that are manufactured in the subject country, wafers that are manufactured in the subject country, or cells where the manufacturing process begins in the subject country and is completed in a non-subject country.*

The second sentence above has been referred to by the Petitioner as the "2 out of 3" rule.[4]  As explained by Petitioner (described below), the 2 out of 3 rule is intended to be in addition to and a supplement to the Department's existing origin analysis in the prior

---

[2] *Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China and Taiwan: Initiation of Antidumping Duty Investigations*, 79 FR 4,661, 4,662 (January 29, 2014), and *Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China: Initiation of Countervailing Duty Investigation*, 79 FR 4,667, 4,668 (January 29, 2014). (hereinafter, "Notices of Initiation").

[3] Request for Comment Period on Scope, Letter from Steptoe & Johnson on behalf of Suniva, dated January 15, 2014.

[4] *See, e.g.*, ITC Post-Conference Brief, by Wiley Rein on behalf of SolarWorld Industries America, Inc., dated January 29, 2014 at Exhibit 1, pages 1-2 (excerpts at **Attachment 1**) (hereinafter, "SW ITC Post-Conf. Brief").

U.S. Department of Commerce
February 18, 2014
page 3



<u>**Public Document**</u>

CSPV investigations.[5]  In light of the 2 out of 3 rule, Suniva respectfully requests two revisions to the scope of these investigations.

First, if the Department is to expand into a new analysis, in addition to its existing origin rule from the prior CSPV investigations, it cannot do so in a way that would apply duties to products already defined by the Department as being of U.S. origin.  U.S. antidumping and countervailing duty law makes specific reference to duties on foreign merchandise and to protection of domestic production.  Accordingly, we respectfully request that the scope be revised to incorporate an exclusion for CSPV products assembled using U.S.-origin cells.

Second, because there are two countries at issue in these investigations, it is not clear on the face of the scope language which are the "two" countries in which 2 out of 3 events must occur in order for the merchandise to be subject.  However, Petitioner's consistent, repeated comments (made outside the written scope language) explain its intention that the "same" country must be both of the "2 out of 3."  In order to improve clarity for the CSPV industry and to avoid any enforcement confusion by U.S. Customs and Border Protection ("CBP"), the scope should be revised to include this word "same" in the way used by Petitioner in multiple statements.

## II.    <u>Background</u>

Suniva is the leading American manufacturer of high-efficiency, cost-competitive PV solar cells and modules. The company is known worldwide for its high-quality solar products, patented low-cost manufacturing technology, and long-term reliable performance.

Suniva is a venture-backed company, evolved from Georgia Tech's University Center of Excellence for Photovoltaic Research and Education ("UCEP") – one of the most advanced crystalline photovoltaic labs in world.  In fact, UCEP is partially funded by the U.S. Department of Energy and has been since the inception of UCEP in 1992. Today, Suniva's corporate offices, manufacturing plant and R&D labs are headquartered in Norcross, Georgia, just 12 miles from Georgia Tech.  The company employs approximately 250 people, with a growth of more than 50 skilled employees in the last 12 months.

---

[5] *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order*, 77 Fed. Reg. 73,018 (December 7, 2012) and *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Countervailing Duty Order*, 77 Fed. Reg. 73,017 (December 7, 2012).

U.S. Department of Commerce
February 18, 2014
page 4



**Public Document**

Suniva has a large production of CSPV cells in the United States.  The company has a history of technology innovation and has developed over 50 patents.  Recently, the U.S. Department of Energy awarded Suniva significant research grants for future cell designs.

Since its inception in 2008, Suniva has led the industry in high-performance, affordable CSPV cells. The company makes record-setting 20+% conversion efficiency full-size cells in its labs, and averages 19+% efficiency daily on its production lines – manufacturing the world's highest commercially-available cell efficiencies using low manufacturing costs.

## III.   The "2 out of 3" Rule Must Contain a Scope Exclusion for CSPV Products Assembled from U.S.-origin Cells

The 2 out of 3 rule would be an analysis in addition to the Department's usual substantial transformation origin analysis.  As a U.S. producer of the subject merchandise, Suniva respectfully submits that the Department can only add to or deviate from its substantial transformation analysis in a way that would be consistent with the fundamental objectives of the U.S. antidumping and countervailing duty laws.  Specifically, U.S. law is designed to apply duties to foreign merchandise and to protect domestic production.  The Department has already found that cells converted in the United States are of U.S. origin.  Consequently, under this analysis, modules, panels and laminates assembled from U.S.-origin cells are of U.S. origin for ADD/CVD purposes.  Accordingly, the 2 out of 3 rule should contain a scope exclusion for CSPV products assembled from U.S.-origin cells.

### A.   CSPV modules, panels and laminates are of U.S. origin if assembled from cells of U.S. origin

In a letter to the Department revising the scope, Petitioner explained that it:

> … intends that country of origin would be determined through a two-step process:
>
> 1) By reference to the country of origin of the cell, consistent with the Department's investigation and final determination in Solar Cells and Modules from China;
>
> 2) However, if the cell is completed or partially manufactured within a customs territory other than that subject country, and both the module, laminate, or panel and the input (either ingot, wafer, or partially manufactured cell) are manufactured

# Tab 17

# AD P.R. Doc. 779

## Suniva Case Brief
## (Oct. 16, 2014)

Gregory S. McCue
202 429 6421
gmccue@steptoe.com



1330 Connecticut Avenue, NW
Washington, DC 20036-1795
202 429 3000 main
www.steptoe.com

October 16, 2014

**PUBLIC DOCUMENT**

Case Nos.  A-570-010
A-583-853
C-570-011

Investigations

Total Number of Pages:  23

AD/CVD Operations
Office IV

<u>via electronic filing in IA ACCESS</u>

The Honorable Penny Pritzker
Secretary of Commerce
U.S. Department of Commerce
<u>Attn</u>: Enforcement and Compliance
APO/Dockets Unit, Room 1870
14th Street & Pennsylvania Ave., NW
Washington, DC  20230

Re:    **Case Brief on Scope Issues**
**Certain Crystalline Silicon Photovoltaic Products**
<u>**from China and Taiwan**</u>

Dear Secretary Pritzker:

On behalf of our client, Suniva, Inc., a U.S. producer of crystalline silicon photovoltaic ("CSPV") products, we hereby submit this case brief in the above-referenced investigations.

In its memorandum dated October 9, 2014, the Department set the date for case briefs as no later than October 16, 2014.  Accordingly, this case brief is timely filed.

