IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

| | | |
|---|---|---|
| SUNPOWER CORPORATION and SUNPOWER CORPORATION, SYSTEMS, | ) ) ) | |
| Plaintiffs, | ) ) | |
| and | ) ) | |
| SUNIVA, INC., *ET AL.*, | ) ) | |
| Consolidated Plaintiffs, | ) ) | Consol. Court No. 15-00067 |
| and | ) ) | Before:  Hon. Donald C. Pogue, Senior Judge |
| CANADIAN  SOLAR, INC., *ET AL.*, | ) ) | |
| Plaintiff-Intervenors | ) ) | **PUBLIC DOCUMENT** |
| v. | ) ) | **Contains No Business Proprietary Information** |
| UNITED STATES, | ) ) | |
| Defendant, | ) ) | |
| and | ) ) | |
| SOLARWORLD AMERICAS, INC., | ) ) | |
| Defendant-Intervenor. | ) ) ) | |

## REPLY BRIEF OF PLAINTIFFS SUNPOWER CORPORATION AND SUNPOWER CORPORATION, SYSTEMS

Daniel J. Gerkin
Vinson & Elkins LLP
2200 Pennsylvania Avenue, N.W., Suite 500 West
Washington, DC 20037
Tel.: (202) 639-6654
*Counsel to SunPower Corporation
and SunPower Corporation, Systems*

Jerome J. Zaucha
K&L Gates LLP
1601 K Street, N.W.
Washington, DC 20006
Tel.: (202) 778-9013
*Counsel to SunPower Corporation
and SunPower Corporation, Systems*

March 29, 2016

## TABLE OF CONTENTS

Page

I.    INTRODUCTION ...................................................................................1

II.   ARGUMENT .........................................................................................1

      A.   The Department's Material Expansion of the Scope is Contrary to Law ......5

      B.   The Traditional "Substantial Transformation" Test is the Only Viable
           Means of Determining Origin for Purposes of this Investigation ...............8

      C.   The Department's Deviation from the Traditional "Substantial
           Transformation" Test and Adoption of Its Scope "Clarification" is not
           Supported by Substantial Record Evidence and is not in Accordance with
           Law ...............................................................................................11

           1.   The Stated Intent of the Solar II Petition Was to Capture Chinese-
                Assembled CSPV Modules Incorporating Non-Chinese-Origin Cells
                That Are Manufactured Using Chinese-Origin Inputs ..................11

           2.   Circumvention and Evasion Considerations Do Not Justify the
                Department's Departure from the Traditional "Substantial
                Transformation" Test and Adoption of Its Scope "Clarification" ....14

           3.   Given the Impact on the Rights of CSPV Module Manufacturers,
                Exporters, and Importers, the Department's Departure from the
                Traditional "Substantial Transformation" Test and Adoption of Its
                Scope "Clarification" Cannot Be Justified Based on Ease of
                Administration and Enforcement ...........................................17

      D.   The Department's Adoption of its Scope "Clarification" in the Final
           Determinations Substantially Burdened Administrative Process and
           Adversely Affected the Finality of Administrative Action .......................19

      E.   As a Matter of Law and Policy, the Scope "Clarification" Reasonably Only
           Should Apply to Entries Made On or After the Department's Final
           Determinations .................................................................................21

III.  CONCLUSION .....................................................................................23

**TABLE OF AUTHORITIES**

Page

**Federal Cases**

*Ad Hoc Shrimp Trade Action Comm. v. United States*, 637 F. Supp. 2d 1166, 1175 (Ct. Int'l
Trade 2009) ............................................................................................................7

*Allegheny Bradford Corp. v. United States*, 342 F. Supp. 2d 1172, 1184
(Ct. Int'l Trade 2004) ........................................................................................7, 21

*AMS Assoc., Inc. v. United States*, 737 F. 3d 1338 (Fed. Cir. 2013) ...............................22

*Consol. Bearings Co. v. United States*, 348 F. 3d 997 (Fed Cir. 2003) ...............................1

*Diversified Prods. Corp. v. United States*, 572 F. Supp. 882 (Ct. Int'l Trade 1983) .................6

*Louis Dreyfus Citrus Inc. v. United States*, 495 F. Supp. 2d 1338, 1355 (Ct. Int'l Trade 2007) ...6

*Minebea Co., Ltd. v. United States*, 782 F. Supp. 117, 120 (Ct. Int'l Trade 1992) ...............1, 6

*Mitsubishi Elec. Corp. v. United States*, 700 F. Supp. 538, 547 (Ct. Int'l Trade 1988), *aff'd* 898
F. 2d 1577 (Fed. Cir. 1990) ..................................................................................6

*Mitsubishi Heavy Indus., Ltd. v. United States*, 986 F. Supp. 1428 (Ct. Int'l Trade 1997) ......1,16

*PT Pindo Deli Pulp & Paper Mills v. United States*, 825 F. Supp. 2d 1310
(Ct. Int'l Trade 2012) ..........................................................................................8

*Royal Business Machines, Inc. v. United States*, 507 F. Supp. 1007, 1014
(Ct. Int'l Trade 1980) ..........................................................................................6

*Smith Corona Corp. v. United States*, 796 F. Supp. 1532, 1535 (Ct. Int'l Trade 1992) ..........6,7

*Ugine et al. v. United States*, 551 F. 3d 1339, 1349 (Fed. Cir. 2009) ...............................1

