**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**SUNPOWER CORPORATION and SUNPOWER CORPORATION, SYSTEMS,**

**Plaintiffs,**

**and**

**SUNIVA, INC., *ET AL.*,**

**Consolidated Plaintiffs,**

**and**

**CANADIAN SOLAR, INC., *ET AL.*,**

**Plaintiff-Intervenors**

**v.**

**UNITED STATES,**

**Defendant,**

**and**

**SOLARWORLD AMERICAS, INC.,**

**Defendant-Intervenor.**

**Consol. Court No. 15-00067**

**Before: Hon. Donald C. Pogue, Senior Judge**

**PUBLIC DOCUMENT**

**Contains No Business Proprietary Information**

**APPENDIX TO REPLY BRIEF OF PLAINTIFFS SUNPOWER CORPORATION AND SUNPOWER CORPORATION, SYSTEMS**

Daniel J. Gerkin
Vinson & Elkins LLP
2200 Pennsylvania Avenue, N.W., Suite 500 West
Washington, DC 20037
Tel.: (202) 639-6654
*Counsel to SunPower Corporation and SunPower Corporation, Systems*

Jerome J. Zaucha
K&L Gates LLP
1601 K Street, N.W.
Washington, DC 20006
Tel.: (202) 778-9013
*Counsel to SunPower Corporation and SunPower Corporation, Systems*

April 4, 2016

**SUNPOWER CORP. ET AL. V. UNITED STATES**
**CONSOL. COURT NO. 15-00067**
**BEFORE THE HONORABLE DONALD C. POGUE, SENIOR JUDGE**

**APPENDIX TO REPLY BRIEF OF PLAINTIFFS SUNPOWER CORPORATION AND SUNPOWER CORPORATION, SYSTEMS**

| TAB | DOCUMENT | PAGES | AD P.R. # | CVD P.R. # |
|---|---|---|---|---|
| 1 | Case Brief of Changzhou Trina Solar Energy Co., Ltd. (Oct. 16, 2014), *citing* Memorandum to Paul Piquado, Assistant Secretary for Import Administration, from Christian Marsh, Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations: Issues and Decision Memorandum for the Final Determination in the Antidumping Duty Investigation of Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China (Oct. 9, 2012) | 1 - 4 | 784 | |
| 2 | Exhibit 1 to Respondent's Case Brief (Oct. 16, 2014)<br><br>Memorandum to Gary Taverman, Acting Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations, from Jeff Pedersen, Case Analyst, AD/CVD Operations, Office: Scope Clarification - Antidumping and Countervailing Duty Investigations of Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China (Mar. 19, 2012) | Cover Page, Exhibit 1 | 780 | |
| 3 | Petition for the Imposition of Antidumping and Countervailing Duties Pursuant to Sections 701 and 731 of the Tariff Act of 1930, As Amended (Dec. 31, 2013) | Volume I, Pages 1 - 11 | 1 - 10 | |
| 4 | Letter from Howard Smith, Program Manager, AD/CVD Operations, Office IV, Enforcement and Compliance to Wiley Rein LLP (Jan. 6, 2014) | All | 17 | |

**SUNPOWER CORP. ET AL. V. UNITED STATES**
**CONSOL. COURT NO. 15-00067**
**BEFORE THE HONORABLE DONALD C. POGUE, SENIOR JUDGE**

**APPENDIX TO REPLY BRIEF OF PLAINTIFFS SUNPOWER CORPORATION AND SUNPOWER CORPORATION, SYSTEMS**

| TAB | DOCUMENT | PAGES | AD P.R. # | CVD P.R. # |
|---|---|---|---|---|
| 5 | Supplement II to Petition for the Imposition of Antidumping and Countervailing Duties: Certain Crystalline Silicon Photovoltaic Products from China and Taiwan (Jan. 13, 2014) | Cover Page, Pages 1 - 2 | 25 | |
| 6 | Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and Taiwan: Initiation of Antidumping Duty Investigations, 79 Fed. Reg. 4,661 (Jan 29, 2014) | All | 39 (Unpublished); 841 (Published) | |
| 7 | Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: Initiation of Countervailing Duty Investigation, 79 Fed. Reg. 4,667 (Jan. 29, 2014) | All | | 59 (Unpublished); 69 (Published) |
| 8 | Submission of Quantity and Value Questionnaire for SunPower Corporation and its Wholly Owned Subsidiaries (Feb. 13, 2014) | All | 103 | |
| 9 | SunPower Corporation's Response to Request for Information (May 29, 2014) | All | 489 | |
| 10 | Supplement to SunPower Corporation's Separate Rate Application (July 23, 2014) | All | 692 | |
| 11 | Memorandum to All Interested Parties Regarding Antidumping and Countervailing Duty Investigations of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and the Antidumping Duty Investigation of Certain Crystalline Silicon Photovoltaic Products from Taiwan: Opportunity to Submit Scope Comments (Oct. 3, 2014) | All | 765 | |

# TAB 1

**Case Brief of Changzhou Trina Solar Energy Co., Ltd. (Oct. 16, 2014), *citing* Memorandum to Paul Piquado, Assistant Secretary for Import Administration, from Christian Marsh, Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations: Issues and Decision Memorandum for the Final Determination in the Antidumping Duty Investigation of Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China (Oct. 9, 2012)**

**BEFORE THE UNITED STATES DEPARTMENT OF COMMERCE**
**INTERNATIONAL TRADE ADMINISTRATION**
**WASHINGTON, D.C.**

| | |
|---|---|
| Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China | Case Number: A-570-010<br>Investigation |

**PUBLIC DOCUMENT**

# CASE BRIEF OF CHANGZHOU TRINA SOLAR ENERGY CO., LTD.

Of Counsel:
John M. Gurley
Diana Dimitriuc Quaia
Keith F. Huffman

Arent Fox LLP
1717 K Street, N.W.
Washington, D.C. 20006

Date: October 16, 2014

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ........ 1
II. EXECUTIVE SUMMARY ........ 1
III. THE EXPANDED SCOPE LANGUAGE IS INTERNALLY INCONSISTENT ........ 2
  A. Original Scope Language ........ 2
  B. Proposed Scope Language ........ 3
IV. THE SCOPE EXPANSION IS UNLAWFUL AND THUS THE DEPARTMENT SHOULD RESCIND THESE INVESTIGATIONS ........ 6
  A. The Scope Expansion Results in Two Inconsistent Country of Origin Determinations for the Same Product ........ 6
  B. The Scope Expansion Would Result in the Application of AD/CVD Duties on Products That Are Not of Chinese Origin ........ 8
V. CONCLUSION ........ 11

## TABLE OF AUTHORITIES

Page(s)

**CASES**

*E.I. Du Pont de Nemours & Co. v. United States*,
22 CIT 370, 8 F. Supp. 2d 854 (1998) ........ 8, 10

*Ugine & ALZ Belgium, N.V. v. United States*,
31 CIT 1536, 517 F. Supp. 2d 1333 (2007), *aff'd* 551 F.3d 1339 (Fed. Cir. 2009) ........ 6, 9

*Ugine & ALZ Belgium v. United States*,
551 F.3d 1339 (Fed. Cir. 2009) ........ 10

**STATUTES**

19 U.S.C. § 1673a(c)(2) ........ 6

19 U.S.C. § 1673(1) ........ 8

19 U.S.C. § 1677(25) ........ 8

19 U.S.C. § 1677j(b) ........ 10

**REGULATIONS**

19 C.F.R. § 351.225(h) ........ 10

19 C.F.R. § 351.309(c) ........ 1

**ADMINISTRATIVE DETERMINATIONS**

*Certain Cold–Rolled Carbon Steel Flat Products from Argentina*,
58 Fed. Reg. 37062 (Dep't Commerce Jul. 9, 1993) (final determ.) ........ 9

*Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China*,
79 Fed. Reg. 44399 (July 31, 2014) (prelim. determ. of LTFV sales) ........ 1, 2

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order*, 77 Fed. Reg. 73018 (Dep't Commerce December 7, 2012) ........ passim

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Countervailing Duty Order*,
77 Fed. Reg. 73017 (Dep't Commerce December 7, 2012) ........ 1

*Stainless Steel Plate in Coils from Belgium*,
69 Fed. Reg. 74495 (Dep't Commerce Dec. 14, 2004) (final results), and accompanying Issues & Decision Memorandum ........ 9

Barcode:3235612-01 A-570-010 INV - Investigation -

# TABLE OF AUTHORITIES

## OTHER AUTHORITIES

WTO Agreement on Rules of Origin, Art. 2(c) & (d) ....................11

-iii-

AFDOCS/11350089.8

Filed By: gurley.john@arentfox.com, Filed Date: 10/16/14 3:07 PM, Submission Status: Approved

Case 1:15-cv-00067-DCP Document 93 Filed 04/04/16 Page 10 of 161

## I. INTRODUCTION

On behalf of Changzhou Trina Solar Energy Co., Ltd. ("Trina Solar"), we hereby provide comments on the Preliminary Determination issued by the U.S. Department of Commerce ("Department") in the antidumping duty investigation on *Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China* (the "Preliminary Determination").[1] These comments are submitted pursuant to 19 C.F.R. § 351.309(c) and the invitation to comment contained in the Preliminary Determination.

## II. EXECUTIVE SUMMARY

The proposed scope language, as expanded by the Department in its October 3, 2014 memorandum is internally inconsistent. Although the expanded scope language specifically references the existing AD/CVD Orders on solar cells, whether or not assembled into panels, from China, imposed in December 2012 ("*Solar I*"),[2] it is incompatible with the scope determination in *Solar I*. The proposed expansion of the scope language to include modules assembled in China of non-Chinese cells is unlawful. The proposed scope changes would include third country products in an investigation that was intended to cover products from *China*. Indeed, application of the Department's existing origin rule for solar modules indicates that all such modules sought to be included in these investigations are of third country origin, as the data on the record demonstrates. Such a scope determination is unlawful under the statute, the Department's scope determination in *Solar I*, and the Department's application of its

---

[1] *Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China,* 79 Fed. Reg. 44399 (July 31, 2014) (prelim. determ. of LTFV sales) (the "*Preliminary Determination*").

[2] *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order*, 77 Fed. Reg. 73018 (Dep't Commerce December 7, 2012) and *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Countervailing Duty Order*, 77 Fed. Reg. 73017 (Dep't Commerce December 7, 2012) (collectively "*Solar I,*" - all references to *Solar 1* Issues & Decision Memo are to the AD memorandum).

substantial transformation test to determine the origin of products subject to AD/CVD duties. Accordingly, this investigation should be rescinded and all cash deposits paid by U.S. importers for solar panels entered under the current investigations should be released immediately.

## III. THE EXPANDED SCOPE LANGUAGE IS INTERNALLY INCONSISTENT

### A. Original Scope Language

Similar to the scope language in the notice of initiation, in the Preliminary Determination the Department described the scope of the investigation, in relevant part, as follows:

> The merchandise covered by this investigation is crystalline silicon photovoltaic cells, and modules, laminates and/or panels consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including building integrated materials. For purposes of this investigation, subject merchandise also includes modules, laminates and/or panels assembled in the subject country consisting of crystalline silicon photovoltaic cells that are completed or partially manufactured within a customs territory other than that subject country, using ingots that are manufactured in the subject country, wafers that are manufactured in the subject country, or cells where the manufacturing process begins in the subject country and is completed in a non-subject country...
>
> ...Also excluded from the scope of this investigation are any products covered by the existing antidumping and countervailing duty orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the People's Republic of China. See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order, 77 FR 73018 (December 7, 2012); Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Countervailing Duty Order, 77 FR 73017 (December 7, 2012).[3]

With respect to the Department's original scope language, Trina Solar hereby incorporates by reference the scope comments filed on February 18, 2014 and April 21, 2014 by a group of Chinese respondents, including Trina Solar, Yingli Green Energy Holding Company Limited, Yingli Green Energy Americas, Inc., Canadian Solar Inc., Wuxi Suntech Power Co., Ltd., Shanghai JA Solar Technology Co., Ltd., Hefei JA Solar Technology, Co., Ltd., Jinko Solar Co.,

[3] *Preliminary Determination* at 44399.

Ltd. and other parties, that demonstrate the illegal and untenable nature of the scope of these investigations.[4] The issues identified in the above-mentioned comments and the conclusion that the scope language should be rejected have been reinforced throughout the course of these investigations. Trina Solar provides below additional comments regarding the scope of these investigations under the Department recent proposed amendments to the scope language.

### B. Proposed Scope Language

On October 3, 2014, the Department issued a scope memorandum which proposes a much broader, and radically different, scope description:

> The merchandise covered by this investigation is ~~crystalline silicon photovoltaic cells, and~~ modules, laminates and/or panels consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including building integrated materials. For purposes of this investigation, subject merchandise ~~also~~ includes modules, laminates and/or panels assembled in the ~~subject country~~ *People's Republic of China* consisting of crystalline silicon photovoltaic cells ~~that are completed or partially manufactured within~~ *produced in* a customs territory other than *the People's Republic of China* ~~that subject country, using ingots that are manufactured in the subject country, wafers that are manufactured in the subject country, or cells where the manufacturing process begins in the subject country and is completed in a non-subject country~~. Subject merchandise includes *modules, laminates and/or panels assembled in the People's Republic of China* consisting of crystalline silicon photovoltaic cells of thickness equal to or greater than 20 micrometers, having a p/n junction formed by any means, whether or not the cell has undergone other processing, including, but not limited to, cleaning, etching, coating, and/or addition of materials (including, but not limited to, metallization and conductor patterns) to collect and forward the electricity that is generated by the cell…
>
> …Also excluded from the scope of this investigation are any products covered by the existing antidumping and countervailing duty orders on crystalline silicon

[4] *See* Letter from Sidley Austin LLP to the Hon. Penny S. Pritzker, DOC Case Nos. A-570-010, A-583-853, and C-570-011, regarding Comment on Scope, filed on behalf of a group of Chinese companies (February 18, 2014); *see also* Letter from Sidley Austin LLP to the Hon. Penny S. Pritzker, DOC Case Nos. A-570-010, A-583-853, and C-570-011, regarding Response to Petitioner's Rebuttal on Scope, filed on behalf of a group of Chinese companies (April 21, 2014).

photovoltaic cells, whether or not assembled into modules, from the People's Republic of China.[5]

In its Scope Expansion Memo the Department explained that what it intends to accomplish with this scope description is the following:

- For the PRC investigations, subject merchandise includes all modules, laminates and/or panels assembled in the PRC that contain crystalline silicon photovoltaic cells produced in a customs territory other than the PRC.
- For the Taiwan investigation, subject merchandise includes all modules, laminates and/or panels assembled in Taiwan consisting of crystalline silicon photovoltaic cells produced in Taiwan or a customs territory other than Taiwan. In addition, subject merchandise will include modules, laminates, and panels assembled in a third-country, other than the PRC, consisting of crystalline silicon photovoltaic cells produced in Taiwan.[6]

However, the above-mentioned interpretation is incompatible with the Department's existing origin analysis under the AD/CVD Orders in *Solar I*. Such an interpretation of the expanded scope language is also internally inconsistent, as there is an express reference to *Solar I* in the third paragraph of the proposed scope language.

In *Solar I*, the Department considered Petitioner's request that all modules assembled in China must be covered by the scope regardless of the origin of the solar cells, but found that it could not lawfully adopt that scope language.[7] It then explained that "using a substantial transformation analysis, the Department has determined that modules from the PRC are those that have been assembled in the PRC using solar cells produced in the PRC."[8] In short, *Solar I* outlined a binary choice for solar panels produced in China: (1) if they use Chinese solar cells

---

[5] *Antidumping and Countervailing Duty Investigations of Certain Crystalline Silicon Photovoltaic Products, from the People's Republic of China and the Antidumping Duty Investigation of Certain Crystalline Silicon Photovoltaic Products from Taiwan: Opportunity to Submit Scope Comments* (Dep't Commerce October 3, 2014) at Attachment (the "*Scope Expansion*").

[6] *Scope Expansion* at 1.

[7] *See Solar I*, Issues and Decision Memorandum at 8 (Cmt. 1).

[8] *See id.*

# TAB 2

**Exhibit 1 to Respondent's Case Brief (Oct. 16, 2014)**

**Memorandum to Gary Taverman, Acting Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations, from Jeff Pedersen, Case Analyst, AD/CVD Operations, Office: Scope Clarification - Antidumping and Countervailing Duty Investigations of Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China (Mar. 19, 2012)**

BEFORE THE
UNITED STATES DEPARTMENT OF COMMERCE

| In the Matter of: | |
|---|---|
| CERTAIN CRYSTALLINE SILICON PHOTOVOLTAIC PRODUCTS FROM THE PEOPLE'S REPUBLIC OF CHINA AND TAIWAN | Case Nos. A-570-010, A-583-853, and C-570-011<br>Number of Pages: 74<br>Investigation |

**THIS DOCUMENT CONTAINS NO PROPRIETARY INFORMATION**

**CASE BRIEF OF**
**Canadian Solar Inc. and Canadian Solar (USA) Inc.; Changzhou Trina Solar Energy Co., Ltd.; China Sunergy (Nanjing) Co., Ltd.; ET Solar Industry Limited; Hanwha Solarone (Qidong) Co., Ltd.; Hengdian Group DMEGC Magnetics Co., Ltd.; LDK Solar Hi-Tech (Nanchang) Co., Ltd.; Shanghai BYD Co., Ltd. and Shangluo BYD Industrial Co., Ltd.; Shanghai JA Solar Technology Co., Ltd. and Hefei JA Solar Technology Co., Ltd.; Sumec Hardware & Tools Co., Ltd.; Wuxi Suntech Power Co., Ltd.; Wuxi Taichen Machinery & Equipment Co., Ltd.; Yingli Green Energy Holding Company Ltd. and Yingli Green Energy Americas, Inc.; and Zhejiang Heda Solar Technology Co., Ltd.**

Sidley Austin LLP
1501 K Street N.W.
Washington, D.C. 20005
(202) 736-8000

October 16, 2014

# EXHIBIT 1

# CSPV Cells from China, Scope Clarification Memorandum (March 19, 2012)

**UNITED STATES DEPARTMENT OF COMMERCE**
**International Trade Administration**
Washington, D.C. 20230

A-570-979
C-570-980
~~Proprietary Document~~
AD/CVD O4: JDP
Public Version

March 19, 2012

MEMORANDUM TO: Gary Taverman
Acting Deputy Assistant Secretary
for Antidumping and Countervailing Duty Operations

THROUGH: Abdelali Elouaradia
Director, Office 4
AD/CVD Operations

Howard Smith
Program Manager, Office 4
AD/CVD Operations

FROM: Jeff Pedersen
Case Analyst
AD/CVD Operations, Office 4

SUBJECT: Scope Clarification: Antidumping and Countervailing Duty Investigations of Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China

**Summary**

One day prior to the initiation of the above-referenced investigations, Petitioner[1] submitted proposed scope language stating that the scope covers modules/panels produced in the People's Republic of China ("PRC") regardless of where the cells in the modules/panels were manufactured and covers modules/panels produced in a third-country from cells manufactured in the PRC. The Department did not include this proposed language in the scope because it did not have sufficient time to evaluate the language prior to initiation. Since that time we have evaluated Petitioner's proposed language and, for the reasons noted below, recommend clarifying the scope of these investigations to state that modules/panels produced in a third-country from cells produced in the PRC are covered by the scope; however, modules/panels produced in the PRC from cells produced in a third-country are not covered by the scope.

**Background**

On November 8, 2011, the Department of Commerce (the "Department") initiated antidumping duty ("AD") and countervailing duty ("CVD") investigations of crystalline silicon photovoltaic

[1] The petitioner is SolarWorld Industries America Inc. ("Petitioner").



cells ("solar cells"), whether or not assembled into solar modules, from the PRC.[2] In the AD and CVD Initiation Notices the Department noted that Petitioner submitted revised scope language one day before initiation. The revised language included, among other things, the following substantive provision:

> These proceedings cover ... crystalline silicon PV modules/panels produced in the PRC, regardless of country of manufacture of the cells used to produce the modules or panels, ... and crystalline silicon PV modules or panels produced in a third country from crystalline silicon PV cells manufactured in the PRC ... .

See AD Initiation Notice, 76 FR at 70960; CVD Initiation Notice, 76 FR at 70967; see also Standing Analysis and Revised Scope Language: Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China dated November 7, 2011 at Attachment 2.

The Department stated in the AD and CVD Initiation Notices that it has not adopted this specific revision recommended by Petitioner for the purposes of initiation. The Department explained that because the recommendation was filed one day prior to the statutory deadline for initiation the Department did not have sufficient time nor the administrative resources to evaluate Petitioner's proposed language regarding merchandise produced using inputs from third-country markets, or merchandise processed in third-country markets.[3]

The AD and CVD Initiation Notices set aside a period for interested parties to raise issues regarding product coverage. On November 28, 2011, we received comments from Petitioner, and the following interested parties: SolarOne Solutions; Yingli Green Energy Holding Company Limited and Yingli Green Energy Americas, Inc. (collectively, "Yingli"); Canadian Solar Inc. ("Canadian Solar"); Wuxi Suntech Power Co., Ltd., Suntech America, Inc. and Suntech Arizona, Inc. (collectively, "Suntech"); Changzhou Trina Solar Energy Co. Ltd. ("Trina Solar"); DelSolar Co. Ltd. and DelSolar (Wujiang) Ltd. (collectively, "DelSolar"); tenKsolar (Shanghai) Co., Ltd. ("tenK"); Jiangsu Green Power PV Co., Ltd. ("Jiangsu Green"); Transform Solar; Suniva; Q-Cells North America; Hanwha SolarOne ("Qidong") Co., Ltd. ("SolarOne"); Shanghai BYD Company Limited ("Shanghai BYD"); and Konca Solar Cell Co., Ltd. On December 1, 2011, SunPower Corporation submitted rebuttal comments, as did Yingli, Canadian Solar, Suntech, and Trina Solar on December 5, 2011, and Petitioner on December 13, 2011.[4]

---

[2] See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Initiation of Antidumping Duty Investigation, 76 FR 70960 (November 16, 2011) ("AD Initiation Notice"); Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Initiation of Countervailing Duty Investigation, 76 FR 70966 (November 16, 2011) ("CVD Initiation Notice") (collectively "AD and CVD Initiation Notices").

[3] See AD Initiation Notice, 76 FR at 70960; CVD Initiation Notice, 76 FR at 70967.

[4] SolarOne, Shanghai BYD, tenK, Jiangsu Green, Zamp Solar, LLC, and Petitioner also submitted additional comments on the scope of this investigation but they were not applicable to the issue covered in this memorandum, country-of-origin.

Scope

The scope from the AD and CVD Initiation Notices is as follows:

The merchandise covered by this investigation are crystalline silicon photovoltaic cells, and modules, laminates, and panels, consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including, but not limited to, modules, laminates, panels and building integrated materials.

This investigation covers crystalline silicon photovoltaic cells of thickness equal to or greater than 20 micrometers, having a p/n junction formed by any means, whether or not the cell has undergone other processing, including, but not limited to, cleaning, etching, coating, and/or addition of materials (including, but not limited to, metallization and conductor patterns) to collect and forward the electricity that is generated by the cell.

Subject merchandise may be described at the time of importation as parts for final finished products that are assembled after importation, including, but not limited to, modules, laminates, panels, building-integrated modules, building-integrated panels, or other finished goods kits. Such parts that otherwise meet the definition of subject merchandise are included in the scope of this investigation.

Excluded from the scope of this investigation are thin film photovoltaic products produced from amorphous silicon (a-Si), cadmium telluride (CdTe), or copper indium gallium selenide (CIGS).

Also excluded from the scope of this investigation are crystalline silicon photovoltaic cells, not exceeding 10,000mm$^2$ in surface area, that are permanently integrated into a consumer good whose function is other than power generation and that consumes the electricity generated by the integrated crystalline silicon photovoltaic cell. Where more than one cell is permanently integrated into a consumer good, the surface area for purposes of this exclusion shall be the total combined surface area of all cells that are integrated into the consumer good.

Merchandise covered by this investigation is currently classified in the Harmonized Tariff System of the United States ("HTSUS") under subheadings 8501.61.0000, 8507.20.80, 8541.40.6020 and 8541.40.6030. These HTSUS subheadings are provided for convenience and customs purposes; the written description of the scope of this investigation is dispositive.

Parties' Comments

Petitioner:

- The only way to address the material injury caused by Chinese cells and modules/panels is to include both modules/panels produced in the PRC regardless of

Filed By: nellis@sidley.com, Filed Date: 10/16/14 12:49 PM, Submission Status: Approved
Filed By: Drew Jackson, Filed Date: 3/22/12 12:02 PM, Submission Status: Approved

cell origin and Chinese cells incorporated into modules/panels produced in third-countries in the scope of the investigations.

- Not including language specifically covering third-country solar modules/panels made from PRC solar cells and PRC solar modules/panels made from third-country solar cells creates an unenforceable scope that can be easily circumvented.
- Solar cell production and solar module assembly are equally import steps in producing a finished solar module.
- Nearly all solar cell production is dedicated to producing solar modules/panels and all solar module/panel assembly relies on solar cells.
- Some countervailable subsidies are specific to the production of solar modules/panels and other subsidies are available to production of both solar cells and solar modules/panels. Both types of subsidies demonstrate that module assembly, in addition to cell production, is an important stage of production.

Other Interested Parties:

- The Department should reject Petitioner's attempt to expand the scope and not accept actions that would serve to evade the statutory standing requirements and the possibility of polling.
- Petitioner has asked the Department to adopt two conflicting country-of-origin tests for purposes of these investigations.
- The scope should be limited to solar cells made in the PRC or at most products containing solar cells made in the PRC.
- The scope should not include solar modules/panels made from cells not manufactured in the PRC because a substantial transformation analysis indicates that assembling solar cells into solar modules/panels does not change the country-of-origin.
- Solar module/panel assembly does not constitute substantial transformation because:
  - Solar cells represent the majority of the total cost of solar modules/panels.
  - The manufacture of solar cells is the technologically-critical portion of the production of solar modules/panels. Solar module/panel assembly is a low-tech final assembly requiring relatively unskilled labor.
  - Solar module power output is determined by the solar cells in the solar module/panel and not solar module/panel assembly.
  - Solar cells and solar modules/panels have the same end-use.
- Including scope language to capture solar modules assembled in the PRC, regardless of where the cells were manufactured and solar modules assembled in third countries from cells manufactured in the PRC, would ignore judicial precedent stating that the scope of an antidumping duty order is "defined by the type of merchandise and the country-of-origin."[5]

---

[5] See Notice of Final Determination of Sales at Less Than Fair Value: Certain Cold-Rolled Carbon Steel Flat Products from Argentina, 58 FR 37062, 37065 (July 9, 1993) ("Cold-Rolled from Argentina") and noting that this statement was quoted by the Court of International Trade ("CIT") twice in Advanced Tech & Materials Co., Ltd. v. United States, No. 09-511, 2011 Ct. Intl. Trade LEXIS 136, *11 (CIT Oct. 12, 2011) ("Advanced Tech.") and Ugine and ALZ Belgium, N.V. v. United States, 517 F. Supp. 2d 1333, 1345 (CIT 2007) ("Ugine").

On March 7, 2012, and March 14, 2012, Petitioner and tenK, respectively submitted further comments concerning product coverage. Due to the timing of the submissions, we have been unable to consider these comments in this decision. We will consider these comments at a later date.

## Legal Framework

The scope of these investigations and the International Trade Commission final determination will determine the scope of any resulting AD and CVD orders. Because AD and CVD orders apply to merchandise from particular countries, determining the country where the merchandise is produced is fundamental to proper administration and enforcement of the AD and CVD statute. The scope of an AD or CVD order is limited to merchandise that originates in the country covered by the order.[6] The Department has explicitly stated that the scope of an antidumping duty order is "defined by the type of merchandise and the country-of-origin."[7]

In determining the country-of-origin of a product, the Department's practice has been to conduct a substantial transformation analysis.[8] The CIT has upheld the Department's "substantial transformation" analysis as a means to carry out its country-of-origin analysis.[9] The CIT stated that "{t}he 'substantial transformation' rule provides a yardstick for determining whether the processes performed on merchandise in a country are of such significance as to require that the resulting merchandise be considered the product of the country in which the transformation occurred."[10] Because the Petitioner's proposed scope language addresses modules/panels assembled, and cells produced, in a third country we have used a substantial transformation analysis to determine whether one or both of the scenarios described by Petitioner should be covered by the scope of these investigations.

## Analysis

The Department has applied, as appropriate, the following analyses in determining whether substantial transformation occurs, thereby changing a product's country-of-origin. These have

---

[6] See Stainless Steel Plate in Coils from Belgium: Final Results of Antidumping Duty Administrative Review, 69 FR 74495 (December 14, 2004) and the accompanying Issues and Decision Memorandum at Comment 4 ("SSPC Belgium").

[7] In Cold-Rolled from Argentina, 58 FR at 37065, the Department stated that "{t}he scope of an antidumping or countervailing duty order is defined by the type of merchandise and by the country of origin (e.g., widgets from Ruritania). For merchandise to be subject to an order it must meet both parameters, *i.e.*, product type and country of origin. In determining country of origin for scope purposes, the Department applies a 'substantial transformation' rule." As noted above, this language was quoted by the CIT twice in Advanced Tech. at *11 and Ugine, 517 F. Supp. 2d at 1345.

[8] See, e.g., Notice of Final Determination of Sales at Less Than Fair Value: Glycine from India, 73 FR 16640 (March 28, 2008), and accompanying Issues and Decision Memorandum at Comment 5; see also SSPC Belgium, and accompanying Issues and Decision Memorandum at Comment 4.

[9] See E.I. DuPont De Nemours & Company. v. United States, 8 F. Supp. 2d 854, 858 (CIT 1998) ("Dupont").

[10] See Dupont (referencing Smith Corona Corp. v. United States, 811 F. Supp. 692, 695 (CIT 1993) as "noting that in determining if merchandise exported from an intermediate country is covered by an antidumping order, Commerce identified the country of origin by considering whether the essential component is substantially transformed in the country of exportation").

included: 1) whether the processed downstream product falls into a different class or kind of product when compared to the upstream product; 2) whether the essential component of the merchandise is substantially transformed in the country of exportation; or 3) the extent of processing.[11] We have examined these criteria in conducting our substantial transformation analysis:

Class or Kind

The Department "has generally found that substantial transformation has taken place when the upstream and downstream products fall within two different 'classes or kinds' of merchandise.... Conversely, the Department almost invariably determines substantial transformation has not taken place when both products are within the same 'class or kind' of merchandise."[12] The merchandise subject to an investigation, i.e., the class or kind of merchandise to be investigated, is described in the scope. The scope of these investigations covers both solar cells and solar modules/panels.[13] Thus solar cells and solar modules/panels are within the same "class or kind" of product. We further note that the International Trade Commission ("ITC") in its companion preliminary determination defined solar cells and solar modules/panels as one domestic like product.[14]

Essential Component

In examining whether the essential component of the merchandise is substantially transformed in the country of exportation, the Department considers whether processing in the exporting country changes the important qualities or use of the component.[15] The essential component of solar modules/panels is the solar cell since the purpose of solar modules/panels is to convert sunlight into electricity and this process occurs in the solar cells.[16] Thus, in this case, the Department is considering whether the processing of solar cells into solar modules/panels changes the nature or use of the solar cells.

Module/panel assembly does not change the important qualities, i.e., the physical or chemical characteristics, of the solar cell itself. As stated in the original petition, solar cells are made from crystalline silicon wafers. A dopant, which is a trace impurity element diffused into a thin layer of the wafers' surface to impart an opposite electrical orientation to the cell surface, creates the positive/negative junction that is needed for the conversion of sunlight into electricity, which is the purpose of solar cells. Solar cells are normally coated with silicon nitride to increase light

[11] See, e.g., Notice of Final Determination of Sales at Less Than Fair Value: Glycine from India, 73 FR 16640 (March 28, 2008), and accompanying Issues and Decision Memorandum at Comment 5.
[12] See Notice of Final Determination of Sales at Less Than Fair Value: Wax and Wax/Resin Thermal Transfer Ribbons from France, 69 FR 10674, 10675-10676 (March 8, 2004).
[13] See AD Initiation Notice, 76 FR at 70965 and CVD Initiation Notice, 76 FR at 70970.
[14] See Crystalline Silicon Photovoltaic Cells and Modules from China: Investigation Nos. 701-TA-481 and 731-TA-1190 (Preliminary), USITC Publication 4295 (December 2011) ("ITC Solar Cells and Modules Prelim") at 11.
[15] See also Erasable Programmable Read Only Memories (EPROMs) From Japan: Final Determination of Sales at Less Than Fair Value, 51 FR 39680, 39691-39692 (October 30, 1986) ("EPROMs").
[16] See Petition at Exhibit II-19 at 3.

Filed By: nellis@sidley.com, Filed Date: 10/16/14 12:49 PM, Submission Status: Approved
Filed By: Drew Jackson, Filed Date: 3/22/12 12:02 PM, Submission Status: Approved

absorption (this results in a blue-purple color) and undergo a screening process where conductive metal is printed into the cell. Metal conduits or busbars channel electricity generated by the cell into electricity collection points.[17] None of these characteristics are changed during module/panel assembly. Petitioner, Trina Solar, a mandatory respondent, and the ITC all describe module assembly as stringing together 60 or 72 solar cells, laminating them, and fitting them in a glass-covered aluminum frame.[18] These processes do not change the basic nature of a solar cell. Moreover, the function of a solar cell is not changed when assembled into modules/panels; the cell still functions to convert sunlight into electricity. The ITC also noted that "the physical characteristics and functions of cells and solar modules essentially are the same."[19] The purpose of both solar cells and solar modules/panels is to convert sunlight into electricity. Thus, neither the physical qualities nor the function of solar cells are changed when they are assembled into modules/panels.

The instant case is similar to EPROMs.[20] In EPROMs, the scope of the investigation included processed wafers and dice. In that case, the issue was whether processed wafers and dice that were produced in Japan, yet encapsulated in a third country, became a product of the country where the encapsulation occurred. The Department determined that the processed wafers or dice were not just a major component of the finished device, rather they were "the essential active component{s} which define{d} the merchandise under investigation."[21] The Department further found that the assembly process in the third country was not a sophisticated process.[22] Accordingly, the encapsulation of processed wafers or dice in a third country did not qualify as substantial transformation for purposes of determining country-of-origin. Similarly, solar module assembly connects cells into their final end-use form but does not change the "essential active component," the solar cell, which defines the module/panel.

