## UNITED STATES COURT OF INTERNATIONAL TRADE
### BEFORE: THE HONORABLE DONALD C. POGUE, SENIOR JUDGE

|  |  |
|---|---|
| SUNPOWER CORP., | ) |
| Plaintiff, | ) |
| and | ) **PUBLIC DOCUMENT** |
| CANADIAN SOLAR INC., *et. al.,* | ) |
| Plaintiff-Intervenors, | ) Consol. Court No. 15-00067 |
| v. | ) |
| THE UNITED STATES, | ) |
| Defendant, | ) |
| and | ) |
| SOLARWORLD AMERICAS, INC., | ) |
| Defendant-Intervenor. | ) |

## APPENDIX TO
## CONSOLIDATED PLAINTIFFS' JOINT REPLY BRIEF IN SUPPORT OF THEIR RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

John M. Gurley
Diana Dimitriuc Quaia
ARENT FOX LLP
1717 K Street, NW
Washington, DC 20006
(202) 857-6301

Counsel for Consolidated Plaintiffs Canadian Solar Inc., Changzhou Trina Solar Energy Co., Ltd., China Sunergy (Nanjing) Co., Ltd., Chint Solar (Zhejiang) Co., Ltd., ET Solar Industry Ltd., Hefei JA Solar Technology Co., Ltd., Jinko Solar Co., Ltd., LDK Solar Hi-Tech (Nanchang) Co., Ltd., Perlight Solar Co., Ltd., ReneSola Jiangsu Ltd., Shanghai JA Solar Technology Co., Ltd., Shenzhen Sacred Industry Co., Ltd., Shenzhen Sungold Solar Co., Ltd., Sumec Hardware & Tools Co., Ltd., Sunny Apex Development Ltd., Wuhan FYY Technology Co., Ltd., Wuxi Suntech Power Co., Ltd., Zhongli Talesun Solar Co., Ltd., Znshine PV-Tech Co., Ltd.

Craig A. Lewis
Samantha  Clark Sewall
Wesley Verne Carrington
HOGAN LOVELLS US LLP
Columbia Square Building
555 Thirteenth Street, NW.
Washington, DC 20004
(202) 637-8613

Counsel for Consolidated Plaintiffs Shanghai BYD Co., Ltd. and BYD (Shangluo) Industrial Co., Ltd.

April 5, 2016

AFDOCS/13149760.1

**SUNPOWER CORP. v. UNITED STATES**
**Consol. Court No. 15-00067**
**Before the Honorable Donald C. Pogue, Senior Judge**

**Appendix to Consolidated Plaintiffs' Reply Brief in Support of Rule 56.2 Motion**

| Tab | Document | Pages Cited | AD P.R. | CVD P.R. |
|-----|----------|-------------|---------|----------|
| 1 | Letter from Sidley Austin LLP to Commerce, Inv. Nos. A-570-010, A-583-853, and C-570-011, re: Comments on Scope on behalf of Yingli Green Energy Holding Co. Ltd., Yingli Green Energy, Americas, Inc., Canadian Solar Inc., Changzhou Trina Solar Energy Co., Ltd., Wuxi Suntech Power Co., Ltd., Shanghai JA Solar Technology Co., Ltd., Hefei JA Solar Technology, Co., Ltd., and Jinko Solar Co., Ltd. and with the support of the China Chamber of Commerce for Import and Export of Machinery and Electronic Products ("CCCME") and its members (Feb. 18, 2014) | 1-2, Exhibit List, Exhibit 1, Exhibit 2 | AD P.R. 125 | CVD P.R. 88 |
| 2 | Commerce Letter to All Interested Parties, re: Opportunity to Submit Scope Comments (Oct. 3, 2014) | All | AD P.R. 765 | CVD P.R. 349 |
| 3 | Issues and Decision Memorandum for the Final Determination in the Countervailing Duty Investigation (Dec. 15, 2014) | 1, 32-41 | | CVD P.R. 388 |
| 4 | Issues and Decision Memorandum For the Final Determination of Sales at Less Than Fair Value (Dec. 15, 2014) | 1, 8-16 | AD P.R. 817 | |
| 5 | Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China, 79 Fed. Reg. 76962 (Dep't Commerce Dec. 23, 2014) (final CVD determ.) | All | | CVD P.R. 408 |
| 6 | Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China, 79 Fed. Reg. 76970 (Dep't Commerce Dec. 23, 2014) (final LTFV determ.) | All | AD P.R. 834 | |
| 7 | Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China, 80 Fed. Reg. 8592 (Dep't Commerce Feb. 18, 2015) (amended final CVD determ. and AD/CVD orders) | All | AD P.R. 853 | CVD P.R. 417 |

# TAB 1

**Letter from Sidley Austin LLP to Commerce, Inv. Nos. A-570-010, A-583-853, and C-570-011, re: Comments on Scope on behalf of Yingli Green Energy Holding Co. Ltd., Yingli Green Energy, Americas, Inc., Canadian Solar Inc., Changzhou Trina Solar Energy Co., Ltd., Wuxi Suntech Power Co., Ltd., Shanghai JA Solar Technology Co., Ltd., Hefei JA Solar Technology, Co., Ltd., and Jinko Solar Co., Ltd. and with the support of the China Chamber of Commerce for Import and Export of Machinery and Electronic Products ("CCCME") and its members (Feb. 18, 2014)**

**AD P.R. 125, CVD P.R. 88**

Barcode:3181443-01 A-570-010 INV - Investigation -

# SIDLEY

SIDLEY AUSTIN LLP

| | | |
|---|---|---|
| SIDLEY AUSTIN LLP | BEIJING | HONG KONG | SHANGHAI |
| 1501 K STREET, N.W. | BOSTON | HOUSTON | SINGAPORE |
| WASHINGTON, D.C. 20005 | BRUSSELS | LONDON | SYDNEY |
| (202) 736 8000 | CHICAGO | LOS ANGELES | TOKYO |
| (202) 736 8711 FAX | DALLAS | NEW YORK | WASHINGTON, D.C. |
| | FRANKFURT | PALO ALTO | |
| | GENEVA | SAN FRANCISCO | |

nellis@sidley.com
202.736.8075

FOUNDED 1866

## PUBLIC DOCUMENT

February 18, 2014

The Honorable Penny Pritzker
Secretary of Commerce
U.S. Department of Commerce
Constitution Avenue & 14th Street, NW
Washington, DC 20230

Case Nos.: A-570-010, A-583-853, and
C-570-011
Number of Pages: 89
Investigation

Attention:     Enforcement and Compliance
               APO/Dockets Unit, Room 1870

**THIS DOCUMENT CONTAINS NO
PROPRIETARY INFORMATION**

Re:     Certain Crystalline Silicon Photovoltaic Products from the People's Republic of
        China and Taiwan: Comments on Scope

Dear Madame Secretary:

On behalf of Yingli Green Energy Holding Company Limited, Yingli Green Energy Americas, Inc., Canadian Solar Inc., Changzhou Trina Solar Energy Co., Ltd., Wuxi Suntech Power Co., Ltd., Shanghai JA Solar Technology Co., Ltd., Hefei JA Solar Technology, Co., Ltd., and Jinko Solar Co., Ltd. (collectively, "Respondents"),[1] we hereby submit the following

---

[1]     This submission is made with the support of the China Chamber of Commerce for Import and Export of Machinery and Electronic Products ("CCCME"). CCCME represents 90 major Chinese producers and exporters of crystalline silicon photovoltaic ("CSPV") products, including the companies listed above, as well as Sumec Hardware & Tools Co. Ltd, ET Solar Group, ReneSola Ltd., Wuhan FYY Technology Co., Ltd., Jetion Solar (China) Co., Ltd., Tainergy Tech (KunShan) Co., Ltd., Realforce Power Co., Ltd., Lightway Green New Energy Co., Ltd., and Shenzhen Sungold Solar Co., Ltd.

Barcode:3181443-01 A-570-010 INV - Investigation  -

# SIDLEY

SIDLEY AUSTIN LLP

Honorable Penny Pritzker
February 18, 2014
Page 2

comments regarding the product coverage of the above-captioned investigations.[2]  According to

the Department's letter dated February 4, 2014, comments on product coverage are due by

today's date.

      For the reasons discussed herein, Respondents submit that the first paragraph of the scope

of these investigations as currently defined is untenable.  The product scope description in that

paragraph should be modified to include only CSPV cells, and modules, laminates and/or panels

consisting of CSPV cells, which originate in a subject country based on the application of the

Department's "substantial transformation" test for determining country of origin.  Moreover,

Respondents note that when that test is applied, given that CSPV cells and modules from China

are already covered by the existing antidumping ("AD") and countervailing duty ("CVD") orders

and explicitly excluded from the scope of these investigations, no merchandise from China

remains within the scope of these investigations, and therefore these investigations should be

immediately terminated with respect to China.

      Respondents proceed below by: first, discussing the relevant background; second,

explaining why the country of origin of CSPV cells, and therefore also the country of origin of a

CSPV module, is properly the country in which the CSPV cells are produced; and third,

explaining why Petitioner's proposed scope is untenable and should be rejected.

---

[2]    *See Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and Taiwan: Initiation of Antidumping Duty Investigations*, 79 Fed. Reg. 4661, 4662 (January 29, 2014) ("AD Notice of Initiation"); *Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: Initiation of Countervailing Duty Investigation*, 79 Fed. Reg. 4667, 4668 (January 29, 2014) ("CVD Notice of Initiation").

Barcode:3181443-01 A-570-010 INV - Investigation  -

## EXHIBIT LIST

**Exhibit 1**      **Excerpts from CSPV Cells and Modules from China, IDM**

**Exhibit 2**      **CSPV Cells and Modules from China, Scope Clarification Memo**

**Exhibit 3**      **Excerpts from SolarWorld's Post-Conference Brief**

**Exhibit 4**      **Commission Implementing Regulation (EU) No 1357/2013**

**Exhibit 5**      **Excerpts from SolarWorld's Case Brief on General Issues**

Barcode:3181443-01 A-570-010 INV - Investigation  -

# Exhibit 1

Excerpts from CSPV Cells and
Modules from China, IDM

Barcode:3181443-01 A-570-979 INV - Investigation -



**UNITED STATES DEPARTMENT OF COMMERCE**
**International Trade Administration**
Washington, D.C. 20230

A-570-979
POI: 04/01/11-09/30/11
**Public Document**
AD/CVD O4: Team

October 9, 2012

| | |
|---|---|
| **MEMORANDUM TO:** | Paul Piquado<br>Assistant Secretary<br> for Import Administration |
| **FROM:** | Christian Marsh <br>Deputy Assistant Secretary<br> for Antidumping and Countervailing Duty Operations |
| **SUBJECT:** | Issues and Decision Memorandum for the Final Determination in the Antidumping Duty Investigation of Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China |

**SUMMARY:**

We have analyzed the case briefs, and rebuttal briefs, submitted by interested parties in the AD duty investigation of solar cells from the PRC. As a result of our analysis, we have made changes to the *Preliminary Determination*.

We recommend that you approve the positions described in the "Discussion of the Issues" section of this Issues and Decision Memorandum. Below is the complete list of the issues in this AD investigation for which we received comments.

**Case Issues:**

General Issues

Comment 1:   Scope of the Investigation
Comment 2:   Selection of Surrogate Financial Statements
Comment 3:   Date of Sale
Comment 4:   Surrogate Country
Comment 5:   Labor Rate
Comment 6:   Separate Rates
Comment 7:   Overhead Items
Comment 8:   Exclusion of Import Data with Values but Quantities of Zero
Comment 9:   Surrogate Value for Wafers
Comment 10:  Critical Circumstances
Comment 11:  Allegations of Fraud



Barcode:3181443-01 A-570-010 INV - Investigation  -

Comment 12:  Application of *Sigma*
Comment 13:  Double Remedies and Concurrent AD and CVD Investigations
Comment 14:  Collection of Antidumping Duties
Comment 15:  Surrogate Value for Quartz Crucibles
Comment 16:  Surrogate Value for Aluminum Frames
Comment 17:  Surrogate Value for Tin Ribbon
Comment 18:  Surrogate Value for Glass Plate for Wafer Slicing

<u>Issues Relating To Trina</u>

Comment 19:  Unreported FOPs by Cell Suppliers and Tollers
Comment 20:  Ocean Freight Expenses
Comment 21:  Errors Identified at Trina U.S.'s Verification
Comment 22:  Source for Barge Freight
Comment 23:  Whether to Apply NME Freight Charges to All of Trina's Sales
Comment 24:  Surrogate Value for Polysilicon
Comment 25:  Surrogate Value for Suspension
Comment 26:  Surrogate Value for Trina's Back Sheet

<u>Issues Relating To Wuxi Suntech</u>

Comment 27:  Whether Partial AFA Should be Used in Place of Unreported FOPs
             for Modules Assembled Under Back-to-Back Agreements
Comment 28:  Whether Suntech America's Product Recall Expenses Should be
             Included In Indirect Selling Expenses
Comment 29:  Exclusion of South Korean MEP Data
Comment 30:  Acceptance of Minor Corrections Submitted at Verification
Comment 31:  Exclusion of Sample Sales from the Margin Calculation
Comment 32:  Valuing Inputs from NME Suppliers When the Inputs Were Used in Further
             Manufacturing
Comment 33:  Whether Partial AFA Should be Applied to Value Labor and Energy
             for Tolled Modules
Comment 34:  Whether the ISE Rate Should be Applied to Gross Unit Price Less
             Billing Adjustments and Early Payment Discounts
Comment 35:  Suntech Arizona Financial Expense Rate
Comment 36:  Whether Suntech America's Bad Debt Expense Should be Included
Comment 37:  Verification Findings
Comment 38:  Whether Certain Reported Market Economy Purchases Were Purchased from a
             Market Economy Supplier
Comment 39:  Surrogate Value for PEG
Comment 40:  Surrogate Value for Silica Purge of Liquid (IPA)
Comment 41:  Surrogate Value for Hydrochloric Acid
Comment 42:  Diamond Wire Saw Blade Surrogate Value
Comment 43:  Whether Back-to-Back Arrangements Should be Considered
             Purchases or Tolling

Filed By: nellis@sidley.com, Filed Date: 2/18/14 1:23 PM, Submission Status: Approved

Barcode:3181443-01 A-570-010 INV - Investigation -

Issues Relating to Other Respondents

Comment 44:  Voluntary Respondent Treatment of Yingli
Comment 45:  Treatment of Jiasheng's Separate Rate Application
Comment 46:  Treatment of Chaori's Separate Rate Application

**Background:**

The Department published its preliminary determination of sales at LTFV, postponement of final determination, and affirmative preliminary determination of critical circumstances on May 25, 2012.[1]  On May 22 and 25, 2012, Delsolar Co., Ltd./DelSolar (Wujiang) Ltd. and JinkoSolar International Limited, respectively submitted requests that the Department correct errors in their company names that appeared in the *Preliminary Determination*.[2]  The Department made the requested corrections and published its *Preliminary Determination Correction* notice on June 25, 2012.[3]

Between May 28, 2012 and June 25, 2012, the Department conducted verifications of the mandatory respondents Wuxi Suntech, Trina, and certain of their affiliates.[4]

Between July 9, 2012, and July 26, 2012, Wuxi Suntech, Trina, and Petitioner submitted SV and rebuttal SV comments.

On July 24, 2012, and July 23, 2012, respectively, Wuxi Suntech and Trina submitted revised U.S. sales and FOP databases per the Department's request to provide updated databases reflecting the results of verification.

On July 30, 2012, Wuxi Suntech, Trina, Petitioner, Yingli, Jiasheng, Chaori, and the GOC submitted case briefs.  On July 31, 2012, Small Steps Solar, Ltd. submitted a case brief, which the Department rejected because it was untimely filed.[5]  Subsequently, the Department rejected Yingli's case brief because it contained certain new factual information.[6]  Yingli resubmitted its redacted case brief on August 3, 2012.[7]  On August 6, 2012, Wuxi Suntech, Trina, Petitioner,

---

[1] *See Preliminary Determination*.
[2] *See* Letter from JinkoSolar International Limited to the Department regarding, "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China; Ministerial Error in Preliminary Determination," dated May 25, 2012. *See also* Letter from DelSolar Co., Ltd. and DelSolar (Wujiang) Ltd. to the Department regarding, "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Request for Correction," dated May 22, 2012.
[3] *See Preliminary Determination Correction*.
[4] *See* the "Verification" section below.
[5] *See* Letter from the Department to Small Steps Solar, Ltd., regarding "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Small Steps Solar, Ltd.'s July 31, 2012, Submission," dated August 3, 2012.
[6] *See* Letter from the Department to Yingli, regarding "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: July 30, 2012 Case Brief of Yingli Green Energy Holding Company Limited and Yingli Green Energy Americas, Inc.," dated August 2, 2012.
[7] *See* Letter from Yingli to the Department, regarding "Crystalline Silicon Photovoltaic Celis, Whether or Not Assembled into Modules, from the People's Republic of China: Resubmission of Yingli's Case Brief," dated August 3, 2012.

Filed By: nellis@sidley.com, Filed Date: 2/18/14 1:23 PM, Submission Status: Approved

tenKsolar, SunPower, and Sumec Hardware *et al.*[8] submitted rebuttal briefs.  Further, Wuxi
Suntech, Trina, and Yingli jointly submitted a rebuttal brief on August 6, 2012.

On June 25, 2012, Wuxi Suntech, Trina, Petitioner, and Yingli requested a hearing.  Based on
these hearing requests, on August 14, 2012, the Department held a public hearing limited to
issues raised in the case briefs and the rebuttal briefs.

On September 7, 2012, Petitioner requested that the Department re-open the record to consider
new recently available public information which indicates that Wuxi Suntech submitted
potentially fraudulent financial statements to the Department.[9]  On September 11, 2012, the
Department reopened the record for parties to comment on Petitioner's allegation of fraud.  On
September 14, 2012 and September 18, 2012, Wuxi Suntech and Petitioner filed comments and
rebuttal comments, respectively, regarding the fraud issue raised by Petitioner.

## DISCUSSION OF THE ISSUES[10]

## GENERAL ISSUES

### Comment 1:  Scope of the Investigation

*Petitioner*
- All modules assembled in the PRC, regardless of the country in which the solar cell was
  manufactured, should be included in the scope of the investigation because, *inter alia*:
  (1) the Department is legally required to give effect to the intent of the petition which was
  to cover modules from the PRC; (2) doing so will facilitate effective enforcement by CBP
  and prevent circumvention; (3) all PRC modules, regardless of the origin of the cells, are
  dumped into the United States; (4) the PRC module industry benefits from subsidies; (5)
  circumvention will be prevented and; (6) competition, and, consequently, price setting,
  occurs primarily in the module distribution channel.
- The Department's preliminary substantial transformation analysis is flawed.  First, it was
  based on a two-stage production process (cell and module production) when there are
  actually three production stages (wafer, cell, and module production).  When wafer
  production is viewed as a separate process from cell production, cell production becomes
  the least costly of the three stages.  Second, the Department considered the cell as the
  essential active component of the module but both cells and modules are essential active
  components of the finished product.  Third, the Department should not conduct a linear

---

[8] The following separate rate companies jointly submitted a rebuttal brief: Sumec Hardware & Tools Co., Ltd.,
Ningbo Etdz Holdings Ltd., LDK Solar Hi-Tech (Nanchang) Co., Ltd., LDK Solar Hi-Tech (Suzhou) Co., Ltd.,
Ningbo Qixin Solar Electrical Appliance Co., Ltd., Ningbo Komaes Solar Technology Co., Ltd., Zhejiang Jiutai
New Energy Co., Ltd., ET Solar Industry Limited, JingAo Solar Co., Ltd., Dongfang Electric (Yixing) MAGI Solar
Power Technology Co., Ltd., Shanghai JA Solar Technology Co., Ltd., Jiangsu Sunlink PV Technology Co., Ltd.,
and JA Solar Technology Yangzhou Co., Ltd.
[9] *See* Letter from Petitioner to the Department, regarding "Crystalline Silicon Photovoltaic Cells, Whether or Not
Assembled into Modules, from the People's Republic of China: Request to Reopen the Records to New Factual
Information," dated September 7, 2012.
[10] A list of abbreviations, acronyms, and full cites to documents is at the end of this memorandum.

substantial transformation analysis but refine its substantial transformation test by focusing on the country where the aggregate of production occurs.
- Alternatively, the Department should clarify the scope to cover PRC modules containing wafers that were converted into solar cells in third countries in order to prevent PRC exporters from avoiding dumping duties by producing wafers in the PRC, sending them to a third country to be processed into solar cells, and assembling those solar cells into modules in the PRC before exporting them to the United States.

*Respondents Canadian Solar et al.,[11] Sumec Hardware et al.[12], TenKsolar and SunPower*
- The Department should maintain the scope of the investigation as defined in the *Preliminary Determination* by continuing to exclude modules, laminates, and panels produced in the PRC from solar cells produced in a third country because: (1) the substantial transformation analysis used to clarify the scope is accurate, and properly avoids creating conflicting country of origin findings for a single product; (2) Petitioner's proposed alternative substantial transformation test is not supported by law or precedent; (3) the Department is not legally required to accept Petitioner's scope revision when there is an overarching reason to modify it; (4) circumvention concerns were addressed in the Department's scope clarification and the clarified scope can be administered effectively; and (5) at this late stage of the proceeding, the Department is not permitted to expand the scope to cover PRC modules containing wafers that were converted into solar cells in third countries.

**Department's Position**:  We continue to find that modules assembled in the PRC from solar cells produced in third countries are not covered by the scope of this investigation. Although generally the Department will exercise its authority to define or clarify the scope of an investigation in a manner that reflects the intent of the petition and provides the relief requested by the petitioning industry, it cannot merely accept a scope proposed by the industry when the agency's ability to administer any resulting order requires that it modify the proposed scope, which is the case here.[13]  The scope of an AD or CVD order is limited to merchandise that is produced in the country covered by the order.[14]  Thus, Petitioner's proposal that modules assembled in the PRC using solar cells produced in third countries be covered by the scope could only be accepted to the extent that it covers products determined to be of PRC origin.  In determining the country-of-origin of a product, the Department's practice has been to conduct a

---

[11] On August 6, 2012, the following respondents filed a joint rebuttal brief regarding the scope of the investigation: Canadian Solar, Inc.; Trina and its affiliate Trina U.S.; Wuxi Suntech and its affiliates, Suntech America and Suntech Arizona; and Yingli Green Energy Holding and its affiliate, Yingli Green Energy Americas.

[12] On August 6, 2012, the following respondents filed a joint rebuttal brief regarding, *inter alia*, the scope of the investigation: Sumec Hardware & Tools Co., Ltd.; Ningbo Etdz Holdings Ltd.; LDK Solar
Hi-Tech (Nanchang) Co., Ltd.; LDK Solar Hi-Tech (Suzhou) Co., Ltd.; Ningbo Qixin Solar
Electrical Appliance Co., Ltd.; Ningbo Komaes Solar Technology Co., Ltd.; Zhejiang Jiutai New Energy Co., Ltd.; ET Solar Industry Limited; JingAo Solar Co., Ltd.; Dongfang Electric (Yixing) MAGI Solar Power Technology Co., Ltd.; Shanghai JA Solar Technology Co., Ltd.; Jiangsu Sunlink PV Technology Co., Ltd.; and JA Solar Technology Yangzhou Co., Ltd. (collectively, "Sumec Hardware *et al.*").

[13] *See Ribbons from Taiwan Prelim*, 75 FR 7236, 7247 (February 18, 2010) (unchanged in *Ribbons from Taiwan Final*, 75 FR 41804 (July 19, 2010); *see also Lumber from Canada*, and accompanying Issues and Decision Memorandum at section entitled, "Scope Issues," which follows Comment 49.

[14] *See SSPC from Belgium*, and accompanying Issues and Decision Memorandum at Comment 4.

-5-

substantial transformation analysis.[15]  The CIT has upheld the Department's "substantial transformation" test as a means to carry out its country-of-origin analysis.[16]  Hence, this is the analysis that was conducted early in the investigation which we affirm in this final determination.  In its substantial transformation analysis, the Department found that solar cells are the "essential active component" that define the module/panel and that stringing third-country solar cells together and assembling them with other components into a module in the PRC does not constitute substantial transformation such that the assembled module could be considered a product of the PRC.  Contrary to Petitioner's claim, for the reasons explained below, the substantial transformation analysis performed by the Department was not flawed.

First, record evidence supports the Department's finding that the solar cell is the essential active component of the solar module.  Petitioner argues that certain physical qualities of the solar cell are changed when it is incorporated into a module, and, consequently, "both the solar cell and the components of the assembled module are essential active components of the finished product."[17]  In support of this argument, Petitioner states, *inter alia*, that an individual solar cell cannot generate a commercially significant amount of electricity until it is joined together with other cells during the module assembly process.  Petitioner further states that the processes of soldering individual solar cells together and laminating them, which occur during module assembly, changes the physical characteristics of the solar cell.  Petitioner, however, apparently misinterprets the essential component criterion of the Department's substantial transformation analysis.  Under this criterion, the Department considers whether processing in the exporting country changes the *important qualities or use of the component.*[18]  Thus, the Department's essential component analysis focused on the third-country solar cells shipped into, and processed in, the exporting country (the PRC) and the *significance* of the changes in physical qualities or use of the component that occurred as a result of the processing.  Evidence of a change or changes to the physical qualities of a component as a result of further processing does not inevitably lead to the conclusion that further processing substantially transformed the component.  In the instant investigation, the Department found that the essential component of solar modules/panels is the solar cell since the purpose of solar modules/panels is to convert sunlight into electricity and this process occurs in the solar cells.[19]  Accordingly, the Department considered whether the processing of solar cells into solar modules changes the nature or use of the solar cells.[20]  As stated in the Scope Clarification Memorandum, the Department found that a number of the *significant* physical characteristics of the solar cell were not changed during the module assembly process.[21]  As the ITC stated, "the physical characteristics and functions of

---

[15] *See, e.g., Glycine from India*, and accompanying Issues and Decision Memorandum at Comment 5; *see also SSPC from Belgium*, and accompanying Issues and Decision Memorandum at Comment 4.

[16] *See E.I. DuPont De Nemours & Company. v. United States*, 8 F. Supp. 2d 854, 858 (CIT 1998).

[17] *See* Petitioner's Case Brief at 7.

[18] *See also EPROMs*, 51 FR 39680, 39691-39692 (October 30, 1986).  Emphasis added.

[19] *See* Scope Clarification Memorandum at 6 (citing the Petition at Exhibit II-19 at 3).

[20] *See* Scope Clarification Memorandum at 6.

[21] *See* Scope Clarification Memorandum at 6-7 which states, *inter alia*, the following:
Module/panel assembly does not change the important qualities, *i.e.*, the physical or chemical characteristics, of the solar cell itself.  As stated in the original petition, solar cells are made from crystalline silicon wafers.  A dopant, which is a trace impurity element diffused into a thin layer of the wafers' surface to impart an opposite electrical orientation to the cell surface, creates the positive/negative junction that is needed for the conversion of sunlight into electricity, which is the purpose of solar cells.  Solar cells are normally coated with silicon nitride to increase light

-6-

cells and solar modules essentially are the same."[22]  Moreover, the Department noted that its finding that solar module assembly connects cells into their final end-use form but does not change the "essential active component," the solar cell, which defines the module/panel, is consistent with the Department's precedent.[23]  Accordingly, based on a consideration of record evidence and Department's precedent, the Department continues to find that the solar cell is the essential active component of the module.

Second, we disagree with Petitioner's contention that the extent of processing criterion does not support the Department's substantial transformation finding.  Petitioner believes the Department erred because it assumed modules are produced in two steps (cell production and module assembly) rather than three (wafer production, cell production, and module assembly) and alleges that out of these three steps, cell production is the least cost-intensive step.[24]  However, when considering the "extent of processing" criterion used in the substantial transformation analysis, the Department only needed to examine whether the assembly of solar cells into modules was substantial and/or significant.[25]  The Department did not need to identify each step undertaken in producing and assembling module components and then determine where the aggregate of production occurred to determine the country of origin of the module.  Petitioner's contention does not reject how the Department applies the substantial transformation test.[26]  The Department has explicitly acknowledged that solar module producers have identified more than two production stages.[27]

However, identifying the number of production stages and determining where most of these stages occur was not the issue in the Department's "extent of processing" analysis.  Rather, the Department examined the extent of processing at the module assembly stage in relation to the prior production stages and the nature of the processing at the module assembly stage to determine whether module assembly substantially transformed the solar cells such that the final product could be considered a product of the PRC.[28]  The Department concluded that the module assembly stage of production is principally an assembly process, which consists of stringing together solar cells, laminating them, and fitting them in a glass-covered aluminum frame for protection.[29]  For the reasons explained in the Scope Clarification Memorandum, the Department continues to find that the module assembly stage of production is a comparatively less sophisticated process than cell conversion or the production stages that precede it, and thus it does not substantially transform the solar cell.  We note that none of the evidence cited by

---

absorption (this results in a blue-purple color) and undergo a screening process where conductive metal is printed into the cell.  Metal conduits or busbars channel electricity generated by the cell into electricity collection points.  Citations omitted.

