Slip Op. 16-56

UNITED STATES COURT OF INTERNATIONAL TRADE

```
┌─────────────────────────────────────────┐
│ SUNPOWER CORP.,                          │
│                                          │
│                    Plaintiff,            │
│                                          │
│             v.                           │
│                                          │
│ UNITED STATES,                           │
│                                          │
│                    Defendant.            │
│                                          │
└─────────────────────────────────────────┘
```

Before: Donald C. Pogue,
           Senior Judge

Consol. Court No. 15-00067[1]


OPINION and ORDER

[remanding Department of Commerce's antidumping and countervailing duty scope determinations]

Dated: June 8, 2016


        John M. Gurley, Diana Dimitriuc Quaia, and Tina Termei, Arent Fox LLP, of Washington, DC, for Canadian Solar Inc., Changzhou Trina Solar Energy Co., Ltd., China Sunergy (Nanjing) Co., Ltd., Chint Solar (Zhejiang) Co., Ltd., LDK Solar Hi-Tech (Nanchang) Co., Ltd., Perlight Solar Co., Ltd., ReneSola Jiangsu Ltd., Shanghai JA Solar Technology Co., Ltd., Shenzhen Sacred Industry Co., Ltd., Shenzhen Sungold Solar Co., Ltd., Sumec Hardware & Tools Co., Ltd., Sunny Apex Development Ltd., Wuhan FYY Technology Co., Ltd., Wuxi Suntech Power Co., Ltd., Zhongli Talesun Solar Co., Ltd., and Znshine PV-Tech Co., Ltd.

        Craig A. Lewis, Samantha Clark Sewall, and Wesley Verne Carrington, Hogan Lovells US LLP, of Washington, DC, for

---

[1] This action is consolidated with Suniva, Inc. v. United States, Ct. No. 15-00071; Shanghai BYD Co. v. United States, Ct. No. 15-00083, Shanghai BYD Co. v. United States, Ct. No. 15-00087, Canadian Solar Inc. v. United States, Ct. No. 15-00088, Canadian Solar Inc. v. United States, Ct. No. 15-00089, and SunPower Corp. v. United States, Ct. No. 15-00090. Order, July 1, 2015, ECF No. 31, at ¶ 1; Order, Jan. 13, 2016, ECF No. 75.

Shanghai BYD Co., Ltd. and BYD (Shangluo) Industrial Co., Ltd.

     Daniel J. Gerkin and Jerome J. Zaucha, K&L Gates LLP, of Washington, DC, for SunPower Corporation.

     Gregory S. McCue, Steptoe & Johnson LLP, of Washington, DC, for Suniva, Inc.

     Neil R. Ellis, Sidley Austin LLP, of Washington, DC, for Yingli Green Energy Holding Co., Ltd. and Yingli Green Energy Americas, Inc.

     Melissa M. Devine, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for the Defendant.  Also on the brief were Benjamin C. Mizer, Principal Deputy Assistant Attorney General, Jeanne E. Davidson, Director, and Reginald T. Blades, Jr., Assistant Director.  Of counsel was Rebecca Cantu, Senior Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, DC.

     Timothy C. Brightbill and Laura El-Sabaawi, Wiley Rein LLP, of Washington, DC, for Defendant-Intervenor SolarWorld Americas, Inc.

     **Pogue, Senior Judge:**  This consolidated action arises from the final affirmative determinations made by the U.S. Department of Commerce ("Commerce") in its antidumping and countervailing duty ("AD" and "CVD," respectively) investigations of solar panels from the People's Republic of China ("PRC" or "China").[2]  Before the court are motions for

---

[2] See Certain Crystalline Silicon Photovoltaic Products from the [PRC], 79 Fed. Reg. 76,970 (Dep't Commerce Dec. 23, 2014) (final determination of sales at less than fair value) and accompanying Issues & Decision Mem., A-570-010, Investigation (Dec. 15, 2014) ("Solar II PRC AD I&D Mem."); Certain Crystalline Silicon Photovoltaic Products from the [PRC], 79 Fed. Reg. 76,962 (Dep't Commerce Dec. 23, 2014) (final affirmative countervailing duty determination) and accompanying Issues & Decision Mem., C-570-011, Investigation (Dec. 15, 2014) ("Solar II PRC CVD I&D
(footnote continued)

judgment on the agency record, challenging Commerce's final

determinations regarding the scope of these proceedings.[3]

        The court has jurisdiction pursuant to Section

516A(a)(2)(B)(i) of the Tariff Act of 1930, as amended,

19 U.S.C. § 1516a(a)(2)(B)(i) (2012),[4] and 28 U.S.C. § 1581(c)

(2012).

        As explained below, Commerce's final scope

determinations departed from the agency's prior rule for

determining national origin for solar panels without adequate

consideration or discussion of the continuing relevance, if any,

of Commerce's prior factual finding that the assembly of

imported solar cells into panels is insufficient to change the

product's country-of-origin from the country of cell-production

to the country of panel-assembly.  In addition, Commerce's final

scope determinations did not consider or explain an important

_____

Mem.").

[3] See Consol. Pls.' Joint Br. in Supp. of their Rule 56.2 Mot. for J. on the Agency R., ECF No. 61 ("Resp'ts' Br."); Br. in Supp. of SunPower Corp.'s Rule 56.2 Mot. for J. on the Agency R., ECF Nos. 59 (conf. version) & 60 (pub. version) ("SunPower's Br."); Br. of Consol. Pl. Suniva, Inc. in Supp. of its Mot. for J. on the Agency R., ECF No. 58-1 ("Suniva's Br."); see also Mot. of Consol. Pl.-Intervenors Yingli Green Energy Holding Co., Ltd. & Yingli Green Energy Americas, Inc. for J. on the Agency R., ECF No. 57, at 2 (adopting the arguments presented in Resp'ts' Br., ECF No. 61).

[4] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2012 edition.

aspect of the national origin determination, specifically the reasonableness of applying AD/CVD duties to the entire value of solar panels assembled in the PRC when only a small percentage of the cost of production actually occurs there.   Therefore, Commerce's final scope determinations for these proceedings are remanded for reconsideration.

         After a statement of the relevant background, the Plaintiffs' arguments, and the standard of review, the claims presented are discussed below.

                              **BACKGROUND**

         The production process for solar panels complicates Commerce's national origin determination.   Solar panels (also commonly referred to as solar modules or laminates) are assembled from solar cells, which use crystalline silicon to convert sunlight into electricity.[5]   Importantly, the complete solar panel production process consists of multiple steps, each of which may occur in different plants or locations,[6] and potentially in different countries.   First, polysilicon is

---

[5] Certain Crystalline Silicon Photovoltaic Products from China and Taiwan, USITC Pub. 4519, Inv. Nos. 701-TA-511 and 731-TA-1246-1247 (Feb. 2015) (final determination) ("Solar II ITC Final Determination") at 10.

[6] See, e.g., Crystalline Silicon Photovoltaic Cells and Modules from China, USITC Pub. 4360, Inv. Nos. 701-TA-481 and 731-TA-1190 (Nov. 2012) (final determination) at I-15.

refined, then it is formed into ingots, which are sliced into wafers; the wafers are then converted to cells, which are finally assembled into solar panels.[7]

Solar panels from the PRC were also subject to investigation in prior proceedings, resulting in separate AD and CVD orders (hereinafter referred to as the "Solar I PRC" proceedings).[8] The Solar I PRC proceedings covered solar cells produced in China, including cells assembled into panels, regardless of whether or where such panel assembly occurred.[9] The proceedings at issue here (hereinafter referred to as the "Solar II PRC" proceedings) cover all solar panels assembled in China, regardless of where their constituent cells were produced, except those panels already covered by the Solar I PRC proceedings (i.e., panels assembled in China from cells that

---

[7] Id.

[8] See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the [PRC], 77 Fed. Reg. 63,791 (Dep't Commerce Oct. 17, 2012) (final determination of sales at less than fair value, and affirmative final determination of critical circumstances, in part) and accompanying Issues & Decision Mem., A-570-979, Investigation (Oct. 9, 2012) ("Solar I PRC AD I&D Mem."); Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the [PRC], 77 Fed. Reg. 63,788 (Dep't Commerce Oct. 17, 2012) (final affirmative countervailing duty determination and final affirmative critical circumstances determination) and accompanying Issues & Decision Mem., C-570-980, Investigation (Oct. 9, 2012) ("Solar I PRC CVD I&D Mem.").

[9] See id.

were also made in China).[10]  Relevant background with regard to
each of these proceedings is provided below.

   I.   *Solar I PRC*

      In the Solar I PRC proceedings, Petitioner SolarWorld
Americas, Inc. ("SolarWorld") – Defendant-Intervenor in this
action – initially sought investigations and orders covering, as
subject merchandise from the PRC: 1) all solar cells produced in
China, regardless of whether or where they were assembled into
panels; and also 2) all solar panels assembled in China,
regardless of where the constituent cells were produced.[11]  But
Commerce decided that this scope proposal would have
impermissibly required the agency to simultaneously establish
that China is the country-of-origin both for the cells produced
in China but assembled into panels elsewhere, as well as for the

_____

[10] See Solar II PRC AD I&D Mem. cmt. 1 at 11 ("[S]ubject
merchandise includes all modules, laminates and/or panels
assembled in the PRC that contain crystalline silicon
photovoltaic [solar] cells produced in a customs territory other
than the PRC."); id. at 28 ("[T]he scopes adopted in the final
determinations of the [Solar II PRC] investigations emphasize
that they do not alter, revise, or overlap the scope of
[Solar I PRC]."); Solar II PRC CVD I&D Mem. cmt. 1 at 36, 54
(same).