Barcode:3235688-01 A-570-010 INV - Investigation -

U.S. Department of Commerce
October 16, 2014
page 3



**Public Document**

> *For purposes of this investigation, subject merchandise includes modules, laminates and/or panels assembled in the People's Republic of China consisting of crystalline silicon photovoltaic cells produced in a customs territory other than the People's Republic of China.* (emphasis added)

The Department described a comparable clarification to the scope of the investigation involving Taiwan, so that the scope of the Taiwan order would cover CSPV products assembled in Taiwan or assembled using cells produced in Taiwan.

For many of the same reasons described in Suniva's scope comments, we respectfully submit that the Department must recognize that the proposed scope clarification, if adopted, also would need to include an explicit exemption for CSPV products assembled using U.S.-origin cells.


## II.   Background

As described in Suniva's prior scope comments, Suniva is the leading American manufacturer of high-efficiency, cost-competitive PV solar cells and modules. The company is known worldwide for its high-quality solar products, patented low-cost manufacturing technology, and long-term reliable performance.

Suniva is a venture-backed company, evolved from Georgia Tech's University Center of Excellence for Photovoltaic Research and Education ("UCEP") – one of the most advanced crystalline photovoltaic labs in world.  In fact, UCEP is partially funded by the U.S. Department of Energy and has been since the inception of UCEP in 1992. Today, Suniva's corporate offices, manufacturing plant and R&D labs are headquartered in Norcross, Georgia, just 12 miles from Georgia Tech.  The company employs approximately 250 people, with a growth of more than 50 skilled employees in the last 12 months.  Recently, Suniva announced a second U.S. plant in Saginaw Michigan.  At current planned capacity, this new plant will employ 350 additional employees.

Suniva has a large production of CSPV cells in the United States.  The company has a history of technology innovation and has developed over 50 patents.  Recently, the U.S. Department of Energy awarded Suniva significant research grants for future cell designs.

Since its inception in 2008, Suniva has led the industry in high-performance, affordable CSPV cells. The company makes record-setting 21+% conversion efficiency full-size cells in its labs, and averages 19+% efficiency daily on its production lines – manufacturing the world's highest commercially-available cell efficiencies using low manufacturing costs.

U.S. Department of Commerce
October 16, 2014
page 4



**Public Document**

III.    **If Adopted, the Proposed Clarification Must Contain a Scope Exclusion for CSPV Products Assembled from U.S.-origin Cells**

The proposed scope clarification necessarily would be in addition to or deviation the Department's usual substantial transformation origin analysis established in the 2012 CSPV orders.  As a U.S. producer of the subject merchandise, Suniva respectfully submits that the Department can only add to or deviate from its substantial transformation analysis in a way that would be consistent with the fundamental objectives of the U.S. antidumping and countervailing duty laws.  Specifically, U.S. law is designed to apply duties to foreign merchandise and to protect domestic production.  The Department has already found that modules, panels and laminates assembled from U.S.-origin cells are of U.S. origin for AD/CVD purposes.  Accordingly, the proposed clarification should contain a scope exclusion for CSPV products assembled from U.S.-origin cells.

In its Rebuttal Scope Comments,[6] Petitioner quibbled with Suniva's scope comments stating that "the Department has not yet determined - in this case or any previous case - the specific point in the c-Si PV cell production process at which the cell adopts a country of origin."  Divining such a "specific point" for all possible production scenarios is entirely unnecessary.  The Department already has found, in its recent, prior investigation into these very same products, that CSPV modules and panels, assembled from cells, do not experience a substantial transformation.[7]  Moreover, the Department already has stated that, in these investigations, it "will be informed by the product coverage decisions that it made"[8] in the prior CSPV investigations.  Thus, a module assembled in China or Taiwan using U.S.-origin cells does not experience a substantial transformation and retains the U.S. origin of the cell, unchanged.  As detailed below, U.S. law prohibits application of AD/CVD duties to U.S. origin goods.  Thus, both the 2 out of 3 proposal and the newly-proposed scope clarification require an additional exemption to avoid application of AD/CVD duties to U.S. origin CSPV products, that is, CSPV products assembled from U.S.-origin cells.  This necessary conclusion is not undone simply by imagining some hypothetical alternative where so little U.S. work is done that the cell never achieved U.S. origin in the first instance.

---

[6] Dated April 3, 2014, at page 23.

[7] *Scope Clarification:  Antidumping and Countervailing Duty Investigations of Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China*, March 19, 2012, at page 8.

[8] Notices of Initiation.

U.S. Department of Commerce
October 16, 2014
page 6



**Public Document**

Therefore, according to the Department's existing (and long-standing) analysis, which it already has determined to be "informed by" here, modules, panels and laminates assembled from U.S.-origin cells are U.S.-origin goods for AD/CVD purposes.

While the Department may revise or clarify its analysis, it must explain its rationale for doing so.[12]  As part of such an explanation, any such additional analysis adopted by the Department must be consistent with the fundamental objectives of U.S. antidumping and countervailing duty law.  U.S. statutes repeatedly express that duties are to be applied to foreign merchandise and that domestic production is to be protected, as described below.  Accordingly, domestically-produced goods, such as U.S. origin cells and products assembled therefrom, must be acknowledged for unique consideration, and receive a specific scope exclusion, if the scope clarification is adopted.

**B.      An origin analysis cannot result in duties applied to U.S.-origin goods**

If the proposed clarification were to be applied to modules, panels and laminates assembled from U.S.-origin cells, at would appear to applying duties to U.S.-origin merchandise.  However, any clarification of the existing origin rule for CSPV merchandise cannot be applied to such U.S.-origin merchandise.

*1.      U.S. AD/CVD law prohibits application of duties to U.S.-origin goods*

Applying duties to merchandise already found by the Department to be of U.S.-origin would be contrary to the fundamental terms and objectives of the U.S. antidumping and countervailing duty laws.  U.S. law makes clear that duties are to be applied to "foreign" merchandise and that "domestic" production is to be protected. Thus, in any new revision to, or extension of, the origin analysis for CSPV products, the unique statutory status of U.S. origin merchandise must be taken into account.  A review[13] of the explicit terms of U.S. law makes these objectives clear:

---

[12] "An agency is obligated to follow precedent, and if it chooses to change, it must explain why." *M.M. & P. Maritime Advancement, Training, Educ. & Safety Program v. Department of Commerce*, 729 F.2d 748, 755 (Fed. Cir. 1984).