**Federal Statutes and Regulations**

19 C.F.R. § 351.225(l)(2) ........................................................................................22

**Administrative Determinations**

*Large Newspaper Printing Presses and Components Thereof, Whether Assembled or
Unassembled from Germany*, 61 Fed. Reg. 38,166 (Jul. 23, 1996).....................................16

*Cellular Mobile Telephones and Subassemblies from Japan*, 50 Fed. Reg. 45,447 (Oct. 31,
1985).................................................................................................................16

## I.    INTRODUCTION

On behalf of SunPower Corporation and SunPower Corporation, Systems (collectively, "SunPower") and pursuant to the Court's March 17, 2016 scheduling Order, we submit this reply to the responses to SunPower Corporation's Rule 56.2 Motion for Judgment on the Agency Record, dated October 5, 2015, ECF Nos. 59 and 60. *See* Defendant's Opposition to Motions for Judgment on the Agency Record (Feb. 9, 2016), ECF No. 78 ("Defendant Brief"); Defendant-Intervenor SolarWorld Americas, Inc.'s Response Brief (Feb. 9, 2016), ECF No. 79 ("SolarWorld Brief").

## II.    ARGUMENT

There is no dispute that the Department of Commerce ("Commerce" or "Department") has the discretion to define the scope of an investigation, including, in particular, to effectuate the intent of the petition. *See Mitsubishi Heavy Indus., Ltd. v. United States,* 986 F. Supp. 1428 (Ct. Int'l Trade 1997) ("Commerce retains broad discretion to clarify the scope of an antidumping investigation in a manner which reflects the intent of the petition.") But the Department's discretionary authority, including with respect to its country of origin determinations, "must be exercised reasonably and any consequent determination must be supported by substantial evidence in the record." *Minebea Co., Ltd. v. United States*, 782 F. Supp. 117, 120 (Ct. Int'l Trade 1992). Indeed, while the Department has "discretion in defining the criteria for country-of-origin determinations," that discretion is not boundless, particularly with respect to any departure from prior precedent: "[The Department] is obligated to follow prior precedent absent some legitimate reason for departing from it." *Ugine et al. v. United States*, 551 F. 3d 1339, 1349 (Fed. Cir. 2009), *citing Consol. Bearings Co. v. United States*, 348 F. 3d 997 (Fed Cir. 2003).

US 4090931v.4

The Defendant and SolarWorld, however, have characterized the Department's discretion to modify the scope of antidumping and countervailing duty investigations as being nearly limitless. Their response briefs argue, in effect, that the scope language adopted by the Department for the first time in its final antidumping and countervailing duty determinations was supported by substantial record evidence and otherwise in accordance with law because the Department articulated a number of reasons (*i.e.*, effectuating the intent of the petition, the "unique" attributes of the global supply chain in the solar industry and the implications for circumvention or evasion, and ease of administration and enforcement) for: (i) departing from the traditional "substantial transformation" test for determining origin, concluding that for purposes of the Solar II orders crystalline silicon photovoltaic ("CSPV") modules assembled in China using CSPV cells manufactured outside of China are Chinese in origin; and (ii) adopting a scope "clarification" that materially expanded the scope of the investigations beyond that stated in the petition, the initiation notices, and the preliminary antidumping and countervailing duty determinations. However, merely articulating reasons for agency action is insufficient; rather, the reasons themselves must be supported by substantial record evidence and otherwise be in accordance with law to justify the Department's final scope determination. This is where the arguments proffered by the Defendant and SolarWorld fall short.

To assess whether the Department's reasoning is supported by substantial record evidence and otherwise in accordance with law, it is necessary to start with an accurate description of the context of this case. The Defendant and SolarWorld would have the Court believe that this is a relatively routine case in which the Department merely "clarified" the scope of the investigation to effectuate the SolarWorld's clear and unambiguous intent, as reflected in

the petition. The realities of this case, however, are considerably different and, as detailed below, the Department far exceeded the bounds of its discretionary authority.

First, the Department did not merely clarify the scope, but obviously (and even the Defendant and SolarWorld must admit) expanded it such that merchandise not contemplated as being subject to the investigations from their inception was drawn within the scope (and, indeed, there was no need to even "clarify" the scope because the scope, as stated in the petition, the initiation notices, and the preliminary determinations, while itself not valid, was abundantly clear).

Second, in "clarifying" the scope, the Department abandoned the traditional "substantial transformation" test for determining origin for antidumping and countervailing duty purposes without enunciating a viable alternative. In the absence of any substitute guiding legal principle, the origin imperative became whatever the Department views as expedient under the circumstances, which is likely to cause inconsistencies from order-to-order, as well as between the trade remedies and customs laws.

Third, although SolarWorld obviously now supports the scope as stated in the final determinations, there is nothing in the administrative record, including, most importantly, the petition itself (which was drafted by a petitioner, SolarWorld, that is quite experienced with the operation of antidumping and countervailing duty investigations, this being their "second bite at the apple"), suggesting it was SolarWorld's intent to cover all CSPV modules assembled in China, regardless of the origin of the CSPV cells and whether or not such cells incorporated any Chinese-origin content. The suggestion that SolarWorld wishes to use the trade remedy laws to protect itself to the maximum extent possible cannot be construed as an intent justifying a

material modification of the scope SolarWorld itself developed (and, indeed, such an "intent" suggests no particular scope).

Fourth, what the Department characterizes as potential circumvention or evasion reflects the same dynamic found in the case of any antidumping or countervailing order in response to which foreign manufacturers permissibly may adjust their operations to produce items that are legitimately outside the scope of the orders. Furthermore, the potential for circumvention or evasion clearly is contemplated under the trade remedy laws, and there are existing mechanisms for addressing actual circumvention or evasion that do not necessitate speculating about possible future circumvention or evasion or adopting an overly broad scope to address such speculative concerns.