Extent of Processing

When considering the extent of processing, we examine whether the processing was substantial and/or sophisticated.[23] As noted above, module/panel assembly consists of stringing together solar cells, laminating them, and fitting them in a glass-covered aluminum frame for protection. Thus, this stage of production is principally an assembly process. Numerous interested parties, aside from Petitioner, argued that solar module/panel assembly is relatively insubstantial in terms of number of steps, inputs, research and development required, and time.[24] Consistent with these arguments, Trina Solar identified six stages of production when manufacturing solar

---

[17] See Petition for the Imposition of Antidumping and Countervailing Duties: Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China, dated October 19, 2011 ("Petition") at Exhibit II-19 at 3.
[18] See Petition at Exhibit A-26. See also ITC Solar Cells and Modules Prelim at 6 and 10.
[19] See ITC Solar Cells and Modules Prelim at 10.
[20] See EPROMs.
[21] See EPROMs, 51 FR at 39692.
[22] See id.
[23] See, e.g., Notice of Final Determination of Sales at Not Less Than Fair Value: Wax and Wax/Resin Thermal Transfer Ribbon from the Republic of Korea, 69 FR 17645, 17647 (April 5, 2004).
[24] See November 28, 2011 scope comments submitted by tenK, Transform Solar, Suniva, and Q-Cells North America.

Filed By: nellis@sidley.com, Filed Date: 10/16/14 12:49 PM, Submission Status: Approved
Filed By: Drew Jackson, Filed Date: 3/22/12 12:02 PM, Submission Status: Approved

modules/panels, five of which were dedicated to solar cell production and only one pertained to solar module/panel assembly.[25] Petitioner and the ITC also indicated that solar module assembly is one stage of production.[26] Petitioner and Trina Solar also reported consuming many more types of inputs in cell production compared with module assembly.[27] Further, Trina Solar reported a production time for solar cells that is [ ] of module assembly.[28] Accordingly, the assembly of solar cells into solar modules does not rise to the level of changing the country-of-origin of the subject merchandise.

Based on our analysis of the foregoing factors we find that solar module assembly does not substantially transform solar cells such that it changes the country-of-origin. Solar cells and solar modules/panels are within the same class of merchandise. Further, module assembly does not substantially alter the essential nature of solar cells nor does it constitute significant processing such that it changes the country-of-origin of the cell, as it is an assembly process that only strings cells together, adding a protective covering and an aluminum base. Therefore, we believe the scope should be clarified to state that modules/panels produced in a third-country from solar cells produced in the PRC are covered by the scope; however, modules/panels produced in the PRC from solar cells produced in a third-country are not covered by the scope.

While we understand the intent of Petitioner's argument that the scope should cover solar modules/panels produced in the PRC, regardless of the origin of the solar cells, this is not tenable because doing so would either necessitate making inconsistent country-of-origin determinations for a single product,[29] or require ignoring the country-of-origin when considering whether merchandise entering the United States is covered by the scope of these investigations. A product can only have one country-of-origin for AD/CVD purposes, and AD and CVD investigations only cover products with a country-of-origin that is the country under investigation.[30] Petitioner has not cited any example where the Department has found that a product could have two countries-of-origin. Thus, while the Department is not excluding solar modules/panels from the scope of these investigations, in conjunction with the above described substantial transformation analysis, we are clarifying that where solar cell production occurs in a different country from solar module assembly, the country-of-origin of the solar modules/panels is the country in which the solar cell was produced.

---

[25] See also Trina Solar's January 10, 2012 Section A response at Exhibit A-26.
[26] See Petition at Exhibit A-26. See also ITC Solar Cells and Modules Prelim at 11 where the ITC noted in its preliminary determination that the "{p}roduction of the finished product, modules, involves four primary steps – crystallization, wafer production, cell conversion, and module assembly – along with packing and inspection of the final product. {Solar} cells undergo only one additional production step, the assembly into modules, before transformation into the finished product."
[27] See Trina Solar's February 6, 2012 Section D response at Exhibit D-4. See also Petition at Exhibits II-19 and II-20.
[28] See Trina Solar's February 6, 2012 Section D response at Exhibit D-4.
[29] Namely, finding that module assembly in the PRC using solar cells produced in a third-country constitutes substantial transformation and thus the country of origin of the module is the PRC while also finding that module assembly outside the PRC using PRC produced solar cells does not constitute substantial transformation and thus the country of origin of the module is the country where the solar cells were produced, the PRC.
[30] See Cold-Rolled from Argentina, 58 FR at 37065.

Filed By: nellis@sidley.com, Filed Date: 10/16/14 12:49 PM, Submission Status: Approved
Filed By: Drew Jackson, Filed Date: 3/22/12 12:02 PM, Submission Status: Approved

Petitioner's claim that not adopting their proposed language in the scope creates an unenforceable scope that can be easily circumvented. While we acknowledge that the Department has on occasion explicitly addressed the possibility of circumvention as a consideration in determining the country-of-origin of merchandise under investigation, circumvention is not the sole or controlling factor relied upon in making a country-of-origin determination.[31] Nonetheless, whether explicitly stated or not, the factors we consider for making country-of-origin determinations inherently reflect the agency's concern that the relief afforded by AD/CVD orders not be eviscerated by moving minor processing outside of the country covered by the order. Thus, circumvention concerns are reflected in the country-of-origin determination. As stated above, adopting the language proposed by Petitioner would result in two inconsistent country-of-origin determinations.

The Department routinely meets with U.S. Customs and Border Protection ("CBP") to ensure that our AD/CVD orders are enforced. Towards that end, and with respect to these cases in particular, the Department has begun an inter-agency dialogue with CBP that is designed to fulfill that goal. Specifically, Import Administration and CBP staff are meeting to develop procedures which will ensure that Chinese solar cells subject to any potential duties are properly identified at the border. Efforts to evade enforcement will be identified and thwarted. While the Department works closely with CBP, if an importer is declaring the wrong country-of-origin for imported merchandise, this is a matter appropriately dealt with by CBP. Lastly, Petitioner has the option of bringing additional petitions to address any dumping concerns it has regarding solar modules/panels assembled from solar cells produced in a third country.

---

[31] As demonstrated above, the Department considers various factors in a substantial transformation analysis.

**Recommendation**

We recommend that the Department find that solar module/panel assembly does not constitute substantial transformation of the solar cells included in the module. We further recommend clarifying the scope of these investigations to state that modules/panels produced in a third-country from cells produced in the PRC are covered by the scope; however, modules/panels produced in the PRC from cells produced in a third-country are not covered by the scope.[32]

✓
Agree    Disagree

Gary Taverman
Acting Deputy Assistant Secretary
for Antidumping and Countervailing Duty Operations

3/19/12
Date

[32] See Attachment I.

Filed By: nellis@sidley.com, Filed Date: 10/16/14 12:49 PM, Submission Status: Approved
Filed By: Drew Jackson, Filed Date: 3/22/12 12:02 PM, Submission Status: Approved

## Attachment I

## Scope of the Investigation

The merchandise covered by this investigation are crystalline silicon photovoltaic cells, and modules, laminates, and panels, consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including, but not limited to, modules, laminates, panels and building integrated materials.

This investigation covers crystalline silicon photovoltaic cells of thickness equal to or greater than 20 micrometers, having a p/n junction formed by any means, whether or not the cell has undergone other processing, including, but not limited to, cleaning, etching, coating, and/or addition of materials (including, but not limited to, metallization and conductor patterns) to collect and forward the electricity that is generated by the cell.

Subject merchandise may be described at the time of importation as parts for final finished products that are assembled after importation, including, but not limited to, modules, laminates, panels, building-integrated modules, building-integrated panels, or other finished goods kits. Such parts that otherwise meet the definition of subject merchandise are included in the scope of this investigation.

Excluded from the scope of this investigation are thin film photovoltaic products produced from amorphous silicon (a-Si), cadmium telluride (CdTe), or copper indium gallium selenide (CIGS).

Also excluded from the scope of this investigation are crystalline silicon photovoltaic cells, not exceeding 10,000mm$^2$ in surface area, that are permanently integrated into a consumer good whose function is other than power generation and that consumes the electricity generated by the integrated crystalline silicon photovoltaic cell. Where more than one cell is permanently integrated into a consumer good, the surface area for purposes of this exclusion shall be the total combined surface area of all cells that are integrated into the consumer good.

Modules, laminates, and panels produced in a third-country from cells produced in the PRC are covered by this investigation; however, modules, laminates, and panels produced in the PRC from cells produced in a third-country are not covered by this investigation.

Merchandise covered by this investigation is currently classified in the Harmonized Tariff System of the United States ("HTSUS") under subheadings 8501.61.0000, 8507.20.80, 8541.40.6020 and 8541.40.6030. These HTSUS subheadings are provided for convenience and customs purposes; the written description of the scope of this investigation is dispositive.

# TAB 3

# Petition for the Imposition of Antidumping and Countervailing Duties Pursuant to Sections 701 and 731 of the Tariff Act of 1930, As Amended (Dec. 31, 2013)

Barcode:3171232-01 A-570-010 INV - Investigation -

DOC Investigation Nos. A-570-010,
A-583-853, and C-570-011
Total Pages: 596
Investigation
Petitioner's Business Proprietary Information has been removed from the Table of Contents, pages 2, 9, 23, 35, 38, 40-42, 44-47, 49, 64-65, Exhibit List, and Exhibits I-1, I-5, I-15, I-16, and I-18-I-22.
**PUBLIC VERSION**

**BEFORE THE**
**INTERNATIONAL TRADE ADMINISTRATION**
**UNITED STATES DEPARTMENT OF COMMERCE**
**AND THE**
**UNITED STATES INTERNATIONAL TRADE COMMISSION**

# CERTAIN CRYSTALLINE SILICON PHOTOVOLTAIC PRODUCTS FROM THE PEOPLE'S REPUBLIC OF CHINA AND TAIWAN

## PETITION FOR THE IMPOSITION OF ANTIDUMPING AND COUNTERVAILING DUTIES PURSUANT TO SECTIONS 701 AND 731 OF THE TARIFF ACT OF 1930, AS AMENDED

## VOLUME I

## COMMON ISSUES AND INJURY

Timothy C. Brightbill, Esq.

**WILEY REIN LLP**
1776 K Street, N.W.
Washington, D.C. 20006
(202) 719-7000

*Counsel to SolarWorld Industries America, Inc.*

December 31, 2013

Filed By: tbrightbill@wileyrein.com, Filed Date: 12/31/13 11:43 AM, Submission Status: Approved

Table of Contents

Page

I. COMMON ISSUES ........ 8

A. **The Name and Address of the Petitioner (19 C.F.R. § 351.202(b)(1))** ........ 8

B. **Identity of the Industry on Whose Behalf the Petition Is Filed (19 C.F.R. § 207.11(b)(2)(ii); 19 C.F.R. § 351.202(b)(2))** ........ 8

C. **Information Relating to the Degree of Industry Support for the Petitions (19 C.F.R. § 351.202(b)(3))** ........ 8

D. **Previous Requests for Import Relief for the Merchandise (19 C.F.R. § 351.202(b)(4))** ........ 10

E. **Scope of the Investigation and a Detailed Description of the Subject Merchandise (19 C.F.R. § 351.202(b)(5))** ........ 10

1. Scope of Investigation ........ 10
2. Technical Characteristics and Uses ........ 11
3. Production Methodology ........ 13
4. Tariff Classification ........ 17

F. **The Name of the Home Market Country and the Name of Any Intermediate Country Through Which the Merchandise Is Transshipped (19 C.F.R. § 351.202(b)(6))** ........ 17

G. **The Names and Addresses of Each Person Believed to Sell the Merchandise at Less Than Normal Value and the Proportion of Total Exports to the United States (19 C.F.R. § 351.202 (b)(7)(i)(A))** ........ 18

H. **All Factual Information Related to the Calculation of Export Price and the Constructed Export Price of the Subject Merchandise and the Normal Value of the Foreign Like Product for Non-Market Economy Countries (19 C.F.R. § 351.202(b)(7)(i)(B) and (C))** ........ 18

I. **The Names and Addresses of Each Person Believed to Benefit from a Countervailable Subsidy Who Exports the Subject Merchandise to the United States and the Proportion of Total Exports to the United States (19 C.F.R. § 351.202 (b)(7)(ii)(A))** ........ 19

J. **The Alleged Countervailable Subsidies and Factual Information Relevant to the Alleged Countervailable Subsidies (19 C.F.R. § 351.202 (b)(7)(ii)(B))** ........ 20

K. **The Volume and Value of the Merchandise Imported During the Most Recent Three-Year Period (19 C.F.R. § 351.202(b)(8))** ........ 20

Case 1:15-cv-00067-DCP Document 93 Filed 04/04/18 Page 33 of 161

Business Proprietary Information
Has Been Deleted

Table of Contents
(continued)

Page

L. **The Names and Addresses of Each Entity the Petitioner Believes Imports or Is Likely to Import the Merchandise (19 C.F.R. § 207.11(b)(2)(iii); 19 C.F.R. § 351.202(b)(9))** ....... 23

II. DOMESTIC LIKE PRODUCT AND DOMESTIC INDUSTRY ....... 23

A. **Domestic Like Product** ....... 23

1. Physical Characteristics and Uses ....... 25
2. Interchangeability ....... 26
3. Channels of Distribution ....... 27
4. Customer and Producer Perceptions ....... 28
5. Common Manufacturing Facilities, Production Processes, and Employees 28
6. Price ....... 29

B. **Conclusion** ....... **30**

C. **Domestic Industry** ....... **30**

1. Related Parties ....... 30

III. THE DOMESTIC INDUSTRY PRODUCING THE DOMESTIC LIKE PRODUCT IS MATERIALLY INJURED BY REASON OF UNFAIRLY TRADED IMPORTS FROM CHINA AND TAIWAN ....... 33

A. **The Volume and Market Share of Subject Imports Increased During the Period** ....... **36**

B. **Unfairly Traded Subject Imports Have Had Significant Negative Price Effects on the Domestic Industry** ....... **39**

C. **Unfairly Traded Subject Imports Have Had an Injurious Impact on the Domestic Industry** ....... **44**

1. [ ] Demonstrate the Injurious Impact of the Substantial Volumes of Unfairly Traded Subject Imports ....... 45
2. Numerous U.S. Producers Have Shuttered U.S. Production, Reduced Workforces, and/or Declared Bankruptcy ....... 46
3. The Domestic Producers that Remain Have Not Been Able to Effectively Utilize Their Existing Capacity ....... 49

IV. THE DOMESTIC INDUSTRY IS THREATENED WITH MATERIAL INJURY BY REASON OF UNFAIRLY TRADED SUBJECT IMPORTS ....... 49

Table of Contents
(continued)

Page

A. **All Issues Relevant to the Commission's Threat of Material Injury Analysis Should Be Considered in Light of the Current Weakness in the Global Economy** .......... 53

B. **China Encourages Exportation of Subject Merchandise Through Countervailable Subsidies** .......... 56

C. **Subject Producers Have Significant Volumes of New and Unused Capacity, Which Indicate the Likelihood of Substantially Increased Imports** .......... 58

D. **The Volume and Market Penetration of Subject Imports Have Increased, Indicating the Likelihood of Substantially Increased Imports** .......... 63

E. **Subject Imports are Entering at Prices that are Likely to Have a Significant Depressing or Suppressing Effect on Domestic Prices, and are Likely to Increase Demand for Further Imports** .......... 64

F. **Inventories of the Subject Merchandise Threaten the Domestic Industry with Additional Material Injury** .......... 64

G. **Subject Imports Are Hindering the Existing Development and Production Efforts of the Domestic Industry** .......... 65

H. **Other Demonstrable Adverse Trends Indicate the Probability that There is Likely to Be Material Injury by Reason of Subject Imports** .......... 65

V. CONCLUSION .......... 67

Filed By: tbrightbill@wileyrein.com, Filed Date: 12/31/13 11:43 AM, Submission Status: Approved

**PUBLIC VERSION**

**BEFORE THE
UNITED STATES DEPARTMENT OF COMMERCE
AND THE
UNITED STATES INTERNATIONAL TRADE COMMISSION
WASHINGTON, D.C.**

**PETITION FOR THE IMPOSITION
OF ANTIDUMPING AND COUNTERVAILING DUTIES ON
CERTAIN CRYSTALLINE SILICON PHOTOVOLTAIC PRODUCTS
FROM THE PEOPLE'S REPUBLIC OF CHINA AND TAIWAN**

These Petitions are presented on behalf of SolarWorld Industries America Inc. ("SolarWorld" or "Petitioner") and are supported by the Coalition for American Solar Manufacturing.[1] Petitioner alleges that crystalline silicon photovoltaic ("c-Si PV")[2] products[3] imported from the People's Republic of China and Taiwan are being or are likely to be sold at less than normal value within the meaning of section 731 of the Tariff Act of 1930, *as amended*, 19 U.S.C. § 1673 (hereinafter "the Act" or "the Tariff Act"). Petitioner further alleges that Chinese producers and exporters of c-Si PV products imported into the United States have benefited from subsidies that are countervailable within the meaning of section 701 of the Act, *as amended*, 19 U.S.C. § 1671. Finally, Petitioner alleges that these unfairly traded imports are a cause of material injury to the United States domestic industry producing c-Si PV products and threaten to cause further material injury if remedial action is not taken. These Petitions contain information reasonably available to Petitioner in support of these allegations and are filed in conformity with 19 C.F.R. § 351.202 and 19 C.F.R. § 207.11.

---

1 The Coalition for American Solar Manufacturing consists of approximately 240 companies, including U.S. solar manufacturers, installers and distributors. *See* http://www.americansolarmanufacturing.org/members/.

2 U.S. producers of thin-film solar products are not part of the domestic c-Si PV industry on whose behalf these Petitions are being filed.

3 The terms "module" and "panel" are used interchangeably herein. For purposes of this Petition, both terms refer to multiple c-Si PV cells strung together.

Case 1:15-cv-00067-DCP Document 93 Filed 04/04/16 Page 36 of 161

Business Proprietary Information Has Been Deleted

As described in detail below, from 2010 through the third quarter of 2013 (the period of investigation or "POI"), the Chinese and Taiwanese c-Si PV industries have made a deliberate and concerted effort to push large and growing volumes of subject imports into the U.S. market using dumped and subsidized pricing, causing material injury to the domestic industry. In the initial part of the POI, the Chinese solar industry was responsible for the massive volumes of c-Si PV products that entered into the United States and injured the U.S. solar industry. As stated by various industry members and commentators:

- "Suntech, to build market share, is selling solar panels on the American market for less than the cost of the materials, assembly and shipping."[4] – Shi Zhengron, chief executive and founder of Suntech Power Holdings, a Chinese manufacturer of c-Si PV cells and panels that, at times during the POI, was the world's largest producer.

- "The Chinese strategy is very clear. They are engaging in predatory financing and they're trying to drive everybody else out of the market. When you've got free money you can out-dump everybody below cost. . . . If something isn't done, no one will be making solar PV in the U.S."[5] – Bryan Ashley, former chief marketing officer for Suniva Inc.

- "When it comes to . . . solar panels, the differential in labor costs is relatively small, but if we don't get busy – if {China} continue{s} to give free land, subsidies and rig their currency – we're going to lose all production of solar panels in this country, the prediction is, within five years."[6] – Rep. Sander Levin.

- Recognizing the perilous situation facing the U.S. solar industry, Senate Finance trade subcommittee Chairman Ron Wyden urged the U.S. Government to take

---

4 Keith Bradsher, *China Racing Ahead of U.S. in the Drive to Go Solar*, The N.Y. Times (Aug. 25, 2009), attached at **Exhibit I-1A**. This article sparked a firestorm of press articles in which Dr. Shi claimed that he had misunderstood the newspaper's question, despite having been asked about the issue twice in the original interview. *See* Keith Bradsher, *Chinese Solar Firm Revises Price Remark*, The N.Y. Times (Aug. 27, 2009), attached at **Exhibit I-1B**.

5 Stephen Lacey, *How China Dominates Solar Power: Huge Loans from the Chinese Development Bank are Helping Chinese Solar Companies Push American Solar Firms Out of the Market*, The Guardian (Sept. 12, 2011), attached at **Exhibit I-1C**.

6 [ Article ], attached at **Exhibit I-1D**.

Case 1:15-cv-00067-DCP Document 93 Filed 04/04/16 Page 37 of 161

"aggressive action" to counter China's unfair trade practices, including self-initiating a trade remedy case against Chinese subject imports.[7]

These unfair trade practices culminated in AD/CVD cases against c-Si PV cells, whether or not assembled into modules, from China,[8] and a unanimous affirmative material injury determination by the International Trade Commission ("the Commission").[9] Accordingly, in March and May 2012, preliminary AD and CVD duties, respectively, were imposed on Chinese c-Si PV cells, whether or not assembled into modules,[10] and in December 2012, AD/CVD orders were issued and final duties were imposed, at margins ranging from 30 to 250 percent.[11]

However, even before preliminary duties were imposed on Chinese c-Si PV cells, Chinese and Taiwanese solar producers changed their production models slightly in order to exploit a loophole in the scope of the AD/CVD orders, evade the duties, and continue pushing dumped and subsidized product into the U.S. market. Despite the domestic industry's repeated requests, the Department of Commerce's ("the Department") final AD/CVD determinations

---

[7] *Id.*

[8] *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 76 Fed. Reg. 70,960 (Dep't Commerce Nov. 16, 2011) (initiation of antidumping duty investigation); *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 76 Fed. Reg. 70,966 (Dep't Commerce Nov. 16, 2011) (initiation of countervailing duty investigation).

[9] *Crystalline Silicon Photovoltaic Cells and Modules from the People's Republic of China*, Inv. Nos. 701-TA-481 and 731-TA-1190 (Final) USITC Pub. 4360 at 6-12 (Dec. 2012) ("USITC Pub. 4360").

[10] *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 77 Fed. Reg. 17,439 (Dep't Commerce Mar. 26, 2012) (prelim. affirmative countervailing duty deter.); *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 77 Fed. Reg. 31,309 (Dep't Commerce May 25, 2012) (prelim. deter. of sales at less than fair value, postponement of final deter. and affirmative prelim. deter. of critical circumstances).

[11] *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 77 Fed. Reg. 73,017 (Dep't Commerce Dec. 7, 2012) (countervailing duty order); *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 77 Fed. Reg. 73,018 (Dep't Commerce Dec. 7, 2012) (amended final deter. of sales at less than fair value, and antidumping duty order).

failed to cover Chinese solar modules assembled from non-Chinese solar cells,[12] allowing Chinese solar producers to begin using cells fully or partially manufactured in Taiwan in the modules they assembled for export to the United States, and to export those modules, duty-free, to the U.S. market. As a result, Chinese producers have been using – or claiming to use – Taiwanese and other non-Chinese cells in their module production, even prior to the imposition of preliminary duties in March and May 2012, as they themselves have explained:

- In November 2011, the president of Grape Solar, a large U.S. importer of Chinese modules, "said that Chinese manufacturers wanted to keep wafer production in China, but were making plans to ship wafers to Taiwan or South Korea for conversion into solar cells, as one way to potentially avoid any new tariffs the United States Commerce Department might decide to impose."[13]

- In a 2011 earnings conference call, a JA Solar Holding Co., Ltd. executive stated the company's intent to try to avoid any future order that would be issued: "{t}o be prudent, I think we need to have a solution, a *work-around* solution," he said. He noted that the company has strategic partners it has worked with in the past that can provide products.[14]

- The Chief Commercial Officer of Trina Solar Limited stated in the company's fourth quarter 2011 earnings conference call: "{g}oing forward... we're looking at alternatives that wouldn't be subject to those duties."[15] In May 2012, *Recharge* reported that "in the future, {Trina} will outsource cells from Canada or Taiwan to work around the tariffs."[16] In June 2012, the President of Trina Solar Europe stated that "the modules that we're shipping now to the U.S. have solar cells that are made from outside of China and so in that sense we're not so affected by {the tariffs}."[17]

---

[12] Petitioner has challenged this determination at the U.S. Court of International Trade, and the appeal is pending.

[13] Keith Bradsher, *China Bends to U.S. Complaint on Solar Panels but Plans Retaliation*, The N.Y. Times (Nov. 21, 2011), attached at **Exhibit I-1E**.

[14] Erin Coe, *US Duties May Spur Chinese Solar Cos. To Move Operations*, Law 360 (Nov. 23, 2011), attached at **Exhibit I-1F** (emphasis added).

[15] *Trina Solar's CEO Discusses Q4 2011 Results - Earnings Call Transcript*, Seeking Alpha (Feb. 23, 2012), attached at **Exhibit I-1G**.

[16] Dominique Patton, *Trina Solar takes $26m against US duties as it posts Q1 loss*, Recharge (May 23, 2012), attached at **Exhibit I-1H**.

[17] Jonathan Gifford, *Trina Solar: EU trade case major setback for PV*, pv magazine (June 8, 2012), attached at **Exhibit I-1I**.

- Chinese producer Suntech took similar measures to avoid the duties. In May 2012, an analyst stated that "Suntech will experience *no further impact*" from the case, because "{it is} sourcing all cells outside of China going forward for all {its} U.S. shipments, so {it has} no exposure to tariffs."[18]

- "Canadian Solar, which makes most of its panels in China, has been buying solar cells from Taiwan for years as part of its supply chain strategy, said Chief Financial Officer Michael Potter. Now all U.S.-bound modules would be made with these slightly more expensive Taiwanese cells to avoid the tariff."[19]

As a result, the remedy afforded by the first AD/CVD cases was substantially weakened, allowing increasing volumes of subject product to continue shipping large quantities of dumped and subsidized product into the U.S. market during the period (defined herein as 2010 – September 2013).

Even with the imposition of antidumping and countervailing duties on Chinese cells in 2012, imports of c-Si PV cells and modules[20] from China rose from a value of $1.2 billion in 2010 to $1.7 billion in 2012, and increased by 24 percent in September 2013, as compared to September 2012.[21] As described above, from 2010 through early 2012, imports of modules from China consisted largely of modules assembled with Chinese cells. Since that time, imports of modules from China have consisted almost entirely of modules assembled in China from solar cells completed or partially manufactured in Taiwan or other countries (*i.e.*, cells manufactured

---

18 *Trina, Suntech see higher margins despite import duties*, Reuters (May 23, 2012), attached at **Exhibit I-J** (emphasis added).

19 Braden Reddall, *Analysis: U.S. solar tariffs not slowing slide in panel prices*, Reuters (July 18, 2012), attached at **Exhibit I-1K.**

20 Subject imports include both imports of cells (HTSUS 8541.40.6030) and cells assembled into modules or panels (HTSUS 8541.40.6020). These are the primary HTSUS subheadings covering c-Si PV cells, modules, and panels. While subject modules or panels may be imported under HTSUS subheadings 8501.61.00.00 and 8507.20.80, the vast majority of subject imports over the period entered under HTSUS subheadings 8541.40.6020 and 8541.40.6030. Accordingly, references to import volumes throughout this Petition include combined data from these two HTSUS subheadings.

21 *See* Import Data, attached at **Exhibit I-4.**

Filed By: tbrightbill@wileyrein.com, Filed Date: 12/31/13 11:43 AM, Submission Status: Approved

in Taiwan from Taiwanese inputs, or cells manufactured in Taiwan or other countries from Chinese inputs, including wafers).

Imports of c-Si PV cells and modules from Taiwan increased 85 percent, by value, from $277 million in 2010 to $424 million in 2012.[22] Taiwanese cell and module imports continued to increase this year, by 29 percent, from $328 million in January-September 2012 to more than $371 million in the same period in 2013.[23] And Taiwanese imports continue to rise – in September 2013 alone, imports of cells and modules from Taiwan were up 157 percent, as compared to September 2012.[24]

Despite steadily declining prices, overall U.S. imports of solar cells and modules from China and Taiwan are still massive – rising from a value of $1.5 billion in 2010 to $2.1 billion in 2012.[25] Recently, subject imports have continued to rise, with subject imports of cells and modules in September 2013 totaling $211.6 million, compared to $140.7 million in September 2012.[26]

Subject imports, which were pushed into the market through unfair pricing, far outpaced the growth in U.S. demand over the period. Subject producers and exporters used dumped prices to force volume into the U.S. market and gain market share. As a result, prices for subject merchandise caused prices in the entire market to collapse – a collapse that has continued throughout the POI. At a time when it should have been benefitting from healthy demand, the domestic industry suffered from significant and growing operating losses. Due to the collapse in

22 *Id.*

23 *Id.*

24 *Id.*

25 *Id.*

26 *Id.*

Filed By: tbrightbill@wileyrein.com, Filed Date: 12/31/13 11:43 AM, Submission Status: Approved

pricing caused by subject imports, numerous producers have declared bankruptcy and/or shut down U.S. operations, and hundreds of workers have been laid off. There is no doubt that subject imports caused and are causing material injury to the domestic industry.

Domestic producers and workers also are threatened with additional material injury if the unfair pricing practices of subject imports are not restrained by antidumping ("AD") and countervailing duty ("CVD") orders. With U.S. prices and profitability plummeting, several U.S. producers have already shuttered U.S. facilities, and as the rate of demand growth in the United States is expected to slow, the domestic industry is vulnerable to further material injury. In the absence of relief, the future of the domestic c-Si PV industry will be in peril. Subject producers have enormous and growing c-Si PV capacity, are export-oriented, and have demonstrated that they can and will rapidly ship huge volumes of dumped and subsidized product into the U.S. market, irrespective of actual demand. Indeed, the sheer size of Chinese and Taiwanese capacity compels subject producers and exporters to export virtually all of their production at dumped and subsidized prices. With trade remedies now in place against Chinese exports in the European Union ("EU") and EU demand peaking,[27] subject producers and exporters are poised to continue to increase shipments of dumped and subsidized product to the United States. Given the growing vulnerability of the U.S. industry, the industry's very existence will be in peril if AD and CVD orders are not imposed.

Separate volumes regarding the allegations of dumping by Chinese and Taiwanese producers and exporters, and countervailable subsidies provided to Chinese producers and exporters, are being filed simultaneously at both the U.S. Department of Commerce (the

---

[27] Jonathan Stearns, *EU Nations Approve Pact With China on Solar-Panel Imports*, Bloomberg (Dec. 2, 2013), attached at **Exhibit I-1L.**

Case 1:15-cv-00067-DCP Document 93 Filed 04/04/16 Page 42 of 161

"Department") and the U.S. International Trade Commission (the "Commission" or the "ITC"). Petitioner requests that antidumping and countervailing duties be imposed to offset the dumping and subsidy margins detailed in the specific AD and CVD volumes.

# I. COMMON ISSUES

This section contains information required in AD and CVD petitions by 19 C.F.R. §§ 351.202(b)(1)-(9) and 19 C.F.R. § 207.11.

## A. The Name and Address of the Petitioner (19 C.F.R. § 351.202(b)(1))

Petitioner is a company that produces the domestic like product in the United States. Accordingly, Petitioner is a domestic interested party within the meaning of 19 U.S.C. § 1677(9) and 19 C.F.R. § 351.102(b). Petitioner's address and telephone number are provided in **Exhibit I-2**.

## B. Identity of the Industry on Whose Behalf the Petition Is Filed (19 C.F.R. § 207.11(b)(2)(ii); 19 C.F.R. § 351.202(b)(2))

These Petitions are filed on behalf of the United States industry that produces certain c-Si PV products. In addition to information relating to the Petitioner, the names, addresses, and telephone numbers of all other domestic producers in the United States during the POI are provided in **Exhibit I-3**. According to the best information available to Petitioner, **Exhibits I-2** and **I-3** identify all known producers of the domestic like product in the United States.

## C. Information Relating to the Degree of Industry Support for the Petitions (19 C.F.R. § 351.202(b)(3))

According to 19 U.S.C. §§1671a(c)(4)(A) and 1673a(c)(4)(A), a petition is filed by or on behalf of the domestic industry if: (1) petitioning domestic producers account for at least 25 percent of the total production of the domestic like product, and (2) domestic producers who support the petition account for more than 50 percent of the production of the domestic like

PUBLIC VERSION
Business Proprietary Information Has Been Deleted

product produced by that portion of the industry expressing support for or opposition to the petition.

The Petitions meet both of these requirements. Based on production data for the entire U.S. industry published by the Solar Energy Industries Association ("SEIA")/GTM Research, a leading source for the solar industry and Petitioner's detailed knowledge of U.S. c-Si PV cell and module capacity and production, SolarWorld alone represented approximately [ ] percent of 2012 U.S. c-Si PV module production.[28] [ Narrative ], produced [ ] MW of c-Si PV modules in the United States in 2012, bringing the percentage of production of those producers that support the petition to [70] percent.

With regard to c-Si PV cells, Petitioner SolarWorld again accounts for a majority of 2012 U.S. production. The Commission identified two U.S. producers of c-Si PV cells in 2012: SolarWorld and Suniva.[29] SolarWorld produced [ ] MW of c-Si PV cells in 2012, while Suniva's entire U.S. manufacturing capacity in 2012 totaled 170 MW.[30] Thus, even assuming, conservatively, that Suniva's entire manufacturing capacity constituted cell production capacity, and that Suniva produced at full capacity in 2012 (an unlikely scenario), SolarWorld would still account for [ ] percent of U.S. c-Si PV cell production in 2012 – a clear majority.

Therefore, domestic producers who support the Petitions account for at least 25 percent of the total production of the domestic like product and more than 50 percent of the production of the domestic like product produced by that portion of the industry expressing support for or

---

28 According to SEIA/GTM Research's 2012 Solar Market Insight Report, a total of [309] MW of modules were produced in the United States in 2012. Solar Energy Industries Association, *U.S. Solar Market Insight: 2012 Year in Review* (2012) at 74, excerpts attached at **Exhibit I-5**. SolarWorld's produced [ ] MW of modules in the United States in 2012, thus accounting for [ ] percent of total U.S. production.

29 *See* USITC Pub. 4360 at VI-1.

30 Suniva, *Company Overview* (2012) at 2, excerpt attached at **Exhibit I-6**.

opposition to the Petitions. This is consistent with the 2011 findings of the Department in the initial AD/CVD solar cases regarding industry support.[31]

### D. Previous Requests for Import Relief for the Merchandise (19 C.F.R. § 351.202(b)(4))

Petitioner has previously filed for relief from imports of a portion of the products that constitute subject merchandise in this case under Section 701 and Section 731 of the Act. As discussed above, in October 2011, Petitioner filed petitions for the imposition of antidumping and countervailing duties on imports of c-Si PV cells, whether or not assembled into modules, from the People's Republic of China. After affirmative preliminary and final determinations by the Department of sales at less than fair value and countervailable subsidies, and affirmative preliminary and final injury determinations by the Commission, AD/CVD orders were imposed in December 2012.[32] (As noted below, the scope of this investigation specifically excludes merchandise already covered by these orders.)