[22] *See* Scope Clarification Memorandum at 6 (citing *ITC Preliminary Determination* at 10).

[23] *See* Scope Clarification Memorandum at 6 (citing *EPROMs*).

[24] *See* Petitioner's Case Brief at 6.

[25] *See* Scope Clarification Memorandum at 7 (citing *Ribbons from Korea*, 69 FR 17645, 17647 (April 5, 2004).

[26] *See, e.g., EPROMs.*

[27] *See* Scope Clarification Memorandum at 7-8, states the following: Numerous interested parties, aside from Petitioner, argued that solar module/panel assembly is relatively insubstantial in terms of number of steps, inputs, research and development required, and time.  Consistent with these arguments, *Trina identified six stages of production when manufacturing solar modules/panels, five of which were dedicated to solar cell production and only one pertained to solar module/panel assembly.*  Emphasis added. Citations omitted.

[28] *See* Scope Clarification Memorandum at 7-8.

[29] *See* Scope Clarification Memorandum at 7.

Petitioner contradicts this finding.[30]  Additionally, because the Department finds that the application of its substantial transformation test is an appropriate means to resolve country-of-origin issues like the one presented in the instant investigation, the Department has not adopted Petitioner's suggestion to modify the test.

Furthermore, Petitioner's other arguments for why modules that are assembled in the PRC using third-country solar cells should be covered by the scope are not persuasive.  The Department agrees with Petitioner that the scope of these investigations always included modules from the PRC; however, as noted above, using a substantial transformation analysis the Department has determined that modules from the PRC are those that have been assembled in the PRC using solar cells produced in the PRC.  Additionally, the Department has determined that modules assembled in third countries using solar cells produced in the PRC are also PRC products covered by the scope.  While the Department will exercise its authority to define or clarify the scope of an investigation in a manner which reflects the intent of the petition and provides the relief requested by the petitioning industry, it may not accept a proposed scope that covers merchandise that originates from a third country not covered by the investigation.  As noted above, the scope of an AD or CVD order is limited to subject merchandise that originates in the country covered by the investigation.[31]  Petitioner argues that all modules assembled in the PRC must be covered by the scope, regardless of the origin of the solar cells, because they are benefitting from subsidies and being dumped in the United States and competition occurs in the module channel of distribution, but these concerns do not address the main issue.  The main issue is that an investigation covering modules from the PRC cannot at the same time cover modules whose country of origin is not the PRC.  Determining that all modules assembled in the PRC are covered by the scope of the investigation, no matter where the solar cells in the module were produced, would either necessitate making inconsistent country-of-origin determinations for a single product,[32] or require ignoring the country-of-origin when considering whether merchandise entering the United States is covered by the scope of the investigation.  Petitioner has not explained how its proposed scope could be adopted without such a result.  Moreover, even if the substantial transformation test focused on the country where the aggregate of production occurs, as suggested by Petitioner, Petitioner has not explained how such an analysis would support its request that the scope cover all modules assembled in the PRC, even when all of the other production steps occurred in a third country.  Lastly, Petitioner has the option of bringing additional petitions to address any dumping concerns it has regarding solar modules/panels assembled from solar cells produced in a third country.

With respect to Petitioner's contention that all modules assembled in the PRC must be included in the scope of the investigation in order for CBP to effectively enforce any order imposed and to prevent widespread circumvention, we note that the Department, working in conjunction with CBP, has taken additional measures to ensure that the scope of any order imposed as a result of the investigation will be enforced.  Specifically, the Department has informed CBP that

---

[30] See Petitioner's Case Brief at 9-11.

[31] See SSPC from Belgium, and accompanying Issues and Decision Memorandum at Comment 4.

[32] Namely, finding that module assembly in the PRC using solar cells produced in a third country constitutes substantial transformation and thus the country of origin of the module is the PRC while also finding that module assembly outside the PRC using PRC produced solar cells does not constitute substantial transformation and thus the country of origin of the module is the country where the solar cells were produced, the PRC.

-8-

Barcode:3181443-01 A-570-010 INV - Investigation  -

importers claiming that the solar panels/modules they import do not contain solar cells that were produced in the PRC are required to maintain importer certifications and documentation to that effect. Additionally, the Department has notified CBP that both the importer and exporter are required to maintain exporter certifications if the exporter of the panels/modules which the importer claims contain no PRC-produced solar cells is located in the PRC. These certifications and documents must be presented to CBP officials on request. As noted in the *Preliminary Determination*, if the certification or documentation is not provided, the Department has instructed CBP to suspend all unliquidated entries for which the certification or documentation were not provided and require the posting of a cash deposit or bond on those entries equal to the PRC-wide rate in effect at the time of the entry.[33] If a solar panel/module contains some solar cells produced in the PRC, but the importer is unable or unwilling to identify the total value of the panel/module that is subject merchandise, the Department has instructed CBP to require the posting of a cash deposit or bond on the total entered value of the panel/module equal to the PRC-wide rate in effect at the time of the entry. Thus, the Department has taken additional steps to ensure that efforts to evade enforcement of any order imposed as a result of this investigation will be identified and thwarted. If an importer is declaring the wrong country-of-origin for imported merchandise, this is a matter appropriately dealt with by CBP, and thus the Department will work closely with CBP in this regard.

Furthermore, the Department does not agree with the Petitioner's alternative request to clarify the scope of this investigation to include modules/panels produced in the PRC from solar cells produced in a third country when the wafer production process has occurred in the PRC. In the context of this investigation the Department is not deciding whether wafers produced in the PRC and converted into cells in a third country are a product of the third country. The Department also notes that unlike solar cells, wafers are not identified in the scope of this investigation. For the foregoing reasons, the Department has made no revisions to the scope of the investigation to implement Petitioner's proposals.

**Comment 2:   Selection of Surrogate Financial Statements**

In the *Preliminary Determination*, the Department valued SG&A expenses, OH and profit, using the audited financial statements for the fiscal year ending December 31, 2011, from the following companies: Team Precision, Hana, and KCE, which are all Thai producers of merchandise comparable to the merchandise under consideration that earned a before tax profit in 2011. While the Department found that all of these companies had received countervailable subsidies, there were no usable financial statements on the record for the *Preliminary Determination* for companies that did not receive countervailable subsidies.

After the *Preliminary Determination*, parties placed on the record new financial statements that the Department has considered below. Petitioner submitted financial statements for the following companies: Rohm, NEC Tokin, and Starck. In addition, the respondents submitted the financial statements of Styromatic. Interested parties have made arguments on which financial statements should be selected for the calculation of the financial ratios in the final determination. We have addressed each argument below.

---

[33] For a full discussion of the Department's certification requirements, see the *Preliminary Determination*.

Filed By: nellis@sidley.com, Filed Date: 2/18/14 1:23 PM, Submission Status: Approved

Barcode:3181443-01 A-570-010 INV - Investigation  -

# Exhibit 2

CSPV Cells and Modules from China,
Scope Clarification Memo

Filed By: nellis@sidley.com, Filed Date: 2/18/14 1:23 PM, Submission Status: Approved



**UNITED STATES DEPARTMENT OF COMMERCE**
**International Trade Administration**
Washington, D.C. 20230

A-570-979
C-570-980
~~Proprietary Document~~
AD/CVD O4: JDP

*Public Version*

March 19, 2012

MEMORANDUM TO:     Gary Taverman
                   Acting Deputy Assistant Secretary
                       for Antidumping and Countervailing Duty Operations

THROUGH:           Abdelali Elouaradia
                   Director, Office 4
                   AD/CVD Operations

                   Howard Smith
                   Program Manager, Office 4
                   AD/CVD Operations

FROM:              Jeff Pedersen
                   Case Analyst
                       AD/CVD Operations, Office 4

SUBJECT:           Scope Clarification: Antidumping and Countervailing Duty
                   Investigations of Crystalline Silicon Photovoltaic Cells, Whether
                   or Not Assembled Into Modules, from the People's Republic of
                   China

<u>Summary</u>

One day prior to the initiation of the above-referenced investigations, Petitioner[1] submitted proposed scope language stating that the scope covers modules/panels produced in the People's Republic of China ("PRC") regardless of where the cells in the modules/panels were manufactured and covers modules/panels produced in a third-country from cells manufactured in the PRC. The Department did not include this proposed language in the scope because it did not have sufficient time to evaluate the language prior to initiation. Since that time we have evaluated Petitioner's proposed language and, for the reasons noted below, recommend clarifying the scope of these investigations to state that modules/panels produced in a third-country from cells produced in the PRC are covered by the scope; however, modules/panels produced in the PRC from cells produced in a third-country are not covered by the scope.

<u>Background</u>

On November 8, 2011, the Department of Commerce (the "Department") initiated antidumping duty ("AD") and countervailing duty ("CVD") investigations of crystalline silicon photovoltaic

---

[1] The petitioner is SolarWorld Industries America Inc. ("Petitioner").



cells ("solar cells"), whether or not assembled into solar modules, from the PRC.[2]  In the AD and CVD Initiation Notices the Department noted that Petitioner submitted revised scope language one day before initiation.  The revised language included, among other things, the following substantive provision:

> These proceedings cover ... crystalline silicon PV modules/panels produced in the PRC, regardless of country of manufacture of the cells used to produce the modules or panels, ... and crystalline silicon PV modules or panels produced in a third country from crystalline silicon PV cells manufactured in the PRC ... .

See AD Initiation Notice, 76 FR at 70960; CVD Initiation Notice, 76 FR at 70967; see also Standing Analysis and Revised Scope Language:  Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China dated November 7, 2011 at Attachment 2.

The Department stated in the AD and CVD Initiation Notices that it has not adopted this specific revision recommended by Petitioner for the purposes of initiation.  The Department explained that because the recommendation was filed one day prior to the statutory deadline for initiation the Department did not have sufficient time nor the administrative resources to evaluate Petitioner's proposed language regarding merchandise produced using inputs from third-country markets, or merchandise processed in third-country markets.[3]

The AD and CVD Initiation Notices set aside a period for interested parties to raise issues regarding product coverage.  On November 28, 2011, we received comments from Petitioner, and the following interested parties:  SolarOne Solutions; Yingli Green Energy Holding Company Limited and Yingli Green Energy Americas, Inc. (collectively, "Yingli"); Canadian Solar Inc. ("Canadian Solar"); Wuxi Suntech Power Co., Ltd., Suntech America, Inc. and Suntech Arizona, Inc. (collectively, "Suntech"); Changzhou Trina Solar Energy Co. Ltd. ("Trina Solar"); DelSolar Co. Ltd. and DelSolar (Wujiang) Ltd. (collectively, "DelSolar"); tenKsolar (Shanghai) Co., Ltd. ("tenK"); Jiangsu Green Power PV Co., Ltd. ("Jiangsu Green"); Transform Solar; Suniva; Q-Cells North America; Hanwha SolarOne ("Qidong") Co., Ltd. ("SolarOne"); Shanghai BYD Company Limited ("Shanghai BYD"); and Konca Solar Cell Co., Ltd.  On December 1, 2011, SunPower Corporation submitted rebuttal comments, as did Yingli, Canadian Solar, Suntech, and Trina Solar on December 5, 2011, and Petitioner on December 13, 2011.[4]

---

[2] See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China:  Initiation of Antidumping Duty Investigation, 76 FR 70960 (November 16, 2011) ("AD Initiation Notice"); Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China:  Initiation of Countervailing Duty Investigation, 76 FR 70966 (November 16, 2011) ("CVD Initiation Notice") (collectively "AD and CVD Initiation Notices").

[3] See AD Initiation Notice, 76 FR at 70960; CVD Initiation Notice, 76 FR at 70967.

[4] SolarOne, Shanghai BYD, tenK, Jiangsu Green, Zamp Solar, LLC, and Petitioner also submitted additional comments on the scope of this investigation but they were not applicable to the issue covered in this memorandum, country-of-origin.

2

Barcode:3044751-01 A-570-979 INV - Investigation -

Barcode:3181443-01 A-570-010 INV - Investigation -

Scope

The scope from the AD and CVD Initiation Notices is as follows:

The merchandise covered by this investigation are crystalline silicon photovoltaic cells, and modules, laminates, and panels, consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including, but not limited to, modules, laminates, panels and building integrated materials.

This investigation covers crystalline silicon photovoltaic cells of thickness equal to or greater than 20 micrometers, having a p/n junction formed by any means, whether or not the cell has undergone other processing, including, but not limited to, cleaning, etching, coating, and/or addition of materials (including, but not limited to, metallization and conductor patterns) to collect and forward the electricity that is generated by the cell.

Subject merchandise may be described at the time of importation as parts for final finished products that are assembled after importation, including, but not limited to, modules, laminates, panels, building-integrated modules, building-integrated panels, or other finished goods kits. Such parts that otherwise meet the definition of subject merchandise are included in the scope of this investigation.

Excluded from the scope of this investigation are thin film photovoltaic products produced from amorphous silicon (a-Si), cadmium telluride (CdTe), or copper indium gallium selenide (CIGS).

Also excluded from the scope of this investigation are crystalline silicon photovoltaic cells, not exceeding $10,000mm^2$ in surface area, that are permanently integrated into a consumer good whose function is other than power generation and that consumes the electricity generated by the integrated crystalline silicon photovoltaic cell. Where more than one cell is permanently integrated into a consumer good, the surface area for purposes of this exclusion shall be the total combined surface area of all cells that are integrated into the consumer good.

Merchandise covered by this investigation is currently classified in the Harmonized Tariff System of the United States ("HTSUS") under subheadings 8501.61.0000, 8507.20.80, 8541.40.6020 and 8541.40.6030. These HTSUS subheadings are provided for convenience and customs purposes; the written description of the scope of this investigation is dispositive.

Parties' Comments

Petitioner:

- o   The only way to address the material injury caused by Chinese cells and modules/panels is to include both modules/panels produced in the PRC regardless of

3

Barcode:3064731-01 A-570-979 INV - Investigation
Barcode:3181443-01 A-570-010 INV - Investigation  -

cell origin and Chinese cells incorporated into modules/panels produced in third-countries in the scope of the investigations.

o Not including language specifically covering third-country solar modules/panels made from PRC solar cells and PRC solar modules/panels made from third-country solar cells creates an unenforceable scope that can be easily circumvented.

o Solar cell production and solar module assembly are equally import steps in producing a finished solar module.

o Nearly all solar cell production is dedicated to producing solar modules/panels and all solar module/panel assembly relies on solar cells.

o Some countervailable subsidies are specific to the production of solar modules/panels and other subsidies are available to production of both solar cells and solar modules/panels. Both types of subsidies demonstrate that module assembly, in addition to cell production, is an important stage of production.

Other Interested Parties:

o The Department should reject Petitioner's attempt to expand the scope and not accept actions that would serve to evade the statutory standing requirements and the possibility of polling.

o Petitioner has asked the Department to adopt two conflicting country-of-origin tests for purposes of these investigations.

o The scope should be limited to solar cells made in the PRC or at most products containing solar cells made in the PRC.

o The scope should not include solar modules/panels made from cells not manufactured in the PRC because a substantial transformation analysis indicates that assembling solar cells into solar modules/panels does not change the country-of-origin.

o Solar module/panel assembly does not constitute substantial transformation because:
  ▪ Solar cells represent the majority of the total cost of solar modules/panels.
  ▪ The manufacture of solar cells is the technologically-critical portion of the production of solar modules/panels. Solar module/panel assembly is a low-tech final assembly requiring relatively unskilled labor.
  ▪ Solar module power output is determined by the solar cells in the solar module/panel and not solar module/panel assembly.
  ▪ Solar cells and solar modules/panels have the same end-use.

o Including scope language to capture solar modules assembled in the PRC, regardless of where the cells were manufactured and solar modules assembled in third countries from cells manufactured in the PRC, would ignore judicial precedent stating that the scope of an antidumping duty order is "defined by the type of merchandise and the country-of-origin." [5]

---

[5] See Notice of Final Determination of Sales at Less Than Fair Value: Certain Cold-Rolled Carbon Steel Flat Products from Argentina, 58 FR 37062, 37065 (July 9, 1993) ("Cold-Rolled from Argentina") and noting that this statement was quoted by the Court of International Trade ("CIT") twice in Advanced Tech & Materials Co., Ltd. v. United States, No. 09-511, 2011 Ct. Intl. Trade LEXIS 136, *11 (CIT Oct. 12, 2011) ("Advanced Tech.") and Ugine and ALZ Belgium, N.V. v. United States, 517 F. Supp. 2d 1333, 1345 (CIT 2007) ("Ugine").

4

On March 7, 2012, and March 14, 2012, Petitioner and tenK, respectively submitted further comments concerning product coverage. Due to the timing of the submissions, we have been unable to consider these comments in this decision. We will consider these comments at a later date.

## Legal Framework

The scope of these investigations and the International Trade Commission final determination will determine the scope of any resulting AD and CVD orders. Because AD and CVD orders apply to merchandise from particular countries, determining the country where the merchandise is produced is fundamental to proper administration and enforcement of the AD and CVD statute. The scope of an AD or CVD order is limited to merchandise that originates in the country covered by the order.[6] The Department has explicitly stated that the scope of an antidumping duty order is "defined by the type of merchandise and the country-of-origin."[7]

In determining the country-of-origin of a product, the Department's practice has been to conduct a substantial transformation analysis.[8] The CIT has upheld the Department's "substantial transformation" analysis as a means to carry out its country-of-origin analysis.[9] The CIT stated that "{t}he 'substantial transformation' rule provides a yardstick for determining whether the processes performed on merchandise in a country are of such significance as to require that the resulting merchandise be considered the product of the country in which the transformation occurred."[10] Because the Petitioner's proposed scope language addresses modules/panels assembled, and cells produced, in a third country we have used a substantial transformation analysis to determine whether one or both of the scenarios described by Petitioner should be covered by the scope of these investigations.

## Analysis

The Department has applied, as appropriate, the following analyses in determining whether substantial transformation occurs, thereby changing a product's country-of-origin. These have

---

[6] See Stainless Steel Plate in Coils from Belgium: Final Results of Antidumping Duty Administrative Review, 69 FR 74495 (December 14, 2004) and the accompanying Issues and Decision Memorandum at Comment 4 ("SSPC Belgium").
[7] In Cold-Rolled from Argentina, 58 FR at 37065, the Department stated that "{t}he scope of an antidumping or countervailing duty order is defined by the type of merchandise and by the country of origin (e.g., widgets from Ruritania). For merchandise to be subject to an order it must meet both parameters, i.e., product type and country of origin. In determining country of origin for scope purposes, the Department applies a 'substantial transformation' rule." As noted above, this language was quoted by the CIT twice in Advanced Tech. at *11 and Ugine, 517 F. Supp. 2d at 1345.
[8] See, e.g., Notice of Final Determination of Sales at Less Than Fair Value: Glycine from India, 73 FR 16640 (March 28, 2008), and accompanying Issues and Decision Memorandum at Comment 5; see also SSPC Belgium, and accompanying Issues and Decision Memorandum at Comment 4.
[9] See E.I. DuPont De Nemours & Company. v. United States, 8 F. Supp. 2d 854, 858 (CIT 1998) ("Dupont").
[10] See Dupont (referencing Smith Corona Corp. v. United States, 811 F. Supp. 692, 695 (CIT 1993) as "noting that in determining if merchandise exported from an intermediate country is covered by an antidumping order, Commerce identified the country of origin by considering whether the essential component is substantially transformed in the country of exportation").

5

included:  1) whether the processed downstream product falls into a different class or kind of product when compared to the upstream product; 2) whether the essential component of the merchandise is substantially transformed in the country of exportation; or 3) the extent of processing.[11] We have examined these criteria in conducting our substantial transformation analysis:

Class or Kind

The Department "has generally found that substantial transformation has taken place when the upstream and downstream products fall within two different 'classes or kinds' of merchandise.... Conversely, the Department almost invariably determines substantial transformation has not taken place when both products are within the same 'class or kind' of merchandise."[12] The merchandise subject to an investigation, i.e., the class or kind of merchandise to be investigated, is described in the scope.  The scope of these investigations covers both solar cells and solar modules/panels.[13]  Thus solar cells and solar modules/panels are within the same "class or kind" of product.  We further note that the International Trade Commission ("ITC") in its companion preliminary determination defined solar cells and solar modules/panels as one domestic like product.[14]

Essential Component

In examining whether the essential component of the merchandise is substantially transformed in the country of exportation, the Department considers whether processing in the exporting country changes the important qualities or use of the component.[15]  The essential component of solar modules/panels is the solar cell since the purpose of solar modules/panels is to convert sunlight into electricity and this process occurs in the solar cells.[16]  Thus, in this case, the Department is considering whether the processing of solar cells into solar modules/panels changes the nature or use of the solar cells.

Module/panel assembly does not change the important qualities, i.e., the physical or chemical characteristics, of the solar cell itself.  As stated in the original petition, solar cells are made from crystalline silicon wafers.  A dopant, which is a trace impurity element diffused into a thin layer of the wafers' surface to impart an opposite electrical orientation to the cell surface,  creates the positive/negative junction that is needed for the conversion of sunlight into electricity, which is the purpose of solar cells.  Solar cells are normally coated with silicon nitride to increase light

---

[11] See, e.g., Notice of Final Determination of Sales at Less Than Fair Value: Glycine from India, 73 FR 16640 (March 28, 2008), and accompanying Issues and Decision Memorandum at Comment 5.
[12] See Notice of Final Determination of Sales at Less Than Fair Value: Wax and Wax/Resin Thermal Transfer Ribbons from France, 69 FR 10674, 10675-10676 (March 8, 2004).
[13] See AD Initiation Notice, 76 FR at 70965 and CVD Initiation Notice, 76 FR at 70970.
[14] See Crystalline Silicon Photovoltaic Cells and Modules from China: Investigation Nos. 701-TA-481 and 731-TA-1190 (Preliminary), USITC Publication 4295 (December 2011) ("ITC Solar Cells and Modules Prelim") at 11.
[15] See also Erasable Programmable Read Only Memories (EPROMs) From Japan: Final Determination of Sales at Less Than Fair Value, 51 FR 39680, 39691-39692 (October 30, 1986) ("EPROMs").
[16] See Petition at Exhibit II-19 at 3.

6

Barcode:3064751-01 A-570-979 INV - Investigation -

Barcode:3181443-01 A-570-010 INV - Investigation -

absorption (this results in a blue-purple color) and undergo a screening process where conductive metal is printed into the cell. Metal conduits or busbars channel electricity generated by the cell into electricity collection points.[17] None of these characteristics are changed during module/panel assembly. Petitioner, Trina Solar, a mandatory respondent, and the ITC all describe module assembly as stringing together 60 or 72 solar cells, laminating them, and fitting them in a glass-covered aluminum frame.[18] These processes do not change the basic nature of a solar cell. Moreover, the function of a solar cell is not changed when assembled into modules/panels; the cell still functions to convert sunlight into electricity. The ITC also noted that "the physical characteristics and functions of cells and solar modules essentially are the same."[19] The purpose of both solar cells and solar modules/panels is to convert sunlight into electricity. Thus, neither the physical qualities nor the function of solar cells are changed when they are assembled into modules/panels.

The instant case is similar to EPROMs.[20] In EPROMs, the scope of the investigation included processed wafers and dice. In that case, the issue was whether processed wafers and dice that were produced in Japan, yet encapsulated in a third country, became a product of the country where the encapsulation occurred. The Department determined that the processed wafers or dice were not just a major component of the finished device, rather they were "the essential active component{s} which define{d} the merchandise under investigation."[21] The Department further found that the assembly process in the third country was not a sophisticated process.[22] Accordingly, the encapsulation of processed wafers or dice in a third country did not qualify as substantial transformation for purposes of determining country-of-origin. Similarly, solar module assembly connects cells into their final end-use form but does not change the "essential active component," the solar cell, which defines the module/panel.

Extent of Processing

When considering the extent of processing, we examine whether the processing was substantial and/or sophisticated.[23] As noted above, module/panel assembly consists of stringing together solar cells, laminating them, and fitting them in a glass-covered aluminum frame for protection. Thus, this stage of production is principally an assembly process. Numerous interested parties, aside from Petitioner, argued that solar module/panel assembly is relatively insubstantial in terms of number of steps, inputs, research and development required, and time.[24] Consistent with these arguments, Trina Solar identified six stages of production when manufacturing solar

---

[17] See Petition for the Imposition of Antidumping and Countervailing Duties: Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China, dated October 19, 2011 ("Petition") at Exhibit II-19 at 3.

[18] See Petition at Exhibit A-26. See also ITC Solar Cells and Modules Prelim at 6 and 10.

[19] See ITC Solar Cells and Modules Prelim at 10.

[20] See EPROMs.

[21] See EPROMs, 51 FR at 39692.

[22] See id.

[23] See, e.g., Notice of Final Determination of Sales at Not Less Than Fair Value: Wax and Wax/Resin Thermal Transfer Ribbon from the Republic of Korea, 69 FR 17645, 17647 (April 5, 2004).

[24] See November 28, 2011 scope comments submitted by tenK, Transform Solar, Suniva, and Q-Cells North America.

7

Barcode:3064751-01 A-570-979 INV - Investigation -
Barcode:3181443-01 A-570-010 INV - Investigation -

modules/panels, five of which were dedicated to solar cell production and only one pertained to solar module/panel assembly.[25] Petitioner and the ITC also indicated that solar module assembly is one stage of production.[26] Petitioner and Trina Solar also reported consuming many more types of inputs in cell production compared with module assembly.[27] Further, Trina Solar reported a production time for solar cells that is [          ] of module assembly.[28] Accordingly, the assembly of solar cells into solar modules does not rise to the level of changing the country-of-origin of the subject merchandise.

Based on our analysis of the foregoing factors we find that solar module assembly does not substantially transform solar cells such that it changes the country-of-origin. Solar cells and solar modules/panels are within the same class of merchandise. Further, module assembly does not substantially alter the essential nature of solar cells nor does it constitute significant processing such that it changes the country-of-origin of the cell, as it is an assembly process that only strings cells together, adding a protective covering and an aluminum base. Therefore, we believe the scope should be clarified to state that modules/panels produced in a third-country from solar cells produced in the PRC are covered by the scope; however, modules/panels produced in the PRC from solar cells produced in a third-country are not covered by the scope.

While we understand the intent of Petitioner's argument that the scope should cover solar modules/panels produced in the PRC, regardless of the origin of the solar cells, this is not tenable because doing so would either necessitate making inconsistent country-of-origin determinations for a single product,[29] or require ignoring the country-of-origin when considering whether merchandise entering the United States is covered by the scope of these investigations. A product can only have one country-of-origin for AD/CVD purposes, and AD and CVD investigations only cover products with a country-of-origin that is the country under investigation.[30] Petitioner has not cited any example where the Department has found that a product could have two countries-of-origin. Thus, while the Department is not excluding solar modules/panels from the scope of these investigations, in conjunction with the above described substantial transformation analysis, we are clarifying that where solar cell production occurs in a different country from solar module assembly, the country-of-origin of the solar modules/panels is the country in which the solar cell was produced.

---

[25] See also Trina Solar's January 10, 2012 Section A response at Exhibit A-26.
[26] See Petition at Exhibit A-26. See also ITC Solar Cells and Modules Prelim at 11 where the ITC noted in its preliminary determination that the "{p}roduction of the finished product, modules, involves four primary steps – crystallization, wafer production, cell conversion, and module assembly – along with packing and inspection of the final product. {Solar} cells undergo only one additional production step, the assembly into modules, before transformation into the finished product."
[27] See Trina Solar's February 6, 2012 Section D response at Exhibit D-4. See also Petition at Exhibits II-19 and II-20.
[28] See Trina Solar's February 6, 2012 Section D response at Exhibit D-4.
[29] Namely, finding that module assembly in the PRC using solar cells produced in a third-country constitutes substantial transformation and thus the country of origin of the module is the PRC while also finding that module assembly outside the PRC using PRC produced solar cells does not constitute substantial transformation and thus the country of origin of the module is the country where the solar cells were produced, the PRC.
[30] See Cold-Rolled from Argentina, 58 FR at 37065.