[11] [SolarWorld's] Revised Scope Language, Crystalline Silicon
Photovoltaic Cells, Whether or Not Assembled into Modules, from
the [PRC], A-570-979 & C-570-980 (Nov. 7, 2011) ("Solar I PRC
Proposed Scope Clarification"), reproduced in App. to
[SolarWorld]'s Rule 56.2 Mot. for J. on the Agency R. & Br. in
Supp., Ct. No. 13-00219, ECF No. 29 at Tab 8, at 3 & Attach. 2.

cells produced outside of China but assembled into panels in China.[12]  To Commerce, this proposal would have required two conflicting origin rules for the same class of products.[13] Commerce therefore decided, in Solar I PRC, that either constituent cell-production or ultimate panel-assembly must determine the country-of-origin.[14]  Accordingly, Commerce concluded that an AD/CVD order on merchandise from China may cover *either* cells produced in China, regardless of where they are subsequently assembled into panels, *or* panels assembled in China, regardless of the origin of the cells, but not both.[15]

To choose between these alternatives, Commerce employed its usual "substantial transformation" test to determine the country-of-origin for merchandise that is manufactured in multiple countries.[16]  Specifically, Commerce

---

[12] [Commerce's] Mem. re Scope Clarification, Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the [PRC], A-570-979 and C-570-980, Investigations (Mar. 19, 2012), reproduced in, e.g., App. to Br. of Consol. Pl. Suniva, Inc. in Supp. of its Mot. for J. on the Agency R., ECF No. 58-3 at Tab 1 Ex. 2 ("Solar I PRC Scope Clarification Mem."), at 8 (unchanged in Solar I PRC AD I&D Mem. cmt. 1 at 8); Solar I PRC CVD I&D Mem. cmt. 32 at 80 & n.214 (same)).

[13] See id.

[14] Id.

[15] Id.

[16] See id. at 5 ("Because AD and CVD orders apply to merchandise from particular countries, determining the country where the merchandise is produced is fundamental to proper administration

(footnote continued)

analyzed whether solar panel assembly constitutes a substantial

transformation of the solar cells included in the panel,

sufficient for the final product to be considered to originate

in the country of panel assembly.[17]  Based on this analysis,

Commerce determined that "solar module assembly does not

substantially transform solar cells such that it changes the

---

and enforcement of the AD and CVD statute.  The scope of an AD
or CVD order is limited to merchandise that originates in the
country covered by the order.") (citing Stainless Steel Plate in
Coils from Belgium, 69 Fed. Reg. 74,495 (Dep't Commerce Dec. 14,
2004) (final results of antidumping duty administrative review)
and accompanying Issues & Decision Mem., A-423-808, ARP 02-03
(Dec. 14, 2004) ("SSPC from Belgium") at cmt. 4); id. at 5-6
("[Commerce] has applied, as appropriate, the following analyses
in determining whether substantial transformation occurs,
thereby changing a product's country-of-origin [from the country
where the component parts were produced to the country of
subsequent processing or assembly].  These have included:
1) whether the processed downstream product falls into a
different class or kind of product when compared to the upstream
product; 2) whether the essential component of the merchandise
is substantially transformed in the country of exportation; or
3) the extent of processing.  We have examined these criteria in
conducting our substantial transformation analysis [for solar
panels assembled in a different country from that where their
constituent cells were produced].") (citation omitted);
see also SSPC from Belgium, cmt. 4 at 14 ("As the [Court of
International Trade] held, the substantial transformation test
'provides a means for Commerce to carry out its country of
origin examination and properly guards against circumvention of
existing antidumping orders.'") (quoting E.I. DuPont de Nemours
& Co. v. United States, 22 CIT 370, 375, 8 F. Supp. 2d 854, 859
(1998)).
     No party to these proceedings challenges Commerce's
substantial transformation test.

[17] Solar I PRC Scope Clarification Mem., ECF No. 58-3 at Tab 1
Ex. 2, at 5-10.

country-of-origin."[18]   Accordingly, Commerce concluded that "where solar cell production occurs in a different country from solar module assembly, the country-of-origin of the solar modules/panels is the country in which the solar cell was produced [and not the country of panel assembly]."[19]

Thus, in response to SolarWorld's Solar I PRC scope request, Commerce decided that the scope of the Solar I PRC proceedings would include Chinese cells assembled into panels in third countries, but exclude panels assembled in China from third-country cells.[20]  The agency suggested that to the extent that SolarWorld continued to allege additional injury from products left unaddressed by this product coverage, SolarWorld could petition for additional orders to cover the merchandise excluded from Solar I PRC as not of Chinese origin.[21]

Following up on this suggestion, SolarWorld filed the

---

[18] Id. at 8.

[19] Id.

[20] Id. at 10; see Solar I PRC AD I&D Mem. cmt. 1 at 5; Solar I PRC CVD I&D Mem. cmt. 32 at 77.

[21] Solar I PRC AD I&D Mem. cmt. 1 at 8 (noting that "Petitioner has the option of bringing additional petitions to address any dumping concerns it has regarding solar modules/panels assembled from solar cells produced in a third country"); Solar I PRC CVD I&D Mem. cmt. 32 at 80 (same for subsidy concerns).  Obviously, this also invited petitions addressing any PRC subsidization of panel assembly from solar cells produced in a third country.

Solar II petition discussed below.[22]

   II.  *Solar II PRC*

        SolarWorld's Solar II petition, and Commerce's final
Solar II determinations, state that they aim to address
(1) production shifts that occurred after imposition of the
Solar I PRC orders; and (2) unfair subsidization by the Chinese
Government of the panel assembly process for panels assembled in
China from non-Chinese cells.[23]  Specifically, "following the
implementation of the orders in Solar I [PRC], numerous Chinese
companies began to contract with Taiwanese cell producers to
manufacture cells for the purpose of exporting those cells to
China for use in the production of panels, modules and
laminates, and then to export those panels, modules and
laminates to the United States."[24]  As a factual matter, no party

---

[22] See Pet. for Imposition of Antidumping & Countervailing Duties
Pursuant to Secs. 701 & 731 of the Tariff Act of 1930, as
Amended, Certain Crystalline Silicon Photovoltaic Products from
the [PRC] and Taiwan, A-570-010, A-583-853, & C-570-011,
Investigations (Dec. 31, 2013), reproduced in App. to Consol.
Pls.' Joint Br. in Supp. of their Rule 56.2 Mot. for J. on the
Agency R., ECF No. 64 ("Respt's' App.") at Tab 1
("Solar II Pet.").

[23] Id. at 4-6; Solar II PRC AD I&D Mem. cmt. 1 at 13, 24; Solar
II PRC CVD I&D Mem. cmt. 1 at 38-39; see id. at cmts. 6 and 7
(explaining Commerce's determination that the Chinese
governmental provision of aluminum extrusions and solar glass
(inputs used to assemble solar cells into panels) for less than
adequate remuneration constitutes countervailable subsidies).

[24] Solar II PRC AD I&D Mem. cmt. 1 at 18; Solar II PRC CVD I&D
                                        (footnote continued)

challenges this shift of production or its negative effect on
the reach of the Solar I PRC AD/CVD orders.[25]

      Accordingly, SolarWorld petitioned for, and Commerce
initiated, separate AD and CVD investigations to cover
(1) panels assembled in China from non-Chinese cells
(Solar II PRC); and (2) cells and panels from Taiwan
("Solar II Taiwan").[26]

---

Mem. cmt. 1 at 44 (same); see also Issues & Decision Mem.,
Certain Crystalline Silicon Photovoltaic Products from Taiwan,
A-583-853, Investigation (Dec. 15, 2014) (adopted in 79 Fed.
Reg. 76,966, 76,967 (Dep't Commerce Dec. 23, 2014) (final
determination of sales at less than fair value))
("Solar II Taiwan I&D Mem.") cmt. 1 at 17 ("[SolarWorld's
Solar II] Petition claimed that Chinese solar producers were
'using cells fully or partially manufactured in Taiwan in the
modules they assembled for export to the United States,' which
allowed the Chinese solar producers to 'export those modules,
duty-free, to the U.S. market.'  . . .  The Petition claimed
that Taiwanese cell and module imports increased by 85 percent,
in large part as a result of this alleged loophole.")
(quoting and citing, respectively, Solar II Pet., [ECF No. 64
at Tab 1], at 4, 6); id. at 21 ("[F]ollowing the implementation
of the [Solar I PRC] AD and CVD orders . . ., there has been a
measurable shift in trade flows that has resulted in increased
import of non-subject modules produced in China.")
(citing Solar II Pet., [ECF No. 64 at Tab 1], at 3, 5-6, 21, 34,
37, 53).

[25] See Resp'ts' Br., ECF No. 61; SunPower's Br., ECF Nos. 59
& 60; Suniva's Br., ECF No. 58-1.

[26] See Solar II Pet., ECF No. 64 at Tab 1; Certain Crystalline
Silicon Photovoltaic Products from the [PRC] and Taiwan, 79 Fed.
Reg. 4661, 4661 (Dep't Commerce Jan. 29, 2014) (initiation of AD
investigations); Certain Crystalline Silicon Photovoltaic
Products from the [PRC], 79 Fed. Reg. 4667, 4668 (Dep't Commerce
Jan. 29, 2014) (initiation of CVD investigation); Solar II PRC
AD I&D Mem. cmt. 1; Solar II PRC CVD I&D Mem. cmt. 1;
                                        (footnote continued)

Initially, in its preliminary determination in Solar II PRC, Commerce accepted SolarWorld's proposal that, in addition to the solar panels that were already covered as Chinese merchandise under Solar I PRC – because they were assembled in China from cells that were also produced in China – panels assembled in China from cells *not* made in China – but made using ingots, wafers, or partially completed cells that were made in China – should also be covered as 'solar panels from China' under the new Solar II PRC proceedings.[27]

Subsequently, however, Commerce proposed to modify the scope of the Solar II PRC proceedings to include *all* solar panels assembled in China, regardless of the source of their constituent parts.[28]   After considering interested parties'

---

Solar II Taiwan I&D Mem. cmt. 1.

[27] Decision Mem. for the Prelim. Determination, Certain Crystalline Silicon Photovoltaic Products from the [PRC], A-570-010, Investigation (July 24, 2014) (adopted in 79 Fed. Reg. 44,399, 44,399 (Dep't Commerce July 31, 2014) (affirmative preliminary determination of sales at less than fair value and postponement of final determination)) at 4; Decision Mem. for Prelim. Affirmative Countervailing Duty Determination, Certain Crystalline Silicon Photovoltaic Products from the [PRC], C-570-011, Investigation (June 2, 2014) (adopted in 79 Fed. Reg. 33,174, 33,175 (Dep't Commerce June 10, 2014) (preliminary affirmative countervailing duty determination)) at 5; Solar II Pet., ECF No. 64 at Tab 1, at 11.