[13] The citations herein are only examples of "domestic" and "foreign" from the statute, focusing especially, albeit not exclusively, on the Department, rather than the ITC.  We believe these examples are illustrative, representative and thoroughly consistent, but not exhaustive.

U.S. Department of Commerce
October 16, 2014
page 7



**Public Document**

- In determining industry support, the Department is required to consider whether the petition has the support of:

  > (i) the domestic producers or workers who support the petition account for at least 25 percent of the total ***production of the domestic like product***, and

  > (ii) the domestic producers or workers who support the petition account for more than 50 percent of the ***production of the domestic like product*** produced by that portion of the industry expressing support for or opposition to the petition.

  19 U.S.C. § 1671a(c)(4)(A) (emphasis added).  Clearly, the objective of the statute is to collect opinions representing domestic products, because domestic products are to be protected.  Accordingly, the Department's analysis cannot result in duties applied to products that the Department itself already has defined as ***domestic***.


- In analyzing the views of domestic producers, U.S. law directs the Department to "disregard the position of ***domestic*** producers who oppose the petition, if such producers are related to ***foreign*** producers, as defined in section 1677(4)(B)(ii) of this title, unless such domestic producers demonstrate that their interests as domestic producers would be adversely affected by the imposition of a countervailing duty order."  19 U.S.C. § 1671a(c)(4)(B)(i) (emphasis added).  U.S. law explicitly differentiates between domestic producers, who are to be protected by the law, and foreign producers.  Thus, U.S.-produced merchandise similarly must be protected.


- Regarding a quantitative restriction agreement, U.S. law requires the Department to consider:  "(iii) the relative impact on the competitiveness of ***the domestic industry producing the like merchandise***, including any such impact on employment and investment in that industry."  19 U.S.C. § 1671c(a)(2)(B)(iii) (emphasis added).  Thus, U.S. law makes clear that the Department is to take special care to contemplate the impact on domestic products.


- In considering whether to terminate an investigation with a quantitative restriction agreement, U.S. law requires the Department to consult with: "potentially affected producers and workers in ***the domestic industry***

Barcode:3235688-01 A-570-010 INV - Investigation -

U.S. Department of Commerce
October 16, 2014
page 8



**Public Document**

*producing the like merchandise*, including producers and workers not party to the investigation." 19 U.S.C. § 1671c(a)(2)(C)(ii) (emphasis added). U.S. law makes clear that the Department is required to take into account the view of those responsible for domestic production.

- Antidumping duties are imposed when the Department finds that "a class of kind of *foreign* merchandise" is being dumped in the United States. 19 U.S.C. § 1673(1) (emphasis added). Clearly, where solar cells are of U.S. origin, then U.S. origin cells assembled into modules abroad do not lose U.S. origin and are not "foreign merchandise."

- In considering whether to terminate an AD investigation with a quantitative restriction agreement, U.S. law requires the Department to consider whether, under the proposed agreement, "the suppression or undercutting of price levels of *domestic products* by imports of that merchandise will be prevented…". 19 U.S.C. § 1673c(c)(1)(A) (emphasis added). U.S. law makes clear that the Department is required to focus on the impact of its decisions on domestic products.

- In considering whether to terminate an AD investigation with a quantitative restriction agreement, U.S. law allows the Department to find "extraordinary circumstances" where, in part, "suspension of an investigation will be more beneficial to the *domestic industry* than continuation of the investigation…". 19 U.S.C. § 1673c(c)(2)(A)(i) (emphasis added). U.S. law makes clear that the Department is required to focus on the impact of its decisions on domestic producers.

- In the event the Department were to consider self-initiating an antidumping duty investigation, a monitoring system can be established if, among other factors, "in the judgment of the administering authority this extraordinary pattern is causing a serious commercial problem for the *domestic industry*." 19 U.S.C. § 1673a(a)(2)(A)(iii) (emphasis added). U.S. law requires the Department to be on the lookout for and to protect against problems that impact domestic products.

- In sunset reviews, U.S. law requires an examination of "the potential for product-shifting if *production facilities in the foreign country*, which can be used to produce the subject merchandise, are currently being used to

Barcode:3235688-01 A-570-010 INV - Investigation -

U.S. Department of Commerce
October 16, 2014
page 9



**Public Document**

produce other products." 19 U.S.C. § 1675a(a)(2)(D) (emphasis added). Clearly, U.S. law is focused on foreign production facilities and their products, *not* U.S. production facilities and their products.

- In a threat of injury analysis, U.S. law requires consideration of "…the potential for product-shifting if *production facilities in the foreign country*, which can be used to produce the subject merchandise, are currently being used to produce other products…". 19 U.S.C. § 1677(7)(F)(VI) (emphasis added). Clearly, U.S. law is focused on foreign production facilities and their products, *not* U.S. production facilities and their products.

- U.S. AD/CVD law defines "country" as "a *foreign* country, a political subdivision, dependent territory, or possession of a foreign country…". 19 U.S.C. § 1677(3) (emphasis added). Thus, where U.S. law directs calculations and analyses to be made for products from or actions in a country, it is meant to be a "foreign" country, not intended for products or merchandise originating from the United States.

- In an anticircumvention inquiry, the analysis is required to consider "whether the manufacturer or exporter of the parts or components is affiliated with the person who assembles or completes the merchandise sold in the United States from the *parts or components produced in the foreign country* with respect to which the order or finding described in paragraph (1) applies…". 19 U.S.C. § 1677j(a)(3)(B) (emphasis added). Clearly, U.S. law is focused on merchandise produced in a foreign country, not merchandise produced in the United States.

In light of all the above, it is clear that U.S. law expects and requires that duties will be applied only to foreign, not domestic, products and that domestic production is specifically identified for special consideration under U.S. law.

>    *2.     The Department has recognized the imperative not to apply AD/CVD duties to U.S.-origin goods*

The Department has noted this type of statutory imperative in analysis of the connections between the ADD/CVD laws and the U.S. Customs provisions regarding American Goods Returned ("AGR"):

# Tab 18

# CVD P.R. Doc. 357

# Suniva Case Brief
# (Oct. 16, 2014)

Gregory S. M<sup>c</sup>Cue
202 429 6421
gmccue@steptoe.com



1330 Connecticut Avenue, NW
Washington, DC 20036-1795
202 429 3000 main
www.steptoe.com

October 16, 2014

**PUBLIC DOCUMENT**

Case Nos.  A-570-010
A-583-853
C-570-011

Investigations

Total Number of Pages:  23

AD/CVD Operations
Office IV

<u>via electronic filing in IA ACCESS</u>

The Honorable Penny Pritzker
Secretary of Commerce
U.S. Department of Commerce
<u>Attn</u>: Enforcement and Compliance
APO/Dockets Unit, Room 1870
14th Street & Pennsylvania Ave., NW
Washington, DC  20230

Re:   **Case Brief on Scope Issues**
**Certain Crystalline Silicon Photovoltaic Products**
**<u>from China and Taiwan</u>**

Dear Secretary Pritzker:

On behalf of our client, Suniva, Inc., a U.S. producer of crystalline silicon photovoltaic ("CSPV") products, we hereby submit this case brief in the above-referenced investigations.