Fifth, the overly broad scope adopted by the Department in its final determinations cannot be justified by reference to its ease of administration and enforcement.

Sixth, the Department dramatically expanded the scope at an extraordinarily late stage of the investigations, after its fact finding had already been completed. In so doing, the Department severely prejudiced the rights of interested parties to administrative process, because the Department's vague statements regarding possible changes to the scope of the investigations, at least prior to October 3, 2014, do not constitute adequate notice to potentially interested parties that CSPV modules that were not subject to SolarWorld's carefully calibrated scope formulation ultimately would become subject to the investigations. Furthermore, the inclusion of merchandise at an advanced stage of an investigation calls into question whether the final determination possibly could have been supported by substantial evidence.

Accordingly, the circumstances in this case are the opposite of what Defendant and SolarWorld suggest. Whereas the Defendant and SolarWorld, in essence, have characterized this

as a case of an extraordinary industry dealt with by the Department in an ordinary way, the fact

is this is a case of a relatively ordinary industry that was dealt with by the Department in an

extraordinary way. Indeed, viewed individually, each of the reasons asserted by the Department

and further advanced by the Defendant and SolarWorld for the Department's departure from its

"substantial transformation" precedent and adoption of a materially expanded scope

"clarification" is not supported by the evidence on the record and is not in accordance with law

and, collectively, do not justify the scope expressed in the final determinations and ensuing

orders.

Finally, to the extent the Court determines that the Department's actions were reasonable,

supported by substantial record evidence, and otherwise in accordance with law, the

Department's scope "clarification," both as a matter of law and a matter of fairness, cannot be

applied retroactively to any entries made prior to, at the earliest, the date of publication of the

Department's final determinations.

## A.     The Department's Material Expansion of the Scope is Contrary to Law

The Department, which has characterized the scope adopted in the final determinations

and ensuing orders as a mere "clarification" of the scope of the investigations, instead materially

expanded the scope beyond that stated in the petition, its initiation notices, and its preliminary

determinations. As a result, the final scope captures *all* Chinese-assembled CSPV modules

incorporating non-Chinese-origin CSPV cells, whereas the scope in the petition, the initiation

notices, and the preliminary determinations captured a smaller subset of such modules pursuant

SolarWorld's "two out of three" rule scope formulation (Specifically, Chinese-assembled CSPV

modules incorporating non-Chinese-origin CSPV cells manufactured using Chinese-origin

5

inputs).  The Department's material expansion of the scope beyond that stated in the petition is unsupported by substantial record evidence and contrary to law.

The Department's authority and discretion to define and clarify the scope of an investigation to reflect the intent of the petition is well established.  *See Diversified Prods. Corp. v. United States*, 572 F. Supp. 882 (Ct. Int'l Trade 1983); *see also Minebea Co., Ltd. v. United States*, 782 F. Supp. 117, 120 (Ct. Int'l Trade 1992), *citing Mitsubishi Elec. Corp. v. United States*, 700 F. Supp. 538, 547 (Ct. Int'l Trade 1988), *aff'd* 898 F. 2d 1577 (Fed. Cir. 1990). However, once an investigation is initiated, the Department ordinarily may not expand the scope of an investigation.  "Each stage of the proceeding maintains the scope passed on from the previous stage.  Thus, the class or kind of merchandise described in the petition, which becomes the subject of investigation . . . is the subject of the preliminary injury determination . . . and the final determinations."  *Royal Business Machines, Inc. v. United States*, 507 F. Supp. 1007, 1014 (Ct. Int'l Trade 1980).  The Court (and the Department), therefore, have adhered to the principle that the Department "must exercise caution in redefining scope in midstream to include items which were clearly known about and excluded at the time of initiation of the investigation and, indeed in this case, at the time of the preliminary determination." *Smith Corona Corp. v. United States*, 796 F. Supp. 1532, 1535 (Ct. Int'l Trade 1992); *see also Louis Dreyfus Citrus Inc. v. United States*, 495 F. Supp. 2d 1338, 1355 (Ct. Int'l Trade 2007).

Despite the Defendant's assertion in response to SunPower's brief, the facts of *Smith Corona* are analogous to the facts presented in Solar II.  *See* Defendant Brief at 40.  There is no question that, like the personal word processor parts described in the proposed modification of the scope at issue in *Smith Corona* (which also was proposed well after the preliminary determination), *all* Chinese-assembled CSPV modules incorporating non-Chinese CSPV cells

6

regardless of the origin of the origin of the CSPV cell inputs were not covered by the scope of the investigations at the outset of the investigations and subsequently described in the preliminary determinations. The Court declined to uphold the expansion of the scope in *Smith Corona* and should do so again here. And, it is preposterous for Defendant to assert, as detailed below, that SolarWorld had expressed its intent in the petition to cover such modules, thereby justifying this radical expansion of the scope.