Petitioner has not sought relief from subject imports under either Section 337 of the Act, Section 201 or Section 301 of the Trade Act of 1974, or under Section 232 of the Trade Expansion Act of 1962.

### E. Scope of the Investigation and a Detailed Description of the Subject Merchandise (19 C.F.R. § 351.202(b)(5))

#### 1. Scope of Investigation

The scope of this proceeding is defined as follows:

---

[31] *See* Import Administration, Office of AD/CVD Operations, Countervailing Duty Investigation Initiation Checklist, re: *Certain Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China* (Nov. 8, 2011) at Attachment II, excerpt attached at **Exhibit I-7**.

[32] *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 77 Fed. Reg. at 73,017; *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 77 Fed. Reg. at 73,018.

The merchandise covered by this investigation is crystalline silicon photovoltaic cells, and modules, laminates and/or panels consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including building integrated materials. For purposes of this investigation, subject merchandise also includes modules, laminates and/or panels consisting of crystalline silicon photovoltaic cells completed or partially manufactured within a customs territory other than that subject country, using ingots, wafers, or partially manufactured cells sourced from the subject country.

Subject merchandise includes crystalline silicon photovoltaic cells of thickness equal to or greater than 20 micrometers, having a p/n junction formed by any means, whether or not the cell has undergone other processing, including, but not limited to, cleaning, etching, coating, and/or addition of materials (including, but not limited to, metallization and conductor patterns) to collect and forward the electricity that is generated by the cell.

Excluded from the scope of this investigation are thin film photovoltaic products produced from amorphous silicon (a-Si), cadmium telluride (CdTe), or copper indium gallium selenide (CIGS). Also excluded from the scope of this investigation are any products covered by the existing antidumping and countervailing duty orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the People's Republic of China – case numbers A-570-979 and C-570-980.

Merchandise covered by this investigation is currently classified in the Harmonized Tariff Schedule of the United States ("HTSUS") under subheadings 8501.61.0000, 8507.20.80, 8541.40.6020 and 8541.40.6030. These HTSUS subheadings are provided for convenience and customs purposes; the written description of the scope of this investigation is dispositive.

**2. Technical Characteristics and Uses**

C-Si PV cells, which are made from crystalline silicon, are the building blocks of solar photovoltaic power-generation systems. C-Si PV cells are produced from ultra-refined polysilicon. C-Si PV cells convert the energy of sunlight directly into electricity, by the photovoltaic effect. Specifically, c-Si PV cells have a positive-negative junction ("p/n junction"), which is an interface of a p-type semiconductor and an n-type semiconductor that is usually formed by dopant additions to create an intrinsic or extrinsic charge state.[33] The p/n

[33] The p/n junction can be formed by several means, including, but not limited to, dopant diffusion (*i.e.*, the process of using a concentration gradient of one species along with temperature and/or energy to insert those species into another); ion implantation (*i.e.*, the process of using a potential field to accelerate charged species, colliding

# TAB 4

**Letter from Howard Smith, Program Manager, AD/CVD Operations, Office IV, Enforcement and Compliance to Wiley Rein LLP (Jan. 6, 2014)**

Barcode:3172506-01 A-570-010 INV - Investigation -



**UNITED STATES DEPARTMENT OF COMMERCE**
**International Trade Administration**
Washington, D.C. 20230

A-570-010, A-583-853,
C-570-011
Investigations
~~Business Proprietary Document~~
PCAU: WAS
Public Version

January 6, 2014

Timothy C. Brightbill
Wiley Rein LLP
1776 K Street, NW
Washington, DC 20006

Re: Petitions for the Imposition of Antidumping Duties on Imports of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and Taiwan and Countervailing Duties on Imports of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: Supplemental Questions

Dear Mr. Brightbill:

This letter concerns your December 31, 2013, petitions (Petitions) filed with the Department of Commerce (Department) on behalf of your client, SolarWorld Industries America Inc., for the imposition of antidumping duties on imports of certain crystalline silicon photovoltaic products (certain solar cells and panels) from the People's Republic of China and Taiwan and countervailing duties on imports of certain solar cells and panels from the People's Republic of China. We have reviewed the Petitions and have identified certain issues that require clarification, as specified in the attachment to this letter.

Your response to these questions is due to the Department no later than **close of business (5:00 pm), January 8, 2014.**

We remind you that with certain, limited exceptions, all submissions for all proceedings must be filed electronically using Enforcement and Compliance's (formerly, Import Administration) Antidumping and Countervailing Duty Centralized Electronic Service System (IA ACCESS). An electronically filed document must be received successfully in its entirety by the Department's electronic records system, IA ACCESS, by the time and date noted above. Documents excepted from the electronic submission requirements must be filed manually (i.e., in paper form) with the APO/Dockets Unit in Room 1870 and stamped with the date and time of receipt by the deadline noted above. For your convenience, the Department has the following resources available online to assist you in complying with these electronic filing procedures:

IA ACCESS: Help Link
https://iaaccess.trade.gov/help.aspx

IA ACCESS: External User Guide
https://iaaccess.trade.gov/help/IA%20ACCESS%20User%20Guide.pdf

Filed By: brandon farlander, Filed Date: 1/7/14 4:37 PM, Submission Status: Approved

IA ACCESS: Handbook on Electronic Filing Procedures
https://iaaccess.trade.gov/help/Handbook%20on%20Electronic%20Filling%20Procedures.pdf

Federal Register notice: Antidumping and Countervailing Duty Proceedings: Electronic Filing Procedures; Administrative Protective Order Procedures, 76 FR 39263 (July 6, 2011)
http://www.gpo.gov/fdsys/pkg/FR-2011-07-06/pdf/2011-16352.pdf

We will place a copy of your business proprietary response and a copy of the corresponding public version on the official record for each case. We will also place a copy of the public version in our public file for each case, which is open to the general public.

Please note that the Department issued a final rule with respect to certification requirements, effective August 16, 2013. Parties are hereby reminded that revised certification requirements are in effect for company/government officials as well as their representatives. All segments of any antidumping duty or countervailing duty proceedings initiated on or after August 16, 2013, should use the formats for the revised certifications provided at the end of the Final Rule. See Certification of Factual Information To Import Administration During Antidumping and Countervailing Duty Proceedings, 78 FR 42678 (July 17, 2013) (Final Rule); see also the frequently asked questions regarding the Final Rule, available at the following: http://ia.ita.doc.gov/tlei/notices/factual_info_final_rule_FAQ_07172013.pdf. The Department intends to reject factual submissions if the submitting party does not comply with applicable revised certification requirements.

All submissions of business proprietary information that do not contain a statement permitting their release under an Administrative Protective Order (APO), as required by section 777(b)(1)(B)(ii) of the Tariff Act of 1930, as amended, 19 CFR 351.304(b)(1) and 19 CFR 351.303(d)(2)(v) will be rejected at the time of filing. Please place this statement in the upper right-hand corner of your cover letter. If you object to the release of certain information under APO, you must state in full your reasons for objecting.

Please note that, in accordance with 19 CFR 351.303(c)(1), which was recently amended, the one-day lag rule does not apply to pre-initiation submissions, including amendments to the Petitions.

If you have any questions, please contact Vicki Flynn at (202) 482-1756 or Whitney Schablik at (202) 482-2539.

Sincerely,

for Howard Smith
Program Manager
AD/CVD Operations, Office IV
Enforcement and Compliance (formerly Import Administration)

Attachment

Case 1:15-cv-00067-DCP Document 66-1 Filed 10/13/15 Page 204 of 208

**Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China ("PRC") and Taiwan**

General Issues Questionnaire

In your response, please replicate each question and then provide your answer. All questions refer to your December 31, 2013, Petitions.

General

1. Please provide the cover page and relevant pages of the International Trade Commission (ITC) reports cited in footnote 9 (on page 3), footnote 29 (on page 9), footnotes 56-59 (on page 24), footnotes 61-75 (on pages 25-29), footnote 77 (on page 30), footnote 90 (on page 33), footnote 112 (on page 39), and footnotes 132 and 133 (on page 43) of Volume I of the Petitions.

Scope

2. In the second sentence of your proposed scope you state "{f}or purposes of this investigation, subject merchandise also includes modules, laminates and/or panels consisting of crystalline silicon photovoltaic cells completed or partially manufactured within a customs territory other than the subject country, using ingots, wafers, or partially manufactured cells sourced from the subject country." Please respond to the following with respect to this sentence:

    a. Currently, there is ambiguity in your proposed scope as to the amount or extent of production that must take place in the subject country for modules, laminates and/or panels ("solar panels") consisting of crystalline silicon photovoltaic cells ("solar cells") completed or partially manufactured within a customs territory other than the subject country to be covered by the scope. On page 13 of Volume I of your Petitions, you identify the manufacturing process for solar panels as consisting of five phases: (1) crystallization; (2) wafer production; (3) cell conversion; (4) module assembly; and (5) packing. With specific references to the production processes, please provide a revised scope containing a clear and specific definition of the amount or extent of production that must occur in the subject country in order to define solar cells and solar panels "completed or partially manufactured within a customs territory other than the subject country, using ingots, wafers, or partially manufactured cells sourced from the subject country."

    b. It may be ambiguous from this sentence whether "completed or partially manufactured within a customs territory other than the subject country" refers to 1) modules, laminates and/or panels; 2) the crystalline silicon photovoltaic cells contained in the modules, laminates and/or panels; or 3) both 1) and 2). As written, it appears that your scope may state that solar panels assembled in a country other than the subject country would not fall within the scope. Please revise this sentence to clarify what you intend to cover.

Case 1:15-cv-00067-DCP Document 93 Filed 04/04/16 Page 51 of 161

c. In the sentence above you use the phrase "**sourced** from the subject country." Do ingots, wafers, or partially manufactured cells produced in a country other than the subject country, but purchased from a reseller in the subject country meet this description? Or must the ingots, wafers, or partially manufactured cells be **produced** in the subject country? Please clarify your scope or explain why it is more appropriate for your proposed scope to specify "sourced from the subject country."

3. The existing antidumping duty and countervailing duty orders on solar cells from the PRC includes the following exclusion:

   Crystalline silicon photovoltaic cells, not exceeding 10,000mm$^2$ in surface area, that are permanently integrated into a consumer good whose function is other than power generation and that consumes the electricity generated by the integrated crystalline silicon photovoltaic cell. Where more than one cell is permanently integrated into a consumer good, the surface area for purposes of this exclusion shall be the total combined surface area of all cells that are integrated into the consumer good.

   Do you intend for such cells to be included in your proposed scope?

4. In paragraph three of your proposed scope you indicate that the scope excludes any products covered by the existing antidumping and countervailing duty orders on crystalline silicon photovoltaic cells and you provide the case numbers. Please revise this sentence to provide the full cite to the orders rather than the case numbers (i.e., See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order, 77 FR 73018 (December 7, 2012) and Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Countervailing Duty Order, 77 FR 73017 (December 7, 2012)).

5. Please revise your proposed scope to include all Harmonized Tariff Schedule of the United States ("HTSUS") subheadings at the 10-digit level. It appears there are four subheadings under HTSUS 8507.20.80. Do you intend to include all of them? Please specify.

6. The scope of the existing antidumping and countervailing duty orders on crystalline silicon photovoltaic cells includes HTSUS subheading 8501.31.8000. Please include this HTSUS subheading in your revised scope.

7. Please provide a revised proposed scope as it should appear in the Federal Register, incorporating any changes made in response to the questions above.

Domestic Like Product

8. On page 30 of Volume I of the Petitions you state that the "like product in this proceeding is contiguous to the scope of this proceeding." Please explain what you mean by "contiguous."

9. We note that your domestic like product definition differs from your proposed scope of the Petitions. Please explain why this is appropriate and how you have properly calculated industry support given the differences.

Industry Support

10. We note that your industry support data are provided in megawatts. Please explain why this is an appropriate measure of production for purposes of calculating industry support.

11. On page 8 and in Exhibits I-2 and I-3 of Volume I of the Petitions, you identify 17 total domestic producers of certain crystalline silicon photovoltaic products (certain solar cells and panels). Please explain how the universe of producers was established and provide supporting documentation (e.g., an affidavit from an individual with knowledge of the industry) for your response.

12. Do the data on U.S. module production from U.S. Solar Market Insight: 2012 Year in Review (in Exhibit I-5) include all modules produced in the United States? Provide supporting documentation for your response, to the extent it is reasonably available.

13. On pages 31-32 of Volume I of the Petitions, you state that there are two companies, Motech Americas, LLC and Suntech Arizona, Inc., which assemble solar panels in the United States. We note, however, that you have not included these producers as part of the domestic industry in Exhibit I-3. Please identify where these two companies are included in your industry support calculation or revise your calculation to include their 2012 module production.

14. On page 9 of Volume I of the Petitions, you state that [ ], supports the Petitions. Please provide evidence (e.g., an affidavit or signed letter of support) from a company official at [ ] that they support the petition. Please also provide supporting documentation for the how you determined that [ ] produced [ ] megawatts of certain solar panels.

Injury

15. To the extent you want the effect of imports from the PRC and Taiwan to be cumulated, address the following factors and provide reasonably available documentation to support your arguments: (1) the degree of fungibility between imports from the two subject countries and between the imports and the domestic like product; (2) the presence of sales or offers for sale of the imports and the domestic like product in the same geographic markets; (3) whether the imports and the domestic like product are handled in common or similar channels of distribution; and (4) whether the imports are present in the U.S. market simultaneously.

16. Though you state that imports are significant, it is never stated that subject imports are not negligible. Please comment on the negligibility of subject imports. Per Section 771(24)(A)(i) of the Tariff Act of 1930, as amended, please demonstrate that imports from

Filed By: brandon farlander, Filed Date: 1/7/14 4:37 PM, Submission Status: Approved

the PRC and Taiwan were not negligible during the most recent 12-month period for which data are available.

17. We note that in Exhibit I-4, you have only provided import value data. Please revise this exhibit to also include import volume data for the time periods 2010 - 2012, January - September 2012, and January - September 2013.

18. In Exhibit I-19 you provide supporting evidence for lost sales. To the extent possible, please also provide examples of lost revenue.

19. We note that you have alleged injury and threat of injury by reason of subject imports as evident in reduced market share, increased import volumes, and increased market penetration. However, there is no documentation of U.S. consumption data, import volume trends, or market share calculations in the Petitions. Please elaborate on these factors and provide information that supports your injury arguments.

# TAB 5

# Supplement II to Petition for the Imposition of Antidumping and Countervailing Duties: Certain Crystalline Silicon Photovoltaic Products from China and Taiwan (Jan. 13, 2014)

Barcode:3173182-01 A-570-010 INV - Investigation -

DOC Investigation No. A-570-010, A-583-853, C-570-011
Total Pages: 58
Investigation
Business proprietary has been removed from the pages and exhibits identified in the cover letter.
**PUBLIC VERSION**

**BEFORE THE**
**INTERNATIONAL TRADE ADMINISTRATION**
**UNITED STATES DEPARTMENT OF COMMERCE**
**AND THE**
**UNITED STATES INTERNATIONAL TRADE COMMISSION**

**CERTAIN CRYSTALLINE SILICON PHOTOVOLTAIC PRODUCTS FROM THE PEOPLE'S REPUBLIC OF CHINA AND TAIWAN**

**PETITION FOR THE IMPOSITION OF ANTIDUMPING AND COUNTERVAILING DUTIES PURSUANT TO SECTIONS 701 and 731 OF THE TARIFF ACT OF 1930, AS AMENDED**

**VOLUME I**

**SUPPLEMENT II – INFORMATION RELATING TO THE PEOPLE'S REPUBLIC OF CHINA AND TAIWAN – ANTIDUMPING AND COUNTERVAILING DUTIES**

Timothy C. Brightbill, Esq.

**WILEY REIN LLP**
1776 K Street, N.W.
Washington, D.C. 20006
(202) 719-7000

*Counsel to SolarWorld Industries America, Inc.*

January 13, 2014

Filed By: tbrightbill@wileyrein.com, Filed Date: 1/13/14 9:52 AM, Submission Status: Approved

Case 1:15-cv-00067-DCP Document 93 Filed 04/04/16 Page 57 of 161

**Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China ("PRC") and Taiwan**

General Issues Questionnaire

On behalf of Petitioner SolarWorld Industries America, Inc. ("Petitioner" or "SolarWorld"), this submission responds to the Department of Commerce's (the "Department") January 6, 2014 supplemental questions with regard to Volume I of the Petitions filed on December 31, 2013.[1] Each of the Department's questions is reproduced in bold text below, followed by Petitioner's response.

**Scope**

2. **In the second sentence of your proposed scope you state "{f}or purposes of this investigation, subject merchandise also includes modules, laminates and/or panels consisting of crystalline silicon photovoltaic cells completed or partially manufactured within a customs territory other than the subject country, using ingots, wafers, or partially manufactured cells sourced from the subject country." Please respond to the following with respect to this sentence:**

    a. **Currently, there is ambiguity in your proposed scope as to the amount or extent of production that must take place in the subject country for modules, laminates and/or panels ("solar panels") consisting of crystalline silicon photovoltaic cells ("solar cells") completed or partially manufactured within a customs territory other than the subject country to be covered by the scope. On page 13 of Volume I of your Petitions, you identify the manufacturing process for solar panels as consisting of five phases: (1) crystallization; (2) wafer production; (3) cell conversion; (4) module assembly; and (5) packing. With specific references to the production processes, please provide a revised scope containing a clear and specific definition of the amount or extent of production that must occur in the subject country in order to define solar cells and solar panels "completed or partially manufactured within a customs territory other than the subject country, using ingots, wafers, or partially manufactured cells sourced from the subject country."**

1 Petitioner responded to a number of the Department's January 6, 2014 supplemental questions in a previous submission, filed on January 9, 2014. *See* Letter from Wiley Rein LLP to Sec'y Commerce and Acting Sec'y of the International Trade Commission, re: *Supplement to Petition for the Imposition of Antidumping and Countervailing Duties: Certain Crystalline Silicon Photovoltaic Products from China and Taiwan* (Jan. 9, 2014) ("Petitioner's Jan. 9 Supplemental Response"). This submission responds to the remainder of the Department's supplemental questions.

Of the five manufacturing process phases described in the Petition, packing (step 5) is not a step that is relevant to the scope analysis. Phases (1) and (2) are closely related in the sense that wafer production adds relatively little value to the crystallized ingot. The product of the third phase, cell conversion, is already the focus of the existing measures.

Petitioner intends that the present proceeding cover panels and modules assembled in a subject country (*e.g.*, China), even if the cells in those modules are produced in a different country (*e.g.*, Taiwan or a non-subject country), if those cells are made from ingots, wafers or partially manufactured cells that were manufactured in the subject country (*e.g.*, China). This would cover situations where the panels or modules are assembled in a subject country from cells made in a different country but: 1) the ingots used for the wafers made into the cells were manufactured in the subject country; 2) the wafers made into the cells were manufactured in the subject country; or 3) the cell manufacturing process began in the subject country and then was completed in a non-subject country. With reference to the steps described in the petition, this means that the scope covers module assembly (step 4) in a subject country, even if cell conversion (step 3) does not occur in the subject country, if either ingot crystallization (step 1), wafer production (step 2) or the beginning of cell conversion (step 3) also occurs in the same subject country.

To clarify these points, we propose revisions to the scope language as follows:

> For purposes of this investigation, subject merchandise also includes modules, laminates and/or panels assembled in the subject country consisting of crystalline silicon photovoltaic cells that are completed or partially manufactured within a customs territory other than that subject country, using ingots that are manufactured in the subject country, wafers that are manufactured in the subject country, or cells where the manufacturing process begins in the subject country and is completed in a non-subject country.

Filed By: tbrightbill@wileyrein.com, Filed Date: 1/13/14 9:52 AM, Submission Status: Approved

# TAB 6

**Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and Taiwan: Initiation of Antidumping Duty Investigations, 79 Fed. Reg. 4,661 (Jan 29, 2014)**

Barcode:3176040-01 A-570-010 INV - Investigation -

BILLING CODE: 3510-DS-P

DEPARTMENT OF COMMERCE

International Trade Administration

A-570-010, A-583-853

Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and Taiwan: Initiation of Antidumping Duty Investigations

AGENCY: Enforcement and Compliance, formerly Import Administration, International Trade Administration, Department of Commerce.

EFFECTIVE DATE: (Insert date of publication in the Federal Register.)

FOR FURTHER INFORMATION CONTACT: Jeffrey Pedersen at (202) 482-2769 (the People's Republic of China (PRC)); or Karine Gziryan at (202) 482-4081 (Taiwan), AD/CVD Operations, Enforcement and Compliance, U.S. Department of Commerce, 14th Street and Constitution Avenue, NW, Washington, DC 20230.

SUPPLEMENTARY INFORMATION:

The Petitions

On December 31, 2013, the Department of Commerce (the Department) received antidumping duty (AD) petitions concerning imports of certain crystalline silicon photovoltaic products (certain solar cells and panels) from the People's Republic of China (PRC) and Taiwan.[1] The Petitions were filed in proper form on behalf of SolarWorld Industries America, Inc. (Petitioner). Petitioner is a domestic producer of solar cells and panels. The Petitions were accompanied by a countervailing duty (CVD) petition on imports of certain solar cells and panels from the PRC. On January 3, 6, 9 and 10, 2014, the Department requested additional

[1] See Petitions for the Imposition of Antidumping Duties on Imports of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and Taiwan," dated December 31, 2013 (the Petitions).

Filed By: Thomas Martin, Filed Date: 1/24/14 6:27 PM, Submission Status: Approved

Case 1:15-cv-00067-DCP Document 93 Filed 04/04/16 Page 62 of 161

information and clarification of certain areas of the Petitions. Petitioner filed responses to these requests on January 8, 9, 13, 15, and 17, 2014.

In accordance with section 732(b) of the Tariff Act of 1930, as amended (the Act), Petitioner alleges that imports of certain solar cells and panels from the PRC and Taiwan are being, or are likely to be, sold in the United States at less than fair value within the meaning of section 731 of the Act and that such imports are materially injuring, and threatening material injury to, an industry in the United States. Also, consistent with section 732(b)(1) of the Act, the Petitions are accompanied by information reasonably available to Petitioner supporting its allegations.

The Department finds that Petitioner filed these Petitions on behalf of the domestic industry because Petitioner is an interested party as defined in section 771(9)(C) of the Act. The Department also finds that Petitioner has demonstrated sufficient industry support with respect to the initiation of the AD investigations that Petitioner is requesting.[2]

Periods of Investigations

Pursuant to 19 CFR 351.204(b)(1), because the Petitions were filed on December 31, 2013, the period of investigation (POI) for the PRC investigation is April 1, 2013, through September 30, 2013. The POI for the Taiwan investigation is October 1, 2012, through September 30, 2013.

[2] See the "Determination of Industry Support for the Petitions" section below.

Scope of the Investigations

The products covered by these investigations are certain solar cells and panels from the PRC and Taiwan. For a full description of the scope of the investigations, see the "Scope of the Investigations" in Appendix I of this notice.

Comments on the Scope of Investigations

During our review of the Petitions, the Department issued questions to, and received responses from, Petitioner pertaining to the proposed scope to ensure that the scope language in the Petitions would be an accurate reflection of the products for which the domestic industry is seeking relief. Also, on January 15, 2014, Suniva, Inc. ("Suniva"), a U.S. producer of certain solar cells and panels, submitted comments on the scope.[3] As discussed in the preamble to the regulations,[4] we are setting aside a period for interested parties to raise issues regarding product coverage. Parties should note that when considering product coverage with respect to these investigations, the Department will be informed by the product coverage decisions that it made in the investigations that resulted in the existing orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the PRC.[5] The Department encourages all interested parties to submit such comments by 5:00 pm Eastern Time on February 11, 2014. All comments must be filed on the records of the PRC and Taiwan AD investigations, as well as the concurrent PRC CVD investigation.

[3] See Letter from Suniva, dated January 15, 2014.
[4] See Antidumping Duties; Countervailing Duties; Final Rule, 62 FR 27296, 27323 (May 19, 1997).
[5] In the investigations covering crystalline silicon photovoltaic cells, whether or not assembled into modules, from the PRC, the Department determined that modules, laminates, and panels produced in a third-country from cells produced in the PRC are covered by the scope of the investigations; however, modules, laminates, and panels produced in the PRC from cells produced in a third-country are not covered by the scope of the investigations.

Case 1:15-cv-00067-DCP Document 93 Filed 04/04/16 Page 64 of 161

Filing Requirements

All submissions to the Department must be filed electronically using Enforcement and Compliance's Antidumping and Countervailing Duty Centralized Electronic Service System (IA ACCESS).[6] An electronically filed document must be received successfully in its entirety by 5:00 pm on the date of the applicable deadline. Documents excepted from the electronic submission requirements must be filed manually (i.e., in paper form) with the APO/Dockets Unit of Enforcement and Compliance, Room 1870, U.S. Department of Commerce, 14th Street and Constitution Avenue, NW, Washington, DC 20230, and stamped with the date and time of receipt by the applicable deadline.

Comments on Product Characteristics for Antidumping Duty Questionnaires

The Department requests comments from interested parties regarding the appropriate physical characteristics of certain solar cells and panels to be reported in response to the Department's AD questionnaires. This information will be used to identify the key physical characteristics of the subject merchandise in order to report the relevant factors and costs of production (COPs) accurately as well as to develop appropriate product-comparison criteria.

Interested parties may provide any information or comments that they feel are relevant to the development of an accurate list of physical characteristics. Specifically, they may provide comments as to which characteristics are appropriate to use as: 1) general product characteristics and 2) product-comparison criteria. We note that it is not always appropriate to use all product characteristics as product-comparison criteria. We base product-comparison criteria on meaningful commercial differences among products. In other words, while there may be some

[6] See Antidumping and Countervailing Duty Proceedings: Electronic Filing Procedures; Administrative Protective Order Procedures, 76 FR 39263 (July 6, 2011) for details of the Department's electronic filing requirements, which went into effect on August 5, 2011. Information on help using IA ACCESS can be found at https://iaaccess.trade.gov/help.aspx and a handbook can be found at https://iaaccess.trade.gov/help/Handbook%20on%20Electronic%20Filling%20Procedures.pdf.

physical product characteristics utilized by manufacturers to describe certain solar cells and panels, it may be that only a select few product characteristics take into account commercially-meaningful physical characteristics. In addition, interested parties may comment on the order in which the physical characteristics should be used in matching products. Generally, the Department attempts to list the most important physical characteristics first and the least important characteristics last.

In order to consider the suggestions of interested parties in developing and issuing the AD questionnaires, we must receive comments on product characteristics by February 5, 2014. Rebuttal comments must be received by February 12, 2014. All comments and submissions to the Department must be filed electronically using IA ACCESS, as referenced above.

Determination of Industry Support for the Petitions

Section 732(b)(1) of the Act requires that a petition be filed on behalf of the domestic industry. Section 732(c)(4)(A) of the Act provides that a petition meets this requirement if the domestic producers or workers who support the petition account for: (i) at least 25 percent of the total production of the domestic like product; and (ii) more than 50 percent of the production of the domestic like product produced by that portion of the industry expressing support for, or opposition to, the petition. Moreover, section 732(c)(4)(D) of the Act provides that, if the petition does not establish support of domestic producers or workers accounting for more than 50 percent of the total production of the domestic like product, the Department shall: (i) poll the industry or rely on other information in order to determine if there is support for the petition, as required by subparagraph (A); or (ii) determine industry support using a statistically valid sampling method to poll the industry.

Section 771(4)(A) of the Act defines the "industry" as the producers as a whole of a domestic like product. Thus, to determine whether a petition has the requisite industry support, the statute directs the Department to look to producers and workers who produce the domestic like product. The U.S. International Trade Commission (ITC), which is responsible for determining whether "the domestic industry" has been injured, must also determine what constitutes a domestic like product in order to define the industry. While both the Department and the ITC must apply the same statutory definition regarding the domestic like product,[7] they do so for different purposes and pursuant to a separate and distinct authority. In addition, the Department's determination is subject to limitations of time and information. Although this may result in different definitions of the like product, such differences do not render the decision of either agency contrary to law.[8]

Section 771(10) of the Act defines the domestic like product as "a product which is like, or in the absence of like, most similar in characteristics and uses with, the article subject to an investigation under this title." Thus, the reference point from which the domestic like product analysis begins is "the article subject to an investigation" (i.e., the class or kind of merchandise to be investigated, which normally will be the scope as defined in the petition).

With regard to the domestic like product, Petitioner offers a definition of the domestic like product that includes certain crystalline silicon photovoltaic cells and modules and notes that the like product definition in this proceeding is identical to the definition of the like product in the Department's and the ITC's investigation of crystalline silicon photovoltaic cells, whether or

[7] See section 771(10) of the Act

[8] See USEC, Inc. v. United States, 132 F. Supp. 2d 1, 8 (CIT 2001) (citing Algoma Steel Corp., Ltd. v. United States, 688 F. Supp. 639, 644 (CIT 1988), aff'd 865 F.2d 240 (Fed. Cir. 1989)).

Case 1:15-cv-00067-DCP Document 66-2 Filed 10/13/15 Page 78 of 156

not assembled into modules, from China.[9] According to Petitioner, "{t}he definition of the domestic like product in the Petition differs only slightly from the proposed scope of the investigations...." and "slight differences in the definition of the domestic like product and the scope of an investigation are permissible under the statute...."[10] Based on our analysis of the information submitted on the record, we have determined that certain crystalline silicon photovoltaic cells and modules constitute a single domestic like product and we have analyzed industry support in terms of that domestic like product.[11]

In determining whether Petitioner has standing under section 732(c)(4)(A) of the Act, we considered the industry support data contained in the Petitions with reference to the domestic like product as defined in the Petitions. To establish industry support, Petitioner provided its own production of the domestic like product in 2012, and compared this to the estimated total production of the domestic like product for the entire domestic industry.[12] Petitioner obtained total 2012 production of the domestic like product using data published by Solar Energy Industries Association/Greentech Media Research in U.S. Solar Market Insight 2012 Year in

[9] See Volume I of the Petitions, at 24; see also General Issues Supplement to the Petitions, dated January 9, 2014 (General Issues Supplement), at Exhibit I-Supp-1; Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Initiation of Antidumping Duty Investigation, 76 FR 70960, 70961 (November 16, 2011); Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Initiation of Countervailing Duty Investigation, 76 FR 70966, 70967-8 (November 16, 2011); and Crystalline Silicon Photovoltaic Cells and Modules from the People's Republic of China, Inv. Nos. 701-TA-481 and 731-TA-1190 (Final) USITC Pub. 4360 (December 2012), at 6-12.

[10] See General Issues Supplement, at 4.

[11] See Antidumping Duty Investigation Initiation Checklist: Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China (PRC AD Initiation Checklist), at Attachment II, Analysis of Industry Support for the Antidumping and Countervailing Duty Petitions Covering Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and Taiwan (Attachment II); and Antidumping Duty Investigation Initiation Checklist: Certain Crystalline Silicon Photovoltaic Products from Taiwan (Taiwan AD Initiation Checklist), at Attachment II. These checklists are dated concurrently with, and hereby adopted by, this notice and are on file electronically via IA ACCESS. Access to documents filed via IA ACCESS is also available in the Central Records Unit (CRU), Room 7046 of the main Department of Commerce building.

[12] See Volume I of the Petitions, at 8-10 and Exhibits I-3, I-5, and I-6; see also General Issues Supplement, at 5-8 and Exhibits I-Supp-1, I-Supp-2, I-Supp-3 and I-Supp-6.

Review and other publicly available data.[13] We have relied upon data Petitioner provided for purposes of measuring industry support.[14]

On January 10, 2014, in consultations the Department held with respect to the companion CVD case on imports of certain solar cells and modules from the PRC, the Government of China raised the issue of industry support.[15] On January 15, 2014, we received comments on industry support from Yingli Green Energy Holding Company Limited, Yingli Green Energy Americas, Inc., and Canadian Solar Inc (collectively, PRC Producers/Exporters).[16] Petitioner responded to the PRC Producers/Exporters' comments on January 15, 2014.[17] PRC Producers/Exporters filed a rebuttal to Petitioner on January 17, 2014.[18] For further discussion of these comments, see the PRC AD Initiation Checklist and the Taiwan AD Initiation Checklist, at Attachment II.

Based on information provided in the Petitions, supplemental submissions, and other information readily available to the Department, we determine that Petitioner has met the statutory criteria for industry support under section 732(c)(4)(A)(i) of the Act because the domestic producers (or workers) who support the Petitions account for at least 25 percent of the total production of the domestic like product.[19] Based on information provided in the Petitions, the domestic producers (or workers) have met the statutory criteria for industry support under section 732(c)(4)(A)(ii) of the Act because the domestic producers (or workers) who support the Petitions account for more than 50 percent of the production of the domestic like product produced by that portion of the industry expressing support for, or opposition to, the Petitions.

---

[13] See Volume I of the Petitions, at Exhibits I-5 and I-6.
[14] See PRC AD Initiation Checklist and Taiwan AD Initiation Checklist, at Attachment II.
[15] See Memorandum to the File from Vicki Flynn, dated January 14, 2014, titled "Placing Consultations Memorandum on the AD Records."
[16] See Letter from Yingli Green Energy Holding Company Limited, Yingli Green Energy Americas, Inc., and Canadian Solar Inc., dated January 14, 2014.
[17] See Letter from Petitioner, dated January 15, 2014.
[18] See Letter from Yingli Green Energy Holding Company Limited, Yingli Green Energy Americas, Inc., and Canadian Solar Inc., dated January 17, 2014.
[19] See PRC AD Initiation Checklist and Taiwan AD Initiation Checklist, at Attachment II.

Case 1:15-cv-00067-DCP Document 66-2 Filed 10/13/15 Page 80 of 156

Accordingly, the Department determines that the Petitions were filed on behalf of the domestic industry within the meaning of section 732(b)(1) of the Act.[20]

The Department finds that Petitioner filed the Petitions on behalf of the domestic industry because it is an interested party as defined in section 771(9)(C) of the Act and that it has demonstrated sufficient industry support with respect to the AD investigations that it is requesting the Department initiate.[21]

Allegations and Evidence of Material Injury and Causation

Petitioner alleges that the U.S. industry producing the domestic like product is being materially injured, or is threatened with material injury, by reason of the imports of the subject merchandise sold at less than normal value (NV). In addition, Petitioner alleges that subject imports exceed the negligibility threshold provided for under section 771(24)(A) of the Act.[22]

Petitioner contends that the industry's injured condition is illustrated by reduced market share; underselling and price depression or suppression; lost sales and revenues; shuttered production and hindered capacity utilization; reduced employment; and decline in industry financial performance.[23] We have assessed the allegations and supporting evidence regarding material injury, threat of material injury, and causation, and we have determined that these allegations are properly supported by adequate evidence and meet the statutory requirements for initiation.[24]

[20] Id.
[21] Id.
[22] See General Issues Supplement, at 8 and Exhibit I-Supp-4.
[23] See Volume I of the Petitions, at 5-7, 20-22, 33-67 and Exhibits I-1, I-4, I-13 through I-14, I-16 through I-20, and I-22 through I-30; General Issues Supplement, at 8-9 and Exhibits I-Supp-1, I-Supp-4 and I-Supp-5; and Second General Issues Supplement, dated January 13, 2014 (Second General Issues Supplement), at 5-11 and Exhibits I-Supp-7 through I-Supp-15.
[24] See PRC AD Initiation Checklist, at Attachment III, Analysis of Allegations and Evidence of Material Injury and Causation for the Petitions Covering Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and Taiwan (Attachment III); see also Taiwan AD Initiation Checklist, at Attachment III.