8

Petitioner's claim that not adopting their proposed language in the scope creates an unenforceable scope that can be easily circumvented. While we acknowledge that the Department has on occasion explicitly addressed the possibility of circumvention as a consideration in determining the country-of-origin of merchandise under investigation, circumvention is not the sole or controlling factor relied upon in making a country-of-origin determination.[31] Nonetheless, whether explicitly stated or not, the factors we consider for making country-of-origin determinations inherently reflect the agency's concern that the relief afforded by AD/CVD orders not be eviscerated by moving minor processing outside of the country covered by the order. Thus, circumvention concerns are reflected in the country-of-origin determination. As stated above, adopting the language proposed by Petitioner would result in two inconsistent country-of-origin determinations.

The Department routinely meets with U.S. Customs and Border Protection ("CBP") to ensure that our AD/CVD orders are enforced. Towards that end, and with respect to these cases in particular, the Department has begun an inter-agency dialogue with CBP that is designed to fulfill that goal. Specifically, Import Administration and CBP staff are meeting to develop procedures which will ensure that Chinese solar cells subject to any potential duties are properly identified at the border. Efforts to evade enforcement will be identified and thwarted. While the Department works closely with CBP, if an importer is declaring the wrong country-of-origin for imported merchandise, this is a matter appropriately dealt with by CBP. Lastly, Petitioner has the option of bringing additional petitions to address any dumping concerns it has regarding solar modules/panels assembled from solar cells produced in a third country.

---

[31] As demonstrated above, the Department considers various factors in a substantial transformation analysis.

9

Barcode:3084751-01 A-570-979 INV - Investigation  -

Barcode:3181443-01 A-570-010 INV - Investigation  -

## Recommendation

We recommend that the Department find that solar module/panel assembly does not constitute substantial transformation of the solar cells included in the module.  We further recommend clarifying the scope of these investigations to state that modules/panels produced in a third-country from cells produced in the PRC are covered by the scope; however, modules/panels produced in the PRC from cells produced in a third-country are not covered by the scope.[32]

_____    _____

Agree                      Disagree


_____

Gary Taverman
Acting Deputy Assistant Secretary
  for Antidumping and Countervailing Duty Operations


_____
3\19\12

Date

---

[32] See Attachment I.

10

Filed By: nellis@sidley.com, Filed Date: 2/18/14 1:23 PM, Submission Status: Approved
Filed By: Drew Jackson, Filed Date: 3/22/12 12:02 PM, Submission Status: Approved

Barcode:3064751-01 A-570-979 INV - Investigation
Barcode:3181443-01 A-570-010 INV - Investigation -

## Attachment I

### Scope of the Investigation

The merchandise covered by this investigation are crystalline silicon photovoltaic cells, and modules, laminates, and panels, consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including, but not limited to, modules, laminates, panels and building integrated materials.

This investigation covers crystalline silicon photovoltaic cells of thickness equal to or greater than 20 micrometers, having a p/n junction formed by any means, whether or not the cell has undergone other processing, including, but not limited to, cleaning, etching, coating, and/or addition of materials (including, but not limited to, metallization and conductor patterns) to collect and forward the electricity that is generated by the cell.

Subject merchandise may be described at the time of importation as parts for final finished products that are assembled after importation, including, but not limited to, modules, laminates, panels, building-integrated modules, building-integrated panels, or other finished goods kits. Such parts that otherwise meet the definition of subject merchandise are included in the scope of this investigation.

Excluded from the scope of this investigation are thin film photovoltaic products produced from amorphous silicon (a-Si), cadmium telluride (CdTe), or copper indium gallium selenide (CIGS).

Also excluded from the scope of this investigation are crystalline silicon photovoltaic cells, not exceeding $10,000mm^2$ in surface area, that are permanently integrated into a consumer good whose function is other than power generation and that consumes the electricity generated by the integrated crystalline silicon photovoltaic cell. Where more than one cell is permanently integrated into a consumer good, the surface area for purposes of this exclusion shall be the total combined surface area of all cells that are integrated into the consumer good.

Modules, laminates, and panels produced in a third-country from cells produced in the PRC are covered by this investigation; however, modules, laminates, and panels produced in the PRC from cells produced in a third-country are not covered by this investigation.

Merchandise covered by this investigation is currently classified in the Harmonized Tariff System of the United States ("HTSUS") under subheadings 8501.61.0000, 8507.20.80, 8541.40.6020 and 8541.40.6030. These HTSUS subheadings are provided for convenience and customs purposes; the written description of the scope of this investigation is dispositive.

**TAB 2**

**Commerce Letter to All Interested Parties, re:
Opportunity to Submit Scope Comments
(Oct. 3, 2014)**

**AD P.R. 765, CVD P.R. 34**

Barcode:3233175-01 A-570-010

**UNITED STATES DEPARTMENT OF COMMERCE**
**International Trade Administration**
Washington, D.C. 20230

A-570-010
C-570-011
A-583-853
Investigations
**Public Document**
E&C/IV: HS

October 3, 2014

TO ALL INTERESTED PARTIES

Re:    Antidumping and Countervailing Duty Investigations of Certain Crystalline Silicon
Photovoltaic Products from the People's Republic of China and the Antidumping Duty
Investigation of Certain Crystalline Silicon Photovoltaic Products from Taiwan:
Opportunity to Submit Scope Comments

Interested parties have submitted comments on the scopes of the above-referenced antidumping
duty (AD) and countervailing duty (CVD) investigations, including certain concerns about the
scope's administrability and enforcement.  In response, the Department is considering the
possibility of the scope clarification described below and is providing interested parties with an
opportunity to submit comments.  Currently, the scopes of the AD and CVD investigations of
certain crystalline silicon photovoltaic products from the People's Republic of China (PRC) and
the scope of the AD investigation of certain crystalline silicon photovoltaic products from
Taiwan contain the following language:

> For purposes of this investigation, subject merchandise includes modules, laminates
> and/or panels assembled in the subject country consisting of crystalline silicon
> photovoltaic cells that are completed or partially manufactured within a customs
> territory other than that subject country, using ingots that are manufactured in the
> subject country, wafers that are manufactured in the subject country, or cells where the
> manufacturing process begins in the subject country and is completed in a non-subject
> country.

Specifically, we are considering a scope clarification that would make the following points:

- For the PRC investigations, subject merchandise includes all modules, laminates
  and/or panels assembled in the PRC that contain crystalline silicon photovoltaic cells
  produced in a customs territory other than the PRC.
- For the Taiwan investigation, subject merchandise includes all modules, laminates
  and/or panels assembled in Taiwan consisting of crystalline silicon photovoltaic cells
  produced in Taiwan or a customs territory other than Taiwan.[1]  In addition, subject
  merchandise will include modules, laminates, and panels assembled in a third-

---

[1] The scope of the Taiwan investigation and the PRC investigations would continue to exclude any products covered
by the existing AD and CVD orders on crystalline silicon photovoltaic cells, whether or not assembled into modules,
from the PRC.



Barcode:3233173-01 A-570-010 INV - Investigation  -

country, other than the PRC, consisting of crystalline silicon photovoltaic cells produced in Taiwan.

Attached is the current scope language with draft edits that reflect language to implement the clarifications we are considering.  In addition to addressing the substance of the above contemplated clarifications, interested parties may also comment on the edits to the scope language that we are considering and/or propose alternative scope language to use if the Department were to implement such clarifications for purposes of the final determinations and any potential orders.  Interested parties should submit their comments with their case briefs.

Sincerely,

Howard Smith
Program Manager, Office IV
AD/CVD Operations
Enforcement and Compliance

Barcode:3233173-01 A-570-010 INV - Investigation  -

## Attachment

## Draft - China Scope of the Investigation

The merchandise covered by this investigation is ~~crystalline silicon photovoltaic cells, and~~ modules, laminates and/or panels consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including building integrated materials.  For purposes of this investigation, subject merchandise ~~also~~ includes modules, laminates and/or panels assembled in the ~~subject country~~ *People's Republic of China* consisting of crystalline silicon photovoltaic cells ~~that are completed or partially manufactured within~~ *produced in* a customs territory other than *the People's Republic of China* ~~that subject country, using ingots that are manufactured in the subject country, wafers that are manufactured in the subject country, or cells where the manufacturing process begins in the subject country and is completed in a non-subject country~~.

Subject merchandise includes *modules, laminates and/or panels assembled in the People's Republic of China consisting of* crystalline silicon photovoltaic cells of thickness equal to or greater than 20 micrometers, having a p/n junction formed by any means, whether or not the cell has undergone other processing, including, but not limited to, cleaning, etching, coating, and/or addition of materials (including, but not limited to, metallization and conductor patterns) to collect and forward the electricity that is generated by the cell.

Excluded from the scope of this investigation are thin film photovoltaic products produced from amorphous silicon (a-Si), cadmium telluride (CdTe), or copper indium gallium selenide (CIGS). Also excluded from the scope of this investigation are any products covered by the existing antidumping and countervailing duty orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the People's Republic of China.  See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order, 77 FR 73018 (December 7, 2012); Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Countervailing Duty Order, 77 FR 73017 (December 7, 2012).

Also excluded from the scope of this investigation are *modules, laminates and/or panels assembled in the People's Republic of China, consisting of* crystalline silicon photovoltaic cells, not exceeding 10,000mm$^2$ in surface area, that are permanently integrated into a consumer good whose function is other than power generation and that consumes the electricity generated by the integrated crystalline silicon photovoltaic cell.  Where more than one *module* ~~cell~~ is permanently integrated into a consumer good, the surface area for purposes of this exclusion shall be the total combined surface area of all *modules* ~~cells~~ that are integrated into the consumer good.

Merchandise covered by this investigation is currently classified in the Harmonized Tariff Schedule of the United States (HTSUS) under subheadings 8501.61.0000, 8507.20.8030, 8507.20.8040, 8507.20.8060, 8507.20.8090, 8541.40.6020, 8541.40.6030 and 8501.31.8000. These HTSUS subheadings are provided for convenience and customs purposes; the written description of the scope of this investigation is dispositive.

Barcode:3233173-01 A-570-010 INV - Investigation -

**Draft - Taiwan Scope of the Investigation**

The merchandise covered by this investigation is crystalline silicon photovoltaic cells, and modules, laminates and/or panels consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including building integrated materials.  For purposes of this investigation, subject merchandise ~~also~~ includes modules, laminates and/or panels assembled in ~~the subject country~~ *Taiwan* consisting of crystalline silicon photovoltaic cells ~~that are completed or partially manufactured within~~ *produced in Taiwan or* a customs territory other than *Taiwan* ~~that subject country, using ingots that are manufactured in the subject country, wafers that are manufactured in the subject country, or cells where the manufacturing process begins in the subject country and is completed in a non-subject country.~~  *Subject merchandise also includes modules, laminates, and panels assembled in a third-country other than the People's Republic of China consisting of crystalline silicon photovoltaic cells produced in Taiwan.*

Subject merchandise includes crystalline silicon photovoltaic cells of thickness equal to or greater than 20 micrometers, having a p/n junction formed by any means, whether or not the cell has undergone other processing, including, but not limited to, cleaning, etching, coating, and/or addition of materials (including, but not limited to, metallization and conductor patterns) to collect and forward the electricity that is generated by the cell.

Excluded from the scope of this investigation are thin film photovoltaic products produced from amorphous silicon (a-Si), cadmium telluride (CdTe), or copper indium gallium selenide (CIGS). Also excluded from the scope of this investigation are any products covered by the existing antidumping and countervailing duty orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the People's Republic of China. See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order, 77 FR 73018 (December 7, 2012); Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Countervailing Duty Order, 77 FR 73017 (December 7, 2012).

Also excluded from the scope of this investigation are crystalline silicon photovoltaic cells, not exceeding 10,000mm$^2$ in surface area, that are permanently integrated into a consumer good whose function is other than power generation and that consumes the electricity generated by the integrated crystalline silicon photovoltaic cell.  Where more than one cell is permanently integrated into a consumer good, the surface area for purposes of this exclusion shall be the total combined surface area of all cells that are integrated into the consumer good.

Merchandise covered by this investigation is currently classified in the Harmonized Tariff Schedule of the United States (HTSUS) under subheadings 8501.61.0000, 8507.20.8030, 8507.20.8040, 8507.20.8060, 8507.20.8090, 8541.40.6020, 8541.40.6030 and 8501.31.8000.

Barcode:3233173-01 A-570-010 INV - Investigation  -

These HTSUS subheadings are provided for convenience and customs purposes; the written description of the scope of this investigation is dispositive.

**TAB 3**

**Issues and Decision Memorandum for the Final
Determination in the Countervailing Duty
Investigation (Dec. 15, 2014)**

**CVD P.R. 388**

AFDOCS/13149760.1



UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

C-570-011
Investigation
**Public Document**
E&C Office VII: Team

**DATE:** December 15, 2014

**MEMORANDUM TO:** Paul Piquado
Assistant Secretary
  For Enforcement and Compliance

**FROM:** Christian Marsh
Deputy Assistant Secretary
  for Antidumping and Countervailing Duty Operations

**SUBJECT:** Issues and Decision Memorandum for the Final Determination in
the Countervailing Duty Investigation of Certain Crystalline
Silicon Photovoltaic Products from the People's Republic of China

---

## I.   SUMMARY

The Department of Commerce (the Department) determines that countervailable subsidies are
being provided to producers and exporters of certain crystalline silicon photovoltaic products
(certain solar products, or subject merchandise) from the People's Republic of China (the PRC),
within the meaning of section 705 of the Tariff Act of 1930, as amended (the Act).[1]  Below is the
complete list of issues in this investigation for which we received comments from interested
parties:

Issues:
**Comment 1:** Scope Comments and Scope Clarification
**Comment 2:** Whether the Department Should Investigate the Effects of the GOC's Alleged
Cyberhacking on this Investigation
**Comment 3:** Whether Input Providers are "Authorities" Within the Meaning of the Act
**Comment 4:** Whether the Provision of Chinese Polysilicon for LTAR is Countervailable
**Comment 5:** Whether the Department Should Attribute Subsidies under the Provision of
Polysilicon for LTAR Program to Wuxi Suntech's Cross-owned Companies
**Comment 6:** Whether the Provision of Aluminum Extrusions for LTAR is Countervailable
**Comment 7:** Whether the Provision of Solar Glass for LTAR is Countervailable
**Comment 8:** Whether AFA is Applicable to Trina Solar's Land Purchases

---

[1] *See also* section 701(f) of the Act.



INTERNATIONAL
**T R A D E**
ADMINISTRATION

3. Tax Benefit Programs

   a. The Two Free/Three Half Program for FIEs
   b. Income Tax Reductions for Export-Oriented Enterprises
   c. Income Tax Benefits for FIEs Based on Geographic Locations
   d. Local Income Tax Exemption and Reduction Programs for "Productive" FIEs
   e. Tax Reductions for FIEs Purchasing Chinese-Made Equipment
   f. Tax Refunds for Reinvestment of FIE Profits in Export-Oriented Enterprises
   g. Tax Reductions for High and New-Technology Enterprises Involved in Designated Projects
   h. Preferential Income Tax Policy for Enterprises in the Northeast Region
   i. Guangdong Province Tax Programs

4. VAT and Tariff Exemptions for Purchases of Fixed Assets under the Foreign Trade Development Fund Program

## IX. ANALYSIS OF COMMENTS

**Comment 1: Scope Comments and Scope Clarification**

On October 3, 2014, the Department issued a letter to all interested parties inviting parties to include in their case briefs comments concerning a possible clarification to the scope of the AD/CVD investigations that the Department was considering.[180]  The Department stated that the scope clarification under consideration contemplated the following:

- For the PRC investigations, subject merchandise would include all modules, laminates and/or panels assembled in the PRC that contain crystalline silicon photovoltaic cells produced in a customs territory other than the PRC.
- For the Taiwan investigation, subject merchandise would include all modules, laminates and/or panels assembled in Taiwan consisting of crystalline silicon photovoltaic cells produced in Taiwan or a customs territory other than Taiwan and would continue to exclude any products covered by the existing AD and CVD orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the PRC.  In addition, subject merchandise would include modules, laminates, and panels assembled in a third-country, other than the PRC, consisting of crystalline silicon photovoltaic cells produced in Taiwan.

Parties have commented on the scope clarification in this letter and made other scope comments addressed below.  Generally, Respondents oppose adopting the proposed scope clarification in the October 3rd Letter, while Petitioner argues that the Department should adopt the scopes

---

[180] *See* October 3, 2014 letter from Howard Smith, Program Manager, Office IV, AD/CVD Operations, Enforcement and Compliance, to All Interested Parties, re: *Antidumping and Countervailing Duty Investigations of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and the Antidumping Duty Investigation of Certain Crystalline Silicon Photovoltaic Products from Taiwan: Opportunity to Submit Scope Comments* (October 3, 2014) ("October 3rd Letter").

Filed By: Gene Calvert, Filed Date: 12/17/14 12:45 PM, Submission Status: Approved

proposed in the October 3rd Letter because they most effectively apply Petitioner's intent, would best effectuate the U.S. trade laws and provide effective relief to the injured domestic industry, and would be easily administrable and enforceable by the agencies involved. After considering comments, we have determined to clarify the scopes of the PRC AD and CVD investigations consistent with the October 3rd Letter. We address party comments in detail below.

Due to this revision in the scope, we are not requiring exporter and importer certifications. The revocation of the certification requirements previously established in this investigation does not change or rescind the certification requirements established in connection with the existing orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the PRC.

## A.    Consistency with *Solar I*[181] and Court Decisions

*Respondents:*

- The Department's proposed scope clarification is arbitrary because it is inconsistent with the product coverage decisions made by the Department in *Solar I* and also ignores country of origin decisions made by the Court of International Trade (referred to as either the "Court" or the "CIT") and the U.S. Court of Appeals for the Federal Circuit (CAFC), as well as country of origin criteria stated in the Act. Such arbitrary decisions are unlawful because, as the courts have noted, the Department has an obligation to be consistent in its decisions.
  - In *Solar I,* the Department made numerous decisions that directly ruled against establishing a scope that would find solar modules assembled in China but not containing Chinese solar cells subject to the order. The Department's determinations in *Solar I* were made on the following bases:
    - A product can only have one country of origin,[182]
    - AD and CVD investigations only cover products with a country of origin of the country under investigation,[183] and
    - The Department relies on the substantial transformation test to determine the country of origin of a product.[184]
    - In applying this substantial transformation test in *Solar I*, the Department determined that "module assembly does not substantially alter the essential nature of solar cells nor does it constitute significant processing

---

[181] *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Affirmative Countervailing Duty Determination and Final Affirmative Critical Circumstances Determination,* 77 FR 63788 (October 17, 2012) ("*Solar I CVD Final Determination*") and *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Final Determination of Sales at Less Than Fair Value, and Affirmative Final Determination of Critical Circumstances, in Part,* 77 FR 63791 (October 17, 2012) ("*Solar I AD Final Determination*") (these two investigations are referred to generally as "*Solar I*").

[182] *See Solar I AD Final Determination* and accompanying Issues and Decision Memorandum ("Solar I IDM") at Comment 1, page 8.

[183] *Id*.

[184] *Id*. at 5-6.

Filed By: Gene Calvert, Filed Date: 12/17/14 12:45 PM, Submission Status: Approved

such that it changes the country of origin of the cell."[185] The Department found that the solar cell imparts the essential character of a solar module, and, therefore, the origin of the solar cell is determinative of the country of origin of the class or kind of merchandise at issue here. Therefore, "where solar cell production occurs in a different country from solar module assembly, the country of origin of the solar modules/panels is the country in which the solar cell was produced."[186]

- ▪ If the approach in *Solar I* described above were applied to these investigations the conclusion would be that the scope of an CVD order must be limited to subject merchandise "produced" and "originating" in the country covered by the order, which here is China and Taiwan. Merchandise produced or originating in a country other than the country covered by an order, which based on the previous substantial transformation decision, includes solar modules assembled in China or Taiwan from solar cells produced in countries other than China or Taiwan, have a different country of origin than China or Taiwan, and thus may not be included in the scope of these investigations.

- o Decisions by the CIT and the CAFC, as well as sections of the Act support finding that products under an investigation can only have one country of origin and that the basis for determining this is the substantial transformation test.

  - ▪ Applying the country of origin determination implied in the scope as proposed in the October 3rd Letter, as well as the criteria applied in *Solar I*, would result in a solar module assembled in one country containing another country's cell to have two countries of origin. CIT decisions[187] have stated that a product can only have a single country of origin for AD and CVD purposes.

  - ▪ The scope as proposed in the October 3rd Letter is also contrary to the statutory language at Section 731 of the Act, which provides for the imposition of antidumping duties on "subject merchandise," defined as "the class or kind of merchandise that is within the scope of an investigation, a review, a suspension agreement, {or} an order...."[188] This provision requires the Department to make a finding of dumping for a class or kind of merchandise from a particular country.[189]

  - ▪ The scope as proposed in the October 3rd Letter ignores the established criteria for determining the country of origin, which is the substantial transformation analysis.

---

[185] *See* March 19, 2012 Memorandum from Jeff Pedersen to Chris Marsh "Scope Clarification: Antidumping and Countervailing Duty Investigations of Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China ("Solar I Substantial Transformation Memorandum"). Included in December 15, 2014 Other Proceedings' Documents Memorandum at Attachment 1.

[186] *Id.*

[187] *See Ugine & ALZ Belgium, N.V. v. United States*, 517 F. Supp. 2d 1333, 1345 (CIT 2007) ("*Ugine I*"), *aff'd*, 551 F.3d 1339 ("*Ugine III*") (Fed. Cir. 2009).

[188] *Id.*; Section 771(25) of the Act.

[189] *See E.I. DuPont de Nemours & Co. v. United States*, 8 F. Supp. 2d 854, 859 (CIT 1998) ("*Du Pont*"); *see also Ugine I*, 517 F. Supp. 2d at 1345.

Barcode:3247469-01 C-570-011 INV - Investigation -

Filed By: Gene Calvert, Filed Date: 12/17/14 12:45 PM, Submission Status: Approved

- The CIT has determined that the "substantial transformation" analysis provides a means for the Department to carry out its country of origin examination and properly guards against circumvention of existing antidumping orders.[190]

o The Department is prevented from contradicting these decisions in *Solar I* because the Department is obliged to be consistent in its decision-making across its investigations.

- The CIT has explained that although an agency is not strictly bound to its precedent, "{i}t is a principle of administrative law that an 'agency must either conform to its prior norms and decisions or explain the reason for its departure from such precedent."[191] The CAFC has similarly stated that the Department cannot ignore its own precedent absent some legitimate reason for departing from it.[192]

- The Department has not articulated reasons for diverging from these decisions. Instead, the Department stated in these investigations, that it is informed "by the product coverage decisions that it made" in *Solar I*.[193]

*Petitioner:*

- In the preliminary determination, the Department stated that it was continuing to analyze interested parties' scope comments, including comments on whether it is appropriate to apply a traditional substantial transformation or other analysis in determining the country of origin of certain solar modules described in the scope of the investigation.

- Petitioner supports the proposed scope clarification in the Department's October 3rd Letter, and requests that the Department adopt it for purposes of its final determination and any resulting CVD order.

- The Department's proposed scope clarification is fully consistent with the Petitioner's intent. It has been clear since the start of the first solar AD/CVD investigations, and throughout the current investigations, that Petitioner's intent has always been to cover all cells from the PRC and all modules from the PRC and, now, all cells from Taiwan and all modules from Taiwan.[194]

- The Department's proposed scope clarification would best effectuate the U.S. trade laws and provide effective relief to the injured domestic industry, and would be easily administrable and enforceable by the agencies.

- The remedial purposes of the AD/CVD laws are best served by the proposed scope clarification. The Department has determined that both cells and modules from the PRC and Taiwan are being dumped, and both Chinese cells and modules are subsidized. As such, the law obligates Commerce to impose duties on these products.

---

[190] *See Du Pont*, 8 F. Supp. 2d at 857 (emphasis added).

[191] *See Torrington Co. v. United States*, 745 F. Supp. 718, 727 (CIT 1990) (quoting *Mississippi Valley Gas Co. v. Federal Energy Regulatory Comm'n*, 659 F.2d 488, 506 (5th Cir. 1981)); *Neenah Foundry Co. v. United States*, 142 F. Supp. 2d 1008, 1022 (CIT 2001); *Hussey Copper Ltd., v. United States*, 834 F. Supp. 413,418 (CIT 1993).

[192] *See Ugine III*, 551 F.3d at 1349.

[193] *See Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China and Taiwan: Initiation of Antidumping Duty Investigations¸ 79 FR 4661 (January 29, 2014) ("Solar Products Initiation Notice").*

[194] *See, e.g.*, Solar I IDM at Comment 1.

35

- Clarifying the scope language in the manner proposed by the Department would result in AD/CVD orders that are administrable and enforceable by the Department and U.S. Customs and Border Protection (CBP). Solar cells are not required to contain country of origin markings. It can be extremely difficult for CBP to determine the origin of various inputs in a solar module upon importation. On the other hand, all solar modules are clearly marked with country-of-origin and other identifying information. Covering all cells and modules from both the PRC and Taiwan, as described in the October 3rd Letter proposed scope clarification, would therefore significantly improve the enforceability of any future AD/CVD orders.

- To the extent that the Department's proposed scope clarification can be considered a departure from its prior country-of-origin determination, the agency is, of course, permitted to depart from its prior determinations.[195]

- Respondents' argument that the scope clarification results in a single product having two countries of origin is unfounded. Because the country-of-origin rules in the proposed scope clarifications provide a supplemental country-of-origin rule for those products not covered by the initial solar investigations, no product would at any time have two countries of origin.

- For example, Trina Solar claims that modules assembled in China with cells produced in Taiwan would result in identical products having two different countries of origin under the previous analysis and the proposed scope clarification.

- The proposed scope would also be consistent with international precedent. The recent European Union ("EU") AD/CVD investigations of Chinese solar products included "imports of crystalline silicon photovoltaic modules and key components (*i.e.*, cells and wafers) originating in or consigned from the People's Republic of China,"[196] recognizing that all cells and all modules from the subject country, in addition to other key components, must be covered.

- In the alternative, should the Department decide not to make its proposed clarification to the scope, these investigations should continue with the scope proposed by Petitioner and accepted by the Department for purposes of initiation and its preliminary determination.

**Department's Position**: After considering the facts and circumstances presented by the PRC AD and CVD investigations, as well as the parties' comments on the October 3rd Letter, for this final determination the Department has clarified the scope language of the PRC AD and CVD investigations such that subject merchandise includes all modules, laminates and/or panels assembled in the PRC that contain crystalline silicon photovoltaic cells produced in a customs territory other than the PRC. For a complete description of the scope of the investigation for this final determination, *see* section III above.

---

[195] *See Torrington*, 745 F. Supp. at 727.
[196] *See* Council Implementing Regulation (EU) No 1238/2013 of 2, Official Journal of the European Union (Dec. 2013).

Filed By: Gene Calvert, Filed Date: 12/17/14 12:45 PM, Submission Status: Approved

Barcode:3247469-01 C-570-011 INV - Investigation -
Case 1:15-cv-00067-DCP Document 32-1 Filed 04/05/15 Page 42 of 59
Case 1:15-cv-00066-DCP Document 32-1 Filed 04/05/15 Page 43 of 59

Upon initiation of these investigations, the Department set aside a period for interested parties to raise issues relating to product coverage, *i.e.*, scope.[197]  Interested parties submitted affirmative comments and rebuttal comments regarding product coverage.[198]  In the *Preliminary Determination* published on July 31, 2014, we announced that we are continuing to analyze the scope comments, including comments on whether it is appropriate to apply a traditional substantial transformation or other analysis in determining the country of origin of certain solar modules described in the scope of this investigation.[199]  Further, with respect to administering the PRC investigations, we explained that the scope of these investigations explicitly excludes any products covered by the existing AD and CVD orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the PRC.[200]  In response to interested parties' comments on the scope of this investigation (and prior to the deadlines for the submission of case and rebuttal briefs), in the October 3rd Letter the Department announced that it was considering the possibility of a scope clarification, described the possible clarification, and invited interested parties to submit comments on the clarification.  For the reasons discussed below, the Department determines that there are significant reasons for clarifying and modifying the scope of this investigation.