[28] Opportunity to Submit Scope Comments, Crystalline Silicon Photovoltaic Products from the [PRC] and Taiwan, A-570-010, C-570-011, & A-583-853, Investigations (Oct. 3, 2014), reproduced in Respt's' App., ECF No. 64 at Tab 8, at 1.

comments regarding this revised scope proposal, Commerce
ultimately concluded, over numerous parties' objections, that
the scope of the Solar II PRC proceedings would cover all solar
panels assembled in China, regardless of cell-origin, excluding
only those panels that are already covered by the scope of the
parallel Solar I PRC proceedings.[29]

Because Solar I PRC covers all panels assembled in
China from cells that are also produced in China, and all panels
covered by Solar I PRC are explicitly excluded from
Solar II PRC, the final Solar II PRC scope effectively covers
solely panels assembled in China from cells that are
manufactured outside of China.[30]  Unlike the prior preliminary
determination, however, the agency's final Solar II PRC scope
does not require that the non-Chinese cells be partially
produced in China or produced from Chinese inputs or
components.[31]  Rather, the mere fact of assembly into panels in

---

[29] See Solar II PRC AD I&D Mem. cmt. 1 at 11, 28; Solar II PRC
CVD I&D Mem. cmt. 1 at 36, 54.

[30] Solar II PRC AD I&D Mem. cmt. 1 at 28 (excluding merchandise
covered by Solar I PRC); Solar II PRC CVD I&D Mem. cmt. 1 at 54
(same); Solar I PRC Scope Clarification Mem., ECF NO. 58-3
at Tab 1 Ex. 2, at 8 (covering all panels made from cells made
in China as subject merchandise under Solar I PRC) (unchanged in
Solar I PRC AD I&D Mem. cmt. 1 at 6-7; Solar I PRC CVD I&D Mem.
cmt. 32 at 78-79).

[31] Solar II PRC AD I&D Mem. cmt. 1 at 14; Solar II PRC CVD I&D
Mem. cmt. 1 at 40.

the PRC is deemed sufficient to confer PRC origin on any non-PRC cells thus assembled, including, for example, for panels assembled from cells produced entirely in the United States.[32] Thus, in the final Solar II PRC scope determination, Commerce effectively changed its origin-determinative rule from that established for solar panels in Solar I PRC.[33]

Plaintiffs – interested parties that participated in the administrative process below – now challenge this final Solar II PRC scope determination.

## PARTIES' ARGUMENTS

The Plaintiffs make the following arguments regarding Commerce's final scope determinations in the Solar II PRC investigations.

(I) Commerce's late modification of the Solar II PRC

---

[32] See id.; Scope Ruling on Aireko Construction LLC's Solar Modules Composed of U.S.-Origin Cells, Crystalline Silicon Photovoltaic Products from [the PRC], A-570-010 & C-570-011, Scope Ruling (Nov. 12, 2015), reproduced in Ct. No. 15-00319, ECF No. 16-4 ("Solar II PRC Scope Ruling"), at 5 ("[M]odules [that] are assembled in the PRC from U.S.-origin cells . . . are within the scope of the [Solar II PRC orders].").

[33] See Solar II PRC AD I&D Mem. cmt. 1 at 28-29 ("[T]he country of origin criteria in Solar I PRC, applicable to solar modules, differ from these [Solar II PRC] investigations."); Solar II PRC CVD I&D Mem. cmt. 1 at 41, 54 (same).

scope substantially deprived interested parties of due process.[34]

    (II) Commerce unlawfully expanded the Solar II PRC
scope coverage after the close of factual submissions, to cover
merchandise that had been excluded from Commerce's unfair
pricing and countervailable subsidies analyses (as well as the
ITC's injury analysis) throughout the investigations.[35]

    (III) Commerce unlawfully expanded the scope of the
Solar II PRC proceedings beyond the Petitioner's intent, which
was to address solely panels assembled in China using third-
country cells that themselves incorporate Chinese inputs.[36]

    (IV) Commerce's final Solar II PRC scope
determinations unlawfully departed from prior practice without
sufficient explanation.[37]   Commerce provided insufficient
explanation to reconcile the Solar II PRC country-of-origin rule
with the rule established for the same class/kind of merchandise

---

[34] Resp'ts' Br., ECF No. 61, at 31; SunPower's Br., ECF Nos. 59
& 60, at 23.

[35] See Resp'ts' Br., ECF No. 61, at 31-33; SunPower's Br.,
ECF Nos. 59 & 60, at 12-13, 21-22.

[36] SunPower's Br., ECF Nos. 59 & 60, at 18; Resp'ts' Br.,
ECF No. 61, at 23-24.

[37] Resp'ts' Br., ECF No. 61, at 13, 15, 17-18, 25-27, 37;
Suniva's Br., ECF No. 58-1, at 2, 22-23.

in the Solar I PRC and Solar II Taiwan proceedings.[38]  "Simply
put, the same product – third country cells assembled into
modules in China – cannot be both of third country origin [for
purposes of Solar I PRC and Solar II Taiwan] and [of PRC] origin
[for purposes of Solar II PRC]."[39]  Moreover, because the final
Solar II PRC scope captures panels assembled in China from U.S.-
made cells, which Commerce previously found to be *domestic* (non-
foreign) merchandise, Commerce's final Solar II PRC scope
determination also does not explain how its treatment of
U.S.-made cells under Solar II PRC, as compared with the
treatment of such cells under Solar I PRC and Solar II Taiwan,
is consistent with the statutory requirements that AD/CVD orders
apply to foreign merchandise.[40]

---

[38] See Resp'ts' Br., ECF No. 61, at 14 ("Commerce failed to
reconcile the rationale used to determine origin in
[Solar II PRC] with the long-standing substantial transformation
rule that was used in [Solar II Taiwan], [Solar I PRC] and
scores of prior agency determinations."); id. at 21-22 , 27-28;
SunPower's Br., ECF Nos. 59 & 60, at 13; Suniva's Br.,
ECF No. 58-1, at 13-15.

[39] Resp'ts' Br., ECF No. 61, at 21 (emphasis omitted).

[40] Suniva's Br., ECF No. 58-1, at 10 ("U.S. law gives Commerce
the authority to impose AD duties only on 'foreign
merchandise.'") (quoting 19 U.S.C. § 1673) ; id. at 12 ("If
U.S.-origin [solar] cells are not substantially transformed in
China, then such U.S.-origin cells have not become 'foreign.' In
[Solar II PRC], [Commerce] has not explained how it
differentiates 'foreign' from domestic merchandise as required
by the statute[, particularly in light of its Solar I PRC]
analysis, on the very same merchandise, [finding that] such
(footnote continued)

(V) Commerce unlawfully applied the final

Solar II PRC scope determinations to entries made prior to the

publication of the AD and CVD orders.[41]

Following a brief statement of the applicable standard

of review, each group of arguments is addressed in turn below.

## STANDARD OF REVIEW

The court will sustain Commerce's AD/CVD

determinations if they are supported by substantial evidence and

are otherwise in accordance with law.[42]  Substantial evidence

refers to "such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion,"[43] considering any

relevant evidence that fairly detracts from the reasonableness

---

goods . . . retain domestic origin.") (citing Solar I PRC Scope
Clarification Mem., [ECF No. 58-3 at Tab 1 Ex. 2]).

[41] SunPower's Br., ECF Nos. 59 & 60, at 24 ("[S]hould the Court
[affirm Commerce's final Solar II PRC scope determinations], the
Court must prevent the retroactive application of the 'scope
clarification' to entries made prior to the publication of the
antidumping duty order on February 18, 2015, or at least prior
to the publication of [Commerce]'s final determination in the
Federal Register on December 23, 2014."); Suniva's Br.,
ECF No. 58-1, at 2, 23.

[42] See 19 U.S.C. § 1516a(b)(1)(B)(i).

[43] SKF USA, Inc. v. United States, 537 F.3d 1373, 1378
(Fed. Cir. 2008) (quoting Consol. Edison Co. v. NLRB, 305 U.S.
197, 229 (1938)).

of the agency's determination.[44]  The substantial evidence

standard of review can be roughly translated to mean "is the

determination unreasonable?"[45]  The agency must "examine the

relevant data and articulate a satisfactory explanation for its

action,"[46] including "a 'rational connection between the facts

found and the choice made.'"[47]

   "[A]n agency determination that is arbitrary is *ipso

facto* unreasonable,"[48] and a determination is arbitrary when it

fails to "consider an important aspect of the problem,"[49] or

"treat[s] similar situations in dissimilar ways."[50]

---

[44] Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951).

[45] Nippon Steel Corp. v. United States, 458 F.3d 1345, 1351
(Fed. Cir. 2006) (quotation and alteration marks and citation
omitted).

[46] Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.,
463 U.S. 29, 43 (1983).

[47] Id. (quoting Burlington Truck Lines v. United States, 371 U.S.
156, 168 (1962)).

[48] Shenyang Yuanda Aluminum Indus. Eng'g Co. v. United States,
__ CIT __, __ F. Supp. 3d __ [2016 WL 524268], __ n.148 (2016)
(quoting Ward v. Sternes, 334 F.3d 696, 704 (7th Cir. 2003)
("[A] decision [that is] so inadequately supported by the record
as to be arbitrary [is] therefore objectively unreasonable.")
(quotation marks and citations omitted)).

[49] State Farm, 463 U.S. at 43.

[50] Anderson v. U.S. Sec'y of Agric., 30 CIT 1742, 1749,
462 F. Supp. 2d 1333, 1339 (2006) ("Agencies have a
responsibility to administer their statutorily accorded powers
fairly and rationally, which includes not 'treat[ing] similar
situations in dissimilar ways.'") (quoting Burinskas v. NLRB,
(footnote continued)

Where the statutory language is sufficiently broad to permit a range of policy choices, the agency may change course from its prior practice and adopt a new approach within its statutory authority,[51] but it must explain how the new policy is consistent with the continued relevance (if any) of the factual findings on which the agency's prior policy was based.[52]

---

357 F.2d 822, 827 (D.C. Cir. 1966) ("[An agency] cannot act arbitrarily nor can it treat similar situations in dissimilar ways.") (citation and footnote omitted)); see also id. ("Indeed, a principal justification for the administrative state is that in 'area[s] of limitless factual variations, like cases will be treated alike.'") (quoting Nat'l Muffler Dealers Ass'n v. United States, 440 U.S. 472, 477 (1979) (citations omitted)) (also quoting South Shore Hosp., Inc. v. Thompson, 308 F.3d 91, 101 (1st Cir. 2002) ("The goal of regulation is not to provide exact uniformity of treatment, but, rather, to provide uniformity of rules so that those similarly situated will be treated alike.")); Trs. in Bankruptcy of N. Am. Rubber Thread Co. v. United States, 32 CIT 663, 665, 558 F. Supp. 2d 1367, 1370 (2008) ("Generally, an agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently.") (quotation and alteration marks and citation omitted).