In its memorandum dated October 9, 2014, the Department set the date for case briefs as no later than October 16, 2014.  Accordingly, this case brief is timely filed.

U.S. Department of Commerce
October 16, 2014
page 3



**Public Document**

> *For purposes of this investigation, subject merchandise
> includes modules, laminates and/or panels assembled in the
> People's Republic of China consisting of crystalline silicon
> photovoltaic cells produced in a customs territory other than
> the People's Republic of China.* (emphasis added)

The Department described a comparable clarification to the scope of the investigation involving Taiwan, so that the scope of the Taiwan order would cover CSPV products assembled in Taiwan or assembled using cells produced in Taiwan.

For many of the same reasons described in Suniva's scope comments, we respectfully submit that the Department must recognize that the proposed scope clarification, if adopted, also would need to include an explicit exemption for CSPV products assembled using U.S.-origin cells.


## II.    Background

As described in Suniva's prior scope comments, Suniva is the leading American manufacturer of high-efficiency, cost-competitive PV solar cells and modules. The company is known worldwide for its high-quality solar products, patented low-cost manufacturing technology, and long-term reliable performance.

Suniva is a venture-backed company, evolved from Georgia Tech's University Center of Excellence for Photovoltaic Research and Education ("UCEP") – one of the most advanced crystalline photovoltaic labs in world.  In fact, UCEP is partially funded by the U.S. Department of Energy and has been since the inception of UCEP in 1992. Today, Suniva's corporate offices, manufacturing plant and R&D labs are headquartered in Norcross, Georgia, just 12 miles from Georgia Tech.  The company employs approximately 250 people, with a growth of more than 50 skilled employees in the last 12 months.  Recently, Suniva announced a second U.S. plant in Saginaw Michigan.  At current planned capacity, this new plant will employ 350 additional employees.

Suniva has a large production of CSPV cells in the United States.  The company has a history of technology innovation and has developed over 50 patents.  Recently, the U.S. Department of Energy awarded Suniva significant research grants for future cell designs.

Since its inception in 2008, Suniva has led the industry in high-performance, affordable CSPV cells. The company makes record-setting 21+% conversion efficiency full-size cells in its labs, and averages 19+% efficiency daily on its production lines – manufacturing the world's highest commercially-available cell efficiencies using low manufacturing costs.

Barcode:3235692-01 C-570-011 INV - Investigation  -



**Public Document**

III.     **If Adopted, the Proposed Clarification Must Contain a Scope Exclusion for CSPV Products Assembled from U.S.-origin Cells**

The proposed scope clarification necessarily would be in addition to or deviation the Department's usual substantial transformation origin analysis established in the 2012 CSPV orders.  As a U.S. producer of the subject merchandise, Suniva respectfully submits that the Department can only add to or deviate from its substantial transformation analysis in a way that would be consistent with the fundamental objectives of the U.S. antidumping and countervailing duty laws.  Specifically, U.S. law is designed to apply duties to foreign merchandise and to protect domestic production.  The Department has already found that modules, panels and laminates assembled from U.S.-origin cells are of U.S. origin for AD/CVD purposes.  Accordingly, the proposed clarification should contain a scope exclusion for CSPV products assembled from U.S.-origin cells.

In its Rebuttal Scope Comments,[6] Petitioner quibbled with Suniva's scope comments stating that "the Department has not yet determined - in this case or any previous case - the specific point in the c-Si PV cell production process at which the cell adopts a country of origin."  Divining such a "specific point" for all possible production scenarios is entirely unnecessary.  The Department already has found, in its recent, prior investigation into these very same products, that CSPV modules and panels, assembled from cells, do not experience a substantial transformation.[7]  Moreover, the Department already has stated that, in these investigations, it "will be informed by the product coverage decisions that it made"[8] in the prior CSPV investigations.  Thus, a module assembled in China or Taiwan using U.S.-origin cells does not experience a substantial transformation and retains the U.S. origin of the cell, unchanged.  As detailed below, U.S. law prohibits application of AD/CVD duties to U.S. origin goods.  Thus, both the 2 out of 3 proposal and the newly-proposed scope clarification require an additional exemption to avoid application of AD/CVD duties to U.S. origin CSPV products, that is, CSPV products assembled from U.S.-origin cells.  This necessary conclusion is not undone simply by imagining some hypothetical alternative where so little U.S. work is done that the cell never achieved U.S. origin in the first instance.

---

[6] Dated April 3, 2014, at page 23.

[7] *Scope Clarification:  Antidumping and Countervailing Duty Investigations of Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China*, March 19, 2012, at page 8.

[8] Notices of Initiation.



**Public Document**

Therefore, according to the Department's existing (and long-standing) analysis, which it already has determined to be "informed by" here, modules, panels and laminates assembled from U.S.-origin cells are U.S.-origin goods for AD/CVD purposes.

While the Department may revise or clarify its analysis, it must explain its rationale for doing so.[12]  As part of such an explanation, any such additional analysis adopted by the Department must be consistent with the fundamental objectives of U.S. antidumping and countervailing duty law.  U.S. statutes repeatedly express that duties are to be applied to foreign merchandise and that domestic production is to be protected, as described below.  Accordingly, domestically-produced goods, such as U.S. origin cells and products assembled therefrom, must be acknowledged for unique consideration, and receive a specific scope exclusion, if the scope clarification is adopted.

## B.    An origin analysis cannot result in duties applied to U.S.-origin goods

If the proposed clarification were to be applied to modules, panels and laminates assembled from U.S.-origin cells, at would appear to applying duties to U.S.-origin merchandise.  However, any clarification of the existing origin rule for CSPV merchandise cannot be applied to such U.S.-origin merchandise.