Furthermore, the record simply does not support that the initial scope of these investigations was in any way ambiguous, thereby necessitating clarification, *see Allegheny Bradford Corp. v. United States*, 342 F. Supp. 2d 1172, 1184 (Ct. Int'l Trade 2004), or that, as the Defendant and SolarWorld have intimated, the initial scope of these investigations was "overly broad, or insufficiently specific to allow proper investigation, or in any other way defective." *Ad Hoc Shrimp Trade Action Comm. v. United States*, 637 F. Supp. 2d 1166, 1175 (Ct. Int'l Trade 2009); *See* Defendant Brief at 16, 41; SolarWorld Brief at 15. By contrast, the initial scope, albeit unwieldy, was logically consistent with past precedent, precisely tailored, and apparently sufficient for the Department to conduct an investigation. It is the Department's scope "clarification" that is both overly broad and otherwise defective, among other things, because it is inconsistent with the Department's prior precedent pertaining to the same class or kind of merchandise and compels, for identical merchandise, a different country of origin determination than Solar I dictates.

Finally, the Court cannot accept SolarWorld's supposed reliance on precedent that suggests the Department "has the authority to define and clarify the scope of an AD/CVD investigation, *even to include products within the scope that were not specifically mentioned by the petitioner in the scope language drafted in the petition*." SolarWorld Brief at 15 (emphasis

7

in original), *citing, e.g., PT Pindo Deli Pulp & Paper Mills v. United States*, 825 F. Supp. 2d

1310 (Ct. Int'l Trade 2012).  SolarWorld conveniently ignores the fact that, in *PT Pindo*, the

merchandise at issue, although perhaps not specifically referenced in the petition, was

nonetheless included in the scope as presented in the petition.  Whereas the Department's scope

"clarification" here unquestionably describes merchandise that was not covered by the scope

stated in the petition or in the Department's initiation notices or preliminary determinations.

Indeed, it would be highly unusual for a petition to specifically list every product covered, which

is why product-specific "clarifications" that do not amount to changes in scope may be

appropriate.

Because the Department's scope "clarification" was redefined at an advanced stage of the

investigations to include CSPV modules that were well known both to SolarWorld and the

Department upon initiation of the investigations, but which clearly were not included in the

scope of the investigations, the Department's scope "clarification" was contrary to law.

### B.    The Traditional "Substantial Transformation" Test is the Only Viable Means of Determining Origin for Purposes of this Investigation

The scope "clarification" ultimately adopted by the Department departs from the

traditional "substantial transformation" test for determining country of origin in antidumping and

countervailing duty proceedings and directly conflicts with the basis for the scope determination

the Department made in connection with Solar I.  Furthermore, the Department failed to

enunciate a legitimate alternative to the "substantial transformation" test for purposes of

determining the origin of the CSPV modules subject to the Solar II investigations.  Instead, the

Department relies upon a number of extraneous factors in support of its arbitrary determination

that Chinese-assembled CSPV modules incorporating non-Chinese-origin CSPV cells originate

in China.  In effect, the Department, despite having taken the exact opposite position in Solar I,

US 4090931v.4

substituted expediency for a reasoned standard, thereby creating inconsistency across Solar I and Solar II, which results in identical merchandise having differing countries of origin for antidumping and countervailing duty purposes, and considerable uncertainty regarding the manner in which country of origin determinations will be made in other trade remedy proceedings.

The Department has not demonstrated that the "substantial transformation" test is unworkable in Solar II and, in fact, categorically rejected the application of any alternative origin test in Solar I. Specifically, on the day prior to the initiation of the Solar I investigations, SolarWorld sought to include within the scope all CSPV modules assembled in China regardless of the origin of the CSPV cells; yet, this is the same scope that the Department ultimately adopted in Solar II. *See Case Brief of Changzhou Trina Solar Energy Co., Ltd.* (Oct. 16, 2014), AD PR 784, at 4, *citing Memorandum to Paul Piquado, Assistant Secretary for Import Administration, from Christian Marsh, Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations,* the subject of which was *Issues and Decision Memorandum for the Final Determination in the Antidumping Duty Investigation of Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China* (Oct. 9, 2012), at 8, ("2012 AD I&D Memo").

In Solar I, the Department rejected SolarWorld's proposal, explaining that "using a substantial transformation analysis, the Department has determined that modules from [China] are those that have been assembled in [China] using solar cells produced in [China]." *Id.* The Department unequivocally excluded Chinese-assembled CSPV modules incorporating non-Chinese-origin CSPV cells on the basis that the origin of a CSPV cell is determinative of the country of origin of a CSPV module for trade remedy purposes, finding that CSPV modules

9

assembled in China using non-Chinese-origin cells would not be of Chinese origin for trade remedy purposes, because the non-Chinese-origin CSPV cells would not have been substantially transformed by virtue of their assembly into CSPV modules in China. *See Memorandum to Gary Taverman, Acting Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations, from Jeff Pedersen, Case Analyst, AD/CVD Operations, Office 4,* the subject of which was *Scope Clarification: Antidumping and Countervailing Duty Investigations of Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China* (Mar. 19, 2012) (attached to *Respondent's Case Brief* (Oct. 16, 2014) as Exhibit 1, AD PR 780).

The rationale for the Department's rejection of the proposed scope change in Solar I, specifically that it would result in merchandise from a third country being subject to a China-directed investigation, applies equally in Solar II. But, the Department abandoned its prior reasoned reliance on the "substantial transformation" test when it adopted its scope "clarification" in Solar II; and, in so doing failed to enunciate a substitute standard for determining origin. Instead, the Department chose to rely upon a number of unrelated factors, none of which have anything to do with the nature and extent of the processing involved in the assembly of non-Chinese-origin CSPV cells into modules in China, to conclude that CSPV modules assembled in China using non-Chinese-origin CSPV cells are Chinese in origin. Absent a viable alternative for determining origin other than the Department's apparent "end justifies the means" approach, there is no reason for failing to apply the traditional "substantial transformation" test in some manner in connection with Solar II or any future solar trade remedy proceedings. Even if the circumstances of Solar II seemed to necessitate applying the

"substantial transformation" test in a somewhat modified form, the Department has presented no reasonable basis for disregarding it entirely.