Case 1:15-cv-00067-DCP Document 93 Filed 04/04/16 Page 70 of 161

Allegations of Sales at Less Than Fair Value

The following is a description of the allegations of sales at less than fair value upon which the Department based its decision to initiate AD investigations of imports of certain solar cells and panels from the PRC and Taiwan. The sources of data for the deductions and adjustments relating to U.S. price and NV are discussed in greater detail in the country-specific initiation checklists.

Constructed Export Price – PRC

Petitioner calculated constructed export price (CEP) based on an offer for sales of solar panels assembled in, and exported from, the subject country by a manufacturer of subject merchandise. Petitioner classified these offers as CEP transactions because it believed that this manufacurer's products were sold by their U.S. affiliates. Petitioner made deductions from the U.S. price for movement expenses, consistent with the delivery terms. Petitioner also deducted from the U.S. price U.S. selling expenses and CEP profit, both of which it estimated using the financial statements of First Solar, Inc., a U.S. producer of solar modules utilizing thin-film technologies.[25]

Constructed Export Price - Taiwan

Petitioner calculated CEP based on offers for sales of solar panels which were exported from the subject country in the form of laminates and further manufactured in the United States by the U.S. affiliate of the Taiwanese producer of the laminates. Petitioner classified these offers as CEP transactions because it believed that these products were sold by the U.S. affiliate of the Taiwanese producer. Petitioner calculated the further manufacturing costs in the United States using its own production experience and subtracted the further manufacturing cost related to the

[25] For details regarding all adjustments to CEP, see the PRC AD Initiation Checklist at 6-8.

Case 1:15-cv-00067-DCP Document 66-2 Filed 10/13/15 Page 82 of 156

production of finished modules in the United States from the quoted U.S. price. Petitioner made deductions from the U.S. price for movement expenses, consistent with the delivery terms. Petitioner also deducted from the U.S. price U.S. indirect selling expenses and CEP profit, both of which it estimated using the financial statements of First Solar, Inc., a U.S. producer of solar modules utilizing thin-film technologies.[26]

NV – PRC

Petitioner calculated NV for the panels assembled in the PRC using a methodology that was based on the conclusion that the solar cells that were used in the panels were produced in Taiwan from wafers manufactured in the PRC.[27] Petitioner states that the Department has long treated the PRC as a non-market economy (NME) country.[28] Accordingly, Petitioner calculated the portion of NV that was based on production performed in the PRC using the Department's NME methodology, as required by 19 CFR 351.202(b)(7)(i)(C) and 19 CFR 351.408. Specifically, Petitioner calculated the portion of NV relating to production performed in the PRC using factors of production (FOPs) valued in a surrogate market economy country, in accordance with section 773(c) of the Act. Petitioner contends that Thailand is the appropriate surrogate country for the PRC because: 1) it is at a level of economic development comparable to that of the PRC; 2) it is a significant producer of identical merchandise; and 3) that the availability and quality of data are good.[29]

In accordance with section 771(18)(C)(i) of the Act, the presumption of NME status remains in effect until revoked by the Department. The presumption of NME status for the PRC has not been revoked by the Department and, therefore, remains in effect for purposes of the

---

[26] For details regarding all adjustments to CEP, see the Taiwan AD Initiation Checklist at 6-8.
[27] See PRC AD Initiation Checklist, at 6.
[28] See Volume II of the Petitions, at 14.
[29] Id., at 15-17, 23.

Case 1:15-cv-00067-DCP Document 93 Filed 04/04/16 Page 72 of 161

initiation of this investigation. Hence, an NME methodology is appropriate for valuing production performed in the PRC. Moreover, based on the information provided by Petitioner, we believe that it is appropriate to use Thailand as a surrogate country for initiation purposes. After initiation of the investigation, interested parties will have the opportunity to submit comments regarding surrogate country selection and, pursuant to 19 CFR 351.301(c)(3)(i), will be provided an opportunity to submit publicly available information to value factors of production no later than 30 days before the date of the preliminary determination. In addition, in the course of the investigation covering merchandise from the PRC, all parties, including the public, will have the opportunity to provide relevant information related to the issues of the PRC's NME status and the granting of separate rates to individual exporters.

Petitioner calculated a portion of the NV for the PRC Petition based on the cost of producing solar cells in Taiwan using PRC wafers. Petitioner determined the cost of the solar cells produced in Taiwan by valuing FOPs for the Taiwanese production using import prices in Taiwan.[30]

*Factors of Production*

Petitioner based the FOPs for materials, labor, and energy on the consumption rates of a surrogate producer of panels. Petitioner asserts that these consumption rates are reasonably available information, which, to the best of its knowledge, are an appropriate surrogate for consumption of producers of the merchandise under consideration in the PRC because this surrogate producer is comparable to the PRC producers of the merchandise under consideration.[31]

---

[30] See PRC AD Initiation Checklist, at 9.
[31] See Volume II of the Petitions, at 15, 22-23.

*Valuation of Raw Materials and Packing Materials*

Petitioner valued the FOPs for various raw material inputs used to produce subject merchandise in the PRC based on Thai import data for the POI from Global Trade Atlas (GTA) under corresponding Harmonized Tariff Schedule (HTS) numbers.[32] Petitioner added to the raw material surrogate values the inland freight charges reported for importing goods into Thailand, as published by the World Bank in Doing Business 2014: Thailand.[33] Petitioner excluded from its surrogate values all import values from countries previously determined by the Department to maintain broadly available, non-industry-specific export subsidies and from countries previously determined by the Department to be NME countries.[34] In addition, in accordance with the Department's practice, the average import value used as a surrogate excludes imports that were labeled as originating from an unidentified country. We revised the surrogate that Petitioner used to value aluminum frames and frame corners because Petitioner used a HTS number that had been rejected by the Department in a previous AD proceeding involving solar cells and panels from the PRC.[35]

For production performed in Taiwan for the module assembled in the PRC, Petitioner valued various raw material inputs based on Taiwan import data for the POI from GTA under the applicable HTS numbers.[36]

---

[32] See PRC AD Initiation Checklist, at 8; see also Volume II of the Petitions, at 26 and Exhibit II-21; First PRC AD Supplement, at 2-3.
[33] See Volume II of the Petitions, at Exhibits II-9; see also First PRC AD Supplement, at 7-8.
[34] See Volume II of the Petitions, at Exhibits II-19, II-20 and II-21.
[35] See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Final Determination of Sales at Less Than Fair Value, and Affirmative Final Determination of Critical Circumstances, in Part, 77 FR 63791 (October 17, 2012) and the accompanying Issues and Decision Memorandum at Comment 16, as amended by Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order, 77 FR 73018 (December 7, 2012); see also PRC AD Initiation Checklist, at Attachment V.
[36] See PRC AD Initiation Checklist, at 8; see also Volume II of the Petitions, at 26 and Exhibit II-21; First PRC AD Supplement, at 2-3.

*Valuation of Energy*

For production performed in the PRC, Petitioner valued electricity using a 2012 electricity rate in Thai baht per kilowatt hour, as reported by the Thai Board of Investment.[37] In accordance with the Department's policy not to adjust energy tariffs for inflation if those tariffs are likely still in force, Petitioner did not adjust this value for inflation.[38]

For production performed in Taiwan, Petitioner utilized Taiwanese electricity rates for industrial users as collected and disseminated by the U.S. Department of Energy.[39]

*Valuation of Labor*

For production performed in the PRC, Petitioner valued labor using information published in a 2013 industrial survey by the Thailand National Statistics Office.[40]

For production performed in Taiwan, Petitioner valued labor using 2012 data for Taiwan collected by the U.S. Bureau of Labor Statistics.[41] Petitioner adjusted this rate for inflation by utilizing the consumer price index, as reported by the U.S. Bureau of Labor Statistics.[42]

*Valuation of Factory Overhead, Selling, General and Administrative Expenses, and Profit*

Petitioner calculated factory overhead, selling, general and administrative expenses, and profit using data from the 2012-2013 financial statements of Hana Microelectronics Group, a

---

[37] See Volume II of the Petitions, at 26 and Exhibit II-22.
[38] Id.; see also Certain Kitchen Appliance Shelving and Racks from the People's Republic of China: Antidumping Duty Administrative Review, 2010-2011, 77 FR 61385 (October 9, 2012), and accompanying Preliminary Decision Memorandum at 16, unchanged in Certain Kitchen Appliance Shelving and Racks From the People's Republic of China; 2010-2011; Final Results of Antidumping Duty Administrative Review, 78 FR 5414 (January 25, 2013); Certain Activated Carbon From the People's Republic of China: Final Results and Partial Rescission of Second Antidumping Duty Administrative Review, 75 FR 70208 (November 17, 2010), and accompanying Issues and Decision Memorandum at Comment 4; and Certain Oil Country Tubular Goods From the People's Republic of China: Notice of Preliminary Determination of Sales at Less Than Fair Value, Affirmative Preliminary Determination of Critical Circumstances and Postponement of Final Determination, 74 FR 59117 (November 17, 2009), unchanged in Certain Oil Country Tubular Goods from the People's Republic of China: Final Determination of Sales at Less Than Fair Value, Affirmative Final Determination of Critical Circumstances and Final Determination of Targeted Dumping, 75 FR 20335 (April 19, 2010).
[39] See Volume II of the Petitions, at 26 and Exhibit II-22.
[40] Id., at Exhibit II-23.
[41] See Volume II of the Petitions, at 27 and Exhibit II-24.
[42] Id.

Case 1:15-cv-00067-DCP Document 93 Filed 04/04/16 Page 75 of 161

Thai producer of electronics merchandise which Petitioner identified as comparable to the merchandise under consideration.[43]

NV – Taiwan

Petitioner based NV on price information from a Taiwanese producer of panels for panels sold in the subject country. Petitioner was not able to obtain a price quote for a laminate offered for sale in the home market during the POI, but did obtain a finished module price. The only alleged difference between the finished module and laminate is the final stage of the production of the module. Therefore, Petitioner believes that an adjustment to the home market price for the difference in merchandise is appropriate. Petitioner adjusted the home market price by subtracting from the offered price the further manufacturing cost related to the production of finished modules in the United States, based on Petitioner's own experience. Petitioner made adjustments to NV for movement expenses consistent with the sales terms. Petitioner made no other adjustments to NV.[44]

Fair Value Comparisons

Based on the data provided by Petitioner, there is reason to believe that imports of certain solar cells and panels from the PRC and Taiwan are being, or are likely to be, sold in the United States at less than fair value. Based on comparisons of CEP to NV, in accordance with section 773(a)(1) of the Act, the estimated dumping margin for certain solar cells and panels from Taiwan is 75.68 percent.[45] Based on a comparison of CEP to NV, in accordance with section

[43] See PRC AD Initiation Checklist; see Volume II of the Petitions, at 28-29 and Exhibits II-19 and II-24; First PRC AD Supplement at 3-4. and Exhibit II-Supp-2.
[44] See Taiwan AD Initiation Checklist, at 8-9.
[45] See Taiwan Initiation Checklist.

Case 1:15-cv-00067-DCP Document 93 Filed 04/04/16 Page 76 of 161

773(c) of the Act, the estimated dumping margin for certain solar cells and panels from the PRC is 165.04 percent.[46]

Initiation of Antidumping Duty Investigations

Section 732(b)(1) of the Act requires the Department to initiate an AD proceeding whenever an interested party files an AD petition on behalf of an industry that: (1) alleges the elements necessary for the imposition of a duty under section 731 of the Act; and (2) is accompanied by information reasonably available to the petitioners supporting the allegations.

Based upon the examination of the Petitions on certain solar cells and panels from the PRC and Taiwan, we find that the Petitions meet the requirements of section 732 of the Act. Therefore, we are initiating AD investigations to determine whether imports of certain solar cells and panels from the PRC and Taiwan are being, or are likely to be, sold in the United States at less than fair value. In accordance with section 733(b)(1)(A) of the Act and 19 CFR 351.205(b)(1), unless postponed, we will make our preliminary determinations no later than 140 days after the date of this initiation.

Respondent Selection

The Petition for Taiwan names 21 companies as producers/exporters of certain solar cells and panels. Following the Department's standard practice in AD investigations involving market-economy countries, for the Taiwanese AD investigation we will select respondents based on U.S. Customs and Border Protection (CBP) data for U.S. imports of certain solar cells and panels. We intend to release CBP data under Administrative Protective Order (APO) to all parties with access to information protected by APO within five-business days of publication of

[46] See PRC AD Initiation Checklist.

Case 1:15-cv-00067-DCP Document 66-2 Filed 10/13/15 Page 88 of 156

this Federal Register notice. The Department invites comments regarding respondent selection within seven days of publication of this Federal Register notice.

The Petition for the PRC names 78 companies as producers/exporters of certain solar cells and panels. In accordance with the Department's standard practice in AD investigations involving NME countries, for respondent selection in the PRC AD investigation we intend to issue quantity and value (Q&V) questionnaires to each potential respondent named in the Petition and base respondent selection on the responses to our Q&V questionaire. In addition, the Department will post the Q&V questionnaire along with the filing instructions on Enforcement and Compliance's website at http://trade.gov/enforcement/news.asp. Exporters and producers of certain solar cells and panels from the PRC that do not receive a Q&V questionnaire from the Department may still submit a response to the Q&V questionnaire using a copy of the questionnaire obtained from Enforcement and Compliance's website. The Q&V questionnaire must be submitted by all PRC producers/exporters no later than February 13, 2014. All Q&V questionnaires must be filed electronically using IA ACCESS.

Separate Rates

In order to obtain separate rate status in an NME investigation, exporters and producers must submit a separate rate application.[47] The specific requirements for submitting the separate rate application in the PRC investigation are outlined in detail in the application itself, which will be available on Enforcement and Compliance's website at http://trade.gov/enforcement/news.asp on the date of publication of this initiation notice in the Federal Register. The separate rate application will be due 60 days after publication of this initiation notice. All separate rate applications must be filed electronically using IA ACCESS. For exporters and producers who

[47] See Policy Bulletin 05.1: Separate-Rates Practice and Application of Combination Rates in Antidumping Investigations involving Non-Market Economy Countries (April 5, 2005) (Separate Rates and Combination Rates Bulletin), available on the Department's website at http://enforcement.trade.gov/policy/bull05-1.pdf.

submit a separate rate application and have been selected as mandatory respondents, these exporters and producers will no longer be eligible for consideration for separate rate status unless they respond to all parts of the AD questionnaire as mandatory respondents. The Department requires that PRC producers/exporters submit a response to both the Q&V questionnaire and the separate rate application by their respective deadlines in order to receive consideration for separate rate status.

Use of Combination Rates

The Department will calculate combination rates for certain respondents that are eligible for a separate rate in an NME investigation. The Separate Rates and Combination Rates Bulletin states:

> {w}hile continuing the practice of assigning separate rates only to exporters, all separate rates that the Department will now assign in its NME investigations will be specific to those producers that supplied the exporter during the period of investigation. Note, however, that one rate is calculated for the exporter and all of the producers which supplied subject merchandise to it during the period of investigation. This practice applies both to mandatory respondents receiving an individually calculated separate rate as well as the pool of non-investigated firms receiving the weighted-average of the individually calculated rates. This practice is referred to as the application of "combination rates" because such rates apply to specific combinations of exporters and one or more producers. The cash-deposit rate assigned to an exporter will apply only to merchandise both exported by the firm in question and produced by a firm that supplied the exporter during the period of investigation.[48]

Distribution of Copies of the Petitions

In accordance with section 732(b)(3)(A) of the Act and 19 CFR 351.202(f), copies of the public version of the Petitions have been provided to the governments of the PRC and Taiwan via IA ACCESS. Because of the particularly large number of producers/exporters identified in the Petitions, the Department considers the service of the public version of the Petitions to the

[48] See Separate Rates and Combination Rates Bulletin, at 6 (emphasis added).

foreign producers/exporters to be satisfied by the provision of the public version of the Petition to the governments of the PRC and Taiwan, consistent with 19 CFR 351.203(c)(2).

ITC Notification

We have notified the ITC of our initiation, as required by section 732(d) of the Act.

Preliminary Determinations by the ITC

The ITC will preliminarily determine no later than February 14, 2014, whether there is a reasonable indication that imports of certain solar cells and panels from the PRC and Taiwan are materially injuring, or threatening material injury to, a U.S. industry. A negative ITC determination for any country will result in the investigation being terminated with respect to that country; otherwise, these investigations will proceed according to statutory and regulatory time limits.

Submission of Factual Information

On April 10, 2013, the Department published Definition of Factual Information and Time Limits for Submission of Factual Information: Final Rule, 78 FR 21246 (April 10, 2013), which modified two regulations related to AD and CVD proceedings: the definition of factual information (19 CFR 351.102(b)(21)), and the time limits for the submission of factual information (19 CFR 351.301). The final rule identifies five categories of factual information in 19 CFR 351.102(b)(21), which are summarized as follows: (i) evidence submitted in response to questionnaires; (ii) evidence submitted in support of allegations; (iii) publicly available information to value factors under 19 CFR 351.408(c) or to measure the adequacy of remuneration under 19 CFR 351.511(a)(2); (iv) evidence placed on the record by the Department; and (v) evidence other than factual information described in (i)–(iv). The final rule requires any party, when submitting factual information, to specify under which subsection of 19

Case 1:15-cv-00067-DCP Document 93 Filed 04/04/16 Page 80 of 161

CFR 351.102(b)(21) the information is being submitted and, if the information is submitted to rebut, clarify, or correct factual information already on the record, to provide an explanation identifying the information already on the record that the factual information seeks to rebut, clarify, or correct. The final rule also modified 19 CFR 351.301 so that, rather than providing general time limits, there are specific time limits based on the type of factual information being submitted. These modifications are effective for all proceeding segments initiated on or after May 10, 2013, and thus are applicable to these investigations. Please review the final rule, available at http://www.gpo.gov/fdsys/pkg/FR-2013-04-10/pdf/2013-08227.pdf#page=1, prior to submitting factual information in these investigations.

Certification Requirements

Any party submitting factual information in an AD or CVD proceeding must certify to the accuracy and completeness of that information.[49] Parties are hereby reminded that revised certification requirements are in effect for company/government officials, as well as their representatives. Investigations initiated on the basis of petitions filed on or after August 16, 2013, and other segments of any AD or CVD proceedings initiated on or after August 16, 2013, should use the formats for the revised certifications provided at the end of the Final Rule.[50] The Department intends to reject factual submissions if the submitting party does not comply with applicable revised certification requirements.

Revised Extension of Time Limits Regulation

On September 20, 2013, the Department modified its regulation concerning the extension of time limits for submissions in AD and CVD proceedings. The modification clarifies that

[49] See section 782(b) of the Act.
[50] See Certification of Factual Information To Import Administration During Antidumping and Countervailing Duty Proceedings, 78 FR 42678 (July 17, 2013) (Final Rule); see also frequently asked questions regarding the Final Rule, available at http://enforcement.trade.gov/tlei/notices/factual_info_final_rule_FAQ_07172013.pdf.

Case 1:15-cv-00067-DCP Document 66-2 Filed 10/13/15 Page 92 of 156

parties may request an extension of time limits before a time limit established under Part 351 expires, or as otherwise specified by the Secretary. In general, an extension request will be considered untimely if it is filed after the time limit established under Part 351 expires. For submissions which are due from multiple parties simultaneously, an extension request will be considered untimely if it is filed after 10:00 a.m. on the due date. Examples include, but are not limited to: (1) case and rebuttal briefs, filed pursuant to 19 CFR 351.309; (2) factual information to value factors under section 19 CFR 351.408(c), or to measure the adequacy of remuneration under section 19 CFR 351.511(a)(2), filed pursuant to 19 CFR 351.301(c)(3) and rebuttal, clarification and correction filed pursuant to 19 CFR 351.301(c)(3)(iv); (3) comments concerning the selection of a surrogate country and surrogate values and rebuttal; (4) comments concerning CBP data; and (5) Q&V questionnaires. Under certain circumstances, the Department may elect to specify a different time limit by which extension requests will be considered untimely for submissions which are due from multiple parties simultaneously. In such a case, the Department will inform parties in the letter or memorandum setting forth the deadline (including a specified time) by which extension requests must be filed to be considered timely. This modification also requires that an extension request must be made in a separate, stand-alone submission, and clarifies the circumstances under which the Department will grant untimely-filed requests for the extension of time limits. These modifications are effective for all segments initiated on or after October 21, 2013. Please review Extension of Time Limits; Final Rule, available at http://www.gpo.gov/fdsys/pkg/FR-2013-09-20/html/2013-22853.htm, prior to submitting factual information in these segments.

Notification to Interested Parties

Interested parties must submit applications for disclosure under APO in accordance with 19 CFR 351.305. On January 22, 2008, the Department published Antidumping and Countervailing Duty Proceedings: Documents Submission Procedures; APO Procedures, 73 FR 3634 (January 22, 2008). Parties wishing to participate in these investigations should ensure that they meet the requirements of these procedures (e.g., the filing of letters of appearance as discussed at 19 CFR 351.103(d)).

This notice is issued and published pursuant to section 777(i) of the Act and 19 CFR 351.203(c).

Paul Piquado
Assistant Secretary
for Enforcement and Compliance

22 JANUARY 2014
(Date)

Case 1:15-cv-00067-DCP Document 93 Filed 04/04/16 Page 83 of 161

# Appendix I

## Scope of the Investigations

The merchandise covered by these investigations is crystalline silicon photovoltaic cells, and modules, laminates and/or panels consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including building integrated materials. For purposes of these investigations, subject merchandise also includes modules, laminates and/or panels assembled in the subject country consisting of crystalline silicon photovoltaic cells that are completed or partially manufactured within a customs territory other than that subject country, using ingots that are manufactured in the subject country, wafers that are manufactured in the subject country, or cells where the manufacturing process begins in the subject country and is completed in a non-subject country.

Subject merchandise includes crystalline silicon photovoltaic cells of thickness equal to or greater than 20 micrometers, having a p/n junction formed by any means, whether or not the cell has undergone other processing, including, but not limited to, cleaning, etching, coating, and/or addition of materials (including, but not limited to, metallization and conductor patterns) to collect and forward the electricity that is generated by the cell.

Excluded from the scope of these investigations are thin film photovoltaic products produced from amorphous silicon (a-Si), cadmium telluride (CdTe), or copper indium gallium selenide (CIGS). Also excluded from the scope of these investigations are any products covered by the existing antidumping and countervailing duty orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the People's Republic of China. See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order, 77 FR 73018 (December 7, 2012); Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Countervailing Duty Order, 77 FR 73017 (December 7, 2012).

Also excluded from the scope of these investigations are crystalline silicon photovoltaic cells, not exceeding 10,000mm$^2$ in surface area, that are permanently integrated into a consumer good whose function is other than power generation and that consumes the electricity generated by the integrated crystalline silicon photovoltaic cell. Where more than one cell is permanently integrated into a consumer good, the surface area for purposes of this exclusion shall be the total combined surface area of all cells that are integrated into the consumer good.

Merchandise covered by these investigations is currently classified in the Harmonized Tariff Schedule of the United States (HTSUS) under subheadings 8501.61.0000, 8507.20.8030, 8507.20.8040, 8507.20.8060, 8507.20.8090, 8541.40.6020, 8541.40.6030 and 8501.31.8000. These HTSUS subheadings are provided for convenience and customs purposes; the written description of the scope of these investigations is dispositive.



within 30 days of publication of this notice to *OIRA_Submission@omb.eop.gov.*

Dated: January 23, 2014.

**Gwellnar Banks,**

*Management Analyst, Office of the Chief Information Officer.*

[FR Doc. 2014–01624 Filed 1–28–14; 8:45 am]

**BILLING CODE 3510–22–P**

---

## DEPARTMENT OF COMMERCE

### Foreign-Trade Zones Board

**[B–83–2013]**

### Foreign-Trade Zone 138—Columbus, Ohio, Authorization of Production Activity, Rolls Royce Energy Systems, Inc. (Industrial Gas Turbines, Power Generation Turbines, and Generator Sets), Mount Vernon, Ohio

On September 5, 2013, the Columbus Regional Airport Authority, grantee of FTZ 138, submitted a notification of proposed production activity to the Foreign-Trade Zones (FTZ) Board on behalf of Rolls Royce Energy Systems, Inc., in Mount Vernon, Ohio.

The notification was processed in accordance with the regulations of the FTZ Board (15 CFR part 400), including notice in the **Federal Register** inviting public comment (78 FR 58995, 9–25–2013). The FTZ Board has determined that no further review of the activity is warranted at this time. The production activity described in the notification is authorized, subject to the FTZ Act and the FTZ Board's regulations, including Section 400.14.

Dated: January 21, 2014.

**Andrew McGilvray,**

*Executive Secretary.*

[FR Doc. 2014–01579 Filed 1–28–14; 8:45 am]

**BILLING CODE 3510–DS–P**

---

## DEPARTMENT OF COMMERCE

### Foreign-Trade Zones Board

**[B–4–2014]**

### Foreign-Trade Zone (FTZ) 221—Mesa, Arizona; Notification of Proposed Production Activity; Apple Inc./GT Advanced Technologies Inc. (Components for Consumer Electronics), Mesa, Arizona

Apple Inc./GT Advanced Technologies Inc. (Apple/GT) submitted a notification of proposed production activity to the FTZ Board for its facility in Mesa, Arizona. The notification conforming to the requirements of the regulations of the FTZ Board (15 CFR 400.22) was received on January 23, 2014.

A separate application for subzone designation at the Apple/GT facility is being processed under Section 400.31 of the Board's regulations (Doc. S–5–2014). Apple/GT requested authority to manufacture intermediate components for consumer electronics for export. Pursuant to 15 CFR 400.14(b), FTZ activity would be limited to the specific foreign-status materials and components and specific finished products described in the submitted notification (as described below) and subsequently authorized by the FTZ Board.

Production under FTZ procedures could exempt Apple/GT from customs duty payments on the foreign status components listed below used in the export production of sapphire material (duty rate 6.4%). Customs duties also could possibly be deferred or reduced on foreign status production equipment.

The components and materials sourced from abroad include white alumina block, forged metal industrial heat-treating equipment and diamond cutting wire (duty rate ranges from duty-free to 1.3%).

Public comment is invited from interested parties. Submissions shall be addressed to the Board's Executive Secretary at the address below. The closing period for their receipt is March 10, 2014.

A copy of the notification will be available for public inspection at the Office of the Executive Secretary, Foreign-Trade Zones Board, Room 21013, U.S. Department of Commerce, 1401 Constitution Avenue NW., Washington, DC 20230–0002, and in the "Reading Room" section of the Board's Web site, which is accessible via *www.trade.gov/ftz.*

For further information, contact Elizabeth Whiteman at *Elizabeth.Whiteman@trade.gov* or (202) 482–0473.

Dated: January 23, 2014.

**Andrew McGilvray,**

*Executive Secretary.*

[FR Doc. 2014–01727 Filed 1–28–14; 8:45 am]

**BILLING CODE 3510–DS–P**

---

## DEPARTMENT OF COMMERCE

### International Trade Administration

**[A–570–010, A–583–853]**

### Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China and Taiwan: Initiation of Antidumping Duty Investigations

**AGENCY:** Enforcement and Compliance, formerly Import Administration, International Trade Administration, Department of Commerce.

**DATES:** *Effective Date:* January 29, 2014.

**FOR FURTHER INFORMATION CONTACT:** Jeffrey Pedersen at (202) 482–2769 (the People's Republic of China (PRC)); or Karine Gziryan at (202) 482–4081 (Taiwan), AD/CVD Operations, Enforcement and Compliance, U.S. Department of Commerce, 14th Street and Constitution Avenue NW., Washington, DC 20230.

**SUPPLEMENTARY INFORMATION:**

### The Petitions

On December 31, 2013, the Department of Commerce (the Department) received antidumping duty (AD) petitions concerning imports of certain crystalline silicon photovoltaic products (certain solar cells and panels) from the People's Republic of China (PRC) and Taiwan.[1] The Petitions were filed in proper form on behalf of SolarWorld Industries America, Inc. (Petitioner). Petitioner is a domestic producer of solar cells and panels. The Petitions were accompanied by a countervailing duty (CVD) petition on imports of certain solar cells and panels from the PRC. On January 3, 6, 9 and 10, 2014, the Department requested additional information and clarification of certain areas of the Petitions. Petitioner filed responses to these requests on January 8, 9, 13, 15, and 17, 2014.

In accordance with section 732(b) of the Tariff Act of 1930, as amended (the Act), Petitioner alleges that imports of certain solar cells and panels from the PRC and Taiwan are being, or are likely to be, sold in the United States at less than fair value within the meaning of section 731 of the Act and that such imports are materially injuring, and threatening material injury to, an industry in the United States. Also, consistent with section 732(b)(1) of the Act, the Petitions are accompanied by information reasonably available to Petitioner supporting its allegations.

The Department finds that Petitioner filed these Petitions on behalf of the domestic industry because Petitioner is an interested party as defined in section 771(9)(C) of the Act. The Department also finds that Petitioner has demonstrated sufficient industry support with respect to the initiation of

[1] *See* Petitions for the Imposition of Antidumping Duties on Imports of Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China and Taiwan," dated December 31, 2013 (the Petitions).

the AD investigations that Petitioner is requesting.[2]

**Periods of Investigations**

Pursuant to 19 CFR 351.204(b)(1), because the Petitions were filed on December 31, 2013, the period of investigation (POI) for the PRC investigation is April 1, 2013, through September 30, 2013. The POI for the Taiwan investigation is October 1, 2012, through September 30, 2013.

**Scope of the Investigations**

The products covered by these investigations are certain solar cells and panels from the PRC and Taiwan. For a full description of the scope of the investigations, see the "Scope of the Investigations" in Appendix I of this notice.

**Comments on the Scope of Investigations**

During our review of the Petitions, the Department issued questions to, and received responses from, Petitioner pertaining to the proposed scope to ensure that the scope language in the Petitions would be an accurate reflection of the products for which the domestic industry is seeking relief. Also, on January 15, 2014, Suniva, Inc. ("Suniva"), a U.S. producer of certain solar cells and panels, submitted comments on the scope.[3] As discussed in the preamble to the regulations,[4] we are setting aside a period for interested parties to raise issues regarding product coverage. Parties should note that when considering product coverage with respect to these investigations, the Department will be informed by the product coverage decisions that it made in the investigations that resulted in the existing orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the PRC.[5] The Department encourages all interested parties to submit such comments by 5:00 p.m. Eastern Time on February 11, 2014. All comments must be filed on the records of the PRC and Taiwan AD investigations, as well as the concurrent PRC CVD investigation.

**Filing Requirements**

All submissions to the Department must be filed electronically using Enforcement and Compliance's Antidumping and Countervailing Duty Centralized Electronic Service System (IA ACCESS).[6] An electronically filed document must be received successfully in its entirety by 5:00 p.m. on the date of the applicable deadline. Documents excepted from the electronic submission requirements must be filed manually (*i.e.*, in paper form) with the APO/Dockets Unit of Enforcement and Compliance, Room 1870, U.S. Department of Commerce, 14th Street and Constitution Avenue NW., Washington, DC 20230, and stamped with the date and time of receipt by the applicable deadline.

**Comments on Product Characteristics for Antidumping Duty Questionnaires**

The Department requests comments from interested parties regarding the appropriate physical characteristics of certain solar cells and panels to be reported in response to the Department's AD questionnaires. This information will be used to identify the key physical characteristics of the subject merchandise in order to report the relevant factors and costs of production (COPs) accurately as well as to develop appropriate product-comparison criteria.

Interested parties may provide any information or comments that they feel are relevant to the development of an accurate list of physical characteristics. Specifically, they may provide comments as to which characteristics are appropriate to use as: (1) General product characteristics and (2) product-comparison criteria. We note that it is not always appropriate to use all product characteristics as product-comparison criteria. We base product-comparison criteria on meaningful commercial differences among products. In other words, while there may be some physical product characteristics utilized by manufacturers to describe certain solar cells and panels, it may be that only a select few product characteristics take into account commercially-meaningful physical characteristics. In addition, interested parties may comment on the order in which the physical characteristics should be used in matching products. Generally, the Department attempts to list the most important physical characteristics first and the least important characteristics last.

In order to consider the suggestions of interested parties in developing and issuing the AD questionnaires, we must receive comments on product characteristics by February 5, 2014. Rebuttal comments must be received by February 12, 2014. All comments and submissions to the Department must be filed electronically using IA ACCESS, as referenced above.

**Determination of Industry Support for the Petitions**

Section 732(b)(1) of the Act requires that a petition be filed on behalf of the domestic industry. Section 732(c)(4)(A) of the Act provides that a petition meets this requirement if the domestic producers or workers who support the petition account for: (i) At least 25 percent of the total production of the domestic like product; and (ii) more than 50 percent of the production of the domestic like product produced by that portion of the industry expressing support for, or opposition to, the petition. Moreover, section 732(c)(4)(D) of the Act provides that, if the petition does not establish support of domestic producers or workers accounting for more than 50 percent of the total production of the domestic like product, the Department shall: (i) Poll the industry or rely on other information in order to determine if there is support for the petition, as required by subparagraph (A); or (ii) determine industry support using a statistically valid sampling method to poll the industry.

Section 771(4)(A) of the Act defines the "industry" as the producers as a whole of a domestic like product. Thus, to determine whether a petition has the requisite industry support, the statute directs the Department to look to producers and workers who produce the domestic like product. The U.S. International Trade Commission (ITC), which is responsible for determining whether "the domestic industry" has been injured, must also determine what constitutes a domestic like product in order to define the industry. While both the Department and the ITC must apply the same statutory definition regarding the domestic like product,[7] they do so for different purposes and pursuant to a separate and distinct authority. In addition, the Department's

[2] *See* the "Determination of Industry Support for the Petitions" section below.