Importantly, it is within the Department's authority to do so.  The CAFC has explained that "the purpose of the petition is to propose an investigation," and the "purpose of the investigation is to determine what merchandise should be included in the final order."[201]  Therefore, the Department must be able to determine what merchandise should be covered by any final order.  Additionally, the purpose of the AD and CVD law is to provide a remedy, if appropriate, for alleged injury to the domestic industry that is caused by specified merchandise alleged to be dumped or unfairly subsidized.[202]  Accordingly, the Department's "practice is to provide ample deference to the Petitioner with respect to the definition of the product for which it seeks relief under the AD and CVD laws."[203]

---

[197] *See Solar Products Initiation Notice*, 79 FR at 4661; *see also Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China: Initiation of Countervailing Duty Investigation*, 79 FR 4667 (January 29, 2014).

[198] *See* scope comment submissions, dated February 18, 2014, from Gintech; Motech; NextEra Energy, Inc.; SunEdison, Inc.; Suniva, Inc.; and Yingli Green Energy Holding Company Limited, Yingli Green Energy Americas, Inc., Canadian Solar Inc., Changzhou Trina Solar Energy Co., Ltd., Wuxi Suntech Power Co., Ltd., Shanghai JA Solar Technology Co., Ltd., Hefei JA Solar Technology Co., Ltd., and Jinko Solar Co., Ltd.; *see also* rebuttal scope comment submissions, dated April 3, 2014, from Petitioner, and dated April 21, 2014, from Yingli Green Energy Americas, Inc., Canadian Solar Inc., Changzhou Trina Solar Energy Co., Ltd., Wuxi Suntech Power Co., Ltd., Shanghai JA Solar Technology Co., Ltd., Hefei JA Solar Technology Co., Ltd., and Jinko Solar Co., Ltd.

[199] *See AD PDM* at 5; *see also* CVD PDM at 4 (collectively referred to as "Pre-Prelim Scope Comments").

[200] *Id.*

[201] *See Duferco Steel Inc. v. United States*, 296 F.3d 1087, 1096-97 (Fed. Cir. 2002) ("*Duferco*").

[202] *See* sections 731 and 701 of the Act; *see also United States v. American Home Assur. Co.*, 964 F. Supp. 2d 1342, 1352-53 ("Antidumping duties serve the distinct purpose of remedying the effect of unfair trade practices resulting in actual or threatened injury to domestic like-product producers." (*citing Canadian Wheat Bd. v. United States*, 641 F.3d 1344, 1351 (Fed. Cir. 2011))); *Wolff Shoe Co. v. United States*, 141 F.3d 1116, 1117 (Fed. Cir. 1998) (Countervailing duties "are levied on subsidized imports to offset the unfair competitive advantages created by foreign subsidies.").

[203] *See Large Residential Washers From the Republic of Korea*, 77 FR 46391, 46392 (August 3, 2012) and accompanying Issues and Decision Memorandum at Comment 2.  *See also Kern Liebers USA, Inc. v. United States*,

37

The CIT has stated that the Department "retains broad discretion to define and clarify the scope of an antidumping investigation in a manner which reflects the intent of the petition."[204] Indeed, the CIT has confirmed that any scope clarifications made by the Department *should* be made in a manner which reflects the intent of the Petition, and that is what the scope clarification accomplishes here.[205] The Petition[206] and Petitioner's comments in this investigation clearly demonstrate that the Petitioner's intent is a scope that covers all solar modules assembled in the PRC using third-country solar cells. In its Petition to this investigation, the Petitioner stated its intent to include all of these modules in the scope, citing the "loophole" that resulted when, following the application of Department's substantial transformation analysis in the *Solar I* investigations, producers subject to the *Solar I* investigations increased exports to the United States of modules assembled in the PRC with non-PRC cells with the result of avoiding the reach of the *Solar I* AD and CVD orders.[207] Indeed, in the Petition for this investigation, Petitioner noted that it had argued for a scope almost identical to the scope in the October 3rd Letter in Solar I and stated that the Department's refusal to cover Chinese solar modules assembled from non-Chinese solar cells allowed Chinese companies to continue to ship solar modules to the United States duty free.[208] In these investigations, the alleged injury to the domestic industry stems from certain solar modules that are assembled in the PRC using cells produced in third countries, modules which are not covered by the scope of *Solar I* and, thereby, exceed the reach of the remedy afforded by the *Solar I* AD and CVD orders. In addition, taking the instant PRC investigations together with *Solar I*, the Petitioner has alleged that the domestic industry is being injured as a result of the unfair pricing of cells produced in the PRC, modules containing such cells, and modules assembled in the PRC with third-country cells, as well as unfair subsidization in the PRC of both cells and modules.

Beyond the Petitioner's intent, there are other facts and factors that the Department has found to be significant in considering the scope of these investigations. For example, the record demonstrates that the solar products industry involves a complex and very adaptable global supply chain which allows producers to modify their production chains easily and quickly. Petitioner has cited statements by five large Chinese solar module producers and one U.S. importer of solar modules noting the ease with which they were able to modify their production

---

881 F. Supp. 618, 621 (CIT 1995) ("The agency generally exercises {its} broad discretion to define and clarify the scope of an antidumping investigation in a manner which reflects the intent of the petition").

[204] *See Minebea Co. v. United States*, 782 F. Supp. 117, 120 (CIT 1992).

[205] *See AMS Assocs. v. United States*, 881 F. Supp. 2d 1374, 1380 (CIT 2012) (explaining that "Commerce retains broad discretion to define and clarify the scope of an antidumping investigation in a manner which reflects the intent of the petition") (citation and quotation marks omitted), aff'd, 737 F.3d 1338 (Fed. Cir. 2013); *Kern Liebers USA, Inc. v. United States*, 881 F. Supp. 618, 621 (CIT 1995) (*citing Minebea*, 782 F. Supp. at 120).

[206] *See* "Petition for the Imposition of Antidumping and Countervailing Duties on Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and Taiwan," dated December 31, 2013 ("Petitions on China and Taiwan").

[207] *See* the Petition at 3, 5-6, 21, 34, 37, and 53; Letter from Petitioner, "Re: Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: Case Brief of Solar World Americas, Inc.," dated October 16, 2014 at 5-6; Letter from Petitioner to the Department, "Re: Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and Taiwan: Rebuttal to Respondents' Scope Comments" (Apr. 3, 2014) at 11-13.

[208] *See* the Petitions on China and Taiwan, Volume 1 at 3-4.

38

chain to avoid paying the AD and CVDs imposed by *Solar I*.[209]  Further, there exist prior AD and CVD orders on related merchandise (i.e., solar cells and modules) from the PRC – *Solar I* – and following the initiation of the *Solar I* investigations and the imposition of those orders, there has been a shift in trade flows that has resulted in increased imports of non-subject modules produced in China.[210]  Such imports – if they are dumped and/or unfairly subsidized and injurious – should not be beyond the reach of the AD and CVD laws.

The Department has also taken into account considerations regarding administrability, enforceability, and potential evasion.  If these investigations result in an AD and/or CVD order, as relevant, the scope clarification adopted in this final determination will make the resulting order(s) substantially easier to administer and enforce (for both the Department and CBP), by helping to prevent significant and widespread evasion similar to the evasion that we have seen result from parties that exploit the substantial transformation analysis conducted in *Solar I*.  As indicated in the Petition, although "imports of modules from China consisted largely of modules assembled with Chinese cells" from 2010 through early 2012, "{s}ince that time, imports of modules from China have consisted almost entirely of modules assembled in China from solar cells completed or partially manufactured in Taiwan or other countries (*i.e.*, cells manufactured in Taiwan from Taiwanese inputs, or cells manufactured in Taiwan or other countries from Chinese inputs, including wafers)."[211]  The scope which was proposed in the Petition and on which we initiated investigations may result in the evasion of duties and, thus, ineffective relief to the Petitioner due to the complex and adaptable global supply chain that allows production processes for solar cells and modules to be easily moved across borders.  With this scope clarification, it is the Department's intent to reduce as much as possible additional opportunities for evasion like those that resulted after the imposition of AD and CVD cash deposits in *Solar I*.  The Department has a long-standing practice of taking potential circumvention concerns into consideration when defining the scope.[212]  This practice has been upheld by the CIT and the CAFC.[213]  Indeed, the Courts have recognized that the Department has "inherent power to

---

[209] *Id.* at 4-5.

[210] *Id.* at 3, 5-6, 21, 34, 37, and 53.

[211] *Id.* at 5-6; *see also Id.* at 21.

[212] *See, e.g.*, *Notice of Final Determination of Sales at Less Than Fair Value: Large Newspaper Printing Presses and Components Thereof, Whether Assembled or Unassembled, From Germany*, 61 FR 38166, 38169 (July 23, 1996) ("We agree with the petitioner that incomplete merchandise by necessity must be included in the scope of these investigations. Given the very large size of {large newspaper printing presses and components thereof} and the complex importation process, complicated by the further manufacturing and/or installation activities performed in the United States by the respondents, it was the Department's intent to use the language at issue to avoid creating loopholes for circumvention, including those arising from differing degrees of completeness of the imported merchandise. The Department is concerned that, because of the great number of parts involved, there is the potential that a party may attempt to exclude its merchandise from the scope of these investigations on the basis of a lack of completion."); *Cellular Mobile Telephones and Subassemblies from Japan; Final Determination of Sales at Less Than Fair Value*, 50 FR 45447, 45448 (October 31, 1985) ("The determination to include subassemblies within the scope of the investigation was based on the need to prevent circumvention of any antidumping order on {cellular mobile telephones ("CMTs")} through the importation of major CMT subassemblies, and the Department's broader conclusion that the investigation properly should include subassemblies.").

[213] *See Mitsubishi Elec. Corp. v. United States,* 700 F. Supp. 538, 555 (CIT 1988) ("*Mitsubishi I*") ("{the Department} has a certain amount of discretion to expand the language of a petition to encompass the literal intent of the petition, ... with the purpose in mind of preventing the intentional evasion or circumvention of the

39

establish the parameters of the investigation so as to carry out its mandate to administer the law effectively and in accordance with its intent."[214]

Furthermore, certain interested parties commented that they did not track their merchandise in a way that would allow them to definitively report only that merchandise falling within the "two-out-of-three" scope proposed in the Petition.[215]  The scope being adopted in these investigations resolves interested parties' concerns in this respect, by covering *all* modules assembled in the PRC from third-country cells.  Under the scope being adopted for these final determinations, producers and exporters would not need to track for purposes of these proceedings the ingots, wafers, or partial cells that are being used in the third-country cells being assembled into modules in China.

Based on these considerations, and in order to evaluate whether there is unfair pricing and/or subsidization of modules assembled in the PRC using third-country cells, the Department finds it is appropriate to determine for purposes of these investigations that the country of origin of such modules is the PRC.

In determining the country-of-origin of a product, the Department's usual practice has been to conduct a substantial transformation analysis.[216]  Consistent with its practice, the Department considered in *Solar I* whether it should apply its substantial transformation analysis and found that "the application of its substantial transformation test {was} an appropriate means to resolve country-of-origin issues like the one presented *in {that} investigation* …."[217]  Based on this analysis, the Department determined that the solar cell was the essential active component of the module, that assembly of cells into modules did not constitute substantial transformation such

---

[214] antidumping duty law."), *aff'd*, 898 F.2d 1577 (Fed. Cir. 1990); *see also Tung Mung Dev. Co. v. United States*, 26 CIT 969, 979 (CIT 2002) (citing *Mitsubishi I*, 700 F. Supp. at 555), *aff'd*, 354 F.3d 1371 (Fed. Cir. 2004).

[214] *See Torrington*, 745 F. Supp. at 728; *see also Mitsubishi Elec. Co. v. United States*, 898 F.2d 1577, 1582 (Fed. Cir. 1990) ("*Mitsubishi II*") ("The determination of the applicable scope of an antidumping order that will be effective to remedy the dumping that the {Department} has found lies within the {Department's} discretion").

[215] A group of some of the largest Chinese solar product producers stated that it is virtually impossible for importers to know and to trace the origin of the ingots and wafers in cells that are assembled into modules when the module manufacturers purchase the cells from third parties in other countries, or to distinguish between the value of modules with cells that meet Petitioner's "two-out-of-three" test and those that do not.  *See* the February 18, 2014 Scope Comments Letter submitted by of Yingli Green Energy Holding Company Limited, Yingli Green Energy Americas, Inc., Canadian Solar Inc., Changzhou Trina Solar Energy Co., Ltd., Wuxi Suntech Power Co., Ltd., Shanghai JA Solar Technology Co., Ltd., Hefei JA Solar Technology, Co., Ltd., and Jinko Solar Co., Ltd.  Further demonstrating tis, the mandatory respondent Changzhou Trina Solar Energy Co., Ltd. and Trina Solar (Changzhou) Science & Technology Co., Ltd. ("Trina Solar") stated that it does not know what country produced the wafers contained in its purchases of solar cells.  *See* Trina Solar's April 22, 2014 response at Attachment A-1.  Included in December 15, 2014 Other Proceedings' Documents Memorandum at Attachment 2.  Similarly, Yingli Green Energy Holding Company and Yingli Green Energy Americas, Inc. and Canadian Solar Inc. noted that their respective company records do not specifically identify the origin of the wafers used to produce the cells Yingli purchased from non-Chinese suppliers.  *See* both companies' February 14, 2014 quantity and value responses.  Included in December 15, 2014 Other Proceedings' Documents Memorandum at Attachment 3.

[216] *See, e.g.*, *Notice of Final Determination of Sales at Less Than Fair Value: Glycine from India*, 73 FR 16640 (March 28, 2008) and accompanying Issues and Decision Memorandum at Comment 5; *see also Stainless Steel Plate in Coils from Belgium: Final Results of Antidumping Duty Administrative Review*, 69 FR 74495 (December 14, 2004) and accompanying Issues and Decision Memorandum at Comment 4.

[217] *See Solar I IDM* at Comment 1, page 8 (emphasis added).

Filed By: Gene Calvert, Filed Date: 12/17/14 12:45 PM, Submission Status: Approved

that the assembled module could be considered a product of the country of assembly, and consequently, that modules assembled in the PRC from solar cells produced in third countries are not covered by the scope of that investigation.[218]

Although the Department routinely has found a substantial transformation analysis to be an appropriate means to determine the country of origin of merchandise under investigation, in the circumstances presented by these investigations and discussed above, the Department has determined that it needs to conduct additional analysis. Thus, contrary to certain parties' arguments, our adoption of the scope described in the October 3rd Letter is not arbitrary. Rather, it addresses the specific and special circumstances of these proceedings, as described above. Relying on the substantial transformation analysis alone could result in failure to provide relief to the domestic industry for alleged injury caused by a finished product produced in the subject country but which would be deemed to originate from a third-country for AD/CVD purposes if the traditional substantial transformation analysis were applied. In these particular proceedings, a rote application of a substantial transformation analysis would not allow the Department to address unfair pricing decisions and/or unfair subsidization concerning the modules that is taking place in the country of export. Consistent with sections 701 and 731 of the Act, the Department must be able to address such circumstances, and where appropriate, address unfair pricing decisions or unfair subsidization that is taking place in the exporting country where further manufacturing, such as assembly, occurs, notwithstanding that such activities may not necessarily result in a substantial transformation of merchandise. While the Department intends that a substantial transformation analysis will continue to be the primary manner in which it will evaluate country of origin in AD/CVD proceedings, given the facts presented by these investigations (and in light of the *Solar I* orders already in place, under which country of origin was already based on a substantial transformation analysis), the Department finds that its additional analysis is appropriate. We do not agree that our analysis is inconsistent with *Solar I*. Rather, in these investigations we are building upon our decisions in *Solar I* and finding, given the circumstances before us, that it is appropriate to go beyond our decision concerning country of origin from *Solar I* to address merchandise exported from China that is not subject to the *Solar I* orders and that is alleged to injure the domestic industry through unfair pricing and/or subsidization.

With regard to respondents' assertion that the scope clarification results in a single product having two countries of origin, we disagree. No product would at any time have two countries of origin for AD/CVD purposes. The country of origin of these modules, for AD/CVD purposes, is only the PRC. If an AD and/or CVD order results from these investigations, these modules would be subject to AD and/or CVD duties under the relevant order and not another solar-related order (*i.e.*, not *Solar I* or an order covering solar products from Taiwan, should that investigation result in an AD order). We also disagree with the Petitioner's assertion that Taiwanese cells assembled into a module in the PRC would result in a module of Taiwanese origin. With the scope clarification we have adopted for the PRC investigation, the PRC is the country of origin of all modules, laminates and/or panels assembled in the PRC that contain crystalline silicon photovoltaic cells produced in a customs territory other than the PRC.

---

[218] *See* Solar I IDM at Comment 1, page 5-7.

Filed By: Gene Calvert, Filed Date: 12/17/14 12:45 PM, Submission Status: Approved

# TAB 4

# Issues and Decision Memorandum For the Final Determination of Sales at Less Than Fair Value (Dec. 15, 2014)

# AD P.R. 817

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-570-010
Investigation
Public Document
E&C/IV: JDP/TEM

| | |
|---|---|
| DATE: | December 15, 2014 |
| MEMORANDUM TO: | Paul Piquado<br>Assistant Secretary<br>for Enforcement and Compliance |
| FROM: | Christian Marsh $\langle M$<br>Deputy Assistant Secretary<br>for Antidumping and Countervailing Duty Operations |
| SUBJECT: | Certain Crystalline Silicon Photovoltaic Products from the<br>People's Republic of China: Issues and Decision Memorandum for<br>the Final Determination of Sales at Less Than Fair Value |

## I.   SUMMARY

The Department finds that certain solar products from the PRC are being, or are likely to be, sold in the United States at LTFV, as provided in section 735 of the Act. The POI is April 1, 2013, through September 30, 2013.

After analyzing the comments submitted by interested parties, and based on our findings at verification, we made certain changes to the margin calculations for the two mandatory respondents, which also results in a change to the weighted-average dumping margin calculations for the separate-rate companies that were not selected for individual examination. We recommend that you approve the positions described in the "Discussion of the Issues" section of this memorandum. Below is the complete list of the issues for which we received comments:

### Case Issues:

Comment 1:   Scope of the Investigation
Comment 2:   Whether to Select South Africa or Thailand as the Primary Surrogate Country
Comment 3:   Whether to Offset the Cash Deposit Rate for Export Subsidies
Comment 4:   Whether the Department Should Investigate the Effects of the GOC's Alleged
             Cyberhacking on this Investigation
Comment 5:   Ultimate Ownership of Separate Rate Applicants
Comment 6:   Separate Rate Applicants with Managers or Board Members with Ties to the
             Chinese Government



## A.    Consistency with *Solar I*[11] and Court Decisions

*Respondents:*

- The Department's proposed scope clarification is arbitrary because it is inconsistent with the product coverage decisions made by the Department in *Solar I* and also ignores country of origin decisions made by the CIT and CAFC, as well as country of origin criteria stated in the Act. Such arbitrary decisions are unlawful because, as the courts have noted, the Department has an obligation to be consistent in its decisions.
  - In *Solar I,* the Department made numerous decisions that directly ruled against establishing a scope that would find solar modules assembled in China but not containing Chinese solar cells subject to the order. The Department's determinations in *Solar I* were made on the following bases:
    - A product can only have one country of origin,[12]
    - AD and CVD investigations only cover products with a country of origin of the country under investigation,[13] and
    - The Department relies on the substantial transformation test to determine the country of origin of a product.[14]
    - In applying this substantial transformation test in *Solar I*, the Department determined that "module assembly does not substantially alter the essential nature of solar cells nor does it constitute significant processing such that it changes the country of origin of the cell."[15] The Department found that the solar cell imparts the essential character of a solar module, and, therefore, the origin of the solar cell is determinative of the country of origin of the class or kind of merchandise at issue here. Therefore, "where solar cell production occurs in a different country from solar module assembly, the country of origin of the solar modules/panels is the country in which the solar cell was produced."[16]
    - If the approach in *Solar I* described above were applied to these investigations the conclusion would be that the scope of an AD order must be limited to subject merchandise "produced" and "originating" in the country covered by the order, which here is China and Taiwan. Merchandise produced or originating in a country other than the country

---

[11] *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Affirmative Countervailing Duty Determination and Final Affirmative Critical Circumstances Determination*, 77 FR 63788 (October 17, 2012) ("*Solar I CVD Final Determination*") and *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Final Determination of Sales at Less Than Fair Value, and Affirmative Final Determination of Critical Circumstances, in Part*, 77 FR 63791 (October 17, 2012) ("*Solar I AD Final Determination*") (these two investigations are referred to generally as "*Solar I*").

[12] *See Solar I AD Final Determination* and accompanying Issues and Decision Memorandum ("*Solar I IDM*") at Comment 1, page 8.

[13] *Id.*

[14] *Id* at 5-6.

[15] *See* March 19, 2012 Memorandum from Jeff Pedersen to Chris Marsh "Scope Clarification: Antidumping and Countervailing Duty Investigations of Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China ("Solar I Substantial Transformation Memorandum") (placed on the record of this proceeding on December 15, 2014).

[16] *Id.*

covered by an order, which based on the previous substantial transformation decision, includes solar modules assembled in China or Taiwan from solar cells produced in countries other than China or Taiwan, have a different country of origin than China or Taiwan, and thus may not be included in the scope of these investigations.

o Decisions by the CIT and the CAFC, as well as sections of the Act support finding that products under an investigation can only have one country of origin and that the basis for determining this is the substantial transformation test.

- Applying the country of origin determination implied in the scope as proposed in the October 3rd Letter, as well as the criteria applied in *Solar I*, would result in a solar module assembled in one country containing another country's cell to have two countries of origin. CIT decisions[17] have stated that a product can only have a single country of origin for AD and CVD purposes.

- The scope as proposed in the October 3rd Letter is also contrary to the statutory language at Section 731 of the Act, which provides for the imposition of antidumping duties on "subject merchandise," defined as "the class or kind of merchandise that is within the scope of an investigation, a review, a suspension agreement, {or} an order...."[18]  This provision requires the Department to make a finding of dumping for a class or kind of merchandise from a particular country.[19]

- The scope as proposed in the October 3rd Letter ignores the established criteria for determining the country of origin, which is the substantial transformation analysis.

  - The CIT has determined that the "substantial transformation" analysis provides a means for the Department to carry out its country of origin examination and properly guards against circumvention of existing antidumping orders.[20]

o The Department is prevented from contradicting these decisions in *Solar I* because the Department is obliged to be consistent in its decision-making across its investigations.

- The CIT has explained that although an agency is not strictly bound to its precedent, "{i}t is a principle of administrative law that an 'agency must either conform to its prior norms and decisions or explain the reason for its departure from such precedent."[21]  The CAFC has similarly stated that the Department cannot ignore its own precedent absent some legitimate reason for departing from it.[22]

---

[17] *See Ugine & ALZ Belgium, N.V. v. United States*, 517 F. Supp. 2d 1333, 1345 (CIT 2007) ("*Ugine I*"), *aff'd*, 551 F.3d 1339 ("*Ugine III*") (Fed. Cir. 2009).

[18] *Id.*; Section 771(25) of the Act.

[19] *See E.I. DuPont de Nemours & Co. v. United States*, 8 F. Supp. 2d 854, 859 (CIT 1998) ("*Du Pont*"); *see also Ugine I*, 517 F. Supp. 2d at 1345.

[20] *See Du Pont*, 8 F. Supp. 2d at 857 (emphasis added).

[21] *See Torrington Co. v. United States*, 745 F. Supp. 718, 727 (CIT 1990) (quoting *Mississippi Valley Gas Co. v. Federal Energy Regulatory Comm'n*, 659 F.2d 488, 506 (5th Cir. 1981)); *Neenah Foundry Co. v. United States,* 142 F. Supp. 2d 1008, 1022 (CIT 2001); *Hussey Copper Ltd., v. United States*, 834 F. Supp. 413,418 (CIT 1993).

[22] *See Ugine III*, 551 F.3d at 1349.

Filed By: Jeffrey Pedersen, Filed Date: 12/17/14 12:45 PM, Submission Status: Approved

■ The Department has not articulated reasons for diverging from these decisions. Instead, the Department stated in these investigations, that it is informed "by the product coverage decisions that it made" in *Solar I*.[23]

*Petitioner:*

- In the preliminary determination, the Department stated that it was continuing to analyze interested parties' scope comments, including comments on whether it is appropriate to apply a traditional substantial transformation or other analysis in determining the country of origin of certain solar modules described in the scope of the investigation.
- Petitioner supports the proposed scope clarification in the Department's October 3rd Letter, and requests that the Department adopt it for purposes of its final determination and any resulting AD order.
- The Department's proposed scope clarification is fully consistent with the Petitioner's intent. It has been clear since the start of the first solar AD/CVD investigations, and throughout the current investigations, that Petitioner's intent has always been to cover all cells from the PRC and all modules from the PRC and, now, all cells from Taiwan and all modules from Taiwan.[24]
- The Department's proposed scope clarification would best effectuate the U.S. trade laws and provide effective relief to the injured domestic industry, and would be easily administrable and enforceable by the agencies.
- The remedial purposes of the AD/CVD laws are best served by the proposed scope clarification. The Department has determined that both cells and modules from the PRC and Taiwan are being dumped, and both Chinese cells and modules are subsidized. As such, the law obligates Commerce to impose duties on these products.
- Clarifying the scope language in the manner proposed by the Department would result in AD/CVD orders that are administrable and enforceable by the Department and CBP. Solar cells are not required to contain country of origin markings. It can be extremely difficult for CBP to determine the origin of various inputs in a solar module upon importation. On the other hand, all solar modules are clearly marked with country-of-origin and other identifying information. Covering all cells and modules from both the PRC and Taiwan, as described in the October 3rd Letter proposed scope clarification, would therefore significantly improve the enforceability of any future AD/CVD orders.
- To the extent that the Department's proposed scope clarification can be considered a departure from its prior country-of-origin determination, the agency is, of course, permitted to depart from its prior determinations.[25]
- Respondents' argument that the scope clarification results in a single product having two countries of origin is unfounded. Because the country-of-origin rules in the proposed scope clarifications provide a supplemental country-of-origin rule for those products not covered by the initial solar investigations, no product would at any time have two countries of origin. As an example, Trina Solar claims that modules assembled in China with cells produced in Taiwan would result in identical products having two different countries of origin under the previous analysis and the proposed scope clarification.

---

[23] *See Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China and Taiwan: Initiation of Antidumping Duty Investigations*, 79 FR 4661 (January 29, 2014) ("*Solar Products Initiation Notice*").
[24] *See, e.g.*, Solar I IDM at Comment 1.
[25] *See Torrington*, 745 F. Supp. at 727.

- The proposed scope would also be consistent with international precedent. The recent EU AD/CVD investigations of Chinese solar products included "imports of crystalline silicon photovoltaic modules and key components (*i.e.*, cells and wafers) originating in or consigned from the People's Republic of China,"[26] recognizing that all cells and all modules from the subject country, in addition to other key components, must be covered.

- In the alternative, should the Department decide not to make its proposed clarification to the scope, these investigations should continue with the scope proposed by Petitioner and accepted by the Department for purposes of initiation and its preliminary determination.

**Department's Position**:

After considering the facts and circumstances presented by the PRC AD and CVD investigations, as well as the parties' comments on the October 3rd Letter, for this final determination the Department has clarified the scope language of the PRC AD and CVD investigations such that subject merchandise includes all modules, laminates and/or panels assembled in the PRC that contain crystalline silicon photovoltaic cells produced in a customs territory other than the PRC. For a complete description of the scope of the investigation for this final determination, *see* section III above.

Upon initiation of these investigations, the Department set aside a period for interested parties to raise issues relating to product coverage, *i.e.*, scope.[27] Interested parties submitted affirmative comments and rebuttal comments regarding product coverage.[28] In the *Preliminary Determination* published on July 31, 2014, we announced that the Department was continuing to analyze the scope comments, including comments on whether it was appropriate to apply a traditional substantial transformation or other analysis in determining the country of origin of certain solar modules described in the scope of this investigation.[29] Further, with respect to administering the PRC investigations, we explained that the scope of these investigations explicitly excludes any products covered by the existing AD and CVD orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the PRC.[30] In response to interested parties' comments on the scope of this investigation (and prior to the deadlines for the submission of case and rebuttal briefs), in the October 3rd Letter the Department announced that it was considering the possibility of a scope clarification, described the possible clarification, and invited interested parties to submit comments on the clarification. For the reasons discussed

---

[26] *See* Council Implementing Regulation (EU) No 1238/2013 of 2, Official Journal of the European Union (Dec. 2013).