[51] See, e.g., Nakornthai Strip Mill Pub. Co. v. United States, 32 CIT 1272, 1276, 587 F. Supp. 2d 1303, 1307 (2008) ("Commerce has discretion to change its policies and practices as long as they are reasonable and consistent with their statutory mandate and may adapt its views and practices to the particular circumstances . . . at hand, so long as the agency's decisions are explained and supported by substantial evidence on the record.") (quotation and alteration marks and citation omitted).

[52] See British Steel PLC v. United States, 127 F.3d 1471, 1475 (Fed. Cir. 1997) ("An agency is obligated to follow [its] precedent, and if it chooses to change, it must explain why.") (quotation marks and citations omitted); State Farm, 463 U.S. 29, 46-48 (holding that an agency may not change course without addressing the continued relevance of factual findings on which
(footnote continued)

"[A] reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy."[53]  Thus, "when departing from its own precedent, Commerce must explain its departure,"[54] providing a rational link between the facts found and the conclusions reached, after considering all important aspects of the problem.

**DISCUSSION**

I.   Remand on Other Grounds Makes Reaching Due Process
     Arguments Unnecessary.

          Because remand of Commerce's final Solar II PRC scope determinations is warranted on other grounds,[55] and because the parties will therefore have ample opportunity to address the scope issues on remand, Plaintiffs' due process challenges are moot.  The court therefore need not reach those of Plaintiffs'

---

the agency's prior policy was based); FCC v. Fox Television Stations, Inc., 556 U.S. 502, 537 (2009) (J. Kennedy, concurring in part and concurring in judgment) (explaining that State Farm followed the principle that an agency "cannot simply disregard contrary or inconvenient factual determinations that it made in the past, any more than it can ignore inconvenient facts when it writes on a blank slate").

[53] Fox, 556 U.S. at 516.

[54] Nakornthai, 32 CIT at 1276, 587 F. Supp. 2d at 1308 (citing and quoting Trs. in Bankruptcy of N. Am. Rubber Thread Co. v. United States, 31 CIT 2040, 2047, 533 F. Supp. 2d 1290, 1297 (2007) ("Commerce [must] attempt to distinguish the reasoning set forth in [prior cases] from the present case.") (alterations in Nakornthai)).

[55] See infra Discussion Section IV.

arguments that are grounded in due process concerns, and
accordingly offers no opinion in this regard.

II.  Commerce's Final *Solar II PRC* Scope Determinations Did Not
     Affect the Actual Datasets Used to Calculate Dumping
     Margins and Subsidy Rates Throughout the Investigations.

        As Commerce explains, the final Solar II PRC scope
modification had "no impact on the data required from and
submitted by the parties"[56] – it "result[ed] in no change in the
reported sales of the mandatory respondents,"[57] because in fact
"most, if not all, parties reported in their Quantity and Value
questionnaires all [sales of] solar modules containing solar
cells from third countries,"[58] claiming that they "did not know
the source of the wafer contained in the solar cells they
purchased from third countries."[59]  Accordingly, the final
Solar II PRC scope did not cover different merchandise than that
which was actually investigated.[60]

_____

[56] Solar II PRC AD I&D Mem. cmt. 1 at 23; Solar II PRC CVD I&D
Mem. cmt. 1 at 48 (same).

[57] Id.

[58] Id.

[59] Id. (citations omitted).

[60] Id.; see also Solar II ITC Final Determination, *supra* note 5,
at 7 ("[Although] Commerce did not finalize the scope of the
[Solar II PRC] investigations until a late stage in the
investigations[,] . . . [t]he [International Trade] Commission
recognized early in these investigations that changes in the
                                          (footnote continued)

III.  Commerce Did Not Unlawfully Expand the Scope of the
      *Solar II PRC* Proceedings Beyond the Petitioner's Intent.

     Third, the record adequately supports Commerce's

conclusion that covering all panels assembled in China as

merchandise from China, regardless of cell origin, was in accord

with SolarWorld's intent.[61]  Moreover, Commerce may modify the

---

scopes were likely and took steps to ensure that it collected
the information that would allow it to fulfill its statutory
obligations.  In the questionnaires issued in the final phase of
these investigations, the Commission asked U.S. producers and
importers to segregate their import data into sixteen
categories, which were designed to provide the Commission with
flexibility to adjust the data to conform to different possible
scope definitions.  The manner in which the Commission collected
the data in these investigations permitted the agency and the
parties to consider and evaluate the implications of various
possible scope definitions to the Commission's analysis.")
(citations omitted); cf. Resp'ts' Br., ECF No. 61, at 31-33;
SunPower's Br., ECF Nos. 59 & 60, at 12-13 (arguing that
"[Commerce] investigated modules/panels with non-Chinese-origin
[solar] cells containing Chinese-origin inputs, but issued a
final determination as to modules/panels with non-Chinese-origin
[solar] cells, regardless of the origin of the [solar] cell
inputs") (relying on Smith Corona Corp. v. United States, 16 CIT
562, 565, 796 F. Supp. 1532, 1535 (1992) ("[Commerce] must
exercise caution in redefining scope in midstream to include
items which were clearly known about and excluded at the time of
initiation of the investigation and, indeed in this case, at the
time of the preliminary determination.")); id. at 21-22.

[61] See Solar I PRC Proposed Scope Clarification,
Ct. No. 13-00219, ECF No. 29 at Tab 8, at 3 & Attach. 2 (seeking
to cover, under Solar I PRC, all solar modules and panels
assembled in China, regardless of where the constituent cells
were produced); Solar II Pet., ECF No. 64 at Tab 1; Solar II PRC
AD I&D Mem. cmt. 1 at 12 ("The Petition and Petitioner's
comments in this investigation demonstrate that the Petitioner's
intent is a scope that covers all solar modules assembled in the
PRC using third-country solar cells.  In its Petition to this
investigation, the Petitioner stated its intent to include all

                                          (footnote continued)

proposed scope as necessary to best effectuate the Petitioner's
intent while ensuring that any resulting AD/CVD orders are
properly administrable and enforceable, based on a reasonable
reading of the record and consistent with applicable legal
requirements and principles.[62]  Here, although Commerce
preliminarily agreed with SolarWorld's proposal in the Solar II
Petition to cover panels assembled in China using third-country
cells containing Chinese inputs,[63] the agency ultimately
determined that a scope covering *all* panels assembled in China
from non-Chinese cells was more easily administrable and
enforceable.[64]  This determination did not contravene

---

of these modules within the scope, citing the 'loophole' that
resulted [from the exclusion from Solar I PRC coverage of panels
assembled in China from third-country cells].") (citing Solar II
Pet., [ECF No. 64 at Tab 1], at 3, 5-6, 21, 34, 37, and 53);
Solar II CVD I&D Mem. cmt. 1 at 38 (same).

[62] See, e.g., Ad Hoc Shrimp Trade Action Comm. v. United States,
33 CIT 915, 637 F. Supp. 2d, 1166, 1175 (2009) ("Commerce
retains authority to define the scope of the investigation and
may depart from the scope as proposed by a petition if it
determines that petition to be overly broad, or insufficiently
specific to allow proper investigation, or in any other way
defective.") (quotation marks and citation omitted).

[63] See *supra* note 27 (providing relevant citations).

[64] See Solar II PRC AD I&D Mem. cmt. 1 at 14 ("[C]ertain
interested parties commented that they did not track their
merchandise in a manner that would allow them to definitively
report only that merchandise falling within the 'two-out-of-
three' scope proposed in the [Solar II] Petition.  The scope
being adopted in these [Solar II PRC] investigations resolves
[these administrability and enforcement concerns], by covering
*all* modules assembled in the PRC from third-country cells.

(footnote continued)

SolarWorld's original intent to cover all panels assembled in

the PRC as PRC-origin merchandise.[65]

IV.  <u>Commerce Insufficiently Considered, and Did Not Adequately
     Explain, its Departure from Prior Policy, the Factual
     Findings Upon Which its Prior Policy Was Based, and an
     Important Aspect of its Revised Origin Determination.</u>

         It is well-established that the scope of an

antidumping or countervailing duty proceeding is "defined by the

---

Under the scope being adopted for these final [<u>Solar II PRC</u>]
determinations, producers and exporters would not need to track
for purposes of these proceedings the ingots, wafers, or partial
cells that are being used in the third-country cells being
assembled into modules in China.") (footnote and citations
omitted); <u>Solar II PRC CVD I&D Mem.</u> cmt. 1 at 40 (same);
<u>see also Solar II Taiwan I&D Mem.</u> cmt. 1 at 24 ("We have
determined that the enforcement of the 'two out of three'
language [contained in SolarWorld's <u>Solar II</u> Petition and
adopted in Commerce's <u>Solar II PRC</u> and <u>Solar II Taiwan</u>
preliminary determinations] could be difficult and complicated.
. . .  Importers might have to: 1) provide evidence that the
ingot, wafer, or solar cell was/was not processed in Taiwan [or
China]; 2) provide evidence that the cell was then subsequently
processed in a third country; and then 3) provide evidence that
it was subsequently assembled into a solar module in Taiwan [or
China, as the case may be].  Given that different, unaffiliated
parties might be responsible for each of these steps of
production, and that additional parties might provide additional
steps of subassembly in the production process of a solar
product, the evidentiary burden on importers could be
complicated, and likewise the burden on [U.S. Customs and Border
Protection] to confirm the validity and reliability of such
evidence could also be difficult.  Further complicating this
task is the fact that respondents have been nearly unanimous in
claiming that they are unable to track where the wafer contained
in a solar cell was manufactured . . . .") (footnote and
citation omitted).