### 1.    *U.S. AD/CVD law prohibits application of duties to U.S.-origin goods*

Applying duties to merchandise already found by the Department to be of U.S.-origin would be contrary to the fundamental terms and objectives of the U.S. antidumping and countervailing duty laws.  U.S. law makes clear that duties are to be applied to "foreign" merchandise and that "domestic" production is to be protected.  Thus, in any new revision to, or extension of, the origin analysis for CSPV products, the unique statutory status of U.S. origin merchandise must be taken into account.  A review[13] of the explicit terms of U.S. law makes these objectives clear:

---

[12] "An agency is obligated to follow precedent, and if it chooses to change, it must explain why." *M.M. & P. Maritime Advancement, Training, Educ. & Safety Program v. Department of Commerce*, 729 F.2d 748, 755 (Fed. Cir. 1984).

[13] The citations herein are only examples of "domestic" and "foreign" from the statute, focusing especially, albeit not exclusively, on the Department, rather than the ITC.  We believe these examples are illustrative, representative and thoroughly consistent, but not exhaustive.

Barcode:3235692-01 C-570-011 INV - Investigation  -

U.S. Department of Commerce
October 16, 2014
page 7



**Public Document**

- In determining industry support, the Department is required to consider whether the petition has the support of:

    > (i) the domestic producers or workers who support the petition account for at least 25 percent of the total ***production of the domestic like product***, and

    > (ii) the domestic producers or workers who support the petition account for more than 50 percent of the ***production of the domestic like product*** produced by that portion of the industry expressing support for or opposition to the petition.

    19 U.S.C. § 1671a(c)(4)(A) (emphasis added).  Clearly, the objective of the statute is to collect opinions representing domestic products, because domestic products are to be protected.  Accordingly, the Department's analysis cannot result in duties applied to products that the Department itself already has defined as ***domestic***.

- In analyzing the views of domestic producers, U.S. law directs the Department to "disregard the position of ***domestic*** producers who oppose the petition, if such producers are related to ***foreign*** producers, as defined in section 1677(4)(B)(ii) of this title, unless such domestic producers demonstrate that their interests as domestic producers would be adversely affected by the imposition of a countervailing duty order."  19 U.S.C. § 1671a(c)(4)(B)(i) (emphasis added).  U.S. law explicitly differentiates between domestic producers, who are to be protected by the law, and foreign producers.  Thus, U.S.-produced merchandise similarly must be protected.

- Regarding a quantitative restriction agreement, U.S. law requires the Department to consider:  "(iii) the relative impact on the competitiveness of ***the domestic industry producing the like merchandise***, including any such impact on employment and investment in that industry."  19 U.S.C. § 1671c(a)(2)(B)(iii) (emphasis added).  Thus, U.S. law makes clear that the Department is to take special care to contemplate the impact on domestic products.

- In considering whether to terminate an investigation with a quantitative restriction agreement, U.S. law requires the Department to consult with: "potentially affected producers and workers in ***the domestic industry***

Barcode:3235692-01 C-570-011 INV - Investigation  -

U.S. Department of Commerce
October 16, 2014
page 8



***producing the like merchandise***, including producers and workers not party to the investigation." 19 U.S.C. § 1671c(a)(2)(C)(ii) (emphasis added).  U.S. law makes clear that the Department is required to take into account the view of those responsible for domestic production.

- Antidumping duties are imposed when the Department finds that "a class of kind of ***foreign*** merchandise" is being dumped in the United States.  19 U.S.C. § 1673(1) (emphasis added).  Clearly, where solar cells are of U.S. origin, then U.S. origin cells assembled into modules abroad do not lose U.S. origin and are not "foreign merchandise."

- In considering whether to terminate an AD investigation with a quantitative restriction agreement, U.S. law requires the Department to consider whether, under the proposed agreement, "the suppression or undercutting of price levels of ***domestic products*** by imports of that merchandise will be prevented…".  19 U.S.C. § 1673c(c)(1)(A) (emphasis added).  U.S. law makes clear that the Department is required to focus on the impact of its decisions on domestic products.

- In considering whether to terminate an AD investigation with a quantitative restriction agreement, U.S. law allows the Department to find "extraordinary circumstances" where, in part, "suspension of an investigation will be more beneficial to the ***domestic industry*** than continuation of the investigation…".  19 U.S.C. § 1673c(c)(2)(A)(i) (emphasis added).  U.S. law makes clear that the Department is required to focus on the impact of its decisions on domestic producers.

- In the event the Department were to consider self-initiating an antidumping duty investigation, a monitoring system can be established if, among other factors, "in the judgment of the administering authority this extraordinary pattern is causing a serious commercial problem for the ***domestic industry***."  19 U.S.C. § 1673a(a)(2)(A)(iii) (emphasis added).  U.S. law requires the Department to be on the lookout for and to protect against problems that impact domestic products.

- In sunset reviews, U.S. law requires an examination of "the potential for product-shifting if ***production facilities in the foreign country***, which can be used to produce the subject merchandise, are currently being used to

Barcode:3235692-01 C-570-011 INV - Investigation -



**Public Document**

produce other products."  19 U.S.C. § 1675a(a)(2)(D) (emphasis added).
Clearly, U.S. law is focused on foreign production facilities and their
products, ***not*** U.S. production facilities and their products.

- In a threat of injury analysis, U.S. law requires consideration of "…the
  potential for product-shifting if ***production facilities in the foreign
  country***, which can be used to produce the subject merchandise, are
  currently being used to produce other products…".  19 U.S.C. §
  1677(7)(F)(VI) (emphasis added).  Clearly, U.S. law is focused on foreign
  production facilities and their products, ***not*** U.S. production facilities and
  their products.

- U.S. AD/CVD law defines "country" as "a ***foreign*** country, a political
  subdivision, dependent territory, or possession of a foreign country…".  19
  U.S.C. § 1677(3) (emphasis added).  Thus, where U.S. law directs
  calculations and analyses to be made for products from or actions in a
  country, it is meant to be a "foreign" country, not intended for products or
  merchandise originating from the United States.

- In an anticircumvention inquiry, the analysis is required to consider
  "whether the manufacturer or exporter of the parts or components is
  affiliated with the person who assembles or completes the merchandise
  sold in the United States from the ***parts or components produced in the
  foreign country*** with respect to which the order or finding described in
  paragraph (1) applies…".  19 U.S.C. § 1677j(a)(3)(B) (emphasis added).
  Clearly, U.S. law is focused on merchandise produced in a foreign
  country, not merchandise produced in the United States.

In light of all the above, it is clear that U.S. law expects and requires that duties will be
applied only to foreign, not domestic, products and that domestic production is
specifically identified for special consideration under U.S. law.