C. **The Department's Deviation from the Traditional "Substantial Transformation" Test and Adoption of Its Scope "Clarification" is not Supported by Substantial Record Evidence and is not in Accordance with Law**

1. **The Stated Intent of the Solar II Petition Was to Capture Chinese-Assembled CSPV Modules Incorporating Non-Chinese-Origin Cells That Are Manufactured Using Chinese-Origin Inputs**

Based on certain of SolarWorld's statements regarding its motivation for filing the petition, both the Defendant and SolarWorld attempt to justify the Department's deviation from the traditional "substantial transformation" test and subsequent adoption of its scope "clarification" as necessary to effectuate SolarWorld's intent. *See* Defendant Brief at 29 – 32; SolarWorld Brief at 13 – 14. However, the scope language in SolarWorld's carefully calibrated petition, which initially was adopted by the Department in slightly modified form and maintained by the Department until the final determinations, and SolarWorld's specific communications with the Department, demonstrate that SolarWorld's intent was to capture only those CSPV modules described in the Department's initiation notice, rather than all CSPV modules assembled in China regardless of the origin of the CSPV cells incorporated into those modules. Rather than ascribing "undue weight," Defendant Brief at 29, to SolarWorld's scope language, SunPower has reasonably characterized SolarWorld's intent based on SolarWorld's actions taken in connection with the Solar II proceedings. Accordingly, the Department's purported justification is not supported by substantial record evidence or by law.

11

On December 31, 2013, SolarWorld requested that the Department and the U.S. International Trade Commission initiate new antidumping and countervailing duty investigations concerning *Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and Taiwan. See Petition for the Imposition of Antidumping and Countervailing Duties Pursuant to Sections 701 and 731 of the Tariff Act of 1930, As Amended* (Dec. 31, 2013), AD PR 1 - 10.

The stated intent of the new investigations was to address shifts in final CSPV cell production away from China to third countries, including, in particular, Taiwan, despite the continued use of Chinese-origin inputs in manufacturing such cells in third countries and the resulting exclusion of any CSPV modules that were manufactured/assembled in China using such third-country cells from the scope of the 2012 orders. *See id.* at 3. Accordingly, in its petition, SolarWorld proposed a product scope that read, in relevant part:

> The merchandise covered by this investigation is crystalline silicon photovoltaic cells, and modules, laminates and/or panels consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including building integrated materials.
>
> For purposes of this investigation, subject merchandise also includes modules, laminates and/or panels consisting of crystalline silicon photovoltaic cells completed or partially manufactured within a customs territory other than that subject country, using ingots, wafers, or partially manufactured cells sourced from the subject country.[1]

*Id.* at 11.

In a letter to counsel for SolarWorld, dated January 6, 2014, the Department stated that "there is ambiguity in your proposed scope as to the amount or extent of production that must

---

[1]     The reference to "subject country" should be understood to mean China.

US 4090931v.4

take place in the subject country for modules, laminates, and/or panels ('solar panels') consisting of crystalline silicon photovoltaic cells ('solar cells') completed or partially manufactured within a customs territory other than the subject country to be covered by the scope." *Letter from Howard Smith, Program Manager, AD/CVD Operations, Office IV, Enforcement and Compliance to Wiley Rein LLP* (Jan. 6, 2014), at 3, AD PR 17.

SolarWorld responded by stating: "Petitioner intends that the present proceeding cover panels and modules assembled in a subject country (*e.g.*, China), even if the cells in those modules are produced in a different country (*e.g.*, Taiwan or a non-subject country), if those cells are made from ingots, wafers, or partially manufactured cells that were manufactured in the subject country (*e.g.*, China). This would cover situations where the panels or modules are assembled in a subject country from cells made in a different country but: 1) the ingots used for the wafers made into the cells were manufactured in the subject country; 2) the wafers made into the cells were manufactured in the subject country; or 3) the cell manufacturing process began in the subject country and then was completed in a non-subject country." *Supplement II to Petition for the Imposition of Antidumping and Countervailing Duties: Certain Crystalline Silicon Photovoltaic Products from China and Taiwan* (Jan. 13, 2014), at 2, AD PR 25.

The Department published notices initiating the Chinese antidumping and countervailing duty investigations on January 29, 2014. *See* 79 Fed. Reg. 4,661 (Jan 29, 2014), AD PR 39; 79 Fed. Reg. 4,667 (Jan. 29, 2014), CVD PR 59 (please note that the Department initiated the companion Taiwan antidumping duty investigation in the same notice). In its initiation notice, the Department adopted a slightly modified version of the petition scope that was consistent with the petition scope). It read, in relevant part:

> For purposes of these investigations, subject merchandise also includes modules, laminates and/or panels assembled in the subject

13

> country consisting of crystalline silicon photovoltaic cells that are completed or partially manufactured within a customs territory other than that subject country, using ingots that are manufactured in the subject country, wafers that are manufactured in the subject country, or cells where the manufacturing process begins in the subject country and is completed in a non-subject country.

*e.g.*, 79 Fed. Reg. 4,661, 4,667 (Jan 29, 2014). In addition, the Department noted that "the Department issued questions to, and received responses from, Petitioner pertaining to the proposed scope to ensure that the scope language in the Petitions would be an accurate reflection of the products for which the domestic industry is seeking relief." *Id.* at 4,662.