[3] *See* Letter from Suniva, dated January 15, 2014.

[4] *See Antidumping Duties; Countervailing Duties; Final Rule*, 62 FR 27296, 27323 (May 19, 1997).

[5] In the investigations covering crystalline silicon photovoltaic cells, whether or not assembled into modules, from the PRC, the Department determined that modules, laminates, and panels produced in a third-country from cells produced in the PRC are covered by the scope of the investigations; however, modules, laminates, and panels produced in the PRC from cells produced in a third-country are not covered by the scope of the investigations.

[6] *See Antidumping and Countervailing Duty Proceedings: Electronic Filing Procedures; Administrative Protective Order Procedures*, 76 FR 39263 (July 6, 2011) for details of the Department's electronic filing requirements, which went into effect on August 5, 2011. Information on help using IA ACCESS can be found at *https://iaaccess.trade.gov/help.aspx* and a handbook can be found at *https://iaaccess.trade.gov/help/Handbook%20on%20Electronic%20Filling%20Procedures.pdf*.

[7] *See* section 771(10) of the Act

determination is subject to limitations of time and information. Although this may result in different definitions of the like product, such differences do not render the decision of either agency contrary to law.[8]

Section 771(10) of the Act defines the domestic like product as "a product which is like, or in the absence of like, most similar in characteristics and uses with, the article subject to an investigation under this title." Thus, the reference point from which the domestic like product analysis begins is "the article subject to an investigation" (*i.e.*, the class or kind of merchandise to be investigated, which normally will be the scope as defined in the petition).

With regard to the domestic like product, Petitioner offers a definition of the domestic like product that includes certain crystalline silicon photovoltaic cells and modules and notes that the like product definition in this proceeding is identical to the definition of the like product in the Department's and the ITC's investigation of crystalline silicon photovoltaic cells, whether or not assembled into modules, from China.[9] According to Petitioner, "{t}he definition of the domestic like product in the Petition differs only slightly from the proposed scope of the investigations . . ." and "slight differences in the definition of the domestic like product and the scope of an investigation are permissible under the statute . . ."[10] Based on our analysis of the information submitted on the record, we have determined that certain crystalline silicon photovoltaic cells and modules constitute a single domestic like product and we have analyzed industry support in terms of that domestic like product.[11]

In determining whether Petitioner has standing under section 732(c)(4)(A) of the Act, we considered the industry support data contained in the Petitions with reference to the domestic like product as defined in the Petitions. To establish industry support, Petitioner provided its own production of the domestic like product in 2012, and compared this to the estimated total production of the domestic like product for the entire domestic industry.[12] Petitioner obtained total 2012 production of the domestic like product using data published by Solar Energy Industries Association/Greentech Media Research in *U.S. Solar Market Insight 2012 Year in Review* and other publicly available data.[13] We have relied upon data Petitioner provided for purposes of measuring industry support.[14]

On January 10, 2014, in consultations the Department held with respect to the companion CVD case on imports of certain solar cells and modules from the PRC, the Government of China raised the issue of industry support.[15] On January 15, 2014, we received comments on industry support from Yingli Green Energy Holding Company Limited, Yingli Green Energy Americas, Inc., and Canadian Solar Inc (collectively, PRC Producers/Exporters).[16] Petitioner responded to the PRC Producers/Exporters' comments on January 15, 2014.[17] PRC Producers/Exporters filed a rebuttal to Petitioner on January 17, 2014.[18] For further discussion of these comments, see the PRC AD Initiation Checklist and the Taiwan AD Initiation Checklist, at Attachment II.

Based on information provided in the Petitions, supplemental submissions, and other information readily available to the Department, we determine that Petitioner has met the statutory criteria for industry support under section 732(c)(4)(A)(i) of the Act because the domestic producers (or workers) who support the Petitions account for at least 25 percent of the total production of the domestic like product.[19] Based on information provided in the Petitions, the domestic producers (or workers) have met the statutory criteria for industry support under section 732(c)(4)(A)(ii) of the Act because the domestic producers (or workers) who support the Petitions account for more than 50 percent of the production of the domestic like product produced by that portion of the industry expressing support for, or opposition to, the Petitions. Accordingly, the Department determines that the Petitions were filed on behalf of the domestic industry within the meaning of section 732(b)(1) of the Act.[20]

The Department finds that Petitioner filed the Petitions on behalf of the domestic industry because it is an interested party as defined in section 771(9)(C) of the Act and that it has demonstrated sufficient industry support with respect to the AD investigations that it is requesting the Department initiate.[21]

**Allegations and Evidence of Material Injury and Causation**

Petitioner alleges that the U.S. industry producing the domestic like product is being materially injured, or is threatened with material injury, by reason of the imports of the subject merchandise sold at less than normal value (NV). In addition, Petitioner alleges that subject imports exceed the negligibility threshold provided for under section 771(24)(A) of the Act.[22]

Petitioner contends that the industry's injured condition is illustrated by reduced market share; underselling and price depression or suppression; lost sales and revenues; shuttered production and hindered capacity utilization; reduced employment; and decline in industry financial performance.[23] We have assessed the

[8] *See USEC, Inc.* v. *United States*, 132 F. Supp. 2d 1, 8 (CIT 2001) (citing *Algoma Steel Corp., Ltd.* v. *United States*, 688 F. Supp. 639, 644 (CIT 1988), *aff'd* 865 F.2d 240 (Fed. Cir. 1989)).

[9] *See* Volume I of the Petitions, at 24; *see also* General Issues Supplement to the Petitions, dated January 9, 2014 (General Issues Supplement), at Exhibit I–Supp–1; *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Initiation of Antidumping Duty Investigation*, 76 FR 70960, 70961 (November 16, 2011); *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Initiation of Countervailing Duty Investigation*, 76 FR 70966, 70967–8 (November 16, 2011); and *Crystalline Silicon Photovoltaic Cells and Modules From the People's Republic of China*, Inv. Nos. 701–TA–481 and 731–TA–1190 (Final) USITC Pub. 4360 (December 2012), at 6–12.

[10] *See* General Issues Supplement, at 4.

[11] *See* Antidumping Duty Investigation Initiation Checklist: Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China (PRC AD Initiation Checklist), at Attachment II, Analysis of Industry Support for the Antidumping and Countervailing Duty Petitions Covering Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China and Taiwan (Attachment II); and Antidumping Duty Investigation Initiation Checklist: Certain Crystalline Silicon Photovoltaic Products from Taiwan (Taiwan AD Initiation Checklist), at Attachment II. These checklists are dated concurrently with, and hereby adopted by, this notice and are on file electronically via IA ACCESS. Access to documents filed via IA ACCESS is also available in the Central Records Unit (CRU), Room 7046 of the main Department of Commerce building.

[12] *See* Volume I of the Petitions, at 8–10 and Exhibits I–3, I–5, and I–6; *see also* General Issues Supplement, at 5–8 and Exhibits I–Supp–1, I–Supp–2, I–Supp–3 and I–Supp–6.

[13] *See* Volume I of the Petitions, at Exhibits I–5 and I–6.

[14] *See* PRC AD Initiation Checklist and Taiwan AD Initiation Checklist, at Attachment II.

[15] *See* Memorandum to the File from Vicki Flynn, dated January 14, 2014, titled "Placing Consultations Memorandum on the AD Records."

[16] *See* Letter from Yingli Green Energy Holding Company Limited, Yingli Green Energy Americas, Inc., and Canadian Solar Inc., dated January 14, 2014.

[17] *See* Letter from Petitioner, dated January 15, 2014.

[18] *See* Letter from Yingli Green Energy Holding Company Limited, Yingli Green Energy Americas, Inc., and Canadian Solar Inc., dated January 17, 2014.

[19] *See* PRC AD Initiation Checklist and Taiwan AD Initiation Checklist, at Attachment II.

[20] *Id.*

[21] *Id.*

[22] *See* General Issues Supplement, at 8 and Exhibit I–Supp–4.

[23] *See* Volume I of the Petitions, at 5–7, 20–22, 33–67 and Exhibits I–1, I–4, I–13 through I–14, I–

Continued

Case 1:15-cv-00067-DCP Document 93 Filed 04/04/16 Page 88 of 161

allegations and supporting evidence regarding material injury, threat of material injury, and causation, and we have determined that these allegations are properly supported by adequate evidence and meet the statutory requirements for initiation.[24]

**Allegations of Sales at Less Than Fair Value**

The following is a description of the allegations of sales at less than fair value upon which the Department based its decision to initiate AD investigations of imports of certain solar cells and panels from the PRC and Taiwan. The sources of data for the deductions and adjustments relating to U.S. price and NV are discussed in greater detail in the country-specific initiation checklists.

**Constructed Export Price—PRC**

Petitioner calculated constructed export price (CEP) based on an offer for sales of solar panels assembled in, and exported from, the subject country by a manufacturer of subject merchandise. Petitioner classified these offers as CEP transactions because it believed that this manufacturer's products were sold by their U.S. affiliates. Petitioner made deductions from the U.S. price for movement expenses, consistent with the delivery terms. Petitioner also deducted from the U.S. price U.S. selling expenses and CEP profit, both of which it estimated using the financial statements of First Solar, Inc., a U.S. producer of solar modules utilizing thin-film technologies.[25]

**Constructed Export Price—Taiwan**

Petitioner calculated CEP based on offers for sales of solar panels which were exported from the subject country in the form of laminates and further manufactured in the United States by the U.S. affiliate of the Taiwanese producer of the laminates. Petitioner classified these offers as CEP transactions because it believed that these products were sold by the U.S. affiliate of the Taiwanese producer. Petitioner calculated the further manufacturing costs in the United States using its own production experience and subtracted the further manufacturing cost related to the production of finished modules in the United States from the quoted U.S. price. Petitioner made deductions from the U.S. price for movement expenses, consistent with the delivery terms. Petitioner also deducted from the U.S. price U.S. indirect selling expenses and CEP profit, both of which it estimated using the financial statements of First Solar, Inc., a U.S. producer of solar modules utilizing thin-film technologies.[26]

**NV—PRC**

Petitioner calculated NV for the panels assembled in the PRC using a methodology that was based on the conclusion that the solar cells that were used in the panels were produced in Taiwan from wafers manufactured in the PRC.[27] Petitioner states that the Department has long treated the PRC as a non-market economy (NME) country.[28] Accordingly, Petitioner calculated the portion of NV that was based on production performed in the PRC using the Department's NME methodology, as required by 19 CFR 351.202(b)(7)(i)(C) and 19 CFR 351.408. Specifically, Petitioner calculated the portion of NV relating to production performed in the PRC using factors of production (FOPs) valued in a surrogate market economy country, in accordance with section 773(c) of the Act. Petitioner contends that Thailand is the appropriate surrogate country for the PRC because: (1) It is at a level of economic development comparable to that of the PRC; (2) it is a significant producer of identical merchandise; and (3) that the availability and quality of data are good.[29]

In accordance with section 771(18)(C)(i) of the Act, the presumption of NME status remains in effect until revoked by the Department. The presumption of NME status for the PRC has not been revoked by the Department and, therefore, remains in effect for purposes of the initiation of this investigation. Hence, an NME methodology is appropriate for valuing production performed in the PRC. Moreover, based on the information provided by Petitioner, we believe that it is appropriate to use Thailand as a surrogate country for initiation purposes. After initiation of the investigation, interested parties will have the opportunity to submit comments regarding surrogate country selection and, pursuant to 19 CFR 351.301(c)(3)(i), will be provided an opportunity to submit publicly available information to value factors of production no later than 30 days before the date of the preliminary determination. In addition, in the course of the investigation covering merchandise from the PRC, all parties, including the public, will have the opportunity to provide relevant information related to the issues of the PRC's NME status and the granting of separate rates to individual exporters.

Petitioner calculated a portion of the NV for the PRC Petition based on the cost of producing solar cells in Taiwan using PRC wafers. Petitioner determined the cost of the solar cells produced in Taiwan by valuing FOPs for the Taiwanese production using import prices in Taiwan.[30]

*Factors of Production*

Petitioner based the FOPs for materials, labor, and energy on the consumption rates of a surrogate producer of panels. Petitioner asserts that these consumption rates are reasonably available information, which, to the best of its knowledge, are an appropriate surrogate for consumption of producers of the merchandise under consideration in the PRC because this surrogate producer is comparable to the PRC producers of the merchandise under consideration.[31]

*Valuation of Raw Materials and Packing Materials*

Petitioner valued the FOPs for various raw material inputs used to produce subject merchandise in the PRC based on Thai import data for the POI from Global Trade Atlas (GTA) under corresponding Harmonized Tariff Schedule (HTS) numbers.[32] Petitioner added to the raw material surrogate values the inland freight charges reported for importing goods into Thailand, as published by the World Bank in *Doing Business 2014: Thailand*.[33] Petitioner excluded from its surrogate values all import values from countries previously determined by the Department to maintain broadly available, non-industry-specific export subsidies and from countries previously determined by the Department to be

16 through I–20, and I–22 through I–30; General Issues Supplement, at 8–9 and Exhibits I–Supp–1, I–Supp–4 and I–Supp–5; and Second General Issues Supplement, dated January 13, 2014 (Second General Issues Supplement), at 5–11 and Exhibits I–Supp–7 through I–Supp–15.

[24] *See* PRC AD Initiation Checklist, at Attachment III, Analysis of Allegations and Evidence of Material Injury and Causation for the Petitions Covering Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and Taiwan (Attachment III); *see also* Taiwan AD Initiation Checklist, at Attachment III.

[25] For details regarding all adjustments to CEP, see the PRC AD Initiation Checklist at 6–8.

[26] For details regarding all adjustments to CEP, see the Taiwan AD Initiation Checklist at 6–8.

[27] *See* PRC AD Initiation Checklist, at 6.

[28] *See* Volume II of the Petitions, at 14.

[29] *Id.*, at 15–17, 23.

[30] *See* PRC AD Initiation Checklist, at 9.

[31] *See* Volume II of the Petitions, at 15, 22–23.

[32] *See* PRC AD Initiation Checklist, at 8; *see also* Volume II of the Petitions, at 26 and Exhibit II–21; First PRC AD Supplement, at 2–3.

[33] *See* Volume II of the Petitions, at Exhibits II–9; *see also* First PRC AD Supplement, at 7–8.

Case 1:15-cv-00067-DCP Document 93 Filed 04/04/16 Page 89 of 161

NME countries.[34] In addition, in accordance with the Department's practice, the average import value used as a surrogate excludes imports that were labeled as originating from an unidentified country. We revised the surrogate that Petitioner used to value aluminum frames and frame corners because Petitioner used a HTS number that had been rejected by the Department in a previous AD proceeding involving solar cells and panels from the PRC.[35]

For production performed in Taiwan for the module assembled in the PRC, Petitioner valued various raw material inputs based on Taiwan import data for the POI from GTA under the applicable HTS numbers.[36]

*Valuation of Energy*

For production performed in the PRC, Petitioner valued electricity using a 2012 electricity rate in Thai baht per kilowatt hour, as reported by the Thai Board of Investment.[37] In accordance with the Department's policy not to adjust energy tariffs for inflation if those tariffs are likely still in force, Petitioner did not adjust this value for inflation.[38]

For production performed in Taiwan, Petitioner utilized Taiwanese electricity rates for industrial users as collected and disseminated by the U.S. Department of Energy.[39]

*Valuation of Labor*

For production performed in the PRC, Petitioner valued labor using information published in a 2013 industrial survey by the Thailand National Statistics Office.[40]

For production performed in Taiwan, Petitioner valued labor using 2012 data for Taiwan collected by the U.S. Bureau of Labor Statistics.[41] Petitioner adjusted this rate for inflation by utilizing the consumer price index, as reported by the U.S. Bureau of Labor Statistics.[42]

*Valuation of Factory Overhead, Selling, General and Administrative Expenses, and Profit*

Petitioner calculated factory overhead, selling, general and administrative expenses, and profit using data from the 2012–2013 financial statements of Hana Microelectronics Group, a Thai producer of electronics merchandise which Petitioner identified as comparable to the merchandise under consideration.[43]

**NV—Taiwan**

Petitioner based NV on price information from a Taiwanese producer of panels for panels sold in the subject country. Petitioner was not able to obtain a price quote for a laminate offered for sale in the home market during the POI, but did obtain a finished module price. The only alleged difference between the finished module and laminate is the final stage of the production of the module. Therefore, Petitioner believes that an adjustment to the home market price for the difference in merchandise is appropriate. Petitioner adjusted the home market price by subtracting from the offered price the further manufacturing cost related to the production of finished modules in the United States, based on Petitioner's own experience. Petitioner made adjustments to NV for movement expenses consistent with the sales terms. Petitioner made no other adjustments to NV.[44]

**Fair Value Comparisons**

Based on the data provided by Petitioner, there is reason to believe that imports of certain solar cells and panels from the PRC and Taiwan are being, or are likely to be, sold in the United States at less than fair value. Based on comparisons of CEP to NV, in accordance with section 773(a)(1) of the Act, the estimated dumping margin for certain solar cells and panels from Taiwan is 75.68 percent.[45] Based on a comparison of CEP to NV, in accordance with section 773(c) of the Act, the estimated dumping margin for certain solar cells and panels from the PRC is 165.04 percent.[46]

**Initiation of Antidumping Duty Investigations**

Section 732(b)(1) of the Act requires the Department to initiate an AD proceeding whenever an interested party files an AD petition on behalf of an industry that: (1) Alleges the elements necessary for the imposition of a duty under section 731 of the Act; and (2) is accompanied by information reasonably available to the petitioners supporting the allegations.

Based upon the examination of the Petitions on certain solar cells and panels from the PRC and Taiwan, we find that the Petitions meet the requirements of section 732 of the Act. Therefore, we are initiating AD investigations to determine whether imports of certain solar cells and panels from the PRC and Taiwan are being, or are likely to be, sold in the United States at less than fair value. In accordance with section 733(b)(1)(A) of the Act and 19 CFR 351.205(b)(1), unless postponed, we will make our preliminary determinations no later than 140 days after the date of this initiation.

**Respondent Selection**

The Petition for Taiwan names 21 companies as producers/exporters of certain solar cells and panels. Following the Department's standard practice in AD investigations involving market-economy countries, for the Taiwanese AD investigation we will select respondents based on U.S. Customs and Border Protection (CBP) data for U.S. imports of certain solar cells and panels. We intend to release CBP data under Administrative Protective Order (APO) to all parties with access to information protected by APO within five-business

[34] *See* Volume II of the Petitions, at Exhibits II–19, II–20 and II–21.

[35] *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Final Determination of Sales at Less Than Fair Value, and Affirmative Final Determination of Critical Circumstances, in Part,* 77 FR 63791 (October 17, 2012) and the accompanying Issues and Decision Memorandum at Comment 16, as amended by *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order,* 77 FR 73018 (December 7, 2012); *see also* PRC AD Initiation Checklist, at Attachment V.

[36] *See* PRC AD Initiation Checklist, at 8; *see also* Volume II of the Petitions, at 26 and Exhibit II–21; First PRC AD Supplement, at 2–3.

[37] *See* Volume II of the Petitions, at 26 and Exhibit II–22.

[38] *Id.; see also Certain Kitchen Appliance Shelving and Racks from the People's Republic of China: Antidumping Duty Administrative Review, 2010–2011,* 77 FR 61385 (October 9, 2012), and accompanying Preliminary Decision Memorandum at 16, unchanged in *Certain Kitchen Appliance Shelving and Racks From the People's Republic of China; 2010–2011; Final Results of Antidumping Duty Administrative Review,* 78 FR 5414 (January 25, 2013); *Certain Activated Carbon From the People's Republic of China: Final Results and Partial Rescission of Second Antidumping Duty Administrative Review,* 75 FR 70208 (November 17, 2010), and accompanying Issues and Decision Memorandum at Comment 4; and *Certain Oil Country Tubular Goods From the People's Republic of China: Notice of Preliminary Determination of Sales at Less Than Fair Value, Affirmative Preliminary Determination of Critical Circumstances and Postponement of Final Determination,* 74 FR 59117 (November 17, 2009), unchanged in *Certain Oil Country Tubular Goods from the People's Republic of China: Final Determination of Sales at Less Than Fair Value, Affirmative Final Determination of Critical Circumstances and Final Determination of Targeted Dumping,* 75 FR 20335 (April 19, 2010).

[39] *See* Volume II of the Petitions, at 26 and Exhibit II–22.

[40] *Id.*, at Exhibit II–23.

[41] *See* Volume II of the Petitions, at 27 and Exhibit II–24.

[42] *Id.*

[43] *See* PRC AD Initiation Checklist; *see* Volume II of the Petitions, at 28–29 and Exhibits II–19 and II–24; First PRC AD Supplement at 3–4, and Exhibit II–Supp–2.

[44] *See* Taiwan AD Initiation Checklist, at 8–9.

[45] *See* Taiwan Initiation Checklist.

[46] *See* PRC AD Initiation Checklist.

days of publication of this **Federal Register** notice. The Department invites comments regarding respondent selection within seven days of publication of this **Federal Register** notice.

The Petition for the PRC names 78 companies as producers/exporters of certain solar cells and panels. In accordance with the Department's standard practice in AD investigations involving NME countries, for respondent selection in the PRC AD investigation we intend to issue quantity and value (Q&V) questionnaires to each potential respondent named in the Petition and base respondent selection on the responses to our Q&V questionnaire. In addition, the Department will post the Q&V questionnaire along with the filing instructions on Enforcement and Compliance's Web site at *http://trade.gov/enforcement/news.asp.* Exporters and producers of certain solar cells and panels from the PRC that do not receive a Q&V questionnaire from the Department may still submit a response to the Q&V questionnaire using a copy of the questionnaire obtained from Enforcement and Compliance's Web site. The Q&V questionnaire must be submitted by all PRC producers/exporters no later than February 13, 2014. All Q&V questionnaires must be filed electronically using IA ACCESS.

## Separate Rates

In order to obtain separate rate status in an NME investigation, exporters and producers must submit a separate rate application.[47] The specific requirements for submitting the separate rate application in the PRC investigation are outlined in detail in the application itself, which will be available on Enforcement and Compliance's Web site at *http://trade.gov/enforcement/news.asp* on the date of publication of this initiation notice in the **Federal Register.** The separate rate application will be due 60 days after publication of this initiation notice. All separate rate applications must be filed electronically using IA ACCESS. For exporters and producers who submit a separate rate application and have been selected as mandatory respondents, these exporters and producers will no longer be eligible for consideration for separate rate status unless they respond to all parts of the AD questionnaire as mandatory respondents. The Department requires that PRC producers/exporters submit a response to both the Q&V questionnaire and the separate rate application by their respective deadlines in order to receive consideration for separate rate status.

## Use of Combination Rates

The Department will calculate combination rates for certain respondents that are eligible for a separate rate in an NME investigation. The Separate Rates and Combination Rates Bulletin states:

> {w}hile continuing the practice of assigning separate rates only to exporters, all separate rates that the Department will now assign in its NME investigations will be specific to those producers that supplied the exporter during the period of investigation. Note, however, that one rate is calculated for the exporter and all of the producers which supplied subject merchandise to it during the period of investigation. This practice applies both to mandatory respondents receiving an individually calculated separate rate as well as the pool of non-investigated firms receiving the weighted-average of the individually calculated rates. This practice is referred to as the application of "combination rates" because such rates apply to specific combinations of exporters and one or more producers. The cash-deposit rate assigned to an exporter will apply only to merchandise both exported by the firm in question *and* produced by a firm that supplied the exporter during the period of investigation.[48]

## Distribution of Copies of the Petitions

In accordance with section 732(b)(3)(A) of the Act and 19 CFR 351.202(f), copies of the public version of the Petitions have been provided to the governments of the PRC and Taiwan via IA ACCESS. Because of the particularly large number of producers/exporters identified in the Petitions, the Department considers the service of the public version of the Petitions to the foreign producers/exporters to be satisfied by the provision of the public version of the Petition to the governments of the PRC and Taiwan, consistent with 19 CFR 351.203(c)(2).

## ITC Notification

We have notified the ITC of our initiation, as required by section 732(d) of the Act.

## Preliminary Determinations by the ITC

The ITC will preliminarily determine no later than February 14, 2014, whether there is a reasonable indication that imports of certain solar cells and panels from the PRC and Taiwan are materially injuring, or threatening material injury to, a U.S. industry. A negative ITC determination for any country will result in the investigation being terminated with respect to that country; otherwise, these investigations will proceed according to statutory and regulatory time limits.

## Submission of Factual Information

On April 10, 2013, the Department published *Definition of Factual Information and Time Limits for Submission of Factual Information: Final Rule,* 78 FR 21246 (April 10, 2013), which modified two regulations related to AD and CVD proceedings: the definition of factual information (19 CFR 351.102(b)(21)), and the time limits for the submission of factual information (19 CFR 351.301). The final rule identifies five categories of factual information in 19 CFR 351.102(b)(21), which are summarized as follows: (i) Evidence submitted in response to questionnaires; (ii) evidence submitted in support of allegations; (iii) publicly available information to value factors under 19 CFR 351.408(c) or to measure the adequacy of remuneration under 19 CFR 351.511(a)(2); (iv) evidence placed on the record by the Department; and (v) evidence other than factual information described in (i)–(iv). The final rule requires any party, when submitting factual information, to specify under which subsection of 19 CFR 351.102(b)(21) the information is being submitted and, if the information is submitted to rebut, clarify, or correct factual information already on the record, to provide an explanation identifying the information already on the record that the factual information seeks to rebut, clarify, or correct. The final rule also modified 19 CFR 351.301 so that, rather than providing general time limits, there are specific time limits based on the type of factual information being submitted. These modifications are effective for all proceeding segments initiated on or after May 10, 2013, and thus are applicable to these investigations. Please review the final rule, available at *http://www.gpo.gov/fdsys/pkg/FR-2013-04-10/pdf/2013-08227.pdf#page=1,* prior to submitting factual information in these investigations.

## Certification Requirements

Any party submitting factual information in an AD or CVD proceeding must certify to the accuracy and completeness of that information.[49] Parties are hereby reminded that revised certification requirements are in effect

---

[47] *See* Policy Bulletin 05.1: Separate-Rates Practice and Application of Combination Rates in Antidumping Investigations involving Non-Market Economy Countries (April 5, 2005) (Separate Rates and Combination Rates Bulletin), available on the Department's Web site at *http://enforcement.trade.gov/policy/bull05-1.pdf.*

[48] *See* Separate Rates and Combination Rates Bulletin, at 6 (emphasis added).

[49] *See* section 782(b) of the Act.

for company/government officials, as well as their representatives. Investigations initiated on the basis of petitions filed on or after August 16, 2013, and other segments of any AD or CVD proceedings initiated on or after August 16, 2013, should use the formats for the revised certifications provided at the end of the *Final Rule.*[50] The Department intends to reject factual submissions if the submitting party does not comply with applicable revised certification requirements.

**Revised Extension of Time Limits Regulation**

On September 20, 2013, the Department modified its regulation concerning the extension of time limits for submissions in AD and CVD proceedings. The modification clarifies that parties may request an extension of time limits before a time limit established under Part 351 expires, or as otherwise specified by the Secretary. In general, an extension request will be considered untimely if it is filed after the time limit established under Part 351 expires. For submissions which are due from multiple parties simultaneously, an extension request will be considered untimely if it is filed after 10:00 a.m. on the due date. Examples include, but are not limited to: (1) Case and rebuttal briefs, filed pursuant to 19 CFR 351.309; (2) factual information to value factors under section 19 CFR 351.408(c), or to measure the adequacy of remuneration under section 19 CFR 351.511(a)(2), filed pursuant to 19 CFR 351.301(c)(3) and rebuttal, clarification and correction filed pursuant to 19 CFR 351.301(c)(3)(iv); (3) comments concerning the selection of a surrogate country and surrogate values and rebuttal; (4) comments concerning CBP data; and (5) Q&V questionnaires. Under certain circumstances, the Department may elect to specify a different time limit by which extension requests will be considered untimely for submissions which are due from multiple parties simultaneously. In such a case, the Department will inform parties in the letter or memorandum setting forth the deadline (including a specified time) by which extension requests must be filed to be considered timely. This modification also requires that an extension request must be made in a separate, stand-alone submission, and clarifies the circumstances under which the Department will grant untimely-filed requests for the extension of time limits. These modifications are effective for all segments initiated on or after October 21, 2013. Please review *Extension of Time Limits; Final Rule,* available at *http://www.gpo.gov/fdsys/pkg/FR-2013-09-20/html/2013-22853.htm,* prior to submitting factual information in these segments.

[50] *See Certification of Factual Information To Import Administration During Antidumping and Countervailing Duty Proceedings,* 78 FR 42678 (July 17, 2013) (*Final Rule*); *see also* frequently asked questions regarding the *Final Rule,* available at *http://enforcement.trade.gov/tlei/notices/factual_info_final_rule_FAQ_07172013.pdf.*

**Notification to Interested Parties**

Interested parties must submit applications for disclosure under APO in accordance with 19 CFR 351.305. On January 22, 2008, the Department published *Antidumping and Countervailing Duty Proceedings: Documents Submission Procedures; APO Procedures,* 73 FR 3634 (January 22, 2008). Parties wishing to participate in these investigations should ensure that they meet the requirements of these procedures (*e.g.,* the filing of letters of appearance as discussed at 19 CFR 351.103(d)).

This notice is issued and published pursuant to section 777(i) of the Act and 19 CFR 351.203(c).

Dated: January 22, 2014.

**Paul Piquado,**

*Assistant Secretary for Enforcement and Compliance.*

## Appendix I

**Scope of the Investigations**

The merchandise covered by these investigations is crystalline silicon photovoltaic cells, and modules, laminates and/or panels consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including building integrated materials. For purposes of these investigations, subject merchandise also includes modules, laminates and/or panels assembled in the subject country consisting of crystalline silicon photovoltaic cells that are completed or partially manufactured within a customs territory other than that subject country, using ingots that are manufactured in the subject country, wafers that are manufactured in the subject country, or cells where the manufacturing process begins in the subject country and is completed in a non-subject country.

Subject merchandise includes crystalline silicon photovoltaic cells of thickness equal to or greater than 20 micrometers, having a p/n junction formed by any means, whether or not the cell has undergone other processing, including, but not limited to, cleaning, etching, coating, and/or addition of materials (including, but not limited to, metallization and conductor patterns) to collect and forward the electricity that is generated by the cell.

Excluded from the scope of these investigations are thin film photovoltaic products produced from amorphous silicon (a-Si), cadmium telluride (CdTe), or copper indium gallium selenide (CIGS). Also excluded from the scope of these investigations are any products covered by the existing antidumping and countervailing duty orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the People's Republic of China. *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order,* 77 FR 73018 (December 7, 2012); *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Countervailing Duty Order,* 77 FR 73017 (December 7, 2012).

Also excluded from the scope of these investigations are crystalline silicon photovoltaic cells, not exceeding 10,000mm² in surface area, that are permanently integrated into a consumer good whose function is other than power generation and that consumes the electricity generated by the integrated crystalline silicon photovoltaic cell. Where more than one cell is permanently integrated into a consumer good, the surface area for purposes of this exclusion shall be the total combined surface area of all cells that are integrated into the consumer good.

Merchandise covered by these investigations is currently classified in the Harmonized Tariff Schedule of the United States (HTSUS) under subheadings 8501.61.0000, 8507.20.8030, 8507.20.8040, 8507.20.8060, 8507.20.8090, 8541.40.6020, 8541.40.6030 and 8501.31.8000. These HTSUS subheadings are provided for convenience and customs purposes; the written description of the scope of these investigations is dispositive.

[FR Doc. 2014–01738 Filed 1–28–14; 8:45 am]

BILLING CODE 3510–DS–P

## DEPARTMENT OF COMMERCE

## International Trade Administration

**[C–570–011]**

## Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China: Initiation of Countervailing Duty Investigation

**AGENCY:** Enforcement & Compliance, formerly Import Administration, International Trade Administration, Department of Commerce.

**DATES:** *Effective Date:* January 29, 2014.

**FOR FURTHER INFORMATION CONTACT:** Justin Neuman or Milton Koch, Office VII, AD/CVD Operations, Enforcement & Compliance, International Trade Administration, U.S. Department of Commerce, 14th Street and Constitution Avenue NW., Washington, DC 20230; telephone; (202) 482–0486 or (202) 482–2584, respectively.

**SUPPLEMENTARY INFORMATION:**

# TAB 7

**Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: Initiation of Countervailing Duty Investigation, 79 Fed. Reg. 4,667 (Jan. 29, 2014)**

BILLING CODE: 3510-DS-P

DEPARTMENT OF COMMERCE

INTERNATIONAL TRADE ADMINISTRATION

C-570-011

Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: Initiation of Countervailing Duty Investigation

AGENCY: Enforcement & Compliance, formerly Import Administration, International Trade Administration, Department of Commerce

EFFECTIVE DATE: (Insert date of publication in the Federal Register.)

FOR FURTHER INFORMATION CONTACT: Justin Neuman or Milton Koch, Office VII, AD/CVD Operations, Enforcement & Compliance, International Trade Administration, U.S. Department of Commerce, 14th Street and Constitution Avenue, NW, Washington, DC 20230; telephone; (202) 482-0486 or (202) 482-2584, respectively.

SUPPLEMENTARY INFORMATION:

The Petition

On December 31, 2013, the Department of Commerce (the Department) received a countervailing duty (CVD) petition concerning imports of certain crystalline silicon photovoltaic products (certain solar cells and panels) from the People's Republic of China (PRC), filed in proper form by SolarWorld Industries America, Inc. (Petitioner), a domestic producer of certain solar cells and panels. The CVD petition was accompanied by an antidumping duty (AD) petition concerning imports of certain solar cells and panels.[1] Between January 3 and January 9, 2014, the Department

[1] See "Petition for the Imposition of Antidumping and Countervailing Duties Pursuant to Sections 701 and 731 of the Tariff Act of 1930, As Amended," (December 31, 2013) (Petition).

requested additional information and clarification of certain areas of the Petition, and between January 7 and January 13, 2014, Petitioner filed a timely response to each request.[2]

In accordance with section 702(b)(1) of the Tariff Act of 1930, as amended (the Act), Petitioner alleges that producers/exporters of certain solar cells and panels in the PRC received countervailable subsidies under thirty-three programs within the meaning of sections 701 and 771(5) of the Act, and that imports from these producers/exporters materially injure, or threaten material injury to, an industry in the United States.

The Department finds that Petitioner filed this Petition on behalf of the domestic industry because it is an interested party defined in section 771(9)(C) of the Act, and that Petitioner has demonstrated sufficient industry support with respect to the CVD investigation that it is requesting the Department to initiate (see "Determination of Industry Support for the Petition" below).