[27] *See Solar Products Initiation Notice*, 79 FR at 4661; *see also Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China: Initiation of Countervailing Duty Investigation*, 79 FR4667 (January 29, 2014).

[28] *See* scope comment submissions, dated February 18, 2014, from Gintech; Motech; Neo Solar Power Corporation; NextEra Energy, Inc.; SunEdison, Inc.; Suniva, Inc.; Solartech Energy Corp.; and Yingli Green Energy Holding Company Limited, Yingli Green Energy Americas, Inc., Canadian Solar Inc., Changzhou Trina Solar Energy Co., Ltd., Wuxi Suntech Power Co., Ltd., Shanghai JA Solar Technology Co., Ltd., Hefei JA Solar Technology Co., Ltd., and Jinko Solar Co., Ltd.; *see also* rebuttal scope comment submissions, dated April 3, 2014, from Petitioner, and dated April 21, 2014, from Yingli Green Energy Americas, Inc., Canadian Solar Inc., Changzhou Trina Solar Energy Co., Ltd., Wuxi Suntech Power Co., Ltd., Shanghai JA Solar Technology Co., Ltd., Hefei JA Solar Technology Co., Ltd., and Jinko Solar Co., Ltd.

[29] *See AD PDM* at 5; *see also* CVD PDM at 4.

[30] *See id.*

11

below, the Department determines that there are significant reasons for clarifying and modifying the scope of this investigation.

As a threshold matter, the Department has final authority to clarify and modify the scope in this proceeding in order to fulfill its statutory mandate. The CAFC has explained that "the purpose of the petition is to propose an investigation," and the "purpose of the investigation is to determine what merchandise should be included in the final order."[31] Therefore, the Department must be able to determine what merchandise should be covered by any final order. Additionally, the purpose of the AD and CVD law is to provide a remedy, if appropriate, for alleged injury to the domestic industry that is caused by specified merchandise alleged to be dumped or unfairly subsidized.[32] Accordingly, the Department's "practice is to provide ample deference to the Petitioner with respect to the definition of the product for which it seeks relief under the AD and CVD laws."[33]

The CIT has likewise stated that the Department "retains broad discretion to define and clarify the scope of an antidumping investigation in a manner which reflects the intent of the petition."[34] Indeed, the CIT has confirmed that any scope clarifications made by the Department *should* be made in a manner which reflects the intent of the Petition, and that is what the scope clarification accomplishes here.[35] The Petition[36] and Petitioner's comments in this investigation demonstrate that the Petitioner's intent is a scope that covers all solar modules assembled in the PRC using third-country solar cells. In its Petition to this investigation, the Petitioner stated its intent to include all of these modules in the scope, citing the "loophole" that resulted when, following the application of Department's substantial transformation analysis in the *Solar I* investigations, producers subject to the *Solar I* investigations increased exports to the United States of modules assembled in the PRC with non-PRC cells with the result of avoiding the reach of the *Solar I* AD and CVD orders.[37] Indeed, in the Petition for this investigation, Petitioner noted that it had argued for a scope almost identical to the scope in the October 3rd Letter in Solar I and stated

---

[31] *See Duferco Steel Inc. v. United States*, 296 F.3d 1087, 1096-97 (Fed. Cir. 2002) ("*Duferco*").

[32] *See* sections 731 and 701 of the Act; *see also United States v. American Home Assur. Co.*, 964 F. Supp. 2d 1342, 1352-53 ("Antidumping duties serve the distinct purpose of remedying the effect of unfair trade practices resulting in actual or threatened injury to domestic like-product producers." (*citing Canadian Wheat Bd. v. United States*, 641 F.3d 1344, 1351 (Fed. Cir. 2011))); *Wolff Shoe Co. v. United States*, 141 F.3d 1116, 1117 (Fed. Cir. 1998) (Countervailing duties "are levied on subsidized imports to offset the unfair competitive advantages created by foreign subsidies.").

[33] *See Large Residential Washers From the Republic of Korea*, 77 FR 46391, 46392 (August 3, 2012) and accompanying Issues and Decision Memorandum at Comment 2. *See also Kern Liebers USA, Inc. v. United States*, 881 F. Supp. 618, 621 (CIT 1995) ("The agency generally exercises {its} broad discretion to define and clarify the scope of an antidumping investigation in a manner which reflects the intent of the petition").

[34] *See Minebea Co. v. United States*, 782 F. Supp. 117, 120 (CIT 1992).

[35] *See AMS Assocs. v. United States*, 881 F. Supp. 2d 1374, 1380 (CIT 2012) (explaining that "Commerce retains broad discretion to define and clarify the scope of an antidumping investigation in a manner which reflects the intent of the petition") (citation and quotation marks omitted), aff'd, 737 F.3d 1338 (Fed. Cir. 2013); *Kern Liebers USA, Inc. v. United States*, 881 F. Supp. 618, 621 (CIT 1995) (*citing Minebea*, 782 F. Supp. at 120).

[36] *See* "Petition for the Imposition of Antidumping and Countervailing Duties on Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and Taiwan," dated December 31, 2013 ("Petitions on China and Taiwan").

[37] *See* the Petition at 3, 5-6, 21, 34, 37, and 53; Letter from Petitioner, "Re: Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: Case Brief of Solar World Americas, Inc.," dated October 16, 2014 at 5-6; Letter from Petitioner to the Department, "Re: Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and Taiwan: Rebuttal to Respondents' Scope Comments" (Apr. 3, 2014) at 11-13.

that the Department's refusal to cover Chinese solar modules assembled from non-Chinese solar cells allowed Chinese companies to continue to ship solar modules to the United States duty free.[38]  In these investigations, the alleged injury to the domestic industry stems from certain solar modules that are assembled in the PRC using cells produced in third countries, modules which are not covered by the scope of *Solar I* and, thereby, exceed the reach of the remedy afforded by the *Solar I* AD and CVD orders.  In addition, taking the instant PRC investigations together with *Solar I*, the Petitioner has alleged that the domestic industry is being injured as a result of the unfair pricing of cells produced in the PRC, modules containing such cells, and modules assembled in the PRC with third-country cells, as well as unfair subsidization in the PRC of both cells and modules.

Beyond the Petitioner's intent, there are other facts and factors that the Department has found to be significant in considering the scope of these investigations.  For example, the record demonstrates that the solar products industry involves a complex and readily adaptable global supply chain which allows producers to modify their production chains easily and quickly. Petitioner has cited statements by five large Chinese solar module producers and one U.S. importer of solar modules noting the ease with which they were able to modify their production chain to avoid paying the AD and CVDs imposed by *Solar I*.[39]  Further, there exist prior AD and CVD orders on related merchandise (i.e., solar cells and modules) from the PRC – *Solar I* – and following the initiation of the *Solar I* investigations and the imposition of those orders, there has been a shift in trade flows that has resulted in increased imports of non-subject modules produced in China.[40]  Such imports – if they are dumped and/or unfairly subsidized and injurious – should not be beyond the reach of the AD and CVD laws.

The Department has also taken into account considerations regarding administrability, enforceability, and potential evasion.  If these investigations result in an AD and/or CVD order, as relevant, the scope clarification adopted in this final determination will make the resulting order(s) substantially easier to administer and enforce (for both the Department and CBP), by helping to prevent significant and widespread evasion similar to the evasion that that has resulted due to parties that have exploited the substantial transformation analysis conducted in *Solar I*. As indicated in the Petition, although "imports of modules from China consisted largely of modules assembled with Chinese cells" from 2010 through early 2012, "{s}ince that time, imports of modules from China have consisted almost entirely of modules assembled in China from solar cells completed or partially manufactured in Taiwan or other countries (*i.e.*, cells manufactured in Taiwan from Taiwanese inputs, or cells manufactured in Taiwan or other countries from Chinese inputs, including wafers)."[41]  The scope which was proposed in the Petition and on which we initiated investigations may result in the evasion of duties and, thus, ineffective relief to the Petitioner due to the complex and adaptable global supply chain that allows production processes for solar cells and modules to be easily moved across borders.  With this scope clarification, it is the Department's intent to reduce as much as possible additional opportunities for evasion like those that resulted after the imposition of AD and CVD cash

---

[38] *See* the Petitions on China and Taiwan, Volume 1 at 3-4.
[39] *See Id*. at 4-5.
[40] *See Id*. at 3, 5-6, 21, 34, 37, and 53.
[41] *See Id*. at 5-6; *see also Id*. at 21.

deposits in *Solar I*.  The Department has a long-standing practice of taking potential circumvention concerns into consideration when defining the scope.[42]  This practice has been upheld by the CIT and the CAFC.[43]  Indeed, the Courts have recognized that the Department has "inherent power to establish the parameters of the investigation so as to carry out its mandate to administer the law effectively and in accordance with its intent."[44]

Furthermore, certain interested parties commented that they did not track their merchandise in a manner that would allow them to definitively report only that merchandise falling within the "two-out-of-three" scope proposed in the Petition.[45]  The scope being adopted in these investigations resolves interested parties' concerns in this respect, by covering *all* modules assembled in the PRC from third-country cells.  Under the scope being adopted for these final determinations, producers and exporters would not need to track for purposes of these proceedings the ingots, wafers, or partial cells that are being used in the third-country cells being assembled into modules in China.

---

[42] *See, e.g.*, *Notice of Final Determination of Sales at Less Than Fair Value: Large Newspaper Printing Presses and Components Thereof, Whether Assembled or Unassembled, From Germany*, 61 FR 38166, 38169 (July 23, 1996) ("We agree with the petitioner that incomplete merchandise by necessity must be included in the scope of these investigations. Given the very large size of {large newspaper printing presses and components thereof} and the complex importation process, complicated by the further manufacturing and/or installation activities performed in the United States by the respondents, it was the Department's intent to use the language at issue to avoid creating loopholes for circumvention, including those arising from differing degrees of completeness of the imported merchandise. The Department is concerned that, because of the great number of parts involved, there is the potential that a party may attempt to exclude its merchandise from the scope of these investigations on the basis of a lack of completion."); *Cellular Mobile Telephones and Subassemblies from Japan; Final Determination of Sales at Less Than Fair Value*, 50 FR 45447, 45448 (October 31, 1985) ("The determination to include subassemblies within the scope of the investigation was based on the need to prevent circumvention of any antidumping order on {cellular mobile telephones ("CMTs")} through the importation of major CMT subassemblies, and the Department's broader conclusion that the investigation properly should include subassemblies.").

[43] *See Mitsubishi Elec. Corp. v. United States*, 700 F. Supp. 538, 555 (CIT 1988) ("*Mitsubishi I*") ("{the Department} has a certain amount of discretion to expand the language of a petition to encompass the literal intent of the petition, ... with the purpose in mind of preventing the intentional evasion or circumvention of the antidumping duty law."), *aff'd*, 898 F.2d 1577 (Fed. Cir. 1990); *see also Tung Mung Dev. Co. v. United States*, 26 CIT 969, 979 (CIT 2002) (citing *Mitsubishi I*, 700 F. Supp. at 555), *aff'd*, 354 F.3d 1371 (Fed. Cir. 2004).

[44] *See Torrington*, 745 F. Supp. at 728; *see also Mitsubishi Elec. Co. v. United States*, 898 F.2d 1577, 1582 (Fed. Cir. 1990) ("*Mitsubishi II*") ("The determination of the applicable scope of an antidumping order that will be effective to remedy the dumping that the {Department} has found lies largely in the {Department's} discretion").

[45] A group of some of the largest Chinese solar product producers stated that it is virtually impossible for importers to know and to trace the origin of the ingots and wafers in cells that are assembled into modules when the module manufacturers purchase the cells from third parties in other countries, or to distinguish between the value of modules with cells that meet Petitioner's "two-out-of-three" test and those that do not.  *See* the February 18, 2014 Scope Comments Letter submitted by of Yingli Green Energy Holding Company Limited, Yingli Green Energy Americas, Inc., Canadian Solar Inc., Changzhou Trina Solar Energy Co., Ltd., Wuxi Suntech Power Co., Ltd., Shanghai JA Solar Technology Co., Ltd., Hefei JA Solar Technology, Co., Ltd., and Jinko Solar Co., Ltd.  Further demonstrating tis, the mandatory respondent Trina Solar stated that it does not know what country produced the wafers contained in its purchases of solar cells.  *See* Trina Solar's April 22, 2014 response at Attachment A-1.  Similarly, Yingli Green Energy Holding Company and Yingli Green Energy Americas, Inc. and Canadian Solar Inc. noted that their respective company records do not specifically identify the origin of the wafers used to produce the cells Yingli purchased from non-Chinese suppliers.  *See* both companies' February 14, 2014 quantity and value responses.

Filed By: Jeffrey Pedersen, Filed Date: 12/17/14 12:45 PM, Submission Status: Approved

Based on these considerations, and in order to evaluate whether there is unfair pricing and/or subsidization of modules assembled in the PRC using third-country cells, the Department finds it is appropriate to determine for purposes of these investigations that the country of origin of such modules is the PRC.

In determining the country-of-origin of a product, the Department's usual practice has been to conduct a substantial transformation analysis.[46] Consistent with its practice, the Department considered in *Solar I* whether it should apply its substantial transformation analysis and found that "the application of its substantial transformation test {was} an appropriate means to resolve country-of-origin issues like the one presented *in {that} investigation* …."[47] Based on this analysis and the facts in that proceeding, the Department determined in *Solar I* that the solar cell was the essential active component of the module, that assembly of cells into modules did not constitute substantial transformation such that the assembled module could be considered a product of the country of assembly, and consequently, that modules assembled in the PRC from solar cells produced in third countries were not covered by the scope of that investigation.[48]

Although the Department routinely has found a substantial transformation analysis to be an appropriate means to determine the country of origin of merchandise under investigation, in the circumstances presented by these investigations and discussed above, the Department has determined that it needs to conduct additional analysis. Thus, contrary to certain parties' arguments, our adoption of the scope described in the October 3rd Letter is not arbitrary. Rather, it addresses the specific and special circumstances of these proceedings, as described above. Relying on the substantial transformation analysis alone could result in failure to provide relief to the domestic industry for alleged injury caused by a finished product produced in the subject country but which would be deemed to originate from a third-country for AD/CVD purposes if the traditional substantial transformation analysis were applied. In these particular proceedings, a rote application of a substantial transformation analysis would not allow the Department to address unfair pricing decisions and/or unfair subsidization concerning the modules that is taking place in the country of export. Consistent with sections 701 and 731 of the Act, the Department must be able to address such circumstances, and where appropriate, address unfair pricing decisions or unfair subsidization that is taking place in the exporting country where further manufacturing, such as assembly, occurs, notwithstanding that such activities may not necessarily result in a substantial transformation of merchandise. While the Department intends that a substantial transformation analysis will continue to be the primary manner in which it will evaluate country of origin in AD/CVD proceedings, given the facts presented by these investigations (and in light of the *Solar I* orders already in place, under which country of origin was already based on a substantial transformation analysis), the Department finds that its additional analysis is appropriate. We do not agree that our analysis is inconsistent with *Solar I*. Rather, in these investigations we are building upon our decisions in *Solar I* and finding, given

---

[46] *See, e.g., Notice of Final Determination of Sales at Less Than Fair Value: Glycine from India*, 73 FR 16640 (March 28, 2008) and accompanying Issues and Decision Memorandum at Comment 5; *see also Stainless Steel Plate in Coils from Belgium: Final Results of Antidumping Duty Administrative Review*, 69 FR 74495 (December 14, 2004) and accompanying Issues and Decision Memorandum at Comment 4.

[47] *See* Solar I IDM at Comment 1, page 8 (emphasis added).

[48] *Id.* at Comment 1, page 5-7.

the circumstances before us, that it is appropriate to go beyond our decision concerning country of origin from *Solar I* to address merchandise exported from China that is not subject to the *Solar I* orders and that is alleged to injure the domestic industry through unfair pricing and/or subsidization.

With regard to respondents' assertion that the scope clarification results in a single product having two countries of origin, we disagree. No product would at any time have two countries of origin for AD/CVD purposes. The country of origin of these modules, for AD/CVD purposes, is only the PRC. If an AD and/or CVD order results from these investigations, these modules would be subject to AD and/or CVD duties under the relevant order and not another solar-related order (*i.e.*, not *Solar I* or an order covering solar products from Taiwan, should that investigation result in an AD order). We also disagree with the Petitioner's assertion that Taiwanese cells assembled into a module in the PRC would result in a module of Taiwanese origin. With the scope clarification we have adopted for the PRC investigation, the PRC is the country of origin of all modules, laminates and/or panels assembled in the PRC that contain crystalline silicon photovoltaic cells produced in a customs territory other than the PRC.

## B.     Extent of the Scope Clarification

*Respondents:*
- The scope as proposed in the October 3rd Letter is not a clarification, but an unlawful expansion and alteration of the scope.
  - The scope as proposed in the October 3rd Letter eliminates entirely the "two out of three" principle incorporated into the scope of these investigations, adds to the scope solar modules made from solar cells from countries outside China and Taiwan, and thereby crafts a scope of the investigation that was never contemplated in the Petitions or in any other submission or determination before or after the initiation of these investigations.
  - Petitioner has not requested the expanded scope proposed by the Department, and nothing in the Petition or in Petitioner's subsequent submissions to the Department or the ITC indicates otherwise.
  - There are numerous CIT decisions demonstrating that a significant expansion and alteration of the scope as outlined in the October 3rd Letter goes far beyond what the CIT decisions have found permissible.[49]
  - The Department stated in *Softwood Lumber from Canada* that while it has the authority to define or clarify the scope of an investigation and must exercise this authority in a manner which reflects the intent of the Petition, the Department generally should not use its authority to define the scope of an investigation in a manner that would thwart the statutory mandate to provide the relief requested in the Petition. As a result, absent an "overarching reason to modify the scope in the Petition, the Department accepts it."[50]

---

[49] *See Minebea*, 782 F. Supp. at 120; *see also Allegheny Bradford Corp. v. United States*, 342 F. Supp. 2d 1172 (CIT 2004); *Smith Corona Corp. v. United States*, 796 F. Supp. 1532 (CIT 1992).
[50] *Notice of Final Determination of Sales at Less Than Fair Value: Certain Softwood Lumber Products from Canada*, 67 FR 15539, 15542 (April 2, 2002) ("*Softwood Lumber from Canada*").

Filed By: Jeffrey Pedersen, Filed Date: 12/17/14 12:45 PM, Submission Status: Approved

**TAB 5**

**Certain Crystalline Silicon Photovoltaic Products
From the People's Republic of China**, 79 Fed.
Reg. 76962 (Dep't Commerce Dec. 23, 2014) (final
CVD determ.)

**CVD P.R. 408**

**76962**   **Federal Register** / Vol. 79, No. 246 / Tuesday, December 23, 2014 / Notices

which subsection of 19 CFR 351.102(b)(21) the information is being submitted and, if the information is submitted to rebut, clarify, or correct factual information already on the record, to provide an explanation identifying the information already on the record that the factual information seeks to rebut, clarify, or correct. The final rule also modified 19 CFR 351.301 so that, rather than providing general time limits, there are specific time limits based on the type of factual information being submitted. These modifications are effective for all segments initiated on or after May 10, 2013. Please review the final rule, available at *http://enforcement.trade.gov/frn/2013/1304frn/2013–08227.txt*, prior to submitting factual information in this segment.

Any party submitting factual information in an antidumping duty or countervailing duty proceeding must certify to the accuracy and completeness of that information.[7] Parties are hereby reminded that revised certification requirements are in effect for company/government officials as well as their representatives. Ongoing segments of any antidumping duty or countervailing duty proceedings initiated on or after March 14, 2011 should use the formats for the revised certifications provided at the end of the *Interim Final Rule*.[8] All segments of any antidumping duty or countervailing duty proceedings initiated on or after August 16, 2013, should use the formats for the revised certifications provided at the end of the *Final Rule*.[9] The Department intends to reject factual submissions in any proceeding segments if the submitting party does not comply with applicable revised certification requirements.

**Revised Extension of Time Limits Regulation**

On September 20, 2013, the Department modified its regulation concerning the extension of time limits for submissions in antidumping and countervailing duty proceedings: *Final Rule*, 78 FR 57790 (September 20, 2013). The modification clarifies that parties may request an extension of time limits before a time limit established under Part 351 expires, or as otherwise specified by the Secretary. In general, an extension request will be considered untimely if it is filed after the time limit established under Part 351 expires. For submissions which are due from multiple parties simultaneously, an extension request will be considered untimely if it is filed after 10:00 a.m. on the due date. Examples include, but are not limited to: (1) Case and rebuttal briefs, filed pursuant to 19 CFR 351.309; (2) factual information to value factors under 19 CFR 351.408(c), or to measure the adequacy of remuneration under 19 CFR 351.511(a)(2), filed pursuant to 19 CFR 351.301(c)(3) and rebuttal, clarification and correction filed pursuant to 19 CFR 351.301(c)(3)(iv); (3) comments concerning the selection of a surrogate country and surrogate values and rebuttal; (4) comments concerning U.S. Customs and Border Protection data; and (5) quantity and value questionnaires. Under certain circumstances, the Department may elect to specify a different time limit by which extension requests will be considered untimely for submissions which are due from multiple parties simultaneously. In such a case, the Department will inform parties in the letter or memorandum setting forth the deadline (including a specified time) by which extension requests must be filed to be considered timely. This modification also requires that an extension request must be made in a separate, stand-alone submission, and clarifies the circumstances under which the Department will grant untimely-filed requests for the extension of time limits. These modifications are effective for all segments initiated on or after October 21, 2013. Please review the final rule, available at *http://www.gpo.gov/fdsys/pkg/FR-2013-09-20/html/2013-22853.htm*, prior to submitting factual information in these segments.

These initiations and this notice are in accordance with section 751(a) of the Act (19 U.S.C. 1675(a)) and 19 CFR 351.221(c)(1)(i).

Dated: December 17, 2014.

**Christian Marsh,**

*Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations.*

[FR Doc. 2014–30074 Filed 12–22–14; 8:45 am]

**BILLING CODE 3510–DS–P**

---

**DEPARTMENT OF COMMERCE**

**International Trade Administration**

**[C–570–011]**

**Countervailing Duty Investigation of Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China: Final Affirmative Countervailing Duty Determination**

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** The Department of Commerce (the Department) published the *Preliminary Determination* of the countervailing duty (CVD) investigation of certain crystalline silicon photovoltaic products (certain solar products) from the People's Republic of China (the PRC) on June 10, 2014.[1] The Department determines that countervailable subsidies are being provided to producers and exporters of certain solar products from the PRC. For information on the estimated subsidy rates, *see* the "Suspension of Liquidation" section of this notice. The period of investigation (POI) is January 1, 2012, through December 31, 2012.

**DATES:** *Effective Date:* December 23, 2014.

**FOR FURTHER INFORMATION CONTACT:** Gene Calvert or Justin Neuman, AD/CVD Operations, Office VII, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 14th Street and Constitution Avenue NW., Washington, DC 20230; Phone: (202) 482–3586, or (202) 482–0486, respectively.

**SUPPLEMENTARY INFORMATION:**

**Background**

The petitioner, SolarWorld Americas, Inc., filed its petition with the Department on December 31, 2013, seeking the imposition of countervailing duties on certain solar products from the PRC and we initiated this investigation on January 29, 2014.[2] The Department published the *Preliminary Determination* on June 10, 2014. On

---

[7] *See* section 782(b) of the Act.

[8] *See Certification of Factual Information to Import Administration during Antidumping and Countervailing Duty Proceedings: Interim Final Rule*, 76 FR 7491 (February 10, 2011) ("*Interim Final Rule*"), amending 19 CFR 351.303(g)(1) and (2); *Certification of Factual Information to Import Administration during Antidumping and Countervailing Duty Proceedings: Supplemental Interim Final Rule*, 76 FR 54697 (September 2, 2011).

[9] *See Certification of Factual Information To Import Administration During Antidumping and Countervailing Duty Proceedings*, 78 FR 42678 (July 17, 2013) ("*Final Rule*"); *see also* the frequently asked questions regarding the *Final Rule*, available at *http://enforcement.trade.gov/tlei/notices/factual_info_final_rule_FAQ_07172013.pdf*.

[1] *See Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China: Preliminary Affirmative Countervailing Duty Determination*, 79 FR 33174 (June 10, 2014) (*Preliminary Determination*).

[2] *See* Letter from Petitioner, "Petition for the Imposition of Antidumping and Countervailing Duties: Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and Taiwan,'' (December 31, 2013) (the petition); *Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China: Initiation of Countervailing Duty Investigation*, 79 FR 4667 (January 29, 2014) (Initiation Notice).

**Federal Register** / Vol. 79, No. 246 / Tuesday, December 23, 2014 / Notices          **76963**

June 9, 2014, the Government of the People's Republic of China submitted a ministerial error allegation regarding aspects of the *Preliminary Determination*. On June 10, 2014, the mandatory company respondents, Changzhou Trina Solar Energy Co., Ltd. and its cross-owned affiliate Trina Solar (Changzhou) Science & Technology Co., Ltd. (Collectively, Trina Solar), and Wuxi Suntech Power Co., Ltd. and its cross-owned affiliates also submitted a ministerial error allegation. On July 31, 2014, we aligned the final determination in this investigation with the final determination in the companion antidumping duty investigation on certain solar products from the PRC.[3] On August 15, 2014, the Department rejected the Government of the People's Republic of China's (the GOC's) June 9, 2014, ministerial error allegation, as well as Trina Solar's and Wuxi Suntech's June 10, 2014, submissions, explaining that their submissions were noncompliant with the Department's procedures for submitting factual information. Trina Solar and Wuxi Suntech each timely resubmitted their ministerial error allegations on August 19, 2014. On August 21, 2014, the Department determined that no ministerial errors exist with respect to Trina Solar's and Wuxi Suntech's allegations.[4] Between August 20 and September 2, 2014, we conducted verification of the questionnaire responses submitted by the GOC, Trina Solar, and Wuxi Suntech.[5]

On October 3, 2014, in response to interested parties' comments on the scope of this investigation, the Department announced that it was considering the possibility of a scope clarification, described the possible clarification, and provided interested parties with an opportunity to submit comments on the potential clarification.[6]

Between October 16 and October 27, 2014, interested parties submitted case and rebuttal briefs. We did not conduct a hearing in this proceeding, as any requests for a hearing were timely withdrawn. A full discussion of the issues raised by parties for this final determination may be found in the Final Decision Memorandum.[7] The Final Decision Memorandum is a public document and is on file electronically via Enforcement and Compliance's Antidumping and Countervailing Duty Centralized Electronic Service System (ACCESS).[8] ACCESS is available to registered users at *http://access.trade.gov*, and is available to all parties in the Central Records Unit, room 7046 of the main Department of Commerce building. In addition, a complete version of the Final Decision Memorandum can be accessed directly at *http://enforcement.trade.gov/frn/*. The signed Final Decision Memorandum and the electronic version are identical in content.

## Scope Comments and Scope Clarification

As indicated in the "Background" section above, the Department received comments regarding the scope of this investigation from numerous interested parties. The Department summarized these comments and addressed them in the accompanying Final Decision Memorandum.[9] As explained in the Final Decision Memorandum, to facilitate the scope's administrability and enforcement, we have clarified the scope language such that subject merchandise includes all modules, laminates and/or panels assembled in the PRC that contain crystalline silicon photovoltaic cells produced in a customs territory other than the PRC.[10]

The scope of the investigation for this final determination is below.

## Scope of the Investigation

The merchandise covered by this investigation is modules, laminates and/or panels consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including integrated materials. For purposes of this investigation, subject merchandise includes modules, laminates and/or panels assembled in the PRC consisting of crystalline silicon photovoltaic cells produced in a customs territory other than the PRC.

Subject merchandise includes modules, laminates and/or panels assembled in the PRC consisting of crystalline silicon photovoltaic cells of thickness equal to or greater than 20 micrometers, having a p/n junction formed by any means, whether or not the cell has undergone other processing, including, but not limited to, cleaning, etching, coating, and/or addition of materials (including, but not limited to, metallization and conductor patterns) to collect and forward the electricity that is generated by the cell.