[65] <u>See</u> <i>supra</i> note 61 (discussing and providing citations for the
Petitioner's intent in this regard).

type of merchandise and by the country-of-origin (e.g., widgets from Ruritania)."[66]  Accordingly, "[f]or merchandise to be subject to an order it must meet both parameters, i.e., product type and country of origin."[67]  This "involve[s] two separate inquiries."[68]

The product type covered by the Solar II PRC proceedings is solar cells assembled into solar panels.[69]  In

---

[66] Certain Cold-Rolled Carbon Steel Flat Products from Argentina, 58 Fed. Reg. 37,062, 37,065 (Dep't Commerce July 9, 1993) (notice of final determination of sales at less than fair value) ("Cold-Rolled Steel from Argentina") (relied on by Commerce in Solar I PRC, see Solar I PRC Scope Clarification Mem., ECF No. 58-3 at Tab 1, at 5 n.7, 8, and Solar II Taiwan, see Solar II Taiwan I&D Mem. cmt. 1 at 18 n.52).

[67] Id.; see also Solar II Taiwan I&D Mem. cmt. 1 at 18 ("In determining the scope of the investigation, [Commerce] must not only address . . . the products intended to be covered by the scope, but also determine the country-of-origin of the solar products at issue.").

[68] 3.5″ Microdisks and Coated Media Thereof from Japan, 54 Fed. Reg. 6433 (Dep't Commerce Feb. 10, 1989) (final determination of sales at less than fair value) ("3.5″ Microdisks from Japan") (relied on in Cold-Rolled Steel from Argentina, 58 Fed. Reg. at 37,065).

[69] Because the Solar II PRC scope excludes any merchandise covered by the Solar I PRC orders, which cover all solar cells produced in China, whether or not and regardless of where assembled, the type of merchandise covered by the Solar II PRC scope is exclusively cells assembled into panels. See also Solar II Taiwan I&D Mem. cmt. 1 at 19 ("[T]he scope of the concurrent [Solar II PRC] investigations on solar products from the PRC . . . covers only modules, and not cells.") (footnote and citation omitted).  In any event, Commerce has determined that the individual solar cells and the panels assembled from them are products within the same class/kind of merchandise. Solar I PRC Scope Clarification Mem., ECF No. 58-3

(footnote continued)

<u>Solar I PRC</u>, Commerce covered all solar cells produced in China
and assembled into panels anywhere in the world, including
China, as merchandise from China.[70]  Then in <u>Solar II PRC</u>,
Commerce covered, also as merchandise from China, all panels
assembled in China from cells produced anywhere in the world,
other than China.[71]  To do this, Commerce established two
different rules of origin for solar panels, depending on where
they were assembled.  For solar panels assembled anywhere other
than China, origin is the country of cell-production.[72]  For
solar panels assembled in China, origin is instead determined by
the country of assembly,[73] even though most of the production

---

at Tab 1 Ex. 2, at 6.

[70] See Solar I PRC Scope Clarification Mem., ECF NO. 58-3
at Tab 1 Ex. 2, at 8 (unchanged in <u>Solar I PRC AD I&D Mem.</u> cmt.
1 at 6-7; <u>Solar I PRC CVD I&D Mem.</u> cmt. 32 at 78-79); <u>see also</u>
<u>Solar I PRC AD I&D Mem.</u> cmt. 1 at 8 ("[Commerce] has determined
that modules from the PRC are those that have been assembled in
the PRC using solar cells produced in the PRC."); <u>Solar I PRC</u>
<u>CVD I&D Mem.</u> cmt. 32 at 80 (same).

[71] See Solar II PRC AD I&D Mem. cmt. 1 at 28-29; <u>Solar II PRC CVD</u>
<u>I&D Mem.</u> cmt. 1 at 54; <u>Solar I PRC Scope Clarification Mem.</u>,
ECF NO. 58-3 at Tab 1, at 8 (unchanged in <u>Solar I PRC AD</u>
<u>I&D Mem.</u> cmt. 1 at 6-7; <u>Solar I PRC CVD I&D Mem.</u> cmt. 32
at 78-79); <u>see also</u> <i>supra</i> note 30.

[72] See Solar I PRC Scope Clarification Mem., ECF NO. 58-3
at Tab 1 Ex. 2, at 8 (unchanged in <u>Solar I PRC AD I&D Mem.</u> cmt.
1 at 6-7; <u>Solar I PRC CVD I&D Mem.</u> cmt. 32 at 78-79); <u>Solar II</u>
<u>Taiwan I&D Mem.</u> cmt. 1 at 24 ("[T]he solar cell determines the
country of origin, unless manufactured into a module, laminate
or panel in the PRC.").

[73] See Solar II PRC AD I&D Mem. cmt. 1 at 14, 16; <u>Solar II PRC</u>
                                                    (footnote continued)

(the making of the constituent cells) takes place in another country.[74]  The Solar II PRC rule is an exception to the agency's otherwise generally applicable rule that the country of cell-production determines a solar panel's country-of-origin.[75]

---

CVD I&D Mem. cmt. 1 at 40, 41; Solar II Taiwan I&D Mem. cmt. 1 at 5, 16 (excluding Taiwanese cells assembled into panels in China from the otherwise applicable rule that panels assembled anywhere in the world from Taiwanese cells are products of Taiwan).

[74] Commerce has found that the panel assembly process "only strings cells together, adding a protective covering and an aluminum base" – it simply "connects cells into their final end-use form but does not change the 'essential active component,' the solar cell, which defines the module/panel." Solar I PRC Scope Clarification Mem., ECF NO. 58-3 at Tab 1 Ex.2, at 7-8 (unchanged in Solar II PRC AD I&D Mem. cmt. 1 at 15; Solar II PRC CVD I&D Mem. cmt. 1 at 40-41).  Commerce also found that "solar module/panel assembly is relatively insubstantial in terms of number of steps, inputs, research and development required, and time"; that of the six stages of producing a finished solar panel, five are "dedicated to solar cell production and only one pertained to solar module/panel assembly"; that many more types of inputs are consumed in cell production as compared with panel assembly; and that the production time and complexity for producing the constituent solar cells far outweighs that for then assembling them into panels. Id.

[75] Solar II PRC AD I&D Mem. cmt. 1 at 15, 28; Solar II PRC CVD I&D Mem. cmt. 1 at 41, 54; Solar I PRC Scope Clarification Mem., ECF NO. 58-3 at Tab 1 Ex. 2, at 8 (unchanged in Solar I PRC AD I&D Mem. cmt. 1 at 6-7; Solar I PRC CVD I&D Mem. cmt. 32 at 78-79); Solar II Taiwan I&D Mem. cmt. 1 at 23 ("[S]olar modules assembled in the PRC using Taiwanese cells are within the scope of, and therefore subject to, the [Solar II PRC] AD and CVD investigations as Chinese modules assembled from third-country cells[,] [but for] . . . cells from Taiwan which are used in the assembly of solar modules in other countries[,] . . . the country-of-origin of the solar modules assembled using Taiwanese cells will not change through the assembly of those

(footnote continued)

Historically, however, it appears unprecedented for
Commerce to apply more than one country-of-origin determinative
rule to products within the same class or kind of merchandise.
Rather, when faced with merchandise produced in more than one
country, Commerce has consistently held that AD/CVD liability
for such products is based on an analysis of the market in a
single country-of-origin for the product, and that such origin
rule will generally be applied consistently to all products
within that class or kind of merchandise.[76]

In DRAMs from Korea, for example, Commerce determined
that because the country-of-origin of semiconductors assembled
in other countries from wafers produced in Korea was the country
of wafer-production (Korea), the origin of semiconductors

solar modules.").

[76] See, e.g., Erasable Programmable Read Only Memories (EPROMs)
from Japan, 51 Fed. Reg. 39,680, 39,692 (Dep't Commerce Oct. 30,
1986) (final determination of sales at LTFV) ("EPROMs from
Japan") (finding country of constituent wafer-production to
determine legal origin of semiconductors assembled in a
different country from that where the wafers were produced);
Dynamic Random Access Memory Semiconductors from the Republic of
Korea, 67 Fed. Reg. 70,927, 70,927-28 (Dep't Commerce Nov. 27,
2002) (notice of initiation of countervailing duty
investigation) ("DRAMs from Korea") ("[I]n numerous past
proceedings on DRAMs and similar products such as EPROMs,
[Commerce] has consistently maintained that the country of
origin is the country where wafer fabrication occurs."); Solar I
PRC Scope Clarification Mem., ECF NO. 58-3 at Tab 1 Ex.2, at 8
& n.29 (noting that "Petitioner has not cited any example" where
Commerce used "inconsistent country-of-origin [rules] for a
single [type of] product" in the past).

assembled in Korea from wafers produced outside of Korea must
also be the country of wafer-production (i.e., not Korea).[77]
Commerce reasoned that "it would not be appropriate or feasible
to have a class or kind of merchandise subject to investigation
that would require two different potentially conflicting
country-of-origin tests."[78]  As with solar panels here, Commerce
based its general origin rule for semiconductors on the country
where the essential components were produced, rather than the
country where those components were then assembled into the
finished product.[79]  Also like here, the Petitioner then argued
that the effect of this component-based origin rule was that the
assembly-specific governmental subsidies provided by the
country-of-assembly for products assembled from essential

---

[77] DRAMs from Korea, 67 Fed. Reg. at 70,927-28.

[78] Id.