> 2.   *The Department has recognized the imperative not to apply
>       AD/CVD duties to U.S.-origin goods*

The Department has noted this type of statutory imperative in analysis of the
connections between the ADD/CVD laws and the U.S. Customs provisions regarding
American Goods Returned ("AGR"):

# Tab 19

# AD P.R. Doc. 822

# Message No. 5002303
# (Jan. 2, 2015)

MESSAGE NO:        5002303        MESSAGE DATE:    01/02/2015

MESSAGE STATUS:    Active    CATE        GORY:        Antidumping
TYPE:        PUBLIC FIN-Final Determination        ☑        NON-PUBLIC
SUB-TYPE:        AFF-Affirmative

FR CITE:        FR 79 FR 76970        CITE DATE:    12/23/2014

REFERENCE
MESSAGE #
(s):

CASE #(s):        A-570-010

EFFECTIVE DATE:    12/23/2014        CASE #:

PERIOD OF REVIEW:  04/01/2013        TO            09/30/2013

PERIOD COVERED:            TO

LIFTING OF SUSPENSION DATE:


TO: { DIRECTORS OF FIELD OPERATIONS, PORT DIRECTORS }


FROM: { DIRECTOR AD/CVD & REVENUE POLICY & PROGRAMS }


RE: Notice of final determination in the antidumping duty investigation of certain crystalline silicon photovoltaic products from the People's Republic of China (A-570-010)


1.  On 12/23/2014, Commerce published in the Federal Register (79 FR 76970) its final determination of sales at less than fair value in the antidumping duty investigation of certain crystalline silicon photovoltaic products from the People's Republic of China ("PRC").


2.  The merchandise covered by this investigation is modules, laminates and/or panels consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including building integrated materials.  For purposes of this investigation, subject merchandise includes modules, laminates and/or panels assembled in the PRC consisting of crystalline silicon photovoltaic cells produced in a customs territory other than the PRC. Subject merchandise includes modules, laminates and/or panels assembled in the PRC consisting of crystalline silicon photovoltaic cells of thickness equal to or greater than 20 micrometers, having a p/n junction formed by any means, whether or not the cell has undergone other processing, including, but not limited to, cleaning, etching, coating, and/or addition of materials (including, but not limited to, metallization and conductor patterns) to collect and forward the electricity that is generated by the cell.


Excluded from the scope of this investigation are thin film photovoltaic products produced from amorphous silicon (a-Si), cadmium telluride (CdTe), or copper indium gallium selenide (CIGS). Also excluded from the scope of this investigation are modules, laminates and/or panels assembled in the PRC, consisting of crystalline silicon photovoltaic cells, not exceeding 10,000mm2 in surface area, that are permanently integrated into a consumer good whose function is other than power generation and that consumes the electricity generated by the integrated crystalline silicon photovoltaic cells.  Where more than one module, laminate and/or panel is permanently integrated into a consumer good, the surface area for purposes of this exclusion shall be the total combined surface area of all modules, laminates and/or panels that are integrated into the consumer good.  Further, also excluded from the scope of this investigation are any products covered by the existing antidumping and countervailing duty orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, laminates and/or panels, from the PRC.  See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From

the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order, 77 FR 73018 (December 7, 2012); Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Countervailing Duty Order, 77 FR 73017 (December 7, 2012).

Merchandise covered by this investigation is currently classified in the Harmonized Tariff Schedule of the United States (HTSUS) under subheadings 8501.61.0000, 8507.20.8030, 8507.20.8040, 8507.20.8060, 8507.20.8090, 8541.40.6020, 8541.40.6030 and 8501.31.8000. These HTSUS subheadings are provided for convenience and customs purposes; the written description of the scope of this investigation is dispositive.

3.  This investigation has been assigned investigation number A-570-010.

4.  For imports of certain crystalline silicon photovoltaic products from the PRC, CBP shall suspend liquidation of such shipments entered, or withdrawn from warehouse, for consumption on or after 12/23/2014.

5.  Effective 12/23/2014, CBP shall require, for entries of certain crystalline silicon photovoltaic products from the PRC from the exporter/producer combinations listed below, a cash deposit equal to the antidumping duty cash deposit(s) shown below:

Exporter:  PRC-Wide Entity
Case number:  A-570-010-000
Cash deposit rate: 165.04%

Exporter:  Changzhou Trina Solar Energy Co., Ltd./Trina Solar (Changzhou) Science & Technology Co., Ltd.
Producer:  Changzhou Trina Solar Energy Co., Ltd./Trina Solar (Changzhou) Science & Technology Co., Ltd.
Case number:  A-570-010-001
Cash deposit rate: 26.71%

Exporter:  Renesola Jiangsu Ltd./Renesola Zhejiang Ltd./Jinko Solar Co. Ltd./Jinko Solar Import and Export Co., Ltd.
Producer:  Renesola Jiangsu Ltd./Jinko Solar Co. Ltd.
Case number:  A-570-010-002
Cash deposit rate: 78.42%

# Tab 20

# CVD P.R. Doc. 825

# Message No. 5002303
# (Jan. 2, 2015)

MESSAGE NO:          5002303          MESSAGE DATE:          01/02/2015

MESSAGE STATUS:      Active    CATE        GORY:          Antidumping

TYPE:          PUBLIC FIN-Final Determination        ☑          NON-PUBLIC

SUB-TYPE:              AFF-Affirmative

FR CITE:          FR 79 FR 76970          CITE DATE:          12/23/2014

REFERENCE
MESSAGE #
(s):

CASE #(s):          A-570-010

EFFECTIVE DATE:          12/23/2014          CASE #:

PERIOD OF REVIEW:  04/01/2013        TO                  09/30/2013

PERIOD COVERED:                        TO

Filed By: Thomas Martin, Filed Date: 1/8/15 10:50 AM, Submission Status: Approved

LIFTING OF SUSPENSION DATE:


TO: { DIRECTORS OF FIELD OPERATIONS, PORT DIRECTORS }


FROM: { DIRECTOR AD/CVD & REVENUE POLICY & PROGRAMS }


RE: Notice of final determination in the antidumping duty investigation of certain crystalline silicon photovoltaic products from the People's Republic of China (A-570-010)


1.  On 12/23/2014, Commerce published in the Federal Register (79 FR 76970) its final determination of sales at less than fair value in the antidumping duty investigation of certain crystalline silicon photovoltaic products from the People's Republic of China ("PRC").