There was no ambiguity regarding SolarWorld's intent with respect to the scope of the Solar II investigations. SolarWorld unequivocally sought relief from imports of CSPV modules satisfying the so-called "two out of three" rule scope criteria and, therefore, the Department's attempts to justify deviating from the traditional "substantial transformation" test and adopting the scope "clarification" as based on SolarWorld's intent, lacks credibility, is unsupported by substantial record evidence, and is otherwise not in accordance with law.

### 2.   Circumvention and Evasion Considerations Do Not Justify the Department's Departure from the Traditional "Substantial Transformation" Test and Adoption of Its Scope "Clarification"

The Department's expansion of the scope purportedly to deal with anticipated risks of circumvention and evasion constitutes the imposition of an extraordinary measure to deal with an ordinary circumstance. Circumvention or evasion can be a legitimate concern. But, this is why the trade remedy laws provide specific mechanisms for dealing with circumvention and evasion if it occurs – mechanisms which operate within the parameters of the fact finding that occurs in connection with the investigation giving rise to an order. Once an order is issued, additional products/countries can become the subject of dumping/subsidy concerns. But, this why it is always possible to file a new petition covering additional products/countries alleged to benefit

14

from dumping and/or subsidization. However, expanding the scope in a material way at a late stage in the proceedings in anticipation of circumvention or evasion that has not occurred, potentially sweeping products not specifically investigated into the scope of the orders, is inappropriate; and, completely disregarding the "substantial transformation" test to adopt a materially expanded scope is never an appropriate response to concerns about evasion and/or circumvention.

SunPower acknowledges that CSPV cell and module manufacturing involves a complex and readily adaptable supply chain (although, when compared to current supply chain standards and practices in most industries, the solar supply chain is not unusual). Moreover, shifting cell production to Taiwan or any other country in response to the Solar I antidumping or countervailing duty orders is a rational and reasonable response to changing market conditions that include the existence of antidumping and countervailing duty orders and the availability of additional suppliers. Such procurement adjustments routinely occur in connection with antidumping and countervailing duty orders – procurement tends to shift towards non-subject products. Indeed, unless the Department in this case is relying on an unsubstantiated presumption that any solar products from any country are dumped and/or subsidized, such adjustments presumably are part of the goal of the trade remedy laws, which seek to discourage the import of dumped and/or subsidized merchandise. As such, as a general matter, while certain third-country production activities relating to a product subject to any order may, under some circumstances, constitute evasion or circumvention of the order, that most appropriately would be dealt with through the circumvention provisions of the antidumping/countervailing duty laws, other production activities may merely constitute production of products outside the scope of any

15

order, which most appropriately would be dealt with by filing a new petition in the face of any concerns about dumping or subsidization.

However, the Court should not approve of the Defendant's and SolarWorld's attempts to broaden the definitions of circumvention and evasion in the context of antidumping and countervailing duty orders to capture anticipated conduct, particularly when such conduct is predicated on the Department's well-reasoned country of origin determination in Solar I. Indeed, the Department's overly burdensome scope "clarification" in Solar II underscores the necessity for consistent country of origin determinations across trade proceedings involving adaptable supply chains. The issues presented by this industry are not like those the Department faced in connection with *Large Newspaper Printing Presses and Components Thereof, Whether Assembled or Unassembled from Germany* and *Cellular Mobile Telephones and Subassemblies from Japan, see* Defendant Brief at 33, because, in those proceedings, the incomplete subassemblies still were products of Germany and Japan, respectively, and, at least with respect to *Large Newspaper Printing Presses*, the Department's scope clarification related to subassemblies that, based on the language of the petition and the Department's initiation notice, already were understood to be potentially subject to the investigations. *See Mitsubishi Heavy Indus., Ltd. v. United States,* 986 F. Supp. 1428 (Ct. Int'l Trade 1997). The Department's scope "clarification" in Solar II, by contrast, targets merchandise that should not reasonably be construed to be Chinese and certainly was not targeted by the petition, the initiation notices, or even the preliminary determinations.

Furthermore, as the Department rightly noted in making its country of origin determination in Solar I, SolarWorld could request that the Department initiate new investigations to address any additional products and/or countries of concern. SolarWorld

16

followed the Department's protocol by filing new petitions in this case. Indeed, if SolarWorld primarily was concerned with the use of Taiwanese cells in Chinese-assembled modules, it is unclear why the Taiwan investigation, which, similar to Solar I, is directed toward Taiwanese-origin cells, regardless of the country of their assembly, would not have afforded sufficient relief.

For these reasons, the Department's purported justification is not supported by substantial record evidence and is otherwise contrary to law.

<blockquote>

3.    **Given the Impact on the Rights of CSPV Module Manufacturers, Exporters, and Importers, the Department's Departure from the Traditional "Substantial Transformation" Test and Adoption of Its Scope "Clarification" Cannot Be Justified Based on Ease of Administration and Enforcement**

</blockquote>

The Defendant also attempts to justify the Department's departure from the traditional "substantial transformation" test and radical expansion of the Solar II scope based on ease of administration and enforcement. *See* Defendant Brief at 34-35; *see also* SolarWorld Brief at 19-21. As with circumvention and evasion, in appropriate circumstances, administrability and enforcement can be legitimate concerns; but, the Department's scope "clarification" elevates these concerns to an unreasonable level and to the considerable detriment of non-U.S. CSPV module manufacturers, exporters, and importers.