Period of Investigation

The period of investigation (POI) is January 1, 2012, through December 31, 2012, in accordance with 19 CFR 351.204(b)(2).

Scope of the Investigation

The products covered by this investigation are certain solar cells and panels the PRC.[3]

Comments on the Scope of the Investigation

During our review of the Petition, we solicited information from Petitioner to ensure that the proposed scope language is an accurate reflection of the products for which the domestic industry is seeking relief. Also, on January 15, 2014, Suniva, Inc. (Suniva), a U.S. producer of certain solar

[2] See Petitioner's filings, "Supplement to the China CVD Petition," (January 7, 2014) (China CVD Supplement); "General Issues Supplement to the Petition," (January 9, 2014) (General Issues Supplement); and "Second General Issues Supplement to the Petition," (January 13, 2014) (Second General Issues Supplement).
[3] See Appendix I of this notice for a full description of the scope of this investigation.

cells and panels, submitted comments on the scope.[4] Moreover, as discussed in the preamble to the Department's regulations,[5] we are setting aside a period for interested parties to raise issues regarding product coverage. Parties should note that when considering product coverage with respect to this investigation, the Department will be informed by the product coverage decisions that it made in the investigations that resulted in the existing orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the PRC.[6] The Department encourages all interested parties to submit such comments by February 11, 2014, which is 20 calendar days from the signature date of this notice. All comments must be filed on the record of the CVD investigation, as well as the concurrent AD investigations.

Filing Requirements

All submissions to the Department must be filed electronically using Enforcement & Compliance's Antidumping and Countervailing Duty Centralized Electronic Service System (IA ACCESS). An electronically filed document must be received successfully in its entirety by the Department's electronic records system, IA ACCESS, by 5 pm on the due date. Documents excepted from the electronic submission requirements must be filed manually (i.e., in paper form) with the Enforcement & Compliance's APO/Dockets Unit, Room 1870, U.S. Department of Commerce, 14th Street and Constitution Avenue NW, Washington, DC 20230, and stamped with the date and time of receipt by the deadline established by the Department.[7]

[4] See Letter from Suniva, "Request for Comment Period on Scope for Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China," (January 15, 2014).
[5] See Antidumping Duties; Countervailing Duties; Final Rule, 62 FR 27296, 27323 (May 19, 1997).
[6] The AD and CVD Orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the PRC, cover modules, laminates, and panels produced in a third-country from cells produced in the PRC; however, modules, laminates, and panels produced in the PRC from cells produced in a third-country are not covered by the scope of the Orders.
[7] See 19 CFR 351.303(b)(1). Information on help using IAACCESS can be found at https://iaaccess.trade.gov/help.aspx and a handbook can be found at https://iaaccess.trade.gov/help/Handbook%20on%20Electronic%20Filing%20Procedures.pdf.

Consultations

Pursuant to section 702(b)(4)(A)(ii) of the Act, on January 2, 2014, the Department invited representatives from the Government of China (GOC) for consultations with respect to the CVD Petition. Consultations were held with the GOC on January 10, 2014.[8]

Determination of Industry Support for the Petition

Section 702(b)(1) of the Act requires that a petition be filed on behalf of the domestic industry. Section 702(c)(4)(A) of the Act provides that a petition meets this requirement if the domestic producers or workers who support the petition account for: (i) at least 25 percent of the total production of the domestic like product; and (ii) more than 50 percent of the production of the domestic like product produced by that portion of the industry expressing support for, or opposition to, the petition. Moreover, section 702(c)(4)(D) of the Act provides that, if the petition does not establish support of domestic producers or workers accounting for more than 50 percent of the total production of the domestic like product, the Department shall: (i) poll the industry or rely on other information in order to determine if there is support for the petition, as required by subparagraph (A); or (ii) determine industry support using a statistically valid sampling method to poll the industry.

Section 771(4)(A) of the Act defines the "industry" as the producers as a whole of a domestic like product. Thus, to determine whether a petition has the requisite industry support, the statute directs the Department to look to producers and workers who produce the domestic like product. The U.S. International Trade Commission (ITC), which is responsible for determining whether "the domestic industry" has been injured, must also determine what constitutes a domestic

[8] See Ex-Parte Memorandum to the File from Justin Neuman, International Trade Analyst, AD/CVD Operations, Office VII, Enforcement & Compliance, "Consultations with Officials from the Government of the People's Republic of China Regarding the Countervailing Duty Petition Concerning Certain Crystalline Silicon Photovoltaic Products," (January 13, 2014) (Consultations Memorandum).

like product in order to define the industry. While both the Department and the ITC must apply the same statutory definition regarding the domestic like product,[9] they do so for different purposes and pursuant to a separate and distinct authority. In addition, the Department's determination is subject to limitations of time and information. Although this may result in different definitions of the like product, such differences do not render the decision of either agency contrary to law.[10]

Section 771(10) of the Act defines the domestic like product as "a product which is like, or in the absence of like, most similar in characteristics and uses with, the article subject to an investigation under this title." Thus, the reference point from which the domestic like product analysis begins is "the article subject to an investigation" (i.e., the class or kind of merchandise to be investigated, which normally will be the scope as defined in the petition).

With regard to the domestic like product, Petitioner offers a definition of the domestic like product that includes certain crystalline silicon photovoltaic cells and modules and notes that the like product definition in this proceeding is identical to the definition of the like product in the Department's and the ITC's investigation of crystalline silicon photovoltaic cells, whether or not assembled into modules, from China.[11] According to Petitioner, "{t}he definition of the domestic like product in the Petition differs only slightly from the proposed scope of the investigations…." and "slight differences in the definition of the domestic like product and the scope of an investigation are permissible under the statute…."[12] Based on our analysis of the information

---

[9] See section 771(10) of the Act.
[10] See USEC, Inc. v. United States, 132 F. Supp. 2d 1, 8 (CIT 2001) (citing Algoma Steel Corp., Ltd. v. United States, 688 F. Supp. 639, 644 (CIT 1988), aff'd 865 F.2d 240 (Fed. Cir. 1989)).
[11] See Volume I of the Petition, at 24; see, also General Issues Supplement, at Exhibit I-Supp-1; Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Initiation of Antidumping Duty Investigation, 76 FR 70960, 70961 (November 16, 2011); Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Initiation of Countervailing Duty Investigation, 76 FR 70966, 70967-8 (November 16, 2011); and Crystalline Silicon Photovoltaic Cells and Modules from the People's Republic of China, Inv. Nos. 701-TA-481 and 731-TA-1190 (Final) USITC Pub. 4360 (December 2012), at 6-12.
[12] See General Issues Supplement, at 4.

submitted on the record, we have determined that certain crystalline silicon photovoltaic cells and modules constitute a single domestic like product and we have analyzed industry support in terms of that domestic like product.[13]

In determining whether Petitioner has standing under section 702(c)(4)(A) of the Act, we considered the industry support data contained in the Petition with reference to the domestic like product as defined in the Petition. To establish industry support, Petitioner provided its own production of the domestic like product in 2012, and compared this to the estimated total production of the domestic like product for the entire domestic industry.[14] Petitioner obtained total 2012 production of the domestic like product using data published by Solar Energy Industries Association/Greentech Media Research in U.S. Solar Market Insight 2012 Year in Review and other publicly available data.[15] We have relied upon data Petitioner provided for purposes of measuring industry support.[16]

On January 10, 2014, in its consultations with the Department, the GOC raised the issue of industry support.[17] On January 15, 2014, we received comments on industry support from Yingli Green Energy Holding Company Limited, Yingli Green Energy Americas, Inc., and Canadian Solar Inc. (collectively, PRC Producers/Exporters).[18] Petitioner responded to the PRC Producers/Exporters' comments on January 15, 2014.[19] PRC Producers/Exporters filed a rebuttal to

---

[13] See Countervailing Duty Investigation Initiation Checklist: Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China (PRC CVD Initiation Checklist), at Attachment II, Analysis of Industry Support for the Antidumping and Countervailing Duty Petitions Covering Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and Taiwan (Attachment II). This checklist is dated concurrently with this notice and on file electronically via IA ACCESS. Access to documents filed via IA ACCESS is also available in the Central Records Unit (CRU), Room 7046 of the main Department of Commerce building.
[14] See Volume I of the Petition, at 8-10 and Exhibits I-3, I-5, and I-6; see also General Issues Supplement, at 5-8 and Exhibits I-Supp-1, I-Supp-2, I-Supp-3 and I-Supp-6.
[15] See Volume I of the Petition, at Exhibits I-5 and I-6.
[16] See PRC CVD Initiation Checklist, at Attachment II.
[17] See Consultations Memorandum.
[18] See Letter from Yingli Green Energy Holding Company Limited, Yingli Green Energy Americas, Inc., and Canadian Solar Inc., (January 15, 2014).
[19] See Letter from Petitioner, (January 15, 2014).

Petitioner on January 17, 2014.[20] For further discussion of these comments, see the PRC CVD Initiation Checklist, at Attachment II.

Based on information provided in the Petition, supplemental submissions, and other information readily available to the Department, we determine that Petitioner has met the statutory criteria for industry support under section 702(c)(4)(A)(i) of the Act because the domestic producers (or workers) who support the Petition account for at least 25 percent of the total production of the domestic like product.[21] Based on information provided in the Petition, the domestic producers (or workers) have met the statutory criteria for industry support under section 702(c)(4)(A)(ii) of the Act because the domestic producers (or workers) who support the Petition account for more than 50 percent of the production of the domestic like product produced by that portion of the industry expressing support for, or opposition to, the Petition. Accordingly, the Department determines that the Petition was filed on behalf of the domestic industry within the meaning of section 702(b)(1) of the Act.[22]

The Department finds that Petitioner filed the Petition on behalf of the domestic industry because it is an interested party as defined in section 771(9)(C) of the Act and it has demonstrated sufficient industry support with respect to the countervailing duty investigation that it is requesting the Department initiate.[23]

Injury Test

Because the PRC is a "Subsidies Agreement Country" within the meaning of section 701(b) of the Act, section 701(a)(2) of the Act applies to this investigation. Accordingly, the ITC must

---

[20] See Letter from Yingli Green Energy Holding Company Limited, Yingli Green Energy Americas, Inc., and Canadian Solar Inc., (January 17, 2014).
[21] See CVD Initiation Checklist, at Attachment II.
[22] Id.
[23] Id.

determine whether imports of the subject merchandise from the PRC materially injure, or threaten material injury to, a U.S. industry.

Allegations and Evidence of Material Injury and Causation

Petitioner alleges that imports of the subject merchandise are benefitting from countervailable subsidies and that such imports are causing, or threaten to cause, material injury to the U.S. industry producing the domestic like product. In addition, Petitioner alleges that subject imports exceed the negligibility threshold provided for under section 771(24)(A) of the Act.[24]

Petitioner contends that the industry's injured condition is illustrated by reduced market share; underselling and price depression or suppression; lost sales and revenues; shuttered production and hindered capacity utilization; reduced employment; and decline in industry financial performance.[25] We have assessed the allegations and supporting evidence regarding material injury, threat of material injury, and causation, and we have determined that these allegations are properly supported by adequate evidence and meet the statutory requirements for initiation.[26]

Initiation of Countervailing Duty Investigation

Section 702(b)(1) of the Act requires the Department to initiate a CVD proceeding whenever an interested party files a CVD petition on behalf of an industry that: (1) alleges the elements necessary for an imposition of a duty under section 701(a) of the Act; and (2) is accompanied by information reasonably available to the petitioners supporting the allegations.

The Department has examined the Petition on certain solar cells and panels from the PRC and finds that it complies with the requirements of section 702(b)(1) of the Act. Therefore, in

[24] See General Issues Supplement, at 8 and Exhibit I-Supp-4.
[25] See Volume I of the Petition, at 5-7, 20-22, 33-67 and Exhibits I-1, I-4, I-13 through I-14, I-16 through I-20, and I-22 through I-30; General Issues Supplement, at 8-9 and Exhibits I-Supp-1, I-Supp-4 and I-Supp-5; and Second General Issues Supplement, at 5-11 and Exhibits I-Supp-7 through I-Supp-15.
[26] See PRC CVD Initiation Checklist, at Attachment III, Analysis of Allegations and Evidence of Material Injury and Causation for the Petitions Covering Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and Taiwan.

accordance with section 702(b)(1) of the Act, we are initiating a CVD investigation to determine whether producers/exporters of certain solar cells and panels in the PRC receive countervailable subsidies. For a discussion of evidence supporting our initiation determination, see the CVD Initiation Checklist which accompanies this notice.

Based on our review of the Petition, we find that there is sufficient information to initiate a CVD investigation of 28 alleged programs. For the other five programs alleged by Petitioner, we have determined that the requirements for initiation have not been met. For a full discussion of the basis for our decision to initiate or not initiate on each program, see the CVD Initiation Checklist.

Respondent Selection

For this investigation, the Department intends to select respondents based on U.S. Customs and Border Protection (CBP) data for U.S. imports during the POI (i.e., calendar year 2012) under the following Harmonized Tariff Schedule of the United States numbers: 8501.61.0000, 8507.20.8030, 8507.20.8040, 8507.20.8060, 8507.20.8090, 8541.40.6020, 8541.40.6030 and 8501.31.8000. We intend to release the CBP data under Administrative Protective Order (APO) to all parties with access to information protected by APO within five days of the announcement of the initiation of this investigation. Interested parties may submit comments regarding the CBP data and respondent selection within seven calendar days of release of this data. We intend to make our decision regarding respondent selection within 20 days of publication of this Federal Register notice.

Notification to Interested Parties

Interested parties must submit applications for disclosure under APO in accordance with 19 CFR 351.305(b). Instructions for filing such applications may be found on the Department's Web site at http://enforcement.trade.gov/apo/index.html.

Distribution of Copies of the CVD Petition

In accordance with section 702(b)(4)(A)(i) of the Act and 19 CFR 351.202(f), a copy of the public version of the Petition has been provided to the representatives of the GOC. Because of the particularly large number of producers/exporters identified in the Petition, the Department considers the service of the public version of the petition to the foreign producers/exporters satisfied by the delivery of the public version to the GOC, consistent with 19 CFR 351.203(c)(2).

ITC Notification

We have notified the ITC of our initiation, as required by section 702(d) of the Act.

Preliminary Determination by the ITC

The ITC will preliminarily determine, within 45 days after the date on which the Petition was filed, whether there is a reasonable indication that imports of subsidized certain solar cells and panels from the PRC materially injure, or threaten material injury to, a U.S. industry.[27] A negative ITC determination will result in the investigation being terminated.[28] Otherwise, the investigation will proceed according to statutory and regulatory time limits.

Submission of Factual Information

On April 10, 2013, the Department published Definition of Factual Information and Time Limits for Submission of Factual Information: Final Rule, 78 FR 21246 (April 10, 2013), which modified two regulations related to AD and CVD proceedings: the definition of factual information (19 CFR 351.102(b)(21)), and the time limits for the submission of factual information (19 CFR 351.301). The final rule identifies five categories of factual information in 19 CFR 351.102(b)(21), which are summarized as follows: (i) evidence submitted in response to questionnaires; (ii) evidence submitted in support of allegations; (iii) publicly available information to value factors

[27] See section 703(a)(2) of the Act.
[28] See section 703(a)(1) of the Act.

under 19 CFR 351.408(c) or to measure the adequacy of remuneration under 19 CFR 351.511(a)(2); (iv) evidence placed on the record by the Department; and (v) evidence other than factual information described in (i)-(iv). The final rule requires any party, when submitting factual information, to specify under which subsection of 19 CFR 351.102(b)(21) the information is being submitted and, if the information is submitted to rebut, clarify, or correct factual information already on the record, to provide an explanation identifying the information already on the record that the factual information seeks to rebut, clarify, or correct. The final rule also modified 19 CFR 351.301 so that, rather than providing general time limits, there are specific time limits based on the type of factual information being submitted. These modifications are effective for all proceeding segments initiated on or after May 10, 2013, and thus are applicable to this investigation. Please review the final rule, available at http://enforcement.trade.gov/frn/2013/1304frn/2013-08227.txt, prior to submitting factual information in this investigation.

Revised Extension of Time Limits Regulation

On September 20, 2013, the Department modified its regulation concerning the extension of time limits for submissions in AD and CVD proceedings.[29] The modification clarifies that parties may request an extension of time limits before a time limit established under Part 351 expires, or as otherwise specified by the Secretary. In general, an extension request will be considered untimely if it is filed after the time limit established under Part 351 expires. For submissions which are due from multiple parties simultaneously, an extension request will be considered untimely if it is filed after 10:00 a.m. on the due date. Examples include, but are not limited to: (1) Case and rebuttal briefs, filed pursuant to 19 CFR 351.309; (2) factual information to value factors under section 19 CFR 351.408(c), or to measure the adequacy of remuneration under section 19 CFR 351.511(a)(2), filed pursuant to 19 CFR 351.301(c)(3) and rebuttal, clarification and correction filed pursuant to 19

[29] See Extension of Time Limits; Final Rule, 78 FR 57790 (September 20, 2013).

CFR 351.301(c)(3)(iv); (3) comments concerning the selection of a surrogate country and surrogate values and rebuttal; (4) comments concerning CBP data; and (5) quantity and value questionnaires. Under certain circumstances, the Department may elect to specify a different time limit by which extension requests will be considered untimely for submissions which are due from multiple parties simultaneously. In such a case, the Department will inform parties in the letter or memorandum setting forth the deadline (including a specified time) by which extension requests must be filed to be considered timely. This modification also requires that an extension request must be made in a separate, stand-alone submission, and clarifies the circumstances under which the Department will grant untimely-filed requests for the extension of time limits. These modifications are effective for all segments initiated on or after October 21, 2013. Please review the Extension of Time Limits; Final Rule, available at http://www.gpo.gov//fdsys//pkg//FR-2013-09-20//html//2013-22853.htm, prior to submitting factual information in this segment.

Certification Requirements

Any party submitting factual information in an AD or CVD proceeding must certify to the accuracy and completeness of that information.[30] Parties are hereby reminded that revised certification requirements are in effect for company/government officials as well as their representatives in all AD or CVD investigations or proceedings initiated on or after August 16, 2013, including this investigation.[31] The formats for the revised certifications are provided at the end of the Final Rule. The Department intends to reject factual submissions if the submitting party does not comply with the revised certification requirements.

[30] See section 782(b) of the Act.
[31] See Certification of Factual Information To Import Administration During Antidumping and Countervailing Duty Proceedings, 78 FR 42678 (July 17, 2013) (Final Rule).

Barcode:3175799-01 C-570-011 INV - Investigation -

This notice is issued and published pursuant to section 777(i) of the Act.

Paul Piquado
Assistant Secretary
for Enforcement & Compliance

22 JANUARY 2014
Date

13

Filed By: Justin Neuman, Filed Date: 1/24/14 12:45 PM, Submission Status: Approved

# Appendix I

## Scope of the Investigation

The merchandise covered by this investigation is crystalline silicon photovoltaic cells, and modules, laminates and/or panels consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including building integrated materials. For purposes of this investigation, subject merchandise also includes modules, laminates and/or panels assembled in the subject country consisting of crystalline silicon photovoltaic cells that are completed or partially manufactured within a customs territory other than that subject country, using ingots that are manufactured in the subject country, wafers that are manufactured in the subject country, or cells where the manufacturing process begins in the subject country and is completed in a non-subject country.

Subject merchandise includes crystalline silicon photovoltaic cells of thickness equal to or greater than 20 micrometers, having a p/n junction formed by any means, whether or not the cell has undergone other processing, including, but not limited to, cleaning, etching, coating, and/or addition of materials (including, but not limited to, metallization and conductor patterns) to collect and forward the electricity that is generated by the cell.

Excluded from the scope of this investigation are thin film photovoltaic products produced from amorphous silicon (a-Si), cadmium telluride (CdTe), or copper indium gallium selenide (CIGS). Also excluded from the scope of this investigation are any products covered by the existing antidumping and countervailing duty orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the People's Republic of China. See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order, 77 FR 73018 (December 7, 2012); Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Countervailing Duty Order, 77 FR 73017 (December 7, 2012).

Also excluded from the scope of this investigation are crystalline silicon photovoltaic cells, not exceeding 10,000mm$^2$ in surface area, that are permanently integrated into a consumer good whose function is other than power generation and that consumes the electricity generated by the integrated crystalline silicon photovoltaic cell. Where more than one cell is permanently integrated into a consumer good, the surface area for purposes of this exclusion shall be the total combined surface area of all cells that are integrated into the consumer good.

Merchandise covered by this investigation is currently classified in the Harmonized Tariff Schedule of the United States (HTSUS) under subheadings 8501.61.0000, 8507.20.8030, 8507.20.8040, 8507.20.8060, 8507.20.8090, 8541.40.6020, 8541.40.6030 and 8501.31.8000. These HTSUS subheadings are provided for convenience and customs purposes; the written description of the scope of this investigation is dispositive.



for company/government officials, as well as their representatives. Investigations initiated on the basis of petitions filed on or after August 16, 2013, and other segments of any AD or CVD proceedings initiated on or after August 16, 2013, should use the formats for the revised certifications provided at the end of the *Final Rule*.[50] The Department intends to reject factual submissions if the submitting party does not comply with applicable revised certification requirements.

**Revised Extension of Time Limits Regulation**

On September 20, 2013, the Department modified its regulation concerning the extension of time limits for submissions in AD and CVD proceedings. The modification clarifies that parties may request an extension of time limits before a time limit established under Part 351 expires, or as otherwise specified by the Secretary. In general, an extension request will be considered untimely if it is filed after the time limit established under Part 351 expires. For submissions which are due from multiple parties simultaneously, an extension request will be considered untimely if it is filed after 10:00 a.m. on the due date. Examples include, but are not limited to: (1) Case and rebuttal briefs, filed pursuant to 19 CFR 351.309; (2) factual information to value factors under section 19 CFR 351.408(c), or to measure the adequacy of remuneration under section 19 CFR 351.511(a)(2), filed pursuant to 19 CFR 351.301(c)(3) and rebuttal, clarification and correction filed pursuant to 19 CFR 351.301(c)(3)(iv); (3) comments concerning the selection of a surrogate country and surrogate values and rebuttal; (4) comments concerning CBP data; and (5) Q&V questionnaires. Under certain circumstances, the Department may elect to specify a different time limit by which extension requests will be considered untimely for submissions which are due from multiple parties simultaneously. In such a case, the Department will inform parties in the letter or memorandum setting forth the deadline (including a specified time) by which extension requests must be filed to be considered timely. This modification also requires that an extension request must be made in a separate, stand-alone submission, and clarifies the circumstances under which the Department will grant untimely-filed requests for the extension of time limits. These modifications are effective for all segments initiated on or after October 21, 2013. Please review *Extension of Time Limits; Final Rule*, available at *http://www.gpo.gov/fdsys/pkg/FR-2013-09-20/html/2013-22853.htm*, prior to submitting factual information in these segments.

[50] *See Certification of Factual Information To Import Administration During Antidumping and Countervailing Duty Proceedings*, 78 FR 42678 (July 17, 2013) (*Final Rule*); *see also* frequently asked questions regarding the *Final Rule*, available at *http://enforcement.trade.gov/tlei/notices/factual_info_final_rule_FAQ_07172013.pdf*.

**Notification to Interested Parties**

Interested parties must submit applications for disclosure under APO in accordance with 19 CFR 351.305. On January 22, 2008, the Department published *Antidumping and Countervailing Duty Proceedings: Documents Submission Procedures; APO Procedures*, 73 FR 3634 (January 22, 2008). Parties wishing to participate in these investigations should ensure that they meet the requirements of these procedures (*e.g.*, the filing of letters of appearance as discussed at 19 CFR 351.103(d)).

This notice is issued and published pursuant to section 777(i) of the Act and 19 CFR 351.203(c).

Dated: January 22, 2014.

**Paul Piquado,**

*Assistant Secretary for Enforcement and Compliance.*

## Appendix I

**Scope of the Investigations**

The merchandise covered by these investigations is crystalline silicon photovoltaic cells, and modules, laminates and/or panels consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including building integrated materials. For purposes of these investigations, subject merchandise also includes modules, laminates and/or panels assembled in the subject country consisting of crystalline silicon photovoltaic cells that are completed or partially manufactured within a customs territory other than that subject country, using ingots that are manufactured in the subject country, wafers that are manufactured in the subject country, or cells where the manufacturing process begins in the subject country and is completed in a non-subject country.

Subject merchandise includes crystalline silicon photovoltaic cells of thickness equal to or greater than 20 micrometers, having a p/n junction formed by any means, whether or not the cell has undergone other processing, including, but not limited to, cleaning, etching, coating, and/or addition of materials (including, but not limited to, metallization and conductor patterns) to collect and forward the electricity that is generated by the cell.

Excluded from the scope of these investigations are thin film photovoltaic products produced from amorphous silicon (a-Si), cadmium telluride (CdTe), or copper indium gallium selenide (CIGS). Also excluded from the scope of these investigations are any products covered by the existing antidumping and countervailing duty orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the People's Republic of China. *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order*, 77 FR 73018 (December 7, 2012); *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Countervailing Duty Order*, 77 FR 73017 (December 7, 2012).

Also excluded from the scope of these investigations are crystalline silicon photovoltaic cells, not exceeding 10,000mm$^2$ in surface area, that are permanently integrated into a consumer good whose function is other than power generation and that consumes the electricity generated by the integrated crystalline silicon photovoltaic cell. Where more than one cell is permanently integrated into a consumer good, the surface area for purposes of this exclusion shall be the total combined surface area of all cells that are integrated into the consumer good.

Merchandise covered by these investigations is currently classified in the Harmonized Tariff Schedule of the United States (HTSUS) under subheadings 8501.61.0000, 8507.20.8030, 8507.20.8040, 8507.20.8060, 8507.20.8090, 8541.40.6020, 8541.40.6030 and 8501.31.8000. These HTSUS subheadings are provided for convenience and customs purposes; the written description of the scope of these investigations is dispositive.

[FR Doc. 2014–01738 Filed 1–28–14; 8:45 am]

BILLING CODE 3510–DS–P

## DEPARTMENT OF COMMERCE

## International Trade Administration

**[C–570–011]**

## Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China: Initiation of Countervailing Duty Investigation

**AGENCY:** Enforcement & Compliance, formerly Import Administration, International Trade Administration, Department of Commerce.

**DATES:** *Effective Date:* January 29, 2014.

**FOR FURTHER INFORMATION CONTACT:** Justin Neuman or Milton Koch, Office VII, AD/CVD Operations, Enforcement & Compliance, International Trade Administration, U.S. Department of Commerce, 14th Street and Constitution Avenue NW., Washington, DC 20230; telephone; (202) 482–0486 or (202) 482–2584, respectively.

**SUPPLEMENTARY INFORMATION:**

**The Petition**

On December 31, 2013, the Department of Commerce (the Department) received a countervailing duty (CVD) petition concerning imports of certain crystalline silicon photovoltaic products (certain solar cells and panels) from the People's Republic of China (PRC), filed in proper form by SolarWorld Industries America, Inc. (Petitioner), a domestic producer of certain solar cells and panels. The CVD petition was accompanied by an antidumping duty (AD) petition concerning imports of certain solar cells and panels.[1] Between January 3 and January 9, 2014, the Department requested additional information and clarification of certain areas of the Petition, and between January 7 and January 13, 2014, Petitioner filed a timely response to each request.[2]

In accordance with section 702(b)(1) of the Tariff Act of 1930, as amended (the Act), Petitioner alleges that producers/exporters of certain solar cells and panels in the PRC received countervailable subsidies under thirty-three programs within the meaning of sections 701 and 771(5) of the Act, and that imports from these producers/exporters materially injure, or threaten material injury to, an industry in the United States.

The Department finds that Petitioner filed this Petition on behalf of the domestic industry because it is an interested party defined in section 771(9)(C) of the Act, and that Petitioner has demonstrated sufficient industry support with respect to the CVD investigation that it is requesting the Department to initiate (*see* "Determination of Industry Support for the Petition" below).

**Period of Investigation**

The period of investigation (POI) is January 1, 2012, through December 31, 2012, in accordance with 19 CFR 351.204(b)(2).

**Scope of the Investigation**

The products covered by this investigation are certain solar cells and panels the PRC.[3]

**Comments on the Scope of the Investigation**

During our review of the Petition, we solicited information from Petitioner to ensure that the proposed scope language is an accurate reflection of the products for which the domestic industry is seeking relief. Also, on January 15, 2014, Suniva, Inc. (Suniva), a U.S. producer of certain solar cells and panels, submitted comments on the scope.[4] Moreover, as discussed in the preamble to the Department's regulations,[5] we are setting aside a period for interested parties to raise issues regarding product coverage. Parties should note that when considering product coverage with respect to this investigation, the Department will be informed by the product coverage decisions that it made in the investigations that resulted in the existing orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the PRC.[6] The Department encourages all interested parties to submit such comments by February 11, 2014, which is 20 calendar days from the signature date of this notice. All comments must be filed on the record of the CVD investigation, as well as the concurrent AD investigations.

**Filing Requirements**

All submissions to the Department must be filed electronically using Enforcement & Compliance's Antidumping and Countervailing Duty Centralized Electronic Service System (IA ACCESS). An electronically filed document must be received successfully in its entirety by the Department's electronic records system, IA ACCESS, by 5 p.m. on the due date. Documents excepted from the electronic submission requirements must be filed manually (*i.e.*, in paper form) with the Enforcement & Compliance's APO/Dockets Unit, Room 1870, U.S. Department of Commerce, 14th Street and Constitution Avenue NW., Washington, DC 20230, and stamped with the date and time of receipt by the deadline established by the Department.[7]

**Consultations**

Pursuant to section 702(b)(4)(A)(ii) of the Act, on January 2, 2014, the Department invited representatives from the Government of China (GOC) for consultations with respect to the CVD Petition. Consultations were held with the GOC on January 10, 2014.[8]

**Determination of Industry Support for the Petition**

Section 702(b)(1) of the Act requires that a petition be filed on behalf of the domestic industry. Section 702(c)(4)(A) of the Act provides that a petition meets this requirement if the domestic producers or workers who support the petition account for: (i) At least 25 percent of the total production of the domestic like product; and (ii) more than 50 percent of the production of the domestic like product produced by that portion of the industry expressing support for, or opposition to, the petition. Moreover, section 702(c)(4)(D) of the Act provides that, if the petition does not establish support of domestic producers or workers accounting for more than 50 percent of the total production of the domestic like product, the Department shall: (i) Poll the industry or rely on other information in order to determine if there is support for the petition, as required by subparagraph (A); or (ii) determine industry support using a statistically valid sampling method to poll the industry.

Section 771(4)(A) of the Act defines the "industry" as the producers as a whole of a domestic like product. Thus, to determine whether a petition has the requisite industry support, the statute directs the Department to look to producers and workers who produce the domestic like product. The U.S. International Trade Commission (ITC), which is responsible for determining whether "the domestic industry" has been injured, must also determine what constitutes a domestic like product in order to define the industry. While both the Department and the ITC must apply

[1] *See* "Petition for the Imposition of Antidumping and Countervailing Duties Pursuant to Sections 701 and 731 of the Tariff Act of 1930, As Amended," (December 31, 2013) (Petition).

[2] *See* Petitioner's filings, "Supplement to the China CVD Petition," (January 7, 2014) (China CVD Supplement); "General Issues Supplement to the Petition," (January 9, 2014) (General Issues Supplement); and "Second General Issues Supplement to the Petition," (January 13, 2014) (Second General Issues Supplement).

[3] *See* Appendix I of this notice for a full description of the scope of this investigation.

[4] *See* Letter from Suniva, "Request for Comment Period on Scope for Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China," (January 15, 2014).

[5] *See Antidumping Duties; Countervailing Duties; Final Rule*, 62 FR 27296, 27323 (May 19, 1997).

[6] The AD and CVD Orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the PRC, cover modules, laminates, and panels produced in a third-country from cells produced in the PRC; however, modules, laminates, and panels produced in the PRC from cells produced in a third-country are not covered by the scope of the Orders.

[7] *See* 19 CFR 351.303(b)(1). Information on help using IAACCESS can be found at *https://iaaccess.trade.gov/help.aspx* and a handbook can be found at *https://iaaccess.trade.gov/help/Handbook%20on%20Electronic%20Filing%20Procedures.pdf*.

[8] *See* Ex-Parte Memorandum to the File from Justin Neuman, International Trade Analyst, AD/CVD Operations, Office VII, Enforcement & Compliance, "Consultations with Officials from the Government of the People's Republic of China Regarding the Countervailing Duty Petition Concerning Certain Crystalline Silicon Photovoltaic Products," (January 13, 2014) (Consultations Memorandum).

the same statutory definition regarding the domestic like product,[9] they do so for different purposes and pursuant to a separate and distinct authority. In addition, the Department's determination is subject to limitations of time and information. Although this may result in different definitions of the like product, such differences do not render the decision of either agency contrary to law.[10]

Section 771(10) of the Act defines the domestic like product as "a product which is like, or in the absence of like, most similar in characteristics and uses with, the article subject to an investigation under this title." Thus, the reference point from which the domestic like product analysis begins is "the article subject to an investigation" (*i.e.,* the class or kind of merchandise to be investigated, which normally will be the scope as defined in the petition).

With regard to the domestic like product, Petitioner offers a definition of the domestic like product that includes certain crystalline silicon photovoltaic cells and modules and notes that the like product definition in this proceeding is identical to the definition of the like product in the Department's and the ITC's investigation of crystalline silicon photovoltaic cells, whether or not assembled into modules, from China.[11] According to Petitioner, "{t}he definition of the domestic like product in the Petition differs only slightly from the proposed scope of the investigations . . ." and "slight differences in the definition of the domestic like product and the scope of an investigation are permissible under the statute. . . ."[12] Based on our analysis of the information submitted on the record, we have determined that certain crystalline silicon photovoltaic cells and modules constitute a single domestic like product and we have analyzed industry support in terms of that domestic like product.[13]

In determining whether Petitioner has standing under section 702(c)(4)(A) of the Act, we considered the industry support data contained in the Petition with reference to the domestic like product as defined in the Petition. To establish industry support, Petitioner provided its own production of the domestic like product in 2012, and compared this to the estimated total production of the domestic like product for the entire domestic industry.[14] Petitioner obtained total 2012 production of the domestic like product using data published by Solar Energy Industries Association/Greentech Media Research in *U.S. Solar Market Insight 2012 Year in Review* and other publicly available data.[15] We have relied upon data Petitioner provided for purposes of measuring industry support.[16]

On January 10, 2014, in its consultations with the Department, the GOC raised the issue of industry support.[17] On January 15, 2014, we received comments on industry support from Yingli Green Energy Holding Company Limited, Yingli Green Energy Americas, Inc., and Canadian Solar Inc. (collectively, PRC Producers/Exporters).[18] Petitioner responded to the PRC Producers/Exporters' comments on January 15, 2014.[19] PRC Producers/Exporters filed a rebuttal to Petitioner on January 17, 2014.[20] For further discussion of these comments, *see* the PRC CVD Initiation Checklist, at Attachment II.