Excluded from the scope of this investigation are thin film photovoltaic products produced from amorphous silicon (a-Si), cadmium telluride (CdTe), or copper indium gallium selenide (CIGS). Also excluded from the scope of this investigation are modules, laminates and/or panels assembled in the PRC, consisting of crystalline silicon photovoltaic cells, not exceeding 10,000mm² in surface area, that are permanently integrated into a consumer good whose function is other than power generation and that consumes the electricity generated by the integrated crystalline silicon photovoltaic cells. Where more than one module, laminate and/or panel is permanently integrated into a consumer good, the surface area for purposes of this exclusion shall be the total combined surface area of all modules, laminates and/or panels that are integrated into the consumer good. Further, also excluded from the scope of this investigation are any products covered by the existing antidumping and countervailing duty orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, laminates and/or panels, from the PRC.[11]

---

[3] *See Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China: Alignment of Final Countervailing Duty Determination With Final Antidumping Duty Determination*, 79 FR 44402 (July 31, 2014).

[4] *See* Department Memorandum, "Allegations of Ministerial Errors in the Preliminary Determination," (August 21, 2014).

[5] *See* Department Memoranda, "Verification of the Questionnaire Responses Submitted by Changzhou Trina Solar Energy Co., Ltd. and its Cross-Owned Companies," (October 2, 2014); "Verification of the Questionnaire Responses Submitted by the Government of the People's Republic of China," (October 3, 2014); and "Verification of the Questionnaire Responses Submitted by Wuxi Suntech Power Co., Ltd. and its Cross-Owned Companies," (October 3, 2014).

[6] *See* Letter to All Interested Parties, "Antidumping and Countervailing Duty Investigations of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and the Antidumping Duty Investigation of

Certain Crystalline Silicon Photovoltaic Products from Taiwan: Opportunity to Submit Scope Comments," (October 3, 2014).

[7] *See* the Department's Memorandum to Paul Piquado, Assistant Secretary for Enforcement and Compliance, "Issues and Decision Memorandum for the Final Determination in the Countervailing Duty Investigation of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China," dated concurrently with this notice and hereby adopted by this notice (Final Decision Memorandum).

[8] On November 24, 2014, Enforcement and Compliance changed the name of Enforcement and Compliance's AD and CVD Centralized Electronic Service System (IA ACCESS) to AD and CVD Centralized Electronic Service System (ACCESS). The Web site location was changed from *http://iaaccess.trade.gov* to *http://access.trade.gov*. The Final Rule changing the references to the Regulations can be found at 79 FR 69046 (November 20, 2014).

[9] *See* Final Decision Memorandum at Comment 1, "Scope Comments and Scope Clarification."

[10] *Id.*

[11] *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order*, 77 FR 73018 (December 7, 2012); *Crystalline Silicon Photovoltaic*

Continued

Merchandise covered by this investigation is currently classified in the Harmonized Tariff Schedule of the United States (HTSUS) under subheadings 8501.61.0000, 8507.20.8030, 8507.20.8040, 8507.20.8060, 8507.20.8090, 8541.40.6020, 8541.40.6030 and 8501.31.8000. These HTSUS subheadings are provided for convenience and customs purposes; the written description of the scope of this investigation is dispositive.

**Analysis of Subsidy Programs and Comments Received**

The subsidy programs under investigation and the issues raised in the case and rebuttal briefs by parties in this investigation are discussed in the Final Decision Memorandum. A list of the issues that parties raised, and to which we responded in the Final Decision Memorandum, is attached to this notice as an Appendix.

**Use of Adverse Facts Available**

The Department notes that, in making these findings, we relied, in part, on facts available and, because one or more respondents did not act to the best of their ability to respond to the Department's requests for information, we drew an adverse inference where appropriate in selecting from among the facts otherwise available.[12] For further information, *see* the section "Use of Facts Otherwise Available and Adverse Inferences," in the Final Decision Memorandum.

**Suspension of Liquidation**

In accordance with section 705(c)(1)(B)(i) of the Act, we calculated a rate for each company respondent. Section 705(c)(5)(A)(i) of the Act states that, for companies not individually investigated, we will determine an "all others" rate equal to the weighted-average countervailable subsidy rates established for exporters and producers individually investigated, excluding zero and *de minimis* countervailable subsidy rates, and any rates determined entirely under section 776 of the Act.

In accordance with section 703(d) and 705(c)(5)(A) of the Act, for companies not investigated, we apply an "all others" rate, which is normally calculated by weighing the subsidy rates of the individual companies selected as respondents by those companies' exports of the subject merchandise to

the United States. Under section 705(c)(5)(A)(i) of the Act, the all others rate should exclude zero and *de minimis* rates calculated for the exporters and producers individually investigated. Where the rates for the investigated companies are all zero or *de minimis*, section 705(c)(5)(A)(ii) of the Act instructs the Department to establish an all others rate using "any reasonable method." Notwithstanding the language of section 705(c)(5)(A)(i) of the Act, we have not calculated the all others rate by weight averaging the rates of the two individually investigated company respondents, because doing so risks disclosure of proprietary information. Therefore, and consistent with the Department's practice, for the all others rate, we calculated a simple average of the two company respondents' rates.[13] We determine the total estimated net countervailable subsidy rates to be:

| Company | Subsidy Rate (*ad valorem*) (Percent) |
|---|---|
| Wuxi Suntech Power Co., Ltd. ...................... | 27.64 |
| Changzhou Trina Solar Energy Co., Ltd. ................... | 49.79 |
| All Others .............................. | 38.72 |

As a result of our *Preliminary Determination,* and pursuant to section 703(d) of the Act, we instructed U.S. Customs and Border Protection (CBP) to suspend liquidation of all entries of merchandise under consideration from the PRC that were entered or withdrawn from warehouse, for consumption, on or after June 10, the date of publication of the *Preliminary Determination* in the **Federal Register**. In accordance with section 703(d) of the Act, we issued instructions to CBP to discontinue the suspension of liquidation for CVD purposes for subject merchandise entered, or withdrawn from warehouse, on or after October 8, 2014, but to continue the suspension of liquidation of all entries from June 10, 2014 through October 7, 2014.[14]

If the U.S. International Trade Commission (the ITC) issues a final

affirmative injury determination, we will issue a CVD order and will reinstate the suspension of liquidation under section 706(a) of the Act and will require a cash deposit of estimated CVDs for such entries of subject merchandise in the amounts indicated above. If the ITC determines that material injury, or threat of material injury, does not exist, this proceeding will be terminated and all estimated duties deposited or securities posted as a result of the suspension of liquidation will be refunded or canceled.

**ITC Notification**

In accordance with section 705(d) of the Act, we will notify the ITC of our determination. In addition, we are making available to the ITC all non-privileged and non-proprietary information related to this investigation. We will allow the ITC access to all privileged and business proprietary information in our files, provided the ITC confirms that it will not disclose such information, either publicly or under an administrative protective order (APO), without the written consent of the Assistant Secretary for Enforcement and Compliance.

**Return or Destruction of Proprietary Information**

In the event the ITC issues a final negative injury determination, this notice will serve as the only reminder to parties subject to an APO of their responsibility concerning the destruction of proprietary information disclosed under APO in accordance with 19 CFR 351.305(a)(3). Timely written notification of the return/destruction of APO materials or conversion to judicial protective order is hereby requested. Failure to comply with the regulations and terms of an APO is a violation which is subject to sanction.

This determination is issued and published pursuant to sections 705(d) and 777(i) of the Act.

Dated: December 15, 2014.

**Paul Piquado,**

*Assistant Secretary for Enforcement and Compliance.*

**Appendix—Final Decision Memorandum**

I. Summary
II. Background
III. Scope of the Investigation
IV. Application of the Countervailing Duty Law to Imports from the PRC
V. Subsidies Valuation Information
VI. Benchmarks and Discount Rates
VII. Use of Facts Otherwise Available and Adverse Inferences
VIII. Analysis of Programs

---

*Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Countervailing Duty Order,* 77 FR 73017 (December 7, 2012).

[12] *See* sections 776(a) and (b) of the Tariff Act of 1930, as amended (the Act).

[13] *See, e.g., Countervailing Duty Investigation of Chlorinated Isocyanurates From the People's Republic of China: Preliminary Determination and Alignment of Final Determination With Final Antidumping Determination,* 79 FR 10097 (February 24, 2014), unchanged in *Countervailing Duty Investigation of Chlorinated Isocyanurates From the People's Republic of China: Final Affirmative Countervailing Duty Determination,* 79 FR 56560 (September 22, 2014).

[14] *See* CBP's Antidumping Duty and Countervailing Duty Message Database, *http://adcvd.cbp.dhs.gov/adcvdweb/,* at Message No. 4283302 (October 10, 2014).

IX. Analysis of Comments

Comment 1: Scope Comments and Scope Clarification

Comment 2: Whether the Department Should Investigate the Effects of the GOC's Alleged Cyberhacking on this Investigation

Comment 3: Whether Input Providers are "Authorities" Within the Meaning of the Act

Comment 4: Whether the Provision of Chinese Polysilicon for LTAR is Countervailable

Comment 5: Whether the Department Should Attribute Subsidies Under the Provision of Polysilicon for LTAR Program to Wuxi Suntech's Cross-owned Companies

Comment 6: Whether the Provision of Aluminum Extrusions for LTAR is Countervailable

Comment 7: Whether the Provision of Solar Glass for LTAR is Countervailable

Comment 8: Whether AFA is Applicable to Trina Solar's Land Purchases

Comment 9: Whether All Banks in China Offering Preferential Loans to Respondents Constitute "Authorities"

Comment 10: Whether the Department Should Adjust Its Benefit Calculations for Loans Received by Wuxi Suntech and Zhenjiang Ren De

Comment 11: Whether the High or New Technology Tax Program is Specific

Comment 12: Whether the Tax Offsets for R&D under the Enterprise Income Tax Law Program is Specific

Comment 13: Whether the Department Should Adjust Its Benefit Calculation for Wuxi Suntech's Use of the "Preferential Income Tax Program for High or New Technology Enterprises" and for the "Tax Offsets for R&D under the Enterprise Income Tax Law" Programs

Comment 14: Whether the Golden Sun Program is Countervailable

Comment 15: Whether the Department Should Countervail the "Discovered Subsidies" or Subsidies Discovered During the Course of Verification

Comment 16: Whether the Department Should Apply AFA to the Ex-Im Bank Buyer's Credit Program

Comment 17: Whether the Department Should Find Trina Solar and Wuxi Suntech to be Uncreditworthy

Comment 18: Whether the Department Should Adjust the Sales Denominators Used in Calculating Subsidy Benefits for Wuxi Suntech

Comment 19: Whether the Department Should Accept the Minor Corrections Presented by Wuxi Suntech at Verification

X. Recommendation Attachment

[FR Doc. 2014–30071 Filed 12–22–14; 8:45 am]

**BILLING CODE 3510–DS–P**

# DEPARTMENT OF COMMERCE

## International Trade Administration

**[A–570–901]**

**Certain Lined Paper Products From the People's Republic of China: Notice of Rescission of Antidumping Duty Administrative Review**

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**DATES:** *Effective Date:* December 23, 2014.

**FOR FURTHER INFORMATION CONTACT:** Stephanie Moore or Cindy Robinson AD/CVD Operations, Office III, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 14th Street and Constitution Avenue NW., Washington, DC 20230; telephone: (202) 482–3692 or (202) 482–3797, respectively.

**SUPPLEMENTARY INFORMATION:**

### Background

On September 2, 2014, the Department of Commerce (the Department) published a notice of opportunity to request an administrative review of the antidumping duty order on certain lined paper products from the People's Republic of China.[1] Pursuant to a request from the Association of American School Paper Suppliers and its individual members (petitioners),[2] the Department published in the **Federal Register** the notice of initiation of this antidumping duty administrative review with respect to Shanghai Lian Li Paper Products Co., Ltd. (Shanghai Lian Li) for the period September 1, 2013, through August 31, 2014.

On October 30, 2014, the Department published the Notice of Initiation.[3] On November 24, 2014, Petitioners timely withdrew their request for administrative review of the antidumping duty order with respect to Shanghai Lian Li.

### Rescission of the 2013–2014 Administrative Review

Pursuant to 19 CFR 351.213(d)(1), the Secretary will rescind an administrative review, in whole or in part, if the parties that requested a review withdraw the request within 90 days of the date of publication of the notice of initiation of the requested review. The instant review was initiated on October 30, 2014.[4] Petitioners withdrew their request for a review on November 24, 2014, which is within the 90-day deadline. No other party requested an administrative review of this segment of the proceeding. Therefore, in accordance with 19 CFR 351.213(d)(1), we are rescinding this review of the antidumping duty order on certain lined paper products from the People's Republic of China.

### Assessment

Antidumping duties shall be assessed at rates equal to the cash deposit of estimated antidumping duties required at the time of entry, or withdrawal from warehouse, for consumption, during the period September 1, 2013, through August 31, 2014.

The Department intends to issue appropriate assessment instructions directly to CBP 15 days after publication of this notice.

### Notification to Importers

This notice serves as a reminder to importers of their responsibility under 19 CFR 351.402(f)(2) to file a certificate regarding the reimbursement of antidumping duties prior to liquidation of the relevant entries during this review period. Failure to comply with this requirement could result in the Secretary's presumption that reimbursement of antidumping duties occurred and the subsequent increase in the amount of antidumping duties reimbursed.

### Notification Regarding Administrative Protective Order

This notice serves as a final reminder to parties subject to administrative protective orders (APOs) of their responsibility concerning the disposition of proprietary information disclosed under an APO in accordance with 19 CFR 351.305(a)(3), which continues to govern business proprietary information in this segment of the proceeding. Timely written notification of the return/destruction of APO materials or conversion to judicial protective order is hereby requested. Failure to comply with the regulations and terms of an APO is a violation which is subject to sanction.

This notice is issued and published in accordance with section 777(i)(1) of the Tariff Act of 1930, as amended, and 19 CFR 351.213(d)(4).

---

[1] *See Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity To Request Administrative Review,* 79 FR 51958 (September 2, 2014).

[2] The individual members are ACCO Brands USA LLC; Norcom, Inc.; and Top Flight, Inc.

[3] *See Initiation of Antidumping and Countervailing Duty Administrative Reviews,* 79 FR 64565 (October 30, 2014) (*Initiation*).

[4] *See id.*

**TAB 6**

**<u>Certain Crystalline Silicon Photovoltaic Products
From the People's Republic of China</u>, 79 Fed.
Reg. 76970 (Dep't Commerce Dec. 23, 2014) (final
LTFV determ.)**

**AD P.R. 834**





12. Whether the Department Should Reallocate to Prime Products the Production Costs of Off-Grade Cells Reported to the Department as Non-Prime Products (Non-Prime Products)

13. Whether the Department Should Adjust the Affiliated Supplier's Cost of Wafers Before Testing Gintech's Transfer Prices with the Affiliated Wafer Supplier (Affiliated's COP)

14. Whether the Department Should Include Losses Related to Inventory Disposals in Gintech's G&A Expense Rate (Inventory Disposals)

15. Whether the Department Should Include LCM Adjustments in Gintech's Reported Costs (LCM Adjustments)

16. Whether the Department Should Account for the Differences between Gintech's Total Cost Accounting System Costs and its Total Reported Costs (Methodological Difference)

17. Whether the Department Should Adjust Gintech's Financial Expense Rate for Certain Items Identified at Verification (Financial Expense Rate)

C. Issues Involving Motech

18. Whether to Include Reported ''Indirect'' Sales in the Calculation of U.S. Price

19. Whether to Exclude Sales of Modules Produced by Motech's Affiliate in the PRC

20. Whether U.S. Indirect Selling Expenses Should Not Include Expenses for R&D

21. Whether Motech's Short-Term Interest Rate Should be used to Calculate U.S. Credit and Inventory Carrying Cost

22. Whether U.S. Warehousing Expense Calculation Should be Revised

23. Whether a Different Basis Should be Used for Certain Payment Dates

24. Whether a Downward Adjustment Should be Made to the Price for a Home Market Transaction

25. Whether Grade Z Cells Should Bear the Same Cost as Grades A and B Cells

26. Whether the Inventory Adjustment Ratio Should be Revised

27. Whether the Financial Expense Ratio Calculation Should Include the Gains on Foreign Currency Translation

28. Whether the Cost for One of Motech's Modules CONNUMs Should be Adjusted

V. Recommendation

## Appendix II

### Importer Certification

I hereby certify that I am an official of (insert name of company importing solar panels/modules), that I have knowledge of the facts regarding the importation of the solar panels/modules or other products containing solar panels/modules that entered under entry number(s) (insert entry number(s) covered by the certification), and that these solar panels/modules do not contain solar cells produced in Taiwan.

By signing this certificate, I also hereby certify that (insert name of company importing solar panels/modules) maintains sufficient documentation supporting this certification for all solar cells used to produce the solar panels/modules imported under the above-referenced entry number(s).

I understand that agents of the importer, such as brokers, are not permitted to make this certification. Also, I am aware that records pertaining to this certification may be requested by CBP. I understand that this certification must be completed at the time of the entry. I also understand that failure to maintain the required certification or failure to substantiate the claim that the panels/modules do not contain solar cells produced in Taiwan will result in suspension of all unliquidated entries for which these requirements were not met and the requirement that the importer post an AD cash deposit on those entries equal to the applicable rate in effect at the time of entry.[1]

_____

Name of Company Official

_____

Title

_____

Date

### Exporter Certification

I hereby certify that I am an official of (insert name of company exporting solar panels/modules), that I have knowledge of the facts regarding the exportation of the solar panels/modules or other products containing the solar panels/modules identified below, and that these solar panels/modules do not contain solar cells produced in Taiwan.

By signing this certificate, I also hereby certify that (insert name of company exporting solar panels/modules) maintains sufficient documentation supporting this certification for all solar cells used to produce the solar panels/modules identified below. I am aware that records pertaining to this certification may be subject to verification by Department of Commerce officials and I consent to verification with respect to this certification and these records. I understand that this certification must be completed at the time of shipment. I also understand that failure to maintain the required certification or failure to substantiate the claim that the panels/modules do not contain solar cells produced in Taiwan will result in suspension of all unliquidated entries for which these requirements were not met and the requirement that the importer post an AD cash deposit on those entries equal to the applicable rate in effect at the time of entry. The exports covered by this certification are (insert invoice numbers, purchase order numbers, export documentation, etc. to identify the exports covered by the certification).

_____

Name of Company Official

_____

[1] However, if the certification also does not meet the requirements set forth in _Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Final Determination of Sales at Less Than Fair Value, and Affirmative Final Determination of Critical Circumstances, in Part,_ 77 FR 63791 (October 17, 2012) (_Solar I_), then the applicable rate is the appropriate rate as set forth in the _Solar I_ order.

_____

Title

_____

Date

[FR Doc. 2014–30107 Filed 12–22–14; 8:45 am]

**BILLING CODE 3510–DS–P**

_____

## DEPARTMENT OF COMMERCE

### International Trade Administration

**[A–570–010]**

**Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China: Final Determination of Sales at Less Than Fair Value**

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**DATES:** _Effective Date:_ December 23, 2014.

**SUMMARY:** The Department of Commerce (the Department) determines that certain crystalline silicon photovoltaic products (certain solar products) from the People's Republic of China (PRC) are being, or are likely to be, sold in the United States at less than fair value (LTFV), as provided in section 735 of the Tariff Act of 1930, as amended (the Act). The final weighted-average dumping margins for this investigation are listed in the ''Final Determination Margins'' section below.

**FOR FURTHER INFORMATION CONTACT:** Jeffrey Pedersen or Thomas Martin, AD/CVD Operations, Office IV, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 14th Street and Constitution Avenue NW., Washington, DC 20230; telephone: (202) 482–2769 or (202) 482–3936, respectively.

**SUPPLEMENTARY INFORMATION:**

### Background

The Department published the preliminary determination in the LTFV investigation of certain solar products from the PRC on July 31, 2014.[1] The following events occurred since the preliminary determination. Between August 4 and 14, 2014, the Department conducted a verification of Changzhou Trina Solar Energy Co., Ltd. and Trina Solar (Changzhou) Science & Technology Co., Ltd. (collectively, Trina

_____

[1] _See Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China: Affirmative Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination,_ 79 FR 44399 (July 31, 2014) (''_Preliminary Determination_'').

Solar) in Changzhou, PRC, and conducted a verification of their U.S. sales affiliate, Trina Solar (U.S.) Inc., in San Jose, California. Between August 7 and 20, 2014, the Department conducted a verification of Renesola Jiangsu Ltd., Renesola America Inc., Jinko Solar Import and Export Co., Ltd., and Jinko Solar (U.S.) Inc., in Shanghai and Yixing, PRC, and in San Francisco, California.[2] The Department issued the verification reports regarding Trina Solar on September 26, 2014.[3] The Department issued the verification reports regarding Renesola/Jinko on September 30 and October 2, 2014.[4]

On October 3, 2014, in response to interested parties' comments on the scope of this investigation, the Department announced that it was considering the possibility of a scope clarification, described the possible clarification, and provided interested

parties with an opportunity to submit comments on the potential clarification.[5]

On October 16, 2014, Trina Solar, Renesola/Jinko, SolarWorld Americas Inc. (Petitioner) (formerly SolarWorld Industries America, Inc.), the Government of the PRC, a U.S. importer, Suniva Inc., and certain separate rate applicants submitted case briefs.[6] From October 22, 2014 to October 27, 2014, Trina Solar, Renesola/Jinko, Petitioner, and certain separate rate applicants submitted rebuttal briefs.[7]

Although certain parties requested that a hearing be held, on October 24, 2014, all requests were subsequently withdrawn. Thus, the Department did not hold a hearing with respect to this investigation.

**Period of Investigation**

The period of investigation (POI) is April 1, 2013, through September 30, 2013. This period corresponds to the two most recent fiscal quarters prior to the month of the filing of the petition, which was December 2013.[8]

**Scope Comments and Scope Clarification**

As indicated in the "Background" section above, the Department received comments regarding the scope of this investigation from numerous interested parties. The Department summarized these comments and addressed them in the accompanying Issues and Decision Memorandum.[9] As explained in the Issues and Decision Memorandum, we have clarified the scope language such that subject merchandise includes all modules, laminates and/or panels assembled in the PRC that contain crystalline silicon photovoltaic cells produced in a customs territory other than the PRC.[10] The scope of the investigation for this final determination is below.

---

[2] The Department is treating the Renesola and Jinko companies under investigation as a single entity hereinafter collectively referred to as Renesola/Jinko. *See* Memorandum to Paul Piquado, Assistant Secretary for Enforcement and Compliance, From Christian Marsh, Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations regarding Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: Issues and Decision Memorandum for the Final Determination of Sales at Less Than Fair Value," dated concurrently with and hereby adopted by this notice ("Issues and Decision Memorandum") at Comment 16.

[3] *See* Memorandum to the File, from Erin Kearney, Patrick O'Connor, and Jeff Pedersen, International Trade Compliance Analysts, AD/CVD Operations, Office IV, titled "Verification of the Sales and Factors of Production Information Submitted by Changzhou Trina Solar Energy Co., Ltd. in the Antidumping Duty Investigation of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China ("PRC")," dated September 26, 2014; *see* Memorandum to the File, from Patrick O'Connor and Jeff Pedersen, International Trade Compliance Analysts, AD/CVD Operations, Office IV, titled "Verification of Trina Solar (U.S.) Inc. in the Antidumping Duty Investigation of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China ("PRC")," dated September 26, 2014.

[4] *See* Memorandum to the File, from Thomas Martin, Lilit Astvatsatrian, Theresa Deeley, International Trade Compliance Analysts, AD/CVD Operations, Office IV, titled "Verification of the Sales Responses of Renesola America Inc. in the Antidumping Investigation of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China," dated September 30, 2014; *see* Memorandum to the File, from Thomas Martin, Lilit Astvatsatrian, Theresa Deeley, International Trade Compliance Analysts, AD/CVD Operations, Office IV, titled "Verification of Jinko Solar Import & Export Co., Ltd. and Jinko Solar (U.S.) Inc. in the Antidumping Duty Investigation of Certain Crystalline Silicon Photovoltaic Products, from the People's Republic of China ("PRC")," dated September 30, 2014; *see* Memorandum to the File, from Thomas Martin, Lilit Astvatsatrian, Theresa Deeley, International Trade Compliance Analysts, AD/CVD Operations, Office IV, titled "Verification of the Sales and Factors Responses of Renesola Jiangsu Ltd. in the Antidumping Investigation of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China," dated October 2, 2014.

[5] *See* Letter to All Interested Parties "Re: Antidumping and Countervailing Duty Investigations of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and the Antidumping Duty Investigation of Certain Crystalline Silicon Photovoltaic Products from Taiwan: Opportunity to Submit Scope Comments," dated October 3, 2014.

[6] *See* Letter from fourteen separate rate applicants, "Re: Antidumping and Countervailing Duty Investigations of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China, and Antidumping Duty Investigation of Certain Crystalline Silicon Photo voltaic Products from Taiwan: Respondents' Case Brief," dated October 16, 2014; Letter from the PRC Government, "Re: Government of China's Case Brief: Certain Crystalline Silicon Photovoltaic Products from the People's Republic Of China," dated October 16, 2014; Letter from Asun Energy Co., Ltd. (a/k/a Suzhou Asun Energy Co., Ltd.), "Re: Administrative Case Brief: Antidumping Duty Investigation of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China (A–570–010)," dated October 16, 2014; Letter from Trina, "Re: Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China; Case Brief of Changzhou Trina Solar Energy Co., Ltd.," dated October 16, 2014; Letter from Renesola, "Re: Certain Crystalline Silicon Photovoltaic Products from China; Case Brief," dated October 16, 2014; Letter from Junco, "Re: Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: Case Brief," dated October 16, 2014; Letter from Hanwha QCELLS USA, Inc., "Re: Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China," dated October 16, 2014; Letter from Suniva, Inc., "Re: Case Brief on Scope Issues Certain Crystalline Silicon Photovoltaic Products from China and Taiwan," dated October 16, 2014; Letter from tenKsolar (Shanghai) Co., Ltd., "Re: Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and Taiwan–Case Brief," dated October 16, 2014; Letter from SNJ Enterprises LLC dba Zamp Solar and Quebec Inc. dba RDK Products, "Re: Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: Case Brief," dated October 16, 2014; Letter from Petitioner, "Re: Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: Case Brief of Solar World Americas, Inc.," dated October 16, 2014.

[7] *See* Letter from Hanwha SolarOne (Qidong) Co., Ltd. and Hanwha SolarOne Hong Kong Limited, "Re: Rebuttal Brief: Antidumping Duty Investigation of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China (A–570–010)," dated October 22, 2014; Letter from Asun Energy Co., Ltd. (a/k/a Suzhou Asun Energy Co., Ltd.), "Re: Rebuttal Brief: Antidumping/ Countervailing Duty Investigations of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China," dated October 22, 2014; Letter from Shangluo BYD Industrial Co., Ltd. and Shanghai BYD Co., Ltd. "Re: Crystalline Silicon Photovoltaic Products from the People's Republic of

China and Taiwan: Rebuttal Brief," dated October 22, 2014; Letter from Changzhou Almaden Co., Ltd., "Re: Crystalline Silicon Photovoltaic Products from P.R. China: Rebuttal Brief," dated October 22, 2014; Letter from Renesola "Re: Certain Crystalline Silicon Photovoltaic Products from China; Rebuttal Brief," dated October 22, 2014; Letter from Petitioner, "Re: Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: Rebuttal Brief of Solar World Americas, Inc.," dated October 22, 2014; Letter from Trina, "Re: Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: Rebuttal Brief of Changzhou Trina Solar Energy Co., Ltd.," dated October 22, 2014. *see also* Letter from fourteen separate rate applicants, "Re: Antidumping and Countervailing Duty Investigations of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China, and Antidumping Duty Investigation of Certain Crystalline Silicon Photo voltaic Products from Taiwan: Respondents' Rebuttal Brief," dated October 27, 2014; Letter from Hanwha QCELLS USA, Inc. "Re: Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China," dated October 27, 2014; Letter from SNJ Enterprises LLC dba Zamp Solar LLC and Quebec Inc. dba RDK Products, "Re: Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: Rebuttal Brief," dated October 27, 2014; Letter from Petitioner, "Re: Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: SolarWorld's Rebuttal Brief on Scope," dated October 27, 2014.