[79] Compare Solar I PRC Scope Clarification Mem., ECF NO. 58-3
at Tab 1 Ex. 2, at 6-8 (determining the solar cell to be the
most technologically intensive, essential active component of
finished solar panels, the substance and function of which is
unchanged by the relatively insubstantial assembly process)
(unchanged in Solar I PRC AD I&D Mem. cmt. 1 at 6-7; Solar I PRC
CVD I&D Mem. cmt. 32 at 78-79; Solar II PRC AD I&D Mem. cmt. 1
at 15; Solar II PRC CVD I&D Mem. cmt. 1 at 40-41; Solar II
Taiwan I&D Mem. cmt. 1 at 19-20), with DRAMs from Korea, 67 Fed.
Reg. at 70,928; EPROMs from Japan, 51 Fed. Reg. at 39,692;
Dynamic Random Access Memory Semiconductors of 256 Kilobits and
Above from Japan, 51 Fed. Reg. 28,396, 28,397 (Dep't Commerce
Aug. 7, 1986) (suspension of antidumping investigation and
amendment of preliminary determination) ("DRAMs from Japan").

components made elsewhere could not be addressed.[80]  Unlike here,

however, in DRAMs from Korea Commerce concluded, as the agency

has consistently maintained in all other proceedings up to and

including the Solar I PRC proceedings, that a single class or

kind of merchandise (like wafers assembled into semiconductors

or solar cells assembled into panels) cannot be subject to

multiple "different and potentially conflicting country-of-

origin tests,"[81] notwithstanding the resultant necessary

exclusion from the product's AD/CVD liability analysis of that

portion of production that occurs in a country other than the

country where most of the essential production takes place.[82]

---

[80] Compare Solar I PRC AD I&D Mem. cmt. 1 at 8 & n.32
("Petitioner argues that all modules assembled in the PRC must
be covered [as Chinese-origin merchandise], regardless of the
origin of the solar cells . . . ."); Solar I PRC CVD I&D Mem.
cmt. 32 at 80 & n.214 (same), with Solar II PRC AD I&D Mem. cmt.
1 at 24-25; Solar II PRC CVD I&D Mem. cmt. 1 at 38-39 (stating
that one of the considerations underlying Commerce's ultimate
Solar II PRC scope determination was the aim to capture Chinese
assembly-specific subsidies), with DRAMs from Korea, 67 Fed.
Reg. at 70,928.

[81] Compare DRAMs from Korea, 67 Fed. Reg. at 70,928 (quoted),
with Solar I PRC AD I&D Mem. cmt. 1 at 8 & n.32 ("[F]inding that
module assembly in the PRC . . . [renders] the country-of-origin
of the module [to be] the PRC while also finding that module
assembly outside the PRC using PRC produced solar cells . . .
[also renders] the country-of-origin of the module [to be] the
PRC . . . necessitate[s] making inconsistent country-of-origin
determinations for a single product . . . ."); Solar I PRC CVD
I&D Mem. cmt. 32 at 80 & n.214 (same).

[82] See DRAMs from Korea, 67 Fed. Reg. at 70,928 (declining to
address assembly-specific subsidies provided by the government
                                        (footnote continued)

As the agency explained in Solar I PRC, because "[a] product can only have one country-of-origin for AD/CVD purposes,"[83] Commerce rejected SolarWorld's proposal to treat both cells made in China and assembled into panels elsewhere and cells made elsewhere and assembled into panels in China as subject merchandise from China because doing so would "necessitate making inconsistent country-of-origin determinations for a single product."[84]  Instead, in Solar I PRC as in all prior cases, Commerce established a single consistent country-of-origin rule for the class/kind of merchandise, even though – as with semiconductors assembled in a country other than the country of wafer-production,[85] or pipes refurbished in a country other than the country of pipe production,[86] or

---

of a different foreign country from that where the essential components were produced, because a given product's AD/CVD liability is holistically based upon a single foreign country-of-origin, even where that results in some additional subsidies provided by other foreign governments remaining unaccountable, and explaining that "[w]hile the petitioner may be correct that testing and assembly may be more costly than in the past, there does not seem to be any dispute that wafer fabrication is still the more important stage of the production process").

[83] Solar I PRC Scope Clarification Mem., ECF NO. 58-3 at Tab 1 Ex.2, at 8.

[84] Id.

[85] DRAMs from Korea, 67 Fed. Reg. at 70,928; EPROMs from Japan, 51 Fed. Reg. at 39,681, 39,692; DRAMs from Japan, 51 Fed. Reg. at 28,397.

[86] Certain Carbon Steel Butt-Weld Pipe Fittings from India,

(footnote continued)

pistachios roasted in a country other than the one where they were grown[87] – doing so necessarily limits the AD/CVD analysis to the pricing behavior and subsidies occurring in the country where most of the essential production takes place, leaving any subsidies provided by the country of subsequent processing effectively unaccounted for.[88]  Because a product's AD/CVD liability may be based on only one country's comparison market,[89]

---

60 Fed. Reg. 10,545, 10,545 (Dep't Commerce Feb. 27, 1995) (final determination of sales at less than fair value) (determining that rusty pipe fittings obtained from Singapore and then reconditioned and refurbished in India prior to exportation to the United States are legally products of Singapore, not India (despite the fact that removing the rust and then re-painting the Singaporean fitting incurred costs in the Indian market)).

[87] Certain In-Shell Pistachios from Iran, 51 Fed. Reg. 18,919, 18,920 (Dep't Commerce May 23, 1986) (final determination of sales at less than fair value) ("[Commerce] considers pistachios grown in Iran as products of Iran, whether or not they have been sold or roasted in the European market [prior to exportation to the United States].").

[88] But see infra notes 127-31 and accompanying text.

[89] See Large Newspaper Printing Presses and Components Thereof, Whether Assembled or Unassembled, from Germany, 61 Fed. Reg. 38,166, 38,171 (Dep't Commerce July 23, 1996) (notice of final determination of sales at less than fair value) ("LNPPs from Germany") ("[Commerce] has stated that any interpretation [of the law] which sought to limit the application of antidumping duties . . . to the foreign content [attributable solely to a particular country] would be inconsistent with [Commerce]'s statutory mandate to assess antidumping duties on the extent to which the normal value . . . (previously referred to as 'foreign market value') exceeds the export price (previously referred to as 'United States price').  Application of antidumping duties only on [a particular country's partial] processing or content portion of the import might mean that the margin of dumping

(footnote continued)

it follows that, when production takes place in more than one
country, it is reasonable and consistent with prior practice to
focus on the country where "the more important stage of the
production process" takes place.[90]

    In Solar I PRC, Commerce determined (in findings left
unmodified by Solar II PRC[91]) that the most essential and
important stage of the solar panel production process is the
production of the panels' constituent solar cells, such that it
is most important to capture the pricing behavior and subsidies
occurring within the cell-producing country, even if that means
that additional subsidies provided by the country of assembly
will not be included in the analysis.[92]  Moreover, because

---

would not be fully offset.") (citing Certain Corrosion-Resistant
Carbon Steel Products from Canada, 58 Fed. Reg. 37,099 (Dep't
Commerce July 9, 1993) (final determination of sales at less
than fair value), aff'd, In the Matter of Certain Corrosion-
Resistant Carbon Steel Products from Canada, USA-93-1904-03
(Binational Panel under the United States-Canada Free Trade
Agreement Oct. 31, 1994)); Cold-Rolled Steel from Argentina,
58 Fed. Reg. at 37,065 (same); see also DRAMs from Korea,
67 Fed. Reg. at 70,928 (explaining that the country-of-origin of
a given product within a certain class or kind of merchandise is
determined using the same test "for purposes of both antidumping
and countervailing duty proceedings"). But see infra notes 127-
31 and accompanying text.

[90] See DRAMs from Korea, 67 Fed. Reg. at 70,928.

[91] See Solar II PRC AD I&D Mem. cmt. 1 at 15; Solar II PRC CVD
I&D Mem. cmt. 1 at 41 (same).

[92] See Solar I PRC Scope Clarification Mem., ECF NO. 58-3
at Tab 1 Ex.2, at 8 ("While we understand the intent of
Petitioner's argument that the scope should cover solar
                                        (footnote continued)

Commerce generally has interpreted the law to permit only one country to serve as the comparison home market, on which the AD/CVD liability for the entire value of the product is based,[93] the origin rule established for a given class/kind of merchandise also serves to determine whether products that are partially manufactured within the United States but further processed abroad thereby acquire "foreign" origin.[94]  That origin rule therefore also determines whether AD/CVD duties "would be assessed on the full value of the import, inclusive of the U.S. content,"[95] or, conversely, whether such products retain their U.S. origin, and are therefore not subject to AD/CVD liability at all.[96]  Because "[solar panel assembly] does [not] constitute

---

modules/panels produced in the PRC, regardless of the origin of the solar cells, this is not tenable because doing so would . . . necessitate making inconsistent country-of-origin determinations for [products within a single class or kind of merchandise] . . . .") (footnote omitted).

[93] LNPPs from Germany, 61 Fed. Reg. at 38,171.

[94] See 19 U.S.C. § 1673 (providing for the imposition of duties solely on "foreign" merchandise).

[95] LNPPs from Germany, 61 Fed. Reg. at 38,171.

[96] See, e.g., Cold-Rolled Steel from Argentina, 58 Fed. Reg. at 37,065 ("The AD/CVD provisions provide for the assessment of duties only on products of the subject foreign country – not on products of the United States.  Therefore, even if a U.S. origin product is deemed to be 'foreign' for Customs purposes, it is not subject to AD and CVD duties unless it is transformed through processing or manufacture into a product of the subject country.").

significant processing such that it changes the country-of-origin of the cell,"[97] panels assembled from U.S.-origin cells were accordingly exempted from AD/CVD liability under Solar I PRC as not "foreign."[98]

Here in the Solar II PRC proceedings, however, Commerce adopted a different policy, without explicitly acknowledging it as such, that provides an exception from the otherwise generally applicable origin rule for solar panels.[99] And while Commerce is correct that the use of multiple orders ensures that no individual product is simultaneously deemed to originate from two different countries,[100] Commerce has

---

[97] Solar I PRC Scope Clarification Mem., ECF No. 58-3 at Tab 1 Ex. 2, at 8 (unchanged in Solar II PRC AD I&D Mem. cmt. 1 at 15; Solar II PRC CVD I&D Mem. cmt. 1 at 41); Solar II PRC AD I&D Mem. cmt. 1 at 15 ("[Commerce] determined in [Solar I PRC] that the solar cell [is] the essential active component of the module, [and] that assembly of cells into modules [does] not constitute substantial transformation such that the assembled module could be considered a product of the country of assembly . . . .") (citation omitted); Solar II PRC CVD I&D Mem. cmt. 1 at 40-41 (same).

[98] See id.

[99] See supra note 75.

[100] See Solar II PRC AD I&D Mem. cmt. 1 at 16 ("No [single] product would at any time have two countries of origin for AD/CVD purposes."), 28-29 ("[T]he country-of-origin criteria in Solar I PRC, applicable to solar modules, differ from these [Solar II PRC] investigations[,] . . . but the scopes adopted in the final determinations of [Solar II PRC and Solar II Taiwan] emphasize that they do not alter, revise, or overlap the scope of Solar I PRC. . . . Further, any possible overlaps between [Solar II PRC] and [Solar II Taiwan] are eliminated by the scope
(footnote continued)

nonetheless applied two different rules to similarly situated products within the same class or kind of merchandise.