2.  The merchandise covered by this investigation is modules, laminates and/or panels consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including building integrated materials.  For purposes of this investigation, subject merchandise includes modules, laminates and/or panels assembled in the PRC consisting of crystalline silicon photovoltaic cells produced in a customs territory other than the PRC. Subject merchandise includes modules, laminates and/or panels assembled in the PRC consisting of crystalline silicon photovoltaic cells of thickness equal to or greater than 20 micrometers, having a p/n junction formed by any means, whether or not the cell has undergone other processing, including, but not limited to, cleaning, etching, coating, and/or addition of materials (including, but not limited to, metallization and conductor patterns) to collect and forward the electricity that is generated by the cell.


Excluded from the scope of this investigation are thin film photovoltaic products produced from amorphous silicon (a-Si), cadmium telluride (CdTe), or copper indium gallium selenide (CIGS). Also excluded from the scope of this investigation are modules, laminates and/or panels assembled in the PRC, consisting of crystalline silicon photovoltaic cells, not exceeding 10,000mm2 in surface area, that are permanently integrated into a consumer good whose function is other than power generation and that consumes the electricity generated by the integrated crystalline silicon photovoltaic cells.  Where more than one module, laminate and/or panel is permanently integrated into a consumer good, the surface area for purposes of this exclusion shall be the total combined surface area of all modules, laminates and/or panels that are integrated into the consumer good.  Further, also excluded from the scope of this investigation are any products covered by the existing antidumping and countervailing duty orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, laminates and/or panels, from the PRC.  See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From

the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order, 77 FR 73018 (December 7, 2012); Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Countervailing Duty Order, 77 FR 73017 (December 7, 2012).

Merchandise covered by this investigation is currently classified in the Harmonized Tariff Schedule of the United States (HTSUS) under subheadings 8501.61.0000, 8507.20.8030, 8507.20.8040, 8507.20.8060, 8507.20.8090, 8541.40.6020, 8541.40.6030 and 8501.31.8000. These HTSUS subheadings are provided for convenience and customs purposes; the written description of the scope of this investigation is dispositive.

3.  This investigation has been assigned investigation number A-570-010.

4.  For imports of certain crystalline silicon photovoltaic products from the PRC, CBP shall suspend liquidation of such shipments entered, or withdrawn from warehouse, for consumption on or after 12/23/2014.

5.  Effective 12/23/2014, CBP shall require, for entries of certain crystalline silicon photovoltaic products from the PRC from the exporter/producer combinations listed below, a cash deposit equal to the antidumping duty cash deposit(s) shown below:

Exporter:  PRC-Wide Entity
Case number:  A-570-010-000
Cash deposit rate: 165.04%

Exporter:  Changzhou Trina Solar Energy Co., Ltd./Trina Solar (Changzhou) Science & Technology Co., Ltd.
Producer:  Changzhou Trina Solar Energy Co., Ltd./Trina Solar (Changzhou) Science & Technology Co., Ltd.
Case number:  A-570-010-001
Cash deposit rate: 26.71%

Exporter:  Renesola Jiangsu Ltd./Renesola Zhejiang Ltd./Jinko Solar Co. Ltd./Jinko Solar Import and Export Co., Ltd.
Producer:  Renesola Jiangsu Ltd./Jinko Solar Co. Ltd.
Case number:  A-570-010-002
Cash deposit rate: 78.42%

# Tab 21

# AD P.R. Doc. 836

# Message No. 5051302
# (Feb. 20, 2015)

MESSAGE NO:        5051302        MESSAGE DATE:    02/20/2015

MESSAGE STATUS:    Active     CATE      GORY:       Antidumping
TYPE:         PUBLIC ORD-Order            ☑          NON-PUBLIC
SUB-TYPE:

FR CITE:       F 80 FR 8592      CITE DATE:      02/18/2015

REFERENCE
MESSAGE #
(s):

CASE #(s):       A-570-010

EFFECTIVE DATE:   02/18/2015        CASE #:

PERIOD OF REVIEW:  04/01/2013    TO           09/30/2013

PERIOD COVERED:              TO

Filed By: Jeffrey Pedersen, Filed Date: 4/23/15 2:38 PM, Submission Status: Approved

LIFTING OF SUSPENSION DATE:


TO: { DIRECTORS OF FIELD OPERATIONS, PORT DIRECTORS }


FROM: { DIRECTOR AD/CVD & REVENUE POLICY & PROGRAMS }


RE: Antidumping duty order on certain crystalline silicon photovoltaic products from the People's Republic of China (A-570-010)


1.  On 02/18/2015, Commerce published in the Federal Register its antidumping duty order on certain crystalline silicon photovoltaic products from the People's Republic of China (A-570-010) (80 FR 8592).


2.  The merchandise covered by this investigation is modules, laminates and/or panels consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including building integrated materials. For purposes of this investigation, subject merchandise includes modules, laminates and/or panels assembled in the PRC consisting of crystalline silicon photovoltaic cells produced in a customs territory other than the PRC. Subject merchandise includes modules, laminates and/or panels assembled in the PRC consisting of crystalline silicon photovoltaic cells of thickness equal to or greater than 20 micrometers, having a p/n junction formed by any means, whether or not the cell has undergone other processing, including, but not limited to, cleaning, etching, coating, and/or addition of materials (including, but not limited to, metallization and conductor patterns) to collect and forward the electricity that is generated by the cell.


Excluded from the scope of this investigation are thin film photovoltaic products produced from amorphous silicon (a-Si), cadmium telluride (CdTe), or copper indium gallium selenide (CIGS). Also excluded from the scope of this investigation are modules, laminates and/or panels assembled in the PRC, consisting of crystalline silicon photovoltaic cells, not exceeding 10,000mm2 in surface area, that are permanently integrated into a consumer good whose function is other than power generation and that consumes the electricity generated by the integrated crystalline silicon photovoltaic cells. Where more than one module, laminate and/or panel is permanently integrated into a consumer good, the surface area for purposes of this exclusion shall be the total combined surface area of all modules, laminates and/or panels that are integrated into the consumer good. Further, also excluded from the scope of this investigation are any products covered by the existing antidumping and countervailing duty orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, laminates and/or panels, from the PRC. See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From

Filed By: Jeffrey Pedersen, Filed Date: 4/23/15 2:38 PM, Submission Status: Approved

the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order, 77 FR 73018 (December 7, 2012); Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Countervailing Duty Order, 77 FR 73017 (December 7, 2012).

Merchandise covered by this investigation is currently classified in the Harmonized Tariff Schedule of the United States (HTSUS) under subheadings 8501.61.0000, 8507.20.8030, 8507.20.8040, 8507.20.8060, 8507.20.8090, 8541.40.6020, 8541.40.6030 and 8501.31.8000. These HTSUS subheadings are provided for convenience and customs purposes; the written description of the scope of this investigation is dispositive.