Administrability and enforcement similarly were at issue in Solar I, but the Department implemented a certification protocol to address them. Likewise, in connection with the preliminary determinations that adhered to the scope stated in the petition and the initiation notices, the Department developed a certification protocol for Solar II. While it undoubtedly would be easier for the Department and U.S. Customs and Border Protection to administer and enforce a scope covering all CSPV modules assembled in China, the interests of scope administration must be carefully weighed against the dictates of the trade remedy laws and the

17

interests of non-U.S. CSPV module manufacturers, exporters, and importers, who, without adequate warning, had their modules swept into the scope of Solar II.

Manufacturers, exporters, and importers may have suggested that their CSPV cell and module manufacturing processes did not track the incorporation of Chinese-origin inputs into CSPV cells early in the investigations; but, the absence of such tracking at that point in time would not constitute an ongoing administration and enforcement concern. Industries subject to an investigation often follow inventory-tracking protocols that are not entirely in accordance with the scope of an investigation. However, those industries inevitably adapt by implementing protocols consistent with the scope. Indeed, SunPower commented that it ordinarily does not track the origin of the wafers used in CSPV cell production and noted in its Quantity & Value Questionnaire response that "the data being provided to the Department likely overstates the number of imported CSPV modules that are the subject to the present investigation." *Submission of Quantity and Value Questionnaire for SunPower Corporation and its Wholly Owned Subsidiaries* (Feb. 13, 2014), AD PR 103. Before the Department published the final affirmative antidumping and countervailing duty determinations, however, SunPower implemented a wafer-tracking protocol to ensure compliance with what it reasonably understood would be the scope of any resulting orders. SunPower alluded to these efforts in submissions filed with the Department on May 29, 2014 and July 23, 2014 and reported to the Department, in connection with the latter submission, that only a small percentage of the CSPV cells used by SunPower's Chinese toller incorporated Chinese-origin wafers. *See SunPower Corporation's Response to Request for Information* (May 29, 2014), AD PR 489; *Supplement to SunPower Corporation's Separate Rate Application* (July 23, 2014), AD PR 692.

18

D.     **The Department's Adoption of its Scope "Clarification" in the Final Determinations Substantially Burdened Administrative Process and Adversely Affected the Finality of Administrative Action**

Contrary to Defendant's and SolarWorld's assertions, no notice prior to the issuance by the Department of its scope "clarification" memorandum on October 3, 2014, was adequate to apprise interested parties that the scope was subject to change in as radical a fashion as implemented by the Department, because, among other things, the Department had already conducted its investigation based on the scope stated in the petition, the initiation notices, and the preliminary determinations. *See Memorandum to All Interested Parties Regarding Antidumping and Countervailing Duty Investigations of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and the Antidumping Duty Investigation of Certain Crystalline Silicon Photovoltaic Products from Taiwan: Opportunity to Submit Scope Comments* (Oct. 3, 2014) ("Oct. 3 Scope Memo"), AD PR 765; Defendant Brief at 37 - 41; SolarWorld Brief at 22 – 27. Accordingly, both the administrative process afforded to interested parties and the finality of the administrative action are called into question.

Although the Department may have afforded interested parties an opportunity to comment on product coverage following the initiation of the investigations and indicated in its preliminary determinations that it would be continuing to analyze the parties' scope submissions, including those relating to the methodology for determining the country of origin of the CSPV modules, the parties could not reasonably have anticipated that the Department would reject the substantial transformation analysis it had undertaken in Solar I in favor of a radically expanded scope (the Department, of course, prefers to characterize its scope "clarification" as building upon the prior scope determination). Indeed, the comments submitted to the Department addressed the viability of the "two out of three" rule scope formulation in light of Solar I, such

19

that the Department's reference in the preliminary determinations to continuing analysis more
than likely was interpreted by interested parties as relating to whether the "two out of three" rule
scope formulation and, therefore, the investigations themselves, would survive. It is
unreasonable for the Department and SolarWorld to suggest that because, out of an abundance of
caution, tenKsolar Shanghai submitted a separate rate application, even though it had no
shipments of subject merchandise based on the original scope formulation, all interested parties
were on notice that the original scope formulation would be shunted aside in its entirety. *See*
SolarWorld Brief at 24 -25. In addition, the scope "clarification" announced on October 3, 2014
and ultimately adopted by the Department in its final determinations was no mere clarification;
rather, it was a wholesale change to the scope that the parties could not reasonably have
anticipated during the course of the investigations. A precautionary filing by a single party
cannot be relied upon to suggest that all potentially interested parties reasonably could have
anticipated that the Department would radically depart from the initial scope at such a late stage
of the proceedings.

Furthermore, SolarWorld mischaracterizes the impact of the lateness of the Department's
scope "clarification" as negligible. SolarWorld ignores the fact that, as noted above, the majority
of CSPV modules assembled in China by SunPower's Chinese toller did not incorporate non-
Chinese CSPV cells that were manufactured using Chinese-origin wafers. *See* SolarWorld Brief
at 25 – 26. Accordingly, to SolarWorld, it "stated throughout the proceeding its well-supported
belief that the majority of solar panels exported by Chinese producers during the period of
investigation consisted of solar panels consisting of cells made in Taiwan, either with or without
Chinese-made inputs." *Id.* at 26. However, SolarWorld concluded that "the majority of modules
shipped from China and Taiwan, which were subject to the scope under the scope clarification.

were also subject to the scope at the time that data was collected from respondents and the preliminary determination was issued." *Id.* While SolarWorld's comments were made in connection with alleged data deficiencies, they convey the distinct impression that the Department's untimely scope "clarification" did not draw much in the way of merchandise that was "understood to be excluded at the time the investigation began" into the scope of Solar II. *Allegheny Bradford Corp. v. United States*, 342 F. Supp. 2d 1172, 1187-1188 (Ct. Int'l Trade 2004). Nonetheless, this is precisely what happened to SunPower. The Court should not allow the Department to unjustly exercise its discretion to adjust the scope in such manner as to capture merchandise that clearly was not contemplated as being covered at the outset of an investigation.