Based on information provided in the Petition, supplemental submissions, and other information readily available to the Department, we determine that Petitioner has met the statutory criteria for industry support under section 702(c)(4)(A)(i) of the Act because the domestic producers (or workers) who support the Petition account for at least 25 percent of the total production of the domestic like product.[21] Based on information provided in the Petition, the domestic producers (or workers) have met the statutory criteria for industry support under section 702(c)(4)(A)(ii) of the Act because the domestic producers (or workers) who support the Petition account for more than 50 percent of the production of the domestic like product produced by that portion of the industry expressing support for, or opposition to, the Petition. Accordingly, the Department determines that the Petition was filed on behalf of the domestic industry within the meaning of section 702(b)(1) of the Act.[22]

The Department finds that Petitioner filed the Petition on behalf of the domestic industry because it is an interested party as defined in section 771(9)(C) of the Act and it has demonstrated sufficient industry support with respect to the countervailing duty investigation that it is requesting the Department initiate.[23]

**Injury Test**

Because the PRC is a "Subsidies Agreement Country" within the meaning of section 701(b) of the Act, section 701(a)(2) of the Act applies to this investigation. Accordingly, the ITC must determine whether imports of the subject merchandise from the PRC materially injure, or threaten material injury to, a U.S. industry.

**Allegations and Evidence of Material Injury and Causation**

Petitioner alleges that imports of the subject merchandise are benefitting from countervailable subsidies and that such imports are causing, or threaten to cause, material injury to the U.S. industry producing the domestic like product. In addition, Petitioner alleges that subject imports exceed the negligibility threshold provided for under section 771(24)(A) of the Act.[24]

Petitioner contends that the industry's injured condition is illustrated by reduced market share; underselling and price depression or suppression; lost sales and revenues; shuttered production and hindered capacity utilization; reduced employment; and decline in industry financial

[9] *See* section 771(10) of the Act.

[10] *See USEC, Inc.* v. *United States,* 132 F. Supp. 2d 1, 8 (CIT 2001) (citing *Algoma Steel Corp., Ltd. v. United States,* 688 F. Supp. 639, 644 (CIT 1988), *aff'd* 865 F.2d 240 (Fed. Cir. 1989)).

[11] *See* Volume I of the Petition, at 24; *see, also* General Issues Supplement, at Exhibit I–Supp–1; *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Initiation of Antidumping Duty Investigation,* 76 FR 70960, 70961 (November 16, 2011); *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Initiation of Countervailing Duty Investigation,* 76 FR 70966, 70967–8 (November 16, 2011); and *Crystalline Silicon Photovoltaic Cells and Modules from the People's Republic of China,* Inv. Nos. 701–TA–481 and 731–TA–1190 (Final) USITC Pub. 4360 (December 2012), at 6–12.

[12] *See* General Issues Supplement, at 4.

[13] *See* Countervailing Duty Investigation Initiation Checklist: Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China (PRC CVD Initiation Checklist), at Attachment II, Analysis of Industry Support for the Antidumping and Countervailing Duty Petitions Covering Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and Taiwan (Attachment II). This checklist is dated concurrently with this notice and on file electronically via IA ACCESS. Access to documents filed via IA ACCESS is also available in the Central Records Unit (CRU), Room 7046 of the main Department of Commerce building.

[14] *See* Volume I of the Petition, at 8–10 and Exhibits I–3, I–5, and I–6; *see also* General Issues Supplement, at 5–8 and Exhibits I–Supp–1, I–Supp–2, I–Supp–3 and I–Supp–6.

[15] *See* Volume I of the Petition, at Exhibits I–5 and I–6.

[16] *See* PRC CVD Initiation Checklist, at Attachment II.

[17] *See* Consultations Memorandum.

[18] *See* Letter from Yingli Green Energy Holding Company Limited, Yingli Green Energy Americas, Inc., and Canadian Solar Inc., (January 15, 2014).

[19] *See* Letter from Petitioner, (January 15, 2014).

[20] *See* Letter from Yingli Green Energy Holding Company Limited, Yingli Green Energy Americas, Inc., and Canadian Solar Inc., (January 17, 2014).

[21] *See* CVD Initiation Checklist, at Attachment II.

[22] *Id.*

[23] *Id.*

[24] *See* General Issues Supplement, at 8 and Exhibit I–Supp–4.

performance.[25] We have assessed the allegations and supporting evidence regarding material injury, threat of material injury, and causation, and we have determined that these allegations are properly supported by adequate evidence and meet the statutory requirements for initiation.[26]

**Initiation of Countervailing Duty Investigation**

Section 702(b)(1) of the Act requires the Department to initiate a CVD proceeding whenever an interested party files a CVD petition on behalf of an industry that: (1) Alleges the elements necessary for an imposition of a duty under section 701(a) of the Act; and (2) is accompanied by information reasonably available to the petitioners supporting the allegations.

The Department has examined the Petition on certain solar cells and panels from the PRC and finds that it complies with the requirements of section 702(b)(1) of the Act. Therefore, in accordance with section 702(b)(1) of the Act, we are initiating a CVD investigation to determine whether producers/exporters of certain solar cells and panels in the PRC receive countervailable subsidies. For a discussion of evidence supporting our initiation determination, *see* the CVD Initiation Checklist which accompanies this notice.

Based on our review of the Petition, we find that there is sufficient information to initiate a CVD investigation of 28 alleged programs. For the other five programs alleged by Petitioner, we have determined that the requirements for initiation have not been met. For a full discussion of the basis for our decision to initiate or not initiate on each program, *see* the CVD Initiation Checklist.

**Respondent Selection**

For this investigation, the Department intends to select respondents based on U.S. Customs and Border Protection (CBP) data for U.S. imports during the POI (*i.e.,* calendar year 2012) under the following Harmonized Tariff Schedule of the United States numbers: 8501.61.0000, 8507.20.8030, 8507.20.8040, 8507.20.8060, 8507.20.8090, 8541.40.6020, 8541.40.6030, and 8501.31.8000. We intend to release the CBP data under Administrative Protective Order (APO) to all parties with access to information protected by APO within five days of the announcement of the initiation of this investigation. Interested parties may submit comments regarding the CBP data and respondent selection within seven calendar days of release of this data. We intend to make our decision regarding respondent selection within 20 days of publication of this **Federal Register** notice.

**Notification to Interested Parties**

Interested parties must submit applications for disclosure under APO in accordance with 19 CFR 351.305(b). Instructions for filing such applications may be found on the Department's Web site at *http://enforcement.trade.gov/apo/index.html.*

**Distribution of Copies of the CVD Petition**

In accordance with section 702(b)(4)(A)(i) of the Act and 19 CFR 351.202(f), a copy of the public version of the Petition has been provided to the representatives of the GOC. Because of the particularly large number of producers/exporters identified in the Petition, the Department considers the service of the public version of the petition to the foreign producers/exporters satisfied by the delivery of the public version to the GOC, consistent with 19 CFR 351.203(c)(2).

**ITC Notification**

We have notified the ITC of our initiation, as required by section 702(d) of the Act.

**Preliminary Determination by the ITC**

The ITC will preliminarily determine, within 45 days after the date on which the Petition was filed, whether there is a reasonable indication that imports of subsidized certain solar cells and panels from the PRC materially injure, or threaten material injury to, a U.S. industry.[27] A negative ITC determination will result in the investigation being terminated.[28] Otherwise, the investigation will proceed according to statutory and regulatory time limits.

**Submission of Factual Information**

On April 10, 2013, the Department published *Definition of Factual Information and Time Limits for Submission of Factual Information: Final Rule,* 78 FR 21246 (April 10, 2013), which modified two regulations related to AD and CVD proceedings: The definition of factual information (19 CFR 351.102(b)(21)), and the time limits for the submission of factual information (19 CFR 351.301). The final rule identifies five categories of factual information in 19 CFR 351.102(b)(21), which are summarized as follows: (i) Evidence submitted in response to questionnaires; (ii) evidence submitted in support of allegations; (iii) publicly available information to value factors under 19 CFR 351.408(c) or to measure the adequacy of remuneration under 19 CFR 351.511(a)(2); (iv) evidence placed on the record by the Department; and (v) evidence other than factual information described in (i)–(iv). The final rule requires any party, when submitting factual information, to specify under which subsection of 19 CFR 351.102(b)(21) the information is being submitted and, if the information is submitted to rebut, clarify, or correct factual information already on the record, to provide an explanation identifying the information already on the record that the factual information seeks to rebut, clarify, or correct. The final rule also modified 19 CFR 351.301 so that, rather than providing general time limits, there are specific time limits based on the type of factual information being submitted. These modifications are effective for all proceeding segments initiated on or after May 10, 2013, and thus are applicable to this investigation. Please review the final rule, available at *http://enforcement.trade.gov/frn/2013/1304frn/2013-08227.txt,* prior to submitting factual information in this investigation.

**Revised Extension of Time Limits Regulation**

On September 20, 2013, the Department modified its regulation concerning the extension of time limits for submissions in AD and CVD proceedings.[29] The modification clarifies that parties may request an extension of time limits before a time limit established under Part 351 expires, or as otherwise specified by the Secretary. In general, an extension request will be considered untimely if it is filed after the time limit established under Part 351 expires. For submissions which are due from multiple parties simultaneously, an extension request will be considered untimely if it is filed after 10:00 a.m. on the due date. Examples include, but are not limited

[25] *See* Volume I of the Petition, at 5–7, 20–22, 33–67 and Exhibits I–1, I–4, I–13 through I–14, I–16 through I–20, and I–22 through I–30; General Issues Supplement, at 8–9 and Exhibits I–Supp–1, I–Supp–4 and I–Supp–5; and Second General Issues Supplement, at 5–11 and Exhibits I–Supp–7 through I–Supp–15.

[26] *See* PRC CVD Initiation Checklist, at Attachment III, Analysis of Allegations and Evidence of Material Injury and Causation for the Petitions Covering Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and Taiwan.

[27] *See* section 703(a)(2) of the Act.

[28] *See* section 703(a)(1) of the Act.

[29] *See Extension of Time Limits; Final Rule,* 78 FR 57790 (September 20, 2013).

to: (1) Case and rebuttal briefs, filed pursuant to 19 CFR 351.309; (2) factual information to value factors under section 19 CFR 351.408(c), or to measure the adequacy of remuneration under section 19 CFR 351.511(a)(2), filed pursuant to 19 CFR 351.301(c)(3) and rebuttal, clarification and correction filed pursuant to 19 CFR 351.301(c)(3)(iv); (3) comments concerning the selection of a surrogate country and surrogate values and rebuttal; (4) comments concerning CBP data; and (5) quantity and value questionnaires. Under certain circumstances, the Department may elect to specify a different time limit by which extension requests will be considered untimely for submissions which are due from multiple parties simultaneously. In such a case, the Department will inform parties in the letter or memorandum setting forth the deadline (including a specified time) by which extension requests must be filed to be considered timely. This modification also requires that an extension request must be made in a separate, stand-alone submission, and clarifies the circumstances under which the Department will grant untimely-filed requests for the extension of time limits. These modifications are effective for all segments initiated on or after October 21, 2013. Please review the Extension of Time Limits; Final Rule, available at *http://www.gpo.gov//fdsys//pkg//FR-2013-09-20//html//2013-22853.htm,* prior to submitting factual information in this segment.

**Certification Requirements**

Any party submitting factual information in an AD or CVD proceeding must certify to the accuracy and completeness of that information.[30] Parties are hereby reminded that revised certification requirements are in effect for company/government officials as well as their representatives in all AD or CVD investigations or proceedings initiated on or after August 16, 2013, including this investigation.[31] The formats for the revised certifications are provided at the end of the *Final Rule.* The Department intends to reject factual submissions if the submitting party does not comply with the revised certification requirements.

This notice is issued and published pursuant to section 777(i) of the Act.

[30] *See* section 782(b) of the Act.

[31] *See Certification of Factual Information To Import Administration During Antidumping and Countervailing Duty Proceedings,* 78 FR 42678 (July 17, 2013) (*Final Rule*).

Dated: January 22, 2014.

**Paul Piquado,**

*Assistant Secretary for Enforcement & Compliance.*

## Appendix I

**Scope of the Investigation**

The merchandise covered by this investigation is crystalline silicon photovoltaic cells, and modules, laminates and/or panels consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including building integrated materials. For purposes of this investigation, subject merchandise also includes modules, laminates and/or panels assembled in the subject country consisting of crystalline silicon photovoltaic cells that are completed or partially manufactured within a customs territory other than that subject country, using ingots that are manufactured in the subject country, wafers that are manufactured in the subject country, or cells where the manufacturing process begins in the subject country and is completed in a non-subject country.

Subject merchandise includes crystalline silicon photovoltaic cells of thickness equal to or greater than 20 micrometers, having a p/n junction formed by any means, whether or not the cell has undergone other processing, including, but not limited to, cleaning, etching, coating, and/or addition of materials (including, but not limited to, metallization and conductor patterns) to collect and forward the electricity that is generated by the cell.

Excluded from the scope of this investigation are thin film photovoltaic products produced from amorphous silicon (a-Si), cadmium telluride (CdTe), or copper indium gallium selenide (CIGS). Also excluded from the scope of this investigation are any products covered by the existing antidumping and countervailing duty orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the People's Republic of China. *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order,* 77 FR 73018 (December 7, 2012); *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Countervailing Duty Order,* 77 FR 73017 (December 7, 2012).

Also excluded from the scope of this investigation are crystalline silicon photovoltaic cells, not exceeding 10,000mm² in surface area, that are permanently integrated into a consumer good whose function is other than power generation and that consumes the electricity generated by the integrated crystalline silicon photovoltaic cell. Where more than one cell is permanently integrated into a consumer good, the surface area for purposes of this exclusion shall be the total combined surface area of all cells that are integrated into the consumer good.

Merchandise covered by this investigation is currently classified in the Harmonized Tariff Schedule of the United States (HTSUS) under subheadings 8501.61.0000, 8507.20.8030, 8507.20.8040, 8507.20.8060, 8507.20.8090, 8541.40.6020, 8541.40.6030 and 8501.31.8000. These HTSUS subheadings are provided for convenience and customs purposes; the written description of the scope of this investigation is dispositive.

[FR Doc. 2014–01743 Filed 1–28–14; 8:45 am]

BILLING CODE 3510–DS–P

---

## DEPARTMENT OF COMMERCE

### International Trade Administration

**[Application No. 97–12A003]**

### Export Trade Certificate of Review

**ACTION:** Notice of Application (97–12A003) to amend the Export Trade Certificate of Review held by the Association for the Administration of Rice Quotas, Inc.

**SUMMARY:** The Office of Trade and Economic Analysis ("OTEA") of the International Trade Administration, Department of Commerce, has received an application to amend an Export Trade Certificate of Review ("Certificate"). This notice summarizes the proposed amendment and requests comments relevant to whether the amended Certificate should be issued.

**FOR FURTHER INFORMATION CONTACT:** Joseph Flynn, Director, Office of Trade and Economic Analysis, International Trade Administration, (202) 482–5131 (this is not a toll-free number) or email at *etca@trade.gov.*

**SUPPLEMENTARY INFORMATION:** Title III of the Export Trading Company Act of 1982 (15 U.S.C. 4001–21) authorizes the Secretary of Commerce to issue Export Trade Certificates of Review. An Export Trade Certificate of Review protects the holder and the members identified in the Certificate from State and Federal government antitrust actions and from private treble damage antitrust actions for the export conduct specified in the Certificate and carried out in compliance with its terms and conditions. Section 302(b)(1) of the Export Trading Company Act of 1982 and 15 CFR 325.6(a) require the Secretary to publish a notice in the **Federal Register** identifying the applicant and summarizing its proposed export conduct.

**Request for Public Comments**

Interested parties may submit written comments relevant to the determination whether an amended Certificate should be issued. If the comments include any privileged or confidential business

# TAB 8

# Submission of Quantity and Value Questionnaire for SunPower Corporation and its Wholly Owned Subsidiaries (Feb. 13, 2014)

Barcode:3180828-01 A-570-010 INV - Investigation -

K&L GATES

K&L GATES LLP
1601 K STREET, N.W.
WASHINGTON, DC 20006
T +1 202 778 9000 F +1 202 778 9100 klgates.com

February 13, 2014

Daniel Gerkin
daniel.gerkin@klgates.com

T +1 202 778 9168

**PUBLIC VERSION**

Case No. A-570-010
Total Pages:
Investigation
POI: 04/01/13–09/30/13
Office 4, AD/CVD Operations, Enforcement and Compliance
Business Proprietary Information Has Been Ranged or Deleted from Exhibit 1

***The Business Proprietary Version of this Submission May Be Released Under APO***

**VIA IA ACCESS**

The Honorable Penny S. Pritzker
Secretary of Commerce
Attn: Enforcement and Compliance
APO/Docket Unit, Room 1870
U.S. Department of Commerce
14th Street and Constitution Avenue, N.W.
Washington, DC 20230

Attn: Mr. Jeffrey Pedersen

**Re: Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China; Submission of Quantity and Value Questionnaire for SunPower Corporation and its Wholly Owned U.S. Subsidiaries**

Dear Secretary Pritzker:

We are writing on behalf of our client, SunPower Corporation, 77 Rio Robles, San Jose, CA 95134, and its wholly owned U.S. subsidiaries, SunPower Corporation Systems, 1414 Harbour Way South, Richmond, CA 94804, and SunPower North America LLC, 77 Rio Robles, San Jose, CA 95134 (collectively, "SunPower U.S."), to respond to the Quantity and Value

Filed By: daniel.gerkin@klgates.com, Filed Date: 2/13/14 2:55 PM, Submission Status: Approved

Questionnaire issued by the Department on January 23, 2014 in connection with the above-captioned investigation. Although SunPower U.S. did not receive a request to respond to a Quantity and Value Questionnaire, as detailed below, SunPower U.S., during the period covered by the questionnaire, was involved in a tolling arrangement in China for the assembly of modules incorporating crystalline silicon photovoltaic ("CSPV") cells that were exported to SunPower U.S. Depending on how the Department treats the toll manufacturing arrangement, the affiliated intermediate parties that may have sold the CSPV modules to SunPower U.S., and SunPower U.S., SunPower U.S. believes it may be considered to be the producer and/or exporter of such modules from China or otherwise may be required to report sales of such modules to the first unaffiliated customers of SunPower U.S. in the United States, during the period between April 1, 2013 and September 30, 2013. Accordingly, such sales for export, based on import data, are being reported, in accordance with Attachment I to the Department's Quantity and Value Questionnaire, in the table attached as **Exhibit 1**. No CSPV cells were exported to the U.S. that were not incorporated into CSPV modules.

The CSPV modules are assembled in China pursuant to a tolling arrangement, wherein raw materials and components, including CSPV cells manufactured by SunPower U.S. affiliates in Malaysia or the Philippines, are consigned to the Chinese toller. SunPower U.S. understands that the Chinese toller and its affiliated manufacturing companies in China, as the entity(ies) that export(s) the CSPV modules to the United States, separately has/have responded to the Department's Quantity and Value Questionnaire. However, it is unclear how the Department would treat SunPower U.S. in the context of the above-captioned investigation because of its involvement in the tolling arrangement with the Chinese toller and possible sales of products by affiliated SunPower entities assembled by the Chinese toller to SunPower U.S. Accordingly, to ensure that SunPower U.S. fully cooperates with the Department's investigation, and maintains the ability to seek separate rate status for the exports involved, as appropriate, SunPower U.S. is reporting the sales of CSPV modules to SunPower U.S.[1]

In addition, SunPower Switzerland and SunPower Philippines, both of which are wholly owned subsidiaries of SunPower and which may be considered to have sold the CSPV modules being reported to SunPower U.S., separately will be submitting responses to the Department's Quantity and Value Questionnaire. Please note that the responses to the Department's Quantity and Value Questionnaire are being submitted by SunPower Switzerland, SunPower Philippines, and SunPower U.S. based on the involvement of such entities in the CSPV module toll manufacturing arrangement with a Chinese toller and the sales for export of such modules to SunPower U.S. Each report covers the same sales for export of modules from China incorporating CSPV cells to the United States during the period covered by the questionnaire (and does not report different sales).

[1] Please note that SunPower Systems SARL, 8 Avenue de Frontenex, 1207, Geneva, Switzerland ("SunPower Switzerland") and SunPower Philippines Manufacturing Ltd., 100 East Main Avenue, Phase 4, Special Economic Zone, Laguna Technopark, Binan, Laguna, Philippines 4024 ("SunPower Philippines"), also may be considered to sell modules incorporating CSPV cells to SunPower U.S.

As noted above, there were no sales for export of CSPV cells during this time period and each of the CSPV modules sold for export to the United States incorporated non-Chinese CSPV cells. However, certain of the CSPV cells may have incorporated Chinese-origin wafers, which SunPower U.S. understands would make the Chinese-assembled modules subject to the present antidumping duty investigation. SunPower U.S.'s affiliates in Malaysia and the Philippines source wafers from a number of countries, including China,[2] but do not track the origin of the wafers used in CSPV cell production. Accordingly, the data being provided to the Department likely overstates the number of imported CSPV modules that are subject to the present investigation.

Please note that SunPower U.S. has reported two values in response to the Department's Quantity and Value Questionnaire: (i) the total value of the CSPV modules that may be considered to be sold by SunPower Switzerland and/or SunPower Philippines to SunPower U.S. during the relevant time period; and (ii) the total value of such modules as sold to unaffiliated U.S. customers during the relevant time period. The former is based on the intercompany pricing from SunPower Switzerland and/or SunPower Philippines to SunPower U.S. The latter was derived by multiplying the weighted average selling price of standalone CSPV modules and the quantity of commercial shipments of CSPV modules, without regard to their origin, made during the relevant time period (SunPower U.S. does not track its U.S. sales by origin).

* * *

Pursuant to 19 C.F.R. § 351.304(a), SunPower U.S. requests proprietary treatment for the information designated by single brackets ("[ ]") in **Exhibit 1** to this submission. **Exhibit 1** is marked "Business Proprietary Treatment Requested" in accordance with 19 C.F.R. § 351.303(d)(2)(v). SunPower U.S. requests confidential treatment because such information consists of terms of sale, pricing, and other financial data the release of which to the public would cause substantial harm to the competitive position of SunPower U.S. *See* 19 C.F.R. § 351.105(c)(4), (c)(5), and (c)(11). SunPower U.S. consents to the release of this information under the Administrative Protective Order ("APO") issued by the Department in this investigation. *See* 19 C.F.R. § 351.304(b). In addition, SunPower U.S. separately is submitting a public version of this submission, in which the information for which confidential treatment is requested has been ranged or deleted. *See* 19 C.F.R. § 351.304(c).

Pursuant to 19 C.F.R. § 351.303(f), SunPower U.S. has served each of the parties identified on the attached Certificate of Service via first class mail.

Should the Department have any questions regarding this submission or require any additional information, please do not hesitate to contact the undersigned at (202) 778-9168 or daniel.gerkin@klgates.com.

---

[2] Certain of the CSPV wafers may be sourced in Taiwan, but SunPower U.S. understands that Chinese-assembled CSPV modules incorporating CSPV cells produced in Malaysia or the Philippines from wafers originating in Taiwan would not be subject to the present investigation.

Barcode:3180828-01 A-570-010 INV - Investigation -

K&L GATES

Page 4
February 13, 2014

Respectfully submitted,

Daniel J. Gerkin
*Counsel to SunPower Corporation*

Filed By: daniel.gerkin@klgates.com, Filed Date: 2/13/14 2:55 PM, Submission Status: Approved

Barcode:3180828-01 A-570-010 INV - Investigation -

## EXHIBIT 1

## RESPONSE BY SUNPOWER CORPORATION, SUNPOWER CORPORATION SYSTEMS, AND SUNPOWER NORTH AMERICA LLC TO QUANTITY AND VALUE QUESTIONNAIRE (CASE NO. A-570-010)

| Market: United States | Total Number of Modules, Panels or Laminates | Total Megawatts (MW) | Terms of Sale | Total Import Value ($US)[1] | Total U.S. Sales ($U.S.) (Constructed Export Price) |
|---|---|---|---|---|---|
| | [117,000] | [38.00] | [ ] | [38M] | [53M] |

1 Please note that this figure represents approximately [65] percent of the total number of CSPV modules assembled for SunPower U.S. in China. Other of the CSPV modules assembled for SunPower U.S. in China are directed to markets other than the United States.

Filed By: daniel.gerkin@klgates.com, Filed Date: 2/13/14 2:55 PM, Submission Status: Approved

## COMPANY CERTIFICATION

I, **Michael Holland, Commercial Counsel**, currently employed by **SunPower Corporation**, certify that I prepared or otherwise supervised the preparation of the attached submission of **SunPower Corporation's Quantity and Value Questionnaire Response** filed on **February 13, 2014** pursuant to the antidumping investigation of **Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China, A-570-010.** I certify that the public information and any business proprietary information of **SunPower Corporation** contained in this submission is accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: ____________________

Date: 13 February 2014

**REPRESENTATIVE CERTIFICATION**

I, **Daniel J. Gerkin**, with **K&L Gates LLP, Counsel to SunPower Corporation**, certify that I have read the attached submission of **SunPower Corporation's Quantity and Value Questionnaire Response** filed on **February 13, 2014** pursuant to the antidumping investigation of **Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China, A-570-010.** In my capacity as **Counsel** of this submission, I certify that the information contained in this submission is accurate and complete to the best of my knowledge. I am aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: Daniel J. Gerkin

Date: 2/13/14

# PUBLIC CERTIFICATE OF SERVICE

**Crystalline Silicon Photovoltaic Products from the People's Republic of China Investigation**
**POI: 4/1/2013 – 9/30/2013**

I, **Daniel J. Gerkin**, with **K&L Gates LLP, Counsel** to **SunPower Corporation**, hereby certify that on this 13th day of February, 2014, I have caused to be served a true and correct copy of the foregoing submission upon the following parties, via express mail or first-class mail, postage prepaid:

Timothy C. Brightbill, Esq.
Representative of SolarWorld Industries America Inc.
Wiley Rein LLP
1776 K Street, NW
Washington, DC 20006
Phone/Fax: 202-719-7000 / 202-719-7049
Email: trade@wileyrein.com

Gregory S. McCue, Esq.
Representative of Suniva, Inc.
Steptoe & Johnson LLP
1330 Connecticut Street, NW
Washington, DC 20036
Phone/Fax: 202-429-3000 / 202-429-3902
Email: gmccue@steptoe.com

Neil R. Ellis, Esq.
Representative of Canadian Solar Inc. and Yingli Green Energy Holdings Company Limited and Yingli Green Energy Americas, Inc.
Sidley Austin LLP
1501 K Street, NW
Washington, DC 20005
Phone/Fax: 202-736-8000 / 202-736-8711
Email: nellis@sidley.com

David S. Christy, Jr. Esq.
Representative of SunEdison, Inc.
Perkins Coie LLP
700 13th Street, NW
Washington, DC 20005-3960
Phone/Fax: 202-654-6200 / 202-654-6211
Email: dchristy@perkinscoie.com, swright@perkinscoie.com

Gregory S. Menegaz, Esq.
Representative of Dongfang Electric (Yixing) MAGI Solar Power Technology Co., Ltd.,
Jiangsu
Sunlink PV Technology Co., Ltd., Shenzhen Topray Solar Co. Ltd., LDK Solar Hi-Tech
(Nanchang) Co., Ltd.
deKieffer & Horgan
1455 Pennsylvania Avenue
Suite 900B
Washington, DC 20004
Phone/Fax: 202-783-6900 / 202-783-6909
Email: gmenegaz@dhlaw.com

Francis J. Sailer, Esq.
Representative of Hanwha Solarone (Qidong) Co., Ltd. and Hanwha Solarone Hong Kong
Limited
Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP
1201 New York Ave., NW
Suite 650
Washington, DC 20005
Phone/Fax: 202-783-6881 / 202-783-0405
Email: fsailer@gdlsk.com, mpardo@gdlsk.com

John M. Gurley, Esq.
Representative of Changzhou Trina Solar Energy Co., Ltd.
Arent Fox LLP
1717 K Street, NW
Washington, DC 20036-5342
Phone/Fax: 202-857-6000 / 202-857-6395
Email: john.gurley@arentfox.com

Craig A. Lewis, Esq.
Representative of Shanghai BYD Co., Ltd.
Hogan Lovells US LLP
555 13th Street, NW
Washington, DC 20004
Phone/Fax: 202-637-5600 / 202-637-5910
Email: craig.lewis@hoganlovells.com

Matthew J. McConkey, Esq.
Representative of China Sunergy (Nanjing) Co., Ltd.
Mayer Brown LLP
1999 K Street, NW
Washington, DC 20006-1101
Phone/Fax: 202-263-3000 / 202-263-3300
Email: mmcconkey@mayerbrown.com


Daniel J. Gerkin
*Counsel to SunPower Corporation*

# TAB 9

# SunPower Corporation's Response to Request for Information (May 29, 2014)

K&L GATES

**K&L GATES LLP**
1601 K STREET, N.W.
WASHINGTON, DC 20006
T +1 202 778 9000 F +1 202 778 9100 klgates.com

May 29, 2014

Daniel Gerkin
daniel.gerkin@klgates.com

T +1 202 778 9168

**PUBLIC VERSION**

Case No. A-570-010
Total Pages: 14
Investigation
POI: 04/01/13–09/30/13
Office VII, AD/CVD Operations,
Enforcement and Compliance
Business Proprietary Information Has Been Ranged or Deleted from Appendix 1

***The Business Proprietary Version of this Submission May Be Released Under APO***

**VIA IA ACCESS**

The Honorable Penny S. Pritzker
Secretary of Commerce
Attn: Enforcement and Compliance
APO/Docket Unit, Room 1870
U.S. Department of Commerce
14th Street and Constitution Avenue, N.W.
Washington, DC 20230

Attn: Mr. Jeffrey Pedersen
Mr. Howard Smith

**Re: Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: SunPower Corporation's Response to Request for Information**

Dear Secretary Pritzker:

On behalf of SunPower Corporation, 77 Rio Robles, San Jose, CA 95134 ("SunPower"), we hereby provide as **Appendix 1** the following response to the Department's Request for Information, dated May 15, 2014. The extended deadline for the response is May 29, 2014. Accordingly, the response to the Request for Information is timely filed.

Pursuant to 19 C.F.R. § 351.304(a), SunPower requests proprietary treatment for the information designated by single brackets ("[ ]") in **Appendix 1** to this submission. **Appendix 1** is marked "Business Proprietary Treatment Requested" in accordance with 19 C.F.R. § 351.303(d)(2)(v). SunPower requests confidential treatment because such information consists of terms of sale, pricing, and other financial data the release of which to the public would cause substantial harm to the competitive position of SunPower. *See* 19 C.F.R. 351.105(c)(4), (c)(5), and (c)(11). SunPower consents to the release of this information under the Administrative Protective Order ("APO") issued by the Department in this investigation. *See* 19 C.F.R. § 351.304(b). In addition, SunPower separately is submitting a public version of this submission, which includes a public summary of the proprietary information and in which the information for which confidential treatment is requested has been ranged or deleted. *See* 19 C.F.R. § 351.304(c).

In accordance with the Department's regulations, we are filing this submission through IA ACCESS at http://iaacess.trade.gov and are serving today each of the parties identified on the attached Certificate of Service via courier or first class mail, postage prepaid.

Should the Department have any questions regarding this submission or require any additional information, please do not hesitate to contact the undersigned at (202) 778-9168 or daniel.gerkin@klgates.com.

Respectfully submitted,

Daniel J. Gerkin
*Counsel to SunPower Corporation*

Case 1:15-cv-00067-DCP Document 93 Filed 04/04/16 Page 131 of 161

**PUBLIC VERSION**

## APPENDIX 1

**1. For the module, laminate, or panel exports, or sales for export, on which you based your certification that you exported, or sold for export, subject merchandise to the United States during the POI, please describe in detail how the module, laminate, or panel meets the scope description provided above.**

**Response:**

As detailed in its Separate Rate Application, dated March 31, 2014, in November 2008, SunPower entered into a Module Manufacturing Service Supply Agreement with Jiawei Solarchina Co., Ltd., based in Hong Kong ("Jiawei"). Jiawei's wholly owned mainland China subsidiary, SunEnergy (S.Z.) Co., Ltd. ("SunEnergy"), performs the tolling services on behalf of Jiawei. Under this tolling arrangement, SunPower's Swiss affiliate, SunPower Systems SARL, 8 Avenue de Frontenex, 1207, Geneva, Switzerland ("SunPower Switzerland") consigns raw materials and components, including crystalline silicon photovoltaic ("CSPV") cells manufactured by SunPower affiliates in Malaysia or the Philippines, to the Chinese toller, SunEnergy.[1] Thus, the Chinese toller neither purchases, nor owns, the requisite raw materials or components. Once the CSPV modules, which also are not owned by SunEnergy, are assembled by SunEnergy, they are shipped from mainland China to Jiawei in Hong Kong, from where they are shipped to SunPower or SunPower Corporation, Systems, 1414 Harbour Way South, Richmond, CA 94804 ("SunPower Systems") in the United States. As of July 1, 2013, however, SunEnergy has been exporting the CSPV modules directly to SunPower or SunPower Systems in the United States.

In connection with the preparation of its response to the Department's Request for Information, SunPower has determined that [ ] of the wafers for the CSPV cells manufactured by its affiliates in Malaysia and the Philippines, which, in turn, are consigned to SunEnergy, are sourced in China. However, as noted in the Separate Rate Application, SunPower's affiliates do not track the origin of the wafers used in CSPV cells production. Accordingly, SunPower presumptively is treating all CSPV modules exported to the United States during the period of investigation by Jiawei or SunEnergy and imported by SunPower or SunPower Systems as being within the scope of the present antidumping and countervailing duty investigations.

SunPower currently is working to develop additional information to substantiate its assertion that at least some percentage of the modules assembled by SunEnergy and exported by Jiawei or

[1] Specifically, SunPower's wholly owned subsidiary, SunPower Philippines Manufacturing Ltd., a Cayman Islands company manufacturing in the Philippines, and SunPower's 50-percent-owned joint venture AUO SunPower Sdn. Bhd., a Malaysian company manufacturing in Malaysia, produce the CSPV cells used by SunEnergy to assemble CSPV modules for SunPower.