[8] 19 CFR 351.204(b)(1).

[9] *See* Issues and Decision Memorandum.

[10] *Id.* at Comment 1.

## Certifications No Longer Required for This Proceeding

In the *Preliminary Determination,* the Department announced that (1) if an importer imports solar modules that were assembled in the PRC and (2) claims the solar modules do not contain solar cells manufactured in third countries using ingots, wafers, or partially produced solar cells manufactured in the PRC, the importer and PRC exporter of those solar modules are required to certify the claim and maintain documentation supporting the certifications.[11] However, given the clarification to the scope language, the Department is revoking the importer and exporter certification requirements announced in the *Preliminary Determination.* Importers and PRC exporters will not be required to maintain the certifications identified in the *Preliminary Determination* for merchandise entered, or withdrawn from warehouse, for consumption on or after July 31, 2014, the date of publication of the *Preliminary Determination* notice in the **Federal Register**. The revocation of the certification requirements previously established in this investigation does not change or rescind the certification requirements established in connection with the existing AD order on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the PRC.[12]

## Scope of the Investigation

The merchandise covered by this investigation is modules, laminates and/or panels consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including building integrated materials. For purposes of this investigation, subject merchandise includes modules, laminates and/or panels assembled in the PRC consisting of crystalline silicon photovoltaic cells produced in a customs territory other than the PRC.

Subject merchandise includes modules, laminates and/or panels assembled in the PRC consisting of crystalline silicon photovoltaic cells of thickness equal to or greater than 20 micrometers, having a p/n junction formed by any means, whether or not the cell has undergone other processing, including, but not limited to, cleaning, etching, coating, and/or addition of materials (including, but not limited to, metallization and conductor patterns) to collect and forward the electricity that is generated by the cell.

Excluded from the scope of this investigation are thin film photovoltaic products produced from amorphous silicon (a-Si), cadmium telluride (CdTe), or copper indium gallium selenide (CIGS). Also excluded from the scope of this investigation are modules, laminates and/or panels assembled in the PRC, consisting of crystalline silicon photovoltaic cells, not exceeding 10,000mm² in surface area, that are permanently integrated into a consumer good whose function is other than power generation and that consumes the electricity generated by the integrated crystalline silicon photovoltaic cells. Where more than one module, laminate and/or panel is permanently integrated into a consumer good, the surface area for purposes of this exclusion shall be the total combined surface area of all modules, laminates and/or panels that are integrated into the consumer good. Further, also excluded from the scope of this investigation are any products covered by the existing antidumping and countervailing duty orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, laminates and/or panels, from the PRC.[13]

Merchandise covered by this investigation is currently classified in the Harmonized Tariff Schedule of the United States (HTSUS) under subheadings 8501.61.0000, 8507.20.8030, 8507.20.8040, 8507.20.8060, 8507.20.8090, 8541.40.6020, 8541.40.6030 and 8501.31.8000. These HTSUS subheadings are provided for convenience and customs purposes; the written description of the scope of this investigation is dispositive.

## Analysis of Comments Received

All issues raised in the case and rebuttal briefs by parties to this investigation are addressed in the Issues and Decision Memorandum. A list of the issues which the parties raised and to which the Department responded in the Issues and Decision Memorandum is attached to this notice as an Appendix. The Issues and Decision Memorandum is a public document and is on file electronically via Enforcement and Compliance's Antidumping and Countervailing Duty Centralized Electronic Service System (ACCESS). ACCESS is available to registered users at *http://access.trade.gov* and it is available to all parties in the Central Records Unit, room 7046 of the main Department of Commerce building. In addition, a complete version of the Issues and Decision Memorandum can be accessed directly at *http://enforcement.trade.gov/frn/*. The signed and electronic versions of the Issues and Decision Memorandum are identical in content.

Changes to the Margin Calculations Since the Preliminary Determination

Based on the Department's analysis of the comments received and our findings at verification, we made certain changes to the margin calculations. For a discussion of these changes, *see* the Issues and Decision Memorandum, the company-specific analysis and surrogate value memoranda, and the separate rate calculation memorandum, all dated concurrently with this notice.

## Verification

As provided in section 782(i) of the Act and 19 CFR 351.307(b)(1)(i), in August 2014, the Department verified the information submitted by Trina Solar and Renesola/Jinko for use in the final determination. The Department used standard verification procedures, including examination of relevant accounting and production records and original source documents provided by Trina Solar and Renesola/Jinko.

## Final Determination Margins

The Department determines that the following weighted-average dumping margins exist for the period April 1, 2013 through September 30, 2013.

---

[11] *Preliminary Determination,* 79 FR 44901–44902.

[12] *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Affirmative Countervailing Duty Determination and Final Affirmative Critical Circumstances Determination,* 77 FR 63788 (October 17, 2012) ("crystalline silicon photovoltaic cells, whether or not assembled into modules, from the PRC").

[13] *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order,* 77 FR 73018 (December 7, 2012); *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Countervailing Duty Order,* 77 FR 73017 (December 7, 2012).

**Federal Register** / Vol. 79, No. 246 / Tuesday, December 23, 2014 / Notices   **76973**

| Exporter | Producer | Weighted-average dumping margin (percent) |
|---|---|---|
| Changzhou Trina Solar Energy Co., Ltd./Trina Solar (Changzhou) Science & Technology Co., Ltd. | Changzhou Trina Solar Energy Co., Ltd./Trina Solar (Changzhou) Science & Technology Co., Ltd. | 26.71 |
| Renesola Jiangsu Ltd./Renesola Zhejiang Ltd./Jinko Solar Co. Ltd./Jinko Solar Import and Export Co., Ltd. | Renesola Jiangsu Ltd./Jinko Solar Co. Ltd. ............................ | 78.42 |
| Anji DaSol Solar Energy Science & Technology Co., Ltd. ...... | Anji DaSol Solar Energy Science & Technology Co., Ltd. ...... | 52.13 |
| Asun Energy Co., Ltd. (a/k/a Suzhou Asun Energy Co., Ltd.) | Asun Energy Co., Ltd. (a/k/a Suzhou Asun Energy Co., Ltd.) | 52.13 |
| Baoding Tianwei Yingli New Energy Resources Co. , Ltd. ...... | Baoding Tianwei Yingli New Energy Resources Co., Ltd., Yingli Energy (China) Co., Ltd., and Lixian Yingli New Energy Co., Ltd.. | 52.13 |
| BYD (Shangluo) Industrial Co., Ltd. ...................................... | BYD (Shangluo) Industrial Co., Ltd. ...................................... | 52.13 |
| Canadian Solar International Limited ...................................... | Canadian Solar Manufacturing (Luoyang) Inc., Canadian Solar Manufacturing (Changshu), Inc. | 52.13 |
| Canadian Solar Manufacturing (Changshu), Inc .................... | Canadian Solar Manufacturing (Changshu), Inc .................... | 52.13 |
| Canadian Solar Manufacturing (Luoyang) Inc ....................... | Canadian Solar Manufacturing (Luoyang) Inc ....................... | 52.13 |
| CEEG Nanjing Renewable Energy Co., Ltd. ........................... | CEEG Nanjing Renewable Energy Co., Ltd. ........................... | 52.13 |
| Changzhou Almaden Co., Ltd. ............................................... | Changzhou Almaden Co., Ltd. ............................................... | 52.13 |
| Chint Solar (Zhejiang) Co., Ltd. ............................................ | Chint Solar (Zhejiang) Co., Ltd. ............................................ | 52.13 |
| ET Solar Industry Limited ....................................................... | ET Solar Industry Limited ....................................................... | 52.13 |
| Hainan Yingli New Energy Resources Co. Ltd. ...................... | Hainan Yingli New Energy Resources Co. Ltd. ...................... | 52.13 |
| Hangzhou Zhejiang University Sunny Energy Science and Technology Co., Ltd. | Hangzhou Zhejiang University Sunny Energy Science and Technology Co., Ltd. | 52.13 |
| Hanwha SolarOne (Qidong) Co., Ltd. ..................................... | Hanwha SolarOne (Qidong) Co., Ltd. ..................................... | 52.13 |
| Hanwha SolarOne Hong Kong Limited ................................... | Hanwha SolarOne (Qidong) Co., Ltd. ..................................... | 52.13 |
| Hefei JA Solar Technology Co., Ltd. ...................................... | Hefei JA Solar Technology Co., Ltd. ...................................... | 52.13 |
| Hengdian Group DMEGC Magnetics Co., Ltd. ....................... | Hengdian Group DMEGC Magnetics Co., Ltd. ....................... | 52.13 |
| Hengshui Yingli New Energy Resources Company Limited .... | Hengshui Yingli New Energy Resources Company Limited ... | 52.13 |
| Jiangyin Hareon Power Co., Ltd. ............................................ | Jiangyin Xinhui Solar Co., Ltd.; Altusvia Energy Taicang Co., Ltd.; Hareon Solar Technology Co., Ltd.. | 52.13 |
| Jiawei Solarchina Co., Ltd. .................................................... | Jiawei Solarchina (Shenzhen) Co., Ltd. ................................ | 52.13 |
| Jiawei Technology (HK) Ltd. ................................................... | Shenzhen Jiawei Photovoltaic Lighting Co. Ltd. ................... | 52.13 |
| LDK Solar Hi-Tech (Nanchang) Co., Ltd. ............................... | LDK Solar Hi-Tech (Nanchang) Co., Ltd. ............................... | 52.13 |
| Lixian Yingli New Energy Company Ltd. ................................. | Lixian Yingli New Energy Company Ltd. ................................. | 52.13 |
| MOTECH (Suzhou) Renewable Energy Co., Ltd. .................... | MOTECH (Suzhou) Renewable Energy Co., Ltd. .................... | 52.13 |
| Ningbo Qixin Solar Electrical Appliance Co., Ltd. ................. | Ningbo Qixin Solar Electrical Appliance Co., Ltd. ................. | 52.13 |
| Perlight Solar Co., Ltd. .......................................................... | Perlight Solar Co., Ltd. .......................................................... | 52.13 |
| Risen Energy Co., Ltd. ........................................................... | Risen Energy Co., Ltd. ........................................................... | 52.13 |
| Shanghai JA Solar Technology Co., Ltd. ............................... | Shanghai JA Solar Technology Co., Ltd. ............................... | 52.13 |
| Shanghai Solar Energy Science & Technology Co., Ltd. ....... | Lianyungang Shenzhou New Energy Co., Ltd. ...................... | 52.13 |
| Shenzhen Jiawei Photovoltaic Lighting Co. Ltd. ................... | Shenzhen Jiawei Photovoltaic Lighting Co. Ltd. ................... | 52.13 |
| Shenzhen Sungold Solar Co., Ltd. ......................................... | Shenzhen Sungold Solar Co., Ltd. ......................................... | 52.13 |
| Shenzhen Topray Solar Co., Ltd. ........................................... | Shenzhen Topray Solar Co., Ltd. ........................................... | 52.13 |
| Sun Earth Solar Power Co., Ltd. ............................................ | Sun Earth Solar Power Co., Ltd. ............................................ | 52.13 |
| Sunny Apex Development Ltd. ................................................ | Shenzhen Jiawei Photovoltaic Lighting Co. Ltd., Wuhan FYY Technology Co., Ltd.. | 52.13 |
| SunPower Systems SARL ...................................................... | SunEnergy (S.Z.) Co., Ltd. ..................................................... | 52.13 |
| tenKsolar (Shanghai) Co., Ltd. .............................................. | tenKsolar (Shanghai) Co., Ltd. .............................................. | 52.13 |
| Upsolar Global Co., Ltd. and including Upsolar Group, Co., Ltd. | Shandong Dahai Group Co., Ltd. ........................................... | 52.13 |
| Wanxiang Import & Export Co., Ltd. ....................................... | Zhejiang Wanxiang Solar Co., Ltd. ........................................ | 52.13 |
| Wuhan FYY Technology Co., Ltd. ........................................... | Wuhan FYY Technology Co., Ltd. ........................................... | 52.13 |
| Wuxi Suntech Power Co., Ltd. ................................................ | Wuxi Suntech Power Co., Ltd. ................................................ | 52.13 |
| Yingli Energy (China) Company Limited ................................. | Yingli Energy (China) Company Limited, Baoding Tianwei Yingli New Energy Resources Co., Ltd. and Lixian Yingli New Energy Co., Ltd.. | 52.13 |
| Yingli Green Energy International Trading Limited .................. | Yingli Energy (China) Company Limited, Baoding Tianwei Yingli New Energy Resources Co., Ltd., and Hainan Yingli New Energy Resources Co., Ltd.. | 52.13 |
| Zhongli Talesun Solar Co., Ltd. .............................................. | Zhongli Talesun Solar Co., Ltd. .............................................. | 52.13 |
| PRC-Wide Rate | | 165.04 |

**PRC-Wide Entity**

Consistent with the *Preliminary Determination,* the PRC-wide entity includes, among other companies, CSG PVTech Co., Ltd.; Lianyungang Shenzhou New Energy Co., Ltd.; Lightway Green New Energy Co., Ltd.; SunEnergy (S.Z.) Co., Ltd.; SunPower Corporation (U.S.); Jiawei Solarchina (Shenzhen) Co., Ltd.; and Sumec Hardware & Tools Co., Ltd. We found these companies either have not demonstrated an absence of *de facto* government control, or did not have a sales transaction during the POI that provided a basis for granting separate rate status.[14]

---

[14] *See* the memorandum from Jeff Pedersen, Senior International Trade Analyst, Office IV, AD/CVD Operations to Abdelali Elouaradia, Director,

Continued

The PRC-wide entity also includes 35 PRC exporters and/or producers of the merchandise under consideration during the POI that did not respond to the Department's request for information.[15] These companies withheld necessary information, failed to provide information by the established deadlines, and significantly impeded this proceeding by not submitting the requested quantity and value information within the meaning of sections 776(a)(1) and (a)(2)(A)–(C) of the Act, and further, failed to cooperate by not acting to the best of their ability to comply with the Department's requests for information within the meaning of section 776(b) of the Act. Therefore, we are continuing to apply adverse facts available to the PRC-wide entity. *See* Issues and Decision Memorandum for further discussion.

**Disclosure**

We intend to disclose to parties the calculations performed in this proceeding within five days of the date of publication of this notice in accordance with 19 CFR 351.224(b).

**Separate Rate**

The rate assigned to companies granted separate rate status that were not individually examined is normally determined based on the weighted-average of the estimated dumping margins calculated for exporters and producers individually investigated, excluding zero and *de minimis* margins or margins based entirely on facts available (FA).[16] In this investigation,

we calculated above *de minimis* estimated weighted-average dumping margins that are not based on total FA for the two mandatory respondents, Trina Solar and Renesola/Jinko. Because we individually examined two companies in this investigation, basing the estimated dumping margin for the companies not individually examined on a weighted-average of the dumping margins for the two individually examined companies risks disclosure of business proprietary information (BPI). Therefore, we calculated both a weighted-average of the dumping margins calculated for the two mandatory respondents using public values for their sales of subject merchandise and a simple average of these two dumping margins, and selected, as the separate rate, the average that provides a more accurate proxy for the weighted-average margin of both companies calculated using BPI.[17]

**Continuation of Suspension of Liquidation**

In accordance with section 735(c)(1)(B) of the Act, the Department will instruct U.S. Customs and Border Protection (CBP) to continue to suspend liquidation of all appropriate entries of certain solar products from the PRC as described in the ''Scope of the Investigation'' section, which were entered, or withdrawn from warehouse, for consumption on or after July 31, 2014, the date of publication in the **Federal Register** of the notice of an affirmative preliminary determination that certain solar products are being, or are likely to be, sold in the United States at LTFV. Further, consistent with our practice, where the product from the PRC under investigation is also subject to a concurrent countervailing duty (CVD) investigation, the Department will instruct CBP to require a cash deposit [18] equal to the weighted-average amount by which the normal value exceeds U.S. price, adjusted where appropriate for export subsidies and estimated domestic subsidy pass-through.[19] The cash deposit rates, before any adjustments for export subsidies and estimated domestic subsidy pass-through,[20] are as follows: (1) For each

exporter/producer combination listed in the table above, the cash deposit rate will be equal to the dumping margin listed for that exporter/producer combination in the table; (2) for all other combinations of PRC exporters/producers of the merchandise under consideration, the cash deposit rate will be equal to the dumping margin established for the PRC-wide entity; and (3) for all non-PRC exporters of the merchandise under consideration which have not received their own separate rate above, the cash deposit rate will be equal to the cash deposit rate applicable to the PRC exporter/producer combination that supplied that non-PRC exporter. These suspension-of-liquidation instructions will remain in effect until further notice.

**ITC Notification**

In accordance with section 735(d) of the Act, we notified the International Trade Commission (ITC) of the final affirmative determination of sales at LTFV. As the Department's final determination is affirmative, in accordance with section 735(b)(2) of the Act, the ITC will determine, within 45 days, whether the domestic industry in the United States is materially injured, or threatened with material injury, by reason of imports of subject merchandise, or sales (or the likelihood of sales) for importation, of the subject merchandise. If the ITC determines that such injury does not exist, this proceeding will be terminated and all estimated duties deposited as a result of the suspension of liquidation will be refunded. If the ITC determines that such injury does exist, the Department will issue an antidumping duty order directing CBP to assess, upon further instructions by the Department, antidumping duties on all imports of the subject merchandise entered, or withdrawn from warehouse, for consumption on or after the effective date of the suspension of liquidation.

**Return or Destruction of Proprietary Information**

This notice also serves as a reminder to the parties subject to administrative protective order (APO) of their responsibility concerning the disposition of propriety information

Office IV AD/CVD Operations regarding ''Companies Not Receiving a Separate Rate,'' dated July 24, 2014; *see also* Comments 7 and 8 of the Issues and Decision Memorandum.

[15] Those companies are: Beijing Hope Industry, China Sunergy, CNPV, EGing, ENN Solar Energy, Era Solar, Goldpoly (Quanzhou), Himin Holdings, Jetion, Jia Yi Energy Technology, Jiasheng Photovoltaic Tech., Jiutai Energy, Komaes Solar, Leye Photovoltaic Science Tech., Magi Solar Technology, Perfectenergy, Polar Photovoltaics, Qiangsheng (QS Solar), Refine Solar, Risun Solar (JiangXi Ruijing Solar Power Co., Ltd.), Shanghai Chaori Solar Energy, Shangpin Solar, Shanshan Ulica, Shenglong PV-Tech, Shenzhen Global Solar Energy Tech., Shuqimeng Energy Tech, Skybasesolar, Solargiga Energy Holdings Ltd., Sopray Solar, Sunlink PV, Tianjin Jinneng Solar Cell, Topsolar, Trony, Weihai China Glass Solar, and Yuhan Sinosola. For an additional 12 PRC exporters and/or producers of merchandise that were named in the Petition, the Department issued a questionnaire, but did not receive confirmation of delivery. Those companies are: Aiko Solar, Best Solar Hi-tech, Dai Hwa Industrial, Eoplly New Energy, Golden Partner development, Innovosolar, Jiangxi Green Power Co. Ltd., Sanjing Silicon, Sunflower, Sunvim Solar Technology, Yunnan Tianda, and Yunnan Zhuoye Energy. *See* memorandum to the file from Erin Kearney, International Trade Analyst, Office 4, AD/CVD Operations on the subject ''Delivery of Quantity and Value Questionnaires'' dated March 12, 2014.

[16] *See* section 735(c)(5)(A) of the Act.

[17] *See* the December 15, 2014, memorandum from Jeff Pedersen to the File entitled ''Calculation of the Final Margin for Separate Rate Recipients.''

[18] *See* Modification of Regulations Regarding the Practice of Accepting Bonds During the Provisional Measures Period in Antidumping and Countervailing Duty Investigations, 76 FR 61042 (October 3, 2011).

[19] *See* sections 772(c)(1)(C) and 777A(f) of the Act.

[20] With respect to a final affirmative countervailing duty determination in the

companion investigation, because the provisional measures period has expired, Commerce will only order the resumption of the suspension of liquidation, and require cash deposits for countervailing duties equal to the final subsidy rates, if the U.S. International Trade Commission issues a final affirmative injury determination. In the event of a final affirmative injury determination, the Department will make an adjustment to AD cash deposits where appropriate for export subsidies and estimated domestic subsidy pass-through.

disclosed under APO in accordance with 19 CFR 351.305. Timely written notification of return or destruction of APO materials or conversion to judicial protective order is hereby requested. Failure to comply with the regulations and terms of an APO is a sanctionable violation.

This determination is issued and published in accordance with sections 735(d) and 777(i)(1) of the Act.

Dated: December 15, 2014.

**Paul Piquado,**

*Assistant Secretary for Enforcement and Compliance.*

**Appendix**

**List of Topics Discussed in the Issues and Decision Memorandum**

I. Summary
II. Background
III. Scope of the Investigation
IV. Separate Rate Companies
V. Use of Adverse Facts Available
VI. Discussion of the Issues
Comment 1. Scope of the Investigation
Comment 2. Whether to Select South Africa or Thailand as the Primary Surrogate Country
Comment 3. Whether to Offset the Cash Deposit Rate for Export Subsidies
Comment 4. Whether the Department Should Investigate the Effects of the GOC's Alleged Cyberhacking on this Investigation
Comment 5. Ultimate Ownership of Separate Rate Applicants
Comment 6. Separate Rate Applicants with Managers or Board Members with Ties to the Chinese Government
Comment 7. Separate Rate Status of Lianyungang Shenzhou New Energy Co., Ltd.
Comment 8. Separate Rate Status of Sumec Hardware & Tools Co., Ltd.
Comment 9. The Appropriate Surrogate Value for Aluminum Frames
Comment 10. The Appropriate Surrogate Value for Scrap Solar Cells
Comment 11. Unpaid Sales
Comment 12. Quality Insurance
Comment 13. Warranty Costs
Comment 14. Incorrect Allocation of Indirect Material, Labor, and Electricity Consumption
Comment 15. Whether to Base Renesola/Jinko's Dumping Margin on Partial AFA
Comment 16. Whether to Collapse Jinko and Renesola
Comment 17. Whether to Use Market-Economy Purchase Prices to Value all of Renesola/Jinko's Solar Cells
Comment 18. Whether to Adjust Renesola/Jinko's Cash Deposit Rate by the Full Amount of Domestic Subsidies

Comment 19. Separate Rate Application of tenKsolar
VII. Recommendation

[FR Doc. 2014–30092 Filed 12–22–14; 8:45 am]

**BILLING CODE 3510–DS–P**

---

**DEPARTMENT OF COMMERCE**

**National Oceanic and Atmospheric Administration**

**RIN 0648–XD660**

**Takes of Marine Mammals Incidental to Specified Activities; Seabird and Pinniped Research Activities in Central California, 2015–2016**

**AGENCY:** National Marine Fisheries Service (NMFS), National Oceanic and Atmospheric Administration (NOAA), Commerce.

**ACTION:** Notice; proposed incidental harassment authorization; request for comments.

**SUMMARY:** We, NMFS, have received an application from Point Blue Conservation Science (Point Blue) requesting an Incidental Harassment Authorization (Authorization) to take marine mammals, by harassment, incidental to conducting proposed seabird research activities on Southeast Farallon Island, Año Nuevo Island, and Point Reyes National Seashore in central California from January 2015 through January 2016. Per the Marine Mammal Protection Act, we are requesting comments on our proposal to issue an Authorization to Point Blue to incidentally harass, by Level B harassment only, four species of marine mammals during the year-long monitoring project.

**ADDRESSES:** Address comments on the application to Jolie Harrison, Chief, Permits and Conservation Division, Office of Protected Resources, National Marine Fisheries Service, 1315 East-West Highway, Silver Spring, MD 20910. The mailbox address for providing email comments is *ITP.Cody@noaa.gov*. You must include 0648–XD660 in the subject line. We are not responsible for email comments sent to addresses other than the one provided here. Comments sent via email, including all attachments, must not exceed a 25-megabyte file size. NMFS is not responsible for email comments sent to addresses other than the one provided here.

Instructions: All submitted comments are a part of the public record and NMFS will post them to *http://www.nmfs.noaa.gov/pr/permits/incidental/military.htm* without change. All Personal Identifying Information (for

example, name, address, etc.) voluntarily submitted by the commenter may be publicly accessible. Do not submit confidential business information or otherwise sensitive or protected information.

To obtain an electronic copy of the application, a list of the references used in this document, and Point Blue's Authorization request, visit the Internet at: *http://www.nmfs.noaa.gov/pr/permits/incidental/military.htm.*

NMFS prepared an Environmental Assessment (EA) in 2014 titled "Issuance of an Incidental Harassment Authorization to Point Blue Conservation Science and Partners to Take Marine Mammals by Harassment Incidental to Seabird and Pinniped Research Conducted in Central California." We provided relevant environmental information to the public through a notice for a previous proposed authorization (78 FR 66686, November 6, 2013) and considered public comments received in response prior to finalizing our EA.

At that time, NMFS concluded that issuance of an annual Authorization would not significantly affect the quality of the human environment and issued a Finding of No Significant Impact (FONSI) regarding issuing an Authorization for Point Blue's 2014–2015 seabird research activities. In conjunction with Point Blue's 2015–2016 application, NMFS will review the 2014 EA to determine whether supplementation is necessary. Information from Point Blue's application, NMFS' 2014 EA, and this notice collectively provide the environmental information related to a proposed issuance of the Authorization for public review and comment. An electronic copy of the EA for this activity is available upon request (see **ADDRESSES**).

**FOR FURTHER INFORMATION CONTACT:** Jeannine Cody, Office of Protected Resources, NMFS (301) 427–8401.

**SUPPLEMENTARY INFORMATION:** Section 101(a)(5)(D) of the Marine Mammal Protection Act of 1972, as amended (MMPA; 16 U.S.C. 1361 *et seq.*) directs the Secretary of Commerce to allow, upon request, the incidental, but not intentional, taking of small numbers of marine mammals of a species or population stock, by U.S. citizens who engage in a specified activity (other than commercial fishing) within a specified geographical region if, after NMFS provides a notice of a proposed authorization to the public for review and comment: (1) NMFS makes certain findings; and (2) the taking is limited to harassment.

**TAB 7**

**<u>Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China</u>, 80 Fed. Reg. 8592 (Dep't Commerce Feb. 18, 2015) (amended final CVD determ. and AD/CVD orders)**

**AD P.R. 853, CVD P.R. 417**

*bis.doc.gov* no later than February 26, 2015.

A limited number of seats will be available during the public session of the meeting. Reservations are not accepted. To the extent time permits, members of the public may present oral statements to the Committee. The public may submit written statements at any time before or after the meeting. However, to facilitate distribution of public presentation materials to Committee members, the Committee suggests that presenters forward the public presentation materials prior to the meeting to Ms. Springer via email.

For more information, call Yvette Springer at (202) 482–2813.

Dated: February 12, 2015.

**Yvette Springer,**

*Committee Liaison Officer.*

[FR Doc. 2015–03325 Filed 2–17–15; 8:45 am]

**BILLING CODE 3510–JT–P**

## DEPARTMENT OF COMMERCE

### Bureau of Industry and Security

### Technical Advisory Committees; Notice of Recruitment of Private-Sector Members

**SUMMARY:** Seven Technical Advisory Committees (TACs) advise the Department of Commerce on the technical parameters for export controls applicable to dual-use commodities and technology and on the administration of those controls. The TACs are composed of representatives from industry representatives, academic leaders and U.S. Government representing diverse points of view on the concerns of the exporting community. Industry representatives are selected from firms producing a broad range of goods, technologies, and software presently controlled for national security, non-proliferation, foreign policy, and short supply reasons or that are proposed for such controls, balanced to the extent possible among large and small firms.

TAC members are appointed by the Secretary of Commerce and serve terms of not more than four consecutive years. The membership reflects the Department's commitment to attaining balance and diversity. TAC members must obtain secret-level clearances prior to appointment. These clearances are necessary so that members may be permitted access to the classified information needed to formulate recommendations to the Department of Commerce. Each TAC meets approximately four times per year. Members of the Committees will not be compensated for their services.