For example, the general country-of-origin rule established for solar panels in Solar I PRC and maintained in Solar II Taiwan provides that, for all Taiwanese cells assembled into panels in any country other than China, AD/CVD liability is based on pricing and subsidies within the Taiwanese market.[101] Solar II PRC, on the other hand, provides that those same Taiwanese cells assembled into panels in China are instead assessed AD/CVD liability based on pricing and subsidies within the Chinese (surrogate) market.[102]  And the disparate treatment of similarly situated products is even more apparent in the case

language stating that solar cells assembled in China using solar cells manufactured in Taiwan are subject to [the Solar II PRC exception for panels assembled in China from non-Chinese inputs] and not [Solar II Taiwan].  Thus, we have eliminated any overlap of solar products subject to [Solar II PRC or Solar II Taiwan] and those subject to Solar I PRC. . . .  Thus, while the country of origin criteria of [Solar I PRC] and the country of origin analysis [of Solar II PRC] may differ, . . . identifying the proceeding to which a given solar module may be subject, based on these analyses, will be straightforward.") (citations omitted); Solar II PRC AD I&D Mem. cmt. 1 at 41, 54 (same).

[101] See Solar II Taiwan I&D Mem. cmt. 1 at 19-21, 24.

[102] See Solar II PRC AD I&D Mem. cmt. 1 at 28 ("[S]olar cells assembled in China using solar cells manufactured in Taiwan are subject to [the Solar II PRC exception for panels assembled in China from non-Chinese inputs] and not [Solar II Taiwan]."); Solar II Taiwan I&D Mem. cmt. 1 at 23 ("[S]olar modules assembled in the PRC using Taiwanese cells are within the scope of, and therefore subject to, the [Solar II PRC] AD and CVD investigations as Chinese modules . . . .").

of panels assembled abroad using cells produced in the United
States.  Pursuant to the general origin-determinative rule
established for solar panels, such merchandise is not subject to
AD/CVD liability at all when assembled in any country other than
China, because the origin of such merchandise is the United
States, and such products are accordingly not "foreign" for
AD/CVD purposes.[103]  But when those same U.S. solar cells are
assembled into panels in China, they are treated differently
from the U.S. cells that are assembled into panels in any other
customs territory.  Unlike the latter, which retain their U.S.
origin regardless of where they are ultimately assembled, the
U.S. cells that are assembled into panels in China are subject
to AD/CVD liability as merchandise of China.[104]  Commerce has
determined that this result prevails despite the agency's
unmodified finding that panel-assembly does not substantially
transform the constituent cells so as to change their country-
of-origin.[105]  This appears to be contrary to the agency's long-
standing policy that U.S. merchandise that is further processed

---

[103] See Solar I PRC Scope Clarification Mem., ECF NO. 58-3
at Tab 1 Ex.2, at 8; Solar II Taiwan I&D Mem. cmt. 1 at 24;
Solar II PRC AD I&D Mem. cmt. 1 at 15; Solar II PRC CVD I&D Mem.
cmt. 1 at 41.

[104] See Solar II PRC Scope Ruling, Ct. No. 15-00319,
ECF No. 16-4, at 5.

[105] See supra notes 18 and 97.

abroad does not become "foreign" merchandise unless it is

substantially transformed.[106]

Moreover, the origin rule of the Solar II PRC

proceedings for panels assembled in China from non-Chinese cells

imposes AD/CVD liability on the entire value of such solar

panels based on an analysis of "foreign like product[s]" in the

Chinese (surrogate) market,[107] despite the fact that most of the

cost of manufacture and essential production occurred in another

country,[108] including products mostly manufactured within the

United States.[109]  Thus Commerce essentially reversed course and,

without acknowledging any deviation from its established prior

policy, not only applied two different rules of origin to solar

panels, depending on where they were assembled, but also applied

AD/CVD liability to the entire value of merchandise mostly

produced outside of the subject country's comparison market,

---

[106] Cf. Cold-Rolled Steel from Argentina, 58 Fed. Reg. at 37,065
("[A U.S.-origin product] is not subject to AD and CVD duties
unless it is transformed through processing or manufacture into
a product of the subject country").

[107] See 19 U.S.C. §§ 1677b(a), 1677b(c).

[108] For Taiwanese cells assembled into panels in China, for
example, Commerce uses a constructed normal value based on
factors of production in a surrogate for China, see 19 U.S.C.
§ 1677b(c), when in fact most of the inputs (which mostly go
into cell production) were actually consumed in Taiwan, a market
economy. See Solar II Taiwan I&D Mem. cmt. 1 at 20, 23.

[109] See, e.g., Solar II PRC Scope Ruling, Ct. No. 15-00319,
ECF No. 16-4, at 5.

including merchandise that was mostly produced in the United
States.

Commerce provides two separate grounds for this
determination: (1) addressing circumvention of the Solar I PRC
orders; and (2) addressing assembly-specific Chinese government
subsidies.[110]  Neither is sufficient.

First, while it is generally well-established that
Commerce may consider the effectiveness of an order in
determining its scope,[111] Commerce does not explain why either of
its rationales provides a sufficient basis for disregarding
Commerce's prior factual findings regarding the relative
insignificance of panel assembly in determining country-of-
origin.  Nor does Commerce explain why either ground provides a
sufficient basis for applying AD/CVD duties to the entire value
of panels that are assembled in China from non-Chinese cells,
thereby failing to consider and explain an important aspect of
the problem.

Specifically, with regard to circumvention of
Solar I PRC, SolarWorld's Solar II petitions identified two
types of production shifts that SolarWorld characterized as

---

[110] Solar II PRC AD I&D Mem. cmt. 1 at 12-15; Solar II PRC CVD
I&D Mem. cmt. 1 at 38-40.

[111] E.g., Ad Hoc Shrimp, 33 CIT at __, 637 F. Supp. 2d at 1175.

circumventions of the Solar I PRC orders: (1) the shifting of
cell-production out of China to make non-Chinese cells that are
still largely made out of Chinese inputs (i.e., using Chinese
ingots or wafers);[112] and (2) the increase in imports of panels
assembled in China using Taiwanese cells made from Taiwanese
inputs.[113]  Commerce's solution was to cover all non-Chinese
(including Taiwanese and U.S.) cells assembled into panels in
China under Solar II PRC, and to cover all remaining Taiwanese
cells, whether or not and regardless of where else assembled,
under Solar II Taiwan.  But at the same time Commerce continued
to hold, in Solar II Taiwan as in Solar I PRC, with respect to

---

[112] Solar II Pet., ECF No. 64 at Tab 1, at 5-6 (concerned with
"modules assembled in China from solar cells completed or
partially manufactured in . . . other countries *from Chinese
inputs*, including wafers"); see also SolarWorld's Solar I PRC
Case Br., Ct. No. 13-00219, ECF No. 29-1 at Tab 17, at 10-11
(explaining SolarWorld's original concern in Solar I PRC that
Commerce's 'country of cell-production is the country-of-origin'
rule could lead to circumvention because Chinese inputs could be
used to make cells outside of China and thereby avoid duties on
products from China "even though the *overwhelming majority of
the production activities and costs [would still] occur in
China*") (emphasis added).

[113] See Solar II Pet., ECF No. 64 at Tab 1, at 5-6 ("[Before the
imposition of the Solar I PRC orders], imports of modules from
China consisted largely of modules assembled with Chinese cells.
Since that time, imports of modules from China have consisted
almost entirely of modules assembled in China from solar cells
completed or partially manufactured in Taiwan or other countries
(i.e., cells manufactured in Taiwan from Taiwanese inputs, or
cells manufactured in Taiwan or other countries from Chinese
inputs, including wafers.").

all solar cells except those assembled into panels in China,
that analyzing the market where most of the essential production
takes place, i.e., the country of cell-production, is more
important than basing the AD/CVD analysis and liability on the
market of the much less significant subsequent assembly step.
Commerce does not square this circle in its rationale.

Thus while Solar II PRC does provide the product
coverage sought by SolarWorld, Commerce does not explain why,
with respect to only the panels assembled in China, the analysis
of inputs consumed during cell-production – that is, most of the
finished product's inputs – in, for example, Taiwan, is no
longer important or relevant, and instead the country of final
assembly should be the basis for all home market comparisons.
Nor does the agency explain why all panels that are assembled
from U.S.-made cells anywhere in the world, other than China,
are treated as domestic merchandise, and therefore not subject
to AD/CVD liability, but when those same U.S. cells are
assembled into panels in China, the fact that most of the
panel's production occurred in the U.S. is no longer relevant.

If, as Commerce found in Solar I PRC, and as it
continues to maintain in Solar II PRC, the essential component
that is generally determinative of the relevant country-of-
origin for this class or kind of merchandise is the solar

cell,[114] why are SolarWorld's concerns regarding the shifting of cell-production to different countries not appropriately addressed, consistent with the agency's own analysis and suggestion in Solar I PRC,[115] by issuing orders to cover those cell-producing countries, just as was done with respect to cells made in Taiwan?  Why would it not be more appropriate and effective to focus on the country with the highest percentage of production of inputs for the entire process?

In addition, as previously noted, Commerce's solution has the effect of imposing AD/CVD liability based on a relatively insignificant production step for products mostly produced (i.e., with over fifty percent of the cost of production occurring) in a market other than the one on which the AD/CVD liability is based, including for products that are mostly produced in the United States.  Although Commerce does not consider or explain this important aspect of the problem here, the agency has emphasized in the past that when determining the appropriate scope of AD (or CVD[116]) orders, "we

---

[114] See Solar I PRC Scope Clarification Mem., ECF NO. 58-3 at Tab 1 Ex.2, at 8; Solar II PRC AD I&D Mem. cmt. 1 at 15; Solar II PRC CVD I&D Mem. cmt. 1 at 41 (same).

[115] See Solar I PRC Scope Clarification Mem., ECF NO. 58-3 at Tab 1 Ex.2, at 8-9.