3.  For imports of certain crystalline silicon photovoltaic products from the People's Republic of China, CBP shall suspend liquidation of entries of subject merchandise entered, or withdrawn from warehouse, for consumption on or after 02/18/2015.  Effective 02/18/2015, CBP shall require a cash deposit equal to the percentages for the exporter/producer combinations identified below. These cash deposit rates have been adjusted to reflect the appropriate subsidy offsets determined in the companion countervailing duty proceeding.

Exporter: PRC-Wide Entity
Case number: A-570-010-000
Cash deposit rate: 151.98%

Exporter: Changzhou Trina Solar Energy Co., Ltd./Trina Solar (Changzhou) Science & Technology Co., Ltd.
Producer: Changzhou Trina Solar Energy Co., Ltd./Trina Solar (Changzhou) Science & Technology Co., Ltd.
Case number: A-570-010-001
Cash deposit rate: 3.47%

Exporter: Renesola Jiangsu Ltd./Renesola Zhejiang Ltd./Jinko Solar Co. Ltd./Jinko Solar Import and Export Co., Ltd.
Producer: Renesola Jiangsu Ltd./Jinko Solar Co. Ltd.
Case number: A-570-010-002
Cash deposit rate: 65.36%

Exporter: Anji DaSol Solar Energy Science & Technology Co., Ltd.
Producer: Anji DaSol Solar Energy Science & Technology Co., Ltd.
Case number: A-570-010-003
Message Date: 02/20/2015 Message Number: 5051302 Page 3 of 10

# Tab 22

# CVD P.R. Doc. 412

# Message No. 5051303
# (Feb. 20, 2015)

MESSAGE NO:          5051303          MESSAGE DATE:          02/20/2015

MESSAGE STATUS:     Active     CATE          GORY:          Countervailing
TYPE:               PUBLIC ORD-Order          ☑          NON-PUBLIC
SUB-TYPE:

FR CITE:            F80 FR 8592          CITE DATE:          02/18/2015

REFERENCE
MESSAGE #
(s):

CASE #(s):          C-570-011

EFFECTIVE DATE:     02/1 0/20R5          CASE #:

PERIOD OF REVIEW:   01/01/2013     TO          12/31/2013

PERIOD COVERED:               TO

Message Date: 02/20/2015 Message Number: 5051303 Page 1 of 4

LIFTING OF SUSPENSION DATE:


TO: { DIRECTORS OF FIELD OPERATIONS, PORT DIRECTORS }


FROM: { DIRECTOR AD/CVD & REVENUE POLICY & PROGRAMS }


RE: Countervailing duty order and amended final determination on certain crystalline silicon photovoltaic products from the People's Republic of China (C-570-011)


1.  On 02/18/2015, Commerce published in the Federal Register its countervailing duty order and amended final determination on certain crystalline silicon photovoltaic products (solar products) from the People's Republic of China (the PRC) (80 FR 8592).


2.  The merchandise covered by this order is modules, laminates and/or panels consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including building integrated materials.  For purposes of this order, subject merchandise includes modules, laminates and/or panels assembled in the PRC consisting of crystalline silicon photovoltaic cells produced in a customs territory other than the PRC.


Subject merchandise includes modules, laminates and/or panels assembled in the PRC consisting of crystalline silicon photovoltaic cells of thickness equal to or greater than 20 micrometers, having a p/n junction formed by any means, whether or not the cell has undergone other processing, including, but not limited to, cleaning, etching, coating, and/or addition of materials (including, but not limited to, metallization and conductor patterns) to collect and forward the electricity that is generated by the cell.


Excluded from the scope of this order are thin film photovoltaic products produced from amorphous silicon (a-Si), cadmium telluride (CdTe), or copper indium gallium selenide (CIGS).  Also excluded from the scope of this order are modules, laminates and/or panels assembled in the PRC, consisting of crystalline silicon photovoltaic cells, not exceeding 10,000mm2 in surface area, that are permanently integrated into a consumer good whose function is other than power generation and that consumes the electricity generated by the integrated crystalline silicon photovoltaic cells.  Where more than one module, laminate and/or panel is permanently integrated into a consumer good, the surface area for purposes of this exclusion shall be the total combined surface area of all modules, laminates and/or panels that are integrated into the consumer good.  Further, also excluded from the scope of this order are any products covered by the existing antidumping and countervailing duty orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, laminates and/or panels, from the PRC.  See Crystalline Silicon

Filed By: Gene Calvert, Filed Date: 2/26/15 3:17 PM, Submission Status: Approved

Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order, 77 FR 73018 (December 7, 2012); Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Countervailing Duty Order, 77 FR 73017 (December 7, 2012).

Merchandise covered by this order is currently classified in the Harmonized Tariff Schedule of the United States (HTSUS) under subheadings 8501.61.0000, 8507.20.8030, 8507.20.8040, 8507.20.8060, 8507.20.8090, 8541.40.6020, 8541.40.6030 and 8501.31.8000.  These HTSUS subheadings are provided for convenience and customs purposes; the written description of the scope of this order is dispositive.


3.  For imports of solar products from the PRC, CBP shall suspend liquidation of entries of subject merchandise entered, or withdrawn from warehouse, for consumption on or after 02/10/2015 (date of publication of the International Trade Commission final determination in the Federal Register). Effective 02/10/2015, CBP shall require a cash deposit equal to the percentages identified below.

Producer and/or Exporter:  All-Others
Case Number:  C-570-011-000
Subsidy Rate:  38.43 percent

Producer and/or Exporter:  Wuxi Suntech Power Co., Ltd.
Case Number:  C-570-011-001
Subsidy Rate:  27.64 percent

Producer and/or Exporter: Changzhou Trina Solar Energy Co., Ltd.
Case Number:  C-570-011-002
Subsidy Rate:  49.21 percent

4.  If there are any questions by the importing public regarding this message, please contact the Call Center for the Office of AD/CVD Operations, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce at (202) 482-0984.  CBP ports should submit their inquiries through authorized CBP channels only.  (This message was generated by OVII:GC)

5.  There are no restrictions on the release of this information.

Michael B. Walsh

COMPANY DETAILS

*Party Indicator Value
I= Importer, M= Manufacturer, E= Exporter, S= Sold to Party

Filed By: Gene Calvert, Filed Date: 2/26/15 3:17 PM, Submission Status: Approved