In defending the appropriateness of the Department's late stage scope "clarification," the Defendant takes issue with SunPower's reliance on *Allegheny* by asserting that "the record demonstrates that SolarWorld's expressed intent was to cover modules assembled in China using third-country cells and that there was a discrepancy between this intent and the scope language proposed in the petition." Defendant Brief at 39-40. As detailed above, SolarWorld's and the Department's actions speak far louder than their words. SolarWorld formulated a scope that the Department adopted with minor modifications after seeking explicit confirmation from SolarWorld that its proposed scope accurately reflected its intentions. That is the end of the story.

### E.    As a Matter of Law and Policy, the Scope "Clarification" Reasonably Only Should Apply to Entries Made On or After the Department's Final Determinations

Finally, if the Defendant's position is that the expanded scope, as embodied in the Department's scope "clarification," is not being applied to entries prior to the date of the final determinations, we agree with the Defendant's position. As the Defendant explained:

"Commerce's suspension and cash deposit instructions applied the clarified scope, for purposes of the *Solar II* antidumping proceeding, to merchandise entering *on or after* the publication of the antidumping final determination. Further, Commerce's suspension and cash deposit instructions applied the clarified scope, for purposes of the *Solar II* countervailing duty proceeding, to merchandise entering *on or after* the date of the [U.S. International Trade Commission's] affirmative injury determination following the publication of the countervailing duty final determination." Defendant Brief at 48 – 49 (emphasis in original).

We believe this result is compelled as a matter of law, because the Department cannot impose antidumping and countervailing duties on merchandise that is not subject to an affirmative determination; a determination, which, in the case of the Department's scope "clarification," was not made until the Department's final determinations. Indeed, we believe that the extraordinary action taken by the Department in these investigations is akin to a determination by the Department in connection with a post-order scope inquiry that merchandise is subject to an order, which requires only that liquidations be suspended as of the date the scope inquiry is made. *See* 19 C.F.R. § 351.225(l)(2); *see also AMS Assoc., Inc. v. United States*, 737 F. 3d 1338 (Fed. Cir. 2013).

Furthermore, for the reasons detailed above, we believe the interests of justice and fairness only are served if the scope "clarification" is applied in the manner described by the Defendant. Indeed, despite SolarWorld's characterization of the Department's action as a "slightly different scope definition," SolarWorld Brief at 37, the Department's scope "clarification" represented a material expansion of the scope beyond what reasonably was contemplated at the inception of the investigations.

22

## III.   CONCLUSION

For the reasons above, SunPower respectfully requests that the Court find the

Department's final scope determinations in the contested antidumping and countervailing duty

investigations to be unreasonable, unsupported by substantial record evidence, and otherwise

contrary to law; and, that the Court remand the determinations to the Department for purposes of

modifying the Department's prior determinations consistent with the Court's opinion.


Daniel J. Gerkin
Vinson & Elkins LLP
2200 Pennsylvania Avenue, N.W., Suite 500 West
Washington, DC 20037
Tel.: (202) 639-6654
*Counsel to SunPower Corporation
and SunPower Corporation, Systems*

Jerome J. Zaucha
K&L Gates LLP
1601 K Street, N.W.
Washington, DC 20006
Tel.: (202) 778-9013
*Counsel to SunPower Corporation
and SunPower Corporation, Systems*

March 29, 2016

23

## CERTIFICATE OF COMPLIANCE

Pursuant to the Section 2(B)(1) of the Court's Standard Chambers Procedures and the

Court's July 1, 2015 scheduling Order, ECF No. 31, the undersigned certify that this brief

complies with the word limitation requirement for Plaintiffs' reply brief of 7,000 words.  The

word count for SunPower Corporation's and SunPower Corporation, Systems' reply brief, as

computed by the word processing systems in use by Vinson & Elkins LLP and K&L Gates LLP

(Microsoft Word), is 6,503 words.


Daniel J. Gerkin
Vinson & Elkins LLP

*Counsel to SunPower Corporation*
*and SunPower Corporation, Systems*

March 29, 2016

Jerome J. Zaucha
K&L Gates LLP

*Counsel to SunPower Corporation*
*and SunPower Corporation, Systems*

## CERTIFICATE OF SERVICE

We hereby certify that, on March 29, 2016, the foregoing Reply Brief of Plaintiffs

SunPower Corporation and SunPower Corporation, Systems was filed electronically with the

Court through the CM/ECF System.  Pursuant to the Court's Administrative Order 02-01, this

filing constitutes service on all parties participating in *SunPower Corporation and SunPower*

*Corporation, Systems et al. v. United States*, Consol. Court No. 15-00067.


Daniel J. Gerkin
Vinson & Elkins LLP

*Counsel to SunPower Corporation*
*and SunPower Corporation, Systems*

March 29, 2016

Jerome J. Zaucha
K&L Gates LLP

*Counsel to SunPower Corporation*
*and SunPower Corporation, Systems*