SunEnergy to SunPower and SunPower Systems during the period of investigation are, in fact, subject to the scope of the present investigations. Any such information developed by SunPower will be provided to the Department in connection with SunPower Switzerland's response to the Department's Request for Information, which is due June 4, 2014, as well as in a supplemental submission made on behalf of SunPower.

**2. Please characterize your knowledge that the module, laminate, or panel meets the scope description provided above using one of the following descriptions (*select one from (a)-(e)*):**

**a. You have knowledge that solar cells within the module, panel, or laminate meet the scope description above (i.e., the cells are completed or partially manufactured within a customs territory other than the PRC, using ingots that are manufactured in the PRC, wafers that are manufactured in the PRC, or cells where the manufacturing process begins in the PRC and is completed in a non-subject country).**

**Response:**

As detailed above, SunPower knows that at least a certain percentage of the modules assembled in China by SunEnergy and exported by Jiawei or SunEnergy to SunPower and SunPower Systems during the period of investigation incorporated CSPV cells manufactured either in Malaysia or the Philippines which, in turn, incorporated Chinese-origin wafers.

**b. You have reason to believe that the solar cells within the module, panel, or laminate meet the scope description above but you do not have information that the specific solar cells in the module panel or laminate meet the scope description above (e.g., you know that the solar cells within the module, panel, or laminate are from a third-country cell manufacturer who receives a certain percentage of ingots/wafers/partially manufactured solar cells from the PRC). Please explain the basis for your reason to believe that the solar cells within the module, panel, or laminate meet the scope description above.**

**Response:**

Please see the response above.

**c. The module, panel, or laminate contains solar cells which you know are manufactured in a third-country; however you have no information regarding whether any of the ingots or wafers used to produce those solar cells were manufactured in the PRC or whether any of those solar cells were manufactured in a process that began in the PRC and was completed in a nonsubject country.**

**Response:**

Please see the response above.

**d. The module, panel, or laminate contains solar cells which you purchased from a third-country supplier however you have no other information about the solar cells.**

**Response:**

Please see the response above.

**e. Other- please explain the type of knowledge that you have.**

**Response:**

Please see the response above.

**3. For one module, laminate, or panel export, or sale for export to the United States during the POI, please provide documentation demonstrating that the module, laminate, or panel meets the scope description provided above. The documentation provided should demonstrate that:**

**a. The panel/laminate/module was assembled in the PRC.**

The customs entry documentation submitted as **Appendix A.1** of SunPower's Separate Rate Application demonstrates that the modules imported by SunPower were manufactured in China by SunEnergy. Specifically, the Entry Summary on CBP Form 7501 and associated documentation state the country of origin of the imported modules as China. Furthermore, the commercial invoice accompanying the customs entry, Invoice No. 18001A, identifies SunEnergy as the manufacturer and the country of origin as China.

**b. The solar cells assembled into the panel/laminate/module were completed or partially manufactured within a customs territory other than the PRC, using ingots that are manufactured in the PRC, wafers that are manufactured in the PRC, or cells where the manufacturing process begins in the PRC and is completed in a non-subject country.**

The commercial invoice described above also states: "Modules . . . assembled in China using crystalline silicon photovoltaic cells manufactured either in Malaysia or Philippines . . . Modules are assembled in SunEnergy." However, as noted above, SunPower's affiliated CSPV cell producers do not track the origin of the wafers utilized in connection with the manufacture of CSPV cells. Nevertheless, SunPower is continuing to work to develop additional information responsive to the Department's questionnaire.

c. **If you are unable to provide any documentation, please explain why you cannot provide documentation and please describe the steps you have taken to obtain such documentation.**

Please see the responses above.

**4. Do you have records, such as inventory movement records, that allow you to track and link the ingot/wafer/partially manufactured solar cells from the PRC to the solar cells completed or partially manufactured within a customs territory other than the PRC and then to the panel/laminate/module assembled in the PRC and shipped to an unaffiliated customer in the United States? If you do, please provide such documentation for the export/sale for which you provided documentation in response to item 3 above. If you are unable to provide such documentation, please explain why you cannot provide it.**

**Response:**

As detailed above, SunPower is continuing to work to develop additional information responsive to the Department's questionnaire.

# COMPANY CERTIFICATION

I, Michael Holland, Commercial Counsel, currently employed by **SunPower Corporation**, certify that I prepared or otherwise supervised the preparation of the attached submission of **SunPower Corporation's Response to Request for Information** filed on **May 29, 2014** pursuant to the antidumping investigation of **Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China, A-570-010.** I certify that the public information and any business proprietary information of **SunPower Corporation** contained in this submission is accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature:

Date: 29 May 2014

# REPRESENTATIVE CERTIFICATION

I, **Daniel J. Gerkin**, with **K&L Gates LLP, Counsel to SunPower Corporation**, certify that I have read the attached submission of **SunPower Corporation's Response to Request for Information** filed on **May 29, 2014** pursuant to the antidumping investigation of **Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China, A-570-010.** In my capacity as **Counsel** of this submission, I certify that the information contained in this submission is accurate and complete to the best of my knowledge. I am aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: [signature]

Date: 5/29/14

# PUBLIC CERTIFICATE OF SERVICE

**Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China Investigation**
**POI: 04/01/13–09/30/13**

I, **Daniel J. Gerkin**, with **K&L Gates LLP**, **Counsel** to **SunPower Corporation**, certify that on this 29th day of May, 2014, I have caused to be served a true and correct copy of the foregoing submission upon the following parties, via first-class mail, postage prepaid:

Timothy C. Brightbill, Esq.
Representative of SolarWorld Industries America Inc.
Wiley Rein LLP
1776 K Street, NW
Washington, DC 20006
Phone/Fax: 202-719-7000 / 202-719-7049
Email: trade@wileyrein.com

Gregory S. McCue, Esq.
Representative of Suniva, Inc. ("Suniva")
Steptoe & Johnson LLP
1330 Connecticut Street, NW
Washington, DC 20036
Phone/Fax: 202-429-3000 / 202-429-3902
Email: gmccue@steptoe.com

Neil R. Ellis, Esq.
Representative of Canadian Solar Inc. ("Canadian Solar") and Yingli Green Energy Holdings Company Limited ("YGE") and Yingli Green Energy Americas, Inc. ("YGEA") ("Yingli")
Sidley Austin LLP
1501 K Street, NW
Washington, DC 20005
Phone/Fax: 202-736-8000 / 202-736-8711
Email: nellis@sidley.com

David S. Christy, Jr. Esq.
Representative of SunEdison, Inc. ("SunEdison")
Perkins Coie LLP
700 13th Street, NW
Washington, DC 20005-3960
Phone/Fax: 202-654-6200 / 202-654-6211
Email: dchristy@perkinscoie.com, swright@perkinscoie.com

Case 1:15-cv-00067-DCP Document 66-2 Filed 10/13/15 Page 139 of 156
Case 1:15-cv-00067-DCP Document 93 Filed 04/04/16 Page 138 of 161
Barcode:3205180-01 A-570-010 INV - Investigation -

Gregory S. Menegaz, Esq.
Representative of Dongfang Electric (Yixing) MAGI Solar Power Technology Co., Ltd., Jiangsu
Sunlink PV Technology Co., Ltd., Shenzhen Topray Solar Co. Ltd., LDK Solar Hi-Tech
(Nanchang) Co., Ltd., Risen Energy Co., Ltd., Sumec Hardware & Tools Co., Ltd., CSG PVTech
Co., Ltd., ET Solar Industry Limited, Lightway Green New Energy Co., Ltd., Changzhou
Almaden Co., Ltd., Shenzhen Sungold Solar Co., Ltd., Dongguan Sunworth Solar Energy Co.,
Ltd.
deKieffer & Horgan PLLC
1455 Pennsylvania Avenue
Suite 900B
Washington, DC 20004
Phone/Fax: 202-783-6900 / 202-783-6909
Email: gmenegaz@dhlaw.com

Francis J. Sailer, Esq.
Representative of Hanwha Solarone (Qidong) Co., Ltd., Hanwha Solarone Hong Kong Limited
("Hanwha"), and Asun Energy Co Ltd. (a/k/a Suzhou Asun Energy Co., Ltd.)
Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP
1201 New York Ave., NW
Suite 650
Washington, DC 20005
Phone/Fax: 202-783-6881 / 202-783-0405
Email: fsailer@gdlsk.com, mpardo@gdlsk.com

John M. Gurley, Esq.
Representative of Changzhou Trina Solar Energy Co., Ltd. ("Trina Solar")
Arent Fox LLP
1717 K Street, NW
Washington, DC 20036-5342
Phone/Fax: 202-857-6000 / 202-857-6395
Email: john.gurley@arentfox.com

Craig A. Lewis, Esq.
Representative of Shanghai BYD Co., Ltd.
Hogan Lovells US LLP
555 13th Street, NW
Washington, DC 20004
Phone/Fax: 202-637-5600 / 202-637-5910
Email: craig.lewis@hoganlovells.com

Matthew J. McConkey, Esq.
Representative of China Sunergy (Nanjing) Co., Ltd. ("CSUN"), Wuxi Suntech Power Co., Ltd.
("Suntech") and Motech (Suzhou Renewable Energy, Co., Ltd.
Mayer Brown LLP

1999 K Street, NW
Washington, DC 20006-1101
Phone/Fax: 202-263-3000 / 202-263-3300
Email: mmcconkey@mayerbrown.com

Robert G. Gosselink, Esq.
Representative of tenKsolar (Shanghai) Co., Ltd
Trade Pacific PLLC
719 A Street, NE
Washington, DC 20002
Phone/Fax: 202-223-3760 / 202-223-3763
Email: rgosselink@tradepacificlaw.com, jfreed@tradepacificlaw.com

Matthew T. McGrath, Esq.
Representative of Jiangyin Hareon Power Co., Ltd
Barnes, Richardson & Colburn LLP
11 Dupont Circle, NW
Suite 500
Washington, DC 20036
Phone/Fax: 202-483-0070 / 202-483-0092
Email: mmcgrath@barnesrichardson.com

Lizbeth R. Levinson, Esq.
Representative of Anji DaSol Solar Energy Science & Technology Co., Ltd. ("Anji DaSol") and Sun Earth Solar Power Co., Ltd., ("Sun Earth")
Kutak Rock LLP
1101 Connecticut Avenue, NW
Suite 10000
Washington, DC 20036-4374
Phone/Fax: 202-828-2400 / 202-828-2488
Email: lizbeth.levinson@kutakrock.com

William E. Perry, Esq.
Representative of Upsolar Global Co., Ltd., Upsolar Group, Co., Ltd. and Upsolar American, Inc.
Dorsey & Whitney LLP
701 Fifth Avenue
Suite 6100
Seattle, WA 98104-7043
Phone/Fax: 206-903-8800 / 206-903-8820
Email: perry.william@dorsey.com

Adams C. Lee, Esq.
Representative of DelSolar (Wujiang), Ltd
White & Case LLP

701 Thirteenth Street, NW
Washington, DC 20005-3807
Phone/Fax: 202-626-3600 / 202-639-9355
Email: alee@whitecase.com

Daniel L. Porter, Esq.
Representative of Ministry of Commerce, People's Republic of China, Bureau of Fair Trade for Imports and Exports ("BOFT")
Curtis, Mallet-Prevost, Colt & Mosle LLP
1717 Pennsylvania Ave., NW
Washington, DC 20006
Phone/Fax: 202-452-7373 / 202-452-7333
Email: internationaltrade@curtis.com

Deen Kaplan, Esq.
Representative of NextEra Energy
Hogan Lovells US LLP
555 Thirteenth Street, NW
Washington,DC 20004
Phone/Fax: 202-637-5600 / 202-637-5910
Email: deen.kaplan@hoganlovells.com

Edmund W. Sim, Esq.
Representative of ReneSola Jiangsu Ltd. ("ReneSola")
Appleton Luff PTE Ltd
1025 Connecticut Avenue, NW
Suite 1000
Washington, DC 20036
Phone/Fax: 301-649-2149 / 202-449-4129
Email: sim@appletonluff.com, slater@appletonluff.com

Thomas Peele, Esq
Representative of Jiangsu Shunfeng Photovoltaic Technology Co., Ltd. ("Shunfeng")
Baker & McKenzie
815 Connecticut Avenue, N.W.
Washington, DC 20006
Phone/Fax: 202-452-7000 / 202-452-7074
Email: thomas.peele@bakermckenzie.com

David A. Riggle, Esq.
Representative of Chint Solar (Zhejiang) Co., Ltd., Ningbo Qixin Solar Electrical Appliance Co., Ltd., Perlight Solar Co., Ltd., Hangzhou Zhejiang University Sunny Energy Science and Technology Co., Ltd., Wanxing Import & Export Co., Ltd.
Riggle & Craven

5515 North Cumberland Avenue
Suite 803
Chicago, Illinois 60656
Phone/Fax: 312-368-8787 / 312-368-0939
Email: riggle@tradelaw.com

Lifern Dai
Representative of Shanghai JA Solar Technology Co., Ltd.; Hefei JA Solar Technology Co., Ltd.
Gaopeng & Partners
28th/F, Silver Tower, 2 North Dongsanhuan Road
Beijing 100027, People's Republic of China
Phone/Fax: +8610-59241188 / +8610-59241199
Email: lifern.dai@gaopenglaw.com

Daniel J. Gerkin
*Counsel to SunPower Corporation*

# TAB 10

# Supplement to SunPower Corporation's Separate Rate Application (July 23, 2014)

Barcode:3217199-01 A-570-010 INV - Investigation -

K&L GATES

K&L GATES LLP
1601 K STREET, N.W.
WASHINGTON, DC 20006
T +1 202 778 9000 F +1 202 778 9100 klgates.com

July 23, 2014

Daniel Gerkin
daniel.gerkin@klgates.com

T +1 202 778 9168

**PUBLIC VERSION**

Case No. A-570-010
Total Pages: 11
Investigation
POI: 04/01/13–09/30/13
Office VII, AD/CVD Operations,
Enforcement and Compliance
Business Proprietary Information Has Been Ranged or Deleted

***The Business Proprietary Version of this Submission May Be Released Under APO***

**VIA IA ACCESS**

The Honorable Penny S. Pritzker
Secretary of Commerce
Attn: Enforcement and Compliance
APO/Docket Unit, Room 1870
U.S. Department of Commerce
14th Street and Constitution Ave, N.W.
Washington, DC 20230

Attn: Mr. Jeffrey Pedersen
Mr. Howard Smith

**Re: Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: Supplement to SunPower Corporation's Separate Rate Application**

Dear Secretary Pritzker:

On behalf of SunPower Corporation, 77 Rio Robles, San Jose, CA 95134 ("SunPower"), we hereby supplement certain information previously provided in SunPower's Separate Rate Application and SunPower's response to the Department's Request for Information dated May

Filed By: daniel.gerkin@klgates.com, Filed Date: 7/23/14 1:40 PM, Submission Status: Approved

15, 2014 to ensure that the record of the above-captioned investigation appropriately is clarified in advance of the Department's preliminary determination.

SunPower explained in its Separate Rate Application that during the period covered by the investigation, SunPower was involved in a tolling arrangement with Jiawei Solarchina Co., Ltd., based in Hong Kong ("Jiawei"). The tolling arrangement was for the assembly of modules incorporating crystalline silicon photovoltaic ("CSPV") cells that were exported to SunPower and/or SunPower's wholly owned subsidiary, SunPower Corporation, Systems ("SunPower Systems"), in the United States. Jiawei's wholly owned mainland China subsidiary, SunEnergy (S.Z.) Co., Ltd. ("SunEnergy"), performed the tolling services on behalf of Jiawei. Under this tolling arrangement, SunPower Systems SARL ("SunPower Switzerland"), consigns raw materials and components, including CSPV cells manufactured by SunPower affiliates in Malaysia or the Philippines, to the Chinese toller, SunEnergy. SunPower's Separate Rate Application further explained that while each of the CSPV modules sold by Jiawei for export to the United States incorporated non-Chinese CSPV cells, certain of the CSPV cells produced by SunPower's affiliates in Malaysia and the Philippines that are used by SunEnergy may have incorporated Chinese-origin wafers, which we understand would make the Chinese-assembled modules subject to the present antidumping and countervailing duty investigations. We noted that the CSPV cells that are produced by SunPower's affiliates in Malaysia and the Philippines and used by SunEnergy incorporate wafers from a number of countries, including China, but that the CSPV cell producers generally have not tracked the origin of the wafers used in the CSPV cells' production. Accordingly, SunPower presumed for purposes of this investigation that all CSPV modules exported to the United States under the tolling arrangement during the period of

investigation were within the scope of the present antidumping and countervailing duty investigations.

In SunPower's response to the Department's Request for Information dated May 15, 2014, SunPower stated that [ ] of the wafers for the CSPV cells manufactured by its affiliates in Malaysia and the Philippines, which, in turn, are consigned to SunEnergy, are sourced in China. SunPower reiterated that SunPower's affiliates have not tracked the origin of the wafers used in CSPV cell production, and, accordingly, SunPower is continuing to presume for purposes of this investigation that all CSPV modules exported to the United States under the tolling arrangement during the period of investigation were within the scope of the present antidumping duty and countervailing duty investigations. SunPower stated in its response that it was endeavoring to develop additional information to substantiate its assertion that at least some percentage of the modules assembled by SunEnergy and exported by Jiawei or SunEnergy to SunPower and/or SunPower Systems during the period of investigation are, in fact, subject to the scope of the present investigations.

SunPower's efforts to date have confirmed that [ ] of the cells used in SunPower's global module production include Chinese-origin wafers, but SunPower more specifically has determined that approximately [ ] of the cells that SunEnergy receives from SunPower's affiliates in Malaysia and the Philippines to assemble the modules in China pursuant to the tolling arrangement incorporate Chinese-origin wafers.

Accordingly, we believe it is reasonable for the Department, like SunPower, to presume that certain of the modules exported under the tolling arrangement to the United States during the period of investigation constituted subject merchandise, and that SunPower, to the extent the

Case 1:15-cv-00067-DCP Document 93 Filed 04/04/16 Page 147 of 161

Department decides to treat it as an exporter for purposes of the investigation, should qualify for a separate rate. SunPower recognizes that it and its affiliated cell producers are responsible for tracking any Chinese-origin wafers through cell production to ensure that future module shipments properly are declared to U.S. Customs and Border Protection ("CBP") as being subject to the investigations and any ensuing orders, as necessary, including in accordance with any certification protocol established by the Department and CBP.

*******

Pursuant to 19 C.F.R. § 351.304(a), SunPower requests proprietary treatment for the information designated by single brackets ("[ ]"). This submission is marked "Business Proprietary Treatment Requested" in accordance with 19 C.F.R. § 351.303(d)(2)(v). SunPower requests confidential treatment because such information consists of terms of sale, pricing, and other financial data the release of which to the public would cause substantial harm to the competitive position of SunPower. *See* 19 C.F.R. 351.105(c)(4), (c)(5), and (c)(11). SunPower consents to the release of this information under the Administrative Protective Order ("APO") issued by the Department in this investigation. *See* 19 C.F.R. § 351.304(b). In addition, SunPower separately is submitting a public version of this submission, which includes a public summary of the proprietary information and in which the information for which confidential treatment is requested has been ranged or deleted. *See* 19 C.F.R. § 351.304(c).

In accordance with the Department's regulations, we are filing this submission through IA ACCESS at http://iaacess.trade.gov and are serving today each of the parties identified on the attached Certificate of Service via courier or first class mail, postage prepaid.

Case 1:15-cv-00067-DCP Document 66-2 Filed 10/13/15 Page 149 of 156

**Public Version**

Should the Department have any questions regarding this submission or require any additional information, please do not hesitate to contact the undersigned at (202) 778-9168 or daniel.gerkin@klgates.com.

Respectfully submitted,

Daniel J. Gerkin
*Counsel to SunPower Corporation*

COMPANY CERTIFICATION

I, Michael Holland, Commercial Counsel, currently employed by **SunPower Corporation**, certify that I prepared or otherwise supervised the preparation of the attached submission of the **Supplement to SunPower Corporation's Separate Rate Application** filed on **July 23, 2014** pursuant to the antidumping investigation of **Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China, A-570-010.** I certify that the public information and any business proprietary information of **SunPower Corporation** contained in this submission is accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: [signature]

Date: 23 July 2014

# REPRESENTATIVE CERTIFICATION

I, **Daniel J. Gerkin**, with **K&L Gates LLP**, **Counsel to SunPower Corporation**, certify that I have read the attached submission of the **Supplement to SunPower Corporation's Separate Rate Application** filed on **July 23, 2014** pursuant to the antidumping investigation of **Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China, A-570-010.** In my capacity as **Counsel** of this submission, I certify that the information contained in this submission is accurate and complete to the best of my knowledge. I am aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: Daniel J. Gerkin

Date: 7/23/14

## PUBLIC CERTIFICATE OF SERVICE

**Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China Investigation**
**POI: 04/01/13–09/30/13**

I, **Daniel J. Gerkin**, with **K&L Gates LLP**, **Counsel** to **SunPower Corporation**, certify that on this 23rd day of July, 2014, I have caused to be served a true and correct copy of the foregoing submission upon the following parties, via first-class mail, postage prepaid:

Timothy C. Brightbill, Esq.
Representative of SolarWorld Industries America Inc
Wiley Rein LLP
1776 K Street, NW
Washington, DC 20006

Gregory S. McCue, Esq.
Representative of Suniva, Inc. ("Suniva")
Steptoe & Johnson LLP
1330 Connecticut Street, NW
Washington, DC 20036

Neil R. Ellis, Esq.
Representative of Canadian Solar Inc. ("Canadian Solar") and Yingli Green Energy Holdings Company Limited ("YGE") and Yingli Green Energy Americas, Inc. ("YGEA") ("Yingli")
Sidley Austin LLP
1501 K Street, NW
Washington, DC 20005

David S. Christy, Jr. Esq.
Representative of SunEdison, Inc. ("SunEdison")
Perkins Coie LLP
700 13th Street, NW
Washington, DC 20005-3960

Gregory S. Menegaz, Esq.
Representative of Dongfang Electric (Yixing) MAGI Solar Power Technology Co., Ltd., Jiangsu Sunlink PV Technology Co., Ltd., Shenzhen Topray Solar Co. Ltd., LDK Solar Hi-Tech (Nanchang) Co., Ltd., Risen Energy Co., Ltd., Sumec Hardware & Tools Co., Ltd., CSG PVTech Co., Ltd., ET Solar Industry Limited, Lightway Green New Energy Co., Ltd., Changzhou Almaden Co., Ltd., Shenzhen Sungold Solar Co., Ltd., Dongguan Sunworth Solar Energy Co., Ltd.
deKieffer & Horgan PLLC

1455 Pennsylvania Avenue
Suite 900B
Washington, DC 20004

Francis J. Sailer, Esq.
Representative of Hanwha Solarone (Qidong) Co., Ltd., Hanwha Solarone Hong Kong Limited ("Hanwha"), and Asun Energy Co Ltd. (a/k/a Suzhou Asun Energy Co., Ltd.)
Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP
1201 New York Ave., NW
Suite 650
Washington, DC 20005

John M. Gurley, Esq.
Representative of Changzhou Trina Solar Energy Co., Ltd. ("Trina Solar")
Arent Fox LLP
1717 K Street, NW
Washington, DC 20036-5342

Craig A. Lewis, Esq.
Representative of Shanghai BYD Co., Ltd.
Hogan Lovells US LLP
555 13th Street, NW
Washington, DC 20004

Matthew J. McConkey, Esq.
Representative of China Sunergy (Nanjing) Co., Ltd. ("CSUN"), Wuxi Suntech Power Co., Ltd. ("Suntech") and Motech (Suzhou Renewable Energy, Co., Ltd.
Mayer Brown LLP
1999 K Street, NW
Washington, DC 20006-1101

Robert G. Gosselink, Esq.
Representative of tenKsolar (Shanghai) Co., Ltd
Trade Pacific PLLC
719 A Street, NE
Washington, DC 20002

Lizbeth R. Levinson, Esq.
Representative of Anji DaSol Solar Energy Science & Technology Co., Ltd. ("Anji DaSol") and Sun Earth Solar Power Co., Ltd., ("Sun Earth")
Kutak Rock LLP
1101 Connecticut Avenue, NW
Suite 10000
Washington, DC 20036-4374

Daniel J. Gerkin, Esq.
Representative of SunPower Corporation
K&L Gates LLP
1601 K Street, NW
Washington, DC 20006

William E. Perry, Esq.
Representative of Upsolar Global Co., Ltd., Upsolar Group, Co., Ltd. and Upsolar American, Inc.
Dorsey & Whitney LLP
701 Fifth Avenue
Suite 6100
Seattle, WA 98104-7043

Adams C. Lee, Esq.
Representative of DelSolar (Wujiang), Ltd
White & Case LLP
701 Thirteenth Street, NW
Washington, DC 20005-3807

Daniel L. Porter, Esq.
Representative of Ministry of Commerce, People's Republic of China, Bureau of Fair Trade for
Imports and Exports ("BOFT")
Curtis, Mallet-Prevost, Colt & Mosle LLP
1717 Pennsylvania Ave., NW
Washington, DC 20006

Deen Kaplan, Esq.
Representative of NextEra Energy
Hogan Lovells US LLP
555 Thirteenth Street, NW
Washington,DC 20004

Edmund W. Sim, Esq.
Representative of ReneSola Jiangsu Ltd. ("ReneSola")
Appleton Luff PTE Ltd
1025 Connecticut Avenue, NW
Suite 1000
Washington, DC 20036

Thomas Peele, Esq
Representative of Jiangsu Shunfeng Photovoltaic Technology Co., Ltd. ("Shunfeng")
Baker & McKenzie
815 Connecticut Avenue, N.W.
Washington, DC 20006

Case 1:15-cv-00067-DCP Document 93 Filed 04/04/16 Page 154 of 161

David A. Riggle, Esq.
Representative of Chint Solar (Zhejiang) Co., Ltd., Ningbo Qixin Solar Electrical Appliance Co., Ltd., Perlight Solar Co., Ltd., Hangzhou Zhejiang University Sunny Energy Science and Technology Co., Ltd., Wanxing Import & Export Co., Ltd.
Riggle & Craven
5515 North Cumberland Avenue
Suite 803
Chicago, Illinois 60656

Lifern Dai
Representative of Shanghai JA Solar Technology Co., Ltd.; Hefei JA Solar Technology Co., Ltd.
Gaopeng & Partners
28th/F, Silver Tower, 2 North Dongsanhuan Road
Beijing 100027, People's Republic of China

Jeffrey S. Neeley, Esq.
Representative of Jiangyin Hareon Power Co., Ltd. ("Jiangyin Hareon")
Husch Blackwell LLP
750 17th Street, NW
Suite 900
Washington, DC 20006

Alexander H. Schaefer, Esq.
Representative of Jinko Solar Co., Ltd., Jinko Solar Import & Export Co., Ltd. and JinkoSolar (U.S.) Inc., (collectively, "Jinko Solar")
Crowell & Moring LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004-2595

Daniel J. Gerkin
*Counsel to SunPower Corporation*

# TAB 11

**Memorandum to All Interested Parties Regarding Antidumping and Countervailing Duty Investigations of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and the Antidumping Duty Investigation of Certain Crystalline Silicon Photovoltaic Products from Taiwan:  Opportunity to Submit Scope Comments (Oct. 3, 2014)**

Barcode:3233173-01 A-570-010

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-570-010
C-570-011
A-583-853
Investigations
**Public Document**
E&C/IV: HS

October 3, 2014

TO ALL INTERESTED PARTIES

Re: Antidumping and Countervailing Duty Investigations of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and the Antidumping Duty Investigation of Certain Crystalline Silicon Photovoltaic Products from Taiwan: Opportunity to Submit Scope Comments

Interested parties have submitted comments on the scopes of the above-referenced antidumping duty (AD) and countervailing duty (CVD) investigations, including certain concerns about the scope's administrability and enforcement. In response, the Department is considering the possibility of the scope clarification described below and is providing interested parties with an opportunity to submit comments. Currently, the scopes of the AD and CVD investigations of certain crystalline silicon photovoltaic products from the People's Republic of China (PRC) and the scope of the AD investigation of certain crystalline silicon photovoltaic products from Taiwan contain the following language:

> For purposes of this investigation, subject merchandise includes modules, laminates and/or panels assembled in the subject country consisting of crystalline silicon photovoltaic cells that are completed or partially manufactured within a customs territory other than that subject country, using ingots that are manufactured in the subject country, wafers that are manufactured in the subject country, or cells where the manufacturing process begins in the subject country and is completed in a non-subject country.

Specifically, we are considering a scope clarification that would make the following points:

- For the PRC investigations, subject merchandise includes all modules, laminates and/or panels assembled in the PRC that contain crystalline silicon photovoltaic cells produced in a customs territory other than the PRC.
- For the Taiwan investigation, subject merchandise includes all modules, laminates and/or panels assembled in Taiwan consisting of crystalline silicon photovoltaic cells produced in Taiwan or a customs territory other than Taiwan.[1] In addition, subject merchandise will include modules, laminates, and panels assembled in a third-

[1] The scope of the Taiwan investigation and the PRC investigations would continue to exclude any products covered by the existing AD and CVD orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the PRC.

Filed By: Patrick O'connor, Filed Date: 10/3/14 4:41 PM, Submission Status: Approved



country, other than the PRC, consisting of crystalline silicon photovoltaic cells produced in Taiwan.

Attached is the current scope language with draft edits that reflect language to implement the clarifications we are considering.  In addition to addressing the substance of the above contemplated clarifications, interested parties may also comment on the edits to the scope language that we are considering and/or propose alternative scope language to use if the Department were to implement such clarifications for purposes of the final determinations and any potential orders.  Interested parties should submit their comments with their case briefs.

Sincerely,

Howard Smith
Program Manager, Office IV
AD/CVD Operations
Enforcement and Compliance

## Attachment

**Draft - China Scope of the Investigation**

The merchandise covered by this investigation is ~~crystalline silicon photovoltaic cells, and~~ modules, laminates and/or panels consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including building integrated materials. For purposes of this investigation, subject merchandise ~~also~~ includes modules, laminates and/or panels assembled in the ~~subject country~~ *People's Republic of China* consisting of crystalline silicon photovoltaic cells ~~that are completed or partially manufactured within~~ *produced in* a customs territory other than *the People's Republic of China* ~~that subject country, using ingots that are manufactured in the subject country, wafers that are manufactured in the subject country, or cells where the manufacturing process begins in the subject country and is completed in a non-subject country~~.

Subject merchandise includes *modules, laminates and/or panels assembled in the People's Republic of China consisting of* crystalline silicon photovoltaic cells of thickness equal to or greater than 20 micrometers, having a p/n junction formed by any means, whether or not the cell has undergone other processing, including, but not limited to, cleaning, etching, coating, and/or addition of materials (including, but not limited to, metallization and conductor patterns) to collect and forward the electricity that is generated by the cell.

Excluded from the scope of this investigation are thin film photovoltaic products produced from amorphous silicon (a-Si), cadmium telluride (CdTe), or copper indium gallium selenide (CIGS). Also excluded from the scope of this investigation are any products covered by the existing antidumping and countervailing duty orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the People's Republic of China. See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order, 77 FR 73018 (December 7, 2012); Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Countervailing Duty Order, 77 FR 73017 (December 7, 2012).

Also excluded from the scope of this investigation are *modules, laminates and/or panels assembled in the People's Republic of China, consisting of* crystalline silicon photovoltaic cells, not exceeding 10,000mm$^2$ in surface area, that are permanently integrated into a consumer good whose function is other than power generation and that consumes the electricity generated by the integrated crystalline silicon photovoltaic cell. Where more than one *module* ~~cell~~ is permanently integrated into a consumer good, the surface area for purposes of this exclusion shall be the total combined surface area of all *modules* ~~cells~~ that are integrated into the consumer good.

Merchandise covered by this investigation is currently classified in the Harmonized Tariff Schedule of the United States (HTSUS) under subheadings 8501.61.0000, 8507.20.8030, 8507.20.8040, 8507.20.8060, 8507.20.8090, 8541.40.6020, 8541.40.6030 and 8501.31.8000. These HTSUS subheadings are provided for convenience and customs purposes; the written description of the scope of this investigation is dispositive.

**Draft - Taiwan Scope of the Investigation**

The merchandise covered by this investigation is crystalline silicon photovoltaic cells, and modules, laminates and/or panels consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including building integrated materials. For purposes of this investigation, subject merchandise ~~also~~ includes modules, laminates and/or panels assembled in ~~the subject country~~ *Taiwan* consisting of crystalline silicon photovoltaic cells ~~that are completed or partially manufactured within~~ *produced in Taiwan or* a customs territory other than *Taiwan* ~~that subject country, using ingots that are manufactured in the subject country, wafers that are manufactured in the subject country, or cells where the manufacturing process begins in the subject country and is completed in a non-subject country~~. *Subject merchandise also includes modules, laminates, and panels assembled in a third-country other than the People's Republic of China consisting of crystalline silicon photovoltaic cells produced in Taiwan.*

Subject merchandise includes crystalline silicon photovoltaic cells of thickness equal to or greater than 20 micrometers, having a p/n junction formed by any means, whether or not the cell has undergone other processing, including, but not limited to, cleaning, etching, coating, and/or addition of materials (including, but not limited to, metallization and conductor patterns) to collect and forward the electricity that is generated by the cell.

Excluded from the scope of this investigation are thin film photovoltaic products produced from amorphous silicon (a-Si), cadmium telluride (CdTe), or copper indium gallium selenide (CIGS). Also excluded from the scope of this investigation are any products covered by the existing antidumping and countervailing duty orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the People's Republic of China. See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order, 77 FR 73018 (December 7, 2012); Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Countervailing Duty Order, 77 FR 73017 (December 7, 2012).

Also excluded from the scope of this investigation are crystalline silicon photovoltaic cells, not exceeding 10,000mm$^2$ in surface area, that are permanently integrated into a consumer good whose function is other than power generation and that consumes the electricity generated by the integrated crystalline silicon photovoltaic cell. Where more than one cell is permanently integrated into a consumer good, the surface area for purposes of this exclusion shall be the total combined surface area of all cells that are integrated into the consumer good.

Merchandise covered by this investigation is currently classified in the Harmonized Tariff Schedule of the United States (HTSUS) under subheadings 8501.61.0000, 8507.20.8030, 8507.20.8040, 8507.20.8060, 8507.20.8090, 8541.40.6020, 8541.40.6030 and 8501.31.8000.

These HTSUS subheadings are provided for convenience and customs purposes; the written description of the scope of this investigation is dispositive.