The seven TACs are responsible for advising the Department of Commerce on the technical parameters for export controls and the administration of those controls within the following areas: Information Systems TAC: Control List Categories 3 (electronics), 4 (computers), and 5 (telecommunications and information security); Materials TAC: Control List Category 1 (materials, chemicals, microorganisms, and toxins); Materials Processing Equipment TAC: Control List Category 2 (materials processing); Regulations and Procedures TAC: The Export Administration Regulations (EAR) and Procedures for implementing the EAR; Sensors and Instrumentation TAC: Control List Category 6 (sensors and lasers); Transportation and Related Equipment TAC: Control List Categories 7 (navigation and avionics), 8 (marine), and 9 (propulsion systems, space vehicles, and related equipment) and the Emerging Technology and Research Advisory Committee: (1) The identification of emerging technologies and research and development activities that may be of interest from a dual-use perspective; (2) the prioritization of new and existing controls to determine which are of greatest consequence to national security; (3) the potential impact of dual-use export control requirements on research activities; and (4) the threat to national security posed by the unauthorized exports of technologies.

To respond to this recruitment notice, please send a copy of your resume to Ms. Yvette Springer at *Yvette.Springer@bis.doc.gov.*

*Deadline:* This Notice of Recruitment will be open for one year from its date of publication in the **Federal Register**.

**FOR FURTHER INFORMATION CONTACT:** Ms. Yvette Springer on (202) 482–2813.

Dated: February 12, 2015.

**Yvette Springer,**

*Committee Liaison Officer.*

[FR Doc. 2015–03323 Filed 2–17–15; 8:45 am]

**BILLING CODE 3510–JT–P**

## DEPARTMENT OF COMMERCE

### International Trade Administration

[A–570–010, C–570–011]

### Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China: Antidumping Duty Order; and Amended Final Affirmative Countervailing Duty Determination and Countervailing Duty Order

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** Based on affirmative final determinations by the Department of Commerce (the Department) and the International Trade Commission (the ITC), the Department is issuing antidumping duty (AD) and countervailing duty (CVD) orders on certain crystalline silicon photovoltaic products (certain solar products) from the People's Republic of China (the PRC). Also, as explained in this notice, the Department is amending its final affirmative CVD determination to correct an error regarding the inclusion of a subsidy program that was not properly reflected on the record of the CVD investigation.

**DATES:** *Effective Date:* February 18, 2015.

**FOR FURTHER INFORMATION CONTACT:** Jeff Pedersen at (202) 482–2769 or Thomas Martin at (202) 482–3936 (AD); or Gene Calvert at (202) 482–3586 or Justin Neuman at (202) 482–0486 (CVD), AD/CVD Operations, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 14th Street and Constitution Avenue NW., Washington, DC 20230.

**SUPPLEMENTARY INFORMATION:**

### Background

On December 23, 2014, the Department published its affirmative final determination of sales at less than fair value (LTFV) in the AD investigation of certain solar products from the PRC,[1] and its final affirmative determination that countervailable subsidies are being provided to producers and exporters of certain solar products from the PRC.[2] On February 5, 2015, the ITC notified the Department of its final determination pursuant to

---

[1] *See Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China: Final Determination of Sales at Less Than Fair Value,* 79 FR 76970 (December 23, 2014).

[2] *See Countervailing Duty Investigation of Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China: Final Affirmative Countervailing Duty Determination,* 79 FR 76962 (December 23, 2014) (*CVD Final Determination*).

**Federal Register** / Vol. 80, No. 32 / Wednesday, February 18, 2015 / Notices

sections 735(d) and 705(d) of the Tariff Act of 1930, as amended (the Act), that an industry in the United States is materially injured within the meaning of sections 735(b)(1)(A)(i) and 705(b)(1)(A)(i) of the Act by reason of LTFV imports and subsidized imports of subject merchandise from the PRC.[3]

**Scope of the Orders**

The merchandise covered by these orders are modules, laminates and/or panels consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including building integrated materials. For purposes of these orders, subject merchandise includes modules, laminates and/or panels assembled in the PRC consisting of crystalline silicon photovoltaic cells produced in a customs territory other than the PRC.

Subject merchandise includes modules, laminates and/or panels assembled in the PRC consisting of crystalline silicon photovoltaic cells of thickness equal to or greater than 20 micrometers, having a p/n junction formed by any means, whether or not the cell has undergone other processing, including, but not limited to, cleaning, etching, coating, and/or addition of materials (including, but not limited to, metallization and conductor patterns) to collect and forward the electricity that is generated by the cell.

Excluded from the scope of these orders are thin film photovoltaic products produced from amorphous silicon (a-Si), cadmium telluride (CdTe), or copper indium gallium selenide (CIGS). Also excluded from the scope of these orders are modules, laminates and/or panels assembled in the PRC, consisting of crystalline silicon photovoltaic cells, not exceeding 10,000 mm$^2$ in surface area, that are permanently integrated into a consumer good whose function is other than power generation and that consumes the electricity generated by the integrated crystalline silicon photovoltaic cells. Where more than one module, laminate and/or panel is permanently integrated into a consumer good, the surface area for purposes of this exclusion shall be the total combined surface area of all modules, laminates and/or panels that are integrated into the consumer good. Further, also excluded from the scope of these orders are any products covered by the existing antidumping and countervailing duty orders on crystalline silicon photovoltaic cells,

whether or not assembled into modules, laminates and/or panels, from the PRC.[4]

Merchandise covered by these orders is currently classified in the Harmonized Tariff Schedule of the United States (HTSUS) under subheadings 8501.61.0000, 8507.20.8030, 8507.20.8040, 8507.20.8060, 8507.20.8090, 8541.40.6020, 8541.40.6030 and 8501.31.8000. These HTSUS subheadings are provided for convenience and customs purposes; the written description of the scope of these orders is dispositive.

**Amendment to the CVD Final Determination**

On December 23, 2014, the Department published its affirmative final determination in the CVD investigation.[5] On December 24, 2014, Changzhou Trina Solar Energy Co., Ltd. (Trina Solar) and Wuxi Suntech Power Co., Ltd. (Wuxi Suntech), respondents in the CVD investigation, submitted timely ministerial error allegations and requested that the Department correct the alleged ministerial errors in the subsidy margin calculations.[6] On December 29, 2014, SolarWorld Americas, Inc., the petitioner in the CVD investigation, submitted timely rebuttal comments on Trina Solar's and Wuxi Suntech's allegations.[7] No other interested party submitted ministerial error allegations or replied to Trina Solar's or Wuxi Suntech's submissions.

After analyzing all comments and rebuttals from all interested parties, we determined, in accordance with section 705(e) of the Act and 19 CFR 351.224(e), that we made a ministerial error in our calculations for the *CVD Final Determination* with respect to Trina

Solar. At the verification of Trina Solar's questionnaire responses, we discovered unreported subsidy programs in Trina Solar's accounting system. We translated certain line items from that accounting system at verification and found that every translated line item represented a countervailable subsidy in our *CVD Final Determination*. In so doing, we inadvertently countervailed a subsidy program that did not appear among the list of translated subsidy programs submitted as a verification exhibit.[8] This amended final CVD determination corrects this error and revises the *ad valorem* subsidy rate for Trina Solar.

In the *CVD Final Determination*, we based the estimated subsidy rate for "all others" by calculating the simple average of Trina Solar's and Wuxi Suntech's estimated subsidy rates.[9] Because the subsidy rate for all others is based on the rates for Trina Solar and Wuxi Suntech, and the rate for Trina Solar changed because of the aforementioned ministerial error, we have revised the calculation for the estimated subsidy rate for all others in this amended final CVD determination.[10] The amended estimated *ad valorem* subsidy rates are provided below.

**Antidumping Duty Order**

As stated above, on February 5, 2015, in accordance with section 735(d) of the Act, the ITC notified the Department of its final determination in this investigation, in which it found that an industry in the United States is materially injured within the meaning of section 735(b)(1)(A)(i) of the Act by reason of imports of certain solar products from the PRC.[11] Because the ITC determined that imports of certain solar products from the PRC are materially injuring a U.S. industry, unliquidated entries of such merchandise from the PRC, entered or withdrawn from warehouse, for consumption are subject to the assessment of antidumping duties.

Therefore, in accordance with section 736(a)(1) of the Act, the Department will direct U.S. Customs and Border Protection (CBP) to assess, upon further instruction by the Department, antidumping duties equal to the amount

---

[3] See the ITC Notification Letter to the Deputy Assistant Secretary for Enforcement and Compliance referencing ITC Investigation Nos. 701–TA–511 and 731–TA–1246–1247 (February 5, 2015).

[4] See *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order,* 77 FR 73018 (December 7, 2012); *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Countervailing Duty Order,* 77 FR 73017 (December 7, 2012).

[5] See *CVD Final Determination.*

[6] See the Letter from Trina Solar, "Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: Ministerial Errors Allegation," (December 24, 2014); *see also* the Letter to the Secretary from Wuxi Suntech, "Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: Ministerial Error Comments of Wuxi Suntech Power Co., Ltd.," (December 24, 2014).

[7] See the Letter to the Secretary, "Crystalline Silicon Photovoltaic Products from the People's Republic of China: Response to Trina's Ministerial Error Allegation," (December 29, 2014); *see also* the Letter to the Secretary, "Crystalline Silicon Photovoltaic Products from the People's Republic of China: Response to Suntech's Ministerial Error Comments," (December 29, 2014).

[8] For a detailed discussion of all alleged ministerial errors, as well as the Department's analysis, *see* the memorandum, "Amended Final Determination in the Countervailing Duty Investigation of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: Ministerial Error Allegations," (February 6, 2015) (Ministerial Error Memorandum).

[9] See *CVD Final Determination,* 79 FR at 76964.

[10] See Ministerial Error Memorandum at 10.

[11] See *ITC Determination.*

by which the normal value of the merchandise exceeds the export price (or constructed export price) of the merchandise, for all relevant entries of certain solar products from the PRC. These antidumping duties will be assessed on unliquidated entries of certain solar products from the PRC entered, or withdrawn from warehouse, for consumption on or after July 31, 2014, the date of publication of the *AD Preliminary Determination*,[12] but will not include entries occurring after the expiration of the provisional measures period and before publication of the ITC's final injury determination as further described below.

## Continuation of Suspension of Liquidation (AD)

In accordance with section 735(c)(1)(B) of the Act, the Department will instruct CBP to continue to suspend liquidation of all appropriate entries of certain solar products from the PRC as described in the ''Scope of the Orders'' section, which were entered, or withdrawn from warehouse, for consumption on or after July 31, 2014, the date of publication in the **Federal Register** of the notice of an affirmative preliminary determination that certain solar products are being, or are likely to be, sold in the United States at LTFV. Further, consistent with our practice, where the product from the PRC under investigation is also subject to a concurrent CVD investigation, the Department will instruct CBP to require a cash deposit [13] equal to the weighted-average amount by which the normal value exceeds U.S. price, adjusted where appropriate for export subsidies

and estimated domestic subsidy pass-through.[14] The cash deposit rates, before any adjustments for export subsidies and estimated domestic subsidy pass-through, are as follows: (1) For each exporter/producer combination listed in the table below, the cash deposit rate will be equal to the dumping margin listed for that exporter/producer combination in the table; (2) for all other combinations of PRC exporters/producers of the merchandise under consideration, the cash deposit rate will be equal to the dumping margin established for the PRC-wide entity; and (3) for all non-PRC exporters of the merchandise under consideration which have not received their own separate rate above, the cash deposit rate will be equal to the cash deposit rate applicable to the PRC exporter/producer combination that supplied that non-PRC exporter. These suspension-of-liquidation instructions will remain in effect until further notice.

Accordingly, effective on the date of publication of the ITC's final affirmative injury determination, CBP will require, at the same time as importers would normally deposit estimated duties on this subject merchandise, a cash deposit equal to the estimated weighted-average dumping margins indicated below, adjusted, where appropriate, for export subsidies and estimated domestic subsidy pass-through, as discussed above.[15]

## Provisional Measures (AD)

Section 733(d) of the Act states that instructions issued pursuant to an affirmative preliminary determination in an AD investigation may not remain

in effect for more than four months except where exporters representing a significant proportion of exports of the subject merchandise request the Department to extend that four-month period to no more than six months. At the request of exporters that account for a significant proportion of certain solar products from the PRC, we extended the four-month period to no more than six months in this case.[16] As stated above, in the investigation covering certain solar products from the PRC, the Department published the preliminary determination in the AD investigation on July 31, 2014. Therefore, the six-month period beginning on the date of publication of the preliminary determination in the AD investigation ended on January 27, 2015. Furthermore, section 737(b) of the Act states that definitive duties are to begin on the date of publication of the ITC's final injury determination.

Therefore, in accordance with section 733(d) of the Act and our practice, we will instruct CBP to terminate the suspension of liquidation and to liquidate, without regard to antidumping duties, unliquidated entries of certain solar products from the PRC, entered, or withdrawn from warehouse, for consumption on or after January 27, 2015, the date the provisional measures expired, until and through the day preceding the date of publication of the ITC's final injury determination in the **Federal Register**.

## Estimated Weighted-Average Dumping Margins

The estimated weighted-average dumping margins are as follows:

| Exporter | Producer | Weighted-average dumping margin (percent) |
|---|---|---|
| Changzhou Trina Solar Energy Co., Ltd./Trina Solar (Changzhou) Science & Technology Co., Ltd. | Changzhou Trina Solar Energy Co., Ltd./Trina Solar (Changzhou) Science & Technology Co., Ltd. | 26.71 |
| Renesola Jiangsu Ltd./Renesola Zhejiang Ltd./Jinko Solar Co. Ltd./Jinko Solar Import and Export Co., Ltd. | Renesola Jiangsu Ltd./Jinko Solar Co. Ltd ........................... | 78.42 |
| Anji DaSol Solar Energy Science & Technology Co., Ltd ..... | Anji DaSol Solar Energy Science & Technology Co., Ltd ..... | 52.13 |
| Asun Energy Co., Ltd. (a/k/a Suzhou Asun Energy Co., Ltd.) | Asun Energy Co., Ltd. (a/k/a Suzhou Asun Energy Co., Ltd.). | 52.13 |
| Baoding Tianwei Yingli New Energy Resources Co. , Ltd .... | Baoding Tianwei Yingli New Energy Resources Co., Ltd., Yingli Energy (China) Co., Ltd., and Lixian Yingli New Energy Co., Ltd. | 52.13 |
| BYD (Shangluo) Industrial Co., Ltd ........................................ | BYD (Shangluo) Industrial Co., Ltd ........................................ | 52.13 |
| Canadian Solar International Limited ..................................... | Canadian Solar Manufacturing (Luoyang) Inc., Canadian Solar Manufacturing (Changshu), Inc. | 52.13 |

---

[12] *See Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China: Affirmative Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination,* 79 FR 44399 (July 31, 2014) (*AD Preliminary Determination*).

[13] *See* Modification of Regulations Regarding the Practice of Accepting Bonds During the Provisional Measures Period in Antidumping and

Countervailing Duty Investigations, 76 FR 61042 (October 3, 2011).

[14] *See* sections 772(c)(1)(C) and 777A(f) of the Act.

[15] With respect to the final affirmative countervailing duty determination in the companion investigation, because the provisional measures period has expired, the Department will only order the resumption of the suspension of liquidation, and require cash deposits for

countervailing duties equal to the final subsidy rates, upon issuance of a final affirmative injury determination by the ITC. As a result, the Department will make an adjustment to AD cash deposits, where appropriate, for export subsidies and estimated domestic subsidy pass-through as of the date of publication of the ITC's final affirmative injury determination.

[16] *See AD Preliminary Determination,* 79 FR at 44396.

| Exporter | Producer | Weighted-average dumping margin (percent) |
|---|---|---|
| Canadian Solar Manufacturing (Changshu), Inc .................. | Canadian Solar Manufacturing (Changshu), Inc .................. | 52.13 |
| Canadian Solar Manufacturing (Luoyang) Inc ..................... | Canadian Solar Manufacturing (Luoyang) Inc ..................... | 52.13 |
| CEEG Nanjing Renewable Energy Co., Ltd ......................... | CEEG Nanjing Renewable Energy Co., Ltd ......................... | 52.13 |
| Changzhou Almaden Co., Ltd .............................................. | Changzhou Almaden Co., Ltd .............................................. | 52.13 |
| Chint Solar (Zhejiang) Co., Ltd ........................................... | Chint Solar (Zhejiang) Co., Ltd ........................................... | 52.13 |
| ET Solar Industry Limited .................................................... | ET Solar Industry Limited .................................................... | 52.13 |
| Hainan Yingli New Energy Resources Co., Ltd ................... | Hainan Yingli New Energy Resources Co., Ltd ................... | 52.13 |
| Hangzhou Zhejiang University Sunny Energy Science and Technology Co., Ltd. | Hangzhou Zhejiang University Sunny Energy Science and Technology Co., Ltd. | 52.13 |
| Hanwha SolarOne (Qidong) Co., Ltd .................................. | Hanwha SolarOne (Qidong) Co., Ltd .................................. | 52.13 |
| Hanwha SolarOne Hong Kong Limited ................................ | Hanwha SolarOne (Qidong) Co., Ltd .................................. | 52.13 |
| Hefei JA Solar Technology Co., Ltd ................................... | Hefei JA Solar Technology Co., Ltd ................................... | 52.13 |
| Hengdian Group DMEGC Magnetics Co., Ltd ..................... | Hengdian Group DMEGC Magnetics Co., Ltd ..................... | 52.13 |
| Hengshui Yingli New Energy Resources Company Limited .. | Hengshui Yingli New Energy Resources Company Limited .. | 52.13 |
| Jiangyin Hareon Power Co., Ltd ......................................... | Jiangyin Xinhui Solar Co., Ltd.; Altusvia Energy Taicang Co., Ltd.; Hareon Solar Technology Co., Ltd. | 52.13 |
| Jiawei Solarchina Co., Ltd .................................................. | Jiawei Solarchina (Shenzhen) Co., Ltd .............................. | 52.13 |
| Jiawei Technology (HK) Ltd ................................................ | Shenzhen Jiawei Photovoltaic Lighting Co. Ltd .................. | 52.13 |
| LDK Solar Hi-Tech (Nanchang) Co., Ltd ............................ | LDK Solar Hi-Tech (Nanchang) Co., Ltd ............................ | 52.13 |
| Lixian Yingli New Energy Company Ltd .............................. | Lixian Yingli New Energy Company Ltd .............................. | 52.13 |
| MOTECH (Suzhou) Renewable Energy Co., Ltd ................. | MOTECH (Suzhou) Renewable Energy Co., Ltd ................. | 52.13 |
| Ningbo Qixin Solar Electrical Appliance Co., Ltd ............... | Ningbo Qixin Solar Electrical Appliance Co., Ltd ............... | 52.13 |
| Perlight Solar Co., Ltd ........................................................ | Perlight Solar Co., Ltd ........................................................ | 52.13 |
| Risen Energy Co., Ltd ........................................................ | Risen Energy Co., Ltd ........................................................ | 52.13 |
| Shanghai JA Solar Technology Co., Ltd ............................. | Shanghai JA Solar Technology Co., Ltd ............................. | 52.13 |
| Shanghai Solar Energy Science & Technology Co., Ltd ....... | Lianyungang Shenzhou New Energy Co., Ltd ..................... | 52.13 |
| Shenzhen Jiawei Photovoltaic Lighting Co. Ltd .................. | Shenzhen Jiawei Photovoltaic Lighting Co. Ltd .................. | 52.13 |
| Shenzhen Sungold Solar Co., Ltd ...................................... | Shenzhen Sungold Solar Co., Ltd ...................................... | 52.13 |
| Shenzhen Topray Solar Co., Ltd ........................................ | Shenzhen Topray Solar Co., Ltd ........................................ | 52.13 |
| Sun Earth Solar Power Co., Ltd ......................................... | Sun Earth Solar Power Co., Ltd ......................................... | 52.13 |
| Sunny Apex Development Ltd ............................................. | Shenzhen Jiawei Photovoltaic Lighting Co. Ltd,., Wuhan FYY Technology Co., Ltd .................................... | 52.13 |
| SunPower Systems SARL ................................................... | SunEnergy (S.Z.) Co., Ltd .................................................. | 52.13 |
| tenKsolar (Shanghai) Co., Ltd ........................................... | tenKsolar (Shanghai) Co., Ltd ........................................... | 52.13 |
| Upsolar Global Co., Ltd. and including Upsolar Group, Co., Ltd. | Shandong Dahai Group Co. Ltd ......................................... | 52.13 |
| Wanxiang Import & Export Co., Ltd .................................... | Zhejiang Wanxiang Solar Co., Ltd ..................................... | 52.13 |
| Wuhan FYY Technology Co., Ltd ........................................ | Wuhan FYY Technology Co., Ltd ........................................ | 52.13 |
| Wuxi Suntech Power Co., Ltd ............................................ | Wuxi Suntech Power Co., Ltd ............................................ | 52.13 |
| Yingli Energy (China) Company Limited .............................. | Yingli Energy (China) Company Limited, Baoding Tianwei Yingli New Energy Resources Co. , Ltd. and Lixian Yingli New Energy Co. , Ltd. | 52.13 |
| Yingli Green Energy International Trading Limited ................ | Yingli Energy (China) Company Limited, Baoding Tianwei Yingli New Energy Resources Co., Ltd.,. and Hainan Yingli New Energy Resources Co., Ltd .............. | 52.13 |
| Zhongli Talesun Solar Co., Ltd .......................................... | Zhongli Talesun Solar Co., Ltd .......................................... | 52.13 |
| PRC-Wide Rate | | 165.04 |

## Countervailing Duty Order

As stated above, on February 5, 2015, in accordance with section 705(d) of the Act, the ITC notified the Department of its final determination in this investigation, in which it found that an industry in the United States is materially injured within the meaning of section 705(b)(1)(A)(i) of the Act by reason of imports of certain solar products from the PRC.[17]

Therefore, in accordance with section 706(a) of the Act, the Department will direct CBP to assess, upon further instruction by the Department, countervailing duties equal to the amounts listed below for all relevant entries of certain solar products from the PRC. These countervailing duties will be assessed on unliquidated entries of certain solar products from the PRC entered, or withdrawn from warehouse, for consumption on or after June 10, 2014, the date of publication of the *CVD Preliminary Determination*,[18] and before October 8, 2014, the date on which the Department instructed CBP to discontinue the suspension of liquidation in accordance with section 703(d) of the Act. Section 703(d) of the Act states that the suspension of liquidation pursuant to a preliminary determination may not remain in effect for more than four months. Entries of certain solar products from the PRC made on or after October 8, 2014, and prior to the date of publication of the ITC's final determination in the **Federal Register** are not liable for the assessment of countervailing duties, due to the Department's discontinuation, effective October 8, 2014, of the suspension of liquidation.

## Suspension of Liquidation (CVD)

In accordance with section 706 of the Act, we will instruct CBP to reinstitute the suspension of liquidation on all relevant entries of certain solar products from the PRC. We will also instruct CBP

[17] *See ITC Determination.*

[18] *See Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China: Preliminary Affirmative Countervailing Duty Determination,* 79 FR 33174 (June 10, 2014) (*CVD Preliminary Determination*).

to require cash deposits equal to the amounts indicated below. These instructions suspending liquidation will remain in effect until further notice. Accordingly, effective on the date of publication of the ITC's final affirmative injury determination, CBP will require, at the same time as importers would normally deposit estimated duties on this subject merchandise, cash deposits equal to the amounts indicated below: [19]

| Company | Subsidy rate (percent) (*ad valorem*) |
|---|---|
| Wuxi Suntech Power Co., Ltd ..................................... | 27.64 |
| Changzhou Trina Solar Energy Co., Ltd ...................... | 49.21 |
| All Others ................................. | 38.43 |

**Notifications to Interested Parties**

This notice constitutes the antidumping duty and countervailing duty orders with respect to certain solar products from the PRC pursuant to sections 736(a) and 706(a) of the Act. Interested parties can find an updated list of orders currently in effect by either visiting *http://enforcement.trade.gov/ stats/iastats1.html* or by contacting the Department's Central Records Unit, Room 7046 of the main Commerce Building.

These orders and the amended *CVD Final Determination* are published in accordance with sections 705(e), 706(a), 736(a), and 777(i) of the Act, and 19 CFR 351.211(b) and 351.224(e).

Dated: February 10, 2015.

**Paul Piquado,**

*Assistant Secretary for Enforcement and Compliance.*

[FR Doc. 2015–03183 Filed 2–17–15; 8:45 am]

**BILLING CODE 3510–DS–P**

---

**DEPARTMENT OF COMMERCE**

**International Trade Administration**

**[A–583–853]**

**Certain Crystalline Silicon Photovoltaic Products From Taiwan: Antidumping Duty Order**

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** Based on affirmative final determinations by the Department of Commerce (the "Department") and the International Trade Commission (the "ITC"), the Department is issuing an antidumping duty ("AD") order on certain crystalline silicon photovoltaic

products ("certain solar products") from Taiwan.

**DATES:** *Effective Date:* February 18, 2015.

**FOR FURTHER INFORMATION CONTACT:** Charles Riggle or Magd Zalok AD/CVD Operations, Enforcement and Compliance, U.S. Department of Commerce, 14th Street and Constitution Avenue NW., Washington, DC 20230; telephone: (202) 482–0650 or (202) 482–4162.

**SUPPLEMENTARY INFORMATION:**

**Background**

In accordance with sections 735(d) and 777(i)(1) of the Tariff Act of 1930, as amended (the "Act") and 19 CFR 351.210(c), on December 23, 2014, the Department published an affirmative final determination of sales at less than fair value ("LTFV") in the investigation of certain solar products from Taiwan.[1] On February 5, 2015, the ITC notified the Department of its affirmative determinations that an industry in the United States is materially injured within the meaning of section 735(b)(1)(A)(i) of the Act by reason of LTFV imports of certain solar products from the People's Republic of China and Taiwan.[2]

**Scope of the Order**

The merchandise covered by this order is crystalline silicon photovoltaic cells, and modules, laminates and/or panels consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including building integrated materials.

Subject merchandise includes crystalline silicon photovoltaic cells of thickness equal to or greater than 20 micrometers, having a p/n junction formed by any means, whether or not the cell has undergone other processing, including, but not limited to, cleaning, etching, coating, and/or addition of materials (including, but not limited to, metallization and conductor patterns) to collect and forward the electricity that is generated by the cell.

Modules, laminates, and panels produced in a third-country from cells produced in Taiwan are covered by this investigation. However, modules, laminates, and panels produced in Taiwan from cells produced in a third-country are not covered by this investigation.

Excluded from the scope of this investigation are thin film photovoltaic products produced from amorphous silicon (a-Si), cadmium telluride (CdTe), or copper indium gallium selenide (CIGS). Also excluded from the scope of this investigation are crystalline silicon photovoltaic cells, not exceeding 10,000 mm$^2$ in surface area, that are permanently integrated into a consumer good whose function is other than power generation and that consumes the electricity generated by the integrated crystalline silicon photovoltaic cells. Where more than one cell is permanently integrated into a consumer good, the surface area for purposes of this exclusion shall be the total combined surface area of all cells that are integrated into the consumer good.

Further, also excluded from the scope of this investigation are any products covered by the existing antidumping and countervailing duty orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the People's Republic of China ("PRC").[3] Also excluded from the scope of this investigation are modules, laminates, and panels produced in the PRC from crystalline silicon photovoltaic cells produced in Taiwan that are covered by an existing proceeding on such modules, laminates, and panels from the PRC.

Merchandise covered by this investigation is currently classified in the Harmonized Tariff Schedule of the United States ("HTSUS") under subheadings 8501.61.0000, 8507.20.8030, 8507.20.8040, 8507.20.8060, 8507.20.8090, 8541.40.6020, 8541.40.6030 and 8501.31.8000. These HTSUS subheadings are provided for convenience and customs purposes; the written description of the scope of this investigation is dispositive.

**Antidumping Duty Order**

As stated above, on February 5, 2015, in accordance with section 735(d) of the Act, the ITC notified the Department of its final determination in its investigation, in which it found that an industry in the United States is materially injured by reason of imports of certain solar products from Taiwan. Because the ITC determined that imports of certain solar products from

---

[19] *See* section 706(a)(3) of the Act.

[1] *See Certain Crystalline Silicon Photovoltaic Products: Final Determination of Sales at Less Than Fair Value,* 79 FR 76966 (December 23, 2014).

[2] *See* ITC Notification letter to the Deputy Assistant Secretary for Enforcement and Compliance referencing ITC Investigation Nos. 701–TA–511 and 731–TA–1246–1247 (Final).

[3] *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order,* 77 FR 73018 (December 7, 2012); *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Countervailing Duty Order,* 77 FR 73017 (December 7, 2012).