[116] See DRAMs from Korea, 67 Fed. Reg. at 70,928 (noting that the antidumping statute and the subsidy statute use "almost the
(footnote continued)

are primarily concerned with where the actual manufacturing is occurring."[117]  More generally, a fair comparison is required between the U.S. export price and the subject merchandise's foreign "normal value."[118]  To achieve this goal, most production of subject merchandise must occur in the subject country (or, put another way, the country-of-origin of a product subject to AD/CVD duties will ordinarily be the country where most of the production occurs).[119]  This is because duties are ultimately assessed on the entire value of the final product, and those duties must be based on an analysis of pricing and subsidies within a single appropriate home market.[120]  Using the market where most of the production occurs as the home market for AD normal value comparison and/or CVD governmental subsidy evaluation ensures that the appropriate comparisons are made.[121]

---

identical language" to define the "class or kind of merchandise," and concluding that, for each individual member of such class or kind of merchandise, the country-of-origin must be determined based on a consistent test "for purposes of both antidumping and countervailing duty proceedings"). But see infra notes 127-31 and accompanying text.

[117] LNPPs from Germany, 61 Fed. Reg. at 38,168.

[118] See 19 U.S.C. § 1677b(a)(1).

[119] See LNPPs from Germany, 61 Fed. Reg. at 38,168-171.

[120] Id. at 38,171.

[121] In LNPPs from Germany, Commerce explicitly linked the country-of-origin determinative rule to the country in which a majority of the production took place – establishing a rule
(footnote continued)

Commerce does not appear to have considered, and certainly did

not discuss, this important aspect of the problem here.  Because

"[solar panel assembly] does [not] constitute significant

processing such that it changes the country-of-origin of the

_____

whereby if a part of the LNPP (the subject class or kind of
merchandise) is imported from Germany (the subject country), it
is covered by the order on LNPPs from Germany if the part
comprises at least *50 percent of the cost of manufacture* of the
entire LNPP. See LNPPs from Germany, 61 Fed. Reg. at 38,170-71
(emphasis added).  This was implicitly also the case in all the
prior instances where Commerce relied on its 'substantial
transformation' test to determine country-of-origin, including
the general country-of-origin rule established for solar panels
in Solar I PRC and Solar II Taiwan.  Thus in the semiconductor
(EPROMs and DRAMs) cases, for example, Commerce consistently
focused on the country where the most "technology intensive
portion" of production took place as the relevant country-of-
origin comparison market for determining the full AD/CVD
liability of the finished semiconductors. EPROMs from Japan,
51 Fed. Reg. at 39,692; DRAMs from Japan, 51 Fed. Reg.
at 28,397; DRAMs from Korea, 67 Fed. Reg. at 70,928.  Moreover,
although this situation is not explicitly addressed by the
statute, a "fair comparison" between the U.S. export price and
the "foreign like product"'s "normal value" is required for the
imposition of antidumping duties, see 19 U.S.C. § 1677b(a)(1),
and the statutory parameters defining foreign "normal value" are
generally consistent with Commerce's prior practice of basing
normal value on data from the market where most of production
takes place. See id. (normal value determined by market of
exporting country); id. at § 1677(16) ("foreign like product"
must be "produced in the same country" as subject merchandise);
id. at § 1677b(a)(3) (normal value not to be based on market of
countries through which merchandise "is merely transshipped");
id. at § 1677b(c)(1),(4) (for non-market economy merchandise,
normal value may be based on factors of production used to
produce the merchandise in an appropriate market economy
surrogate for the non-market exporting country);
id. at § 1677b(e) (normal value may be constructed using the sum
of the producer's actual costs of producing merchandise in the
same general category of products as the subject merchandise).

cell,"[122] it would seem to follow that Plaintiff Suniva's U.S. cells[123] and Plaintiff SunPower's Malaysian/Philippine cells[124] – and indeed all of the non-Chinese solar cells covered by the Solar II PRC scope – are similarly not sufficiently transformed by the panel assembly process to justify using China as the relevant comparison market for calculating the normal value of the entire finished product.  Calculating the cost of producing the merchandise in *China*, when in fact the vast majority of the production occurs in another country, seems to ignore a significant aspect of the problem to be addressed here. Commerce's final Solar II PRC scope determination does not explain, or consider, this important aspect of the problem.

      For the same reason, Commerce's second ground for the Solar II PRC exception to the otherwise generally-applicable origin rule for solar panels – that of addressing assembly-specific Chinese government subsidies – is also insufficient to explain the agency's action.  Commerce does not address or explain how this case is different from the agency's consistent prior position that products can only have one origin, which is

---

[122] Solar I PRC Scope Clarification Mem., ECF No. 58-3 at Tab 1 Ex. 2, at 8 (unchanged in Solar II PRC AD I&D Mem. cmt. 1 at 15; Solar II PRC CVD I&D Mem. cmt. 1 at 41); see also Solar II Taiwan I&D Mem. cmt. 1 at 19-20.

[123] Suniva's Br., ECF No. 58-1, at 5-6.

[124] SunPower's Br., ECF Nos. 59 & 60, at 3.

determined by a consistent origin rule for all products within a given class/kind of merchandise, and which should generally result in a country-of-origin and comparison market where most of the essential or cost-intensive production takes place. Because the Solar II PRC scope addresses assembly-specific subsidies by covering solely products that were otherwise produced entirely outside the country-of-assembly, including those that were mostly produced in the United States, it imposes AD/CVD liability based on an analysis that excludes consideration of the majority of actual essential production, contrary to the reasoning consistently employed in prior precedents.[125]  Because Commerce did not acknowledge, consider, or discuss this matter, remand is necessary so that the agency may address this important aspect of the problem, and either provide additional explanation or modify its decision, as necessary.[126]

The court notes that these problematic aspects of

---

[125] See DRAMs from Korea, 67 Fed. Reg. at 70,927-28; LNPPs from Germany, 61 Fed. Reg. at 38,168; Cold-Rolled Steel from Argentina, 58 Fed. Reg. at 37,065.

[126] No opinion is expressed herein regarding Plaintiff SunPower's challenge to Commerce's since-abandoned approach from the preliminary determination. See SunPower's Br., ECF Nos. 59 & 60, at 24-25; see also supra note 27 and accompanying text.  Should Commerce decide to reinstate that approach on remand, the agency and the court will then consider SunPower's challenges thereto.

Commerce's <u>Solar II PRC</u> decision affect most directly the
agency's AD, rather than its CVD, analysis.  As Commerce has
previously explained, antidumping duties should be assessed on
the entire value of the finished product, rather than solely the
value added within just one of the multiple countries in which
the product is manufactured, because the AD statute requires
that Commerce assess such duties "in an amount 'equal to the
amount by which the foreign market value [now referred to as
'normal value'] of the merchandise [i.e., the entire finished
product] exceeds the United States price of the merchandise.'"[127]
Because the calculation of the foreign like product's normal
value is not susceptible to subdivision (because the market
value of a fully completed product is not equivalent to the sum
of the market values of its individual constituent parts[128]),
Commerce must ordinarily choose a single foreign market within

---

[127] <u>Cold-Rolled Steel from Argentina</u>, 58 Fed. Reg. at 37,065
(quoting predecessor to 19 U.S.C. § 1673e (requiring assessment
of antidumping duties "equal to the amount by which the normal
value of the merchandise exceeds the export price (or
constructed export price) of the merchandise"));
<u>see also</u> <u>LNPPs from Germany</u>, 61 Fed. Reg. at 38,171.

[128] <u>See Cold-Rolled Steel from Argentina</u>, 58 Fed. Reg. at 37,065
("[Antidumping] duties are not an assessment against value.
They are expressed as a percentage of value merely . . . to
facilitate the mechanics of implementing assessment.  . . .
[T]he amount of [the antidumping] duties is determined by the
amount of [ultimate] price discrimination . . ., not by the
value of the good.").

which to calculate the normal value of the entire finished

product.  Accordingly, to obtain a fair comparison,[129] it is

generally reasonable to base the product's AD liability on an

analysis of the foreign market in which the majority of

production occurred.

On the other hand, the CVD statute does not appear to

require that the same reasoning apply.[130]  Nonetheless, Commerce

has consistently held that, as with AD liability, CVD liability

must also be based on a single foreign market's subsidy

analysis,[131] even though it is not immediately apparent why the

net subsidy amount received in the course of producing a product

in multiple countries may not be subdivided to account for each

---

[129] See 19 U.S.C. § 1677b(a)(1).

[130] Cf., e.g., 19 U.S.C. § 1677(3) (providing that, "except for
the purpose of antidumping proceedings, [the relevant 'foreign
country'] may include an association of 2 or more foreign
countries, political subdivisions, dependent territories, or
possessions of countries into a customs union outside the United
States"); id. at § 1671(a) (providing that if Commerce
determines that "the government of a country . . . is providing
. . . a countervailable subsidy with respect to the manufacture,
production, or export of a class or kind of merchandise imported
. . . into the United States," then "there shall be imposed upon
such merchandise a countervailing duty, in addition to any other
duty imposed, equal to the amount of the net countervailable
subsidy," and imposing no explicit limits on how many countries'
subsidies may be thus countervailed with respect to a given
product).  The court expresses no view at this time on the reach
of this statute.

[131] See Cold-Rolled Steel from Argentina, 58 Fed. Reg. at 37,065;
DRAMs from Korea, 67 Fed. Reg. 70,928.

country's contribution.

V.    Effective Date of Final *Solar II PRC* Scope

        The court defers consideration of Plaintiffs'
arguments that Commerce unlawfully applied the final
Solar II PRC scope determinations to entries made prior to the
publication of the AD and CVD orders[132] until after Commerce's
remand results are complete.

CONCLUSION

        For all of the foregoing reasons, the Solar II PRC
final scope determination is remanded to Commerce for
reconsideration in accordance with this opinion.  Commerce shall
have until August 8, 2016, to complete and file its remand
results.  Plaintiffs shall have until August 29, 2016, to file
comments, and the agency and Defendant-Intervenor shall then
have until September 12, 2016, to respond.

        It is SO ORDERED.

                                    /s/ Donald C. Pogue
                            Donald C. Pogue, Senior Judge


Dated: June 8, 2016
       New York, NY

---

[132] SunPower's Br., ECF Nos. 59 & 60, at 24; Suniva's Br.,
ECF No. 58-1, at 2, 23.